# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DEMOCRATIC NATIONAL COMMITTEE, ) | |
| ) | |
| Plaintiff, ) | Civil Action No. 1:18-cv-03501-JGK |
| ) | |
| v. ) | **MOTION FOR LEAVE TO** |
| ) | **SERVE THREE DEFENDANTS** |
| THE RUSSIAN FEDERATION et al., ) | **THROUGH THE SECRETARY** |
| ) | **OF STATE UNDER 28 U.S.C.** |
| Defendants. ) | **§ 1608(a)(4)** |
| ) | |
| ) | |

## MOTION FOR LEAVE TO SERVE THREE FOREIGN DEFENDANTS THROUGH THE <u>SECRETARY OF STATE UNDER 28 U.S.C. § 1608(a)(4)</u>

Pursuant to Federal Rule of Civil Procedure 4(j) and the service provisions of the Foreign Sovereign Immunities Act, 28 U.S.C. § 1608, Plaintiff respectfully requests that this Court grant Plaintiff leave to serve Defendants Russian Federation, the General Staff of the Armed Forces of the Russian Federation ("GRU"), and the GRU operative using the pseudonym "Guccifer 2.0" ("GRU Operative #1")[1] through the United States Secretary of State under 28 U.S.C. § 1608(a)(4). For the reasons described in detail below, service cannot be effectuated under 28 U.S.C. § 1608(a)(1)-(3), and service under subsection (a)(4) is the only other means available to Plaintiff to effect service.

## <u>BACKGROUND</u>

On April 20, 2018, Plaintiff filed the instant lawsuit against, among other defendants, the Russian Federation ("Russia") the GRU, and GRU Operative #1. In the complaint, Plaintiff pled that its claims against Russia, the GRU, and GRU Operative #1 arise out of their trespass onto

---

[1]     GRU Operative #1 is more publicly known by the pseudonym "Guccifer 2.0." However, to more accurately reflect that "Guccifer 2.0" is a desk or division of the GRU, and for consistency with the Complaint, Plaintiff refers to this Defendant as "GRU Operative #1" throughout this motion.

Plaintiff's private servers—a tortious act committed in the United States—and that these Defendants committed this trespass in order to steal trade secrets and commit economic espionage--two forms of commercial activity undertaken in and directly affecting the United States. Complaint, ¶ 29, ECF No. 1. As a result, Plaintiff alleged, Russia, the GRU, and GRU Operative #1 are not entitled to sovereign immunity under the "commercial activity" exception and the "non-commercial tort" exceptions to the Foreign Sovereign Immunities Act. 28 U.S.C. § 1605(a)(2), (5). Plaintiff filed the summons for the Court's seal on the same day, and the Court issued the summons on April 26, 2018.

**LEGAL STANDARD**

Federal Rule of Civil Procedure 4(j), "Serving a Foreign, State, or Local Government," provides, "A foreign state or its political subdivision, agency, or instrumentality must be served in accordance with 28 U.S.C. § 1608." Fed. R. Civ. P. 4(j)(1). In turn, 28 U.S.C. § 1608--the service of process provision of the Foreign Sovereign Immunities Act—provides more specific instructions on how service must be effectuated. Subsections 1608(a) (1)-(4) govern service in U.S. courts upon "a foreign state or political subdivision of a foreign state," and subsections 1608(b)(1)-(3) govern service in U.S. courts upon "an agency or instrumentality of a foreign state." The provisions for service under sections 1608(a) and 1608(b), respectively, are hierarchical, "such that a plaintiff must attempt the methods of service in the order they are laid out in the statute." *Magness v. Russian Fed'n*, 247 F.3d 609, 613 (5th Cir. 2001). The FSIA "provides the sole basis for obtaining jurisdiction over a foreign state in federal court." *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 439 (1989).

In the Second Circuit, "governmental departments or ministries--including ministries of the Russian Federation and the former Soviet Union--qualify as political subdivisions of a

foreign state under the FSIA." *Compagnie Noga D'Importation et D'Exportation, S.A. v. Russian Fed'n*, 361 F.3d 676, 687–88 (2d Cir. 2004) (internal quotations omitted). In drawing this conclusion, the Second Circuit uses the analysis set forth in *Transaero, Inc. v. La Fuerza Aerea Boliviana*, 30 F.3d 148, 153 (D.C. Cir. 1994). In that case:

> the District of Columbia Circuit held that the Bolivian Air Force was a foreign state rather than an agency or instrumentality of Bolivia because the air force's "core functions" were "predominantly governmental." According to the court, the "armed forces are as a rule so closely bound up with the structure of the state that they must in all cases be considered as the 'foreign state' itself, rather than a separate 'agency or instrumentality' of the state." Indeed, "[a]ny government of reasonable complexity must act through men organized into offices and departments."

*Compagnie Noga D'Importation et D'Exportation*, 361 F.3d 687–88 (internal citations omitted); *accord Garb v. Republic of Poland*, 440 F.3d 579, 591 (2d Cir. 2006).

## ARGUMENT

Plaintiff respectfully seeks leave to serve Russia, the GRU, and GRU Operative #1 under 28 U.S.C. § 1608(a)(4). Russia is a foreign state under the FSIA; 28 U.S.C. § 1608; the GRU is a "ministry of the Russian Federation" and is therefore a political subdivision of a foreign state under 28 U.S.C. § 1608(a), *Compagnie Noga D'Importation et D'Exportation*, 361 F.3d 687–88; and GRU Operative #1--the desk that operates the online persona "Guccifer 2.0"--is an "office or department" of the GRU, and therefore subject to service under § 1608(a), *Compagnie Noga D'Importation et D'Exportation*, 361 F.3d 688. Further, because the provisions for service under sections 1608(a) are hierarchical and the first three methods of service described under § 1608(a) are unavailable to Plaintiff, for the reasons set forth below, § 1608(a)(4) is the only means available to the plaintiff to effectuate service on Russia, the GRU, and GRU Operative #1. *See, e.g., Magness*, 247 F.3d at 613.

3

The first subsection of § 1608(a) provides that service may be made "by delivery of a copy of the summons and complaint in accordance with any special arrangement for service between the plaintiff and the foreign state or political subdivision." 28 U.S.C. § 1608(a)(1). This method of service is unavailable because there is no "special arrangement" between Russia, the GRU, or GRU Operative #1 and the United States. *See* Memorandum Opinion and Order, *Ford Motor Co. v. Russian Federation, et al.*, No. 09 Civ. 1646(JGK), 2010 WL 2010867 (S.D.N.Y. May 18, 2010), ECF No. 22.

The second subsection of § 1608(a) provides that service may be made "by delivery of a copy of the summons and complaint in accordance with an applicable international convention on service of judicial documents." § 1608(a)(2). The "applicable international convention" ostensibly governing service of process by a United States Plaintiff on Russia is the Hague Service Convention.[2] However, service through the Hague Convention is also unavailable to

---

[2] As one court in this District has explained:

> The Hague Service Convention is a multilateral treaty intended "to create appropriate means" for service abroad and "to improve the organization of mutual judicial assistance for that purpose by simplifying and expediting the procedure." Convention on the Service Abroad of Judicial and Extrajudicial Documents In Civil Or Commercial Matters ("Hague Service Convention"), Nov. 15, 1965, 20 U.S.T. 361, T.I.A.S. No. 6638, Preamble; *see also Volkswagenwerk Aktiengesellschaft v. Schlunk,* 486 U.S. 694, 698-700 (1988). Each member state is required to establish a Central Authority for receiving and processing requests for service upon defendants residing within the state. *See Schlunk*, 486 U.S. at 699. Service through the member state's Central Authority is not the exclusive method of service under the Hague Service Convention. *See Burda Media, Inc. v. Viertel*, 417 F.3d 292, 299-300 (2d Cir.2005). Article 10, for example, states in pertinent part:
>
> > Provided the State of destination does not object, the present Convention shall not interfere with-
> > > (a) the freedom to send judicial documents, by postal channels, directly to persons abroad,
> > > (b) the freedom of judicial officers, officials or other competent persons of the State of origin to effect service of judicial documents directly through the judicial officers, officials or other competent persons of the State of destination,
> > > (c) the freedom of any person interested in a judicial proceeding to effect service of judicial documents directly through the judicial officers, officials or other competent persons of the State of destination.

4

Plaintiff, as Russia refuses to accept service of process from the United States. As courts in this district have found, "the Central Authority of the Russian Federation denies all requests for service of process originating from the United States. While the Russian Federation and the United States are parties to the Hague Service Convention, judicial cooperation between the two countries has been suspended since July, 2003." *See, e.g., Arista Records v. Media Servs.*, No. 06 Civ. 15319(NRB), 2008 WL 563470 (S.D.N.Y. Feb. 25, 2008). As a result, "requests sent by litigants to the Russian Central Authority under the Hague Convention are returned unexecuted."[3] *See, e.g., id.; AMTO, LLC v. Bedford Asset Mgmt., LLC*, No. 14-CV-9913, 2015 WL 3457452, at *4 (S.D.N.Y. June 1, 2015); *Ambiz Trading Corp. v. URALSIB Fin. Corp.*, No. 11 Civ. 4420(SAS), 2011 WL 5844115, at *6 (S.D.N.Y. Nov. 21, 2011). Thus, Plaintiff is unable to serve Russia or its political subdivisions the GRU and GRU Operative #1 through 28 U.S.C. § 1608(a)(2).

Plaintiff similarly cannot avail itself of subsection 28 U.S.C. § 1608(a)(3). That subsection provides, "if service cannot be made under paragraphs (1) or (2)," service can be effectuated "by sending a copy of the summons and the complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs of the foreign state concerned." However, in December 2004,

---

20 U.S.T. 362, T.I.A.S. 6638, Art. 10.

*Arista Records v. Media Servs.*, No. 06 Civ. 15319(NRB), 2008 WL 563470, at *1, n. 1 (S.D.N.Y. Feb. 25, 2008).

[3], *Service of Process*, U.S. Department of State, Bureau of Consular Affairs, https://travel.state.gov/content/travel/en/legal/Judicial-Assistance-Country-Information/RussianFederation.html (last visited April 30, 2018).

Russia filed a series of declarations regarding certain aspects of the Convention, including a declaration that Russia will not accept service by mail under Article 10.[4] And in fact, in proceedings before this Court, counsel for Russia has represented that their client would not accept service by postal mail. *See* Memorandum of Law in Support of Defendants' Motion to Dismiss Complaint at 4, *Ford Motor Co. v. Russian Federation, et al.*, No. 09 Civ. 1646 (JGK), 2010 WL 2010867 (S.D.N.Y. Nov. 6, 2009) ECF No. 12.("In its accession, the Russian Federation requested that documents are to be served on the Russian Federation through diplomatic channels, and it prohibited service of documents directly by mail, as is otherwise provided in Section 10 of the Hague Convention.")

Because service through subsections 28 U.S.C. § 1608(a)(1)-(3) are unavailable, Plaintiff respectfully requests leave to serve Russia, the GRU, and GRU Operative #1 by diplomatic means under § 1608(a)(4). That subsection provides that, "if service cannot be made within 30 days under paragraph (3)," service may be effectuated:

> by sending two copies of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the Secretary of State in Washington, District of Columbia, to the attention of the Director of Special Consular Services—and the Secretary shall transmit one copy of the papers through diplomatic channels to the foreign state and shall send to the clerk of the court a certified copy of the diplomatic note indicating when the papers were transmitted.

Plaintiff proposes to commence procedures for serving Russia by requesting that, for each Defendant named in this Motion, the District Court mail two copies of the Summons and Complaint, a Notice of Suit, a copy of the Electronic Case Filing Rules and Instructions, and this Court's individual practices, along with Russian translations of each, to the Office

---

[4] *See* http://www.hcch.net/index_en.php?act=status.comment&csid=418&disp=resdn for the complete text of the "Reservation Declarations" posted by the Russian Federation in regard to the Hague Service Convention.

of Citizens Consular Services. Copies of those documents, along with a proposed order, are attached hereto.

<u>**CONLCUSION**</u>

For the foregoing reasons, Plaintiff respectfully requests that this Court grant Plaintiff leave to serve Defendants Russian Federation, the General Staff of the Armed Forces of the Russian Federation, and the GRU operative using the pseudonym "Guccifer 2.0" through the United States Secretary of State under 28 U.S.C. § 1608(a)(4).

2345655 v1

Dated: May 18, 2018

Respectfully submitted,

*/s/ Joseph M. Sellers*

Joseph M. Sellers (admitted *Pro Hac Vice*)
Geoffrey A. Graber (admitted *Pro Hac Vice*)
Julia A. Horwitz (*Pro Hac Vice* forthcoming)
Alison S. Deich (*Pro Hac Vice* forthcoming)
Cohen Milstein Sellers & Toll PLLC
1100 New York Ave. NW ● Fifth Floor
Washington, DC 20005
(202) 408-4600

Michael Eisenkraft
Cohen Milstein Sellers & Toll PLLC
88 Pine St. # 14
New York, NY 10005
(212) 838-7797

jsellers@cohenmilstein.com
ggraber@cohenmilstein.com
jhorwitz@cohenmilstein.com
adeich@cohenmilstein.com
meisenkraft@cohenmilstein.com

*Attorneys for Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that on May 18, 2018, I electronically filed the foregoing with the Clerk of the Court using the ECF, who in turn sent notice to all counsel of record.


Dated:    May 18, 2018                    /s/ Julia A. Horwitz
                                          Julia A. Horwitz

2345655 v1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DEMOCRATIC NATIONAL COMMITTEE, | ) |
| | ) |
| Plaintiff, | ) Civil Action No. _____ |
| | ) |
| v. | ) **JURY DEMAND** |
| | ) |
| THE RUSSIAN FEDERATION; | ) **COMPLAINT** |
| GENERAL STAFF OF THE ARMED | ) COMPUTER FRAUD AND ABUSE |
|   FORCES OF THE RUSSIAN | ) ACT (18 U.S.C. § 1030(a)) |
|   FEDERATION ("GRU"); | ) RICO (18 U.S.C. § 1962(c)) |
| GRU OPERATIVE USING | ) RICO CONSPIRACY (18 U.S.C. |
|   PSEUDONYM "GUCCIFER 2.0"; | ) § 1962(d)) |
| ARAS ISKENEROVICH AGALAROV; | ) WIRETAP ACT (18 U.S.C. |
| EMIN ARAZ AGALAROV; | ) §§ 2510-22) |
| JOSEPH MIFSUD; | ) STORED COMMUNICATIONS |
| WIKILEAKS; | ) ACT (18 U.S.C. §§ 2701-12) |
| JULIAN ASSANGE; | ) DIGITAL MILLENNIUM |
| DONALD J. TRUMP FOR PRESIDENT, INC.; | ) COPYRIGHT ACT (17 U.S.C. |
| DONALD J. TRUMP, JR.; | ) § 1201 *et seq.*) |
| PAUL J. MANAFORT, JR.; | ) MISAPPROPRIATION OF TRADE |
| ROGER J. STONE, JR.; | ) SECRETS UNDER THE DEFEND |
| JARED C. KUSHNER; | ) TRADE SECRETS ACT (18 U.S.C. |
| GEORGE PAPADOPOULOS; | ) § 1836 *et seq.*) |
| RICHARD W. GATES, III; | ) WASHINGTON D.C. UNIFORM |
| JOHN DOES 1-10, | ) TRADE SECRETS ACT (D.C. Code |
| | ) Ann. §§ 36-401 – 46-410) |
| Defendants. | ) TRESPASS (D.C. Common Law) |
| | ) TRESPASS TO CHATTELS |
| | ) (Virginia Common Law) |
| | ) CONSPIRACY TO COMMIT |
| | ) TRESPASS TO CHATTELS |
| | ) (Virginia Common Law) |
| | ) VIRGINIA COMPUTER CRIMES |
| | ) ACT (Va. Code Ann. § 18.2-152.5 *et* |
| | ) *seq.*) |
| | ) |
| | ) |

# TABLE OF CONTENTS

Page

NATURE OF ACTION ...................................................................................... 1

I.     INTRODUCTION ........................................................................................ 1

II.    OVERVIEW OF THE CONSPIRACY ......................................................... 2

III.   DAMAGES TO THE DNC ............................................................................ 6

JURISDICTION AND VENUE ............................................................................ 7

PARTIES ............................................................................................................. 8

GENERAL ALLEGATIONS ............................................................................. 13

I.     TRUMP'S AND TRUMP ASSOCIATES' PRE-EXISTING RELATIONSHIPS WITH RUSSIA AND RUSSIAN OLIGARCHS PROVIDED FERTILE GROUND FOR RUSSIA-TRUMP CONSPIRACY ....................................... 13

II.    THE COMMON PURPOSE: BOLSTER TRUMP AND DENIGRATE THE DEMOCRATIC PARTY NOMINEE ......................................................... 15

III.   THE CONSPIRACY TO DISSEMINATE STOLEN DNC DATA TO AID TRUMP ................................................................................................... 17

    A.    Trump Announces His Candidacy for President and Russia Begins Its Attack on the DNC Computer Systems ................................................. 18

    B.    European Allies Sound the Alarm to U.S. Intelligence Regarding Communications Between Russians and Trump Associates ................................ 18

    C.    While Campaigning for President, Trump Signs a Letter of Intent to Build Trump Tower Moscow ............................................................. 18

    D.    The Trump Campaign Establishes Further Ties to Russia and Russian Intelligence Agents ....................................................................... 19

    E.    Russia Steals Massive Trove of Documents from the DNC as Trump Associate Brags About Stolen Documents ........................................... 21

    F.    The DNC Discovers the Hack and Hires CrowdStrike ........................................ 22

    G.    Forensic Evidence Confirms Russia's Attack on the DNC's Network ............... 23

    H.    Russians Offer to Assist Trump—and Trump Associates Accept the Offer ........ 24

    I.    Following Trump Tower Meeting, Russia Launches a Massive Public Dissemination of Stolen DNC Documents .......................................... 26

    J.    The Trump Campaign Blocks Anti-Russian Language from Being Added to the GOP Platform ............................................................... 27

**TABLE OF CONTENTS**

Page

K.   After the Trump Campaign Blocks Anti-Russia Language from the GOP Platform, WikiLeaks Begins Disseminating Stolen DNC Documents ................ 27

L.   Trump Associates Secretly Communicate with Russian Agents and WikiLeaks as They Strategically Release Stolen DNC Documents .................... 28

M.   Trump Publicly Praises the Illegal Dissemination of Stolen DNC Documents ........................................................................................... 30

N.   Trump—and Russia—Win. .................................................................... 32

IV.   DEFENDANTS' REPEATED EFFORTS TO COVER UP CONTACTS WITH RUSSIANS EVIDENCE THEIR CONSCIOUSNESS OF GUILT ............................... 32

V.   THE SIGNIFICANT HARM INFLICTED UPON PLAINTIFF ..................................... 34

CAUSES OF ACTION ...................................................................................... 36

COUNT I ..................................................................................................... 36

COMPUTER FRAUD AND ABUSE ACT (18 U.S.C. § 1030(A)) (AGAINST RUSSIA, THE GRU, AND GRU OPERATIVE #1) ....................................... 36

COUNT II .................................................................................................... 38

RICO (18 U.S.C. § 1962(C)) (AGAINST ALL DEFENDANTS) ................................. 38

A.   The Trump Campaign Was the Racketeering Enterprise ..................................... 38

B.   Alternatively, and at the Very Least, the Trump Campaign Was Part of an Association-In-Fact Enterprise ................................................................. 39

C.   RICO Predicate Acts ........................................................................... 39

D.   RICO Damages ................................................................................. 42

COUNT III ................................................................................................... 42

RICO CONSPIRACY (18 U.S.C. § 1962(D))  (AGAINST ALL DEFENDANTS) ....... 42

COUNT IV .................................................................................................... 43

WIRETAP ACT (18 U.S.C. §§ 2510-22) (AGAINST GRU OPERATIVE #1, WIKILEAKS, ASSANGE, THE TRUMP CAMPAIGN, AND THE TRUMP ASSOCIATES) .................................................................................... 43

COUNT V ..................................................................................................... 44

STORED COMMUNICATIONS ACT (18 U.S.C. §§ 2701-12) (AGAINST RUSSIA, THE GRU, AND GRU OPERATIVE #1) ....................................... 44

COUNT VI .................................................................................................... 45

DIGITAL MILLENNIUM COPYRIGHT ACT (17 U.S.C. § 1201 *ET SEQ.*) (AGAINST RUSSIA, THE GRU, AND GRU OPERATIVE #1) ..................................... 45

# TABLE OF CONTENTS

Page

COUNT VII ..................................................................................................... 46

    MISAPPROPRIATION OF TRADE SECRETS UNDER THE DEFEND TRADE
    SECRETS ACT (18 U.S.C. § 1836 *ET SEQ.*) (AGAINST RUSSIA, THE GRU,
    GRU OPERATIVE #1, WIKILEAKS, AND ASSANGE) .................................... 46

COUNT VIII .................................................................................................... 47

    WASHINGTON D.C. UNIFORM TRADE SECRETS ACT (D.C. CODE ANN.
    §§ 36-401 – 46-410) (AGAINST ALL DEFENDANTS) .................................. 47

COUNT IX........................................................................................................ 48

    TRESPASS (D.C. COMMON LAW) (AGAINST RUSSIA, THE GRU, AND
    GRU OPERATIVE #1).................................................................................. 48

COUNT X......................................................................................................... 49

    TRESPASS TO CHATTELS (VIRGINIA COMMON LAW) (AGAINST
    RUSSIA, THE GRU, AND GRU OPERATIVE #1) ........................................ 49

COUNT XI........................................................................................................ 50

    CONSPIRACY TO COMMIT TRESPASS TO CHATTELS (VIRGINIA
    COMMON LAW) (AGAINST ALL DEFENDANTS) .................................... 50

COUNT XII....................................................................................................... 51

    VIOLATION OF THE VIRGINIA COMPUTER CRIMES ACT (VA. CODE
    ANN. § 18.2-152.5 ET SEQ.) (AGAINST ALL DEFENDANTS)................... 51

PRAYER FOR RELIEF ..................................................................................... 52

JURY DEMAND ............................................................................................... 54

Plaintiff the Democratic National Committee ("DNC"), brings this Complaint against The Russian Federation ("Russia"), the General Staff of the Armed Forces of the Russian Federation ("GRU"), the GRU operative using the pseudonym "Guccifer 2.0") ("GRU Operative #1"), Aras Iskenerovich Agalarov ("Aras Agalarov"); Emin Araz Agalarov ("Emin Agalarov"); Joseph Mifsud ("Mifsud"); WikiLeaks, Julian Assange ("Assange"), Donald J. Trump for President, Inc. ("the Trump Campaign"), Donald J. Trump, Jr. ("Trump, Jr."), Paul J. Manafort, Jr. ("Manafort"), Roger J. Stone, Jr. ("Stone"), Jared C. Kushner ("Kushner"), George Papadopoulos ("Papadopoulos"), Richard W. Gates, III ("Gates"), and John Does 1-10, and alleges as follows:

## NATURE OF ACTION

## I.    INTRODUCTION

1.      No one is above the law. In the run-up to the 2016 election, Russia mounted a brazen attack on American Democracy.  The opening salvo was a cyberattack on the DNC, carried out on American soil.  In 2015 and 2016, Russian intelligence services hacked into the DNC's computers, penetrated its phone systems, and exfiltrated tens of thousands of documents and emails.  Russia then used this stolen information to advance its own interests: destabilizing the U.S. political environment, denigrating the Democratic presidential nominee, and supporting the campaign of Donald J. Trump ("Trump"), whose policies would benefit the Kremlin.

2.      In the Trump campaign, Russia found a willing and active partner in this effort.  In 2016, individuals tied to the Kremlin notified the Trump campaign that Russia intended to interfere with our democracy.  Through multiple meetings, emails, and other communications, these Russian agents made clear that their government supported Trump and was prepared to use stolen emails and other information to damage his opponent and the Democratic party.

3.     Rather than report these repeated messages that Russia intended to interfere with U.S. elections, the Trump Campaign and its agents gleefully welcomed Russia's help.  Indeed, the Trump Campaign solicited Russia's illegal assistance, and maintained secret communications with individuals tied to the Russian government, including one of the intelligence agencies responsible for attacking the DNC.

4.     Through these communications, the Trump Campaign, Trump's closest advisors, and Russian agents formed an agreement to promote Donald Trump's candidacy through illegal means.  Russian agents trespassed onto the DNC's computer network in the United States, as well as other email accounts, collected trade secrets and other private data, and then transmitted the data to Defendant WikiLeaks, whose founder, Assange, shared the defendants' common goal of damaging the Democratic party in advance of the election.  Russia, through military intelligence (GRU) officer(s) posing as "Guccifer 2.0" (hereinafter referred to as "GRU Operative #1"), and through WikiLeaks, then disseminated the information at times when it would best suit the Trump Campaign.

5.     As stolen DNC information was strategically released into the public sphere, then-candidate Trump openly praised the illegal disseminations and encouraged Russia to continue its violations of U.S. law through its ongoing hacking campaign against the Democratic party.

## II.     OVERVIEW OF THE CONSPIRACY

6.     Russia's cyberattack on the DNC began only weeks after Trump announced his candidacy for President of the United States in June of 2015.  And, within months, allied European intelligence services began reporting suspicious communications between Trump associates and Russian operatives to their U.S. counterparts.

7.     In late 2015, while campaigning for President, Trump himself signed a letter of intent to develop and license his name to a new real estate development in Moscow—potentially

fulfilling a decades-long dream. This project was to be financed through a Russian bank under sanction by the United States. The deal was brokered by Felix Sater, a Russian émigré, convicted felon, and longtime business partner of Trump. In explaining the deal to Michael Cohen, Trump's personal attorney, Sater suggested that he would get Russian President Vladimir V. Putin ("Putin") to support the project in an effort to boost Trump's electoral hopes: "I will get Putin on this program and we will get Donald elected . . . . I know how to play it and we will get this done. Buddy our boy can become President of the USA and we can engineer it. I will get all of Putins team to buy in on this, I will."

8.      By early 2016, Trump was well on his way to becoming the favorite to win the GOP nomination. As Trump moved closer to securing the nomination, the ties between his campaign and Russia's government grew substantially.

9.      In February 2016, retired Lt. Gen. Michael T. Flynn began serving as an informal foreign policy advisor to the Trump campaign. Just months earlier, in December 2015, Flynn had been paid by the Russian government-funded propaganda outlet Russia Today ("RT") to attend and speak at its anniversary gala in Moscow, where he dined at the same table as Putin.

10.      In March 2016, Trump hired Manafort, who had spent the previous decade working to advance Kremlin interests, as his campaign's convention manager. Even after joining the Trump campaign, Manafort maintained contact with an individual tied to the GRU. Manafort also offered to brief a Putin-connected Russian regarding the campaign.

11.      In April 2016, another set of Russian intelligence agents successfully hacked into the DNC. And, on April 22, 2016, Russian intelligence prepared massive amounts of data for exfiltration from DNC servers. Four days later, on April 26, 2016, Trump's foreign policy advisor, Papadopoulos, met with a Kremlin-tied agent, who informed Papadopoulos that the Russians

"have dirt" on the Democratic presidential nominee in the form of "thousands of emails." Papadopoulos did not report this information to American law enforcement. Rather, he reported back to his superiors at the Trump Campaign, regarding "interesting messages coming in from Moscow about a trip when the time is right."

12. By June 2016, Russia had stolen thousands of DNC documents and emails. On June 3, 2016, Russians connected to the Kremlin contacted Donald Trump, Jr. to offer damaging information about the Democratic presidential nominee as "part of Russia and its government's support for Mr. Trump." Trump, Jr. did nothing to alert American law enforcement. Rather, he expressly embraced the illegal plan, responding: "I love it especially later in the summer."

13. On June 9, 2016, Trump Jr., Manafort, and Kushner met with the Russians in Trump Tower. Days later, on June 15, 2016, GRU Operative #1 widely disseminated a trove of stolen documents to the public, claiming they were DNC material.

14. In July 2016, the GOP held its national convention. At the convention, the Trump Campaign intervened to prevent other Republicans from inserting anti-Russian language regarding Ukraine into the GOP platform. Days later, on July 22, 2016, also on the eve of the Democratic National Convention, WikiLeaks began disseminating stolen DNC documents, including emails and other sensitive proprietary documents, to the public.

15. Throughout the summer and fall of 2016, during the height of the Presidential campaign, Trump's associates continued to secretly communicate with Russian agents and WikiLeaks as they strategically disseminated information stolen from Democratic targets. Beginning in August 2016, Stone began secretly communicating with GRU Operative #1 and continued to brag about his contacts with Assange. In addition, during this time, Gates, who served as the Trump Campaign's deputy chairman and then liaison to the Republican National

Committee, maintained secret communication with an individual he knew to be connected to the GRU.

16.     In the summer and fall of 2016, Stone revealed information that he could not have had unless he were communicating with either WikiLeaks or Russian operatives about their hacking operations in the United States.  In August of 2016, nobody in the public sphere knew that Russia had stolen emails from John Podesta, the chairman of Secretary Hillary Clinton's presidential campaign. Nevertheless, on August 21, 2016, Stone predicted that damaging information about Podesta would be released, tweeting "it will soon [be] Podesta's time in the barrel." Weeks later, WikiLeaks began releasing batches of Podesta's emails on a near-daily basis until Election Day—as Stone had predicted.  Similarly, in mid-September 2016, Stone said that he expected "Julian Assange and the WikiLeaks people to drop a payload of new documents on Hillary [Clinton] on a weekly basis fairly soon."  And, beginning on October 7, 2016, WikiLeaks began releasing stolen emails on a near-daily basis—as Stone had predicted.

17.     Trump, Jr. also secretly communicated with WikiLeaks.  In one exchange, Trump, Jr. was offered a password to an anti-Trump website.  WikiLeaks also asked Trump, Jr. to have his father retweet a link to WikiLeaks' trove of stolen emails.  Fifteen minutes later, Trump tweeted a message about the media's lack of attention to WikiLeaks' email releases.

18.     Throughout the fall of 2016, Trump praised the illegal dissemination of DNC and other Democratic documents, at various points making it a central theme of his speeches and rallies.  Indeed, Trump repeatedly praised the illegal disseminations with exclamations such as: "I love Wikileaks!"

19.     On November 8, 2016, Trump won the Presidency of the United States.  The reaction in Russia was jubilation, with a member of Russia's parliament announcing to his fellow legislators: "I congratulate you all on this."

20.     The conspiracy constituted an act of previously unimaginable treachery:  the campaign of the presidential nominee of a major party in league with a hostile foreign power to bolster its own chance to win the Presidency.  And, in carrying out this effort, Defendants conspired to disseminate documents stolen from the DNC in violation of the laws of the United States, as well as the laws of the State of Virginia and the District of Columbia.  Under the laws of this nation, Russia and its co-conspirators must answer for these actions.

## III.     DAMAGES TO THE DNC

21.     The illegal conspiracy inflicted profound damage upon the DNC.  Defendants undermined and distorted the DNC's ability to communicate the party's values and vision to the American electorate; sowed discord within the Democratic party at a time when party unity was essential to electoral success; and seriously compromised the DNC's internal and external communications.

22.     At the same time, Defendants' conduct resulted in a dramatic drop in donations to the DNC.  The dissemination of hacked information heightened donors' concerns that confidential information disclosed through their contributions might be publicly disseminated.

23.     The DNC also paid more than a million dollars to repair and remediate electronic equipment, and to hire staff and consultants to address the cyber-security fallout from the hack and dissemination.

24.     Finally, because the releases included personal, and in some cases protected information about DNC employees, some DNC employees were exposed to harassment and death threats.  One representative email said: "I hope all your children get raped and murdered. I hope

your family knows nothing but suffering, torture and death." Understandably, this harassment impaired the employees' ability to function effectively in their jobs.

25. While no suit can ever fully redress the harm that Defendants' illegal conduct exacted, the DNC brings this lawsuit to seek the full measure of relief under the laws of the United States.

26. Accordingly, Plaintiff brings this action to address the individual and collective conduct of Defendants under the statutes and common law discussed herein. Plaintiff is entitled to relief from all those involved in the scheme.

### JURISDICTION AND VENUE

27. This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under 18 U.S.C. § 1030 (the Computer Fraud and Abuse Act); 18 U.S.C. §§ 1961-68 (Racketeer Influenced and Corrupt Organizations Act); 18 U.S.C. §§ 2701-11 (the Stored Communications Act); 28 U.S.C. §§ 2510-22 (commonly referred to as the Federal Wiretap Act); Pub. L. No. 114-152, 130 Stat. 376 (the Defend Trade Secrets Act, codified in scattered sections of 18 U.S.C. and 28 U.S.C.); and 17 U.S.C. § 1201 *et seq.* (the Digital Millennium Copyright Act). This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. §1367(b).

28. This Court has jurisdiction over the claims against Russia and the GRU pursuant to 28 U.S.C. § 1330 because Russia is a foreign state, *see* 28 U.S.C. § 1603(a), and the GRU is an "agency or instrumentality" of the state, 28 U.S.C. § 1603(b).

29. Russia is not entitled to sovereign immunity because the DNC's claims arise out of Russia's trespass onto the DNC's private servers—a tortious act committed in the United States. *See* 28 U.S.C. § 1605(a)(5). In addition, Russia committed the trespass in order to steal

trade secrets and commit economic espionage, two forms of commercial activity undertaken in and directly affecting the United States. *See id.* § 1605(a)(2).

30.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in New York City, NY. Defendant Trump Campaign, Inc. is headquartered at 725 Fifth Avenue, New York City, NY 10022; Defendant Donald J. Trump, Jr. resides in New York City, NY; and a substantial number of the meetings and interactions made in furtherance of the conspiracy at issue were located in New York City, NY.

31.     Venue is proper for the claims arising under RICO pursuant to 18 U.S.C. § 1965(a) because Defendants reside, are found, have agents, or transact affairs in New York, NY.

### PARTIES

32.     Plaintiff DNC, registered with the Federal Election Commission as DNC Services Corp./Dem. Nat'l Committee, is a national committee as that term is defined by and used in 52 U.S.C. § 30101, dedicated to electing local, state, and national candidates—including presidential candidates—of the Democratic Party to public office. To accomplish its mission, the DNC, among other things, works closely with Democratic public officials and assists state parties and candidates by contributing money, making expenditures on their behalves, and providing active support through the development of programs benefiting Democratic candidates. The DNC also plans the Democratic Party's presidential nominating convention and promotes the Democratic Party's platform. The DNC regularly conducts its business via email housed on secured servers. It also regularly creates and maintains copyrighted materials on its servers as well as confidential, proprietary documents related to campaigns, fundraising, and campaign strategy that are the DNC's trade secrets.

33.     Defendant Russia is a foreign state as defined under the laws of the United States.

34.     Defendant GRU is Russia's military intelligence agency. Upon information and belief, the GRU created the online pseudonym "Guccifer 2.0" to disseminate stolen documents and information.

35.     Defendant GRU Operative #1 is the Russian intelligence operative(s) who used the online pseudonym "Guccifer 2.0" to disseminate stolen documents and information. Upon information and belief, GRU Operative #1 is a GRU intelligence officer(s) working out of GRU headquarters located on Grizodubovoy Street in Moscow, Russia.

36.     Defendants John Doe 1-10 are other Russian intelligence officers or agencies who participated in the conspiracy to hack into Plaintiff's computers and disseminate stolen documents and information.

37.     Defendant Aras Agalarov is an Azeri-born oligarch in Russia who is a close ally of Putin. Trump worked with Aras Agalarov, who served as a liaison between Trump and Putin, to bring the Miss Universe pageant to Moscow in 2013, for which Aras Agalarov paid Trump millions of dollars. During Trump's November 2013 trip to Russia, he and Aras Agalarov reportedly agreed on another deal to explore real estate opportunities in Russia together.  Aras Agalarov reportedly has land reserved in Russia for a Trump-branded real estate development.

38.     Defendant Emin Agalarov is Aras Agalarov's son. Emin Agalarov is a pop-singer and executive at the family's real estate company.  He established a close relationship with the Trumps over the course of their partnership on the 2013 Miss Universe pageant.  Like his father, Emin Agalarov remained in contact with Trump and Trump Jr. after 2013 and into the 2016 campaign.  The Agalarovs figure prominently in the June 2016 Trump Tower meeting (described below).

39.     Defendant Joseph Mifsud is an academic who, upon information and belief, worked in several positions for the government of Malta.  Mifsud apparently had affiliations with a variety of educational organizations and institutions in the United Kingdom and Malta. Upon information and belief, Mifsud has substantial connections to the Russian government and acted as a de facto agent of the Russian government in his contacts with Papadopoulos in 2016.

40.     Defendant Assange is the founder and publisher of WikiLeaks. He is a citizen of Australia and resides in the embassy of the Government of Ecuador in London, England.  Assange has exhibited support for the Russian government and has hosted a talk show on Russia Today ("RT"), a television propaganda outlet funded by the Russian government.

41.     Defendant WikiLeaks is an organization of unknown structure that operates a website, WikiLeaks.org, on which it publishes leaked or stolen confidential and classified information. Its registered address is P.O. Box 701, San Mateo, CA 94401.

42.     Defendant Trump Campaign is an American not-for-profit corporation formed and registered in Virginia on June 17, 2015 to support Trump's candidacy for President of the United States. The Trump Campaign is incorporated under the laws of Virginia and has or had an office at 675 N. Washington St., Alexandria, VA 22314. Its principal place of business is Trump Tower, 725 Fifth Avenue, New York City, NY 10022. From June 2015 to June 2016, Corey Lewandowski was Campaign Manager of the Trump Campaign. From March 2016 to May 2016, Manafort was Convention Manager of the Trump Campaign, and from May 2016 to August 2016, he was Campaign Chairman of the Trump Campaign. From June 2016 to August 2016, Gates was Deputy Campaign Chairman, and from August 2016 to November 2016, he was the campaign's liaison to the Republican National Committee. Multiple senior members of the Trump Campaign are

reported to have long-time ties to Russia and to have engaged in frequent communication with individuals tied to the Russian government during the 2016 campaign cycle.

43. Defendant Trump, Jr. is the oldest son of President of the United States Donald J. Trump. From June 16, 2015, until November 8, 2016, when Donald J. Trump was a Republican candidate for president, Trump, Jr. served as a frequent surrogate for now-President Trump and has been described as "a close political advisor to his father" and a "key player in [his] father's White House run." Trump, Jr. currently works as Executive Vice President of the Trump Organization, the business organization that was run by Trump prior to his inauguration as President of the United States. Trump, Jr. resides in New York City, New York.

44. Defendant Manafort is a long-time Republican political operative, who was Convention Manager of the Trump Campaign from March 2016 to May 2016, and Campaign Chairman of the Trump Campaign from May 2016 to August 2016, when he resigned amid reports of his work with the formerly pro-Russian government in Ukraine. Since October 27, 2017, Manafort has been indicted on dozens of counts, including money laundering and false statements, related to his work for the pro-Russian government in Ukraine. Manafort resides in Virginia.

45. Defendant Stone is Trump's long-time confidant. "[F]ew people go as far back [as] Trump [and] Stone," and Stone has "nurtured the dream of a [Trump] presidential run . . . for 30 years." Stone also has a long history with Manafort: Manafort helped run Stone's campaign for national chairman of the Young Republicans in 1977, and the two co-founded a consulting firm— Black, Manafort, Stone, and Kelly—in the 1980s. Upon information and belief, Stone served as an informal adviser to Trump and remained in contact with him throughout the 2016 election. Stone resides in Florida.

46.    Defendant Kushner is Trump's son-in-law and was a senior advisor to and one of the key decision-makers for the Trump Campaign. In June 2016, Kushner "took over all data-driven efforts" for the campaign, setting up a 100-person "data hub" in San Antonio, Texas, and hiring Cambridge Analytica, a social media and analytics firm to help his father-in-law's campaign. Kushner resides in Washington, D.C.

47.    Defendant Papadopoulos was one of the earliest foreign policy advisors to the Trump campaign. He became a foreign policy adviser to the Trump Campaign in March 2016. Papadopoulos was in frequent contact with the Trump Campaign's most senior officials in the summer and fall of 2016. He resides in Chicago, Illinois.  On October 5, 2017, Papadopoulos pleaded guilty to one count of making a false statement to a federal agent.

48.    Defendant Gates is a longtime employee and business partner of Manafort. Between 2006 and 2015, Gates was closely involved in Manafort's work for the former pro-Russian regime in Ukraine and its successor political party.  Between October 27, 2017 and February 23, 2018, Gates was indicted on dozens of counts, including money laundering and false statements, related to his work with Manafort for the pro-Russian government in Ukraine.  On February 23, 2018, Gates pleaded guilty to one count of conspiracy against the United States and one count of making a false statement to a federal agent. Gates resides in Richmond, VA.

## GENERAL ALLEGATIONS

### I. TRUMP'S AND TRUMP ASSOCIATES' PRE-EXISTING RELATIONSHIPS WITH RUSSIA AND RUSSIAN OLIGARCHS PROVIDED FERTILE GROUND FOR RUSSIA-TRUMP CONSPIRACY

49. Trump's and several Trump Associates' long-standing personal, professional, and financial ties to Russia and numerous individuals closely linked to the Russian government provided fertile ground for a conspiracy between Defendants to interfere in the 2016 elections.

50. ***Trump's Business Connections to Russia:*** As early as the 1980s, the Soviet Union paid for Trump to travel to Moscow to discuss a potential development project—a pattern which continued into the 1990s and 2000s.[1] In the mid-1990s, Trump negotiated with Russian government officials over potential real estate developments in Moscow.[2] Beginning in 2003, Trump engaged in multiple real estate deals with the Bayrock Group, a firm founded and run by Soviet emigres, who reportedly had close ties to the Russian government and Russian organized crime.[3] In 2004, Trump negotiated with the Deputy Mayor of Moscow over a potential real estate development.[4] In the mid-2000s, Trump partnered with wealthy Russian-Canadian businessmen to develop real estate in Toronto.[5] And in 2006, Trump contracted with the Russian Standard Corporation, a Moscow-based entity that owns and operates the Miss Russia beauty pageant, to allow the winner of the pageant to compete in Trump's Miss Universe pageant, an action that had not been taken since at least 2002.[6] In 2008, Trump sold a Palm Beach, Florida mansion to a Russian oligarch for a $54 million profit.[7] In 2013, Trump established a business relationship with Russian oligarch Aras Agalarov, a close ally of Putin, to bring the Miss Universe pageant to Russia and work on plans to develop a Trump-branded project in Moscow.[8] Trump's efforts to develop real estate in Russia continued into the first months of the 2016 presidential campaign.[9] And throughout this 30-year history, Trump sought out wealthy Russian buyers for his condominiums in the United States and abroad.[10]

13

51.     As Trump, Jr. explained, the Trump Organization "s[aw] a lot of money pouring in from Russia," and "Russians make up a pretty disproportionate cross-section of our assets."[11] And Trump's son Eric Trump has reportedly stated that substantial funding for Trump's golf courses comes from Russian investors.[12]

52.     ***Manafort and Gates' Ukrainian Connections***: From 2004 until at least 2015, Manafort was an advisor to the Russian-allied former Ukrainian President Viktor Yanukovych ("Yanukovych") and his Kremlin-allied Party of Regions, as well as its successor, the Opposition Bloc.[13] In 2012, Manafort allegedly helped the Ukrainian party secretly route at least $2.2 million in payments to two prominent Washington lobbying firms.[14] Manafort's ties to Yanukovych and the Ukraine are so deep that his own daughter has stated that the "money we have is blood money."[15] After repeatedly denying that he had ever worked for the Ukrainian government, on June 27, 2017, Manafort retroactively registered as a foreign agent and reported $17.1 million in payments from Yanukovych's party between 2012 and 2014.[16] Since October 27, 2017, Manafort has been indicted on dozens of counts, including money laundering and making false statements, related to his work for the pro-Russian government in Ukraine.[17] Additional financial records indicate that Manafort was in debt to Putin-tied oligarch Oleg Deripaska ("Deripaska") by as much as $17 million prior to joining the Trump Campaign.[18]

53.     Manafort also employed Konstantin Kilimnik ("Kilimnik") as his close aide. Kilimnik is a former linguist in the Russian army who is believed to be an agent of the GRU, and whom the FBI believes maintained ties to Russian intelligence during the 2016 U.S. presidential campaign.[19] Kilimnik was in communication with both Manafort and Gates while they were serving in the two most senior positions in the Trump Campaign, and acted as a middleman between them and Deripaska.[20]

54.     Gates was in direct contact with Kilimnik while serving as a high-ranking official of the Trump Campaign in 2016 and was aware that Kilimnik was tied to the GRU.[21]

## II.     THE COMMON PURPOSE: BOLSTER TRUMP AND DENIGRATE THE DEMOCRATIC PARTY NOMINEE

55.     The common purpose of the conspiracy among Russia and the Trump Associates was to bolster Trump's campaign for president, to injure the DNC, and to harm the Democratic party's chances for success in the 2016 presidential election.  This common purpose sprang from multiple, well-documented motives.

56.     In December 2011, massive protests broke out in Russia in response to allegations of vote rigging and election fraud in the Russian parliamentary elections. Thousands of Russians took to the streets to protest the victory of then-Prime Minister Putin's political party, in one of Russia's largest protests since the fall of the U.S.S.R.[22]

57.     Concerned about maintaining power and exerting control, Putin lashed out, blaming the protests on then-Secretary of State Hillary Clinton. Putin asserted that Secretary Clinton had "set the tone for some of our actors in the country and gave the signal." And he accused her of ordering the opposition movement into action: "They heard this and, with the support of the U.S. State Department, began active work." [23]

58.     At the same time, Trump left no doubt as to his views on Russia. Prior to the 2016 campaign, he spent nearly a decade espousing pro-Russian and pro-Putin views, praising Putin as "doing a great job in rebuilding the image of Russia" (2007);[24] stating that he "really like[d] Vladimir Putin [and] respect[ed] him. He does his work well. Much better than our Bush" (2008);[25] and characterizing Putin's illegal annexation of Crimea as "so smart . . . . And he [Putin] really goes step by step by step, and you have to give him a lot of credit" (2014).[26]

59.     Despite the obvious political risks of associating himself with a foreign despot, Trump continued to make laudatory statements about Putin well into the presidential primary season. He said that he would have a "great relationship with Putin";[27] and that it was a "great honor to be so nicely complimented by [Putin, who was] so highly respected within his own country and beyond."[28]

60.     Further, Trump's statements—as well as the pro-Russian entourage with which he surrounded himself—left little doubt that Trump, if elected president, would adopt policies that favored Russia and Putin, even if those policies conflicted with longstanding U.S. foreign policy, and the best interests of the United States. Trump called NATO "obsolete" and threatened to renege on U.S. treaty obligations;[29] argued that the U.S. should not counteract Russia's attempts to be a global power; supported Great Britain's exit from the European Union, while noting that it would "probably" benefit Putin;[30] and opposed U.S. sanctions for Russia's annexation of Crimea, saying, "The people of Crimea, from what I've heard would rather be with Russia than where they were."[31]

61.     Thus, the Trump Campaign, Trump Associates, and Russia shared the common purpose of undermining Secretary Clinton's candidacy, undermining the DNC and the Democratic Party, and promoting Trump, whose presidency was expected to benefit Russia's political and financial interests, and in turn, benefit Trump's financial interests.

62.     Assange and WikiLeaks also shared a common purpose in undermining Secretary Clinton's candidacy and promoting Trump.  Assange had a long of history conflicts with Secretary Clinton, and Assange publicly stated that his policy disagreements with Clinton would make her presidency far more problematic than a Trump presidency.[32]

**III.     THE CONSPIRACY TO DISSEMINATE STOLEN DNC DATA TO AID TRUMP**

63.     In a January 2017 report ("The IC Report"), the U.S. intelligence community concluded: "Russian President Vladimir Putin ordered an influence campaign in 2016 aimed at the US presidential election, the consistent goals of which were to undermine public faith in the US democratic process, denigrate Secretary Clinton, and harm her electability and potential presidency."[33] Further, the IC Report concluded:  "In July 2015, Russian intelligence gained access to Democratic National Committee (DNC) networks and maintained that access until at least June 2016"; that "by May, the GRU had exfiltrated large volumes of data from the DNC"; and that the "GRU relayed material it acquired from the DNC and senior Democratic officials to WikiLeaks."

64.     This operation to infiltrate the DNC servers and disseminate stolen DNC material was carried out in the United States:  Russian operatives trespassed onto computer servers located in Virginia and Washington, D.C. and stole information located on those servers.  It was also carried out in concert with Assange and WikiLeaks, and with the active support and approval of the Trump Campaign and the Trump Associates.

65.     The conspirators worked in tandem to accomplish their goal.  Russia's intelligence services illegally hacked into the DNC's computer systems and email accounts in order to steal and publish trade secrets, including confidential, proprietary documents related to campaigns, fundraising, and campaign strategy. Russian intelligence services then disseminated the stolen, confidential materials through GRU Operative #1, as well as WikiLeaks and Assange, who were actively supported by the Trump Campaign and Trump Associates as they released and disclosed the information to the American public at a time and in a manner that served their common goals. The disclosures to the American electorate were undertaken with the purpose and had the effect of creating dissention within the Democratic party, directing media coverage away from stories critical of Trump, and generally promoting Trump's presidential candidacy.

**A.    Trump Announces His Candidacy for President and Russia Begins Its Attack on the DNC Computer Systems**

66.    On June 16, 2015, Trump announced his candidacy for President of the United States in the lobby of Trump Tower. By the next month, Russia had undertaken its cyberattack on the DNC.[34] The hacks by Russian intelligence were directed at systems in Virginia and Washington, D.C. that contained some of the DNC's most sensitive strategic and operational data. Later, the disclosure of this sensitive data not only significantly disrupted the election strategy implemented by the DNC, but also interfered directly with the DNC's ability to effectively communicate with and persuade voters and to raise critical funds for its organization and to support Democratic campaigns.

**B.    European Allies Sound the Alarm to U.S. Intelligence Regarding Communications Between Russians and Trump Associates**

67.    Beginning in late 2015, European intelligence agencies began reporting suspicious communications between persons associated with the Trump Campaign and Russian operatives, including suspected intelligence agents, to U.S. authorities.  Over the next six months, and through the summer of 2016, these allied European intelligence agencies reported the continuation of these contacts between Trump Associates and Russian operatives.

**C.    While Campaigning for President, Trump Signs a Letter of Intent to Build Trump Tower Moscow**

68.    In the fall of 2015, as Trump campaigned for President, members of the Trump Organization were actively negotiating with Russians on a Trump-branded real estate project in Moscow—a longtime goal of Trump.[35]  By October 2015, the Trump Organization had secured a letter of intent to license Trump's name for the project in Moscow.[36]  Trump signed the letter of intent.[37]

69.     The deal was brokered by Felix Sater, a Russian émigré, convicted felon, and longtime business associate of the Trump Organization.[38]  The funding for the project was to be provided by Vneshtorgbank, or VTB—a Russian bank against which the United States Treasury has leveled sanctions.[39]

70.     On November 3, 2015, in an email to Cohen, Sater explained how this project would promote Trump's presidential aspirations:

> Michael I arranged for Ivanka to sit in Putins [sic] private chair at his desk and office in the Kremlin.  I will get Putin on this program and we will get Donald elected.  We both know no one else knows how to pull this off without stupidity or greed getting in the way.  I know how to play it and we will get this done.  Buddy our boy can become President of the USA and we can engineer it.  I will get all of Putins [sic] team to buy in on this, I will manage this process.[40]

**D.      The Trump Campaign Establishes Further Ties to Russia and Russian Intelligence Agents**

71.     From the spring of 2016 through the 2016 presidential election, high-level and other advisers to the Trump Campaign, including Manafort, Gates, Kushner, Papadopoulos, and others, were in frequent contact with individuals connected to Russian intelligence and the Russian government.[41]

72.     By March 2016, Papadopoulos was notified that he would become a foreign policy adviser to the Trump Campaign, and that a principal foreign policy focus of the Trump Campaign was an improved relationship with Russia.[42]  On March 21, 2016, Trump announced that Papadopoulos would be among the first members of the Trump Campaign's foreign policy team.[43]

73.     Thereafter, Papadopoulos frequently communicated with a professor based in London named Joseph Mifsud.  In his guilty plea, Papadopoulos, attested that he "understood that the professor had substantial connections to high-level Russian government officials."  Further,

Papadopoulos admitted that he "repeatedly sought to use the professor's Russian connections in an effort to arrange a meeting between the campaign and Russian government officials."[44]

74.     According to Papadopoulos' Statement of Offense, Mifsud was initially "uninterested" in Papadopoulos, but "appeared to take great interest" when Papadopoulos was publicly named to Trump's foreign policy team.  As a result:

(a)     On March 14, 2016, Mifsud met with Papadopoulos in Italy.

(b)     On March 24, 2016, Mifsud met again with Papadopoulos, this time bringing along a Russian national who was introduced as a relative of Putin.

(c)     On April 18, 2016, Mifsud introduced Papadopoulos to an individual he said had connections to the Russian Ministry of Foreign Affairs.  Papadopoulos proceeded to have multiple Skype conversations with this individual in which they discussed setting up a meeting between Russian officials and the Trump campaign.

(d)     On April 26, 2016, Mifsud again met with Papadopoulos in London.  At this meeting, Mifsud told Papadopoulos that the Russians had "thousands of emails" that could harm Hillary Clinton's presidential campaign.[45] Papadopoulos understood that Mifsud had met with Russian officials in Moscow "immediately prior" to relaying this information. [46]

75.     In a November 2017 interview with an Italian newspaper, Mifsud acknowledged his contacts with Papadopoulos, stating that he met with him "three or four times" and helped connect him to "official and unofficial sources."

76.     The Trump Campaign was aware of, and encouraged, these meetings.   After meeting with Mifsud and the Russian national on March 24, 2016, Papadopoulos reported back to the Trump Campaign that his conversation was "to arrange a meeting between us and the Russian leadership to discuss U.S.-Russia ties under President Trump."[47]  Informed of this meeting, Trump campaign National Co-Chairman Sam Clovis responded that he would "work it through the campaign" and added: "Great work."[48]

E.      **Russia Steals Massive Trove of Documents from the DNC as Trump Associate Brags About Stolen Documents**

77.     On April 18, 2016, Russia launched a second phase of its cyberattack on DNC servers located in Virginia and Washington, D.C.  This attack was executed by GRU agents and targeted the DNC's research department, document repositories, information technology department, and other departments.  Upon information and belief, high-ranking Russian officials ordered the GRU agents to infiltrate the DNC's servers, and the agents were obligated to carry out that order.

78.     On April 22, 2016, the GRU staged several gigabytes of DNC data located on the DNC's servers for unauthorized and surreptitious exfiltration—or, more commonly, theft.

79.     Four days later, on April 26, 2016, Papadopoulos met again with Russian agent Mifsud.  At the meeting, Mifsud informed Papadopoulos that the Russians "have dirt on [Hillary Clinton]" in the form of "thousands of emails."[49] In his guilty plea, Papadopoulos attested that he understood Mifsud had "substantial connections to high-level government officials" and "had met with some of those officials in Moscow immediately prior to telling [Papadopoulos] about the 'thousands of emails.'"[50] Rather than report such information to any authorities or halt communications with Mifsud, Papadopoulos excitedly emailed a Trump Campaign official on April 27, 2016:  "Have some interesting messages coming in from Moscow about a trip when the time is right." He also emailed Trump Campaign Manager Corey Lewandowski, reiterating Russia's interest in hosting Trump.  And in May 2016, Papadopoulos confided to an Australian diplomat that Russia had politically damaging information on Secretary Clinton.  The Australian diplomat reported this to U.S. authorities.[51]  This exchange between Papadopoulos and the Australian diplomat prompted the FBI to launch its counterintelligence investigation into contacts between Russia and the Trump campaign.[52]

80.     Throughout the campaign, at least until mid-August 2016, Papadopoulos continued to have communications with Russian nationals, and continued to report those communications to Trump Campaign officials, who encouraged him to set up an off-the-record meeting with Russian officials on behalf of the campaign.[53]  In October 2017, Papadopoulos pleaded guilty to lying about these communications with Russian nationals.[54]

81.     Following their initial access, for months, Russian intelligence agencies maintained an unauthorized presence in DNC servers located in the United States.  By May 2016, Russia had stolen a large amount of sensitive data from the DNC, including donor information, opposition research, information regarding planned political activities, and thousands of private confidential emails.

**F.     The DNC Discovers the Hack and Hires CrowdStrike**

82.     On April 28, 2016, DNC IT staff detected and ultimately confirmed access to the DNC network by unauthorized users.

83.     Upon discovering the intrusion, the DNC contacted CrowdStrike Services, Inc. ("CrowdStrike"), a cybersecurity technology firm, to investigate the attack, assess the damage done to the DNC's computers and servers, and assist the DNC in its remediation efforts.

84.     CrowdStrike performed forensic analysis on the DNC's computer network and servers.  CrowdStrike also set up a system for monitoring the ongoing attack on Plaintiffs' computer system and to alert the DNC to future attacks.

85.     As a result of the persistence of the Russian state-sponsored infiltration, in order to remove the unauthorized users from its network, the DNC was required to decommission more than 140 servers, remove and reinstall all software, including the operating systems, for more than 180 computers, and rebuild at least 11 servers.

### G. Forensic Evidence Confirms Russia's Attack on the DNC's Network

86. Both CrowdStrike's forensic analysis and the U.S. Government concluded that the DNC's computer systems had been hacked by two independent, sophisticated Russian state-sponsored adversaries, both with a nexus to Russia's intelligence services.[55] The forensic analysts tracked the hacking activities of these adversaries by assigning them code names: "Cozy Bear" and "Fancy Bear," which correspond to the more widely used names Advanced Persistent Threat 29 (APT 29) and Advanced Persistent Threat 28 (APT 28), respectively.[56] The IC Report concluded that "Fancy Bear" was acting as an agent of the GRU.

87. Forensic analysis found evidence that Cozy Bear had infiltrated and remained present in the DNC's network since at least July 27, 2015. The IC Report similarly concluded that the Russian intelligence first gained access to the DNC network in July 2015. CrowdStrike also determined that Cozy Bear used the stolen credentials of user accounts to access the DNC's computer systems.

88. CrowdStrike determined that the objective of the Cozy Bear actor was to access and collect information from DNC systems that were primarily used for communications. The analysis identified Cozy Bear malware in DNC systems providing email, email support, backup servers, voiceover internet protocol, and chat.

89. The U.S. Government concluded that Cozy Bear was an operative of or associated with Russian intelligence.[57]

90. The DNC first detected the infiltration of the GRU, or "Fancy Bear," in its network on April 28, 2016.

91. CrowdStrike determined that the GRU's objective was to collect information about the DNC's political and research activities.

23

92.    On April 22, 2016, the GRU staged for exfiltration several gigabytes of data that included opposition research on Donald Trump.

93.    On information and belief, the GRU exfiltrated DNC documents, and GRU Operative #1 posted some of those documents publicly online.

94.    According to an analysis of metadata in other documents, documents that originally resided on DNC servers were published without permission on a website, found at www.guccifer2.wordpress.com, by GRU Operative #1.

95.    Forensic analysis shows that both Cozy Bear and Fancy Bear used the stolen credentials of user accounts to access the DNC's computer systems. [58]

96.    In addition, forensic analysis showed that the hackers accessed the DNC's Voice-over Internet Protocol ("VOIP") transfers, permitting them to monitor voice-based communications, such as phone calls and voicemail.

97.    On information and belief, the hackers intercepted or endeavored to intercept emails and voice-based communications while in the DNC servers.

**H.    Russians Offer to Assist Trump—and Trump Associates Accept the Offer**

98.    Trump clinched the Republican presidential nomination on May 26, 2016. A week later, the scheme was launched to disseminate information that was damaging to the Democratic party and the DNC.

99.    On June 3, 2016, Aras and Emin Agalarov made an offer of assistance from the Russian government to the Trump Campaign, as evidenced by the following communication:

> Good morning.
>
> Emin [Defendant Emin Agalarov] just called and asked me to contact you with something very interesting.
>
> The Crown prosecutor of Russia met with his father Aras [Defendant Aras Agalarov] this morning and in their meeting

offered to provide the Trump campaign with some official
documents and information that would incriminate Hillary and her
dealings with Russia and would be very useful to your father.

*This is obviously very high level and sensitive information but is
part of Russia and its government's support for Mr. Trump –
helped along by Aras and Emin.*

. . .

(Emphasis added.) [59]

100.    Seventeen minutes later, Trump, Jr. responded:

Thanks Rob I appreciate that.  I am on the road at the moment but
perhaps I [will] just speak to Emin first.  Seems we have some time
and *if it's what you say I love it especially later in the summer*.

(Emphasis added.) [60]

101.    On June 7, 2016, shortly after the meeting between the Russians and Trump
Associates was set, Trump Jr. emailed: "Great.  It will likely be Paul Manafort (campaign boss)
my brother in law and me, 725 Fifth Ave 25th floor." [61]  That night, Trump announced that he
would give "a major speech. . . discussing all of the things that have taken place with the
Clintons."[62]

102.    Two days later, on June 9, 2016, the meeting between the Russians and Trump
Associates took place.  The Trump Campaign was represented by Trump's inner-circle:  Trump,
Jr., Kushner, and Manafort.    Representing Russia's interests were Agalarov publicist Rob
Goldstone, Kremlin-connected Russian lawyer Natalia Veselnitskaya, Agalarov business associate
Irakyl Kaveladze, lobbyist Rinat Akhmetshin, and a translator. [63]

103.    Trump and Trump, Jr. would later go to great lengths to conceal the meeting and
its content. For months, Trump Jr. and others familiar with the June 2016 meeting denied that they
had contacts with Russians during the campaign.  For example, in March 2017, when asked
whether he had held any meetings with Russians related to the presidential campaign, Trump, Jr.

falsely stated: "Certainly none that I was representing the campaign in any way, shape or form." Months later, in July 2017, when confronted with limited information about the June 2016 meeting, Trump, Jr. released a series of false statements that mischaracterized and omitted key facts about the June 2016 meeting and the email exchange that led to it, including the Russians' offer of damaging information about the Democratic presidential nominee and the fact that the email exchange explicitly informed Trump, Jr. that the Russian government was seeking to help the Trump Campaign. According to news reports, Trump helped craft the first of these misleading statements after rejecting an initial attempt to fully disclose the nature of the June 2016 meeting.

**I.    Following Trump Tower Meeting, Russia Launches a Massive Public Dissemination of Stolen DNC Documents**

104.    The first public disclosure that the Russians were interfering in the 2016 election occurred on June 14, 2016, when the DNC publicly announced that its systems had been hacked by Russian intelligence agencies. [64]

105.    The next day, on June 15, 2016, GRU Operative #1 claimed responsibility for the DNC hack and leaked a DNC-authored opposition research report on Trump from December 2015.[65] GRU Operative #1 also disclosed that he had given DNC documents to WikiLeaks. [66]

106.    The strategic dissemination of DNC documents by the GRU continued unabated through at least June and early July 2016, including:

(a)    On June 21, 2016, GRU Operative #1 released a batch of stolen DNC documents about Secretary Clinton, one day after Trump fired Corey Lewandowski on June 20. [67]

(b)    On June 30, 2016, GRU Operative #1 released stolen DNC documents to the public, including research on Republican candidates and Secretary Clinton.[68]

(c)    On July 6, 2016, GRU Operative #1 released stolen DNC documents, including DNC strategy documents related to the DNC's "counter-convention" to the RNC convention. [69] This was one day after FBI Director James Comey announced that no criminal charges would be brought against Secretary Clinton for maintaining a private email server during her time at the State Department. [70]

**J.    The Trump Campaign Blocks Anti-Russian Language from Being Added to the GOP Platform**

107.    On July 18, 2016, during the Republican National Convention, members of the Trump campaign intervened to prevent the Republican National Committee's foreign policy platform committee from amending the draft platform to include a call for the United States to provide lethal arms to Ukraine to help defend itself against Russia.  The Trump campaign succeeded in this effort, watering down the proposed amendment to support only "appropriate assistance" to Ukraine.

108.    Just days before the Trump campaign softened the platform's language, Trump campaign chairman Paul Manafort had emailed Konstantin Kilimnik, his longtime aide with ties to the GRU, offering private briefings on the presidential campaign to Russian oligarch and Putin ally Oleg Deripaska.  After the convention, Kilimnik reportedly told associates that he had played a role in the Trump campaign's success at watering down the Ukraine amendment.

**K.    After the Trump Campaign Blocks Anti-Russia Language from the GOP Platform, WikiLeaks Begins Disseminating Stolen DNC Documents**

109.    On July 22, 2016, just three days before the Democratic National Convention, WikiLeaks released its first major tranche of DNC emails and documents stolen by Russian intelligence agents.  These emails contained names, addresses, telephone numbers, dates of birth, social security numbers, passport numbers, and other identifying information of individuals who had communicated with or donated to the DNC. The release also included dozens of private voicemail messages to DNC employees.[71]

110.    In the midst of the Democratic Convention, Trump and the Trump Campaign openly celebrated this leak, and Trump himself encouraged Russia to continue its hacking campaign. At a press conference just five days letter, after commenting extensively on the materials that were stolen from the DNC servers, Trump called on the Russians to continue their

hacking: "Russia, if you're listening, I hope you're able to find the 30,000 emails that are missing." He then predicted great rewards would come to Russia if that occurred, stating, "I think you will probably be rewarded mightily by our press. Let's see if that happens." [72]

### L. Trump Associates Secretly Communicate with Russian Agents and WikiLeaks as They Strategically Release Stolen DNC Documents

111.    The unauthorized release of documents from DNC servers by Russia, through WikiLeaks, and GRU Operative #1, through the online persona "Guccifer 2.0," continued until November 2016, with a critical increase in the volume and damaging nature of these releases as the general election began.

112.    From June 2016 to October 2016, the GRU and GRU Operative #1, through the online persona "Guccifer 2.0," systematically released stolen documents from the DNC on a regular basis. [73] Many of the disclosures were timed to divert attention from adverse publicity about the Trump campaign, and to obscure positive news about the Clinton campaign and DNC activities – serving the common interests of the Trump Associates, Russia, and WikiLeaks.

113.    Beginning in the spring of 2016, Trump's longtime friend and political advisor Roger Stone revealed on multiple occasions that he was in contact with Assange and WikiLeaks as well as GRU Operative #1 about information in their possession that would be damaging to the Clinton campaign, to prominent members of the Democratic Party, and to Clinton campaign chairman John Podesta. [74] Many of these reports from Stone occurred well before it was publicly known that the DNC's computer systems and Podesta's emails had been hacked by the same Russian intelligence entities. [75]

114.    On August 8, 2016, speaking to a local Republican Party group in Florida, Stone predicted the future disclosure of hacked materials: "I have actually communicated with Assange.

I believe the next tranche of his documents pertain to the Clinton Foundation, but there's no telling what the October surprise may be." [76]

115.    On August 12, 2016, Stone said that he believed Assange had emails belonging to Secretary Clinton.[77]   That same day, GRU Operative #1 disseminated another set of stolen documents – this time containing personal information about Democratic candidates.[78]   Shortly thereafter, on August 12, GRU Operative #1 tweeted at Stone:  "Thanks that u believe in the real #Guccifer2."[79]

116.    Also on August 12, 2016, GRU Operative #1 released documents stolen from other Democratic entities, including strategy memos for five House races in Florida.[80]   These documents were released just days before legislative primaries in the key battleground state of Florida.[81]

117.    Beginning on August 14, 2016, Stone began secretly communicating with GRU Operative #1.[82] On August 17, 2016, GRU Operative #1 tweeted to Stone, "please tell me if i can help u anyhow. it would be a great pleasure to me."[83]

118.    On August 21, 2016, amidst his communications with Assange and Russian intelligence, Stone prophesized the future dissemination of Podesta's emails, tweeting: "Trust me, it will soon [be] Podesta's time in the barrel." [84] There had been no public disclosure that Podesta's emails had been hacked at that time.

119.    In mid-September 2016, Stone accurately predicted on Boston Herald Radio that he expected "Julian Assange and the WikiLeaks people to drop a payload of new documents on Hillary on a weekly basis fairly soon." [85]

120.    By September 20, 2016, Trump, Jr. was secretly communicating with WikiLeaks as well.  Through these communications, WikiLeaks provided Trump, Jr. with a password to an anti-Trump PAC website, and asked Trump, Jr. to have his father retweet a link to a WikiLeaks

website containing stolen Democratic documents.[86]   Fifteen minutes after WikiLeaks sent this request, Trump in fact did tweet "Very little pick-up by the dishonest media of incredible information provided by Wikileaks. So dishonest! Rigged system!"[87]

121.    On October 2, 2016, Stone stated on Twitter: "Wednesday @HillaryClinton is done. #WikiLeaks."[88]   And on October 3, 2016, Stone reiterated that he was confident WikiLeaks would continue disseminating hacked materials: "I have total confidence that @wikileaks and my hero Julian Assange will educate the American people soon."[89]

122.    Four days later, on October 7, 2016—and just one hour after the release of the infamous Hollywood Access recording in which Trump admitted to sexually assaulting women— WikiLeaks released 2,000 emails stolen from Podesta.[90] WikiLeaks continued to release documents stolen from Podesta on a near-daily basis until November 9, 2017 – just as Stone had predicted.[91]

### M.    Trump Publicly Praises the Illegal Dissemination of Stolen DNC Documents

123.    Trump repeatedly lauded the disclosure of documents stolen by the Russians, and encouraged the media and voters to pay more attention to the leaks.

124.    On July 24, 2016, Trump tweeted, "The Democrats are in a total meltdown but the biased media will say how great they are doing! E-mails say the rigged system is alive & well!"[92]

125.    On July 24, 2016, Trump tweeted, "If the Republican Convention had blown up with e-mails, resignation of boss and the beat down of a big player. (Bernie), media would go wild[.]"[93]

126.    On July 25, 2016, Trump tweeted, "The new joke in town is that Russia leaked the disastrous DNC e-mails, which should never have been written (stupid), because Putin likes me."[94]

127.    On October 12, 2016, Trump tweeted, "Very little pick-up by the dishonest media of incredible information provided by WikiLeaks. So dishonest! Rigged system!"[95]

128.    Similarly, on October 14, 2016, Trump Jr. tweeted, "For those who have the time to read about all the corruption and hypocrisy all the @wikileaks emails are right here: http://wlsearch.tk/."[96] The link in the October 14, 2016 tweet was provided to Trump Jr. by WikiLeaks via a private tweet to Trump, Jr.'s Twitter account.[97]

129.    At his rallies, Trump repeatedly discussed the disclosure of documents on WikiLeaks, enthusiastically directing attention to those stolen documents, as the accounts below reflect:

(a)    October 10, 2016: Trump said, "I love WikiLeaks . . ."[98]

(b)    October 31: 2016: Trump said that "WikiLeaks is like a treasure trove," and "Did you see where, on Wikileaks, it was announced that they were paying protestors to be violent, $1,500."[99]

(c)    November 2, 2016: Trump said, "WikiLeaks just came out with a new one," and "[I]t's just been shown [by Wikileaks] that [it's] a rigged system with more collusion, possibly illegal, between the Department of Justice, the Clinton campaign[,] and the State Department."[100]

(d)    November 4, 2016: Trump said, "Boy, I love reading those WikiLeaks."[101]

(e)    November 6, 2016: Trump cited Wikileaks while claiming that "Clinton was sending highly classified information through her maid." [102]

(f)    November 7, 2016: Trump, "They got it all down folks, WikiLeaks. WikiLeaks."
[103]

130.    Finally, on November 6, 2016—just two days before the election, and at a critical time for undecided voters—WikiLeaks released additional hacked DNC emails, which it dubbed "DNC Leak 2."[104] The emails included, among other things, internal discussions regarding DNC strategy and communications efforts. [105]

### N.  Trump—and Russia—Win.

131.     On November 8, 2016, Trump won the election to become President of the United States.

132.     In Moscow, the reaction was jubilation.  When the news of Trump's victory broke in the Duma (Russia's parliament), legislators burst into applause, and the announcement by Vyacheslav Nikonov, a member of the Foreign Affairs Committee, was almost drowned out by clapping and cheering.[106]  Nikonov stated: "Three minutes ago, Hillary Clinton acknowledged her defeat in the US presidential elections and just seconds ago, Trump began his speech as president-elect.  I congratulate you all on this."[107]  Defendants' common goal had been achieved.

## IV.  DEFENDANTS' REPEATED EFFORTS TO COVER UP CONTACTS WITH RUSSIANS EVIDENCE THEIR CONSCIOUSNESS OF GUILT

133.     Trump's advisers repeatedly denied that members of the Trump Campaign had contacts with Russians or Russian officials, and when confronted with evidence to the contrary, issued false and misleading statements about the nature of these contacts.  For example:

   (a)     On July 24, 2016, Trump, Jr. was asked about suggestions that the July 22, 2016 release of stolen DNC emails was part of a Russian plot to "help Donald Trump and hurt Hillary Clinton."  Despite having been informed via email weeks earlier that there was such a plot, Trump, Jr. responded: "Well, just goes to show you their exact moral compass. They'll say anything to be able to win this. This is time and time again, lie after lie…It's disgusting; it's so phony."

   (b)     On July 24, 2016, just weeks after he participated in the June 2016 meeting, Paul Manafort was asked whether there were any "ties between Mr. Trump, you and your campaign and Putin and his regime."  Manafort replied: "No, there are not.  That's absurd.  And, you know, there's no basis to it."

   (c)     On November 11, 2016, Trump campaign spokesperson Hope Hicks provided the *Associated Press* with a statement denying that the Trump campaign had any communications with any "foreign entity" during the campaign: "Never happened. There was no communication between the campaign and any foreign entity during the campaign."

(d)    On December 18, 2016, Trump campaign manager Kellyanne Conway was asked whether anyone involved in the Trump campaign had "any contact with Russians trying to meddle with the election?" Conway responded: "Absolutely not. And I discussed that with the president-elect just last night. Those conversations never happened. I hear people saying it like it's a fact on television. That is just not only inaccurate and false, but it's dangerous."

(e)    In March 2017, Trump, Jr. falsely stated: *"Did I meet with people that were Russian? I'm sure, I'm sure I did. But none that were set up. None that I can think of at the moment. And certainly none that I was representing the campaign in any way, shape or form."*

(f)    On July 8, 2017, Trump, Jr. released a highly misleading statement about the June 2016 meeting that was reportedly crafted by his father: "It was a short introductory meeting. I asked Jared [Kushner] and Paul [Manafort] to stop by. We primarily discussed a program about the adoption of Russian children that was active and popular with American families years ago and was since ended by the Russian government, but it was not a campaign issue at the time and there was no follow up…"

(g)    On July 9, 2017, Trump, Jr. released another highly misleading statement about the June 2016 meeting that continued to omit that he had been told that the Russian government itself was seeking to help his father: "The woman stated that she had information that individuals connected to Russia were funding the Democratic National Committee and supporting Mrs. Clinton. Her statements were vague, ambiguous and made no sense. No details or supporting information was provided or even offered. It quickly became clear that she had no meaningful information. She then changed subjects and began discussing the adoption of Russian children and mentioned the Magnitsky Act. It became clear to me that this was the true agenda all along and that the claims of potentially helpful information were a pretext for the meeting."

(h)    On October 5, 2017, Papadopoulos pleaded guilty to lying about his contacts with Mifsud and other Russian contacts during interviews with the FBI. Papadopoulos also deleted his Facebook account, scrubbed other social media accounts, and changed his cell phone number in an attempt to hide those contacts.

134.    The Russian government has also repeatedly denied responsibility for interference in the 2016 election, including the cyberattacks on the DNC. Likewise, WikiLeaks and Assange have repeatedly denied that the stolen DNC material they disseminated was provided to them by Russia, and have cast doubt on whether Russia was responsible for the cyberattacks on the DNC.

## V.    THE SIGNIFICANT HARM INFLICTED UPON PLAINTIFF

135.    The illegal conspiracy inflicted profound damage upon the DNC.  The timing and selective release of the stolen materials prevented the DNC from communicating with the American electorate on its own terms.  These selective releases of stolen material reach a peak immediately before the Democratic National Convention and continued through the general election.

136.    The timing and selective release of stolen materials was designed to and had the effect of driving a wedge between the DNC and Democratic voters.  The release of stolen materials also impaired the DNC's ability to support Democratic candidates in the general election.

137.    The public release of stolen DNC materials was enormously disruptive to the convention, undermining the party's ability to achieve unity and rally members around their shared values.  The release cast a cloud over the convention's activities, interfering with the party's opportunity to communicate its vision to the electorate.

138.    The release of this stolen material upended the DNC's ability to communicate effectively among staff and with members of the party and broader community.  It also exposed the DNC's staff to constant threats by telephone and email, which were unavoidable because staff could not change their contact information with the convention underway.

139.    The DNC also suffered significant interruption and disruption of its political and fundraising activities throughout the United States during the critical final months of the presidential campaign. Specifically, the release of personal, and sometimes embarrassing, information about DNC donors had a chilling effect on donations to the DNC, resulting in a substantial loss of income to the DNC and a reduction in the overall amounts of funds that the DNC could expend to support Democratic candidates nationwide.

140.     In addition, because the public releases included personal and in some cases protected information about DNC employees, it exposed employees of the DNC to intense, frightening, and sometimes life-threatening harassment.    Understandably, this harassment impaired the employees' ability to function effectively in their jobs.

141.     On July 22, 2016—the same day as the first WikiLeaks release of stolen DNC emails—a DNC employee received a voicemail from an unknown caller stating that the employee should be "executed" and that he hoped the employee would be "put in jail, put on trial, and executed for being [a] traitor."

142.     On July 23, 2016, multiple DNC employees received an email stating: "I hope all your children get raped and murdered. I hope your family knows nothing but suffering, torture and death."

143.     On July 24, 2016, an employee received a voicemail stating "you got a target on your back, better keep looking over your shoulder, [expletive]. . . .You [expletives]. Die, Die, Die, Die. I hate you [expletive] guts, you [expletive]. You've got an arrow on your back. And you know what? Snipers are going to get you. You [expletives]."

144.     Another received a profanity-laden voicemail warning him that "We're coming for you." These threats as well as others all began after July 22, when WikiLeaks released the over 20,000 stolen DNC emails which contained the names, e-mail addresses, and phone numbers of the DNC employees.

145.     In addition, the Defendants' conduct caused enormous damage to the DNC's computer systems, creating the need to: (a) repair and replace of the DNC's computer hardware and software, telephone and telephone systems, and back-up systems due to damage from the illegal hacking and related release of such information; (b) retain staff and consultants to

investigate the hacking; and (c) retain staff and consultants to remediate the damage caused by the hacking's impact.

## CAUSES OF ACTION

### COUNT I

### COMPUTER FRAUD AND ABUSE ACT (18 U.S.C. § 1030(A))
### (AGAINST RUSSIA, THE GRU, AND GRU OPERATIVE #1)

146.    Plaintiff realleges and incorporates by reference all prior paragraphs of this Complaint and paragraphs in the counts below as though set forth fully herein.

147.    The DNC's computers are involved in interstate and foreign commerce and communication, and are protected computers under 18 U.S.C. § 1030(e)(2).

148.    On information and belief, Russia, the GRU, and GRU Operative #1 knowingly and intentionally accessed the DNC's computers without authorization or in excess of authorization, and thereby obtained and used valuable information from those computers in violation of 18 U.S.C. § 1030(a)(2)(C). Such information included, but was not limited to: private, politically sensitive communications between the DNC and Democratic stakeholders and candidates; confidential donor data; confidential campaign strategy plans; opposition and policy research; and documents regarding planned political events, including fundraisers and rallies. The information was used to advance the plan to denigrate the Democratic presidential nominee and the Democratic party (discussed herein) and bolster Trump's candidacy by strategically releasing the confidential, proprietary information publicly online, including on WikiLeaks.

149.    Upon information and belief, Russia, the GRU, and GRU Operative #1 knowingly caused the transmission of a program, information, code, or command, and as a result of such conduct, intentionally caused damage without authorization, to a protected computer, in violation

of 18 U.S.C. § 1030(a)(5)(A). Such transmission included, but was not limited to, the use of malware on DNC systems.

150.    Upon information and belief, Russia, the GRU, and GRU Operative #1 intentionally accessed a protected computer or computers without authorization, and as a result of such conduct, caused damage and loss, in violation of 18 U.S.C. § 1030(a)(5)(C), or recklessly caused damage, in violation of 18 U.S.C. § 1030(a)(5)(B).

151.    Upon information and belief, Russia, the GRU, and GRU Operative #1 knowingly and with intent to defraud trafficked passwords and similar information from the DNC systems, and such trafficking affected interstate or foreign commerce in violation of 18 U.S.C. § 1030(a)(6)(A).

152.    Russia, the GRU, and GRU Operative #1 caused loss to one or more persons during a one-year period aggregating well over $5,000 in value, and they also caused damage affecting ten or more protected computers during a one-year period.

153.    The DNC suffered damage and loss as a consequence of Russia, the GRU, and GRU Operative #1's actions, including but not limited to the cost of investigating and responding to the unauthorized access and abuse of their computer networks, conducting damage assessments, restoring and replacing computers and data, programs, systems, or information, the loss of the value of the DNC's trade secrets, and the harm to the DNC's business as described above. The DNC seeks compensatory and other equitable relief under 18 U.S.C. § 1030(g).

## COUNT II

## RICO (18 U.S.C. § 1962(C))
## (AGAINST ALL DEFENDANTS)

154.    Plaintiff realleges and incorporates by reference all prior paragraphs of this Complaint and paragraphs in the counts below as though set forth fully herein.

155.    Defendants are all "persons" within the meaning of 18 U.S.C. § 1961(3). At all relevant times, Defendants conducted the affairs of an Enterprise—which affected interstate and foreign commerce—through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c).

### A.    The Trump Campaign Was the Racketeering Enterprise

156.    The Trump Campaign was a Racketeering Enterprise, as that term is used in 18 U.S.C. § 1961(4). The Enterprise was formed by June 2015.

157.    The Trump Campaign had an ongoing organizational framework for carrying out its objectives.

158.    As described above, each Defendant participated in the operation or management of the Enterprise.

159.    Because the Trump Campaign expended millions of dollars on the 2016 presidential race, it affected interstate and foreign commerce.

160.    Each Defendant conducted and/or participated in the affairs of the Enterprise through a pattern of racketeering activity, including acts indictable under 18 U.S.C. § 1831 (economic espionage); and 18 U.S.C. § 1832 (theft of trade secrets). The Trump Associates, WikiLeaks and Assange directed, induced, urged, and/or encouraged Russia and the GRU to engage in this conduct and/or to provide WikiLeaks and Assange with DNC's trade secrets, with the expectation that WikiLeaks and Assange would disseminate those secrets and increase the Trump Campaign's chance of winning the election.

38

**B.      Alternatively, and at the Very Least, the Trump Campaign Was Part of an Association-In-Fact Enterprise**

161.    Alternatively, and at the very least, the Trump Campaign was part of an Association-In-Fact Enterprise comprising Russia, the GRU, and GRU Operative #1, WikiLeaks, Assange, the Trump Campaign, Aras and Emin Agalarov, Misfud, and the Trump Associates, their employees and agents, and additional entities and individuals known and unknown. The Association-In-Fact Enterprise was formed by at least June 2016.  From that time until November 8, 2016, the members of the Association-In-Fact Enterprise worked together to further their mutual goals of improving Trump's electoral prospects and damaging the DNC.

162.    The Association-In-Fact Enterprise had an ongoing organizational framework for carrying out its objectives.  In fact, the Association-In-Fact Enterprise could not have carried out its intricate task of sharing confidential information at the moments when it would be most beneficial to the Trump Campaign unless it had some structure for making and communicating group decisions.

163.    As described above, each Defendant participated in the operation or management of the Association-In-Fact Enterprise, and benefitted financially from the enterprise.

164.    Because the Association-In-Fact Enterprise's activities affected electoral spending in 2016, as well as the media response to the 2016 presidential race, it affected interstate and foreign commerce.

**C.      RICO Predicate Acts**

165.    Each Defendant conducted and/or participated in the affairs of the Trump Campaign and the Association-In-Fact Enterprise through a pattern of racketeering activity, including acts indictable under 18 U.S.C. § 1831 (economic espionage); and 18 U.S.C. § 1832 (theft of trade secrets). The Trump Campaign, the Trump Associates, WikiLeaks and Assange

directed, induced, urged, and/or encouraged Russia and the GRU to engage in this conduct and/or to provide WikiLeaks and Assange with DNC's trade secrets, with the expectation that WikiLeaks and Assange would disseminate those secrets and increase the Trump Campaign's chance of winning the election.

166.     Beginning on or before July 27, 2015, Russia, the GRU, and GRU Operative #1 took trade secrets from the DNC without authorization, intending or knowing that doing so would benefit Russia, Russian instrumentalities, or Russian agents.

167.     Russia, the GRU, and GRU Operative #1 also copied, duplicated, downloaded, uploaded, altered, destroyed, replicated, transmitted, delivered, sent, communicated, or conveyed Plaintiff's trade secrets, intending or knowing that doing so would benefit the Russian government, Russian Instrumentalities or Russian agents, in furtherance of the illegal scheme.  Russia—acting through GRU Operative #1—released and transmitted DNC trade secrets without authorization on June 15, June 20, June 21, June 30, July 6, September 13, and October 18, of 2016. Each release constitutes a separate act of economic espionage.

168.     Beginning on or before July 27, 2015, Russia, the GRU, and GRU Operative #1 received, bought, or possessed DNC trade secrets, knowing the same to have been stolen or appropriated, obtained, or converted without authorization, and intending or knowing that doing so would benefit the Russian Government, Russian instrumentalities, or Russian agents.

169.     WikiLeaks and Assange also copied, duplicated, downloaded, uploaded, altered, destroyed, replicated, transmitted, delivered, sent, communicates, or conveyed Plaintiff's trade secrets intending or knowing that doing so would benefit the Russian government, Russian instrumentalities, or Russian agents, in furtherance of the illegal scheme.

170. WikiLeaks and Assange released and transmitted DNC trade secrets, including confidential, proprietary documents related to campaigns, fundraising, and campaign strategy, on July 22 and November 6, 2016. Each release constituted a separate act of economic espionage.

171. Beginning on or before July 22, 2016, and continuing daily thereafter through November 2016, WikiLeaks and Assange, received, bought, or possessed Plaintiff's trade secrets, knowing them to have been stolen or appropriated, obtained, or converted without authorization, and intending or knowing that doing so would benefit the Russian government, Russian instrumentalities, or Russian agents.

172. Russia, the GRU, and GRU Operative #1 also committed the acts described above with the intent to convert Plaintiff's trade secrets, which are related to a product or service used in or intended for use in interstate or foreign commerce, to the economic benefit of others besides Plaintiff. Each unauthorized release constitutes a separate act of theft of trade secrets.

173. WikiLeaks and Assange also committed the acts described above with the intent to convert Plaintiff's trade secrets, which are related to a product or service used in or intended for use in interstate or foreign commerce, to the economic benefit of others besides Plaintiff. Each unauthorized release constitutes a separate act of theft of trade secrets.

174. Trump, the Trump Campaign, and the Trump Associates furthered the common goals of the Enterprise by agreeing that Russia, the GRU, GRU Operative #1, WikiLeaks, and Assange would commit the predicate acts and further the scheme and by remaining in constant communication with Russian intelligence officials and advising, instructing, and providing the other Defendants with intelligence regarding the timing of the unauthorized releases; encouraging continued illegal hacking and unauthorized disclosure of stolen Democratic information; actively

using the illegal disclosures to bolster Trump; and actively working to conceal and cover up the scheme through false statements.

**D.      RICO Damages**

175.     Plaintiff has been injured in its business and property by Defendants' violation of 18 U.S.C. § 1962(c). Defendants caused enormous harm to Plaintiff's business, as described above, and to Plaintiff's computers and servers. All of these injuries occurred within the United States.

**COUNT III**

**RICO CONSPIRACY (18 U.S.C. § 1962(D))
(AGAINST ALL DEFENDANTS)**

176.     Plaintiff realleges and incorporates by reference all prior paragraphs of this Complaint and paragraphs in the counts below as though set forth fully herein.

177.     Defendants conspired with each other to violate 18 U.S.C. § 1962(c). Defendants knowingly agreed, combined, and conspired to conduct the affairs of the Enterprise or the Association-In-Fact Enterprise through a cyber-espionage operation.  Each Defendant agreed that the operation would involve repeated violations of 18 U.S.C. § 1831 (economic espionage); and 18 U.S.C. § 1832 (theft of trade secrets).

178.     Defendants' conspiracy to violate 18 U.S.C. § 1962(c) violated § 1962(d).

179.     Plaintiff has been injured in their business or property by Defendants' violation of 18 U.S.C. § 1962(d). Plaintiff has been injured in its business and property by Defendants' violation of 18 U.S.C. § 1962(c). Defendants caused enormous harm to Plaintiff's business, as described above, and to Plaintiff's computers and servers. All of these injuries occurred within the United States.

## COUNT IV

### WIRETAP ACT (18 U.S.C. §§ 2510-22)
### (AGAINST GRU OPERATIVE #1, WIKILEAKS, ASSANGE, THE TRUMP CAMPAIGN, AND THE TRUMP ASSOCIATES)

180.    Plaintiff realleges and incorporates by reference all prior paragraphs of this Complaint and paragraphs in the counts below as though set forth fully herein.

181.    Each Defendant is a "person" within the meaning of 18 U.S.C. §§ 2510, 2511.

182.    In violation of 18 U.S.C. § 2511(1)(a), GRU Operative #1 willfully and intentionally intercepted or endeavored to intercept Plaintiff's wire, oral, or electronic communications by hacking into Plaintiff's computer systems, VOIP, and/or email accounts and extracting Plaintiff's private, confidential documents and files.

183.    In violation of 18 U.S.C. § 2511(1)(c), GRU Operative #1, WikiLeaks, and Assange willfully and intentionally disclosed the contents of Plaintiff's wire, oral, or electronic communications, knowing or having reason to know that the information was obtained through the interception of wire, oral, or electronic communication in violation of 18 U.S.C. § 2511.

184.    In violation of 18 U.S.C. § 2511(1)(d), GRU Operative #1, WikiLeaks, Assange, the Trump Associates, and the Trump Campaign willfully and intentionally used the contents of wire, oral, electronic communications, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of 18 U.S.C. § 2511.

185.    Plaintiff had a justifiable expectation that its wire, oral, or electronic communications were not subject to interception.

186.    Plaintiff is a "person" whose wire, oral, or electronic communications were intercepted within the meaning of 18 U.S.C. § 2520.

187.    As a direct result of GRU Operative #1, WikiLeaks, Assange, the Trump Associates, and the Trump Campaign's actions, Plaintiff suffered irreparable harm to its business and property and is entitled to an award of the greater of the actual damages suffered or the statutory damages and injunctive relief pursuant to 18 U.S.C. § 2520(c). This harm includes, but is not limited to, harm to DNC computers and servers, harm to the DNC's reputation, loss in the value of DNC trade secrets and business information, and harm to business as described above.

188.    In light of the egregious nature of GRU Operative #1, WikiLeaks, Assange, the Trump Associates, and the Trump Campaign's violations, Plaintiff is entitled to punitive damages and reasonable attorneys' fees and costs pursuant to 18 U.S.C. §§ 2520(b)(2) & (3).

## COUNT V

### STORED COMMUNICATIONS ACT (18 U.S.C. §§ 2701-12) (AGAINST RUSSIA, THE GRU, AND GRU OPERATIVE #1)

189.    Plaintiff realleges and incorporates by reference all prior paragraphs of this Complaint and paragraphs in the counts below as though set forth fully herein.

190.    Plaintiff is a "person" within the meaning of 18 U.S.C. §§ 2510(6) and 2707(a).

191.    Russia, the GRU, and GRU Operative #1 willfully and intentionally accessed without authorization a facility through which an electronic communication service is provided, namely, the DNC's computer systems, including their email servers, thereby obtaining access to wire or electronic communications while they were in electronic storage in such systems, in violation of 18 U.S.C. § 2701(a).

192.    As a result of these willful and intentional violations, Plaintiff has suffered damages and, as provided for in 18 U.S.C. § 2707, seeks an award of the greater of the actual damages suffered or the statutory damages; punitive damages; attorneys' fees and other costs of this action; and appropriate equitable relief.

# COUNT VI

## DIGITAL MILLENNIUM COPYRIGHT ACT (17 U.S.C. § 1201 *ET SEQ.*) (AGAINST RUSSIA, THE GRU, AND GRU OPERATIVE #1)

193.    Plaintiff realleges and incorporates by reference all prior paragraphs of this Complaint and paragraphs in the counts below as though set forth fully herein.

194.    Plaintiff's computer networks and files contained information subject to protection under the copyright laws of the United States, including campaign strategy documents and opposition research that were illegally accessed without authorization by Russia and the GRU.

195.    Access to the copyrighted material contained on Plaintiff's computer networks and email was controlled by technological measures, including measures restricting remote access, firewalls, and measures restricting access to users with valid credentials and passwords.

196.    In violation of 17 U.S.C. § 1201(a), Russia, the GRU, and GRU Operative #1 circumvented these technological measures by stealing credentials from authorized users, conducting a "password dump" to unlawfully obtain passwords to the system controlling access to the DNC's domain, and installing malware on Plaintiff's computer systems.

197.    Russia, the GRU, and GRU Operative #1's conduct caused Plaintiff significant damages. These damages include, but are not limited to, damage resulting from harm to DNC computers and servers, loss in the value of DNC trade secrets and business information, and harm to business as described above. Plaintiff is entitled to the greater of its actual damages or statutory damages as provided by 17 U.S.C. § 1203, in an amount to be proven at trial.

198.    Plaintiff is entitled to an award of attorneys' fees and costs as provided by 17 U.S.C. § 1203.

## COUNT VII

### MISAPPROPRIATION OF TRADE SECRETS UNDER THE DEFEND TRADE SECRETS ACT (18 U.S.C. § 1836 *ET SEQ.*)
### (AGAINST RUSSIA, THE GRU, GRU OPERATIVE #1, WIKILEAKS, AND ASSANGE)

199. Plaintiff realleges and incorporates by reference all prior paragraphs of this Complaint and paragraphs in the counts below as though set forth fully herein.

200. The documents that Russia, the GRU, and GRU Operative #1 stole from the DNC's computer systems include trade secrets within the meaning of 18 U.S.C. § 1839.

201. Specifically, the DNC is in the business of supporting Democratic political campaigns, and the stolen documents included Democratic donor information, opposition research, and strategic information regarding planned political activities that allow it to effectively carry out its mission.

202. The DNC takes and has taken reasonable measures to keep such information secret. In particular, the DNC maintains and maintained their information on secured servers that are password protected; they give their staff trainings; their staff sign confidentiality agreements.

203. Plaintiff's trade secrets were related to products or services used in, or intended for use in, interstate or foreign commerce.

204. Defendants Russia, the GRU, and GRU Operative #1 misappropriated Plaintiff's trade secrets. Defendants Russia, the GRU, and GRU Operative #1 acquired Plaintiff's trade secrets knowing or having reason to know that the trade secrets were acquired by improper means. Defendants Russia, the GRU, GRU Operative #1, WikiLeaks, and Assange disclosed Plaintiff's trade secrets without consent, on multiple dates, discussed herein, knowing or having reason to know that the trade secrets were acquired by improper means.

205. As a direct consequence of Defendants' misappropriation, Plaintiff has suffered damages for the cost of materials, loss of goodwill, and attorneys' fees and costs. Plaintiff is also

entitled to punitive damages. These damages include, but are not limited to, damage resulting from harm to DNC computers and servers, loss in the value of DNC trade secrets and business information, and harm to business as described above.

206.    Plaintiff is also entitled to a preliminary and permanent injunction pursuant to 18 U.S.C. § 1836(b)(3).

## COUNT VIII

### WASHINGTON D.C. UNIFORM TRADE SECRETS ACT
### (D.C. CODE ANN. §§ 36-401 – 46-410)
### (AGAINST ALL DEFENDANTS)

207.    Plaintiff realleges and incorporates by reference all prior paragraphs of this Complaint and paragraphs in the counts below as though set forth fully herein.

208.    The District of Columbia expressly empowers a party to recover damages for misappropriation of a trade secret.

209.    The documents that Russia, the GRU, and GRU Operative #1 exfiltrated from the DNC's computer systems include trade secrets under District of Columbia law, as discussed above, and in keeping with the definition of trade secrets under District of Columbia law:

> information, including a formula, pattern, compilation, program, device, method, technique, or process, that: (A) Derives actual or potential independent economic value, from not being generally known to, and not being readily ascertainable by, proper means by another who can obtain economic value from its disclosure or use; and (B) Is the subject of reasonable efforts to maintain its secrecy.

> D.C. Code Ann. § 36-401(2).

210.    This information derived an actual independent economic value by remaining confidential and private, and not being readily ascertainable to others. Plaintiff takes and has taken reasonable measures to keep such information secret, as discussed *supra* in Count VIII.

211.    Each Defendant disclosed, received, and used these misappropriated trade secrets without Plaintiff's consent, knowing or having reason to know that the trade secrets were acquired by improper means.

212.    As a direct consequence of Defendants' misappropriation, Plaintiff has suffered damages for actual loss and from Defendants' unjust enrichment. These damages include, but are not limited to, damage resulting from harm to DNC computers and servers, loss in the value of DNC trade secrets and business information, and harm to business as described above.

213.    Defendants' misappropriation of Plaintiff's trade secrets was willful and malicious. Accordingly, Plaintiff is entitled to exemplary damages in an amount up to twice actual damages awarded, as well as attorneys' fees and costs.

**COUNT IX**

**TRESPASS (D.C. COMMON LAW)**
**(AGAINST RUSSIA, THE GRU, AND GRU OPERATIVE #1)**

214.    Plaintiff realleges and incorporates by reference all prior paragraphs of this Complaint and paragraphs in the counts below as though set forth fully herein.

215.    The DNC owns and operates private computers and a private computer network. This network and the information contained therein constitutes the property of Plaintiff.

216.    On or about July 27, 2015, Russian intelligence agents hacked into the DNC's computers and network.  On or about April 18, 2016, Russia, the GRU, and GRU Operative #1 separately hacked into the DNC's computers and network. These constituted two separate and independent trespasses in the United States. The hacks provided Russia, the GRU, and GRU Operative #1 with unauthorized access to the Plaintiff's property in its network.

217.    Russia, the GRU, and GRU Operative #1's hacks interfered with the DNC's possessory interests in their network and the information contained therein. By means of trespass

48

onto Plaintiff's computer network, Russia, the GRU, and GRU Operative #1 acquired and disseminated confidential and personal information that is Plaintiff's property. Defendants would have been unable to disclose this information but for the illegal trespass. Russia, the GRU, and GRU Operative #1 therefore deprived Plaintiff of its possessory interest in maintaining the privacy and confidentiality of its property. As a result, Plaintiff has suffered diminution in the value of its property, and is entitled to damages.

### COUNT X

### TRESPASS TO CHATTELS (VIRGINIA COMMON LAW)
### (AGAINST RUSSIA, THE GRU, AND GRU OPERATIVE #1)

218.    Plaintiff realleges and incorporates by reference all prior paragraphs of this Complaint and paragraphs in the counts below as though set forth fully herein.

219.    Plaintiff the DNC owns and operates a private computer network, with computers and servers located in Washington, D.C. and in Virginia. This network and the information contained therein constitutes the property of Plaintiff.

220.    On or about July 27, 2015, Russian intelligence agents hacked into the DNC's computers and network.  On or about April 18, 2016, Russia, the GRU, and GRU Operative #1 separately hacked into the DNC's computers and network.  These constituted two separate and independent trespasses in the United States. The hacks provided Russia, the GRU, and GRU Operative #1 with unauthorized access to Plaintiff's property in its network. At no point has anyone with authority to do so provided Defendants with authorization to access Plaintiff's networks.

221.    Russia, the GRU, and GRU Operative #1's hacks interfered with Plaintiff's possessory interests in its network and the information contained therein. By means of trespass onto Plaintiff's network, Russia, the GRU, and GRU Operative #1 acquired and disseminated confidential and personal information that is Plaintiff's property. Defendants would have been

unable to disclose this information but for the illegal trespass. Russia, the GRU, and GRU Operative #1 therefore deprived Plaintiff of its possessory interest in maintaining the privacy and confidentiality of its property. As a result, Plaintiff has suffered diminution in the value of its property, and is entitled to damages.

## COUNT XI

### CONSPIRACY TO COMMIT TRESPASS TO CHATTELS
### (VIRGINIA COMMON LAW)
### (AGAINST ALL DEFENDANTS)

222.    Plaintiff realleges and incorporates by reference all prior paragraphs of this Complaint and paragraphs in the counts below as though set forth fully herein.

223.    Defendants were part of a common scheme in which they conspired and combined to access without authorization the DNC's computer systems to steal confidential information, publicly disseminate the stolen information, and use that stolen and publicly disclosed information for the common purpose of denigrating Secretary Clinton and the Democratic Party, and bolstering Trump's electoral prospects. These actions constituted an exercise of wrongful dominion over Plaintiff's computers and computer system and private email accounts.

224.    Pursuant to, and in furtherance of, this common scheme, Defendants conspired to commit the unlawful acts described herein, including acts that constitute trespass.

225.    Pursuant to, and in furtherance of, this common scheme, each Defendant committed overt acts, including arranging meetings between the co-conspirators, encouraging and planning for the scheme to occur, hacking into the DNC's network, stealing the DNC's private, confidential information, and releasing that information, without permission, to the public. These overt acts caused Plaintiff injury and damages, as discussed *supra*.

226.    All of the named Defendants aided and abetted in the unlawful acts described herein as part of and furtherance of a common scheme, and each of these Defendants knowingly and

substantially assisted the common scheme, and was generally aware of his role as part of an overall common scheme. Accordingly, the actions of Defendants constitute conspiracy to trespass.

227.    As a result, Plaintiff has suffered diminution in the value of its property, and is entitled to damages.

## COUNT XII

### VIOLATION OF THE VIRGINIA COMPUTER CRIMES ACT
### (VA. CODE ANN. § 18.2-152.5 ET SEQ.)
### (AGAINST ALL DEFENDANTS)

228.    Plaintiff realleges and incorporates by reference all prior paragraphs of this Complaint and paragraphs in the counts below as though set forth fully herein.

229.    Russia, the GRU, and GRU Operative #1 used Plaintiff's computers and computer networks without authority, obtained property by false pretenses, and converted Plaintiff's property in violation of Va. Code Ann. § 18.2-152.3.

230.    Russia, the GRU, and GRU Operative #1, with malicious intent:

   a.    temporarily or permanently removed, halted, or otherwise disabled computer data, computer programs or computer software from the DNC's computer or computer network, in violation of Va. Code Ann. § 18.2-152.4(1);

   b.     caused the DNC's computers to malfunction, in violation of Va. Code Ann. § 18.2-152.4(2);

   c.    altered, disabled, or erased computer data, computer programs or computer software, in violation of Va. Code Ann. § 18.2-152.4(3);

   d.    used a computer or computer network to make or cause to be made an unauthorized copy of computer data, computer programs or computer

software residing in, communicated by, or produced by a computer or computer network, in violation of Va. Code Ann. § 18.2-152.4(6);

e.    installed or caused to be installed, or collected information through, a keystroke logger on the DNC's computers and, without their authorization, in violation of Va. Code. Ann. § 18.2-152.4(8).

231.    Defendants Russia, the GRU, and GRU Operative #1 used a computer or computer network and intentionally examined without authority employment, credit, financial, or identifying information relating to other persons, in violation of in Va. Code. Ann. § 18.2-152.5.

232.    Each Defendant knowingly aided, abetted, encouraged, induced, instigated, contributed to and assisted Russia, the GRU, and GRU Operative #1's violation of Va. Code Ann. § 18.2-152.3, § 18.2-152.4, and § 18.2-152.5.

233.    All Defendants' violations of the foregoing provisions caused Plaintiff injury. This injury includes, but is not limited to, injury resulting from harm to DNC computers and servers, loss in the value of DNC trade secrets and business information, and harm to business as described above. Plaintiff is entitled to recover damages and the costs of suit under Va. Code Ann. § 18.2-152.12.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants on all Counts, and seeks such relief as specified below for all Counts for which such relief is provided by law:

a)    Awarding Plaintiff damages in an amount to be determined, including but not limited to all damages and losses suffered by Plaintiff as a result of the illegal hacking, theft, and subsequent release of Plaintiff's confidential documents and/or Plaintiff's response to and remediation related thereto;

b) Awarding Plaintiff compensatory and treble damages, as available, in an amount to be proven at trial;

c) Awarding Plaintiff the financial gain earned by Defendants as a consequence of the violations described herein;

d) Awarding Plaintiff statutory damages, as available;

e) Awarding Plaintiff punitive damages, as available;

f) Issuing a declaration that: Defendants, according to proof, conspired to and did engage in a common scheme to effect the illegal and unauthorized hacking of Plaintiff's computer systems and/or personal emails and the exfiltration of confidential information; disseminated that stolen information to the public; and used that disclosed stolen information to impact the 2016 election for their own gain;

g) Issuing an injunction restraining Defendants and their officers, agents, servants, employees, assigns, and those acting in active concert or participation with them from:

   a. Accessing Plaintiff's computer networks and/or personal emails without Plaintiff's authorizations;

   b. Engaging in any activity that disrupts, diminishes the quality of, interferes with the performance of, or impairs the functionality of Plaintiff's computer networks or personal emails; and

   c. Selling, publishing, distributing, or using any property or information obtained from Plaintiff's computer networks or personal emails without Plaintiff's authorization;

   d. Removing, extracting, or copying any information or data from Plaintiff's computers or personal emails without Plaintiff's authorization;

h) Awarding Plaintiff all costs and attorneys' fees to the full extent permitted under the applicable law;

i) Awarding Plaintiff pre- and post-judgment interest as permitted by law;

j) Awarding any other relief as the Court may deem just and proper.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands trial by jury in this action of all issues so triable.


April 20, 2018                                    Respectfully submitted,
New York, NY

*/s/ Michael Eisenkraft*
Michael Eisenkraft                               Joseph M. Sellers
Cohen Milstein Sellers & Toll PLLC               Geoffrey A. Graber
88 Pine St., 14th Floor                          Julia A. Horwitz
New York, NY 10005                               Alison S. Deich
(212) 838-7797                                   Cohen Milstein Sellers & Toll PLLC
                                                 1100 New York Ave. NW ● Fifth Floor
meisenkraft@cohenmilstein.com                    Washington, DC 20005
                                                 (202) 408-4600

                                                 jsellers@cohenmilstein.com
                                                 ggraber@cohenmilstein.com
                                                 jhorwitz@cohenmilstein.com
                                                 adeich@cohenmilstein.com


*Attorneys for Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that on April 20, 2018, I electronically filed the *Complaint* with the Clerk

of the Court using the ECF, who in turn sent notice to all counsel of record.


Dated: April 20, 2018                                    /s/ *Michael Eisenkraft*
                                                         Michael Eisenkraft

# **ENDNOTES**

[1] Steve Goldstein, *Trump May Build Hotels in USSR*, Philly.com. Philadelphia Media Network, PBC, (July 7, 1987), https://articles.philly.com/1987-07-07/news/26200012_1_trump-tower-second-largest-soviet-city-soviet-officials.

[2] Associated Press, *Russian Real Estate Deals Never Materialized for Trump*, Fortune (March 4, 2017) http://fortune.com/2017/03/04/trump-russian-real-estate/.

[3] Richard Behar, *Donald Trump And The Felon: Inside His Business Dealings With A Mob-Connected Hustler*, Forbes Business (Oct. 3, 2016, 7:59 AM), https://www.forbes.com/sites/richardbehar/2016/10/03/donald-trump-and-the-felon-inside-his-business-dealings-with-a-mob-connected-hustler/#5b94d7b52282.

[4] *Moscow deputy mayor says 60 skyscrapers to be built in Moscow*, Prime-Tass Business Newswire, (Mar. 19, 2004).

[5] Amy Dempsey, *Trump vs. Trump: Inside Toronto's 5-star tower struggle*, Toronto Star (April 17, 2016), https://www.thestar.com/news/gta/2016/04/17/trump-vs-trump-inside-torontos-5-star-tower-struggle.html.

[6] Vernon Silver & Evgenia Pismennaya, *Trump's Two Nights of Parties in Moscow Echo Years Later*, Bloomberg (July 13, 2017) https://www.bloomberg.com/news/articles/2017-07-13/trumps-two-nights-of-parties-in-moscow-reverberate-years-later.

[7] Tom Hamburger et al.,, *Inside Trump's financial ties to Russia and his unusual flattery of Vladimir Putin*, Wash. Post (Jun. 17, 2016), https://www.washingtonpost.com/politics/inside-trumps-financial-ties-to-russia-and-his-unusual-flattery-of-vladimir-putin/2016/06/17/dbdcaac8-31a6-11e6-8ff7-7b6c1998b7a0_story.html?noredirect=on&utm_term=.dc2924d0db41.

[8] Michael Crowley, *When Donald Trump brought Miss Universe to Moscow*, Politico (May 15, 2016, 7:45 AM) https://www.politico.com/story/2016/05/donald-trump-russia-moscow-miss-universe-223173.

[9] Carol D. Leonnig et al., *Trump's business sought deal on a Trump Tower in Moscow while he ran for president,* Wash. Post (Aug. 27, 2017), https://www.washingtonpost.com/politics/trumps-business-sought-deal-on-a-trump-tower-in-moscow-while-he-ran-for-president/2017/08/27/d6e95114-8b65-11e7-91d5-ab4e4bb76a3a_story.html.

[10] Nathan Layne et al.,, *Russian elite invested nearly $100 million in Trump buildings*, Reuters (Mar. 17, 2017) https://www.reuters.com/investigates/special-report/usa-trump-property/.

[11] David Ignatius, *A history of Donald Trump's business dealings in Russia*, The Washington Post (Nov. 2, 2017), https://www.washingtonpost.com/opinions/a-history-of-donald-trumps-business-dealings-in-russia/2017/11/02/fb8eed22-ba9e-11e7-be94-fabb0f1e9ffb_story.html?utm_term=.340eff428fe4.

[12] Caitlin Yilek, *Author claims Eric Trump told him all funding for Trump golf courses comes from Russia in 2014,* Washington Examiner (May 7, 2017),

https://www.washingtonexaminer.com/author-claims-eric-trump-told-him-all-funding-for-trump-golf-courses-comes-from-russia-in-2014.

[13] Andrew E. Kramer et al., *Secret Ledger in Ukraine Lists Cash for Donald Trump's Campaign Chief*, N.Y. Times (Aug. 14, 2016), https://www.nytimes.com/2016/08/15/us/politics/paul-manafort-ukraine-donald-trump.html.

[14] *Manafort helped funnel money to US lobbyists from pro-Putin Ukrainian party, report claims*, Fox News (Aug. 17, 2016) http://www.foxnews.com/politics/2016/08/17/manafort-helped-funnel-money-to-us-lobbyists-from-pro-putin-ukrainian-party-report-claims.html.

[15] Michael Kranish & Tom Hamburger, *Paul Manafort's 'lavish lifestyle' highlighted in indictment*, Wash. Post (Oct. 30, 2017) https://www.washingtonpost.com/politics/paul-manaforts-lavish-lifestyle-highlighted-in-indictment/2017/10/30/23615680-bd8f-11e7-8444-a0d4f04b89eb_story.html?utm_term=.bb5d54a2da8e.

[16] Tom Hamburger & Rosalind S. Helderman, *Former Trump campaign chairman Paul Manafort files as foreign agent for Ukraine work*, Wash. Post (June 27, 2017), https://www.washingtonpost.com/politics/former-trump-campaign-chairman-paul-manafort-files-as-foreign-agent-for-ukraine-work/2017/06/27/8322b6ac-5b7b-11e7-9fc6-c7ef4bc58d13_story.html?utm_term=.c0c580285583.

[17] Brooke Singman, *Paul Manafort, Rick Gates indicted by federal grand jury in Russia probe,* Fox News (Oct. 30, 2017), http://www.foxnews.com/politics/2017/10/30/report-paul-manafort-rick-gates-to-surrender-to-special-counsel.html.

[18] Sonam Sheth, *Manafort's financial troubles raise new questions about why he offered to work as an unpaid volunteer to the Trump campaign*, Business Insider (Feb. 28, 2018, 2:52 PM), http://www.businessinsider.com/paul-manafort-ukraine-debt-trump-campaign-unpaid-volunteer-2018-2.

[19] Kenneth P. Vogel, *Manafort's man in Kiev*, Politico (Aug. 18, 2016, 9:27 PM), https://www.politico.com/story/2016/08/paul-manafort-ukraine-kiev-russia-konstantin-kilimnik-227181.

[20] David Voreacos, *Mueller Draws Line to Russian Spy's Work With Manafort and Gates*, Bloomberg (Mar. 28, 2018), https://www.bloomberg.com/news/articles/2018-03-28/mueller-draws-line-to-russian-spy-s-work-with-manafort-and-gates.

[21] Statement of the Offense, *United States v. George Papadopoulos*, No. 1:17-cr-00182-RDM (D.D.C. Oct. 5, 2017).

[22] Howard Amos & Patrick Sawyer, *Russian protests: December 10 as it happened*, The Telegraph (Dec. 10, 2011, 4:50 PM), https://web.archive.org/web/20140109114019/http://www.telegraph.co.uk/news/worldnews/europe/russia/8947840/Russian-protests-live.html.

[23] Evan Osnos et al., *Trump, Putin, and the New Cold War*, New Yorker (Mar. 6, 2017), https://www.newyorker.com/magazine/2017/03/06/trump-putin-and-the-new-cold-war.

[24] Steven Pifer, *Trump and Russia: Expect a change in tone. But in substance?*, Brookings (Jan. 4, 2017), https://www.brookings.edu/blog/order-from-chaos/2017/01/04/trump-and-russia-expect-a-change-in-tone-but-in-substance/.

[25] Franklin Foer, *Putin's Puppet*, Slate (July 4, 2016, 8:01 PM), http://www.slate.com/articles/news_and_politics/cover_story/2016/07/vladimir_putin_has_a_plan_for_destroying_the_west_and_it_looks_a_lot_like.html.

[26] Andrew Kaczynski et al., *80 times Trump talked about Putin*, CNN Politics (Mar. 2017), http://www.cnn.com/interactive/2017/03/politics/trump-putin-russia-timeline/.

[27] *Presidential Candidate Donald Trump Primary Night Speech*, C-SPAN (Apr. 26, 2016), https://www.c-span.org/video/?408719-1/donald-trump-primary-night-speech&start=1889&transcriptQuery=putin.

[28] John Santucci, *Trump Says 'Great Honor' to Get Compliments from 'Highly Respected' Putin*, ABC News (Dec. 17, 2015, 6:05 PM), http://abcnews.go.com/Politics/trump-great-honor-compliments-highly-respected-putin/story?id=35829618.

[29] Michael R. Gordon & Niraj Chokshi, *Trump Criticizes NATO and Hopes for 'Good Deals' With Russia*, N.Y. Times (Jan. 15, 2017), https://www.nytimes.com/2017/01/15/world/europe/donald-trump-nato.html.

[30] Ashley Parker, *Donald Trump, in Scotland, Calls 'Brexit' Result 'a Great Thing'*, N.Y. Times (June 24, 2016), https://www.nytimes.com/2016/06/25/us/politics/donald-trump-scotland.html.

[31] Alexander Mallin, *Trump: Crimea's People Prefer Russia, But If He's Elected Putin Is 'Not Going Into Ukraine'*, ABC News (July 31, 2016, 3:23 PM), http://abcnews.go.com/ThisWeek/trump-crimeas-people-prefer-russia-elected-putin-ukraine/story?id=41029437.

[32] Charlie Savage, *Assange, Avowed Foe of Clinton, Timed Email Release for Democratic Convention*, N.Y. Times (July 26, 2016), https://www.nytimes.com/2016/07/27/us/politics/assange-timed-wikileaks-release-of-democratic-emails-to-harm-hillary-clinton.html.

[33] Director of National Intelligence, *Assessing Russian Activities and Intentions in Recent US Elections* (2017), *available at* https://www.dni.gov/files/documents/ICA_2017_01.pdf.

[34] *Id.*

[35] Gloria Borger & Marshall Cohen, *Document details scrapped deal for Trump Tower Moscow*, CNN Politics (Sept. 9, 2017, 2:41 AM), https://www.cnn.com/2017/09/08/politics/document-trump-tower-moscow/index.html+&cd=1&hl=en&ct=clnk&gl=us.

[36] *Id.*

[37] *Id.*

[38] *Id.*

[39] Exec. Order 13,662, 79 Fed. Reg. 16,169 (Mar. 24, 2014).

[40] [40] Brian Beutler, *Donald Trump and the Fruit of the Poisonous Tree*, The New Republic (Aug. 29, 2017), https://newrepublic.com/article/144596/donald-trump-fruit-poisonous-tree.

[41] Pamela Brown et al., *Trump aides were in constant touch with senior Russian officials during campaign*, CNN Politics (Feb. 15, 2017, 10:37 PM), https://www.cnn.com/2017/02/14/politics/donald-trump-aides-russians-campaign/index.html.

[42] Sharon LaFraniere et al., *How the Russia Inquiry Began: A Campaign Aide, Drinks and Talk of Political Dirt*, N.Y. Times (Dec. 30, 2017), https://www.nytimes.com/2017/12/30/us/politics/how-fbi-russia-investigation-began-george-papadopoulos.html.

[43] Philip Bump, *Timeline: How a Trump adviser tried to work with the Russian government*, *Wash. Post* (Oct. 30, 2017), https://www.washingtonpost.com/news/politics/wp/2017/10/30/timeline-how-a-trump-adviser-tried-to-work-with-the-russian-government/.

[44] Statement of the Offense, *supra* note 21.

[45] *Id.*

[46] *Id.*

[47] *Id.*
[48] *Id*.

[49] *Id.*
[50] *Id.*
[51] *Id.*
[52] *Id.*
[53] *Id.*
[54] Shane Harris, *Former Trump Adviser's Guilty Plea Ties Campaign to Russian Officials*, Wall St. J. (Oct. 30, 2017, 7:31 PM), https://www.wsj.com/articles/former-trump-foreign-policy-adviser-to-plead-guilty-to-lying-to-fbi-1509374354.

[55] Department of Homeland Security and the Federal Bureau of Investigation, *GRIZZLY STEPPE – Russian Malicious Cyber Activity* (December 29, 2016), *available at* https://www.us-cert.gov/sites/default/files/publications/JAR_16-20296A_GRIZZLY%20STEPPE-2016-1229.pdf.

[56] Throughout this section, *see* Dmitri Alperovitch, *Bears in the Midst: Intrusion into the Democratic National Committee,* CrowdStrike (Jun. 15, 2016), https://www.crowdstrike.com/blog/bears-midst-intrusion-democratic-national-committee/.

[57] Director of National Intelligence, *supra* note 33.

[58] Throughout this section, *see* Dmitri Alperovitch, *Bears in the Midst: Intrusion into the Democratic National Committee,* CrowdStrike (Jun. 15, 2016), https://www.crowdstrike.com/blog/bears-midst-intrusion-democratic-national-committee/.

[59] Priscilla Alvarez & Elaine Godfrey, *Donald Trump Jr.'s Email Exchange With Rob Goldstone*, The Atlantic (July 11, 2017), https://www.theatlantic.com/politics/archive/2017/07/donald-trumps-jrs-email-exchange/533244/.

[60] *Id.*

[61] *Id.*

[62] Ryan Teague Beckwith, *Read Donald Trump's Subdued Victory Speech After Winning New Jersey*, TIME (June 8, 2016), http://time.com/4360872/donald-trump-new-jersey-victory-speech-transcript/.

[63] K.K. Rebecca Lai & Alicia Parlapiano, *What We Know About Donald Trump Jr.'s Russia Meeting*, N.Y. Times (July 18, 2017), https://www.nytimes.com/interactive/2017/07/18/us/politics/donald-trump-jr-russia-meeting.html.

[64] James Rogers, *Russian government-affiliated hackers breach DNC, take research on Donald Trump*, Fox News (June 14, 2016), http://www.foxnews.com/tech/2016/06/14/russian-government-affiliated-hackers-breach-dnc-take-research-on-donald-trump.html.

[65] Guccifer2, *Guccifer 2.0 DNC's Servers Hacked By A Lone Hacker*, Wordpress (June 15, 2016), https://guccifer2.wordpress.com/2016/06/15/dnc/.

[66] *Id.*

[67] Guccifer2, *Dossier on Hillary Clinton from DNC*, Wordpress (June 21, 2016), https://guccifer2.wordpress.com/2016/06/21/hillary-clinton/.

[68] Guccifer2, *FAQ from Guccifer 2.0*, Wordpress (June 30, 2016), https://guccifer2.wordpress.com/2016/06/30/faq/.

[69] Guccifer2, *Trumpocalypse and Other DNC Plans for July*, Wordpress (July 6, 2016), https://guccifer2.wordpress.com/2016/07/06/trumpocalypse/.

[70] *Statement by FBI Director James B. Comey on the Investigation of Secretary Hillary Clinton's Use of a Personal E-Mail System*, FBI (July 5, 2016), https://www.fbi.gov/news/pressrel/press-releases/statement-by-fbi-director-james-b-comey-on-the-investigation-of-secretary-hillary-clinton2019s-use-of-a-personal-e-mail-system.

[71] *Search the DNC email database*, WikiLeaks (July 22, 2016 10:30 AM), https://wikileaks.org/dnc-emails/.

[72] *What Donald Trump Said About Russian Hacking and Hillary Clinton's Emails*, N.Y. Times (July 27, 2016), https://www.nytimes.com/2016/07/28/us/politics/trump-conference-highlights.html.

[73] *Id.*

[74] *Id.*

[75] *Id.*

[76] *Id.*

[77] Andrew Kaczynski et al., *Trump adviser Roger Stone repeatedly claimed to know of forthcoming WikiLeaks dumps,* CNN (Mar. 20, 2017), https://www.cnn.com/2017/03/20/politics/kfile-roger-stone-wikileaks-claims/index.html.

[78] Eric Lichtblau & Noah Weiland, *Hacker Releases More Democratic Party Documents*, N.Y. Times (Aug. 12, 2016), https://www.nytimes.com/2016/08/13/us/politics/democratic-party-documents-hack.html.

[79] *Id*.

[80] Matt Dixon & Marc Caputo, *Hacked DCCC docs dish on strategy and scandal for Florida congressional candidates*, Politico (Aug. 16, 2016), https://www.politico.com/states/florida/story/2016/08/dccc-hack-unearths-dirt-on-partys-own-candidates-104744.

[81] *Id*.

[82] Andrew Blake, *Roger Stone, Trump confidant, acknowledges 'innocuous' Twitter conversation with DNC hackers*, Washington Times (Mar. 10, 2017), https://www.washingtontimes.com/news/2017/mar/10/roger-stone-trump-confidant-acknowledges-innocuous/.

[83] Ryan Goodman, *How Roger Stone Interacted With Russia's Guccifer and Wikileaks*, Newsweek (Sep. 28, 2017), http://www.newsweek.com/how-stone-interacted-russias-guccifer-and-wikileaks-673268.

[84] *Id*.

[85] *Roger Stone Joins Herald Drive Discussing 2016 Election*, Boston Herald Radio (Sept. 16, 2016), https://soundcloud.com/bostonherald/roger-stone-joins-herald-drive-discussing-2016-election-1.

[86] Julia Ioffe, *The Secret Correspondence Between Donald Trump Jr. and WikiLeaks*, The Atlantic (Nov. 13, 2017, 10:28 PM), https://www.theatlantic.com/politics/archive/2017/11/the-secret-correspondence-between-donald-trump-jr-and-wikileaks/545738/.

[87] Donald J. Trump (@realDonaldTrump), Twitter (Oct. 12, 2016, 9:46 AM), https://twitter.com/realdonaldtrump/status/786201435486781440.

[88] Kaczynski et al., *supra* note 77.

[89] *Id.*

[90] *The Podesta Emails*, WikiLeaks (Oct. 7, 2016), https://wikileaks.org/podesta-emails/.

[91] *Leaks*, WikiLeaks, https://wikileaks.org/-Leaks-.html (last visited Apr. 11, 2018).

[92] Donald J. Trump (@realDonaldTrump), Twitter (July 24, 2016, 6:16 PM), https://twitter.com/realdonaldtrump/status/757338816487235584.

[93] Donald J. Trump (@realDonaldTrump), Twitter (July 24, 2016, 5:53 PM), https://twitter.com/realdonaldtrump/status/757332905047752704.

[94] Donald J. Trump (@realDonaldTrump), Twitter (July 25, 2016, 7:31 AM), https://twitter.com/realdonaldtrump/status/757538729170964481.

[95] Donald J. Trump (@realDonaldTrump), Twitter (Oct. 12, 2016, 9:46 AM), https://twitter.com/realdonaldtrump/status/786201435486781440.

[96] Donald Trump Jr. (@DonaldJTrumpJr), Twitter (Oct. 14, 2016, 9:34 AM), https://twitter.com/DonaldJTrumpJr/status/786923210512142336.

[97] Ioffe, *supra* note 86.

[98] *Id.*

[99] Chuck Todd et al., *How Trump took advantage of Russian interference: Amplifying Wikileaks*, NBC News (Feb. 19, 2018, 8:20 AM), https://www.nbcnews.com/politics/first-read/how-trump-took-advantage-russian-interference-amplifying-wikileaks-n849326.

[100] *Id.*

[101] *Id.*

[102] *Id.*

[103] *Id.*

[104] WikiLeaks (@wikileaks), Twitter (Nov. 6, 2016, 5:39 PM), https://twitter.com/wikileaks/status/795440430259335168?lang=en.

[105] *Id.*

[106] Peter Walker, *Donald Trump wins: Russian parliament bursts into applause upon hearing result*, The Independent (Nov. 9, 2016), https://www.independent.co.uk/news/world/americas/us-elections/donald-trump-wins-us-election-russia-putin-result-a7406866.html.

[107] *Id.*

**ФЕДЕРАЛЬНЫЙ ОКРУЖНОЙ СУД ЮЖНОГО ОКРУГА НЬЮ-ЙОРКА, СОЕДИНЕННЫЕ ШТАТЫ АМЕРИКИ,**

| | |
|---|---|
| НАЦИОНАЛЬНЫЙ КОМИТЕТ ДЕМОКРАТИЧЕСКОЙ ПАРТИИ, | ) |
| | ) |
| Истец, | ) Гражданский иск № _____ |
| | ) |
| против | ) **ПИСЬМЕННОЕ ХОДАТАЙСТВО О** |
| | ) **РАССМОТРЕНИИ ДЕЛА СУДОМ** |
| | ) **ПРИСЯЖНЫХ** |
| | ) |
| РОССИЙСКАЯ ФЕДЕРАЦИЯ; | ) **ИСК** |
| ГЕНЕРАЛЬНЫЙ ШТАБ ВООРУЖЕННЫХ | ) ЗАКОН О КОМПЬЮТЕРНОМ |
| СИЛ РОССИЙСКОЙ | ) МОШЕННИЧЕСТВЕ И ЗЛОУПОТРЕБЛЕНИИ |
| ФЕДЕРАЦИИ («ГРУ»); | ) (РАЗДЕЛ 18 СВОДА ЗАКОНОВ США, § |
| АГЕНТ ГРУ ПОД | ) 1030(a)) |
| ПСЕВДОНИМОМ «ГУЧЧИФЕР 2.0» ("GUCCIFER 2.0"); | ) ЗАКОН ОБ ОРГАНИЗАЦИЯХ, СВЯЗАННЫХ |
| АРАС ИСКЕНДЕРОВИЧ АГАЛАРОВ; | ) С РЭКЕТОМ И КОРРУПЦИЕЙ (RICO) |
| ЭМИН АРАС АГАЛАРОВ; | ) (РАЗДЕЛ 18 СВОДА ЗАКОНОВ США, § |
| ДЖОЗЕФ МИФСУД; | ) 1962(c)) |
| ВИКИЛИКС (WIKILEAKS); | ) ПРЕСТУПНЫЙ СГОВОР ПО ЗАКОНУ |
| ДЖУЛИАН АССАНЖ; | ) RICO (РАЗДЕЛ 18 СВОДА ЗАКОНОВ |
| ДОНАЛЬДА ДЖ. ТРАМПА В ПРЕЗИДЕНТЫ, ИНК. | ) США, § 1962(d)) |
| (DONALD J. TRUMP FOR PRESIDENT, INC.); | ) ЗАКОН О НАКАЗАНИЯХ ЗА |
| ДОНАЛЬД ДЖ. ТРАМП-МЛАДШИЙ; | ) НЕСАНКЦИОНИРОВАННОЕ |
| ПОЛ ДЖ. МАНАФОРТ-МЛАДШИЙ; | ) ПОДКЛЮЧЕНИЕ К ЛИНИЯМ |
| РОДЖЕР ДЖ. СТОУН-МЛАДШИЙ; | ) СВЯЗИ (РАЗДЕЛ 18 СВОДА |
| ДЖАРЕД Ч. КУШНЕР; | ) ЗАКОНОВ США, §§ 2510-22) |
| ДЖОРДЖ ПАПАДОПУЛОС; | ) |
| РИЧАРД В. ГЕЙТС III; | ) ЗАКОН О СОХРАНЕННЫХ СООБЩЕНИЯХ |
| ДЖОН ДОУ 1-10, | ) (РАЗДЕЛ 18 СВОДА ЗАКОНОВ США, §§ |
| | ) 2701-12) |
| Ответчики. | ) В ЦИФРОВУЮ ЭПОХУ |
| | ) ЗАКОН ОБ АВТОРСКОМ ПРАВЕ (РАЗДЕЛ 17 |
| | ) СВОДА ЗАКОНОВ США § 1201 *и далее.*) |
| | ) |
| | ) НЕЗАКОННОЕ ЗАВЛАДЕНИЕ |
| | ) КОММЕРЧЕСКОЙ ТАЙНОЙ |
| | ) ЗАКОН О КОММЕРЧЕСКОЙ ТАЙНЕ |
| | ) (РАЗДЕЛ 18 СВОДА ЗАКОНОВ США, § 1836 |
| | ) *и далее.*) |
| | ) ЕДИНООБРАЗНЫЙ ЗАКОН О ТОРГОВЫХ |
| | ) СЕКРЕТАХ, ВАШИНГТОН, ОКРУГ |
| | ) КОЛУМБИЯ (Аннотированный свод законов |
| | ) округа Колумбия, §§ 36-401 – 46-410) |
| | ) ПОСЯГАТЕЛЬСТВО (Общее право округа |
| | Колумбия) |
| | ) ПОСЯГАТЕЛЬСТВО НА ДВИЖИМОЕ |
| | ) ИМУЩЕСТВО |
| | ) (Общее право шт. Вирджиния) |
| | ) ПРЕСТУПНЫЙ СГОВОР С ЦЕЛЬЮ |
| | ) ПОСЯГАТЕЛЬСТВА НА ДВИЖИМОЕ |
| | ) ИМУЩЕСТВО (Общее право шт. Вирджиния) |
| | ) ЗАКОН ВИРДЖИНИИ О КОМПЬЮТЕРНЫХ |
| | ) ПРЕСТУПЛЕНИЯХ (Аннотированный свод |
| | ) законов шт. Вирджиния, § 18.2-152.5 *и далее.*) |
| | ) |
| | ) |
| | ) |

# СОДЕРЖАНИЕ

<u>Страница</u>

СУТЬ ИСКА ......................................................................................................................... 5

I.     ВВЕДЕНИЕ ................................................................................................................. 5

II.    ПРЕСТУПНАЯ ГРУППИРОВКА ............................................................................. 6

III.   УЩЕРБ ДЛЯ НКДП ................................................................................................ 10

ПОДВЕДОМСТВЕННОСТЬ И МЕСТО РАССМОТРЕНИЯ ......................................... 11

СТОРОНЫ............................................................................................................................ 12

ОБЩИЕ ОБВИНЕНИЯ ...................................................................................................... 17

I.     РАНЕЕ СУЩЕСТВОВАВШАЯ СВЯЗЬ ТРАМПА И ЕГО СОЮЗНИКОВ С РОССИЕЙ И РОССИЙСКИМИ ОЛИГАРХАМИ ПОСЛУЖИЛА ПЛОДОРОДНОЙ ПОЧВОЙ ДЛЯ ОРГАНИЗАЦИИ ПРЕСТУПНОГО СГОВОРА МЕЖДУ РОССИЕЙ И ТРАМПОМ ........................... 17

II.    ОДНА ЦЕЛЬ: ПОДДЕРЖКА ТРАМПА И ОПОРОЧИВАНИЕ КАНДИДАТА ОТ ДЕМОКРАТИЧЕСКОЙ ПАРТИИ ................................................................. 19

III.   СГОВОР С ЦЕЛЬЮ РАСПРОСТРАНЕНИЯ УКРАДЕННЫХ ДАННЫХ НКДП ДЛЯ ПОМОЩИ ТРАМПУ ................................................................................... 21

      A.     Трамп объявляет о выдвижении себя в качестве кандидата в президенты, а Россия начинает атаку на компьютерные системы НКДП ...................................................... 22

      B.     Европейские союзники передавали «сигнал тревоги» разведке США в отношении связи россиян с помощниками Трампа ................................... 22

      C.     Во время президентской кампании Трамп подписывает письмо о намерении построить Trump Tower в Москве ................................................... 22

      D.    Кампания Трампа углубляет связи с Россией и агентами российской разведки ................... 23

      E.     Россия крадет огромное количество документов у НКДП в то время, как сотрудник Трампа хвастается украденными документами ........................... 25

      F.     НКДП обнаруживает взлом и нанимает компанию CrowdStrike .............................................. 26

      G.    Результаты экспертизы подтверждают атаку России на сеть НКДП ........................................ 27

      H.    Русские предлагают помощь Трампу — и сотрудники Трампа принимают предложение..... 28

      I.     После встречи в Трамп-тауэр Россия запускает массовое публичное распространение украденных документов НКДП ......................................... 30

      J.     Кампания Трампа блокирует добавление в программу республиканской партии США текста, направленного против России ................................. 31

# СОДЕРЖАНИЕ

Страница

K. После того, как кампания Трампа блокирует антироссийский текст в программе республиканской партии, WikiLeaks начинает распространять украденные документы НКДП ................................................................................................ 31

L. Сотрудники Трампа тайно общаются с русскими агентами и WikiLeaks по мере стратегического разглашения украденных документов НКДП .................................................. 32

M. Трамп публично хвалит незаконное распространение украденных документов НКДП.......... 34

N. Трамп — и Россия — выиграли. .......................................................................... 36

IV. НЕОДНОКРАТНЫЕ УСИЛИЯ ОТВЕТЧИКОВ СКРЫТЬ СВЯЗИ С РУССКИМИ ДОКАЗЫВАЮТ ИХ ОСОЗНАНИЕ СВОЕЙ ВИНЫ ................................................................................. 36

V. ЗНАЧИТЕЛЬНЫЙ УЩЕРБ, НАНЕСЕННЫЙ ИСТЦУ ........................................................... 38

ОСНОВАНИЕ ДЛЯ ИСКА ............................................................................................. 40

ПУНКТ I ..................................................................................................................... 40

АКТ О КОМПЬЮТЕРНОМ МОШЕННИЧЕСТВЕ И ЗЛОУПОТРЕБЛЕНИИ (18 раздел Свода законов США, статья 1030(A)) (ПРОТИВ РОССИИ, ГРУ И АГЕНТА ГРУ #1)............... 40

ПУНКТ II ..................................................................................................................... 42

ФЕДЕРАЛЬНЫЙ ЗАКОН О ПРОТИВОДЕЙСТВИИ РЭКЕТУ И КОРРУПЦИИ (18 РАЗДЕЛ СВОД ЗАКОНОВ США, СТАТЬЯ 1962(C)) (ПРОТИВ ВСЕХ ОТВЕТЧИКОВ) ................................ 42

A. Кампания Трампа являла собой Предприятие, деятельность которого осуществлялась с применением методов организационной преступности .................................................. 42

B. Альтернативно, и, как минимум, кампания Трампа была частью, фактически связанной с таким Предприятием ................................................................................................ 43

C. ФЕДЕРАЛЬНЫЙ ЗАКОН О ПРОТИВОДЕЙСТВИИ РЭКЕТУ И КОРРУПЦИИ ОСНОВНЫЕ ДЕЙСТВИЯ .............................................................................................. 43

D. Ущерб, причиненный вследствие нарушения закона США «О коррумпированных и находящихся под влиянием рэкетиров организациях» (РИКО) ........................................ 46

ПУНКТ ОБВИНЕНИЯ III ............................................................................................... 46

ПРЕСТУПНЫЙ СГОВОР С ЦЕЛЬЮ НАРУШЕНИЯ ЗАКОНА РИКО (18 раздел Свода законов США, § 1962(D)) (ПРОТИВ ВСЕХ ОБВИНЯЕМЫХ) .................................................. 46

ПУНКТ ОБВИНЕНИЯ IV ............................................................................................... 47

ЗАКОН «О НАКАЗАНИЯХ ЗА НЕСАНКЦИОНИРОВАННОЕ ПОДКЛЮЧЕНИЕ К ЛИНИЯМ СВЯЗИ» (18 раздел Свода законов США, §§ 2510-22) (ПРОТИВ АГЕНТА ГРУ №1, WIKILEAKS, АССАНЖА, TRUMP CAMPAIGN И СООБЩНИКОВ ТРАМПА) ........................................ 47

ПУНКТ ОБВИНЕНИЯ V ............................................................................................... 48

ЗАКОН «О ДОСТУПЕ К ХРАНИМЫМ ДАННЫМ ПРОВОДНОЙ И ЭЛЕКТРОННОЙ СВЯЗИ И ДЕЛОВОЙ ДОКУМЕНТАЦИИ» (18 раздел Свода законов США, §§ 2701-12) (ПРОТИВ РОССИИ, ГРУ И АГЕНТА ГРУ №1) ................................................................................................ 48

ПУНКТ ОБВИНЕНИЯ VI ............................................................................................... 49

ЗАКОН «О ЗАЩИТЕ АВТОРСКИХ ПРАВ В ЦИФРОВУЮ ЭПОХУ» (17 раздел Свода законов США, § 1201 И ДАЛЕЕ.) (ПРОТИВ РОССИИ, ГРУ И АГЕНТА ГРУ №1) ........................................ 49

# СОДЕРЖАНИЕ

<u>Страница</u>

ПУНКТ ОБВИНЕНИЯ VII .................................................................................................. 50

    НЕПРАВОМЕРНОЕ ЗАВЛАДЕНИЕ КОММЕРЧЕСКОЙ ТАЙНОЙ В НАРУШЕНИЕ ЗАКОНА «О ЗАЩИТЕ КОММЕРЧЕСКОЙ ТАЙНЫ» (18 раздел Свода законов США, § 1836, *И ДАЛЕЕ*.) (ПРОТИВ РОССИИ, ГРУ, АГЕНТА ГРУ №1, WIKILEAKS И АССАНЖА)......................................... 50

ПУНКТ ОБВИНЕНИЯ VIII ................................................................................................ 51

    ДИНЫЙ ЗАКОН «О КОММЕРЧЕСКОЙ ТАЙНЕ» Г. ВАШИНГТОН, ФЕДЕРАЛЬНЫЙ ОКРУГ КОЛУМБИЯ (Свод законов федерального округа Колумбия анн., §§ 36-401 – 46-410) (ПРОТИВ ВСЕХ ОБВИНЯЕМЫХ) .............................................................................................. 51

ПУНКТ ОБВИНЕНИЯ IX .................................................................................................. 52

    ПРОТИВОЗАКОННОЕ НАРУШЕНИЕ ПРАВА ВЛАДЕНИЯ С ПРИЧИНЕНИЕМ ВРЕДА (ОБЩЕЕ ПРАВО ФЕДЕРАЛЬНОГО ОКРУГА КОЛУМБИЯ) (ПРОТИВ РОССИИ, ГРУ И АГЕНТА ГРУ №1)52

ПУНКТ ОБВИНЕНИЯ X ................................................................................................... 53

    ПОСЯГАТЕЛЬСТВО НА ДВИЖИМОЕ ИМУЩЕСТВО (ОБЩЕЕ ПРАВО ВИРДЖИНИИ) (ПРОТИВ РОССИИ, ГРУ И ОПЕРАТИВНОГО ОТДЕЛА ГРУ №1)...................................... 53

ПУНКТ ОБВИНЕНИЯ XI .................................................................................................. 54

    ПРЕДВАРИТЕЛЬНЫЙ СГОВОР С ЦЕЛЬЮ СОВЕРШЕНИЯ ПОСЯГАТЕЛЬСТВА НА ДВИЖИМОЕ ИМУЩЕСТВО (ОБЩЕЕ ПРАВО ВИРДЖИНИИ) (ПРОТИВ ВСЕХ ОТВЕТЧИКОВ) 54

ПУНКТ ОБВИНЕНИЯ XII ................................................................................................. 55

    НАРУШЕНИЕ ЗАКОНА ВИРДЖИНИИ О ПРЕСТУПЛЕНИИ В СФЕРЕ КОМПЬЮТЕРНОЙ ИНФОРМАЦИИ (СВОД ЗАКОНОВ ВИРДЖИНИИ С КОММЕНТАРИЯМИ § 18.2-152.5 И ДАЛЕЕ) (ПРОТИВ ВСЕХ ОТВЕТЧИКОВ)............................................................................... 55

ИСКОВОЕ ТРЕБОВАНИЕ ................................................................................................ 56

ТРЕБОВАНИЕ СУДА ПРИСЯЖНЫХ ............................................................................. 58

Истец, Национальный комитет демократической партии («НКДП»), подает данный Иск против Российской Федерации («Россия»), Генерального штаба вооруженных сил Российской Федерации («ГРУ»), агента ГРУ под псевдонимом «Гуччифер 2.0» («Guccifer 2.0») («Агент ГРУ №1»), Араса Искендеровича Агаларова («Арас Агаларов»); Эмина Араса Агаларова («Эмин Агаларов»); Джозефа Мифсуда («Мифсуд»); Викиликс (WikiLeaks), Джулиана Ассанжа («Ассанж»), Дональда Дж. Трампа в Президенты, Инк. (Donald J. Trump for President, Inc.) («Избирательная кампания Трампа»), Дональда Дж. Трампа-младшего («Трамп-младший»), Пола Дж. Манафорта-младшего («Манафорт»), Роджера Дж. Стоуна-младшего («Стоун»), Джареда Ч. Кушнера («Кушнер»), Джорджа Пападопулоса («Пападопулос»), Ричарда В. Гейтса III («Гейтс»), Джона Доу 1-10, который заключается в следующем:

## СУТЬ ИСКА

## I.   ВВЕДЕНИЕ

1.   Никто не выше закона. При подготовке к выборам 2016 г. Россия организовала наглое нападение на американскую демократию. Вначале была проведена кибератака на НКДП на американской территории. В 2015 и 2016 гг. российские спецслужбы проникли в компьютеры НКДП и телефонные системы, похитив десятки тысяч документов и электронных писем. Затем Россия использовала похищенную информацию в своих интересах: в целях дестабилизации политической обстановки в США, очернения кандидата в президенты от демократов и поддержки кампании Дональда Дж. Трампа («Трамп»), чья политика выгодна Кремлю.

2.   В лице Трампа Россия нашла сговорчивого и активного партнера. В 2016 г. источники, близкие к Кремлю, уведомили Трампа о намерении России вмешаться в нашу демократию. Получив большое количество информации о встречах, электронные письма и прочие сведения, данные русские агенты поняли, что их правительство поддерживало Трампа и было готово воспользоваться похищенными электронными письмами и другой информацией для нанесения вреда оппоненту и Демократической партии.

3.      Вместо того, чтобы сообщить об этих повторяющихся сообщениях о намерениях России вмешаться в выборы в США, Трамп и его агенты с радостью приняли помощь России. Фактически, Трамп добивался незаконной поддержки России и вел секретные переговоры с лицами, близкими к российскому правительству, включая одну из спецслужб, ответственных за атаку на НКДП.

4.      В результате данных переговоров Трамп, его ближайшие советники и русские агенты составили соглашение о продвижении кандидатуры Дональда Трампа незаконными методами. Русские агенты проникли в компьютерную сеть НКДП в Соединенных Штатах, а также в учетные записи электронной почты, и завладели коммерческой тайной и другими конфиденциальными данными, которые затем передали ответчику, ресурсу WikiLeaks, основатель которого Ассанж преследовал схожие цели с ответчиками по уничтожению Демократической партии перед выборами. Через офицера(ов) военной разведки (ГРУ) под псевдонимом «Гуччифер 2.0» («Guccifer 2.0») (здесь и далее «Агент ГРУ №1») и сервис WikiLeaks Россия распространила информацию в самый подходящий для компании Трампа момент.

5.      Информация, похищенная у НКДП, была умышленно обнародована, затем кандидат Трамп открыто выразил благодарность за незаконное распространение информации и стимулировал Россию к дальнейшим нарушениям законодательства США, которые состояли в продолжающихся компьютерных атаках на Демократическую партию.

**II.     ПРЕСТУПНАЯ ГРУППИРОВКА**

6.      Кибератака против НКДП со стороны России началась всего через несколько недель после того, как Трамп заявил о том, что выдвигает свою кандидатуру на пост Президента Соединенных Штатов в июне 2015 г. В течение нескольких месяцев дружественные европейские спецслужбы начали сообщать своим американским партнерам о подозрительных переговорах между окружением Трампа и российскими агентами.

7.      В конце 2015 г., во время проведения предвыборной кампании, Трамп собственноручно подписал соглашение о намерении принять участие в новом строительстве в Москве — приблизившись к

реализации своей давней мечты. Данный проект должен был финансироваться через российский банк, на который США наложили санкции. Посредником в сделке выступал Феликс Сатер, осужденный за преступление российский эмигрант, который долгое время был деловым партнером Трампа. В разговоре о сделке с Майклом Коэном, адвокатом Трампа, Сатер предложил добиться того, чтобы Президент России Владимир Владимирович Путин («Путин») поддержал проект, чтобы повысить шансы Трампа на выборах: «Я привлеку к программе Путина, и мы добьемся того, чтобы Дональда избрали . . . . Я знаю, как это сделать, и у нас получится. Приятель, наш человек может стать Президентом США, и мы это организуем. Я задействую всю команду Путина, я это сделаю».

8. К началу 2016 г. Трамп был на верном пути к тому, чтобы стать фаворитом и выдвинуть свою кандидатуру от Республиканской партии. Чем ближе подбирался Трамп к своему выдвижению, тем прочнее становилась связь между его кампанией и российским правительством.

9. В феврале 2016 г. Генерал-лейтенант в отставке Майкл Т. Флинн стал неофициальным внешнеполитическим советником Трампа. Несколькими месяцами ранее, в декабре 2015 г., пропагандистский рупор российского правительства «Россия сегодня» («RT») заплатил Флинну за участие и выступление на праздновании юбилея в Москве, на котором Флинн сидел за одним столом с Путиным.

10. В марте 2016 г. организатором мероприятий в в рамках своей кампании Трамп назначил Манафорта, который последние десять лет продвигал интересы Кремля. Даже перейдя на работу к Трампу, Манафорт поддерживал связь с лицом, связанным с ГРУ. Манафорт тоже предложил рассказать о кампании одному российскому лицу, близкому к Путину.

11. В апреле 2016 г. еще одна российская разведывательная группа взломала информационную систему НКДП. 22 апреля 2016 г. российская разведка подготовила похищение огромного количества данных с серверов НКДП. Через четыре дня, 26 апреля 2016 г., Пападопулос, советник Трампа по вопросам внешней политики, встретился с кремлевским агентом, который сообщил Пападопулосу о том, что у русских «есть компромат» на кандидата в Президенты от Демократической

партии в виде «тысяч электронных писем». Пападопулос не передал эту информацию американским правоохранительным органам. Вместо этого он доложил своему начальству из штаба Трампа о «любопытных сообщениях, которые придут из Москвы в нужный момент».

12. К июню 2016 г. Россия похитила тысячи документов и электронных писем у НКДП. 3 июня 2016 г. русские, близкие к Кремлю, связались с Дональдом Трампом-младшим и предложили компромат на кандидата в Президенты от Демократической партии «в рамках поддержки Мистера Трампа со стороны России и ее правительства». Трамп-младший не предпринял никаких шагов, чтобы предупредить американские правоохранительные органы. Напротив, он воспользовался этим незаконным планом, ответив: «Они мне пригодятся в конце лета».

13. 9 июня 2016 г. Трамп-младший, Манафорт и Кушнер встретились с представителями России в Башне Трампа (Трамп Тауэр). Через несколько дней, 15 июня 2016 г., агент ГРУ №1 обнародовал похищенные ценные документы, заявив что это материалы НКДП.

14. В июле 2016 г. республиканцы провели национальный съезд партии. На этом съезде Трамп вмешался, чтобы предотвратить использование другими республиканцами антироссийских высказываний в отношении Украины в рамках политической платформы Республиканской партии. Через несколько дней, 22 июля 2016 г., накануне национального съезда Демократической партии, ресурс WikiLeaks тоже распространил похищенные документы НКДП, включая электронные письма и другие секретные служебные документы.

15. На протяжении всего лета и осени 2016 г., в разгар президентской кампании, союзники Трампа продолжали тайно поддерживать связь с российскими агентами и WikiLeaks, пока те умышленно распространяли похищенную у демократов информацию. С августа 2016 г. Стоун начал тайно общаться с агентом ГРУ №1 и продолжал хвастаться своими связями с Ассанжем. Кроме того, на протяжении всего этого времени Гейтс, заместитель главы предвыборного штаба Трампа, а позднее контактное лицо по

связям с Национальным комитетом Республиканской партии, провел тайные переговоры с лицом, которое, насколько было известно Гейтсу, было связано с ГРУ.

16.     Летом и осенью 2016 г. Стоун раскрыл информацию, которую он мог получить только от WikiLeaks или агентов русской разведки, о хакерских атаках в Соединенных Штатах Америки. В августе 2016 г. общественности не было известно, что Россия похитила электронные письма Джона Подесты, Главы предвыборного штаба Хиллари Клинтон. Тем не менее, 21 августа 2016 г. Стоун предупредил о раскрытии компромата на Подесту, написав в твиттере: «Подесте скоро [придет] конец». Через несколько недель ресурс WikiLeaks начал публиковать серии электронных писем Подесты практически ежедневно вплоть до дня выборов, как и предсказывал Стоун. Аналогично, в середине сентября 2016 г. Стоун сказал, что «очень скоро Джулиан Ассанж и WikiLeaks будут еженедельно выкладывать новые полезные документы по Хиллари [Клинтон]». И 7 октября 2016 г. ресурс WikiLeaks начал практически ежедневно публиковать похищенные электронные письма, как и говорил Стоун.

17.     Трамп-младший тоже тайно общался с WikiLeaks. Однажды Трампу-младшему предложили пароль от сайта анти-Трамп. WikiLeaks попросили Трампа-младшего, чтобы его отец опубликовал в твиттере ссылку на WikiLeaks с похищенными электронными письмами. Через пятнадцать минут Трамп написал в твиттере сообщение о недостаточном внимании СМИ к электронным письмам, опубликованным WikiLeaks.

18.     В течение осени 2016 г. Трамп поощрял незаконное распространение документов НКДП и других документов Демократической партии, делая это центральной темой многих своих выступлений и митингов. Фактически, Трамп несколько раз восторженно отзывался о незаконном распространении информации, восклицая что-то наподобие «Обожаю Wikileaks!»

19.     8 ноября 2016 г. Трамп стал Президентом Соединенных Штатов Америки. Реакцией России было ликование, а член российского Парламента объявил своим коллегам: «Я поздравляю с этим всех вас».

20.     Преступная группировка совершила беспрецедентный предательский поступок: кампания кандидата на пост Президента от крупнейшей партии в сговоре с враждебным иностранным государством с целью повысить свои шансы на победу в президентских выборах. Осуществляя данные попытки, Ответчики вступили в сговор для распространения документов, похищенных у НКДП, в нарушение законов Соединенных Штатов Америки, а также законов штата Вирджиния и округа Колумбия. По нашему закону Россия и ее сообщники должны ответить за содеянное.

## III.     УЩЕРБ ДЛЯ НКДП

21.     Преступный сговор нанес существенный ущерб НКДП. Ответчики подорвали и извратили возможность НКДП донести цели и точку зрения партии до американских граждан; посеяли раздор внутри Демократической партии в тот момент, когда единство было так важно для успеха в выборах; и серьезно скомпрометировали внутреннюю и внешнюю информационную систему НКДП.

22.     Кроме того, действия Ответчиков привели к драматическому снижению пожертвований в пользу НКДП. Распространение похищенной информации заставило жертвователей в пользу политической партии забеспокоиться об утечке конфиденциальной информации в результате пожертвований.

23.     НКДП потратил более миллиона долларов на ремонт и восстановление электронного оборудования, а также привлечение специалистов и консультантов для устранения последствий нарушения кибербезопасности в результате взлома систем и распространения данных.

24.     Наконец, из-за утечки персональных и секретных данных о персонале НКДП некоторые сотрудники НКДП подверглись агрессии и угрозам физической расправы. В одном из таких электронных писем говорилось: «Надеюсь, всех ваших детей изнасилуют и убьют. Надеюсь, вашей семье суждены

только страдания, мучения и смерть». По вполне понятным причинам такая враждебность повлияла на способность сотрудников эффективно выполнять свои обязанности на работе.

25.     Хотя никакой иск не компенсирует вред, причиненный незаконными действиями Ответчиков, НКДП все же хочет возбудить дело против них, чтобы добиться справедливости в соответствии с законами Соединенных Штатов Америки.

26.     Поэтому Истец подает данный иск с целью разобраться в индивидуальных и коллективных действиях Ответчиков на основании указанных здесь нормативных актов и общего права. Истец вправе требовать восстановление справедливости в отношении всех участников схемы.

## ПОДВЕДОМСТВЕННОСТЬ И МЕСТО РАССМОТРЕНИЯ

27.     Данный Суд наделен юрисдикцией в отношении федеральных вопросов согласно разделу 28 Свода законов США, § 1331, данный иск связан с разделом 18 Свода законов США § 1030 (Закон о компьютерном мошенничестве и злоупотреблении); 18 Свода законов США, §§ 1961- 68 (Закон об организациях, связанных с рэкетом и коррупцией); 18 Свода законов США, §§ 2701-11 (Закон о сохраненных сообщениях); 28 Свода законов США, §§ 2510-22 (совместно именуются «Федеральный закон о наказаниях за несанкционированное подключение к линиям связи»); Пуб. L. No. 114-152, 130 Закон 376 (Закон о коммерческой тайне, разнесенный по разделам 18 Свода законов США и 28 Свода законов США); и раздел 17 Свода законов США, § 1201 *и далее.* (Закон об авторском праве в цифровую эпоху). Данный Суд обладает дополнительной юрисдикцией в отношении требований Истца на основании законов штата согласно разделу 28 Свода законов США, §1367(b).

28.     Данный Суд обладает юрисдикцией в отношении требований против России и ГРУ согласно разделу 28 Свода законов США, § 1330, так как Россия является иностранным государством, *см.* раздел 28 Свода законов США, § 1603(a), а ГРУ является «агентством или органом правительства» данного государства, раздел 28 Свода законов США, § 1603(b).

29.     У России нет суверенного иммунитета, так как требования НКДП связаны с посягательством России на частные серверы НКДП — гражданское правонарушение, совершенное в Соединенных Штатах Америки. *См. раздел* 28 Свода законов США, § 1605(a)(5). Кроме того, Россия совершила данное посягательство с целью хищения коммерческой тайны и экономического шпионажа,

две формы коммерческой деятельности на территории Соединенных Штатов Америки, повлекшие прямые последствия для Соединенных Штатов Америки. *См. там же* § 1605(a) (2).

30. В качестве места рассмотрения подходит данный Суд согласно разделу 28 Свода законов США, § 1391(b) (2), так как большая часть событий, повлекших за собой возникновение требований, произошла в городе Нью-Йорк, штат Нью-Йорк. Штаб-квартира Ответчика «Избирательная кампания Трампа, Инк.» находится по адресу: 725 Пятая авеню, город Нью-Йорк, NY 10022; Ответчик Дональд Дж. Трамп-младший проживает в городе Нью-Йорк, штат Нью-Йорк; большинство встреч и контактов, служащих целям указанной преступной группировки, происходили в городе Нью-Йорк, штат Нью-Йорк.

31. Место подходит для рассмотрения требований, подпадающих под Закон об организациях, связанных с рэкетом и коррупцией (RICO), согласно разделу 18 Свода законов США, § 1965(a), так как Ответчики проживают, находятся, нанимают агентов и ведут дела в городе Нью-Йорк, штат Нью-Йорк.

## СТОРОНЫ

32. Истец НКДП зарегистрирован Федеральной избирательной комиссией как НКДП Сервисиз Корп./Дем. (DNC Services Corp./Dem.) Согласно определению и использованию данного термина в разделе 52 Свода законов США, § 30101, Нац. комитет – это национальный комитет, который занимается отбором кандидатов от Демократической партии на посты в местные органы управления, органы управления штатов и государственные органы управления, включая кандидатов на пост Президента. Для выполнения своих задач НКДП, помимо всего прочего, тесно сотрудничает с государственными представителями-демократами и помогает партии и кандидатам в различных штатах путем денежного финансирования, оплаты их расходов и оказания активной поддержки посредством разработки полезных программ для кандидатов от демократов. Кроме того, НКДП составляет планы съездов по выдвижению кандидатов в президенты от Демократической партии и продвигает платформу Демократической партии. В своей деятельности НКДП активно пользуется электронной почтой на базе безопасных серверов. На базе своих серверов НКДП регулярно создает и ведет материалы, на которые распространяется закон об авторском праве, а также конфиденциальные служебные документы, связанные с кампаниями, привлечением финансов и стратегиями, составляющими коммерческую тайну НКДП.

33. Ответчик Россия является иностранным государством по определению данному законодательством Соединенных Штатов Америки.

8

34.     Ответчик ГРУ – это служба военной разведки России. По имеющимся сведениям и убеждениям ГРУ создало сетевой псевдоним «Гуччифер 2.0» («Guccifer 2.0») для распространения похищенных документов и информации.

35.     Ответчик Агент ГРУ №1 – это агент(ы) российской разведки, распространяющий(ие) похищенные документы и информацию под псевдонимом «Гуччифер 2.0» («Guccifer 2.0»). По имеющимся сведениям и убеждениям Агент ГРУ №1 – это агент(ы) ГРУ, работающий(е) за пределами штаба ГРУ, который находится на улице Гризодубовой в Москве, Россия.

36.     Ответчики Джон Доу 1-10 – это другие агенты или агентства российской разведки, участвовавшие в преступном сговоре с целью взлома компьютеров Истца и распространения похищенных документов и информации.

37.     Ответчик Арас Агаларов – это российский олигарх, родившийся в Азербайджане, который является близким соратником Путина. Трамп взаимодействовал с Арасом Агаларовым, который был посредником между Трампом и Путиным, чтобы привезти в Москву Конкурс красоты «Мисс Вселенная» в 2013 г., за что Арас Агаларов заплатил Трампу несколько миллионов долларов. В ходе визита Трампа в Россию в ноябре 2013 г. он, как сообщается, договорился с Арасом Агаларовым еще об одной сделке: о совместном строительстве недвижимости в России. Как сообщается, у Араса Агаларова в России есть земля, зарезервированная под строительство недвижимости под брендом Трампа.

38.     Ответчик Эмин Агаларов – это сын Араса Агаларова. Эмин Агаларов – исполнитель поп-музыки и исполнительный директор семейной строительной компании. Он установил тесное сотрудничество с Трампами во время партнерства в рамках Конкурса красоты «Мисс Вселенная-2013». Как и его отец, Эмин Агаларов поддерживал отношения с Трампом и Трампом-младшим после 2013 г. и во время кампании 2016 г. Агаларовы сыграли заметную роль в июньской встрече в 2016 г. в Башне Трампа (см. ниже).

39.     Ответчик Джозеф Мифсуд – это ученый, который, по имеющимся сведениям и убеждениям, работал на различных должностях в правительстве Мальты. По всей видимости, у Мифсуда были связи в различных образовательных организациях и учреждениях в Великобритании и на Мальте. По имеющимся сведениям и убеждениям Мифсуд тесно связан с российским правительством и фактически действовал как агент российского правительства при взаимодействии с Пападпулосом в 2016 г.

40.     Ответчик Ассанж – это основатель и редактор ресурса WikiLeaks. Он является гражданином Австралии, проживает в посольстве Эквадора в Лондоне, Англия. Ассанж оказывал поддержку российскому правительству и организовал ток-шоу для «России сегодня» («RT»), телевизионного пропагандистского рупора российского правительства.

41.     Ответчик WikiLeaks – это организация с неизвестной структурой, которая управляет сайтом WikiLeaks.org, на котором публикует информацию, полученную по каналам утечки, или похищенную конфиденциальную и засекреченную информацию. Адрес регистрации: P.O. Box 701, Сан-Матео, CA 94401.

42.     Ответчик «Избирательная кампания Трампа» - это американская некоммерческая корпорация, организованная и зарегистрированная в Вирджинии 17 июня 2015 г. в поддержку кандидатуры Трампа на пост Президента Соединенных Штатов Америки. Избирательная кампания Трампа зарегистрирована в соответствии с законами штата Вирджиния. Текущий или бывший адрес регистрации: 675 H. Вашингтон Ст., Александрия, VA 22314. Основное место ведения деятельности – Башня Трампа (Трамп Тауэр, 725 Пятая авеню, город Нью-Йорк, NY 10022). С июня 2015 г. по июнь 2016 г. Руководителем избирательной кампании Трампа была Кори Левандовски. С марта 2016 г. по май 2016 г. Организатором мероприятий в поддержку избирательной кампании Трампа на съезде партии был Манафорт, а с мая 2016 г. по август 2016 г. он был главой избирательного штаба Трампа. С июня 2016 г. по август 2016 г. помощником главы избирательного штаба был Гейтс, а с августа 2016 г. по ноябрь 2016 г. он был посредником между избирательным штабом и Национальным комитетом Республиканской партии. По сообщениям многие руководители Избирательной кампании Трампа имели долгосрочные

связи с Россией и участвовали в регулярных переговорах с лицами, связанными с российским правительством в ходе кампании 2016 года.

43.     Ответчик Трамп-младший – старший сын Президента Соединенных Штатов Дональда Дж. Трампа. С 16 июня 2015 г. по 8 ноября 2016 г., когда Дональд Дж. Трамп был кандидатом в Президенты от республиканцев, Трамп-младший часто подменял теперь уже Президента Трампа, и его характеризовали как «близкого политического советника отца» и называли «ключевым игроком в борьбе [его] отца за Белый Дом». Сейчас Трамп-младший работает на посту Исполнительного вице-президента «Организации Трампа» (the Trump Organization), предпринимательской структуры, которой Трамп управлял еще до его инаугурации в качестве Президента Соединенных Штатов Америки. Трамп-младший проживает в городе Нью-Йорк, штат Нью-Йорк.

44.     Ответчик Манафорт – это давний республиканский политтехнолог, который был Организатором мероприятий в поддержку избирательной кампании Трампа на съезде партии с марта 2016 г. по май 2016 г., а с мая 2016 г. по август 2016 г. был главой избирательного штаба Трампа, затем он подал в отставку в связи с появлением сообщений о его сотрудничестве с бывшим пророссийским правительством на Украине. С 27 октября 2017 г. Манафорт обвинялся по десяткам пунктов, включая легализацию доходов, полученных преступным путем, и дачу ложных показаний в связи с его работой на пророссийское правительство на Украине. Манафорт проживает в штате Вирджиния.

45.     Ответчик Стоун – это давнее доверенное лицо Трампа. «[М]ало кто имеет такую же долгую историю взаимоотношений, [как] Трамп [и] Стоун», и Стоун «лелеял мечту о президентской гонке [Трампа]. . . в течение 30 лет». У Стоуна также долгая история знакомства с Манафортом: Манафорт помогал Стоуну вести кампанию за место председателя национального комитета Юных республиканцев в 1977 г. В 1980-х гг. они совместно основали консалтинговую компанию «Блэк, Манафорт, Стоун и Келли». По имеющимся сведениям и убеждениям Стоун был неофициальным советником Трампа и поддерживал с ним связь во время выборов 2016 года. Стоун проживает в штате Флорида.

46.     Ответчик Кушнер – зять Трампа. Он был старшим советником и одним из ключевых лиц, принимающих решения, в Избирательной кампании Трампа. В июне 2016 г. Кушнер «взял на себя всю работу по управлению данными» кампании, организовав «компанию по концентрации и обработке данных» в составе 100 человек в Сан-Антонио, штат Техас, а также наняв Cambridge Analytica, аналитическую компанию по работе с соцсетями, чтобы помочь тестю в его избирательной кампании. Кушнер проживает в Вашингтоне, округ Колумбия.

47.     Ответчик Пападопулос был одним из первых советников кампании Трампа по вопросам внешней политики. Он стал советником кампании Трампа по вопросам внешней политики в марте 2016 г. Пападопулос часто общался с высшим руководством избирательной кампании Трампа летом и осенью 2016 г. Он проживает в Чикаго, штат Иллинойс. 5 октября 2017 г. Пападопулос признал свою вину в одном эпизоде дачи ложных показаний агенту федеральной службы.

48.     Ответчик Гейтс давно работает у Манафорта и является его деловым партнером. С 2006 по 2015 гг. Гейтс принимал активное участие в работе Манафорта на бывший пророссийский режим в Украине и политическую партию, ставшую преемницей данного режима. С 27 октября 2017 г. по 23 февраля 2018 г. Гейтс обвинялся по десяткам пунктов, включая легализацию доходов, полученных преступным путем, и дачу ложных показаний в связи с его работой с Манафортом на пророссийское правительство на Украине. 23 февраля 2018 г. Гейтс признал свою вину в участии в заговоре против Соединенных Штатов Америки и в даче ложных показаний агенту федеральной службы. Гейтс проживает в Ричмонде, штат Вирджиния.

**ОБЩИЕ ОБВИНЕНИЯ**

I. **РАНЕЕ СУЩЕСТВОВАВШАЯ СВЯЗЬ ТРАМПА И ЕГО СОЮЗНИКОВ С РОССИЕЙ И РОССИЙСКИМИ ОЛИГАРХАМИ ПОСЛУЖИЛА ПЛОДОРОДНОЙ ПОЧВОЙ ДЛЯ ОРГАНИЗАЦИИ ПРЕСТУПНОГО СГОВОРА МЕЖДУ РОССИЕЙ И ТРАМПОМ**

49.     Долгосрочные личные, профессиональные и финансовые связи Трампа и нескольких его союзников с Россией и многочисленными лицами, тесно связанными с российским правительством, послужили основанием для организации преступного сговора между Ответчиками с целью вмешательства в выборы 2016 года.

50.     *Деловые связи Трампа с Россией:* Еще в 1980-х гг. Советский Союз оплатил Трампу поездку в Москву для обсуждения проекта строительства, который затянулся и захватил 1990-е и 2000-е гг.[1] В середине 1990-х гг. Трамп обсудил с российскими представителями власти возможность строительства недвижимости в Москве.[2] Начиная с 2003 г. Трамп заключил множество сделок с недвижимостью с Бейрок Групп (Bayrock Group), фирмой, основанной советскими эмигрантами, которые, как сообщается, были тесно связаны с правительством России и российской организованной преступностью.[3] В 2004 г. Трамп обсудил возможности строительства недвижимости с Заместителем мэра Москвы.[4] В середине 2000-х гг. Трамп сотрудничал с состоятельным российско-канадским бизнесменом в рамках строительства недвижимости в Торонто.[5] А в 2006 г. Трамп заключил контракт с корпорацией «Русский стандарт», московской компанией, которая проводит конкурсы красоты «Мисс Россия», об участии победительницы российского конкурса в организуемом Трампом конкурсе красоты «Мисс Вселенная», чего не происходило уже с 2002 г.[6] В 2008 г. Трамп продал особняк в Палм-Бич, штат Флорида, российскому олигарху, получив выгоду $54 миллиона.[7] В 2013 г. Трамп договорился с российским олигархом Арасом Агаларовым, близким соратником Путина, о проведении конкурса красоты «Мисс Вселенная» в России. Также они обсудили проект строительства недвижимости под брендом Трампа в Москве.[8] Попытки Трампа договориться о строительстве недвижимости в России продолжались вплоть до первых месяцев президентской кампании 2016 года.[9] На протяжении всей 30-летней истории Трамп подыскивал в России состоятельных покупателей на свои многоэтажные дома в Соединенных Штатах Америки и за их пределами.[10]

13

51.     Как объяснял Трамп мл., организация Trump Organization «у[видела], что из России идет вливание огромных средств» и «россияне имеют довольно непропорциональную долю в наших активах».[11] Также сообщается, что сын Трампа, Эрик Трамп, заявлял, что значительная часть инвестиций в поля для гольфа Трампа имеет российское происхождение.[12]

52.     ***Связи Манафорта и Гейтса с Украиной***: Манафорт был советником бывшего президента Украины Виктора Януковича («Янукович») и его Партии регионов, связанной с Кремлем, а также ее преемника, Оппозиционного блока, с 2004 года и по меньшей мере до 2015 года.[13] В 2012 году Манафорт якобы помог украинской стороне тайно провести платежи двум известным лоббистским фирмам в Вашингтоне на сумму не менее 2,2 млн долл. США.[14] Связи Манафорта с Януковичем и Украиной настолько глубоки, что его собственная дочь заявила, что «наши деньги — это деньги, заработанные на крови».[15] После неоднократного отрицания того, что он никогда не работал на правительство Украины, 27 июня 2017 года Манафорт ретроактивно зарегистрировался как иностранный агент и задекларировал платежи от Януковича на сумму 17,1 млн долл. США в период с 2012 по 2014 год.[16] Начиная с 27 октября 2017 года, Манафорту были предъявлены обвинения по десяткам пунктов, включая отмывание денег и ложные заявления, связанные с его работой на пророссийское правительство Украины.[17] Дополнительные финансовые отчеты показывают, что до присоединения к кампании Трампа, Манафорт имел долг перед связанным с Путиным олигархом — Олегом Дерипаской («Дерипаска»), в размере 17 миллионов долларов.[18]

53.     В качестве своего ближайшего помощника Манафорт также нанял Константина Килимника («Килимник»). Килимник — бывший российский военный переводчик, который, как полагают, является агентом ГРУ и который, по мнению ФБР, поддерживал связь с российской разведкой в ходе президентской кампании в 2016 году.[19] Килимник взаимодействовал как с Манафортом, так и с Гейтсом, пока они занимали две самые высокие должности в кампании Трампа, и выступал в качестве посредника между ними и Дерипаской.[20]

14

54.     Гейтс непосредственно контактировал с Килимником в качестве высокопоставленного должностного лица кампании Трампа в 2016 году и знал, что Килимник связан с ГРУ.[21]

## II.     ОДНА ЦЕЛЬ: ПОДДЕРЖКА ТРАМПА И ОПОРОЧИВАНИЕ КАНДИДАТА ОТ ДЕМОКРАТИЧЕСКОЙ ПАРТИИ

55.     Общая цель сговора между Россией и помощниками Трампа заключалась в том, чтобы поддержать Трампа в качестве кандидата в президенты, нанести ущерб Национальному комитету Демократической партии США и снизить шансы Демократической партии на успех на президентских выборах 2016 года. Эта общая цель всплыла после анализа нескольких хорошо задокументированных причин.

56.     В декабре 2011 года в России начались массовые протесты в ответ на обвинения в фальсификации результатов парламентских выборов в России. В рамках одного из крупнейших протестов в России со времен падения СССР на улицы вышли тысячи россиян в знак протеста против победы политической партии тогдашнего премьер-министра Путина.[22]

57.     Путин, обеспокоенный сохранением власти и усилением контроля, обвинил в организации протестов тогдашнего госсекретаря Хиллари Клинтон. Путин утверждал, что секретарь Клинтон «задала тон некоторым нашим деятелям внутри страны, дала сигнал». Он также обвинил ее в том, что она активизировала оппозиционное движение: «Они этот сигнал услышали и при поддержке Госдепа США начали активную работу». [23]

58.     В то же время Трамп не сомневался в своих взглядах относительно России. До начала кампании в 2016 году он почти десять лет поддерживал пророссийские и пропутинские взгляды, восхваляя Путина за «большую работу по восстановлению имиджа России» (2007);[24] заявлял, что ему «действительно нравит[я] Владимир Путин, [и] он уважае[т] его. Он хорошо делает свою работу. Гораздо лучше, чем наш Буш» (2008);[25] характеризовал незаконную аннексию Крыма Путиным как «очень умный ход. . . . И он [Путин] действительно идет шаг за шагом, и вы должны дать ему большой кредит доверия» (2014).[26]

59.     Несмотря на очевидные политические риски связи с иностранным деспотом, Трамп продолжал делать хвалебные заявления о Путине в течение значительной части президентский кампании. Он сказал, что у него будут «отличные отношения с Путиным»;[27] что это всегда «большая честь слышать столь комплиментарные высказывания от человека [Путина, который очень] уважаемый в своей стране и за ее пределами».[28]

60.     Кроме того, заявления Трампа, а также его пророссийское окружение, не оставляли сомнений в том, что если он будет избран президентом, он будет проводить политику, которая будет благоприятствовать России и Путину, даже если эта политика будет противоречить установившейся внешней политике и наилучшим интересам Соединенных Штатов. Трамп назвал НАТО «устаревшим» и пригрозил отказаться от обязательств по договорам США;[29] он утверждал, что США не должны противодействовать попыткам России стать глобальной державой; поддержал выход Великобритании из Европейского Союза, отметив, что это, «вероятно», принесет пользу Путину;[30] выступал против санкций США в отношении России за аннексию Крыма, заявив, что «народ Крыма, как я слышал, предпочел бы быть с Россией, нежели там, где он был раньше».[31]

61.     Таким образом, кампания Трампа, помощники Трампа и Россия имели общую цель — противодействие кандидату Клинтон, НКДП и Демократической партии, а также продвижение Трампа, чье президентство, как ожидалось, принесет пользу политическим и финансовым интересам России и, в свою очередь, принесет пользу финансовым интересам Трампа.

62.     Ассанж и WikiLeaks также имели цель — противодействие Клинтон и продвижение Трампа. У Ассанжа были давние конфликты с секретарем Клинтон. Он публично заявлял, что его политические разногласия с Клинтон сделают ее президентство более проблематичным, чем президентство Трампа.[32]

**III.    СГОВОР С ЦЕЛЬЮ РАСПРОСТРАНЕНИЯ УКРАДЕННЫХ ДАННЫХ НКДП ДЛЯ ПОМОЩИ ТРАМПУ**

63.    В отчете за январь 2017 года («Отчет СС») спецслужбы США пришли к такому выводу: «В 2016 году Президент России Владимир Путин поручил провести кампанию по оказанию влияния в рамках президентских выборов в США. Целями этой кампании были подрыв общественной веры в демократические процессы США, очернение госсекретаря Клинтон и нанесение ущерба ее «избираемости и потенциальному президентству».[33] Кроме того, в отчете СС говорится такое: «В июле 2015 года российская разведка получила доступ к сети Национального комитета Демократической партии (НКДП) и имела его по крайней мере до июня 2016 года»; «к маю ГРУ извлекло большие объемы данных из сети НКДП»; «ГРУ передало полученные из сети НКДП и от высокопоставленных представителей материалы в организацию WikiLeaks».

64.    Эта операция по взлому серверов НКДП и распространению украденных материалов НКДП была проведена в Соединенных Штатах: агенты российской разведки проникли в компьютерные серверы, расположенные в Вирджинии и Вашингтоне, округ Колумбия, и украли хранящуюся на этих серверах информацию. Она также проводилась совместно с Ассанжем и WikiLeaks, а также при активной поддержке и одобрении кампании Трампа и его помощников.

65.    Чтобы достичь своей цели, участники сговора действовали сообща. Российские разведывательные службы незаконно взломали компьютерные системы и учетные записи электронной почты НКДП, чтобы украсть и опубликовать коммерческие тайны, в том числе конфиденциальные, секретные документы, связанные с кампаниями, сбором средств и стратегией кампании. Затем российские разведывательные службы распространяли похищенные конфиденциальные материалы с помощью агента № 1 ГРУ, а также WikiLeaks и Ассанжа, которые активно поддерживались кампанией Трампа и его помощниками, поскольку они публиковали и раскрывали эту информацию для американской общественности одновременно и в порядке, который помогал достичь их общих целей. Раскрытие информации американским избирателям было предпринято именно с этой целью и привело к созданию раздора в Демократической партии, отвлечению внимания средств массовой информации от критики Трампа и в целом способствовало повышению рейтинга кандидата в президенты Трампа.

**A. Трамп объявляет о выдвижении себя в качестве кандидата в президенты, а Россия начинает атаку на компьютерные системы НКДП**

66.      16 июня 2015 года в холле Trump Tower Трамп объявил о выдвижении себя в качестве кандидата на пост президента Соединенных Штатов. В следующем месяце Россия совершила кибератаку на НКДП.[34] Хакерские атаки со стороны российской разведки были направлены на системы в Вирджинии и Вашингтоне, округ Колумбия, которые содержали конфиденциальные стратегические и оперативные данные НКДП. Позже раскрытие этих конфиденциальных данных не только значительно нарушило избирательную стратегию НКДП, но также напрямую повлияло на способность НКДП эффективно взаимодействовать и убеждать избирателей и привлекать очень важные средства для организации и поддержки кампании Демократической партии.

**B. Европейские союзники передавали «сигнал тревоги» разведке США в отношении связи россиян с помощниками Трампа**

67.      Начиная с конца 2015 года, европейские спецслужбы начали сообщать властям США о подозрительных связях между лицами, связанными с кампанией Трампа, и российскими агентами, включая подозреваемых агентов разведки. В течение следующих шести месяцев, а также летом 2016 года европейские разведывательные агентства сообщали о продолжении контактов между помощниками Трампа и российскими агентами.

**C. Во время президентской кампании Трамп подписывает письмо о намерении построить Trump Tower в Москве**

68.      Осенью 2015 года, когда Трамп проводил свою президентскую кампанию, члены Trump Organization активно вели переговоры с россиянами касательно строительства в Москве объекта недвижимости под брендом Trump (давняя цель Трампа).[35] В октябре 2015 года Trump Organization получила письмо о намерении получить разрешение на строительство в Москве объекта под именем Trump.[36] Трамп подписал письмо о намерениях.[37]

69. Посредником в сделке выступал Феликс Сатер, российский эмигрант, осужденный за преступление, и давний деловой партнер Trump Organization.[38] Финансирование проекта должен был осуществлять «Внешторгбанк» или «ВТБ» — российский банк, против которого Министерство финансов Соединенных Штатов ввело санкции.[39]

70. 3 ноября 2015 года в электронном письме Коэну Сатер объяснил, как этот проект будет способствовать стремлению Трампа стать президентом:

> Я и Майкл договорились, что Иванка посидит [как в оригинале] в кресле за столом Путина в его кабинете в Кремле. Я привлеку Путина к этой программе, и мы добьемся избрания Дональда. Мы оба знаем, что никто другой не знает, как успешно сделать это без глупости или жадности. Я знаю правила этой игры, поэтому мы сделаем это. Дружище, наш приятель может стать президентом США, мы можем это проверить. Я привлеку всю команду Путина [как в оригинале] к этому проекту и буду контролировать процесс.[40]

**D.      Кампания Трампа углубляет связи с Россией и агентами российской разведки**

71. С весны 2016 года до президентских выборов 2016 года высокопоставленные и другие советники кампании Трампа, в том числе Манафорт, Гейтс, Кушнер, Пападопулос и другие, часто контактировали с людьми, связанными с российской разведкой и российским правительством.[41]

72. В марте 2016 года Пападопулос был уведомлен о том, что он станет советником по внешней политике в рамках кампании Трампа и что основным направлением внешней политики кампании Трампа будет улучшение отношений с Россией.[42] 21 марта 2016 года Трамп заявил, что Пападопулос будет одним из главных членов команды Трампа по внешней политике.[43]

73. Впоследствии Пападопулос часто общался с профессором Джозефом Мифсудом из Лондона. В своем заявлении о признании вины Пападопулос засвидетельствовал, что он «понимал, что профессор имел связи с высокопоставленными чиновниками из правительства России». Кроме того,

Пападопулос признался, что «неоднократно пытался использовать российские связи профессора, чтобы организовать встречу между кампанией и должностными лицами из правительства России».[44]

74.     Согласно формулировке обвинения Пападопулоса, Мифсуд изначально был «не заинтересован» в Пападопулосе, однако «проявил большой интерес», когда Пападопулос был публично назван членом команды Трампа по внешней политике. В результате:

(a)     14 марта 2016 года Мифсуд встретился с Пападопулосом в Италии.

(b)     24 марта 2016 года Мифсуд снова встретился с Пападопулосом и на этот раз привез с собой гражданина России, который был представлен как родственник Путина.

(c)     18 апреля 2016 года Мифсуд представил Пападопулоса человеку, который, по его словам, имел связи с Министерством иностранных дел России. Пападопулос имел несколько разговоров по Skype с этим человеком, в ходе которых они обсудили встречу российских официальных лиц с кампанией Трампа.

(d)     26 апреля 2016 года Мифсуд снова встретился с Пападопулосом в Лондоне. На этой встрече Мифсуд сказал Пападопулосу, что у россиян есть «тысячи писем», которые могут нанести ущерб президентской кампании Хиллари Клинтон.[45] Пападопулос понял, что Мифсуд «недавно» встречался с российскими официальными лицами в Москве, чтобы передать эту информацию.[46]

75.     В ноябре 2017 года в интервью итальянской газете Мифсуд признал связи с Пападопулосом и заявил, что встречался с ним «три или четыре раза» и свел его с «официальными и неофициальными источниками».

76.     Кампания Трампа знала об этих встречах и поощряла их. После встречи с Мифсудом и российским гражданином 24 марта 2016 года, Пападопулос сообщил кампании Трампа, что целью его разговора было «организовать встречу между нами и российским руководством для обсуждения американо-российских отношений при президенте Трампе».[47] Узнав о данной встрече, Национальный сопредседатель Сэм Кловис ответил, что он «проработает это через кампанию» и добавил: «Отличная работа».[48]

**E. Россия крадет огромное количество документов у НКДП в то время, как сотрудник Трампа хвастается украденными документами**

77.   18 апреля 2016 года Россия инициировала вторую фазу кибератаки на сервера НКДП, расположенные в штате Виргиния и городе Вашингтон округа Колумбия. Данная атака была осуществлена агентами ГРУ и была нацелена на исследовательский отдел, хранилища документов, отдел информационных технологий и другие отделы НКДП. По имеющимся сведениям и убеждениям, высокопоставленные российские должностные лица приказали агентам ГРУ проникнуть на сервера НКДП, и агенты были обязаны выполнить этот приказ.

78.   22 апреля 2016 года ГРУ подготовили несколько гигабайт данных НКДП, расположенных на серверах НКДП, для несанкционированного и тайного просачивания — или, как это чаще называется, кражи.

79.   Через четыре дня, 26 апреля 2016 года, Пападополус снова встретился с российским агентом Мифсудом. Во время встречи Мифсуд сообщил Пападополусу, что у русских «есть грязь на [Хиллари Клинтон]» в виде «тысячей электронных писем».[49] В своем заявлении о признании вины Пападополус подтвердил, что он понял, что у Мифсуда были «значительные связи с высокопоставленными государственными служащими» и что он «встретился с некоторыми из этих служащих в Москве незадолго до того, как рассказал [Пападополусу] о «тысячах электронных писем»».[50] Вместо того, чтобы сообщить подобную информацию каким-либо властям или приостановить коммуникацию с Мифсудом, Пападополус в восторге послал электронное письмо должностному лицу кампании Трампа 27 апреля 2016 году, в котором говорилось: «Очень интересные сообщения приходят из Москвы относительно поездки в подходящий момент». Он также отправил электронное письмо менеджеру кампании Трампа Кори Левандовски, вновь заявляя о заинтересованности России принять Трампа. А в мае 2016 года Пападополус по секрету сообщил австралийскому дипломату, что у России имеется политический компромат на Секретаря Клинтон. Австралийский дипломат сообщил это властям США.[51] Этот разговор между Пападополусом и австралийским дипломатом побудил ФБР начать контрразведывательное расследование связей между Россией и кампанией Трампа.[52]

80.     В ходе кампании, по крайней мере, до середины августа 2016 года, Пападополус продолжал общаться с российскими гражданами и сообщать информацию об этих связях должностным лицам кампании Трампа, которые призывали его организовать неофициальную встречу с российскими властями от имени кампании.[53] В октябре 2017 года Пападополус признал свою вину в том, что лгал относительно этих связей с российскими гражданами.[54]

81.     После получения первоначального доступа, на протяжении месяцев, российские спецслужбы поддерживали несанкционированное присутствие на серверах НКДП, расположенных в Соединенных Штатах. К маю 2016 года Россия украла большое количество конфиденциальных данных у НКДП, включая информацию о спонсорах, исследовательские сведения о политической оппозиции, информацию относительно запланированной политической деятельности и тысячи частных конфиденциальных электронных писем.

**F.      НКДП обнаруживает взлом и нанимает компанию CrowdStrike**

82.     28 апреля 2016 года персонал отдела ИТ НКДП обнаружил и, в конечном счете, подтвердил доступ к сети НКДП неуполномоченных пользователей.

83.     После обнаружения вторжения, НКДП связался с CrowdStrike Services, Inc. («CrowdStrike»), фирмой, предоставляющей технологии кибербезопасности, в целях расследования атаки, оценки вреда, нанесенного компьютерам и серверам НКДП, и помощи НКДП с мероприятиями по ликвидации последствий.

84.     CrowdStrike провел экспертный анализ компьютерной сети и серверов НКДП. CrowdStrike также установил систему для наблюдения за текущей атакой на компьютерную систему истцов и оповещения НКДП о будущих атаках.

85.     В результате устойчивости финансируемого Россией проникновения в систему, чтобы удалить несанкционированных пользователей из своей сети, НКДП потребовалось вывести из эксплуатации более 140 серверов, удалить и переустановить все программное обеспечение, включая операционные системы, на более 180 компьютерах и перестроить, по меньшей мере, 11 серверов.

22

### G. Результаты экспертизы подтверждают атаку России на сеть НКДП

86. Как экспертный анализ компании CrowdStrike, так и правительство США пришли к выводу, что компьютерные системы НКДП были взломаны двумя независимыми, изощренными, финансируемыми Россией противниками, оба связанными со спецслужбами России.[55] Эксперты-аналитики отследили хакерскую деятельность этих противник, присвоив им кодовые названия: «Уютный медведь» (Cozy Bear) и «Модный медведь» (Fancy Bear), которые соотносятся с более широко известными названиями Продвинутая постоянная угроза 29 (ППУ 29) и Продвинутая постоянная угроза 28 (ППУ 28), соответственно.[56] В докладе разведывательного сообщества делается вывод, что «Уютный медведь» действовал в качестве агента ГРУ.

87. Экспертный анализ обнаружил доказательство тому, что «Уютный медведь» проник и оставался в сети НКДП с, по крайней мере, 27 июля 2015 года. В докладе разведывательного сообщества также делается вывод о том, что российская разведка впервые получила доступ к сети НКДП в июле 2015 года. CrowdStrike также определил, что «Уютный медведь» использовал украденные данные учетных записей пользователей, чтобы получить доступ к компьютерным системам НКДП.

88. CrowdStrike определил, что целью «Уютного медведя» было получить доступ и собрать информацию из систем НКДП, которые, по большей части, использовались для коммуникаций. Анализ выявил вредоносное программное обеспечение «Уютного медведя» в системах НКДП, предоставляющих электронную почту, поддержку электронной почты, резервные сервера, голосовой интернет протокол и чат.

89. Правительство США пришло к выводу, что «Уютный медведь» был оперативным сотрудником или был связан с российской разведывательной службой.[57]

90. НКДП впервые обнаружил проникновение ГРУ, или «Уютного медведя», в свою сеть 28 апреля 2016 года.

91. CrowdStrike установил, что целью ГРУ было собрать информацию о политической и исследовательской деятельности НКДП.

23

92.     22 апреля 2016 года ГРУ подготовил несколько гигабайтов данных, включающих исследовательскую информацию о политическом оппоненте Дональде Трампе, к просачиванию.

93.     По имеющимся сведениям и убеждениям, ГРУ несанкционированно переместил документы НКДП, а оперативный сотрудник ГРУ № 1 опубликовал эти документы публично онлайн.

94.     Согласно анализу метаданных других документов, документы, изначально располагавшиеся на серверах НКДП, были опубликованы без разрешения на вебсайте по адресу www.guccifer2.wordpress.com оперативным сотрудником № 1 ГРУ.

95.     Экспертный анализ демонстрирует, что и «Уютный медведь» и «Модный медведь» использовали украденную информацию учетных записей пользователей, чтобы получить доступ к компьютерным системам НКДП. [58]

96.     Более того, экспертный анализ показал, что хакеры получили доступ к передачи голосовой связи по интернет-протоколу («VOIP») НКДП, что позволило им прослушивать голосовые коммуникации такие, как телефонные звонки и голосовую почту.

97.     По имеющимся сведениям и убеждениям, хакеры перехватили или попытались перехватить электронные письма и голосовые сообщения во время их нахождения на серверах НКДП.

**H.      Русские предлагают помощь Трампу — и сотрудники Трампа принимают предложение**

98.     Трамп закрепил за собой место кандидата на должность президента от республиканской партии 26 мая 2016 года. Через неделю был запущен план распространить информацию, компрометирующую демократическую партию и НКДП.

99.     3 июня 2016 года Арас и Эмин Агаларовы выступили с предложением о помощи от российского правительства кампании Трампа, о чем свидетельствует следующее сообщение:

Доброе утро.

Эмин [Ответчик Эмин Агаларов] только что позвонил и попросил меня связаться с вами относительно очень интересной информации.

Государственный прокурор России встретился с его отцом Арасом [Ответчик Арас Агаларов] сегодня утром и во время встречи предложил предоставить

24

кампании Трампа некоторые официальные документы и информацию, которая бы инкриминировала Хиллари и ее сделки с Россией и была бы очень полезна твоему отцу.

*Это, безусловно, очень конфиденциальная информация высокого уровня, но она является частью поддержки России и ее правительства г-ну Трампу – при содействии Араса и Эмина.*

. . .

(Выделение наше.)[59]

100.   Через семнадцать минут Трамп младший ответил:

Спасибо Роб, я это ценю. В настоящий момент я нахожусь в дороге, но, возможно, я сначала поговорю только с Эмином. Кажется, у нас есть немного времени, и *если это то, что ты говоришь, мне это нравится, особенно, позже летом.*

(Выделение наше.)[60]

101.   7 июня 2016 года вскоре после того, как встреча между русскими и сотрудниками Трампа была назначена, Трамп младший написал в электронном сообщении: «Замечательно. Скорее всего на встрече будут присутствовать Пол Манафорт (руководитель кампании), мой зять и я, 725 Fifth Ave 25-ый этаж».[61] В этот вечер Трамп объявил, что он выступит с «важной речью... во время которой обсудит все, что произошло с Клинтонами».[62]

102.   Через два дня, 9 июня 2016 года, произошла встреча между русскими и сотрудниками Трампа. Кампанию Трампа представлял ближний круг Трампа: Трамп младший, Кушнер и Манафорт. Интересы России представляли публицист Агаларова Роб Голдстоун, российский адвокат Наталья Весельницкая, имеющая связи с Кремлином, деловой партнер Агаларова Ираклий Кавеладзе, лоббист Ринат Ахметшин и переводчик.[63]

103.   Трамп и Трамп младший позже приложат большие усилия, чтобы скрыть информацию об этой встрече и ее содержании. На протяжении месяцев Трамп младший и другие лица, которые знали о встрече в июне 2016 года, отрицали какие-либо связи с русскими во время кампании. Например, в марте 2017 года, когда его спросили, были ли у него какие-либо встречи с русскими относительно президентской кампании, Трамп младший ложно заявил: «Безусловно, не было, где я бы представлял

кампанию в какой бы то ни было форме». Спустя несколько месяцев, в июле 2017 года, столкнувшись с ограниченной информацией о встрече в июне 2016 года, Трамп младший опубликовал ряд ложных заявлений, которые превратно истолковывали и опускали основные факты об июньской встрече 2016 года, а также об электронной переписке, которая привела к этой встрече, включая предложение русских предоставить компрометирующую информацию о кандидате демократической партии на должность президента, и тот факт, что в электронной переписке Трампа младшего явно информировали о том, что российское правительство желает помочь кампании Трампа. Согласно новостным сообщениям Трамп помог написать первое из этих ложных заявлений после отказа от первоначальной попытки полностью разгласить характер встречи в июне 2016 года.

I.     **После встречи в Трамп-тауэр Россия запускает массовое публичное распространение украденных документов НКДП**

104.     Первое публичное разглашение того, что русские вмешивались в выборы 2016 года, произошло 14 июня 2016 года, когда НКДП публично заявило о том, что их системы были взломаны российскими разведывательными агентствами. [64]

105.     На следующий день, 15 июня 2016 года, оперативный сотрудник ГРУ № 1 взял на себя ответственность за взлом НКДП и просочил исследовательский доклад НКДП о противнике Трампе от декабря 2015 года.[65] Оперативный сотрудник ГРУ № 1 также разгласил, что он предоставил документы НКДП WikiLeaks. [66]

106.     Стратегическое распространение документов НКДП ГРУ продолжалось, без остановки, до, по крайней мере, июня и начала июля 2016 года, включая:

(a)     21 июня 2016 года оперативный сотрудник ГРУ № 1 разгласил украденные документы НКДП о госсекретаре Клинтоне, через день после увольнения Трампом Кори Левандовски 20 июня. [67]

(b)     30 июня 2016 года оперативный сотрудник ГРУ № 1 разгласил публике украденные документы НКДП, включая исследования республиканских кандидатов и госсекретаря Клинтона.[68]

(c)     6 июля 2016 года оперативный сотрудник ГРУ № 1 разгласил украденные документы НКДП, включая стратегические документы НКДП, связанные со «встречным съездом» НКДП съезду НКРП. [69] Это произошло через день после того, как директор ФБР Джеймс Коми объявил, что Госсекретарю Клинтон не будет предъявлено каких-либо уголовных обвинений за поддержание частного сервера электронной почты во время ее работы в Государственном департаменте. [70]

**J. Кампания Трампа блокирует добавление в программу республиканской партии США текста, направленного против России**

107.    18 июля 2016 года во время Национального съезда республиканской партии члены кампании Трампа вмешались, чтобы предотвратить внесение поправок Комитетом по вопросам внешней политики Национального комитета республиканской партии в проект программы, связанных с призывом к Соединенным Штатам предоставить летальное оружие Украине в целях защиты от России. Кампания Трампа преуспела в этих усилиях, смягчив предложенную поправку, чтобы поддержать только «надлежащую помощь» Украине.

108.    За несколько дней до того, как кампания Трампа смягчила формулировку программы, председатель кампании Трампа написал электронное письмо Константину Килимнику, его давнему помощнику, имеющему связи с ГРУ, предлагая частные брифинги о президентской кампании российскому олигарху и союзнику Путина Олегу Дерипаска. После съезда, сообщается, что Килимник заявил окружающим, что он сыграл роль в успехе кампании Трампа по смягчению поправки, касающейся Украины.

**K. После того, как кампания Трампа блокирует антироссийский текст в программе республиканской партии, WikiLeaks начинает распространять украденные документы НКДП**

109.    22 июля 2016 года, всего за три дня до Национального съезда демократической партии, WikiLeaks опубликовал первую крупную часть электронных писем и документов НКДП, украденных российскими спецслужбами. Эти электронные письма содержали имена, адреса, номера телефонов, даты рождения, номера социального страхования, номера паспортов и другую идентифицирующую информацию лиц, связывавшихся или сделавших пожертвование НКДП. В разглашение также вошли десятки частных голосовых сообщений сотрудникам НКДП.[71]

110.    В разгаре Съезда демократической партии Трамп и кампания Трампа открыто праздновали эту утечку, и Трамп сам призывал Россию продолжать хакерскую кампанию. Во время пресс-конференции, всего через пять дней, подробно комментируя материалы, украденные с серверов НКДП, Трамп призвал русских продолжать их взлом: «Россия, если вы слушаете, я надеюсь, что вы

сможете найти 30000 потерянных электронных писем». Затем он предсказал, что Россию ждут великие награды, если это произойдет, заявив: «Я думаю, что, вероятно, вы будете чрезвычайно в почете у нашей прессы. Давайте посмотрим, если это произойдет».[72]

**L.** **Сотрудники Трампа тайно общаются с русскими агентами и WikiLeaks по мере стратегического разглашения украденных документов НКДП**

111. Несанкционированное разглашение документов с серверов НКДП Россией посредством WikiLeaks и оперативным сотрудником ГРУ № 1 посредством онлайн персоны «Guccifer 2.0» продолжалось до ноября 2016 года с критическим увеличением объема и наносимого ущерба этих разглашений, когда начались всеобщие выборы.

112. С июня 2016 года по октябрь 2016 года ГРУ и оперативный сотрудник ГРУ № 1 посредством онлайн персоны «Guccifer 2.0» систематически разглашали украденные у НКДП документы на регулярной основе. [73] Многие из разглашений были спланированы таким образом, чтобы отвлечь внимание от негативного освещения кампании Трампа, а также завуалировать положительные новости о кампании Клинтон и деятельности НКДП – что служило общим интересам сотрудникам Трампа, России и WikiLeaks.

113. Начиная с весны 2016 года, давний друг и политический советник Трампа Роджер Стоун неоднократно заявлял, что он связывался с Ассанжем и WikiLeaks, а также с оперативным сотрудником ГРУ № 1 относительно имеющейся у них информации, которая нанесла бы ущерб кампании Клинтон, высокопоставленным членам демократической партии и председателю кампании Клинтон Джону Подеста. [74] Многие из этих заявлений от Стоуна были сделаны задолго до того, как стало публично известно, что компьютерные системы НКДП и электронная почта Подесты были взломаны теми же русскими разведывательными службами. [75]

114. 8 августа 2016 года, выступая перед местной группой республиканской партии во Флориде, Стоун предсказал будущие разглашения украденных материалов: «Я разговаривал с Ассанжем.

Я думаю, что следующая часть его документов связана с Фондом Клинтонов, но пока еще нельзя сказать, каким будет октябрьский сюрприз».[76]

115.    12 августа 2016 года Стоун сказал, что он считает, что у Ассанжа есть электронные письма, принадлежащие госсекретарю Клинтон.[77] В этот же день оперативный сотрудник ГРУ № 1 распространил еще одну серию украденных документов – в этот раз содержащих личную информацию о кандидатах демократической партии.[78] Чуть позже, 12 августа, оперативный сотрудник ГРУ № 1 опубликовал твит, адресованный Стоуну: «Спасибо, что вы верите в реального #Guccifer2».[79]

116.    Также 12 августа 2016 года оперативный сотрудник ГРУ № 1 разгласил документы, украденные у других организаций демократической партии, включая стратегические меморандумы пяти избирательных кампаний в палату представителей США во Флориде.[80] Эти документы были разглашены всего лишь за несколько дней до законодательных предварительных выборов в ключевом колеблющемся штате Флорида.[81]

117.    Начиная с 14 августа 2016 года, Стоун начал тайно общаться с оперативным сотрудником ГРУ № 1.[82] 17 августа 2016 года оперативный сотрудник ГРУ № 1 опубликовал твит, адресованный Стоуну: «пожалуйста, скажи мне, если я могу тебе чем-нибудь помочь. мне было бы это очень приятно».[83]

118.    21 августа 2016 года во время коммуникаций с Ассанжем и русской разведкой, Стоун пророчествовал о будущем распространении электронных писем Подесты, опубликовав в Твиттере: «Поверьте мне, скоро придет время Подесты оказаться в плохой ситуации». [84] В то время еще не было публичного разглашения, что электронная почта Подесты была взломана.

119.    В середине сентября 2016 года Стоун точно предсказал по радио Бостон Херальд, что он ожидает, что «Джулиан Ассанж и сотрудники WikiLeaks будут еженедельно разглашать огромное количество новых документов о Хиллари довольно скоро». [85]

120.    К 20 сентябрю 2016 года Трамп младший также тайно общался с WikiLeaks. В ходе обмена сообщениями WikiLeaks предоставил Трампу младшему пароль к антитрампскому вебсайту PAC и попросил Трампа младшего, чтобы его отец ретвитнул ссылку на вебсайт WikiLeaks, содержащий

29

украденные документы демократической партии. [86] Через пятнадцать минут после того, как WikiLeaks отправил этот запрос, Трамп, на самом деле, опубликовал в Твиттере: «Слишком мало освещается нечестными СМИ поразительная информация, предоставленная WikiLeaks. Настолько нечестные! Коррумпированная система!»[87]

121.    2 октября 2016 года Стоун заявил в Твиттере: «В среду @ХиллариКлинтон конец. #WikiLeaks».[88] А 3 октября 2016 года Стоун повторил, что он был уверен, что WikiLeaks продолжит распространять украденные материалы: «Я совершенно уверен, что @wikileaks и мой герой Джулиан Ассанж скоро просветит американский народ».[89]

122.    Через четыре дня, 7 октября 2016 года — и только через час после разглашения скандально известной записи Hollywood Access, в которой Трамп признавался в сексуальном домогательстве женщин — WikiLeaks разгласил 2000 электронных писем, украденных у Подесты.[90] WikiLeaks продолжил разглашать документы, украденные у Подесты практически ежедневно до 9 ноября 2017 года – как и предсказал Стоун.[91]

**M.    Трамп публично хвалит незаконное распространение украденных документов НКДП**

123.    Трамп неоднократно приветствовал разглашение документов, украденных русскими, и призывал СМИ и избирателей уделять больше внимания утечкам.

124.    24 июля 2016 года Трамп опубликовал в Твиттере: «Демократы находятся в полном развале, в то время как пристрастные СМИ говорят, что у них все замечательно! Эмэйлы подтверждают, что коррумпированная система здравствует и поныне!»[92]

125.    24 июля 2016 года Трамп опубликовал в Твиттере: «Если бы республиканский съезд взорвался электронными письмами, отставкой босса и подавлением крупного игрока. (Берни), СМИ бы вышло из себя[.]»[93]

126.    25 июля 2016 года Трамп опубликовал в Твиттере: «В городе новая шутка, что Россия просочила ужасные электронные письма НКДП, которые никогда не должны были быть написаны (глупые), потому что я нравлюсь Путину».[94]

127.    12 октября 2016 года Трамп опубликовал в Твиттере: «Слишком мало освещается нечестными СМИ поразительная информация, предоставленная WikiLeaks. Настолько нечестные! Коррумпированная система!»[95]

128.     Подобным образом, 14 октября 2016 года, Трамп младший опубликовал в Твиттере: «Для тех, у кого есть время прочитать о всей коррупции и лицемерии, все @wikileaks электронные письма здесь: http://wlsearch.tk/».[96] Ссылка в твите от 14 октября 2016 года была предоставлена Трампу младшему WikiLeaks через частный твит на учетную запись Твиттера Трампа младшего.[97]

129.     На своих митингах Трамп неоднократно обсуждал разглашение документов на WikiLeaks, с энтузиазмом направляя внимание на эти украденные документы, что отражают нижеуказанные заявления:

(a)     10 октября 2016 года: Трамп сказал «Я люблю WikiLeaks.. .»[98]

(b)     31 октября 2016 года: Трамп сказал, что «WikiLeaks подобно сокровищнице» и «Вы видели, где в Wikileaks было объявлено, что они платили протестующим быть агрессивными 1500 долларов».[99]

(c)     2 ноября 2016 года: Трамп сказал: «WikiLeaks только что опубликовал новую серию» и «[WikiLeaks] только что продемонстрировал, что [это] коррумпированная система с большим сговором, возможно, незаконным, между Министерством юстиции, кампанией Клинтон и Госдепартаментом».[100]

(d)     4 ноября 2016 года: Трамп сказал: «Ох, как я люблю читать эти WikiLeaks».[101]

(e)     6 ноября 2016 года: Трамп процитировал Wikileaks, заявив о том, что «Клинтон отправляла сведения, представляющие государственную тайну, через свою горничную». [102]

(f)     7 ноября 2016 года: Трамп: «У них все есть, у WikiLeaks. WikiLeaks».[103]

130.     В итоге, 6 ноября 2016 года — всего за два дня до выборов и в критическое время для непринявших решение избирателей — WikiLeaks разгласил дополнительные украденные электронные письма НКДП, которые они назвали «Утечка НКДП 2».[104] Электронные письма включали, помимо прочего, внутренние обсуждения относительно стратегии и коммуникационных усилий НКДП. [105]

**N.** **Трамп — и Россия — выиграли.**

131.    8 ноября 2016 года Трамп победил в выборах на должность президента Соединенных Штатов.

132.    В Москве реакцией было торжество. Когда в Думе (российском парламенте) узнали о победе Трампа, законодатели стали рьяно аплодировать, а объявление Вячеслава Никонова, члена Комитета по иностранным делам, почти заглушили апплодисментами и приветствиями.[106] Никонов заявил: «Три минуты назад Хиллари Клинтон подтвердила свое поражение на президентских выборах США и всего пару секунд назад Трамп начал выступать с речью избранного президента. Я поздравляю вас всех с этим».[107] Общая цель ответчиков была достигнута.

## IV.    НЕОДНОКРАТНЫЕ УСИЛИЯ ОТВЕТЧИКОВ СКРЫТЬ СВЯЗИ С РУССКИМИ ДОКАЗЫВАЮТ ИХ ОСОЗНАНИЕ СВОЕЙ ВИНЫ

133.    Советники Трампа неоднократно отрицали, что члены кампании Трампа имели контакты с русскими или российскими должностными лицами, а при столкновении с опровергающими доказательствами, делали ложные и вводящие в заблуждение заявления относительно характера этих контактов. Например:

(a)    24 июля 2016 года Трампа младшего спросили о предположении, что разглашение украденных электронных писем НКДП от 22 июля 2016 года было частью российского заговора «помочь Дональду Трампу и нанести вред Хиллари Клинтон». Несмотря на то, что неделями ранее его проинформировали по емейлу о существовании такого замысла, Трамп младший ответил: «Это лишь доказывает их нравственные ориентиры. Они скажут что угодно, лишь бы выиграть. Это повторяется снова и снова, ложь за ложью... Это отвратительно; это так фальшиво».

(b)    24 июля 2016 года, всего лишь через несколько недель после его участия в июньской встрече 2016 года, Пола Манафорта спросили, были ли какие-либо «связи у г-на Трампа, вас и вашей кампании с Путиным и его режимом». Манафорт ответил: «Нет, не было. Это абсурд. И вы знаете, что для этого нет никаких оснований».

(c)    11 ноября 2016 года пресс-секретарь кампании Трампа Хоуп Хикс сделала заявление *Associated Press*, в котором она отрицала, что у кампании Трампа были какие-либо связи с какой-либо «иностранной организацией» во время кампании: «Этого никогда не было. В ходе кампании не было никаких связей между кампанией и какой-либо иностранной организацией».

(d)     18 декабря 2016 года менеджера кампании Трампа Келлиэнн Конуэй спросили, были ли у кого-либо в кампании Трампа «какие-либо связи с русскими, которые вмешивались в выборы?» Конуэй ответила: «Совершенно не было. И я это обсуждала с избранным президентом только вчера вечером. Таких разговоров никогда не было. Я слышу, как люди обсуждают это, как о факте на телевидении. Это не только неточно и ложно, но и опасно».

(e)     В марте 2017 года Трамп младший ложно заявил: «Встречался ли я с русскими людьми? Я уверен, я уверен, что встречался. Но ни одна из встреч не была организованной. Ни одна, из тех, что я могу подумать в настоящий момент. И, безусловно, ни одна, во время которой я бы хоть каким бы то ни было образом представлял кампанию».

(f)     8 июля 2017 года Трамп младший сделал крайне дезориентирующее заявление об июньской встрече 2016 года, которое, как сообщается, было подготовлено его отцом: «Это была короткая вводная встреча. Я попросил Джареда [Кушнера] и Пола [Манафорта] ненадолго остановиться. Мы, в основном, обсуждали программу усыновления русских детей, которая действовала и была популярной среди американских семей несколько лет назад и с тех пор была прекращена российским правительством, но это не входило в интересующие вопросы кампании и не было никаких последующих действий...»

(g)     9 июля 2017 года Трамп младший сделал еще одно крайне дезориентирующее заявление об июньской встрече 2016 года, которое продолжало опускать тот факт, что ему сообщили, что российское правительство пытается помочь его отцу: «Женщина сообщила, что у нее была информация, что лица, связанные с Россией, финансировали Национальный комитет демократической партии и поддерживали г-жу Клинтон. Ее заявления были неопределенными, неоднозначными и не имели никакого смысла. Не было не только не предоставлено, но и не предложено никаких деталей или поддерживающей информации. Очень быстро стало ясно, что у нее не было никакой значимой информации. Она затем сменила тему и начала обсуждать усыновление русских детей и отметила закон Магнитского. Мне стало ясно, что все это время это была реальная тема встречи, а заявления о потенциально полезной информации были предлогом для встречи».

(h)     5 октября 2017 года Пападополус признал свою вину в том, что он лгал относительно связей с Мифсудом и другими русскими в ходе опроса ФБР. Пападополус также удалил свою учетную запись в Facebook, очистил другие учетные записи в социальных сетях и изменил свой номер мобильного телефона в попытке скрыть эти контакты.

134.    Российское правительство также неоднократно отрицало свою ответственность за вмешательство в выборы 2016 года, включая кибератаки на НКДП. Подобным образом, WikiLeaks и Ассанж неоднократно отрицали, что украденные материалы НКДП, распространенные ими, были предоставлены им Россией, и поставили под сомнение то, что Россия несет ответственность за кибератаки на НКДП.

## V.     ЗНАЧИТЕЛЬНЫЙ УЩЕРБ, НАНЕСЕННЫЙ ИСТЦУ

135.     Незаконный сговор нанес огромный ущерб НКДП. Выбор времени и избирательное разглашение украденных материалов не позволяли НКДП общаться с американским электоратом на своих условиях. Эти выборочные разглашения похищенного материала достигают пика непосредственно перед Национальным съездом демократической партии и продолжаются на всеобщих выборах.

136.     Сроки и выборочная публикация украденных материалов были задуманы для внесения разобщающего фактора между Национальным комитетом Демократической партии США и сторонниками Демократической партии. Выпуск украденных материалов также подорвал способность Национального комитета оказывать поддержку кандидатам от Демократической партии на всеобщих выборах.

137.     Публикация украденных материалов Национального комитета имела разрушительное действие на Национальный комитет, подорвав способность партии достичь единства и сплотить своих членов вокруг общих интересов. Эта публикация бросила тень на деятельность комитета, подрывая способность партии донести свое видение до электората.

138.     Публикация обозначенного украденного материала не позволила Национальному комитету обеспечить эффективное общение своих сотрудников с членами партии и широкой публикой. Сотрудники Национального комитета в результате подвергались постоянным угрозам по телефону и электронной почте, которые были неизбежны ввиду того, что сотрудники не могли изменить свои контактные данные во время работы конвенции.

139.     Кроме того, в критические последние месяцы президентской кампании политическая деятельность и деятельность по сбору средств Национальным комитетом была в значительной степени приостановлена и дестабилизирована по всей территории Соединенных Штатов. В частности, обнародование личной, а иногда и компрометирующей, информации о донорах Национального комитета негативно сказалось на поступлениях благотворительных взносов в адрес Национального комитета, что привело к существенной потере в доходах Национального комитета и сокращению общих сумм средств, которые комитет мог выделить на поддержку кандидатов от демократов по всей стране.

140.    Помимо прочего, поскольку в публикациях разглашалась личная, а в некоторых случаях и засекреченная информация о сотрудниках Национального комитета, сотрудники комитета подверглись преследованиям, которые носили весьма серьезный, а иногда и опасный, характер. Естественно, что такие преследования ослабили способность сотрудников эффективно выполнять свои обязанности.

141.    22 июля 2016 года, в день, когда WikiLeaks опубликовали первые украденные письма, один из сотрудников Национального комитета получил голосовое сообщение от неизвестного абонента, в котором говорилось, что этот сотрудник должен быть «казнен» и выразил свою надежду на то, что этот сотрудник «окажется в тюрьме, будет предан суду и казнен за предательство».

142.    23 июля 2016 года несколько сотрудников Национального комитета получили электронные письма, в которых говорилось: «Я надеюсь, что ваши дети будут изнасилованы и убиты, а вашу семью постигнут страдания, пытки и смерть».

143.    24 июля 2016 года один из сотрудников получил голосовое сообщение, в котором сообщалось, что он «является мишенью», и что ему лучше «внимательно смотреть по сторонам, [ругательство]. . .»: «Ты [ругательство]. Умрешь, умрешь, умрешь. Ненавижу тебя [ругательство], ты [ругательство]. Я целюсь тебе в спину. Снайперы следуют за тобой. Ты [ругательство].»

144.    Еще один сотрудник получил сообщение, полное ненормативной лексики и предупреждающее его, что «за [ним] придут». Эти угрозы, и многие другие, начались после 22 июля, когда WikiLeaks опубликовали более 20 000 писем, украденных у Национального комитета и содержащих имена, адреса электронной почты и номера телефонов сотрудников комитета.

145.    Кроме того, поведение Ответчиков нанесло большой ущерб компьютерным системам комитета, создав необходимость: (a) ремонта и замены компьютерного оборудования, программного обеспечения, телефонной связи и телефонных систем, а также системы резервного копирования из-за ущерба, нанесенного взломом и последующей публикацией этой информации; (b) удержания сотрудников

и консультантов для проведения расследования взлома; и (с) удержание персонала и консультантов для устранения ущерба, понесенного в результате взлома.

## ОСНОВАНИЕ ДЛЯ ИСКА

### ПУНКТ I
**АКТ О КОМПЬЮТЕРНОМ МОШЕННИЧЕСТВЕ И ЗЛОУПОТРЕБЛЕНИИ
(18 раздел Свода законов США, статья 1030(А)) (ПРОТИВ РОССИИ, ГРУ И
АГЕНТА ГРУ #1)**

146.      Истец повторно подтверждает и включает все предыдущие параграфы этого Искового заявления и параграфы в пунктах ниже, как если бы они были полностью изложены здесь.

147.      Компьютеры Национального комитета Демократической партии вовлечены в торговлю и коммуникации между штатами и внешнюю торговлю и коммуникации и являются защищенными в соответствии с 18 разделом Свода законов США, статьей 1030(е)(2).

148.      По нашей информации и убеждениям, Россия, ГРУ и агент ГРУ #1 сознательно и преднамеренно осуществляли доступ к компьютерам Национального комитета неправомочно или превышая полномочия и в результате этого получали и использовали ценную информацию, содержащуюся на этих компьютерах, нарушая при этом 18 раздел Свода законов США, статью 1030(а)(2)(С). Такая информация включала в себя, помимо прочего: частную, важную в политическом отношении переписку между Национальным комитетом Демократической партии и заинтересованными лицами и кандидатами со стороны демократов; конфиденциальные данные доноров; конфиденциальную информацию относительно планов по стратегии кампании; анализ оппозиции и политических инициатив; и документы, касающиеся запланированных политических событий, в том числе кампаний по сбору средств и митингов. Эта информация была использована с целью очернить кандидата в президенты от Демократической партии и саму Демократическую партию (о которой здесь говорится) и тем самым оказать поддержку кандидатуре Трампа, опубликовав конфиденциальную информацию для публичного доступа в интернете, в том числе на WikiLeaks.

149.      По имеющимся сведениям и убеждениям, Россия, ГРУ и агент ГРУ #1 умышленно вызвали передачу программы, информации, кода или сигнала, и в результате умышленно несанкционированно причинив вред защищенному компьютеру, нарушив при этом 18 раздел Свода

законов США, статью 1030(а)(5)(А). Такая передача включала в себя, помимо прочего, использование вредоносных программ в отношении систем Национального комитета.

150.    По имеющимся сведениям и убеждениям, России, ГРУ и агент ГРУ #1 умышленно получили доступ к защищенному компьютеру или компьютерам неправомочно, и в результате такого поведения, причинили ущерб, нарушив 18 раздел Свода законов США, статью 1030(а)(5)(С), или причинили ущерб по неосторожности, нарушив 18 раздел Свода законов США, статью 1030(а)(5)(В).

151.    По имеющимся сведениям и убеждениям, Россия, ГРУ и агент ГРУ #1 умышленно и с намерением обманным способом завладеть паролями и аналогичной информацией из систем Национального комитета, повлияли на торговлю между штатами или с иностранными государствами, нарушив 18 раздел Свода законов США, статью 1030(а)(6)(А).

152.    Россия, ГРУ и агент ГРУ #1 причинили ущерб одному или нескольким лицам в течение одного года, который совокупно оценивается в более чем 5 000 долларов США, а также нанесли ущерб десяти или более защищенным компьютерам в течение одного года.

153.    Национальный комитет Демократической партии претерпел убытки вследствие действий России, ГРУ и агента ГРУ #1, в их числе, помимо прочего, расходы на расследования и реагирование на несанкционированный доступ к компьютерным сетям, проведение оценки ущерба, восстановление и замена компьютеров и данных, программ, систем или информации, потеря стоимости коммерческих секретов Национального комитета, и вреда коммерческой деятельности комитета в порядке, описанном выше. Национальный комитет обращается за компенсационными и иными средствами правовой защиты по праву справедливости согласно 18 разделу Свода законов США, статье 1030(g).

**ПУНКТ II**

**ФЕДЕРАЛЬНЫЙ ЗАКОН О ПРОТИВОДЕЙСТВИИ РЭКЕТУ И КОРРУПЦИИ (18 РАЗДЕЛ СВОД ЗАКОНОВ США, СТАТЬЯ 1962(C)) (ПРОТИВ ВСЕХ ОТВЕТЧИКОВ)**

154.     Истец повторно подтверждает и включает все предыдущие параграфы этого Искового заявления и параграфы в пунктах ниже, как если бы они были полностью изложены здесь.

155.     Ответчиками являются все «лица» в значении, определенном 18 разделом Свода законов США, статьей 1961(3). Во все соответствующие периоды времени Ответчики в нарушение 18 раздела Свода законов США, статьи 1962(c) вели дела Предприятия, которое затронуло торговлю между штатами и внешнюю торговлю, пользуясь методами деятельность организованной преступности.

**A.     Кампания Трампа являла собой Предприятие, деятельность которого осуществлялась с применением методов организационной преступности**

156.     Кампания Трампа была Предприятием, деятельность которого осуществлялась с применением методов организационной преступности, в том значении, в котором этот термин используется в 18 разделе Свода законов США, статье 1961(4). Предприятие было образовано к июню 2015 года.

157.     Кампания Трампа имела постоянную организационную структуру для претворения в жизнь своих целей.

158.     Как указывалось выше, каждый Ответчик участвовал в деятельности или управлении этим Предприятием.

159.     Поскольку кампания Трампа потратила миллионы долларов на президентскую гонку 2016 года, это оказало влияние на торговлю между штатами и с другими государствами.

160.     Каждый Ответчик занимался и/или участвовал в делах Предприятия, осуществляя преступные действия, подлежащие преследованию в соответствии с 18 разделом Свода законов США, статьей 1831 (экономический шпионаж) и 18 разделом Свода законов США, статьей 1832 (хищение коммерческой тайны). Помощники Трампа, WikiLeaks и Ассанж направляли, вовлекали, призывали и/или поощряли такие действия России и ГРУ, в том числе и предоставление WikiLeaks и Ассанжу коммерческих тайн Национального комитета Демократической партии с расчетом на то, что WikiLeaks и Ассанж станут распространять эти секреты, что, в свою очередь, увеличит шансы Трампа победить на выборах.

**B.     Альтернативно, и, как минимум, кампания Трампа была частью, фактически связанной с таким Предприятием**

161.     Альтернативно, и, как минимум, кампания Трампа была частью, фактически связанной с таким Предприятием, в состав которого входила Россия, ГРУ, агент ГРУ #1, WikiLeaks, Ассанж, кампании Трампа, Арас и Эмин Агаларовы, Мисфуд, помощники Трампа, их сотрудники и агенты, а также дополнительные юридические и физические лица, известные и неизвестные. Фактически связанное Предприятие было образовано не позднее июня 2016 года. С этого времени и до 8 ноября 2016 года члены фактически связанного Предприятия работали вместе для продвижения своих взаимных целей улучшения предвыборных перспектив Трампа и нанесения ущерба Национальному комитету Демократической партии.

162.     Фактически связанное Предприятие имело постоянную организационную основу, необходимую для достижения своих целей. Фактически связанное Предприятие не могло бы выполнить свою сложную задачу публикации конфиденциальной информацией в то время, когда это было наиболее выгодно для кампании Трампа, если бы у него не было определенной структуры для принятия и коммуникации решений группы.

163.     Как указывалось выше, каждый Ответчик участвовал в функционировании или управлении фактически связанным Предприятием и получал финансовую выгоду от этого Предприятия.

164.     Поскольку деятельность фактически связанного Предприятия повлияла на расходы избирателей на выборы в 2016 году, а также на реакцию СМИ в отношении президентской гонки 2016 года, это оказало воздействие на торговлю между штатами и внешнюю торговлю.

**C.     ФЕДЕРАЛЬНЫЙ ЗАКОН О ПРОТИВОДЕЙСТВИИ РЭКЕТУ И КОРРУПЦИИ ОСНОВНЫЕ ДЕЙСТВИЯ**

165.     Каждый Ответчик занимался и/или участвовал в делах кампании Трампа и фактически связанного Предприятия, осуществляя организованную преступную деятельность, в том числе действия, подлежащие преследованию в соответствии с 18 разделом Свода законов США, статьей 1831 (экономический шпионаж) и 18 разделом Свода законов США, статьей 1832 (хищение коммерческой

тайны). Кампания Трампа, помощники Трампа, WikiLeaks и Ассанж направляли, вовлекали, призывали и/или поощряли такие действия России и ГРУ, в том числе и предоставление WikiLeaks и Ассанжу коммерческих тайн Национального комитета с расчетом на то, что WikiLeaks и Ассанж станут распространять эти секреты, что, в свою очередь, увеличит шансы Трампа победить на выборах.

166.    Начиная с или до 27 июля 2015 года, Россия, ГРУ и агент ГРУ #1 завладевали коммерческими тайнами Национального комитета неправомочно, намереваясь или зная, что это принесет пользу России, российским структурам или агентам.

167.    Россия, ГРУ и агент ГРУ #1 также копировали, дублировали, загружали, изменяли, уничтожали, тиражировали, передавали, доставляли, отправляли, сообщали или переводили коммерческие тайны Истца, намереваясь или зная, что это пойдет на пользу российскому правительству, российским структурам или агентам в связи с реализацией этой незаконной схемы. Россия, действуя через агента ГРУ #1, неправомочно раскрыла и передала коммерческие тайны Национального комитета 15 июня, 20 июня, 21 июня, 30 июня, 6 июля, 13 сентября и 18 октября 2016 года. Каждое такое раскрытие представляет собой отдельный акт экономического шпионажа.

168.    Начиная с или до 27 июля 2015 года, Россия, ГРУ и агент ГРУ #1 получили, купили или завладели коммерческими тайнами Национального комитета, зная, что они были украдены или присвоены, получены или обращены в собственность неправомочно, и зная, что это принесет пользу российскому правительству, российским структурам или агентам.

169.    WikiLeaks и Ассанж также копировали, дублировали, загружали, изменяли, уничтожали, тиражировали, передавали, доставляли, отправляли, сообщали или переводили коммерческие тайны Истца, намереваясь или зная, что это пойдет на пользу российскому правительству, российским структурам или агентам в связи с реализацией этой незаконной схемы.

170.    WikiLeaks и Ассанж неправомочно раскрыли и передали коммерческие тайны Национального комитета, в том числе конфиденциальные документы, связанные с кампаниями, сбором средств и стратегией кампании, 22 июля и 6 ноября 2016 года. Каждое такое раскрытие представляет собой отдельный акт экономического шпионажа.

171.    Начиная с или до 22 июля 2016 года ежедневно до ноября 2016 года, WikiLeaks и Ассанж получали, покупали или завладевали коммерческими тайнами Истца, зная, что они были украдены или присвоены, получены или обращены в собственность неправомочно, и зная, что это принесет пользу российскому правительству, российским структурам или агентам.

172.    Россия, ГРУ и агент ГРУ #1 также совершили описанные выше действия с намерением использовать коммерческую тайну Истца, относящуюся к продукту или услуге, используемым или предназначенным для использования в торговле между штатами или другими государствами, с экономической выгодой для других лиц. Каждый такое несанкционированное раскрытие представляет собой отдельный акт хищения коммерческой тайны.

173.    WikiLeaks и Ассанж также совершили описанные выше действия с намерением использовать коммерческую тайну Истца, относящуюся к продукту или услуге, используемым или предназначенным для использования в торговле между штатами или другими государствами, с экономической выгодой для других лиц. Каждый такое несанкционированное раскрытие представляет собой отдельный акт хищения коммерческой тайны.

174.    Трамп, организация Trump Campaign и Сообщники Трампа способствовали достижению общих целей Организации, условившись о том, что Россия, ГРУ и Агент ГРУ №1, WikiLeaks и Ассанж будут совершать предикатные преступные деяния и далее осуществлять данный сговор, поддерживая непрерывную связь с должностными лицами российской разведки и давая рекомендации, инструктируя и предоставляя остальным Обвиняемым разведывательные данные, относящиеся к согласованию по времени несанкционированного разглашения сведений, поощряя непрерывные противозаконные несанкционированные попытки доступа и неправомочное раскрытие похищенной информации

41

Демократической партии, активно используя противоправное раскрытие информации для содействия Трампу и активно работая над маскировкой и сокрытием данного сговора с помощью лживых заявлений.

**D.** **Ущерб, причиненный вследствие нарушения закона США «О коррумпированных и находящихся под влиянием рэкетиров организациях» (РИКО)**

175.    Бизнесу и имуществу Истца причинен ущерб вследствие нарушения Обвиняемыми Свода законов США 18 U.S.C. § 1962(c). Бизнесу и собственности Истца был нанесен ущерб вследствие нарушения Обвиняемыми 18 раздела Свода законов США § 1962(c). Обвиняемые причинили огромный вред бизнесу Истца, как было указано выше, а также компьютерам и серверам Истца. Все эти нарушения прав и имущественный ущерб имели место на территории Соединенных Штатов.

**ПУНКТ ОБВИНЕНИЯ III**

**ПРЕСТУПНЫЙ СГОВОР С ЦЕЛЬЮ НАРУШЕНИЯ ЗАКОНА РИКО (18 раздел Свода законов США, § 1962(D)) (ПРОТИВ ВСЕХ ОБВИНЯЕМЫХ)**

176.    Истец повторно утверждает и включает в свое заявление посредством отсылки все предшествующие параграфы настоящего Искового заявления, а также параграфы нижеприведенных пунктов обвинения, как если бы они были полностью изложены в данном разделе.

177.    Обвиняемые вступили между собой в сговор с целью нарушения 18 раздела Свода законов США, § 1962(c). Defendants knowingly agreed, combined, and conspired to conduct the affairs of the Enterprise or the Association-In-Fact Enterprise through a cyber-espionage operation. Обвиняемые сознательно согласились, объединили свои усилия и вступили в сговор с целью ведения дел Организации или Организации в виде устойчивого объединения лиц путем осуществления кибершпионажа. Все Обвиняемые согласились с тем, что эта деятельность будет включать в себя многократное нарушение 18 раздела Свода законов США, § 1831 (экономический шпионаж); и 18 раздела Свода законов США, § 1832 (хищение коммерческих тайн).

178.    Преступный сговор Обвиняемых с целью нарушения 18 раздела Свода законов США, § 1962(c), является нарушением § 1962(d).

179.    Бизнесу или собственности Истца был нанесен ущерб вследствие нарушения Обвиняемыми 18 раздела Свода законов США, § 1962(d). Бизнесу и собственности Истца был нанесен ущерб вследствие нарушения Обвиняемыми 18 раздела Свода законов США § 1962(c). Обвиняемые причинили огромный вред бизнесу Истца, как было указано выше, а также компьютерам и серверам Истца. Все эти нарушения прав и имущественный ущерб имели место на территории Соединенных Штатов.

**ПУНКТ ОБВИНЕНИЯ IV**

**ЗАКОН «О НАКАЗАНИЯХ ЗА НЕСАНКЦИОНИРОВАННОЕ ПОДКЛЮЧЕНИЕ К ЛИНИЯМ СВЯЗИ» (18 раздел Свода законов США, §§ 2510-22) (ПРОТИВ АГЕНТА ГРУ №1, WIKILEAKS, АССАНЖА, TRUMP CAMPAIGN И СООБЩНИКОВ ТРАМПА)**

180.      Истец повторно утверждает и включает в свое заявление посредством отсылки все предшествующие параграфы настоящего Искового заявления, а также параграфы нижеприведенных пунктов обвинения, как если бы они были полностью изложены в данном разделе.

181.      Все Обвиняемые являются «лицами» в значении, установленном 18 разделом Свода законов США, §§ 2510, 2511.

182.      В нарушение 18 раздела Свода законов США § 2511(l)(a) Агент ГРУ №1 умышленно и преднамеренно перехватывал или пытался перехватывать обмен данными Истца, осуществляемый средствами проводной связи, в устной или электронной форме, путем несанкционированных попыток доступа к компьютерным системам, голосовой связи по IP-протоколу и (или) учетным записям электронной почты с извлечением частных конфиденциальных документов и файлов Истца.

183.      В нарушение 18 раздела Свода законов США, §2511(l)(c), Агент ГРУ №1, WikiLeaks и Ассанж умышленно и преднамеренно разглашали содержание обмена данными Истца, осуществляемого средствами проводной связи, в устной или электронной форме, зная или имея основание полагать, что эта информация была получена путем перехвата данных, передаваемых средствами проводной связи, в устной или электронной форме, в нарушение 18 раздела Свода законов США, § 2511.

184.      В нарушение 18 раздела Свода законов США, § 251 l(l)(d), Агент ГРУ №1, WikiLeaks, Ассанж, Сообщники Трампа и организация Trump Campaign умышленно и преднамеренно использовали содержание данных, передаваемых средствами проводной связи, в устной или электронной форме, зная или имея основание полагать, что эта информация была получена путем перехвата данных, передаваемых средствами проводной связи, в устной или электронной форме, в нарушение 18 раздела Свода законов США, §2511.

185.      Истец обоснованно рассчитывал на то, что данные, передаваемые средствами проводной связи, в устной или электронной форме, не подлежали перехвату.

186.      Истец является «лицом», чей обмен данными, осуществляемый средствами проводной связи, в устной или электронной форме, перехватывался в значении, установленном 18 разделом Свода законов США, § 2520.

187.     Прямым следствием действий Агента ГРУ №1, WikiLeaks, Ассанжа, Сообщников Трампа и организации Trump Campaign явилось то, что бизнесу и собственности Истца был нанесен непоправимый вред, и Истец имеет право на присуждение ему возмещения наибольшего реального ущерба или компенсации ущерба, предусмотренной законодательными актами, и правовой защиты в виде судебного запрета во исполнение 18 раздела Свода законов США, § 2520(c). Причиненный вред включает в себя, помимо прочего, вред, нанесенный компьютерам и серверам Национального комитета Демократической партии, вред репутации Национального комитета Демократической партии, падение стоимости коммерческой тайны и деловой информации, а также вышеописанный ущерб бизнесу.

188.     В свете вопиющего характера нарушений, совершенных Агентом ГРУ №1, WikiLeaks, Ассанжем, Сообщниками Трампа и организацией Trump Campaign, Истец имеет право на штрафную компенсацию (убытки) и возмещение обоснованного гонорара поверенных за юридические услуги и судебных издержек во исполнение 18 раздела Свода законов США, §§ 2520(b)(2) и (3).

**ПУНКТ ОБВИНЕНИЯ V**

**ЗАКОН «О ДОСТУПЕ К ХРАНИМЫМ ДАННЫМ ПРОВОДНОЙ И ЭЛЕКТРОННОЙ СВЯЗИ И ДЕЛОВОЙ ДОКУМЕНТАЦИИ» (18 раздел Свода законов США, §§ 2701-12) (ПРОТИВ РОССИИ, ГРУ И АГЕНТА ГРУ №1)**

189.     Истец повторно утверждает и включает в свое заявление посредством отсылки все предшествующие параграфы настоящего Искового заявления, а также параграфы нижеприведенных пунктов обвинения, как если бы они были полностью изложены в данном разделе.

190.     Истец является «лицом» в значении, установленном 18 разделом Свода законов США, §§ 2510(6) и 2707(a).

191.     Россия, ГРУ и Агент ГРУ №1 умышленно и преднамеренно осуществляли несанкционированный доступ к оборудованию, с помощью которого предоставляются услуги электронной связи, а именно, к компьютерным системам Национального комитета Демократической партии, в том числе к серверам электронной почты, получив таким образом доступ к проводной и электронной связи, данные которых хранились в названных системах, в нарушение 18 раздела Свода законов США, § 2701(a).

192.     В результате таковых умышленных преднамеренных действий Истцу был причинен ущерб, и он, в порядке, предусмотренном 18 разделом Свода законов США, § 2707, требует присуждения компенсации наибольшего понесенного реального ущерба или компенсации ущерба, предусмотренной законодательными актами, штрафной компенсации (убытков), возмещения гонорара поверенных за юридические услуги и иных судебных издержек в связи с данным судопроизводством, а также надлежащих средств судебной защиты по праву справедливости.

## ПУНКТ ОБВИНЕНИЯ VI

### ЗАКОН «О ЗАЩИТЕ АВТОРСКИХ ПРАВ В ЦИФРОВУЮ ЭПОХУ» (17 раздел Свода законов США, § 1201 *И ДАЛЕЕ.*) (ПРОТИВ РОССИИ, ГРУ И АГЕНТА ГРУ №1)

193.      Истец повторно утверждает и включает в свое заявление посредством отсылки все предшествующие параграфы настоящего Искового заявления, а также параграфы нижеприведенных пунктов обвинения, как если бы они были полностью изложены в данном разделе.

194.      В компьютерных сетях и файлах Истца содержалась информация, подлежащая защите в соответствии с законодательством Соединенных Штатов о защите авторских прав, в том числе документация по стратегии избирательной кампании, а также исследования по соперникам, и к этой информации получили несанкционированный доступ Россия и ГРУ.

195.      Доступ к защищенной авторскими правами информации, хранящейся в компьютерных сетях Истца, и к электронной почте регулировался техническими средствами, включая меры по ограничению удаленного доступа, межсетевые экраны, а также меры по ограничению доступа и его предоставление только пользователям с юридически действительными регистрационными данными и паролями.

196.      В нарушение 17 раздела Свода законов США, § 1201(а), Россия, ГРУ и Агент ГРУ №1 преодолевали названные технические меры защиты путем кражи регистрационных данных авторизованных пользователей, проводя извлечение паролей из дампов памяти для противоправного получения паролей к системе, контролирующей доступ к домену Национального комитета Демократической партии, и установки вредоносных программ на компьютерную систему Истца.

197.      Поведение России, ГРУ и Агента ГРУ №1 нанесло Истцу значительный ущерб. Причиненный ущерб включает в себя, помимо прочего, ущерб, вытекающий из вреда, нанесенного компьютерам и серверам Национального комитета Демократической партии, падения стоимости коммерческой тайны и деловой информации, а также вышеописанного ущерба бизнесу. Истец имеет право на возмещение наибольшего реального ущерба или на компенсацию ущерба, предусмотренную законодательными актами в соответствии с 17 разделом Свода законов США, § 1203, в сумме, которая должна быть определена в ходе слушания дела.

198.      Истец имеет право на присуждение ему возмещения гонорара поверенных за юридические услуги и судебных издержек в соответствии с 17 разделом Свода законов США, § 1203.

45

**ПУНКТ ОБВИНЕНИЯ VII**

**НЕПРАВОМЕРНОЕ ЗАВЛАДЕНИЕ КОММЕРЧЕСКОЙ ТАЙНОЙ В НАРУШЕНИЕ ЗАКОНА
«О ЗАЩИТЕ КОММЕРЧЕСКОЙ ТАЙНЫ» (18 раздел Свода законов США, § 1836, *И ДАЛЕЕ.*)
(ПРОТИВ РОССИИ, ГРУ, АГЕНТА ГРУ №1, WIKILEAKS И АССАНЖА)**

199.     Истец повторно утверждает и включает в свое заявление посредством отсылки все предшествующие параграфы настоящего Искового заявления, а также параграфы нижеприведенных пунктов обвинения, как если бы они были полностью изложены в данном разделе.

200.     В документах, похищенных Россией, ГРУ и Агентом ГРУ №1 из компьютерных систем Национального комитета Демократической партии, содержались коммерческие тайны в значении, установленном 18 разделом Свода законов США, § 1839.

201.     В частности, Национальный комитет Демократической партии занимается проведением политических кампаний Демократической партии, а в похищенных документах содержались сведения о донорах Демократической партии, данные исследований оппозиции, а также стратегическая информация о планируемой политической деятельности, позволяющие ему эффективно выполнять свою миссию.

202.     Национальный комитет Демократической партии принимает и ранее принимал разумные меры предосторожности для обеспечения сохранения секретности такой информации. В частности, Национальный комитет Демократической партии хранит и ранее хранил свою информацию на защищенных серверах с доступом по паролю, проводится обучение персонала, сотрудники подписывают соглашение о неразглашении конфиденциальной информации.

203.     Коммерческие тайны Истца относились к продуктам или услугам, применяемым или предназначенным для применения в междуштатной или международной коммерческой деятельности.

204.     Обвиняемые Россия, ГРУ и Агент ГРУ №1 неправомерное завладели коммерческой тайной Истца. Обвиняемые Россия, ГРУ и Агент ГРУ №1 получили сведения, составляющие коммерческие тайны Истца, зная или имея основание полагать, что эти коммерческие тайны были получены негодными средствами. Обвиняемые Россия, ГРУ, Агент ГРУ №1, WikiLeaks и Ассанж многократно в различные сроки, обсуждаемые в настоящем документе, разглашали коммерческие тайны Истца без его на то согласия, зная или имея основание полагать, что эти коммерческие тайны были получены негодными средствами.

205.     Прямым следствием того, что Обвиняемые осуществили неправомерное завладение информацией, явился понесенный Истцом ущерб в виде стоимости материалов, в виде финансовых

потерь в результате утраты репутации и в виде гонорара поверенных за юридические услуги и судебных издержек. Истец также имеет право на штрафную компенсацию (убытки). Причиненный ущерб включает в себя, помимо прочего, ущерб, вытекающий из вреда, нанесенного компьютерам и серверам Национального комитета Демократической партии, падения стоимости коммерческой тайны и деловой информации, а также вышеописанного ущерба бизнесу.

206.     Истец также имеет право на предварительный судебный запрет и бессрочный судебный запрет во исполнение 18 раздела Свода законов США, § 1836(b)(3).

## ПУНКТ ОБВИНЕНИЯ VIII

### ДИНЫЙ ЗАКОН «О КОММЕРЧЕСКОЙ ТАЙНЕ» Г. ВАШИНГТОН, ФЕДЕРАЛЬНЫЙ ОКРУГ КОЛУМБИЯ (Свод законов федерального округа Колумбия анн., §§ 36-401 – 46-410) (ПРОТИВ ВСЕХ ОБВИНЯЕМЫХ)

207.     Истец повторно утверждает и включает в свое заявление посредством отсылки все предшествующие параграфы настоящего Искового заявления, а также параграфы нижеприведенных пунктов обвинения, как если бы они были полностью изложены в данном разделе.

208.     Федеральный округ Колумбия в явно выраженной форме управомочивает сторону взыскивать за убытки, причиненные неправомерным завладением коммерческой тайной.

209.     Документы, скрытно выведенные Россией, ГРУ и Агентом ГРУ №1 из DNC's компьютерных систем Национального комитета Демократической партии, содержат коммерческие тайны, являющиеся таковыми по законодательству федерального округа Колумбия, как обсуждалось выше, и согласно определению коммерческой тайны по законодательству федерального округа Колумбия:

> информация, в т. ч. формула, конкретная комбинация, преобразование программы, программа, устройство, метод, методика или процесс, который: (А) образует действительную или потенциальную самостоятельную экономическую ценность благодаря тому, что они не являются общеизвестными и не могут быть легко выявлены с использованием законных средств посторонними лицами, которые могли бы приобрести экономическую выгоду в результате их раскрытия или использования; (В) является объектом разумных усилий по сохранению секретности.

> Свод законов федерального округа Колумбия анн., § 36-401(2).

210.     Эта информация образовывала действительную экономическую ценность благодаря тому, что она оставалась конфиденциальной и закрытой и не могла быть легко выявлена посторонними лицами. Истец принимает и ранее принимал разумные меры предосторожности для обеспечения секретности этой информации, как обсуждалось *ранее* в Пункте обвинения VIII.

211. Каждый из Обвиняемых разглашал, получал и использовал такие неправомерно добытые коммерческие тайны без согласия Истца, зная или имея основание полагать, что эти коммерческие тайны были получены негодными средствами.

212. Прямым следствием того, что Обвиняемые осуществили неправомерное завладение информацией, Истец потерпел ущерб в связи с действительными убытками и в результате неправомерного обогащения Обвиняемых. Причиненный ущерб включает в себя, помимо прочего, ущерб, вытекающий из вреда, нанесенного компьютерам и серверам Национального комитета Демократической партии, падения стоимости коммерческой тайны и деловой информации, а также вышеописанного ущерба бизнесу.

213. Обвиняемые совершили неправомерное завладение коммерческими тайнами Истца умышленно и злонамеренно. Соответственно, Истец имеет право на убытки, присуждаемые в порядке наказания, вдвое превосходящие установленный судом размер действительных убытков, а также возмещение гонорара поверенных за юридические услуги и судебных издержек.

## ПУНКТ ОБВИНЕНИЯ IX

### ПРОТИВОЗАКОННОЕ НАРУШЕНИЕ ПРАВА ВЛАДЕНИЯ С ПРИЧИНЕНИЕМ ВРЕДА (ОБЩЕЕ ПРАВО ФЕДЕРАЛЬНОГО ОКРУГА КОЛУМБИЯ) (ПРОТИВ РОССИИ, ГРУ И АГЕНТА ГРУ №1)

214. Истец повторно утверждает и включает в свое заявление посредством отсылки все предшествующие параграфы настоящего Искового заявления, а также параграфы нижеприведенных пунктов обвинения, как если бы они были полностью изложены в данном разделе.

215. Национальный комитет Демократической партии владеет и пользуется находящимися в частной собственности компьютерами и частной компьютерной сетью. Эта сеть и хранящаяся в ней информация являются собственностью Истца.

216. 27 июля 2015 г. или около этой даты агенты российской разведки взломали принадлежащие Национальному комитету Демократической партии компьютеры и сеть. 18 апреля 2016 г. или около этой даты Россия, ГРУ и Агент ГРУ №1 раздельно взломали принадлежащие Национальному комитету Демократической партии компьютеры и сеть. Эти эпизоды являются двумя отдельными и самостоятельными противозаконными нарушениями права владения с причинением вреда, совершенными в Соединенных Штатах. Эти взломы обеспечили России, ГРУ и Агенту ГРУ №1 возможность несанкционированного доступа к собственности Истца, хранящейся в его сети.

217. Взломы, совершенные Россией, ГРУ и Агентом ГРУ №1 препятствовали реализации Национальным комитетом Демократической партии его владельческого права на его сеть и на содержащуюся в ней

информацию. Посредством противозаконного нарушения права владения с причинением вреда в отношении компьютерной сети Истца Россия, ГРУ и Агент ГРУ №1 получили и распространяли конфиденциальную и частную информацию, являющуюся собственностью Истца. Обвиняемые не смогли бы разгласить эту информацию, если бы не совершили противозаконного нарушения права владения с причинением вреда. Таким образом, Россия, ГРУ и Агент ГРУ №1 лишили Истца возможности реализовать свое владельческое право на сохранение приватности и конфиденциальности своей собственности. В результате произошло уменьшение стоимости собственности Истца, поэтому Истец имеет право на возмещение ущерба.

### ПУНКТ ОБВИНЕНИЯ X

### ПОСЯГАТЕЛЬСТВО НА ДВИЖИМОЕ ИМУЩЕСТВО (ОБЩЕЕ ПРАВО ВИРДЖИНИИ) (ПРОТИВ РОССИИ, ГРУ И ОПЕРАТИВНОГО ОТДЕЛА ГРУ №1)

218.     Истец повторно ссылается на и включает все ссылки на предыдущие абзацы настоящей Жалобы и абзацев в пунктах обвинения, изложенных ниже, как если бы они были полностью изложены здесь.

219.     Истец, компания DNC, владеет и управляет частной компьютерной сетью с компьютерами и серверами, расположенными в Вашингтоне, округ Колумбия и в Вирджинии. Эта сеть и содержащаяся в ней информация являются собственностью истца.

220.     27 июля 2015 года российские агенты разведки взломали компьютеры и сеть DNC. Примерно 18 апреля 2016 года Россия, ГРУ и оперативный отдел ГРУ № 1 по-отдельности взломали компьютеры и сеть DNC. Это является двумя отдельными и независимыми нарушениями в Соединенных Штатах. Вследствие взломов у России, ГРУ и оперативного отдела ГРУ № 1 появился неавторизованный доступ к собственности истца в его сети. Никто наделенный такими полномочиями не предоставлял Ответчикам разрешение на доступ к сетям истца.

221.     Взлом, осуществленный Россией, ГРУ и оперативным отделом ГРУ № 1 затронул владельческое право истца относительно его сети и содержащейся в ней информации. Посредством проникновения в сеть истца Россия, ГРУ и оперативный отдел ГРУ № 1 получили доступ к конфиденциальной и личной информации, являющейся собственностью Истца и распространяли ее.

Ответчики не могли бы раскрыть эту информацию, если бы не это незаконное нарушение. Таким образом, Россия, ГРУ и оперативный отдел ГРУ № 1 лишили истца его владельческого права на сохранение тайны и конфиденциальности его имущества. В результате истец понес убытки в стоимости своего имущества и имеет право на возмещение ущерба.

## ПУНКТ ОБВИНЕНИЯ XI

### ПРЕДВАРИТЕЛЬНЫЙ СГОВОР С ЦЕЛЬЮ СОВЕРШЕНИЯ ПОСЯГАТЕЛЬСТВА НА ДВИЖИМОЕ ИМУЩЕСТВО (ОБЩЕЕ ПРАВО ВИРДЖИНИИ) (ПРОТИВ ВСЕХ ОТВЕТЧИКОВ)

222.     Истец повторно ссылается на и включает все ссылки на предыдущие абзацы настоящей Жалобы и абзацев в пунктах обвинения, изложенных ниже, как если бы они были полностью изложены здесь.

223.     Ответчики были частью общей схемы, в рамках которой они сговорились и объединились, чтобы неправомочно получить доступ к компьютерным системам DNC, украсть конфиденциальную информацию, публично распространять похищенную информацию и использовать эту украденную и публично раскрытую информацию для общей цели очернения госсекретаря Клинтон и Демократической партии и усиления избирательных перспектив Трампа. Эти действия представляют собой противоправное владение компьютерами и компьютерной системой истца, а также частными почтовыми учетными записями.

224.     В соответствии с и во исполнение этой общей схемы ответчики сговорились совершить незаконные действия, описанные здесь, включая действия, которые представляют собой нарушение.

225.     В соответствии с и во исполнение этой общей схемы каждый Ответчик совершал правонарушения, включая организацию встреч между соучастниками преступной схемы, поощрение осуществления и планирование схемы, взламывание сети DNC, кражу Конфиденциальной информации DNC и публикацию этой информации в открытом доступе. Эти правонарушения нанесли истцу ущерб и убытки, как обсуждалось *выше* .

226.     Все названные ответчики помогали и содействовали совершению незаконных действий, описанным здесь, как часть и во исполнение общей схемы, и каждый из этих ответчиков сознательно и

существенно помог выполнению схемы, и, в целом, знал о своей роли в общей схеме. Соответственно, действия ответчиков составляют заговор с целью нарушения.

227.    В результате истец понес убытки в стоимости своего имущества и имеет право на возмещение ущерба.

## ПУНКТ ОБВИНЕНИЯ XII

### НАРУШЕНИЕ ЗАКОНА ВИРДЖИНИИ О ПРЕСТУПЛЕНИИ В СФЕРЕ КОМПЬЮТЕРНОЙ ИНФОРМАЦИИ (СВОД ЗАКОНОВ ВИРДЖИНИИ С КОММЕНТАРИЯМИ § 18.2-152.5 И ДАЛЕЕ) (ПРОТИВ ВСЕХ ОТВЕТЧИКОВ)

228.    Истец повторно ссылается на и включает все ссылки на предыдущие абзацы настоящей Жалобы и абзацев в пунктах обвинения, изложенных ниже, как если бы они были полностью изложены здесь.

229.    Россия, ГРУ и оперативный отдел ГРУ № 1 неправомочно использовали компьютеры и компьютерные сети истца, завладели собственностью обманным путем и использовали имущество истца в нарушение Свода Законов Вирджинии с комментариями § 18.2-152.3.

230.    Россия, ГРУ и оперативный отдел ГРУ № 1, со злым умыслом:

a.    временно или постоянно удалили, остановили или иным образом отключили компьютерные данные, компьютерные программы или компьютерное программное обеспечение из компьютера или компьютерной сети DNC в нарушение Свода Законов Вирджинии с комментариями § 18.2- 152.4(1);

b.    вследствие чего компьютеры DNC стали неисправно работать, в нарушение Свода Законов Вирджинии с комментариями § 18.2-152.4(2);

c.    изменили, отключили или стерли компьютерные данные, компьютерные программы или компьютерное программное обеспечение, в нарушение Свода Законов Вирджинии с комментариями § 18.2-152.4(3);

d.    использовали компьютерную или компьютерную сеть, чтобы несанкционированно скопировать компьютерные данные, компьютерные

программы или программное обеспечение компьютеров , находящихся, передаваемых или создаваемых компьютером или компьютерной сетью, в нарушение Свода Законов Вирджинии с комментариями § 18.2-152.4(6);

e.     установили или инициировали установку регистратора нажатия клавиш для сбора информации на компьютерах DNC и, без их разрешения, в нарушение Свода Законов Вирджинии с комментариями § 18.2-152.4(8).

231.     Ответчики Россия, ГРУ и оперативный отдел ГРУ № 1 использовали компьютер или компьютерную сеть и умышленно неправомочно изучали информацию о трудоустройстве, кредитную, финансовую или идентифицирующую информацию, относящуюся к другим лицам, в нарушение Свода Законов Вирджинии с комментариями § 18.2-152.5.

232.     Каждый ответчик сознательно помогал, подстрекал, поощрял, побуждал, провоцировал, содействовал и помогал нарушению Россией, ГРУ и оперативным отделом ГРУ № 1 Свода Законов Вирджинии с комментариями § 18.2-152.3, § 18.2-152.4, и § 18.2-152.5.

233.     Нарушения всех ответчиков вышеуказанных положений привели к ущербу истца. Этот ущерб включает в себя, помимо прочего, ущерб, возникший вследствие вреда компьютерам и серверам DNC, потери ценности коммерческой тайны и деловой информации DNC и вреда для бизнеса, как описано выше. Истец имеет право на возмещение убытков и расходов по иску в соответствии со Сводом Законов Вирджинии с комментариями § 18.2- 152.12.

## ИСКОВОЕ ТРЕБОВАНИЕ

ВСЛЕДСТВИЕ ЭТОГО истец требует проведения судебного разбирательства против ответчиков по всем пунктам обвинения и добивается такого средства судебной защиты, как указано ниже по всем пунктам обвинения, по которым такое средство судебной защиты предоставляется законом:

a)  Вынести решение о возмещении убытков истца, размер которых определяется, включая, помимо прочего, размером всех убытков и потерь, понесенных истцом в результате незаконного взлома, кражи и последующего обнародования конфиденциальных документов истца и/или ответа истца и связанных с этим мер по исправлению;

b) Присуждение возмещения в размере понесённых убытков и в тройном размере, если таковые имеются, в размере, который должен быть доказан в ходе судебного разбирательства;

c) Присуждение истцу финансовой выгоды, полученной ответчиками в результате нарушений, описанных в настоящем документе;

d) Присуждение истцу установленного законом возмещения, если таковое имеется;

e) Присуждение истцу штрафных убытков, если таковые имеются;

f) Предоставление заявления о том, что: Ответчики, согласно доказательству, сговорились и приняли участие в общей схеме для осуществления незаконного и несанкционированного взлома компьютерных систем и/или личных писем истца и распространения конфиденциальной информации; распространили эту краденную информацию среди общественности; и использовали раскрытую краденную информацию, чтобы повлиять на выборы в 2016 году для собственной выгоды;

g) Выдача судебного запрета, запрещающего ответчикам и их должностным лицам, агентам, служащим, сотрудникам, правопреемникам и лицам, которые действовали по уговору или совместно с ними:

    a. доступ к компьютерным сетям и/или персональным электронным письмам истца без разрешения истца;

    b. участие в любой деятельности, которая нарушает, снижает качество, мешает работе или ухудшает функциональность компьютерных сетей истца или личных писем; а также

    c. Продажу, публикацию, распространение или использование любого имущества или информации, полученной из компьютерных сетей истца или личных писем без разрешения истца;

    d. удаление, извлечение или копирование любой информации или данных с компьютеров и личных писем истца без разрешения истца;

h) Присуждение истцу всех расходов и вознаграждений адвокатов в полной мере, разрешенных в соответствии с применимым законодательством;

i) Присуждение истцу всех процентов до и после судебного разбирательства, разрешенных в соответствии с законодательством;

j) Присуждение любого иного средства судебной защиты, которое суд может посчитать справедливым и правильным.

**ТРЕБОВАНИЕ СУДА ПРИСЯЖНЫХ**

В соответствии с Правилом 38 Федеральных правил гражданского судопроизводства истец требует, чтобы было проведено судебное разбирательство со стороны присяжных по всем вопросам, которые подлежат рассмотрению в суде.

20 Апреля 2018 г.                                                С совершенным почтением
Нью-Йорк, штат Нью-Йорк

*/s/ Майкл Эйзенкрафт (Michael Eisenkraft)*

Майкл Эйзенкрафт (Michael Eisenkraft)          Джозеф М. Селлерс (Joseph M. Sellers)

Профессиональное общество с ограниченной          Джеффри А. Грабер (Geoffrey A. Graber)
ответственностью «Коэн Милштейн Селлерс энд
Толл» (Cohen Milstein Sellers & Toll PLLC)

88 Пайн ст., 14й этаж                                        Юлия А. Хорвиц (Julia A. Horwitz)

Нью-Йорк, штат Нью-Йорк 10005                    Элисон С. Дейч (Alison S. Deich)

(212) 838-7797                                                Профессиональное общество с ограниченной
                                                                ответственностью «Коэн Милштейн Селлерс
                                                                энд Толл» (Cohen Milstein Sellers & Toll
                                                                PLLC)

                                                                1100 Нью-Йорк авеню NW ● пятый этаж

meisenkraft@cohenmilstein.com                      шт. Вашингтон, 20005

                                                                (202) 408-4600

                                                                jsellers@cohenmilstein.com
                                                                ggraber@cohenmilstein.com
                                                                jhorwitz@cohenmilstein.com
                                                                adeich@cohenmilstein.com

*Адвокаты истца*

**СУДЕБНОЕ ИЗВЕЩЕНИЕ**

Настоящим я подтверждаю, что 20 апреля 2018 года я в электронном виде подал *Жалобу* с секретарем Суда с использованием ECF, который в свою очередь, отправил уведомление всем адвокатам.

Дата: 20 Апреля 2018 г.

/s/ *Майкл Эйзенкрафт (Michael Eisenkraft)*

Майкл Эйзенкрафт (Michael Eisenkraft)

**КОНЦЕВЫЕ СНОСКИ**

[1] Стив Гольдштейн (Steve Goldstein), *Трамп может построить отели в СССР* , Philly.com . Компания Philadelphia Media Network, PBC, (7 июля, 1987), https://articles.philly.com/1987-07-07/news/26200012_1_trump-tower-second-largest-soviet-city-soviet-officials.

[2] Ассошиэйтед пресс (Associated Press), *Сделки с недвижимостью никогда не осуществлялись для Трампа* , Fortune (4 марта, 2017) http://fortune.com/2017/03/04/trump-russian-real-estate/.

[3] Ричард Бехар (Richard Behar) *, Дональд Трамп и фелон: Внутри его деловых сделок с Mob-Connected Hustler* , Forbes Business (3 октября 2016, 7:59), https://www.forbes.com/sites/richardbehar/2016/10/03/donald-trump-and-the-felon-inside-his-business-dealings-with-a-mob-connected-hustler/#5b94d7b52282.

[4] *Помощник мэра г. Москвы говорит, что в Москве будет построено 60 небоскребов* , Агентство экономической информации ПРАЙМ-ТАСС, (19 марта 2004 г.).

[5] Эми Демпси (Amy Dempsey), *Трамп против Трампа: Битва внутри 5-звездной башни Торонто* ,звезда Торонто (17 апреля 2016 года), https://www.thestar.com/news/gta/2016/04/17/trump-vs-trump-inside-torontos-5-star-tower-struggle.html.

[6] Вернон Сильвер (Vernon Silver) и Евгения Письменная, *Две ночи Трампа в Москве: Эхо спустя года* , Bloomberg (13 июля 2017 г.) https://www.bloomberg.com/news/articles/2017-07-13/trump-s-two-nights-of-parties-in-moscow-reverberate-years-later.

[7] Том Хэмбургер (Tom Hamburger) и др. *Финансовые связи Трампа с Россией и его необычное заискивание перед Владимиром Путиным [4 ], Wash. Post (17 июня, 2016), https://www.washingtonpost.com/politics/inside-trumps-financial-ties-to-russia-and-his-unusual-flattery-of-vladimir-putin/2016/06/17/dbdcaac8-31a6-11e6-8ff7-7b6c1998b7a0_story.html?noredirect=on&utm_term=.dc2924d0db41.*

[8] Майкл Краули (Michael Crowley), *Когда Дональд Трамп привез Мисс Вселенная в Москву* , Politico (15 мая, 2016, 7:45) https://www.politico.com/story/2016/05/donald-trump-russia-miss-universe-223173.

[9] Кэрол Д. Леонниг (Carol D. Leonnig) и др., *Бизнес Трампа был заинтересован в постройке Трамп-Тауэр в Москве, когда он баллотировался на пост президента,* Wash. Post (27 августа, 2017), https://www.washingtonpost.com/politics/trumps-business-sought-deal-on-a-trump-tower-in-moscow-while-he-ran-for-president/2017/08/27/d6e95114-8b65-11e7-91d5-ab4e4bb76a3a_story.html.

[10] Натан Лейн (Nathan Layne) и др. *Российская элита инвестировала почти 100 миллионов долларов в здания Трампа* , Reuters (17 марта 2017 года) https://www.reuters.com/investigates/special-report/usa-trump-property/.

[11] Дэвид Игнатиус (David Ignatius), *История деловых отношений Дональда Трампа в России* , The Washington Post (2 ноября 2017 г.), https://www.washingtonpost.com/opinions/a-history-of-donald-trumps-business-dealings-in-russia/2017/11/02/fb8eed22-ba9e-11e7-be94-fabb0f1e9ffb_story.html?utm_term=.340eff428fe4.

[12] Кейтлин Йилек (Caitlin Yilek), *Автор утверждает, что Эрик Трамп сказал ему, что все финансирование площадки Трампа для игры в гольф происходит из России в 2014 году,* Washington Examiner (7 мая 2017 года),

https://www.washingtonexaminer.com/author-claims-eric-trump-told-him-all-funding-for-trump- golf-courses-comes-from-russia-in-2014.

[13] Эндрю Крамер (Andrew E. Kramer) и др., *В чёрной бухгалтерии Украины: перечисление наличных для руководителя кампании Дональда Трампа* , NY Times (14 августа, 2016), https://www.nytimes.com/2016/08/15/us/politics/paul-manafort-ukraine-donald-trump.html.

[14] *Манафорт (Manafort) помог переправить денежные средства от пропутинской украинской партии лоббистам США, заявляется в отчёте* , Fox News (17 августа 2016 года) http://www.foxnews.com/politics/2016/08/17/manafort-helped-funnel-money-to-us-lobbyists-from-pro-putin-ukrainian-party-report-claims.html.

[15] Майкл Краниш (Michael Kranish) и Том Хэмбургер (Tom Hamburger), *«Благородный образ жизни» Пола Манафорта (Paul Manafort) выделен в обвинительном заключении* , Wash. Post (30 октября, 2017) https://www.washingtonpost.com/politics/paul-manaforts-lavish-lifestyle-highlighted-in-indictment/2017/10/30/23615680-bd8f-11e7-8444-a0d4f04b89eb_story.html?utm_term=.bb5d54a2da8e.

[16] Том Хэмбургер (Tom Hamburger) и Розалинд Хелдерман (Rosalind S. Helderman), *Бывший председатель Кампании Трампа Пол Манафорт (Paul Manafort) выступает в качестве иностранного агента для работы в Украине* , Wash. Post (27 июня, 2017), https://www.washingtonpost.com/politics/former-trump-campaign-chairman-paul-manafort-files-as-foreign-agent-for-ukraine-work/2017/06/27/8322b6ac-5b7b-11e7-9fc6-c7ef4bc58d13_story.html?utm_term=.c0c580285583.

[17] Брук Сингман (Brooke Singman), *Пол Манафорт (Paul Manafort), Рик Гейтс (Rick Gates), обвинены федеральным судом присяжных в России,* Fox News (30 октября 2017 года), http://www.foxnews.com/politics/2017/10/30/report-paul-manafort-rick-gates-to-surrender-to-special-counsel.html.

[18] Сонам Шет (Sonam Sheth), *Финансовые проблемы Манафорта (Manafort) поднимают новые вопросы о том, почему он предложил работать добровольцем без оплаты в кампании Трампа* , Business Insider (28 февраля 2018, 14:32), http://www.businessinsider.com/paul-manafort-ukraine-debt-trump-campaign-unpaid-volunteer-2018-2.

[19] Кеннет П. Фогель (Kenneth P. Vogel), *Человек Манафорта (Manafort) в Киеве* , Politico (18 авг. 2016, 21:27), https://www.politico.com/story/2016/08/paul-manafort-ukraine-kiev-russia-konstantin-kilimnik-227181.

[20] Дэвид Вореакос (David Voreacos), *Мюллер (Mueller) проводит линию между работой русского шпиона с Манафортом (Manafort) и Гейтсом (Gates)* , Bloomberg (28 марта 2018 года), https://www.bloomberg.com/news/articles/2018-03-28/mueller-draws-line-to-russian-spy-s-work-with-manafort-and-gates.

[21] Заявление о нарушении, *США против Джорджа Пападопулоса (George Papadopoulos)* , №. 1:17-cr-00182-RDM (окружной суд штата Делавэр 5 октября, 2017).

[22] Ховард Амос (Howard Amos) и Патрик Сойер (Patrick Sawyer), *Российские протесты: 10 декабря, как это случилось* , The Telegraph (10 декабря 2011 года, 16:50), https://web.archive.org/web/20140109114019/http://www.telegraph.co.uk/news/worldnews/europe/russia/8947840/Russian-protests-live.html.

[23] Эван Оснос (Evan Osnos) и др., *Трамп, Путин и новая холодная война* , New Yorker (6 марта 2017 года), https://www.newyorker.com/magazine/2017/03/06/trump-putin-and-the-new-cold-war.

[24] Стивен Пайфер (Steven Pifer), *Трамп и Россия: Ожидайте изменения тона. Но по существу?* , Brookings (4 января 2017 года), https://www.brookings.edu/blog/order-from-chaos/2017/01/04/trump-and-russia-expect-a-change-in-tone-but-in-substance/.

[25] Франклин Фоер (Franklin Foer), *Марионетка Путина* , Slate (4 июля 2016, 20:01), http://www.slate.com/articles/news_and_politics/cover_story/2016/07/vladimir_putin_has_a_plan_for_destroying_the_west_and_it_looks_a_lot_like.html.

[26] Эндрю Кацински (Andrew Kaczynski) и др., *Трамп говорил о Путине 80 раз* , CNN Politics (Март 2017), http://www.cnn.com/interactive/2017/03/politics/trump-putin-russia-timeline/.

[27] *Речь кандидата в президенты Дональда Трампа на первичных выборах* , C-SPAN (26 апреля 2016 года), https://www.c-span.org/video/?408719-1/donald-trump-primary-night-speech&start=1889&transcriptQuery=putin.

[28] Джон Сантуччи (John Santucci), *Трамп говорит «Великая честь», получить комплименты от «уважаемого» Путина* , ABC News (17 декабря 2015 г., 18:05), http://abcnews.go.com/Politics/trump-great-honor-compliments-highly-respected-putin/story?id=35829618.

[29] Майкл Р. Гордон (Michael R. Gordon) и Нирадж Чокши (Niraj Chokshi), *Трамп критикует НАТО и надеется на «хорошие сделки» с Россией [4 ], NY Times (15 января, 2017),* https://www.nytimes.com/2017/01/15/world/europe/donald-trump-nato.html.

[30] Эшли Паркер (Ashley Parker), *Дональд Трамп, в Шотландии, называет результат Брэксита «Великим деянием»* , NY Times (24 июня, 2016), https://www.nytimes.com/2016/06/25/us/politics/donald-trump-scotland.html.

[31] Александр Маллин (Alexander Mallin), *Трамп: Население Крыма предпочитают Россию, но если его изберут, Путин «не идет в Украину»* , ABC News (31 июля 2016 года, 15:23), http://abcnews.go.com/ThisWeek/trump-crimeas-people-prefer-russia-elected-putin-ukraine/story?id=41029437.

[32] Чарли Сэвидж (Charlie Savage), *Ассанж (Assange), объявленный враг Клинтон, вовремя опубликованные письма электронной почты для съезда демократической партии* , NY Times (26 июля, 2016), https://www.nytimes.com/2016/07/27/us/politics/assange-timed-wikileaks-release-of-democratic-emails-to-harm-hillary-clinton.html.

[33] Директор Национальной разведки, *Оценка деятельности и намерений России в недавних выборах в США* (2017 год) ), *доступно по* https://www.dni.gov/files/documents/ICA_2017_01.pdf.

[34] *Id.*

[35] Глория Борджер (Gloria Borger) и Маршалл Коэн (Marshall Cohen), *Детали документа о несостоявшейся сделке для Трамп-Тауэр в Москве* , CNN Politics (9 сентября 2017 года, 2:41), https://www.cnn.com/2017/09/08/politics/document-trump-tower-moscow/index.html+&cd=1&hl=en&ct=clnk&gl=us.

[36] *Id.*

[37] *Id.*

[38] *Id.*

[39] приказ президента США 13,662, 79 Федеральный Регистр 16,169 (24 марта, 2014).

[40] Брайан Битлер (Brian Beutler), *Дональд Трамп и плод ядовитого дерева* , Новая Республика (29 августа 2017 года), https://newrepublic.com/article/144596/donald-trump-fruit-poisonous-tree.

[41] Памела Браун (Pamela Brown) и др., *Помощники Трампа были в постоянном контакте с высокопоставленными российскими официальными лицами во время кампании* , CNN Politics(15 февраля 2017, 22:37), https://www.cnn.com/2017/02/14/politics/donald-trump-aides-russians-campaign/index.html.

[42] Шарон ЛаФранниер (Sharon LaFraniere) и др., *Как возник вопрос о России: Помощник кампании, напитки и разговоры о политической грязи* , N.Y. Times (30 декабря, 2017), https://www.nytimes.com/2017/12/30/us/politics/how-fbi-russia-investigation-began-george-papadopoulos.html.

[43] Филипп Бамп (Philip Bump), *Сроки: Как советник Трампа пытался работать с российским правительством*, Wash. Post (30 октября, 2017), https://www.washingtonpost.com/news/politics/wp/2017/10/30/timeline-how-a-trump-adviser-tried-to-work-with-the-russian-government/.

[44] Заявление о нарушении, *ранее* примечание 21.

[45] *Id.*

[46] *Id.*

[47] *Id.*

[48] *Id*.

[49] *Id.*

[50] *Id.*

[51] *Id.*

[52] *Id.*

[53] *Id.*

[54] Шейн Харрис (Shane Harris), *Бывший советник Трампа признан виновным в связи Кампании с российскими официальными лицам* , Wall St J. (30 октября, 2017, 19:31), https://www.wsj.com/articles/former-trump-foreign-policy-adviser-to-plead-guilty-to-lying-to-fbi-1509374354.

[55] Департамент внутренней безопасности и Федеральное бюро расследований, *Кампания «GRIZZLY STEPPE» - Русская злонамеренная кибер-активность* (29 декабря 2016 года), *доступно по* https://www.us-cert.gov/sites/default/files/publications/JAR_16-20296A_GRIZZLY%20STEPPE-2016-1229.pdf.

[56] В этом разделе *см.* Дмитрий Альперович (Dmitri Alperovitch), *Медведи в середине: Вторжение в Национальный комитет демократической партии,* CrowdStrike ( 15 июня, 2016), https://www.crowdstrike.com/blog/bears-midst-intrusion-democratic-national-committee/.

[57] Директор национальной разведки, *ранее* примечание 33.

[58] В этом разделе, *see* Дмитрий Альперович (Dmitri Alperovitch), *Медведи в середине: Вторжение в Национальный комитет демократической партии,* CrowdStrike ( 15 июня, 2016), https://www.crowdstrike.com/blog/bears-midst-intrusion-democratic-national-committee/.

[59] Присцилла Альварес (Priscilla Alvarez) и Элейн Годфри (Elaine Godfrey), *Электронная переписка Дональда Трампа с Робом Голдстоуном (Rob Goldstone)* , The Atlantic (11 июля 2017 г.), https://www.theatlantic.com/politics/archive/2017/07/donald- trumps-jrs-email-exchange/533244/.

[60] *Id.*

[61] *Id.*

[62] Райан Тиг Беквит (Ryan Teague Beckwith), *Прочитайте речь о победе Дональда Трампа после победы в Нью-Джерси* , TIME (8 июня 2016 года), http://time.com/4360872/donald-trump-new-jersey-victory-speech-transcript/.

[63] К.К. Ребекка Лай (Rebecca Lai) и Алисия Парлапьяно (Alicia Parlapiano), *Что мы знаем о встрече России с Дональдом Трампом-младшим* , N.Y. Times (18 июля, 2017), https://www.nytimes.com/interactive/2017/07/18/us/politics/donald-trump-jr-russia-meeting.html.

[64] Джеймс Роджерс (James Rogers), *Хакеры, подшефные Российскому правительству, взломали DNC, изучили сведения на Дональда Трампа* , Fox News (14 июня 2016 года), http://www.foxnews.com/tech/2016/06/14/russian-government-affiliated-hackers-breach-dnc-take-research-on-donald-trump.html.

[65] Guccifer2, *Guccifer 2.0 Серверы DNC, взломанные одним хакером* , Wordpress (15 июня, 2016), https://guccifer2.wordpress.com/2016/06/15/dnc/.

[66] *Id.*

[67] Guccifer2, *Досье на Хиллари Клинтон из DNC* , Wordpress (21 июня 2016 г.), https://guccifer2.wordpress.com/2016/06/21/hillary-clinton/.

[68] Guccifer2, *ЧаВо от Guccifer 2.0* , Wordpress (30 июня 2016 г.), https://guccifer2.wordpress.com/2016/06/30/faq/.

[69] Guccifer2, *Тримпокалипс и другие планы DNC на июль* , Wordpress (6 июля 2016 г.), https://guccifer2.wordpress.com/2016/07/06/trumpocalypse/.

[70] *Заявление директора ФБР Джеймса Б. Коми (James B. Comey) о расследовании использования Секретарем Хиллари Клинтон системы личной электронной почты* , ФБР (5 июля 2016 года), https://www.fbi.gov/news/pressrel/press- releases/statement-by-fbi-director-james-b-comey-on-the-investigation-of-secretary-hillary- clinton2019s-use-of-a-personal-e-mail-system.

[71] *Поиск в базе данных электронной почты DNC* , WikiLeaks (22 июля 2016 10:30), https://wikileaks.org/dnc-emails/.

[72] *Что Дональд Трамп сказал о русских хаках и письмах Хиллари Клинтон* , N.Y. Times (27 июля, 2016), https://www.nytimes.com/2016/07/28/us/politics/trump-conference-highlights.html.

[73] *Id.*

[74] *Id.*

[75] *Id.*

[76] *Id.*

[77] Эндрю Кацински (Andrew Kaczynski) и др., *Консультант Трампа Роджер Стоун (Roger Stone) неоднократно утверждал, что знал о предстоящем проникновении WikiLeaks,* CNN (20 марта 2017 г.), https://www.cnn.com/2017/03/20/politics/kfile-roger-stone-wikileaks-claims/index.html.

[78] Эрик Лихтблау (Eric Lichtblau) и Ной Вейланд (Noah Weiland), *Хакер обнародует больше документов Демократической партии* , N.Y. Times (12 августа, 2016), https://www.nytimes.com/2016/08/13/us/politics/democratic-party-documents-hack.html.

[79] *Id.*

[80] Мэтт Диксон (Matt Dixon) и Марк Капуто (Marc Caputo), *Взломанное приложение DCCC docs распространяет слухи о стратегии и скандале для кандидатов в конгресс штата Флорида* , Politico (16 августа 2016 года), https://www.politico.com/states/florida/story/2016/08/dccc-hack-unearths-dirt-on-partys-own-candidates-104744.

[81] *Id.*

[82] Эндрю Блейк (Andrew Blake), *Роджер Стоун (Roger Stone), доверенное лицо Трампа, признает «безобидную» беседу в Twitter с хакерами DNC* , Washington Times (10 марта 2017 года), https://www.washingtontimes.com/news/2017/mar/10/roger-stone-trump-confidant-acknowledges-innocuous/.

[83] Райан Гудман (Ryan Goodman), *Как Роджер Стоун (Roger Stone) взаимодействовал с российскими Guccifer и Wikileaks* , Newsweek (28 сентября 2017), http://www.newsweek.com/how-stone-interacted-russias-guccifer-and-wikileaks-673268.

[84] *Id.*

[85] *Роджер Стоун (Roger Stone) присоединяется к Herald Drive, обсуждая выборы в 2016 году* , Boston Herald Radio (16 сентября 2016 года), https://soundcloud.com/bostonherald/roger-stone-joins-herald-drive-discussing-2016-election-1.

[86] Юлия Иоффе (Julia Ioffe), *Секретная переписка между Дональдом Трампом-младшим и WikiLeaks* , The Atlantic (13 ноября 2017 года, 22:28), https://www.theatlantic.com/politics/archive/2017/11/the-secret-correspondence-between-donald-trump-jr-and-wikileaks/545738/.

[87] Дональд Дж. Трамп (@realDonaldTrump), Twitter (12 октября 2016, 9:46), https://twitter.com/realdonaldtrump/status/786201435486781440.

[88] Кацински (Kaczynski) и др., *ранее* примечание 77.

[89] *Id.*

[90] *Электронная почта Podesta* , WikiLeaks (7 октября 2016 г.), https://wikileaks.org/podesta-emails/.

[91] *Утечки* , WikiLeaks, https://wikileaks.org/-Leaks-.html (последнее посещение 11 апреля 2018 года).

[92] Дональд Дж. Трамп (@realDonaldTrump), Twitter (24 июля 2016, 18:16), https://twitter.com/realdonaldtrump/status/757338816487235584.

[93] Дональд Дж. Трамп (@realDonaldTrump), Twitter (24 июля 2016, 17:53), https://twitter.com/realdonaldtrump/status/757332905047752704.

[94] Дональд Дж. Трамп (@realDonaldTrump), Twitter (25 июля 2016, 7:31), https://twitter.com/realdonaldtrump/status/757538729170964481.

[95] Дональд Дж. Трамп (@realDonaldTrump), Twitter (12 октября 2016, 9:46), https://twitter.com/realdonaldtrump/status/786201435486781440.

[95] Дональд Дж. Трамп (@realDonaldTrump), Twitter (14 октября 2016, 9:34), https://twitter.com/DonaldJTrumpJr/status/786923210512142336.

[97] Иоффе (Ioffe), *ранее* примечание 86.

[98] *Id.*

[99] Чак Тодд (Chuck Todd) и др., *Как Трамп воспользовался русским вмешательством: Усиление Wikileaks* , NBC News (19 февраля 2018, 8:20), https://www.nbcnews.com/politics/first-read/how-trump-took-advantage-russian-interference-amplifying-wikileaks-n849326.

[100] *Id.*

[101] *Id.*

[102] *Id.*

[103] *Id.*

[104] WikiLeaks (@wikileaks), Twitter (6 ноября, 2016, 17:39), https://twitter.com/wikileaks/status/795440430259335168?lang=en.

[105] *Id.*

[106] Питер Уокер (Peter Walker), *Дональд Трамп выигрывает: Услышав результаты, парламент России разразился аплодисментами* , The Independent (9 ноября 2016 года), https://www.independent.co.uk/news/world/americas/us- elections/donald-trump-wins-us-election-russia-putin-result-a7406866.html.

[107] *Id.*

RUBY J. KRAJICK
CLERK OF COURT

**UNITED STATES DISTRICT COURT**
SOUTHERN DISTRICT OF NEW YORK
500 PEARL STREET, NEW YORK, NY 10007
300 QUARROPAS STREET, WHITE PLAINS, NY 10601

WWW.NYSD.USCOURTS.GOV

# Electronic Case Filing
# Rules & Instructions

June 8, 2015 Edition
Includes Addenda Through January 3, 2018

---

### Important Information for New Civil Cases

New civil cases are required to be filed on-line through the Court's
Electronic Case Filing (ECF) system.

Certain exceptions apply.

See section 14, Opening a Civil Action, for more information.

# Table of Contents

**Section**                                                                                    **Page**

Introduction.................................................................................................   3

What's New..................................................................................................   4


**Part I. Electronic Case Filing Rules**


1.   Scope of Electronic Case Filing...............................................   5
2.   Eligibility, Registration, Passwords..........................................   5
3.   Consequences of Electronic Case Filing...................................   6
4.   Entry of Court Orders...............................................................   7
5.   Attachments and Exhibits.........................................................   7
6.   Sealed Documents....................................................................   7
7.   Retention Requirements...........................................................   8
8.   Signatures.................................................................................   8
9.   Service of Documents by Electronic Means............................   8
10.  Notice of Court Orders and Judgments....................................   9
11.  Technical Failures.....................................................................   9
12.  Public Access............................................................................   9


**Part II. - Electronic Case Filing Instructions**


13.  ECF Basics................................................................................  10
14.  Opening a Civil Action..............................................................  14
15.  Amended Pleadings and Motions.............................................  16
16.  Default Judgments....................................................................  17
17.  Appeals.....................................................................................  18
18.  Non-Electronic Documents.......................................................  19
19.  Service of Electronically Filed Documents...............................  20
20.  Attorney Appearances..............................................................  21
21.  Privacy and Public Access to ECF Cases................................  22
22.  ECF Passwords.........................................................................  24
23.  ECF Computer System Information............................................  25
24.  ECF Help Desk and Training......................................................  26

# Introduction

The United States District Court for the Southern District of New York implemented a Case Management / Electronic Case Filing (ECF) system in December 2003.   Electronic versions of documents have largely replaced paper documents in the Court's files.   All new civil and criminal cases filed in this Court after December 2, 2003 are ECF cases.

*Pro se* litigants must file pleadings and documents in the traditional manner on paper unless the assigned judge has granted permission to electronically file on the ECF system.   The information in this document applies only to cases assigned to the ECF system.

Please reference any addenda to these Rules & Instructions for interim updates.

The following should be observed when filing electronically:

- The Federal Rules of Civil and Criminal Procedure,

- The Court's Local Rules,

- The assigned judge's Individual Practices, and

- The Court's Electronic Case Filing Rules & Instructions.

The Court is prepared to assist you in filing electronically in the following manner:

- The SDNY Electronic Case Filing Rules & Instructions are your guide to electronic filing.

- Training in Electronic Case Filing (ECF) is available both in person at the courthouse and on-line at http://www.nysd.uscourts.gov/ecf_training.php   (*See also section 24 - ECF Help Desk and Training*).

SDNY ELECTRONIC CASE FILING RULES & INSTRUCTIONS

# What's New

June 8, 2015 Edition

Civil Case Opening - Effective June 8, 2015, new civil cases must be filed electronically on the Court's ECF system. Any required filing fee will be paid on-line during this process. Summonses will be requested and issued electronically on the ECF system. With certain exceptions listed below, new civil cases are no longer filed in hard copy form with the Clerk's Office. See section 14 for details and exceptions.

Bill of Costs - Effective March 1, 2015, requests to tax costs, and any opposition, are required to be electronically filed through the Court's ECF system. Unless requested by the Clerk, parties are no longer required to appear in person at the time designated for taxation.

Electronic Filing Errors – Errors made in electronic filing may now be reported to the Clerk of Court via email. This will permit Filing Users to immediately report an error and refile, even after normal business hours. See section 13.20.

Please see the back of this document for any addenda added since the publication date above.

# Part I. Electronic Case Filing Rules

The Court will accept for filing documents submitted, signed or verified by electronic means that comply with the following rules.

## Section 1. Scope of Electronic Filing

**1.1**     Except as expressly provided and in exceptional circumstances preventing a party from filing electronically, all documents required to be filed with the Court must be filed electronically.   Any party unable to comply with this requirement must seek permission of the Court to file in the traditional manner, on paper.   Any such application made after regular business hours may be submitted through the night depository box maintained pursuant to Local Civil Rule 1.2.   Unless otherwise ordered by the Court, documents filed by *pro se* litigants must be filed in the traditional manner, on paper, and will be scanned and docketed by the Clerk's Office into the ECF system.

**1.2**     In civil and miscellaneous cases the filing of the initial papers, including complaints, notices, petitions, etc., the payment of any applicable fees and the request for and issuance of summonses will be accomplished electronically.   (*See section 14 - Opening a Civil Action*).

**1.3**     Unless limited by their terms to civil cases, the provisions of these procedures relating to electronic filing apply in miscellaneous and criminal cases.   Electronic filing procedures shall not apply to applications for arrest, search or electronic surveillance warrants; for other orders in aid of or ancillary to a criminal investigation; or to proceedings relating to the grand jury.

**1.4**     In a criminal case the indictment or information, including any superseders, shall be filed and given to the defendant in the traditional manner on paper in accordance with the Federal Rules of Criminal Procedure and applicable Local Rules rather than electronically; in addition, service of subpoenas shall be made in the traditional manner on paper in accordance with the Federal Rules of Criminal Procedure and applicable Local Rules.   After a criminal case has been opened, counseled parties must promptly provide the Clerk of Court with electronic copies in PDF-A format of all documents previously provided in paper form.   All subsequent documents must be electronically filed except as provided in these Rules & Instructions or as ordered by the Court.

**1.5**     The Clerk of Court shall write and revise as necessary Instructions to guide Filing Users and maximize the efficiency of the Electronic Case Filing system.   (*See Part II - Electronic Case Filing Instructions*).

## Section 2. Eligibility, Registration, Passwords

**2.1**     Attorneys admitted to the bar of this Court, including those admitted *pro hac vice* and attorneys authorized to represent the United States, may register and may be required to register as Filing Users of the Court's ECF system.   Unless excused by the Court, attorneys not already Filing Users appearing in cases must register as Filing Users.   Registration is in a form prescribed by the Clerk and requires the Filing User's name, address, telephone number, Internet e-mail address and a declaration that the attorney is admitted to the bar of this Court or authorized to represent the United States or admitted *pro hac vice*.   See the ECF page at http://www.nysd.uscourts.gov for details.

**2.2**     **(a)** The Court may permit or require a *pro se* party to a pending civil action to register as a Filing User in the ECF system solely for purposes of that action. Registration is in a form prescribed by the Clerk and requires identification of the action as well as the name, address, telephone number and Internet e-mail address of the party. A sample

Motion for Permission for Electronic Case Filing is available here.    The Court may require the party to attend in-person training for Electronic Case Filing as a condition of registering as a Filing User.    If, during the course of the proceeding, the party retains an attorney who appears on the party's behalf the attorney must advise the Clerk to terminate the party's registration as a Filing User upon the attorney's appearance.

**(b)** A *pro se* party who is not incarcerated may consent to be a Receiving User (one who receives notices of court filings by e-mail instead of by regular mail, but who cannot file electronically).    A sample *Pro Se (Nonprisoner) Consent & Registration Form to Receive Documents Electronically is available here*.

**2.3**    Once registration is completed the Filing User will receive notification of the user log-in and password. Filing Users agree to protect the security of their passwords and immediately notify the Clerk if they learn that their password has been compromised.

**2.4**    In a civil action the Clerk will transmit Notices of Electronic Filing (NEF) to **(a)** the attorney who electronically filed the case initiating document, **(b)** each attorney identified on the Civil Cover Sheet or case initiating document in cases opened on the ECF system by the Clerk, **(c)** each additional attorney who subsequently appears in the action and electronically files a Notice of Appearance, **(d)** any *pro se* party who has received permission from the Court to register as a Filing User, and **(e)** any *pro se* party who has registered as a Receiving User.    In a criminal case the Clerk will enter, as Filing Users to whom Notices of Electronic Filing will be transmitted and who will be granted access to electronically file and retrieve documents in the case, the attorney(s) for the United States identified on the Criminal Designation Form or subsequently identified as representing the United States in the case and each attorney electronically filing a Notice of Appearance on behalf of a defendant.

**2.5**    An attorney of record may, by written request to the judge, have transmission of Notices of Electronic Filing (NEF) to another attorney in his or her firm terminated.    Please review the judge's Individual Practices. (*See section 22 - ECF Passwords*).

## Section 3. Consequences of Electronic Filing

**3.1**    Except as otherwise provided in section 4 herein, electronic filing of a document in the ECF system consistent with these procedures, together with the transmission of a Notice of Electronic Filing (NEF) from the Court, constitutes filing of the document for all purposes of the Federal Rules of Civil Procedure, the Federal Rules of Criminal Procedure, and the Local Rules of this Court and constitutes entry of the document on the docket kept by the Clerk under Federal Rules of Civil Procedure 58 and 79 and Federal Rules of Criminal Procedure 49 and 55.

**3.2**    When a document has been filed electronically, the official record is the electronic recording of the document as stored by the Court (subject to the exception set out in section 4 below), and the filing party is bound by the document as filed.    Except in the case of documents first filed in paper form and subsequently submitted electronically under section 1, a document filed electronically is deemed filed on the date and time stated on the Notice of Electronic Filing (NEF) from the Court.    For *pro se* litigants, paper documents filed with the Court, and subsequently scanned and docketed to the ECF system, shall be deemed filed on the date the documents are received by the Court.

**3.3**    Electronic filing must be completed before midnight local time where the Court is located in order to be considered timely filed that day.

**3.4**    Judges' Individual Practices should continue to be followed with respect to delivery of courtesy copies.    (*See section 19 - Service of Electronically Filed Documents*).

## Section 4. Entry of Court Orders

**4.1**     All orders, decrees, judgments and proceedings of the Court will be filed in accordance with these procedures and entered on the docket kept by the Clerk under Federal Rules of Civil Procedure 58 and 79 and Federal Rules of Criminal Procedure 49 and 55.   Orders of the Court may appear solely in electronic form. Documents may be signed by a judge using an electronic signature or may be scanned so as to contain an image of the judge's signature.

**4.2**     A Filing User submitting a document electronically that requires a judge's signature must promptly deliver the document in such other form, if any, as the Court requires.     (*See section 18 - Non-Electronic Documents*).

**4.3**     All Filing and Receiving Users have an obligation to review the Court's actual order, decree, or judgment, as available on ECF, and should not rely on the description of such order, decree or judgment in the Notice of Electronic Filing (NEF) alone.    In the case of any discrepancy between an order, decree, or judgment of the Court and the description of such order, decree, or judgment in the NEF, the order, decree, or judgment of the Court shall control.

## Section 5. Attachments and Exhibits

**5.1**     Filing Users must submit in electronic form all documents referenced as exhibits or attachments, unless the Court permits paper filing.   Exhibits must be filed as attachments to the main document.   Each attachment must be clearly titled so the subject of the exhibit is clear.

**5.2**     A Filing User must submit as exhibits or attachments only those excerpts of the referenced documents that are relevant to the matter under consideration by the Court.    Excerpted material must be clearly and prominently identified as such.   Filing Users who file excerpts of documents as exhibits or attachments under this procedure do so without prejudice to their right to file timely additional excerpts or the complete document.   Responding parties may file timely additional excerpts that they believe are relevant or the complete document.    A party may move before the Court for permission to serve and file in hard copy documents that cannot be reasonably scanned.

**5.3**     In cases where the record of an administrative or other prior proceeding must be filed with the Court, such record may be served and filed in hard copy without prior motion and order of the Court.     (*See section 15 – Amended Pleadings and Motions*).

## Section 6. Sealed Documents

**6.1**     Documents may not be placed under seal without leave of the Court.     Documents ordered to be placed under seal may not be filed electronically.

**6.2**     A motion to file documents under seal should be filed electronically unless prohibited by law, in redacted form if necessary; however, a motion to file under seal that includes a statement of why the filing should not be made electronically may be made in paper copy.   The order of the Court authorizing the filing of documents under seal may be filed electronically unless prohibited by law.    For complete instructions see the sealed records filing instructions on the Cases page at http://nysd.uscourts.gov/index.php.

**6.3**     A paper copy of the sealing order must be attached to the outside of the envelope containing the documents under seal and be delivered to the Clerk's Office.     (*See section 18 - Non-Electronic Documents*).

### Section 7. Retention Requirements

Documents that are electronically filed and require original signatures other than that of the Filing User must be maintained in paper form by the Filing User until one year after all time periods for appeals expire, except that affidavits, declarations and proofs of service must be maintained in paper form by the Filing User until five years after all time periods for appeals expire.   On request of the Court, the Filing User must provide original documents for review.

### Section 8. Signatures

**8.1**     The user log-in and password required to submit documents to the ECF system serve as the Filing User's signature on all electronic documents filed with the Court.    They also serve as a signature for purposes of the Federal Rules of Civil Procedure, including Rule 11, the Federal Rules of Criminal Procedure, the Local Rules of this Court, and any other purpose for which a signature is required in connection with proceedings before the Court.

**8.2**     Electronically filed documents must include a signature block and must set forth the name, address, telephone number and e-mail address all in compliance with the Federal Rules of Civil Procedure and Local Civil Rule 11.1.   In the absence of a scanned signature image, the name of the Filing User under whose log-in and password the document is submitted must be preceded by an "S/" typed in the space where the signature would otherwise appear.

**8.3**     No Filing User or other person may knowingly permit or cause to permit a Filing User's password to be used by anyone other than an authorized agent of the Filing User.    Filing Users are obligated to immediately bring to the attention of the court any unauthorized filings.

**8.4**     A document requiring the signature of a party or witness shall be electronically filed in a scanned format that contains an image of the actual signature.

**8.5**     Documents requiring signatures of more than one party must be electronically filed either by: (a) submitting a scanned document containing all necessary signatures; (b) representing the consent of the other parties on the document; (c) identifying on the document the parties whose signatures are required and by the submission of a notice of endorsement by the other parties no later than three business days after filing; or (d) in any other manner approved by the Court.   (*See section 13 - ECF Basics*).

### Section 9. Service of Documents by Electronic Means

**9.1**     In cases assigned to the ECF system, service is complete provided all parties receive a Notice of Electronic Filing (NEF), which is sent automatically by email from the Court (see the NEF for a list of who did/did not receive notice electronically).    Transmission of the NEF constitutes service upon all Filing and Receiving Users who are listed as recipients of notice by electronic mail.    It remains the duty of Filing and Receiving Users to maintain current contact information with the court and to regularly review the docket sheet of the case.

**9.2**     Attorneys and *pro se* parties who are not Filing or Receiving Users must be served with a paper copy of any electronically filed pleading or other document.    Service of such paper copy must be made according to the Federal Rules of Civil Procedure, the Federal Rules of Criminal Procedure and the Local Rules.    Such paper service must be documented by electronically filing proof of service.    Where the Clerk scans and electronically files pleadings and documents on behalf of a *pro se* party, the associated NEF constitutes service.

SDNY ELECTRONIC CASE FILING RULES & INSTRUCTIONS

## Section 10. Notice of Court Orders and Judgments

Immediately upon the entry of an order or judgment in a proceeding assigned to the ECF system, the Clerk will transmit to all Filing and Receiving Users in the case, in electronic form, a Notice of Electronic Filing (NEF).     Electronic transmission of the NEF constitutes the notice required by Federal Rule of Criminal Procedure 49(c) and Federal Rule of Civil Procedure 77(d).    In ECF cases, it remains the duty of Filing and Receiving Users to regularly review the docket sheet of the case. The Clerk must give notice in paper form to a person who is not a Filing or Receiving User in accordance with the Federal Rules of Civil Procedure or the Federal Rules of Criminal Procedure.    In the case of any discrepancy between an order, decree, or judgment of the Court and the description of such order, decree, or judgment in the NEF, the order, decree, or judgment of the Court shall control.     (*See section 19 - Service of Electronically Filed Documents*).

## Section 11. Technical Failures

A Filing User whose filing is made untimely as the result of a technical failure may seek appropriate relief from the Court. (*See section 23 - ECF Computer System Information*).

## Section 12. Public Access

A person may review filings that have not been sealed by the Court, in person, at the Clerk's Office.

A person may also view available Court records on-line through the Public Access to Court Electronic Records (PACER) electronic public access service at pacer.gov (separate PACER log-in and password required).    A person who has PACER access may retrieve docket sheets in civil, criminal and miscellaneous cases; documents in civil and miscellaneous cases assigned to the ECF System; and documents in criminal cases filed after November 1, 2004.    Only counsel for the United States and for a defendant may retrieve documents in criminal cases filed prior to November 1, 2004.     (*See section 13 - ECF Basics*).

SDNY ELECTRONIC CASE FILING RULES & INSTRUCTIONS

# Part II. Electronic Case Filing Instructions

<u>Section 13. ECF Basics</u>

**13.1    May letters be filed electronically?**

Except for letters to be filed under seal, letters addressed to judges who accept letters may be filed electronically.    Parties should consult the assigned judge's Individual Practices to determine if the judge accepts letters at all and, if he or she does, whether the judge has any page limitations on letters and/or requires courtesy copies of letters filed on ECF (and, if so, by what means of delivery).   All letters addressed to the Court must include a subject line with the case name and docket number (e.g., "Re: *Doe v. Smith*, 13 Civ. 1234 (ABC)").   Letters solely between parties or their counsel or otherwise not addressed to the Court may not be filed electronically on ECF (except as exhibits to an otherwise properly filed document).

In civil and miscellaneous cases, letters filed electronically must be filed in the following manner:

- Letters that are informational in nature, and do not request relief, should be filed using the ECF Filing Event LETTER listed under OTHER DOCUMENTS.

- Letters requesting relief must be permitted by the Local Rules and these Rules, and must be filed using the ECF Filing Event MOTION.    After selecting the ECF Filing Event MOTION, the Filing User should identify the motion as a LETTER-MOTION.    The Filing User must then select from the following list of motions that may be made by LETTER-MOTION:

        Motion to Adjourn Conference
        Motion to Change Attorney Name on Roll
        Motion to Compel
        Motion for Conference
        Motion to Consolidate Cases
        Motion to Continue
        Motion re: Discovery
        Motion to Expedite
        Motion for Extension of Time
        Motion for Extension of Time to Amend
        Motion for Extension of Time to Answer
        Motion for Extension of Time to Complete Discovery
        Motion for Extension of Time to File Document
        Motion for Extension of Time to File Response/Reply
        Motion for Extension of Time re Transcript
        Motion to File Amicus Brief
        Motion for Leave to File Document
        Motion for Leave to File Excess Pages
        Motion for Local Rule 37.2 Conference
        Motion for Oral Argument
        Motion to Reopen
        Motion to Reopen Case

SDNY ELECTRONIC CASE FILING RULES & INSTRUCTIONS

Motion to Seal Document
Motion to Stay
Motion to Substitute Attorney

- If the Filing User is making a type of motion that does not appear in this list, the motion may not be made by letter.
- If a motion is made by letter, the opposing party may file any response in letter form and the moving party may file any reply in letter form.   When filing such a response letter or reply letter, the Filing User should answer yes when prompted if the filing is in connection with a letter-motion.

In criminal cases, letters filed electronically must be filed in the following manner:

- Letters relating to sentencing should be filed using the ECF Filing Event SENTENCING SUBMISSION.
- All other letters requesting relief should be filed using the ECF Filing Event MOTION.   After selecting the ECF Filing Event MOTION, the Filing User should identify the motion as a LETTER-MOTION.   If a motion is made by letter, the opposing party may file any response in letter form and the moving party may file any reply in letter form.   When filing such a response letter or reply letter, the Filing User should answer yes when prompted if the filing is in connection with a LETTER-MOTION.
- All other letters - that is, letters that are informational in nature and do not request relief - should be filed using the ECF Filing Event LETTER listed under OTHER DOCUMENTS.

## 13.2   In brief, how do I file a document electronically?

(a)      Use your secure SDNY ECF password to log-in to the ECF system from any Internet connection.
(b)      Select the appropriate category, CIVIL or CRIMINAL.
(c)      Find the appropriate ECF Filing Event, or title, for the document.    Find a list of ECF Filing Events in the ECF Docketing Events List.
(d)      Indicate the party filing the document (hold down the control key to designate more than one party).
(e)      Upload a PDF-A version of the document.    Include any exhibits as attachments to the main document. Separately file supporting documents such as a Memorandum of Law or Affidavit in Support.
(f)      Save the final screen, the Notice of Electronic Filing (NEF).
(g)      Submit a paper courtesy copy to the judge if required (see the judges' Individual Practices at www.nysd.uscourts.gov).

## 13.3   How are exhibits filed?

Exhibits must always be filed as attachments to a document.    Exhibits should not be scanned into the same PDF file with the main document.    Each attachment must be clearly titled in the ECF entry so the subject of the exhibit is clear.    For example: NOTICE OF REMOVAL (Attachments: #1 State Court Complaint, #2 State Court Summons).

## 13.4   What is the secure website for electronic filing on the SDNY ECF system?

To file electronically, go to https://ecf.nysd.uscourts.gov, or link to the filing website via the Court's website (see below). You will need your SDNY ECF log-in and password to file electronically.

11

SDNY ELECTRONIC CASE FILING RULES & INSTRUCTIONS

**13.5    What is the public website for information about the Court?**

For publicly available information, go to www.nysd.uscourts.gov (no password required).    From the homepage click on ECF for information on Electronic Case Filing.

**13.6    What are the mailing addresses for the Court?**

- United States District Court, Southern District of New York, Daniel Patrick Moynihan United States Courthouse, 500 Pearl Street, New York, NY 10007-1312;
- United States District Court, Southern District of New York, Thurgood Marshall United States Courthouse, 40 Centre Street, New York, NY 10007-1312; and
- United States District Court, Southern District of New York, Charles L. Brieant Jr. Federal Building and United States Courthouse, 300 Quarropas Street, White Plains, NY 10601-4150.

**13.7    How can I tell if my case is an ECF case?**

All new civil, criminal and miscellaneous cases are assigned to the ECF system.    The docket sheet will include the letters "ECF" in the upper right corner and an entry titled "CASE DESIGNATED ECF".

**13.8    If a case is deemed an ECF case, am I required to file documents electronically?**

Yes.    In an ECF case the Filing User is responsible for electronically filing documents over the Internet using a secure SDNY log-in and password.    With certain exceptions outlined below, the Clerk's Office will not accept paper filings in an ECF case. (See *section 18 - Non-Electronic Documents*).

**13.9    May I file documents electronically in a non-ECF (paper) case?**

No.    Do not file documents electronically in non-ECF (paper) case.

**13.10    Will the Court file documents electronically in a non-ECF (paper) case?**

Yes, the Court may file Orders and Opinions in electronic format in a non-ECF (paper) case.    This will not convert a non-ECF case to an ECF case, and parties should continue to file documents on paper.

**13.11    Can I file electronically at any time?**

Yes. You can file electronically 24 hours a day, 7 days a week, 365 days a year.    Filing must be <u>completed</u> before midnight local time where the Court is located in order to be considered timely filed that day.    (*See section 3 - Consequences of Electronic Case Filing*).

**13.12    When is an electronically filed document deemed filed?**

An electronically filed document is deemed filed on the "filed on" date indicated on the Notice of Electronic Filing (NEF). (*See section 3 - Consequences of Electronic Case Filing*).

**13.13    What is a docket sheet, and how can I view one?**

The docket sheet is the official record of a case.    You can view the docket sheet, including images of electronically filed documents, at the Clerk's Office or remotely via the Public Access to Court Electronic Records (PACER) electronic public access service (pacer.gov).    (*See section 12 - Public Access*).

**13.14    Should I routinely view the docket sheet in my case?**

Yes.    In ECF cases parties are alerted to case activity by a Notice of Electronic Filing (NEF) sent by email.    However, e-mail is not infallible.    It remains the duty of Filing and Receiving Users to regularly review the docket sheet of the case in order not to miss a filing and in order to ensure all items filed using his/her ECF password are authorized filings.    Filing Users are obligated to immediately bring to the attention of the court any unauthorized filings.    (*See section 9 - Service of Documents by Electronic Means*).

**13.15    How do I sign an electronically filed document?**

The ECF log-in and password of the filing attorney serve as an electronic signature.    The filing attorney may sign a document by placing an "S/" before his or her typed name or by using a digital image of his or her signature.    The attorney's name and contact information, including e-mail address, must appear in the signature block below the signature line. Signatures for all others (clients, witnesses, etc.) must be scanned in order to capture the ink signature.    (*See section 8 - Signatures*).

**13.16    How will I know if it is appropriate to electronically file my document?**

First, determine if your case is an ECF case - not all cases are ECF cases.    When filing in an ECF case, if you can find an ECF Filing Event that directly matches your document then it should be electronically filed.    If you cannot find a matching ECF Filing Event it may not be appropriate to file electronically.    See the list of non-ECF documents in section 18.    (*See section 24 - ECF Help Desk and Training*).

**13.17    Should discovery related requests and responses be electronically filed?**

No.    Most discovery related requests and responses "must not be filed until they are used in the proceeding or the court orders filing…" (see Fed. R. Civ. P. 5(d)(1)).    When the filing of discovery related material is appropriate only relevant excerpts should be filed (see Local Civil Rule 5.1 and ECF Rule 5.2).

**13.18    How do I find the correct ECF Filing Event for my document?**

When filing electronically you will be asked to name your document by selecting the appropriate ECF Filing Event.    The ECF Filing Event is essentially the title of the document on the docket sheet, such as Motion for Summary Judgment or Affidavit in Support of Motion.    ECF Filing Events are listed by category on the ECF system.    Within each category is an alphabetical listing of available ECF Filing Events.    You may use the search function to find your Filing Event.    The ECF Docketing Events List is useful for finding your event and the category in which it is listed.    If you cannot find the appropriate event for your document <u>do not file it using the wrong event</u>.    Call the ECF Help Desk at (212) 805-0800 for assistance if necessary.    (*See section 24 - ECF Help Desk and Training*).

**13.19    Should I submit courtesy copies?**

Read the judge's Individual Practices to learn if courtesy copies are required.    Individual Practices are available on-line at

www.nysd.uscourts.gov/judges.    (*See section 3 - Consequences of Electronic Case Filing*).

### 13.20    Are transcripts filed electronically?

Pursuant to the Judicial Conference of the United States Policy on Privacy and Public Access to Electronic Case Files, official transcripts of Court proceedings taken by official court reporters, contract court reporters and transcribers may be available electronically through the PACER electronic public access service.

### 13.21    In Consolidated and MDL cases can I file simultaneously in member cases?

Yes.    When filing in Consolidated and Multi-District Litigation (MDL) cases you can save time by electronically filing a document simultaneously in the member case(s) using the computer function titled "Spread Text and Effects" (not available in related cases).    Please observe the following MDL filing rules:

- In consolidated and MDL cases you must file all documents first under the Lead or MDL case number.
- You then may precisely designate the member case(s) in which you wish to simultaneously file.
- Do not file in all cases unless it is appropriate.    Your document may not relate to all member cases.
- The case caption must include all the case numbers in which your document will be filed.

### 13.22    What if I make a mistake in electronic filing?

Immediately refile the document in correct form on the ECF system.    Then send an email to the Court's Quality Assurance Unit (ECF_error@nysd.uscourts.gov).    The email must include the case number, case title, judge's name, the document number and name/title of the document that was incorrectly filed as well as the document number and name/title of the document that was the correctly filed.    Please indicate the error that was made when filing the initial document.    Other questions may be directed to the ECF Help Desk at helpdesk@nysd.uscourts.gov.    For information regarding the filing of sensitive or confidential information in error, see section 21.8.


### Section 14. Opening a Civil Action


### 14.1    Must new civil and miscellaneous cases be electronically filed on the ECF system?

Yes.    Attorneys seeking to commence a new civil or miscellaneous case are required to electronically file the new case on the Court's ECF system.    With the exception of certain cases listed below, the Clerk's Office will not accept new civil or miscellaneous cases filed in paper form.

Any party unable to electronically file must seek permission of the court to file in the traditional manner, on paper.    Any such request made after business hours may be submitted through the night depository box maintained pursuant to Local Civil Rule 1.1.

### 14.2    Are there cases that must not be electronically filed?

Yes.    The following cases must not be electronically filed and must be filed in the traditional manner, on paper:
- Civil or miscellaneous cases that include an Order to Show Cause, Temporary Restraining Order, or other documents sought to be filed under seal;

SDNY ELECTRONIC CASE FILING RULES & INSTRUCTIONS

- Civil or miscellaneous cases commenced by a *pro se* party;
- *Habeas Corpus* cases filed pursuant to 28 U.S.C. §2255 (prisoner in Federal custody);
- False Claims Act cases (*Qui Tam* or "whistleblower" cases) filed pursuant to 31 U.S.C. §3729 et seq;

### 14.3     How do I electronically file a new civil or miscellaneous case on the ECF system?

Directions for electronically filing a new civil or miscellaneous case may be found at http://www.nysd.uscourts.gov/ecf.php.

### 14.4     Are courtesy copies required?

Read the judge's Individual Practices to determine if a courtesy copies should be submitted to chambers.

### 14.5     Can a Motion for Admission *Pro Hac Vice* and a new civil or miscellaneous case be electronically filed simultaneously?

Yes.   An attorney who is not admitted to the bar of this court who seeks to file a new civil or miscellaneous case may apply for a temporary ECF account enabling the electronic filing of the case initiating documents as well as a Motion for Admission *Pro Hac Vice*.   Applicants must first complete the Petition for Admission *Pro Hac Vice*/ECF Registration form at www.nysd.uscourts.gov/pro_hac.php.    Temporary ECF account information will be sent to the applicant via email.   The new case may then be electronically filed, including a Motion for Admission *Pro Hac Vice*.

### 14.6     Are summonses issued electronically?

Yes.   After electronically filing a new case, a party must electronically file a REQUEST FOR ISSUANCE OF SUMMONSES and attach proposed summonses in PDF format to the filing.   The Clerk's Office will review the REQUEST and use the ECF system to issue summonses suitable for printing.

### 14.7     Does the method for serving a summons and complaint remain the same?

Yes.   Although new civil and miscellaneous cases must be commenced with the court through electronic filing, the method of serving a summons and complaint remains the same pursuant to Fed.R.Civ.P. 4.

### 14.8     Am I required to deliver other documents to my adversary?

Yes.   In order to alert an adversary to the requirements of Electronic Case Filing and the assigned Judge's Individual Practices you are required to send to all parties the following documents (available at www.nysd.uscourts.gov), either as a PDF attachment to an e-mail or in paper form: (a) Electronic Case Filing Rules & Instructions (this document); and (b) the Individual Practices of the assigned Judge.   *Pro se* litigants who are not Filing Users are exempt from this Rule.

### 14.9     How is proof of service for the case initiating document filed?

- Electronically file the proof of service for the initiating document on the ECF system (do not e-mail); and
- Deliver the original paper proof of service, with summons attached, to the Clerk's Office.   Include a copy of the ECF Notice of Electronic Filing (NEF or filing receipt).

*Pro se* litigants who have been granted *in forma pauperis* (IFP) status are exempt from this Rule.    *Pro se* litigants who have not been granted IFP status shall deliver the original paper proof of service with summons attached to the Clerk's Office. (*See section 19 - Service of Electronically Filed Documents*).

15

### 14.10   Are records from state or administrative courts electronically filed?

Where the record of an administrative or other prior proceeding must be filed with the Court, and it is voluminous, such record may be filed and served in hard copy without prior motion and order of the Court.   (*See section 5 – Attachments and Exhibits*).

### 14.11   What if I make a mistake electronically filing a new case?

New civil and miscellaneous cases filed electronically that contain the following deficiencies may be administratively closed without prejudice and summons may not be issued unless the deficiency is corrected within five (5) days of electronic transmission by the Clerk of a Notice of Deficient Filing:

- The case initiating document contains the wrong document; an illegible or unreadable document; or no document at all; or
- The filing fee due was not paid, either in whole or in part.

Where a case is administratively closed for one of the reasons above, a filing party may seek to reopen the case after any deficiency is cured.   Within 60 days after the case closing a party should file a Notice of Application to Reopen Case, describing the efforts to cure the deficiency and seeking to reopen the case.   Applications to reopen such administratively closed cases filed after 60 days of closing must proceed by motion.

Questions regarding other errors may be directed to the ECF Help Desk at helpdesk@nysd.uscourts.gov or by calling (212) 805-0800 during business hours.

### 14.12   What if I make a duplicate payment when electronically filing a new case?

You may request a refund of a duplicate payment by sending a letter to the Clerk of Court.   The letter should include the case number, date of payment, the document associated with the payment, the pay.gov receipt number(s) and an email address where you can be reached.   Do not contact your credit card company to request a refund.

### Section 15. Amended Pleadings and Motions

### 15.1   Are amended pleadings filed electronically?

Yes.   After a case is opened in accordance with section 14 of these Rules, all subsequent amended complaints, intervenor complaints, third party complaints, etc. must be filed electronically on the ECF system.   When filing, select only those parties the amended pleading is filed against.   Do not select "all plaintiffs" or "all defendants" unless it is appropriate. Filers should review the judge's Individual Practices to determine if courtesy copies are necessary.

### 15.2   How are summonses issued when electronically filing an amended pleading?

If a party is added when electronically filing an amended pleading, a summons should be requested by electronically filing a REQUEST FOR ISSUANCE OF SUMMONS and attaching a proposed summons in PDF/A format.   Where multiple parties are added, a rider may be attached to a single summons listing all new parties.   In response, the Clerk's Office will electronically file a SUMMONS ISSUED event containing a summons with an electronic seal suitable for printing.   Summons forms are available at www.nysd.uscourts.gov/forms.   A summons is not necessary when no party is added to a case.

SDNY ELECTRONIC CASE FILING RULES & INSTRUCTIONS

### 15.3    Are sealed documents filed electronically?

No.    See sealed filing instructions on the cases page at www.nysd.uscourts.gov/cases.

### 15.4    What ECF Filing Event should be used to file a motion?

Use the ECF Filing Event beginning with the word "Motion".    The ECF system contains over 160 separate motion Filing Events, all beginning with the word "Motion".    See the ECF Docketing Events List for a complete list of motions and supporting documents.    Do not use the "Notice" filing event to file a motion.

### 15.5    What ECF Filing Event should be used to file supporting papers?

Use the ECF Filing Events for supporting papers found in the category "Replies, Opposition and Supporting Documents". Do not use the ECF Filing Event for Motion to file supporting papers.    For example, a motion, an affidavit in support and a memorandum of law in support constitute three separate filings.    Labeling each one "Motion" is incorrect and would make it appear that three motions were filed instead of one.

### 15.6    How can I learn to electronically file amended pleadings and motions?

Instructions and training information are available at www.nysd.uscourts.gov/ecf_training.php.

### Section 16. Default Judgments

### 16.1    How do I file a Default Judgment?

Consult the Individual Practices of the assigned judge to determine the appropriate method (at www.nysd.uscourts.gov). If the judge's Individual Practices contain no specific rules regarding Default Judgments you should follow section 16.4 below.

When electronically filing a Request to Enter Default Judgment before submitting a Default Judgment, you must:

(a)    File an unsigned Clerk's Certificate as an attachment to the Request to Enter Default;

(b)    Submit a paper copy of the proposed Clerk's Certificate to the Orders and Judgments Clerk (the clerk will sign and docket the Clerk's Certificate); and

(c)    After completion of the above, you may then move for a Default Judgment using the appropriate method outlined in section 16.2, 16.3 or 16.4 below.

When necessary, submit paper documents to the Orders and Judgements Clerk in Manhattan or White Plains, depending upon where the judge sits.    If sending documents by mail, enclose a return envelope with postage.    For mailing addresses *see section 13 - ECF Basics*.

### 16.2    Default Judgment brought by Motion:

(a)    Submit to the Orders and Judgments Clerk a paper Clerk's Certificate.    The clerk will sign and docket the Certificate, and provide a copy to the filing party.

(b)    Electronically file the Motion for Default Judgment on the ECF system.    The following items should be filed as attachments to the Motion: (1) the signed Clerk's Certificate; (2) a copy of the Summons and Complaint with proof of service; and (3) a form of proposed default judgment.    The following supporting documents should be filed as separate ECF Filing Events: Affidavit in Support; and Statement of Damages (unless requesting an inquest).

(c)    Electronically file proof of service for the Motion for Default Judgment.

(d)    Submit a courtesy copy of the Motion to the judge, including all attachments.

## 16.3    Default Judgment brought by Order to Show Cause (O.S.C.):

(a)    Submit to the Orders and Judgments Clerk a paper original of the O.S.C.    Include the following: Affidavit or Affirmation in Support; a Clerk's Certificate if failure to answer is the basis for the default; a Statement of Damages; a proposed Default Judgment; copies of the case initiating document; and the Affidavit of Service of the original Summons and Complaint.    Include courtesy copies of all documents.

(b)    If signed by the Court, the Clerk's Office will electronically file only the Order.    After the Order appears on the docket sheet, the attorney must electronically file all supporting papers and exhibits.

(c)    Electronically file proof of service for the O.S.C.

## 16.4    Default Judgment brought on by Default Judgment and Order:

(a)    Submit to the Orders and Judgments Clerk: (1) a paper original of the proposed Default Judgment and Order; (2) the Affidavit in Support; (3) a Statement of Damages (unless requesting an inquest); (4) a copy of the Summons and Complaint with proof of service; and (5) a Clerk's Certificate.    The papers will be forwarded to the judge for signature.

(b)    If signed by the Court, the Clerk's Office will electronically file only the Order.    After the Order appears on the docket sheet, the attorney must electronically file all supporting papers.

## Section 17. Appeals

### 17.1    How do I file a Notice of Appeal in a civil or miscellaneous case?

In civil and miscellaneous cases Filing Users must electronically file any Notice of Appeal through the ECF system.    The fee is paid on-line through the ECF system.    Instructions and training are available at nysd.uscourts.gov/ecf_training.php.

*Pro se* litigants who are not Filing Users are exempt from that portion of this Rule that requires litigants to electronically file the Notice of Appeal.    The Clerk's Office will scan and electronically file all proper appellate papers received from *pro se* litigants who are not Filing Users.

### 17.2    How do I file a Notice of Appeal in a criminal case?

A Notice of Appeal in a criminal case must be filed in the traditional manner on paper either at the courthouse or by mail. Include the filing fee if necessary.    Within 24 hours of filing the paper copy of your Appeal, you are required to e-mail to the Clerk's Office a stamped electronic copy of the Notice of Appeal in PDF-A format.    Include any exhibits.    Each document must be in a separate file no larger than 4 megabytes.    The District Court case number followed by the judge's initials must appear in the document's case caption.    When sending e-mail, the subject line of the e-mail should always list

the case number followed by a document description (e.g., "Re: 01cv1234-appeal").   Questions may be directed to the Appeals Clerk in Manhattan at (212) 805-0636, or in White Plains at (914) 390-4000.   Send the e-mail (do not file on the ECF system) to:

- For appeals from an ECF case assigned to a Manhattan judge, email to:
  appeals@nysd.uscourts.gov
- For appeals from an ECF case assigned to a White Plains judge, email to:
  wpclerk@nysd.uscourts.gov

*Pro se* parties who are not Filing Users are exempt from that portion of this Rule that requires litigants to e-mail to the Clerk's Office the Notice of Appeal.   The Clerk's Office will scan and electronically file all proper appellate papers received from *pro se* litigants who are not Filing Users.


### Section 18. Non-Electronic Documents


**18.1     In an ECF case are there documents that should not be electronically filed?**

Yes, including:

- Proposed orders; proposed judgments, stipulations; consents, see below;
- Orders to show cause / temporary restraining orders, see below;
- Sealed documents, see below;
- Surety bonds, see below; and
- Notices of Appeal in criminal cases, see section 17;

**18.2     Are Proposed Orders, Proposed Judgments, Stipulations or Consents filed electronically?**

No.   Any document that requires the signature of a judge should not be electronically filed except as an exhibit to another document.   Proposed orders, judgments, stipulations and consents should not be submitted through the ECF system. Instead they should be sent by e-mail to the Clerk.   Proposed orders should be submitted in word processing format rather than as a PDF document.   Stipulations should be submitted in PDF-A format.   Stipulations must contain ink signatures not s/.   Faxed or emailed signatures are acceptable.   Please note that Stipulations of Voluntary Dismissal pursuant to F.R.C.P. Rule 41(a)(1)(A)(ii) do not require the signature of a judge and must be electronically filed on the ECF system. Questions may be directed to the Orders & Judgments Clerk in Manhattan at (212) 805-0143 or in White Plains at (914) 390-4000.   Email the proposed order, judgment or stipulation to:

- For cases assigned to a Manhattan judge, e-mail to:
  judgments@nysd.uscourts.gov
- For cases assigned to a White Plains judge, e-mail to:
  wpclerk@nysd.uscourts.gov

*Pro se* litigants who are not Filing Users are exempt from that portion of this Rule that requires litigants to email proposed orders, judgments, stipulations and consents, and shall deliver such documents to the Clerk's Office in paper form.

**18.3     Are Orders to Show Cause filed electronically?**

No.   An Order to Show Cause or Temporary Restraining Order must be submitted in the traditional manner on paper, to

the Orders and Judgments Clerk.    If signed by the Court, the Clerk's Office will electronically file only the Order.    After the Order appears on the docket sheet, the attorney must electronically file all supporting papers

### 18.4    Are sealed documents filed electronically?

No.    Sealed documents are filed in the traditional manner on paper.    The sealed envelope must contain the paper document and a CD-ROM containing a PDF-A copy of the document.    A copy of the judge's sealing order must be attached to the outside of the envelope.    (*See section 6 - Sealed Documents*).

### 18.5    Are surety bonds filed electronically?

No. Surety bonds are filed in the traditional manner on paper.    Include a copy of the Court's Order regarding the bond.

### Section 19. Service of Electronically Filed Documents

### 19.1    How is service accomplished for electronically filed documents?

Filing and Receiving Users who have appeared in the case will receive a Notice of Electronic Filing (NEF) by e-mail whenever there is case activity.    The NEF constitutes service upon all Filing and Receiving Users.    A hyperlink to a PDF image of any electronically filed document will be included (not all activity includes a PDF document).    The Clerk's Office will no longer mail paper copies of court-initiated documents to Filing and Receiving Users.    The Clerk's Office will mail copies of all court-initiated documents to *pro se* parties who have not registered as Filing or Receiving Users.    (*See section 9 - Service of Documents by Electronic Means*).

### 19.2    Am I required to serve a paper copy of an electronically filed document?

Possibly.    In cases assigned to the ECF system, if all parties receive a NEF, service is complete upon transmission of the NEF by the Court, and you are not required to serve a paper copy.

If any party does not receive a NEF, you are required to accomplish service on that party in the traditional manner, in paper form.    Then you must electronically file proof of service (see below).    The NEF receipt will inform you who will receive notice of the filing "electronically" (by e-mail from the Court) and who will receive notice "by other means" (traditional service in paper form).    (*See section 9 - Service of Documents by Electronic Means*).

### 19.3    Am I required to electronically file proof of service in an ECF case?

Only two circumstances require the electronic filing of proof of service in an ECF case:

(a)    Proof of service for the case initiating document must be filed as follows:

(1)    Electronically file proof of service for the case initiating document on the ECF system (do not send by e-mail), and

(2)    Deliver the original paper proof of service with summons attached to the Clerk's Office.    Attach a copy of the ECF filing receipt for this document.

SDNY ELECTRONIC CASE FILING RULES & INSTRUCTIONS

(b)       Proof of service must be electronically filed any time a party is served with a paper document.

*Pro se* parties who are not Filing Users are exempt from that portion of this Rule requiring proof of service to be filed electronically.   (*See section 9 - Service of Documents by Electronic Means*).

### 19.4    Is a filing timely if it is completed before midnight?

Yes.   Filing must be completed before midnight local time where the Court is located in order to be considered timely filed that day.   (*See section 3 - Consequences of Electronic Case Filing*).

### 19.5    Do I receive a receipt when I file electronically?

Yes.   When an electronic filing is successful the final screen will display a Notice of Electronic Filing (NEF), or filing receipt. The NEF indicates what was filed, by whom, when it was filed and if a document number was assigned on the docket sheet. If you do not see the NEF screen your filing may not have been successful and you are advised to check the docket sheet.

### 19.6    Should I routinely view the docket sheet in my case?

Yes.   Although service is accomplished in ECF cases by an e-mail sent by the Court, e-mail is not infallible and you risk missing an e-mail message.   It remains the duty of Filing and Receiving Users to maintain current contact information with the court and to review regularly the docket sheet of the case.   Filing Users are obligated to immediately bring to the attention of the court any unauthorized filings.   (*See section 9 - Service of Documents by Electronic Means*).

### Section 20. Attorney Appearances

### 20.1    How does an attorney's name appear on the docket sheet?

Each attorney whose name appears under the signature line on the initiating document will be added to the docket sheet when the Clerk's Office opens the case on the ECF system.   The attorney responding to that filing must add his or her own name to the docket sheet the first time he or she appears in the case.   When electronically filing the first document, the responding attorney must: (a) click to create an "Association" with the client (i.e. represent the client); (b) ensure the "Notice" box is checked to receive electronic notice of case activity; and (c) click the "Lead" attorney box if applicable.   If the responding attorney is not offered the opportunity to create an "Association" with the client on the first electronic filing, the attorney must electronically file a Notice of Appearance in order to appear on the docket.

### 20.2    If the attorney's name is on the docket sheet why doesn't the attorney receive e-mail notification of filings?

It could be because the attorney's name was added to the docket sheet before the attorney obtained an ECF password. In that case the attorney's name and firm address will appear at the top of the docket sheet, but the e-mail address will be missing.   If this is the case the solution is to obtain an ECF password.   Or it could be because the attorney filed a Notice of Appearance but failed to check the "Notice" box when creating an association with the client.   In this case, call the ECF Help Desk at (212) 805-0800.   (*See section 24 - ECF Help Desk and Training*).

SDNY ELECTRONIC CASE FILING RULES & INSTRUCTIONS

20.3    How do I file a Notice of Appearance in an ECF case?

An attorney who joins a case already in progress must electronically file a Notice of Appearance.    When electronically filing the Notice of Appearance, the attorney must: (a) click to create an "Association" with the client (i.e., represent the client); (b) ensure the "Notice" box is checked to receive electronic notice of case activity; and (c) click the "Lead" attorney box if applicable.    Please note the ECF system will not allow an attorney to file electronically a Notice of Appearance on behalf of another attorney.    The Notice of Appearance and the ECF password must belong to the same attorney.    (*See section 2 - Eligibility, Registration, Passwords*).

20.4    How do I file a Motion for Admission *pro hac vice* in an ECF case?

A Motion for Admission *pro hac vice* (PHV) must be filed electronically and the associated fee paid on the ECF system.    See the Attorney Admissions page at www.nysd.uscourts.gov for details and sample forms.    For information regarding filing a PHV motion and a new civil case simultaneously, see section 14.5 above.

20.5    Am I required to notify the Court when my contact information changes?

Yes.    To ensure communications from the court reach all parties, Local Civil Rule 1.3(d) requires an attorney to notify the court of any changes in contact information.    For more information go to www.nysd.uscourts.gov.    A *pro se* party must notify the court of any changes in contact information, whether or not the party is a Filing or Receiving User, by submitting a Notice of Change of Address for *Pro Se* Litigants form.

20.6    What if only my e-mail address has changed?

Filing Users can change their own e-mail addresses on the ECF system: log into the SDNY ECF system, click on Utilities, click on Maintain Your Account and E-mail Information.    If, however, other contact information has changed, the directions above must be followed to update full contact information.    Receiving Users must send a letter to the court to update any changes in contact information, including email addresses.

20.7    Can I specify additional e-mail addresses to receive notification of activity in my cases?

Yes. You can add alternate e-mail addresses in the ECF system by clicking on Utilities, Maintain Your Account, and E-mail Information.

20.8    Can I receive electronic notification of activity in cases where I do not represent a party?

Yes.    You can add a case to your e-mail notification list on the ECF system even if you don't represent a party to the case. Click on Utilities, Maintain Your Account, and E-mail Information.

<u>Section 21. Privacy and Public Access to ECF Cases</u>

21.1    Has electronic filing expanded public access to documents?

Yes, documents filed electronically on the ECF system are more widely available than ever before.    Electronic documents can now be viewed over the Internet by anyone with a PACER account.    In order to protect people's privacy and reduce

SDNY ELECTRONIC CASE FILING RULES & INSTRUCTIONS

the threat of identity theft, parties should be cautious when filing sensitive information.

## 21.2    Who is responsible for redacting sensitive information from filed documents?

It is the sole responsibility of counsel and the parties to be sure that all documents comply with the rules of this Court requiring redaction of personal identifiers.    Neither the judge nor the Clerk of Court will review documents for compliance with these rules.

## 21.3    Am I required to redact certain sensitive information in a document?

Yes.    Amendments to Federal Rule of Civil Procedure 5.2 and Criminal Procedure 49.1 require that personal identification information be redacted from documents filed with the Court. You should not include sensitive information in any document filed with the Court unless such inclusion is necessary and relevant to the case.    A party wishing to file a document containing the personal data identifiers listed below must file a redacted version in the public file:

In all cases:

- Social Security Numbers:          include only the last four digits of the number.
- Names of Minor Children:        include only the initials of the child.
- Dates of Birth:                        include only the year.
- Financial Account #'s:              include only the last four digits of these numbers.

In criminal cases:

- Home Addresses:                    include only the City and State.

## 21.4    Is there other sensitive information that I should consider redacting?

Yes.    Caution should be exercised when filing documents that contain the following:

- Personal identifying numbers (PIN #'s), such as a driver's license number
- Medical records, treatment and diagnosis
- Employment history
- Individual financial information
- Proprietary or trade secret information
- Information regarding an individual's cooperation with the government

## 21.5    Am I required to file sensitive information under seal?

No.    In addition to the redacted public filing a party may, but is not required to, file the personal data identifiers listed above by filing under seal.    You may file under seal either: (a) a reference list or (b) an original, unredacted version of the document.
If you find it necessary to file sensitive information, the Court prefers a reference list to the filing of a complete document. The reference list shall contain the complete personal data identifier(s) and the redacted identifier(s) used in its (their) place in the filing.    The reference list may be amended as of right.

## 21.6    Are sealed documents filed electronically?

No.    Sealed documents are filed in the traditional manner on paper.    The sealed envelope must contain the paper

23

SDNY ELECTRONIC CASE FILING RULES & INSTRUCTIONS

document and a CD-ROM containing a PDF-A format copy of the document.    A copy of the judge's sealing order must be attached to the outside of the envelope.    For complete instructions see the sealed records filing instructions on the Cases page at www.nysd.uscourts.gov.    (*See section 6 - Sealed Documents*).

### 21.7    Who should maintain custody of original unredacted documents?

Parties are responsible for maintaining possession of original, unredacted documents, and information redacted from publicly filed documents.    The Court may later require counsel to furnish the unredacted information.

### 21.8    What if I mistakenly file sensitive or confidential information?

(a)    Contact the ECF Help Desk via email at helpdesk@nysd.uscourts.gov, or by telephone at (212) 805-0800, Monday through Friday during normal Clerk's Office hours.    The filing will be temporarily sealed and made invisible to the public.

(b)    After notifying the ECF Help Desk, the filing party must ask the presiding judge, in writing, for the filing to be formally sealed by the Court.

(c)    Electronically file a redacted version of the mistaken filing.

### Section 22. ECF Passwords

### 22.1    To file electronically in this Court, do I need an ECF password from the United States District Court for the Southern District of New York?

Yes.    To file electronically in this District Court you must have an ECF log-in and password issued by this Court.    ECF accounts are available to attorneys in good standing and *pro se* parties granted permission to file electronically.    This password is unique, and is not the same as a password from another District or Bankruptcy Court, or a PACER password. Protect the security of your password.    You may reset a lost ECF password via a link on the SDNY ECF login page at ecf.nysd.uscourts.gov.    (See addendum) *(See section 2 - Eligibility, Registration, Passwords)*.

### 22.2    How do I obtain an ECF password if I am already admitted to the bar of this Court?

An attorney admitted to the bar of this court may register for an ECF password on-line at www.nysd.uscourts.gov.

### 22.3    How do I gain admission to the bar of this court and obtain an ECF password?

The application to be admitted to the bar of this Court includes a request for an ECF password.    Go to www.nysd.uscourts.gov.

### 22.4    How do I gain admission *pro hac vice* and obtain an ECF password?

An attorney may be admitted to practice in one case only by moving for admission *pro hac vice*.    For complete *pro hac vice* motion and ECF password instructions go to www.nysd.uscourts.gov.

SDNY ELECTRONIC CASE FILING RULES & INSTRUCTIONS

**22.5    Do I need a new ECF password if I change law firms?**

No.    Your ECF password will remain the same even if your contact information changes.    Local Civil Rule 1.3 requires an attorney to notify the court of any contact information changes.    For more information go to www.nysd.uscourts.gov.

**22.6    How will I know if my ECF password application was submitted successfully on-line?**

When you are ready click the "Submit" button on the bottom of the form.    The screen will turn red and you will be asked to review your answers for accuracy.    After review click "Proceed".    If the screen turns green your application was submitted successfully.

**22.7    How long does it take to obtain an ECF password?**

Your ECF password will be sent to you by e-mail, within 48 hours of your on-line request.    The Court recommends you print a copy of your ECF account information for your records.

<u>Section 23. ECF Computer System Information</u>

**23.1    What Internet browser should I use to file electronically on the ECF system?**

Each new version of ECF is tested with specific Internet browsers before release.    Check the ECF log-in page for a list of approved Internet browsers.

**23.2    What is a PDF-A file and how do I create one?**

All documents electronically filed on the ECF system must be in PDF-A format (portable document format).    A PDF-A file is created using PDF writer software such as Adobe Acrobat (go to Adobe.com for details).    PDF-A files cannot be altered, providing security to the filer and the Court.

**23.3    Is there a limit to the size of a document that can be filed on ECF?**

Yes.    No single PDF file may be larger than 10.0 megabytes (10.0 mb).    If the filing is too large, the ECF system will not allow it to be filed, and you will not see a Notice of Electronic Filing (NEF or filing receipt) screen.    To determine the size of an Adobe Acrobat PDF file click on File, Document Properties, Summary.

**23.4    What if my document exceeds the file size limit?**

Converting documents directly from a word processor to PDF-A format creates the smallest possible file in terms of computer memory.    If that is not possible, scan your document at low resolution.    Within the Adobe Acrobat program, on the "Scan Manager" screen, adjust the settings for black and white and 200 dpi (dots per inch).    This allows more pages to fit into a single PDF-A file.    If that does not work, separate an oversized file into 2 or more parts.    Simply label each file 1a, 1b, 1c, etc.    Only relevant excerpts of exhibits should be electronically filed.    (*See section 5 - Attachments and Exhibits*).

SDNY ELECTRONIC CASE FILING RULES & INSTRUCTIONS

**23.5    What if a technical failure prevents me from filing electronically?**

If a technical failure prevents you from filing electronically, follow the steps below:

(a)    Do not attempt to file paper documents in ECF cases except for emergency filings (e.g., Temporary Restraining Order).

(b)    If the Court's ECF system is out of order you should electronically file your document as soon as the system is restored.

(c)    If you missed a filing deadline when the ECF system was out of order, attach a statement to your filing explaining how the interruption in service prevented you from filing in a timely fashion.    (*See section 11 - Technical Failures*)

**Section 24. ECF Help Desk & Training**

**24.1    How can I learn how to file electronically?**

The Court offers several options for ECF training.    Details are available on the ECF page at www.nysd.uscourts.gov

(a)    In-person training classes are offered for attorneys and support staff.

(b)    Step by step filing instructions can be found on-line in the course materials for our in-person training. From the ECF page click on Training.    Then click on Instructor Led Training, and click on the course title.

(c)    A web based tutorial for electronic filing is also available.

**24.2    How do I sign up for free alerts concerning ECF news?**

Sign up for free electronic alerts from the Court at www.nysd.uscourts.gov.    From the homepage click on ECF, then POC. You will receive periodic RSS messages through your web browser alerting you to interruptions in ECF service and other ECF information.    You do not need to be an attorney to sign up for this service.

**24.3    How do I contact the ECF Help Desk?**

The ECF Help Desk is available via email at helpdesk@nysd.uscourts.gov, or by telephone at (212) 805-0800, Monday through Friday during normal Clerk's Office hours.

The preceding Electronic Case Filing Rules & Instructions were approved on May 27, 2015.    Subsequent addenda approved prior to the date of publication indicated.

SDNY ELECTRONIC CASE FILING RULES & INSTRUCTIONS

United States District Court
Southern District of New York
ECF Rules & Instructions

June 15, 2015, Addendum to the
June 8, 2015 Edition

ECF Password Reset Feature

The Southern District of New York has announced the availability of a new feature for resetting a lost ECF password.

Effective Monday, June 15, 2015, attorneys admitted to the bar of this court who are registered ECF Filing Users may reset their password via a link on the SDNY ECF login page at ecf.nysd.uscourts.gov.    A new password will be sent by email to the address registered to the user's ECF account.

The ECF Rules & Instructions have been revised accordingly, as described below.

Section 22.1 – To file electronically in this court, do I need an ECF password from the United States District Court for the Southern District of New York?

Yes.    To file electronically in this District Court you must have an ECF log-in and password issued by this Court.    ECF accounts are available to attorneys in good standing and *pro se* parties granted permission to file electronically.    This password is unique, and is not the same as a password from another District or Bankruptcy Court, or a PACER password. Protect the security of your password. ~~by reporting a lost or stolen password immediately to the ECF Help Desk by email helpdesk@nysd.uscourts.gov or by telephone (212) 805-0136~~.    *You may reset a lost ECF password via a link on the SDNY ECF login page at* ecf.nysd.uscourts.gov.    *(See section 2 - Eligibility, Registration, Passwords)*.

Questions may be directed to the ECF Help Desk at helpdesk@nysd.uscourts.gov, or by calling (212)805-0800 during business hours.

SDNY ELECTRONIC CASE FILING RULES & INSTRUCTIONS

United States District Court
Southern District of New York
ECF Rules & Instructions

September 1, 2015, Addendum to the
June 8, 2015 Edition

ECF Rule 2.4 Revised to Note Recipients of Notices of Electronic Filing

With the advent of the electronic filing of new civil cases by attorneys, a revision to Rule 2.4 is necessary to note the recipients of Notices of Electronic Filing.

Where an attorney electronically files a new civil case on the court's ECF system, only the filing attorney will receive Notices of Electronic Filing (NEF) for case activity.    Any co-counsel must electronically file a Notice of Appearance in order to receive a NEF.

Where a new civil case is permitted to be filed in hard copy form and the Clerk files the case on the ECF system, each attorney identified on the civil cover sheet or case initiating document will receive Notices of Electronic Filing (NEF) for case activity.    (See Section 14.2 for cases filed in hard copy form.)

ECF Rule 2.4 has been revised accordingly, as described below:

> **2.4**        In a civil action the Clerk will transmit Notices of Electronic Filing (NEF) to (a) *the attorney who electronically filed the case initiating document,* (b) each attorney identified on the Civil Cover Sheet *or case initiating document in cases opened on the ECF system by the Clerk, (c)* each additional attorney who subsequently appears in the action and electronically files a Notice of Appearance, *(d)* any *pro se* party who has received permission from the Court to register as a Filing User, and *(e)* any *pro se* party who has registered as a Receiving User.    In a criminal case the Clerk will enter, as Filing Users to whom Notices of Electronic Filing will be transmitted and who will be granted access to electronically file and retrieve documents in the case, the attorney(s) for the United States identified on the Criminal Designation Form or subsequently identified as representing the United States in the case and each attorney electronically filing a Notice of Appearance on behalf of a defendant.

Questions may be directed to the ECF Help Desk at helpdesk@nysd.uscourts.gov, or by calling (212)805-0800 during business hours.

SDNY ELECTRONIC CASE FILING RULES & INSTRUCTIONS

United States District Court
Southern District of New York
ECF Rules & Instructions

September 1, 2015, Addendum to the
June 8, 2015 Edition

ECF Rule 13.1 Revised to Include Additional Letter Motions

The Southern District of New York has announced that effective Tuesday, September 1, 2015, ECF Rule 13.1, "May letters be filed electronically?", has been revised to include the following additional letter motions that may be electronically filed:

Motion to Compel
Motion to Consolidate Cases
Motion to Continue
Motion re: Discovery
Motion to Expedite
Motion to File Amicus Brief
Motion for Leave to File Document
Motion for Oral Argument
Motion to Reopen
Motion to Seal Document
Motion to Stay
Motion to Substitute Attorney

Before filing, parties should consult the Individual Practices of the assigned judge for guidance regarding the filing of motions.

Questions may be directed to the ECF Help Desk at helpdesk@nysd.uscourts.gov, or by calling (212)805-0800 during business hours.

SDNY ELECTRONIC CASE FILING RULES & INSTRUCTIONS

United States District Court
Southern District of New York
ECF Rules & Instructions

March 7, 2017, Addendum to the

June 8, 2015 Edition

ECF Rule 5.1 – Attachments and Exhibits

ECF Rule 13.3 - How are exhibits filed?

The Southern District of New York announces revisions to the court's ECF Rules & Instructions intended to clarify the proper procedure for including exhibits to a filing on the ECF system.    Specifically, Rule 5.1 has been revised and new Rule 13.3 has been added as described below.

5.1     Filing Users must submit in electronic form all documents referenced as exhibits or attachments, unless the Court permits paper filing.   *Exhibits must be filed as attachments to the main document.    Each attachment must be clearly titled so the subject of the exhibit is clear*.

13.3     How are exhibits filed?    Exhibits must always be filed as attachments to a document.    Exhibits should not be scanned into the same PDF file with the main document.    Each attachment must be clearly titled in the ECF entry so the subject of the exhibit is clear.    For example: NOTICE OF REMOVAL (Attachments: #1 State Court Complaint, #2 State Court Summons).

Questions may be directed to the ECF Help Desk at helpdesk@nysd.uscourts.gov, or by calling (212)805-0800 during business hours.

SDNY ELECTRONIC CASE FILING RULES & INSTRUCTIONS

United States District Court
Southern District of New York
ECF Rules & Instructions

March 13, 2017, Addendum to the

June 8, 2015 Edition

ECF Rule 14.11 – What if I make a mistake electronically filing a new civil case?

The Southern District of New York announces a revision to the court's ECF Rules & Instructions regarding the process to reopen certain administratively closed civil cases.

14.11   What if I make a mistake electronically filing a new civil case?

New civil cases filed electronically that contain the following deficiencies may be administratively closed without prejudice and summons may not be issued unless the deficiency is corrected within five (5) days of electronic transmission by the Clerk of a Notice of Deficient Filing:

- The case initiating document contains the wrong document; an illegible or unreadable document; or no document at all; or
- The filing fee due was not paid, either in whole or in part.

Where a case is administratively closed for one of the reasons above, a filing party may ~~move~~ *seek* to reopen the case after any deficiency is cured.   *Within 60 days after the case closing a party should file a Notice of Application to Reopen Case, describing the efforts to cure the deficiency and seeking to reopen the case.   Applications to reopen such administratively closed cases filed after 60 days of closing must proceed by motion.*

Questions may be directed to the ECF Help Desk at helpdesk@nysd.uscourts.gov, or by calling (212) 805-0800 during business hours.

SDNY ELECTRONIC CASE FILING RULES & INSTRUCTIONS

United States District Court
Southern District of New York
ECF Rules & Instructions

June 26, 2017, Addendum to the

June 8, 2015 Edition

S.D.N.Y. to Require Electronic Miscellaneous Civil Case Opening

Beginning June 26, 2017, the United States District Court for the Southern District of New York will require new miscellaneous civil actions to be filed electronically using the Court's Electronic Case Filing (ECF) system (see exceptions below).

The following miscellaneous civil actions may not be commenced on-line through the ECF system and must continue to be filed in the traditional manner, on paper:

- New miscellaneous civil actions that include an Order to Show Cause, a Temporary Restraining Order, a Stipulation and Order, or documents sought to be filed under seal;

- New miscellaneous civil actions commenced by a *pro se* party;

Attorneys admitted to the bar of this Court, who are registered ECF Filing Users, and attorneys seeking admission *pro hac vice*, will open miscellaneous civil actions and pay any required fee on-line.

Any party unable to comply with the requirement for electronically commencing a new miscellaneous civil action through the ECF system must seek permission of the Court to file in the traditional manner, on paper.

Further guidance may be found in the Court's Standing Order Regarding Miscellaneous Civil Case Opening (attached) and the electronic case opening training materials, available on-line at www.nysd.uscourts.gov/ecf.php.

Following are those ECF Rules & Instructions revised in accordance with this change in practice.

<u>Section 1. Scope of Electronic Filing</u>

**1.2**     In civil *and miscellaneous* cases the filing of the initial papers, including complaints, notices, petitions, etc., the payment of any applicable fees and the request for and issuance of summonses will be accomplished electronically.     (*See section 14 - Opening a Civil Action*).

**1.3**     Unless limited by their terms to civil cases, the provisions of these procedures relating to electronic filing apply in *miscellaneous and* criminal cases.    Electronic filing procedures shall not apply to applications for arrest, search or electronic surveillance warrants; for other orders in aid of or ancillary to a criminal investigation; or to proceedings relating to the grand jury.

SDNY ELECTRONIC CASE FILING RULES & INSTRUCTIONS

June 26, 2017, Addendum to the

June 8, 2015 Edition

## Section 13. ECF Basics

**13.1    May letters be filed electronically?**

Except for letters to be filed under seal, letters addressed to judges who accept letters may be filed electronically.     Parties should consult the assigned judge's Individual Practices to determine if the judge accepts letters at all and, if he or she does, whether the judge has any page limitations on letters and/or requires courtesy copies of letters filed on ECF (and, if so, by what means of delivery).    All letters addressed to the Court must include a subject line with the case name and docket number (e.g., "Re: *Doe v. Smith*, 13 Civ. 1234 (ABC)").     Letters solely between parties or their counsel or otherwise not addressed to the Court may not be filed electronically on ECF (except as exhibits to an otherwise properly filed document). In civil *and miscellaneous* cases, letters filed electronically must be filed in the following manner: …

## Section 14. Opening a Civil Action

**14.1    Must new civil *and miscellaneous* cases be electronically filed on the ECF system?**

Yes.    Attorneys seeking to commence a new civil *or miscellaneous* case are required to electronically file the new case on the Court's ECF system.    With the exception of certain cases listed below, the Clerk's Office will not accept new civil *or miscellaneous* cases filed in paper form.

Any party unable to electronically file must seek permission of the court to file in the traditional manner, on paper.    Any such request made after business hours may be submitted through the night depository box maintained pursuant to Local Civil Rule 1.1.

**14.2    Are there cases that must not be electronically filed?**

Yes.    The following cases must not be electronically filed and must be filed in the traditional manner, on paper:

- Civil *or miscellaneous* cases that include an Order to Show Cause, Temporary Restraining Order, or other documents sought to be filed under seal;
- Civil *or miscellaneous* cases commenced by a *pro se* party;
- *Habeas Corpus* cases filed pursuant to 28 U.S.C. §2255 (prisoner in Federal custody);
- False Claims Act cases (*Qui Tam* or "whistleblower" cases) filed pursuant to 31 U.S.C. §3729 et seq;

**14.3    How do I electronically file a new civil *or miscellaneous* case on the ECF system?**

Directions for electronically filing a new civil *or miscellaneous* case may be found at http://www.nysd.uscourts.gov/ecf.php.

**14.5    Can a Motion for Admission *Pro Hac Vice* and a new civil *or miscellaneous* case be electronically filed simultaneously?**

Yes.    An attorney who is not admitted to the bar of this court who seeks to file a new civil *or miscellaneous* case may apply

SDNY ELECTRONIC CASE FILING RULES & INSTRUCTIONS

June 26, 2017, Addendum to the

June 8, 2015 Edition

for a temporary ECF account enabling the electronic filing of the case initiating documents as well as a Motion for Admission *Pro Hac Vice*. Applicants must first complete the Petition for Admission *Pro Hac Vice*/ECF Registration form at www.nysd.uscourts.gov/pro_hac.php. Temporary ECF account information will be sent to the applicant via email. The new ~~civil~~ case may then be electronically filed, including a Motion for Admission *Pro Hac Vice*.

### 14.7    Does the method for serving a summons and complaint remain the same?

Yes. Although new civil *and miscellaneous* cases must be commenced with the court through electronic filing, the method of serving a summons and complaint remains the same pursuant to Fed.R.Civ.P. 4.

### 14.11    What if I make a mistake electronically filing a new ~~civil~~ case?

New civil *and miscellaneous* cases filed electronically that contain the following deficiencies may be administratively closed without prejudice and summons may not be issued unless the deficiency is corrected within five (5) days of electronic transmission by the Clerk of a Notice of Deficient Filing:

- The case initiating document contains the wrong document; an illegible or unreadable document; or no document at all; or
- The filing fee due was not paid, either in whole or in part.

Where a case is administratively closed for one of the reasons above, a filing party may seek to reopen the case after any deficiency is cured. Within 60 days after the case closing a party should file a Notice of Application to Reopen Case, describing the efforts to cure the deficiency and seeking to reopen the case. Applications to reopen such administratively closed cases filed after 60 days of closing must proceed by motion.

Questions regarding other errors may be directed to the ECF Help Desk at helpdesk@nysd.uscourts.gov or by calling (212) 805-0800 during business hours.

### 14.12    What if I make a duplicate payment when electronically filing a new ~~civil~~ case?

You may request a refund of a duplicate payment by sending a letter to the Clerk of Court. The letter should include the case number, date of payment, the document associated with the payment, the pay.gov receipt number(s) and an email address where you can be reached. Do not contact your credit card company to request a refund.

### <u>Section 17. Appeals</u>

### 17.1    How do I file a Notice of Appeal in a civil *or miscellaneous* case?

In civil *and miscellaneous* cases Filing Users must electronically file any Notice of Appeal through the ECF system. The fee is paid on-line through the ECF system. Instructions and training are available at nysd.uscourts.gov/ecf_training.php. *Pro se* litigants who are not Filing Users are exempt from that portion of this Rule that requires litigants to electronically file the

SDNY ELECTRONIC CASE FILING RULES & INSTRUCTIONS

June 26, 2017, Addendum to the

June 8, 2015 Edition

Notice of Appeal.   The Clerk's Office will scan and electronically file all proper appellate papers received from *pro se* litigants who are not Filing Users.

<u>Section 18. Non-Electronic Documents</u>

**18.1    In an ECF case are there documents that should not be electronically filed?**

Yes, including:

- *Miscellaneous Case initiating documents, see below;*
- Proposed orders; proposed judgments, stipulations; consents, see below;
- Orders to show cause / temporary restraining orders, see below;
- Sealed documents, see below;
- Surety bonds, see below; and
- Notices of Appeal in criminal cases, see section 17;

*18.2    How is a Miscellaneous Case opened?*

*Civil miscellaneous cases are opened in the traditional manner, on paper.   Subsequent documents must be electronically filed on the ECF system.   A party initiating a civil miscellaneous case is required to submit the following:*

*(a)    A completed <u>miscellaneous civil cover sheet</u> (original & two copies).*
*(b)    The hard copy of the civil miscellaneous application and any other supporting documents.*
*(c)    The <u>applicable filing fee.</u>*

*Within 24 hours of the assignment of a case number, the filing party is required to e-mail the PDF-A copy of the initiating document, any supporting documents and the civil miscellaneous case cover sheet to:*

- *For miscellaneous applications assigned to Manhattan, e-mail to: miscfoley@nysd.uscourts.gov*
- *For miscellaneous applications assigned to White Plains, e-mail to: miscwhiteplains@nysd.uscourts.gov*

*The subject line of the e-mail and name of the file should list the case number followed by a brief document description (e.g., "Re: 10 MC 1234 - a letter rogatory").   Each document must be in a separate PDF-A format file no larger than 4.0 megabytes (separate large computer files into smaller parts if necessary).   Failure to do so within 24 hours will delay adding your documents to the computerized ECF docket.*

*The party commencing the civil miscellaneous action is required to serve initiating documents on the opposing party in the traditional manner on paper.   Filing Users must electronically file the proof of service for the initiating documents on the ECF system.   The original paper proof of service is required to be delivered to the Clerk's Office along with a copy of the ECF Notice of Electronic Filing (NEF) of the proof of service (the filing receipt).   There is no fee for the subsequent filing of any opposition/response and/or reply papers.   Pro se parties who are not Filing Users are exempt from those portions of this rule requiring electronic filing.*

SDNY ELECTRONIC CASE FILING RULES & INSTRUCTIONS

United States District Court
Southern District of New York
ECF Rules & Instructions


January 3, 2018, Addendum to the

June 8, 2015 Edition

ECF Rule 13.17 – Should discovery related requests and responses be electronically filed?


The Southern District of New York announces a revision to the court's ECF Rules & Instructions intended to promote compliance with the limitations on filing discovery material found in the Federal Rules of Civil Procedure and the court's Local Rules.   A new Rule 13.17 has been added to the courts Electronic Case Filing Rules & Instructions as described below.

*13.17   Should discovery related requests and responses be electronically filed?*

*No.   Most discovery related requests and responses "must not be filed until they are used in the proceeding or the court orders filing…" (see Fed. R. Civ. P. 5(d)(1)).   When the filing of discovery related material is appropriate only relevant excerpts should be filed (see Local Civil Rule 5.1 and ECF Rule 5.2).*

Questions may be directed to the ECF Help Desk at helpdesk@nysd.uscourts.gov, or by calling (212)805-0136 during business hours.

SDNY ELECTRONIC CASE FILING RULES & INSTRUCTIONS

United States District Court
Southern District of New York
ECF Rules & Instructions


January 3, 2018, Addendum to the

June 8, 2015 Edition

ECF Rule 23.3 – Is there a limit to the size of a document that can be filed on ECF?


The Southern District of New York announces a revision to the court's ECF Rules & Instructions regarding the maximum size of a document that may be electronically filed on the court's Electronic Case Filing (ECF) system.

23.3    Is there a limit to the size of a document that can be filed on ECF?

Yes.    No single PDF file may be larger than ~~4.0 megabytes (4.0 mb)~~ *10 megabytes (10mb).*    If the filing is too large, the ECF system will not allow it to be filed, and you will not see a Notice of Electronic Filing (NEF or filing receipt) screen.    To determine the size of an Adobe Acrobat PDF file click on File, Document Properties, Summary.

Questions may be directed to the ECF Help Desk at helpdesk@nysd.uscourts.gov, or by calling (212)805-0136 during business hours.

WWW.NYSD.USCOURTS.GOV

РУБИ ДЖ. КРАЖИК
СЕКРЕТАРЬ СУДА

**ФЕДЕРАЛЬНЫЙ ОКРУЖНОЙ СУД**
**СОЕДИНЕННЫХ ШТАТОВ АМЕРИКИ**
ЮЖНЫЙ ОКРУГ НЬЮ-ЙОРКА
500 ПЕРЛ СТРИТ, НЬЮ-ЙОРК, NY 10007
300 КВАРРОПАС СТРИТ, УАЙТ-ПЛЕЙНС, NY 10601

# Электронная подача документов
# Правила и инструкции

В редакции от 8 июня 2015 г.
Включает Приложения до 3 января 2018 г.

---

**Важная информация о новых гражданских исках**

Новые гражданские иски должны предъявляться через систему суда для электронной подачи документов (ECF).

Возможны исключения.

Подробнее см. раздел 14, Возбуждение гражданского дела.

# Содержание

Раздел                                                                        Страница

Введение ................................................................................................................ 3

Новости ................................................................................................................. 4

## Часть I. Правила электронной подачи документов

1. Предмет электронной подачи документов .............................................. 5
2. Соответствие критериям, Регистрация, Пароли ................................... 5
3. Последствия электронной подачи иска .................................................. 6
4. Вступление в силу решений суда ............................................................ 7
5. Вложения и приложения........................................................................... 7
6. Документы, скрепленные печатью .......................................................... 7
7. Ограничительные требования .................................................................. 8
8. Подписи ..................................................................................................... 8
9. Электронная доставка документов .......................................................... 8
10. Уведомление ответчику о явке в суд ...................................................... 9
11. Технические неполадки ............................................................................ 9
12. Свободный доступ .................................................................................... 9

## Часть II. - Инструкции по электронной подаче иска

13. Основные принципы электронной подачи исков .................................. 10
14. Возбуждение гражданского дела ........................................................... 14
15. Внесение изменений в состязательные бумаги и ходатайства ............ 16
16. Заочные решения суда ............................................................................ 17
17. Апелляции................................................................................................ 18
18. Неэлектронные документы..................................................................... 19
19. Вручение документов, поданных в электронной форме...................... 20
20. Явка адвоката .......................................................................................... 21
21. Конфиденциальность и открытый доступ к делам по искам, поданным электронно 22
22. Пароли при электронной подаче документов....................................... 24
23. Информация о компьютерной системе для электронной подачи документов...... 25
24. Справочная и обучение по электронной подаче документов................ 26

## Введение

В декабре 2003 г. Федеральный окружной суд Соединенных Штатов Америки по Южному округу Нью-Йорка внедрил систему организации рассмотрения дел / электронной подачи документов (ECF). В большинстве случаев электронные версии документов в суде вытеснили бумажные документы. С 2 декабря 2003 г. все новые гражданские и уголовные дела в данном суде открываются на основании исков, предъявленных в электронной форме.

Стороны по делу, не пользующиеся услугами адвоката, должны предъявлять состязательные бумаги и ходатайства обычным способом – на бумажном носителе, пока назначенный судья не разрешит электронную подачу документов через систему ECF. Информация, содержащаяся в данном документе, распространяется только на те дела, которые предусмотрены данной системой.

Укажите ссылки на все дополнения к данным Правилам и инструкциям для внесения промежуточных изменений.

При электронной подаче документов нужно соблюдать следующее:

- Федеральный гражданский и уголовный процессуальный кодекс,

- [Внутренние правила](), суда

- [Индивидуальная практика]() судьи, и

- Правила и инструкции по электронной подаче документов в суд.

Суд готов помочь вам с электронной подачей документов следующим образом:

- Правила и инструкции по электронной подаче документов в Южном округе Нью-Йорка – ваше руководство по электронной подаче документов.

- Обучение по электронной подаче документов (ECF) можно пройти очно в здании суда или удаленно на сайте http://www.nysd.uscourts.gov/ecf_training.php (*Также см. раздел 24 – Справочная и обучение по ECF*).

## Новости

Редакция от 8 июня 2015 г.

Возбуждение гражданских дел – с 8 июня 2015 г. новые гражданские иски предъявляются электронно через систему суда ECF. Если требуется оплатить пошлину за подачу иска, это можно сделать онлайн в процессе. Повестки запрашиваются и выдаются системой ECF в электронном виде. Новые гражданские иски больше не принимаются канцелярией суда на бумажном носителе, кроме описанных ниже исключений. Подробнее об исключениях см. Раздел 14.

Счет судебных издержек – с 1 марта 2015 г. заявления об определении размера судебных издержек должны подаваться в электронной форме через систему суда ECF. Если этого не требует Секретарь суда, сторонам более не нужно присутствовать лично при определении размера судебных издержек.

Ошибки при электронной подаче – теперь об ошибках, допущенных при электронной подаче, Секретарю суда можно сообщить по электронной почте. Это позволит пользователям незамедлительно сообщать об ошибках, даже по окончании рабочего дня. См. раздел 13.20.

На обороте приводятся дополнения, появившиеся после указанной выше даты публикации.

ПРАВИЛА И ИНСТРУКЦИИ ПО ЭЛЕКТРОННОЙ ПОДАЧЕ ДОКУМЕНТОВ В ЮЖНОМ ОКРУГЕ НЬЮ-ЙОРКА

## Часть I. Правила электронной подачи документов

Суд принимает документы, поданные, подписанные или удостоверенные электронным способом в соответствии со следующими правилами.

### Раздел 1. Предмет электронной подачи документов

**1.1**      Если прямо не установлено иное, и кроме исключительных случаев, не позволяющих одной из сторон предъявить документы электронно, все документы, которые должны быть поданы в Суд, подаются в электронной форме. Если одна из сторон не может выполнить данное требование, она должна получить разрешение Суда на обычную подачу документов на бумажном носителе. После обычных часов работы такие заявления можно подать через специальный ночной сейф в соответствии с Местными нормами гражданско-процессуального кодекса 1.2. Если Суд не требует иное, документы, предъявляемые сторонами *лично, без привлечения адвоката, должны предъявляться обычным способом – на бумажном носителе, затем их отсканируют в канцелярии суда и загрузят в систему ECF.*

**1.2**      В случае гражданских и прочих дел подача первичных документов, включая иски, уведомления, ходатайства и т.д., оплата необходимых пошлин, запрос и выдача повесток производятся электронно. (*См. раздел 14 – Возбуждение гражданского дела*).

**1.3**      Кроме случаев ограничения только гражданскими исками, настоящие положения, связанные с электронной подачей документов, распространяются на прочие и уголовные дела. Процедуры электронной подачи документов не применяются к ходатайствам об аресте, ордерам на обыск и ордерам на электронное наблюдение; к другим актам в рамках уголовного расследования или в дополнение к нему; и к делам большого жюри.

**1.4**      В рамках уголовного дела обвинение или информация, включая все отменяющие и заменяющие документы, должны вручаться ответчику обычным способом на бумажном носителе в соответствии с Уголовно-процессуальным кодексом США и действующими местными нормами, а не в электронной форме; кроме того, повестки должны вручаться обычным способом на бумажном носителе в соответствии с Уголовно-процессуальным кодексом США и действующими местными нормами. После возбуждения уголовного дела представители сторон должны оперативно предоставить Секретарю суда электронные копии всех предъявленных ранее на бумажном носителе документов в формате PDF-A. Все последующие документы предъявляются в электронной форме, кроме случаев, предусмотренных данными Правилами и инструкциями или Судом.

**1.5**      Секретарь суда должен издавать и пересматривать Инструкции для пользователей системы электронной подачи документов, чтобы максимально повысить ее эффективность. (*См. Часть II – Инструкции по электронной подаче документов*).

### Раздел 2. Соответствие критериям, Регистрация, Пароли

**2.1**      Адвокаты, допущенные к юридической практике в данном Суде, включая допущенных *по конкретному делу* и адвокатов, уполномоченных представлять интересы Соединенных Штатов Америки, могут зарегистрироваться, либо им потребуется зарегистрироваться в качестве пользователей системы ECF данного Суда. Кроме случаев, когда Суд разрешил иное, адвокаты, ведущие дела и еще не зарегистрированные в качестве пользователей системы электронной подачи документов, должны зарегистрироваться в системе. Регистрация осуществляется в соответствии с требованиями Секретаря суда, которые предусматривают указание полного имени пользователя системы, почтового адреса, номера телефона, адреса электронной почты и заявления о том, что данный адвокат допущен к юридической практике в данном Суде, либо уполномочен представлять интересы Соединенных Штатов Америки, либо допущен *по конкретному делу*. Подробности см. на странице ECF по ссылке http://www.nysd.uscourts.gov.

**2.2**      (а) Суд может разрешить или потребовать от стороны по гражданскому делу на рассмотрении, *не пользующейся услугами адвоката, зарегистрироваться в качестве пользователя системы электронной подачи документов ECF исключительно в целях данного дела. Регистрация осуществляется в соответствии с требованиями Секретаря суда, которые предусматривают идентификацию дела и указание полного имени, почтового адреса, номера телефона и адреса электронной почты данной стороны.*

Пример _ходатайства о разрешении электронной подачи документов можно посмотреть здесь_. Суд может потребовать от стороны очного прохождения обучения по использованию системы электронной подачи документов в качестве условия для регистрации в системе. Если в ходе судебного разбирательства сторона нанимает адвоката, который будет представлять ее в суде, такой представитель должен попросить Секретаря суда прекратить регистрацию данной стороны в системе после его появления.

(b) Сторона, _не пользующаяся услугами адвоката и не взятая под стражу, может согласиться стать Получающим пользователем (то есть получать уведомления от суда об изменениях в деле по электронной почте вместо обычной почты, но не иметь возможности подавать документы в электронной форме). Пример согласия и регистрационной формы на получение электронных документов_ _стороной, не пользующейся услугами адвоката_ (не взятой под стражу), можно посмотреть здесь.

**2.3** По окончании регистрации пользователь системы электронной подачи документов получит имя пользователя и пароль. Пользователи системы электронной подачи документов обязуются сохранять в тайне свой пароль и незамедлительно уведомить Секретаря суда, если им станет известно о том, что их пароль скомпрометирован.

**2.4** В рамках гражданского дела Секретарь суда рассылает уведомления об электронной подаче документов (NEF) **(a)** адвокату стороны, предъявившей первый иск в электронной форме, **(b)** каждому адвокату, указанному на титульном листе гражданского дела или в первом иске в электронной форме, если дело возбуждено Секретарем суда в системе ECF, **(c)** прочим адвокатам, которые присоединились позже и подали электронное уведомление о явке в суд, **(d)** _всем сторонам_, не пользующимся услугами адвоката, которым Суд разрешил зарегистрироваться в качестве пользователя системы, _и_ **(e)** _всем_ сторонам, не пользующимся услугами адвоката, которые зарегистрированы в системе в качестве получающих пользователей. В рамках уголовного дела, в качестве пользователей системы подачи электронных документов, которым будут рассылаться уведомления об электронной подаче документов, и которым будет предоставлено право предъявлять и получать электронные документы по делу, Секретарь суда добавит представителей Соединенных Штатов Америки, указанных в качестве представителей или позднее указанных в качестве представителей Соединенных Штатов Америки в данном деле, и всех адвокатов, подавших электронные уведомления о явке в суд от имени одного из ответчиков.

**2.5** Адвокат по делу может подать судье письменное заявление о прекращении рассылки уведомлений об электронной подаче документов (NEF) в адрес другого адвоката из его/ее фирмы. Ознакомьтесь с индивидуальной практикой судьи. (_См. раздел 22 – пароли от системы ECF_).

### Раздел 3. Последствия электронной подачи документов

**3.1** Если иное не предусмотрено разделом 4 настоящего документа, электронная подача документов через систему ECF в соответствии с описанными здесь процедурами и рассылка Судом уведомления об электронной подаче документов (NEF) относятся к предъявлению документов во всех смыслах в контексте Федерального гражданско-процессуального кодекса, Федерального уголовно-процессуального кодекса и внутренних правил Суда и предполагают внесение документов в материалы дела, которые Секретарь суда ведет в соответствии со статьями 58 и 79 Федерального гражданско-процессуального кодекса и статьями 49 и 55 Федерального уголовно-процессуального кодекса.

**3.2** Если документ предъявлен в электронной форме, его официальной регистрацией считается электронная регистрация данного документа в Суде (согласно исключению, предусмотренному в разделе 4 ниже), а за предъявившей его стороной закрепляется факт подачи документа. Кроме случаев, когда документы вначале предъявляются на бумажном носителе, а затем подаются электронно согласно разделу 1, предъявленный электронно документ считается поданным в день и час, указанный в уведомлении от Суда об электронной подаче документов (NEF). Стороны по делу, не пользующиеся услугами адвоката, предъявляют документы в Суд на бумажном носителе, затем их сканируют и загружают в систему ECF. Такие документы считаются поданными в день получения их Судом.

**3.3** Электронные документы нужно подавать до полуночи по местному времени по месту нахождения Суда, чтобы они считались вовремя поданными в тот же день.

**3.4** Необходимо продолжать действовать в соответствии с индивидуальной практикой судьи в отношении вручения копий сообщений. (_См. раздел 19 – Вручение документов, поданных в электронной форме_).

### Раздел 4. Загрузка постановлений суда

**4.1**      Все постановления, приказы, решения и материалы дела, рассматриваемого Судом, предъявляются в соответствии с описанными здесь процедурами и приобщаются к делу Секретарем суда согласно статьям 58 и 79 Федерального гражданско-процессуального кодекса и статьям 49 и 55 Федерального уголовно-процессуального кодекса. Постановления суда доступны только в электронной форме. Судья может подписывать документы электронной подписью или сканировать документы, собственноручно подписанные им.

**4.2**      Если пользователь системы предъявляет электронный документ, который должен быть подписан судьей, он должен в кратчайшие сроки доставить документ на другом носителе по требованию Суда, если применимо. (*См. раздел 18 – Неэлектронные документы*).

**4.3**      Все пользователи системы электронной подачи документов и получающие пользователи обязаны проверять постановления, приказы или решения Суда в системе ECF, а не полагаться только на описание такого постановления, приказа или решения, приведенное в уведомлении о подаче электронных документов (NEF). В случае расхождений между постановлением, приказом или решением Суда и описанием такого постановления, приказа или решения в NEF, преимущественную силу имеет непосредственно постановление, приказ или решение Суда.

### Раздел 5. Вложения и приложения

**5.1**      Пользователи системы электронной подачи документов должны предъявить в электронной форме все документы, которые упоминаются как вложения и приложения, если Суд не разрешит подать их на бумажном носителе. Приложения должны быть предъявлены как вложения к основному документу. Каждое вложение должно иметь четкий заголовок, из которого ясна суть приложения.

**5.2**      Пользователь системы электронной подачи документов должен предъявлять в качестве приложения или вложений только те выдержки из упоминаемых документов, которые относятся к вопросу, рассматриваемому Судом. Выбранный материал должен быть ясно и четко обозначен как таковой. Пользователи системы электронной подачи документов, которые предъявляют выдержки из документов как приложения или вложения в соответствии с данной процедурой, делают это без ущерба их праву своевременно подать дополнительные выдержки или полный документ. Отвечающие стороны могут своевременно подать дополнительные выдержки, которые считают относящимися к делу, или полный документ. Одна из сторон может ходатайствовать перед Судом о разрешении доставить и предъявить на бумажном носителе документы, которые по разумным причинам не могут быть отсканированы.

**5.3**      Если нужно предъявить Суду протоколы административных или иных предыдущих разбирательств, такие протоколы можно доставить и подать на бумажном носителе без предварительного ходатайства и получения разрешения Суда. (*См. раздел 15 – Внесение изменений в состязательные бумаги и ходатайства*).

### Раздел 6. Документы в опечатанном виде

**6.1**      Документы не могут быть опечатаны без разрешения Суда. Документы, которые требуется опечатать, не могут быть поданы электронно.

**6.2**      Ходатайство о подаче документов в опечатанном виде должно быть подано электронно, если это не противоречит закону, при необходимости в отредактированном виде; однако, ходатайство о предъявлении документов в опечатанном виде, в котором указана причина невозможности их подачи в электронной форме, может быть подано на бумажном носителе. Определение Суда, которое разрешает подачу документов в опечатанном виде, может быть оформлено электронно, если это не противоречит закону. Подробную информацию см. в инструкциях по подаче документов в опечатанном виде на странице дел по ссылке http://nysd.uscourts.gov/index.php.

**6.3**      Копия приказа суда о запрете на ознакомление с материалами дела лицам, не участвующим в деле, на бумажном носителе должна быть прикреплена с внешней стороны к конверту с опечатанными документами и доставлена в канцелярию суда. (*См. раздел 18 – Неэлектронные документы*).

ПРАВИЛА И ИНСТРУКЦИИ ПО ЭЛЕКТРОННОЙ ПОДАЧЕ ДОКУМЕНТОВ В ЮЖНОМ ОКРУГЕ НЬЮ-ЙОРКА

## Раздел 7. Требования к хранению

Документы, которые предъявляются электронно, но должны быть подписаны собственноручно лицом, отличным от пользователя системы электронной подачи документов, должны храниться пользователем системы электронной подачи документов в течение одного года после истечения всех сроков для апелляций, кроме данных под присягой письменных показаний, заявлений и документов о вручении, которые должны храниться пользователем системы электронной подачи документов на бумажном носителе в течение пяти лет после истечения всех сроков для апелляций. По требованию Суда пользователь системы электронной подачи документов должен предъявить оригиналы документов для ознакомления.

## Раздел 8. Подписи

**8.1**      Логин и пароль для подачи документов в системе ECF заменяют подпись пользователя системы электронной подачи документов на всех электронных документах, предъявляемых Суду. Они также заменяют подпись в контексте Гражданско-процессуального кодекса США, включая статью 11, Уголовно-процессуального кодекса США, внутренних правил данного Суда и в иных целях, когда подпись нужна в связи с рассмотрением дела в Суде.

**8.2**      Документы, предъявляемые электронно, должны содержать место для подписи, а также полное имя, почтовый адрес, номер телефона и адрес электронной почты в соответствии с Гражданско-процессуальным кодексом США и Местными нормами гражданско-процессуального кодекса 11.1. При отсутствии отсканированного изображения подписи, перед именем пользователя системы электронной подачи документов, под чьей учетной записью предъявлен документ, должно стоять «S/» в поле, предназначенном для подписи.

**8.3**      Пользователь системы электронной подачи документов и другие лица не должны сознательно разрешать или допускать использование пароля данного пользователя системы электронной подачи документов третьими лицами, отличными от уполномоченных представителей пользователя системы электронной подачи документов. Пользователи системы электронной подачи документов обязуются незамедлительно уведомить суд о несанкционированной подаче документов.

**8.4**      Документ, который должен быть подписан стороной по делу или свидетелем, подается электронно в форме отсканированной копии, содержащей изображение подлинной подписи.

**8.5**      Документы, которые должны быть подписаны несколькими лицами, предъявляются электронно одним из следующих способов: (a) предъявление отсканированного документа, содержащего все необходимые подписи; (b) выражение согласия остальных лиц в документе; (c) указание в документе лиц, чьи подписи нужны, и предъявление уведомления о подтверждении другими лицами в течение трех рабочих дней после подачи документа; либо (d) иной способ, утвержденный Судом. (*См. раздел 13 - Основные принципы электронной подачи исков*).

## Раздел 9. Электронная доставка документов

**9.1**      Если дело должно вестись в системе ECF, доставка считается выполненной, если все стороны получили уведомление об электронной подаче документов (NEF), которое автоматически рассылается Судом по электронной почте (в NEF есть список получивших/не получивших электронное уведомление). Рассылка NEF приравнивается к уведомлению всех пользователей системы электронной подачи документов, включая получающих пользователей, которые указаны в качестве получателей уведомлений по электронной почте. Пользователи системы электронной подачи документов, включая получающих пользователей, обязаны своевременно предоставить суду актуальную контактную информацию и регулярно проверять материалы дела.

**9.2**      Адвокатам и лицам, не пользующимся услугами адвоката, отличным от пользователей системы электронной подачи документов, включая получающих пользователей, необходимо вручать экземпляры электронно поданных состязательных и других документов на бумажном носителе. Вручение таких экземпляров на бумажном носителе производится в соответствии с Гражданско-процессуальным кодексом США, Уголовно-процессуальным кодексом США и внутренними правилами. Вручение бумажных документов должно быть подтверждено путем электронного предъявления документов о вручении. Если Секретарь суда сканирует и загружает состязательные и другие документы от имени стороны, не пользующейся услугами адвоката, соответствующее NEF подтверждает вручение.

## Раздел 10. Уведомление о судебных приказах и определениях

Сразу после загрузки приказа или определения суда в материалы дела в системе ECF Секретарь суда рассылает электронное уведомление об электронной подаче документов (NEF) всем пользователям системы электронной подачи документов, включая получающих пользователей. Электронная рассылка NEF приравнивается к уведомлению в контексте статьи 49(c) Уголовно-процессуального кодекса США и статьи 77(d) Гражданско-процессуального кодекса США. Если дело ведется системе ECF, пользователи системы электронной подачи документов, включая получающих пользователей, должны самостоятельно отслеживать изменения в материалах дела. Секретарь суда должен направить уведомление на бумажном носителе лицу, отличному от пользователя системы электронной подачи документов и получающего пользователя, в соответствии с Гражданско-процессуальным кодексом США или Уголовно-процессуальным кодексом США. В случае расхождений между постановлением, приказом или решением Суда и описанием такого постановления, приказа или решения в NEF, преимущественную силу имеет непосредственно постановление, приказ или решение Суда. (*См. раздел 19 - Вручение документов, поданных в электронной форме*).

## Раздел 11. Технические неполадки

Если пользователь системы электронной подачи документов не подал документы вовремя по причине технических неполадок, он может добиваться снисхождения суда. (*См. раздел 23 - Информация о компьютерной системе для электронной подачи документов*).

## Раздел 12. Открытый доступ

Любое лицо может лично ознакомиться с материалами дела в канцелярии суда, если на ознакомление с ними не наложен запрет Суда.

Кроме того, любое лицо может просматривать доступные материалы онлайн через службу открытого доступа к электронным документам Суда (PACER), пройдя по ссылке pacer.gov (требуется логин и пароль для входа в PACER). Лицо, имеющее доступ в систему PACER, может получить записи по гражданским, уголовным и прочим делам; документы в рамках гражданских и прочих производств в системе ECF; и документы в рамках уголовных производств, поданные после 1 ноября 2004 г. Только представитель Соединенных Штатов Америки и адвокат ответчика могут получить документы в рамках уголовных производств, поданные до 1 ноября 2004 г. (*См. раздел 13 - Основные принципы электронной подачи исков*).

## Часть II. Инструкции по электронной подаче документов

### Раздел 13. Основные принципы электронной подачи исков

**13.1     Можно ли предъявлять письма в электронном виде?**

Кроме писем, которые должны подаваться в опечатанном виде, письма к судьям, принимающим корреспонденцию, можно направлять в электронной форме. Стороны должны ознакомиться с индивидуальной практикой своего судьи, чтобы понять, принимает ли данный судья письма, и, если принимает, то имеются ли ограничения по количеству страниц, требуются ли оригиналы сообщений, предъявляемых через систему ECF (если да, то как их доставлять). Для всех писем, адресованных Суду, в строке с темой необходимо указывать наименование и номер дела (например, «Re: *Доу против Смита*, 13 Гр. 1234 (АВС)»). Обмен письмами исключительно между сторонами или их представителями, не адресованными Суду, нельзя загружать в систему ECF (кроме случаев, когда они предъявляются в качестве приложений к надлежащим образом поданным документам).

В рамках гражданских и прочих производств предъявляемые электронно письма должны подаваться следующим образом:

- Информационные письма без требований должны подаваться при помощи опции системы ECF – подача ПИСЬМА в списке ДРУГИЕ ДОКУМЕНТЫ.

- Письма с требованиями могут загружаться, если это допускается внутренними правилами и данными правилами, и должны подаваться при помощи опции системы ECF – подача ХОДАТАЙСТВА. Выбрав ХОДАТАЙСТВО для подачи в системе ECF, пользователь системы электронной подачи документов должен назвать такое ходатайство ПИСЬМО-ХОДАТАЙСТВО. Затем пользователь системы электронной подачи документов должен выбрать из списка ходатайство, которое может быть подано как ПИСЬМО-ХОДАТАЙСТВО:

>Ходатайство об оставлении без движения
>Ходатайство о смене адвоката
>Ходатайство об обязании
>Ходатайство о судебном заседании
>Ходатайство об объединении дел в одно производство
>Ходатайство об отложении рассмотрения
>Ходатайство о пересмотре в связи с вновь открывшимися обстоятельствами
>Ходатайство о направлении дела
>Ходатайство о восстановлении пропущенного срока
>Ходатайство о продлении срока внесения изменений
>Ходатайство о продлении срока ответа
>Ходатайство о продлении срока обеспечения доказательств
>Ходатайство о продлении срока подачи документов
>Ходатайство о продлении срока предъявления ответа
>Ходатайство о продлении срока расшифровки
>Ходатайство о получении консультативного заключения
>Ходатайство о приобщении документов к материалам дела
>Ходатайство о приобщении к делу избыточного количества страниц
>Ходатайство о применении внутреннего правила 37.2 о предварительном заседании
>Ходатайство о прениях сторон
>Ходатайство о пересмотре
>Ходатайство о возобновлении дела

> Ходатайство о подаче документов в опечатанном виде
> Ходатайство о приостановке
> Ходатайство о замене представителя

- Если пользователь системы электронной подачи документов хочет подать ходатайство, которого нет в списке, такое ходатайство нельзя подавать в виде письма.
- Если ходатайство подается в форме письма, противная сторона может подать ответ в форме письма, и ходатайствующая сторона может снова ответить в форме письма. При подаче ответного письма пользователь системы электронной подачи документов должен ответить «да» на соответствующий вопрос, если его ответ связан с письмом-ходатайством.

В рамках уголовных производств, электронные письма должны предъявляться следующим образом:

- Письма, связанные с приговором, должны подаваться при помощи опции системы ECF – подача – ВЫНЕСЕНИЕ ПРИГОВОРА.
- Все остальные письма с требованиями подаются при помощи опции системы ECF – подача ХОДАТАЙСТВА. Выбрав ХОДАТАЙСТВО для подачи в системе ECF, пользователь системы электронной подачи документов должен назвать такое ходатайство ПИСЬМО-ХОДАТАЙСТВО. Если ходатайство подается в виде письма, противная сторона может подать ответ в форме письма, и ходатайствующая сторона может снова ответить в форме письма. При подаче ответного письма пользователь системы электронной подачи документов должен ответить «да» на соответствующий вопрос, если его ответ связан с ПИСЬМОМ-ХОДАТАЙСТВОМ.
- Все остальные письма – информационные письма, не содержащие требований, должны подаваться при помощи опции системы ECF – подача ПИСЬМА в списке ДРУГИЕ ДОКУМЕНТЫ.

**13.2    Коротко, как я могу подать документ в электронной форме?**

(a)    Используйте свой пароль, чтобы войти в систему ECF Южного округа Нью-Йорка при наличии любого интернет-подключения.

(b)    Выберите категорию, ГРАЖДАНСКИЕ или УГОЛОВНЫЕ.

(c)    Найдите нужную опцию для подачи документа в системе ECF или название. Найдите список опций для подачи документов через ECF в Списке опций для подачи документов в ECF.

(d)    Укажите сторону, подающую документ (удерживайте кнопку «control», чтобы указать несколько сторон).

(e)    Загрузите документ в формате PDF-A. Прикрепите приложения и вложения к основному документу. Отдельно предъявите вспомогательные документы, такие как краткое письменное изложение дела или письменные показания.

(f)    Сохраните последний скрин, уведомление об электронной подаче документов (NEF).

(g)    При необходимости предоставьте копию судье (см. индивидуальную практику судьи по ссылке www.nysd.uscourts.gov).

**13.3    Как подавать приложения?**

Приложения всегда подаются как вложения к основному документу. Приложения не сканируют в один файл PDF вместе с основным документом. Каждое вложение нужно четко озаглавить в системе ECF, чтобы была понятна суть приложения. Пример: УВЕДОМЛЕНИЕ О ЗАМЕНЕ (Вложение: №1 Иск в суд штата, №2 Повестка в суд штата).

**13.4    Что такое безопасный веб-сайт системы электронной подачи документов SDNY ECF?**

Чтобы подать документы в электронном виде, перейдите по ссылке https://ecf.nysd.uscourts.gov, либо зайдите на веб-сайт подачи документов через веб-сайт суда (см. ниже). Вам понадобится имя пользователя и пароль SDNY ECF для подачи документов в электронном виде.

**13.5      На каком общедоступном веб-сайте можно получить информацию о суде?**

Для получения общедоступной информации перейдите по адресу www.nysd.uscourts.gov (пароль не требуется). На главной странице нажмите ECF для получения информации о системе электронной подачи документов Electronic Case Filing.

**13.6      Какие почтовые адреса суда?**

- United States District Court, Southern District of New York, Daniel Patrick Moynihan United States Courthouse, 500 Pearl Street, New York, NY 10007-1312;
- United States District Court, Southern District of New York, Thurgood Marshall United States Courthouse, 40 Centre Street, New York, NY 10007-1312; и
- United States District Court, Southern District of New York, Charles L. Brieant Jr. Federal Building and United States Courthouse, 300 Quarropas Street, White Plains, NY 10601-4150.

**13.7      Как узнать, является ли мое дело делом ECF?**

В системе ECF регистрируются все новые гражданские, уголовные и прочие дела. В выписке из реестра в верхнем правом углу будут указаны буквы «ECF» и запись «CASE DESIGNATED ECF».

**13.8      Если дело считается делом ECF, должен ли я подавать документы в электронном виде?**

Да. Если дело является делом ECF, лицо, подающее документы несет ответственность за электронную подачу документов через Интернет с помощью защищенного имени пользователя и пароля SDNY. За исключением некоторых случаев, описанных ниже, канцелярия суда не принимает бумажные документы, если дело является делом ECF. (См. *раздел 18 «Неэлектронные документы»*).

**13.9      Могу ли я подать документы в электронном виде, если дело не является делом ECF (документы подаются на бумажном носителе)?**

Нет. Не подавайте документы в электронном виде, если дело не является делом ECF (документы подаются на бумажном носителе).

**13.10     Будет ли суд подавать документы в электронном виде, если дело не является делом ECF (документы подаются на бумажном носителе)?**

Да, суд может выносить определения и заключения в электронном виде в деле, которое не является делом ECF (документы подаются на бумажном носителе). Это не приведет к изменению дела, которое не является делом ECF, в дело ECF, и стороны должны продолжать подавать документы на бумажном носителе.

**13.11     Могу ли я подавать документы в электронном виде в любое время?**

Да. Вы можете подавать документы в электронном виде круглосуточно. Документы должны быть поданы до полуночи по местному времени, где находится суд, чтобы они считались своевременно поданным в этот день. (*см. раздел 3 «Последствия электронной подачи документов»*)

**13.12     Когда поданный в электронном виде документ считается поданным?**

Документ, поданный в электронном виде, считается поданным на дату, указанную в уведомлении об электронной подаче документов (Notice of Electronic Filing, NEF) (раздел «дата подачи»). (*См. раздел 3 «Последствия электронной подачи документов»*).

ПРАВИЛА И ИНСТРУКЦИИ ПО ЭЛЕКТРОННОЙ ПОДАЧЕ ДОКУМЕНТОВ В ЮЖНОМ ОКРУГЕ НЬЮ-ЙОРКА

**13.13    Что такое выписка из реестра, и как ее просмотреть?**

Выписка из реестра — это официальная запись о регистрации дела. Вы можете просмотреть выписку из реестра, включая изображения поданных в электронном виде документов, в канцелярии суда или удаленно через электронную службу общественного доступа Public Access to Court Electronic Records (PACER) (pacer.gov). (*См. раздел 12 «Общественный доступ»*).

**13.14    Должен ли я регулярно просматривать выписку из реестра в моем деле?**

Да. В делах ECF стороны уведомляются о действия в рамках дела посредством уведомления об электронной подаче документов (Notice of Electronic Filing (NEF)), отправляемого по электронной почте. Однако электронная почта не является надежным способом. Лица, подающие и получающие документы, обязаны регулярно просматривать выписку из реестра, чтобы не пропустить подачу документов и убедиться в том, что все документы, поданные с использованием пароля ECF пользователя, были приняты. Лица, подающие документы, обязаны немедленно сообщать суду о несанкционированной подаче документов. (*См. раздел 9 «Вручение документов с помощью электронных средств»*).

**13.15    Как подписать документ, подаваемый в электронном виде?**

Имя пользователя и пароль ECF адвоката, подающего документы, служат в качестве электронной подписи. Адвокат может подписать документ, поставив «S/» перед своим именем или используя цифровое изображение своей подписи. Имя и контактная информация адвоката, включая адрес электронной почты, должны отображаться в блоке электронно-цифровой подписи под подписью. Подписи всех остальных лиц (клиенты, свидетели и т. д.) должны быть отсканированы, чтобы зафиксировать чернильную подпись. (*См. раздел 8 «Подписи»*).

**13.16    Как я узнаю, целесообразно ли подавать документ в электронном виде?**

Во-первых, определите, является ли ваше дело делом ECF (не все дела являются делами ECF). При подачи документов в деле ECF, если вы нашли документ, который подлежит подаче в электронном виде (ECF Filing Event) и который непосредственно совпадает с вашим документом, тогда вы должны подать его в электронном виде. Если вы не нашли документ, который подлежит подаче в электронном виде (ECF Filing Event), возможно, его не стоит подавать в электронном виде. Список документов, не подлежащих подаче в электронном виде к ECF, см. в разделе 18. (*См. раздел 24 «Справочная служба ECF и обучение»*).

**13.17    Должны ли запросы документов и ответы на них подаваться в электронном виде?**

Нет. Большинство запросов документов и ответов на них «не должны подаваться, если они не будут использоваться в судебном процессе или при вынесении определений...» (см. Fed. R. Civ. P. 5(d)(1)). Если подача материалов, связанных с запросом документов, уместна, должны подаваться только соответствующие выдержки (см. ст. 5.1. местного гражданского процессуального кодекса и ст. 5.2 ECF).

**13.18    Как найти правильный документ, который подлежит подаче в электронном виде (ECF Filing Event)?**

При подаче документа в электронном виде вам будет предложено указать название вашего документа, выбрав соответствующий документ, который подлежит подаче в электронном виде (ECF Filing Event). Документ, который подлежит подаче в электронном виде (ECF Filing Event) — это, по сути, название документа, указанное в выписке из реестра, например «Ходатайство о вынесении решения в порядке суммарного судопроизводства» (Motion for Summary Judgment) или «Заявление для обоснования ходатайства» (Affidavit in Support of Motion). Документы, которые подлежат подаче в электронном виде (ECF Filing Event), перечислены по категориям в системе ECF. В каждой категории есть алфавитный список документов, которые подлежат подаче в электронном виде (ECF Filing Events). Вы можете использовать функцию поиска, чтобы найти ваш документ, который подлежит подаче в электронном виде (ECF Filing Event). Список зарегистрированных электронных документов (ECF Docketing Events List) поможет вам найти ваш документ и категорию, в которой он указан. Если вы не можете найти документ, соответствующий вашему документу, не загружайте его с указанием неправильного названия. При необходимости обратитесь в службу поддержки ECF по телефону (212) 805-0800. (*См. раздел 24 «Справочная служба ECF и обучение»*).

**13.19    Должен ли я предоставлять копии?**

Ознакомьтесь с индивидуальной практикой судьи, чтобы узнать, требуются ли копии. С индивидуальной практикой можно ознакомиться в режиме онлайн по адресу www.nysd.uscourts.gov/judges. (*см. раздел 3 «Последствия электронной подачи документов»*).

**13.20    Подаются ли стенограммы в электронном виде?**

В соответствии с политикой Судебной конференции Соединенных Штатов в отношении конфиденциальности и общественного доступа к электронным материалам дела официальные стенограммы судебных разбирательств, составленные официальными судебными стенографистами, стенографистами, нанятыми по договору, и расшифровщикам аудио- и видеозаписей могут предоставляться в электронном виде через электронную службу общественного доступа PACER.

**13.21    Могу ли я подавать документы одновременно в смежных делах в рамках объединенного производства (Consolidated cases) и производства по взаимосвязанным искам (MDL cases)?**

Да. При подаче документов в рамках объединенного производства и производства по взаимосвязанным искам вы можете сэкономить время, одновременно подав документы в электронном виде в смежных делах, используя компьютерную функцию под названием «Spread Text and Effects» (недоступно в связанных делах). Соблюдайте следующие правила подачи документов в рамках производства по взаимосвязанным искам:

- В рамках объединенного производства и производства по взаимосвязанным искам вы сначала должны подать все документы по номеру основного дела или производства по взаимосвязанным искам.
- Затем вы можете точно определить дело, в котором вы хотите одновременно подать документы.
- Не подавайте документы во всех делах, если это не целесообразно. Ваш документ может относиться не ко всем смежным делам.
- Заголовок дела должен содержать номера всех дел, в рамках которых вы подаете документ.

**13.22    Что делать, если я допускаю ошибку во время электронной подачи документов?**

Немедленно подайте документ еще раз в системе ECF в правильной форме. Затем отправьте электронное письмо в отдел обеспечения качества суда (ECF_error@nysd.uscourts.gov). В электронном письме должны быть указаны номер дела, название дела, имя судьи, номер документа и название документа, который был неправильно подан, а также номер документа и название документа, который был подан правильно. Просьба указать ошибку, которая была допущена при подаче первого документа. Другие вопросы можно направлять в справочную службу ECF по адресу: helpdesk@nysd.uscourts.gov. Информацию об ошибочной подаче секретной или конфиденциальной информации см. в разделе 21.8.


**Раздел 14. Подача гражданского иска**


**14.1    Должны ли новые гражданские и прочие иски регистрироваться в электронном виде с помощью системы ECF?**

Да. Адвокаты, желающие подать новый гражданский или прочий иски, обязаны подать новый иск в электронном виде с помощью системы ECF суда. За исключением некоторых случаев, перечисленных ниже, канцелярия суда не принимает новые гражданские или прочие иски, поданные на бумажном носителе.

Любая сторона, которая не может подать документ в электронном виде, должна получить разрешение суда подать его в обычном порядке на бумажном носителе. Такой запрос можно отправить в нерабочее время через ящик для ночной входящей корреспонденции в соответствии со статьей 1.1 местного кодекса.

**14.2    Существуют ли дела, в рамках которых документы не подаются в электронном виде?**

Да. В следующих делах документы подаются не в электронном виде, а в обычном порядке на бумажном носителе:
- гражданские или прочие дела, в рамках которых выносится определение о представлении обоснования, определение о временном запрещении, или другие документы, которые подаются с грифом «секретно»;

- гражданские или прочие дела, инициированные лицом, участвующим в деле без представителя;
- дела о доставлении в суд лица, содержащегося под стражей, для выяснения правомерности содержания его под стражей согласно 28 U.S.C. §2255 (заключение в федеральном исправительном учреждении);
- дела согласно закону о ложных исках (уголовные дела, в которых представители государства выступают совместно с лицом, сообщившим о преступлении, или дела, в которых выступает лицо, заявившее о правонарушении или правонарушителе), инициированные согласно 31 U.S.C. §3729 и далее;

**14.3    Как подать новый гражданский или прочий иск в электронном виде в системе ECF?**

Инструкции по подаче нового гражданского или прочего иска в электронном виде можно найти по адресу: http://www.nysd.uscourts.gov/ecf.php.

**14.4    Требуются ли копии?**

Ознакомьтесь с индивидуальной практикой судьи, чтобы определить необходимость предоставления копий суду.

**14.5    Можно ли одновременно подать в электронном виде ходатайство о допуске к участию в деле адвоката, недопущенного к практике в этой юрисдикции, и новый гражданский или прочий иск?**

Да. Адвокат, который не имеет права выступать в этом суде, который желает подать новый гражданский или прочий иск, может подать заявление о предоставлении временной учетной записи в системе ECF для подачи в электронном виде документов для возбуждения дела, а также ходатайства о допуске к участию в деле адвоката, недопущенного к практике в этой юрисдикции. Заявители должны сначала заполнить форму ходатайства о допуске к участию в деле адвоката, недопущенного к практике в этой юрисдикции/форму регистрации в ECF по адресу: www.nysd.uscourts.gov/pro_hac.php. Информация о временной учетной записи в ECF будет отправлена заявителю по электронной почте. После этого можно подать новый иск в электронном виде, в том числе ходатайство *о допуске к участию в деле адвоката, недопущенного к практике в этой юрисдикции.*

**14.6    Выдаются ли повестки в электронном виде?**

Да. После подачи нового иска в электронной форме сторона должна в электронном виде подать ЗАПРОС НА ВЫДАЧУ ПОВЕСТКИ и приложить предлагаемые повестки в формате PDF. Канцелярия суда рассмотрит ЗАПРОС и использует систему ECF для выдачи повестки, которую можно будет распечатать.

**14.7    Остается ли способ для вручения повесток и исковых заявлений прежним?**

Да. Несмотря на то, что новые гражданские и прочие иски должны подаваться в суд в электронном виде, способ вручения повесток и исковых заявлений остается неизменным в соответствии с Fed.R.Civ.P. 4.

**14.8    Должен ли я предоставлять другие документы противной стороне?**

Да. Чтобы уведомить противную сторону о требованиях электронной подачи документов дела и индивидуальной практике назначенного судьи, вам необходимо отправить всем сторонам следующие документы (доступны на www.nysd.uscourts.gov), либо в виде вложения в формате PDF в электронном письме, либо на бумажном носителе: (а) Правила и инструкции по электронной подаче документов (настоящий документ); (б) индивидуальную практику назначенного судьи. *Лица, участвующее в деле без представителя,* которые не являются пользователями системы, освобождаются от этого правила.

**14.9    Как представлять доказательство вручения документов о подаче иска?**

- Представляйте доказательство вручения документов о подаче иска в электронном виде через систему ECF (не отправляйте по электронной почте).
- Отправьте оригинал доказательства вручения документов о подаче иска вместе с повесткой на бумажном носителе в канцелярию суда. Приложите копию уведомления об электронной подаче документов (уведомление об электронной подаче документов или расписка в поступлении документа).

Лица, участвующие в деле без представителя, которые получили статус малоимущего лица (in forma pauperis) (IFP), освобождаются от этого правила. Лица, участвующие в деле без представителя, которые получили статус малоимущего лица (IFP), должны отправить оригинал доказательства вручения повестки на бумажном носителе в канцелярию суда. (См. раздел 19 «Вручение документов, поданных в электронно виде»).

**14.10    Подаются ли документы из судов штата или административных судов в электронном виде?**

Если суду необходимо предоставить документ административного или иного предыдущего разбирательства, и он является объемным, этот документ можно предоставить и вручить на бумажном носителе без предварительной подачи ходатайства в суд и получения разрешения суда. (*См. раздел 5 «Приложения»*).

**14.11    Что делать, если я допущу ошибки при подаче нового иска в электронном виде?**

Новые гражданские и прочие иски, подаваемые в электронном виде, которые содержат следующие ошибки, могут быть закрыты в административном порядке без ущерба для прав лица, а повестки не смогут быть выданы, если ошибка не будет исправлена в течение 5 (пяти) дней после получения уведомления об ошибке в подаваемых документах (Notice of Deficient Filing) от канцелярии суда:

- документ об инициировании дела содержит неправильный документ; документ неразборчивый или нечитаемый; документ отсутствует;
- плата за подачу не внесена или внесена частично.

Если дело закрыто в административном порядке по одной из вышеуказанных причин, подающая документы сторона может попытаться возобновить дело после устранения ошибок. В течение 60 дней после закрытия дела сторона должна подать заявление о повторном открытии дела, описав действия по устранению ошибки и пытаясь повторно открыть дело. Заявления на повторное открытие закрытых в административном порядке дел, поданные через 60 дней после закрытия, должны подаваться в форме ходатайства.

Вопросы относительно других ошибок можно направлять в справочную службу ECF по адресу helpdesk@nysd.uscourts.gov или по телефону (212) 805-0800 в рабочее время.

**14.12    Что делать, если я дважды выполню платеж при подаче нового иска в электронном виде?**

Вы можете попросить вернуть второй платеж, отправив письмо в канцелярию суда. Письмо должно содержать номер дела, дату платежа, документ, связанный с платежом, номер квитанции pay.gov и адрес электронной почты, по которому с вами можно связаться. Не обращайтесь в компанию, выдавшую вашу кредитную карту, чтобы запросить возврат средств.

**Раздел 15. Измененные заявления и ходатайства**

**15.1    Подаются ли измененные документы в электронном виде?**

Да. После того, как дело будет открыто в соответствии с разделом 14 настоящих Правил, все последующие измененные исковые заявления, заявления третьих лиц, не заявляющих самостоятельные требования, заявления третьих лиц и т. д. должны подаваться в электронном виде через систему ECF. При подаче документов выберите только те стороны, против которых вы подаете исправленное заявление. Не выбирайте «всех истцов» или «всех ответчиков», если это не уместно. Лица, подающие документы, должны ознакомиться с индивидуальной практикой судьи, чтобы определить, необходимы ли копии.

**15.2    Как выдаются повестки при подаче исправленного заявления в электронном виде?**

Если при подаче исправленного заявления в электронном виде добавляется сторона, повестку необходимо запросить путем подачи ЗАПРОСА НА ВЫДАЧУ ПОВЕСТКИ в электронно виде и приложения предлагаемой повестки в формате PDF/A. При добавлении нескольких сторон к одной повестке можно прикрепить список, в котором перечислены все новые стороны. В ответ канцелярия суда выдаст повестку в электронном виде с электронной печатью, которую можно распечатать. Формы повесток доступны по адресу: www.nysd.uscourts.gov/forms. Повестка не требуется, если к делу не добавляется ни одна сторона.

**15.3 Подаются ли содержащие мокрую печать документы в электронном виде?**

Нет. Инструкции по подаче содержащих мокрую печать документов см. на странице дел по адресу: www.nysd.uscourts.gov/cases.

**15.4 Какой указывать документ, который подлежит подаче в электронном виде (ECF Filing Event), для подачи ходатайства?**

Используйте документ, начинающийся со слова «Motion» (ходатайство). Система ECF содержит более 160 отдельных документов-ходатайств, все из которых начинаются со слова «Motion» (ходатайство). Полный список ходатайств и подтверждающих документов см. в Списке зарегистрированных электронных документов (ECF Docketing Events List) . Не используйте документы из категории «Notice» (уведомление) для подачи ходатайства.

**15.5 Какой указывать документ, который подлежит подаче в электронном виде (ECF Filing Event), для подачи подтверждающих документов?**

Используйте подтверждающий документ из раздела «Ответы, возражения и подтверждающие документы» (Replies, Opposition and Supporting Documents). Не используйте документы из категории «Motion» (ходатайство) для подачи подтверждающих документов. Например, ходатайство, заявление в подтверждение и юридическая справка в подтверждение являются тремя отдельными документами. Обозначение каждого из них как «Motion» (ходатайство) неверно и может создать впечатление, что вместо одного ходатайства было подано три движения.

**15.6 Как я научиться подавать исправленные заявления и ходатайства в электронном виде?**

Инструкции и обучающая информация доступны по адресу: www.nysd.uscourts.gov/ecf_training.php.

## **Раздел 16. Заочные решения суда**

**16.1 Ка подать заявление о вынесении заочного решения?**

Ознакомьтесь с индивидуальной практикой назначенного судьи, чтобы определить соответствующий способ (www.nysd.uscourts.gov). Если индивидуальная практика судьи не содержит конкретных правил, касающихся заочных решений, вы должны следовать нижеприведенному разделу 16.4.

При подаче в электронном виде ходатайства о вынесении заочного решения перед отправкой вам необходимо:

    (а)    подать в качестве вложения свидетельство секретаря к ходатайству о вынесении заочного решения;
    (б)    отправить предлагаемое свидетельство секретаря на бумажном носителе в отдел определений и решений (секретарь подпишет и зарегистрирует свидетельство секретаря);
    (в)    после завершения вышеуказанных действий вы можете подать ходатайство о вынесении заочного решения, используя соответствующий способ, описанный ниже в разделах 16.2, 16.3 или 16.4.

При необходимости отправьте документы на бумажном носителе в отдел определений и решений на Манхэттене или в городе Уайт-Плейнс, в зависимости от того, где заседает судья. При отправке документов по почте приложите конверт с обратным адресом и оплаченным почтовым сбором. Почтовые адреса см. в разделе 13 «Основные сведения о системе ECF».

**16.2 Заочное решение, вынесенное по ходатайству:**

    (а)    отправьте в отдел определений и решений свидетельство секретаря на бумажном носителе. Секретарь подпишет и зарегистрирует свидетельство, а также предоставит копию подающей стороне.

(б)    Подайте ходатайство о вынесении заочного решения в электронном виде с помощью системы ECF. Следующие документы должны быть приложены к ходатайству: (1) подписанное свидетельство секретаря; (2) копию повестки и искового заявления с доказательством вручения; (3) форму предлагаемого заочного решения. Следующие подтверждающие документы должны быть представлены как отдельные электронные документы (ECF Filing Events): заявление в подтверждение; заявление об ущербе (за исключением запроса о проведении судебного следствия).

(в)    Подайте в электронном виде подтверждение вручения ходатайства о вынесении заочного решения.

(г)    Отправьте судье копию ходатайства, включая все приложения.

**16.3    Заочное решение, вынесенное по определению о представлении обоснования (Order to Show Cause, O.S.C.):**

(а)    Подайте в отдел определений и решений оригинал определения о представлении обоснования на бумажном носителе. Приложите следующее: заявление или подтверждение; свидетельство секретаря, если непредоставление ответа является основанием для заочного решения; заявление об ущербе; предлагаемое заочное решение; копии документа об открытии дела; заявление о вручении оригинала повестки и искового заявления. Приложите копии всех документов.

(б)    В случае подписания представителем суда, канцелярия суда подаст в электронном виде только определение. После того, как определение появится в выписке из реестра, адвокат должен в электронном виде подать все подтверждающие документы и доказательства.

(в)    Подайте в электронном виде доказательство вручения определения о представлении обоснования.

**16.4    Заочное решение, вынесенное по заочному решению или определению:**

(а)    Подайте в отдел определений и решений: (1) оригинал предлагаемого заочного решения и определения на бумажном носителе; (2) заявление в поддержку; (3) заявление об ущербе (за исключением запроса о проведении судебного следствия); (4) копию повестки и искового заявления с доказательством вручения; (5) свидетельство секретаря. Документы будут направлены судье для подписания.

(б)    В случае подписания представителем суда, канцелярия суда подаст в электронном виде только определение. После того, как определение появится в выписке из реестра, адвокат должен в электронном виде подать все подтверждающие документы.

## **Раздел 17. Апелляции**

**17.1    Как подать уведомление об апелляции в гражданском или прочем деле?**

В гражданских и прочих делах лицо, подающее документы, должно в электронном виде подать уведомление об апелляции через систему ECF. Сбор оплачивается онлайн через систему ECF. Инструкции и обучающая информация доступны по адресу: nysd.uscourts.gov/ecf_training.php.

*Лица, участвующие в деле без представителя,* которые не являются пользователями системы, освобождаются от этой части этого правила, которая требует, чтобы они в электронном виде подавали уведомление об апелляции. Канцелярия суда сканирует и в электронном виде подает все надлежащие документы по апелляции, полученные от *лиц, участвующих в деле без представителя,* не являющихся пользователями системы.

**17.2    Как подать уведомление об апелляции по уголовному делу?**

Уведомление об апелляции по уголовному делу должно быть подано обычным способом на бумажном носителе либо через суд, либо по почте. При необходимости приложите квитанцию об оплате сбора за подачу документов. В течение 24 часов с момента подачи копии вашей апелляции на бумажном носителей вам необходимо отправить в канцелярию суда электронное письмо с уведомлением об апелляции в формате PDF-A. Приложите любые документы. Каждый документ должен быть в отдельном файле размером не более 4 мегабайт. Номер дела районного суда, за которым следуют инициалы судьи, должен быть указан в заголовке документа.

ПРАВИЛА И ИНСТРУКЦИИ ПО ЭЛЕКТРОННОЙ ПОДАЧЕ ДОКУМЕНТОВ В ЮЖНОМ ОКРУГЕ НЬЮ-ЙОРКА

При отправке электронного письма в строке темы сообщения всегда следует указывать номер дела, за которым следует описание документа (например, «Re: 01cv1234-appeal»). С вопросами можно обращаться к секретарю по апелляциям на Манхэттене по телефону (212) 805-0636 или в Уайт-Плейнс по телефону (914) 390-4000. Отправьте электронное письмо (не подавайте через систему ECF) по адресу:

- Для апелляций по делу ECF, рассматриваемых судьей на Манхэттене, отправьте электронное письмо по адресу:

    appeals@nysd.uscourts.gov

- Для апелляций по делу ECF, рассматриваемых судьей в Уайт-Плейнс, отправьте электронное письмо по адресу:

    wpclerk@nysd.uscourts.gov

*Лица, участвующие в деле без представителя,* которые не являются пользователями системы, освобождаются от той части этого правила, которая требует, чтобы они отправляли уведомление об апелляции в канцелярию суда по электронной почте. Канцелярия суда сканирует и в электронном виде подает все надлежащие документы по апелляции, полученные от *лиц, участвующих в деле без представителя,* не являющихся пользователями системы.

### Раздел 18. Неэлектронные документы

**18.1    Есть ли в деле ECF документы, которые не нужно подавать в электронном виде?**

Да, в том числе:

- предлагаемые определения; предлагаемые решения, договоренности; согласия, см. ниже;
- определения о представлении обоснования / определения о временном запрещении, см. ниже;
- документы с мокрой печатью, см. ниже;
- поручительства, см. ниже;
- уведомления об апелляции в уголовных делах, см. раздел 17;

**18.2    Подаются ли предлагаемые определения, предлагаемые судебные решения, договоренности или соглашения в электронном виде?**

Нет. Любой документ, требующий подписи судьи, не должен подаваться в электронном виде, за исключением приложения к другому документу. Предлагаемые определения, предлагаемые судебные решения, договоренности или соглашения не должны предоставляться через систему ECF. Вместо этого они должны отправляться по электронной почте секретарю. Предлагаемые определения должны быть представлены в редактируемом текстовом формате, а не в формате PDF. Договоренности должны быть представлены в формате PDF-A. Договоренности должны содержать мокрые подписи, а не символ «s/». Факсимильные или электронные подписи являются приемлемыми. Обращаем ваше внимание на то, что договоренности о прекращении дела по соглашению сторон в соответствии со статьей 41(a)(1)(A)(ii) F.R.C.P. не требуют подписи судьи и должны быть поданы через систему ECF. С вопросами можно обращаться к секретарю по определениям и решениям на Манхэттене по телефону (212) 805-0143 или в Уайт-Плейнс по телефону (914) 390-4000. Отправьте по электронной почте предлагаемое определение, решение или договоренность:

- В случае дел, рассматриваемых судьей на Манхэттене, по адресу:
    judgments@nysd.uscourts.gov
- В случае дел, рассматриваемых судьей в Уайт-Плейнс, по адресу:
    wpclerk@nysd.uscourts.gov

*Лица, участвующие в деле без представителя,* которые не являются пользователями системы, освобождаются от этой части этого правила, которая требует, чтобы они отправляли по электронной почте предлагаемые определения, решения, договоренности и соглашения, и вместо этого они должны отправлять эти документы в канцелярию суда на бумажном носителе.

**18.3    Подаются ли определения о представлении обоснования в электронном виде?**

Нет. Определения о представлении обоснования или определения о временном запрещении должны быть поданы в обычном порядке на бумажном носителе в отдел определений и решений.

В случае подписания представителем суда, канцелярия суда подаст в электронном виде только определение. После того, как определение появится в выписке из реестра, адвокат должен в электронном виде подать все подтверждающие документы.

**18.4    Подаются ли содержащие мокрую печать документы в электронном виде?**

Нет. Содержащие мокрую печать документы подаются в обычном порядке на бумажном носителе. Запечатанный конверт должен содержать документ на бумажном носителе и компакт-диск, содержащий документ в формате PDF-A. Копия определения о запрете на ознакомление с материалами дела лицам, не участвующим в деле, должна быть прикреплена к внешней стороне конверта. (*См. раздел 6 «Документы, скрепленные печатью»*).

**18.5    Подаются ли поручительства в электронном виде?**

Нет. Поручительства документы подаются в обычном порядке на бумажном носителе. Приложите копию определения суда в отношении поручительства.

### Раздел 19. Вручение документов, поданных в электронно виде

**19.1    Как осуществляется вручение документов, поданных в электронно виде?**

Лица, подающие и получающие документы, которые выступают по делу, получают уведомление о подаче документов в электронном виде (NEF) по электронной почте при каждой подачи документов в деле. Уведомление о подаче документов в электронном виде представляет собой уведомление всех лиц, подающих и получающих документы. В любой подаваемый в электронном виде документ будет включена гиперссылка на изображение в формате PDF (не вся виды действий включают в себя документ PDF). Канцелярия суда больше не будет отправлять копии судебных документов на бумажном носителе лицам, подающим и получающим документы. Канцелярия суда отправляет по почте копии всех судебных документов *лицам, участвующим в деле без представителя*, которые не зарегистрированы в качестве лица, подающего и получающего документы. (*См. раздел 9 «Вручение документов с помощью электронных средств»*).

**19.2    Нужно ли мне предоставлять бумажные копии документов, зарегистрированных в электронном виде?**

Возможно, да. Когда речь идет о делах, открытых в системе ECF, документ считается доставленным сторонам в момент передачи им судом файла NEF. В этом случае бумажную копию предоставлять не нужно.

Если же какая-либо из сторон не получила NEF, вам придется оповестить эту сторону традиционным способом, предоставив бумажный документ. После этого необходимо зарегистрировать подтверждение доставки в электронном виде (см. ниже). В расписке NEF будет указано, кому из сторон направляются электронные уведомления об оформлении документов (в виде электронного письма от суда) и кто из них оповещается «другими способами» (путем вручения бумажных копий). (*См. Раздел 9. Вручение документов с помощью электронных средств*).

**19.3    Нужно ли мне регистрировать подтверждение доставки в электронном виде при работе с делом в системе ECF?**

Электронная регистрация подтверждения доставки при работе с делом ECF требуется только в двух случаях:

(a)       Регистрация подтверждения вручения документа, инициирующего дело, производится следующими способами:

(1)    через систему ECF (не по электронной почте), или
(2)    путем доставки оригинального бумажного подтверждения с приложенной повесткой в секретариат суда. Также необходимо предоставить копию расписки об оформлении данного документа в системе ECF.

(б)      Подтверждение вручения регистрируется в электронном виде в каждом случае получения сторонами бумажных документов.

*На стороны, которые действуют в суде от собственного имени (pro se) и при этом не являются Регистрирующими пользователями (Filing Users), действие данного правила касающегося обязательного электронного оформления подтверждений вручения не распространяется. (См. Раздел 9. Вручение документов с помощью электронных средств).*

**19.4      Если регистрация была завершена до полуночи, будет ли она считаться своевременной?**

Да. Своевременная регистрация — это оформление документов, совершенное до полуночи (время по месту нахождения суда). (*См. Раздел 3. Следствия электронной регистрации дел* ).

**19.5      Выдаются ли расписки о поступлении документов при их электронном оформлении?**

Да. После успешной регистрации документов в системе на последнем экране отобразится Уведомление об электронной регистрации (Notice of Electronic Filing, NEF), которое считается распиской о поступлении. В расписке NEF указывается, какой документ был зарегистрирован, кем, время регистрации и номер, присвоенный документу в досье производства по делу (если есть). Если вы не видите экран NEF, это может означать, что файл не был принят системой. В этом случае рекомендуется проверить досье производства по делу.

**19.6      Нужно ли мне регулярно просматривать досье производства по моему делу?**

Да. Хотя в делах ECF все сообщения отправляются судом по электронной почте, это средство связи не является абсолютно надежным — вы можете пропустить такое письмо. В обязанности Регистрирующего и Принимающего пользователей входит предоставление суду актуальной контактной информации и регулярная проверка досье производства по делу. При обнаружении незаконно поданных документов Регистрирующие пользователи должны немедленно уведомить об этом суд. (*См. Раздел 9. Вручение документов с помощью электронных средств*).

### Раздел 20. Регистрация явки адвоката

**20.1      Как в досье производства по делу добавляется имя адвоката?**

Все адвокаты, чьи имена имеются в блоке подписей инициирующего документа, будут автоматически добавлены в досье производства при открытии дела в системе ECF секретариатом суда. Юрист, ответственный за регистрацию этого документа, должен указать свое имя в досье сразу после принятия дела. При электронном оформлении первого документа адвокату ответчика необходимо: (а) выбрать команду «Связь» (Association), чтобы привязать клиента (т.е. стать его представителем); (б) убедиться в том, что в поле «Уведомления» (Notice) проставлен флажок для получения электронных извещений о движениях по делу; (в) отметить пункт «Ведущий» (Lead) в сведениях об юрисконсульте, если это применимо. Если система не предложила адвокату ответчика создать связь с клиентом при первой электронной регистрации документов, чтобы внести свое имя в досье производства по делу, ему необходимо подать Уведомление о явке в электронном виде.

**20.2      Имя адвоката имеется в досье производства по делу, но он не получает уведомления о регистрации документов по электронной почте. Почему?**

Такие ситуации возникают, если имя адвоката было добавлено в досье до того, как он получил пароль к системе ECF. В этом случае имя юриста и адрес его фирмы будет находиться в верхней части досье производства по делу без указания адреса электронной почты. Чтобы решить эту проблему, адвокату необходимо получить пароль ECF. Еще одна возможная причина — адвокат зарегистрировал Уведомление о явке, но не отметил флажком пункт «Уведомления» при создании связи с клиентом. В этом случае необходимо обратиться в Службу поддержки ECF по телефону (212) 805-0800. (*См. Раздел 24. Служба поддержки ECF и обучение*).

**20.3     Как зарегистрировать Уведомление о явке при работе с делом в системе ECF?**

Адвокат, который присоединяется к делу, которое уже находится в производстве, должен подать Уведомление о явке в электронном виде. Для регистрации такого уведомления юристу необходимо: (а) выбрать команду «Связь» (Association), чтобы привязать клиента (т.е. стать его представителем); (б) убедиться в том, что в поле «Уведомления» (Notice) проставлен флажок для получения электронных извещений о движениях по делу; (в) отметить пункт «Ведущий» (Lead) в сведениях об юрисконсульте, если это применимо. Обратите внимание, что адвокат не сможет зарегистрировать Уведомление о явке в системе ECF от имени другого адвоката. Уведомление и пароль ECF должны принадлежать одному и тому же человеку. (*См. Раздел 2. Правомочность, регистрация, пароли*).

**20.4     Как зарегистрировать Ходатайство о допуске к участию в деле адвоката, недопущенного к практике в этой юрисдикции (pro hac vice), в системе ECF?**

Ходатайство о допуске *pro hac vice* (PHV) регистрируется в электронном виде, соответствующая пошлина оплачивается через систему ECF. Дополнительную информацию и примеры заявлений можно посмотреть на сайте www.nysd.uscourts.gov . О возможности одновременной регистрации Ходатайства PHV и нового гражданского дела читайте в разделе 14.5 выше.

**20.5     Нужно ли мне уведомлять суд об изменении моих контактных данных?**

Да. Согласно требованиям ст. 1.3(d) местного Гражданско-процессуального кодекса , в целях поддержки информирования судом всех сторон дела, адвокат обязан уведомлять суд о любых изменениях в контактной информации. Дополнительные сведения представлены на сайте www.nysd.uscourts.gov . Сторона *pro se* , независимо от того, является ли она Регистрирующим или Принимающим пользователем, сообщает суду новые контакты посредством Уведомления об изменении адреса для *участников процесса*, выступающих от собственного имени .

**20.6     Как поступить в случае, если изменился только адрес электронной почты?**

Регистрирующие пользователи могут самостоятельно исправить свой адрес электронной почты. Для этого нужно войти в систему SDNY ECF, а затем выбрать команды «Утилиты» (Utilities), «Управление учетной записью» (Maintain Your Account) и «Сведения об электронной почте» (E-mail Information). В случае изменения других контактных данных для их полноценного обновления необходимо выполнить операции, описанные выше. Принимающие пользователи сообщают суду новые контакты, включая адреса электронной почты, письмом.

**20.7     Могу ли я указать дополнительный адрес электронной почты для получения уведомлений о движениях по моим делам?**

Да. Чтобы добавить альтернативные адреса электронной почты в системе ECF, нажмите «Утилиты» (Utilities), «Управление учетной записью» (Maintain Your Account) и «Сведения об электронной почте» (E-mail Information).

**20.8     Могу ли я получать электронные уведомления о движениях по делам, в которых я не представляю ни одну из сторон?**

Да. Вы можете добавить дело в список уведомлений в системе ECF даже если вы не являетесь его участником. Нажмите «Утилиты» (Utilities), «Управление учетной записью» (Maintain Your Account) и «Сведения об электронной почте» (E-mail Information).

### Раздел 21. Защита личной информации и открытый доступ к делам ECF

**21.1     Расширила ли система электронной регистрации возможности публичного доступа к документам?**

Да, документы, поданные в систему ECF электронным способом, доступны намного более широкому кругу лиц. Любой владелец учетной записи PACER может просматривать их по интернету. Чтобы защитить личные данные и устранить риск их хищения, стороны должны проявлять осмотрительность при регистрации конфиденциальных сведений.

**21.2** **Кто несет ответственность за вымарывание конфиденциальных сведений из зарегистрированных документов?**

Исключительную ответственность за выполнение правил суда по сокрытию (вымарыванию) персональных идентификаторов из документов несут адвокат и стороны-участники процесса. Ни судья, ни секретарь суда не будут проверять поданные документы на соответствие этим требованиям.

**21.3** **Нужно ли мне вымарывать какую-либо конфиденциальную информацию из документа?**

Да. Согласно поправке 5.2 к Федеральному Гражданско-процессуальному кодексу и поправке 49.1 к Уголовно-процессуальному кодексу, из документов, поданных в суд, необходимо удалить персональные сведения. Все эти документы не должны содержать конфиденциальной информации за исключением случаев, когда это необходимо в интересах дела. Сторона, которая желает зарегистрировать документ с перечисленными ниже персональными идентификаторами, должна предоставить для общего доступа отредактированный файл.

Во всех делах вымарываются:

- номера социального страхования:  следует оставить только четыре последние цифры номера;
- имена несовершеннолетних детей:  следует оставить только инициалы;
- даты рождения:  следует оставить только год;
- номера финансовых счетов:  следует оставить только четыре последние цифры.

В уголовных делах вымарываются:

- домашние адреса:  следует оставить только город и штат.

**21.4** **Есть ли иная конфиденциальная информация, которую следует скрыть (вымарать)?**

Да. Осторожность следует проявлять также при регистрации документов, которые содержат следующее:

- персональные идентификационные номера (PIN) — например, номера водительских удостоверений;
- медицинские сведения, информацию о лечении и диагнозе;
- сведения о трудовой деятельности;
- личную финансовую информацию;
- служебную информацию и сведения, составляющие коммерческую тайну;
- информацию о сотрудничестве индивида с правительством.

**21.5** **Нужно ли мне регистрировать конфиденциальную информацию, которую запрещено разглашать?**

Нет. В дополнение к вымаранным общедоступным документам сторона-участник процесса может подать перечисленные выше личные сведения за печатью, но она не обязана это делать. В качестве секретных можно зарегистрировать: (а) справочный список или (б) неотредактированный оригинальный документ.
Если вы считаете необходимым предоставить конфиденциальную информацию, суд предпочтет получить ее в виде справочного списка, а не полного документа. Данный список обычно содержит полные персональные идентификаторы, соотнесенные с их отредактированными вариантами, которые используются в зарегистрированных документах. Справочный список может редактироваться по неотъемлемому праву.

**21.6** **Секретные документы регистрируются в электронном виде?**

Нет.  Они предоставляются традиционным способом. Запечатанный конверт должен содержать бумажный документ и диск CD-ROM с копией документа в формате PDF-A.

К внешней части конверта необходимо прикрепить копию судебного приказа о запрете на ознакомление с материалами дела лицам, не участвующим в деле. Подробные инструкции по оформлению секретных документов можно найти на странице «Дела» (Cases) сайта www.nysd.uscourts.gov. (*См. Раздел 6. Секретные документы*).

**21.7    Кто несет ответственность за хранение и использование оригинальных неотредактированных документов?**

Владельцами и законными распорядителями оригиналов секретных документов и информации, вымаранной из зарегистрированных для общего доступа файлов, являются стороны-участники процесса. Впоследствии суд может запросить у адвоката неотредактированные данные.

**21.8    Что делать, если я по ошибке зарегистрировал в системе конфиденциальные или закрытые сведения?**

(а)    Свяжитесь со Службой поддержки ECF по электронной почте helpdesk@nysd.uscourts.gov или по телефону (212) 805-0800. Специалисты отвечают на запросы с понедельника по пятницу в обычные часы работы секретариата суда. Поданные документы будут временно заблокированы и невидимы для широкой публики.

(б)    После уведомления Службы поддержки ECF о сложившейся ситуации, регистрирующей стороне необходимо обратиться к председательствующему судье с письменным запросом о том, чтобы официально признать предоставленные документы секретными.

(в)    Зарегистрируйте в системе отредактированную версию ошибочно поданного файла.


### Раздел 22. Пароли ECF


**22.1    Для электронной регистрации документов в вашем суде мне нужен пароль ECF, предоставляемый Окружным судом США для Южного округа Нью-Йорка?**

Да. Чтобы подавать документы в электронном виде в данный окружной суд, у пользователя должны быть выданы этим судом логин и пароль к системе ECF? Учетные записи ECF создаются для правомочных адвокатов с надежной репутацией и сторон *pro se* с разрешением на электронную регистрацию файлов. Данный пароль является уникальным и не совпадает с паролями других окружных или арбитражных судов, а также паролем к учетной записи PACER. Никому не сообщайте свой пароль, храните его в тайне. Сбросить забытый пароль ECF можно по ссылке на странице входа в систему SDNY ECF по адресу ecf.nysd.uscourts.gov. (см. приложение) (*См. Раздел 2. Правомочность, регистрация, пароли)*.

**22.2    Как получить пароль к системе ECF, если я уже являюсь членом коллегии данного суда?**

Адвокаты, входящие в судебную коллегию, могут зарегистрироваться для получения пароля ECF онлайн, через сайт www.nysd.uscourts.gov.

**22.3    Как мне вступить в коллегию адвокатов данного суда и получить пароль к системе ECF?**

В соответствующем заявлении на допуск в судебную коллегию содержится запрос на предоставление пароля к ECF. Подробности на сайте www.nysd.uscourts.gov.

**22.4    Как мне получить разрешение на одноразовое представительство в суде pro hac vice (для данного случая) и получить пароль ECF (система подачи иска в электронном виде)?**

Поверенный может быть допущен к практике в одном судебном разбирательстве только путем подачи ходатайства о предоставлении судом разрешения юристу на одноразовое представительство в суде *pro hac vice*. Для заполнения формы ходатайства *pro hac vice* и получения инструкций по созданию пароля ECF посетите сайт www.nysd.uscourts.gov.

**22.5    Мне потребуется новый пароль ECF, если я перейду в другую юридическую фирму?**

Нет. Ваш пароль ECF остается тем же самым даже при изменении контактных данных. Местное правило гражданского судопроизводства 1.3 требует, чтобы поверенный уведомлял суд о любых изменениях в контактных данных. Дополнительную информацию можно найти на сайте www.nysd.uscourts.gov.

**22.6    Как мне узнать, что мною успешно подана в онлайновом режиме заявка на пароль ECF?**

По завершении заполнения формы заявки нажмите на кнопку "Submit" ("Подать") в нижней части формы. Экран окрасится в красный цвет, и вам будет предложено проверить правильность своих ответов. После проверки нажмите на кнопку "Proceed" ("Продолжить"). Если экран окрасился в зеленый цвет, подача заявки прошла успешно.

**22.7    Сколько времени занимает получение пароля ECF?**

Ваш пароль ECF будет отправлен вам по электронной почте в течение 48 часов после подачи вами заявки в онлайновом режиме. Суд рекомендует вам распечатать и хранить в своих документах экземпляр со сведениями о вашей учетной записи ECF.

**Раздел 23. Информация о компьютерных системах для подачи иска в электроном виде (ECF)**

**23.1    Каким интернет-браузером мне следует пользоваться для подачи иска в электроном виде в системе ECF?**

Перед выпуском каждая новая версия ECF тестируется на конкретных интернет-браузерах. На странице входа в систему ECF представлен список одобренных интернет-браузеров.

**23.2    Что такое файл PDF-A, и как мне его создать?**

Все документы, подаваемые в системе ECF в электронном виде, должны быть выполнены в формате PDF-A (формат переносимого документа). Файл PDF-A создается с помощью программного обеспечения для формирования файлов в формате PDF, например, такого как Adobe Acrobat ((более подробные сведения можно найти на сайте Adobe.com ). Файлы PDF-A невозможно изменить, что обеспечивает безопасность подателя документа и Суда.

**23.3    Имеется ли какое-то ограничение по размеру для документа, подаваемого через систему ECF?**

Да. Размер отдельного файла в формате PDF не должен превышать 10,0 мегабайт (10,0 Мб). Если подаваемый документ слишком велик, система ECF не примет его, а вы не увидите экран с уведомлением о принятии электронного документа (NEF или квитанция о принятии документа). Для определения размера файла PDF в приложении Adobe Acrobat щелкнуть в меню на File (Файл), Document Properties (свойства документа), Summary (Краткие сведения).

**23.4    Что, если размер моего документа превышает лимит?**

Преобразование документов, сформированных в текстовом редакторе, непосредственно в формат PDF-A создает наименьший по занимаемой компьютерной памяти файл. Если такой возможности нет, отсканируйте свой документ с низким разрешением. В приложении Adobe Acrobat в окне "Scan Manager" (Диспетчер сканирования) установите настройки на черно-белое сканирование с разрешением 200 точек на дюйм. Это позволяет поместить больше страниц в один файл в формате PDF-A. Если это не даст требуемого результата, разделите файл слишком большого объема на две части или больше. Просто присвойте каждому файлу индекс 1a, 1b, 1c и т.п. В электронном виде следует подавать только относящиеся к делу выдержки из приложений. (*См. раздел 5 - Приложения и дополнения*).

**23.5    Что, если техническая неисправность не позволит мне подать документ в электронном виде?**

Если техническая неисправность не даст вам произвести подачу документа в электронном виде, следуйте приведенным ниже указаниям:

(а)    Не пытайтесь подавать бумажные документы в случаях, требующих подачи иска в электронном виде, за исключением экстренной подачи документов (например, в случае судебного приказа о временном запрещении).

(б)    Если система ECF в Суде вышла из строя, вам следует подать исковое заявление в электронном виде, как только система будет восстановлена.

(в)    Если по причине неисправности системы ECF был пропущен срок подачи искового заявления, приложите к подаваемому заявлению пояснение того, как перерыв в работе системы помешал вам своевременно подать документ. (*См. раздел 11 - Технические неисправности*)

### Раздел 24. Система ECF - Служба технической поддержки и обучение

**24.1    Как мне научиться подавать документы в электронном виде?**

Суд предлагает несколько вариантов обучения пользованию системой ECF. Подробные сведения представлены на странице ECF по адресу www.nysd.uscourts.gov

(а)    Поверенным и вспомогательному персоналу предлагается обучение с личным присутствием на занятиях;

(б)    С пошаговыми инструкциями к процессу подачи искового заявления можно ознакомиться в онлайновом режиме. Они содержатся в учебных материалах для обучения с личным присутствием на занятиях. На странице ECF щелкнуть по пункту меню Training (Обучение). Затем щелкнуть по пункту меню Instructor Led Training (Обучение с инструктором) и щелкнуть по названию учебного курса.

(в)    Кроме того, имеется доступное через сеть учебное пособие по подаче документов в электронном виде.

**24.2    Как мне подписаться на бесплатные извещения о новостях в системе ECF?**

Подпишитесь на бесплатные электронные сообщения, выпускаемые Судом, на сайте www.nysd.uscourts.gov. Находясь на домашней странице, щелкнуть по пункту меню ECF, а затем РОС. Вы будете периодически получать сообщения RSS на свой веб-браузер, которые будут извещать вас о перерывах в работе сервиса ECF и предоставлять другую информацию о системе ECF. Для того, чтобы подписаться на этот сервис, не обязательно быть поверенным.

**24.3    Как мне связаться со Службой технической поддержки ECF?**

Со службой технической поддержки ECF можно связаться по электронной почте по адресу helpdesk@nysd.uscourts.gov или по телефону (212) 805-0800 с понедельника по пятницу в обычное время работы канцелярия суда.

Предыдущие Правила и инструкции для пользователей системы подачи иска в электронном виде были утверждены 27 мая 2015 г. Последующие дополнения утверждены до указанной даты публикации.

ПРАВИЛА И ИНСТРУКЦИИ ПО ЭЛЕКТРОННОЙ ПОДАЧЕ ДОКУМЕНТОВ В ЮЖНОМ ОКРУГЕ НЬЮ-ЙОРКА

Федеральный окружной суд США
по Южному округу Нью-Йорка
Правила и инструкции для пользователей ECF

15 июня 2015 г., Дополнение к
изданию от 8 июня 2015 г.

Функция переустановки пароля ECF

Южный округ Нью-Йорка объявил о наличии новой функции для переустановки утерянного пароля ECF.

Начиная с 15 июня 2015 г. поверенные, являющиеся членами адвокатуры данного суда и зарегистрированные в качестве пользователей системы ECF для подачи исковых заявлений в электроном виде, могут выполнить переустановку своего пароля, перейдя по ссылке на странице входа в систему SDNY ECF Федерального окружного суда США по Южному округу Нью-Йорка ecf.nysd.uscourts.gov. Новый пароль будет отправлен по электронной почте на адрес, зарегистрированный в учетной записи пользователя системы ECF.

Правила и инструкции для пользователей ECF были переработаны соответственно, как указано ниже.

Раздел 22.1 – Для подачи в этот суд документов в электронном виде мне нужен пароль ECF от Федерального окружного суда США по Южному округу Нью-Йорка?

Да. Для подачи документов в электронном виде в этот окружной суд вы должны располагать регистрационным кодом и паролем ECF, выданными этим Судом. Учетные записи ECF предоставляются должным образом зарегистрированным поверенным и сторонам, *выступающим в суде pro se (за себя, без адвоката)*, для подачи документов в электронном виде. Такой пароль является уникальным и не совпадает с паролем из другого округа или суда по делам о банкротстве, а также с паролем к системе публичного доступа к судебным электронным документам (PACER). Храните секретность своего пароля. *Вы можете переустановить утерянный пароль ECF, перейдя по ссылке на странице входа в систему SDNY ECF Федерального окружного суда США по Южному округу Нью-Йорка* ecf.nysd.uscourts.gov. (*См. раздел 2 - Правомочность, регистрация, пароли*)

Вопросы можно направлять в службу технической поддержки ECF по адресу helpdesk@nysd.uscourts.gov, или задавать их по телефону (212) 805-0800 в рабочее время.

Федеральный окружной суд США
по Южному округу Нью-Йорка
Правила и инструкции для пользователей ECF

1 сентября 2015 г., Дополнение к
изданию от 8 июня 2015 г

Правило ECF 2.4 переработано с целью извещения получателей уведомлений о принятии электронного документа

В связи с введением подачи поверенными новых гражданских исков в электронном виде необходима доработка Правила 2.4 для извещения получателей уведомлений о принятии электронного документа.

В случае подачи поверенным нового гражданского иска в электроном виде через систему ECF данного суда только поверенный, подавший иск, будет получать уведомления о принятии электронного документа (NEF) для ведения дела. Любой адвокат, участвующий в совместном ведении дела, обязан подать в электронном виде уведомление о явке в суд для получения уведомления о принятии электронного документа (NEF).

В случае, если допускается подача нового гражданского иска в документарной форме, а вносит данное дело в систему ECF, каждый поверенный, указанный на титульном листе гражданского дела или документа, инициирующего процедуру рассмотрения дела, будет получать уведомления о принятии электронного документа (NEF) для ведения дела. (См. Раздел 14.2 информацию по делам, поданным в документарной форме.)

Правило ECF 2.4 переработано соответственно, как показано ниже:

> **2.4** В гражданском судопроизводстве Секретарь суда передает уведомления о принятии электронного документа (NEF): (a) *поверенному, который подал в электронном виде документ, инициирующий процедуру рассмотрения дела;* (b) каждому поверенному, чье имя указано на титульном листе гражданского дела *или документа, инициирующего процедуру рассмотрения дел, открытых в системе ECF Секретарем суда; (c)* каждому дополнительному поверенному, который впоследствии принимает участие в ведении дела и подает в электроном виде уведомление о явке в суд; *(d)* любой стороне *pro se,* получившей от Суда разрешение зарегистрироваться в качестве пользователя системы, подавшего иск, и *(e)* любой стороне *pro se,* которая зарегистрирована в качестве пользователя системы, получающего извещения. В уголовном судопроизводстве Секретарь суда вносит в список пользователей системы лиц, подавших иск, которым будут рассылаться уведомления о принятии электронного документа, и которым предоставляется доступ к системе для подачи и извлечения в электронном виде процессуальных документов, используемых в рамках судебного разбирательства, федерального прокурора / прокуроров, указанных в форме назначения для участия в разбирательстве по уголовному делу или впоследствии идентифицированных в качестве представителей Соединенных Штатов по данному делу, а также всех поверенных, подавших в электронном виде уведомление о явке в суд в интересах обвиняемого.

Вопросы можно направлять в службу технической поддержки ECF по адресу: helpdesk@nysd.uscourts.gov или задавать их по телефону (212) 805-0800 в рабочее время.

Федеральный окружной суд США
по Южному округу Нью-Йорка
Правила и инструкции для пользователей ECF

1 сентября 2015 г., Дополнение к
изданию от 8 июня 2015 г.

Правило ECF 13.1 Переработано с целью включения дополнительных писем-ходатайств

Южный округ Нью-Йорка объявил, что начиная с 1 сентября 2015 г. Правило ECF 13.1, гласящее "Возможна подача писем в электронном виде?", было переработано с целью включения в него дополнительных писем-ходатайств, которые могут подаваться в электронном виде:

> Ходатайство об обязании
> Ходатайство об объединении дел
> Ходатайство о продолжении разбирательства
> Ходатайство о раскрытии сведений
> Ходатайство об ускорении рассмотрения дела
> Ходатайство о привлечении специалиста для участия в судебном заседании
> Ходатайство об отложении судебного заседания для приобщения документов
> Ходатайство о переходе к прениям сторон
> Ходатайство о возобновлении дела
> Ходатайство о засекречивании документа
> Ходатайство о приостановке судопроизводства
> Ходатайство о замене адвоката

Перед подачей ходатайств стороны должны проконсультироваться относительно индивидуальных особенностей ведения судебной процедуры назначенным судьей, чтобы получить рекомендации в отношении подачи ходатайств.

Вопросы можно направлять в службу технической поддержки ECF по адресу: helpdesk@nysd.uscourts.gov или задавать их по телефону (212) 805-0800 в рабочее время.

ПРАВИЛА И ИНСТРУКЦИИ ПО ЭЛЕКТРОННОЙ ПОДАЧЕ ДОКУМЕНТОВ В ЮЖНОМ ОКРУГЕ НЬЮ-ЙОРКА

Федеральный окружной суд США
по Южному округу Нью-Йорка
Правила и инструкции для пользователей ECF

7 марта 2017 г., Дополнение к
изданию от 8 июня 2015 г.

Правило ECF 5.1 – Приложения и дополнения

Правило ECF 13.3 - Как производится подача дополнений?

Южный округ Нью-Йорка объявляет о внесении изменений в Правила и инструкции для пользователей ECF данного суда, направленных на прояснение надлежащей процедуры по включению дополнений к документу, поданному через систему ECF. А именно, переработано Правило 5.1 и добавлено новое Правило 13.3, как указано ниже.

5.1      Пользователи системы, подавшие иск, должны подать в электронном виде все документы, упоминаемые в качестве дополнений или приложений, если Суд не разрешает подачу документов в виде печатной копии. *Дополнения должны подаваться как приложения к основному документу. Каждое приложение должно быть четко озаглавлено, чтобы тема дополнения была понятна.*.

13.3      Как производится подача дополнений? Дополнения всегда должны подаваться как приложения к основному документу. Присоединение отсканированных дополнений к файлу PDF, содержащему основной документ, не допускается. Каждое приложение должно быть четко озаглавлено в записи системы ECF, чтобы тема дополнения была понятна. Например: УВЕДОМЛЕНИЕ О ЗАМЕНЕ (Приложения: №1 Исковое заявление в суд штата, №2 Вызов в суд штата).

Вопросы можно направлять в службу технической поддержки ECF по адресу: helpdesk@nysd.uscourts.gov или задавать их по телефону (212) 805-0800 в рабочее время.

ПРАВИЛА И ИНСТРУКЦИИ ПО ЭЛЕКТРОННОЙ ПОДАЧЕ ДОКУМЕНТОВ В ЮЖНОМ ОКРУГЕ НЬЮ-ЙОРКА

Федеральный окружной суд США
по Южному округу Нью-Йорка
Правила и инструкции для пользователей ECF

13 марта 2017 г., Дополнение к

изданию от 8 июня 2015 г.

Правило ECF 14.11 – Что, если я допущу ошибку при подаче нового гражданского иска в электроном виде?

Южный округ Нью-Йорка объявляет о внесении изменений в Правила и инструкции для пользователей ECF данного суда, касающихся процедуры возобновления определенных гражданских дел, закрытых в административном порядке.

14.11 Что, если я допущу ошибку при подаче нового гражданского иска в электроном виде?

Новые гражданские иски, поданные в электронном виде и содержащие следующие недостатки, могут быть закрыты в административном порядке без предопределения окончательного решения вопроса, а повестка о вызове в суд может не выдаваться, если недостаток не будет исправлен в течение 5 (пяти) дней от даты передачи в электронном виде Секретарем суда Уведомления о подаче документа с недостатками:

- документ, инициирующий процедуру рассмотрения дела, содержит ошибочный документ; неразборчивый или нечитабельный документ; документ отсутствует; или
- причитающийся регистрационный сбор не был уплачен целиком либо частично.

В случае, если дело закрыто в административном порядке по одной из вышеназванных причин, сторона, подающая заявление может обратиться *с просьбой* о возобновлении дела после устранения всех недостатков. *В течение 60 дней после закрытия дела заинтересованная сторона должна подать Уведомление с Обращением о возобновлении дела с описанием мер, принятых для устранения недостатков, и с просьбой о возобновлении дела. Заявления о возобновлении таких закрытых в административном порядке дел, поданные по истечении 60 дней после закрытия дел, должны рассматриваться на основании ходатайства.*

Вопросы можно направлять в службу технической поддержки ECF по адресу: helpdesk@nysd.uscourts.gov или задать их по телефону (212) 805-0800 в рабочее время.

Федеральный окружной суд США
Южный судебный округ штата Нью-Йорк
Правила и инструкции: возбуждение дела в электронном виде

26 июня, 2017, Приложение к

8 июня, 2015 Редакция

Южный судебный округ штата Нью-Йорк - требование возбуждать гражданские дела разнообразного характера в электронном виде

Начиная с 26 июня 2017 года Южный судебный округ штата Нью-Йорк Федерального окружного суда США будет требовать, чтобы новые гражданские дела разнообразного характера возбуждались в электронном виде в системе ECF (возбуждение дела в электронном виде) (за исключением нижеуказанных случаев).

Следующие гражданские иски разнообразного характера не могут быть поданы в режиме онлайн через систему ECF и должны, по-прежнему, подаваться традиционным образом на бумаге:

- Новые гражданские иски разнообразного характера, включающие приказ о представлении обоснования, приказ о временном запрещении, поручительство за явку ответчика в суд или приказ или документы, которые должны скрепляться печатью;

- Новые гражданские иски разнообразного характера, поданные стороной *самостоятельно* без адвоката ;

Адвокаты, принятые в коллегию адвокатов данного суда, зарегистрированные в качестве пользователей системы ECF, и адвокаты, желающие быть допущенными *для этого случая,* будут подавать онлайн гражданские иски разнообразного характера и оплачивать соответствующие пошлины.

Сторона, которая не может выполнить требование по подаче нового гражданского иска разнообразного характера в электронном виде через систему ECF, должна запросить разрешения суда подать иск традиционным способом, на бумажном носителе.

Дополнительные инструкции относительно возбуждения гражданских дел разнообразного характера можно найти в Регламенте суда (прилагается) и учебных материалах по возбуждению дела в электронном виде, которые доступны онлайн по ссылке:www.nysd.uscourts.gov/ecf.php.

Ниже изложены правила и инструкции относительно возбуждения дела в электронном виде, измененные в соответствии с изменением процедуры.

**Раздел 1. Сфера применения электронного возбуждения дел**

**1.2**     В гражданских делах разнообразного характера в электронном виде будут подаваться первоначальные документы, включая исковые заявления, извещения, жалобы и т.д., будут оплачиваться соответствующие пошлины и будут подаваться запросы на выдачу повесток и их выдача. (*Смотри раздел 14 - Подача гражданского иска* ).

**1.3**     Если иное не предусмотрено условиями гражданских дел, положения данных процедур относительно возбуждения в электронном виде применяется к *делам разнообразного характера и* уголовным делам. Процедуры электронной подачи не применяются к ходатайству об аресте, запросу или ордеру на электронное наблюдение, а также к иным распоряжениям в целях расследования уголовного дела или судопроизводства по второстепенному вопросу в одной юрисдикции в помощь судопроизводству по существу иска в другой юрисдикции или к процедурам, связанным с следственным советом присяжных.

ПРАВИЛА И ИНСТРУКЦИИ ПО ЭЛЕКТРОННОЙ ПОДАЧЕ ДОКУМЕНТОВ В ЮЖНОМ ОКРУГЕ НЬЮ-ЙОРКА

26 июня, 2017, Приложение к

8 июня, 2015 Редакция

## Раздел 13. Основы ECF

**13.1      Можно ли подавать письма в электронном виде?**

 Письма, адресованные судьям, которые принимают письма, можно подавать в электронном виде, за исключением писем, которые должны быть скреплены печатью. Сторонам необходимо узнать, предполагается ли вообще в индивидуальной практике назначенного судьи прием писем, и если судья принимает письма, то имеется ли ограничение на количество страниц письма и/или требуется ли направить копию письма, поданного в ECF (если да, то каким способом доставки). Все письма, адресованные суду, должны содержать адресную строку с указанием наименования дела и номер в досье (например, «На: *Дое против Смита* , 13 Дело 1234 (ABC)»). Переписка исключительно между сторонами или их законными представителями, или иным образом не адресованная суду, не может быть осуществлена в электронном виде через ECF (за исключением случаев, если переписка является приложением к иному документу, поданному должным образом).

В гражданских делах разнообразного характера, письма, направляемые в электронном виде, должны передаваться в следующем порядке:
…

## Раздел 14. Подача гражданского иска

**14.1      Должны ли возбуждаться новые гражданские дела разнообразного характера в электронном виде в системе ECF?**

Да. Требуется, чтобы адвокаты, желающие возбудить новое дело гражданского *или* иного характера, возбуждали новое дело в системе суда ECF. В секретариате не примут новое дело гражданского *или иного характера* , возбужденное на бумажном носителе, за исключением конкретных случаев, указанных ниже.

Сторона, которая не может возбудить дело в электронном виде, должна запросить разрешения суда подать иск традиционным способом, на бумажном носителе. Любой такой запрос, сделанный в нерабочие часы, может быть передан через ящик ночного приема, который обслуживается в соответствии со статьей 1.1 местного Гражданского процессуального кодекса.

**14.2      Существуют ли дела, которые нельзя возбуждать в электронном виде?**

Да. Следующие дела нельзя возбуждать в электронном виде, и они должны возбуждаться традиционным образом на бумаге:

- Гражданские дела *разнообразного характера*, включающие приказ о представлении обоснования, приказ о временном запрещении или иные документы, которые должны скрепляться печатью;
- Гражданские *иски разнообразного* характера, поданные стороной *самостоятельно* без адвоката;
- *Дела относительно права арестованного быть доставленным в суд для пересмотра решения об избрании меры пресечения* в соответствии с §2255, 28 Свода законов США (заключенный в федеральном исправительном учреждении);
- Дела относительно Закона о неправомерных претензиях (*дела по уголовным искам, с которым выступают представители государства совместно с лицом, сообщившим о преступлении* или «осведомителей»), возбужденные в соответствии с §3729 и далее, 31 ода законов США;

**14.3      Как мне возбудить новое гражданское дело разнообразного характера в электронном виде в системе ECF?**

Указания о том, как возбудить новое гражданское дело *разнообразного* характера в электронном виде можно найти по ссылке: http://www.nysd.uscourts.gov/ecf.php.

**14.5      Можно ли одновременно подать в электронном виде заявление о допуске для этого случая и возбудить новое дело гражданского или иного характера?**

Да. Адвокат, который не принят в коллегию адвокатов данного суда и желающий возбудить новое дело гражданского *или иного* характера,

26 июня, 2017, Приложение к

8 июня, 2015 Редакция

может подать заявку на временный доступ к ECF, чтобы получить возможность подать первичные документы для возбуждения дела, а так же заявление о допуске *для этого случая*. Заявители должны сначала заполнить ходатайство о допуске *для этого случая*/бланк регистрации в ECF по ссылке: www.nysd.uscourts.gov/pro_hac.php. Информация о временной учетной записи в ECF будет направлена заявителю по электронной почте. Затем можно возбудить новое *гражданское* дело в электронном виде, включая заявление о допуске *для этого случая*.

**14.7    Остается ли прежним метод вручения повесток и подачи исковых заявлений?**

Да. Несмотря на то, что возбуждение новых дел гражданского *и иного* характера в суде осуществляется в электронном виде, метод вручения повесток и подачи исковых заявлений остается прежним в соответствии с федеральными правилами гражданского судопроизводства 4.

**14.11    А если я допущу ошибку при возбуждении нового гражданского дела в электронном виде?**

Новые дела гражданского *и иного* характера, возбужденные в электронном виде, содержащие следующие недочеты, могут быть закрыты в административном порядке, что не предопределяет окончательное решение вопроса, и повестки не могут быть выданы, пока недочеты не устранены в течение пяти (5) дней после того, как Секретарь передает уведомление о недочетах в возбуждении дела в электронном виде:

- В первичных документах для возбуждения дела содержится неверный документ; текст документа неразборчивый или его невозможно прочесть; или документы вообще отсутствуют; или
- Пошлина за возбуждение дела не оплачена полностью или частично.

Если дело закрыто в административном порядке по одной из вышеуказанных причин, то сторона, возбуждающая дела, может обратиться с требованием о возобновлении дела, после устранения недочетов. В течение 60 дней после закрытия дела, сторона должна подать Извещение о заявлении о возобновлении дела, содержащее описание мер по исправлению недочетов и требование о возобновлении дела. Заявления о возобновлении таких дел, закрытых в административном порядке, поданные в течение 60 дней после закрытия, должны быть обработаны.

С вопросами относительно ошибок иного рода можно обратиться в службу поддержки ECF по электронной почте: helpdesk@nysd.uscourts.gov или по телефону (212) 805-0800 в течение рабочего времени.

**14.12    А если я дважды произведу оплату во время возбуждения нового гражданского дела в электронном виде?**

Вы можете направить Секретарю суда письмо с запросом вернуть Вам сумму повторного платежа. В письме должен быть указан номер дела, дата платежа, документ, связанный с оплатой, номер(а) квитанции(й) оплаты государственных пошлин и Ваш адрес электронной почты. Для того чтобы вернуть платеж не связывайтесь с компанией, которая выдала Вам пластиковую карту.

<u>**Раздел 17. Апелляционные обжалования**</u>

**17.1    Как подать извещение об апелляционном обжаловании по делу гражданского или иного характера?**

Пользователи должны подавать любые извещения об апелляционном обжаловании по делу гражданского *или иного характера* в электронном виде через систему ECF. Пошлина оплачивается онлайн через систему ECF. Инструкции и учебные материалы доступны по ссылке: nysd.uscourts.gov/ecf_training.php. *На сторону по гражданскому делу, выступающую самостоятельно* и не являющуюся пользователем, возбуждающим дело, не распространяются такая часть правил, в которых требуется, чтобы извещение об апелляционном обжаловании подавалось в электронном виде.

26 июня, 2017, Приложение к

8 июня, 2015 Редакция

Сотрудники Секретариата отсканируют и подадут в электронном виде все соответствующие апелляционные документы, полученные от сторон по гражданскому делу, выступающих *самостоятельно* и не являющихся пользователем, возбуждающим дело.

### Раздел 18. Документы на бумажных носителях

**18.1    Существуют ли документы по делу, возбужденному в электронном виде в системе ECF, которые не должны быть поданы в электронном виде?**

Да, включая:

- Предлагаемые распоряжения; предполагаемые решения суда, поручительства за явку ответчика в суд; согласия, см. ниже:
- Приказы о представлении обоснования/приказы о временном запрещении, см. ниже;
- Документы, скрепленные печатью, см. ниже;
- Обязательство поручителя за явку ответной стороны в суд, см. ниже; и
- Извещение об апелляционном обжаловании в уголовных делах, см. раздел 17;

Федеральный окружной суд США
Южный судебный округ штата Нью-Йорк
Правила и инструкции: возбуждение дела в электронном виде

3 января, 2018, Приложение к

8 июня, 2015 Редакция

Правило 13.17 системы ECF - Следует ли подавать в электронном виде запросы, связанные с досудебным представлением доказательств?

Южный судебный округ штата Нью-Йорк объявляет о пересмотре правил и инструкций суда о возбуждение дела в электронном виде, цель которого состоит в обеспечении соответствия с ограничениями, установленными для подачи найденных доказательств, существующих в федеральных правилах гражданского судопроизводства и местном Гражданском процессуальном кодексе. В правила и инструкции по возбуждению дела в электронном виде добавлено новое правило 13.17, как описано ниже.

*13.17 Следует ли подавать в электронном виде запросы, связанные с досудебным представлением доказательств?*

*Нет. Большинство запросов, связанных с досудебным представлением доказательств и ответы «не должны подаваться до тех пор, пока они не используются в судебном разбирательстве или подаче судебных распоряжений...» (см. федеральные правила гражданского судопроизводства 5(d)(1)). Если уместно подавать материалы, связанные с найденными доказательствами, до подавать следует только извлечения (см. статью 5.1 местного Гражданского процессуального кодекса и правило 5.2 ECF).*

С вопросами можно обратиться в службу поддержки ECF по электронной почте: helpdesk@nysd.uscourts.gov или по телефону(212)805-0136 в течение рабочего времени.

Федеральный окружной суд США
Южный судебный округ штата Нью-Йорк
Правила и инструкции: возбуждение дела в электронном виде

3 января, 2018, Приложение к

8 июня, 2015 Редакция

Правило 23.3 системы ECF - Имеется ли ограничение по размеру документа, который можно подать в систему ECF?

Южный судебный округ штата Нью-Йорк объявляет о пересмотре правил и инструкций суда о возбуждение дела в электронном виде относительно максимального размера документа, который можно подать в электронном виде в систему ECF.

23.3 Имеется ли ограничение по размеру документа, который можно подать в систему ECF?

Да. Один файл формата PDF может быть не больше *10 мегабайт (10 Мбайт)* Если размер подаваемых документом слишком большой, то система ECF не сможет загрузить их, и Вы не увидите на экране извещение о загрузке документов в электронном виде (или уведомление о загрузке). Кликните на «файл», «свойства документа», «обзор» чтобы определить размер файла в программе Adobe Acrobat PDF.

С вопросами можно обратиться в службу поддержки ECF по электронной почте: helpdesk@nysd.uscourts.gov или по телефону(212)805-0136 в течение рабочего времени.

PL 94–583, October 21, 1976, 90 Stat 2891

UNITED STATES PUBLIC LAWS

94th Congress - Second Session

Convening January 19, 1976

DATA SUPPLIED BY THE U.S. DEPARTMENT OF JUSTICE. (SEE SCOPE)

Additions and Deletions are not identified in this document.

PL 94–583 (HR 11315)

October 21, 1976

An Act to define the jurisdiction of United States courts in suits against foreign states, the circumstances in which foreign states are immune from suit and in which execution may not be levied on their property, and for other purposes.

Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That this Act may be cited as the "Foreign Sovereign Immunities Act of 1976". // 28 USC 1 note. //

Sec. 2. (a) That chapter 85 of title 28, United States Code, is amended by inserting immediately before section 1331 the following new section:

"Section 1330.

// 28 USC 1330. // Actions against foreign states
  "(a) The district courts shall have original jurisdiction without regard to amount in controversy of any nonjury civil action against a foreign state as defined in section 1603 (a) of this title as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity either under sections 1605—1607 of this title or under any applicable international agreement.
  "(b) Personal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have jurisdiction under subsection (a) where service has been made under section 1608 of this title.
  "(c) For purposes of subsection (b), an appearance by a foreign state does not confer personal jurisdiction with respect to any claim for relief not arising out of any transaction or occurrence enumerated in sections 1605—1607 of this title.".
  (b) By inserting in the chapter analysis of that chapter before—,

    "1331. Federal question; amount in controversy; costs."

the following new item:

    "1330. Action against foreign states.".

Sec. 3. That section 1332 of title 28, United States Code, is amended by striking subsections (a) (2) and (3) and substituting in their place the following:
  "(2) citizens of a State and citizens or subjects of a foreign state;
  "(3) citizens of different States and in which citizens or subjects of a foreign state are additional parties; and
  "(4) a foreign state, defined in section 1603 (a) of this title, as plaintiff and citizens of a Stateor of different States.".

SEC. 4. (a) That title 28, United States Code, is amended by inserting after chapter 95 the following new chapter:

" Chapter 97.—JURISDICTION IMMUNITIES OF FOREIGN STATES

"Sec.
"1602. Findings and declaration of purpose.
"1603. Definitions.
"1604. Immunity of a foreign state from jurisdiction.
"1605. General exceptions to the jurisdictional immunity of a foreign state.
"1606. Extent of liability.
1607. Counterclaims.
"1608. Service; time to answer default.
"1609. Immunity from attachment and execution of property of a foreign state.
"1610. Exceptions to the immunity from attachment or execution.
"1611. Certain types of property immune from execution.

" Section 1602. // 28 USC 1602. // Findings and declaration of purpose

" The Congress finds that the determination by United States courts of the claims of foreign states to immunity from the jurisdiction of such courts would serve the interests of justice and would protect the rights of both foreign states and litigants in United States courts. Under international law, states are not immune from the jurisdiction of foreign courts insofar as their commercial activities are concerned, and their commercial property may be levied upon for the satisfaction of judgments rendered against them in connection with their commercial activities. Claims of foreign states to immunity should henceforth be decided by courts of the United States and of the States in conformity with the principles set forth in this chapter.

" Section 1603. // 28 USC 1603. // Definitions

"For purposes of this chapter—,
"(a) A 'foreign state', except as used in section 1608 of this title, includes a political subdivision of a foreign state or an agency or instrumentality of a foreign state as defined in subsection (b).
"(b) An 'agency or instrumentality of a foreign state' means an entity—,
  "(1) which is a spearate legal person, corporate or othewise, and
  "(2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and
  "(3) which is neither a citizen of a State of the United States as defined in section 1332 (c) and (d) of this title, nor created under the laws of any third country.
"(c) The ' United States' includes all territory and waters, continental or insular, subject to the jurisdiction of the United States.
"(d) A 'commercial activity' means either a regular course of commercial conduct or a particular commercial transaction or act. The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose.
"(e) A 'commercial activity carried on in the United States by a foreign state' means commercial activity carried on by such state and having substantial contract with the United States.

" Section 1604.

// 28 USC 1604. // Immunity of a foreign state from jurisdiction
" Subject to existing international agreements to which the United States is a party at the time of enactment of this Act a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607 of this chapter.

" Section 1605.

// 28 USC 1605. // General exceptions to the jurisdictional immunity of a foreign state

"(a) Foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case—,

"(1) in which the foreign state has waived its immunity either explicitly or by implication, notwithstanding any withdrawal of the waiver which the foreign state may purport to effect except in accordance with the terms of the waiver;

"(2) in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States;

"(3) in which rights in property taken in violation of international law are in issue and that property or any property exchanged for such property is present in the United States in connection with a commercial activity carried on in the United States by the foreign state; or that property or any property exchanged for such property is owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States;

"(4) in which rights in property in the United States acquired by succession or gift or rights in immovable property situated in the United States are in issue; or

"(5) not otherwise encompassed in paragraph (2) above, in which money damages are sought against a foreign state for personal injury or death, or damage to or loss of property, occurring in the United States and caused by the tortious act or omission of that foreign state or of any official or employee of that foreign state while acting within the scope of his office or employment; except this paragraph shall not apply to—,

"(A) any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function regardless of whether the discretion be abused, or

"(B) any claim arising out of malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights.

"(b) A foreign state shall not be immune from the jurisdiction of the courts of the United States in any case in which a suit in admiralty is brought to enforce a maritime lien against a vessel or cargo of the foreign state, which maritime lien is based upon a commercial activity of the foreign state: Provided, That—,

"(1) notice of the suit is given by delivery of a copy of the summons and of the complaint to the person, or his agent, having possession of the vessel or cargo against which the maritime lien is asserted; but such notice shall not be deemed to have been delivered, nor may it thereafter be delivered, if the vessel or cargo is arrested pursuant to process obtained on behalf of the party bringing the suit—unless the party was unaware that the vessel or cargo of a foreign state was involved, in which event the service of process of arrest shall be deemed to constitute valid delivery of such notice; and

"(2) notice to the foreign state of the commencement of suit as provided in section 1608 of this title is initiated within ten days either of the delivery of notice as provided in subsection (b) (1) of this section or, in the case of a party who was unaware that the vessel or cargo of a foreign state was involved, of the date such party determined the existence of the foreign state's interest.

Whenever notice is delivered under subsection (b) (1) of this section, the maritime lien shall thereafter be deemed to be an in personam claim against the foreign state which at that time owns the vessel or cargo involved: Provided, That a court may not award judgment against the foreign state in an amount greater than the value of the vessel or cargo upon which the maritime lien arose, such value to be determined as of the time notice is served under subsection (b) (1) of this section.

" Section 1606.

// 28 USC 1606. // Extent of liability

" As to any claim for relief with respect to which a foreign state is not entitled to immunity under section 1605 or 1607 of this chapter, the foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances; but a foreign state except for an agency or instrumentality thereof shall not be liable for punitive damages; if, however, in any case wherein death was caused, the law of the place where the action or omission occured

provides, or has been construed to provide, for damages only punitive in nature, the foreign state shall be liable for actual or compensatory damages measured by the pecuniary injuries resulting from such death which were incurred by the persons for whose benefit the action was brought.

" Section 1607.

// 28 USC 1607. // Counterclaims
   "In any action brought by a foreign state, or in which a foreign state intervenes, in a court of the United States or of a State, the foreign state shall not be accorded immunity with respect to any counterclaim—,
   "(a) for which a foreign state would not be entitled to immunity under section 1605 of this chapter had such claim been brought in a separate action against the foreign state; or
   "(b) arising out of the transaction or occurrence that is the subject matter of the claim of the foreign state; or
   "(c) to the extent that the counterclaim does not seek relief exceeding in amount or differing in kind from that sought by the foreign state.

" Section 1608.

// 28 USC 1608. // Service; time to answer; default
   "(a) Service in the courts of the United States and of the States shall be made upon a foreign state or political subdivision of a foreign state:
   "(1) by delivery of a copy of the summons and complaint in accordance with any special arrangement for service between the plaintiff and the foreign state or political subdivision; or
   "(2) if no special arrangement for exists, by delivery of a copy of the summons and complaint in accordance with an applicable international convention on service of judicial documents; or
   "(3) if service cannot be made under paragraphs (1) or (2), by sending a copy of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs of the foreign state concerned, or
   "(4) if service cannot be made within 30 days under paragraph (3), by sending two copies of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the Secretary of State in Washington, District of Columbia, to the attention of the Director of Special Consular Services—and the Secretary shall transmit one copy of the papers through diplomatic channels to the foreign state and shall send to the clerk of the court a certified copy of the diplomatic note indicating when the papers were transmitted.

As uded in this subsection, a 'notice of suit' shall means a notice addressed to a foreign state and in a form prescribed by the Secretary of State by regulation.
   "(b) Service in the courts of the United States and of the States shall be made upon an agency or instrumentality of a foreign state:
   "(1) by delivery of a copy of the summons and complaint in accordance with any special arrangement for service between the plaintiff and the agency or instrumentality; or
   "(2) if no special arrangement exists, by delivery of a copy of the summons and complaint either to an officer, a managing or general agent, or to any other agent authorized by appointment or by law to receive service of process in the United States; or in accordance with an applicable international convention on service of judicial documents; or
   "(3) if service cannot be made under paragraphs (1) or (2), and if reasonably calculated to give actual notice, by delivery of a copy of the summons and complaint, together with a translation of each into the official language of the foreign state—,
      "(A) as directed by an authority of the foreign state or political subdivision in response to a letter rogatory or request or
      "(B) by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the agency or instrumentality to be served, or

"(C) as directed by order of the cuort consistent with the law of the place where service is to be made.

"(c) Service shall be deemed to have been made—,

"(1) in the case of service under subsection (a) (4), as of the date of transmittal indicated in the certified copy of the diplomatic note; and

"(2) in any other case under this section, as of the date of receipt indicated in the certification, signed and returned postal receipt, or other proof of service applicable to the method of service employed.

"(d) In any action brought in a court of the United States or of a State, a foreign state, a political subdivision thereof, or an agency or instrumentality of a foreign state shall serve an answer or other responsive pleading to the complaint within sixty days after service has been made under this section.

"(e) No judgment by default shall be entered by a court of the United States or of a State against a foreign state, a political subdivision thereof, or an agency or instrumentality of a foreign state, unless the claimant establishes his claim or right to relief by evidence satisfactory ot the court. A copy of any such default judgment shall be sent to the foreign state or political subdivision in the manner prescribed for service in this section.

” Section 1609.

// 28 USC 1609. // Immunity from attachment and execution of property of a foreign state

” Subject to existing international agreements to which the United States is a party at the time of enactment of this Act the property in the United States of a foreign state shall be immune from attachment arrest and execution except as provided in sections 1610 and 1611 of this chapter.

” Section 1610.

// 28 USC 1610. // Exceptions to the immunity from attachment or execution

"(a) The property in the United States of a foreign state, as defined in section 1603 (a) of this chapter, used for a commercial activity in the United States, shall not be immune form attachment in aid of execution, or from execution, upon a judgment entered by a court of the United States or of a State after the effective date of this Act, if—,

"(1) the foreign state has waived its immunity from attachment in aid of execution or from execution either explicitly or by implication, notwithstanding any withdrawal of the waiver the foreign state may purport to effect except in accordance with the terms of the waiver, or

"(2) the property is or was used for the commercial activity upon which the claim is based, or

"(3) the execution relates to a judgment establishing rights in property which has been taken in violation of international law or which has been exchanged for property taken in violation of international law, or

"(4) the execution relates to a judgment establishing rights in property—,

"(A) which is axquired by succession or gift, or

"(B) which is immovable and situated in the United States: Provided, That such property is not used for purposes of maintaining a diplomatic or consular mission or the residence of the Chief of such mission, or

"(5) the property consists of any contractual obligation or any proceeds from such a contractual obligation to indemnify or hold harmless the foreign state or its employees under a policy of automobile or other liability or casualty insurance covering the claim which merged into the judgment.

"(b) In addition to subsection (a), any property in the United States of an agency or instrumentality of a foreign state engaged in commercial activity in the United States shall not be immune from attachment in aid of execution, or from execution, upon a judgment entered by a court of the United States or of a State after the effective date of this Act, if—,

"(1) the agency or instrumentality had waived its immunity from attachment in aid of execution or from execution either explicitly or implicitly, notwithstanding any withdrawal of the waiver the agency or instrumentality may purport to effect except in accordance with the terms of the waiver, or

"(2) the judgment relates to a claim for which the agency or instrumentality is not immune by virtue of section 1605 (a) (2), (3), or (5), or 1605 (b) of this chapter, regardless of whether the property is or was used for the activity upon which the claim is based.

Case 1:18-cv-03501-JGK   Document 64-5   Filed 05/18/18   Page 6 of 7

"(c) No attachment or execution referred to in subsections (a) and (b) of this section shall be permitted until the court has ordered such attachment and execution after having determined that a reasonable period of time has elapsed following the entry of judgment and the giving of any notice required under section 1608 (e) of this chapter.

"(d) The property of a foreign state, as defined in section 1603 (a) of this chapter, used for a commercial activity in the United States, shall not be immune from attachment prior to the entry of judgment in any action brought in a court of the United States or of a State, or prior to the elapse of the period of time provided in subsection (c) of this section, if—,

"(1) the foreign state has explicitly waived its immunity from attachment prior to judgment, notwithstanding any withdrawal of the waiver the foreign state may purport to effect except in accordance with the terms of the waiver, and

"(2) the purpose of the attachment is to secure satisfaction of a judgment that has been or may ultimately be entered against the foreign state, and not to obtain jurisdiction.

" Section 1611.

// 28 USC 1611. // Certain types of property immune from execution

"(a) Notwithstanding the provisions of section 1610 of this chapter, the property of those organizations designated by the President as being entitled to enjoy the privileges, exemptions, and immunities provided by the International Organizations Immunities Act // 22 USC 288 note. // shall not be subject to attachment or any other judicial process impeding the disbursement of funds to, or on the order of, a foreign state as the result of an action brought in the courts of the United States or of the States.

"(b) Notwithstanding the provisions of section 1610 of this chapter, the property of a foreign state shall be immune from attachment and from execution, if—,

"(1) the property is that of a foreign central bank or monetary authority held for its own account, unless such bank or authority, or its parent foreign government, has explicitly waived its immunity from attachment in aid of execution, or from execution, notwithstanding any withdrawal of the waiver which the bank, authority or government may purport to effect except in accordance with the terms of the waiver; or

"(2) the property is, or is intended to be, used in connection with a military activity and

"(A) is of a military character, or

"(B) is under the control of a military authority or defense agency."

(b) That the analysis of " PART IV.— JURISDICTION AND VENUE" of title 28, United States Code, is amended by inserting after—,

"95. Customs Court.", the following new item:

"97. Jurisdictional Immunities of Foreign States.".

SEC. 5. That section 1391 of title 28, United States Code, is amended by adding at the end thereof the following new subsection:

"(f) A civil action against a foreign state as defined in section 1603 (a) of this title may be brought—,

"(1) in any judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated;

"(2) in any judicial district in which the vessel or cargo of a foreign state is situated, if the claim is asserted under section 1605 (b) of this title;

"(3) in any judicial district in which the agency or instrumentality is licensed to do business or is doing business, if the action is brought against an agency or instrumentality of a foreign state as defined in section 1603 (b) of this title; or

"(4) in the United States District Court for the District of Columbia if the action is brought against a foreign state or political subdivision thereof.".

SEC. 6. That section 1441 of title 28, United States Code, is amended by adding at the end thereof the following new subsection:

"(d) Any civil action brought in a State court against a foreign state as defined in section 1603 (a) of this title may be removed by the foreign state to the district court of the United States for the district and division embracing the place

where such action is pending. Upon removal the action shall be tried by the court without jury. Where removal is based upon this subsection, the time limitations of section 1446 (b) // 28 USC 1446. // of this chapter may be enlarged at any time for cause shown.".

Sec. 7. // 28 USC 1602 note. // If any provision of this Act or the application thereof to any foreign state is held invalid, the invalidity does not affect other provisions or applications of the Act which can be given effect without the invalid provision or application, and to this end the provisions of this Act are severable.

Sec. 8. // 28 USC 1602 note. // This Act shall take effect ninety days after the date of its enactment.

Approved October 21, 1976.

## LEGISLATIVE HISTORY:

HOUSE Report No. 94—1487 (Comm. on the Judiciary).

SENATE REPORT No. 94—1310 accompanying S. 3553 (Comm. on the Judiciary).

CONGRESSIONAL RECORD, Vol. 122 (1976): Sept. 29, considered and passed House. Oct. 1, considered and passed Senate.

WEEKLY COMPILATION OF PRESIDENTIAL DOCUMENTS, Vol. 12, No. 43: Oct. 22, Presidential Statement.

PL 94–583, 1976 HR 11315

**End of Document**                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

PL 94-583, 21 октября 1976 г., 90 Stat 2891

ОБЩИЕ ЗАКОНЫ СОЕДИНЕННЫХ ШТАТОВ

94-й Конгресс - Вторая сессия

Созыв 19 января 1976 г.

ДАННЫЕ ПРЕДОСТАВЛЕНЫ МИНИСТЕРСТВОМ ЮСТИЦИИ США. (СМ. ОБЪЕМ ОХВАТА)

Дополнения и удаления в этом документе не указаны.

PL 94-583 (HR 11315)

21 октября 1976 г.

Закон об определении юрисдикции судов Соединенных Штатов на предмет судебного преследования иностранных государств; обстоятельств, при которых иностранные государства пользуется иммунитетом от судебного преследования и при которых взыскание не может быть обращено на их имущество; и также других целей.

В том случае, если этот Закон будет принят Сенатом и Палатой представителей Соединенных Штатов Америки на собравшемся Конгрессе, этот закон может быть известен под названием «Закон об иностранном суверенном иммунитете 1976 г.». // титул 28 Свода законов США, 1 примечание. //

Раздел 2. (a) В эту главу 85 титула 28 Свода законов США вносятся поправки путем вставки непосредственно перед разделом 1331 следующего нового раздела:

«Раздел 1330.

// Титул 28 Свода законов США, 1330. //Иски против иностранных государств

"(a) Окружные суды имеют юрисдикцию суда первой инстанции вне зависимости от исковой суммы гражданского иска против иностранного государства, рассматриваемого без участия суда присяжных, как это определено в разделе 1603 (a) настоящего титула, в связи с любым требованием о защите прав в отношении конкретных лиц, касательно которых иностранное государство не имеет права иммунитета либо в соответствии с разделами 1605-1607 настоящего титула, либо в соответствии с применимым международным соглашением.

"(b) Персональная юрисдикция над иностранным государством существует в отношении каждого требования о защите прав, над которыми окружные суды имеют юрисдикцию в соответствии с подразделом (a), в тех случаях, когда вручение произошло в соответствии с разделом 1608 настоящего титула.

"(c) Для целей подраздела (b), подчинение юрисдикции суда со стороны иностранного государства не создает персональную юрисдикцию в отношении любого требования о защите прав, не возникающего в связи с любой сделкой или событием, перечисленными в разделе 1605-1607 настоящего титула."

(b) Путем вставки в главу анализа этой главы до:

"1331. Вопрос, относящийся к федеральной компетенции; исковая сумма; издержки."

следующего нового пункта:

"1330. Иски против иностранных государств.".

Раздел 3. В этот раздел 1332 титула 28 Свода законов США вносятся изменения путем вычеркивания подразделов (a) (2) и (3) с заменой их следующими формулировками:

"(2) гражданами Штата и гражданами или подданными иностранного государства;

"(3) гражданами разных Штатов, когда в качестве дополнительных сторон выступают граждане или подданные иностранных государств; и

"(4) иностранным государством, как определено в разделе 1603 (a) настоящего титула, выступающим в качестве истца, и гражданами Штата или разных Штатов.".

РАЗДЕЛ 4. (a) В титул 28 Свода законов США вносятся поправки путем вставки после главы 95 следующей новой главы:

### "Глава 97. — ЮРИСДИКЦИОННЫЙ ИММУНИТЕТ ИНОСТРАННЫХ ГОСУДАРСТВ

"Раздел
"1602. Заключение и заявление о целевом назначении
"1603. Определения.
"1604. Иммунитет иностранного государства от юрисдикции.
"1605. Общие исключения из юрисдикционного иммунитета иностранного государства.
"1606. Степень ответственности.
1607. Встречные иски.
"1608. Вручение; срок для ответа, неявка.
"1609. Иммунитет от наложения ареста на имущество иностранного государства.
"1610. Исключения из иммунитета от наложения ареста на имущество.
"1611. Определенные виды имущества, пользующегося иммунитетом в исполнительном производстве

"Раздел 1602. // Титул 28 Свода законов США, 1602. // Заключение и заявление о целевом назначении

"Конгресс заключил, что рассмотрение судами США претензий иностранных государств на иммунитет от юрисдикции таких судов будет служить интересам правосудия и будет защищать права как иностранных государств, так и участников судебных споров в судах Соединенных Штатов. Согласно международному праву, государства не имеют иммунитета от юрисдикции иностранных судов в той мере, в какой это касается их коммерческой деятельности, и на их коммерческую собственность может быть обращено взыскание для удовлетворения судебных решений, вынесенных против них в связи с их коммерческой деятельностью. Претензии иностранных государств на иммунитет будут впредь рассматриваться судами США и судами Штатов в соответствии с принципами, изложенными в этой главе.

"Раздел 1603. // Титул 28 Свода законов США, 1603. // Определения

"Для целей настоящей главы:
"(a) «Иностранное государство», за исключением случаев, указанных в разделе 1608 настоящего титула, включает политическое образование иностранного государства, агентство или представительство иностранного государства, как они определяются в соответствии с подразделом (b).
(b) «Агентство или представительство иностранного государства» означает любое лицо, которое:
"(1) является самостоятельным юридическим лицом, корпорацией или другим юридическим лицом, и
"(2) является органом иностранного государства или его политическим образованием, или основная часть его акций или долевого участия в капитале принадлежит иностранному государству или его политическому образованию; и
"(3) не является ни гражданином Соединенных Штатов как определено в разделах 1332(c) и (e) настоящего титула, ни учреждено в соответствии с законодательством какой-либо третьей страны.
"(c) «Соединенные Штаты» включают в себя всю территорию и воды, континентальные или островные, подчиненные юрисдикции Соединенных Штатов.
"(d) «Коммерческая деятельность» означает постоянное ведение коммерческой деятельности или заключение отдельной коммерческой сделки или совершение действия. Коммерческий характер деятельности определяется природой ведения деятельности или заключенной отдельной сделки или совершенного действия, нежели их целью.
"(e) «Коммерческая деятельность, осуществляемая в Соединенных Штатах иностранным государством» означает коммерческую деятельность, осуществляемую таким государством и имеющую существенную связь с Соединенными Штатами.

"Раздел 1604.

// Титул 28 Свода законов США, 1604. // Иммунитет
иностранного государства от юрисдикции
С учетом международных соглашений, участником которых являются Соединенные Штаты, существующих во время вступления настоящего Закона в силу, иностранное государство обладает иммунитетом от юрисдикции в судах Соединенных Штатов и судах Штатов, за исключением положений, предусмотренных в разделах с 1605 по 1607 настоящей главы.

"Раздел 1605.

// Титул 28 Свода законов США, 1605. // Общие исключения из юрисдикционного иммунитета иностранного государства

"(a) Иностранное государство не пользуется иммунитетом от юрисдикции в судах Соединенных Штатов в любом деле: "(1) в котором иностранное государство отказалось от своего иммунитета явно выраженным или подразумеваемым образом, несмотря на любой отзыв данного отказа, которым иностранное государство намеревалось воспользоваться, за исключением тех случаев, когда это предусмотрено условиями отказа;

"(2) в котором иск основан на коммерческой деятельности, осуществляемой в Соединенных Штатах иностранным государством, или на действии, совершенном в Соединенных Штатах в связи с коммерческой деятельностью иностранного государства, осуществляемой в любом месте, или на действии, совершенном вне территории Соединенных Штатов в связи с коммерческой деятельностью иностранного государства в любом месте, и оказывающем непосредственный эффект на Соединенные Штаты;

"(3) в котором предметом разбирательства являются нарушенные согласно международному праву права собственности, и эта собственность или любая собственность, которая была обменена на такую собственность, находится в Соединенных Штатах и связана с коммерческой деятельностью, осуществляемой иностранным государством в Соединенных Штатах, или эта собственность или любая собственность, которая была обменена на такую собственность, принадлежит или используется агентством или представительством иностранного государства, и это агентство или представительство занимается коммерческой деятельностью в Соединенных Штатах;

"(4) в котором предметом разбирательства является право собственности в Соединенных Штатах, приобретенное путем правопреемства или дарения или право собственности на недвижимое имущество, находящееся в Соединенных Штатах;

"(5) в котором, если иное не предусмотрено в изложенном выше пункте (2), предъявлен иск о денежной компенсации за нанесение телесных повреждений или смерть, или имущественный (материальный) вред или убытки, причиненные в Соединенных Штатах и вызванные правонарушением или упущением иностранного государства или любого официального лица или сотрудника этого государства, действующего в пределах своих полномочий или должностных обязанностей:

"(A) любого искового требования, основанного либо на применении или осуществлении, либо на неспособности применения или осуществления дискреционных функций, независимо от того, имели ли место злоупотребления дискреционного усмотрения, или

"(B) любого искового требования, возникшего в связи со злонамеренным судебным преследованием, использованием судебной процедуры в незаконных целях, клеветой, оговором, искажением фактов, обманом или вмешательством в договорные права.

"(b) Иностранное государство не пользуется иммунитетом от юрисдикции в судах Соединенных Штатов в любом деле, в котором предъявляется иск в адмиралтейство для признания и удовлетворения права удержания судна или груза иностранного государства, которое вытекает из коммерческой деятельности иностранного государства: При условии, что:

"(1) уведомление об иске производится путем вручения копии повестки и искового заявления лицу (или его агенту), владеющему судном или грузом, в отношении которых заявлено право удержания судна или груза; при этом такое уведомление не считается доставленным и не может быть доставлено впоследствии, если судно или груз будут арестованы в соответствии с процессуальными документами, полученными от имени стороны, возбудившей иск, за исключением случая, когда такая сторона не была в курсе того, что судно или груз принадлежат соответствующему иностранному государству, и в этом случае считается, что получение процессуальных уведомлений является действительным вручением такого уведомления; и

"(2) уведомление иностранному государству о возбуждении иска, предусмотренное в разделе 1608 этого титула, инициируется в течение десяти дней либо с момента вручения уведомления, как указано в части (b) (1) настоящего раздела, либо в случае стороны, которая не была в курсе того, что судно или груз принадлежат иностранному государству, – с даты, когда такая сторона определила наличие интересов иностранного государства.

Во всех случаях, когда, когда уведомление доставляется в соответствии с подразделом (b) (1) настоящего раздела, морское залоговое право впоследствии считается личным (in personam) иском к иностранному государству, которое в это время является владельцем соответствующего судна или груза: Принимая во внимание, что суд не может вынести решение иностранному государству в размере, превышающем стоимость судна или груза, в отношении которого возникло морское залоговое право, в соответствии с подразделом (b) (1) этого раздела размер этой суммы должен быть определен на момент вручения уведомления.

"Раздел 1606.

// Титул 28 Свода законов США, 1606. // Степень ответственности

"[По любому требованию о защите прав, в отношении которого иностранное государство не обладает иммунитетом согласно разделу 1605 или 1607 настоящей главы, иностранное государство несет ответственность в такой же форме и степени, как и частное лицо в сходных обстоятельствах, при этом иностранное государство (за исключением его агентства или представительства) не несет ответственность по штрафным убыткам; тем не менее, в случае смерти, наступившей вследствие действия или упущения в месте, право которого прямо или посредством толкования предусматривает ответственность исключительно в виде штрафных убытков, иностранное государство несет

ответственность за реальные или фактические убытки, установленные по соображениям денежной заинтересованности в продолжении жизни умершего, которое имеет лицо, в чьих интересах предъявлен иск.

"Раздел 1607.

// Титул 28 Свода законов США, 1607. // Встречные иски

"В случае предъявления любого иска иностранным государством, или к которому иностранное государство присоединяется в судах Соединенных Штатов или судах Штата, иностранное государство не пользуется иммунитетом от встречного иска:

"а) на который иностранное государство не имело бы права согласно разделу 1605 настоящей главы, если бы требования были предъявлены в отдельном иске против иностранного государства; или

"b) возникающего из сделки или события, являющихся предметом требования иностранного государства; или "с) в той мере, в которой встречный иск не добивается защиты прав, превышающую по размеру суммы, или отличающуюся по характеру от той, которая испрашивается иностранным государством.

"Раздел 1608.

// Титул 28 Свода законов США, 1608. // Вручение; срок для ответа, неявка

"(а) Вручение в судах Соединенных Штатов и судах Штатов в адрес иностранного государства или политического подразделения иностранного государства должно производиться:

"(1) путем доставки копии повестки и искового заявления в соответствии с любой специальной договоренностью о вручении между истцом и иностранным государством или политическим образованием; или

"(2) в том случае, если никакой специальной договоренности не существует, – путем доставки копии повестки и искового заявления в соответствии с применимой международной конвенцией о вручении судебных документов; или

"(3) в том случае, если вручение не может быть произведено в соответствии с пунктами (1) или (2), –путем отправки копии повестки, искового заявления и уведомления об иске вместе с переводом каждого из этих документов на официальный язык иностранного государства посредством любого вида почтового отправления, требующего расписки в получении, которое должно быть адресовано и отправлено секретарем суда главе министерства иностранных дел соответствующего иностранного государства; или

"(4) если вручение не может быть произведено в течение 30 дней в соответствии с пунктом (3), – путем направления двух экземпляров повестки, искового заявления и уведомления об иске посредством любого вида почтового отправления, требующего расписки в получении, которое должно быть адресовано и отправлено секретарем суда Государственному секретарю в Вашингтоне, округ Колумбия, для передачи Директору отдела специальных консульских служб, при этом Государственный секретарь передает один экземпляр документов по дипломатическим каналам иностранному государству и направляют секретарю суда заверенную копию дипломатической ноты, указывающую, когда были переданы документы.

Как указано в этом подразделе, «уведомление об иске» означает адресованное иностранному государству уведомление по форме, установленной Государственным секретарем согласно нормативно-правовым положениям.

"(с) Вручение в судах Соединенных Штатов и судах Штатов в адрес агенства или представительства иностранного государства должно производиться:

"(1) путем доставки копии повестки и искового заявления в соответствии с любой специальной договоренностью о вручении между истцом и агенством или представительством иностранного государства; или

"(2) в том случае, если никакой специальной договоренности не существует, – путем доставки копии повестки и искового заявления либо должностному лицу, управляющему или генеральному агенту, либо любому иному агенту, уполномоченному в силу назначения или закона получать процессуальные документы в Соединенных Штатах; или в соответствии с применимой международной конвенцией о вручении судебных документов; или "(3) в том случае, если вручение не может быть произведено в соответствии с пунктами (1) или (2), но с обоснованным расчетом предназначено для предоставления фактического уведомления – путем вручения копии повестки и искового заявления вместе с переводом каждого из этих документов на официальный язык иностранного государства:

"(А) в соответствии с указаниями иностранного государства или политического образования в ответ на судебное поручение или запрос, или

"(В) посредством любого вида почтового отправления, требующего расписки в получении, которое должно быть адресовано и отправлено секретарем суда агенству или представительству, которым должно быть произведено вручение, или

"(C) согласно приказу суда в соответствии с законом места, где должно быть произведено вручение.

"(c) Вручение будет считаться произведенным:

"(1) в случае вручения согласно подразделу (a) (4) – на дату передачи, указанную в заверенной копии дипломатической ноты; и

"(2) в любом другом случае согласно настоящему разделу – на дату получения, указанную в подтверждающем документе, подписанном уведомлении о вручении или другом документе, подтверждающем вручение, применимом к используемому методу вручения.

"(d) По любому иску, возбужденному в суде Соединенных Штатов или суде Штата, иностранное государство, его политическое образование либо какое-либо агентство или представительство иностранного государства должны вручить ответ или другое ответное заявление на исковое заявление в течение шестидесяти дней после того, как было произведено вручение согласно этому разделу.

"(e) Против иностранного государства, политического образования, агентства или представительства иностранного государства судом Соединенных Штатов или судом Штата не выносится никакое решение в порядке заочного судопроизводства, за исключением случаев, когда истец обосновывает свое требование или право на защиту при помощи доказательств, удовлетворительных для суда. Копия любого такого судебного решения в пользу истца вследствие неявки ответчика должна быть направлена иностранному государству или его политическому образованию в порядке, установленном этим разделом для произведения вручения.

"Раздел 1609.

// Титул 28 Свода законов США, 1609. // Иммунитет от наложения ареста на имущество иностранного государства

"С учетом международных соглашений, участниками которых являются Соединенные Штаты, существующих в момент вступления в силу настоящего Закона, имущество иностранного государства в Соединенных Штатах пользуется иммунитетом от наложения ареста, за исключением положений, предусмотренных в разделах 1610 и 1611 настоящей главы.

"Раздел 1610.

// Титул 28 Свода законов США, 1610. //Исключения из иммунитета от наложения ареста на имущество

"(a) Имущество иностранного государства в Соединенных Штатах, как оно определено в разделе 1603 (a) настоящей главы, используемое для коммерческой деятельности в Соединенных Штатах, не пользуется иммунитетом от наложения ареста на имущество в исполнительном производстве или по исполнительному листу, по судебному решению, принятому судом Соединенных Штатов или судом Штата после вступления в силу настоящего Закона, если:

"(1) иностранное государство отказалось от своего иммунитета от наложения ареста на имущество в исполнительном производстве или по исполнительному листу явно выраженным или подразумеваемым способом, несмотря на любой отказ, которым иностранное государство намеревалось воспользоваться, за исключением тех случаев, когда это предусмотрено условиями отказа; или

"(2) имущество используется или использовалось для коммерческой деятельности, на которой основывается исковое требование, или

"(3) исполнительное производство осуществляется по судебному решению, устанавливающему право собственности, которое согласно международному праву было нарушено, или эта собственность была обменена на собственность, право на которую было нарушено, или

"(4) исполнительное производство осуществляется по судебному решению, устанавливающему право собственности,

"(A) которая приобретается путем правопреемства или дарения, или

"(B) которая является недвижимым имуществом с нахождением в Соединенных Штатах: При этом следует иметь в виду, что назначением такого имущества не является обеспечение дипломатической или консульской миссии или резиденции главы такой миссии, или

"(5) имущество состоит из любого договорного обязательства или выручки, поступающей из такого договорного обязательства для возмещения или восстановления ущерба иностранному государству или его работникам в соответствии с полисом о страховании автотранспортных средств или иной ответственности, или о страховании от несчастных случаев, представляющим собой страховое покрытие искового требования, по которому вынесено судебное решение.

"(b) В дополнение подразделу (4), любое имущество агентства или представительства иностранного государства в Соединенных Штатах, используемое для коммерческой деятельности в Соединенных Штатах, не пользуется иммунитетом от наложения ареста на имущество в исполнительном производстве или по исполнительному листу по судебному решению, вынесенному судом Соединенных Штатов или судом Штата после вступления в силу настоящего Закона, если:

"(1) агентство или представительство отказалось от своего иммунитета от наложения ареста на имущество в исполнительном производстве или по исполнительному листу явно выраженным или подразумеваемым образом, несмотря на любой отзыв отказа, которым агентство или представительство намеревалось воспользоваться, за исключением тех случаев, когда это предусмотрено условиями отказа; или

"(2) судебное решение касается требования, в отношении которого агентство или представительство не пользуется иммунитетом согласно разделам 1605 (а) 2, 3 или 5, или 1605 (b) настоящей главы, независимо от того используется/использовалось ли имущество в деятельности, на которой основано требование, или нет.

"(c) Никакое наложение ареста на имущество или исполнительное производство, предусмотренное в частях (а) и (b) настоящего раздела, не будет разрешено до тех пор, пока суд не вынесет приказ о таком наложении ареста на имущество в исполнительном производстве после установления того, что истек обоснованно необходимый срок после вынесения судебного решения и вручения любых уведомлений, предусмотренных разделом 1608 (а) настоящей главы.

"(d) Имущество иностранного государства, как оно определено в разделе 1603 (а) настоящей главы, используемое в коммерческой деятельности в Соединенных Штатах, не пользуется иммунитетом от наложения ареста до вынесения судебного решения по любому предъявленному иску в суде Соединенных Штатов или суде Штата или до истечения срока, предусмотренного в подразделе (с) настоящего раздела, если:

"(1) иностранное государство явно выраженным образом отказалось от иммунитета от наложения ареста на имущество до вынесения судебного решения, несмотря на любой отзыв отказа, которым агентство или представительство намеревалось воспользоваться, за исключением тех случаев, когда это предусмотрено условиями отказа; и

"(2) цель наложения ареста на имущество заключается в обеспечении исполнения судебного решения, которое было вынесено или в конечном итоге может быть вынесено против иностранного государства, а не в приобретении юрисдикции.

"Раздел 1611.

// Титул 28 Свода законов США, 1611. // Некоторые виды собственности, пользующиеся иммунитетом от принудительного исполнения

"(а) Несмотря на положения раздела 1610 настоящей главы, имущество тех организаций, которые определены Президентом как обладающие привилегиями, льготами и иммунитетом как предусмотрено Законом об иммунитетах и привилегиях международных организаций// Титул 22 Свода законов США, примечание. // не подлежат наложению ареста или любому другому судебному процессу, препятствующему выплатам из фондов иностранному государству или по его приказу как результат подачи иска в суд Соединенных Штатов или суд Штата.

"(b) Несмотря на положения раздела 1610 настоящей главы, имущество иностранного государства пользуется иммунитетом от наложения ареста и от исполнительного производства, если:

"(1) эта собственность является собственностью иностранного центрального банка или финансового органа, которой они владеют для своей собственной выгоды, за исключением тех случаев, когда такой банк или орган, или правительство иностранного государства, которому они принадлежат, не отказались явно выраженным образом от иммунитета от наложения ареста на имущество в исполнительном производстве или по исполнительному листу, несмотря на любой отзыв отказа, которым банк, государственный орган или правительство намеревались воспользоваться, за исключением тех случаев, когда это предусмотрено условиями отказа; и

"(2) имущество используется или его намеревались использовать в связи с военной деятельностью; и

"(А) в деятельности военного характера, или

"(В) в деятельности, контролируемой военным ведомством или органом обороны."

(b) что в анализ «ЧАСТИ IV. - ЮРИСДИКЦИЯ И МЕСТО РАССМОТРЕНИЯ СПОРОВ» Титула 28 Свода законов США, внесены поправки путем вставки после:

"95. Суд по таможенным делам", следующего нового пункта:

"97. Юрисдикционный иммунитет иностранных государств.".

РАЗДЕЛ 5. Что в раздел 1391 титула 28 Свода законов США вносятся поправки путем добавления в конце этого раздела следующего нового подраздела:

"(f) Гражданский иск против иностранного государства как определено в разделе 1603(а) настоящего титула, может быть возбужден:

"(1) в любом судебном округе, на юрисдикционной территории которого произошла значительная часть событий или бездействия, послуживших основанием для иска, или находится существенная часть имущества, являющегося предметом иска;

"(2) в любом судебном округе, в котором находится судно или груз иностранного государства, если иск подан в соответствии с разделом 1605(b) настоящего титула;

"(3) в любом судебном округе, в котором агентство или представительство лицензированы для ведения коммерческой деятельности или ведут коммерческую деятельность, если иск возбужден против агентства или представительства иностранного государства, как определено в соответствии с разделом 1603(b) настоящего титула; или

"(4) в окружном суде Соединенных Штатов по округу Колумбия, если иск возбужден против иностранного государства или его политического образования.

РАЗДЕЛ 6. Что в раздел 1441 титула 28 Свода законов США вносятся поправки путем добавления в конце этого раздела следующего нового подраздела:

"(d) Любой гражданский иск, возбужденный в суде Штата против иностранного государства, как это определено в

разделе 1603(a) настоящего титула, может быть передан иностранным государством в окружной суд Соединенных Штатов того округа и подразделения, в пределах территориальной юрисдикции которого такой иск подлежит рассмотрению. Когда иск передан, он рассматривается судом без участия присяжных. В тех случаях, когда передача основана на этом подразделе, временные ограничения раздела 1446 (b) // Титул 28 Свода законов США 1446. // этой главы могут быть увеличены в любое время по указанной причине.".

Раздел 7. // Титул 28 Свода законов США, 1602, примечание. // Если какое-либо положение настоящего Закона или применение его к любому иностранному государству будет признано недействительным, то такая недействительность не влияет на действительность других положений или применений Закона, которые могут быть введены в действие без недействительного положения или применения, и с этой целью положения настоящего Закона являются автономными.

Раздел 8. // Титул 28 Свода законов США, 1602, примечание. // Настоящий Закон вступает в силу через

девяносто дней после даты его принятия.

Утверждено 21 октября 1976 г.

ИСТОРИЯ ПРИНЯТИЯ ЗАКОНА:

Отчет в Палате представителей № 94-1487 (Судебный комитет).

ОТЧЕТ СЕНАТА № 94-1310, сопровождающий С. 3553 (Судебный комитет).

ОФИЦИАЛЬНЫЙ БЮЛЛЕТЕНЬ КОНГРЕССА, том. 122 (1976): 29 сентября, рассмотрен и принят в Палате представителей. 1 октября рассмотрен и принят в Сенате.

ЕЖЕНЕДЕЛЬНЫЙ СБОРНИК ПРЕЗИДЕНТСКИХ ДОКУМЕНТОВ, том. 12, № 43: 22 октября, Заявление Президента.

PL 94–583, 1976 HR 11315

Конец документа                     © 2018 Thomson Reuters. Без претензии на оригинальные материалы правительства США.

# UNITED STATES DISTRICT COURT
for the
Southern District of New York

Democratic National Committee

_____

Plaintiff

v.

The Russian Federation; General Staff of the Armed
Forces of the Russian Federation ("GRU"), et al.

_____

Defendant

)
)
)
)
)
)
)
)

Civil Action No. 1:18-cv-03501

## SUMMONS IN A CIVIL ACTION

To:     General Staff of the Armed Forces of the Russian Federation ("GRU") –
76 Khoroshyovskoe shosse,
Khodinka, Moscow
Russian Federation

A lawsuit has been filed against you.

Within 60 days after service of this summons on you (not counting the day you received it) you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

Joseph M. Sellers
Cohen Milstein Sellers & Toll PLLC
1100 New York Ave., NW, Fifth Floor Washington,
DC 20005
(202) 408-4600

If you fail to respond, judgment by default may be entered against you for the relief demanded in the complaint.  You also must file your answer or motion with the court.

**CLERK OF COURT**

Date:  4/20/2018          /S/ P. NEPTUNE

Signature of Clerk or Deputy Clerk

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

    ❑ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

    ❑ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

    ❑ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

    ❑ I returned the summons unexecuted because _____ ; or

    ❑ Other *(specify):*

                                                      .

My fees are $ _____ for travel and $ _____ for services, for a total of $ _____ .

I declare under penalty of perjury that this information is true.

Date: _____

                                  _____
                                          *Server's signature*

                                  _____
                                      *Printed name and title*

                                  _____
                                      *Server's address*

Additional information regarding attempted service, etc:

Извещение ответчика о предъявленном иске в соответствии с 28 USC 1608 Summons IH 6

4/17

## ОКРУЖНОЙ СУД СОЕДИНЕННЫХ ШТАТОВ
по
Южному округу Нью-Йорка

Национальный комитет демократической партии

|  |  |  |
|---|---|---|
| Истец | ) | |
| против | ) | |
| | ) | Гражданский иск № |
| Российская Федерация; Генеральный штаб Вооруженных | ) | |
| Сил Российской Федерации («ГРУ») и др. | ) | |
| Ответчик | ) | |

### ИЗВЕЩЕНИЕ ОТВЕТЧИКА О ПРЕДЪЯВЛЕННОМ ГРАЖДАНСКОМ ИСКЕ

Кому: Генеральный штаб Вооруженных Сил Российской Федерации («ГРУ»),
Хорошевское шоссе, д. 76,
Ходинка, Москва
Российская Федерация

Против Вас был подан иск.

Вы должны предоставить истцу ответ на прилагаемое исковое заявление или ходатайство согласно правилу 12 Федерального гражданского процессуального кодекса в течение 60 дней после вручения Вам этого извещения (не считая день, в который Вы получили его). Ответ или ходатайство необходимо вручить истцу или адвокату истца, т. е.:

Джозеф М. Селлерс (Joseph M. Sellers)
Cohen Milstein Sellers & Toll PLLC
1100 New York Ave., NW, Fifth Floor Washington,
DC 20005
(202) 408-4600

Если Вы не предоставите ответ, суд вправе заочно удовлетворить исковое требование. Вы также должны направить Ваш ответ или ходатайство в суд.

### СЕКРЕТАРЬ СУДА

Дата: _____

_____
Подпись секретаря или заместителя секретаря

Извещение согласно 28 USC 1608 (12/11) (Стр. 2)

Гражданский иск №

# ДОКАЗАТЕЛЬСТВО ВРУЧЕНИЯ

*(Этот раздел не предоставляется суду, если это не требуется согласно правилу 4 (l) Федерального гражданского процессуального кодекса)*

Настоящее извещение, предоставляемое *(Ф.И.О. и должность лица, если таковые имеются)*
_____, было получено мной *(дата)* _____.

Я лично вручил(-а) данное извещение указанному лицу в *(место)* _____
_____ *(дата)* _____; либо

Я передал(-а) данное извещение по месту регистрации или жительства упомянутого лица в руки *(Ф.И.О.)*
_____ _____ , который(-ая) является дееспособным и

вменяемым лицом и проживает по этому же адресу, *(дата)* _____ , а также отправил

копию извещения по последнему известному адресу; либо

Я вручил извещение в руки *(Ф.И.О. лица)* _____, который(-ая) по

закону имеет право получать процессуальные документы от имени *(наименование организации)*
_____ _____, *(дата)* _____;

либо

Я вернул извещение, потому что _____; либо

Другое *(указать)*:

_____ .

Мое вознаграждение составляет _____ долл. США в качестве расходов на проезд и _____

долл. США за предоставленные услуги, в общей сложности — _____ долл. США.

Я заявляю под страхом наказания за лжесвидетельство, что приведенная выше информация является

достоверной.

Дата: _____

_____
*Подпись лица, вручающего судебные документы*

_____
*Ф.И.О. и должность (разборчиво)*

_____
*Адрес лица, вручающего судебные документы*

Дополнительная информация о попытке вручения и т. д.:

28 USC 1608 Summons IH 6
4/17

# UNITED STATES DISTRICT COURT
for the
Southern District of New York

Democratic National Committee

_____  )
Plaintiff                                 )
                                          )
v.                                        )      Civil Action No. 1:18-cv-03501
The Russian Federation, et al.            )
_____  )
Defendant                                 )

## SUMMONS IN A CIVIL ACTION

To:   (Defendant's name and address)

GRU Operative Using Pseudonym "Guccifer 2.0"
c/o General Staff of the Armed Forces of the Russian Federation ("GRU")
76 Khoroshyovskoe shosse,
Khodinka, Moscow
Russian Federation

A lawsuit has been filed against you.

Within 60 days after service of this summons on you (not counting the day you received it) you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

Joseph M. Sellers
Cohen Milstein Sellers & Toll PLLC
1100 New York Avenue NW
Fifth Floor
Washington, DC 20005
(202) 408-4600

If you fail to respond, judgment by default may be entered against you for the relief demanded in the complaint.  You also must file your answer or motion with the court.

**CLERK OF COURT**

Date:  4/20/2018                                    /s/ J. Gonzalez
_____                    _____
                                                    Signature of Clerk or Deputy Clerk

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

      ❒   I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

      ❒   I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

      ❒   I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

      ❒   I returned the summons unexecuted because _____ ; or

      ❒   Other *(specify):*

                                                                           .

My fees are $ _____ for travel and $ _____ for services, for a total of $ _____ .

I declare under penalty of perjury that this information is true.

Date: _____

                                              _____

                                                          *Server's signature*

                                              _____

                                                     *Printed name and title*

                                              _____

                                                            *Server's address*

Additional information regarding attempted service, etc:

Повестка IH 6 на основании титула 28 Свода законов США, 1608

4/17

## ОКРУЖНОЙ СУД СОЕДИНЕННЫХ ШТАТОВ
### по
### Южному округу г. Нью-Йорк

Национальный комитет демократической партии

| | |
|---|---|
| Истец | ) |
| | ) |
| | ) |
| против | ) |
| Российской Федерации и пр. | ) |
| | ) |
| Ответчик | |

Гражданский иск № 1:18-cv-03501

## ИЗВЕЩЕНИЕ ОТВЕТЧИКА О ПРЕДЪЯВЛЕННОМ ЕМУ ИСКЕ ПО ГРАЖДАНСКОМУ ДЕЛУ

В адрес:   (Имя/наименование и адрес Ответчика)
Оперативного сотрудника ГРУ, известного под псевдонимом «Гуччифер 2.0»
для вручения через Главное управление Генерального штаба Вооруженных Сил Российской
Федерации («ГРУ»)
Хорошевское шоссе, д. 76,
Ходынка, г. Москва
Российская Федерация

Против Вас был подан иск.

Согласно Правилу 12 Федерального гражданского процессуального кодекса США течение 60
дней после вручения Вам настоящей повестки (не считая дня вручения), Вы должны вручить истцу
истец ответ на прилагаемое исковое заявление или ходатайство. Ответ или ходатайство должны быть
вручены истцу или адвокатам истца, наименование и адрес которых:

Джозеф М. Селлерс (Joseph M. Sellers)
Cohen Milstein Sellers & Toll PLLC
1100 New York Avenue NW
Fifth Floor
Washington, DC 20005
(202) 408-4600

Если Вы не ответите, против Вас в порядке заочного судопроизводства может быть вынесено
постановление суда на предмет средства правовой защиты, испрашиваемого в исковом заявлении.
Вы также должны подать ответ или ходатайство в суд.

**СЕКРЕТАРЬ СУДА**

[печать:] ОКРУЖНОЙ СУД СОЕДИНЕННЫХ
ШТАТОВ

Дата: 4/20/2018

ОКРУГУ Г. НЬЮ-ЙОРКА
ПО ЮЖНОМУ

| [подпись] |
|---|

/ расшифровка подписи / Дж. Гонсалес (J.
Gonzalez)

Подпись Секретаря или Заместителя секретаря
суда

Повестка на основании титула 28 Свода законов США, 1608 (12/11) (стр. 2)

Гражданский иск №

## ДОКАЗАТЕЛЬСТВО ВРУЧЕНИЯ

*(Этот раздел не подлежит регистрации в суде, за исключением тех случаев, когда это требуется Федеральными правилами гражданского судопроизводства, часть 4 (l))*

Эта повестка в адрес *(имя лица и титул, при наличии)*

_____ была получен мной *(дата)*

_____ .

Я лично вручил(-а) повестку этому лицу по адресу *(адрес)* _____

_____ *(дата)* _____ ; или

Я оставил(-а) повестку в резиденции или обычном месте проживания лица *(имя)* _____

_____ , лицу соответствующего возраста и дискреционных

полномочий, которое проживает там, *(дата)* _____ , и направил(-а) копию на

последний известный адрес лица; или

Я вручил(-а) повестку *(имя физического лица)* _____ ,

который назначается законом для получения процессуальных уведомлений от имени *(название организации)*

_____ _____ *(дата)*

_____ ; или

Я вернул(-а) повестку, не вручив ее, потому что_____ ;

или

Другое *(укажите конкретно):*

\_\_\_\_\_ .

Мое вознаграждение составляет_____долл. США за проезд и _____ долл. США за вручение на общую сумму _____долл. США.

Я заявляю под страхом наказания за лжесвидетельство, что эта информация соответствует действительности.

Дата: _____

_____

*Подпись лица, вручающего повестку*

_____

*Имя и должность печатными буквами*

_____

*Адрес лица, вручающего повестку*

Дополнительная информация о попытке вручения и т.д.:

**March 2018**

## INDIVIDUAL PRACTICES OF JUDGE JOHN G. KOELTL

Unless otherwise ordered by Judge Koeltl, matters before Judge Koeltl shall be conducted in accordance with the following practices:

**1.      Communications with Chambers**

**A.      Letters.**  Except as otherwise provided below, communications with the Court should be by letter, with copies simultaneously delivered to all counsel.  Unless there is a request to file a letter under seal or a letter contains sensitive or confidential information, **letters should be filed electronically on ECF**.  Courtesy copies are no longer accepted.  Letters to be filed under seal or containing sensitive or confidential information should be delivered to the Court by mail.  Whether filed electronically or not, letters may not exceed 3 pages in length.  Letters solely between parties or their counsel or otherwise not addressed to the Court may not be filed on ECF or otherwise sent to the Court (except as exhibits to an otherwise properly filed document).

**B.      Telephone Calls.**  Except as provided below, telephone calls to Chambers are permitted only in emergency situations requiring immediate attention.  In such situations only, call Chambers at (212) 805-0222 or (212) 805-0107.

**C.      Faxes**.  If necessary, faxes to Chambers are permitted only if copies are also simultaneously faxed or delivered to all counsel. No document longer than 20 pages may be faxed without prior authorization.  **Do not follow with a hardcopy.** The fax number is (212) 805-7912.

**D.      Docketing, Scheduling, and Calendar Matters.**  For docketing, scheduling and calendar matters, call the Court Clerk, Mr. Don Fletcher at (212) 805-0107 between 9:00 A.M. and 5:00 P.M.

**E.      Requests for Adjournments or Extensions of Time**.  All requests for adjournment or extensions of time must be made in writing and filed on ECF as letter-motions. Courtesy copies are no longer accepted.  If a request contains sensitive or confidential information, it may be submitted by fax or mail in lieu of being filed electronically.  The letter-motion must state (1) the original date, (2) the number of previous requests for adjournment or extension, (3) whether these previous requests were granted or denied, and (4) whether the adversary consents, and, if not, the reasons given by the adversary for refusing to consent.  If the requested adjournment or extension affects any other scheduled dates, a proposed Revised Scheduling Order (reflecting only business days) must be attached.  If the request is for an adjournment of a court appearance, absent an emergency, it shall be made at least 48 hours prior to the scheduled appearance.

1

**F.     Letter-Motions.**  Letter-motions may be filed via ECF if they comply with the S.D.N.Y. Local Rules and the S.D.N.Y. Electronic Case Filing Rules and Instructions.  In particular, all requests for adjournments, extensions, and pre-motion conferences (including pre-motion conferences with respect to discovery disputes) should be filed as letter-motions.  Courtesy copies are no longer accepted. Letter-motions, together with any related exhibits, should not exceed 3 pages in length.

**G.     Sentencing Submissions.**  Except for submissions to be filed under seal, every document in a sentencing submission, including letters, must be filed on ECF.  Parties should assure that all sentencing submissions filed on ECF are redacted as necessary, and comply with Rule 49.1 of the Federal Rules of Criminal Procedure.  Letters should be grouped and filed together with attachments to a single document marked SENTENCING MEMORANDUM with the caption and docket number clearly indicated.  The defendant is responsible for filing all letters submitted on behalf of the defendant, including those from friends and relatives.  The Government is responsible for filing all letters from victims. Courtesy copies of all sentencing submissions should be provided to the Court promptly after they are field.

**H.     Urgent Communications.**  As a general matter, materials filed via ECF are reviewed by the Court the business day after they have been filed.  If your submission requires immediate attention, please notify Chambers by telephone or fax after you file via ECF.

**2.     Motions**

**A.     Initial Pretrial Conferences.** The parties are expected to confer with each other pursuant to Rule 26(f) of the Federal Rules of Civil Procedure before the initial conference with the Court.  The parties are expected to provide a Rule 26(f) report to the Court before the initial conference.

**B.     Pre-Motion Conferences in Civil Cases.**  For discovery motions, follow Local Civil Rule 37.2.  For motions other than discovery motions, a pre-motion conference with the court is required only before making a motion to dismiss, motion to amend or a motion for summary judgment.

**C.     Courtesy Copies.**  The moving party should furnish to Chambers **one** courtesy copy of all the motion papers (including papers in opposition to the motion) after the motion has been fully briefed. Each submission related to the motion should be filed on the docket promptly after service, **but the full set of courtesy copies should be furnished to chambers only once the motion is fully briefed.** Courtesy copies of pleadings, marked as such, shall be submitted to Chambers as soon as practicable after filing. For documents that are too lengthy to be stapled, the Court has a preference for binding on the side.  Velo binding is discouraged.  Parties are encouraged to print declarations with lengthy exhibits double sided, but memoranda of law should be single sided.

**D.    Memoranda of Law in Civil Cases.**  Unless prior permission has been granted, memoranda of law in support of and in opposition to motions are limited to 7,000 words or fewer, and reply memoranda are limited to 2,800 words or fewer. All memoranda shall contain a certificate signed by counsel stating the number of words in the brief and certifying that the brief complies with these formatting rules. All memoranda shall contain a table of contents and a table of authorities. The cover page, certification of compliance, table of contents, and table of authorities shall not be included in any word count. All memoranda should be double spaced, in legible font, and with reasonable margins. All footnotes must be double spaced and in legible font. Parties should not omit statements of facts from memoranda submitted in connection with summary judgment motions; Local Rule 56.1 statements and supporting affidavits are not substitutes for statements of facts and should not be incorporated by reference.

**E.    Memoranda of Law in Criminal Cases.** There is no limitation with regard to pages or words for memoranda of law in criminal cases.

**F.    Filing of Motion Papers.**  Motion papers shall be filed and served on ECF for all ECF cases.  In non-ECF cases, such as Social Security cases and cases in which there is a Pro Se litigant, motion papers shall be filed in the Clerk's Office promptly after service.

**G.    Oral Argument on Motions.**  Parties may request oral argument by letter at the time their moving or opposing or reply papers are filed.  The Court will determine whether argument will be heard and, if so, will advise counsel of the argument date.

**H.    Motion Schedule.**  Unless otherwise stipulated by the Court, the schedule for responses and replies to civil motions shall be that established by Local Civil Rule 6.1.

**3.    Notice of Court Orders and Judgments**

The Court will provide notice of entry of any order or judgment through the Electronic Filing System for all ECF cases.  The Court will no longer send facsimile copies of orders or judgments, except in cases which are not ECF cases and in extraordinary circumstances.  <u>See</u> Paragraph 10 of the Southern District Procedures for Electronic Case Filing.  <u>It remains the duty of the attorney for a party to review regularly the docket sheet of the case</u>.

**4.    Pretrial Procedures**

**A.    Joint Pretrial Orders**

In accordance with the Scheduling Order adopted by the Court, in all civil cases, the parties shall submit to the Court for its approval a joint pretrial order, which shall include the following:

iv.    The full caption of the action.

iv.     The names, addresses (including firm names), and telephone and fax numbers of trial counsel.

v.     A brief statement by the plaintiff as to the basis of subject matter jurisdiction and a brief statement by each other party as to the presence or absence of subject matter jurisdiction. Such statements shall include citations to all statutes relied on and relevant facts as to citizenship and jurisdictional amount.

vi.     A brief summary by each party of the claims and defenses that party has asserted which remain to be tried, without recital of evidentiary matters but including citations to all statutes relied on. Such summaries shall identify all claims and defenses previously asserted which are not to be tried.

vii.     A statement by each party as to whether the case is to be tried with or without a jury, and the number of trial days needed.

viii.     A statement as to whether or not all parties have consented to trial of the case by a magistrate judge (without identifying which parties have or have not so consented).

ix.     Any stipulations or agreed statements of fact or law which have been agreed to by all parties.

x.     A statement by each party as to the witnesses whose testimony is to be offered in its case in chief, indicating whether such witnesses will testify in person or by deposition.

xi.     A designation by each party of deposition testimony to be offered in its case in chief, with any cross-designations and objections by any other party.

xii.     A list by each party of exhibits to be offered in its case in chief, with one star indicating exhibits to which no party objects on grounds of authenticity, and two stars indicating exhibits to which no party objects on any ground.

## B.     FLSA Actions

Parties in FLSA actions that are not collective actions should abide by the attached Initial Discovery Protocols.

### C.     Filings Prior to Trial in Civil Cases

In accordance with the Scheduling Order adopted by the Court, in all civil cases, each party shall submit prior to the date scheduled for trial:

      ii.     in jury cases, requests to charge and proposed voir dire questions.  When feasible, proposed jury charges should also be submitted on a  CD-ROM in Word or WordPerfect format;

      iii.     in non-jury cases, proposed findings of fact and conclusions of law;

      iv.     in all cases, motions addressing any evidentiary or other issues which should be resolved in limine; and

      v.     in any case where a party believes it would be useful, a pretrial memorandum.

## 5.  Criminal Procedures

### A.     Presentence Referral/Investigation

1.     Defense counsel shall promptly schedule with the Probation Department a Pre‑Sentence interview of the defendant to occur within fourteen (14) days after the date of the defendant's guilty plea or verdict.

2.     The Assistant United States Attorney shall submit the prosecution case summary to the Probation Department within fourteen (14) days after the date of the defendant's guilty plea or verdict.

3.     Within twenty-eight (28) days of the plea or verdict, the Probation Department will complete its Pre-Sentence interview of the defendant or notify the judge why it was unable to do so.

4.     Fifty-five (55) days after the plea or verdict, the Probation Department will make its initial disclosure of the Pre-Sentence Investigation Report to the parties.

5.     Within fourteen (14) days of the initial disclosure, the parties must provide the Probation Department with any objections to the Pre-Sentence Investigation Report.

6.     Twenty-eight (28) days after its initial disclosure, the Probation Department will make its final disclosure of the Pre-Sentence Investigation Report to the parties; and,

7.     The time-table for preparation and completion of Pre-Sentence Investigation Reports is summarized as follows:

| Action | Date Completed |
|---|:---:|
| Guilty Plea or Verdict and Electronic Notification to Probation | Day 1 |
| Pre-Sentence Investigation Interview Scheduled and Prosecution Case Summary Submitted | Day 14 |
| Pre-Sentence-Investigation Interview Completed | Day 28 |
| Initial Disclosure of the Pre-Sentence Investigation Report | Day 55 |
| Objections by the Parties | Day 69 |
| Final Disclosure of the Pre-Sentence Investigation Report | Day 83 |

### B. Timetable for Sentencing Submissions to the Court

      1.     Defense submissions to the Court in connection with sentencing should be submitted 14 days prior to the sentencing date.

      2.     The Government submissions to the Court in connection with sentencing should be submitted 8 days prior to the sentencing date.

      3.     The defense and Government submissions should be filed on ECF after redacting any personal identifying information and any other information that may properly be redacted.  The parties should provide the Court courtesy copies of all sentencing submissions. The Court will file copies of the parties' submission in the record under seal along with the Pre-Sentence Report after sentencing.

6

**INITIAL DISCOVERY PROTOCOLS
FOR FAIR LABOR STANDARDS ACT
CASES NOT PLEADED AS COLLECTIVE ACTIONS**

**January 2018**

The Federal Judicial Center is making this document available at the request of the Advisory Committee on Civil Rules, in furtherance of the Center's statutory mission to conduct and stimulate research and development for the improvement of judicial administration. While the Center regards the contents as responsible and valuable, this document does not reflect policy or recommendations of the Board of the Federal Judicial Center.

## <u>TABLE OF CONTENTS</u>

Page

Introduction ................................................................................................................. 1

FLSA Protocols Committee Roster ............................................................................. 3

Initial Discovery Protocols for Fair Labor Standards Act Cases .......................................... 4

Standing Order for Certain Fair Labor Standards Act Cases ............................................. 10

Interim Protective Order .............................................................................................. 12

## INTRODUCTION

The Initial Discovery Protocols for Fair Labor Standards Act Cases Not Pleaded as Collective Actions (Initial Discovery Protocols) provide a new pretrial procedure for certain types of Fair Labor Standards Act (FLSA) cases. As described in the Initial Discovery Protocols, their intent is to "encourage the parties and their counsel to exchange information and documents early in the case, help frame the issues to be resolved, and plan for more efficient and targeted discovery." The Initial Discovery Protocols are designed to be implemented on an individual basis by judges throughout the United States District Courts.

The Initial Discovery Protocols are the second set of case-specific discovery protocols to be developed and implemented in the federal courts. The first set of protocols, the Initial Discovery Protocols for Employment Cases Alleging Adverse Action (Employment Protocols), were published as a pilot project by the FJC in November 2011.[1] The Employment Protocols were developed by a nationwide committee of attorneys with expertise in employment matters, and the project was facilitated by IAALS, the Institute for the Advancement of the American Legal System at the University of Denver. The Employment Protocols project grew out of the 2010 Conference on Civil Litigation at Duke University, sponsored by the Judicial Conference Advisory Committee on Civil Rules. During the conference, a wide range of attendees expressed support for the idea of case-type-specific "pattern discovery" as a possible solution to the problems of unnecessary cost and delay in the litigation process.

The Employment Protocols have been adopted by over 50 judges and on a district-wide basis in multiple jurisdictions around the country, including the District of Connecticut and the District of Oregon. The FJC issued a formal report on the pilot project in October 2015.[2] The report includes several key findings, including that there was less motions activity in pilot cases than in comparison cases. The average number of discovery motions filed was about half the average number in comparison cases, and both motions to dismiss and motions for summary judgment were less likely to be filed. In addition, the study found that it appears the pilot cases were more likely to settle.[3] The FJC issued a follow up Memorandum in 2016 noting the results of the FJC's ongoing research on the Employment Protocols pilot.[4]

Inspired by the results of the Initial Discovery Protocols for Employment Cases Alleging Adverse Action, and at the encouragement of Judge Lee Rosenthal, Chief Judge of the United States District Court of the Southern District of Texas, to consider pattern discovery for FLSA cases, IAALS formed a Committee with the goal of replicating the successes of the Employment

---

[1] FED. JUDICIAL CTR., PILOT PROJECT REGARDING INITIAL DISCOVERY PROTOCOLS FOR EMPLOYMENT CASES ALLEGING ADVERSE ACTION (2011).
[2] EMERY G. LEE, III AND JASON A. CANTONE, FED. JUDICIAL CTR., REPORT ON PILOT PROJECT REGARDING INITIAL DISCOVERY PROTOCOLS FOR EMPLOYMENT CASES ALLEGING ADVERSE ACTION (2015).
[3] *Id.* at 1.
[4] Memorandum from Emery G. Lee, III and Jason A. Cantone to the Judicial Conference Advisory Committee on Civil Rules (Oct. 26, 2016).

Protocols for another case type that is both prevalent in our federal district courts and lends itself well to pattern initial discovery.

As with the Employment Protocols, the committee was composed of a balanced group of highly experienced attorneys from across the country who regularly represent plaintiffs or defendants in FLSA matters. The Committee was co-chaired by Joseph Garrison and Chris Kitchel, who also co-chaired the Committee that developed the Employment Protocols, and IAALS supported and facilitated the effort throughout. Judge Lee Rosenthal and Judge John Koeltl, District Judge of the United States District Court of the Southern District of New York, played an instrumental role in this effort, each facilitating a meeting and providing important guidance and support.

The Committee worked diligently over the course of the project, meeting three times in person and holding numerous conference calls of the Plaintiff and Defense Sub-Committees. As with the Employment Protocols, the Committee's final product is the result of rigorous debate and compromise on both sides, inspired by the ultimate goal of improving the pretrial process in FLSA cases nationwide.

The Initial Discovery Protocols create a new category of information exchange, replacing initial disclosures with initial discovery specific to FLSA cases. This discovery is provided automatically by both sides within 30 days of the defendant's responsive pleading or motion. While the parties' subsequent right to discovery under the Federal Rules of Civil Procedure is not affected, the amount and type of information initially exchanged ought to focus the disputed issues, streamline the discovery process, and minimize opportunities for gamesmanship. The Initial Discovery Protocols are accompanied by a Standing Order for their implementation by individual judges, as well as an Interim Protective Order that the attorneys and the judge can use as a template for discussion.

The FJC's 2016 report noted that judges have applied the Employment Protocols "more widely than one would expect given the parameters in the pilot materials, such as in actions brought under the Fair Labor Standards Act or the Family Medical Leave Act."[5] It is the goal of these Initial Discovery Protocols to meet the needs of judges and litigants around the country seeking to implement pattern discovery in FLSA cases and to make the process in FLSA cases more efficient, more streamlined, and less costly.

---

[5] *Id.* at 1.

## **FAIR LABOR STANDARDS ACT PROTOCOLS COMMITTEE ROSTER**

William F. Allen
*Littler Mendelson*
*Washington, D.C.*

David Borgen
*Goldstein, Borgen, Dardarian & Ho*
*Oakland, CA*

Reena I. Desai
*Nichols Kaster*
*Minneapolis, MN*

Joseph D. Garrison
*Garrison, Levin-Epstein, Fitzgerald & Pirrotti, P.C.*
*New Haven, CT*

Chris Kitchel
*Stoel Rives*
*Portland, OR*

Michael D. Mandel
*McGuireWoods*
*Los Angeles, CA*

Dennis M. McClelland
*Phelps Dunbar LLP*
*Tampa, FL*

Camille Olson
*Seyfarth Shaw LLP*
*Chicago, IL*

Justin M. Swartz
*Outten & Golden LLP*
*New York, NY*

Douglas M. Werman
*Werman Salas PC*
*Chicago, IL*

**INITIAL DISCOVERY PROTOCOLS FOR FAIR LABOR STANDARDS ACT**

**CASES NOT PLEADED AS COLLECTIVE ACTIONS**

## PART 1: INTRODUCTION AND DEFINITIONS.

(1) Statement of purpose.

    a. These Initial Discovery Protocols apply to FLSA cases not pleaded as collective actions. The Protocols are designed to be implemented by trial judges throughout the United States District Courts. The Protocols encourage the parties and their counsel to exchange information and documents early in the case, help frame the issues to be resolved, and plan for more efficient and targeted discovery.

    b. Participating courts may implement the Initial Discovery Protocols by local rule or by standing, general, or individual case orders. The Protocols apply to cases alleging minimum wage and overtime violations under the FLSA (the "FLSA Claims"). If any party believes that there is good cause why a case should be exempted, in whole or in part, from the Protocols, that party may raise such reason with the Court.

    c. The Initial Discovery Protocols are not intended to preclude or modify the rights of any party for discovery as provided by the Federal Rules of Civil Procedure and other applicable local rules, but they are intended to supersede the parties' obligations to make initial disclosures under FRCP 26(a)(1) for the FLSA Claims.

    d. The Initial Discovery Protocols were prepared by a balanced group of highly experienced attorneys from across the country who regularly represent plaintiffs or defendants in FLSA matters. The Protocols require the exchange of information and documents routinely requested in FLSA cases. They are unlike initial disclosures under FRCP 26(a)(1) because they focus on the type of information most likely to be useful in narrowing the issues for FLSA cases.

(2) Definitions. The following definitions apply to cases proceeding under the Initial Discovery Protocols.

    a. *Concerning*. The term "concerning" means referring to, describing, evidencing, or constituting.

    b. *Document*. The terms "document" and "documents" are defined to be synonymous in meaning and equal in scope to the terms "documents" and "electronically stored information" as used in F.R.C.P. 34(a).

4

c. ***Identify (Documents)***. When referring to documents, to "identify" means to give, to the extent known: (i) the type of document; (ii) the general subject matter of the document; (iii) the date of the document; (iv) the author(s), according to the document; and (v) the person(s) to whom, according to the document, the document(or a copy) was to have been sent; or, alternatively, to produce the document.

d. ***Identify (Persons)***. When referring to natural persons, to "identify" means to give the person's: (i) full name; (ii) present or last known address and telephone number; (iii) present or last known place of employment; (iv) present or last known job title; and (v) relationship, if any, to the plaintiff or defendant. Once a person has been identified in accordance with this subparagraph, only the name of that person need be listed in response to subsequent discovery requesting the identification of that person.

e. ***Defendant***. Any person or entity alleged to be an employer or joint employer of the plaintiff(s) in the operative Complaint, unless otherwise specified.

f. ***Plaintiff***. Any named individual(s) alleging FLSA Claim(s) in the operative Complaint.

(3) Instructions.

a. For this Initial Discovery, the relevant time period begins two years before the date the initial Complaint was filed, or, if willfulness is alleged, three years. If the Plaintiff alleges a shorter relevant time period, then that is the time period for Initial Discovery.

b. For this Initial Discovery, the relevant time period continues through the last date for which the Plaintiff seeks recovery or relief.

c. This Initial Discovery is not subject to objections except for the reasons under FRCP 26(b)(2)(B) or on the grounds of privilege or work product. Documents withheld based on a claim of privilege or work product are subject to the provisions of FRCP 26(b)(5).

d. If a partial or incomplete answer or production is provided, the responding party must state the reason that the answer or production is partial or incomplete.

e. This Initial Discovery is subject to FRCP 26(e) on supplementation and FRCP 26(g) on certification of responses.

f. This Initial Discovery is subject to FRCP 34(b)(2)(E) on form of production.

5

g. This Initial Discovery will be subject to the attached Interim Protective Order unless the parties agree or the court orders otherwise. The Interim Protective Order will remain in place only until the parties agree to or the court orders a different protective order. Absent agreement by the parties, the Interim Protective Order will not apply to subsequent discovery.

h. Prior to the production of documents by either Party to the other pursuant to the Initial Discovery Protocols, the Parties will meet and confer regarding the format (e.g. TIFF/text, searchable .pdf, Excel) for such production. This will not delay the timeframes for Initial Discovery absent ruling by the court.

## PART 2: PRODUCTION BY THE PLAINTIFF.

(1) Timing.

The Plaintiff's Initial Discovery must be provided within 30 days after the Defendant has submitted a responsive pleading or motion, unless the court rules otherwise.

(2) Documents that the Plaintiff must produce to the Defendant.

a. Documents created or maintained by the Plaintiff recording time worked.

b. Documents created or maintained by the Plaintiff recording wages or other compensation paid or unpaid by the Defendant.[1]

c. If the Plaintiff reported or complained internally to the Defendant (including but not limited to supervisors or administrative departments, such as human resources, payroll, timekeeping or benefits) about the FLSA Claim(s), the report(s) or complaint(s) and any response that the Defendant provided to the Plaintiff.

d. Any offer letters, employment agreements, or compensation agreements for the Plaintiff.

e. Any sworn statements from individuals with information relevant to the FLSA Claim(s).

f. Documents that the Plaintiff relies on to support a claim of willful violation.

---

[1] This Initial Disclosure does not include personal tax returns or tax informational documents.

    g.   All other documents that the Plaintiff relies on to support the Plaintiff's FLSA Claim(s).

(3) Information that the Plaintiff must produce to the Defendant.

    a.   Identify persons the Plaintiff believes to have knowledge of the facts concerning the FLSA Claim(s) or defenses, and a brief description of that knowledge.

    b.   Identify the start and end dates for the FLSA Claim(s);

    c.   The Plaintiff's title or position and a brief description of the Plaintiff's job duties for the relevant time period.

    d.   Describe the basis for the FLSA Claim(s).

    e.   A computation of each category of damages claimed by the Plaintiff, including a) applicable dates, b) amounts of claimed unpaid wages, and c) the method used for computation (including applicable rates and hours).

    f.   The names of the Plaintiff's supervisors during the relevant time period.

    g.   If the Plaintiff reported or complained about the FLSA Claim(s) to any government agency, the identity of each such agency, the date(s) or such reports or complaints, and the outcome or status of each report or complaint.

    h.   If the Plaintiff reported or complained to the Defendant (including but not limited to supervisors or administrative departments such as human resources, payroll, timekeeping or benefits) about the any FLSA Claim(s), state whether the report or complaint was written or oral, when the report or complaint(s) was made, to whom any report or complaint(s) were made, and any response provided by the Defendant.

## PART 3: PRODUCTION BY THE DEFENDANT.

(1) Timing.

The Defendant's Initial Discovery must be provided within 30 days after the Defendant has submitted a responsive pleading or motion, unless the court rules otherwise.

(2) Documents that the Defendant must produce to the Plaintiff.

    a.   Time and pay records created or maintained by the Defendant for the Plaintiff.

b. If the Plaintiff reported or complained internally to the Defendant (including but not limited to supervisors or administrative departments, such as human resources, payroll, timekeeping or benefits) about the FLSA Claim(s), the report(s) or complaint(s) and any response that the Defendant provided to the Plaintiff.

c. Any sworn statements from individuals with information relevant to the FLSA Claim(s).

d. Documents that the Defendant relies on to support a claim that any alleged violation was in good faith.

e. Any offer letters, employment agreements, or compensation agreements for the Plaintiff.

f. Collective bargaining agreement(s) applicable to the Plaintiff.

g. The job description for the position(s) the Plaintiff held during the relevant time period(s), if the job duties are at issue in the FLSA Claim(s).

h. The Defendant's policies, procedures, or guidelines for compensation that are relevant to the FLSA Claim(s).

i. The cover page, table of contents, and index of any employee handbook, code of conduct, or employment policies and procedures manual pertaining to compensation or time worked.

j. Any other documents the Defendant relies on to support the defenses, affirmative defenses, and counterclaims to the FLSA Claim(s).

k. Any insurance agreement under which an insurance business may be liable to satisfy all or part of a possible judgment in the action or to indemnify or reimburse for payments made to satisfy the judgment.

(3) Information that the Defendant must produce to the Plaintiff.

a. Provide the following information related to the Plaintiff :
   1. Start and end dates for work performed;
   2. Work location(s);
   3. Job title(s);
   4. Employee or contractor identification number;

8

5.   In cases alleging the misclassification of the Plaintiff, the classification status of the Plaintiff (i.e., exempt or non-exempt);

6.   Immediate supervisor(s) and/or manager(s).

b.   If the Defendant does not have a job description for the Plaintiff, a brief description of the Plaintiff's job duties for the relevant time period(s), if the job duties are at issue in the FLSA Claim(s).

c.   Identify persons the Defendant believes to have knowledge of the facts concerning the FLSA Claim(s) or defenses, and a brief description of that knowledge.

d.   If the Plaintiff reported or complained to the Defendant about the FLSA Claim(s), whether the report(s) or complaint(s) were written or oral, when the report(s) or complaint(s) were made, to whom any report(s) or complaint(s) were made, and any response(s) provided by the Defendant.

**UNITED STATES DISTRICT COURT**
**FOR THE _____ DISTRICT OF _____**
**_____ DIVISION**

| | | |
|---|---|---|
| _____, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. _____ |
| | ) | |
| _____, | ) | Judge _____ |
| | ) | |
| Defendant. | ) | |

**STANDING ORDER FOR FAIR LABOR STANDARDS ACT CASES**
**NOT PLEADED AS COLLECTIVE ACTIONS**

This Court is implementing the **INITIAL DISCOVERY PROTOCOLS FOR FLSA CASES NOT PLEADED AS COLLECTIVE ACTIONS**, as supported by the Advisory Committee on Civil Rules. The Initial Discovery Protocols apply to FLSA cases not pleaded as collective actions.

Parties and counsel shall comply with the Initial Discovery Protocols, attached to this Order.  If any party believes that there is good cause why a particular case should be exempted from the Initial Discovery Protocols, in whole or in part, that party may raise the issue with the Court.

Within 30 days following the defendant's submission of a responsive pleading or motion, the parties shall provide to one another the documents and information described in the Initial Discovery Protocols for the relevant time period.  This obligation supersedes the parties' obligations to provide initial disclosures under FRCP 26(a)(1) for the FLSA Claims.  The parties

10

shall use the documents and information exchanged in accordance with the Initial Discovery Protocols to prepare the FRCP 26(f) discovery plan.

The parties' responses to the Initial Discovery Protocols shall comply with the FRCP obligations to certify and supplement discovery responses, as well as the form of production standards for documents and electronically stored information.  As set forth in the Protocols, this Initial Discovery is not subject to objections, except upon the grounds set forth in FRCP 26(b)(2)(B) or on the grounds of privilege or work product.  Documents withheld based on a claim of privilege or work product are subject to the provisions of FRCP 26(b)(5).

ENTER:

Dated:_____

_____

[Name]

United States [District/Magistrate] Judge

11

The Initial Discovery Protocols for FLSA Cases Not Pleaded as Collective Actions are designed to achieve the goal of more efficient and targeted discovery.  Immediate entry of a protective order will allow the parties to commence discovery without delay.  In furtherance of that goal, the FLSA Protocols Committee offers the following Interim Protective Order.  The Interim Protective Order will remain in place only until the parties agree to or the court orders a different protective order. Absent agreement by the parties, the Interim Protective Order will not apply to subsequent discovery. Recognizing that the decision to enter a protective order, as well as the parameters of any such order, rests within the Court's sound discretion and is subject to local practice, the following provisions are options from which the Court might select.

## <u>INTERIM PROTECTIVE ORDER</u>

It is hereby ordered by the Court that the following restrictions and procedures shall apply to certain information, documents and excerpts from documents supplied by the parties to each other in response to discovery requests:

1. ☐  Counsel for any party may designate any document, information contained in a document, information revealed in an interrogatory response or information revealed during a deposition as confidential if counsel determines, in good faith, that such designation is necessary to protect the interests of the client.  Information and documents designated by a party as confidential will be stamped "CONFIDENTIAL." "Confidential" information or documents may be referred to collectively as "confidential information."

2. ☐  Unless ordered by the Court, or otherwise provided for herein, the Confidential Information disclosed will be held and used by the person receiving such information solely for use in connection with the above-captioned action.

3. ☐  In the event a party challenges another party's confidential designation, counsel shall make a good faith effort to resolve the dispute, and in the absence of a resolution, the challenging party may thereafter seek resolution by the Court. Nothing in this Protective Order constitutes an admission by any party that Confidential Information disclosed in this case is relevant or admissible.  Each party specifically reserves the right to object to the use or admissibility of all Confidential Information disclosed, in accordance with applicable law and Court rules.

4. ☐  Information or documents designated as "confidential" shall not be disclosed to any person, except:

   a. ☐  The requesting party and counsel, including in-house counsel;

   b. ☐  Employees of such counsel assigned to and necessary to assist in the litigation;

    c.  ☐  Consultants or experts assisting in the prosecution or defense of the matter, to the extent deemed necessary by counsel;

    d.  ☐  Any person from whom testimony is taken or is to be taken in these actions, except that such a person may only be shown that Confidential Information during and in preparation for his/her testimony and may not retain the Confidential Information; and

    e.  ☐  The Court (including any clerk, stenographer, or other person having access to any Confidential Information by virtue of his or her position with the Court) or the jury at trial or as exhibits to motions.

5.  ☐  Prior to disclosing or displaying the Confidential Information to any person, counsel shall:

    a.  ☐  inform the person of the confidential nature of the information and documents; and

    b.  ☐  inform the person that this Court has enjoined the use of the information or documents by him/her for any purpose other than this litigation and has enjoined the disclosure of that information or documents to any other person.

6.  ☐  The Confidential Information may be displayed to and discussed with the persons identified in Paragraphs 4(c) and (d) only on the condition that prior to any such display or discussion, each such person shall be asked to sign an agreement to be bound by this Order in the form attached hereto as Exhibit A.  In the event such person refuses to sign an agreement in the form attached as Exhibit A, the party desiring to disclose the Confidential Information may seek appropriate relief from the Court.

7.  ☐  The disclosure of a document or information without designating it as "confidential" shall not constitute a waiver of the right to designate such document or information as Confidential Information provided that the material is designated pursuant to the procedures set forth herein no later than that latter of fourteen (14) days after the close of discovery or fourteen (14) days after the document or information's production.  If so designated, the document or information shall thenceforth be treated as Confidential Information subject to all the terms of this Stipulation and Order.

8.  ☐  All information subject to confidential treatment in accordance with the terms of this Stipulation and Order that is filed with the Court, and any pleadings, motions or other papers filed with the Court disclosing any Confidential Information, shall be filed under seal to the extent permitted by law (including without limitation any

applicable rules of court) and kept under seal until further order of the Court.  To the extent the Court requires any further act by the parties as a precondition to the filing of documents under seal (beyond the submission of this Stipulation and Order Regarding Confidential Information), it shall be the obligation of the producing party of the documents to be filed with the Court to satisfy any such precondition.  Where possible, only confidential portions of filings with the Court shall be filed under seal.

9.   ☐   At the conclusion of litigation, the Confidential Information and any copies thereof shall be promptly (and in no event later than thirty (30) days after entry of final judgment no longer subject to further appeal) returned to the producing party or certified as destroyed, except that the parties' counsel shall be permitted to retain their working files on the condition that those files will remain confidential.

The foregoing is entirely without prejudice to the right of any party to apply to the Court for any further Protective Order relating to confidential information; or to object to the production of documents or information; or to apply to the Court for an order compelling production of documents or information; or for modification of this Order.  This Order may be enforced by either party and any violation may result in the imposition of sanctions by the Court.

**EXHIBIT A**

      I have been informed by counsel that certain documents or information to be disclosed to me in connection with the matter entitled _____ have been designated as confidential.  I have been informed that any such documents or information labeled "CONFIDENTIAL – PRODUCED PURSUANT TO PROTECTIVE ORDER" are confidential by Order of the Court.

      I hereby agree that I will not disclose any information contained in such documents to any other person. I further agree not to use any such information for any purpose other than this litigation.

_____   DATED:

Signed in the presence of:

_____

(Attorney)

15

**Март 2018**

## ИНДИВИДУАЛЬНЫЕ ПРИНЦИПЫ СУДЬИ ДЖОНА Г. КОУЛТЛА

Если судьей Коултлом не было принято иное, дела будут рассматриваться судьей Коултлом в соответствии со следующими принципами:

### 1. Коммуникации с кабинетом судьи

**A.    Письма.** Если ниже не указано иное, коммуникация с Судом осуществляется в письменном виде. Копии всех писем одновременно доставляются всем адвокатам. Если вы был направлен запрос о направлении письма, скрепленного печатью, и если письмо не содержит конфиденциальную информацию, то **письма должны направляться в электронном виде через систему электронной передачи документов (ECF)**. Копии более не принимаются. Письма, скрепленные печатью, и письма, содержащие конфиденциальную информацию, доставляются в Суд по почте. Вне зависимости от способы доставки письма его длина не должна превышать 3 страниц. Письма, которыми обмениваются исключительно стороны между собой либо стороны обмениваются со своими адвокатами или другими лицами, и не адресуемые Суду, запрещено подавать в электронном виде через систему электронной передачи документов (ECF) либо иным способом направлять в Суд, за исключением случаев, когда такие письма являются приложением к надлежащим образом направляемому документу.

**B.    Телефонные звонки.** За исключением случаев, описанных ниже, телефонные звонки в кабинет судьи допускаются только в экстренных ситуациях, требующих немедленного внимания. Только в таких ситуациях в кабинет судьи можно позвонить по телефону (212) 805-0222 или (212) 805-0107.

**C.    Факсимильная связь.** Отправка документов по факсимильной связи в кабинет судьи допускается при необходимости только при условии, что копии документов одновременно отправляются по факсимильной связи или доставляются всем адвокатам. Отправка по факсимильной связи документов свыше 20 страниц допускается только по предварительному разрешению. **Не следует направлять физическую копию документа, отправленного по факсимильной связи.** Номер факса: (212) 805-7912.

**D.    Подготовка досье производства по делу, график и регистрация в календаре.** По вопросам, связанным с подготовкой досье производства по делу, графиком и регистрацией в календаре, обращайтесь к секретарю г-ну Дону Флетчеру (Mr. Don Fletcher) по телефону (212) 805-0107 с 09:00 до 17:00.

**E.    Запросы перерыва в судебном слушании и продления сроков.** Все запросы перерывов в судебном слушании и продления сроков должны быть оформлены в письменном виде и направлены через систему электронной передачи документов (ECF) в форме письма-ходатайства. Копии более не принимаются. Если в запросе содержится конфиденциальная информация, его можно отправить по факсимильной связи или почте (вместо электронной передачи). Письмо-ходатайство должно содержать: (1) дату, (2) количество предыдущих запросов перерыва в судебном слушании или продления сроков, (3) были ли предыдущие запросы одобрены или отклонены, (4) одобрен ли запрос противником, и если нет, то указанные им причины. Если запрошенный перерыв в судебном слушании или продление сроков влияет на даты других мероприятий, необходимо также приложить исправленное постановление в отношении графика (с указанием только рабочих дней). В случае направления запроса на перенос явки в суд при отсутствии чрезвычайных обстоятельств, такой запрос должен быть направлен не позднее 48 часов до запланированной явки.

**F.    Письма-ходатайства.** Письма-ходатайства могут направляться через систему электронной передачи документов (ECF), если они соответствуют локальным правилам Южного судебного округа Нью-Йорка и правилам и инструкциям электронной подачи документов Южного судебного округа Нью-Йорка. В частности, все запросы перерывов в судебном слушании, продления сроков и совещаний перед подачей ходатайств (включая консультации перед подачей ходатайств в отношении споров, связанных с раскрытием доказательств) должны подаваться в форме писем-ходатайств. Копии более не принимаются. Длина писем-ходатайств, а также всех сопутствующих им приложения, не может превышать 3 страниц.

**G.    Предоставление документации для вынесения судебного решения.** За исключением документации, скрепляемой печатью, каждый документ для вынесения судебного решения, включая письма, должен быть подан через систему электронной передачи документов (ECF). Сторонам необходимо убедиться в том, что вся документация для вынесения судебного решения, поданная через систему электронной передачи документов (ECF), включает все необходимые корректировки и соответствует статье 49.1 Уголовно-процессуального кодекса США. Письма группируются и направляются вместе с приложениями к единому документу под названием SENTENCING MEMORANDUM (Меморандом о вынесении судебного решения). Кроме того, письма должны содержать четко указанные заголовок и номер согласно досье производства по делу. Ответчик несет ответственность за подачу всех писем от имени ответчика, включая письма от друзей и родственников. Обвинение несет ответственность за подачу всех писем от пострадавших. Суду должны быть незамедлительно предоставлены копии документации для вынесения судебного решения после ее подачи.

**H.    Срочные коммуникации.** Обычно материалы, направленные через систему электронной передачи документов (ECF), рассматриваются Судом на следующий рабочий день. Если ваши материалы необходимо рассмотреть в срочном порядке, сообщите об этом в кабинет судьи по телефону или факсимильной связи после их подачи через систему электронной передачи документов (ECF).

**2.    Ходатайства**

**A.    Первоначальные досудебные совещания.** В соответствии со статьей 26(f) Федерального гражданского процессуального кодекса США, стороны должны провести совещание между собой, прежде чем проводить первоначальное досудебное совещание с Судом. Перед первоначальным сообщением стороны должны предоставить Суду отчет согласно статье 26(f).

**B.    Совещания перед подачей ходатайств в гражданско-правовых спорах.** В случае с ходатайствами в связи с раскрытием доказательств следуйте согласно статье 37.2 Местного гражданского процессуального кодекса. В случае со всеми остальными ходатайствами совещание с судом требуется только перед подачей ходатайства о прекращении дела, ходатайства о внесении поправок в дело или ходатайства об ускоренном судопроизводстве.

**C.    Копии.** Стороне, заявившей ходатайство, необходимо предоставить кабинету судь **одну** копию всей документации по ходатайству (включая документы против ходатайства) после краткого изложения ходатайства. Каждый пакет документов, относящийся к ходатайству, должен быть предоставлен в производство в кратчайшие сроки после вручения, **однако полный комплект копий должен быть предоставлен в кабинет судьи только после завершения краткого изложения ходатайства.** Копии заявлений оснований иска или защиты против иска, помеченные надлежащим образом, предоставляются в кабинет судьи при первой возможности после подачи. В случае если документ невозможно скрепить скобками, предпочтителен переплет сбоку. Не рекомендуется использовать переплет гребенкой. Сторонам рекомендуется распечатывать заявления с длинными приложениями с использованием двусторонней печати. Для юридической справки рекомендуется использовать одностороннюю печать.

**D.      Юридические справки в гражданско-правовых спорах.** Если заранее не было предоставлено соответствующего разрешения, объем юридической справки в поддержку или против ходатайства не должен превышать 7000 слов, а объем ответной справки не должен превышать 2800 слов. Юридическая справка должна содержать удостоверительную надпись, подписанную адвокатом, с указанием количества слов и удостоверением того, что документ составлен с соблюдением правил форматирования. Справка должна включать содержание и таблицу полномочий. Титульная страница, удостоверительная надпись, содержание и таблица полномочий при подсчете количества слов не учитываются. Справка должна быть набрана через двойной интервал читаемым шрифтом, с полями разумной ширины. Все сноски должны быть набраны через двойной интервал читаемым шрифтом. Сторонам не следует исключать изложения фактов из справок, подаваемых в связи с ходатайством об ускоренном судопроизводстве. Заявления согласно статье 56.1 Местного гражданского процессуального кодекса и подкрепляющие аффидавиты не заменяют собой изложения фактов и не должны включаться в документ путем ссылки.

**E.      Юридические справки в уголовно-правовых спорах.** В отношении количества страниц и слов в юридических справках в уголовно-правовых спорах ограничения отсутствуют.

**F.      Подача документации по ходатайству.** Документация по ходатайствам во всех делах, обрабатываемых с использованием системы электронной передачи документов (ECF) подается и вручается через систему электронной передачи документов (ECF). В случае если дело не обрабатывается при помощи системы электронной передачи документов (ECF), например, в случае с делами по социальному страхованию и делами, в которых сторона действует от собственного имени, документация по ходатайству подается через секретариат в кратчайшие сроки после вручения.

**G.      Судебные прения при ходатайствах.** Стороны могут запросить судебные прения путем направления письма во время подачи ходатайства или оспаривания либо во время подачи ответной документации. Суд определит, будет ли проводиться слушание, и в случае положительного решения сообщит адвокату дату проведения судебных прений.

**H.      График ходатайств.** Если Судом не постановлено иное, график предоставления ответов на ходатайства по гражданско-правовым спорам определяется в соответствии со статьей 6.1 Местного гражданского процессуального кодекса.

**3.      Уведомление о судебных постановлениях и решениях**

Суд предоставляет уведомление о вынесении постановления или решения через систему электронной передачи документов (ECF) для всех дел, обрабатываемых с использованием системы электронной передачи документов (ECF). Суд более не высылает копии постановлений или решений по факсимильной связи. Исключение составляют дела, не обрабатываемые с использованием системы электронной передачи документов (ECF), а также исключительные обстоятельства. См. параграф 10 Правил Южного судебного округа Нью-Йорка об электронной передаче исков. Адвокат стороны несет ответственность за осуществление регулярной проверки досье производства по делу.

**4.      Досудебное производство**

**A.      Совместные досудебные постановления**

В соответствии с принятым Судом постановлением в отношении графика, во всех гражданско-правовых спорах стороны обязаны подать в Суд на одобрение совместное досудебное постановление, содержащее следующее:

iv.      Полный заголовок иска.

iv.     Имена, адреса (включая названия предприятий), номера телефона и факса адвоката.

v.      Краткое заявление истца об основании посудности спора, а также краткое заявление каждой стороны о наличии или отсутствия подсудности спора. Данные заявления должны содержать ссылки на все законы, на которые полагаются стороны, а также на релевантные факты гражданства и минимальной суммы для юрисдикции данного суда.

vi.     Предоставленное каждой стороной краткое описание подлежащих судебному рассмотрению претензий и возражений, без перечисления доказательств, но со ссылками на соответствующие законы. Описания также должны содержать все предыдущие претензии и возражения, не подлежащие судебному рассмотрению.

vii.    Заявление каждой стороны в отношении того, должен ли иск рассматриваться с использованием суда присяжных или без него, а также в отношении длительности судебного разбирательства в днях.

viii.   Заявление в отношении того, согласны ли все стороны на рассмотрение дела мировым судьей (без указания конкретных сторон).

ix.     Требования или согласованные всеми сторонами изложения фактов либо законов.

x.      Заявление каждой стороны в отношении свидетелей, чьи показания будут приведены в рамках основного аргумента с указанием того, будут ли свидетели давать показания лично или в письменном виде.

xi.     Предоставленное каждой стороной уведомление об используемых в рамках основного аргумента показаниях, предоставленных в письменном виде, включая предоставляемые встречные материалы и возражения прочих сторон.

xii.    Предоставленный каждой стороной список приложений, используемых в рамках основного аргумента. Приложения, в отношении подлинности которых у сторон отсутствуют возражения, отмечаются одной звездочкой. Приложения, в отношении которых у всех сторон отсутствуют любые возражения, отмечаются двумя звездочками.

**B.     Иски по Закону о справедливых трудовых стандартах (FLSA)**

Стороны исков по закону FLSA, не являющихся коллективными исками, должны соблюдать приложенные протоколы первоначального раскрытия доказательств.

4

C.    **Досудебная подача документации в гражданско-правовых спорах**

В соответствии с принятым Судом постановлением в отношении графика, во всех гражданско-правовых спорах, до даты проведения суда каждая из сторон должна предоставить следующее:

ii.    если дело рассматривается с участием присяжных: напутственное обращение к присяжным и предлагаемые вопросы для проведения собеседования с кандидатами в присяжные заседатели. Если возможно, предлагаемые напутственные обращения к присяжным также должны быть предоставлены на CD-ROM в формате Word или WordPerfect;

iii.   если дело рассматривается без участия присяжных: предлагаемые фактические заключения и заключения о применимых нормах права;

iv.    во всех случаях: ходатайства в отношении любых доказательственных и прочих вопросов должны быть разрешены до начала разбирательства; и

v.     если какая-либо сторон считает, что таковое будет полезным, — досудебный меморандум.

5.   **Уголовное судопроизводство**

A.    **Передача на рассмотрение/расследование до вынесения приговора**

1.     Адвокату защиты следует в кратчайшие сроки назначить доприговорное собеседование подзащитного с Департаментом пробации в течение четырнадцати (14) дней с даты признания подзащитным вины либо вынесения решения о виновности.

2.     Помощник федерального прокурора США должен направить в Департамент пробации краткое изложение версии Обвинителя в течение четырнадцати (14) дней с даты признания подзащитным вины либо вынесения решения о виновности.

3.     В течение двадцати восьми (28) дней с даты признания подзащитным вины либо вынесения решения о виновности Департамент пробации проводит доприговорное собеседование с подзащитным либо уведомит судью о невозможности проведения такого собеседования.

4.     В течение пятидесяти пяти (55) дней с даты признания подзащитным вины либо вынесения решения о виновности Департамент пробации осуществляет первоначальное раскрытие сторонам Отчета о доприговорном расследовании.

5.     В течение четырнадцати (14) дней с даты первоначального раскрытия сторонам отчета стороны обязаны предоставить Департаменту пробации любые возражения в отношении Отчета о доприговорном расследовании.

6.     В течение двадцати восьми (28) дней с даты первоначального раскрытия сторонам отчета Департамент пробации осуществляет окончательное раскрытие сторонам Отчета о доприговорном расследовании; и

7.     График подготовки и завершения отчетов о доприговорных расследованиях:

| Иск | Дата завершения |
|---|---|
| Признание подзащитным вины либо вынесение решения о виновности и электронное уведомление Департамента пробации | День 1 |
| Назначается собеседование в рамках доприговорного расследования, подается краткое изложение версии Обвинителя | День 14 |
| Завершение собеседования в рамках доприговорного расследования | День 28 |
| Первоначальное раскрытие Отчета о доприговорном расследовании | День 55 |
| Прием возражений сторон | День 69 |
| Окончательное раскрытие Отчета о доприговорном расследовании | День 83 |

**B.    График подачи в Суд документации для вынесения судебного решения**

1.    Защита должна предоставить в Суд документацию, относящуюся к вынесению судебного решения, за 14 дней до даты вынесения судебного решения.

2.    Обвинение должно предоставить в Суд документацию, относящуюся к вынесению судебного решения, за 8 дней до даты вынесения судебного решения.

3.    Защита и Обвинение должны предоставить документацию через систему электронной передачи документов (ECF), предварительно удалив персональные данные, позволяющие установить личность, а также прочую информацию, разрешенную к удалению. Сторонам следует предоставить в Суд копии всей документации для вынесения судебного решения. После вынесения судебного решения Суд приложит копии предоставленной сторонами документации к скрепленному печатью делу вместе с доприговорным отчетом.

**ПРОТОКОЛЫ ПЕРВОНАЧАЛЬНОГО РАСКРЫТИЯ ДОКАЗАТЕЛЬСТВ**
**ПО ЗАКОНУ О СПРАВЕДЛИВЫХ ТРУДОВЫХ СТАНДАРТАХ (FLSA)**
**ИСКИ, НЕ ЯВЛЯЮЩИЕСЯ ГРУППОВЫМИ**

**Январь 2018 г.**

Данный документ предоставлен Федеральным судебным центром по просьбе Консультативного совета по Гражданскому процессуальному кодексу в целях содействия исполнению законной миссии центра по проведению и поощрения исследовательской и развивающей деятельности для повышения качества работы судебной администрации. Несмотря на то, что Центр считает содержание данного документа ценным и ответственно составленным, данный документ не является правилом или рекомендацией Руководства Федерального судебного центра.

## **СОДЕРЖАНИЕ**

Страница

Введение ...................................................................................................................................1

Реестр комитета по протоколам FLSA ...............................................................................3

Протоколы первоначального раскрытия доказательств исков по закону о справедливых трудовых стандартах (FLSA) ..............................................................................................................................4

Регламент производства по некоторым искам по закону о справедливых трудовых стандартах ...... 10

Временный охранный судебный приказ..............................................................................12

**ВВЕДЕНИЕ**

Проколы первоначального раскрытия доказательств исков по закону о справедливых трудовых стандартах (FLSA), не являющихся коллективными (далее «Протоколы первоначального раскрытия доказательств») содержат новую досудебную процедуру, распространяющуюся на определенные виды исков FLSA. Как описано в Протоколах первоначального раскрытия доказательств, их целью являются «содействие обмену информацией и документацией между сторонами и их юридическими представителями на ранних этапах судопроизводства, оказание помощи в определении вопросов, подлежащих разрешению, и планирование более эффективного и целенаправленного процесса раскрытия доказательств». Протоколы первоначального раскрытия доказательств внедряются судьями в индивидуальном порядке во всех окружных судах США.

Протоколы первоначального раскрытия доказательств являются вторым видом протоколов первоначального раскрытия доказательств по конкретным искам. Эти протоколы разрабатываются и внедряются в федеральных судах. Первый тип протоколов — Протоколы первоначального раскрытия доказательств для исков, связанных с трудовой занятостью и вменяющих осуществление враждебных действий (далее «Трудовые протоколы») — публиковался Федеральным судебным центром в качестве пилотного проекта в ноябре 2011 г.[1] Трудовые протоколы были разработаны национальным комитетом адвокатов, обладающих значительным опытом в вопросах трудовой занятости. Проект был осуществлен при поддержке Института развития Американской юридической системы (IAALS) при Университете Денвера. Проект трудовых протоколов взял свое начало на конференции по гражданским процессам 2010 г. в Университете Дьюка при спонсорской поддержке Судебного консультативного комитета конференций по гражданскому процессуальному кодексу. Во время конференции многие участники поддержали идею создания типичного процесса раскрытия доказательств для конкретного типа исков. Такой процесс мог стать решением таких проблем, как неоправданные затраты и задержки судебного разбирательства.

Трудовые протоколы были приняты более чем 50 судьями, а также внедрены на всей территории судебных округов во многих юрисдикциях по всей стране, включая судебный округ штата Коннектикут и судебный округ штата Орегон. В октябре 2015 г. Федеральным судебным центром был опубликован официальный отчет о пилотном проекте.[2] Данный отчет включает несколько ключевых фактов, в том числе о том, что в пилотных исках осуществлялось меньше ходатайств в сравнении с аналогичными исками. Среднее количество поданных ходатайств в рамках раскрытия доказательств составило примерно половину числа ходатайств, поданных в аналогичных исках. Кроме того, сократилась вероятность подачи ходатайств о прекращении дела и об ускоренном судопроизводстве. Также исследование показало, что вероятность урегулирования была выше у исков, участвовавших в пилотном проекте.[3] В 2016 г. Федеральный судебный центр опубликовал меморандум о результатах текущего исследования пилотного проекта по трудовым протоколам.[4]

Вдохновившись результатами проекта, посвященного протоколам первоначального раскрытия доказательств по искам, связанным с трудовой занятостью и вменяющим осуществление враждебных действий, а также по совету судьи Ли Розенталь — старшей судьи окружного суда США Южного судебного округа штата Техас — рассмотреть типичный процесс раскрытия доказательств для исков по закону FLSA, институт IAALS создал комитет, целью которого стало повторение успеха пилотного проекта по трудовым протоколам в применении к другому типу исков, превалирующему в федеральных окружных судах страны и подходящему для использования типичного процесса раскрытия доказательств.

---

[1] ФЕДЕРАЛЬНЫЙ СУДЕБНЫЙ ЦЕНТР, ПИЛОТНЫЙ ПРОЕКТ ПО ПРОТОКОЛАМ ПЕРВОНАЧАЛЬНОГО РАСКРЫТИЯ ДОКАЗАТЕЛЬСТВ ПО ИСКАМ, СВЯЗАННЫМ С ТРУДОВОЙ ЗАНЯТОСТЬЮ И ВМЕНЯЮЩИМ ОСУЩЕСТВЛЕНИЕ ВРАЖДЕБНЫХ ДЕЙСТВИЙ (2011).
[2] ЭМЕРИ Г. ЛИ III И ДЖЕЙСОН А. КАНТОУН, ФЕДЕРАЛЬНЫЙ СУДЕБНЫЙ ЦЕНТР, ПИЛОТНЫЙ ПРОЕКТ ПО ПРОТОКОЛАМ ПЕРВОНАЧАЛЬНОГО РАСКРЫТИЯ ДОКАЗАТЕЛЬСТВ ПО ИСКАМ, СВЯЗАННЫМ С ТРУДОВОЙ ЗАНЯТОСТЬЮ И ВМЕНЯЮЩИМ ОСУЩЕСТВЛЕНИЕ ВРАЖДЕБНЫХ ДЕЙСТВИЙ (2015).
[3] *Id.* в 1.
[4] Меморандум Эмери Г. Ли III и Джейсона А. Кантоуна к Судебному консультативному комитету конференций по гражданскому процессуальному кодексу (26 октября 2016 г.).

Как и в случае с проектом по трудовым протоколам, в состав комитета вошла сбалансированная группа очень опытных адвокатов со всей страны, регулярно представляющих истцов и ответчиков по искам, связанным с FLSA. Председателями комитета стали Джозеф Гаррисон и Крис Китчел, которые также являлись председателями комитета, разработавшего трудовые протоколы. Институт IAALS в течение всего проекта оказывал поддержку комитету. Судья Ли Розенталь и судья Джон Коултл — окружной судья окружного суда США Южного судебного округа штата Нью-Йорк — сыграли важную роль в проекте за счет организации встреч и предоставления важных наставлений и поддержки.

Комитет прилежно работал в течение периода проекта: были проведены три личные встречи и многочисленные конференц-звонки подкомитетов истцов и ответчиков. Подобно проекту по трудовым протоколам, окончательный продукт работы комитета стал результатом активных дебатов и принятия компромиссов обеими сторонами. Все это делалось с конечной целью повышения качества досудебного процесса по искам FLSA по всей стране.

Протоколы первоначального раскрытия доказательств стали новой категорией обмена информацией, пришедшей на замену первоначальному раскрытию информации. Результатом стал процесс первоначального раскрытия доказательств, специально разработанный для исков FLSA. Раскрытие доказательств осуществляется обеими сторонами автоматически в течение 30 дней с даты ответного заявления или ходатайства обвиняемого. Стороны сохраняют права на раскрытие доказательств согласно Федеральному гражданскому процессуальному кодексу США, но при этом количество и тип информации, которой стороны обмениваются изначально, должны относиться строго к спорному вопросу, что ускоряет процесс раскрытия доказательств и сокращает возможности для использования сомнительных схем. Протоколы первоначального раскрытия доказательств сопровождаются регламентом по их внедрению для отдельных судей, а также временным охранным судебным приказом, который может использоваться адвокатами и судьей в качестве шаблона для ведения дискуссий.

В отчете Федерального судебного центра от 2016 года говорится, что судьи используют трудовые протоколы «активнее, чем можно было ожидать, учитывая параметры пилотных материалов, такие как количество исков, подпадающих под закон FLSA и Закон США об отпуске по семейным и медицинским причинам».[5] Целью настоящих протоколов первоначального раскрытия доказательств является удовлетворение потребностей судей и сторон судебных разбирательств в области внедрения типичного процесса раскрытия доказательств в исках FLSA, а также повышение эффективности, скорости и экономичности производства по искам FLSA.

---

[5] *Id.* в 1.

**РЕЕСТР КОМИТЕТА ПО ПРОТОКОЛАМ ПО ЗАКОНУ О СПРАВЕДЛИВЫХ ТРУДОВЫХ СТАНДАРТАХ**

Уильям Ф. Аллен
*Littler Mendelson*
*Вашингтон, округ Коламбия*

Дэвид Борген
*Goldstein, Borgen, Dardarian & Ho*
*Окленд, Калифорния*

Рина И. Десай
*Nichols Kaster*
*Миннеаполис, Миннесота*

Джозеф Д. Гаррисон
*Garrison, Levin-Epstein, Fitzgerald & Pirrotti, P.C.*
*Нью-Хейвен, Коннектикут*

Крис Китчел
*Stoel Rives*
*Портленд, Орегон*

Майкл Д. Мандел
*McGuireWoods*
*Лос-Анджелес, Калифорния*

Деннис М. МакКлелланд
*Phelps Dunbar LLP*
*Тампа, Флорида*

Камил Олсон
*Seyfarth Shaw LLP*
*Чикаго, Иллинойс*

Джастин М. Суортз
*Outten & Golden LLP*
*Нью-Йорк, Нью-Йорк*

Даглас М. Уэрман
*Werman Salas PC*
*Чикаго, Иллинойс*

**ПРОТОКОЛЫ ПЕРВОНАЧАЛЬНОГО РАСКРЫТИЯ ДОКАЗАТЕЛЬСТВ ПО ЗАКОНУ О СПРАВЕДЛИВЫХ ТРУДОВЫХ СТАНДАРТАХ (FLSA)**

**<u>ИСКИ, НЕ ЯВЛЯЮЩИЕСЯ ГРУППОВЫМИ</u>**

**ЧАСТЬ 1: ВВЕДЕНИЕ И ОПРЕДЕЛЕНИЯ.**

(1) Заявление о целях.

    a.  Протоколы первоначального раскрытия доказательств относятся ко всем искам по закону FLSA, не являющихся групповыми. Данные протоколы внедряются судьями первой инстанции во всех окружных судах США. Целью протоколов являются содействие обмену информацией и документацией между сторонами и их юридическими представителями на ранних этапах судопроизводства, оказание помощи в определении вопросов, подлежащих разрешению, и планирование более эффективного и целенаправленного процесса раскрытия доказательств.

    b.  Участвующие суды могут внедрить протоколы первоначального раскрытия доказательств в соответствии с правилами местной юрисдикции либо в соответствии с регламентами, правилами судопроизводства или правилами индивидуального иска. Протоколы применимы к искам в связи с нарушением FLSA в отношении минимальной заработной платы и сверхурочной работы (далее «иски FLSA»). Если у какой-либо из сторон имеется веское основание для того, чтобы иск частично или полностью не рассматривался с использованием протоколов, такая сторона может сообщить о таком основании Суду.

    c.  Протоколы первоначального раскрытия доказательств не отрицают и не изменяют права любой из сторон в отношении раскрытия доказательство согласно Федеральному гражданскому процессуальному кодексу США, а также другим применимым местным законам. Целью протоколов является заменить собой обязательства сторон и осуществить первоначальное раскрытие информации по искам FLSA согласно статье 26(a)(1) Федерального гражданского процессуального кодекса США.

    d.  Протоколы первоначального раскрытия доказательств были подготовлены сбалансированной группой очень опытных адвокатов со всей страны, регулярно представляющих истцов и ответчиков по искам, связанным с FLSA. Протоколы требуют осуществления обмена информацией и документами, обычно запрашиваемых в рамках исков FLSA. Такой обмен информацией и документами отличается от первоначального раскрытия информации согласно статье 26(a)(1) Федерального гражданского процессуального кодекса США, поскольку его целью является обмен информацией, которая с наибольшей вероятностью будет полезной для определения конкретных вопросов в рамках исков FLSA.

(2) Определения. Следующие определения относятся к искам, рассматриваемым в соответствии с протоколами первоначального раскрытия доказательств.

    a.  ***В отношении***. Словосочетание «в отношении» означает «в связи с», «относительно», «касательно», «свидетельствующий о», «отражающий».

    b.  ***Документ***. Термины «документ», «документы» и «документация» являются синонимами и имеют то же значение, что и термины «документы» (documents) и «хранящаяся в электронном виде информация» (electronically stored information) в статье 34(a) Федерального гражданского процессуального кодекса США.

c. ***Указать (документы)***. В отношении документов термин «указать» означает предоставить в известной мере: (i) тип документа; (ii) общую тему документа; (iii) дату документа; (iv) автора (-ов), согласно документу; и (v) лица (лиц), которым, согласно документу, адресовался документ (или его копия); либо предоставить сам документ.

d. ***Указать (лица)***. В отношении физических лиц термин «указать» означает предоставить: (i) полное имя лица; (ii) текущий или последний известный адрес и номер телефона лица; (iii) текущее или последнее известное место работы; (iv) название текущей или последней известной должности; и (v) отношение, если таковое имеется, к истцу или обвиняемому. После указания лица в соответствии с данным разделом, в ответной документации на последующий запрос раскрытия доказательств с запросом указания такого лица достаточно предоставить только имя лица.

e. ***Обвиняемый***. Любое физическое или юридическое лицо, указанное в иске как работодатель или совместный работодатель истца (истцов) в действующей жалобе, если не указано иное.

f. ***Истец***. Любое (-ые) лицо (-а), подающее (-ие) иск (-и) FLSA в соответствии с действующей жалобой.

(3) Инструкции.

a. Период, относящийся к первоначальному раскрытию доказательств, начинается за два года до подачи первоначального иска либо, если в иске говорится об умышленном нарушении закона, то за три года. Если истец заявляет о том, что релевантный период короче указанного периода, то для первоначального раскрытия доказательств используется такой период.

b. Период, относящийся к первоначальному раскрытию доказательств, завершается в последнюю дату, за которую истец требует взыскание или возмещение.

c. В рамках первоначального раскрытия доказательств не допускаются возражения, за исключением возражений на основании статьи 26(b)(2)(B) Федерального гражданского процессуального кодекса США либо на основании привилегии или результата работы. На документы, изъятые на основании заявления о привилегии или результата работы, распространяются положения статьи 26(b)(5) Федерального гражданского процессуального кодекса США.

d. В случае предоставления частичного или неполного ответа либо документа отвечающей стороной должна быть указана причина предоставления частичного или неполного ответа или документа.

e. На первоначальное раскрытие доказательств распространяются положения статьи 26(e) Федерального гражданского процессуального кодекса США о предоставлении приложений и 26(g) Федерального гражданского процессуального кодекса США о заверении ответной корреспонденции.

f. На первоначальное раскрытие доказательств распространяются положения статьи 34(b)(2)(E) Федерального гражданского процессуального кодекса США о форме предоставления документации.

g. К первоначальному раскрытию доказательств относится приложенный временный охранный судебный приказ, если сторонами не согласовано либо судом не постановлено иное. Временный охранный судебный приказ действует только до согласования сторонами либо постановления судом другого охранного судебного приказа. В случае отсутствия соглашения сторон действие временного охранного судебного приказа не распространяется на последующий процесс раскрытия доказательств.

h. Прежде чем какая-либо из сторон предоставит другой стороне какие-либо документы в соответствии с протоколом первоначального раскрытия доказательств сторонам следует провести встречу и согласовать формат (например, TIFF, текстовый документ, файл .pdf с возможностью поиска, Excel) таких документов. В отсутствие соответствующего постановления суда данное требование не удлиняет период первоначального раскрытия доказательств.

**ЧАСТЬ 2: ПРЕДСТАВЛЕНИЕ ДОКУМЕНТОВ ИСТЦОМ.**

(1) Сроки.

Первоначальное раскрытие доказательств Истцом должно быть осуществлено в течение 30 дней после подачи Ответчиком ответного заявления или ходатайства, если суд не примет иного решения.

(2) Документы, которые Истец должен предоставить Ответчику.

a. Документы, созданные или находящиеся в ведении Истца, документирующие затраченное рабочее время.

b. Документы, созданные или находящиеся в ведении Истца, фиксирующие заработную плату или другую компенсацию, выплаченную или невыплаченную Ответчиком.[1]

c. Если Истец сообщал или жаловался внутри организации Ответчику (включая, помимо прочего, руководителей или административные отделы, такие как отделы кадров, отделы по расчету заработной платы, отделы табельного учета или отделы по вопросам пособий) относительно иска(ов), отчета(ов) или жалобы (жалоб), связанных с Законом о справедливых трудовых стандартах (Federal Labor Standards Act, FLSA), и любой ответ, который Ответчик предоставил Истцу.

d. Любые письма с предложением о работе, трудовые соглашения или компенсационные соглашения для Истца.

e. Любые показания под присягой лиц, имеющих информацию, применимую к иску(ам) FLSA.

f. Документы, на которые Истец полагается, чтобы поддержать заявление об умышленном нарушении.

---

[1] Это первоначальное раскрытие доказательств не включает налоговую декларацию на доходы физических лиц или документы, информирующие о налогах.

       g.   Все другие документы, на которые Истец полагается, чтобы поддержать иск(и) FLSA Истца.

(3)  Информация, которую Истец должен предоставить Ответчику.

      a.   Определите лиц, которые, как полагает Истец, знают о фактах, касающихся иска(ов) или возражений FLSA, и краткое описание этих знаний.

      b.   Определите даты начала и окончания иска(ов) FLSA;

      c.   Название должности или должность Истца и краткое описание должностных обязанностей Истца за применимый временной период.

      d.   Опишите основание для иска(ов) FLSA.

      e.   Расчет каждой категории убытков, заявленных Истцом, включая: а) применимые даты, б) суммы заявленной неоплаченной заработной платы и в) метод, используемый для расчета (включая применимые ставки и часы).

      f.   Имена руководителей Истца за применимый временной период.

      g.   Если Истец сообщал или жаловался на иск(и) FLSA любому государственному учреждению, название любого такого агентства, дата (даты) или такие отчеты или жалобы, а также результаты или статус каждого отчета или жалобы.

      h.   Если Истец сообщал или жаловался Ответчику (включая, помимо прочего, руководителей или административные отделы, такие как отделы кадров, отделы по расчету заработной платы, отделы табельного учета или отделы по вопросам пособий) относительно любого иска(ов) FLSA, укажите, был ли отчет или жалоба выражены устно или письменно, когда отчет или жалоба(ы) были предоставлены, кому любой отчет или жалоба(ы) были предоставлены и любой ответ, предоставленный Ответчиком.

## ЧАСТЬ 3: ПРЕДСТАВЛЕНИЕ ДОКУМЕНТОВ ОТВЕТЧИКОМ.

(1)  Сроки.

Первоначальное раскрытие доказательств Ответчиком должно быть осуществлено в течение 30 дней после подачи Ответчиком ответного заявления или ходатайства, если суд не примет иного решения.

(2)  Документы, которые Ответчик должен предоставить Истцу.

      a.   Табельные и платежные ведомости, созданные или находящиеся в ведении Ответчика на имя Истца.

b. Если Истец сообщал или жаловался внутри организации Ответчику (включая, помимо прочего, руководителей или административные отделы, такие как отделы кадров, отделы по расчету заработной платы, отделы табельного учета или отделы по вопросам пособий) относительно иска(ов), отчета(ов) или жалобы (жалоб), связанных с Законом о справедливых трудовых стандартах (Federal Labor Standards Act, FLSA), и любой ответ, который Ответчик предоставил Истцу.

c. Любые показания под присягой лиц, имеющих информацию, применимую к иску(ам) FLSA.

d. Документы, на которые Ответчик полагается, чтобы поддержать заявление, что любое заявленное нарушение произошло с честными намерениями.

e. Любые письма с предложением о работе, трудовые соглашения или компенсационные соглашения для Истца.

f. Коллективный(е) трудовой(ые) договор(ы), применимый(ые) к Истцу.

g. Описание обязанностей для должности(ей), занимаемой(ых) Истцом во время применимого(ых) временного(ых) периода (периодов), если должностные обязанности рассматриваются в иске(ах) FLSA.

h. Политики, процедуры или руководящие принципы Ответчика в отношении компенсации, которые являются применимыми к иску(ам) FLSA.

i. Титульный лист, оглавление и указатель любого руководства сотрудника, кодекса поведения или справочника правил внутреннего трудового распорядка, касающиеся компенсации или отработанного времени.

j. Любые другие документы, на которые Ответчик полагается, чтобы поддержать возражения, заявления в защиту и встречные претензии на иск(и) FLSA.

k. Любое соглашение о страховании, в соответствии с которым страховая компания может удовлетворить все или часть возможного решения по делу, а также возместить или компенсировать платежи, выплаченные для выполнения судебного решения.

(3) Информацию, которую Ответчик должен предоставить Истцу.

a. Предоставьте следующую информацию, связанную с Истцом:
   1. Даты начала и окончания выполненной работы;
   2. Местоположение(я) работы;
   3. Название(я) должности;
   4. Идентификационный номер сотрудника или подрядчика;

     5.    В случаях, связанных с неправильной классификацией Истца, статус классификации Истца (т.е., привилегированный или непривилегированный);

     6.    Непосредственный руководитель(и) и/или начальник(и).

b.    Если у Ответчика нет описания работы Истца, краткое описание должностных обязанностей Истца в ходе применимого(ых) временного(ых) периода(ов), если должностные обязанности рассматриваются в иске(ах) FLSA.

c.    Определите лиц, которые, как полагает Ответчик, знают о фактах, касающихся иска(ов) или возражений FLSA, и краткое описание этих знаний.

d.    Если Истец сообщал или жаловался Ответчику относительно любого иска(ов) FLSA, укажите, был ли отчет(ы) или жалоба(ы) выражены устно или письменно, когда отчет(ы) или жалоба(ы) были предоставлены, кому любой отчет(ы) или жалоба(ы) были предоставлены и любой ответ(ы), предоставленный Ответчиком.

**ФЕДЕРАЛЬНЫЙ ОКРУЖНОЙ СУД США**
**ДЛЯ _____ ОКРУГА _____**
**_____ ПОДРАЗДЕЛЕНИЕ**

| | | |
|---|---|---|
| _____, | ) | |
| | ) | |
| Истец, | ) | |
| | ) | |
| против | ) | Дело № _____ |
| | ) | |
| _____, | ) | Судья _____ |
| | ) | |
| Ответчик. | ) | |


**РЕГЛАМЕНТ ДЛЯ ДЕЛ, КАСАЮЩИХСЯ ЗАКОНА О СПРАВЕДЛИВЫХ ТРУДОВЫХ СТАНДАРТАХ,**

**НЕ ПРЕДСТАВЛЕННЫХ В ВИДЕ КОЛЛЕКТИВНЫХ ДЕЙСТВИЙ**


Данный Суд вводит **ПРОТОКОЛЫ ПЕРВОНАЧАЛЬНОГО РАСКРЫТИЯ ДОКАЗАТЕЛЬСТВ ДЛЯ ДЕЛ FLSA, НЕ ПРЕДСТАВЛЕННЫХ В ВИДЕ КОЛЛЕКТИВНЫХ ДЕЙСТВИЙ**, при поддержке Консультативного Комитета по правилам гражданского судопроизводства. Протоколы первоначального раскрытия доказательств для дел FLSA, не представленных в виде коллективных действий.

Стороны и адвокаты будут следовать Протоколам первоначального раскрытия доказательств, приложенным к данному Приказу. Если какая-либо сторона считает, что есть хорошая причина, по которой конкретный случай должен стать исключением к Протоколам первоначальных раскрытий доказательств, полностью или частично, эта сторона может поднять этот вопрос в Суде.

В течение 30 дней после подачи ответчиком ответного заявления или ходатайства, стороны предоставят друг другу документы и информацию, описанные в Протоколах первоначального раскрытия доказательств за применимый временной период. Это обязательство заменяет обязательства сторон предоставлять первоначальные раскрытия доказательств в соответствии с Федеральными правилами гражданского процесса (Federal Rules of Civil Procedure, FRCP) 26 (a) (1) для исков FLSA.

Стороны будут использовать документы и информацию, обмениваемые в соответствии с Протоколами первоначального обнаружения, для подготовки плана раскрытия доказательств FRCP 26 (f).

Ответные заявления сторон на Протоколы первоначального обнаружения должны соответствовать требованиям FRCP сертифицировать и дополнить ответные заявления на обнаружения, а также форме стандартов предоставления документов и электронной информации. Как указано в Протоколах, это Первоначальное раскрытие доказательств не подлежит возражениям, за исключением оснований, указанных в FRCP 26 (b) (2) (B), или на основании привилегии или продукта работы. Документы, удержанные на основании требования привилегии или рабочего продукта, попадают под действие положений FRCP 26 (b) (5).

УКАЗАТЬ:

Дата: _____     _____

[Имя]

[Окружной/мировой] судья Соединенных Штатов

11

Протоколы первоначального раскрытия доказательств для дел FLSA, не представленных в виде коллективных действий, предназначены для достижения цели более эффективного и целенаправленного обнаружения. Незамедлительная регистрация защитного предписания позволит сторонам начать процедуру раскрытия доказательств без промедления. Во исполнение этой цели, Комитет по протоколам FLSA предлагает следующее временное Защитное предписание. Временное Защитное предписание останется в силе только до тех пор, пока стороны не договорятся или суд не издаст приказ о другом защитном предписании. При отсутствии согласия сторон, временное Защитное предписание не будет применяться к последующему раскрытию доказательств. Признавая, что решение о вводе защитного предписания, а также параметры любого такого предписания лежат в пределах разумного усмотрения Суда и попадают под действие местной практики, следующие положения являются вариантами, из которых Суд может выбрать.

## ВРЕМЕННОЕ ЗАЩИТНОЕ ПРЕДПИСАНИЕ

Настоящим Суд постановил, что следующие ограничения и процедуры применяются к определенной информации, документам и выдержкам из документов, предоставленных сторонами друг другу в ответ на запросы на обнаружение:

1.  ☐ Адвокат любой стороны может обозначить любой документ, информацию, содержащуюся в документе, информацию, указанную в ответах на вопросы, или информацию, разглашенную во время дачи показаний, в качестве конфиденциальных, если адвокат добросовестно определяет, что такое обозначение необходимо для защиты интересов клиента. На информации и документах, обозначенных стороной в качестве конфиденциальных, будет поставлен штамп «КОНФИДЕНЦИАЛЬНО». «Конфиденциальная» информация или документы могут называться совместно «конфиденциальной информацией».

2.  ☐ Если иное не предусмотрено Судом или иным образом указано в настоящем документе, раскрываемая конфиденциальная информация будет храниться и использоваться лицом, получающим такую информацию, исключительно для применения в связи с вышеупомянутым делом.

3.  ☐ В случае, если одна сторона оспаривает конфиденциальное обозначение другой стороны, адвокат добросовестно приложит усилия для разрешения спора, и в случае отсутствия решения оспариваемая сторона может впоследствии добиваться решения Суда. Ничто в этом Защитном предписании не является признанием любой стороны, что конфиденциальная информация, раскрытая в этом деле, является релевантной или приемлемой. Каждая сторона, в частности, оставляет за собой право возражать против использования или допустимости всей раскрываемой конфиденциальной информации в соответствии с применимым законодательством и правилами Суда.

4.  ☐ Информация или документы, обозначенные как «конфиденциальные», не должны быть раскрыты никому, кроме:

    a.  ☐ Запрашивающей стороны и адвоката, в том числе внутреннего адвоката;

    b.  ☐ Сотрудников такого адвоката, назначенных и необходимых для оказания помощи в судебном разбирательстве;

c. ☐ Консультантов или экспертов, помогающих в судебном преследовании или защите по делу, в той мере, в которой это требуется адвокатом;

d. ☐ Любого лица, у которого были взяты показания или у которого возьмут показания по этому делу, за исключением того, что такому лицу Конфиденциальная информация может быть показана только во время и в процессе подготовки к его/ее показаниям, и он не может сохранять себе Конфиденциальную информацию; а также

e. ☐ Суда (включая любого клерка, стенографиста или другого лица, имеющего доступ к любой Конфиденциальной информации в силу его или ее должности в Суде) или присяжных во время суда или в качестве приложений к ходатайствам.

5. ☐ До разглашения или раскрытия Конфиденциальной информации любому лицу адвокат должен:

a. ☐ проинформировать лицо о конфиденциальном характере информации и документов; и

b. ☐ проинформировать лицо о том, что этот Суд наложил запрет на использование им/ей информации или документов в каких-либо иных целях, кроме этого судебного разбирательства, и запретил раскрытие этой информации или документов любому другому лицу.

6. ☐ Конфиденциальная информация может быть представлена и обсуждена с лицами, указанными в пунктах 4 (c) и (d), только при условии, что до любого такого раскрытия или обсуждения каждого такого лица попросят подписать соглашение, обязывающее его/ее соблюдать настоящее Предписание в форме, прилагаемой здесь в качестве Приложения А. В случае, если такое лицо отказывается подписывать соглашение в форме, прилагаемой в качестве Приложения А, сторона, желающая раскрывать Конфиденциальную информацию, может обратиться за надлежащей помощью от Суда.

7. ☐ Раскрытие документа или информации без пометки «конфиденциально» не является отказом от права обозначить такой документ или информацию как конфиденциальную информацию при условии, что материал обозначен в соответствии с процедурами, изложенными здесь, не позднее последнего четырнадцатого (14) дня после закрытия обнаружения или через четырнадцать (14) дней после предоставления документа или информации. В случае пометки, документ или информация должны считаться Конфиденциальной информацией в соответствии со всеми условиями настоящего Положения и Предписания.

8. ☐ Вся информация, подлежащая конфиденциальному обращению в соответствии с условиями настоящего Положения и Предписания, поданная в Суд, и любые заявления, ходатайства или другие документы, поданные в Суд, раскрывающие любую Конфиденциальную информацию, должны быть поданы за печатью в той мере, в которой это разрешено законом (включая, без ограничений, любые применимые правила суда), и хранится за печатью до дальнейшего распоряжения Суда.

В той степени, в которой Суд требует каких-либо дальнейших действий сторон в качестве предварительного условия для подачи документов, скрепленных печатью (за исключением представления настоящего Положения и Предписания в отношении конфиденциальной информации), обязанностью стороны, предоставляющей документы, подаваемые в Суд, является удовлетворить любые такие предварительные условия. Там, где это возможно, только конфиденциальные части документов, предоставляемых в Суд, подаются за печатью.

9.   ☐ По завершении судебного разбирательства Конфиденциальная информация и любые ее копии должны быть незамедлительно (и ни в коем случае не позднее тридцати (30) дней после вступления в силу окончательного решения, не подлежащего дальнейшему обжалованию), возвращены стороне, которая их предоставила, или заверены как уничтоженные, за исключением того, что адвокату сторон разрешается сохранять свои рабочие файлы при условии сохранения конфиденциальности этих файлов.

Вышеизложенное полностью не наносит ущерба праву любой стороны обратиться в Суд с просьбой о любом дальнейшем Защитном предписании, касающемся конфиденциальной информации; или возразить против предоставления документов или информации; или обратиться в Суд с просьбой о принудительном предоставлении документов или информации; или для модификации этого Предписания. Это предписание может быть исполнено любой стороной, и любое нарушение может привести к введению санкций со стороны Суда.

**ПРИЛОЖЕНИЕ А**

       Я был проинформирован адвокатом о том, что определенные документы или информация, которые будут раскрыты мне в связи с делом, озаглавленным _____, были определены, как конфиденциальные. Мне сообщили, что любые такие документы или информация, обозначенные как «КОНФИДЕНЦИАЛЬНО - ПРЕДОСТАВЛЕНЫ СОГЛАСНО ЗАЩИТНОМУ ПРЕДПИСАНИЮ», являются конфиденциальными согласно Приказу Суда.

       Настоящим я соглашаюсь, что я не буду раскрывать какую-либо информацию, содержащуюся в таких документах, любому другому лицу. Я также соглашаюсь не использовать такую информацию для каких-либо иных целей, кроме этого судебного разбирательства.


_____          ДАТА:

Подписано в присутствии:


_____

(Адвокат)

15

**ФЕДЕРАЛЬНЫЙ ОКРУЖНОЙ СУД США**
**ЮЖНОГО ОКРУГА НЬЮ-ЙОРКА**

---

НАЦИОНАЛЬНЫЙ КОМИТЕТ )
ДЕМОКРАТИЧЕСКОЙ ПАРТИИ, )
)  Гражданский иск № 1:18-cv-03501-
Истец )  JGK
)
против )  **УВЕДОМЛЕНИЕ ОБ ИСКЕ**
)
РОССИЙСКОЙ ФЕДЕРАЦИИ и пр., )
)
Ответчики. )
)

---

**УВЕДОМЛЕНИЕ ОБ ИСКЕ**

Согласно Закону США об иностранном суверенном иммунитете, Титул 28 Свода законов

США, § 1608 (а) и Федеральному правилу 22 Кодекс федеральных правил, § 93.2, настоящим

Истец предоставляет Ответчикам это Уведомление об иске.

1.  Это дело под названием *Национальный комитет демократической партии против Российской Федерации и др.,* Гражданское дело № 1: 18-cv-03501-JGK (Южный округ Нью-Йорка (S.D.N.Y.) *предъявлено к регистрации* 20 апреля 2018 г.). Оно было предъявлено к регистрации в Федеральный окружной суд Соединенных Штатов Южного округа Нью-Йорка.

2.  Иностранное государство, о котором идет речь – Российская Федерация. К политическим образованиям, о котором идет речь, относятся Генеральный штаб Вооруженных Сил Российской Федерации («ГРУ») и оперативный сотрудник, отдел или подразделение ГРУ, работающие онлайн под псевдонимом «Гуччифер 2.0».

3.  Истцом является Национальный комитет демократической партии. В дополнение к трем Ответчикам, перечисленным в пункте 2, другими Ответчиками являются: Арас Искенерович Агаларов; Эмин Арас Агаларов; Йозеф Мифсуд; Wikileaks; Джулиан Ассанж; Donald J. Trump For President, Inc..; Дональд Дж. Трамп, младший; Пол Дж. Манафорт, младший; Роджер Дж. Стоун, младший; Джаред К. Кушнер; Джордж Пападопулос; и Ричард У. Гейтс, III.

4.  Вручаемые документы – Повестки и Исковое заявление.

5.  Это гражданское производство в федеральных судах Соединенных Штатов. Истец утверждает, что иностранное государство и политические образования, названные в качестве Ответчиков по этому делу, взломали их компьютерные системы и сети, украли коммерческую тайну, другие документы и информацию, а также способствовали использованию и распространению этих документов. Истцы также утверждают, что Ответчики вступили в сговор для совершения этих действий.

В частности, Истец утверждает, что Ответчики нарушили:

- Закон «О компьютерном мошенничестве и злоупотреблении» (Титул 18 Свода законов США, § 1030 (А));

- Закон «О коррумпированных и находящихся под влиянием рэкетиров организациях» («RICO») (Титул 18 Свода законов США, § 1962);

- Закон «О перехвате телефонных разговоров» (Титул 18 Свода законов США, §§ 2510-22); Закон «О сохраненных сообщениях» (Титул 18 Свода законов США, §§ 2701-12);

- Закон «О защите авторских прав в цифровую эпоху» (Титул 17 Свода законов США, § 1201 *и далее.*);

- Неправомерное использование коммерческой тайны согласно Закону «О защите коммерческой тайны» (Титул 18 Свода законов США, § 1836 *и далее*);

- «Федеральный единообразный закон о торговых секретах» Вашингтона, Округ Колумбия (Свод законов округа Колумбия, §§ 36-401 - 46-410);

- Нарушение чужого права владения по Общему праву Округа Колумбия;

- Нарушение чужого права владения движимым имуществом по Общему праву шт. Виргиния;

- Заговор с целью нарушения чужого права владения движимым имуществом по Общему праву шт. Виргиния; и

- Закон «О компьютерных преступлениях») шт. Виргиния (Свод законов шт. Виргиния, § 18.2-152.5 *и далее.*).

Истец испрашивает следующие средства правовой защиты:

- Возмещение ущерба в размере, который должен быть определен, включая (помимо прочего) все убытки и потери, понесенные Истцом в результате незаконного взлома, кражи и последующего разглашения конфиденциальных документов Истца и/или ответа Истца и устранений нарушений в этой связи;

- Компенсаторные убытки в тройном размере (по наличию) на сумму, которая должна быть доказана в ходе судебного разбирательства;

- Финансовая выгода, полученная Ответчиками в результате нарушений;

- Компенсация ущерба, предусмотренная законодательными актами (по наличию);

- Штрафные убытки (по наличию);

- Заявление о том, что Ответчики, согласно доказательству, вступили в сговор и фактически участвовали в махинации для совершения незаконного и несанкционированного взлома компьютерных систем и/или личных электронных писем Истца и вывода конфиденциальной информации; распространили эту краденую информацию широкой публике; и использовали такую раскрытую краденую информацию с целью повлиять на выборы в 2016 г. для собственной выгоды;

2

- Средство правовой защиты в виде судебного запрещения, препятствующего Ответчикам получать доступ к компьютерным сетям Истца и/или личным электронным письмам без разрешения Истца; принимать участие в любой деятельности, которая нарушает, снижает качество, мешает исполнению или ухудшает функциональность компьютерных сетей или личных электронных писем Истца; продавать, публиковать, распространять или использовать любую собственность или информацию, полученную из компьютерных сетей или личных электронных писем Истца без разрешения Истца; а также удалению, извлечению или копированию любой информации или данных с компьютеров и личных электронных писем Истца без разрешения Истца;

- Гонорары и расходы адвокатов;

- Проценты за период до и после вынесения судебного решения; и

- Любые другие средства правовой защиты, которые Суд может счесть справедливыми и правильными.

С совершенным почтением,

Дата: 18 мая 2018 г.

_____

Джозеф М. Селлерс (законным образом допущенный *к участию в этом деле*)
Джеффри А. Грабер (законным образом допущенный *к участию в этом деле*)
Джулия А. Хорвиц (*допуск к участию в этом деле* рассматривается)
Элисон С. Дейч (*допуск к участию в этом деле* рассматривается)
Cohen Milstein Sellers & Toll PLLC
1100 New York Ave. NW ● Fifth Floor
Washington, DC 20005
(202) 408-4600

Майкл Эйзенкрафт,
Cohen Milstein Sellers & Toll PLLC
88 Pine St. # 14
New York, NY 10005
(212) 838-7797

jsellers@cohenmilstein.com
ggraber@cohenmilstein.com
jhorwitz@cohenmilstein.com
adeich@cohenmilstein.com
meisenkraft@cohenmilstein.com

*Представители Истца*

3

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| DEMOCRATIC NATIONAL COMMITTEE, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 1:18-cv-03501-JGK |
| | ) | |
| v. | ) | **NOTICE OF SUIT** |
| | ) | |
| THE RUSSIAN FEDERATION et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

## NOTICE OF SUIT

Pursuant to the Foreign Sovereign Immunities Act, 28 U.S.C. § 1608(a), and Federal

Regulation 22 CFR § 93.2, Plaintiff hereby provides Defendants with this Notice of Suit.

1. This case is called *Democratic National Committee v. The Russian Federation, et al.,* Civil Action No. 1:18-cv-03501-JGK (S.D.N.Y. *filed* April 20, 2018). It was filed in the United States District Court for the Southern District of New York.

2. The foreign state concerned is the Russian Federation. The political subdivisions concerned are the General Staff of the Armed Forces of the Russian Federation ("GRU"), and the GRU operative, desk, or division which operates the online persona "Guccifer 2.0."

3. The Plaintiff is the Democratic National Committee. In addition to the three Defendants listed in paragraph 2, the other Defendants are Aras Iskenerovich Agalarov; Emin Araz Agalarov; Joseph Mifsud; Wikileaks; Julian Assange; Donald J. Trump For President, Inc.; Donald J. Trump, Jr.; Paul J. Manafort, Jr.; Roger J. Stone, Jr.; Jared C. Kushner; George Papadopoulos; and Richard W. Gates, III.

4. The documents being served are the Summons and Complaint.

5. This is a civil proceeding in the United States federal courts. Plaintiff alleges that the foreign state and political subdivisions named as Defendants in this case hacked into their computer systems and networks, stole trade secrets and other documents and information, and caused the documents to be used and disseminated. Plaintiffs also alleges that the Defendants participated in a conspiracy to do the same.

Specifically, Plaintiff alleges that the Defendants violated:

- The Computer Fraud and Abuse Act (18 U.S.C. § 1030(A));
- The Racketeer Influenced and Corruption Organizations Act ("RICO") (18 U.S.C. § 1962);
- The Wiretap Act (18 U.S.C. §§ 2510-22); the Stored Communications Act (18 U.S.C. §§ 2701-12);
- The Digital Millennium Copyright Act (17 U.S.C. § 1201 *et seq*.);
- Misappropriation of Trade Secrets Under the Defend Trade Secrets Act (18 U.S.C. § 1836 *et seq*.);
- The Washington D.C. Uniform Trade Secrets Act (D.C. Code Ann. §§ 36-401 – 46-410);
- D.C. Common Law Trespass;
- Virginia Common Law Trespass to Chattels;
- Virginia Common Law Conspiracy to Commit Trespass to Chattels; and
- The Virginia Computer Crimes Act (Va. Code Ann. § 18.2-152.5 *et seq*.).

Plaintiff seeks the following relief:

- Damages in an amount to be determined, including but not limited to all damages and losses suffered by Plaintiff as a result of the illegal hacking, theft, and subsequent release of Plaintiff's confidential documents and/or Plaintiff's response to and remediation related thereto;
- Compensatory and treble damages, as available, in an amount to be proven at trial;
- The financial gain earned by Defendants as a consequence of the violations;
- Statutory damages, as available;
- Punitive damages, as available;
- A declaration that Defendants, according to proof, conspired to and did engage in a common scheme to effect the illegal and unauthorized hacking of Plaintiff's computer systems and/or personal emails and the exfiltration of confidential information; disseminated that stolen information to the public; and used that disclosed stolen information to impact the 2016 election for their own gain;
- Injunctive relief restraining Defendants from accessing Plaintiff's computer networks and/or personal emails without Plaintiff's authorizations; engaging in any activity that disrupts, diminishes the quality of, interferes with the performance of, or impairs the functionality of Plaintiff's computer networks or personal emails; selling, publishing, distributing, or using any property or information obtained from Plaintiff's computer networks or personal emails without Plaintiff's authorization; and removing, extracting, or copying any information or data from Plaintiff's computers or personal emails without Plaintiff's authorization;

2

- Attorneys' fees and costs;
- Pre- and post-judgment interest; and
- Any other relief that the Court may deem just and proper.

                                    Respectfully submitted,

Dated: May 18, 2018


                                    */s/ Joseph M. Sellers*
                                    Joseph M. Sellers (admitted *Pro Hac Vice*)
                                    Geoffrey A. Graber (admitted *Pro Hac Vice*)
                                    Julia A. Horwitz (*Pro Hac Vice* forthcoming)
                                    Alison S. Deich (*Pro Hac Vice* forthcoming)
                                    Cohen Milstein Sellers & Toll PLLC
                                    1100 New York Ave. NW ● Fifth Floor
                                    Washington, DC 20005
                                    (202) 408-4600

                                    Michael Eisenkraft
                                    Cohen Milstein Sellers & Toll PLLC
                                    88 Pine St. # 14
                                    New York, NY 10005
                                    (212) 838-7797


                                    jsellers@cohenmilstein.com
                                    ggraber@cohenmilstein.com
                                    jhorwitz@cohenmilstein.com
                                    adeich@cohenmilstein.com
                                    meisenkraft@cohenmilstein.com


                                    *Attorneys for Plaintiff*

2345655 v1

28 USC 1608 Summons IH 6
4/17

# UNITED STATES DISTRICT COURT
## for the
### Southern District of New York

| | | |
|---|---|---|
| Democratic National Committee | ) | |
| Plaintiff | ) | |
| v. | ) | Civil Action No. 1:18-cv-03501 |
| The Russian Federation; General Staff of the Armed Forces of the Russian Federation ("GRU"), et al. | ) ) ) | |
| Defendant | ) | |

## SUMMONS IN A CIVIL ACTION

To:     The Russian Federation

c/o The Ministry of Justice of the Russian Federation

 ul.Zhitnaya, 14
Moscow, 119991,
Russian Federation

A lawsuit has been filed against you.

Within 60 days after service of this summons on you (not counting the day you received it) you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

Joseph M. Sellers
Cohen Milstein Sellers & Toll PLLC
1100 New York Ave., NW, Fifth Floor
Washington, DC 20005
(202) 408-4600

If you fail to respond, judgment by default may be entered against you for the relief demanded in the complaint.  You also must file your answer or motion with the court.

**CLERK OF COURT**

Date:     4/20/2018                                                    /S/ P. NEPTUNE

                                                                    Signature of Clerk or Deputy Clerk

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

     ˒ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

     ˒ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

     ˒ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

     ˒ I returned the summons unexecuted because _____ ; or

     ˒ Other *(specify):*

                                                            .

My fees are $ _____ for travel and $ _____ for services, for a total of $ _____ .

I declare under penalty of perjury that this information is true.

Date: _____

                                 _____
                                                      *Server's signature*

                                 _____
                                                      *Printed name and title*

                                 _____
                                                      *Server's address*

Additional information regarding attempted service, etc:

Извещение ответчика о предъявленном иске в соответствии с 28 USC 1608 Summons IH 6

4/17

## ОКРУЖНОЙ СУД СОЕДИНЕННЫХ ШТАТОВ
по
### Южному округу Нью-Йорка

Национальный комитет Демократической партии США

                Истец

против

Российская Федерация; Генеральный штаб Вооруженных           Гражданский иск
Сил Российской Федерации («ГРУ») и др.                          №

                Ответчик

### ИЗВЕЩЕНИЕ ОТВЕТЧИКА О ПРЕДЪЯВЛЕННОМ ГРАЖДАНСКОМ ИСКЕ

Кому: Российская Федерация через

Министерство юстиции Российской Федерации

        ул. Житная, 14
        Москва, 119991,
        Российская Федерация

        Против Вас был подан иск.

        Вы должны предоставить истцу ответ на прилагаемое исковое заявление или ходатайство согласно правилу 12 Федерального гражданского процессуального кодекса в течение 60 дней после вручения Вам этого извещения (не считая день, в который Вы получили его). Ответ или ходатайство необходимо вручить истцу или адвокату истца, т. е.:

        Джозеф М. Селлерс (Joseph M. Sellers)
        Cohen Milstein Sellers & Toll PLLC
        1100 New York Ave., NW, Fifth Floor
        Washington, DC 20005 (США)
        (202) 408-4600

        Если Вы не предоставите ответ, суд вправе заочно удовлетворить исковое требование. Вы также должны направить Ваш ответ или ходатайство в суд.

### СЕКРЕТАРЬ СУДА

Дата: _____

                                   _____
                                   Подпись секретаря или заместителя секретаря

Извещение согласно 28 USC 1608 (12/11) (Стр. 2)

Гражданский иск №

# ДОКАЗАТЕЛЬСТВО ВРУЧЕНИЯ

*(Этот раздел не предоставляется суду, если это не требуется согласно правилу 4 (l) Федерального гражданского процессуального кодекса)*

Настоящее извещение, предоставляемое *(Ф.И.О. и должность лица, если таковые имеются)*
_____, было получено мной *(дата)* _____.

Я лично вручил(-а) данное извещение указанному лицу в *(место)* _____

_____ *(дата)* _____ ; либо

Я передал(-а) данное извещение по месту регистрации или жительства упомянутого лица в руки *(Ф.И.О.)*
_____ , который(-ая) является дееспособным и

вменяемым лицом и проживает по этому же адресу, *(дата)* _____ , а также отправил

копию извещения по последнему известному адресу; либо

Я вручил извещение в руки *(Ф.И.О. лица)* _____, который(-ая) по

закону имеет право получать процессуальные документы от имени *(наименование организации)*
_____ _____, *(дата)* _____ ;

либо

Я вернул извещение, потому что _____ ; либо

Другое *(указать):*

_____.

Мое вознаграждение составляет _____ долл. США в качестве расходов на проезд и _____
долл. США за предоставленные услуги, в общей сложности — _____ долл. США.

Я заявляю под страхом наказания за лжесвидетельство, что приведенная выше информация является
достоверной.

Дата: _____

_____

*Подпись лица, вручающего судебные документы*

_____

*Ф.И.О. и должность (разборчиво)*

_____

*Адрес лица, вручающего судебные документы*

Дополнительная информация о попытке вручения и т. д.:


TRANSPERFECT

City of New York, State of New York, County of New York

I, Aurora Landman, hereby certify that the following documents are, to the best of my knowledge and belief and within the given parameters, a true and accurate translation from English into Russian:

- DNC COMPLAINT – STAMPED
- GRU Summons
- Russian Federation Summons

_____
Aurora Landman

Sworn to before me this

_____
April 24, 2018

_____
Signature, Notary Public

WENDY POON
NOTARY
NO. 01PO6358754
QUALIFIED IN
QUEENS COUNTY
COMM. EXP.
04-03-2021
PUBLIC
STATE OF NEW YORK

_____
Stamp, Notary Public



City of New York, State of New York, County of New York

I, Aurora Landman, hereby certify that the following documents are, to the best of my knowledge and belief and within the given parameters, a true and accurate translation from English into Russian:

- ECF Rules 060815 + 010318 Addendum Final
- Individual Rules March 26 2018

_____

Aurora Landman

Sworn to before me this

_____

April 25, 2018

_____

Signature, Notary Public

WENDY POON
NOTARY
NO. 01PO6356754
QUALIFIED IN
QUEENS COUNTY
COMM. EXP.
04-03-2021
PUBLIC
STATE OF NEW YORK

_____

Stamp, Notary Public

LANGUAGE AND TECHNOLOGY SOLUTIONS FOR GLOBAL BUSINESS

THREE PARK AVENUE, 39TH FLOOR, NEW YORK, NY 10016 | T 212.689.5555 | F 212.689.1059 | WWW.TRANSPERFECT.COM

OFFICES IN 90 CITIES WORLDWIDE



City of New York, State of New York, County of New York

I, Aurora Landman, hereby certify that the document "Notice of Suit" is, to the best of my knowledge and belief, a true and accurate translation from English into Russian.

_____
Aurora Landman

Sworn to before me this
May 16, 2018

_____
Signature, Notary Public

WENDY POON
NOTARY
NO. 01PO6356754
QUALIFIED IN
QUEENS COUNTY
COMM. EXP.
04-03-2021
PUBLIC
STATE OF NEW YORK

_____
Stamp, Notary Public



City of New York, State of New York, County of New York

I, Aurora Landman, hereby certify that the document "PL 94583 (HR 11315)" is, to the best of my knowledge and belief, a true and accurate translation from English into Russian.

_____
Aurora Landman

Sworn to before me this
May 16, 2018

_____
Signature, Notary Public

WENDY POON
NOTARY
NO. 01PO6356754
QUALIFIED IN
QUEENS COUNTY
COMM. EXP.
04-03-2021
PUBLIC
STATE OF NEW YORK

_____
Stamp, Notary Public

LANGUAGE AND TECHNOLOGY SOLUTIONS FOR GLOBAL BUSINESS

THREE PARK AVENUE, 39TH FLOOR, NEW YORK, NY 10016 | T 212.689.5555 | F 212.689.1059 | WWW.TRANSPERFECT.COM

OFFICES IN 90 CITIES WORLDWIDE


TRANSPERFECT

City of New York, State of New York, County of New York

I, Aurora Landman, hereby certify that the document "Summons to Guccifer Stamped" is, to the best of my knowledge and belief, a true and accurate translation from English into Russian.

_____
Aurora Landman

Sworn to before me this
May 16, 2018

_____
Signature, Notary Public

WENDY POON
NOTARY
NO. 01PO6356754
QUALIFIED IN
QUEENS COUNTY
COMM. EXP.
04-03-2021
PUBLIC
STATE OF NEW YORK

_____
Stamp, Notary Public

LANGUAGE AND TECHNOLOGY SOLUTIONS FOR GLOBAL BUSINESS

THREE PARK AVENUE, 39TH FLOOR, NEW YORK, NY 10016 I T 212.689.5555 I F 212.689.1059 I WWW.TRANSPERFECT.COM
OFFICES IN 90 CITIES WORLDWIDE

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DEMOCRATIC NATIONAL COMMITTEE, | ) |
| | ) |
| Plaintiff, | ) Civil Action No. 1:18-cv-03501-JGK |
| | ) |
| v. | ) **PROPOSED ORDER** |
| | ) |
| THE RUSSIAN FEDERATION et al., | ) |
| | ) |
| Defendants. | ) |
| | ) |
| | ) |

Having reviewed Plaintiff's Motion for Leave to Serve Three Foreign Defendants Through the Secretary of State Under 28 U.S.C. § 1608(a)(4), and good cause appearing therefore, it is hereby

ORDERED  that Plaintiff's Motion for Leave to Serve Three Foreign Defendants Through the Secretary of State Under 28 U.S.C. § 1608(a)(4) is GRANTED, and it is further

ORDERED  that for each Defendant to be served pursuant to this Order, Plaintiff shall send two copies of the summons and complaint, a notice of suit, a copy of the Electronic Case Filing Rules and Instructions, and this Court's individual practices, together with a translation of each into Russian, by any form of mail requiring a signed receipt to the Clerk, and it is further

ORDERED that the Clerk of the Court shall address and dispatch these documents to the Secretary of State in Washington, District of Columbia, to the attention of the Director of Special Consular Services, and it is further

ORDERED that the Secretary shall transmit one copy of the papers through diplomatic channels to the Russian Federation and shall send to the clerk of the court a certified copy of the diplomatic note indicating when the papers were transmitted.

IT IS SO ORDERED.

Dated: May 18, 2018

_____
**Judge John G. Koeltl**
United States District Judge