# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DEMOCRATIC NATIONAL COMMITTEE, ) | |
| ) | |
| Plaintiff, ) | Civil Action No. _____ |
| ) | |
| v. ) | **JURY DEMAND** |
| ) | |
| THE RUSSIAN FEDERATION; ) | **COMPLAINT** |
| GENERAL STAFF OF THE ARMED ) | COMPUTER FRAUD AND ABUSE |
|   FORCES OF THE RUSSIAN ) | ACT (18 U.S.C. § 1030(a)) |
|   FEDERATION ("GRU"); ) | RICO (18 U.S.C. § 1962(c)) |
| GRU OPERATIVE USING ) | RICO CONSPIRACY (18 U.S.C. |
|   PSEUDONYM "GUCCIFER 2.0"; ) | § 1962(d)) |
| ARAS ISKENEROVICH AGALAROV; ) | WIRETAP ACT (18 U.S.C. |
| EMIN ARAZ AGALAROV; ) | §§ 2510-22) |
| JOSEPH MIFSUD; ) | STORED COMMUNICATIONS |
| WIKILEAKS; ) | ACT (18 U.S.C. §§ 2701-12) |
| JULIAN ASSANGE; ) | DIGITAL MILLENNIUM |
| DONALD J. TRUMP FOR PRESIDENT, INC.; ) | COPYRIGHT ACT (17 U.S.C. |
| DONALD J. TRUMP, JR.; ) | § 1201 *et seq.*) |
| PAUL J. MANAFORT, JR.; ) | MISAPPROPRIATION OF TRADE |
| ROGER J. STONE, JR.; ) | SECRETS UNDER THE DEFEND |
| JARED C. KUSHNER; ) | TRADE SECRETS ACT (18 U.S.C. |
| GEORGE PAPADOPOULOS; ) | § 1836 *et seq.*) |
| RICHARD W. GATES, III; ) | WASHINGTON D.C. UNIFORM |
| JOHN DOES 1-10, ) | TRADE SECRETS ACT (D.C. Code |
| ) | Ann. §§ 36-401 – 46-410) |
| Defendants. ) | TRESPASS (D.C. Common Law) |
| ) | TRESPASS TO CHATTELS |
| ) | (Virginia Common Law) |
| ) | CONSPIRACY TO COMMIT |
| ) | TRESPASS TO CHATTELS |
| ) | (Virginia Common Law) |
| ) | VIRGINIA COMPUTER CRIMES |
| ) | ACT (Va. Code Ann. § 18.2-152.5 *et* |
| ) | *seq.*) |
| ) | |
| ) | |

## TABLE OF CONTENTS

Page

NATURE OF ACTION ................................................................................................ 1

I.      INTRODUCTION ........................................................................................... 1

II.     OVERVIEW OF THE CONSPIRACY ........................................................... 2

III.    DAMAGES TO THE DNC ............................................................................. 6

JURISDICTION AND VENUE ................................................................................... 7

PARTIES ...................................................................................................................... 8

GENERAL ALLEGATIONS ..................................................................................... 13

I.      TRUMP'S AND TRUMP ASSOCIATES' PRE-EXISTING RELATIONSHIPS
        WITH RUSSIA AND RUSSIAN OLIGARCHS PROVIDED FERTILE
        GROUND FOR RUSSIA-TRUMP CONSPIRACY ....................................... 13

II.     THE COMMON PURPOSE: BOLSTER TRUMP AND DENIGRATE THE
        DEMOCRATIC PARTY NOMINEE ............................................................ 15

III.    THE CONSPIRACY TO DISSEMINATE STOLEN DNC DATA TO AID
        TRUMP ........................................................................................................ 17

        A.     Trump Announces His Candidacy for President and Russia Begins Its
               Attack on the DNC Computer Systems ............................................... 18

        B.     European Allies Sound the Alarm to U.S. Intelligence Regarding
               Communications Between Russians and Trump Associates ................ 18

        C.     While Campaigning for President, Trump Signs a Letter of Intent to Build
               Trump Tower Moscow ....................................................................... 18

        D.     The Trump Campaign Establishes Further Ties to Russia and Russian
               Intelligence Agents ........................................................................... 19

        E.     Russia Steals Massive Trove of Documents from the DNC as Trump
               Associate Brags About Stolen Documents .......................................... 21

        F.     The DNC Discovers the Hack and Hires CrowdStrike ........................ 22

        G.     Forensic Evidence Confirms Russia's Attack on the DNC's Network ..... 23

        H.     Russians Offer to Assist Trump—and Trump Associates Accept the Offer ........ 24

        I.     Following Trump Tower Meeting, Russia Launches a Massive Public
               Dissemination of Stolen DNC Documents .......................................... 26

        J.     The Trump Campaign Blocks Anti-Russian Language from Being Added
               to the GOP Platform .......................................................................... 27

# TABLE OF CONTENTS

Page

K.    After the Trump Campaign Blocks Anti-Russia Language from the GOP Platform, WikiLeaks Begins Disseminating Stolen DNC Documents ................ 27

L.    Trump Associates Secretly Communicate with Russian Agents and WikiLeaks as They Strategically Release Stolen DNC Documents .................... 28

M.    Trump Publicly Praises the Illegal Dissemination of Stolen DNC Documents ........................................................................................................ 30

N.    Trump—and Russia—Win. .............................................................................. 32

IV.    DEFENDANTS' REPEATED EFFORTS TO COVER UP CONTACTS WITH RUSSIANS EVIDENCE THEIR CONSCIOUSNESS OF GUILT ................................ 32

V.    THE SIGNIFICANT HARM INFLICTED UPON PLAINTIFF ..................................... 34

CAUSES OF ACTION ......................................................................................................... 36

COUNT I ............................................................................................................................. 36

COMPUTER FRAUD AND ABUSE ACT (18 U.S.C. § 1030(A)) (AGAINST RUSSIA, THE GRU, AND GRU OPERATIVE #1) ........................................ 36

COUNT II ............................................................................................................................ 38

RICO (18 U.S.C. § 1962(C)) (AGAINST ALL DEFENDANTS) ................................. 38

A.    The Trump Campaign Was the Racketeering Enterprise ..................................... 38

B.    Alternatively, and at the Very Least, the Trump Campaign Was Part of an Association-In-Fact Enterprise ............................................................................. 39

C.    RICO Predicate Acts ............................................................................................ 39

D.    RICO Damages .................................................................................................... 42

COUNT III ........................................................................................................................... 42

RICO CONSPIRACY (18 U.S.C. § 1962(D)) (AGAINST ALL DEFENDANTS) ....... 42

COUNT IV ........................................................................................................................... 43

WIRETAP ACT (18 U.S.C. §§ 2510-22) (AGAINST GRU OPERATIVE #1, WIKILEAKS, ASSANGE, THE TRUMP CAMPAIGN, AND THE TRUMP ASSOCIATES) ...................................................................................................... 43

COUNT V ............................................................................................................................ 44

STORED COMMUNICATIONS ACT (18 U.S.C. §§ 2701-12) (AGAINST RUSSIA, THE GRU, AND GRU OPERATIVE #1) ........................................ 44

COUNT VI ........................................................................................................................... 45

DIGITAL MILLENNIUM COPYRIGHT ACT (17 U.S.C. § 1201 *ET SEQ.*) (AGAINST RUSSIA, THE GRU, AND GRU OPERATIVE #1) ................................... 45

# TABLE OF CONTENTS

Page

COUNT VII ........................................................................................................ 46

    MISAPPROPRIATION OF TRADE SECRETS UNDER THE DEFEND TRADE
    SECRETS ACT (18 U.S.C. § 1836 *ET SEQ.*) (AGAINST RUSSIA, THE GRU,
    GRU OPERATIVE #1, WIKILEAKS, AND ASSANGE) ............................... 46

COUNT VIII ...................................................................................................... 47

    WASHINGTON D.C. UNIFORM TRADE SECRETS ACT (D.C. CODE ANN.
    §§ 36-401 – 46-410) (AGAINST ALL DEFENDANTS) ................................. 47

COUNT IX.......................................................................................................... 48

    TRESPASS (D.C. COMMON LAW) (AGAINST RUSSIA, THE GRU, AND
    GRU OPERATIVE #1)................................................................................... 48

COUNT X............................................................................................................ 49

    TRESPASS TO CHATTELS (VIRGINIA COMMON LAW) (AGAINST
    RUSSIA, THE GRU, AND GRU OPERATIVE #1) ...................................... 49

COUNT XI.......................................................................................................... 50

    CONSPIRACY TO COMMIT TRESPASS TO CHATTELS (VIRGINIA
    COMMON LAW) (AGAINST ALL DEFENDANTS) ................................... 50

COUNT XII......................................................................................................... 51

    VIOLATION OF THE VIRGINIA COMPUTER CRIMES ACT (VA. CODE
    ANN. § 18.2-152.5 ET SEQ.) (AGAINST ALL DEFENDANTS)................... 51

PRAYER FOR RELIEF ..................................................................................... 52

JURY DEMAND ................................................................................................ 54

Plaintiff the Democratic National Committee ("DNC"), brings this Complaint against The Russian Federation ("Russia"), the General Staff of the Armed Forces of the Russian Federation ("GRU"), the GRU operative using the pseudonym "Guccifer 2.0") ("GRU Operative #1"), Aras Iskenerovich Agalarov ("Aras Agalarov"); Emin Araz Agalarov ("Emin Agalarov"); Joseph Mifsud ("Mifsud"); WikiLeaks, Julian Assange ("Assange"), Donald J. Trump for President, Inc. ("the Trump Campaign"), Donald J. Trump, Jr. ("Trump, Jr."), Paul J. Manafort, Jr. ("Manafort"), Roger J. Stone, Jr. ("Stone"), Jared C. Kushner ("Kushner"), George Papadopoulos ("Papadopoulos"), Richard W. Gates, III ("Gates"), and John Does 1-10, and alleges as follows:

## NATURE OF ACTION

## I.  INTRODUCTION

1.  No one is above the law. In the run-up to the 2016 election, Russia mounted a brazen attack on American Democracy.  The opening salvo was a cyberattack on the DNC, carried out on American soil.  In 2015 and 2016, Russian intelligence services hacked into the DNC's computers, penetrated its phone systems, and exfiltrated tens of thousands of documents and emails.  Russia then used this stolen information to advance its own interests: destabilizing the U.S. political environment, denigrating the Democratic presidential nominee, and supporting the campaign of Donald J. Trump ("Trump"), whose policies would benefit the Kremlin.

2.  In the Trump campaign, Russia found a willing and active partner in this effort.  In 2016, individuals tied to the Kremlin notified the Trump campaign that Russia intended to interfere with our democracy.  Through multiple meetings, emails, and other communications, these Russian agents made clear that their government supported Trump and was prepared to use stolen emails and other information to damage his opponent and the Democratic party.

3.      Rather than report these repeated messages that Russia intended to interfere with U.S. elections, the Trump Campaign and its agents gleefully welcomed Russia's help.  Indeed, the Trump Campaign solicited Russia's illegal assistance, and maintained secret communications with individuals tied to the Russian government, including one of the intelligence agencies responsible for attacking the DNC.

4.      Through these communications, the Trump Campaign, Trump's closest advisors, and Russian agents formed an agreement to promote Donald Trump's candidacy through illegal means.  Russian agents trespassed onto the DNC's computer network in the United States, as well as other email accounts, collected trade secrets and other private data, and then transmitted the data to Defendant WikiLeaks, whose founder, Assange, shared the defendants' common goal of damaging the Democratic party in advance of the election.  Russia, through military intelligence (GRU) officer(s) posing as "Guccifer 2.0" (hereinafter referred to as "GRU Operative #1"), and through WikiLeaks, then disseminated the information at times when it would best suit the Trump Campaign.

5.      As stolen DNC information was strategically released into the public sphere, then-candidate Trump openly praised the illegal disseminations and encouraged Russia to continue its violations of U.S. law through its ongoing hacking campaign against the Democratic party.

## II.    OVERVIEW OF THE CONSPIRACY

6.      Russia's cyberattack on the DNC began only weeks after Trump announced his candidacy for President of the United States in June of 2015.  And, within months, allied European intelligence services began reporting suspicious communications between Trump associates and Russian operatives to their U.S. counterparts.

7.      In late 2015, while campaigning for President, Trump himself signed a letter of intent to develop and license his name to a new real estate development in Moscow—potentially

2

fulfilling a decades-long dream.  This project was to be financed through a Russian bank under sanction by the United States.  The deal was brokered by Felix Sater, a Russian émigré, convicted felon, and longtime business partner of Trump.  In explaining the deal to Michael Cohen, Trump's personal attorney, Sater suggested that he would get Russian President Vladimir V. Putin ("Putin") to support the project in an effort to boost Trump's electoral hopes: "I will get Putin on this program and we will get Donald elected . . . . I know how to play it and we will get this done.  Buddy our boy can become President of the USA and we can engineer it.  I will get all of Putins team to buy in on this, I will."

8.      By early 2016, Trump was well on his way to becoming the favorite to win the GOP nomination.  As Trump moved closer to securing the nomination, the ties between his campaign and Russia's government grew substantially.

9.      In February 2016, retired Lt. Gen. Michael T. Flynn began serving as an informal foreign policy advisor to the Trump campaign.  Just months earlier, in December 2015, Flynn had been paid by the Russian government-funded propaganda outlet Russia Today ("RT") to attend and speak at its anniversary gala in Moscow, where he dined at the same table as Putin.

10.     In March 2016, Trump hired Manafort, who had spent the previous decade working to advance Kremlin interests, as his campaign's convention manager.  Even after joining the Trump campaign, Manafort maintained contact with an individual tied to the GRU.  Manafort also offered to brief a Putin-connected Russian regarding the campaign.

11.     In April 2016, another set of Russian intelligence agents successfully hacked into the DNC.  And, on April 22, 2016, Russian intelligence prepared massive amounts of data for exfiltration from DNC servers. Four days later, on April 26, 2016, Trump's foreign policy advisor, Papadopoulos, met with a Kremlin-tied agent, who informed Papadopoulos that the Russians

"have dirt" on the Democratic presidential nominee in the form of "thousands of emails." Papadopoulos did not report this information to American law enforcement. Rather, he reported back to his superiors at the Trump Campaign, regarding "interesting messages coming in from Moscow about a trip when the time is right."

12.     By June 2016, Russia had stolen thousands of DNC documents and emails. On June 3, 2016, Russians connected to the Kremlin contacted Donald Trump, Jr. to offer damaging information about the Democratic presidential nominee as "part of Russia and its government's support for Mr. Trump." Trump, Jr. did nothing to alert American law enforcement. Rather, he expressly embraced the illegal plan, responding: "I love it especially later in the summer."

13.     On June 9, 2016, Trump Jr., Manafort, and Kushner met with the Russians in Trump Tower. Days later, on June 15, 2016, GRU Operative #1 widely disseminated a trove of stolen documents to the public, claiming they were DNC material.

14.     In July 2016, the GOP held its national convention. At the convention, the Trump Campaign intervened to prevent other Republicans from inserting anti-Russian language regarding Ukraine into the GOP platform. Days later, on July 22, 2016, also on the eve of the Democratic National Convention, WikiLeaks began disseminating stolen DNC documents, including emails and other sensitive proprietary documents, to the public.

15.     Throughout the summer and fall of 2016, during the height of the Presidential campaign, Trump's associates continued to secretly communicate with Russian agents and WikiLeaks as they strategically disseminated information stolen from Democratic targets. Beginning in August 2016, Stone began secretly communicating with GRU Operative #1 and continued to brag about his contacts with Assange. In addition, during this time, Gates, who served as the Trump Campaign's deputy chairman and then liaison to the Republican National

Committee, maintained secret communication with an individual he knew to be connected to the GRU.

16. In the summer and fall of 2016, Stone revealed information that he could not have had unless he were communicating with either WikiLeaks or Russian operatives about their hacking operations in the United States. In August of 2016, nobody in the public sphere knew that Russia had stolen emails from John Podesta, the chairman of Secretary Hillary Clinton's presidential campaign. Nevertheless, on August 21, 2016, Stone predicted that damaging information about Podesta would be released, tweeting "it will soon [be] Podesta's time in the barrel." Weeks later, WikiLeaks began releasing batches of Podesta's emails on a near-daily basis until Election Day—as Stone had predicted. Similarly, in mid-September 2016, Stone said that he expected "Julian Assange and the WikiLeaks people to drop a payload of new documents on Hillary [Clinton] on a weekly basis fairly soon." And, beginning on October 7, 2016, WikiLeaks began releasing stolen emails on a near-daily basis—as Stone had predicted.

17. Trump, Jr. also secretly communicated with WikiLeaks. In one exchange, Trump, Jr. was offered a password to an anti-Trump website. WikiLeaks also asked Trump, Jr. to have his father retweet a link to WikiLeaks' trove of stolen emails. Fifteen minutes later, Trump tweeted a message about the media's lack of attention to WikiLeaks' email releases.

18. Throughout the fall of 2016, Trump praised the illegal dissemination of DNC and other Democratic documents, at various points making it a central theme of his speeches and rallies. Indeed, Trump repeatedly praised the illegal disseminations with exclamations such as: "I love Wikileaks!"

19.     On November 8, 2016, Trump won the Presidency of the United States.  The reaction in Russia was jubilation, with a member of Russia's parliament announcing to his fellow legislators: "I congratulate you all on this."

20.     The conspiracy constituted an act of previously unimaginable treachery:  the campaign of the presidential nominee of a major party in league with a hostile foreign power to bolster its own chance to win the Presidency.  And, in carrying out this effort, Defendants conspired to disseminate documents stolen from the DNC in violation of the laws of the United States, as well as the laws of the State of Virginia and the District of Columbia.  Under the laws of this nation, Russia and its co-conspirators must answer for these actions.

## III.     DAMAGES TO THE DNC

21.     The illegal conspiracy inflicted profound damage upon the DNC.  Defendants undermined and distorted the DNC's ability to communicate the party's values and vision to the American electorate; sowed discord within the Democratic party at a time when party unity was essential to electoral success; and seriously compromised the DNC's internal and external communications.

22.     At the same time, Defendants' conduct resulted in a dramatic drop in donations to the DNC.  The dissemination of hacked information heightened donors' concerns that confidential information disclosed through their contributions might be publicly disseminated.

23.     The DNC also paid more than a million dollars to repair and remediate electronic equipment, and to hire staff and consultants to address the cyber-security fallout from the hack and dissemination.

24.     Finally, because the releases included personal, and in some cases protected information about DNC employees, some DNC employees were exposed to harassment and death threats.  One representative email said: "I hope all your children get raped and murdered. I hope

your family knows nothing but suffering, torture and death." Understandably, this harassment impaired the employees' ability to function effectively in their jobs.

25.     While no suit can ever fully redress the harm that Defendants' illegal conduct exacted, the DNC brings this lawsuit to seek the full measure of relief under the laws of the United States.

26.     Accordingly, Plaintiff brings this action to address the individual and collective conduct of Defendants under the statutes and common law discussed herein.  Plaintiff is entitled to relief from all those involved in the scheme.

## JURISDICTION AND VENUE

27.     This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under 18 U.S.C. § 1030 (the Computer Fraud and Abuse Act); 18 U.S.C. §§ 1961-68 (Racketeer Influenced and Corrupt Organizations Act); 18 U.S.C. §§ 2701-11 (the Stored Communications Act); 28 U.S.C. §§ 2510-22 (commonly referred to as the Federal Wiretap Act); Pub. L. No. 114-152, 130 Stat. 376 (the Defend Trade Secrets Act, codified in scattered sections of 18 U.S.C. and 28 U.S.C.); and 17 U.S.C. § 1201 *et seq.* (the Digital Millennium Copyright Act). This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. §1367(b).

28.     This Court has jurisdiction over the claims against Russia and the GRU pursuant to 28 U.S.C. § 1330 because Russia is a foreign state, *see* 28 U.S.C. § 1603(a), and the GRU is an "agency or instrumentality" of the state, 28 U.S.C. § 1603(b).

29.     Russia is not entitled to sovereign immunity because the DNC's claims arise out of Russia's trespass onto the DNC's private servers—a tortious act committed in the United States. *See* 28 U.S.C. § 1605(a)(5).  In addition, Russia committed the trespass in order to steal

7

trade secrets and commit economic espionage, two forms of commercial activity undertaken in and directly affecting the United States. *See id.* § 1605(a)(2).

30.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in New York City, NY. Defendant Trump Campaign, Inc. is headquartered at 725 Fifth Avenue, New York City, NY 10022; Defendant Donald J. Trump, Jr. resides in New York City, NY; and a substantial number of the meetings and interactions made in furtherance of the conspiracy at issue were located in New York City, NY.

31.     Venue is proper for the claims arising under RICO pursuant to 18 U.S.C. § 1965(a) because Defendants reside, are found, have agents, or transact affairs in New York, NY.

## PARTIES

32.     Plaintiff DNC, registered with the Federal Election Commission as DNC Services Corp./Dem. Nat'l Committee, is a national committee as that term is defined by and used in 52 U.S.C. § 30101, dedicated to electing local, state, and national candidates—including presidential candidates—of the Democratic Party to public office. To accomplish its mission, the DNC, among other things, works closely with Democratic public officials and assists state parties and candidates by contributing money, making expenditures on their behalves, and providing active support through the development of programs benefiting Democratic candidates. The DNC also plans the Democratic Party's presidential nominating convention and promotes the Democratic Party's platform. The DNC regularly conducts its business via email housed on secured servers. It also regularly creates and maintains copyrighted materials on its servers as well as confidential, proprietary documents related to campaigns, fundraising, and campaign strategy that are the DNC's trade secrets.

33.     Defendant Russia is a foreign state as defined under the laws of the United States.

34.     Defendant GRU is Russia's military intelligence agency. Upon information and belief, the GRU created the online pseudonym "Guccifer 2.0" to disseminate stolen documents and information.

35.     Defendant GRU Operative #1 is the Russian intelligence operative(s) who used the online pseudonym "Guccifer 2.0" to disseminate stolen documents and information. Upon information and belief, GRU Operative #1 is a GRU intelligence officer(s) working out of GRU headquarters located on Grizodubovoy Street in Moscow, Russia.

36.     Defendants John Doe 1-10 are other Russian intelligence officers or agencies who participated in the conspiracy to hack into Plaintiff's computers and disseminate stolen documents and information.

37.     Defendant Aras Agalarov is an Azeri-born oligarch in Russia who is a close ally of Putin. Trump worked with Aras Agalarov, who served as a liaison between Trump and Putin, to bring the Miss Universe pageant to Moscow in 2013, for which Aras Agalarov paid Trump millions of dollars. During Trump's November 2013 trip to Russia, he and Aras Agalarov reportedly agreed on another deal to explore real estate opportunities in Russia together.  Aras Agalarov reportedly has land reserved in Russia for a Trump-branded real estate development.

38.     Defendant Emin Agalarov is Aras Agalarov's son. Emin Agalarov is a pop-singer and executive at the family's real estate company.  He established a close relationship with the Trumps over the course of their partnership on the 2013 Miss Universe pageant.  Like his father, Emin Agalarov remained in contact with Trump and Trump Jr. after 2013 and into the 2016 campaign.  The Agalarovs figure prominently in the June 2016 Trump Tower meeting (described below).

39.     Defendant Joseph Mifsud is an academic who, upon information and belief, worked in several positions for the government of Malta.  Mifsud apparently had affiliations with a variety of educational organizations and institutions in the United Kingdom and Malta. Upon information and belief, Mifsud has substantial connections to the Russian government and acted as a de facto agent of the Russian government in his contacts with Papadopoulos in 2016.

40.     Defendant Assange is the founder and publisher of WikiLeaks. He is a citizen of Australia and resides in the embassy of the Government of Ecuador in London, England.  Assange has exhibited support for the Russian government and has hosted a talk show on Russia Today ("RT"), a television propaganda outlet funded by the Russian government.

41.     Defendant WikiLeaks is an organization of unknown structure that operates a website, WikiLeaks.org, on which it publishes leaked or stolen confidential and classified information. Its registered address is P.O. Box 701, San Mateo, CA 94401.

42.     Defendant Trump Campaign is an American not-for-profit corporation formed and registered in Virginia on June 17, 2015 to support Trump's candidacy for President of the United States. The Trump Campaign is incorporated under the laws of Virginia and has or had an office at 675 N. Washington St., Alexandria, VA 22314. Its principal place of business is Trump Tower, 725 Fifth Avenue, New York City, NY 10022. From June 2015 to June 2016, Corey Lewandowski was Campaign Manager of the Trump Campaign. From March 2016 to May 2016, Manafort was Convention Manager of the Trump Campaign, and from May 2016 to August 2016, he was Campaign Chairman of the Trump Campaign. From June 2016 to August 2016, Gates was Deputy Campaign Chairman, and from August 2016 to November 2016, he was the campaign's liaison to the Republican National Committee. Multiple senior members of the Trump Campaign are

reported to have long-time ties to Russia and to have engaged in frequent communication with individuals tied to the Russian government during the 2016 campaign cycle.

43.     Defendant Trump, Jr. is the oldest son of President of the United States Donald J. Trump. From June 16, 2015, until November 8, 2016, when Donald J. Trump was a Republican candidate for president, Trump, Jr. served as a frequent surrogate for now-President Trump and has been described as "a close political advisor to his father" and a "key player in [his] father's White House run." Trump, Jr. currently works as Executive Vice President of the Trump Organization, the business organization that was run by Trump prior to his inauguration as President of the United States. Trump, Jr. resides in New York City, New York.

44.     Defendant Manafort is a long-time Republican political operative, who was Convention Manager of the Trump Campaign from March 2016 to May 2016, and Campaign Chairman of the Trump Campaign from May 2016 to August 2016, when he resigned amid reports of his work with the formerly pro-Russian government in Ukraine. Since October 27, 2017, Manafort has been indicted on dozens of counts, including money laundering and false statements, related to his work for the pro-Russian government in Ukraine. Manafort resides in Virginia.

45.     Defendant Stone is Trump's long-time confidant. "[F]ew people go as far back [as] Trump [and] Stone," and Stone has "nurtured the dream of a [Trump] presidential run . . . for 30 years." Stone also has a long history with Manafort: Manafort helped run Stone's campaign for national chairman of the Young Republicans in 1977, and the two co-founded a consulting firm— Black, Manafort, Stone, and Kelly—in the 1980s. Upon information and belief, Stone served as an informal adviser to Trump and remained in contact with him throughout the 2016 election. Stone resides in Florida.

46.     Defendant Kushner is Trump's son-in-law and was a senior advisor to and one of the key decision-makers for the Trump Campaign. In June 2016, Kushner "took over all data-driven efforts" for the campaign, setting up a 100-person "data hub" in San Antonio, Texas, and hiring Cambridge Analytica, a social media and analytics firm to help his father-in-law's campaign. Kushner resides in Washington, D.C.

47.     Defendant Papadopoulos was one of the earliest foreign policy advisors to the Trump campaign. He became a foreign policy adviser to the Trump Campaign in March 2016. Papadopoulos was in frequent contact with the Trump Campaign's most senior officials in the summer and fall of 2016. He resides in Chicago, Illinois.  On October 5, 2017, Papadopoulos pleaded guilty to one count of making a false statement to a federal agent.

48.     Defendant Gates is a longtime employee and business partner of Manafort. Between 2006 and 2015, Gates was closely involved in Manafort's work for the former pro-Russian regime in Ukraine and its successor political party.  Between October 27, 2017 and February 23, 2018, Gates was indicted on dozens of counts, including money laundering and false statements, related to his work with Manafort for the pro-Russian government in Ukraine.  On February 23, 2018, Gates pleaded guilty to one count of conspiracy against the United States and one count of making a false statement to a federal agent. Gates resides in Richmond, VA.

## GENERAL ALLEGATIONS

I. **TRUMP'S AND TRUMP ASSOCIATES' PRE-EXISTING RELATIONSHIPS WITH RUSSIA AND RUSSIAN OLIGARCHS PROVIDED FERTILE GROUND FOR RUSSIA-TRUMP CONSPIRACY**

49.     Trump's and several Trump Associates' long-standing personal, professional, and financial ties to Russia and numerous individuals closely linked to the Russian government provided fertile ground for a conspiracy between Defendants to interfere in the 2016 elections.

50.     ***Trump's Business Connections to Russia:*** As early as the 1980s, the Soviet Union paid for Trump to travel to Moscow to discuss a potential development project—a pattern which continued into the 1990s and 2000s.[1] In the mid-1990s, Trump negotiated with Russian government officials over potential real estate developments in Moscow.[2] Beginning in 2003, Trump engaged in multiple real estate deals with the Bayrock Group, a firm founded and run by Soviet emigres, who reportedly had close ties to the Russian government and Russian organized crime.[3] In 2004, Trump negotiated with the Deputy Mayor of Moscow over a potential real estate development.[4] In the mid-2000s, Trump partnered with wealthy Russian-Canadian businessmen to develop real estate in Toronto.[5] And in 2006, Trump contracted with the Russian Standard Corporation, a Moscow-based entity that owns and operates the Miss Russia beauty pageant, to allow the winner of the pageant to compete in Trump's Miss Universe pageant, an action that had not been taken since at least 2002.[6] In 2008, Trump sold a Palm Beach, Florida mansion to a Russian oligarch for a $54 million profit.[7] In 2013, Trump established a business relationship with Russian oligarch Aras Agalarov, a close ally of Putin, to bring the Miss Universe pageant to Russia and work on plans to develop a Trump-branded project in Moscow.[8] Trump's efforts to develop real estate in Russia continued into the first months of the 2016 presidential campaign.[9] And throughout this 30-year history, Trump sought out wealthy Russian buyers for his condominiums in the United States and abroad.[10]

51.     As Trump, Jr. explained, the Trump Organization "s[aw] a lot of money pouring in from Russia," and "Russians make up a pretty disproportionate cross-section of our assets."[11] And Trump's son Eric Trump has reportedly stated that substantial funding for Trump's golf courses comes from Russian investors.[12]

52.     ***Manafort and Gates' Ukrainian Connections***: From 2004 until at least 2015, Manafort was an advisor to the Russian-allied former Ukrainian President Viktor Yanukovych ("Yanukovych") and his Kremlin-allied Party of Regions, as well as its successor, the Opposition Bloc.[13] In 2012, Manafort allegedly helped the Ukrainian party secretly route at least $2.2 million in payments to two prominent Washington lobbying firms. [14] Manafort's ties to Yanukovych and the Ukraine are so deep that his own daughter has stated that the "money we have is blood money."[15] After repeatedly denying that he had ever worked for the Ukrainian government, on June 27, 2017, Manafort retroactively registered as a foreign agent and reported $17.1 million in payments from Yanukovych's party between 2012 and 2014.[16] Since October 27, 2017, Manafort has been indicted on dozens of counts, including money laundering and making false statements, related to his work for the pro-Russian government in Ukraine.[17] Additional financial records indicate that Manafort was in debt to Putin-tied oligarch Oleg Deripaska ("Deripaska") by as much as $17 million prior to joining the Trump Campaign.[18]

53.     Manafort also employed Konstantin Kilimnik ("Kilimnik") as his close aide. Kilimnik is a former linguist in the Russian army who is believed to be an agent of the GRU, and whom the FBI believes maintained ties to Russian intelligence during the 2016 U.S. presidential campaign.[19] Kilimnik was in communication with both Manafort and Gates while they were serving in the two most senior positions in the Trump Campaign, and acted as a middleman between them and Deripaska.[20]

54.     Gates was in direct contact with Kilimnik while serving as a high-ranking official of the Trump Campaign in 2016 and was aware that Kilimnik was tied to the GRU.[21]

## II.     THE COMMON PURPOSE: BOLSTER TRUMP AND DENIGRATE THE DEMOCRATIC PARTY NOMINEE

55.     The common purpose of the conspiracy among Russia and the Trump Associates was to bolster Trump's campaign for president, to injure the DNC, and to harm the Democratic party's chances for success in the 2016 presidential election.  This common purpose sprang from multiple, well-documented motives.

56.     In December 2011, massive protests broke out in Russia in response to allegations of vote rigging and election fraud in the Russian parliamentary elections. Thousands of Russians took to the streets to protest the victory of then-Prime Minister Putin's political party, in one of Russia's largest protests since the fall of the U.S.S.R.[22]

57.     Concerned about maintaining power and exerting control, Putin lashed out, blaming the protests on then-Secretary of State Hillary Clinton. Putin asserted that Secretary Clinton had "set the tone for some of our actors in the country and gave the signal." And he accused her of ordering the opposition movement into action: "They heard this and, with the support of the U.S. State Department, began active work."[23]

58.     At the same time, Trump left no doubt as to his views on Russia. Prior to the 2016 campaign, he spent nearly a decade espousing pro-Russian and pro-Putin views, praising Putin as "doing a great job in rebuilding the image of Russia" (2007);[24] stating that he "really like[d] Vladimir Putin [and] respect[ed] him. He does his work well. Much better than our Bush" (2008);[25] and characterizing Putin's illegal annexation of Crimea as "so smart . . . . And he [Putin] really goes step by step by step, and you have to give him a lot of credit" (2014).[26]

59.     Despite the obvious political risks of associating himself with a foreign despot, Trump continued to make laudatory statements about Putin well into the presidential primary season. He said that he would have a "great relationship with Putin";[27] and that it was a "great honor to be so nicely complimented by [Putin, who was] so highly respected within his own country and beyond."[28]

60.     Further, Trump's statements—as well as the pro-Russian entourage with which he surrounded himself—left little doubt that Trump, if elected president, would adopt policies that favored Russia and Putin, even if those policies conflicted with longstanding U.S. foreign policy, and the best interests of the United States. Trump called NATO "obsolete" and threatened to renege on U.S. treaty obligations;[29] argued that the U.S. should not counteract Russia's attempts to be a global power; supported Great Britain's exit from the European Union, while noting that it would "probably" benefit Putin;[30] and opposed U.S. sanctions for Russia's annexation of Crimea, saying, "The people of Crimea, from what I've heard would rather be with Russia than where they were."[31]

61.     Thus, the Trump Campaign, Trump Associates, and Russia shared the common purpose of undermining Secretary Clinton's candidacy, undermining the DNC and the Democratic Party, and promoting Trump, whose presidency was expected to benefit Russia's political and financial interests, and in turn, benefit Trump's financial interests.

62.     Assange and WikiLeaks also shared a common purpose in undermining Secretary Clinton's candidacy and promoting Trump.  Assange had a long of history conflicts with Secretary Clinton, and Assange publicly stated that his policy disagreements with Clinton would make her presidency far more problematic than a Trump presidency.[32]

## III.     THE CONSPIRACY TO DISSEMINATE STOLEN DNC DATA TO AID TRUMP

63.     In a January 2017 report ("The IC Report"), the U.S. intelligence community concluded: "Russian President Vladimir Putin ordered an influence campaign in 2016 aimed at the US presidential election, the consistent goals of which were to undermine public faith in the US democratic process, denigrate Secretary Clinton, and harm her electability and potential presidency."[33] Further, the IC Report concluded: "In July 2015, Russian intelligence gained access to Democratic National Committee (DNC) networks and maintained that access until at least June 2016"; that "by May, the GRU had exfiltrated large volumes of data from the DNC"; and that the "GRU relayed material it acquired from the DNC and senior Democratic officials to WikiLeaks."

64.     This operation to infiltrate the DNC servers and disseminate stolen DNC material was carried out in the United States:  Russian operatives trespassed onto computer servers located in Virginia and Washington, D.C. and stole information located on those servers.  It was also carried out in concert with Assange and WikiLeaks, and with the active support and approval of the Trump Campaign and the Trump Associates.

65.     The conspirators worked in tandem to accomplish their goal.  Russia's intelligence services illegally hacked into the DNC's computer systems and email accounts in order to steal and publish trade secrets, including confidential, proprietary documents related to campaigns, fundraising, and campaign strategy. Russian intelligence services then disseminated the stolen, confidential materials through GRU Operative #1, as well as WikiLeaks and Assange, who were actively supported by the Trump Campaign and Trump Associates as they released and disclosed the information to the American public at a time and in a manner that served their common goals. The disclosures to the American electorate were undertaken with the purpose and had the effect of creating dissention within the Democratic party, directing media coverage away from stories critical of Trump, and generally promoting Trump's presidential candidacy.

### A. Trump Announces His Candidacy for President and Russia Begins Its Attack on the DNC Computer Systems

66. On June 16, 2015, Trump announced his candidacy for President of the United States in the lobby of Trump Tower. By the next month, Russia had undertaken its cyberattack on the DNC.[34] The hacks by Russian intelligence were directed at systems in Virginia and Washington, D.C. that contained some of the DNC's most sensitive strategic and operational data. Later, the disclosure of this sensitive data not only significantly disrupted the election strategy implemented by the DNC, but also interfered directly with the DNC's ability to effectively communicate with and persuade voters and to raise critical funds for its organization and to support Democratic campaigns.

### B. European Allies Sound the Alarm to U.S. Intelligence Regarding Communications Between Russians and Trump Associates

67. Beginning in late 2015, European intelligence agencies began reporting suspicious communications between persons associated with the Trump Campaign and Russian operatives, including suspected intelligence agents, to U.S. authorities. Over the next six months, and through the summer of 2016, these allied European intelligence agencies reported the continuation of these contacts between Trump Associates and Russian operatives.

### C. While Campaigning for President, Trump Signs a Letter of Intent to Build Trump Tower Moscow

68. In the fall of 2015, as Trump campaigned for President, members of the Trump Organization were actively negotiating with Russians on a Trump-branded real estate project in Moscow—a longtime goal of Trump.[35] By October 2015, the Trump Organization had secured a letter of intent to license Trump's name for the project in Moscow.[36] Trump signed the letter of intent.[37]

69.    The deal was brokered by Felix Sater, a Russian émigré, convicted felon, and longtime business associate of the Trump Organization.[38]  The funding for the project was to be provided by Vneshtorgbank, or VTB—a Russian bank against which the United States Treasury has leveled sanctions.[39]

70.    On November 3, 2015, in an email to Cohen, Sater explained how this project would promote Trump's presidential aspirations:

> Michael I arranged for Ivanka to sit in Putins [sic] private chair at his desk and office in the Kremlin.  I will get Putin on this program and we will get Donald elected.  We both know no one else knows how to pull this off without stupidity or greed getting in the way.  I know how to play it and we will get this done.  Buddy our boy can become President of the USA and we can engineer it.  I will get all of Putins [sic] team to buy in on this, I will manage this process.[40]

**D.    The Trump Campaign Establishes Further Ties to Russia and Russian Intelligence Agents**

71.    From the spring of 2016 through the 2016 presidential election, high-level and other advisers to the Trump Campaign, including Manafort, Gates, Kushner, Papadopoulos, and others, were in frequent contact with individuals connected to Russian intelligence and the Russian government.[41]

72.    By March 2016, Papadopoulos was notified that he would become a foreign policy adviser to the Trump Campaign, and that a principal foreign policy focus of the Trump Campaign was an improved relationship with Russia.[42]  On March 21, 2016, Trump announced that Papadopoulos would be among the first members of the Trump Campaign's foreign policy team.[43]

73.    Thereafter, Papadopoulos frequently communicated with a professor based in London named Joseph Mifsud.  In his guilty plea, Papadopoulos, attested that he "understood that the professor had substantial connections to high-level Russian government officials."  Further,

Papadopoulos admitted that he "repeatedly sought to use the professor's Russian connections in an effort to arrange a meeting between the campaign and Russian government officials."[44]

74.     According to Papadopoulos' Statement of Offense, Mifsud was initially "uninterested" in Papadopoulos, but "appeared to take great interest" when Papadopoulos was publicly named to Trump's foreign policy team.  As a result:

(a)     On March 14, 2016, Mifsud met with Papadopoulos in Italy.

(b)     On March 24, 2016, Mifsud met again with Papadopoulos, this time bringing along a Russian national who was introduced as a relative of Putin.

(c)     On April 18, 2016, Mifsud introduced Papadopoulos to an individual he said had connections to the Russian Ministry of Foreign Affairs.  Papadopoulos proceeded to have multiple Skype conversations with this individual in which they discussed setting up a meeting between Russian officials and the Trump campaign.

(d)     On April 26, 2016, Mifsud again met with Papadopoulos in London.  At this meeting, Mifsud told Papadopoulos that the Russians had "thousands of emails" that could harm Hillary Clinton's presidential campaign.[45] Papadopoulos understood that Mifsud had met with Russian officials in Moscow "immediately prior" to relaying this information.[46]

75.     In a November 2017 interview with an Italian newspaper, Mifsud acknowledged his contacts with Papadopoulos, stating that he met with him "three or four times" and helped connect him to "official and unofficial sources."

76.     The Trump Campaign was aware of, and encouraged, these meetings.   After meeting with Mifsud and the Russian national on March 24, 2016, Papadopoulos reported back to the Trump Campaign that his conversation was "to arrange a meeting between us and the Russian leadership to discuss U.S.-Russia ties under President Trump."[47]  Informed of this meeting, Trump campaign National Co-Chairman Sam Clovis responded that he would "work it through the campaign" and added: "Great work."[48]

E.      **Russia Steals Massive Trove of Documents from the DNC as Trump Associate Brags About Stolen Documents**

77.     On April 18, 2016, Russia launched a second phase of its cyberattack on DNC servers located in Virginia and Washington, D.C.  This attack was executed by GRU agents and targeted the DNC's research department, document repositories, information technology department, and other departments.  Upon information and belief, high-ranking Russian officials ordered the GRU agents to infiltrate the DNC's servers, and the agents were obligated to carry out that order.

78.     On April 22, 2016, the GRU staged several gigabytes of DNC data located on the DNC's servers for unauthorized and surreptitious exfiltration—or, more commonly, theft.

79.     Four days later, on April 26, 2016, Papadopoulos met again with Russian agent Mifsud.  At the meeting, Mifsud informed Papadopoulos that the Russians "have dirt on [Hillary Clinton]" in the form of "thousands of emails."[49] In his guilty plea, Papadopoulos attested that he understood Mifsud had "substantial connections to high-level government officials" and "had met with some of those officials in Moscow immediately prior to telling [Papadopoulos] about the 'thousands of emails.'"[50] Rather than report such information to any authorities or halt communications with Mifsud, Papadopoulos excitedly emailed a Trump Campaign official on April 27, 2016:  "Have some interesting messages coming in from Moscow about a trip when the time is right." He also emailed Trump Campaign Manager Corey Lewandowski, reiterating Russia's interest in hosting Trump.  And in May 2016, Papadopoulos confided to an Australian diplomat that Russia had politically damaging information on Secretary Clinton.  The Australian diplomat reported this to U.S. authorities.[51]  This exchange between Papadopoulos and the Australian diplomat prompted the FBI to launch its counterintelligence investigation into contacts between Russia and the Trump campaign.[52]

80.     Throughout the campaign, at least until mid-August 2016, Papadopoulos continued to have communications with Russian nationals, and continued to report those communications to Trump Campaign officials, who encouraged him to set up an off-the-record meeting with Russian officials on behalf of the campaign.[53]  In October 2017, Papadopoulos pleaded guilty to lying about these communications with Russian nationals.[54]

81.     Following their initial access, for months, Russian intelligence agencies maintained an unauthorized presence in DNC servers located in the United States.  By May 2016, Russia had stolen a large amount of sensitive data from the DNC, including donor information, opposition research, information regarding planned political activities, and thousands of private confidential emails.

### F.     The DNC Discovers the Hack and Hires CrowdStrike

82.     On April 28, 2016, DNC IT staff detected and ultimately confirmed access to the DNC network by unauthorized users.

83.     Upon discovering the intrusion, the DNC contacted CrowdStrike Services, Inc. ("CrowdStrike"), a cybersecurity technology firm, to investigate the attack, assess the damage done to the DNC's computers and servers, and assist the DNC in its remediation efforts.

84.     CrowdStrike performed forensic analysis on the DNC's computer network and servers.  CrowdStrike also set up a system for monitoring the ongoing attack on Plaintiffs' computer system and to alert the DNC to future attacks.

85.     As a result of the persistence of the Russian state-sponsored infiltration, in order to remove the unauthorized users from its network, the DNC was required to decommission more than 140 servers, remove and reinstall all software, including the operating systems, for more than 180 computers, and rebuild at least 11 servers.

### G. Forensic Evidence Confirms Russia's Attack on the DNC's Network

86.    Both CrowdStrike's forensic analysis and the U.S. Government concluded that the DNC's computer systems had been hacked by two independent, sophisticated Russian state-sponsored adversaries, both with a nexus to Russia's intelligence services.[55]  The forensic analysts tracked the hacking activities of these adversaries by assigning them code names: "Cozy Bear" and "Fancy Bear," which correspond to the more widely used names Advanced Persistent Threat 29 (APT 29) and Advanced Persistent Threat 28 (APT 28), respectively.[56]    The IC Report concluded that "Fancy Bear" was acting as an agent of the GRU.

87.    Forensic analysis found evidence that Cozy Bear had infiltrated and remained present in the DNC's network since at least July 27, 2015.  The IC Report similarly concluded that the Russian intelligence first gained access to the DNC network in July 2015. CrowdStrike also determined that Cozy Bear used the stolen credentials of user accounts to access the DNC's computer systems.

88.    CrowdStrike determined that the objective of the Cozy Bear actor was to access and collect information from DNC systems that were primarily used for communications. The analysis identified Cozy Bear malware in DNC systems providing email, email support, backup servers, voiceover internet protocol, and chat.

89.     The U.S. Government concluded that Cozy Bear was an operative of or associated with Russian intelligence.[57]

90.    The DNC first detected the infiltration of the GRU, or "Fancy Bear," in its network on April 28, 2016.

91.    CrowdStrike determined that the GRU's objective was to collect information about the DNC's political and research activities.

92.     On April 22, 2016, the GRU staged for exfiltration several gigabytes of data that included opposition research on Donald Trump.

93.     On information and belief, the GRU exfiltrated DNC documents, and GRU Operative #1 posted some of those documents publicly online.

94.     According to an analysis of metadata in other documents, documents that originally resided on DNC servers were published without permission on a website, found at www.guccifer2.wordpress.com, by GRU Operative #1.

95.     Forensic analysis shows that both Cozy Bear and Fancy Bear used the stolen credentials of user accounts to access the DNC's computer systems. [58]

96.     In addition, forensic analysis showed that the hackers accessed the DNC's Voice-over Internet Protocol ("VOIP") transfers, permitting them to monitor voice-based communications, such as phone calls and voicemail.

97.     On information and belief, the hackers intercepted or endeavored to intercept emails and voice-based communications while in the DNC servers.

**H.     Russians Offer to Assist Trump—and Trump Associates Accept the Offer**

98.     Trump clinched the Republican presidential nomination on May 26, 2016. A week later, the scheme was launched to disseminate information that was damaging to the Democratic party and the DNC.

99.     On June 3, 2016, Aras and Emin Agalarov made an offer of assistance from the Russian government to the Trump Campaign, as evidenced by the following communication:

> Good morning.
>
> Emin [Defendant Emin Agalarov] just called and asked me to contact you with something very interesting.
>
> The Crown prosecutor of Russia met with his father Aras [Defendant Aras Agalarov] this morning and in their meeting

offered to provide the Trump campaign with some official
documents and information that would incriminate Hillary and her
dealings with Russia and would be very useful to your father.

*This is obviously very high level and sensitive information but is
part of Russia and its government's support for Mr. Trump –
helped along by Aras and Emin.*

. . .

(Emphasis added.) [59]

100. Seventeen minutes later, Trump, Jr. responded:

Thanks Rob I appreciate that. I am on the road at the moment but
perhaps I [will] just speak to Emin first. Seems we have some time
and *if it's what you say I love it especially later in the summer.*

(Emphasis added.) [60]

101. On June 7, 2016, shortly after the meeting between the Russians and Trump
Associates was set, Trump Jr. emailed: "Great. It will likely be Paul Manafort (campaign boss)
my brother in law and me, 725 Fifth Ave 25th floor." [61] That night, Trump announced that he
would give "a major speech. . . discussing all of the things that have taken place with the
Clintons."[62]

102. Two days later, on June 9, 2016, the meeting between the Russians and Trump
Associates took place. The Trump Campaign was represented by Trump's inner-circle: Trump,
Jr., Kushner, and Manafort. Representing Russia's interests were Agalarov publicist Rob
Goldstone, Kremlin-connected Russian lawyer Natalia Veselnitskaya, Agalarov business associate
Irakyl Kaveladze, lobbyist Rinat Akhmetshin, and a translator. [63]

103. Trump and Trump, Jr. would later go to great lengths to conceal the meeting and
its content. For months, Trump Jr. and others familiar with the June 2016 meeting denied that they
had contacts with Russians during the campaign. For example, in March 2017, when asked
whether he had held any meetings with Russians related to the presidential campaign, Trump, Jr.

falsely stated: "Certainly none that I was representing the campaign in any way, shape or form." Months later, in July 2017, when confronted with limited information about the June 2016 meeting, Trump, Jr. released a series of false statements that mischaracterized and omitted key facts about the June 2016 meeting and the email exchange that led to it, including the Russians' offer of damaging information about the Democratic presidential nominee and the fact that the email exchange explicitly informed Trump, Jr. that the Russian government was seeking to help the Trump Campaign. According to news reports, Trump helped craft the first of these misleading statements after rejecting an initial attempt to fully disclose the nature of the June 2016 meeting.

### I. Following Trump Tower Meeting, Russia Launches a Massive Public Dissemination of Stolen DNC Documents

104. The first public disclosure that the Russians were interfering in the 2016 election occurred on June 14, 2016, when the DNC publicly announced that its systems had been hacked by Russian intelligence agencies. [64]

105. The next day, on June 15, 2016, GRU Operative #1 claimed responsibility for the DNC hack and leaked a DNC-authored opposition research report on Trump from December 2015.[65] GRU Operative #1 also disclosed that he had given DNC documents to WikiLeaks. [66]

106. The strategic dissemination of DNC documents by the GRU continued unabated through at least June and early July 2016, including:

(a) On June 21, 2016, GRU Operative #1 released a batch of stolen DNC documents about Secretary Clinton, one day after Trump fired Corey Lewandowski on June 20. [67]

(b) On June 30, 2016, GRU Operative #1 released stolen DNC documents to the public, including research on Republican candidates and Secretary Clinton.[68]

(c) On July 6, 2016, GRU Operative #1 released stolen DNC documents, including DNC strategy documents related to the DNC's "counter-convention" to the RNC convention. [69] This was one day after FBI Director James Comey announced that no criminal charges would be brought against Secretary Clinton for maintaining a private email server during her time at the State Department. [70]

**J.    The Trump Campaign Blocks Anti-Russian Language from Being Added to the GOP Platform**

107.    On July 18, 2016, during the Republican National Convention, members of the Trump campaign intervened to prevent the Republican National Committee's foreign policy platform committee from amending the draft platform to include a call for the United States to provide lethal arms to Ukraine to help defend itself against Russia.  The Trump campaign succeeded in this effort, watering down the proposed amendment to support only "appropriate assistance" to Ukraine.

108.    Just days before the Trump campaign softened the platform's language, Trump campaign chairman Paul Manafort had emailed Konstantin Kilimnik, his longtime aide with ties to the GRU, offering private briefings on the presidential campaign to Russian oligarch and Putin ally Oleg Deripaska.  After the convention, Kilimnik reportedly told associates that he had played a role in the Trump campaign's success at watering down the Ukraine amendment.

**K.    After the Trump Campaign Blocks Anti-Russia Language from the GOP Platform, WikiLeaks Begins Disseminating Stolen DNC Documents**

109.    On July 22, 2016, just three days before the Democratic National Convention, WikiLeaks released its first major tranche of DNC emails and documents stolen by Russian intelligence agents.  These emails contained names, addresses, telephone numbers, dates of birth, social security numbers, passport numbers, and other identifying information of individuals who had communicated with or donated to the DNC. The release also included dozens of private voicemail messages to DNC employees.[71]

110.    In the midst of the Democratic Convention, Trump and the Trump Campaign openly celebrated this leak, and Trump himself encouraged Russia to continue its hacking campaign. At a press conference just five days letter, after commenting extensively on the materials that were stolen from the DNC servers, Trump called on the Russians to continue their

hacking: "Russia, if you're listening, I hope you're able to find the 30,000 emails that are missing." He then predicted great rewards would come to Russia if that occurred, stating, "I think you will probably be rewarded mightily by our press. Let's see if that happens." [72]

### L. Trump Associates Secretly Communicate with Russian Agents and WikiLeaks as They Strategically Release Stolen DNC Documents

111.    The unauthorized release of documents from DNC servers by Russia, through WikiLeaks, and GRU Operative #1, through the online persona "Guccifer 2.0," continued until November 2016, with a critical increase in the volume and damaging nature of these releases as the general election began.

112.    From June 2016 to October 2016, the GRU and GRU Operative #1, through the online persona "Guccifer 2.0," systematically released stolen documents from the DNC on a regular basis. [73] Many of the disclosures were timed to divert attention from adverse publicity about the Trump campaign, and to obscure positive news about the Clinton campaign and DNC activities – serving the common interests of the Trump Associates, Russia, and WikiLeaks.

113.    Beginning in the spring of 2016, Trump's longtime friend and political advisor Roger Stone revealed on multiple occasions that he was in contact with Assange and WikiLeaks as well as GRU Operative #1 about information in their possession that would be damaging to the Clinton campaign, to prominent members of the Democratic Party, and to Clinton campaign chairman John Podesta. [74]  Many of these reports from Stone occurred well before it was publicly known that the DNC's computer systems and Podesta's emails had been hacked by the same Russian intelligence entities. [75]

114.    On August 8, 2016, speaking to a local Republican Party group in Florida, Stone predicted the future disclosure of hacked materials: "I have actually communicated with Assange.

I believe the next tranche of his documents pertain to the Clinton Foundation, but there's no telling what the October surprise may be." [76]

115.    On August 12, 2016, Stone said that he believed Assange had emails belonging to Secretary Clinton.[77]   That same day, GRU Operative #1 disseminated another set of stolen documents – this time containing personal information about Democratic candidates.[78]   Shortly thereafter, on August 12, GRU Operative #1 tweeted at Stone:  "Thanks that u believe in the real #Guccifer2."[79]

116.    Also on August 12, 2016, GRU Operative #1 released documents stolen from other Democratic entities, including strategy memos for five House races in Florida.[80]   These documents were released just days before legislative primaries in the key battleground state of Florida.[81]

117.    Beginning on August 14, 2016, Stone began secretly communicating with GRU Operative #1.[82] On August 17, 2016, GRU Operative #1 tweeted to Stone, "please tell me if i can help u anyhow. it would be a great pleasure to me."[83]

118.    On August 21, 2016, amidst his communications with Assange and Russian intelligence, Stone prophesized the future dissemination of Podesta's emails, tweeting: "Trust me, it will soon [be] Podesta's time in the barrel." [84] There had been no public disclosure that Podesta's emails had been hacked at that time.

119.    In mid-September 2016, Stone accurately predicted on Boston Herald Radio that he expected "Julian Assange and the WikiLeaks people to drop a payload of new documents on Hillary on a weekly basis fairly soon." [85]

120.    By September 20, 2016, Trump, Jr. was secretly communicating with WikiLeaks as well.  Through these communications, WikiLeaks provided Trump, Jr. with a password to an anti-Trump PAC website, and asked Trump, Jr. to have his father retweet a link to a WikiLeaks

website containing stolen Democratic documents. [86]   Fifteen minutes after WikiLeaks sent this request, Trump in fact did tweet "Very little pick-up by the dishonest media of incredible information provided by Wikileaks. So dishonest! Rigged system!" [87]

121.   On October 2, 2016, Stone stated on Twitter: "Wednesday @HillaryClinton is done. #WikiLeaks." [88]   And on October 3, 2016, Stone reiterated that he was confident WikiLeaks would continue disseminating hacked materials: "I have total confidence that @wikileaks and my hero Julian Assange will educate the American people soon."[89]

122.   Four days later, on October 7, 2016—and just one hour after the release of the infamous Hollywood Access recording in which Trump admitted to sexually assaulting women— WikiLeaks released 2,000 emails stolen from Podesta.[90] WikiLeaks continued to release documents stolen from Podesta on a near-daily basis until November 9, 2017 – just as Stone had predicted.[91]

### M.   Trump Publicly Praises the Illegal Dissemination of Stolen DNC Documents

123.   Trump repeatedly lauded the disclosure of documents stolen by the Russians, and encouraged the media and voters to pay more attention to the leaks.

124.   On July 24, 2016, Trump tweeted, "The Democrats are in a total meltdown but the biased media will say how great they are doing! E-mails say the rigged system is alive & well!" [92]

125.   On July 24, 2016, Trump tweeted, "If the Republican Convention had blown up with e-mails, resignation of boss and the beat down of a big player. (Bernie), media would go wild[.]"[93]

126.   On July 25, 2016, Trump tweeted, "The new joke in town is that Russia leaked the disastrous DNC e-mails, which should never have been written (stupid), because Putin likes me."[94]

127.   On October 12, 2016, Trump tweeted, "Very little pick-up by the dishonest media of incredible information provided by WikiLeaks. So dishonest! Rigged system!"[95]

128.  Similarly, on October 14, 2016, Trump Jr. tweeted, "For those who have the time to read about all the corruption and hypocrisy all the @wikileaks emails are right here: http://wlsearch.tk/."[96] The link in the October 14, 2016 tweet was provided to Trump Jr. by WikiLeaks via a private tweet to Trump, Jr.'s Twitter account.[97]

129.  At his rallies, Trump repeatedly discussed the disclosure of documents on WikiLeaks, enthusiastically directing attention to those stolen documents, as the accounts below reflect:

  (a)  October 10, 2016: Trump said, "I love WikiLeaks . . ."[98]

  (b)  October 31: 2016: Trump said that "WikiLeaks is like a treasure trove," and "Did you see where, on Wikileaks, it was announced that they were paying protestors to be violent, $1,500."[99]

  (c)  November 2, 2016: Trump said, "WikiLeaks just came out with a new one," and "[I]t's just been shown [by Wikileaks] that [it's] a rigged system with more collusion, possibly illegal, between the Department of Justice, the Clinton campaign[,] and the State Department."[100]

  (d)  November 4, 2016: Trump said, "Boy, I love reading those WikiLeaks."[101]

  (e)  November 6, 2016: Trump cited Wikileaks while claiming that "Clinton was sending highly classified information through her maid." [102]

  (f)  November 7, 2016: Trump, "They got it all down folks, WikiLeaks. WikiLeaks."[103]

130.  Finally, on November 6, 2016—just two days before the election, and at a critical time for undecided voters—WikiLeaks released additional hacked DNC emails, which it dubbed "DNC Leak 2."[104] The emails included, among other things, internal discussions regarding DNC strategy and communications efforts. [105]

### N.    Trump—and Russia—Win.

131.    On November 8, 2016, Trump won the election to become President of the United States.

132.    In Moscow, the reaction was jubilation.  When the news of Trump's victory broke in the Duma (Russia's parliament), legislators burst into applause, and the announcement by Vyacheslav Nikonov, a member of the Foreign Affairs Committee, was almost drowned out by clapping and cheering.[106]  Nikonov stated: "Three minutes ago, Hillary Clinton acknowledged her defeat in the US presidential elections and just seconds ago, Trump began his speech as president-elect.  I congratulate you all on this."[107]  Defendants' common goal had been achieved.

## IV.    DEFENDANTS' REPEATED EFFORTS TO COVER UP CONTACTS WITH RUSSIANS EVIDENCE THEIR CONSCIOUSNESS OF GUILT

133.    Trump's advisers repeatedly denied that members of the Trump Campaign had contacts with Russians or Russian officials, and when confronted with evidence to the contrary, issued false and misleading statements about the nature of these contacts.  For example:

(a)    On July 24, 2016, Trump, Jr. was asked about suggestions that the July 22, 2016 release of stolen DNC emails was part of a Russian plot to "help Donald Trump and hurt Hillary Clinton."  Despite having been informed via email weeks earlier that there was such a plot, Trump, Jr. responded: "Well, just goes to show you their exact moral compass. They'll say anything to be able to win this. This is time and time again, lie after lie…It's disgusting; it's so phony."

(b)    On July 24, 2016, just weeks after he participated in the June 2016 meeting, Paul Manafort was asked whether there were any "ties between Mr. Trump, you and your campaign and Putin and his regime."  Manafort replied: "No, there are not.  That's absurd.  And, you know, there's no basis to it."

(c)    On November 11, 2016, Trump campaign spokesperson Hope Hicks provided the *Associated Press* with a statement denying that the Trump campaign had any communications with any "foreign entity" during the campaign: "Never happened. There was no communication between the campaign and any foreign entity during the campaign."

(d)     On December 18, 2016, Trump campaign manager Kellyanne Conway was asked whether anyone involved in the Trump campaign had "any contact with Russians trying to meddle with the election?" Conway responded: "Absolutely not. And I discussed that with the president-elect just last night. Those conversations never happened. I hear people saying it like it's a fact on television. That is just not only inaccurate and false, but it's dangerous."

(e)     In March 2017, Trump, Jr. falsely stated: "Did I meet with people that were Russian? I'm sure, I'm sure I did. But none that were set up. None that I can think of at the moment. And certainly none that I was representing the campaign in any way, shape or form."

(f)     On July 8, 2017, Trump, Jr. released a highly misleading statement about the June 2016 meeting that was reportedly crafted by his father: "It was a short introductory meeting. I asked Jared [Kushner] and Paul [Manafort] to stop by. We primarily discussed a program about the adoption of Russian children that was active and popular with American families years ago and was since ended by the Russian government, but it was not a campaign issue at the time and there was no follow up…"

(g)     On July 9, 2017, Trump, Jr. released another highly misleading statement about the June 2016 meeting that continued to omit that he had been told that the Russian government itself was seeking to help his father: "The woman stated that she had information that individuals connected to Russia were funding the Democratic National Committee and supporting Mrs. Clinton. Her statements were vague, ambiguous and made no sense. No details or supporting information was provided or even offered. It quickly became clear that she had no meaningful information. She then changed subjects and began discussing the adoption of Russian children and mentioned the Magnitsky Act. It became clear to me that this was the true agenda all along and that the claims of potentially helpful information were a pretext for the meeting."

(h)     On October 5, 2017, Papadopoulos pleaded guilty to lying about his contacts with Mifsud and other Russian contacts during interviews with the FBI. Papadopoulos also deleted his Facebook account, scrubbed other social media accounts, and changed his cell phone number in an attempt to hide those contacts.

134.     The Russian government has also repeatedly denied responsibility for interference in the 2016 election, including the cyberattacks on the DNC.  Likewise, WikiLeaks and Assange have repeatedly denied that the stolen DNC material they disseminated was provided to them by Russia, and have cast doubt on whether Russia was responsible for the cyberattacks on the DNC.

## V.     THE SIGNIFICANT HARM INFLICTED UPON PLAINTIFF

135.     The illegal conspiracy inflicted profound damage upon the DNC.  The timing and selective release of the stolen materials prevented the DNC from communicating with the American electorate on its own terms.  These selective releases of stolen material reach a peak immediately before the Democratic National Convention and continued through the general election.

136.     The timing and selective release of stolen materials was designed to and had the effect of driving a wedge between the DNC and Democratic voters.  The release of stolen materials also impaired the DNC's ability to support Democratic candidates in the general election.

137.     The public release of stolen DNC materials was enormously disruptive to the convention, undermining the party's ability to achieve unity and rally members around their shared values.  The release cast a cloud over the convention's activities, interfering with the party's opportunity to communicate its vision to the electorate.

138.     The release of this stolen material upended the DNC's ability to communicate effectively among staff and with members of the party and broader community.  It also exposed the DNC's staff to constant threats by telephone and email, which were unavoidable because staff could not change their contact information with the convention underway.

139.     The DNC also suffered significant interruption and disruption of its political and fundraising activities throughout the United States during the critical final months of the presidential campaign. Specifically, the release of personal, and sometimes embarrassing, information about DNC donors had a chilling effect on donations to the DNC, resulting in a substantial loss of income to the DNC and a reduction in the overall amounts of funds that the DNC could expend to support Democratic candidates nationwide.

140.    In addition, because the public releases included personal and in some cases protected information about DNC employees, it exposed employees of the DNC to intense, frightening, and sometimes life-threatening harassment.  Understandably, this harassment impaired the employees' ability to function effectively in their jobs.

141.    On July 22, 2016—the same day as the first WikiLeaks release of stolen DNC emails—a DNC employee received a voicemail from an unknown caller stating that the employee should be "executed" and that he hoped the employee would be "put in jail, put on trial, and executed for being [a] traitor."

142.    On July 23, 2016, multiple DNC employees received an email stating: "I hope all your children get raped and murdered. I hope your family knows nothing but suffering, torture and death."

143.    On July 24, 2016, an employee received a voicemail stating "you got a target on your back, better keep looking over your shoulder, [expletive]. . . .You [expletives]. Die, Die, Die, Die. I hate you [expletive] guts, you [expletive]. You've got an arrow on your back. And you know what? Snipers are going to get you. You [expletives]."

144.    Another received a profanity-laden voicemail warning him that "We're coming for you." These threats as well as others all began after July 22, when WikiLeaks released the over 20,000 stolen DNC emails which contained the names, e-mail addresses, and phone numbers of the DNC employees.

145.    In addition, the Defendants' conduct caused enormous damage to the DNC's computer systems, creating the need to: (a) repair and replace of the DNC's computer hardware and software, telephone and telephone systems, and back-up systems due to damage from the illegal hacking and related release of such information; (b) retain staff and consultants to

investigate the hacking; and (c) retain staff and consultants to remediate the damage caused by the hacking's impact.

**CAUSES OF ACTION**

**COUNT I**

**COMPUTER FRAUD AND ABUSE ACT (18 U.S.C. § 1030(A))**
**(AGAINST RUSSIA, THE GRU, AND GRU OPERATIVE #1)**

146.    Plaintiff realleges and incorporates by reference all prior paragraphs of this Complaint and paragraphs in the counts below as though set forth fully herein.

147.    The DNC's computers are involved in interstate and foreign commerce and communication, and are protected computers under 18 U.S.C. § 1030(e)(2).

148.    On information and belief, Russia, the GRU, and GRU Operative #1 knowingly and intentionally accessed the DNC's computers without authorization or in excess of authorization, and thereby obtained and used valuable information from those computers in violation of 18 U.S.C. § 1030(a)(2)(C). Such information included, but was not limited to: private, politically sensitive communications between the DNC and Democratic stakeholders and candidates; confidential donor data; confidential campaign strategy plans; opposition and policy research; and documents regarding planned political events, including fundraisers and rallies. The information was used to advance the plan to denigrate the Democratic presidential nominee and the Democratic party (discussed herein) and bolster Trump's candidacy by strategically releasing the confidential, proprietary information publicly online, including on WikiLeaks.

149.    Upon information and belief, Russia, the GRU, and GRU Operative #1 knowingly caused the transmission of a program, information, code, or command, and as a result of such conduct, intentionally caused damage without authorization, to a protected computer, in violation

of 18 U.S.C. § 1030(a)(5)(A). Such transmission included, but was not limited to, the use of malware on DNC systems.

150.    Upon information and belief, Russia, the GRU, and GRU Operative #1 intentionally accessed a protected computer or computers without authorization, and as a result of such conduct, caused damage and loss, in violation of 18 U.S.C. § 1030(a)(5)(C), or recklessly caused damage, in violation of 18 U.S.C. § 1030(a)(5)(B).

151.    Upon information and belief, Russia, the GRU, and GRU Operative #1 knowingly and with intent to defraud trafficked passwords and similar information from the DNC systems, and such trafficking affected interstate or foreign commerce in violation of 18 U.S.C. § 1030(a)(6)(A).

152.    Russia, the GRU, and GRU Operative #1 caused loss to one or more persons during a one-year period aggregating well over $5,000 in value, and they also caused damage affecting ten or more protected computers during a one-year period.

153.    The DNC suffered damage and loss as a consequence of Russia, the GRU, and GRU Operative #1's actions, including but not limited to the cost of investigating and responding to the unauthorized access and abuse of their computer networks, conducting damage assessments, restoring and replacing computers and data, programs, systems, or information, the loss of the value of the DNC's trade secrets, and the harm to the DNC's business as described above. The DNC seeks compensatory and other equitable relief under 18 U.S.C. § 1030(g).

## COUNT II

## RICO (18 U.S.C. § 1962(C))
## (AGAINST ALL DEFENDANTS)

154.    Plaintiff realleges and incorporates by reference all prior paragraphs of this Complaint and paragraphs in the counts below as though set forth fully herein.

155.    Defendants are all "persons" within the meaning of 18 U.S.C. § 1961(3). At all relevant times, Defendants conducted the affairs of an Enterprise—which affected interstate and foreign commerce—through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c).

### A.    The Trump Campaign Was the Racketeering Enterprise

156.    The Trump Campaign was a Racketeering Enterprise, as that term is used in 18 U.S.C. § 1961(4). The Enterprise was formed by June 2015.

157.    The Trump Campaign had an ongoing organizational framework for carrying out its objectives.

158.    As described above, each Defendant participated in the operation or management of the Enterprise.

159.    Because the Trump Campaign expended millions of dollars on the 2016 presidential race, it affected interstate and foreign commerce.

160.    Each Defendant conducted and/or participated in the affairs of the Enterprise through a pattern of racketeering activity, including acts indictable under 18 U.S.C. § 1831 (economic espionage); and 18 U.S.C. § 1832 (theft of trade secrets). The Trump Associates, WikiLeaks and Assange directed, induced, urged, and/or encouraged Russia and the GRU to engage in this conduct and/or to provide WikiLeaks and Assange with DNC's trade secrets, with the expectation that WikiLeaks and Assange would disseminate those secrets and increase the Trump Campaign's chance of winning the election.

### B. Alternatively, and at the Very Least, the Trump Campaign Was Part of an Association-In-Fact Enterprise

161.    Alternatively, and at the very least, the Trump Campaign was part of an Association-In-Fact Enterprise comprising Russia, the GRU, and GRU Operative #1, WikiLeaks, Assange, the Trump Campaign, Aras and Emin Agalarov, Misfud, and the Trump Associates, their employees and agents, and additional entities and individuals known and unknown. The Association-In-Fact Enterprise was formed by at least June 2016. From that time until November 8, 2016, the members of the Association-In-Fact Enterprise worked together to further their mutual goals of improving Trump's electoral prospects and damaging the DNC.

162.    The Association-In-Fact Enterprise had an ongoing organizational framework for carrying out its objectives. In fact, the Association-In-Fact Enterprise could not have carried out its intricate task of sharing confidential information at the moments when it would be most beneficial to the Trump Campaign unless it had some structure for making and communicating group decisions.

163.    As described above, each Defendant participated in the operation or management of the Association-In-Fact Enterprise, and benefitted financially from the enterprise.

164.    Because the Association-In-Fact Enterprise's activities affected electoral spending in 2016, as well as the media response to the 2016 presidential race, it affected interstate and foreign commerce.

### C. RICO Predicate Acts

165.    Each Defendant conducted and/or participated in the affairs of the Trump Campaign and the Association-In-Fact Enterprise through a pattern of racketeering activity, including acts indictable under 18 U.S.C. § 1831 (economic espionage); and 18 U.S.C. § 1832 (theft of trade secrets). The Trump Campaign, the Trump Associates, WikiLeaks and Assange

directed, induced, urged, and/or encouraged Russia and the GRU to engage in this conduct and/or to provide WikiLeaks and Assange with DNC's trade secrets, with the expectation that WikiLeaks and Assange would disseminate those secrets and increase the Trump Campaign's chance of winning the election.

166.     Beginning on or before July 27, 2015, Russia, the GRU, and GRU Operative #1 took trade secrets from the DNC without authorization, intending or knowing that doing so would benefit Russia, Russian instrumentalities, or Russian agents.

167.     Russia, the GRU, and GRU Operative #1 also copied, duplicated, downloaded, uploaded, altered, destroyed, replicated, transmitted, delivered, sent, communicated, or conveyed Plaintiff's trade secrets, intending or knowing that doing so would benefit the Russian government, Russian Instrumentalities or Russian agents, in furtherance of the illegal scheme. Russia—acting through GRU Operative #1—released and transmitted DNC trade secrets without authorization on June 15, June 20, June 21, June 30, July 6, September 13, and October 18, of 2016. Each release constitutes a separate act of economic espionage.

168.     Beginning on or before July 27, 2015, Russia, the GRU, and GRU Operative #1 received, bought, or possessed DNC trade secrets, knowing the same to have been stolen or appropriated, obtained, or converted without authorization, and intending or knowing that doing so would benefit the Russian Government, Russian instrumentalities, or Russian agents.

169.     WikiLeaks and Assange also copied, duplicated, downloaded, uploaded, altered, destroyed, replicated, transmitted, delivered, sent, communicates, or conveyed Plaintiff's trade secrets intending or knowing that doing so would benefit the Russian government, Russian instrumentalities, or Russian agents, in furtherance of the illegal scheme.

170.   WikiLeaks and Assange released and transmitted DNC trade secrets, including confidential, proprietary documents related to campaigns, fundraising, and campaign strategy, on July 22 and November 6, 2016. Each release constituted a separate act of economic espionage.

171.   Beginning on or before July 22, 2016, and continuing daily thereafter through November 2016, WikiLeaks and Assange, received, bought, or possessed Plaintiff's trade secrets, knowing them to have been stolen or appropriated, obtained, or converted without authorization, and intending or knowing that doing so would benefit the Russian government, Russian instrumentalities, or Russian agents.

172.   Russia, the GRU, and GRU Operative #1 also committed the acts described above with the intent to convert Plaintiff's trade secrets, which are related to a product or service used in or intended for use in interstate or foreign commerce, to the economic benefit of others besides Plaintiff. Each unauthorized release constitutes a separate act of theft of trade secrets.

173.   WikiLeaks and Assange also committed the acts described above with the intent to convert Plaintiff's trade secrets, which are related to a product or service used in or intended for use in interstate or foreign commerce, to the economic benefit of others besides Plaintiff. Each unauthorized release constitutes a separate act of theft of trade secrets.

174.   Trump, the Trump Campaign, and the Trump Associates furthered the common goals of the Enterprise by agreeing that Russia, the GRU, GRU Operative #1, WikiLeaks, and Assange would commit the predicate acts and further the scheme and by remaining in constant communication with Russian intelligence officials and advising, instructing, and providing the other Defendants with intelligence regarding the timing of the unauthorized releases; encouraging continued illegal hacking and unauthorized disclosure of stolen Democratic information; actively

using the illegal disclosures to bolster Trump; and actively working to conceal and cover up the scheme through false statements.

**D.     RICO Damages**

175.     Plaintiff has been injured in its business and property by Defendants' violation of 18 U.S.C. § 1962(c). Defendants caused enormous harm to Plaintiff's business, as described above, and to Plaintiff's computers and servers. All of these injuries occurred within the United States.

**COUNT III**

**RICO CONSPIRACY (18 U.S.C. § 1962(D))**
**(AGAINST ALL DEFENDANTS)**

176.     Plaintiff realleges and incorporates by reference all prior paragraphs of this Complaint and paragraphs in the counts below as though set forth fully herein.

177.     Defendants conspired with each other to violate 18 U.S.C. § 1962(c). Defendants knowingly agreed, combined, and conspired to conduct the affairs of the Enterprise or the Association-In-Fact Enterprise through a cyber-espionage operation.  Each Defendant agreed that the operation would involve repeated violations of 18 U.S.C. § 1831 (economic espionage); and 18 U.S.C. § 1832 (theft of trade secrets).

178.     Defendants' conspiracy to violate 18 U.S.C. § 1962(c) violated § 1962(d).

179.     Plaintiff has been injured in their business or property by Defendants' violation of 18 U.S.C. § 1962(d). Plaintiff has been injured in its business and property by Defendants' violation of 18 U.S.C. § 1962(c). Defendants caused enormous harm to Plaintiff's business, as described above, and to Plaintiff's computers and servers. All of these injuries occurred within the United States.

## COUNT IV

## WIRETAP ACT (18 U.S.C. §§ 2510-22)
## (AGAINST GRU OPERATIVE #1, WIKILEAKS, ASSANGE, THE TRUMP
## CAMPAIGN, AND THE TRUMP ASSOCIATES)

180.    Plaintiff realleges and incorporates by reference all prior paragraphs of this
Complaint and paragraphs in the counts below as though set forth fully herein.

181.    Each Defendant is a "person" within the meaning of 18 U.S.C. §§ 2510, 2511.

182.    In violation of 18 U.S.C. § 2511(1)(a), GRU Operative #1 willfully and
intentionally intercepted or endeavored to intercept Plaintiff's wire, oral, or electronic
communications by hacking into Plaintiff's computer systems, VOIP, and/or email accounts and
extracting Plaintiff's private, confidential documents and files.

183.    In violation of 18 U.S.C. § 2511(1)(c), GRU Operative #1, WikiLeaks, and Assange
willfully and intentionally disclosed the contents of Plaintiff's wire, oral, or electronic
communications, knowing or having reason to know that the information was obtained through
the interception of wire, oral, or electronic communication in violation of 18 U.S.C. § 2511.

184.    In violation of 18 U.S.C. § 2511(1)(d), GRU Operative #1, WikiLeaks, Assange,
the Trump Associates, and the Trump Campaign willfully and intentionally used the contents of
wire, oral, electronic communications, knowing or having reason to know that the information was
obtained through the interception of a wire, oral, or electronic communication in violation of 18
U.S.C. § 2511.

185.    Plaintiff had a justifiable expectation that its wire, oral, or electronic
communications were not subject to interception.

186.    Plaintiff is a "person" whose wire, oral, or electronic communications were
intercepted within the meaning of 18 U.S.C. § 2520.

187.    As a direct result of GRU Operative #1, WikiLeaks, Assange, the Trump Associates, and the Trump Campaign's actions, Plaintiff suffered irreparable harm to its business and property and is entitled to an award of the greater of the actual damages suffered or the statutory damages and injunctive relief pursuant to 18 U.S.C. § 2520(c). This harm includes, but is not limited to, harm to DNC computers and servers, harm to the DNC's reputation, loss in the value of DNC trade secrets and business information, and harm to business as described above.

188.    In light of the egregious nature of GRU Operative #1, WikiLeaks, Assange, the Trump Associates, and the Trump Campaign's violations, Plaintiff is entitled to punitive damages and reasonable attorneys' fees and costs pursuant to 18 U.S.C. §§ 2520(b)(2) & (3).

## COUNT V

### STORED COMMUNICATIONS ACT (18 U.S.C. §§ 2701-12)
### (AGAINST RUSSIA, THE GRU, AND GRU OPERATIVE #1)

189.    Plaintiff realleges and incorporates by reference all prior paragraphs of this Complaint and paragraphs in the counts below as though set forth fully herein.

190.    Plaintiff is a "person" within the meaning of 18 U.S.C. §§ 2510(6) and 2707(a).

191.    Russia, the GRU, and GRU Operative #1 willfully and intentionally accessed without authorization a facility through which an electronic communication service is provided, namely, the DNC's computer systems, including their email servers, thereby obtaining access to wire or electronic communications while they were in electronic storage in such systems, in violation of 18 U.S.C. § 2701(a).

192.    As a result of these willful and intentional violations, Plaintiff has suffered damages and, as provided for in 18 U.S.C. § 2707, seeks an award of the greater of the actual damages suffered or the statutory damages; punitive damages; attorneys' fees and other costs of this action; and appropriate equitable relief.

## COUNT VI

### DIGITAL MILLENNIUM COPYRIGHT ACT (17 U.S.C. § 1201 *ET SEQ.*)
### (AGAINST RUSSIA, THE GRU, AND GRU OPERATIVE #1)

193.     Plaintiff realleges and incorporates by reference all prior paragraphs of this Complaint and paragraphs in the counts below as though set forth fully herein.

194.     Plaintiff's computer networks and files contained information subject to protection under the copyright laws of the United States, including campaign strategy documents and opposition research that were illegally accessed without authorization by Russia and the GRU.

195.     Access to the copyrighted material contained on Plaintiff's computer networks and email was controlled by technological measures, including measures restricting remote access, firewalls, and measures restricting access to users with valid credentials and passwords.

196.     In violation of 17 U.S.C. § 1201(a), Russia, the GRU, and GRU Operative #1 circumvented these technological measures by stealing credentials from authorized users, conducting a "password dump" to unlawfully obtain passwords to the system controlling access to the DNC's domain, and installing malware on Plaintiff's computer systems.

197.     Russia, the GRU, and GRU Operative #1's conduct caused Plaintiff significant damages. These damages include, but are not limited to, damage resulting from harm to DNC computers and servers, loss in the value of DNC trade secrets and business information, and harm to business as described above. Plaintiff is entitled to the greater of its actual damages or statutory damages as provided by 17 U.S.C. § 1203, in an amount to be proven at trial.

198.     Plaintiff is entitled to an award of attorneys' fees and costs as provided by 17 U.S.C. § 1203.

## COUNT VII

## MISAPPROPRIATION OF TRADE SECRETS UNDER THE DEFEND TRADE SECRETS ACT (18 U.S.C. § 1836 *ET SEQ.*)
## (AGAINST RUSSIA, THE GRU, GRU OPERATIVE #1, WIKILEAKS, AND ASSANGE)

199.　Plaintiff realleges and incorporates by reference all prior paragraphs of this Complaint and paragraphs in the counts below as though set forth fully herein.

200.　The documents that Russia, the GRU, and GRU Operative #1 stole from the DNC's computer systems include trade secrets within the meaning of 18 U.S.C. § 1839.

201.　Specifically, the DNC is in the business of supporting Democratic political campaigns, and the stolen documents included Democratic donor information, opposition research, and strategic information regarding planned political activities that allow it to effectively carry out its mission.

202.　The DNC takes and has taken reasonable measures to keep such information secret. In particular, the DNC maintains and maintained their information on secured servers that are password protected; they give their staff trainings; their staff sign confidentiality agreements.

203.　Plaintiff's trade secrets were related to products or services used in, or intended for use in, interstate or foreign commerce.

204.　Defendants Russia, the GRU, and GRU Operative #1 misappropriated Plaintiff's trade secrets. Defendants Russia, the GRU, and GRU Operative #1 acquired Plaintiff's trade secrets knowing or having reason to know that the trade secrets were acquired by improper means. Defendants Russia, the GRU, GRU Operative #1, WikiLeaks, and Assange disclosed Plaintiff's trade secrets without consent, on multiple dates, discussed herein, knowing or having reason to know that the trade secrets were acquired by improper means.

205.　As a direct consequence of Defendants' misappropriation, Plaintiff has suffered damages for the cost of materials, loss of goodwill, and attorneys' fees and costs. Plaintiff is also

entitled to punitive damages. These damages include, but are not limited to, damage resulting from harm to DNC computers and servers, loss in the value of DNC trade secrets and business information, and harm to business as described above.

206.    Plaintiff is also entitled to a preliminary and permanent injunction pursuant to 18 U.S.C. § 1836(b)(3).

## COUNT VIII

### WASHINGTON D.C. UNIFORM TRADE SECRETS ACT
### (D.C. CODE ANN. §§ 36-401 – 46-410)
### (AGAINST ALL DEFENDANTS)

207.    Plaintiff realleges and incorporates by reference all prior paragraphs of this Complaint and paragraphs in the counts below as though set forth fully herein.

208.    The District of Columbia expressly empowers a party to recover damages for misappropriation of a trade secret.

209.    The documents that Russia, the GRU, and GRU Operative #1 exfiltrated from the DNC's computer systems include trade secrets under District of Columbia law, as discussed above, and in keeping with the definition of trade secrets under District of Columbia law:

> information, including a formula, pattern, compilation, program, device, method, technique, or process, that: (A) Derives actual or potential independent economic value, from not being generally known to, and not being readily ascertainable by, proper means by another who can obtain economic value from its disclosure or use; and (B) Is the subject of reasonable efforts to maintain its secrecy.

> D.C. Code Ann. § 36-401(2).

210.    This information derived an actual independent economic value by remaining confidential and private, and not being readily ascertainable to others. Plaintiff takes and has taken reasonable measures to keep such information secret, as discussed *supra* in Count VIII.

211.    Each Defendant disclosed, received, and used these misappropriated trade secrets without Plaintiff's consent, knowing or having reason to know that the trade secrets were acquired by improper means.

212.    As a direct consequence of Defendants' misappropriation, Plaintiff has suffered damages for actual loss and from Defendants' unjust enrichment. These damages include, but are not limited to, damage resulting from harm to DNC computers and servers, loss in the value of DNC trade secrets and business information, and harm to business as described above.

213.    Defendants' misappropriation of Plaintiff's trade secrets was willful and malicious. Accordingly, Plaintiff is entitled to exemplary damages in an amount up to twice actual damages awarded, as well as attorneys' fees and costs.

### COUNT IX

### TRESPASS (D.C. COMMON LAW)
### (AGAINST RUSSIA, THE GRU, AND GRU OPERATIVE #1)

214.    Plaintiff realleges and incorporates by reference all prior paragraphs of this Complaint and paragraphs in the counts below as though set forth fully herein.

215.    The DNC owns and operates private computers and a private computer network. This network and the information contained therein constitutes the property of Plaintiff.

216.    On or about July 27, 2015, Russian intelligence agents hacked into the DNC's computers and network.  On or about April 18, 2016, Russia, the GRU, and GRU Operative #1 separately hacked into the DNC's computers and network. These constituted two separate and independent trespasses in the United States. The hacks provided Russia, the GRU, and GRU Operative #1 with unauthorized access to the Plaintiff's property in its network.

217.    Russia, the GRU, and GRU Operative #1's hacks interfered with the DNC's possessory interests in their network and the information contained therein. By means of trespass

onto Plaintiff's computer network, Russia, the GRU, and GRU Operative #1 acquired and disseminated confidential and personal information that is Plaintiff's property. Defendants would have been unable to disclose this information but for the illegal trespass. Russia, the GRU, and GRU Operative #1 therefore deprived Plaintiff of its possessory interest in maintaining the privacy and confidentiality of its property. As a result, Plaintiff has suffered diminution in the value of its property, and is entitled to damages.

### COUNT X

### TRESPASS TO CHATTELS (VIRGINIA COMMON LAW) (AGAINST RUSSIA, THE GRU, AND GRU OPERATIVE #1)

218. Plaintiff realleges and incorporates by reference all prior paragraphs of this Complaint and paragraphs in the counts below as though set forth fully herein.

219. Plaintiff the DNC owns and operates a private computer network, with computers and servers located in Washington, D.C. and in Virginia. This network and the information contained therein constitutes the property of Plaintiff.

220. On or about July 27, 2015, Russian intelligence agents hacked into the DNC's computers and network. On or about April 18, 2016, Russia, the GRU, and GRU Operative #1 separately hacked into the DNC's computers and network. These constituted two separate and independent trespasses in the United States. The hacks provided Russia, the GRU, and GRU Operative #1 with unauthorized access to Plaintiff's property in its network. At no point has anyone with authority to do so provided Defendants with authorization to access Plaintiff's networks.

221. Russia, the GRU, and GRU Operative #1's hacks interfered with Plaintiff's possessory interests in its network and the information contained therein. By means of trespass onto Plaintiff's network, Russia, the GRU, and GRU Operative #1 acquired and disseminated confidential and personal information that is Plaintiff's property. Defendants would have been

unable to disclose this information but for the illegal trespass. Russia, the GRU, and GRU Operative #1 therefore deprived Plaintiff of its possessory interest in maintaining the privacy and confidentiality of its property. As a result, Plaintiff has suffered diminution in the value of its property, and is entitled to damages.

## COUNT XI

### CONSPIRACY TO COMMIT TRESPASS TO CHATTELS
### (VIRGINIA COMMON LAW)
### (AGAINST ALL DEFENDANTS)

222.    Plaintiff realleges and incorporates by reference all prior paragraphs of this Complaint and paragraphs in the counts below as though set forth fully herein.

223.    Defendants were part of a common scheme in which they conspired and combined to access without authorization the DNC's computer systems to steal confidential information, publicly disseminate the stolen information, and use that stolen and publicly disclosed information for the common purpose of denigrating Secretary Clinton and the Democratic Party, and bolstering Trump's electoral prospects. These actions constituted an exercise of wrongful dominion over Plaintiff's computers and computer system and private email accounts.

224.    Pursuant to, and in furtherance of, this common scheme, Defendants conspired to commit the unlawful acts described herein, including acts that constitute trespass.

225.    Pursuant to, and in furtherance of, this common scheme, each Defendant committed overt acts, including arranging meetings between the co-conspirators, encouraging and planning for the scheme to occur, hacking into the DNC's network, stealing the DNC's private, confidential information, and releasing that information, without permission, to the public. These overt acts caused Plaintiff injury and damages, as discussed *supra*.

226.    All of the named Defendants aided and abetted in the unlawful acts described herein as part of and furtherance of a common scheme, and each of these Defendants knowingly and

substantially assisted the common scheme, and was generally aware of his role as part of an overall

common scheme. Accordingly, the actions of Defendants constitute conspiracy to trespass.

227. As a result, Plaintiff has suffered diminution in the value of its property, and is

entitled to damages.

## COUNT XII

## VIOLATION OF THE VIRGINIA COMPUTER CRIMES ACT
## (VA. CODE ANN. § 18.2-152.5 ET SEQ.)
## (AGAINST ALL DEFENDANTS)

228. Plaintiff realleges and incorporates by reference all prior paragraphs of this

Complaint and paragraphs in the counts below as though set forth fully herein.

229. Russia, the GRU, and GRU Operative #1 used Plaintiff's computers and computer

networks without authority, obtained property by false pretenses, and converted Plaintiff's

property in violation of Va. Code Ann. § 18.2-152.3.

230. Russia, the GRU, and GRU Operative #1, with malicious intent:

  a. temporarily or permanently removed, halted, or otherwise disabled

    computer data, computer programs or computer software from the DNC's

    computer or computer network, in violation of Va. Code Ann. § 18.2-

    152.4(1);

  b.  caused the DNC's computers to malfunction, in violation of Va. Code Ann.

    § 18.2-152.4(2);

  c. altered, disabled, or erased computer data, computer programs or computer

    software, in violation of Va. Code Ann. § 18.2-152.4(3);

  d. used a computer or computer network to make or cause to be made an

    unauthorized copy of computer data, computer programs or computer

software residing in, communicated by, or produced by a computer or computer network, in violation of Va. Code Ann. § 18.2-152.4(6);

e.  installed or caused to be installed, or collected information through, a keystroke logger on the DNC's computers and, without their authorization, in violation of Va. Code. Ann. § 18.2-152.4(8).

231.    Defendants Russia, the GRU, and GRU Operative #1 used a computer or computer network and intentionally examined without authority employment, credit, financial, or identifying information relating to other persons, in violation of in Va. Code. Ann. § 18.2-152.5.

232.    Each Defendant knowingly aided, abetted, encouraged, induced, instigated, contributed to and assisted Russia, the GRU, and GRU Operative #1's violation of Va. Code Ann. § 18.2-152.3, § 18.2-152.4, and § 18.2-152.5.

233.    All Defendants' violations of the foregoing provisions caused Plaintiff injury. This injury includes, but is not limited to, injury resulting from harm to DNC computers and servers, loss in the value of DNC trade secrets and business information, and harm to business as described above. Plaintiff is entitled to recover damages and the costs of suit under Va. Code Ann. § 18.2-152.12.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants on all Counts, and seeks such relief as specified below for all Counts for which such relief is provided by law:

a)  Awarding Plaintiff damages in an amount to be determined, including but not limited to all damages and losses suffered by Plaintiff as a result of the illegal hacking, theft, and subsequent release of Plaintiff's confidential documents and/or Plaintiff's response to and remediation related thereto;

b) Awarding Plaintiff compensatory and treble damages, as available, in an amount to be proven at trial;

c) Awarding Plaintiff the financial gain earned by Defendants as a consequence of the violations described herein;

d) Awarding Plaintiff statutory damages, as available;

e) Awarding Plaintiff punitive damages, as available;

f) Issuing a declaration that: Defendants, according to proof, conspired to and did engage in a common scheme to effect the illegal and unauthorized hacking of Plaintiff's computer systems and/or personal emails and the exfiltration of confidential information; disseminated that stolen information to the public; and used that disclosed stolen information to impact the 2016 election for their own gain;

g) Issuing an injunction restraining Defendants and their officers, agents, servants, employees, assigns, and those acting in active concert or participation with them from:

    a. Accessing Plaintiff's computer networks and/or personal emails without Plaintiff's authorizations;

    b. Engaging in any activity that disrupts, diminishes the quality of, interferes with the performance of, or impairs the functionality of Plaintiff's computer networks or personal emails; and

    c. Selling, publishing, distributing, or using any property or information obtained from Plaintiff's computer networks or personal emails without Plaintiff's authorization;

    d. Removing, extracting, or copying any information or data from Plaintiff's computers or personal emails without Plaintiff's authorization;

h) Awarding Plaintiff all costs and attorneys' fees to the full extent permitted under the applicable law;

i) Awarding Plaintiff pre- and post-judgment interest as permitted by law;

j) Awarding any other relief as the Court may deem just and proper.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands trial by jury in this action of all issues so triable.

April 20, 2018                                    Respectfully submitted,
New York, NY

*/s/ Michael Eisenkraft*
Michael Eisenkraft                               Joseph M. Sellers
Cohen Milstein Sellers & Toll PLLC               Geoffrey A. Graber
88 Pine St., 14th Floor                          Julia A. Horwitz
New York, NY 10005                               Alison S. Deich
(212) 838-7797                                   Cohen Milstein Sellers & Toll PLLC
                                                 1100 New York Ave. NW ● Fifth Floor
meisenkraft@cohenmilstein.com                    Washington, DC 20005
                                                 (202) 408-4600

                                                 jsellers@cohenmilstein.com
                                                 ggraber@cohenmilstein.com
                                                 jhorwitz@cohenmilstein.com
                                                 adeich@cohenmilstein.com

*Attorneys for Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that on April 20, 2018, I electronically filed the *Complaint* with the Clerk

of the Court using the ECF, who in turn sent notice to all counsel of record.

Dated: April 20, 2018

/s/ *Michael Eisenkraft*
Michael Eisenkraft

## **ENDNOTES**

[1] Steve Goldstein, *Trump May Build Hotels in USSR*, Philly.com. Philadelphia Media Network, PBC, (July 7, 1987), https://articles.philly.com/1987-07-07/news/26200012_1_trump-tower-second-largest-soviet-city-soviet-officials.

[2] Associated Press, *Russian Real Estate Deals Never Materialized for Trump*, Fortune (March 4, 2017) http://fortune.com/2017/03/04/trump-russian-real-estate/.

[3] Richard Behar, *Donald Trump And The Felon: Inside His Business Dealings With A Mob-Connected Hustler*, Forbes Business (Oct. 3, 2016, 7:59 AM), https://www.forbes.com/sites/richardbehar/2016/10/03/donald-trump-and-the-felon-inside-his-business-dealings-with-a-mob-connected-hustler/#5b94d7b52282.

[4] *Moscow deputy mayor says 60 skyscrapers to be built in Moscow*, Prime-Tass Business Newswire, (Mar. 19, 2004).

[5] Amy Dempsey, *Trump vs. Trump: Inside Toronto's 5-star tower struggle*, Toronto Star (April 17, 2016), https://www.thestar.com/news/gta/2016/04/17/trump-vs-trump-inside-torontos-5-star-tower-struggle.html.

[6] Vernon Silver & Evgenia Pismennaya, *Trump's Two Nights of Parties in Moscow Echo Years Later*, Bloomberg (July 13, 2017) https://www.bloomberg.com/news/articles/2017-07-13/trumps-two-nights-of-parties-in-moscow-reverberate-years-later.

[7] Tom Hamburger et al.,, *Inside Trump's financial ties to Russia and his unusual flattery of Vladimir Putin*, Wash. Post (Jun. 17, 2016), https://www.washingtonpost.com/politics/inside-trumps-financial-ties-to-russia-and-his-unusual-flattery-of-vladimir-putin/2016/06/17/dbdcaac8-31a6-11e6-8ff7-7b6c1998b7a0_story.html?noredirect=on&utm_term=.dc2924d0db41.

[8] Michael Crowley, *When Donald Trump brought Miss Universe to Moscow*, Politico (May 15, 2016, 7:45 AM) https://www.politico.com/story/2016/05/donald-trump-russia-moscow-miss-universe-223173.

[9] Carol D. Leonnig et al., *Trump's business sought deal on a Trump Tower in Moscow while he ran for president,* Wash. Post (Aug. 27, 2017), https://www.washingtonpost.com/politics/trumps-business-sought-deal-on-a-trump-tower-in-moscow-while-he-ran-for-president/2017/08/27/d6e95114-8b65-11e7-91d5-ab4e4bb76a3a_story.html.

[10] Nathan Layne et al.,, *Russian elite invested nearly $100 million in Trump buildings*, Reuters (Mar. 17, 2017) https://www.reuters.com/investigates/special-report/usa-trump-property/.

[11] David Ignatius, *A history of Donald Trump's business dealings in Russia*, The Washington Post (Nov. 2, 2017), https://www.washingtonpost.com/opinions/a-history-of-donald-trumps-business-dealings-in-russia/2017/11/02/fb8eed22-ba9e-11e7-be94-fabb0f1e9ffb_story.html?utm_term=.340eff428fe4.

[12] Caitlin Yilek, *Author claims Eric Trump told him all funding for Trump golf courses comes from Russia in 2014,* Washington Examiner (May 7, 2017),

https://www.washingtonexaminer.com/author-claims-eric-trump-told-him-all-funding-for-trump-golf-courses-comes-from-russia-in-2014.

[13] Andrew E. Kramer et al., *Secret Ledger in Ukraine Lists Cash for Donald Trump's Campaign Chief*, N.Y. Times (Aug. 14, 2016), https://www.nytimes.com/2016/08/15/us/politics/paul-manafort-ukraine-donald-trump.html.

[14] *Manafort helped funnel money to US lobbyists from pro-Putin Ukrainian party, report claims*, Fox News (Aug. 17, 2016) http://www.foxnews.com/politics/2016/08/17/manafort-helped-funnel-money-to-us-lobbyists-from-pro-putin-ukrainian-party-report-claims.html.

[15] Michael Kranish & Tom Hamburger, *Paul Manafort's 'lavish lifestyle' highlighted in indictment*, Wash. Post (Oct. 30, 2017) https://www.washingtonpost.com/politics/paul-manaforts-lavish-lifestyle-highlighted-in-indictment/2017/10/30/23615680-bd8f-11e7-8444-a0d4f04b89eb_story.html?utm_term=.bb5d54a2da8e.

[16] Tom Hamburger & Rosalind S. Helderman, *Former Trump campaign chairman Paul Manafort files as foreign agent for Ukraine work*, Wash. Post (June 27, 2017), https://www.washingtonpost.com/politics/former-trump-campaign-chairman-paul-manafort-files-as-foreign-agent-for-ukraine-work/2017/06/27/8322b6ac-5b7b-11e7-9fc6-c7ef4bc58d13_story.html?utm_term=.c0c580285583.

[17] Brooke Singman, *Paul Manafort, Rick Gates indicted by federal grand jury in Russia probe,* Fox News (Oct. 30, 2017), http://www.foxnews.com/politics/2017/10/30/report-paul-manafort-rick-gates-to-surrender-to-special-counsel.html.

[18] Sonam Sheth, *Manafort's financial troubles raise new questions about why he offered to work as an unpaid volunteer to the Trump campaign*, Business Insider (Feb. 28, 2018, 2:52 PM), http://www.businessinsider.com/paul-manafort-ukraine-debt-trump-campaign-unpaid-volunteer-2018-2.

[19] Kenneth P. Vogel, *Manafort's man in Kiev*, Politico (Aug. 18, 2016, 9:27 PM), https://www.politico.com/story/2016/08/paul-manafort-ukraine-kiev-russia-konstantin-kilimnik-227181.

[20] David Voreacos, *Mueller Draws Line to Russian Spy's Work With Manafort and Gates*, Bloomberg (Mar. 28, 2018), https://www.bloomberg.com/news/articles/2018-03-28/mueller-draws-line-to-russian-spy-s-work-with-manafort-and-gates.

[21] Statement of the Offense, *United States v. George Papadopoulos*, No. 1:17-cr-00182-RDM (D.D.C. Oct. 5, 2017).

[22] Howard Amos & Patrick Sawyer, *Russian protests: December 10 as it happened*, The Telegraph (Dec. 10, 2011, 4:50 PM), https://web.archive.org/web/20140109114019/http://www.telegraph.co.uk/news/worldnews/europe/russia/8947840/Russian-protests-live.html.

[23] Evan Osnos et al., *Trump, Putin, and the New Cold War*, New Yorker (Mar. 6, 2017), https://www.newyorker.com/magazine/2017/03/06/trump-putin-and-the-new-cold-war.

[24] Steven Pifer, *Trump and Russia: Expect a change in tone. But in substance?*, Brookings (Jan. 4, 2017), https://www.brookings.edu/blog/order-from-chaos/2017/01/04/trump-and-russia-expect-a-change-in-tone-but-in-substance/.

[25] Franklin Foer, *Putin's Puppet*, Slate (July 4, 2016, 8:01 PM), http://www.slate.com/articles/news_and_politics/cover_story/2016/07/vladimir_putin_has_a_plan_for_destroying_the_west_and_it_looks_a_lot_like.html.

[26] Andrew Kaczynski et al., *80 times Trump talked about Putin*, CNN Politics (Mar. 2017), http://www.cnn.com/interactive/2017/03/politics/trump-putin-russia-timeline/.

[27] *Presidential Candidate Donald Trump Primary Night Speech*, C-SPAN (Apr. 26, 2016), https://www.c-span.org/video/?408719-1/donald-trump-primary-night-speech&start=1889&transcriptQuery=putin.

[28] John Santucci, *Trump Says 'Great Honor' to Get Compliments from 'Highly Respected' Putin*, ABC News (Dec. 17, 2015, 6:05 PM), http://abcnews.go.com/Politics/trump-great-honor-compliments-highly-respected-putin/story?id=35829618.

[29] Michael R. Gordon & Niraj Chokshi, *Trump Criticizes NATO and Hopes for 'Good Deals' With Russia*, N.Y. Times (Jan. 15, 2017), https://www.nytimes.com/2017/01/15/world/europe/donald-trump-nato.html.

[30] Ashley Parker, *Donald Trump, in Scotland, Calls 'Brexit' Result 'a Great Thing'*, N.Y. Times (June 24, 2016), https://www.nytimes.com/2016/06/25/us/politics/donald-trump-scotland.html.

[31] Alexander Mallin, *Trump: Crimea's People Prefer Russia, But If He's Elected Putin Is 'Not Going Into Ukraine'*, ABC News (July 31, 2016, 3:23 PM), http://abcnews.go.com/ThisWeek/trump-crimeas-people-prefer-russia-elected-putin-ukraine/story?id=41029437.

[32] Charlie Savage, *Assange, Avowed Foe of Clinton, Timed Email Release for Democratic Convention*, N.Y. Times (July 26, 2016), https://www.nytimes.com/2016/07/27/us/politics/assange-timed-wikileaks-release-of-democratic-emails-to-harm-hillary-clinton.html.

[33] Director of National Intelligence, *Assessing Russian Activities and Intentions in Recent US Elections* (2017), *available at* https://www.dni.gov/files/documents/ICA_2017_01.pdf.

[34] *Id.*

[35] Gloria Borger & Marshall Cohen, *Document details scrapped deal for Trump Tower Moscow*, CNN Politics (Sept. 9, 2017, 2:41 AM), https://www.cnn.com/2017/09/08/politics/document-trump-tower-moscow/index.html+&cd=1&hl=en&ct=clnk&gl=us.

[36] *Id.*

[37] *Id.*

[38] *Id.*

[39] Exec. Order 13,662, 79 Fed. Reg. 16,169 (Mar. 24, 2014).

[40] [40] Brian Beutler, *Donald Trump and the Fruit of the Poisonous Tree*, The New Republic (Aug. 29, 2017), https://newrepublic.com/article/144596/donald-trump-fruit-poisonous-tree.

[41] Pamela Brown et al., *Trump aides were in constant touch with senior Russian officials during campaign*, CNN Politics (Feb. 15, 2017, 10:37 PM), https://www.cnn.com/2017/02/14/politics/donald-trump-aides-russians-campaign/index.html.

[42] Sharon LaFraniere et al., *How the Russia Inquiry Began: A Campaign Aide, Drinks and Talk of Political Dirt*, N.Y. Times (Dec. 30, 2017), https://www.nytimes.com/2017/12/30/us/politics/how-fbi-russia-investigation-began-george-papadopoulos.html.

[43] Philip Bump, *Timeline: How a Trump adviser tried to work with the Russian government, Wash. Post* (Oct. 30, 2017), https://www.washingtonpost.com/news/politics/wp/2017/10/30/timeline-how-a-trump-adviser-tried-to-work-with-the-russian-government/.

[44] Statement of the Offense, *supra* note 21.
[45] *Id.*

[46] *Id.*

[47] *Id.*
[48] *Id*.

[49] *Id.*
[50] *Id.*
[51] *Id.*
[52] *Id.*
[53] *Id.*
[54] Shane Harris, *Former Trump Adviser's Guilty Plea Ties Campaign to Russian Officials*, Wall St. J. (Oct. 30, 2017, 7:31 PM), https://www.wsj.com/articles/former-trump-foreign-policy-adviser-to-plead-guilty-to-lying-to-fbi-1509374354.

[55] Department of Homeland Security and the Federal Bureau of Investigation, *GRIZZLY STEPPE – Russian Malicious Cyber Activity* (December 29, 2016), *available at* https://www.us-cert.gov/sites/default/files/publications/JAR_16-20296A_GRIZZLY%20STEPPE-2016-1229.pdf.
[56] Throughout this section, *see* Dmitri Alperovitch, *Bears in the Midst: Intrusion into the Democratic National Committee,* CrowdStrike (Jun. 15, 2016), https://www.crowdstrike.com/blog/bears-midst-intrusion-democratic-national-committee/.
[57] Director of National Intelligence, *supra* note 33.

[58] Throughout this section, *see* Dmitri Alperovitch, *Bears in the Midst: Intrusion into the Democratic National Committee,* CrowdStrike (Jun. 15, 2016), https://www.crowdstrike.com/blog/bears-midst-intrusion-democratic-national-committee/.
[59] Priscilla Alvarez & Elaine Godfrey, *Donald Trump Jr.'s Email Exchange With Rob Goldstone*, The Atlantic (July 11, 2017), https://www.theatlantic.com/politics/archive/2017/07/donald-trumps-jrs-email-exchange/533244/.

---

[60] *Id.*

[61] *Id.*

[62] Ryan Teague Beckwith, *Read Donald Trump's Subdued Victory Speech After Winning New Jersey*, TIME (June 8, 2016), http://time.com/4360872/donald-trump-new-jersey-victory-speech-transcript/.

[63] K.K. Rebecca Lai & Alicia Parlapiano, *What We Know About Donald Trump Jr.'s Russia Meeting*, N.Y. Times (July 18, 2017), https://www.nytimes.com/interactive/2017/07/18/us/politics/donald-trump-jr-russia-meeting.html.

[64] James Rogers, *Russian government-affiliated hackers breach DNC, take research on Donald Trump*, Fox News (June 14, 2016), http://www.foxnews.com/tech/2016/06/14/russian-government-affiliated-hackers-breach-dnc-take-research-on-donald-trump.html.

[65] Guccifer2, *Guccifer 2.0 DNC's Servers Hacked By A Lone Hacker*, Wordpress (June 15, 2016), https://guccifer2.wordpress.com/2016/06/15/dnc/.

[66] *Id.*

[67] Guccifer2, *Dossier on Hillary Clinton from DNC*, Wordpress (June 21, 2016), https://guccifer2.wordpress.com/2016/06/21/hillary-clinton/.

[68] Guccifer2, *FAQ from Guccifer 2.0*, Wordpress (June 30, 2016), https://guccifer2.wordpress.com/2016/06/30/faq/.

[69] Guccifer2, *Trumpocalypse and Other DNC Plans for July*, Wordpress (July 6, 2016), https://guccifer2.wordpress.com/2016/07/06/trumpocalypse/.

[70] *Statement by FBI Director James B. Comey on the Investigation of Secretary Hillary Clinton's Use of a Personal E-Mail System*, FBI (July 5, 2016), https://www.fbi.gov/news/pressrel/press-releases/statement-by-fbi-director-james-b-comey-on-the-investigation-of-secretary-hillary-clinton2019s-use-of-a-personal-e-mail-system.

[71] *Search the DNC email database*, WikiLeaks (July 22, 2016 10:30 AM), https://wikileaks.org/dnc-emails/.

[72] *What Donald Trump Said About Russian Hacking and Hillary Clinton's Emails*, N.Y. Times (July 27, 2016), https://www.nytimes.com/2016/07/28/us/politics/trump-conference-highlights.html.

[73] *Id.*

[74] *Id.*

[75] *Id.*

[76] *Id.*

[77] Andrew Kaczynski et al., *Trump adviser Roger Stone repeatedly claimed to know of forthcoming WikiLeaks dumps,* CNN (Mar. 20, 2017), https://www.cnn.com/2017/03/20/politics/kfile-roger-stone-wikileaks-claims/index.html.

[78] Eric Lichtblau & Noah Weiland, *Hacker Releases More Democratic Party Documents*, N.Y. Times (Aug. 12, 2016), https://www.nytimes.com/2016/08/13/us/politics/democratic-party-documents-hack.html.

[79] *Id*.

[80] Matt Dixon & Marc Caputo, *Hacked DCCC docs dish on strategy and scandal for Florida congressional candidates*, Politico (Aug. 16, 2016), https://www.politico.com/states/florida/story/2016/08/dccc-hack-unearths-dirt-on-partys-own-candidates-104744.

[81] *Id*.

[82] Andrew Blake, *Roger Stone, Trump confidant, acknowledges 'innocuous' Twitter conversation with DNC hackers*, Washington Times (Mar. 10, 2017), https://www.washingtontimes.com/news/2017/mar/10/roger-stone-trump-confidant-acknowledges-innocuous/.

[83] Ryan Goodman, *How Roger Stone Interacted With Russia's Guccifer and Wikileaks*, Newsweek (Sep. 28, 2017), http://www.newsweek.com/how-stone-interacted-russias-guccifer-and-wikileaks-673268.

[84] *Id*.

[85] *Roger Stone Joins Herald Drive Discussing 2016 Election*, Boston Herald Radio (Sept. 16, 2016), https://soundcloud.com/bostonherald/roger-stone-joins-herald-drive-discussing-2016-election-1.

[86] Julia Ioffe, *The Secret Correspondence Between Donald Trump Jr. and WikiLeaks*, The Atlantic (Nov. 13, 2017, 10:28 PM), https://www.theatlantic.com/politics/archive/2017/11/the-secret-correspondence-between-donald-trump-jr-and-wikileaks/545738/.

[87] Donald J. Trump (@realDonaldTrump), Twitter (Oct. 12, 2016, 9:46 AM), https://twitter.com/realdonaldtrump/status/786201435486781440.

[88] Kaczynski et al., *supra* note 77.

[89] *Id.*

[90] *The Podesta Emails*, WikiLeaks (Oct. 7, 2016), https://wikileaks.org/podesta-emails/.

[91] *Leaks*, WikiLeaks, https://wikileaks.org/-Leaks-.html (last visited Apr. 11, 2018).

[92] Donald J. Trump (@realDonaldTrump), Twitter (July 24, 2016, 6:16 PM), https://twitter.com/realdonaldtrump/status/757338816487235584.

[93] Donald J. Trump (@realDonaldTrump), Twitter (July 24, 2016, 5:53 PM), https://twitter.com/realdonaldtrump/status/757332905047752704.

[94] Donald J. Trump (@realDonaldTrump), Twitter (July 25, 2016, 7:31 AM), https://twitter.com/realdonaldtrump/status/757538729170964481.

[95] Donald J. Trump (@realDonaldTrump), Twitter (Oct. 12, 2016, 9:46 AM), https://twitter.com/realdonaldtrump/status/786201435486781440.

[96] Donald Trump Jr. (@DonaldJTrumpJr), Twitter (Oct. 14, 2016, 9:34 AM), https://twitter.com/DonaldJTrumpJr/status/786923210512142336.

[97] Ioffe, *supra* note 86.

[98] *Id.*

[99] Chuck Todd et al., *How Trump took advantage of Russian interference: Amplifying Wikileaks*, NBC News (Feb. 19, 2018, 8:20 AM), https://www.nbcnews.com/politics/first-read/how-trump-took-advantage-russian-interference-amplifying-wikileaks-n849326.

[100] *Id.*

[101] *Id.*

[102] *Id.*

[103] *Id.*

[104] WikiLeaks (@wikileaks), Twitter (Nov. 6, 2016, 5:39 PM), https://twitter.com/wikileaks/status/795440430259335168?lang=en.

[105] *Id.*

[106] Peter Walker, *Donald Trump wins: Russian parliament bursts into applause upon hearing result*, The Independent (Nov. 9, 2016), https://www.independent.co.uk/news/world/americas/us-elections/donald-trump-wins-us-election-russia-putin-result-a7406866.html.

[107] *Id.*