```
UNITED STATES DISTRICT COURT                    USDC SDNY
SOUTHERN DISTRICT OF NEW YORK                   DOCUMENT
                                                ELECTRONICALLY FILED
------------------------------------------X     DOC# _____
DEMOCRATIC NATIONAL COMMITTEE,                  DATE FILED: 11-9-18
                    Plaintiff,
                                                18 civ 3501 (JGK)
          -against-

THE RUSSIAN FEDERATION, et al.,
                    Defendant.
------------------------------------------X
```

## ORDER

The Court has received the attached facsimile, and is filing it along with this order.

**SO ORDERED.**

*[signature]*

**JOHN G. KOELTL**
**UNITED STATES DISTRICT JUDGE**

Dated: New York, New York
       November 8, 2018





**МИНИСТЕРСТВО ЮСТИЦИИ РОССИЙСКОЙ ФЕДЕРАЦИИ**
**(МИНЮСТ РОССИИ)**

Житная ул., д. 14, Москва, 119991
тел. (495) 955-59-99, факс (495) 955-57-79
E-mail: info@minjust.ru

06.11.2018     № 06-144392/18

На № _____ от _____

U.S. Department of State
Attn: Office of the Legal Adviser
Attn: Bureau of European and Eurasian Affairs
2201 C Street, N.W.
Washington, DC 20520

Honorable John G. Koeltl
United States District Judge
United States District Court for the
Southern District of New York
500 Pearl Street
New York, NY 10007
Fax: +1 (212) 805-7912

В отношении дела Национальный комитет Демократической партии против Российской Федерации и других № 18-CV-03501-JGK (S.D.N.Y.)

Министерство юстиции Российской Федерации имеет честь препроводить прилагаемое Заявление об иммунитете Российской Федерации, касающееся утверждений, содержащихся в уточненном иске, поданном 3 октября 2018 г. Национальным комитетом Демократической партии в рамках ведущегося судебного разбирательства Национальный комитет Демократической партии против Российской Федерации и других (№ 1:18-CV-3501-JGK (S.D.N.Y.).

Направляя настоящее письмо и прилагаемое заявление, Российская Федерация со всем уважением отмечает, что не вступает в вышеуказанное разбирательство, не отказывается от своего суверенного иммунитета в соответствии с международным правом или законодательством Соединенных Штатов Америки или практикой федеральных судов США, а также не признает юрисдикцию Окружного суда Соединенных Штатов Америки. Российская Федерация сохраняет за собой все права иностранного суверенного государства.

Министерство юстиции Российской Федерации также направляет по электронной почте копии этого письма и прилагаемого к нему заявления участникам разбирательства, а именно, Национальному комитету Демократической

2

партии (c/o Joseph M. Sellers, Cohen Milstein Sellers & Toll PLLC (DC), 1100 New York Avenue, N.W., Suite 500, West Tower, Washington, DC 20005, e-mail: jsellers@cohenmilstein.com), фонду «Дональд Трамп в Президенты» (c/o Michael A. Carvin, Jones Day LLP, 51 Louisiana Avenue, NW, Washington, DC 20001, e-mail: macarvin@jonesday.com), Арасу Агаларову и Эмину Агаларову (c/o Scott Sonny Balber, Herbert Smith Freehills New York LLP, 450 Lexington Ave, New York, NY 10017, e-mail: scott.balber@hsf.com), Джареду Кушнеру (c/o Abbe David Lowell, Winston & Strawn LLP, 1700 K St NW, Washington, DC 20006, e-mail: adlowell@winston.com), Джорджу Пападопoлосу (c/o Caroline Johnston Polisi, Pierce Bainbridge Beck Price & Hecht LLP, 20 West 23rd Street, 5th Fl, New York, NY 10010, e-mail: cpolisi@creizmanllc.com), Роджеру Стоуну-младшему (c/o Robert C. Buschel, Buschel Gibbons, P.A., 100 S.E. 3d Ave, Suite 1300, Fort Lauderdale, FL 33394, e-mail: buschel@bglaw-pa.com), организации «WikiLeaks» (c/o Joshua Lewis Dratel, Law Offices of Joshua L. Dratel, P.C., 29 Broadway, Suite 1412, New York, NY 10006, e-mail: jdratel@joshuadratel.com).

Приложение: на 12 л.

Директор Департамента
международного права и сотрудничества            М.В. Виноградов

*Translation into English*

/Official blank of the Ministry of Justice of the Russian Federation/

                U.S. Department of State
                Attn: Office of the Legal Adviser
                Attn: Bureau of European and
                Eurasian Affairs
                2201 C Street, N.W.
                Washington, DC 20520

                Honorable John G. Koeltl
                United States District Judge
                United States District Court for the
                Southern District of New York
                500 Pearl Street
                New York, NY 10007
                Fax: +1 (212) 805-7912

6 November 2018, no. 06-144392/18

RE:   Democratic National Committee v. The Russian Federation et al.
       18-CV-03501-JGK (S.D.N.Y.)

      The Ministry of Justice of the Russian Federation has the honor to convey the enclosed Statement of Immunity by the Russian Federation as to the allegations contained within the Amended Complaint filed on October 3, 2018 by the Democratic National Committee in the ongoing proceedings in *Democratic National Committee v. The Russian Federation et al.*, No. 1:18-CV-3501-JGK (S.D.N.Y.).

      By transmitting this letter and the enclosed Statement, the Russian Federation respectfully does not enter an appearance in the litigation, does not waive its sovereign immunity under international law or the United States' statutory or federal common law, and does not submit to the jurisdiction of the United States District Court.

The Russian Federation reserves all rights as a foreign sovereign State.

      The Ministry of Justice of the Russian Federation also transmits by e-mail copies of this Note and the enclosed Statement to the litigants, namely, Democratic

2

National Committee (c/o Joseph M. Sellers, Cohen Milstein Sellers & Toll PLLC (DC), 1100 New York Avenue, N.W., Suite 500, West Tower, Washington, DC 20005, e-mail: jsellers@cohenmilstein.com), Donald J. Trump For President, Inc. (c/o Michael A. Carvin, Jones Day LLP, 51 Louisiana Avenue, NW, Washington, DC 20001, e-mail: macarvin@jonesday.com), Aras I. Agalarov and Emin A. Agalarov (c/o Scott Sonny Balber, Herbert Smith Freehills New York LLP, 450 Lexington Ave, New York, NY 10017, e-mail: scott.balber@hsf.com), Jared C. Kushner (c/o Abbe David Lowell, Winston & Strawn LLP, 1700 K St NW, Washington, DC 20006, e-mail: adlowell@winston.com), George Papadopoulos (c/o Caroline Johnston Polisi, Pierce Bainbridge Beck Price & Hecht LLP, 20 West 23rd Street, 5th Fl, New York, NY 10010, e-mail: cpolisi@creizmanllc.com), Roger J. Stone, Jr. (c/o Robert C. Buschel, Buschel Gibbons, P.A., 100 S.E. 3d Ave, Suite 1300, Fort Lauderdale, FL 33394, e-mail: buschel@bglaw-pa.com), WikiLeaks (c/o Joshua Lewis Dratel, Law Offices of Joshua L. Dratel, P.C., 29 Broadway, Suite 1412, New York, NY 10006, e-mail: jdratel@joshuadratel.com).

Enclosure: on 12 pages.

Director of the Department
for International Law and Cooperation                                              Mikhail V.Vinogradov

/Official seal of the Ministry of
Justice of the Russian Federation/

ANNEX

# STATEMENT OF IMMUNITY OF THE RUSSIAN FEDERATION

on the Russian Federation's Immunity from the U.S. District Court's Jurisdiction Under the 1976 Foreign Sovereign Immunities Act and Other Issues Relating to the Democratic National Committee's Allegations in Case No. 1:18-CV-3501 (S.D.N.Y.)

November [6], 2018

## I. INTRODUCTION

a. In this Position Paper, the Russian Federation sets forth its legal analysis of the allegations contained within the Amended Complaint filed by the Democratic National Committee ("DNC") in the ongoing proceedings before the U.S. District Court in Case No. 1:18-CV-3501 (S.D.N.Y.).

b. By transmitting this Position Paper to the U.S. District Court and to the U.S. State Department, with copies to the litigants, the Russian Federation does not enter an appearance in the litigation, does not waive its sovereign immunity under customary international law or U.S. statutory law, and does not submit to the subject-matter jurisdiction of the U.S. District Court. The Russian Federation reserves all rights.

c. The Foreign Sovereign Immunities Act ("FSIA") creates an "independent obligation" for the U.S. District Court "to consider the presence or absence of subject matter jurisdiction *sua sponte*."[1] In Case No. 1:18-CV-3501 (S.D.N.Y.), the U.S. District Court lacks subject-matter jurisdiction under the FSIA to hear claims against the Russian Federation based on the DNC's allegations:

   i. Within the U.S. legal system, the FSIA is the exclusive basis for the U.S. District Court's subject-matter jurisdiction as to claims against a foreign sovereign State, such as the Russian Federation.[2]

   ii. The FSIA provides that foreign sovereign States enjoy absolute jurisdictional immunity from suit unless a plaintiff can demonstrate that one of the FSIA's enumerated "exceptions" applies.[3]

---

[1] *Walters v. Indus. & Commer. Bank of China, Ltd.*, 651 F.3d 280, 287 (2d Cir. 2011); *see also Verlinden B.V. v. Cent. Bank of Nig.*, 461 U.S. 480, 493 n.20 (1983) ("[S]ubject matter jurisdiction turns on the existence of an exception to foreign sovereign immunity, . . . even if the foreign state does not enter an appearance to assert an immunity defense, a District Court still must determine that immunity under the FSIA."); *Practical Concepts, Inc. v. Republic of Bolivia*, 811 F.2d 1543, 1552 (D.C. Cir. 1987).

[2] *See Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989).

iii. As detailed below, the DNC's allegations regarding a purported "military attack" by "Russia's military intelligence agency" do not fall within any of the FSIA's enumerated exceptions to the Russian Federation's sovereign immunity. Accordingly, the U.S. District Court must dismiss the DNC's claims against the Russian Federation *sua sponte* based on lack of subject matter jurisdiction.

d. This Position Paper also addresses several additional grounds for the U.S. District Court to dismiss the claims against the Russian Federation. Even if such grounds may be characterized as "non-jurisdictional," the U.S. District Court should nonetheless consider these grounds as a matter of international comity. Notably, the U.S. District Court and other American courts have frequently accepted and relied upon submissions received as diplomatic letters from foreign sovereign States even with respect to non-jurisdictional issues.[4]

## II. BACKGROUND

a. The DNC has alleged that "Russia's military intelligence agency" participated in "a brazen attack on American democracy." Am. Compl. ¶¶ 1, 4, 40. Specifically, the DNC identifies nine "Russian military officer[s]" who acted pursuant to "military orders." Am. Compl. ¶¶ 54-63, 101. This alleged attack involved "a cyberattack on the DNC," followed by a campaign of "destabilizing the U.S. political environment" by disseminating the DNC's emails to the American news media. Am. Compl. ¶ 1.

b. By reference, the DNC's Amended Complaint incorporates the unclassified version of a January 2017 report by the U.S. Intelligence Community and a July 2018 indictment filed by the Special Counsel for the U.S. Department of Justice, Robert S. Mueller III. Both of these incorporated documents contain identical allegations regarding the purportedly "military" nature of the alleged cyber operations.

c. Under the standard applicable within the U.S. legal system under *Twombly* and *Iqbal*, and assuming the truth of all pleaded allegations,[5] the U.S. District Court

---

[3] 28 U.S.C. § 1604; *Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*, 137 S.Ct. 1312, 1316 (2017).

[4] *See Glencore Denrees Paris v. Dep't of Nat'l Store Branch 1 (Vietnam)*, 99 Civ. 8607, 2000 U.S. Dist. LEXIS 9387, at *4 n.4 (S.D.N.Y. July 6, 2000) *rev'd on other grounds*, 24 Fed. Appx. 100 (2d Cir. 2002); *see also Swezey v. Merrill Lynch*, 87 A.D.3d 119, 129 n.10 (N.Y App. Div. 2011); *Lizarbe v. Rondon*, 642 F. Supp. 2d 473, 483 (D. Md. 2009), *Paredes v. Vila*, 479 F. Supp. 2d 187, 192 (D.D.C. 2007); *Prewitt Enters. v. OPEC*, 224 F.R.D. 497, 500 n.4 (N.D. Ala. 2002).

[5] This standard "is similar to that of Rule 12(b)(6), under which dismissal is warranted if no plausible inferences can be drawn from the facts alleged that, if proven, would provide grounds for relief." *Schubarth v. Fed. Republic of Germany*, 891 F.3d 392, 399 (D.C. Cir. 2018) (quoting *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 93 (D.C. Cir. 2002)).

lacks jurisdiction to adjudicate any claims against the Russian Federation based upon the DNC's allegations. As explained by the U.S. Supreme Court, the basis for any exception to the FSIA must be pleaded fully. *Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*, 137 S.Ct. 1312, 1316 (2017).

d. Any alleged "military attack" is a quintessential sovereign act that does not fall within any exception to the FSIA or the customary international law of foreign sovereign immunity. The Russian Federation's sovereign immunity with respect to claims based upon such allegations is absolute.

e. Indeed, the United States benefits significantly from the sovereign immunity that it enjoys (and U.S. officials enjoy) in foreign courts around the world with respect to the United States' frequent acts of cyber intrusion and political interference. As current and former U.S. officials have acknowledged on many occasions, the United States—acting primarily through the National Security Agency (NSA) within the U.S. Department of Defense—is one of the most prolific practitioners of cyberattacks and cyber-intrusions on the planet:

   i. As explained by one former U.S. Assistant Attorney General, "the U.S. intelligence services break into computers and computer networks abroad at an astounding rate, certainly on a greater scale than any other intelligence service in the world."[6]

   ii. The NSA's practices in this regard have been publicly acknowledged by leading voices in the U.S. foreign policy and intelligence communities, including numerous former members of the Bush and Obama administrations.[7]

---

[6] Jack Goldsmith, *Uncomfortable Questions in the Wake of Russia Indictment 2.0 and Trump's Press Conference With Putin*, LAWFARE (July 16, 2018) ("The Mueller indictment at bottom accuses the named Russians of hacking into computers in the United States, stealing information, and using that information in public to Russia's advantage. Similarly, the United States uses the masses of digital information it steals to its advantage in every element of its international relations, including to influence foreign political outcomes."). The author, Jack Goldsmith, is a Professor at Harvard Law School (2004-present) who served as Assistant Attorney General in the Office of Legal Counsel (2003-2004) and Special Counsel to the Department of Defense (2002-2003) under President George W. Bush.

[7] David E. Sanger, *Obama Order Sped Up Wave of Cyberattacks Against Iran*, N.Y. TIMES (June 1, 2012) ("From his first months in office, President Obama secretly ordered increasingly sophisticated attacks on the computer systems that run Iran's main nuclear enrichment facilities, significantly expanding America's first sustained use of cyberweapons, according to participants in the program."); *see also* Spencer Hsu & Ellen Nakashima, *Former Joint Chiefs of Staff vice chairman pleads guilty to false statements in classified leak investigation*, WASHINGTON POST (Oct. 17, 2016) (explaining that General Cartwright admitted in a guilty plea that he had served as a source for David Sanger's June 2012 article in the New York Times); Scott Shane, *Russia Isn't the Only One Meddling in Elections. We Do It, Too*, N.Y. TIMES (Feb. 17, 2018) ("'If you ask an intelligence officer, did the Russians break the rules or do something bizarre, the answer is no, not at all,' said Steven L. Hall, who retired in 2015 after 30 years at the C.I.A., where he was the chief of Russian operations. The United States 'absolutely' has carried out such election influence operations historically, he said, 'and I hope we keep doing it.'").

    iii. Accordingly, the United States' own interests and foreign relations would be significantly undermined by a tidal wave of civil litigation against the United States in foreign courts (*e.g.*, evidentiary discovery, seizure of assets) based upon the activities of the NSA or the United States' other "military intelligence agencies."

  f. This has significant consequences for the DNC's allegations, because foreign sovereign immunity is fundamentally interconnected with "reciprocal self-interest."[8] When drafting and enacting the FSIA, the U.S. Congress could not possibly have intended to encourage a flood of lawsuits against the United States in foreign courts based upon either election interference or cyber warfare. The U.S. District Court must therefore reject the DNC's erroneous interpretation of the FSIA, which would undermine the protections of sovereign immunity routinely relied upon by the United States and would significantly undermine international relations.

  g. Moreover, these are State-to-State matters. The U.S. Executive and U.S. Congress are the proper actors to address this "political question" within the United States' constitutional system. Significantly, neither the Executive nor the U.S. Congress has taken any steps to involve the Judicial Branch in their response. The U.S. Congress has also resisted naive calls over the past decade to create a "cyberattack" exception to the FSIA.

  h. As detailed below, therefore, the Russian Federation is immune and the U.S. District Court has no jurisdiction. Moreover, the U.S. District Court should reject the DNC's efforts to distort the meaning of the existing FSIA exceptions and to involve the U.S. District Court in this political and diplomatic issue.

### III. Legal Analysis of Sovereign Immunity, the "Political Question" Doctrine, and Venue

  **a. Lack of Subject Matter Jurisdiction under the FSIA**

    i. Under 28 U.S.C. § 1604 and decisions of the U.S. Supreme Court, a foreign State is immune from suit unless one of the FSIA's exceptions applies.

    ii. The DNC's allegations do not permit the U.S. District Court to exercise jurisdiction in this case. The DNC attempts to invoke the U.S. District Court's jurisdiction under the "commercial activity" exception and the "tortious act" exception of the FSIA. (Am. Compl. ¶ 35.) But neither

---

[8] *Philippines v. Pimentel*, 553 U.S. 851, 866 (2008) (quoting *National City Bank of N. Y. v. Republic of China*, 348 U.S. 356, 362, and n. 7 (1955)), *see also Aquamar S.A. v. Del Monte Fresh Produce N.A.*, 179 F.3d 1279, 1295 (11th Cir. 1999) ("[T]he FSIA's purposes included . . . according foreign sovereigns treatment in U.S. courts that is similar to the treatment the United States would prefer to receive in foreign courts . . . ." (internal citations omitted)).

4

exception applies to alleged *military activities*—such as alleged cyberattacks on political infrastructure allegedly carried out by the State and/or its military officers.

iii. The "commercial activity" exception under § 1605(a)(2) does not apply here because:

1. The gravamen of the DNC's complaint is an alleged military attack by a "military intelligence agency" upon the United States' political infrastructure. The similar allegations incorporated from the U.S. Intelligence Community's 2017 Report and the Special Counsel's 2018 Indictment confirm the "military" nature of the alleged attack. The DNC therefore has not alleged a commercial activity, but a quintessentially sovereign activity.

2. A tort case cannot be re-characterized as a commercial activity case simply to satisfy FSIA jurisdiction. *Saudi Arabia v. Nelson*, 507 U.S. 349, 358 (1993). Here, the essence of the claim is tortious activity by the Russian State to trespass in U.S. computer systems so as to damage the U.S. election process. Thus, the allegations against the Russian Federation "boil[] down to abuse of the power of its [military] by the [Russian] Government, and . . . a foreign state's exercise of the power of its [military] has long been understood for purposes of the restrictive theory as peculiarly sovereign in nature." *Id.* at 362.

3. This was the conclusion of the first U.S. District Court to consider facts similar to the present case in *Broidy Capital Management, LLC et al v. State of Qatar*, No. 2:18-cv-02421 (C.D. Cal. 2018). In that case, the U.S. District Court concluded that Qatar's alleged hacking and leaking of electronic information belonging to a major Republican fundraiser was not a "commercial activity."

4. Even though a private entity is "capable" of committing a cyberattack, the FSIA's "commercial activity" exception applies only where "the activity is of the type an individual would *customarily* carry on for profit." *Letelier v. Republic of Chile*, 748 F.2d 790 (2d Cir. 1984) (emphasis added); *see also In re Terrorist Attacks on September 11, 2001*, 538 F.3d 71, 92 (2d Cir. 2008) ("[I]nquiry under the Commercial Activities Exception is not just whether the act was public (jure imperii) or private (jure gestionis); it also matters 'whether the particular actions that the foreign state performs (whatever the motive behind them) are the type of actions by which a private party engages in trade and traffic or commerce.' . . . In this context, the Four Princes' donations to charity are not part of the trade and commerce engaged in by a 'merchant in the

5

marketplace.'") (citations omitted). There is no allegation of profit making here.

5. Certainly, a private entity is also "capable" of committing murder or kidnapping—but U.S. courts routinely hold that murder and kidnapping are not commercial acts because they are not customary acts by "a merchant in the marketplace". *Letelier v. Republic of Chile*, 748 F.2d 790 (2d Cir. 1984); *see also Cicippio v. Islamic Republic of Iran*, 30 F.3d 164, 168 (D.C. Cir. 1994) ("[K]idnapping by itself cannot possibly be described as an act typically performed by participants in the market (unless one distorts the notion of a market to include a hostage bazaar)."); *Jin v. Ministry of State Sec.*, 557 F. Supp. 2d 131 (D.D.C. 2008) (observing, in connection with hiring of thugs to implement policy of eradicating Falun Gong, "[n]o private citizen has the authority to engage in such behavior as a routine, legitimate way of participating in the market.").

6. The U.S. Congress cannot have intended to create an exception to a foreign State's sovereign immunity for interference in foreign elections or cyber warfare, because the U.S. Government routinely participates in both types of activities.

iv. The "tortious act" exception under § 1605(a)(5) does not apply here because:

1. The action does not satisfy the "tortious act" exception's situs requirement that requires the whole tort to occur in the United States. The DNC's allegations show that the "entire tort" did not take place in the United States. *In re Terrorist Attacks on September 11, 2001*, 714 F.3d 109, 116 (2d Cir. 2013); *Cabiri v. Government of Ghana*, 165 F.3d 193 (2d Cir. 1999); *Hirsh v. State of Israel*, 962 F. Supp. 377, 383-84 (S.D.N.Y. 1997).

2. The action does not satisfy the "tortious act" exception's property damage or loss requirement, because plaintiff primarily alleges that information was disclosed, not that information (or the systems in which it resided) was lost or destroyed. *See Intel Corp. v. Hamidi*, 30 Cal. 4th 1342, 1347 (2003) (trespass to chattels claim could not encompass "an electronic communication that neither damages the recipient computer system nor impairs its functioning); *Mount v. Pulspoint, Inc.*, No. 13 Civ. 6592, 2016 U.S. Dist. LEXIS 112315, 28-30 (S.D.N.Y. Aug. 17, 2016) (finding on the basis of *Intel* that an electronic incursion into plaintiffs' computing devices could not give rise to a trespass to chattels claim because plaintiff pled no "particularized allegations of diminished device performance").

6

3. The "tortious act" exception contains a carve-out for "discretionary functions" under § 1605(a)(5)(A). The fulfillment of "military orders" is a textbook example of a discretionary function.

   a. "The discretionary function exception preserves the immunity of a sovereign nation when it would otherwise be abrogated by the tortious activity exception "if two conditions are met: (1) the acts alleged to be negligent must be discretionary, in that they involve an element of judgment or choice and are not compelled by statute or regulation, and (2) the judgment or choice in question must be grounded in considerations of public policy or susceptible to policy analysis." *USAA Cas. Ins. Co. v. Permanent Mission of the Republic of Namib.*, 681 F.3d 103, 111-114 (2d Cir. 2012) (internal citations omitted).

   b. Assuming that plaintiff's allegations are true, this would be a quintessential example of an action taken pursuant to a "discretionary function." See *In re Terrorist Attacks on September 11, 2001*, 392 F. Supp. 2d 539, 555 (S.D.N.Y. 2005) (finding Saudi Arabia and the Saudi High Commission retained immunity pursuant to the discretionary function exception because their alleged actions regarding support of Islamic charities and distribution of humanitarian relief funds involved decisions were "grounded in social, economic, and political policy") (internal citations omitted); *see also Kline v. Kaneko*, 685 F. Supp. 386, 391-392 (S.D.N.Y. 1988) (explaining that foreign sovereign's decisions regarding formation and enforcement of national policies are "clearly" discretionary functions "within the scope of [defendant's] official duties.").

b. **Political Question**

   i. The political question doctrine is "essentially a function of the separation of powers," and "excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch." *Tarros S.p.A. v. United States*, 982 F. Supp. 2d 325, 330 (S.D.N.Y. 2013) (citations omitted).

   ii. This case invades the purview of political branches of the U.S. government, which have the exclusive authority to determine the United States' response to a "military attack," notably by imposing sanctions

7

against Russia for cyber-hacking and engaging in other measures relating to US-Russian foreign policy.[9] *See Arar v. Ashcroft*, 585 F.3d 559, 575 (2d Cir. 2009) ("[F]oreign policy [is] the province and responsibility of the Executive. . . . [C]ourts traditionally have been reluctant to intrude upon the authority of the Executive in military and national security affairs."); *El-Shifa Pharm. Indus. Co. v. United States*, 559 F.3d 578, 583 (D.C. Cir. 2009) ("Disputes involving national security and foreign policy decisions are 'quintessential sources of political questions.'"); *Haig v. Agee*, 453 U.S. 280, 292 (1981) ("Matters intimately related to foreign policy and national security are rarely proper subjects for judicial intervention.").

iii. *Baker v. Carr*, 369 U.S. 186, 217 (1962) identified six situations in which a non-justiciable political question may warrant abstention (each of which may serve as an independent grounds for dismissal): (1) a textually demonstrable constitutional commitment of the issue to a coordinate political department; (2) a lack of judicially discoverable and manageable standards for resolving the issue; (3) the impossibility of deciding the issue without an initial policy determination of a kind clearly for nonjudicial discretion; (4) the impossibility of a court's undertaking independent resolution of the issue without expressing lack of the respect due coordinate branches of government; (5) an unusual need for unquestioning adherence to a political decision already made; or (6) the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

iv. Courts in the S.D.N.Y. have recognized that, "The first factor addresses a court's legal authority to resolve the particular issue presented, the second and third focus on the Judiciary's competence to do so, and the final three concern prudential considerations that may counsel against a court's resolution of the issue." *Citizens for Responsibility & Ethics in Wash. v. Trump*, 276 F. Supp. 3d 174, 193 (S.D.N.Y. 2017).

v. The first *Baker v. Carr* factor, which focuses on the Court's legal authority to resolve the matter, warrants dismissal on political question grounds because matters relating to foreign affairs and national security are committed to the Executive. *See Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 414 (2003) ("[T]he historical gloss on the 'executive power' vested in Article II of the Constitution has recognized the President's 'vast share of

---

[9] On March 15, 2018, the Department of the Treasury issued significant sanctions against Russian cyber actors pursuant to Executive Order 13694 "Blocking the Property of Certain Persons Engaging in Significant Malicious Cyber-Enabled Activities," ("E.O. 13694") as amended by the Countering America's Adversaries Through Sanctions Act ("CAATA"). Furthermore, the President has specifically addressed foreign inference in U.S. elections with the September 12, 2018 issuance of Executive Order 13848 "Imposing Certain Sanctions in the Event of Foreign Interference in a United States Election" ("E.O. 13848"). Additionally, on December 28, 2016, President Barak Obama issued Executive Order No. 13757 "Taking Additional Steps to Address the National Emergency With Respect to Significant Malicious Cyber-Enabled Activities."

responsibility for the conduct of our foreign relations.'"); *Oetjen v. Central Leather Co.*, 246 U.S. 297 (1918) ("The conduct of the foreign relations of our Government is committed by the Constitution to the Executive and the Legislative . . . .").

vi. The second and third *Baker v. Carr* factors, which focus on the competence of the Court to resolve the issue, warrant dismissal on political question grounds because the Court is not in a position to address a private claim relating to Russian alleged actions in the midst of the United States' ongoing and evolving response to these allegations. *See Schneider v. Kissinger*, 412 F. 3d 190 at 197 (D.C. Cir. 2005) ("To determine whether drastic measures should be taken in matters of foreign policy and national security is not the stuff of adjudication, but of policymaking").

vii. The fourth, fifth, and six *Baker v. Carr* factors, which are largely prudential considerations, warrant dismissal on political question grounds because (1) the Executive is already committed to a course of action to combat these actions and it should not be "second-guessed" by the courts and (2) the Judiciary's involvement in the dispute would undermine the United States' ability to speak with "one voice" on an issue of foreign affairs and national security. *See El-Shifa Pharm. Indus. Co.*, 559 F.3d at 583-84 ("[C]ourts are not a forum for second-guessing the merits of foreign policy and national security decisions [] committed to the political branches."); *Baker v. Carr*, 369 U.S. at 211 (1962) (noting that resolution of foreign relations matters "uniquely demand single-voiced statement of the Government's views"); *Whiteman v. Dorotheum GmbH & Co KG*, 431 F.3d 57, 72 (2d Cir. 2005) ("We further conclude that 'a court's undertaking independent resolution' of plaintiffs' claims would "express[] [a] lack of . . . respect,' for the foreign policy interests of the United States . . . .").

c. **Venue**

   i. Under 28 U.S.C. § 1391, "a civil action against a foreign state . . . may be brought" either "in the United States District Court for the District of Columbia" or "in any judicial district in which a substantial part of the events or omissions giving rise to the claim occurred."

   ii. In the present case, virtually all of the alleged U.S.-based conduct took place in the Commonwealth of Virginia and the District of Columbia. The core of the DNC's claims is that "Russian operatives trespassed onto computer servers located in Virginia and Washington, D.C. and stole information located on those servers." These servers are mentioned nearly fifty times in the Amended Complaint. Moreover, the Trump Campaign

9

   was based in Virginia. Messrs. Gates and Manafort are both located in Virginia. Mr. Kushner is located in the District of Columbia.

iii. By contrast, the only events allegedly occurring in New York are (1) a meeting at Trump Tower, which has no alleged connection to the alleged hacking or the alleged dissemination of information, and (2) an alleged dinner between Mr. Manafort and Mr. Konstantine Kilimnik. This falls short of "a substantial part of the events or omissions" alleged in the present case. Moreover, none of these events constitute acts of the State.

iv. Finally, no claims have been alleged under New York law. By contrast, the DNC has raised seven distinct claims under D.C. or Virginia law.

v. Accordingly, the case should not be heard in New York.

\*   \*   \*

For the reasons stated above, the Russian Federation is immune to the subject-matter jurisdiction of the U.S. District Court. Moreover, the U.S. District Court should reject the DNC's efforts to distort the meaning of the existing FSIA exceptions and to involve the judiciary in this fundamentally political and diplomatic issue.

10