UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X

DEMOCRATIC NATIONAL COMMITTEE,  :

                                Plaintiff,      :             18 Civ. 3501 (JGK)

           - against -           :

THE RUSSIAN FEDERATION, et al.,    :

                        Defendants.    :
--------------------------------------------------------X


### MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT WIKILEAKS'S PRE-TRIAL MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

Joshua L. Dratel
JOSHUA L. DRATEL, P.C.
29 Broadway, Suite 1412
New York, New York 10006
(212) 732 - 0707
LLewis@joshuadratel.com

*Attorney for Defendant WikiLeaks*

TABLE OF CONTENTS

Table of Contents. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  i

Table of Authorities. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  iii

Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

*Statement of the Facts*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

ARGUMENT

POINT I

THE CLAIMS AGAINST WIKILEAKS SHOULD BE DISMISSED
BECAUSE THEY ARE FORECLOSED BY THE FIRST AMENDMENT. . . . . . . . . . . . . . . . .  3

POINT II

THE CLAIMS AGAINST WIKILEAKS SHOULD BE DISMISSED
BECAUSE WIKILEAKS, AS A USER OR PROVIDER OF AN
INTERACTIVE COMPUTER SERVICE, IS IMMUNE FROM
CIVIL LIABILITY PURSUANT TO 47 U.S.C. §230. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10

POINT III

THE RICO AND RICO CONSPIRACY CLAIMS SHOULD BE
DISMISSED BECAUSE THEY FAIL TO PLEAD CERTAIN
ESSENTIAL ELEMENTS OF A CIVIL RICO VIOLATION. . . . . . . . . . . . . . . . . . . . . . . . . . .  12

     A.     *WikiLeaks Did Not Manage the Affairs of the Alleged RICO Enterprise*. . . . . . .  13

     B.     *The FAC Fails to Plead a Pattern of Racketeering Activity*. . . . . . . . . . . . . . . . .  15

POINT IV

THE CLAIM PURSUANT TO 18 U.S.C. §2511 SHOULD BE
DISMISSED BECAUSE THE FAC DOES NOT ALLEGE ANY
CONTEMPORANEOUS INTERCEPTION OF PLAINTIFF'S
ELECTRONIC COMMUNICATIONS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  16

POINT V

THE CLAIM PURSUANT TO 18 U.S.C. §1836 SHOULD BE
DISMISSED BECAUSE IT FAILS TO IDENTIFY ANY
ECONOMIC ESPIONAGE BY WIKILEAKS, AND/OR
A TRADE SECRET THAT WAS ALLEGEDLY STOLEN,
AND BECAUSE §1836 DOES NOT INCLUDE A PRIVATE
ACTION FOR CONSPIRACY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

POINT VI

THE CLAIMS AGAINST WIKILEAKS SHOULD BE DISMISSED
FOR LACK OF PERSONAL JURISDICTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

POINT VII

THE CLAIMS AGAINST WIKILEAKS SHOULD BE
DISMISSED BECAUSE VENUE IS NOT PROPER IN
THE SOUTHERN DISTRICT OF NEW YORK. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

POINT VIII

THE PENDENT STATE CLAIMS SHOULD BE DISMISSED
PURSUANT TO THE ABSTENTION DOCTRINE AND
BECAUSE THEY FAIL TO STATE A CLAIM. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

POINT IX

WIKILEAKS JOINS IN THE OTHER DEFENDANTS' MOTIONS
AND THE JOINT DEFENSE BRIEF TO DISMISS TO THE
EXTENT THEY INURE TO WIKILEAKS' BENEFIT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

TABLE OF AUTHORITIES

CASES

*Affiliated FM Ins. Co. v. Kuehne + Nagel, Inc.*, 328 F. Supp. 3d 329 (S.D.N.Y. 2018). . . . . 19, 23

*Almeida v. Amazon.com*, 456 F.3d 1316 (11th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Amalgamated Bank of New York v. Marsh*, 823 F. Supp. 209 (S.D.N.Y. 1993). . . . . . . . . . . . . 14

*Ascentive, LLC v. Opinion Corp.*, 842 F. Supp.2d 450 (E.D.N.Y. 2011). . . . . . . . . . . . . . . . . . 11

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Atl. Recording Corp. v. Project Playlist, Inc.*, 603 F. Supp. 2d 690 (S.D.N.Y. 2009). . . . . . . . 11

*Bartnicki v. Vopper*, 532 U.S. 514 (2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4, 5, 6, 9, 17

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 21

*Blatzel v. Smith*, 333 F.3d 1018 (9th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Blumenthal v. Drudge*, 992 F.Supp. 44 (D.D.C. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Cabot Oil & Gas Corp. v. Water Cleaning Services LLC*,
    2012 WL 2133589 (S.D. Tex. June 12, 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158 (2d Cir. 2010). . . . . . . . . . . . . . . . . . 19

*Cockrum v. Donald J. Trump for President, Inc.*, 319 F. Supp. 3d 158 (D.D.C. 2018). . . . . 20, 22

*Cold Spring Harbor Lab. v. Ropes & Gray LLP*,
    762 F. Supp. 2d 543 (E.D.N.Y. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 24

*Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408 (2d Cir. 2005). . . . . . . . . . . . . . . . . . . . . 24

*Elsevier Inc. v. Doctor Evidence, LLC*, 2018 WL 557906 (S.D.N.Y. Jan. 23, 2018). . . . . . . . . 18

*Exxon Mobil Corp. v. Schneiderman*, 316 F. Supp. 3d 679 (S.D.N.Y. 2018). . . . . . . . . . . . . . . 22

*D. Penguin Bros. v. City Nat. Bank*, 587 F. App'x 663 (2d Cir. 2014). . . . . . . . . . . . . . . . . . . . 14

*Daimler AG v. Bauman*, 571 U.S. 117 (2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC,*
    521 F.3d 1157 (9th Cir. 2008) (en banc). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Fed. Trade Comm'n v. LeadClick Media, LLC*, 838 F.3d 158 (2d Cir. 2016). . . . . . . . . . 10, 11, 12

*Florida Star v. B.J.F.*, 491 U.S. 524 (1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*GTE New Media Serv., Inc. v. BellSouth Corp.*, 199 F.3d 1343 (D.C. Cir. 2000). . . . . . . . . 21, 23

*Gulf Ins. Co. v. Glasbrenner*, 417 F.3d 353 (E.D.N.Y. 2011). . . . . . . . . . . . . . . . . . . . . . . . 24

*Hayden v. Paul, Weiss, Rifkind, Wharton & Garrison,*
    955 F. Supp. 248 (S.D.N.Y. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14

*Hourani v. Psybersolutions LLC*, 164 F. Supp.3d 128, 139 (D.D.C. 2016),
    *aff'd*, 690 F. App'x 1 (D.C. Cir. 2017). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Int'l Shoe Co. v. Washington*, 326 U.S. 310(1945). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Jacobs v. Felix Block Erben Verlag fur Buhne Film und Funk KG,*
    160 F. Supp. 2d 722 (S.D.N.Y. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Jane Doe No. 1 v. Backpage.com*, LLC, 817 F.3d 12 (1st Cir. 2016). . . . . . . . . . . . . . . . . . . 12

*Jones v. Dirty World Entm't Recordings LLC*, 755 F.3d 398 (6th Cir 2014). . . . . . . . . . . . . . . 11

*Matera v. Native Eyewear, Inc.*, 355 F. Supp. 680 (E.D.N.Y. 2004). . . . . . . . . . . . . . . . . . . 24

*Mattel, Inc. v. MGA Entm't, Inc.*, 2010 WL 11463911 (C.D. Cal. Sept. 3, 2010). . . . . . . . . . . 18

*Millennium Prod. Grp., LLC. v. World Class Freight, Inc.,*
    2018 WL 1247384 (E.D.N.Y. Mar. 9, 2018). . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20, 21

*Mills v. Alabama*, 384 U.S. 214 (1966). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247 (2010). . . . . . . . . . . . . . . . . . . . . . . . . 19

*PI, Inc. v. Quality Prods., Inc.*, 907 F. Supp. 753 (S.D.N.Y. 1995). . . . . . . . . . . . . . . . . . . . 24

*Pure Power Boot Camp v. Warrior Fitness Boot Camp,*
    587 F. Supp.2d 548 (S.D.N.Y. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Ricci v. Teamsters Union Local 456*, 781 F.3d 25 (2d Cir. 2015). . . . . . . . . . . . . . . . . . . . . . . . 11

*RJR Nabisco v. European Community*, ___U.S. ___ , 136 S. Ct. 2090 (2016). . . . . . . . . . . 16, 19

*Rosenson v. Mordowitz*, 2012 WL 3631308 (S.D.N.Y. Aug. 23, 2012). . . . . . . . . . . . . . . . . . 14

*Sonera Holding B.V. v. Cukurova Holding A.S.*, 750 F.3d 221 (2d Cir. 2014). . . . . . . . . . . . . . 20

*State Farm Fire & Cas. Co. v. Swizz Style, Inc.*,
     246 F. Supp. 3d 880 (S.D.N.Y. 2017). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Steves and Sons, Inc. v. Jeld-Wen, Inc.*, 271 F.Supp.3d 835 (E.D.Va. 2017). . . . . . . . . . . . . . . 18

*United States v. Netyshko*, 18 Cr. 215 (ABJ) (D.D.C.). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 17

*Walden v. Fiore*, 571 U.S. 277 (2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23

*Westchester Cty. Indep. Party v. Astorino*, 137 F. Supp.3d 586 (S.D.N.Y. 2015). . . . . . . . . . . 12

*Wescott v. Reisner*, 2018 WL 2463614 (N.D. Cal. June 1, 2018). . . . . . . . . . . . . . . . . . . . . . . . 22

*Whitaker v. Am. Telecasting, Inc.*, 261 F.3d 196 (2d Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . 21

*Zeran v. America Online, Inc.*, 129 F.3d 327 (4th Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . 12

## STATUTES

U.S. Const. Amend. I. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 3, 5, 6, 10

U.S. Const. Amend. XIV. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

18 U.S.C. § 1831. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 17

18 U.S.C. § 1831(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

18 U.S.C. § 1832. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 17, 18

18 U.S.C. § 1832(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

18 U.S.C. § 1836. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 17, 18

18 U.S.C. § 1837. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

v

18 U.S.C. § 1839(a)(3)(A). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

18 U.S.C. § 1839(a)(3)(B). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

18 U.S.C. § 1962. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

18 U.S.C. § 1965(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

18 U.S.C. § 2511. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 4, 16, 17

18 U.S.C. § 2511(1)(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

18 U.S.C. § 2511(1)(d). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 17

28 U.S.C. § 1391(b)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

47 U.S.C. § 230 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 10, 11, 12

47 U.S.C. § 230(c)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

47 U.S.C. § 230(f)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

47 U.S.C. § 230(f)(3). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

NY CPLR § 302. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20, 21, 23

**Introduction**

This Memorandum of Law is submitted on behalf of defendant WikiLeaks in support of its Motion to Dismiss. WikiLeaks also joins in the joint Memorandum of Law filed today on behalf of all defendants ("Defendants' Joint Memo"). This lawsuit against WikiLeaks constitutes an existential threat to the fundamental First Amendment right – foreshadowed by Andrew Hamilton in defending John Peter Zenger in the latter's historic 1735 trial that served as an inspiration for the Amendment – of "speaking and writing truth."[1] Even though *The New York Times*'s executive editor has stated his newspaper had an "obligation to report" the materials at issue in this suit, and a wide range and number of media organizations published them as well, only WikiLeaks – rather than the industry's influential financial titans – has been singled out for publishing truthful information that is unquestionably of public interest.

Even the prospect of liability at all, much less RICO treble damages, for publication of truthful information of public interest would have a devastating chilling effect on the press's exercise of constitutionally protected speech.  It would quickly drive independent and less financially secure media organizations – and ultimately even the titans – as well as individual journalists at every level everywhere, from reporting and publishing altogether. All that would remain would be a shell of the First Amendment practiced by a cowed and self-censoring media, intimidated by the fear of lawsuits designed to deprive the public of its right to information about powerful public figures and entities.

As detailed below, the First Amended Complaint ("FAC") against WikiLeaks should be

---

[1] *See* <https://www.famous-trials.com/legacyftrials/zenger/chronology.html>; <https://www.nps.gov/feha/learn/historyculture/the-trial-of-john-peter-zenger.htm>.

1

dismissed for several reasons:

(1)      imposing liability on WikiLeaks for the conduct alleged against it in the FAC would violate the First Amendment;

(2)      as a "user or provider of an interactive computer service," WikiLeaks is immune from civil liability pursuant to 47 U.S.C. §230;

(3)      the Racketeer Influenced and Corrupt Organizations Act ("RICO") causes of action are deficient because they fail to allege sufficiently with respect to WikiLeaks several elements of a RICO violation, including (a) a RICO enterprise, and/or WikiLeaks' operation or management of its affairs; (b) a pattern of racketeering activity, including the requisite predicate acts; (c) cognizable injury to plaintiff's business or property; and (d) a RICO conspiracy;

(4)      the cause of action pursuant to 18 U.S.C. §2511 fails because the statute punishes only *contemporaneous* interception of communications, which is not alleged (and did not occur) here;

(5)      the cause of action pursuant to 18 U.S.C. §1836 fails because (a) it does not allege theft of a cognizable trade secret; (b) §1836 does not include conspiratorial or aiding and abetting liability; and (c) §1836 does not apply extraterritorially to the conduct alleged against WikiLeaks;

(6)      personal jurisdiction over WikiLeaks is lacking;

(7)      venue is not proper in the Southern District of New York; and

(8)      any pendent state law claims should be dismissed pursuant to the abstention doctrine, and because they fail to state a claim.

### *Statement of the Facts*

A Statement of Facts is included in Defendants' Joint Memo. Any additional facts relevant to WikiLeaks are incorporated in the points set forth below. The FAC names WikiLeaks as a defendant in five causes of action: RICO (Count II); RICO Conspiracy (III); illegal wiretapping (IV); theft of trade secrets (VII); Washington, D.C. Uniform Trade Act (VIII); Virginia Common Law Trespass (XII); and Virginia Computer Crimes Act (XIV).

## ARGUMENT

## POINT I

## THE CLAIMS AGAINST WIKILEAKS SHOULD BE DISMISSED BECAUSE THEY ARE FORECLOSED BY THE FIRST AMENDMENT

The FAC against WikiLeaks should be dismissed in its entirety because WikiLeaks's conduct – publishing truthful information of public concern as a media organization – is protected by the First Amendment. Indeed, in *Bartnicki v. Vopper*, 532 U.S. 514 (2001), the Court reaffirmed that the issues in that case "implicate[d] the core purposes of the First Amendment because it imposes sanctions on the publication of truthful information of public concern." *Id*., at 533-34.

Defendants' Joint Memo discusses both *Bartnicki* and the First Amendment principles at stake herein, which apply with particular emphasis to WikiLeaks, a media organization and publisher that indisputably meets all three criteria set forth in *Bartnicki*.[2]  In fact, the FAC does *not* allege (1) that WikiLeaks had any advanced knowledge of the alleged intrusion into Plaintiff's servers or computers; (2) that WikiLeaks participated in any way in that intrusion;

---

[2]  In an action in the United Kingdom (seeking records), the Court ruled last year that "WikiLeaks is a media organization which publishes and comments upon censored or restricted official materials involving war, surveillance or corruption, which are leaked to it in a variety of different circumstances." *Maurizi v. The Information Commissioner, et al.*, Appeal No: EA/2017/0041, General Regulatory Chamber, 12 December 2017, at ¶ 28, available at <https://www.repubblica.it/esteri/2017/12/14/news/london_tribunal_dismisses_la_repubblica_s_appeal_to_access_the_full_file_of_julian_assange-184083942/?ref=RHRS-BH-I0-C6-P3-S1.6-T2>. WikiLeaks has won numerous journalism awards from around the world, including The Economist New Media Award (2008), the Amnesty New Media Award (2009) and the peak journalism award in Australia (the Australian equivalent of the Pulitzer Prize in the US), and the Walkley Award for Outstanding Contribution to Journalism (2011).

and/or (3) that WikiLeaks made any other use of the materials beyond publishing them.[3]

Indeed, the facts in *Bartnicki* present some striking similarities to those here. For example, in *Bartnicki* the subject matter of the published information was about a union contract negotiation that, like the 2016 Democratic primary process and general election, was "'contentious'" and received "a lot of media attention." *Id.*, at 518. Also, the respondent in *Bartnicki*, a radio commentator, had been critical of the union whose officials had been recorded on the tape at issue. *Id.*, at 519.[4] In addition, *Bartnicki* involved a claim made pursuant to 18 U.S.C. §2511, which is the basis for a claim herein as well. *See* **post**, at POINT IV.

Here, in addition to lacking any allegation of WikiLeaks's knowledge or involvement until well after the alleged intrusion, the FAC, at ¶¶146-48, alleges that (a) WikiLeaks was not even the first or exclusive vehicle for release of the materials at issue, as DCLeaks and Guccifer

---

[3] In *Bartnicki*, the Court listed from the government's Brief violations of §2511(1)(d) that would, in the Solicitor General's opinion, fall outside the First Amendment – none of which exist in this case with respect to WikiLeaks:

> it is unlawful for a company to use an illegally intercepted communication about a business rival in order to create a competing product; it is unlawful for an investor to use illegally intercepted communications in trading in securities; it is unlawful for a union to use an illegally intercepted communication about management (or vice versa) to prepare strategy for contract negotiations; it is unlawful for a supervisor to use information in an illegally recorded conversation to discipline a subordinate; and it is unlawful for a blackmailer to use an illegally intercepted communication for purposes of extortion.

532 U.S. at 527 n. 10, *citing* Brief for United States, at 24 (other citations omitted).

[4] *See also Mills v. Alabama*, 384 U.S. 214, 219 (1966) (state law punishing an editor for publishing newspaper editorial urging people to vote a particular way violated freedom of the press because "providing criminal penalties for publishing editorials such as the one here silences the press at a time when it can be most effective").

2.0 made the initial releases (in part through other outlets such as WordPress);  (b) WikiLeaks published the materials, as did other journalistic entities, sometime after an open solicitation by Guccifer 2.0; and (c) the alleged transmittal of the materials to WikiLeaks experienced technical problems, which at most would demonstrate the arms-length nature of the relationship.

The July 2018 Indictment in *United States v. Netyksho*, 18 Cr. 215 (ABJ) (D.D.C.) (ECF Dkt #1) ("*Netyksho*") also places WikiLeaks firmly in a journalistic role.  At ¶7, the Indictment alleges that "[t]he Conspirators also used the Guccifer 2.0 persona to release additional stolen documents through a website maintained by an organization ("Organization 1"), that had previously posted documents stolen from U.S. persons, entities, and the U.S. government." It is noteworthy that the Indictment, reflecting the unparalleled investigative arsenal of a federal grand jury, did not characterize WikiLeaks ("Organization 1") as a co-conspirator, or attribute to it *any* wrongdoing.[5] Similarly, the chronology traced in ¶¶35-38, 43-49 (the latter entitled "Use of Organization 1") of *Netyksho* alleges that WikiLeaks was not involved until well after the alleged intrusion, was not the initial publisher of the materials allegedly obtained from the DNC, and, like other journalists, allegedly responded to a mass solicitation by Guccifer 2.0.

Thus, the FAC alleges merely that WikiLeaks was the recipient of some of the materials, and that it published some of them, activity protected by the First Amendment.  As the Court in *Bartnicki* noted, while "delivery of a tape recording might be regarded as conduct, [] given that the purpose of such a delivery is to provide the recipient with the text of recorded statements, it is like the delivery of a handbill or a pamphlet, and as such, it is the kind of 'speech' that the First

---

[5]  The FAC alleges, at ¶99, that an FBI investigation was already underway by May 2016, yet WikiLeaks was not charged in *Netyksho* or deemed a co-conspirator.

Amendment protects." 532 U.S. at 527. Quoting the Third Circuit decision below, the Court added that "'[i]f the acts of 'disclosing' and 'publishing' information do not constitute speech, it is hard to imagine what does fall within that category, as distinct from the category of expressive conduct.'" *Id*., at 527, *quoting* 200 F.3d 109, 120 (3d Cir. 1999).[6]

Nor does it matter whether, as alleged in the FAC, WikiLeaks or Julian Assange harbored a point of view, as according to a former Associate Counsel to President Barack Obama in the White House Counsel's Office, a publisher "certainly would enjoy First Amendment protection to make editorial choices designed to hurt one candidate."[7] Thus, as in *Bartnicki*, *see* **ante**, at POINT I, advocacy does not deprive a journalist of First Amendment protection. Nor is political orientation, or personal or professional popularity, a measure of First Amendment protection.[8]

In fact, soliciting leaks (both from insiders and hacked content) is a common practice in journalism today. At least 40 different organizations accept documents via the anonymous submission platform SecureDrop, including major media organizations such as the Associated

---

[6] *See also* Andy Wright, "The DNC Lawsuit and First Amendment Sensitivities," *Just Security*, May 2, 2018, available at <https://www.justsecurity.org/55563/dnc-lawsuit-amendment-sensitivities/> ("Andy Wright") ("[a]fter the fact knowledge of the illegal provenance of the email is analogous to what reporters get with leaked documents in other contexts"). Andy Wright served as Associate Counsel to President Barack Obama in the White House Counsel's Office.

[7] Andy Wright. *See also id*. ("the First Amendment would shield a publisher, including one of contested motives and affiliations like WikiLeaks, from liability for publishing truthful, but stolen or improperly disclosed, material that was handed to that publisher on a silver platter").

[8] *See also* Jack Goldsmith, "The WikiLeaks-ization of the American Media," *The Weekly Standard*, May 14, 2018 ("Goldsmith"), available at <https://www.weeklystandard.com/jack-goldsmith/trump-leaks-the-new-york-times-and-the-wikileaks-ization-of-the-american-media>.

6

Press, *The New York Times*, and *The Washington Post*.[9] As law Professor Steven Vladeck points

out, "Hollywood depictions to the contrary notwithstanding, most leaks don't involve

uncoordinated dead-drops of materials into a journalist's mailbox, but are rather the result of

careful relationship building and cultivation of sources."[10]

Also, "[i]t is extremely common for media outlets to publish or report on materials that

are stolen, hacked, or otherwise obtained in violation of the law."[11] For example, "[i]n October

2016 – one month before the election – someone mailed a copy of Donald Trump's 1995 tax

returns to the *New York Times*, which published parts of it even though it is illegal to disclose

someone's tax returns without the taxpayer's permission; in March 2017, MSNBC's Rachel

Maddow did the same thing with Trump's 2005 tax returns." *Id.*  Likewise, "[i]n April, 2016, the

*Washington Post* obtained and published a confidential internal memo from the Trump

campaign. Media outlets constantly publish private companies' internal documents. . . .

*BuzzFeed* obtained and published a secret Facebook memo outlining the company's internal

business strategies, the contents of which were covered by most major media outlets." *Id.*

Moreover, "[i]n 2016, more than 100 newspapers from around the world published and

---

[9]  *See* <https://securedrop.org/directory/>; <https://www.nytimes.com/tips#securedrop>; <https://www.washingtonpost.com/securedrop>. SecureDrop replicates the system WikiLeaks invented to protect the confidentiality, even anonymity, of sources.

[10]  Ryan Goodman and Steve Vladeck, "Q & A: Why an Assange Prosecution Could Pose Such a Threat to the Press," *Just Security*, April 26, 2017, available at <https://www.justsecurity.org/40281/qa-assange-prosecution-pose-threat-press/>.

[11]  Glenn Greenwald and Trevor Timm, "The DNC'S Lawsuit Against WikiLeaks Poses a Serious Threat to Press Freedom," *The Intercept*, April 20, 2018, available at <https://theintercept.com/2018/04/20/the-dncs-lawsuit-against-wikileaks-poses-a-serious-threat-to-press-freedom/>.

reported on millions of private financial documents known as the Panama Papers, which were taken without authorization from one of the world's biggest offshore law firms and revealed the personal finances of people around the world." *Id*. Appendix A hereto lists high-profile unauthorized disclosures allegedly obtained by hacking that were published widely by media organizations, including WikiLeaks, across the globe.  *See also* Goldsmith ("[j]ournalists publish stolen information all the time without worrying about the legality of the source's method for obtaining the information").  As Goldsmith points out, "such material is the lifeblood of reporting, especially national security reporting."  *Id*.

The materials published by WikiLeaks were also reprinted by numerous media organizations.  Appendix B hereto lists a sampling of that coverage.  Appendix C lists a sampling of the coverage of the leaks allegedly provided by DCLeaks and Guccifer 2.0 to publishers; Appendix D provides sites where the emails are currently cached on the internet. Also, in addition to their substantive coverage of the emails, *The New York Times* and *Washington Post* explored the ethical issues around covering the DNC emails, ultimately defending their coverage notwithstanding the allegations that Russian intelligence was the source.[12]

Indeed, *New York Times* executive editor Dean Baquet answered that he would publish hacked emails of public interest if they were delivered to the *Times*.[13]  Elaborating, and echoing sentiments expressed by colleagues from other newspapers, Baquet stated, "I get the argument

---

[12]  *See* <https://www.nytimes.com/2016/12/15/business/media/russian-hacking-stolen-emails.html>; <https://www.washingtonpost.com/news/the-fix/wp/2016/12/14/did-the-media-become-a-defacto-instrument-of-russian-intelligence>.

[13]  *BBC Newsnight*, Dec 15, 2016, available at <https://www.youtube.com/watch?v=wCKpM_8WFko>.

that the standards should be different if the stuff is stolen and that should influence the decision, . . . But in the end, I think that we have an obligation to report what we can about important people and important events. There's just no question that the email exchanges inside the Democratic Party were newsworthy."[14]

Those who have spent their careers defending journalism's role in free speech recognize that liability for a media organization in WikiLeaks's position – publishing documents provided by whistle-blowers and others who possess them without authorization – would set an ominous precedent that could not be contained.  David McCraw, *The New York Times*'s Deputy General Counsel, appearing on a panel in July 2018 at the Ninth Circuit's Judicial Conference, stated he "think[s] the prosecution of [Julian Assange] would be a very, very bad precedent for publishers," adding that "from everything I know, he's sort of in a classic publisher's position and I think the law would have a very hard time drawing a distinction between *The New York Times* and WikiLeaks."[15]

Moreover, imposing liability upon WikiLeaks here would exert a chilling effect on journalism and free speech, and deprive the public of an extraordinary amount of newsworthy information.  Avoiding that impact has been an important facet of Supreme Court First Amendment doctrine.  *See, e.g., Bartnicki*, 532 U.S. at 547 (acknowledging "the 'timidity and

---

[14]  Sydney Ember, "Editors Defend Coverage of Stolen Emails After News of Russian Hacks," The New York Times, December 15, 201, available at <https://www.nytimes.com/2016/12/15/business/media/russian-hacking-stolen-emails.html>.

[15]  Maria Dinzeo, "Judges Hear Warning on Prosecution of WikiLeaks," Courthouse News, July 24, 2018 ("McCraw"), available at <https://www.courthousenews.com/judges-hear-warning-on-prosecution-of-wikileaks/>.  *See also* Andy Wright ("First Amendment precedent applied here to a platform like WikiLeaks could later serve as the basis of opinions affecting the Washington Post, Wall Street Journal, or the New York Times").

self-censorship' which may result from allowing the media to be punished for publishing truthful information"), *quoting Florida Star v. B.J.F.*, 491 U.S. 524, 535 (1989) (other citation omitted).

The First Amendment issues are vitally important, and the law is clear and categorical: even viewing the FAC's allegations in the light most favorable to the Plaintiff, WikiLeaks's alleged conduct – in essence, what Mr. McCraw describes as, "committing an act of journalism[,]" – has been protected historically by the First Amendment, and continues to receive such protection today.  Accordingly, the FAC must be dismissed against Wikileaks.

**POINT II**

**THE CLAIMS AGAINST WIKILEAKS SHOULD BE
DISMISSED BECAUSE WIKILEAKS, AS A USER OR
PROVIDER OF AN INTERACTIVE COMPUTER SERVICE, IS
IMMUNE FROM CIVIL LIABILITY PURSUANT TO 47 U.S.C. §230**

All of Plaintiff's claims against WikiLeaks should be dismissed because WikiLeaks is immune from civil liability pursuant to 47 U.S.C. §230, which provides that "[n]o provider or user of an interactive computer service[16] shall be treated as the publisher or speaker of any information provided by another information content provider."[17] 47 U.S.C. §230(c)(1).

In *Fed. Trade Comm'n v. LeadClick Media, LLC*, 838 F.3d 158 (2d Cir. 2016), the Second Circuit emphasized that "[a]t its core, §230 bars 'lawsuits seeking to hold a service

---

[16] An interactive computer service is defined as "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such systems operated or services offered by libraries or educational institutions." 47 U.S.C. §230(f)(2).

[17] An information content provider is defined as "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service." 47 U.S.C. §230(f)(3).

10

provider liable for its exercise of a publisher's traditional editorial functions – such as deciding whether to publish, withdraw, postpone or alter content.'" 838 F.3d at 174, *quoting Jones v. Dirty World Entm't Recordings LLC*, 755 F.3d 398, 407 (6th Cir 2014). *See also Ricci v. Teamsters Union Local 456*, 781 F.3d 25, 28 (2d Cir. 2015) (§230 provides that a plaintiff defamed on the internet "typically cannot sue the messenger") (internal quotations omitted).

In order to qualify for §230's immunity, a defendant need merely demonstrate that it provides or uses an interactive computer service, and that the information contained thereon was provided by a third-party for use on the Internet or other interactive computer service. *Blatzel v. Smith*, 333 F.3d 1018, 1030-35 (9th Cir. 2003). In general, "[c]ourts . . . conclude that a website falls within this definition." *Ascentive, LLC v. Opinion Corp.*, 842 F. Supp.2d 450, 473 (E.D.N.Y. 2011) (citing cases).

In *LeadClick*, the Court noted it has "had limited opportunity to interpret Section 230[,]" but pointed out that "[o]ther circuits, however, have recognized that Section 230 immunity is broad." *Id*., at 173, *citing Jones*, 755 F.3d at 406-07 ("close cases . . . must be resolved in favor of immunity") (*quoting Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*, 521 F.3d 1157, 1174 (9th Cir. 2008) (en banc))); *Almeida v. Amazon.com*, 456 F.3d 1316, 1321 (11th Cir. 2006) ("[t]he majority of federal circuits have interpreted the CDA to establish broad federal immunity to any cause of action that would make service providers liable for information originating with a third-party user of the service") (internal quotation marks omitted)); *id*. at n.3 (collecting cases). *See also Atl. Recording Corp. v. Project Playlist, Inc.*, 603 F. Supp. 2d 690, 699-700 (S.D.N.Y. 2009).

In *LeadClick*, the Court explained that the statute "shields conduct if the defendant (1) 'is

a provider or user of an interactive computer service, (2) the claim is based on information

provided by another information content provider and (3) the claim would treat [the defendant]

as the publisher or speaker of that information.'" 838 F.3d at 173, *quoting Jane Doe No. 1 v.*

*Backpage.com*, LLC, 817 F.3d 12, 19 (1st Cir. 2016); *see also Zeran v. America Online, Inc.*,

129 F.3d 327, 330 (4th Cir. 1997). Moreover, such immunity is absolute. *See Blumenthal v.*

*Drudge*, 992 F.Supp. 44, 49 (D.D.C. 1998).

Here, WikiLeaks, which, according to the FAC, served as the website that posted content

provided by others – the same as posted on Facebook, Twitter, and WordPress – easily satisfies

the standards for §230 immunity, requiring dismissal of the FAC against WikiLeaks.[18]

## POINT III

### THE RICO AND RICO CONSPIRACY CLAIMS SHOULD BE DISMISSED BECAUSE THEY FAIL TO PLEAD CERTAIN ESSENTIAL ELEMENTS OF A CIVIL RICO VIOLATION

The RICO claims (II and III) against WikiLeaks should be dismissed because, as detailed

below, they fail to state a claim with respect to several elements of a viable civil RICO action.

WikiLeaks also adopts the discussion of the general principles of civil RICO pleading included

within Defendants' Joint Memo.

Also, the RICO issues herein bear a strong resemblance to those in *Westchester Cty.*

*Indep. Party v. Astorino*, 137 F. Supp.3d 586 (S.D.N.Y. 2015), a civil RICO action that was

---

[18] Also, the context of this case fits squarely within the purposes of §230. As the preamble
to §230 declares, at (a)(3), "[t]he Internet and other interactive computer services offer a forum
for a true diversity of *political discourse*, unique opportunities for cultural development, and
myriad avenues for intellectual activity." (Emphasis added). *See also id*., at (a)(5)
("[i]ncreasingly Americans are relying on interactive media for a variety of *political*, educational,
cultural, and entertainment services") (emphasis added).

dismissed, and in which the plaintiffs therein alleged "a scheme to raid the Independence Party in anticipation of the September 2013 primary election in order to ensure that [the Republican candidate] would win the Independence Party nomination for County Executive, whereby more than 4,000 people who were not truly in sympathy with the principles of the Independence Party enrolled in the Party 'at the midnight hour' in order to vote in the primary[.]" *Id*., at 594. The Complaint in *Astorino* further alleged that "one purpose of the scheme was rigging the outcome of the Independence Party's Primary Election" as well as that "certain Defendants' goals were to rig the primary and/or the general election, and future elections." *Id*., at 594-95.

**A.**     ***WikiLeaks Did Not Manage the Affairs of the Alleged RICO Enterprise***

As discussed in Defendants' Joint Memo, in *Reves v. Ernst & Young*, 507 U.S. 170 (1993), the Supreme Court set forth the "operation or management" test for determining civil RICO liability. *Id*., at 179. Here, the FAC does not allege – nor is there any evidence – that WikiLeaks played any role in "directing" the affairs of either of the RICO enterprises alleged. There is not any basis for alleging that WikiLeaks "operated or managed" the Trump Campaign, *see* FAC, at ¶¶222-26, or the "association-in-fact" enterprise alleged, *id*., at ¶¶227-30, or that it directed the affairs of either. Indeed, it would have been impossible for WikiLeaks to "conduct the affairs" of either enterprise "through a pattern of racketeering activity" when the only activity alleged to constitute that "pattern" occurred *before* WikiLeaks was even allegedly involved *at all*.

In analogous contexts, those who provide outside services – akin to WikiLeaks's alleged role as a subsequent (and even secondary to earlier releases by DCLeaks and Guccifer 2.0) publisher of the emails – do not meet the "operation or management" criteria. For example, in *Hayden v. Paul, Weiss, Rifkind, Wharton & Garrison*, 955 F. Supp. 248 (S.D.N.Y. 1997),

13

applying the *Reves* test to the conduct of an accounting firm, the Court noted that "it is well established that the provision of professional services by outsiders, such as accountants, to a racketeering enterprise, is insufficient to satisfy the participation requirement of RICO, since participation requires some part in directing the affairs of the enterprise itself." *Id.*, at 254. *See also Amalgamated Bank of New York v. Marsh*, 823 F. Supp. 209, 220 (S.D.N.Y. 1993) (bank teller who retained bank check proceeds not liable under RICO because there was no indication teller "actually directed anyone, as is required by the 'operation or management' test").

Moreover, here, as in *Rosenson v. Mordowitz*, No. 11-CV-6145, 2012 WL 3631308, at *7 (S.D.N.Y. Aug. 23, 2012), "[t]here is nothing about the use of the particular resources alleged that is crucial to the pattern of racketeering activities, nor is there any special connection between the enterprise and the resources." *Id.*, at *7. Indeed, the allegations of the publication of emails by other outlets, including DCLeaks and Guccifer 2.0 (on WordPress), *see* FAC, at ¶144, as well as Guccifer 2.0's solicitations to and communications with other journalists, *see Netyksho* Indictment, at ¶45, dispositively reinforces that conclusion with respect to WikiLeaks. Nor, as detailed in Defendants' Joint Memo, can the FAC make out a claim of aiding and abetting liability, *see* FAC, at ¶235, because that is not recognized under civil RICO.

Moreover, the "association-in-fact" enterprise alleged in ¶244 of the FAC does not meet the standards for a RICO enterprise, which, according to the Second Circuit, "'is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit.'" *D. Penguin Bros. v. City Nat. Bank*, 587 F. App'x 663, 667–68 (2d Cir. 2014).  Here, there is neither allegation nor proof that the alleged enterprise "function[ed] as a continuing unit."

14

**B.**     *The FAC Fails to Plead a Pattern of Racketeering Activity*

The FAC also fails to plead the requisite "pattern of racketeering activity." As a threshold

matter, merely listing statutes – 18 U.S.C. §§1831 & 1832 – that allegedly constitute predicate

acts – *see* FAC, at ¶ 231 – without describing precisely the specific conduct underlying each

alleged predicate act supposedly committed by WikiLeaks, is not sufficient.

Nor does the FAC even allege against WikiLeaks all essential elements of either §1831 or

§1832. For example, §1831(a) requires that a defendant, "intending or knowing that the offense

will benefit any foreign government, foreign instrumentality, or foreign agent, knowingly"

performs any of a series of acts. Yet the FAC fails entirely to allege that WikiLeaks possessed

*any* knowledge or intent that any such conduct would "benefit any foreign government, foreign

instrumentality, or foreign agent[.]" In fact, the FAC alleges that WikiLeaks's purpose,

purportedly in common with the other defendants, was "to bolster Trump's campaign for

president, to injure the DNC, and to harm the Democratic party's chances for success in the 2016

presidential election." FAC, at ¶71. *See also* FAC, at ¶¶79, 294. Moreover, according to the

FAC, WikiLeaks's motivation (to the extent it manifested any at all, as opposed to that attributed

to Julian Assange personally), was "harming Secretary Clinton's candidacy and disrupting the

Democratic party's chances of victory in the 2016 presidential election[]" because Mr. Assange

"publicly stated that his policy disagreements with Clinton would make her presidency far more

problematic than a Trump presidency." *Id*., at ¶79 (footnotes omitted).[19]

---

[19]   That, of course, is not a quote from Mr. Assange, but instead the FAC's distorted
interpretation of other statements attributed to Mr. Assange.  In fact, in a July 2016 interview Mr.
Assange said "personally," he "would prefer neither" presidential candidate.  *See* "Assange: US
election is like choosing between 'cholera or gonorrhea,'" *Politico*, July 27, 2016, available at
<https://www.politico.eu/article/us-election-is-like-choosing-between-cholera-or-gonorrhea/>.

Regarding §1832, it defines a violation as conduct "with intent to convert a trade secret, that is related to a product or service used in or intended for use in interstate or foreign commerce, *to the economic benefit of anyone other than the owner thereof*, and intending or knowing that the offense will, injure any owner of that trade secret, . . ." §1832(a) (emphasis added). Again, the FAC is devoid of any allegation that WikiLeaks committed any §1832 violation with intent to provide any "economic benefit to anyone other than the owner thereof."

Similarly, as discussed in more detail **post,** in POINT V, the FAC does not identify a single trade secret WikiLeaks even possessed, much less is alleged to have published (and did not publish), including computer code or other information. Thus, essential elements of each statute are absent.  Also, as set forth in Defendants' Joint Memo, the alleged "pattern" does not possess the necessary "continuity" – either "closed-ended" or "open-ended."

The "pattern" is also deficient with respect to WikiLeaks because all of the conduct alleged against WikiLeaks was extraterritorial. In *RJR Nabisco v. European Community*, ___ U.S. ___, 136 S. Ct. 2090 (2016), the Supreme Court determined that "[a] violation of §1962 may be based on a pattern of racketeering that includes predicate offenses committed abroad, provided that each of those offenses violates a predicate statute that is itself extraterritorial." *Id.*, at 2103. Here, as detailed **post**, in POINT V at page 18, the alleged predicate acts do not have extraterritorial application to WikiLeaks in this case. In addition, as set forth in the Defendants' Joint Memo, the FAC fails as well for several reasons to (1) identify a cognizable RICO injury; and/or (2) plead a RICO conspiracy.

## POINT IV

## THE CLAIM PURSUANT TO 18 U.S.C. §2511 SHOULD

16

**BE DISMISSED BECAUSE THE FAC DOES NOT
ALLEGE ANY CONTEMPORANEOUS INTERCEPTION
OF PLAINTIFF'S ELECTRONIC COMMUNICATIONS**

Claim IV made pursuant to 18 U.S.C. §2511 must be dismissed because, as detailed in

Defendants' Joint Memo, it does not state a claim due to its lack of an allegation or evidence of a

*contemporaneous interception*,[20] and not removal of documents or information from a storage

device (such as a server).  That deficiency precludes liability under either the "use" or

"disclosure" provisions of §§2511(1)(c) and (d). *See, e.g., Pure Power Boot Camp v. Warrior

Fitness Boot Camp*, 587 F. Supp.2d 548, 556-58 (S.D.N.Y. 2008).[21]

## POINT V

**THE CLAIM PURSUANT TO 18 U.S.C. §1836 SHOULD BE
DISMISSED BECAUSE IT FAILS TO IDENTIFY ANY
ECONOMIC ESPIONAGE BY WIKILEAKS, AND/OR A TRADE
SECRET THAT WAS ALLEGEDLY STOLEN, AND BECAUSE
§1836 DOES NOT INCLUDE A PRIVATE ACTION FOR CONSPIRACY**

There are several reasons why the FAC's claim against WikiLeaks pursuant to 18 U.S.C.

§ 1836 (Claim VII), which, pursuant to the Defend Trade Secrets Act ("DTSA") creates a private

right of action for misappropriation of a trade secret, should be dismissed. Among those reasons

are those set forth in Defendants' Joint Memo with respect to Washington, D.C.'s Uniform Trade

Secrets Act. In addition, as discussed **ante**, at page 15, to the extent §§1831 and 1832 define the

contours of the conduct covered by §1836, the FAC fails to allege essential elements against

WikiLeaks with respect to each statute.

---

[20] Also, *Netyksho*, at ¶ 49, points out that the latest email published by WikiLeaks was dated May 25, 2016, and not released until July 22, 2016.

[21] The reasons in POINT I and POINT II also apply specifically to Claim IV – *Bartnicki* itself involved a claim pursuant to 18 U.S.C. §2511.

Also, trade secrets "are a narrow category of confidential information; to survive a motion to dismiss, a party alleging that it owns a trade secret must put forth specific allegations as to the information owned and its value." *Elsevier Inc. v. Doctor Evidence, LLC*, 2018 WL 557906, at *4 (S.D.N.Y. Jan. 23, 2018). Pleading a DTSA claim consistent with the standards set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), requires that "before information or processes may be accorded trade secret status, it must be shown that it is truly trade secret – a standard far greater than the standard for confidentiality of business information." *Elsevier Inc.*, 2018 WL 557906, at *2 ("'confidential information' is not equivalent to 'trade secrets'"). Here, the FAC has not made such a showing.

Rather, trade secrets are "a narrow category of confidential information" (*id*.) constituting "financial, business, scientific, technical, economic, or engineering information . . ." 18 U.S.C. §1839(a)(3)(A)-(B). Again, there is not any allegation in the FAC that WikiLeaks published (or even received) anything belonging to Plaintiff that would satisfy the definition of "trade secret."

Moreover, the DTSA does not create an express or implied private right of action for redress for conspiracy to engage in theft of trade secrets. *Steves and Sons, Inc. v. Jeld-Wen, Inc.*, 271 F.Supp.3d 835 (E.D.Va. 2017). By the same rationale – that civil remedies are not commensurate with the bases for criminal liability, but are instead limited to the terms of the statute (§1836) – aiding and abetting cannot be a basis for a private §1836 action, either.[22]

The doctrine of extraterritoriality also defeats the §1836 claim. While the DTSA does

---

[22] It is also impossible that WikiLeaks could have either conspired to commit or "aided and abetted" conduct that had already occurred well before the FAC alleges its involvement commenced. *See Mattel, Inc. v. MGA Entm't, Inc.*, No. 04-cv-9049, 2010 WL 11463911, at *3 (C.D. Cal. Sept. 3, 2010) ("one logically cannot contemplate acts committed in furtherance of a conspiracy into which he has not yet entered."). *See also* FAC, at ¶308.

expressly apply extraterritorially, *see* §1837, that section imposes extraterritorial liability only if "(1) the offender is a natural person who is a citizen or permanent resident alien of the United States, or an organization organized under the laws of the United States or a State or political subdivision thereof; or (2) an act in furtherance of the offense was committed in the United States." Neither is present here with respect to WikiLeaks, as it is not organized under U.S. law, and none of its conduct occurred in the U.S. Thus, the §1836 fails for that reason, too, because "when a statute provides for some extraterritorial application, the presumption against extraterritoriality operates to limit that provision to its terms." *RJR Nabisco*, 136 S. Ct. at 2102, *citing Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 265 (2010).

### POINT VI

### THE CLAIMS AGAINST WIKILEAKS SHOULD BE <u>DISMISSED FOR LACK OF PERSONAL JURISDICTION</u>

A "plaintiff bears the burden of establishing jurisdiction over the defendant." *Millennium Prod. Grp., LLC. v. World Class Freight, Inc.*, 2018 WL 1247384, at *2–3 (E.D.N.Y. Mar. 9, 2018). Also, "[p]ersonal jurisdiction of a federal court over a non-resident defendant is governed by the law of the state in which the court sits – subject, of course, to certain constitutional limitations of due process." *Affiliated FM Ins. Co. v. Kuehne+Nagel, Inc.*, 328 F. Supp. 3d 329, 333 (S.D.N.Y. 2018);  *see also Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 163 (2d Cir. 2010).

New York State's "long-arm statute," CPLR §302, provides, in pertinent part, personal jurisdiction if a defendant  "(1) transacts any business within the state or contracts anywhere to supply goods or services in the state; or (2) commits a tortious act within the state, . . .; or (3)

19

commits a tortious act without the state causing injury to person or property within the state . . ."

Here, personal jurisdiction over WikiLeaks – either general or specific – is absent under any and all of §302's provisions. Indeed, the FAC itself, at ¶45, essentially concedes as much. It describes WikiLeaks as an "international organization of unknown structure," allegedly with a P.O. Box in San Mateo, California, and a mailbox in Australia. As the FAC admits, "it is not clear whether WikiLeaks uses or conducts business through those mailboxes." *Id.*

Regarding "general jurisdiction," New York courts "can adjudicate all claims against an individual or a corporation" even if unrelated to its contacts with the state if "a corporation's contacts . . . are so continuous and systematic as to render [it] essentially at home" in New York. *Millennium Prod. Grp., LLC.*, 2018 WL 1247384, at *2–3. Also, "only a limited set of affiliations with a forum" – such as "the corporation's principle place of business or headquarters" – "will render a defendant amendable to all-purpose jurisdiction there[.]" *Sonera Holding B.V. v. Cukurova Holding A.S.*, 750 F.3d 221, 225 (2d Cir. 2014) (*quoting Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014)). Clearly, that does not apply to WikiLeaks.

Also, as a District Court in the District of Columbia has already found with respect to a lawsuit based on the same general activity (but which did not name WikiLeaks as a defendant), "WikiLeaks did not subject itself to personal jurisdiction in the District simply by posting material on the Internet that could be read by District residents." *Cockrum v. Donald J. Trump for President, Inc.*, 319 F. Supp. 3d 158, 186-87 (D.D.C. 2018), *citing Hourani v. Psybersolutions LLC*, 164 F. Supp.3d 128, 139 (D.D.C. 2016), *aff'd*, 690 F. App'x 1 (D.C. Cir. 2017).

Moreover, in *Millenium*, the Court found that the defendant's "website with a contact

form" insufficient to establish general jurisdiction over it because "[h]olding such would effectively undermine the principle of general jurisdiction for any company with a website with a contact form (which is to say, almost every company) would be subject to general jurisdiction in every state." 2018 WL 1247384, at *3; *see also Jacobs v. Felix Block Erben Verlag fur Buhne Film und Funk KG*, 160 F. Supp. 2d 722, 733 (S.D.N.Y. 2001) (explaining that "mere solicitation of business in New York does not subject a corporation to 'doing business' jurisdiction"). Consequently, the accessibility of WikiLeaks in the District does not create specific jurisdiction. *GTE New Media Serv., Inc. v. BellSouth Corp.*, 199 F.3d 1343, 1350 (D.C. Cir. 2000).

Specific jurisdiction in New York also "depends on an affiliation between the forum [state] and the underlying controversy, principally, activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation." *Millennium Prod. Grp., LLC.*, 2018 WL 1247384, at *2-3. In determining where a "tortious act" has occurred (within or without New York), courts "apply a situs-of-injury test, which asks them to locate the 'original event which caused the injury' . . ., not the location where the resultant damages are felt by the plaintiff." *Whitaker v. Am. Telecasting, Inc.*, 261 F.3d 196, 209 (2d Cir. 2001).

Under the "transact[ing] business" provision of §302, the "totality of the defendant's activities within the forum'" are considered "to determine if the defendant's 'transacted business' can be considered purposeful." Also, "[c]onclusory allegations of transacting business are insufficient" to establish specific jurisdiction, and "courts have regularly held that a plaintiff asserting jurisdiction must tender specific allegations about the defendant's contact with the forum state." *Millennium Prod. Grp., LLC.*, 2018 WL 1247384, at *2-3.

Regarding the provision that a tortious act outside New York is felt within the state, "the

21

simple likelihood or foreseeability 'that a defendant's product will find its way into New York

does not satisfy this element[.]'" *State Farm Fire & Cas. Co. v. Swizz Style, Inc.*, 246 F. Supp. 3d

880, 888-89 (S.D.N.Y. 2017), *motion to certify appeal denied*, 2017 WL 3835694 (S.D.N.Y.

Aug. 31, 2017).  Personal jurisdiction under the transacting business prong requires that "plaintiff

. . . demonstrate that defendant transacted business within New York State, and that that business

had some nexus with this cause of action." *Exxon Mobil Corp. v. Schneiderman*, 316 F. Supp. 3d

679, 696 (S.D.N.Y. 2018).  A defendant's "activities here [must be] purposeful and there [must

be] a substantial relationship between the transaction and the claim asserted."  *Id.*, at 697.

Specific jurisdiction can rest only on "contacts that the defendant himself creates with the

forum." *Walden v. Fiore*, 571 U.S. 277, 284 (2014). The Supreme Court has "consistently

rejected attempts to satisfy the defendant-focused 'minimum contacts' inquiry by demonstrating

contacts between the plaintiff (or third parties) and the forum." *Id*. Thus, "it is the defendant, not

the plaintiff or third parties, who must create contacts with the forum State." *Id.*, at 291.

Nor are the alleged actions of alleged co-conspirators sufficient to confer personal

jurisdiction. *See Cockrum*, 319 F. Supp. 3d at 185-86 & n. 25; *Wescott v. Reisner*, 2018 WL

2463614, at *4 (N.D. Cal. June 1, 2018) (district courts in the Ninth Circuit "have refused to

exercise personal jurisdiction over defendants based solely on the actions of their co-

conspirators. In any event, California courts applying both California and federal due process

have held that personal jurisdiction does not lie over an out-of-state defendant merely because of

the residence or acts of a co-conspirator").[23]

_____

[23] In *Cockrum* the Court also held that jurisdiction was not established by acts committed
before a particular defendant alleged joined the purported conspiracy. 319 F. Supp. at 186 ("[t]he
Court cannot exercise jurisdiction over defendants by reference to activities performed by

Even when jurisdiction would be warranted under §302, the Court "then determine[s] whether asserting jurisdiction under that provision would be compatible with requirements of due process established under the Fourteenth Amendment to the United States Constitution." *Affiliated FM Ins. Co.*, 328 F. Supp.3d at 333. Here, it is respectfully submitted that such analysis would compel the conclusion that exercising jurisdiction over WikiLeaks would offend traditional notions of fair play and substantial justice. *See Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945); *see also GTE*, 199 F.3d at 1347 (D.C. Cir. 2000).

## POINT VII

### THE CLAIMS AGAINST WIKILEAKS SHOULD BE DISMISSED BECAUSE VENUE IS NOT PROPER IN THE SOUTHERN DISTRICT OF NEW YORK

Plaintiff's purported basis for venue is "28 U.S.C. §1391(b)(2) because a substantial part of the events giving rise to the claims occurred in New York City, NY[,]," where the Trump Campaign headquarters were located, one defendant resides, and "a substantial number of the meetings and interactions made in furtherance of the conspiracy at issue were located[.]" FAC, at ¶36. However, the FAC fails to provide any evidence of the content of those alleged meetings.[24]

When a defendant challenges venue, the plaintiff shoulders the burden of establishing that venue is proper. *See Cold Spring Harbor Lab. v. Ropes & Gray LLP*, 762 F. Supp. 2d 543, 551 (E.D.N.Y. 2011). "Substantiality" for venue purposes is a qualitative rather than quantitative

---

Russians participating in a separate conspiracy of hacking (as opposed to the publication of emails) that occurred during a different time frame from that of plaintiffs' alleged conspiracies"), *citing Walden*, 134 S. Ct. at 1126 (other citations omitted).

[24] Venue does not lie with respect to WikiLeaks based on 18 U.S.C. §1965(a), *see* FAC, at ¶37, because the Southern District is not a district in which WikiLeaks "resides, is found, has an agent, or transacts [its] affairs."

element, and it is "determined by assessing the overall nature of the plaintiff's claims and the nature of the specific events or omissions in the forum, and not simply by adding up the number of contacts." *Cold Spring Harbor Lab*, 762 F. Supp. 2d at 553 (*quoting Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 432 (2d Cir. 2005)).

The Second Circuit has explained that district courts must "take seriously the adjective 'substantial[,]'" and thus "for venue to be proper, significant events or omissions material to the plaintiff's claim must have occurred in the district in question." *Gulf Ins. Co. v. Glasbrenner*, 417 F.3d 353, 357 (E.D.N.Y. 2011). For instance, in a contract case, courts will look at "'where the contract was negotiated or executed, where it was to be performed, and where the alleged breach occurred.'" *Matera v. Native Eyewear, Inc.*, 355 F. Supp. 680, 686 (E.D.N.Y. 2004) (*quoting PI, Inc. v. Quality Prods., Inc.*, 907 F. Supp. 753, 757 (S.D.N.Y. 1995)).

Here, the FAC has not established with anything more than conclusory allegations that any of the meetings or other conduct in New York were connected to the alleged intrusion into Plaintiff's servers and the gravamen of the subsequent conduct it alleges. Thus, such activities in the Southern District cannot be deemed "substantial" in connection with the essence of the lawsuit against WikiLeaks as described in the FAC.

Indeed, the absence of *any* New York State law claims, and conversely the inclusion of a total of seven District of Columbia (Claims VIII, IX & X)) and Virginia state law (Claims XI, XII, XIII & XIV) tort causes of action demonstrates that any conduct in the Southern District was *not* substantial, and that the *situs* of the lawsuit is outside New York altogether. Nor can venue by satisfied simply because WikiLeaks's website is available within the District. Otherwise, venue would exist in *every* district, a clearly untenable prospect. *See Cabot Oil & Gas Corp. v. Water*

24

*Cleaning Services LLC*, 2012 WL 2133589, at *2 (S.D. Tex. June 12, 2012).

## POINT VIII

**THE PENDENT STATE CLAIMS SHOULD BE DISMISSED
PURSUANT TO THE ABSTENTION DOCTRINE
AND BECAUSE THEY FAIL TO STATE A CLAIM**

As set forth in Defendants' Joint Memo, the state causes of action fail to state a claim and

should be dismissed.

## POINT IX

**WIKILEAKS JOINS IN THE OTHER DEFENDANTS'
MOTIONS AND THE JOINT DEFENSE BRIEF TO DISMISS
TO THE EXTENT THEY INURE TO WIKILEAKS' BENEFIT**

### Conclusion

Accordingly, for all the reasons set forth above, as well as in any other defendants'

motions, including Defendants' Joint Memo, it is respectfully submitted that Plaintiff's First

Amended Complaint against WikiLeaks be dismissed in its entirety.

Dated: 7 December 2018
New York, New York

Respectfully submitted,

   /S/ Joshua L. Dratel
Joshua L. Dratel
Joshua L. Dratel, P.C.
29 Broadway, Suite 1412
New York, New York 10006
(212) 732-0707
jdratel@joshuadratel.com
*Attorneys for Defendant WikiLeaks*

## CERTIFICATE OF COMPLIANCE

I certify that this memorandum is 7,536 words long and a total of 25 pages, in compliance with the Court's rules and the requirements set forth in the Court's November 29, 2018, Order.

Dated:  December 7, 2018

\_\_\_/s/ Joshua L. Dratel\_\_\_\_

JOSHUA L. DRATEL

*Attorneys for Defendant WikiLeaks*
