## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

DEMOCRATIC NATIONAL
COMMITTEE,

*Plaintiff,*

v.

THE RUSSIAN FEDERATION, et al.,

*Defendants.*

Case No. 1:18-cv-3501-JGK-SDA

Oral Argument Requested

---

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT DONALD J. TRUMP FOR PRESIDENT, INC.'S MOTION TO DISMISS COUNTS II, III, IV, VIII, XII, AND XIV OF THE AMENDED COMPLAINT

---

James M. Gross
JONES DAY
250 Vesey Street
New York, NY 10281
(212) 326-3939
jgross@jonesday.com

Michael A. Carvin (*pro hac vice*)
  *Counsel of Record*
William D. Coglianese (*pro hac vice*)
Vivek Suri
JONES DAY
51 Louisiana Avenue, NW
Washington, DC 20001
(202) 879-3939
macarvin@jonesday.com
wcoglianese@jonesday.com

*Counsel for Donald J. Trump for President, Inc.*

# TABLE OF CONTENTS

**Page**

Introduction ...............................................................................................................1

Background ................................................................................................................3

Standard of Review ...................................................................................................4

Argument ..................................................................................................................5

I.   The Court Should Dismiss All Claims Against the Campaign Because the Imposition of Liability Would Violate the First Amendment .............................................6

II.  The DNC Fails to State RICO Claims Against the Campaign. ...........................10

    A.   The DNC has not alleged a valid enterprise. .............................................11

        1.   The DNC fails to allege a common purpose.......................................12

        2.   The DNC fails to allege an unlawful common purpose.......................17

        3.   The DNC fails to allege relationships amongst the purported association-in-fact enterprise members. ...............................................18

        4.   The DNC fails to allege an enterprise with the required longevity......21

        5.   The DNC fails to allege an enterprise that is separate from the purported pattern of racketeering activity. ..............................................21

    B.   The DNC has not alleged that the Campaign conducted or participated in the conduct of the alleged association-in-fact enterprise. ..................................22

    C.   The DNC has not alleged that the Campaign committed any predicate acts, let alone a pattern of racketeering activity. .............................................24

    D.   The DNC has not alleged any cognizable injury that was proximately caused by the alleged RICO violations. .........................................................27

    E.   The DNC's tagalong RICO-conspiracy claim also fails. ............................31

III. The DNC Fails to State a Wiretap Act Claim Against the Campaign..................32

    A.   The DNC fails to allege that there was an interception or that the Campaign knew or had to reason to know of an interception. ......................32

    B.   The DNC fails to allege that the Campaign "used" intercepted communications..................35

IV. The DNC Fails to State State-Law Claims Against the Campaign......................37

    A.   The Court should decline to exercise supplemental jurisdiction over the state-law claims. .......................................................................................37

    B.   The DNC fails to state a trade-secrets claim against the Campaign...........39

    C.   The DNC fails to state a claim against the Campaign for conspiracy to commit trespass to chattels..........................................................................42

    D.   The DNC fails to state a Virginia Computer Crimes Act claim against the Campaign...........43

Conclusion ..............................................................................................................46

# TABLE OF AUTHORITIES

**Page(s)**

### CASES

*4 K & D Corp. v. Concierge Auctions, LLC,*
2 F. Supp. 3d 525 (S.D.N.Y. 2014) ............................................................................. 12, 32

*Aerowest GmbH v. Freitag,*
2016 WL 3636619 (E.D.N.Y. June 28, 2016) ..........................................................22

*Agency Holding Corp. v. Malley-Duff & Assocs.,*
483 U.S. 143 (1987)....................................................................................................24

*Agric. Water v. Occidental Oil & Gas Corp.,*
235 F. Supp. 3d 1132 (E.D. Cal. 2017) .....................................................................13

*Alexander Interactive, Inc. v. Leisure Pro Ltd.,*
2014 WL 4651942 (S.D.N.Y. Sep. 16, 2014)...........................................................39

*Alliance Tech. Grp., LLC v. Achieve 1 LLC,*
2013 WL 143500 (E.D. Va. Jan. 11, 2013) ..............................................................38

*America Online, Inc. v. IMS,*
24 F. Supp. 2d 548 (E.D. Va. 1998) ..........................................................................38

*America Online, Inc. v. LCGM, Inc.,*
46 F. Supp. 2d 444 (E.D. Va. 1998) ..........................................................................42

*Anza v. Ideal Steel Supply Corp.,*
547 U.S. 451 (2006)..............................................................................................27, 29

*Apotex Inc. v. Acorda Therapeutics, Inc.,*
823 F.3d 51 (2d Cir. 2016) ..........................................................................................4

*Ashcroft v. Free Speech Coalition,*
535 U.S. 234 (2002)......................................................................................................9

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009)..............................................................................................32, 34

*Bartnicki v. Vopper,*
532 U.S. 514 (2001)...........................................................................................7, 8, 35

*Bastable v. Muslu,*
2008 WL 7339887 (Va. Cir. Ct. July 8, 2009).........................................................44

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007)........................................................................................4, 34, 39

*Boccardi Capital Sys. v. D.E. Shaw Laminar Portfolios, LLC,*
2009 WL 362118 (S.D.N.Y. Feb. 9, 2009) ..............................................................40

*Boehner v. McDermott,*
    484 F.3d 573 (D.C. Cir. 2007) ........................................................................ 7, 35, 36

*BondPro Cop. v. Siemens Power Generation,*
    463 F.3d 702 (7th Cir. 2006) .................................................................................... 41

*Boyle v. United States,*
    556 U.S. 938 (2009) ............................................................................ 12, 18, 19, 21

*Buckley v. Valeo,*
    424 U.S. 1 (1976) (per curiam) ................................................................................ 17

*CAIR Action Network, Inc. v. Gaubatz,*
    82 F. Supp. 3d 344 (D.D.C. 2015) .......................................................................... 40

*Cal. Democratic Party v. Jones,*
    530 U.S. 567 (2000) .................................................................................................. 10

*Cannon v. Douglas Elliman, LLC,*
    2007 WL 4358456 (S.D.N.Y. Dec. 10, 2007) ...................................................... 20

*Casio Computer Co. v. Sayo,*
    2000 WL 1877516 (S.D.N.Y. Oct. 13, 2000) ....................................................... 31

*Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,*
    511 U.S. 164 (1994) ................................................................... 25, 26, 37, 44

*Cherrie v. Va. Health Servs., Inc.,*
    787 S.E.2d 855 (Va. 2016) ................................................................................ 43, 44

*Citizens United v. FEC,*
    558 U.S. 310 (2010) ............................................................................................ 10, 36

*City of New York v. Smokes-Spirits.com, Inc.,*
    541 F.3d 425 (2d Cir. 2008) .............................................................................. 23, 24

*Clinton v. Jones,*
    520 U.S. 681 (1997) .................................................................................................... 1

*Cofacredit, S.A. v. Windsor Plumbing Supply Co.,*
    187 F.3d 229 (2d Cir. 1999) .................................................................................... 31

*Crichton v. Golden Rule Ins. Co.,*
    576 F.3d 392 (7th Cir. 2009) .................................................................................. 23

*D. Penguin Bros. v. City Nat. Bank,*
    587 F. App'x 663 (2d Cir. 2014) ............................................................................ 13

*DeFalco v. Bernas,*
    244 F.3d 286 (2d Cir. 2001) ........................................................................ 25, 27, 28

*Eagle One Roofing Contractors, Inc. v. Acquafredda,*
    2018 WL 1701939 (E.D.N.Y. Mar. 31, 2018) ....................................................27

*Econ. Research Servs. v. Resolution Econ., LLC,*
    208 F. Supp. 3d 219 (D.D.C. 2016) ...............................................................42

*First Capital Asset Mgmt., Inc. v. Satinwood, Inc.,*
    385 F.3d 159 (2d Cir. 2004) ................................................................... 12, 17

*First Nat'l Bank v. Holland,*
    39 S.E. 126 (Va. 1901) ..................................................................................42

*Fla. Star v. B.J.F.,*
    491 U.S. 524 (1989) .................................................................................8, 9

*Fraser v. Nationwide Mut. Ins. Co.,*
    352 F.3d 107 (3d Cir. 2003) ..........................................................................33

*Gelber v. Glock,*
    800 S.E.2d 800 (Va. 2017) ..................................................................... 42, 43

*Goldfine v. Sichenzia,*
    118 F. Supp. 2d 392 (S.D.N.Y. 2000) ............................................................25

*Green v. New Vision Int'l, Inc.,*
    156 F.3d 721 (7th Cir. 1998) .........................................................................23

*Grimes v. Fremont Gen. Corp.,*
    785 F. Supp. 2d 269 (S.D.N.Y. 2011) ............................................................11

*Grosjean v. Am. Press Co.,*
    297 U.S. 233 (1936) ......................................................................................10

*Gross v. Waywell,*
    628 F. Supp. 2d 475 (S.D.N.Y. 2009) ............................................................30

*H.J. Inc. v. Nw. Bell Tel. Co.,*
    492 U.S. 229 (1989) ........................................................................24, 26, 27

*Hechler Chevrolet, Inc. v. Gen. Motors Corp.,*
    337 S.E. 2d 744 (Va. 1985) ...........................................................................43

*Herold v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,*
    2018 WL 1950641 (E.D. Va. April 25, 2018) ................................................44

*Kerik v. Tacopina,*
    64 F. Supp. 3d 542 (S.D.N.Y. 2014) ..............................................................10

*Klayman v. Zuckerberg,*
    753 F.3d 1354 (D.C. Cir. 2014) .....................................................................26

*Kolari v. N.Y.-Presbyterian Hosp.*,
    455 F.3d 118 (2d Cir. 2006) ................................................................. 38, 39

*Konop v. Hawaiian Airlines, Inc.*,
    302 F.3d 868 (9th Cir. 2002) ....................................................................33

*L-3 Comm'ns Corp. v. Serco, Inc.*,
    2018 WL 1352093 (E.D. Va. Mar. 15, 2018) ...........................................44

*Louis Vuitton Malletier, S.A. v. LY USA, Inc.*,
    676 F.3d 83 (2d Cir. 2012) ........................................................................39

*Luis v. Zang*,
    833 F.3d 619 (6th Cir. 2016) .....................................................................33

*McCutcheon v. FEC*,
    572 U.S. 185 (2014) ...................................................................................17

*Michalowski v. Rutherford*,
    82 F. Supp. 3d 775 (N.D. Ill. 2015) ..........................................................26

*Miller v. California*,
    413 U.S. 15 (1973) .......................................................................................9

*Monitor Patriot Co. v. Roy*,
    401 U.S. 265 (1971) ...................................................................................17

*Moss v. BMO Harris Bank, N.A.*,
    258 F. Supp. 3d 289 (E.D.N.Y. 2017)..................................11, 17, 19, 20, 21, 23,

*N.Y. Times Co. v. United States*,
    403 U.S. 713 (1971) .....................................................................................8

*Nat'l Grp. for Comm'ns & Computers Ltd. v. Lucent Techs. Inc.*,
    420 F. Supp. 2d 253 (S.D.N.Y. 2006).................................................. 13, 31

*Packingham v. North Carolina*,
    137 S. Ct. 1730 (2017) ...............................................................................10

*Pure Power Boot Camp v. Warrior Fitness Boot Camp*,
    587 F. Supp. 2d 548 (S.D.N.Y. 2008).......................................................33

*Reed Constr. Data Inc. v. McGraw-Hill Cos.*,
    745 F. Supp. 2d 343 (S.D.N.Y. 2010)........................................................13

*Reves v. Ernst & Young*,
    507 U.S. 170 (1993) ............................................................................ 22, 23

*Rolo v. City Investing Co. Liquidating Tr.*,
    155 F.3d 644 (3d Cir. 1998) ......................................................................25

*Rosner v. Bank of China*,
    528 F. Supp. 2d 419 (S.D.N.Y. 2007).................................................................... 17, 18

*Roth v. Jennings*,
    489 F.3d 499 (2d Cir. 2007) ......................................................................................... 4

*RSM Prod. Corp. v. Fridman*,
    643 F. Supp. 2d 382 (S.D.N.Y. 2009)......................................................................... 20

*Ruckelshaus v. Monsanto Co.*,
    467 U.S. 986 (1984) ..................................................................................................... 41

*Salinas v. United States*,
    522 U.S. 52 (1997) ....................................................................................................... 31

*Sedima, S.P.R.L. v. Imrex Co.*,
    473 U.S. 479 (1985) ..................................................................................................... 30

*Shaw v. Nissan N. Am., Inc.*,
    220 F. Supp. 3d 1046 (C.D. Cal. 2016) ...................................................................... 13

*Snyder v. Fantasy Interactive, Inc.*,
    2012 WL 569185 (S.D.N.Y. Feb. 9, 2012) ................................................................ 33

*Snyder v. Phelps*,
    562 U.S. 443 (2011)....................................................................................................8, 9

*Snyder v. Phelps*,
    580 F.3d 206 (4th Cir. 2009)......................................................................................... 9

*Spinale v. United States*,
    2004 WL 50873 (S.D.N.Y. Jan. 9, 2004).................................................................... 25

*Spool v. World Child Int'l Adoption Agency*,
    520 F.3d 178 (2d Cir. 2008) ........................................................................... 4, 26, 27

*State Analysis, Inc. v. Am. Fin. Servs. Ass'n*,
    621 F. Supp. 2d 309 (E.D. Va. 2009) ......................................................................... 42

*Stein v. World-Wide Plumbing Supply Inc.*,
    71 F. Supp. 3d 320 (E.D.N.Y. 2014)........................................................................... 22

*Steve Jackson Games, Inc. v. U.S. Secret Serv.*,
    36 F.3d 457 (5th Cir. 1994).......................................................................................... 33

*Tarantos v. Fox News Network, LLC*,
    2018 WL 2731268 (S.D.N.Y. May 18, 2018) ............................................................ 33

*Town of Mamakating v. Lamm*,
    2015 WL 5311265 (S.D.N.Y. Sept. 11, 2015) ............................................................ 19

*Tribune Co. v. Purcigliotti,*
  869 F. Supp. 1076 (S.D.N.Y. 1994) ........................................................... 25

*United Mine Workers v. Gibbs,*
  383 U.S. 715 (1966) ..................................................................................... 37

*United States v. Steiger,*
  318 F.3d 1039 (11th Cir. 2003) .................................................................. 33

*United States v. Turkette,*
  452 U.S. 576 (1981) ....................................................................... 11, 12, 21

*Westchester Cty. Indep. Party v. Astorino,*
  137 F. Supp. 3d 586 (S.D.N.Y. 2015) ............................................ 27, 28, 30, 31

*Wood v. Incorporated Vill. of Patchogue,*
  311 F. Supp. 2d 344 (E.D.N.Y. 2004) ......................................................... 22

**STATUTES**

18 U.S.C. § 1961 ........................................................................................ 11, 24

18 U.S.C. § 1962 ................................................................................. 10, 11, 12

18 U.S.C. § 1964 ........................................................................................ 11, 27

18 U.S.C. § 2510 ................................................................................................ 33

18 U.S.C. § 2511 ............................................................................ 32, 33, 34, 35, 37

18 U.S.C. § 2701 ................................................................................................ 34

28 U.S.C. § 1367 ................................................................................................ 38

47 U.S.C. § 230 .................................................................................................. 26

52 U.S.C. § 30101 .............................................................................................. 40

D.C. Code § 36-401 ................................................................................. 39, 40, 41

Va. Code § 18.2-152.2–4 ................................................................................... 43

Va. Code § 18.2-152.3–4 ................................................................................... 45

Va. Code § 18.2-152.12 ..................................................................................... 44

**OTHER AUTHORITIES**

Merriam-Webster Online Dictionary, *intercept* ............................................. 33

Restatement (Second) of Torts § 217, Comment (e) ...................................... 42

## INTRODUCTION

In this case, the Democratic National Committee ("DNC") seeks to litigate and explain away its candidate's defeat in the 2016 presidential election. The DNC thus alleges—unburdened by any actual facts—that President Trump's campaign (Donald J. Trump for President, Inc.; "the Campaign") conspired with Russia and a hodgepodge of others to publish materials stolen from the DNC's computer systems. But the DNC does not claim the Campaign had any role in hacking its systems and stealing the materials—it attributes that only to Russia. Nor does the DNC claim the Campaign played any part in publishing the stolen materials—it attributes that only to Russia and WikiLeaks. Instead, the DNC predicates its claims against the Campaign exclusively on allegations that: (1) the Campaign received advance notice of some disclosures; and (2) after disclosures occurred, the Campaign made political use of the revealed information and publicly encouraged additional disclosures.

There are many problems with the DNC's politically motivated lawsuit. It threatens to unleash discovery that would interfere with the President's "vast and important" responsibilities, which require "his undivided time and attention." *Clinton v. Jones*, 520 U.S. 681, 697 (1997). And it would inevitably collide with the investigations by Special Counsel Robert Mueller and several congressional committees into alleged collusion between Russia and Americans during the 2016 campaign. The Special Counsel has issued a number of indictments, raising the possibility that this case would need to be stayed so as to not interfere with those criminal defendants' rights.

Fortunately, the DNC's partisan effort to drag the Court into a political thicket already occupied by Congress and the Special Counsel is legally meritless, and so must be dismissed. For starters, *even if* the Campaign had a role in publishing materials stolen by others (which the DNC does not claim), the First Amendment protects disclosures of public issues. This protection undoubtedly covers the disclosed materials, which revealed, for instance, the DNC's questionable conduct during its presidential primaries, its correspondence with wealthy donors, and its cozy relationship with the media.

The DNC's claims also fail on their own terms. *First*, the centerpiece of the Amended Complaint consists of claims that the Campaign participated in an enterprise that violated the Racketeer Influenced Corrupt Organizations Act (RICO) and also conspired to violate RICO. But RICO claims are notoriously meritless, and the DNC's are no different:

- The DNC needs to allege an enterprise whose members pursued an unlawful common purpose by working closely together for an extended period. But its enterprise theory simply lumps together an assortment of individuals and entities who were pursuing differing objectives, who maintained no relationships beyond isolated interactions, and who are not even claimed to have come together until well after the alleged wrongdoing started.
- The DNC needs to allege that the Campaign played a role in directing the enterprise's affairs. But the most it claims is that the Campaign cheered on *others* who were directing those affairs.
- The DNC needs to allege that the Campaign itself committed criminal acts amounting to a pattern of racketeering. But it concedes that the Campaign did no such thing, and instead invokes a theory of aiding-and-abetting that is not available under the civil RICO statute.
- The DNC needs to allege that the supposed RICO violations proximately caused injury to its business or property. But it instead alleges mostly noneconomic (and political) injuries, and fails to establish a single cognizable injury directly traceable to the alleged enterprise.
- Finally, the DNC needs to plausibly allege that the Campaign agreed with the other Defendants to violate RICO. But it does not even attempt to make this showing.

*Second*, the DNC's claim under the Wiretap Act fails, because it does not allege that the Campaign had any role in intercepting in-progress communications or using intercepted communications.

*Finally*, the DNC's state-law claims fare no better. Given the defects in the federal claims and the complex state-law issues raised by the state claims, the Court should decline to exercise supplemental jurisdiction over these claims. But even if the Court were to keep the claims, they would all require dismissal (even if they were not foreclosed by the First Amendment): The DNC invokes D.C.'s Uniform Trade Secrets Act, but fails to plead that this case involves any trade secrets; it brings a claim under Virginia law for conspiracy to commit trespass to chattels, but alleges only that the Campaign agreed to disclose emails that Russia had already obtained on its own; and it asserts a claim under the Virginia Computer Crimes Act, but ignores that that statute does not authorize aiding-and-abetting liability (and that the Campaign is not alleged to have had *any* involvement in hacking, anyway).

The Court should dismiss all claims against the Campaign.

## BACKGROUND

The DNC alleges that, during the 2016 presidential campaign, "Russia's intelligence services illegally hacked into the DNC's computer systems and email server." (Am. Compl. ¶ 83.) Russian intelligence agents allegedly launched the first phase of the cyberattack in July 2015 (*id.* ¶ 115), and the second phase in April 2016 (*id.* ¶ 101). As a result of these attacks, Russian intelligence agents allegedly copied "thousands of DNC documents and emails." (*Id.* ¶ 12.)

The DNC further alleges that, after Russian agents had stolen the DNC's emails and other documents, Russian agents entered into a conspiracy with the Campaign, WikiLeaks, and others to "disseminate [the] stolen DNC material." (*Id.* ¶ 82.) The DNC claims that, in accordance with this supposed conspiracy, Russia and WikiLeaks released batches of stolen DNC materials over the course of the next several months. (*See id.* ¶¶ 140–68.)

These disclosures revealed important information about the DNC to the public. For example:

- The disclosures revealed DNC officials' hostility toward Senator Sanders during the primaries. Officials discussed portraying Senator Sanders as an atheist, speculating that "my Southern Baptist peeps would draw a big difference between a Jew and an atheist." (Ex. 1, 3.) They suggested pushing a "narrative" that he "never ever had his act together, that his campaign was a mess." (Ex. 2, 3.) They opposed his push for additional debates. (Ex. 3.) They complained that he "has no understanding" of the Democratic Party. (Ex. 4.) The DNC's chairperson even leaked debate questions to Secretary Clinton. (Ex. 5.)

- According to *The New York Times*, "thousands of emails" between donors and fundraisers revealed "in rarely seen detail the elaborate, ingratiating and often bluntly transactional exchanges necessary to harvest hundreds of millions of dollars from the party's wealthy donor class." These emails "capture[d] a world where seating charts are arranged with dollar totals in mind, where a White House celebration … is a thinly disguised occasion for rewarding wealthy donors and where physical proximity to the president is the most precious of currencies." (Ex. 6.)

- The disclosures revealed Secretary Clinton's positions on important questions of foreign policy. For example, in one email, Secretary Clinton stated: "My dream is a hemispheric common market, with open trade and open borders." (Ex. 7.)

- The disclosures revealed racism at the DNC and the Clinton Campaign. One memo discussed ways to "acquire the Hispanic consumer," claiming that "Hispanics are the most brand loyal consumers in the World" and that "Hispanics are the most responsive to 'story telling.'" (Ex. 8.) Another email pitched "a new video we'd like to use to mop up some more taco bowl engagement." (Ex. 9.) Still another email described "Latinos" as "needy." (Ex. 10.)

- The disclosures revealed alleged cover-ups of sexual harassment at the Clinton Campaign. A campaign official wrote in one email: "I was recently contacted by a source who claims to have worked on the 2008 Hillary Clinton campaign and is alleging that Marlon Marshall [a senior campaign staffer] made unwelcome sexual advances and propositions towards women on the campaign repeatedly." The email continues: "The source also claims that [campaign manager] Robby Mook was made aware of the issue, but declined to act on it or intervene because he is personal friends with Marshall." (Ex. 11.)

- The disclosures revealed the DNC's cozy relationship with the media. For example, emails showed that reporters would ask DNC to approve articles before publication. (Ex. 12.) They also showed DNC staffers discussing giving a CNN reporter "questions to ask us." (Ex. 13.)

In April 2018, the DNC brought this lawsuit. The DNC raises six claims against the Campaign: (1) violation of RICO (count II), (2) conspiracy to violate RICO (count III), (3) violation of the Wiretap Act (count IV), (4) violation of the Washington, D.C. Uniform Trade Secrets Act (count VIII), (5) conspiracy to commit trespass to chattels in violation of Virginia law (count XI), and (6) violation of the Virginia Computer Crimes Act (count XII).

## STANDARD OF REVIEW

Rule 12(b)(6) provides for the dismissal of a complaint for failure to state a claim. Dismissal is necessary where a complaint fails to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "[B]ald assertions and conclusions of law will not suffice. The pleadings must create the possibility of a right to relief that is more than speculative." *Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 183 (2d Cir. 2008) (citation omitted).

A court must decide a motion under Rule 12(b)(6) on the basis of the factual allegations in the complaint, documents "integral to the complaint," and judicially noticeable matters. *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007). Here, the Court may consider the contents of the materials published by Russia and WikiLeaks: Those materials are integral to the Amended Complaint because it necessarily relies on them, and they are also subject to judicial notice because their contents are publicly available on the internet. *Apotex Inc. v. Acorda Therapeutics, Inc.*, 823 F.3d 51, 60 (2d Cir. 2016).

**ARGUMENT**

Many of the legal issues in this case turn on the distinction between (1) stealing documents and (2) disclosing documents that someone else previously stole. It is thus essential to establish at the outset: The Amended Complaint alleges only that the Campaign conspired to disclose documents that someone else—namely, Russia—previously stole. The Amended Complaint does not allege that the Campaign itself stole any documents, or even that it conspired to steal any documents.

The DNC's description of the Campaign's conduct makes clear that the DNC alleges participation in the disclosure of the emails, not participation in the hacking or the theft (all emphases added):

- "The Conspiracy *To Disseminate* Stolen DNC Data To Aid Trump." (Am. Compl. at 21.)
- "Defendants conspired *to disseminate* documents stolen from the DNC." (*Id.* ¶ 25.)
- "Defendants launched a scheme *to disseminate* information that was damaging to the Democratic party and the DNC." (*Id.* ¶ 131.)
- "Following The Trump Tower Meeting, Russia Continues Its Hacking And Launches A Massive *Public Dissemination* Of Stolen DNC Documents." (*Id.* at 33.)
- "After The Trump Campaign Blocks Anti-Russia Language From The GOP Platform, WikiLeaks Begins *Disseminating* Stolen DNC Documents." (*Id.* at 37.)
- "Trump Associates Secretly Communicate With Russian Agents And WikiLeaks As They *Strategically Release* Stolen DNC Documents." (*Id.*)
- "The illegal conspiracy inflicted profound damage upon the DNC. The timing and selective *release* of the stolen materials prevented the DNC from communicating with the American electorate on its own terms." (*Id.* ¶ 199.)
- "The timing and selective *release* of stolen materials was designed to and had the effect of driving a wedge between the DNC and Democratic voters." (*Id.* ¶ 200.)

The DNC's factual theory likewise makes it clear that the alleged conspiracy between Russia and the Campaign came into being *after* the hack and *after* the theft of the emails. The DNC alleges that Russia began "its cyberattack on the DNC" in July 2015, "launched a pervasive cyberattack on DNC servers" on "April 18, 2016," and "staged several gigabytes of DNC data located on the DNC's servers for unauthorized and surreptitious exfiltration" on "April 22, 2016." (*Id.* ¶ 84, 101, 104.) The DNC separately alleges that, "[f]our days" after the April 22 theft, a "Kremlin-tied agent" informed George Papadopoulos, an advisor to the Campaign, "that the Russians 'have dirt' on [Hillary Clinton]

in the form of 'thousands of emails.'" (*Id.* ¶ 11.) The DNC continues that on "June 3, 2016"—two months after the first theft of information in April, and a month after the last theft of information in May—Russians offered the information to the Campaign. (*Id.* ¶ 12.) The DNC insinuates that the Campaign accepted this supposed offer in a meeting on "June 9, 2016." (*Id.* ¶ 136.) In short, the DNC's own factual theory is that (1) Russia stole the DNC's emails on April 22, 2016, but (2) Russia made contact with the Campaign only on April 26, and offered to assist the Campaign only in June.

To be sure, the Amended Complaint alleges that Russia continued to "maintai[n] an [un]authorized presence within the DNC network" after April 22, 2016. (*Id.* ¶ 120.) Even so, the Amended Complaint fails to tie this continued unauthorized presence to the Campaign. First, the Amended Complaint nowhere alleges that the Campaign agreed that Russia should continue to maintain an unauthorized presence in the DNC's servers. Second, the Amended Complaint nowhere alleges any facts from which one could infer that the Campaign made such an agreement. Third, the DNC identifies "May 2016" as the last date on which Russia stole data from the DNC (*id.* ¶ 57), but "June 9, 2016," as the first date on which Russia offered to assist the Campaign (*id.* ¶ 13). As a result, even taking into account the allegation of Russia's continued presence in the DNC servers, the Amended Complaint *still* fails to allege that the Campaign had any involvement in the hacking of the DNC's servers or in the theft of its materials.

Against this backdrop, the Court should dismiss the DNC's claims.

## I.  The Court Should Dismiss All Claims Against the Campaign Because the Imposition of Liability Would Violate the First Amendment.

In each of their claims, the DNC seeks to hold the Campaign legally responsible for the publication of the DNC's emails and other data on the internet. Of course, the DNC does not actually claim that the Campaign played any role in publishing those materials—only that it took advantage of the materials after WikiLeaks published them. But even if the DNC did make such a claim, the First Amendment protects a speaker's right to disclose stolen information so long as (1) the speaker

did not participate in the theft and (2) the information deals with matters of public concern. The DNC does not allege that the Campaign participated in the theft of the leaked materials, and the materials plainly deal with matters of public concern. Each claim must thus be dismissed.

**A.** In *Bartnicki v. Vopper*, 532 U.S. 514 (2001), the Supreme Court held that the First Amendment protects a speaker's right to disclose stolen information if (1) the speaker was not "involved" in the acquisition and (2) the disclosure deals with "a matter of public concern." *Id.* at 529, 535. There, leaders of a teachers' union spoke on the phone about using violence against school-board members to influence salary negotiations. *Id.* at 518–19. An unknown person secretly intercepted the call and shared the illegal recording with a local radio host, who played the recording on his show. *Id.* at 519. The Court ruled that the First Amendment prohibited the imposition of liability on the radio host, because the host "played no part in the illegal interception" and "the subject matter of the conversation was a matter of public concern." *Id.* at 525. It reasoned that "state action to punish the publication of truthful information" "seldom" complies with the Constitution. *Id.* at 527. The state has an interest in deterring theft of information, but it must pursue that goal by imposing "an appropriate punishment" on "the intercepto[r]"—not by punishing a speaker who was "not involved in the initial illegality." *Id.* at 529. The state also has an interest in protecting "privacy of communication," but "privacy concerns give way when balanced against the interest in publishing matters of public importance." *Id.* at 534. In short, *Bartnicki* establishes that "a stranger's illegal conduct does not suffice to remove the First Amendment shield from speech about a matter of public concern." *Id.* at 535.

"[A]n opposite rule"—under which a speaker may be punished for truthful disclosures on account of a "defect in the chain of title"—"would be fraught with danger." *Boehner v. McDermott*, 484 F.3d 573, 586 (D.C. Cir. 2007) (opinion of Sentelle, J., joined by a majority of the *en banc* court). "U.S. newspapers publish information stolen via digital means all the time." Jack L. Goldsmith, *Uncomfortable Questions in the Wake of Russia Indictment 2.0*, Lawfare (July 16, 2018), https://goo.gl/ovq117. In-

deed, they "openly solicit such information." *Id.*; *see N.Y. Times Co. v. United States*, 403 U.S. 713 (1971) (publication of the stolen *Pentagon Papers*). Punishing "conspiring to publish stolen information" "would certainly narrow protections for 'mainstream' journalists." Goldsmith, *supra*.

**B.** The Campaign satisfies the first part of *Bartnicki*'s test: It "played no part in the illegal interception." *Bartnicki*, 532 U.S. at 525. As explained above, the DNC alleges a "Conspiracy *To Disseminate* Stolen DNC Data To Aid Trump." (Am. Compl. at 21 (emphasis added); *supra* pp. 5–7.) The DNC does not assert—and cannot plausibly assert—a conspiracy to steal the emails in the first place.

**C.** The Campaign also satisfies the second part of *Bartnicki*'s test: the disclosure deals with "a matter of public concern." 532 U.S. at 525. "Speech deals with matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest." *Snyder v. Phelps*, 562 U.S. 443, 453 (2011) (citations and quotation marks omitted). In applying this test, a court must examine the "content, form, and context" of the speech. *Id.*

A court must judge the public character of a disclosure in the aggregate, not line by line. For example, in *Bartnicki*, leaders of a teachers' union spoke on the phone about "blow[ing] off the[] front porches" of school-board members to influence salary negotiations. 532 U.S. at 518–19. Even though that specific threat was not itself speech about public issues, the First Amendment protected the disclosure because the host made it while "engaged in debate about" teacher pay—"a matter of public concern." *Id.* at 535. The "public concern" test thus turns on the broader context of the disclosure, not the nature of the specific fact disclosed.

The Supreme Court followed the same holistic approach in *Florida Star v. B.J.F.*, 491 U.S. 524 (1989). In that case, a newspaper published an article that revealed the name of a rape victim, violating a state statute that forbade the disclosure of this private fact. Even though the victim's name itself was a private fact not of public concern, the Court ruled that the First Amendment barred civil

liability, because "the *news article* concerned a matter of public significance." *Id.* at 536 (emphasis added). The Court emphasized that "the article generally, *as opposed to the specific identity contained within it*, involved a matter of paramount public import." *Id.* at 536–37 (emphasis added).

The Supreme Court and Fourth Circuit again took this approach in *Snyder v. Phelps*. There, protesters held up hateful signs at a soldier's funeral—some addressing public issues ("God Hates the USA"), some specifically condemning the fallen soldier ("You're Going to Hell"). 562 U.S. at 454. Yet the Supreme Court held that the First Amendment protected the entire funeral protest—including the private taunts "related to [the fallen soldier and his family] specifically"—because "the overall thrust and dominant theme of [the] demonstration spoke to broader public issues." *Id.* The Fourth Circuit, too, ruled that the whole protest was protected, "even when [the soldier's parents] are mentioned," because the "general message" "primarily concerned" matters of public concern. *Snyder v. Phelps*, 580 F.3d 206, 225–26 (4th Cir. 2009).

*Bartnicki*, *Florida Star*, and *Snyder* thus show that courts must apply the public-concern test to a disclosure as a whole, not to individual snippets of the disclosure taken in isolation. This approach accords with the broader "First Amendment rule" that courts must always judge speech "as a whole." *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 248 (2002); *cf. Miller v. California*, 413 U.S. 15, 24 (1973) (speech is obscene only if "the work, *taken as a whole*, appeals to the prurient interest" and "*taken as a whole*, lacks serious … value" (citation omitted, emphasis added)).

Here, the content, form, and context of the disclosures establish that the disclosures, in the aggregate, dealt with public issues. To begin with the content: Every disclosed item was (1) work material (2) created, sent, or received by a political operative (3) during a presidential campaign. Every disclosed item thus inherently addressed politics, elections, and campaigns—all paradigmatic public issues. Indeed, the disclosed materials dealt pervasively with *important* public issues. They revealed the DNC's conduct during its presidential primaries—which are "public affair[s]," "structur[ed] and

monitor[ed]" by the state. *Cal. Democratic Party v. Jones*, 530 U.S. 567, 572 (2000). They revealed the nature of the DNC's interactions with rich donors—educating citizens about the influence of "moneyed interests." *Citizens United v. FEC*, 558 U.S. 310, 370 (2010). And they revealed the closeness of the party's ties to the media—"the great interpreters between the government and the people." *Grosjean v. Am. Press Co.*, 297 U.S. 233, 250 (1936). The importance of these issues to the public is only further confirmed by the overwhelming media coverage that the disclosures received.

The form of the disclosure reinforces its public character. WikiLeaks published the emails on "the vast democratic forums of the Internet." *Packingham v. North Carolina*, 137 S. Ct. 1730, 1735 (2017). It communicated the disclosed information to the public at large—not, for example, just to family members of DNC staffers that it sought to embarrass.

Finally, the context of the disclosure confirms that the disclosure deals with matters of public concern. WikiLeaks published the emails on July 22, 2016, "just three days before the Democratic National Convention." (Am. Compl. ¶ 153.) That timing shows that the "overall thrust" of the disclosure was to reveal important facts to the electorate—not to release social security numbers and office gossip buried in a few out of thousands of emails.

In sum, the Campaign did not participate in the theft of the emails, and the emails taken as a whole concerned public issues. The First Amendment bars civil liability.

## II. The DNC Fails to State RICO Claims Against the Campaign.

The DNC asserts that the Campaign committed a substantive violation of RICO under § 1962(c), which makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." A plaintiff thus must plausibly allege "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Kerik v. Tacopina*, 64 F. Supp. 3d 542, 553 (S.D.N.Y.

2014) (citation omitted). The plaintiff also must establish that the RICO violation proximately caused it to suffer an injury to its "business or property." § 1964(c).

The DNC also alleges that the Campaign violated § 1962(d), which makes it "unlawful for any person to conspire to violate any of the" substantive RICO provisions, including § 1962(c).

RICO's standards are hard to satisfy: "although civil RICO may be a 'potent weapon,' plaintiffs wielding RICO almost always miss the mark." *Moss v. BMO Harris Bank, N.A.*, 258 F. Supp. 3d 289, 297 (E.D.N.Y. 2017) (citing *Gross v. Waywell*, 628 F. Supp. 2d 475, 479–83 (S.D.N.Y. 2009)). For example, from 2004 through 2007, all 36 civil RICO cases brought in the Southern District of New York that were "resolved on the merits resulted in judgments against the plaintiffs, mostly at the motion to dismiss stage." *Id.* Courts therefore must "look with particular scrutiny at [RICO] claims." *Grimes v. Fremont Gen. Corp.*, 785 F. Supp. 2d 269, 299 (S.D.N.Y. 2011) (citation omitted).

The DNC's RICO claims do not withstand scrutiny. In fact, the DNC fails to satisfy *any* of the requirements for a claim under either § 1962(c) or (d).

### A. The DNC has not alleged a valid enterprise.

"The existence of an enterprise at all times remains a separate element which must be proved" to prevail in a RICO action. *United States v. Turkette*, 452 U.S. 576, 583 (1981). A RICO enterprise "includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).

The DNC makes two attempts at alleging the existence of a RICO enterprise. It first alleges that the Campaign was itself an enterprise. (Am. Compl. ¶¶ 222–26). It immediately concedes, however, that this theory applies (if at all) only to the other defendants, not the Campaign. (*Id.* ¶ 224 ("[E]ach Defendant—except the Trump Campaign itself—participated in the operation or management of the Trump Campaign.").) This concession was a necessary one: § 1962(c) "imposes liability on a 'person' who is *employed by or associated with* an 'enterprise,'" and so a "plaintiff could not allege a claim

against a corporation as a defendant 'person' while also claiming that the corporation was the 'enterprise.'" *4 K & D Corp. v. Concierge Auctions, LLC*, 2 F. Supp. 3d 525, 536 n.4 (S.D.N.Y. 2014) (Koeltl, J.) (emphasis added). (In any event, the DNC's "Campaign as enterprise" theory fails, because the DNC cannot establish that other Defendants "conduct[ed] or participate[d] … in the conduct of the [Campaign's] affairs through a pattern of racketeering activity (§ 1962(c)), and also for many of the same reasons that its association-in-fact theory fails (*infra* § II.A).)

The DNC's claim against the Campaign thus rests entirely on its second theory of a RICO enterprise: the allegation that the Campaign "was part of an Association-In-Fact comprising" all Defendants ("the AIF Enterprise"), which formed no earlier than March 2016 and which supposedly worked "to further [Defendants'] mutual goals of improving Trump's electoral prospects and damaging the DNC." (Am. Compl. ¶ 227.) This theory, too, fails. An "association-in-fact enterprise must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle v. United States*, 556 U.S. 938, 946 (2009). In addition, the enterprise requirement is separate from the requirement of a pattern of racketeering activity, and so a plaintiff must plausibly allege "an entity separate and apart from the pattern of activity in which it engages." *Turkette*, 452 U.S. at 583. The AIF Enterprise does not satisfy *any* of these requirements. Each failure alone is fatal to the DNC's § 1962(c) claim.

### 1. The DNC fails to allege a common purpose.

The members of an association-in-fact enterprise must be "associated together for a common purpose of engaging in a course of conduct." *Boyle*, 556 U.S. at 946 (citation omitted). A RICO plaintiff therefore must "provide … solid information" from which a court "could fairly conclude that [alleged enterprise] members functioned as a unit … for a common purpose of engaging in a course of conduct." *First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 174–75 (2d Cir. 2004)

(citations and internal quotation marks omitted)). "Individuals or [entities] that do not share such a common purpose cannot be considered part of a RICO enterprise as a matter of law." *Reed Constr. Data Inc. v. McGraw-Hill Cos.*, 745 F. Supp. 2d 343, 351 (S.D.N.Y. 2010).

To satisfy this requirement at the motion-to-dismiss stage, a RICO complaint must "set forth facts to support the conclusion that all [] defendants were actually working with one another … to accomplish a common purpose." *Nat'l Grp. for Commc'ns & Computers Ltd. v. Lucent Techs. Inc.*, 420 F. Supp. 2d 253, 271 (S.D.N.Y. 2006); *see also, e.g.*, *D. Penguin Bros. v. City Nat. Bank*, 587 F. App'x 663, 668 (2d Cir. 2014) (rejecting alleged common purpose of "purchas[ing] the favor and influence of political leaders and government officials" because "this allegation is little more than a 'naked assertion' devoid of further factual enhancement" (citations omitted)); *Shaw v. Nissan N. Am., Inc.*, 220 F. Supp. 3d 1046, 1056 (C.D. Cal. 2016) (rejecting unsupported allegations that defendants "shared a common fraudulent purpose" that were unaccompanied by allegations of "plausible facts that satisfy the common purpose requirement"). Where a plaintiff "allege[s] only a series of disconnected incidents, each involving a subset of the overall group of defendants, with no clear indication of a unified agenda," dismissal is required. *Comm. to Protect our Agric. Water v. Occidental Oil & Gas Corp.*, 235 F. Supp. 3d 1132, 1175 (E.D. Cal. 2017).

The DNC asserts that the members of the AIF Enterprise had the common purpose "of improving Trump's electoral prospects and damaging the DNC." (Am. Compl. ¶ 227; *see also id.* ¶ 71.) To survive dismissal, therefore, the DNC must allege specific facts making it plausible that all Defendants in fact shared this common purpose. The DNC has not done so. To the contrary, the DNC is forced to acknowledge (and to rely on materials explaining) that the hodgepodge, disparate members of the supposed AIF Enterprise—a foreign nation and its intelligence agency, an "Azeri-born oligarch" and his pop-singer son, a London-based Maltese academic, "an international organization of unknown structure" and its founder, the Campaign and several employees, multiple

members of President Trump's family, and the President's supposed "long-time confidant"—actually held widely divergent objectives in connection with the election. (*Id.* ¶¶ 39–52, 71–80.)

*Russia.* The Amended Complaint and the materials cited therein make clear that Russia's goals were complex and evolving, but centered on that nation's overarching geopolitical objectives. For example, a report that the DNC repeatedly cites (reflecting the joint views of the Central Intelligence Agency, the Federal Bureau of Investigation, and the National Security Agency) characterizes "Russian efforts to influence the 2016 US presidential election" as "the most recent expression of Moscow's longstanding desire to undermine the US-led democratic order," "the promotion of which [Russian President Vladimir] Putin and other senior Russian leaders view as a threat to Russia and Putin's regime." Office of the Director of National Intelligence, *Assessing Russian Activities and Intentions in Recent US Elections* at ii, 1 (Jan. 6, 2017), https://goo.gl/GLuFuz (cited at Am. Compl. ¶¶ 81, 115, 118) ("IC Report"). Or, as another article cited by the DNC puts it: "the e-mail hacks were part of a larger, and deeply troubling picture: Putin's desire to damage American confidence and to undermine the Western alliances—diplomatic, financial, and military—that have shaped the postwar world." Evan Osnos et al., *Trump, Putin, and the New Cold War*, New Yorker (Mar. 6, 2017), https://goo.gl/kzdhPo (cited at Am. Compl. ¶ 73).

The tactics that Russia deployed in pursuit of this objective "evolved over the course of the campaign based on Russia's understanding of the electoral prospects of the two main candidates." IC Report at ii. As the DNC admits, Russia's hacking efforts began in July 2015—long before President Trump even became the front-runner for the Republican nomination, let alone clinched that nomination in May 2016. (Am. Compl. ¶¶ 81, 84, 131.) "When it appeared to Moscow that Secretary Clinton was likely to win the election," Russia "began to focus more on undermining her future presidency." IC Report at ii. The common thread in all of this was Russia's objective of improving its own global standing and undermining U.S. democracy, regardless of which candidate prevailed.

The DNC also alleges that Russia was pursuing other objectives having nothing to do with "improving Trump's electoral prospects" or "damaging the DNC." (Am. Compl. ¶ 227.) Specifically, the DNC asserts that Russia's efforts were driven in part by Putin's personal dislike for Secretary Clinton, stemming from his view that she was to blame for "massive protests [that] broke out in Russia" in December 2011. (*Id.* ¶¶ 72–73.) Thus, Russia would have sought to defeat Mrs. Clinton regardless of her Republican opponent, and was seeking to "damage" her, not "the DNC." Moreover, the DNC unsurprisingly does not claim that any other Defendant shared Putin's objective of "maintaining power and exerting control" as President of Russia. (*Id.* ¶ 73.)

***Assange and WikiLeaks.*** The DNC does not allege that Assange or WikiLeaks shared Russia's objective of "undermin[ing] the US-led liberal democratic order." IC Report at ii. More to the point, it does not allege that either of these Defendants had any particular interest in helping President Trump's electoral prospects or damaging the DNC. Instead, the DNC acknowledges that Assange and Wikileaks' objective was to undermine Secretary Clinton, based on Assange's "history [of] conflicts" and personal "policy disagreements" with her. (*Id.* ¶ 79.) Those disagreements stemmed from not only Assange's criticisms of Clinton's actions as Secretary of State (such as her decision to "push[] to intervene in Libya in 2011," which, in Assange's view, caused "Libya's collapse into anarchy, enabling the Islamic State to flourish") but also Assange's view of Clinton "as a personal foe." Charlie Savage, *Assange, Avowed Foe of Clinton, Timed Email Release for Democratic Convention*, N.Y. Times (July 26, 2016), https://goo.gl/JRbCMk (cited at Am. Compl. ¶ 79). That latter sentiment derived from Assange's "personal perspective," as he accused "Mrs. Clinton of having been among those pushing to indict him after WikiLeaks disseminated a quarter of a million diplomatic cables during her tenure as secretary of state," and declared that he saw her "as a bit of a problem for freedom of the press more generally.'" *Id.* No other Defendant is alleged to have shared this particular vendetta against Secretary Clinton.

**The Campaign.** The DNC does not ascribe any of the aforementioned purposes—longstanding desires to "undermine the US-led democratic order," aspirations "to damage American confidence and to undermine [] Western alliances," or efforts to prosecute personal vendettas against Secretary Clinton—to the Campaign. Instead, the DNC offers only a single sentence as to the Campaign's purpose, asserting that the Campaign's "stated goal was to get Trump elected." (Am. Compl. ¶ 80.) In other words, the Campaign is alleged to have held the same purpose held by every other political campaign ever formed, and by the approximately 63 million Americans who voted for President Trump.

**Other Defendants.** The DNC makes only passing references to the purposes supposedly held by the other Defendants. Its sole allegation as to the GRU and Mifsud is that "they wanted to advance Russia's interests." (*Id.* ¶ 78.) This conclusory assertion obviously does not establish that either Defendant held any purpose whatsoever with respect to either President Trump or the DNC. Separately, the DNC alleges, without elaboration, that "the Agalarovs and the Trump Associates shared the conspirators' common purpose because they stood to benefit financially and professionally from a Trump Presidency." (*Id.* ¶ 80.) As to the Defendants who worked for or are related to President Trump, it is hardly surprising that they would desire his election. Regardless, this supposed desire for pecuniary and professional gain—which the DNC does not allege to have been shared by any of the other Defendants—falls far short of establishing that any of these individuals had a specific objective of harming the DNC.

In short, the DNC's own allegations and cited materials confirm that the AIF Enterprise cobbles together an assortment of disparate individuals and entities, each pursuing unique purposes not held by other Defendants. Because the DNC has not plausibly alleged that the supposed enterprise members shared a *common* purpose, this enterprise theory—and with it, the DNC's § 1962(c) claim against the Campaign—fails.

### 2. The DNC fails to allege an unlawful common purpose.

Even if the DNC *had* plausibly alleged that the AIF Enterprise members all shared a common purpose, this enterprise theory would still fall short. A RICO plaintiff must allege not just a common purpose, but an *unlawful* common purpose. Where a complaint does not plausibly allege that the members of an association-in-fact enterprise "shared a common unlawful purpose to violate RICO," it " fails to sufficiently allege the 'enterprise' element" of a § 1962(c) claim. *Rosner v. Bank of China*, 528 F. Supp. 2d 419, 429 (S.D.N.Y. 2007); *see also Moss*, 258 F. Supp. 3d at 299 ("[F]ailing to allege that members of an association-in-fact enterprise shared a wrongful intent to violate RICO is fatal to an 18 U.S.C. § 1962(c) claim."); *First Capital Asset Mgmt.*, 385 F.3d at 174 ("[F]or an association of individuals to constitute an enterprise, the individuals must share a common purpose to engage in a particular *fraudulent* course of conduct and work together to achieve such purposes." (emphasis added)).

There is nothing illicit about the AIF Enterprise's alleged purpose of advancing President Trump's electoral prospects and diminishing the DNC's. Quite the contrary, the rights to "support [a] candidate and his views," and to "affiliate … with a candidate" "in furtherance of common political goals" are at the heart of the First Amendment. *Buckley v. Valeo*, 424 U.S. 1, 22 (1976) (per curiam); *see also McCutcheon v. FEC*, 572 U.S. 185, 226 (2014) (plurality) (noting "the basic nature of the party system, in which party members join together to further common political beliefs, and citizens can choose to support a party because they share some, most, or all of those beliefs"). Indeed, "it can hardly be doubted that the constitutional guarantee has its fullest and most urgent application precisely to the conduct of campaigns for political office." *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 272 (1971).

To be sure, the DNC takes issue with the *tactics* that it accuses the AIF Enterprise of deploying in pursuit of its valid objective. But as explained below, an association-in-fact enterprise must exist independently of the acts in which it engages, and that existence (or nonexistence) turns on whether

the supposed enterprise members shared an unlawful *purpose. Boyle*, 556 U.S. at 946; *infra* II.A.4. It is thus not enough for the DNC to allege that the AIF Enterprise pursued its (legitimate) objective through improper means. Because Defendants' alleged objective was entirely legitimate, Defendants cannot be said to have formed a RICO enterprise.

Indeed, accepting the DNC's theory would have dire and far-reaching consequences. Every campaign that this country has ever seen—and every voter—has held the objective of promoting a political candidate, which necessarily comes at the expense of opposing candidates and their supporters. If this were enough to satisfy the common-purpose requirement, any campaign or group of voters could be deemed a RICO enterprise and subjected to the threat of civil liability (not to mention treble damages) for promoting their preferred candidate. All a plaintiff would need to do, as the DNC has done here, is allege that those defendants used improper tactics in pursuit of their entirely proper goal. Injecting this rule into the already overheated world of modern campaigning would invite abusive litigation designed to turn political contests into legal ones.

The Court need not go down this dangerous path. Because the DNC offers no basis for concluding that the alleged AIF Enterprise members "shared a common unlawful purpose to violate RICO" (*Rosner*, 528 F. Supp. 2d at 429), this enterprise theory fails.

### 3. The DNC fails to allege relationships amongst the purported association-in-fact enterprise members.

For an association-in-fact enterprise to exist, its members also must have "interpersonal relationships" with one another. *Boyle*, 556 U.S. at 946. Such relationships are crucial to providing the needed "evidence of an ongoing organization, formal or informal, and [] evidence that the various associates function as a continuing unit.'" *Id.* at 945 (quoting *Turkette*, 452 U.S. at 583). "[A]n association-in-fact enterprise must have [this] structure." *Id.*

A plaintiff cannot satisfy the relationships requirement merely by alleging that "participants in [an enterprise] preserve close business relationships and maintain established and defined roles with-

in the enterprise" (*Moss*, 258 F. Supp. 3d at 301), or by alleging that "several individuals, independently and without coordination, engaged in a pattern of crimes listed as RICO predicates" (*Boyle*, 556 U.S. at 947 n.4). Nor does it suffice for a plaintiff to simply "string[] together [] various defendants and label[] them an enterprise." *Town of Mamakating v. Lamm*, 2015 WL 5311265, at *9 (S.D.N.Y. Sept. 11, 2015), *aff'd on other grounds*, 651 F. App'x 51 (2d Cir. 2016). Rather, a plaintiff must set forth factual allegations demonstrating that the enterprise members "had an interpersonal relationship in which they worked together for a common illicit interest," from which it could plausibly be inferred that the members were "acting in any way [other than] in their own independent interests." *Moss*, 258 F. Supp. 3d at 301 (citation omitted).

The Amended Complaint does not plausibly allege the relationships that RICO requires. To be sure, the DNC baldly asserts that the AIF Enterprise "had an ongoing organizational framework" and that this supposed enterprise "could not have carried out its intricate task of sharing confidential information at the moments when it would be most beneficial to the Trump Campaign unless it had some structure for making and communicating group decisions." (Am. Compl. ¶ 228.) But at no point does the DNC actually identify any such "framework" or "structure." In fact, the DNC does not even allege any connection whatsoever between most Defendants.

Instead, the DNC alleges a series of isolated connections between various individuals. First, it asserts that some Defendants had "long-standing personal, professional, and financial ties to Russia" or to "individuals closely linked to the Russian government." (Am. Compl. ¶ 64; *see id.* ¶¶ 65–70.) But none of these supposed "ties" (President Trump's pre-presidency business dealings in Russia, Paul Manafort's previous work for "Russian-allied" Ukrainians, Manafort's and Robert Gates' "communication[s]" with a "former linguist in the Russian army," and Assange's attempts to flee to Russia to escape extradition on sexual-assault charges) are alleged to have anything to do with the

supposed enterprise. And it is not enough to allege simply that various individuals "preserve close business relationships" or other relationships. *Moss*, 258 F. Supp. 3d at 301.

Beyond this, the DNC merely alleges isolated interactions between certain Defendants: for instance, Papadopoulos's meetings with Joseph Mifsud, a Maltese academic "based in London" with undefined connections to Russia (Am. Compl. ¶¶ 93–98); a meeting at Trump Tower that Donald Trump, Jr., Jared Kushner, and Manafort attended with a Russian publicist and an allegedly "Kremlin-connected Russian lawyer," among others (*id.* ¶¶ 136–37); and electronic correspondence amongst "GRU operatives," WikiLeaks, and Roger Stone (*id.* ¶¶ 146–48, 157–61). These allegations are insufficient for two reasons.

*First*, many of these allegations rely on unsupported assertions that particular individuals were working as "agents" for other Defendants. (*See, e.g., id.* ¶ 43 (alleging that Mifsud "acted as a de facto agent of the Russian government"); *id.* ¶ 64 n.* (alleging that certain Defendants "acted as agents of, and their acts are attributable to, the Trump Campaign"); *id.* ¶ 137 (alleging that the Russian lawyer who attended the Trump Tower meeting "had a history of acting as an agent of the Russian government").) But "conclusory allegations regarding [an] agency relationship," without "facts that support [this] assertion[,] … are not sufficient to survive a motion to dismiss." *RSM Prod. Corp. v. Fridman*, 643 F. Supp. 2d 382, 408 (S.D.N.Y. 2009), *aff'd*, 387 F. App'x 72 (2d Cir. 2010); *see also Cannon v. Douglas Elliman, LLC,* 2007 WL 4358456, at *5 (S.D.N.Y. Dec. 10, 2007) (dismissing complaint that contained only "conclusory allegations of an agency relationship" and "offer[ed] no facts from which inferences of actual or apparent authority in this context can be drawn"). The DNC offers no such factual support, and so cannot rely on these bare allegations to bootstrap relationships between various Defendants. The DNC thus has no basis for, among other things, establishing relationships between the Campaign and Russia, the GRU, WikiLeaks, or Assange.

*Second*, these isolated interactions between various Defendants do not establish that the disparate and geographically dispersed enterprise members were "work[ing] together for a common illicit interest," through "interpersonal relationships," rather than for "their own independent interests." *Moss*, 258 F. Supp. 3d at 301 (citation omitted). As explained above (*supra* § II.A.1), the Amended Complaint establishes that the Defendants held distinct purposes from one another, and were pursuing those distinct purposes rather than some shared objective. And all of the alleged interactions are entirely consistent with Defendants each pursuing their unique, separate objectives. The fact that various Defendants occasionally communicated with one another simply does not provide any "evidence of an ongoing organization" that "function[ed] as a continuing unit." *Boyle*, 556 U.S. at 945 (citation omitted).

### 4. The DNC fails to allege an enterprise with the required longevity.

The DNC similarly cannot establish the third structural requirement of an association-in-fact enterprise: "longevity sufficient to permit the[] associates to pursue the enterprise's purpose." *Boyle*, 556 U.S. at 946. Even in the DNC's telling, the AIF Enterprise did not form until, at the earliest, March 2016—eight months *after* Russia allegedly "undert[ook] its cyberattack on the DNC" by infiltrating the DNC's network. (Am. Compl. ¶¶ 84, 115, 227.) And the DNC does not allege that any other enterprise members assisted Russia and the GRU in infiltrating the DNC's systems and extracting data. (*See id.* ¶¶ 4, 82–83.) The AIF Enterprise therefore did not exist long enough to play any role in the conduct that facilitated every theft and every disclosure at issue here. The enterprise lacks the required longevity.

### 5. The DNC fails to allege an enterprise that is separate from the purported pattern of racketeering activity.

Under Section 1962, "[t]he 'enterprise' is not the 'pattern of racketeering activity'"; it is an entity separate and apart from the pattern of activity in which it engages." *Turkette*, 452 U.S. at 583. The enterprise, in other words, "must have some sort of existence independent of the commission of

the predicate acts." *Wood v. Incorporated Vill. of Patchogue*, 311 F. Supp. 2d 344, 357 (E.D.N.Y. 2004). A plaintiff asserting a RICO claim therefore cannot merely lump defendants "'together for the sole reason that they all allegedly had [a hand]' in the alleged acts." *Aerowest GmbH v. Freitag*, 2016 WL 3636619, at *4 (E.D.N.Y. June 28, 2016) (citation omitted). A "RICO enterprise that is coterminous with the pattern of racketeering activity in which it engages … is not actionable." *Stein v. World-Wide Plumbing Supply Inc.*, 71 F. Supp. 3d 320, 327 (E.D.N.Y. 2014).

The DNC quite plainly fails this test. At no point does it even attempt to allege that the AIF Enterprise had any "existence independent of the commission of the predicate acts." *Wood*, 311 F. Supp. 2d at 357. To the contrary, even crediting all of the interactions between various Defendants that the DNC cobbles together, those interactions were purely for the purpose of engaging in a pattern of racketeering activity. Confirming as much, the DNC portrays the AIF Enterprise as simply ceasing to exist on Election Day 2016—the very day that the supposed pattern of racketeering activity came to an end. (Am. Compl. ¶ 227.) This makes perfect sense, because the DNC has not alleged "an organized entity," but rather has "plead[ed] only that a group existed to commit" predicate acts. *Aerowest GmbH*, 2016 WL 3636619, at *3. Such allegations "do not substantiate an 'enterprise' as required for a RICO claim." *Id.* at *4.

**B. The DNC has not alleged that the Campaign conducted or participated in the conduct of the alleged association-in-fact enterprise.**

Under § 1962(c), "one is not liable … unless one has participated in the operation or management of the enterprise itself." *Reves v. Ernst & Young*, 507 U.S. 170, 183 (1993). It is not enough for a defendant merely to associate with an enterprise; "*some* part in *directing* the enterprise's affairs is required." *Id.* at 179 (second emphasis added). This standard is not met where a defendant merely attends to its own business; "liability depends on showing that the defendants conducted or participated in the conduct of the *enterprise's* affairs, not just their *own* affairs." *Id.* at 185.

This being the case, "a person may not be held liable merely for taking directions and perform-ing tasks that are necessary and helpful to the enterprise, or for providing goods and services that ultimately benefit the enterprise." *Moss*, 258 F. Supp. 3d at 306; *see also Green v. New Vision Int'l, Inc.*, 156 F.3d 721, 728 (7th Cir. 1998) ("[S]imply performing services for an enterprise, even with knowledge of the enterprise's illicit nature, is not enough to subject an individual to RICO liabil-ity ...."). Nor do "[a]llegations that a defendant had a business relationship with a putative RICO enterprise ... suffice." *Crichton v. Golden Rule Ins. Co.*, 576 F.3d 392, 399 (7th Cir. 2009). In short, "[s]imply alleging that certain entities provide services which are helpful to an enterprise[,] without any allegations that those entities exert any control over the enterprise[,] does not sufficiently allege a claim under RICO against those entities." *City of New York v. Smokes-Spirits.com, Inc.*, 541 F.3d 425, 449 (2d Cir. 2008), *rev'd on other grounds sub nom., Hemi Grp., LLC v. City of New York*, 559 U.S. 1 (2010).

Here, the DNC does not even allege that the Campaign provided helpful services to the sup-posed AIF Enterprise—allegations that *still* would not pass the operation-and-management test. It does not claim the Campaign had any role in hacking into the DNC's systems, any role in exfiltrating data, or any role in publishing that data. In other words, the DNC does not allege that the Campaign played a part in—let alone directed—*any* of the conduct upon which its RICO claim is predicated.

Instead, the most the DNC alleges is that the Campaign cheered on *others* to direct the enter-prise's affairs, by supposedly "counsel[ing] and encourag[ing] Russia, the GRU, WikiLeaks, and Assange to commit economic espionage and theft of trade secrets," and by "prais[ing] the illegal dis-seminations" (Am. Compl. ¶¶ 5, 240; *see also, e.g., id.* ¶¶ 23, 97, 154, 187–94.) This does not suffice.

As an initial matter, "counsel[ing] and encourag[ing]," by definition, do not amount to "directing the enterprise's affairs." *Reves*, 507 U.S. at 179. This is particularly true given that none of the sup-posed counseling or encouraging is alleged to have had any impact on the AIF Enterprise's conduct. The DNC alleges only that those involved in carrying out the actual theft and dissemination of in-

formation told others who worked for or communicated with the Campaign of their plans, without soliciting or receiving any assistance—much less any direction—from those individuals. (E.g., Am. Compl. ¶¶ 94(d), 132, 157, 166.) This is the polar opposite of "exert[ing] … control over the enterprise." *Smokes-Spirits.com*, 541 F.3d at 449.

Just as clearly, praising the results of *others'* efforts in directing the AIF Enterprise's affairs is not tantamount to directing those affairs. If it were, every journalist that credited the disclosures with providing useful information could similarly be said to have directed the AIF Enterprise. But that is obviously nonsense (and contrary to the First Amendment). The Campaign did not direct the AIF Enterprise's affairs by praising the disclosure of (true and newsworthy) information any more than a stadium of baseball fans can be said to have directed their team's affairs on the field.

### C. The DNC has not alleged that the Campaign committed any predicate acts, let alone a pattern of racketeering activity.

"[T]he heart of any RICO complaint is the allegation of a *pattern* of racketeering." *Agency Holding Corp. v. Malley-Duff & Assocs.*, 483 U.S. 143, 154 (1987). A "'pattern of racketeering activity' requires at least two acts of racketeering activity"—known as "predicate acts"—occurring "within ten years" of one another. § 1961(5). A plaintiff must establish that the predicate acts "are related, *and* that they amount to or pose a threat of continued criminal activity." *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989). The DNC is unable to establish that the Campaign engaged in a pattern of racketeering activity, both because the law forecloses the aiding-and-abetting theory on which the DNC exclusively relies, and because the DNC in any event fails to allege the continuous criminal activity that RICO requires.

*First*, the DNC's § 1962(c) claim against the Campaign fails because it does not allege that the Campaign committed *any* predicate acts. Instead, it alleges that only Russia, the GRU, WikiLeaks, and Assange committed predicate acts (namely, economic espionage and theft of trade secrets). (Am. Compl. ¶¶ 231–38.) The DNC's sole theory as to the Campaign is that it "aided and abetted Russia,

the GRU, WikiLeaks, and Assange *as they committed* economic espionage and theft of Trade Secrets," by "counsel[ing] and encourag[ing]" them to commit those acts. (*Id.* ¶ 240 (emphasis added).)

The law forecloses this theory. "Courts in this district have routinely held that 'aiding and abetting' a RICO enterprise is not a valid cause of action." *Spinale v. United States*, 2004 WL 50873, at *6 (S.D.N.Y. Jan. 9, 2004); *see also, e.g.*, *Goldfine v. Sichenzia*, 118 F. Supp. 2d 392, 406 (S.D.N.Y. 2000) (same); *DeFalco v. Bernas*, 244 F.3d 286, 330 (2d Cir. 2001) (affirming decision in which district court dismissed RICO claim on the grounds that "RICO does not provide for aider-and-abettor liability").

The reason for this rule is straightforward. The Supreme Court has emphasized that, when Congress enacts a civil statute "under which a person may sue and recover damages from a private defendant for the defendant's violation of some statutory norm, there is no general presumption that the plaintiff may also sue aiders and abettors." *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 182 (1994) (holding that there is no aiding-and-abetting liability under Section 10(b) of the Securities Exchange Act). "Congress knew how to impose aiding and abetting liability when it chose to do so"; if it "intended to impose aiding and abetting liability" under civil RICO, the presumption mandated in *Central Bank of Denver* is that "it would have used the words 'aid' and 'abet' in the statutory text." *Id.* at 176–77. Those words, however, do not appear in § 1962. *See, e.g.*, *Rolo v. City Investing Co. Liquidating Tr.*, 155 F.3d 644, 657 (3d Cir. 1998) ("Like § 10(b), the text of § 1962 itself contains no indication that Congress intended to impose private civil aiding and abetting liability under RICO."). Because the DNC cannot rely on an aiding-and-abetting theory, it has not alleged a single predicate act by the Campaign—let alone a pattern of racketeering activity.

In all events, the DNC's allegations fail to plausibly allege aiding and abetting. To establish a claim for aiding and abetting, a complaint must allege, among other things, "'substantial assistance' by the aider and abettor in the achievement of the primary violation." *Tribune Co. v. Purcigliotti*, 869 F. Supp. 1076, 1100 (S.D.N.Y. 1994) (citation omitted), *aff'd sub nom. Tribune Co. v. Abiola*, 66 F.3d 12 (2d

Cir. 1995). But the DNC does not plead that the Campaign provided any—let alone substantial—assistance to the Defendants that allegedly committed predicate acts. Instead, it alleges only that the Campaign "counseled and encouraged" those Defendants. (Am. Compl. ¶ 240.) This is not enough. And to the extent that this supposed "counsel[] and encourage[ment]" is premised on the Campaign's encouraging disclosures of materials that it had no role in stealing or its publicly referencing already-disclosed materials (*id.* ¶¶ 154, 187–94), that conduct is shielded by the First Amendment and so cannot provide a basis for liability. *Supra* § I.

Additionally, aiding-and-abetting liability applies only where a person "give[s] a degree of aid" to others who "engage in [] proscribed activities." *Cent. Bank of Denver*, 511 U.S. at 176. But Russia contends that sovereign immunity shields it from liability for any predicate acts. ECF No. 186 at 4–7. And the Communications Decency Act (47 U.S.C. § 230) forecloses liability for a website that provides a forum where "third parties can post information"—which WikiLeaks is accused of doing here (by allegedly providing a forum for Russia to publish content it had obtained). *Klayman v. Zuckerberg*, 753 F.3d 1354, 1358 (D.C. Cir. 2014). To the extent that the law does not reach either Russia's or WikiLeaks' alleged conduct, the Campaign cannot have aided and abetted any "proscribed activities"—further confirming the futility of the DNC's theory.

*Second*, even if the law allowed aiding-and-abetting RICO liability, the DNC still would be unable to establish the "continued criminal activity" that RICO requires. *H.J.*, 492 U.S. at 239. A plaintiff can satisfy this requirement "either by showing a 'closed-ended' pattern—a series of related predicate acts extending over a substantial period of time—or by demonstrating an 'open-ended' pattern of racketeering activity that poses a threat of continuing criminal conduct beyond the period during which the predicate acts were performed." *Spool*, 520 F.3d at 183 (citing *H.J.*, 492 U.S. at 241).

The DNC attempts to establish only closed-ended continuity, as it alleges that the AIF Enterprise ceased on November 8, 2016 (Election Day). (Am. Compl. ¶ 227.) *See also Michalowski v.*

*Rutherford*, 82 F. Supp. 3d 775, 790 (N.D. Ill. 2015) (holding that plaintiff alleging RICO enterprise carried out through a political campaign "has alleged a closed period," because the "campaigns ended with the elections" and so "common sense suggests that there is no credible threat of future harm"). Closed-ended continuity requires "a series of related predicates extending over a substantial period of time" (*H.J.*, 492 U.S. at 242), and the Second Circuit has "never held a period of less than two years to constitute a 'substantial period of time'" (*Spool*, 520 F.3d at 184). *See also Eagle One Roofing Contractors, Inc. v. Acquafredda*, 2018 WL 1701939, at *14 (E.D.N.Y. Mar. 31, 2018) (same). But the DNC alleges that the AIF Enterprise existed for no more than nine months, having formed no earlier than March 2016. This is nowhere near the "long-term criminal conduct" that RICO requires. *H.J.*, 492 U.S. at 242.

### D.  The DNC has not alleged any cognizable injury that was proximately caused by the alleged RICO violations.

A plaintiff has a cause of action to sue under RICO only if it was "injured in [its] business or property." 18 U.S.C. § 1964(c). The injury must be "actual [and] quantifiable"; "courts have required that the plaintiff show concrete financial loss in order to show injury under RICO." *Westchester Cty. Indep. Party v. Astorino*, 137 F. Supp. 3d 586, 613 (S.D.N.Y. 2015).

The injury to business or property, moreover, must be "by reason of a violation of section 1962" (§ 1964(c)) meaning that the RICO violation must be "both the proximate cause and the but-for cause of the plaintiffs' injuries." *Westchester Cty. Indep. Party*, 137 F. Supp. 3d at 612 (citing *UFCW Local 1776 v. Eli Lilly & Co.*, 620 F.3d 121, 132 (2d Cir. 2010)). "When a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led *directly* to the plaintiff's injuries." *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 460–61 (2006) (emphasis added). A plaintiff must plausibly allege that its damages are "attributable to the violation, as distinct from other, independent factors." *DeFalco*, 244 F.3d at 329–30 (quoting *Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258, 269 (1992)).

The DNC makes four attempts at asserting cognizable injuries proximately caused by the supposed RICO violations. All four fail.

*First*, the DNC alleges that the WikiLeaks publications disrupted its political efforts, including by "driving a wedge between the DNC and Democratic voters," "impair[ing] the DNC's ability to support Democratic candidates," "undermining the party's ability to achieve unity and rally members around their shared values," and inflicting "a chilling effect on donations to the DNC." (Am. Compl. ¶ 200–03.) But interference with the DNC's political efforts does not constitute an "injury to business or property." "[I]njury to the [p]arty's 'business of choosing and securing candidates of their choice'"—or supporting those candidates—"does not become a business injury simply by virtue of calling it that." *Westchester Cty. Indep. Party*, 137 F. Supp. 3d at 615. This is instead, "at most, a non-economic" political injury. *Id.* Proving the point, the DNC does not even claim to have any way of quantifying the "impair[ment]" of its "ability to support Democratic candidates" or the "interfer[ence] with [its] opportunity to communicate its vision to the electorate." (Am. Compl. ¶¶ 200–01.) Similarly, allegations that the DNC "has been unable to earn the money donations it normally secures … lack[] the requisite precision necessary to constitute a RICO injury." *Westchester Cty. Indep. Party*, 137 F. Supp. 3d at 615.

Further, the DNC cannot show that these purported injuries directly followed from the alleged RICO violation, "as distinct from other, independent factors." *DeFalco*, 244 F.3d at 329–30. As an initial matter, the DNC cannot establish that any political injury it suffered was caused by the alleged predicate acts (the theft and disclosure of the emails) as opposed to the public's reaction to the information those emails revealed about the DNC's conduct. And in any event, there are a number of well-known factors—having nothing to do with the WikiLeaks releases—that caused the DNC to struggle politically in the lead-up to its candidate's defeat in the general election: the protracted primary fight between Secretary Clinton and Senator Sanders, the then-FBI Director's public statement

declaring that Secretary Clinton had been "extremely careless" in using a private email server as Secretary of State (and later announcing, days before the election, that the investigation into Secretary Clinton's email practices was being reopened), low enthusiasm for Secretary Clinton among important demographic groups, and so on. *See, e.g.*, A. Chozick et al., *Bernie Sanders Endorses Hillary Clinton, Hoping to Unify Democrats*, N.Y. Times (July 12, 2016), https://goo.gl/5y6hQh ("After 14 months of policy clashes and moments of disdain, Senator Bernie Sanders endorsed Hillary Clinton ….");  D. Balz & S. Clement, *Clinton Holds Narrow Lead over Trump on Eve of Conventions*, Wash. Post (July 17, 2016), https://goo.gl/CneHZk (reporting that polls "shift[ed] in Trump's direction" after "Clinton received a stern rebuke from [the] FBI Director" for her and her aides' "handling of sensitive classified material in their email exchanges"); A. Chozick, *Hillary Clinton Blames F.B.I. Director for Election Loss*, N.Y. Times (Nov. 12, 2016), https://goo.gl/CVhaAo ("Hillary Clinton on Saturday cast blame for her surprise election loss on the announcement by the F.B.I. director … days before the election that he had revived the inquiry into her use of a private email server."); J. Peters et al., *Black Turnout Soft in Early Voting, Boding Ill for Hillary Clinton*, N.Y. Times (Nov. 1, 2016), https://goo.gl/cjk9cm (reporting that "disappointing black turnout" was "creating a vexing problem for Hillary Clinton as she clings to a deteriorating lead over Donald J. Trump with Election Day just a week away"); J. Peters and Y. Alcindor, *Hillary Clinton Struggles to Win Back Young Voters From Third Parties*, N.Y. Times (Sept. 28, 2016), https://goo.gl/GTGsjm ("[Young voters] are not moving toward the [Democratic] party and its nominee as quickly and predictably as they have in past elections."). These factors and others all played major roles in "undermining the party's ability to achieve unity." (Am. Compl. ¶ 201.) The DNC thus cannot show that "the alleged violation led *directly* to" its supposed injuries. *Anza*, 547 U.S. at 461 (emphasis added).

*Second*, the DNC alleges that "the public releases … exposed employees of the DNC to intense, frightening, and sometimes life-threatening harassment." (Am. Compl. ¶ 204; *see also id.* ¶¶ 205–08.)

But those individuals are not plaintiffs, and the DNC has no standing to sue on their behalf. A RICO "plaintiff only has standing if, and can only recover to the extent that, *he has been injured in his* business or property by the conduct constituting the violation." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985) (emphases added). And in any event, "RICO violations must cause injury to 'business or property'"; "personal or emotional damages do not qualify." *Gross*, 628 F. Supp. 2d at 488; *see also Westchester Cty. Indep. Party*, 137 F. Supp. 3d at 612 (collecting cases).

*Third*, the DNC alleges that its computer systems were damaged by the alleged hacking, purportedly creating the need to repair and replace certain technology, and to retain staff and consultants to investigate the hacking and remediate the damage. (Am. Compl. ¶ 209.) But the DNC alleges that the hacking commenced in July 2015—months before the AIF Enterprise allegedly came into existence (somewhere between March and June 2016). (*Id.* ¶¶ 115, 227.) And the DNC does not suggest that it can identify particular damage that resulted from subsequent conduct after the AIF Enterprise came into being, rather than the initial hack. It therefore has no basis for claiming that the AIF Enterprise proximately caused this injury.

*Finally*, the DNC alleges that the GRU "stole proprietary computer code" and "proprietary information concerning the ways in which the DNC analyzed its data, developed its strategies and approached decisions in its efforts to win the 2016 election." (*Id.* ¶¶ 210–11.) Although the DNC says that it "derives value" from this code and information "by virtue of their secrecy" (*id.* ¶¶ 176, 178, 181) and that "[t]he GRU could have derived significant economic value" from this data by "selling the data to the highest bidder" (*id.* ¶ 185), it does not allege that the information actually *was* sold, or that the information was disseminated at any point. These supposed injuries thus have no connection to the releases of trade secrets that underlie the DNC's § 1962(c) claim. And even if they did, the DNC does not claim that it can quantify any "concrete financial loss" stemming from this alleged theft, as would be required. *Westchester Cty. Indep. Party*, 137 F. Supp. 3d at 612.

*     *     *     *     *

The DNC does not allege a valid association-in-fact enterprise, does not allege that the Campaign participated in the operation or management of any such enterprise, does not allege that the Campaign committed any predicate acts (let alone a continuous pattern of such acts), and does not allege that it sustained any cognizable injury to its property or business that was proximately caused by RICO violations. Its § 1962(c) claim against the Committee must be dismissed.

### E.  The DNC's tagalong RICO-conspiracy claim also fails.

The DNC's RICO-conspiracy claim under § 1962(d) fares no better. "To establish the existence of a RICO conspiracy, a plaintiff must prove 'the existence of an agreement to violate RICO's substantive provisions.'" *Cofacredit, S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d 229, 244 (2d Cir. 1999) (citation omitted). After all, "[a] conspirator must intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense." *Salinas v. United States*, 522 U.S. 52, 65 (1997). So where, as here, a plaintiff is unable to plead a violation of any of RICO's substantive provisions, that plaintiff by definition cannot establish a conspiracy to violate any of those provisions. That is why "[c]ase law in this Circuit confirms that a 1962(d) conspiracy claim must be dismissed where the substantive RICO claim is deficient." *Nat'l Grp.*, 420 F. Supp. 2d at 272; *see also, e.g.*, *Westchester Cty. Indep. Party*, 137 F. Supp. 3d at 618 (collecting cases so holding).

In any event, the DNC's conspiracy claim fails on its own terms because the DNC has not alleged a conspiratorial agreement with anywhere near the required specificity. "The core of a RICO civil conspiracy is an agreement to commit predicate acts," and so the DNC must plausibly allege a "conscious agreement among all defendants to commit at least two predicate acts." *Casio Computer Co. v. Sayo*, 2000 WL 1877516, at *22 (S.D.N.Y. Oct. 13, 2000). "Conclusory allegations of a conspiracy," by contrast, "are insufficient to plead a Section 1962(d) claim." *Nat'l Grp.*, 420 F. Supp. 2d at 272 (ci-

tation omitted); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice ….").

But conclusory allegations are all that the DNC offers. Its § 1962(d) claim spans all of four paragraphs, one of which just incorporates the rest of the Amended Complaint and the other three of which merely recite the elements of a § 1962(d) cause of action. (Am. Compl. ¶¶ 243–46.) At no point does the DNC allege *specific* facts *plausibly* suggesting that the Campaign reached an agreement with the other Defendants to commit predicate acts of economic espionage and theft of trade secrets. For this reason, too, the DNC's § 1962(d) claim fails. *See 4 K & D Corp.*, 2 F. Supp. 3d at 545 (dismissing § 1962(d) claim because "plaintiffs have alleged no facts to show specifically that the defendants had any 'meeting of the minds' in the alleged violations").

*    *    *    *    *

The DNC's RICO claims under § 1962(c) and § 1962(d) should be dismissed with prejudice.

## III. The DNC Fails to State a Wiretap Act Claim Against the Campaign.

A person violates the "use" clause of the Wiretap Act—the only clause that the Amended Complaint accuses the Campaign of violating (Am. Compl. ¶ 250)—if he "intentionally uses … the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of [the statute]." 18 U.S.C. § 2511(1)(d). The DNC fails to state a claim against the Campaign under the Wiretap Act because (1) it fails to allege that there was an interception or that the Campaign knew or had reason to know that there was an "interception," and (2) it fails to allege a prohibited "us[e]" of an intercepted communication.

### A. The DNC fails to allege that there was an interception or that the Campaign knew or had to reason to know of an interception.

The Wiretap Act addresses the "interception" of communications. "Every circuit court to have considered the matter has held that an 'intercept' under the Act must occur contemporaneously with

transmission." *Luis v. Zang*, 833 F.3d 619, 627 (6th Cir. 2016); *see Fraser v. Nationwide Mut. Ins. Co.*, 352 F.3d 107, 113 (3d Cir. 2003); *United States v. Steiger*, 318 F.3d 1039, 1047 (11th Cir. 2003); *Konop v. Hawaiian Airlines, Inc.*, 302 F.3d 868, 876 (9th Cir. 2002); *Steve Jackson Games, Inc. v. U.S. Secret Serv.*, 36 F.3d 457, 461 (5th Cir. 1994). This Court, too, has ruled that the Act "has a requirement of contemporaneous interception." *Pure Power Boot Camp v. Warrior Fitness Boot Camp*, 587 F. Supp. 2d 548, 557 (S.D.N.Y. 2008); *see Tarantos v. Fox News Network, LLC*, 2018 WL 2731268, at *8 (S.D.N.Y. May 18, 2018); *Snyder v. Fantasy Interactive, Inc.*, 2012 WL 569185, at *2 (S.D.N.Y. Feb. 9, 2012).

This requirement of contemporaneousness follows from the ordinary meaning of "intercept": "stop, seize, or interrupt *in progress or course or before arrival*." Merriam-Webster Online Dictionary, *intercept* (emphasis added). Just as a football player cannot "intercept" a pass that has already been caught, a defendant cannot "intercept" a communication that has already concluded.

This requirement of contemporaneousness also makes sense in context. The Wiretap Act distinguishes between "electronic communication" (a "transfer" of electronic signals) and "electronic storage" (a "storage" of an electronic communication). § 2510(12), (17). "The term 'intercept' … applies only to electronic communications, not to electronic storage.… [This] means that the term intercept applies solely to the transfer of electronic signals. The term does not apply to the acquisition of electronic signals that are no longer being transferred." *Luis*, 833 F.3d at 627.

This interpretation likewise makes sense in light of the distinction between the Wiretap Act and the Stored Communications Act. The Wiretap Act—which, again, addresses "interception"—punishes both the interception itself and the subsequent disclosure of the intercepted information. 18 U.S.C. § 2511(1). In contrast, the Stored Communications Act—which addresses "access to a wire or electronic communication while it is in electronic storage"—punishes only the "access[ing]" of the stored communication; it does not punish the subsequent disclosure of that communication.

§ 2701(a). Interpreting "interception" to cover accessing stored communications would subvert the distinctions that Congress drew between these statutes.

The DNC fails to allege an "interception." The Amended Complaint states that Russian agents stole "several gigabytes of DNC data located"—*i.e.*, stored—"on the DNC's servers." (Am. Compl. ¶ 104.) The Amended Complaint notably does not state that Russian agents acquired the DNC emails *while DNC employees were in the process of sending or receiving them.* The Amended Complaint thus alleges only that Russian agents gained access to stored communications—not that they intercepted communications contemporaneously with the communications' transmission.

The only allegation in the Amended Complaint that relates to interception—"On information and belief, the hackers intercepted or endeavored to intercept emails and voice-based communications while in the DNC servers" (*Id.* ¶ 129)—does not suffice. *First*, a complaint must "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555. The DNC's allegation fails to provide fair notice because it fails to specify which particular "emails and voice-based communications" were intercepted. As a result, the Campaign and the Court have no way to determine whether the DNC has plausibly alleged that those communications were intercepted at all, whether the Campaign knew or had reason to know of such an interception, or whether the Campaign even used those particular communications.

*Second*, a complaint must plead "factual content," not "conclusory statements" that parrot "the elements of a cause of action." *Iqbal*, 556 U.S. at 678. The Amended Complaint asserts the legal conclusion that the hackers "intercepted" emails, but fails to back up that legal conclusion with factual allegations that the hackers obtained any emails contemporaneously with their transmission.

*Third*, the allegation in all events does not establish that the Campaign "kn[ew] or ha[d] reason to know that the information was obtained through … interception." § 2511(1)(d). The Amended Complaint nowhere alleges that the Campaign knew or should have known that Russian agents ac-

quired the emails contemporaneously with the emails' transmission. It is particularly telling that, even though the DNC hired "a cybersecurity technology firm" to "investigate the attack" and conduct a "forensic analysis on the DNC's computer network," the DNC pleads interception only "on information and belief." If the DNC itself cannot tell whether there was an "interception," the Campaign cannot have known or had reason to know that there was an interception.

### B.  The DNC fails to allege that the Campaign "used" intercepted communications.

The provision of the Wiretap Act at issue here prohibits the intentional "use" of intercepted communications. § 2511(1)(d). But a defendant does not "use" an interception if someone else discloses the contents of an intercepted communication to the public, and the defendant then discusses those publicly available materials.

Common sense and the First Amendment both compel this reading of the statute. Newspapers and other media resources routinely publish unlawfully intercepted communications. *See, e.g.*, *Bartnicki*, 532 U.S. 514 (radio show's publication of wiretapped telephone call); *Boehner*, 484 F.3d 573 (newspaper's publication of wiretapped telephone call). Members of the public, in turn, routinely listen to or read these disclosed communications. As discussed above (*supra* § I), it would defy common sense and violate the First Amendment to punish, as an illegal user of intercepted communications, "every reader of the information in the newspapers [who] learned that it had been obtained by unlawful intercept." *Boehner*, 484 F.3d at 586 (opinion of Sentelle, J.). "Under [such a ] rule … no one in the United States could communicate [about publicly available information] because of the defect in the chain of title." *Id.* Neither common sense nor the First Amendment "permits this interdiction of public information." *Id.*

Under these principles, the DNC fails to allege that the Campaign engaged in a prohibited "use" of any intercepted communications. The Amended Complaint alleges that "WikiLeaks and Assange"—*not* the Campaign—"disclosed the contents of [the DNC's] wire, oral, or electronic communi-

cations." (Am. Compl. ¶ 249.) The Amended Complaint adds that, *after* WikiLeaks "disclosed" these communications to the public, Mr. Trump "lauded the disclosure," "encouraged the media and voters to pay more attention to the leaks," and "enthusiastically direct[ed] attention to those stolen documents" "[a]t his rallies." (*id.* ¶¶ 187, 193.) This alleged conduct, however, does not amount to a prohibited "use," because WikiLeaks had already made the emails public by that time. The Wiretap Act does not prohibit—and, under the First Amendment, cannot prohibit—a speaker from discussing publicly available information, even if there is a "defect in the chain of title." *Boehner*, 484 F.3d at 586 (opinion of Sentelle, J.). That is all the more true when the speaker is a political candidate, for "the First Amendment has its fullest and most urgent application to speech uttered during a campaign for political office." *Citizens United*, 558 U.S. at 339.

In effect, the DNC's Wiretap Act claim goes a step beyond what the Supreme Court prohibited in *Bartnicki*. As explained above, the Supreme Court ruled in *Bartnicki* that the Government may prohibit the theft of private communications, but may not punish their subsequent disclosure. *Supra* § I. Here, the DNC does not claim that the Campaign stole or even disclosed its communications; rather, it claims only that the Campaign "used" those communications *after* their theft and *after* their disclosure. This theory of liability has no logical stopping point. Thousands of newspaper, radio, television, and internet journalists covered the disclosed DNC emails, and millions of citizens read and discussed them. On the DNC's theory, all of these people would be "users" of intercepted information, simply because they (like the Campaign) "discussed the disclosure." (Am. Compl. ¶ 193.) Certainly all media that covered the story would fall squarely within the DNC's expansive interpretation of "use." That result is absurd and unconstitutional.

The DNC cannot get around these problems by asserting that the Campaign conspired with Russian agents and WikiLeaks to disclose the DNC emails. For one thing, the Wiretap Act includes separate clauses addressing the "use" and the "disclos[ure]" of intercepted communications.

§ 2511(1)(c)–(d). The Amended Complaint asserts a claim against the Campaign only under the use clause, not the disclosure clause. (Am. Compl. ¶¶ 249–50.) For another thing, federal statutes, as noted, presumptively impose civil liability only on "primary violator[s]"—the people who actually commit the act prohibited by the statute. *Cent. Bank of Denver*, 511 U.S. at 191; *see also supra* § II.C. Courts may impose "secondary liability"—for instance, liability for conspiracy, aiding and abetting, or concerted action—only where Congress expressly authorizes it. *Cent. Bank of Denver*, 511 U.S. at 184. In contrast with other clauses of the Wiretap Act, the use and disclosure clauses do not provide for any form of secondary liability. *Compare* § 2511(1)(a) ("intentionally intercepts, endeavors to intercept, *or procures any other person to intercept or endeavor to intercept*") (emphasis added), *with* § 2511(1)(c)–(d) ("intentionally discloses, or endeavors to disclose … [or] intentionally uses, or endeavors to use"). As a result, allegations that the Campaign conspired with others to disclose the DNC's emails are beside the point. As far as the Wiretap Act is concerned, all that matters is what the Campaign itself allegedly did. What the Campaign itself allegedly did—talk about the DNC emails after WikiLeaks published them—is protected speech, not a violation of a federal statute.

## IV.  The DNC Fails to State State-Law Claims Against the Campaign.

The DNC fails to state a claim against the Campaign for misappropriation of trade secrets in violation of Washington, D.C. law, for conspiracy to commit trespass to chattels in violation of Virginia law, and for violation of Virginia's Computer Crimes Act.

### A.  The Court should decline to exercise supplemental jurisdiction over the state-law claims.

The DNC urges the Court to exercise supplemental jurisdiction over its state-law claims. (Am. Compl. ¶ 33.) But supplemental jurisdiction "is a doctrine of discretion, not of plaintiff's right." *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966). The Court should exercise its discretion to decline supplemental jurisdiction over the state-law claims in this case.

**1.** The supplemental-jurisdiction statute identifies four grounds for declining supplemental jurisdiction, two of which are relevant here. A federal court may decline supplemental jurisdiction over a claim if "the claim raises a novel or complex issue of State law." 28 U.S.C. § 1367(c)(1). The trade-secrets claim raises the novel issue whether a political party's donor information qualifies as a trade secret, and the complex issues associated with sorting through the thousands of documents on the DNC's servers in order to determine which (if any) qualify as trade secrets and which do not. The claim for conspiracy to commit trespass to chattels raises novel issues regarding the scope of the tort of trespass to chattels in Virginia. *See America Online, Inc. v. IMS*, 24 F. Supp. 2d 548, 550 (E.D. Va. 1998) ("[A]uthority under Virginia law respecting an action for trespass to chattels is sparse ....."). And the claim that the Campaign aided and abetted a violation of the Computer Crimes Act raises the novel issue whether the Act imposes liability upon aiders and abetters. *See Alliance Tech. Grp., LLC v. Achieve 1 LLC*, 2013 WL 143500, at *4 (E.D. Va. Jan. 11, 2013) ("[T]he Supreme Court of Virginia has refrained from either recognizing or rejecting a separate 'aiding and abetting' tort.").

A federal court may also decline to exercise supplemental jurisdiction if it "has dismissed all claims over which it has original jurisdiction." § 1367(c)(3). For the reasons explained above and in the other Defendants' motions to dismiss, the Court should dismiss the federal claims in this case—the only claims over which it has original jurisdiction.

**2.** When a case falls within one of the factors set forth in § 1367(c) and "trigger[s]" the district court's discretion, the court "balances the traditional values of judicial economy, convenience, fairness, and comity" to determine whether to exercise that discretion to decline jurisdiction. *Kolari v. N.Y.-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006). These factors strongly support declining jurisdiction here. *First*, the Special Counsel and multiple congressional committees are already investigating allegations of collusion between Russia and Americans during the 2016 presidential campaign. Exercising supplemental jurisdiction would complicate those investigations by forcing the

Special Counsel and congressional committees to coordinate their efforts with a private plaintiff's discovery demands. *Second*, the Special Counsel has already filed an indictment against twelve Russians for allegedly conspiring to hack into the DNC's servers. *See* Indictment, *United States v. Netyshko*, No. 1:18-cr-215 (D.D.C. July 13, 2018), ECF No. 1. If the Court were to exercise supplemental jurisdiction, it may have to stay proceedings in this case anyway, to ensure that civil discovery does not interfere with the criminal defendants' rights in the pending criminal case. *See Louis Vuitton Malletier, S.A. v. LY USA, Inc.*, 676 F.3d 83, 101 (2d Cir. 2012) ("There is considerable authority for the principle that a stay is most justified where a movant … is already under indictment for a serious criminal offense and is required at the same time to defend a civil action involving the same subject matter"). *Finally*, the Second Circuit has "repeatedly held that a district court particularly abuses its discretion when it retains jurisdiction over state-law claims raising unsettled questions of law following dismissal of all original-jurisdiction claims." *Kolari*, 455 F.3d at 124.

**B.  The DNC fails to state a trade-secrets claim against the Campaign.**

The District of Columbia Uniform Trade Secrets Act prohibits the misappropriation of "trade secrets"—"information … that (A) [d]erives actual or potential independent economic value, from not being generally known …; and (B) [i]s the subject of reasonable efforts to maintain its secrecy." D.C. Code § 36-401(4). The DNC fails to state a claim for misappropriation because they fail to plead that this case involves any "trade secrets."

**1.** A complaint must "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555. To give a defendant fair notice of a trade-secrets claim, a plaintiff must, "at a minimum," "generally identify the trade secrets at issue." *Alexander Interactive, Inc. v. Leisure Pro Ltd.*, 2014 WL 4651942, at *5 (S.D.N.Y. Sep. 16, 2014). A plaintiff may not simply identify "broad" "categories" that "potentially encompass both confidential information and [public]

information." *Boccardi Capital Sys. v. D.E. Shaw Laminar Portfolios, LLC*, 2009 WL 362118, at *4 (S.D.N.Y. Feb. 9, 2009).

The DNC's Complaint fails this test. The Amended Complaint asserts that the pertinent "trade secrets" "included Democratic donor information, … opposition research, and strategic information regarding planned political activities." (Am. Compl. ¶ 267.) But these "broad" "categories" encompass at least some plainly public information. *Boccardi*, 2009 WL 362118, at *4. For example, "Democratic donor information" encompasses the names and addresses of donors—information that federal law requires political committees to disclose, and which the Federal Election Commission already posts on its website. *See* 52 U.S.C. § 30101; FEC, *Transaction Query by Individual Contributor*, https://goo.gl/1V6DaC. "Opposition research" encompasses damaging information about political adversaries that is already publicly known. And "strategic information" is so vague that it could encompass nearly anything. The Campaign cannot properly defend itself against the DNC's trade-secrets claim when the DNC refuses to say what the trade secrets in question are.

**2.** To qualify as a trade secret, information must also "[d]eriv[e] … independent economic value[] from not being generally known to, and not being readily ascertainable by, … another who can obtain economic value from its disclosure or use." D.C. Code § 36-401(4)(A). It is not enough for the information simply to have "independent economic value"; the information must *derive* that value "from not being generally known" and "not being readily ascertainable."

The DNC's purported "trade secrets" fail this test. *First*, the DNC has failed to show that "donor information" derives value from secrecy. A list of potential donors may have value to political parties, but that value does not depend on whether the list is public or private. Either way, a political party can continue to use the information to reach potential contributors. *See CAIR Action Network, Inc. v. Gaubatz*, 82 F. Supp. 3d 344, 361 (D.D.C. 2015) ("The Court doubts that Plaintiffs have shown, as necessary, that the donor lists in this case qualify as trade secrets: Plaintiffs have not … shown

how their particular value derives from their secrecy"). *Second*, the DNC has failed to show that "opposition research" derives value from secrecy. Quite the opposite, opposition research derives value from publicity; it can have an effect only when the damaging information is revealed to the public. *Finally*, the DNC has failed to show that "strategic information"—whatever that may be—has any "independent economic value" at all, much less that it derives such value from secrecy.

**3.** Next, a trade secret must be secret—"not … generally known." § 36-401(4)(A). "A trade secret that becomes public knowledge is no longer a trade secret." *BondPro Cop. v. Siemens Power Generation*, 463 F.3d 702, 706 (7th Cir. 2006) (Posner, J.); *see Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1002 (1984).

This principle defeats the DNC's trade-secret claims against the Campaign, because the DNC's information was no longer secret by the time the Campaign allegedly used it. The Amended Complaint alleges that Russian agents first stole the DNC's information, that WikiLeaks then disclosed that information to the public, and that the Campaign then "used" the information by discussing that public disclosure. *Supra* pp. 5–7. The Amended Complaint nowhere alleges that the Campaign itself stole the information, that the Campaign itself disclosed the information, or even that the Campaign itself used the information at any time between the theft and the public disclosure. Put simply, WikiLeaks' public disclosure of the DNC's information had already extinguished any trade-secret protection by the time the Campaign did anything with that information. The trade-secret claim against the Campaign must therefore be dismissed.

**4.** Finally, to qualify as a trade secret, information must be "the subject of reasonable efforts to maintain its secrecy." D.C. Code § 36-401(4)(B). The DNC's Complaint fails to allege this element. The Amended Complaint nowhere describes measures the DNC took to keep its information secret before the theft. Rather, the Amended Complaint discusses only the measures that the DNC took *after* "discovering the intrusion." (Am. Compl. ¶ 110.) Because "the Complaint contains no factual allegations that would support an inference … that [the plaintiff] used 'reasonable efforts to safe-

guard its secrecy,'" the trade-secret claim should be "dismissed … for failure to state a claim." *Econ. Research Servs. v. Resolution Econ., LLC*, 208 F. Supp. 3d 219, 233 (D.D.C. 2016) (citation omitted).

### C. The DNC fails to state a claim against the Campaign for conspiracy to commit trespass to chattels.

Under Virginia law, two or more persons engage in civil conspiracy if they "combin[e] to accomplish, by some concerted action, some criminal or unlawful purpose or some lawful purpose by a criminal or unlawful means." *Gelber v. Glock*, 800 S.E.2d 800, 820 (Va. 2017). And a person commits trespass to chattels if he "intentionally uses or intermeddles with personal property in rightful possession of another without authorization," and as a result "the chattel is impaired as to its condition, quality, or value." *State Analysis, Inc. v. Am. Fin. Servs. Ass'n*, 621 F. Supp. 2d 309, 320 (E.D. Va. 2009).

Critically, hacking a computer network may qualify as trespass to chattels, but publishing emails retrieved from such a hack does not. The term "chattel" covers "visible, tangible, personal property only." *First Nat'l Bank v. Holland*, 39 S.E. 126, 129 (Va. 1901). And a person "intermeddles" with a chattel if he "intentionally bring[s] about a physical contact with the chattel." Restatement (Second) of Torts § 217, comment (e). A "computer network" may qualify as a chattel, because "computers … are tangible personal property." *America Online, Inc. v. LCGM, Inc.*, 46 F. Supp. 2d 444, 452 (E.D. Va. 1998). And the unauthorized "transmission of electrical signals through a computer network [may be] sufficiently 'physical'" to qualify as intermeddling. *Id.* In contrast, however, merely publishing an email that someone else has hacked does not involve unauthorized physical contact with tangible personal property—and, thus, does not amount to trespass to chattels.

In light of this principle, the Court should dismiss the DNC's claim for conspiracy to commit trespass to chattels for two separate reasons. *One*, a plaintiff alleging a civil conspiracy under Virginia law must first show that the defendants have "combined to accomplish" the asserted "criminal or unlawful" act. *Gelber*, 800 S.E.2d at 820. The DNC, however, has not alleged that the Campaign has combined with anyone else to hack into the DNC's servers (which would be a trespass to chattels).

Rather, the DNC has alleged, at most, that the Campaign has combined with Russia to disclose emails that Russia has already obtained (which would not be a trespass to chattels). *Supra* pp. 5–7. The Campaign thus did not conspire to commit a trespass to chattels.

*Two*, a plaintiff alleging a civil conspiracy under Virginia law must also show that the conspirators sought to use "concerted action" to commit the unlawful act. *Gelber*, 800 S.E.2d at 820; *see Hechler Chevrolet, Inc. v. Gen. Motors Corp.*, 337 S.E. 2d 744, 748 (Va. 1985) (contrasting a "criminal conspiracy," which requires only "an agreement," with a "civil conspiracy," which also requires "some concerted action … to accomplish [the] criminal or unlawful purpose"). The DNC, however, alleges that Russia hacked the DNC's servers and extracted information all by itself. *Supra* pp. 5–7. The DNC does not allege that the Campaign acted in concert with Russia during the hacking or the theft of information. Because the DNC fails to allege concerted action to trespass on its computer network (as opposed to mere concerted action to publish the emails after the trespass had occurred), the DNC fails to state a claim against the Campaign for conspiracy to commit a trespass to chattels.

### D.  The DNC fails to state a Virginia Computer Crimes Act claim against the Campaign.

The Virginia Computer Crimes Act prohibits computer fraud, computer trespass, and invasion of computer privacy. Va. Code § 18.2-152.2–4. The DNC claims that the Campaign is liable under the Act because it "knowingly aided, abetted, encouraged, induced, instigated, contributed to and assisted" Russia's violation of these prohibitions. (Am. Compl. ¶ 308.) The Court should dismiss this claim, because (1) the Computer Crimes Act does not authorize aiding-and-abetting liability, and (2) the DNC in all events does not plausibly plead that the Campaign aided and abetted a violation.

**1.** The Computer Crimes Act does not establish liability for aiders and abettors. "One of the basic principles of statutory construction" in Virginia "is that where a statute creates a right and provides a remedy for the vindication of that right," "that remedy is exclusive." *Cherrie v. Va. Health Servs., Inc.*, 787 S.E.2d 855, 858 (Va. 2016). A court has "no authority" to create or expand a remedy

where the statute "is silent" about that remedy. *Id.* This principle means that—in Virginia, as in the federal system—a statute creates a remedy against aiders and abetters only if the legislature "expressly" "used the words 'aid' and 'abet' in the statutory text." *Cent. Bank of Denver*, 511 U.S. at 177. Here, the Computer Crimes Act creates a civil remedy for a "violation of any provision" of the statute—not for the aiding and abetting of a violation of the statute. Va. Code § 18.2-152.12(A). Indeed, the civil-remedy section of the statute nowhere uses the words "aid" and "abet." Under Virginia's "basic principles of statutory construction," a court has "no authority" to create aiding-and-abetting liability that the state legislature refused to create. *Cherrie*, 787 S.E. 2d at 858.

This point is all the more true because, as a general matter, Virginia courts do not even recognize aiding-and-abetting liability in the context of common-law torts. The Supreme Court of Virginia has not definitively resolved the issue, but the Supreme Court of the United States has observed that the "aiding and abetting tort … [has] not [been] expressly recognized by the state courts of the Commonwealth of Virginia." *Cent. Bank of Denver*, 511 U.S. at 182; *see Herold v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 2018 WL 1950641, at *4 (E.D. Va. April 25, 2018) ("Virginia law has not clearly recognized an aiding and abetting cause of action for tortious claims"); *L-3 Commc'ns Corp. v. Serco, Inc.*, 2018 WL 1352093, at *9 (E.D. Va. Mar. 15, 2018) ("Virginia does not recognize an aiding and abetting theory of tort liability"); *Bastable v. Muslu*, 2008 WL 7339887, at *3 (Va. Cir. Ct. July 8, 2009) ("With respect to … [the] cause of action of 'Aiding and Abetting,' the Court does not believe this is a valid cause of action in the Commonwealth … [T]here is no modern authority which supports a claim for aiding and abetting a tortious action"). In other words, Virginia courts refuse to impose aiding-and-abetting liability even when exercising their own common-law powers to define the scope of tort actions. It follows, *a fortiori*, that they would also refuse to impose such liability when interpreting a statute that says nothing about aiding and abetting.

**2.** In all events, the DNC fails to plausibly plead that the Campaign aided and abetted a violation of the Computer Crimes Act. The provisions on which the DNC relies prohibit acts involved in hacking into another person's computer network: "us[ing]" the network to convert property, "disabl[ing]" computer programs, "[c]aus[ing] [the] computer to malfunction," "alter[ing]" computer data, "[u]s[ing] [the] computer … to make … an unauthorized copy," "collect[ing] information" by installing certain kinds of malicious software, and "us[ing] [the] computer" to examine private financial information. Va. Code § 18.2-152.3–4; *see* Am. Compl. ¶ 304–09. None of the provisions prohibits publishing information that someone else has previously retrieved from a computer.

The DNC's Complaint fails to allege that the Campaign did anything to aid and abet the Russian hack of the DNC's servers. Quite the contrary, the Amended Complaint's factual theory is that Russia began colluding with the Campaign *after* the hack had occurred and the information in the DNC's servers had been stolen. The DNC thus fails to state a claim against the Campaign under the Computer Crimes Act.

## CONCLUSION

The Court should dismiss all claims against the Campaign with prejudice for failure to state a claim.

Dated:    December 7, 2018                    Respectfully submitted,

                                             /s/ Michael A. Carvin

James M. Gross                               Michael A. Carvin (*pro hac vice*)
JONES DAY                                      *Counsel of Record*
250 Vesey Street                             William D. Coglianese (*pro hac vice*)
New York, NY 10281                           Vivek Suri
(212) 326-3939                               JONES DAY
jgross@jonesday.com                          51 Louisiana Avenue, NW
                                             Washington, DC 20001
                                             (202) 879-3939
                                             macarvin@jonesday.com
                                             wcoglianese@jonesday.com

                                             *Counsel for Donald J. Trump for President, Inc.*

# CERTIFICATE OF COMPLIANCE

I, Michael A. Carvin, certify that this brief complies with the Scheduling Order that this Court entered on October 1, 2018 (ECF No. 181) because it is under 50 pages, and that this brief complies with this Court's formatting rules.


Dated:    December 7, 2018                    /s/ Michael A. Carvin
                                              _____
                                              Michael A. Carvin

                                              *Counsel for Donald J. Trump for President, Inc.*

**CERTIFICATE OF SERVICE**

I, Michael A. Carvin, certify that on December 7, 2018, I caused the foregoing document to be electronically filed with the Clerk of Court using the CM/ECF system, which will send a notice of electronic filing to all registered parties.

Dated:    December 7, 2018          /s/ Michael A. Carvin
                                                      Michael A. Carvin

                                                      *Counsel for Donald J. Trump for President, Inc.*