## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DEMOCRATIC NATIONAL COMMITTEE, | ) Civil Action No. 1:18-cv-03501 |
| Plaintiff, | ) **JURY DEMAND** |
| v. | ) **SECOND AMENDED COMPLAINT** |
| THE RUSSIAN FEDERATION; | ) COMPUTER FRAUD AND ABUSE ACT (18 U.S.C. § 1030(a)) |
| ARAS ISKENEROVICH AGALAROV; | ) RICO (18 U.S.C. § 1962(c)) |
| EMIN ARAZ AGALAROV; | ) RICO CONSPIRACY (18 U.S.C. § 1962(d)) |
| JOSEPH MIFSUD; | ) |
| WIKILEAKS; | ) WIRETAP ACT (18 U.S.C. §§ 2510-22) |
| JULIAN ASSANGE; | ) STORED COMMUNICATIONS ACT (18 U.S.C. §§ 2701-12) |
| DONALD J. TRUMP FOR PRESIDENT, INC.; | ) |
| DONALD J. TRUMP, JR.; | ) DIGITAL MILLENNIUM COPYRIGHT ACT (17 U.S.C. § 1201 *et seq.*) |
| PAUL J. MANAFORT, JR.; | ) |
| ROGER J. STONE, JR.; | ) MISAPPROPRIATION OF TRADE SECRETS UNDER THE DEFEND TRADE SECRETS ACT (18 U.S.C. § 1831 *et seq.*) |
| JARED C. KUSHNER; | ) |
| GEORGE PAPADOPOULOS; | ) |
| RICHARD W. GATES, III; | ) |
| Defendants. | ) INFLUENCING OR INJURING OFFICER OR JUROR GENERALLY (18 U.S.C. § 1503) |
| | ) TAMPERING WITH A WITNESS, VICTIM, OR AN INFORMANT (18 U.S.C. § 1512) |
| | ) WASHINGTON D.C. UNIFORM TRADE SECRETS ACT (D.C. Code Ann. §§ 36-401 – 46-410) |
| | ) TRESPASS (D.C. Common Law) |
| | ) CONVERSION (D.C. Common Law) |
| | ) TRESPASS TO CHATTELS (Virginia Common Law) |

_____

CONSPIRACY TO COMMIT
TRESPASS TO CHATTELS
(Virginia Common Law)

CONVERSION (Virginia Common
Law)

VIRGINIA COMPUTER CRIMES
ACT (Va. Code Ann. § 18.2-152.5 *et
seq.*)

_____

# TABLE OF CONTENTS

Page

NATURE OF ACTION ............................................................................. 1

I.     INTRODUCTION .......................................................................... 1

II.    OVERVIEW OF THE CONSPIRACY ......................................... 3

III.   DAMAGES TO THE DNC .......................................................... 9

JURISDICTION AND VENUE .......................................................... 10

PARTIES ............................................................................................ 11

GENERAL ALLEGATIONS ............................................................. 18

IV.   SEVERAL DEFENDANTS' PRE-EXISTING RELATIONSHIPS WITH RUSSIA AND RUSSIAN OLIGARCHS PROVIDED FERTILE GROUND FOR A CONSPIRACY ...................................................................... 18

V.    THE COMMON PURPOSE: SECURE TRUMP'S GRIP ON THE PRESIDENCY THROUGH ILLEGAL MEANS .......................... 21

VI.   THE CONSPIRACY TO DISSEMINATE STOLEN DNC DATA TO AID TRUMP .................................................................................. 24

     A.    Trump Announces His Candidacy For President, And Russia Begins Its Attack On The DNC's Computer Systems ........................................... 25

     B.    European Allies Sound The Alarm To U.S. Intelligence Regarding Communications Between Russians And Trump Associates ............................... 25

     C.    While Campaigning For President, Trump Signs A Letter Of Intent To Build Trump Tower Moscow.................................................................. 26

     D.    The Trump Campaign Establishes Further Ties To Russia And Russian Intelligence Agents ............................................................................. 26

     E.    Russia Steals A Massive Trove Of Documents From The DNC.......................... 29

     F.    The DNC Discovers The Hack And Hires CrowdStrike ...................................... 31

     G.    Forensic Evidence Confirms Russia's Attack On The DNC's Network ............. 31

     H.    Russians Again Offer To Assist Trump—And Trump Associates Accept The Offer.............................................................................................. 34

     I.    Following The Trump Tower Meeting, Russia Continues Its Hacking And Launches A Massive Public Dissemination Of Stolen DNC Documents............ 37

     J.    WikiLeaks And Russian Intelligence Discuss A Plan To Use Stolen DNC Documents To Disrupt The Democratic National Convention............................ 39

     K.    The Trump Campaign Continues Communicating With Russian Agents And Blocks Anti-Russian Language From Being Added To The GOP

# TABLE OF CONTENTS

Page

Platform As WikiLeaks And The GRU Finalize Arrangement To Disrupt The Democratic National Convention ................................................................. 39

L. After The Trump Campaign Blocks Anti-Russia Language From The GOP Platform, WikiLeaks Begins Disseminating Stolen DNC Documents ................ 40

M. Trump Associates Secretly Communicate With Russian Agents And WikiLeaks As They Strategically Release Stolen DNC Documents ................... 42

N. The GRU Reaches Out To Stone About Democratic Party Turnout Models ....... 45

O. Russia Launches Another Attack On DNC Servers Housing Sensitive And Valuable Trade Secrets ........................................................................... 46

P. Russia Continues Disseminating Stolen Documents ..................................... 50

Q. Trump Publicly Praises The Illegal Dissemination Of The Stolen DNC Data ........................................................................................................ 50

R. Trump—And Russia—Win ...................................................................... 52

VII. THE DEFENDANTS' CRIMINAL CONSPIRACY CONTINUED AFTER THE 2016 ELECTION .............................................................................................. 52

VIII. RUSSIA'S CONTINUED HACKING ATTEMPTS ...................................... 60

A. Russia Attempts To Hack The Computer Networks Of Three Midterm Candidates ............................................................................................. 60

B. U.S. Authorities Make Clear That Russia Continues To Pose A Hacking Threat .................................................................................................... 60

C. WikiLeaks Releases Amazon Document Compromising Security Of AWS Servers ................................................................................................... 61

D. A Source Consistent With Cozy Bear Attempts To Hack The DNC's Computer System ................................................................................... 61

IX. TRUMP CONTINUES TO SIDE WITH RUSSIA AND DENIGRATE GOVERNMENT INVESTIGATORS ............................................................... 61

X. THE SIGNIFICANT HARM INFLICTED UPON PLAINTIFF ..................... 63

CAUSES OF ACTION ............................................................................................. 65

COUNT I ....................................................................................................... 65

COMPUTER FRAUD AND ABUSE ACT (18 U.S.C. § 1030(A)) (AGAINST RUSSIA) ................................................................................ 65

COUNT II ...................................................................................................... 67

RICO (18 U.S.C. § 1962(C)) (AGAINST ALL DEFENDANTS) .................... 67

A. The Trump Campaign Was The Racketeering Enterprise ........................ 67

B. Alternatively, And At The Very Least, The Trump Campaign Was Part Of An Association-In-Fact Enterprise ................................................ 68

C. RICO Predicate Acts ............................................................................. 69

# TABLE OF CONTENTS

Page

    D.    RICO Damages ........................................................................ 74
COUNT III .................................................................................................. 74

    RICO CONSPIRACY (18 U.S.C. § 1962(D))  (AGAINST ALL
    DEFENDANTS) ................................................................................ 74

COUNT IV .................................................................................................. 75

    WIRETAP ACT (18 U.S.C. §§ 2510-22) (AGAINST WIKILEAKS,
    ASSANGE, THE TRUMP CAMPAIGN, AND THE TRUMP
    ASSOCIATES) ................................................................................. 75

COUNT V .................................................................................................... 76

    STORED COMMUNICATIONS ACT (18 U.S.C. §§ 2701-12)
    (AGAINST RUSSIA) ...................................................................... 76

COUNT VI .................................................................................................. 77

    DIGITAL MILLENNIUM COPYRIGHT ACT (17 U.S.C. § 1201 ET
    SEQ.) (AGAINST RUSSIA) ............................................................ 77

COUNT VII ................................................................................................. 78

    MISAPPROPRIATION OF TRADE SECRETS UNDER THE DEFEND
    TRADE SECRETS ACT (18 U.S.C. § 1836 *ET SEQ.*) (AGAINST
    RUSSIA, WIKILEAKS, AND ASSANGE) ...................................... 78

COUNT VIII ................................................................................................ 79

    WASHINGTON D.C. UNIFORM TRADE SECRETS ACT (D.C. CODE
    ANN. §§ 36-401 – 46-410) (AGAINST ALL DEFENDANTS) ......... 79

COUNT IX ................................................................................................... 81

    TRESPASS (D.C. COMMON LAW) (AGAINST RUSSIA) ............. 81

COUNT X ..................................................................................................... 82

    CONVERSION (D.C. COMMON LAW) (AGAINST RUSSIA) ....... 82

COUNT XI .................................................................................................... 83

    TRESPASS TO CHATTELS (VIRGINIA COMMON LAW) (AGAINST
    RUSSIA) .......................................................................................... 83

COUNT XII .................................................................................................. 84

    CONSPIRACY TO COMMIT TRESPASS TO CHATTELS (VIRGINIA
    COMMON LAW) (AGAINST ALL DEFENDANTS) ...................... 84

COUNT XIII ................................................................................................. 85

    CONVERSION (VIRGINIA COMMON LAW) (AGAINST RUSSIA) ............. 85

# TABLE OF CONTENTS

Page

COUNT XIV ................................................................................................. 86

VIOLATION OF THE VIRGINIA COMPUTER CRIMES ACT (VA.
CODE ANN. § 18.2-152.1 ET SEQ.) (AGAINST ALL DEFENDANTS) ......... 86

PRAYER FOR RELIEF ................................................................................ 87

JURY DEMAND ......................................................................................... 89

Plaintiff the Democratic National Committee ("DNC") brings this Complaint against The Russian Federation ("Russia"); Aras Iskenerovich Agalarov ("Aras Agalarov"); Emin Araz Agalarov ("Emin Agalarov"); Joseph Mifsud ("Mifsud"); WikiLeaks; Julian Assange ("Assange"); Donald J. Trump for President, Inc. ("the Trump Campaign"); Donald J. Trump, Jr. ("Trump, Jr."); Paul J. Manafort; Jr. ("Manafort"); Roger J. Stone, Jr. ("Stone"); Jared C. Kushner ("Kushner"); George Papadapoulos ("Papadapoulos"); and Richard W. Gates, III ("Gates"); and alleges as follows:

## NATURE OF ACTION

### I.      INTRODUCTION

1.       No one is above the law. In the run-up to the 2016 election, Russia mounted a brazen attack on American democracy. The opening salvo was a cyberattack on the DNC, carried out on American soil. In 2015 and 2016, Russian intelligence services hacked into the DNC's computers, penetrated its phone systems, and exfiltrated tens of thousands of documents and emails, some of which contained valuable trade secrets. Russia then used the stolen information to improve Donald J. Trump's ("Trump") chances of winning the 2016 Presidential election because Trump's policies would benefit the Kremlin.

2.       The Trump Campaign was a willing and active partner in Russia's efforts. Through multiple meetings, emails, and other communications, Russian agents told members of the Trump Campaign that their government supported Trump and was prepared to use stolen emails and data to damage his opponent and the Democratic party. Rather than report these repeated overtures to the Federal Bureau of Investigation ("FBI"), the Trump Campaign and its agents gleefully welcomed Russia's help. Indeed, the Trump Campaign solicited Russia's illegal assistance and maintained secret communications with individuals tied to the Russian government, including individuals associated with a Russian intelligence agency responsible for attacking the DNC.

1

3.      Through these communications, the Trump Campaign, Trump's closest advisors and Russian agents formed an agreement to secure Trump's grip on the Presidency through illegal means. Consistent with that agreement, Russian agents trespassed onto the DNC's computer network in the United States, broke into DNC email accounts, collected trade secrets and other private data, and disseminated the information at times when it would best suit the Trump Campaign. Russia released some of the stolen materials through "Guccifer 2.0," a fictitious online persona created by Russian military intelligence officers, and released other materials through WikiLeaks.

4.      As stolen DNC information was strategically released into the public sphere, Trump and his associates openly praised the illegal disseminations and encouraged Russia to continue its illegal hacking campaign against the Democratic party.

5.      In the wake of the 2016 election, the Defendants recognized that Trump's grip on the Presidency would be tested if the American public discovered the illegal coordination between his campaign and the Russian government. The Defendants therefore worked to cover up their collusion, sometimes through a drumbeat of public denials and misstatements, and other times through criminal obstruction of justice and witness tampering.

6.      At the same time, Russia continued to commit cybercrimes against Trump's Democratic critics, who threatened to derail Trump's policy agenda. American intelligence agencies have expressed concern that, going forward, Russia will continue using cybercrimes to influence American elections.

7.      In November 2018, dozens of DNC email addresses were targeted in a spear-phishing campaign, although there is no evidence that the attack was successful. The content of these emails and their timestamps were consistent with a spear-phishing campaign that leading

cybersecurity experts have tied to Russian intelligence. Therefore, it is probable that Russian intelligence again attempted to unlawfully infiltrate DNC computers in November 2018.

## II.    OVERVIEW OF THE CONSPIRACY

8.    Russia's cyberattack on the DNC began in July of 2015, only weeks after Trump announced his candidacy for President of the United States. And, within months, allied European intelligence services notified their U.S. counterparts of suspicious communications between Russian operatives and Trump's associates.

9.    On or about October 28, 2015, while campaigning for President, Trump signed a letter of intent to develop and license his name to a new real estate project in Moscow—potentially fulfilling a decades-long dream. This project was to be financed through a Russian bank under sanction by the United States. The deal was brokered by Felix Sater, a Russian émigré, convicted felon, and longtime business partner of Trump. In explaining the deal to Michael Cohen ("Cohen"), Trump's personal attorney, Sater suggested that he would get Russian President Vladimir V. Putin ("Putin") to support the project in an effort to boost Trump's electoral hopes: "I will get Putin on this program and we will get Donald elected . . . . I know how to play it and we will get this done. Buddy our boy can become President of the USA and we can engineer it. I will get all of Putins team to buy in on this, I will."

10.    By early 2016, Trump was well on his way to becoming the favorite to win the GOP nomination, and the ties between his campaign and Russia's government were growing.

11.    In February 2016, retired Lt. Gen. Michael T. Flynn ("Flynn") began serving as an informal foreign policy advisor to the Trump campaign. Just two months earlier, Flynn had been paid by the Russian government-funded propaganda outlet Russia Today ("RT") to attend and speak at its anniversary gala in Moscow, where he dined at the same table as Putin.

12.     On March 28, 2016, Trump hired Manafort, who had spent the previous decade working to advance Kremlin interests, as his campaign's convention manager. Over the next few months, Manafort maintained contact with an individual tied to Russian military intelligence, and offered to brief a Putin-connected Russian oligarch regarding the Trump Campaign.

13.     On April 18, 2016, Russian intelligence operatives successfully hacked into the DNC's computer network and began planning the staged release of stolen information to influence the 2016 elections. Four days later, on April 22, 2016, Russian intelligence operatives prepared large amounts of data for exfiltration from DNC servers. On April 26, 2016, Trump's foreign policy advisor, Papadopoulos, met with a Kremlin-tied agent, who informed Papadopoulos that the Russians "have dirt" on the Democratic presidential nominee in the form of "thousands of emails." Papadopoulos did not report this information to American law enforcement. Rather, he reported back to his superiors at the Trump Campaign, regarding "interesting messages coming in from Moscow about a trip when the time is right." On April 27, 2016—the day after Papadopoulos's meeting—Trump gave his first major foreign policy address, where he spoke about "improved relations with Russia." That evening, Papadopoulos flagged the speech for one of his Russian contacts, and explained: "That's the signal to meet."

14.     By June 1, 2016, Russia had stolen thousands of DNC documents and emails, including trade secrets. On June 3, 2016, Russians connected to the Kremlin contacted Donald Trump, Jr. to offer damaging information about the Democratic presidential nominee as "part of Russia and its government's support for Mr. Trump." Trump, Jr. did nothing to alert American law enforcement. Rather, he expressly embraced the illegal plan, responding: "I love it especially later in the summer."

15.     On June 9, 2016, Trump Jr., Manafort, and Kushner met with the Kremlin-connected Russians in Trump Tower. Trump and Trump Jr. have both told multiple, conflicting stories about what happened in the meeting. The day after the meeting, Russian intelligence officers placed spy software on a DNC backup computer server.

16.     On June 15, 2016, Russian intelligence agents began disseminating to the public a trove of documents stolen from the DNC and other Democratic party targets. The agents continued these releases through Election Day in 2016. Some documents were disseminated through "Guccifer 2.0," a fictitious persona created by Russian intelligence agents, and others were disseminated through WikiLeaks.

17.     On June 22, 2016, WikiLeaks contacted Guccifer 2.0 to request new stolen DNC materials. In subsequent exchanges, WikiLeaks explained that Trump had a "25 percent chance" of defeating the Democratic presidential nominee and suggested that his odds might improve if WikiLeaks could disseminate stolen documents that would create conflict among Democrats during the upcoming Democratic National Convention.

18.     On July 11, 2016, the Trump Campaign intervened to prevent other Republicans from inserting anti-Russian language regarding Ukraine into the GOP platform.

19.     Between July 14, 2016 and July 18, 2016, Russian intelligence operatives transmitted stolen DNC documents to WikiLeaks, which promised to release them in time to disrupt the Democratic National Convention.

20.     WikiLeaks delivered on that promise: on July 22, 2016, three days before the start of the Convention, WikiLeaks began disseminating stolen DNC documents, including emails and other sensitive proprietary materials, to the public. The result was chaos—the DNC had to change

its anticipated speakers, and DNC employees were flooded with so many threatening phone calls and emails that it was difficult to use their phones to carry out their plans for the Convention.

21.     Throughout the summer and fall of 2016, during the height of the Presidential campaign, Trump's associates continued to communicate secretly with Russian agents and WikiLeaks, who strategically disseminated information stolen from Democratic targets. For example, in August 2016, Stone began communicating secretly with Russian intelligence operatives and bragged about his contacts with Assange. Similarly, Gates, who served as the Trump Campaign's deputy chairman and then liaison to the Republican National Committee, maintained secret communications with an individual he knew to be connected to Russian military intelligence.

22.     In the summer and fall of 2016, Stone revealed information that he could not have had unless he were communicating with WikiLeaks, Russian operatives, or both about their hacking operations in the United States. For instance, in August of 2016, nobody in the public sphere knew that Russia had stolen emails from John Podesta, the chairman of Secretary Hillary Clinton's presidential campaign. Nevertheless, on August 21, 2016, Stone predicted that damaging information about Podesta would be released, tweeting "it will soon [be] the Podesta's time in the barrel." Weeks later, WikiLeaks began releasing batches of Podesta's emails on a near-daily basis until Election Day—as Stone had predicted. Similarly, in mid-September 2016, Stone said that he expected "Julian Assange and the WikiLeaks people to drop a payload of new documents on Hillary [Clinton] on a weekly basis fairly soon." And, beginning on October 7, 2016, WikiLeaks began releasing stolen emails at least once a week—as Stone had predicted.

23.     In September 2016, Russian intelligence agents illegally gained access to DNC computers hosted on a third-party cloud computing service, stole large amounts of the DNC's

private data and proprietary computer code, and exfiltrated the stolen materials to their own cloud-based accounts registered with same service. During this same period, Russian intelligence agents and Stone discussed highly confidential and strategic information that had been stolen from another Democratic party institution and disseminated to the public.

24.     Around that time, Trump, Jr. also secretly communicated with WikiLeaks. In one exchange, WikiLeaks sent Trump, Jr. a direct message on Twitter with a password to an anti-Trump website. In exchange for providing the password, WikiLeaks asked Trump, Jr. to have his father retweet a link to WikiLeaks' trove of stolen emails. Fifteen minutes later, Trump tweeted a message about the media's lack of attention to WikiLeaks. On information and belief, Assange is the individual who operated the WikiLeaks Twitter handle during this interaction.

25.     Throughout the fall of 2016, Trump praised the illegal dissemination of documents from the DNC and other Democratic entities, at various points making it a central theme of his speeches and rallies. Indeed, Trump repeatedly praised the illegal disseminations with exclamations such as: "I love Wikileaks!"

26.     At some point during the runup to the 2016 election, Manafort "shar[ed] polling data . . . related to the 2016 presidential campaign" with an individual connected to Russian military intelligence. This data could have helped Russia assess the most effective ways to interfere in the election, including how best to use stolen Democratic party materials to influence voters.

27.     On November 9, 2016, Trump won the Presidency of the United States. The reaction in Russia was jubilation, with a member of Russia's parliament announcing to his fellow legislators: "I congratulate you all on this."

28.     After Trump won the 2016 election, the Defendants recognized that Trump's grip on political power would be jeopardized if the American public discovered the illegal coordination

between Russia and the Trump Campaign. The Defendants therefore dedicated their criminal enterprise to concealing their collusion, sometimes by lying to the American public, and other times through criminal obstruction of justice.

29.     For example, just two days after the 2016 election, Trump Campaign spokesperson Hope Hicks falsely told the Associated Press that the Trump Campaign had no communications with any "foreign entity" during the campaign: "Never happened. There was no communication between the campaign and any foreign entity during the campaign."

30.     Moreover, Stone, Kushner, Trump Jr., Corsi, and Manafort lied to or misled the Special Counsel, the FBI, and Congressional committees tasked with investigating Russian interference in the American election. Papadopoulos similarly lied to the FBI to cover up his conversations with Mifsud. Both Papadopoulos and Corsi destroyed physical evidence documenting their conversations with coconspirators, and Stone intimidated a witness who threatened to contradict his narrative about his communications with WikiLeaks.

31.     Meanwhile, Russia committed fresh cybercrimes in the runup to the 2018 midterm elections. For instance, in August 2017, Russia attempted to hack into the Senate computer network of a Democratic Senator—a longtime critic of Trump, Russia, and WikiLeaks—and the networks of two other midterm candidates.

32.     Since the 2016 election, U.S. intelligence and law enforcement agencies have repeatedly emphasized the continuing nature of the threat of Russian interference in U.S. elections. For example, in August 2018, senior U.S. national security and intelligence officials announced that Russia was continuing its illicit interference in domestic politics, including through social media disinformation campaigns, attempts to hack political targets, and infiltrate the country's electoral infrastructure. Director of National Intelligence Dan Coats characterized the threat of

continued Russian interference as "real" and "continuing," and FBI Director Chris Wray added that "[t]his threat is not going away."

33.     In November 2018, dozens of DNC email addresses were targeted in a spear-phishing campaign, although there is no evidence that the attack was successful. The content of these emails and their timestamps were consistent with a spear-phishing campaign that leading cybersecurity experts have tied to Russian intelligence. Therefore, it is probable that Russian intelligence again attempted to unlawfully infiltrate DNC computers in November 2018.

34.     The Defendants' conspiracy constitutes an act of previously unimaginable treachery: the campaign of the presidential nominee of a major party in league with a hostile foreign power to bolster its own chance to win the Presidency. In carrying out their conspiratorial objective, the Defendants disseminated documents and data stolen from the DNC in violation of the laws of the United States, as well as the laws of the Commonwealth of Virginia and the District of Columbia. Under the laws of this nation, Russia and its co-conspirators must answer for their actions.

## III.   DAMAGES TO THE DNC

35.     The illegal conspiracy inflicted profound damage upon the DNC. Defendants undermined the DNC's ability to communicate the party's values and vision to the American electorate; sowed discord within the Democratic party at a time when party unity was essential to electoral success; and seriously compromised the DNC's internal and external communications.

36.     Additionally, during its breaches of the DNC's servers, Russia stole highly confidential and proprietary data, including information concerning the ways in which the DNC analyzed its data, developed its strategies, and approached decisions in its efforts to win the 2016 election.

37.     Russia also stole proprietary computer code that DNC computer engineers spent many hours developing. The DNC derived significant economic value from keeping that computer code secret until it was taken by Russian agents.

38.     At the same time, Defendants' conduct resulted in a dramatic drop in donations to the DNC. The dissemination of hacked information heightened donors' concerns that confidential information disclosed through their contributions might be publicly disseminated.

39.     The DNC also paid more than a million dollars to repair and remediate electronic equipment, and to hire staff and consultants to address the cyber-security fallout from the hacking of the DNC's computer systems and dissemination of DNC documents and data. The DNC specifically paid consultants to assess and remediate the damage from the Russian hacking activity.

40.     Finally, because the releases included personal, and in some cases protected information about DNC employees, some DNC employees were exposed to harassment and death threats. One representative email said: "I hope all your children get raped and murdered. I hope your family knows nothing but suffering, torture and death." Understandably, this harassment impaired the employees' ability to function effectively in their jobs.

41.     While no suit can ever fully redress the harm that Defendants' illegal conduct exacted, the DNC brings this lawsuit to seek the full measure of relief afforded by the laws of the United States. Accordingly, Plaintiff brings claims under the statutes and common law discussed herein. Plaintiff is entitled to relief from every member of Defendants' illegal scheme.

## JURISDICTION AND VENUE

42.     This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under 18 U.S.C. § 1030 (the Computer Fraud and Abuse Act); 18 U.S.C. §§ 1961-68 (Racketeer Influenced and Corrupt Organizations Act); 18 U.S.C. §§ 2701-11 (the Stored Communications Act); 28 U.S.C. §§ 2510-22 (commonly referred to as the Federal Wiretap Act);

Pub. L. No. 114-152, 130 Stat. 376 (the Defend Trade Secrets Act, codified in scattered sections of 18 U.S.C. and 28 U.S.C.); and 17 U.S.C. § 1201 *et seq.* (the Digital Millennium Copyright Act). This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. §1367(b).

43.     This Court has jurisdiction over the claims against Russia pursuant to 28 U.S.C. § 1330 because Russia is a foreign state. *See* 28 U.S.C. § 1603(a).

44.     Russia is not entitled to sovereign immunity because the DNC's claims arise out of Russia's trespass on the DNC's private servers and conversion of the DNC's property— tortious acts committed in the United States. *See* 28 U.S.C. § 1605(a)(5). In addition, Russia stole trade secrets, a form of commercial activity undertaken in and directly affecting the United States. *See id.* § 1605(a)(2). Finally, Russia purchased computer servers in the United States and made other payments in furtherance of hacking activity, another form of commercial activity undertaken in and directly affecting the United States.

45.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in New York City, NY. The Trump Campaign is headquartered at 725 Fifth Avenue, New York City, NY 10022; Trump, Jr. resides in New York City, NY; and a substantial number of the meetings and interactions made in furtherance of the conspiracy at issue were located in New York City, NY.

46.     Venue is proper for the claims arising under RICO pursuant to 18 U.S.C. § 1965(a) because Defendants reside, are found, have agents, or transact affairs in New York City, NY.

## PARTIES

47.     ***The DNC.*** Plaintiff DNC, registered with the Federal Election Commission as DNC Services Corp./Dem. Nat'l Committee, is a national committee as that term is defined by and used in 52 U.S.C. § 30101, dedicated to electing local, state, and national candidates—including

11

presidential candidates—of the Democratic Party to public office. To accomplish its mission, the DNC, among other things, works closely with Democratic public officials and assists state parties and candidates by contributing money, making expenditures on their behalves, and providing active support through the development of programs benefiting Democratic candidates. The DNC also plans the Democratic Party's presidential nominating convention and promotes the Democratic Party's platform. The DNC regularly conducts its business via email housed on secured servers. It also regularly creates and maintains copyrighted materials on its servers as well as confidential, proprietary documents related to campaigns, fundraising, and campaign strategy that are the DNC's trade secrets. Additionally, the DNC's servers contain valuable, proprietary computer code written by DNC employees.

48.     ***Russia.*** Defendant Russia is a foreign state as defined under the laws of the United States. Russia's military intelligence agency—the General Staff of the Armed Forces of the Russian Federation ("GRU")—participated in many of the events described below.  GRU Unit 26165, located at 20 Komsomolskiy Prospekt, in Moscow, Russia, was primarily responsible for the cyberattacks on the DNC in 2016. And GRU Unit 74455, located at 22 Khirova Street, Khimki, Moscow, helped disseminate of stolen DNC information through fictitious online personas. One of these fictitious online personas—"Guccifer 2.0"—publicly took responsibility for the hacks on the DNC, but falsely claimed to be a Romanian hacker with no relationship with Russia. Upon information and belief, Guccifer 2.0 claimed to be Romanian to hide Russia's role in cyberattacks on the DNC. Guccifer 2.0 disseminated thousands of stolen documents and emails, through both a GRU-operated website and through a website operated by WikiLeaks.

49.     At least ten GRU officers (collectively, the "GRU Operatives") participated in the theft and dissemination of DNC documents and data:

a. **Viktor Borisovich Netyksho** ("Netyksho") was the Russian military officer in command of GRU Unit 26165 in 2016. That unit is located at 20 Komsomolskiy Prospekt, Moscow, Russia. Unit 26165 was primarily responsible for the hacking the DNC's servers and cloud computing service.

b. **Boris Alekseyevich Antonov** ("Antonov") was a Major in the Russian military in 2016. That year, Antonov was the head of a department within Unit 26165 that was dedicated to computer intrusion activity. Antonov supervised other GRU officers who hacked the DNC's servers and cloud computing service.

c. **Dmitriy Sergeyevich Badin** ("Badin") was a the "Assistant Head" of Antonov's department within Unit 26165 in 2016. Badin worked with Antonov to supervise other GRU officers who hacked the DNC's servers and cloud computing service.

d. **Ivan Sergeyevich Yermakov** ("Yermakov") was a Russian military officer assigned to Antonov's department within Unit 26165 in 2016. In or around May 2016, Yermakov participated in an operation to hack a DNC email server and steal DNC emails.

e. **Sergey Aleksandrovich Morgachev** ("Morgachev") was a Lieutenant Colonel in the Russian military assigned to Unit 26165 in 2016. Morgachev oversaw a department within Unit 26165 that developed and managed malware (*i.e.*, software that damages, disables, or spies upon computer systems). Morgachev supervised the GRU officers who placed and monitored malware, including a proprietary GRU tool called X-Agent, on the DNC's computer network.

f. **Nikolay Yuryevich Kozachek** ("Kozachek") was a Lieutenant Captain in the Russian military assigned to Morgachev's department within Unit 26165 in 2016. In or

around April 2016, Kozachek developed, customized, and monitored the X-Agent malware used on the DNC's computer network.

g. **Pavel Vyacheslavovich Yershov** ("Yershov") was a Russian military officer assigned to Morgachev's department within Unit 26165 in 2016. Yershov helped Kozachek and other GRU officers test and customize X-Agent malware before it was placed on the DNC's network.

h. **Artem Andreyevich Malyshev** ("Malyshev") was a Second Lieutenant in the Russian military assigned to Morgachev's department within Unit 26165 in 2016. In or around 2016, Malyshev monitored the X-Agent malware on the DNC's computer network.

i. **Aleksandr Vladimirovich Osadchuk** ("Osadchuk") was a Colonel in the Russian military and the commanding officer of GRU Unit 74455 in 2016. That unit is located at 22 Kirova Street, Khimki, Moscow. Unit 74455 helped release stolen DNC materials through the online persona Guccifer 2.0.

j. **Aleksey Aleksandrovich Potemkin** ("Potemkin") was an officer in the Russian military assigned to Unit 74455 in 2016. Potemkin supervised a department within Unit 74455 that created computer infrastructure and social media accounts that were used in the dissemination of stolen DNC materials through Guccifer 2.0.

50.    ***Aras Agalarov.*** Defendant Aras Agalarov is an Azeri-born oligarch in Russia who is a close ally of Putin. Trump worked with Aras Agalarov, who served as a liaison between Trump and Putin, to bring the Miss Universe pageant to Moscow in 2013, for which Aras Agalarov paid Trump millions of dollars. Trump and Aras Agalarov also agreed on another deal to explore real estate opportunities in Russia together. Aras Agalarov reportedly has land reserved in Russia for a Trump-branded real estate development.

51.     *Emin Agalarov.* Defendant Emin Agalarov is Aras Agalarov's son. Emin Agalarov is a pop singer and executive at the family's real estate company. He established a close relationship with the Trumps over the course of their partnership on the 2013 Miss Universe pageant, and was closely involved in negotiations with Trump and Trump Jr. on a deal to build a Trump-branded real estate development in Moscow. Like his father, Emin Agalarov remained in contact with Trump and Trump, Jr. after 2013 and into the 2016 campaign. The Agalarovs figure prominently in the June 2016 Trump Tower meeting (described below).

52.     *Mifsud.* Defendant Mifsud is an academic who, upon information and belief, worked in several positions for the government of Malta. Mifsud apparently had affiliations with a variety of educational organizations and institutions in the United Kingdom and Malta. Upon information and belief, Mifsud has substantial connections to the Russian government and acted as a de facto agent of the Russian government in his contacts with Papadopoulos in 2016.

53.     *Assange.* Defendant Assange is the founder and publisher of WikiLeaks. He is a citizen of Australia and resides in the embassy of the Government of Ecuador in London, England. Assange has exhibited support for the Russian government and has hosted a talk show on RT, a television propaganda outlet funded by the Russian government. Upon information and belief, Assange was the only individual who used WikiLeaks' Twitter handle in 2016.

54.     *WikiLeaks.* Defendant WikiLeaks is an international organization of unknown structure that operates a website, WikiLeaks.org, on which it publishes leaked or stolen confidential and classified information. Its maintains a post office box in the United States—P.O. Box 701, San Mateo, CA 94401—and a mailbox at the University of Melbourne in Victoria, Australia, but it is not clear whether WikiLeaks uses or conducts business through those mailboxes.

55.    ***The Trump Campaign.*** Defendant Trump Campaign is an American not-for-profit corporation formed and registered in Virginia on June 17, 2015 to support Trump's candidacy for President of the United States. The Trump Campaign is incorporated under the laws of Virginia and has or had an office at 675 N. Washington St., Alexandria, VA 22314. Its principal place of business is Trump Tower, 725 Fifth Avenue, New York City, NY 10022. From June 2015 to June 2016, Corey Lewandowski was Campaign Manager of the Trump Campaign. From March 2016 to May 2016, Manafort was Convention Manager of the Trump Campaign, and from May 2016 to August 2016, he was Campaign Chairman of the Trump Campaign. From June 2016 to August 2016, Gates was Deputy Campaign Chairman, and from August 2016 to November 2016, he was the campaign's liaison to the Republican National Committee. Multiple senior members of the Trump Campaign are reported to have long-time ties to Russia and to have engaged in frequent communication with individuals tied to the Russian government during the 2016 campaign cycle.

56.    ***Trump, Jr.*** Defendant Trump, Jr. is Trump's oldest son. From at least June 16, 2015, until November 8, 2016, when Trump was a Republican candidate for president, Trump, Jr. was a close political advisor to his father. Trump, Jr. currently works as Executive Vice President of the Trump Organization, the business organization that was run by Trump before his inauguration. Trump, Jr. resides in New York City, New York.

57.    ***Manafort.*** Defendant Manafort is a long-time Republican political operative, who was Convention Manager of the Trump Campaign from March 2016 to May 2016, and Campaign Chairman of the Trump Campaign from May 2016 to August 2016, when he resigned amid reports of his work with the formerly pro-Russian government in Ukraine. In September 2018, Manafort pleaded guilty to two counts of conspiracy against the United States, encompassing charges of money laundering, tax fraud, failure to register as a foreign agent, and other criminal violations

16

related to his work for the pro-Russian government in Ukraine. Manafort is currently in federal custody at the William G. Truesdale Adult Detention Center in Alexandria, Virginia.

58.    ***Stone.*** Defendant Stone is Trump's long-time confidant. "[F]ew people go as far back [as] Trump [and] Stone," and Stone has "nurtured the dream of a [Trump] presidential run . . . for 30 years."[1] Stone also has a long history with Manafort: Manafort helped run Stone's campaign for national chairman of the Young Republicans in 1977, and the two co-founded a consulting firm—Black, Manafort, Stone, and Kelly—in the 1980s. In 2007, Stone worked on the parliamentary campaign of a Ukrainian candidate who formed a coalition with pro-Russian politician Viktor Yanukovych, whose closest political advisor was Manafort. Upon information and belief, Stone served as an informal adviser to Trump and remained in contact with him and other senior officials in the Trump Campaign throughout the 2016 election. In a series of emails sent on October 3-4, 2016, Stone held himself out to senior members of the Trump campaign as a conduit to WikiLeaks. Stone resides in Florida.

59.    ***Kushner.*** Defendant Kushner is Trump's son-in-law and was a senior advisor to, and one of the key decision-makers for, the Trump Campaign. In June 2016, Kushner assumed responsibility for the campaign's "data-driven efforts," setting up a 100-person "data hub" in San Antonio, Texas, and hiring Cambridge Analytica, a social media and analytics firm to help his father-in-law's campaign. Kushner resides in Washington, D.C.

60.    ***Papadopoulos.*** Defendant Papadopoulos was one of the earliest foreign policy advisors to the Trump campaign. He became a foreign policy adviser to the Trump Campaign in March 2016. Papadopoulos was in frequent contact with the Trump Campaign's most senior officials, including Manafort and Gates, in the summer and fall of 2016. He resides in Chicago,

Illinois. On October 5, 2017, Papadopoulos pleaded guilty to one count of making a false statement
to a federal agent about his contacts with individuals connected to the Russian government.

61.     ***Gates.*** Defendant Gates is a longtime employee and business partner of Manafort.
Between 2006 and 2015, Gates was closely involved in Manafort's work for the former pro-
Russian regime in Ukraine and its successor political party. On February 23, 2018, Gates pleaded
guilty to one count of conspiracy against the United States and one count of making a false
statement to a federal agent, both related to his work with Manafort for the pro-Russian
government in Ukraine. Gates resides in Richmond, VA.

62.     The Defendants conspired with other individuals known and unknown to carry out
their criminal objectives. Among their co-conspirators was Jerome Corsi ("Corsi").

## GENERAL ALLEGATIONS

## IV.    SEVERAL DEFENDANTS' PRE-EXISTING RELATIONSHIPS WITH RUSSIA AND RUSSIAN OLIGARCHS PROVIDED FERTILE GROUND FOR A CONSPIRACY

63.     Trump, several Trump Associates,[*] and Assange's long-standing personal,
professional, and financial ties to Russia and numerous individuals closely linked to the Russian
government provided fertile ground for a conspiracy between Defendants to interfere in the 2016
elections.

64.     ***Trump's Business Connections to Russia:*** As early as the 1980s, the Soviet Union
paid for Trump to travel to Moscow to discuss a potential development project—a pattern which
continued into the 1990s and 2000s.[2] In the mid-1990s, Trump negotiated with Russian
government officials over potential real estate developments in Moscow.[3] Beginning in 2003,

---

[*] "Trump Associates" refers to the Trump advisors and confidants named as Defendants herein:
Trump, Jr., Manafort, Kushner, Stone, and Papadopoulos.

Trump engaged in multiple real estate deals with the Bayrock Group, a firm founded and run by Soviet émigrés, who reportedly had close ties to the Russian government and Russian organized crime.[4] In 2004, Trump negotiated with the Deputy Mayor of Moscow over a potential real estate development.[5] In the mid-2000s, Trump partnered with wealthy Russian-Canadian businessmen to develop real estate in Toronto.[6] And in 2006, Trump contracted with the Russian Standard Corporation, a Moscow-based entity that owns and operates the Miss Russia beauty pageant, to allow the winner of the pageant to compete in Trump's Miss Universe pageant, an action that had not been taken since at least 2002.[7] In 2008, Trump sold a Palm Beach, Florida mansion to a Russian oligarch for a $54 million profit.[8] In 2013, Trump established a business relationship with Russian oligarch Aras Agalarov, a close ally of Putin, to bring the Miss Universe pageant to Russia and work on plans to develop a Trump-branded project in Moscow.[9] Trump's efforts to develop real estate in Russia continued into May of 2016—several months into Trump's presidential campaign.[10] And throughout this 30-year history, Trump sought out wealthy Russian buyers for his condominiums in the United States and abroad.[11]

65.     As Trump, Jr. explained, the Trump Organization "s[aw] a lot of money pouring in from Russia," and "Russians make up a pretty disproportionate cross-section of a lot of our assets."[12] Trump's son Eric Trump has reportedly stated that substantial funding for Trump's golf courses also comes from Russian investors.[13]

66.     ***Manafort and Gates' Ukrainian Connections:*** From 2004 until at least 2015, Manafort was an advisor to the Russian-allied former Ukrainian President Viktor Yanukovych ("Yanukovych") and his Kremlin-allied Party of Regions, as well as its successor, the Opposition Bloc.[14] In 2012, Manafort allegedly helped the Ukrainian party secretly route at least $2.2 million in payments to two prominent Washington lobbying firms. [15] Manafort's ties to Yanukovych and

19

Ukraine are so deep that his own daughter has stated that the "money we have is blood money."[16] After repeatedly denying that he had ever worked for the Ukrainian government, on June 27, 2017, Manafort retroactively registered as a foreign agent and reported $17.1 million in payments from Yanukovych's party between 2012 and 2014.[17] In September 2018, Manafort pleaded guilty to two counts of conspiracy against the United States, encompassing charges of money laundering, tax fraud, failure to register as a foreign agent, and other criminal violations related to his work for the pro-Russian government in Ukraine.[18] According to the U.S. government, Manafort's work in Ukraine was backed by Putin-tied oligarch Oleg Deripaska ("Deripaska").[19] Additional financial records indicate that Manafort was in debt to Deripaska by as much as $17 million prior to joining the Trump Campaign.[20]

67.     Manafort also employed Konstantin Kilimnik ("Kilimnik") as his close aide. Kilimnik served as a linguist in the Russian army and reportedly learned to speak fluent English from Russian military intelligence (i.e., the GRU); when he worked for a nonprofit in the 1990s, he was known around the office as "the guy from the GRU."[21] The FBI believes that Kilimnik maintained ties to Russian intelligence during the 2016 U.S. presidential campaign.[22] Kilimnik was in communication with both Manafort and Gates while they were serving in the two most senior positions in the Trump Campaign, and acted as a middleman between them and Deripaska.[23] On June 8, 2018, Kilimnik was indicted for obstruction of justice related to Manafort's criminal charges.[24]

68.     ***Assange's Longstanding Ties to Russia:*** Assange has long exhibited support for the Russian government. In 2010, Assange tried to obtain a Russian visa to escape extradition to Sweden, where he faced sexual assault charges. He used Israel Shamir, a Russian-born writer who has been described as "a fringe intellectual," to arrange the visa. During a January 2011 interview

20

with a Moscow-based radio station, Shamir said he'd personally brokered a Russian visa for Assange, but that it had come too late to rescue Assange from the sex crimes investigation. Russia "would be one of those places where he [Assange] and his organization [WikiLeaks] would be comfortable operating," Shamir stated.[25] Asked if Assange had friends in the Kremlin, Shamir smiled and said, "Let's hope that's the case."[26] In 2012, Assange hosted a talk show on RT, a television propaganda outlet funded by the Russian government.

69.     Assange's alliance with the Russian government continues to this day. In late 2017, Russian diplomats met secretly with a close confidant of Assange to assess whether they could help him flee to Russia. A tentative plan was devised that would have seen Assange smuggled out of Ecuador's London embassy in a diplomatic vehicle. The plan, which was provisionally scheduled to be executed on Christmas Eve 2017, was abandoned after it was deemed too risky. According to news reports, four separate sources confirmed the Kremlin was willing to support the plan.[27]

## V.     THE COMMON PURPOSE: SECURE TRUMP'S GRIP ON THE PRESIDENCY THROUGH ILLEGAL MEANS

70.     The common purpose of the Defendants' conspiracy was to secure Trump's grip on the Presidency through illegal means. The Defendants first pursued this goal by bolstering Trump's campaign for President, injuring the DNC, and harming the Democratic party's chances for success in the 2016 presidential election. After the election, Defendants worked toward their mutual goal of keeping Trump in power though 2024 by covering up their collusion and committing cybercrimes against Democrats who opposed Trump's agenda. The Defendants pursued their common purpose for multiple, well-documented reasons.

71.     In December 2011, massive protests broke out in Russia in response to allegations of vote rigging and election fraud in the Russian parliamentary elections. Thousands of Russians

took to the streets to protest the victory of then-Prime Minister Putin's political party, in one of Russia's largest protests since the fall of the U.S.S.R.[28]

72.     Concerned about maintaining power and exerting control, Putin lashed out, blaming the protests on then-Secretary of State Hillary Clinton. Putin asserted that Secretary Clinton had "set the tone for some of our actors in the country and gave the signal."[29] And he accused her of ordering the opposition movement into action, "They heard this and, with the support of the U.S. State Department, began active work."[30]

73.     At the same time, Trump left no doubt as to his views on Russia. Prior to the 2016 campaign, he spent nearly a decade espousing pro-Russian and pro-Putin views, praising Putin as "doing a great job in rebuilding the image of Russia" (2007);[31] stating that he "really like[d] Vladimir Putin [and] respect[ed] him. He does his work well. Much better than our Bush" (2008);[32] and characterizing Putin's illegal annexation of Crimea as "so smart. . . And he [Putin] really goes step by step by step, and you have to give him a lot of credit" (2014).[33]

74.     Despite the obvious political risks of associating himself with a foreign despot, Trump continued to make laudatory statements about Putin well into the presidential primary season. He said that he would have a "great relationship with Putin";[34] and that it was a "great honor to be so nicely complimented by [Putin, who was] so highly respected within his own country and beyond."[35]

75.     Further, Trump's statements—as well as the pro-Russian entourage with which he surrounded himself—left little doubt that Trump, if elected president, would adopt policies that favored Russia and Putin, even if those policies conflicted with longstanding U.S. foreign policy, and the best interests of the United States. Trump called NATO "obsolete" and threatened to renege on U.S. treaty obligations;[36] argued that the U.S. should not counteract Russia's attempts to be a

global power; supported the United Kingdom's exit from the European Union, while noting that it would "probably" benefit Putin;[37] and opposed U.S. sanctions for Russia's annexation of Crimea, saying, "The people of Crimea, from what I've heard would rather be with Russia than where they were."[38]

76.    In July 2018, Putin confirmed that he had wanted Trump to win the 2016 presidential election because he believed Trump's policies would be more favorable to the Kremlin.[39]

77.    Upon information and belief, Mifsud shared the conspirators' common purpose because he wanted to advance Russia's interests and, as noted above, Russia wanted to secure Trump's grip on the Presidency.

78.    Assange and WikiLeaks also shared the Conspirators' common purpose. Assange had a long of history conflicts with Secretary Clinton, and Assange publicly stated that his policy disagreements with Clinton would make her presidency far more problematic than a Trump presidency.[40] In private messages sent to GRU operatives, WikiLeaks confirmed its goal of harming Secretary Clinton's candidacy and disrupting the Democratic party's chances of victory in the 2016 presidential election.[41] Upon information and belief, Assange drafted those messages and relayed them through WikiLeaks. In fact, upon information and belief, Assange is the only individual who uses WikiLeaks' Twitter handle.[42]

79.    Upon information and belief, Assange and WikiLeaks worked to secure Trump's grip on the Presidency even after the 2016 election because of Trump's favorable view of WikiLeaks, and because of the Russian government's inclination to assist Assange with asylum. In fact, reports have indicated that Russia even participated in a plan to facilitate Assange's escape from the Ecuadorian Embassy in London and fly him to Russia.

80.    Upon information and belief, the Agalarovs and the Trump Associates shared the conspirators' common purpose because they stood to benefit financially and professionally from a Trump Presidency. By using their relationship with the Trump family to facilitate the Russian government's coordination with the Trump campaign, the Agalarovs curried favor with Russian officials. Finally, the Trump Campaign's stated goal was to get Trump elected, both in 2016 and 2020.

## VI.    THE CONSPIRACY TO DISSEMINATE STOLEN DNC DATA TO AID TRUMP

81.    In a January 2017 report (the "IC Report"), the U.S. intelligence community concluded: "Russian President Vladimir Putin ordered an influence campaign in 2016 aimed at the US presidential election, the consistent goals of which were to undermine public faith in the US democratic process, denigrate Secretary Clinton, and harm her electability and potential presidency."[43] Further, the IC Report concluded: "In July 2015, Russian intelligence gained access to Democratic National Committee (DNC) networks and maintained that access until at least June 2016"; that "[b]y May, the GRU had exfiltrated large volumes of data from the DNC"; and that the "GRU relayed material it acquired from the DNC and senior Democratic officials to WikiLeaks."[44]

82.    This operation to infiltrate the DNC servers and disseminate stolen DNC material was carried out in the United States: Russian operatives trespassed onto computer servers located in Virginia and Washington, D.C. and stole information located on those servers. The operation was also carried out in concert with Assange and WikiLeaks, and with the active support and approval of the Trump Campaign and the Trump Associates.

83.    The conspirators worked in tandem to accomplish their goal. Russia's intelligence services illegally hacked into the DNC's computer systems and email server in order to steal and publish trade secrets, including confidential, proprietary documents related to campaigns,

fundraising, and campaign strategy. Russian intelligence services then disseminated the stolen, confidential materials through GRU-created websites, as well as WikiLeaks and Assange, who were actively supported by the Trump Campaign and Trump Associates as they released and disclosed the information to the American public at a time and in a manner that served their common goals. The disclosures to the American electorate were undertaken with the purpose and had the effect of creating dissention within the Democratic party, directing media coverage away from stories critical of Trump, and generally promoting Trump's presidential candidacy.[45]

### A. Trump Announces His Candidacy For President, And Russia Begins Its Attack On The DNC's Computer Systems

84. On June 16, 2015, Trump announced his candidacy for President of the United States in the lobby of Trump Tower. By the next month, Russia had undertaken its cyberattack on the DNC.[46] The hacks by Russian intelligence were directed at systems in Virginia and Washington, D.C. that contained some of the DNC's most sensitive strategic and operational data. Later, the disclosure of this sensitive data not only significantly disrupted the election strategy implemented by the DNC, but also interfered directly with the DNC's ability to effectively communicate with and persuade voters, to raise critical funds for its organization, and to support Democratic campaigns—all activities that occurred in interstate commerce.

### B. European Allies Sound The Alarm To U.S. Intelligence Regarding Communications Between Russians And Trump Associates

85. In late 2015, European intelligence agencies began reporting suspicious communications between persons associated with the Trump Campaign and Russian operatives (including suspected Russian intelligence agents) to U.S. authorities. These reports continued over the next year.

**C.     While Campaigning For President, Trump Signs A Letter Of Intent To Build Trump Tower Moscow**

86.     In the fall of 2015, as Trump campaigned for President, members of the Trump Organization were actively negotiating with Russians to build a Trump-branded real estate project in Moscow—a longtime goal of Trump's.[47] On or about October 28, 2015, Trump signed a letter of intent to license his name for the project.[48]

87.     The deal was brokered by Felix Sater, a Russian émigré, convicted felon, and longtime business associate of the Trump Organization.[49] The funding for the project was to be provided by Vneshtorgbank, or VTB—a Russian bank against which the United States Treasury has leveled sanctions.[50]

88.     On November 3, 2015, Sater explained to Trump's personal attorney, Michael Cohen, how this project would promote Trump's presidential aspirations:

> Michael I arranged for Ivanka to sit in Putins [sic] private chair at his desk and office in the Kremlin. I will get Putin on this program and we will get Donald elected. We both know no one else knows how to pull this off without stupidity or greed getting in the way. I know how to play it and we will get this done. Buddy our boy can become President of the USA and we can engineer it. I will get all of Putins [sic] team to buy in on this, I will manage this process.[51]

**D.     The Trump Campaign Establishes Further Ties To Russia And Russian Intelligence Agents**

89.     From the winter of 2016 through the 2016 presidential election, high-level and other advisers to the Trump Campaign, including Manafort, Gates, Kushner, Papadopoulos, Stone, Cohen, and others, were in frequent contact with individuals connected to Russian intelligence and the Russian government.[52]

90.     In February 2016, Flynn began serving as an informal foreign policy advisor to the Trump Campaign. Flynn had ties to both the GRU and Putin. In 2013, when Flynn was serving as the head of the Defense Intelligence Agency, he was the first U.S. officer who was ever allowed

inside GRU headquarters.[53] While he was there, he lectured GRU officers about leadership. When he returned to the United States, he wanted to make a second visit to the GRU, but he could not get permission from the relevant authorities. Moreover, on December 10, 2015, just a few months before he joined the Trump Campaign, Flynn was paid by the Russian government-funded propaganda outlet RT to attend and speak at its anniversary gala in Moscow, where he dined next to Putin.[54]

91.     In March 2016, the Trump Campaign also hired Manafort. As noted above, Manafort was millions of dollars in debt to Deripaska at the time. He was also broke.[55] Yet he agreed to work for the Trump Campaign for free. A few days after he joined the Trump Campaign, Manafort emailed Kilimnik to discuss how they could use Manafort's "media coverage" to settle his debt with Deripaska.[56] Manafort had multiple discussions with Kilimnik in the runup to the 2016 election, including one in which Manafort "shar[ed] polling data . . . related to the 2016 presidential campaign."[57] This data could have helped Russia assess the most effective ways to interfere in the election, for instance, by helping it determine how best to utilize information stolen from the DNC .

92.     In or around March 2016, Papadopoulos was also notified that he would become a foreign policy adviser to the Trump Campaign, and that a principal foreign policy focus of the Trump Campaign was an improved relationship with Russia.[58] On March 21, 2016, Trump announced that Papadopoulos would be among the first members of the Trump Campaign's foreign policy team.[59]

93.     Thereafter, Papadopoulos frequently communicated with a professor based in London named Joseph Mifsud. In his guilty plea, Papadopoulos, attested that he "understood that the professor had substantial connections to Russian government officials."[60] Further,

Papadopoulos admitted that he "repeatedly sought to use the professor's Russian connections in an effort to arrange a meeting between the campaign and Russian government officials."[61]

94.    According to Papadopoulos' Statement of Offense, Mifsud was initially "uninterested" in Papadopoulos, but "appeared to take great interest" when Papadopoulos was publicly named to Trump's foreign policy team. As a result:

(a)    On March 14, 2016, Mifsud met with Papadopoulos in Italy.[62]

(b)    On March 24, 2016, Mifsud met again with Papadopoulos, this time bringing along a Russian national who was introduced as a relative of Putin.[63]

(c)    On April 18, 2016, Mifsud introduced Papadopoulos to an individual he said had connections to the Russian Ministry of Foreign Affairs. Papadopoulos proceeded to have multiple Skype conversations with this individual in which they discussed setting up a meeting between Russian officials and the Trump campaign.[64]

(d)    On April 26, 2016, Mifsud again met with Papadopoulos in London. At this meeting, Mifsud told Papadopoulos that the Russians had "thousands of emails" that could harm Hillary Clinton's presidential campaign.[65] Papadopoulos understood that Mifsud "had substantial connections to Russian government officials[] and had met with some of those officials in Moscow immediately prior" to telling [Papadopoulos] about the 'thousands of emails.'"[66]

95.    Mifsud later acknowledged his contacts with Papadopoulos, stating that he met with him "three or four times" and helped connect him to "official and unofficial sources."

96.    The Trump Campaign was aware of, and encouraged, Papadopoulos's meetings with his Russian contacts. After meeting with Mifsud and the Russian national on March 24, 2016, Papadopoulos reported back to the Trump Campaign that his conversation was "to arrange a meeting between us and the Russian leadership to discuss U.S.-Russia ties under President Trump."[67] Informed of this meeting, Trump campaign National Co-Chairman Sam Clovis responded that he would "work it through the campaign" and added: "Great work."[68]

97.    Papadopoulos excitedly emailed a Trump Campaign official on April 27, 2016: "Have some interesting messages coming in from Moscow about a trip when the time is right." He

also emailed Trump Campaign Manager Corey Lewandowski, reiterating Russia's interest in hosting Trump. In May 2016, Papadopoulos sent Manafort an email stating that "Russia has been eager to meet Mr. Trump for quite some time and have been reaching out to me to discuss." Manafort forwarded the email to Gates, writing: "Lets discuss. We need someone to communicate that DT is not doing these trips," referring to Trump, and added "[i]t should be someone low level in the campaign so as not to send any signal."[69]

98.     Also on April 27, 2016—the day after Papadopoulos's fourth meeting with Mifsud—Trump gave his first major foreign policy address, where he said: "I believe an easing of tensions, and improved relations with Russia from a position of strength only is possible, absolutely possible. Common sense says this cycle, this horrible cycle of hostility must end and ideally will end soon."[70] That evening, Papadopoulos flagged the speech for one of his Russian contacts, and explained: "That's the signal to meet."[71]

99.     In May 2016, Papadopoulos confided to an Australian diplomat that Russia had politically damaging information on Secretary Clinton, and the diplomat reported this to U.S. authorities.[72] This report prompted the FBI to launch its counterintelligence investigation into contacts between Russia and the Trump campaign.[73]

100.     Over the next three months, Papadopoulos continued to have communications with Russian nationals, and continued to report those communications to Trump Campaign officials, who encouraged him to set up an off-the-record meeting with Russian officials on behalf of the campaign.[74] Papadopoulos later pleaded guilty to lying about these communications with Russian nationals.[75]

### E.     Russia Steals A Massive Trove Of Documents From The DNC

101.     On April 18, 2016—the date of Papadopoulos's third meeting with Mifsud—Russia launched a pervasive cyberattack on DNC servers located in Virginia and Washington, D.C. This

attack was carried out by the GRU, with the help of the GRU Operatives. Upon information and belief, the GRU Operatives were carrying out military orders that they could not disobey. The attackers targeted the DNC's research department, document repositories, information technology department, and other departments.[76]

102.    During that time, the DNC worked to keep the valuable and sensitive data on its servers secret by, among other things, employing a firewall to limit access to its computers and requiring two-factor authentication for users who attempted to access the servers from remote locations. In addition, the DNC periodically monitored its user accounts and imposed password requirements concerning passwords' age, length, and complexity.

103.    Nevertheless, the GRU breached the DNC's cyberdefenses and, with the help of the GRU Operatives, placed malware on the DNC network, including proprietary malware known as "X-Agent."[77] Upon information and belief, the GRU Operatives monitored this malware in realtime and collected data from DNC computers, including keylogs and screenshots.

104.    On April 22, 2016, the GRU staged several gigabytes of DNC data located on the DNC's servers for unauthorized and surreptitious exfiltration (*i.e.*, theft). The GRU then used malware known as "X-Tunnel" to exfiltrate this stolen DNC data to a GRU-leased computer located in Illinois.[78]

105.    Between April and June of 2016, the GRU gained access to at least 33 DNC computers and the DNC's email server. By June 2016, Russia had stolen thousands of emails and documents containing sensitive data from the DNC, including donor information, financial and economic information, proprietary opposition research compiled from multiple sources, information regarding planned political activities, and thousands of private confidential emails.

106.    Some of the stolen documents were compilations of public and private information which derived substantial value from their amalgamation and organization. The documents derived economic value from the fact of their secrecy: if the data they contained were made public, it would reveal critical insights into the DNC's political, financial, and voter engagement strategies.

107.    The DNC used this data in interstate commerce by, among other things, fundraising and organizing events.

108.    The GRU could have derived significant economic value from the theft of the DNC's data by, among other possibilities, selling the data to the highest bidder.

**F.      The DNC Discovers The Hack And Hires CrowdStrike**

109.    On April 28, 2016, the DNC's information technology department detected unauthorized users in the DNC's computer network.

110.    Upon discovering the intrusion, the DNC contacted CrowdStrike Services, Inc. ("CrowdStrike"), a cybersecurity technology firm, to investigate the attack, assess the damage done to the DNC's computers and servers, and assist the DNC in its remediation efforts.

111.    CrowdStrike performed a forensic analysis of the DNC's computer network and servers.

112.     CrowdStrike also set up a system for monitoring the ongoing attack on Plaintiffs' computer system and to alert the DNC to future attacks.

113.    In order to remove the unauthorized users from its network, the DNC had to decommission more than 140 servers, remove and reinstall all software, including the operating systems, for more than 180 computers, and rebuild at least 11 servers.

**G.      Forensic Evidence Confirms Russia's Attack On The DNC's Network**

114.    Both CrowdStrike's forensic analysis and the U.S. Government concluded that the DNC's computer systems had been hacked by two independent, sophisticated Russian state-

sponsored adversaries, both with a nexus to Russia's intelligence services.[79] The forensic analysts tracked the hacking activities of these adversaries by assigning them code names: "Cozy Bear" and "Fancy Bear," which correspond to the more widely used names Advanced Persistent Threat 29 (APT 29) and Advanced Persistent Threat 28 (APT 28), respectively.[80]

115.    Forensic analysis found evidence that Cozy Bear had infiltrated and remained present in the DNC's network since at least July 27, 2015.[81] The IC Report similarly concluded that Russian intelligence first gained access to the DNC network in July 2015. CrowdStrike also determined that Cozy Bear used the stolen credentials of user accounts to access the DNC's computer systems.[82]

116.    CrowdStrike determined that the objective of the Cozy Bear actor was to access and collect information from DNC systems that were primarily used for communications. The analysis identified Cozy Bear malware in DNC systems providing email, email support, backup servers, voiceover internet protocol, and chat.[83]

117.    The U.S. Government concluded that Cozy Bear was an operative of or associated with Russian intelligence.[84]

118.    The DNC first detected "Fancy Bear" in its network on April 28, 2016.[85] The IC Report concluded that "Fancy Bear" was acting as an agent of the GRU. In July 2018, the U.S. Department of Justice announced the indictment of the GRU Operatives for executing cyberattacks on the DNC in 2016 and disseminating stolen DNC data through WikiLeaks and the GRU-created online persona Guccifer 2.0.[86]

119.    CrowdStrike determined that the GRU's objective was to collect information about the DNC's political and research activities.[87]

120. According to the U.S. government, the GRU intentionally deleted logs and computer files to cover their tracks while they maintained an authorized presence within the DNC network and stole DNC data.[88]

121. On April 22, 2016, the GRU staged for exfiltration several gigabytes of data that included opposition research on Donald Trump. According to the U.S. government, the GRU later used proprietary malware known as "X-Tunnel" to move this data outside of the DNC network through encrypted channels to a GRU-leased computer in Illinois. On or about April 28, 2016, the GRU connected to and tested the same computer located in Illinois.[89]

122. According to the U.S. government, while hacking the DNC networks, the GRU covered its tracks by intentionally deleting logs and computer files. For example, on or about May 13, 2016, the GRU cleared the event logs from a DNC computer.[90]

123. Between May 25 and June 1, 2016, the GRU hacked into the DNC's email server and stole thousands of emails from the accounts of DNC employees.[91]

124. According to the U.S. government, the GRU exfiltrated DNC documents, and GRU operatives posted some of those documents publicly online.[92]

125. According to an analysis of metadata, documents that originally resided on DNC servers were published without permission on a website, found at www.guccifer2.wordpress.com, by GRU operatives.

126. According to the U.S. government, the GRU transmitted stolen emails to WikiLeaks between July 14, 2016 and July 18, 2016 after WikiLeaks requested stolen information from the DNC that it could use to harm the Democratic party.[93]

127. Forensic analysis shows that both Cozy Bear and Fancy Bear used the stolen credentials of user accounts to access the DNC's computer systems. [94]

128.    In addition, forensic analysis showed that the hackers accessed the DNC's Voice-over Internet Protocol ("VOIP") transfers.  Upon information and belief, this access allowed the hackers to monitor voice-based communications, such as phone calls and voicemail, in realtime.

129.    On information and belief, the hackers conducted real-time surveillance on the DNC network using the X-Agent software. Because X-Agent was always on, the software captured the contents of communications going to and from the affected computers simultaneously with their transmission.

130.    In this way, the hackers endeavored to intercept and did intercept the contents of emails, instant messages and internal text-based chat, and voice-based communications while in the DNC servers.

131.    To carry out their operations, the Russian hackers—including the GRU Operatives—purchased servers in the United States, registered several domain names, and made multiple "payments in furtherance of hacking activity."[95]

## H.    Russians Again Offer To Assist Trump—And Trump Associates Accept The Offer

132.    Trump clinched the Republican presidential nomination on May 26, 2016. A week later, Defendants launched a scheme to disseminate information that was damaging to the Democratic party and the DNC.

133.    On June 3, 2016, Aras and Emin Agalarov made an offer of assistance from the Russian government to the Trump Campaign:

> Good morning.
>
> Emin [Defendant Emin Agalarov] just called and asked me to contact you with something very interesting.
>
> The Crown prosecutor of Russia met with his father Aras [Defendant Aras Agalarov] this morning and in their meeting offered to provide the Trump campaign with some official

documents and information that would incriminate Hillary and her dealings with Russia and would be very useful to your father.

*This is obviously very high level and sensitive information but is part of Russia and its government's support for Mr. Trump – helped along by Aras and Emin.*

. . .

(Emphasis added).[96]

134.    Seventeen minutes later, Trump, Jr. responded:

Thanks Rob I appreciate that. I am on the road at the moment but perhaps I [will] just speak to Emin first. Seems we have some time and *if it's what you say I love it especially later in the summer.*

(Emphasis added).[97]

135.    Between June 6, 2016, and June 7, 2016, Trump Jr. and Emin Agalarov exchanged several phone calls and discussed the meeting at which Russians would provide the Trump Campaign with damaging information about the Democratic nominee.[98] In between two of those calls, Trump Jr. received a call from an unknown blocked number.[99]

136.    On June 7, 2016, shortly after the meeting between the Russians and Trump Associates was set, Trump Jr. emailed: "Great. It will likely be Paul Manafort (campaign boss) my brother in law and me, 725 Fifth Ave 25th floor." [100] That night, Trump announced that he would give "a major speech. . . discussing all of the things that have taken place with the Clintons."[101]

137.    Two days later, on June 9, 2016, the meeting between the Russians and Trump Associates took place. The Trump Campaign was represented by Trump's inner-circle: Trump, Jr., Kushner, and Manafort. Representing Russia's interests were Agalarov publicist Rob Goldstone, Kremlin-connected Russian lawyer Natalia Veselnitskaya ("Veselnitskaya"), Agalarov business associate Irakly Kaveladze, lobbyist Rinat Akhmestshin, and a translator. [102]

138.    On information and belief, Veselnitskaya was closely connected to the Kremlin, and had a history of acting as an agent of the Russian government. In April 2018, Veselnitskaya called herself an "informant" for the Russian government and admitted that she had been "actively communicating with the office of the Russian Prosecutor General" since 2013.[103] In January 2019, a federal indictment in an unrelated case further elucidated Veselnitskaya's deep ties to senior Russian government officials, detailing her 2014-2015 scheme with a senior Russian prosecutor to obstruct a U.S. investigation into her client, a wealthy Russian businessman.[104]

139.    On the day of the Trump Tower meeting, Cohen started making travel plans to meet top Russian officials—possibly including Putin—in St. Petersburg regarding the Trump Tower Moscow project. He canceled his plans on June 14, 2016, the same day the *Washington Post* revealed the DNC had been hacked by the Russian government.[105]

140.    The day after the Trump Tower meeting, the Agalarovs sent Trump an expensive painting as a gift for his upcoming birthday. In a note to the Agalarovs, Trump thanked them for the gift and their friendship: "I'm rarely at a loss for words, but right now I can only say how much I appreciate your friendship and to thank you for this fantastic gift…This is one birthday that I will always remember."[106]

141.    Trump and Trump, Jr. would later go to great lengths to conceal the meeting and its content. For months, Trump, Jr. and others familiar with the June 2016 meeting denied that they had contacts with Russians during the campaign. For example, in March 2017, when asked whether he had held any meetings with Russians related to the presidential campaign, Trump, Jr. falsely stated: "Certainly none that I was representing the campaign in any way, shape or form."[107] Months later, in July 2017, when confronted with limited information about the June 2016 meeting, Trump, Jr. released a series of false statements that mischaracterized and omitted key facts about the June

36

2016 meeting and the email exchange that led to it, including the Russians' offer of damaging information about the Democratic presidential nominee and the fact that the email exchange explicitly informed Trump, Jr. that the Russian government was seeking to help the Trump Campaign. According to news reports, Trump helped craft the first of these misleading statements after rejecting an initial attempt to fully disclose the nature of the June 2016 meeting.[108]

142.    Manafort also tried to hide the Trump Tower meeting: On July 24, 2016, Manafort was asked whether there were any "ties between Mr. Trump, you and your campaign and Putin and his regime." Manafort replied: "No, there are not. That's absurd. And, you know, there's no basis to it."[109]

## I.    Following The Trump Tower Meeting, Russia Continues Its Hacking And Launches A Massive Public Dissemination Of Stolen DNC Documents

143.    The day after the Trump Tower meeting, GRU agents placed a Linux-based version of the GRU's X-Agent malware, programmed to communicate with the GRU-registered domain linuxkrnl.net,[110] onto a DNC backup server nicknamed "Raider." Raider was located in Virginia, and served the purpose of backing up other DNC servers.

144.    The DNC discovered the GRU's X-Agent malware on its Raider backup server on October 21, 2016, when it detected Raider's attempts to contact the GRU-registered domain linuxkrnl.net. CrowdStrike performed a forensic analysis of Raider and confirmed that a Linux-based version of X-Agent, programmed to communicate with the GRU, was placed on Raider on June 10, 2016. Upon information and belief, the GRU was unable to exfiltrate any data from Raider because, a few hours after it placed malware on Raider, the DNC implemented a firewall rule that prevented the server from communicating with computers outside of the DNC network as part of its effort to limit the damage that GRU officers did to the DNC's computer network. However, later GRU cyberattacks (described in detail below) were more successful.

145.    On June 12, 2016, Assange appeared on a British television show and said that WikiLeaks would soon leak materials concerning the Democratic presidential candidate, adding "WikiLeaks has a very big year ahead."[111]

146.    Two days after this ominous pronouncement, the DNC publicly announced that its systems had been hacked by Russian intelligence agencies; this was the first public statement that the Russians were interfering in the 2016 election.[112]

147.    On June 15, 2016, GRU agents, including Osadchuk and Potemkin, began using their online persona Guccifer 2.0 to disseminate stolen DNC material, both through a GRU-operated website and through WikiLeaks.[113]

148.    The strategic dissemination of DNC documents by the GRU continued unabated through June and early July 2016, including:

(a)    On June 15, 2016, the GRU posted a pdf of a proprietary opposition research report on Trump that the DNC authored in December 2015.[114] This report provided an early roadmap for how the Democratic party could approach messaging about Trump and his candidacy.  Its publication gave the Democrats' opposition access to this roadmap, thus significantly reducing its value.

(b)    On June 21, 2016, GRU operatives using the screenname Guccifer 2.0 released a batch of stolen DNC documents about Secretary Clinton, one day after Trump fired Corey Lewandowski on June 20. [115]

(c)    On June 30, 2016, GRU operatives using the screenname Guccifer 2.0 released stolen DNC documents to the public, including a DNC-authored research report on Republican candidates and Secretary Clinton.[116]

(d)    On July 6, 2016, GRU operatives using the screenname Guccifer 2.0 released stolen DNC documents, including confidential DNC strategy documents related to the DNC's "counter-convention" to the RNC convention. [117] This plan lost its value once it became available in the public sphere. This was one day after FBI Director James Comey announced that no criminal charges would be brought against Secretary Clinton for maintaining a private email server during her time at the State Department.[118]

**J.      WikiLeaks And Russian Intelligence Discuss A Plan To Use Stolen DNC Documents To Disrupt The Democratic National Convention**

149.    On June 22, 2016, WikiLeaks sent GRU operatives using the screenname Guccifer 2.0 a private message, asking the operatives to "[s]end any new material [stolen from the DNC] here for us to review and it will have a much higher impact than what you are doing."[119] Shortly thereafter, in late June 2016, the GRU Operatives first attempted to send stolen DNC documents to WikiLeaks.

150.    On July 6, 2016, WikiLeaks sent another private message to GRU operatives using the screenname Guccifer 2.0 with additional instructions: "if you have anything hillary related we want it in the next tweo[sic] days prefable [sic] because the DNC [Democratic National Convention] is approaching and she will solidify bernie supporters behind her after." Guccifer 2.0 responded, "ok…I see." WikiLeaks explained its strategy to help Trump and harm the Democratic nominee and party in another message to Guccifer 2.0: "we think trump has only a 25% chance of winning against hillary…so conflict between bernie and hillary is interesting."[120] In other words, WikiLeaks and Russian intelligence agreed to use materials stolen from the DNC to disrupt the Democratic National Convention and prevent members of the Democratic party from rallying around the Democratic nominee.

151.    On July 14, 2016, the GRU Operatives sent WikiLeaks instructions for accessing a trove of stolen DNC documents.[121] Four days later, WikiLeaks sent the GRU Operatives a message, confirming that it had the documents and assuring them that the documents would be released "this week."[122]

**K.      The Trump Campaign Continues Communicating With Russian Agents And Blocks Anti-Russian Language From Being Added To The GOP Platform As**

**WikiLeaks And The GRU Finalize Arrangement To Disrupt The Democratic National Convention**

152.     In early July, 2016, Manafort—then chairman of the Trump Campaign—emailed Kilimnik, his longtime aide with ties to the GRU, offering private briefings on the presidential campaign to Russian oligarch and Putin ally Deripaska.

153.     Between July 11, 2016 and July 15, 2016, members of the Trump campaign intervened to prevent the Republican National Committee's foreign policy platform committee from amending the draft platform to include a call for the United States to provide lethal arms to Ukraine to help defend itself against Russia. The Trump campaign succeeded in this effort, watering down the proposed amendment to support only "appropriate assistance" to Ukraine.

154.     As Trump campaign officials worked to block the anti-Russia language from the GOP platform, WikiLeaks and the GRU were finalizing an arrangement to release stolen DNC data to disrupt the Democratic National Convention. On July 14, 2016, Guccifer 2.0 sent WikiLeaks an email with instructions on how to access stolen DNC documents in an online repository. On July 18, 2016, WikiLeaks confirmed that it had retrieved the "1gb or so archive" of stolen DNC documents and would release them "this week," which would coincide with the beginning of the Democratic National Convention.[123]

155.     After the convention, Kilimnik reportedly told associates that he had played a role in the Trump campaign's success at watering down the Ukraine amendment.

**L.     After The Trump Campaign Blocks Anti-Russia Language From The GOP Platform, WikiLeaks Begins Disseminating Stolen DNC Documents**

156.     On July 22, 2016, just three days before the Democratic National Convention, WikiLeaks released its first major tranche of stolen DNC materials, which included more than 20,000 emails and documents stolen by Russian intelligence agents. These documents contained names, addresses, telephone numbers, dates of birth, social security numbers, passport numbers,

and other identifying information of individuals who had communicated with or donated to the DNC, as well Excel, Word, and other types of files containing the confidential work product of DNC staff. The release also included dozens of private voicemail messages to DNC employees.[124] Some of the published documents were sensitive trade secrets belonging to the DNC, including donor lists and detailed proprietary fundraising strategies based on the DNC's analysis of trends in donation data collected over years.

157.    The Defendants publicly denied that the documents were released to help Trump secure power. On July 24, 2016, Trump, Jr. was asked about suggestions that the July 22, 2016 release of stolen DNC emails was part of a Russian plot to "help Donald Trump and hurt Hillary Clinton." Despite having been informed via email weeks earlier that there was such a plot, Trump, Jr. responded: "Well, just goes to show you their exact moral compass. They'll say anything to be able to win this. This is time and time again, lie after lie…It's disgusting; it's so phony."[125]

158.    At the same time, Trump and the Trump Campaign openly celebrated this publication of stolen materials, and Trump himself encouraged Russia to continue its hacking campaign. At a press conference on July 27, 2016, after commenting extensively on the materials that were stolen from the DNC servers, Trump called on the Russians to continue their hacking: "Russia, if you're listening, I hope you're able to find the 30,000 emails that are missing." He then predicted great rewards would come to Russia if that occurred, stating, "I think you will probably be rewarded mightily by our press. Let's see if that happens."[126] That same day, the GRU Operatives attempted—for the first time—to hack email accounts used by Secretary Clinton's personal office.[127]

**M.** **Trump Associates Secretly Communicate With Russian Agents And WikiLeaks As They Strategically Release Stolen DNC Documents**

159.    Russia's unauthorized release of DNC documents continued until November 2016, with a critical increase in the volume and damaging nature of these releases as the general election season began.

160.    From June 2016 to October 2016, the GRU systematically released documents stolen from the DNC on a regular basis.[128] Many of the disclosures were timed to divert attention from adverse publicity about the Trump campaign, and to obscure positive news about the Clinton campaign and DNC activities—serving the common interests of the Trump Associates, Russia, and WikiLeaks.

161.    Beginning in the spring of 2016, Trump's longtime friend and political advisor Roger Stone revealed on multiple occasions that he was in contact with Assange and WikiLeaks as well as Guccifer 2.0 about information in their possession that would be damaging to the Clinton campaign, to prominent members of the Democratic Party, and to Clinton campaign chairman John Podesta. [129] Many of these reports from Stone occurred well before it was publicly known that the DNC's computer systems and Podesta's emails had been hacked by the same Russian intelligence entities. [130]

162.    On July 25, 2016, Stone, who was in frequent contact with senior officials in the Trump Campaign, directed his associate, Corsi, to connect with Assange and WikiLeaks.[131] Stone wanted Corsi to gather additional information about the trove of stolen materials that WikiLeaks had received from Russia.[132] On August 2, 2016, Corsi reported back to Stone, explaining that WikiLeaks planned to release the information in October 2016.[133]

163.    Stone also claimed that, on August 3, 2016, he spoke with Trump[134] and "dined with [his] new pal Julian Assange," an apparent reference to an online meeting.[135]

164.    On August 8, 2016, speaking to a local Republican Party group in Florida, Stone predicted the future disclosure of hacked materials: "I have actually communicated with Assange. I believe the next tranche of his documents pertain to the Clinton Foundation, but there's no telling what the October surprise may be." [136]

165.    On August 12, 2016, Stone said that he believed Assange had emails belonging to Secretary Clinton.[137] That same day, GRU officers posing as Guccifer 2.0 disseminated another set of stolen documents – this time containing personal information about Democratic candidates.[138] Shortly thereafter, on August 12, Guccifer 2.0 sent a thank-you note to Stone.[139]

166.    Also on August 12, 2016, GRU officers posing as Guccifer 2.0 released documents stolen from other Democratic entities, including strategy memos for five House races in Florida.[140] These documents were released just days before legislative primaries in the key battleground state of Florida.[141]

167.    On August 14, 2016, Stone began secretly communicating with GRU operatives posing as Guccifer 2.0.[142] On August 17, 2016, one of these operatives tweeted to Stone, "please tell me if i can help u anyhow. it would be a great pleasure to me."[143] That same day, Trump was briefed by US intelligence agencies that Russia was implicated in the hacking of DNC servers.[144]

168.    In August 2016, about two weeks before Manafort resigned admit reports of improper payments for his pro-Russia political work in Ukraine, Manafort and Kilimnik had dinner in New York City, during which the two discussed Trump's presidential campaign.[145]

169.    After Manafort resigned, Gates (Manafort's deputy) continued communicating with Kilimnik while serving as a high-ranking member of the Trump campaign. Gates, like Manafort, was aware that Kilimnik was tied to the GRU.[146]

43

170.     On August 21, 2016, amidst his communications with Russian intelligence and Assange, Stone prophesized the future dissemination of Podesta's emails, tweeting: "Trust me, it will soon [be] Podesta's time in the barrel."[147] There had been no public disclosure that Podesta's emails had been hacked at that time. A few days later, on August 30, 2016, Stone called Corsi to ask for help creating a cover story to explain how Stone knew about Podesta's emails before WikiLeaks released them.[148]

171.     On September 18, 2016, Stone emailed Randy Credico ("Credico"), a New York radio personality, with a specific document request: "Please ask Assange for any State or HRC e-mail from August 10 to August 30—particularly on August 20, 2011." Credico told Stone that he needed a "little bit of time" and that he "can't ask [WikiLeaks and Assange for] favors every other day. I asked one of his lawyers."[149]

172.     In mid-September 2016, Stone accurately predicted on Boston Herald Radio that he expected "Julian Assange and the WikiLeaks people to drop a payload of new documents on Hillary on a weekly basis fairly soon."[150]

173.     By September 20, 2016, Trump, Jr. was secretly communicating with WikiLeaks as well. At one point, WikiLeaks provided Trump, Jr. with a password to an anti-Trump political action committee website, which Trump. Jr. later used.[151] In exchange, WikiLeaks asked Trump, Jr. to have his father retweet a link to a WikiLeaks website containing stolen Democratic documents.[152] Fifteen minutes after WikiLeaks sent this request, Trump in fact tweeted "Very little pick-up by the dishonest media of incredible information provided by WikiLeaks. So dishonest! Rigged system!"[153]

174.     On October 1, 2016, Stone stated on Twitter: "Wednesday @HillaryClinton is done. #WikiLeaks." [154] The following day, Stone said on Alex Jones' show: "An intermediary met

with him [Assange] in London recently who is a friend of mine and a friend of his, a believer in freedom. I am assured that the mother lode is coming Wednesday. It wouldn't be an October surprise if I told you what it was but I have reason to believe that it is devastating because people with political judgment who are aware of the subject matter tell me this."[155] On October 3, 2016, Stone reiterated that he was confident WikiLeaks would continue disseminating hacked materials: "I have total confidence that @wikileaks and my hero Julian Assange will educate the American people soon."[156]

175.   Four days later, on October 7, 2016—and just one hour after the release of the infamous Access Hollywood recording in which Trump admitted to sexually assaulting women— WikiLeaks released 2,000 emails stolen from Podesta.[157] WikiLeaks continued to release documents stolen from Podesta on a near-daily basis until November 9, 2017 – just as Stone had predicted.[158]

176.   On October 13, 2016, WikiLeaks issued a statement denying it had any communications with Stone. The same day, Stone sent WikiLeaks a private Twitter message asking it to "rexamine [sic] the strategy of attacking me" in view of Stone's publicly "defending wikileaks and Assange against the claim that you are Russian agents . . . ."[159]

**N.    The GRU Reaches Out To Stone About Democratic Party Turnout Models**

177.   On August 22, 2016, GRU operatives transmitted several gigabytes of data stolen from another Democratic party target to a Republican party strategist in Florida. The data included voter turnout analyses for Florida and other states.[160]

178.   Between September 7 and September 8, 2016, the GOP strategist exchanged private messages with GRU operatives posing as Guccifer 2.0 in which he explained the substantial value of the stolen data he had received from them.[161]

45

179.    On September 9, 2016, GRU operatives posing as Guccifer 2.0 contacted Stone, writing him "please tell me if I can help u anyhow[,]" and adding "it would be a great pleasure to me." The operatives then asked Stone for his reaction to the "turnout model for the Democrats' entire presidential campaign." Stone replied, "[p]retty standard."[162]

**O.    Russia Launches Another Attack On DNC Servers Housing Sensitive And Valuable Trade Secrets**

180.    On September 20, 2016, CrowdStrike's monitoring service discovered that unauthorized users—later discovered to be GRU officers—had accessed the DNC's cloud-computing service. The cloud-computing service housed test applications related to the DNC's analytics. The DNC's analytics are its most important, valuable, and highly confidential tools. While the DNC did not detect unauthorized access to its voter file, access to these test applications could have provided the GRU with the ability to see how the DNC was evaluating and processing data critical to its principal goal of winning elections. Forensic analysis showed that the unauthorized users had stolen the contents of these virtual servers by making exact duplicates ("snapshots") of them and moving those snapshots to other accounts they owned on the same service. The GRU stole multiple snapshots of these virtual servers between September 5, 2016 and September 22, 2016. The U.S. government later concluded that this cyberattack had been executed by the GRU as part of its broader campaign to damage to the Democratic party.

181.    In 2016, the DNC used Amazon Web Services ("AWS"), an Amazon-owned company that provides cloud computing space for businesses, as its "data warehouse" for storing and analyzing almost all of its data.

182.    To store and analyze the data, the DNC used a software program called Vertica, which was run on the AWS servers. Vertica is a Hewlett Packard program, which the DNC licensed. The data stored on Vertica included voter contact information, such as the names,

addresses, phone numbers, and email addresses of voters, and notes from the DNC's prior contacts with these voters. The DNC also stored "digital information" on AWS servers. "Digital information" included data about the DNC's online engagement, such as DNC email lists, the number of times internet users click on DNC advertisements (or "click rates"), and the number of times internet users click on links embedded in DNC emails (or "engagement rates"). The DNC also used AWS to store volunteer information—such as the list of people who have signed up for DNC-sponsored events and the number of people who attended those events.

183.    Vertica was used to both store DNC data and organize the data so that DNC computer engineers could access it. To use the Vertica data, DNC employees could not simply type a plain-English question into the database. Instead, DNC engineers needed to write lines of computer code that instructed Vertica to search for and display a data set. The computer engineers' coded requests for data are called "queries."

184.    When the DNC wanted to access and use the data it collected, the DNC described the information it wanted to retrieve, and DNC computer engineers designed and coded the appropriate "queries" to produce that data. These queries are secret, sensitive work product developed by the DNC for the purpose of retrieving specific cross-sections of information in order to develop political, financial, and voter engagement strategies and services. Many of these queries are used or intended for use in interstate commerce. The DNC derives value from these queries by virtue of their secrecy: if made public, these queries would reveal critical insights into the DNC's political, financial, and voter engagement strategies. DNC computer engineers could save Vertica queries that they run repeatedly. In 2016, some of the DNC's most frequently used Vertica queries—which revealed fundamental elements of the DNC's political and financial strategies— were stored on the AWS servers.

185.    When the DNC wanted to analyze its data to look for helpful patterns or trends, the DNC used another piece of software called Tableau. Tableau is commercial software not developed by DNC engineers. Instead, the DNC purchased a license for the Tableau software, and ran the software against Vertica.

186.    Using Tableau, the DNC was able to develop graphs, maps, and other visual reports based on the data stored on Vertica. When the DNC wanted to visualize the data it collected, the DNC described the information it wanted to examine, and DNC computer engineers designed and coded the appropriate "Tableau queries" to produce that data in the form requested. These Tableau queries are secret, sensitive work product developed by the DNC for the purpose of transforming its raw data into useful visualizations. The DNC derives value from these queries by virtue of their secrecy: if made public, these queries would reveal critical insights into the DNC's political, financial, and voter engagement strategies and services. Many of these queries are used or intended for use in interstate commerce.

187.    DNC computer engineers could also save Tableau queries that they ran repeatedly. In 2016, some of the DNC's most frequently used Tableau queries—which revealed fundamental elements of the DNC's political and financial strategies—were stored on the AWS servers.

188.    The DNC's Vertica queries and Tableau Queries that allow DNC staff to analyze their data and measure their progress toward their strategic goals—collectively, the DNC's "analytics,"—are its most important, valuable, and highly confidential tools. Because these tools were so essential, the DNC would often test them before they were used broadly.

189.    The tests were conducted using "testing clusters"—designated portions of the AWS servers where the DNC tests new pieces of software, including new Tableau and Vertica Queries. To test a new query, a DNC engineer could use the query on a "synthetic" data set—mock-up data

generated for the purpose of testing new software—or a small set of real data. For example, the DNC might test a Tableau query by applying the software to a set of information from a specific state or in a specific age range. Thus, the testing clusters housed sensitive, proprietary pieces of software under development. As described above, the DNC derives significant value from its proprietary software by virtue of its secrecy: if made public, it would reveal critical insights into the DNC's political, financial, and voter engagement strategies and services, many of which are used or intended for use in interstate commerce.

190.    The DNC protected all of the data and code in its AWS servers by, among other things, restricting access to authorized users. To gain access to the AWS servers themselves, an authorized user had to take multiple steps. First, the authorized user would have to log onto a Virtual Private Network (VPN) using a unique username and password. Second, once the user entered a valid and password, the system would send a unique six-digit code (PIN) to the authorized user's phone, and the user would have 30 seconds to type it into the computer system. This two-step process is commonly known as "two-factor authentication."

191.    Authorized users would also employ a two-factor authentication system to access Tableau visualizations. First, they would log into a Google account with a unique username and password, and then they would enter a pin sent to their cell phones.

192.    Finally, the DNC's AWS servers were protected with firewalls and cybersecurity best practices, including: (a) limiting the IP addresses and ports with which users could access servers; (b) auditing user account activities; and (c) monitoring authentication and access attempts.

193.    On September 20, 2016, CrowdStrike's monitoring service discovered that unauthorized users had breached DNC AWS servers that contained testing clusters. Further forensic analysis showed that the unauthorized users had stolen the contents of these DNC AWS

servers by taking snapshots of the virtual servers, and had moved those replicas to other AWS accounts they controlled. The GRU stole multiple snapshots of these servers between September 5, 2016 and September 22, 2016. The U.S. later concluded that this cyberattack had been executed by the GRU as part of its broader campaign to damage to the Democratic party. The GRU could have derived significant economic value from the theft of the DNC's data by, among other possibilities, selling the data to the highest bidder.

194.    The software would also be usable as executable code by DNC opponents, who could attempt to re-create DNC data visualizations or derive DNC strategy decisions by analyzing the tools the DNC uses to analyze its data.

**P.    Russia Continues Disseminating Stolen Documents**

195.    Though October 2016, GRU Operatives using the screenname Guccifer 2.0 "release[d] documents through WordPress that they had stolen from [a Democratic organization] and [the] DNC."[163] For example, on October 18, 2016, the GRU Operatives posted screenshots on WordPress of previously-unreleased documents stolen from the DNC.[164]

**Q.    Trump Publicly Praises The Illegal Dissemination Of The Stolen DNC Data**

196.    Trump repeatedly lauded the disclosure of the data stolen by the Russians, and encouraged the media and voters to pay more attention to the leaks.

197.    On July 24, 2016, Trump tweeted, "The Democrats are in a total meltdown but the biased media will say how great they are doing! E-mails say the rigged system is alive & well!"[165]

198.    On July 24, 2016, Trump tweeted, "If the Republican Convention had blown up with e-mails, resignation of boss and the beat down of a big player. (Bernie), media would go wild[.]"[166]

199.    On July 25, 2016, Trump tweeted, "The new joke in town is that Russia leaked the disastrous DNC e-mails, which should never have been written (stupid), because Putin likes me."[167]

200.    On October 12, 2016, Trump tweeted, "Very little pick-up by the dishonest media of incredible information provided by WikiLeaks. So dishonest! Rigged system!"[168]

201.    Similarly, on October 3, 2016, Trump Jr. tweeted, "For those who have the time to read about all the corruption and hypocrisy all the @wikileaks emails are right here: wlsearch.tk."[169] The link in the October 3, 2016 tweet was provided to Trump Jr. by WikiLeaks via a private tweet to Trump, Jr.'s Twitter account.[170]

202.    At his rallies, Trump repeatedly discussed the disclosure of documents on WikiLeaks, enthusiastically directing attention to those stolen documents, as the accounts below reflect:

(a)    October 10, 2016: Trump said, "I love WikiLeaks . . ."[171]

(b)    October 31: 2016: Trump said that "WikiLeaks is like a treasure trove," and "Did you see where, on Wikileaks, it was announced that they were paying protestors to be violent, $1,500."[172]

(c)    November 2, 2016: Trump said, "WikiLeaks just came out with a new one," and "[I]t's just been shown [by Wikileaks] that [it's] a rigged system with more collusion, possibly illegal, between the Department of Justice, the Clinton campaign[,] and the State Department."[173]

(d)    November 4, 2016: Trump said, "Boy, I love reading those WikiLeaks."[174]

(e)    November 6, 2016: Trump cited Wikileaks while claiming that "Clinton was sending highly classified information through her maid."[175]

(f)    November 7, 2016: Trump said, "They got it all down folks, WikiLeaks. WikiLeaks." [176]

203.    Finally, on November 6, 2016—just two days before the election, and at a critical time for undecided voters—WikiLeaks released additional hacked DNC emails, which it dubbed

"DNC Leak 2."[177] The emails included, among other things, internal discussions regarding DNC strategy and communications efforts.[178]

### R.     Trump—And Russia—Win

204.     On November 9, 2016, Trump won the election to become President of the United States.

205.     In Moscow, the reaction was jubilation. When the news of Trump's victory broke in the Duma (Russia's parliament), legislators burst into applause, and the announcement by Vyacheslav Nikonov, a member of the Foreign Affairs Committee, was almost drowned out by clapping and cheering.[179] Nikonov stated: "Three minutes ago, Hillary Clinton acknowledged her defeat in the US presidential elections and just seconds ago, Trump began his speech as president-elect. I congratulate you all on this."[180]

## VII.   THE DEFENDANTS' CRIMINAL CONSPIRACY CONTINUED AFTER THE 2016 ELECTION

206.     After Trump won the 2016 election, the Defendants recognized that Trump's grip on political power was tenuous: If the American public discovered the illegal coordination between Russia and the Trump Campaign, Trump would have trouble accomplishing his political objectives. The Defendants therefore dedicated their criminal enterprise to concealing their collusion, sometimes through false and rancorous public statements, and other times through criminal obstruction of justice and witness tampering. As the Defendants wove their coverup story, they remained in close contact, ready to help one another when necessary.

207.     On November 9, 2016, the same day Trump won the 2016 election, WikiLeaks sent a private message to Stone on Twitter: "Happy? We are now more free to communicate."[181]

208.     On November 11, 2016, Trump Campaign spokesperson Hope Hicks provided the Associated Press with a statement denying that the Trump Campaign had any communications

with any "foreign entity" during the campaign: "Never happened. There was no communication between the campaign and any foreign entity during the campaign."[182]

209.    Similarly, on December 18, 2016, Trump Campaign manager Kellyanne Conway was asked whether anyone involved in the Trump Campaign had "any contact with Russians trying to meddle with the election?" Conway responded: "Absolutely not. And I discussed that with the president-elect just last night. Those conversations never happened. I hear people saying it like it's a fact on television. That is just not only inaccurate and false, but it's dangerous."[183]

210.    During this time, Emin Agalarov and Trump Jr. remained in close contact. In a February 2017 Forbes interview, Emin stated "we are in contact with both [Eric Trump and Trump Jr.]." Indeed, their relationship is so close that, when asked when was the last time he spoke with Trump Jr., Emin replied: "[a]s soon as Mr. Trump got elected, we sent congratulation letters, to which they replied, and we exchanged texts. So basically a couple of weeks ago, a month ago."[184]

211.    Despite the Trump Campaign's protestations of innocence, several investigations threatened to expose the Defendants' criminal scheme to secure Trump's grip on political power through illegal means. On January 13, 2017, the Senate Select Committee on Intelligence ("Senate Intelligence Committee") announced that it would investigate Russian attempts to interfere in the 2016 election, and on January 25, 2017, the House Permanent Select Committee on Intelligence ("House Intelligence Committee") announced that it would conduct a similar probe. On March 20, 2017, then-FBI Director James Comey confirmed publicly that the FBI was investigating possible collusion between the Russian government and the Trump campaign during the 2016 elections. And on May 17, 2017, Deputy Attorney General Rod Rosenstein, acting as Attorney General, appointed Robert Mueller III ("Mueller") to serve as Special Counsel for the Department of Justice, with the authority to investigate whether Russia meddled in the 2016 U.S. presidential

elections, and whether the Trump Campaign was involved in that meddling.[185] Mueller empaneled a grand jury by August 3, 2017.[186] The Defendants and their coconspirators have worked to thwart and discredit these investigations at every turn.

212.    Soon after Mueller's appointment in 2017, Russia worked to neutralize the threat his investigation posed to Trump. Reports prepared for the Senate Intelligence Committee revealed that, through multiple fake accounts on Facebook, Twitter, and other social media platforms, Russian operatives worked to paint Mueller as corrupt and to discredit allegations of Russian interference in the 2016 election as conspiracy theories. As the *Washington Post* put it, "[h]aving worked to help get Trump into the White House, [Russia] now worked to neutralize the biggest threat to his staying there."[187] A recently unsealed federal criminal complaint from the Eastern District of Virginia provides further evidence that in 2018 Russian operatives engaged in a concerted effort to use social media to portray the Special Counsel as a "puppet of the establishment," and "a politician with proven connections to the Democratic party" who is incapable of producing "honest and open results."[188]

213.    The Trump Associates have also worked to undermine government investigations, in part by hiding information from government officials. On January 18, 2017, Kushner submitted his SF-86 security clearance form, which required him to disclose close and/or continuing contact with foreign nationals and any contact with a representative of a foreign government. Among other omissions, Kushner failed to note that he met with Veselnitskaya and other Russian government representatives at the Trump Tower meeting.[189]

214.    In 2017, Stone repeatedly denied having contact with any Russians during the 2016 campaign, testifying before the House Intelligence Committee that he "never had any communications with any Russians or individuals fronting for Russians[] in connection with the

2016 presidential election,"[190] and telling the *Washington Post* that he "didn't talk to anybody who was identifiably Russian during the two-year run-up to this campaign."[191]

215.    Stone and Corsi also lied about their communications with WikiLeaks and Assange. Stone told the House Intelligence Committee that his backchannel to Assange was Credico, rather than Corsi.[192] To maintain that story, Corsi deleted all of his email correspondence that predated October 11, 2016, including an email chain in which: (a) Stone instructed Corsi to get in touch with Assange and WikiLeaks to discuss documents stolen from Democratic targets that had not yet been released to the public; and (b) Corsi followed Stone's instruction.[193] Corsi deleted these incriminating emails between January 13, 2017 (the date that the House Intelligence Committee announced its investigation) and March 1, 2017.[194] Around the same time, Stone visited the Ecuadorian Embassy in London where Assange is living.[195]

216.    Trump Jr. similarly sought to cover up his communications with the other Defendants. In March 2017, Trump, Jr. falsely stated: *"*Did I meet with people that were Russian? I'm sure, I'm sure I did. But none that were set up. None that I can think of at the moment. And certainly none that I was representing the campaign in any way, shape or form."[196]

217.    On July 8, 2017, Trump, Jr. released a highly misleading statement about the June 2016 Trump Tower meeting that was reportedly crafted by his father: "It was a short introductory meeting. I asked Jared [Kushner] and Paul [Manafort] to stop by. We primarily discussed a program about the adoption of Russian children that was active and popular with American families years ago and was since ended by the Russian government, but it was not a campaign issue at the time and there was no follow up…"[197]

218.    On July 9, 2017, Trump, Jr. made further misleading remarks about the Trump Tower meeting: "The woman stated that she had information that individuals connected to Russia

were funding the Democratic National Committee and supporting Mrs. Clinton. Her statements were vague, ambiguous and made no sense. No details or supporting information was provided or even offered. It quickly became clear that she had no meaningful information. She then changed subjects and began discussing the adoption of Russian children and mentioned the Magnitsky Act. It became clear to me that this was the true agenda all along and that the claims of potentially helpful information were a pretext for the meeting."[198]

219.    On July 24, 2017, Kushner provided a written statement to Congress claiming that he did not know what the Trump Tower meeting was going to be about. The House Intelligence Committee Majority's report, however, concluded that Kushner, Trump Jr., and Manafort attended the meeting "where they expected to receive . . . derogatory information on candidate Clinton from Russian sources." In addition, before the Trump Tower meeting, Trump Jr. forwarded to Kushner his emails with Goldstone with the subject line: "Russia – Clinton – private and confidential."[199] Finally, Trump's attorney, Rudy Giuliani, has stated that Kushner, Trump Jr., Manafort, Gates, and Cohen conducted a preparatory meeting on June 7, 2016 before the Trump Tower meeting on June 9, 2016. Kushner therefore knew what was on the agenda for June 9.[200]

220.    In his written statement to Congress, Kushner also denied attempting to create a "secret backchannel" with the Russian government during a meeting with Russian ambassador Sergey Kislyak.[201] Kislyak, however, told his superiors that Kushner had proposed setting up a secret communications channel between the Trump transition team and Moscow, using Russian diplomatic facilities that would bypass U.S. intelligence agencies.[202]

221.    Like Russia, Assange and WikiLeaks also worked to undermine the Special Counsel's investigation. On July 29, 2017, for instance, WikiLeaks tweeted: "Will Special Prosecutor Robert Mueller Fabricate The Results Of His Investigation Like He Did With Iraq?"[203]

222.    On September 7, 2017, Trump Jr. testified before the Senate Judiciary Committee that no attendee of the Trump Tower meeting requested additional meetings or communications with members of the Trump Campaign, but this testimony was flatly contradicted by subsequently-released emails in which Goldstone, on behalf of Aras Agalarov, sought a second meeting between Veselnitskaya and the Trump transition team shortly after the election.[204]

223.    On October 5, 2017, Papadopoulos pleaded guilty to lying to the FBI about his contacts with Mifsud and other Russian agents during a January 27, 2017 interview. Papadopoulos also admitted that, on February 17, 2017, he deleted his Facebook account and scrubbed other social media accounts, and on February 23, 2017 he changed his cell phone number in an attempt to hide those contacts.[205]

224.    On September 25, 2017, Stone repeatedly lied during his testimony to the House Intelligence Committee. As new reports have emerged undermining his testimony, Stone has amended his testimony three separate times regarding his contacts with Russian nationals, the extent of his interactions with WikiLeaks, and his conversations with Trump Campaign officials.[206] As one Committee member noted, "Stone misled us and has repeatedly—three times now—amended his testimony to fit new press reporting."[207]

225.    For instance, in his House Intelligence Committee testimony, Stone denied that he ever "had any communications with any Russians or individuals fronting for Russians, in connection with the 2016 presidential election," but later acknowledged that he met with a Russian national in May 2016 to obtain dirt on Secretary Clinton.[208] Stone also told the Committee he spoke to Assange only through Credico, despite the fact that: (a) he communicated with Assange through Corsi; and (b) he exchanged Twitter direct messages with WikiLeaks in 2016, when Assange was the only user of the WikiLeaks Twitter handle.

226.     After Stone told the House Intelligence Committee that he used Credico as his intermediary, the Committee subpoenaed Credico.[209] Fearing Credico would undermine his narrative, on November 30, 2017, Stone asked Corsi to write publicly about Credico, presumably to discredit or influence his testimony. Corsi responded: "Are you sure you want to make something out of this now? Why not wait to see what [Credico] does? You may be defending yourself too much – raising new questions that will fuel new inquiries. This may be a time to say less, not more." Stone responded by telling Corsi that Credico "will take the 5th—but let's hold a day." Credico stated that, around the time Stone was interviewed by the House Intelligence Committee, Stone told him to "just go along with" Stone's story.[210] Credico later asserted his Fifth Amendment rights and declined to talk to the Committee.[211]

227.     On November 20, 2017, in written responses to Senate Judiciary Committee questions, Veselnitskaya denied she was working with or connected to Russia's Prosecutor General, Yuri Chaika.[212] She has also repeatedly stated that any suggestion she was acting at the Kremlin's behest at the Trump Tower meeting is anti-Russia "hysteria."[213] But in fact Veselnitskaya had extensive contacts with Chaika in the months before the Trump Tower meeting and also engaged in other coordinated activities with the Russian government, indicating that her actions "were coordinated from the very top."[214] Moreover, a recent indictment detailed her extensive work with a senior Russian prosecutor to obstruct a federal investigation in 2014-2015.[215]

228.     In early 2018, Credico began to dispute Stone's claim that he was an intermediary between Stone and WikiLeaks. In response, Stone sent Credico a barrage of communications, including an offer to help pay Credico's legal expenses, in an attempt to convince Credico to stick to Stone's narrative. "He wanted me to be quiet. He wanted me to go along with his narrative,"

Credico contends.[216] When Credico nevertheless threatened to dispute Stone's narrative, Stone told Credico: "I am so ready. Let's get it on. Prepare to die cock sucker."[217]

229.    Stone also engaged in a vigorous effort to secure a pardon for Assange. As part of this effort, Stone worked with Andrew Napolitano, a Fox News personality, on a plan for Napolitano to float the pardon idea on his Fox News show or directly to Trump.[218] On January 6, 2018, Stone sent a text message to Credico, telling him he is "working with others to get JA [Julian Assange] a blanket pardon. . . . It's very real and very possible."[219] In August 2018, Stone again raised the notion of pardoning Assange in an interview with the *Washington Examiner*.[220]

230.    On September 6, 2018, Corsi lied to the Special Counsel's office and FBI special agents, falsely telling them he declined Stone's request to contact WikiLeaks, and that he never provided Stone with any information regarding WikiLeaks, what materials WikiLeaks possessed, or what WikiLeaks intended to do with those materials.[221]

231.    Just over a week later, on September 14, 2018, Manafort falsely told Mueller that he would cooperate with the Special Counsel's investigation. While pretending to tell Mueller everything he knew about Russian meddling in the 2016 election, Manafort in fact used the meetings with Mueller's team to funnel information about the investigation to Trump[222] and to present false information to mislead the Special Counsel.[223] On November 26, 2018, Mueller submitted a status report to the United States District Court for the District of Columbia, explaining that Manafort breached his plea agreement by "lying to the Federal Bureau of Investigation and the Special Counsel's Office on a variety of subject matters."[224] Subsequent filings clarified that Manafort lied about his repeated interactions with Konstantin Kilimnik, which continued through at least April 2018.[225] Most notably, Manafort lied about sharing polling data with Kilimnik related to Trump's 2016 campaign.[226] Manafort also said that he did not have any communications with

officials in the Trump administration, when in fact he communicated with Administration officials until May 26, 2018, if not later.[227]

## VIII.   RUSSIA'S CONTINUED HACKING ATTEMPTS

### A.   Russia Attempts To Hack The Computer Networks Of Three Midterm Candidates

232.    In August 2017, Russia attempted to hack into the Senate computer network of Democratic Senator Claire McCaskill—a longtime critic of Trump, Russia, and WikiLeaks—and the networks of two other midterm candidates.[228]

233.    The GRU hackers targeting Senator McCaskill sent forged notification emails to Senate staff members, claiming the staff member's Microsoft Exchange password had expired, and instructing them to change it. If the staff member clicked on the link, he or she was taken to a convincing replica of the U.S. Senate's Active Directory Federation Services (ADFS) login page, a single sign-on point for e-mail and other services. Each Senate phishing email had a different link coded with the recipient's email address. That allowed the fake password-change webpage to display the user's email address when they arrived, making the site appear even more convincing.[229]

### B.   U.S. Authorities Make Clear That Russia Continues To Pose A Hacking Threat

234.    In August 2018, senior U.S. national security and intelligence officials announced that Russia was continuing its illicit interference in domestic politics, including through social media disinformation campaigns and attempts to hack political targets and infiltrate the country's electoral infrastructure. Director of National Intelligence Dan Coats characterized the threat of continued Russian interference as "real" and "continuing," and FBI Director Chris Wray added that "[t]his threat is not going away."[230]

### C.   WikiLeaks Releases Amazon Document Compromising Security Of AWS Servers

235.   On October 11, 2018, WikiLeaks released a proprietary AWS document showing the locations and some operational details of AWS servers around the world.[231] This was one of WikiLeaks' only releases since Assange and WikiLeaks' activities were constrained in the wake of the 2016 election. Analysts noted that the leaked AWS information would be incredibly valuable for those trying to compromise AWS servers like the ones that house the DNC's documents and data—*i.e.*, Russia.[232]

### D.   A Source Consistent With Cozy Bear Attempts To Hack The DNC's Computer System

236.   On November 14, 2018, dozens of DNC email addresses were targeted in a spear-phishing campaign, although there is no evidence that the attack was successful. The content of these emails and their timestamps were consistent with a spear-phishing campaign that leading cybersecurity experts have tied to Cozy Bear (APT 29). Therefore, it is probable that Cozy Bear again attempted to unlawfully infiltrate DNC computers in November 2018.

## IX.   TRUMP CONTINUES TO SIDE WITH RUSSIA AND DENIGRATE GOVERNMENT INVESTIGATORS

237.   Even Trump—an integral member of the Trump Campaign—has continually cast doubt on Mueller's investigation. On the plane ride home from an in-person meeting with Putin in July 2017—where Trump and Putin had "a very robust and lengthy exchange" on the subject of election hacking—Trump called a *New York Times* reporter and argued that Russia had been falsely accused of election interference.[233]

238.   On July 16, 2018, Trump and Putin met for two hours in Helsinki, Finland, and subsequently held a joint press conference. During the press conference, Trump sided with Putin by stating that the Russian government did not intervene in the 2016 presidential election, referring

to Putin's "strong and powerful denial" of interference. Trump's statements came just three days after the indictment of the GRU Operatives and contradicted the findings of the U.S. intelligence community. In response, Russian Foreign Minister Sergei Lavrov described the meeting as "better than super."[234]

239.    Among a torrent of tweets denigrating Mueller and casting doubt on his investigation, on September 16, 2018, Trump tweeted: "The illegal Mueller Witch Hunt continues in search of a crime. There was never Collusion with Russia, except by the Clinton campaign, so the 17 Angry Democrats are looking at anything they can find. Very unfair and BAD for the country. ALSO, not allowed under the LAW!"[235]

240.    On November 27, 2018, Trump tweeted: "The Fake News Media Builds Bob Mueller Up As A Saint, When In Actuality He Is The Exact Opposite. He Is Doing TREMENDOUS Damage To Our Criminal Justice System, Where He Is Only Looking At One Side And Not The Other."[236]

241.    Trump has also lauded those who have refused to cooperate with Mueller's investigation. For instance, on August 22, 2018, Trump tweeted: "I Feel Very Badly For Paul Manafort And His Wonderful Family. 'Justice' Took A 12 Year Old Tax Case, Among Other Things, Applied Tremendous Pressure On Him And, Unlike Michael Cohen, He Refused To 'Break' - Make Up Stories In Order To Get A 'Deal.' Such Respect For A Brave Man!"[237]

242.    Similarly, on December 3, 2018, Trump tweeted: "'I will never testify against Trump.' This statement was recently made by Roger Stone, essentially stating that he will not be forced by a rogue and out of control prosecutor to make up lies and stories about 'President Trump.' Nice to know that some people still have 'guts!'"[238]

243.    Meanwhile, Trump has continued to help Russia achieve its goals by adopting policies that inure to Russia's benefit. For example, over the last few years, Trump has threatened to withdraw the U.S. from NATO on multiple occasions, which would be advantageous to Putin;[239] and on December 19, 2018, Trump ordered the withdrawal of U.S. forces from Syria, a policy decision that favors Russian interests and which Putin has praised.[240]

## X.    THE SIGNIFICANT HARM INFLICTED UPON PLAINTIFF

244.    The illegal conspiracy inflicted profound damage upon the DNC. The timing and selective release of the stolen materials prevented the DNC from communicating with the American electorate on its own terms. These selective releases of stolen material reached a peak immediately before the Democratic National Convention and continued through the general election.

245.    The timing and selective release of stolen materials was designed to and had the effect of driving a wedge between the DNC and Democratic voters. The release of stolen materials also impaired the DNC's ability to support Democratic candidates in the general election.

246.    The public release of stolen DNC materials was enormously disruptive to the Democratic National Convention, undermining the party's ability to achieve unity and rally members around their shared values. The release cast a cloud over the convention's activities, interfering with the party's opportunity to communicate its vision to the electorate.

247.    The release of this stolen material upended the DNC's ability to communicate effectively among staff and with members of the party and broader community. It also exposed the DNC's staff to constant threats by telephone and email, which were unavoidable because staff could not change their contact information with the Convention underway.

248.    The DNC also suffered significant interruption and disruption of its political and fundraising activities throughout the United States during the critical final months of the

presidential campaign. Specifically, the release of personal, and sometimes embarrassing, information about DNC donors was intended to harm the DNC, including by chilling potential donors, which resulted. The release of stolen Democratic materials had precisely this effect, resulting in a substantial loss of income to the DNC and a reduction in the overall amounts of funds that the DNC could expend to support Democratic candidates nationwide.

249.    In addition, because the public releases included personal and in some cases protected information about DNC employees, it exposed employees of the DNC to intense, frightening, and sometimes life-threatening harassment. Understandably, this harassment impaired the employees' ability to function effectively in their jobs.

250.    On July 22, 2016—the same day as the first WikiLeaks release of stolen DNC emails—a DNC employee received a voicemail from an unknown caller stating that the employee should be "executed" and that he hoped the employee would be "put in jail, put on trial, and executed for being [a] traitor."

251.    On July 23, 2016, multiple DNC employees received an email stating: "I hope all your children get raped and murdered. I hope your family knows nothing but suffering, torture and death."

252.    On July 24, 2016, an employee received a voicemail stating "you got a target on your back, better keep looking over your shoulder, [expletive]. . . .You [expletives]. Die, Die, Die, Die. I hate you [expletive] guts, you [expletive]. You've got an arrow on your back. And you know what? Snipers are going to get you. You [expletives]."

253.    Another received a profanity-laden voicemail warning him that "We're coming for you." These threats as well as others all began after July 22, when WikiLeaks released the over

20,000 stolen DNC emails which contained the names, e-mail addresses, and phone numbers of the DNC employees.

254.    In addition, Defendants' conduct caused enormous damage to the DNC's computer systems, creating the need to: (a) repair and replace all of the DNC's computer hardware and software, telephone and telephone systems, and back-up systems due to damage from the illegal hacking and related release of such information; (b) pay staff and consultants to investigate the hacks described above; and (c) retain staff and consultants to remediate the damage caused by the hacking's impact. The DNC bore the cost of all of these activities, including purchasing new computer hardware and equipment, paying for an ongoing hacking-monitoring services subscription (capable of detecting Cozy Bear, Fancy Bear, and similar intruders).

255.    Additionally, during the September 2016 breach of the DNC's servers, the GRU stole proprietary information concerning the ways in which the DNC analyzed its data, developed its strategies and approached decisions in its efforts to win the 2016 election.

256.    The GRU also stole proprietary computer code that DNC computer engineers spent many hours developing. The DNC derived significant economic value from keeping that computer code secret until it was taken by Russian agents.

## CAUSES OF ACTION

## COUNT I

## COMPUTER FRAUD AND ABUSE ACT (18 U.S.C. § 1030(A)) (AGAINST RUSSIA)

257.    Plaintiff realleges and incorporates by reference all prior paragraphs of this Complaint and paragraphs in the counts below as though set forth fully herein.

258.    The DNC's computers are involved in interstate and foreign commerce and communication, and are protected computers under 18 U.S.C. § 1030(e)(2).

259.    On information and belief, Russia knowingly and intentionally accessed the DNC's computers without authorization or in excess of authorization, and thereby obtained and used valuable information from those computers in violation of 18 U.S.C. § 1030(a)(2)(C). Such information included, but was not limited to: private, politically sensitive communications between the DNC and Democratic stakeholders and candidates; confidential donor data; digital information; DNC-developed code; confidential campaign strategy plans; opposition and policy research; and documents regarding planned political events, including fundraisers and rallies. The information was used to advance the plan to denigrate the Democratic presidential nominee and the Democratic party (discussed herein) and bolster Trump's candidacy by strategically releasing the confidential, proprietary information to the public online, including on WikiLeaks.

260.    Upon information and belief, Russia knowingly caused the transmission of information or a program, code, or command, and as a result of such conduct, intentionally caused damage without authorization, to a protected computer, in violation of 18 U.S.C. § 1030(a)(5)(A). Such transmission included, but was not limited to, the use of malware on DNC systems.

261.    Upon information and belief, Russia intentionally accessed a protected computer or computers without authorization, and as a result of such conduct, caused damage and loss, in violation of 18 U.S.C. § 1030(a)(5)(C), or recklessly caused damage, in violation of 18 U.S.C. § 1030(a)(5)(B).

262.    Upon information and belief, Russia knowingly and with the intent to defraud, trafficked passwords and similar information from the DNC systems, and such trafficking affected interstate or foreign commerce in violation of 18 U.S.C. § 1030(a)(6)(A).

263.    Russia caused loss to one or more persons during a one-year period aggregating well over $5,000 in value, and they also caused damage affecting ten or more protected computers during a one-year period.

264.    The DNC suffered damage and loss as a consequence of Russia's actions, including but not limited to the cost of investigating and responding to the unauthorized access and abuse of their computer networks, conducting damage assessments, restoring and replacing computers and data, programs, systems, or information, the loss of the value of the DNC's trade secrets, and the harm to the DNC's business as described above. The DNC seeks compensatory and other equitable relief under 18 U.S.C. § 1030(g).

## COUNT II

### RICO (18 U.S.C. § 1962(C))
### (AGAINST ALL DEFENDANTS)

265.    Plaintiff realleges and incorporates by reference all prior paragraphs of this Complaint and paragraphs in the counts below as though set forth fully herein.

266.    Defendants are all "persons" within the meaning of 18 U.S.C. § 1961(3). At all relevant times, Defendants conducted the affairs of an Enterprise—which affected interstate and foreign commerce—through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c).

**A.    The Trump Campaign Was The Racketeering Enterprise**

267.    The Trump Campaign was a Racketeering Enterprise, as that term is used in 18 U.S.C. § 1961(4). The Enterprise was formed by June 2015.

268.    The Trump Campaign had an ongoing organizational framework for carrying out its objectives.

269.    As described above, each Defendant—except the Trump Campaign itself—participated in the operation or management of the Trump Campaign.

67

270.    Because the Trump Campaign expended millions of dollars on the 2016 presidential race, it affected interstate and foreign commerce.

271.    Each Defendant—except the Trump Campaign itself—conducted and/or participated in the affairs of the Trump Campaign through a pattern of racketeering activity, including acts indictable under 18 U.S.C. § 1831 (economic espionage); and 18 U.S.C. § 1832 (theft of trade secrets).

## B.    Alternatively, And At The Very Least, The Trump Campaign Was Part Of An Association-In-Fact Enterprise

272.    Alternatively, and at the very least, the Trump Campaign was part of an Association-In-Fact Enterprise comprising Russia, WikiLeaks, Assange, the Trump Campaign, Aras and Emin Agalarov, Mifsud, the Trump Associates, Corsi, the Defendants' employees and agents, and additional entities and individuals known and unknown. The Association-In-Fact Enterprise was formed by March 2016 or, at the very least, by June 2016. From the date the Enterprise was formed until the present, the members of the Association-In-Fact Enterprise have worked together to further their mutual goal of using illegal means to secure Trump's grip on the Presidency, in part by damaging the DNC.

273.    The Association-In-Fact Enterprise had an ongoing organizational framework for carrying out its objectives. In fact, the Association-In-Fact Enterprise could not have carried out its intricate task of sharing confidential information at the moments when it would be most beneficial to the Trump Campaign unless it had some structure for making and communicating group decisions.

274.    As described above, each Defendant participated in the operation or management of the Association-In-Fact Enterprise, and benefitted financially from the enterprise.

275.    Because the Association-In-Fact Enterprise's activities affected electoral spending in 2016, as well as the media response to the 2016 presidential race, it affected interstate and foreign commerce.

C.    **RICO Predicate Acts**

276.    Each Defendant conducted and/or participated in the affairs of the Trump Campaign and the Association-In-Fact Enterprise through a pattern of racketeering activity, including acts indictable under 18 U.S.C. § 1831 (economic espionage); 18 U.S.C. § 1832 (theft of trade secrets); 18 U.S.C. § 1503 (relating to obstruction of justice); and 18 U.S.C. § 1512 (relating to tampering with a witness, victim, or an informant).

a.   **Economic Espionage**

277.    Beginning on or before April 18, 2016, Russia repeatedly attempted—in many instances successfully—to steal, and without authorization appropriate, take, carry away, or by fraud, artifice, or deception obtain trade secrets from the DNC, intending or knowing that doing so would benefit Russia, Russian instrumentalities, or Russian agents, in violation of 18 U.S.C. § 1831(a)(1) and (a)(4).

278.    Beginning on or before April 22, 2016, Russia, without authorization, copied, duplicated, downloaded, uploaded, altered, destroyed, replicated, transmitted, delivered, sent, communicated, and/or conveyed Plaintiff's trade secrets, intending or knowing that doing so would benefit the Russian government, Russian instrumentalities or Russian agents, in violation of 18 U.S.C. § 1831(a)(2).

279.    Beginning on or before April 22, 2016, Russia received, bought, or possessed DNC trade secrets, knowing the same to have been stolen or appropriated, obtained, or converted without authorization, and intending or knowing that doing so would benefit the Russian Government, Russian instrumentalities, or Russian agents, in violation of 18 U.S.C. § 1831(a)(3).

280.   Beginning on or before July 22, 2016, WikiLeaks and Assange, without authorization, copied, duplicated, downloaded, uploaded, altered, destroyed, replicated, transmitted, delivered, sent, communicated, or conveyed Plaintiff's trade secrets intending or knowing that doing so would benefit the Russian government, Russian instrumentalities, or Russian agents, in violation of 18 U.S.C. § 1831(a)(2).

281.   Beginning on or before July 22, 2016, and continuing daily thereafter through November 2016, WikiLeaks and Assange received, bought, or possessed Plaintiff's trade secrets, knowing them to have been stolen or appropriated, obtained, or converted without authorization, and intending or knowing that doing so would benefit the Russian government, Russian instrumentalities, or Russian agents, in violation of 18 U.S.C. § 1831(a)(3).

282.   Beginning on or before March 2016, WikiLeaks, Assange, Manafort, Papadopoulos, Mifsud, the Trump Campaign, and Russia conspired with each other to commit the offenses described in paragraphs 277-281, intending or knowing that those offenses would benefit the Russian government, Russian instrumentalities, or Russian agents, in violation of 18 U.S.C. § 1831(a)(5).

283.   Beginning on or before June 2016, Kushner, Aras Agalarov, Emin Agalarov, Trump, Jr., Stone, and Gates conspired with WikiLeaks, Assange, Manafort, Papadopoulos, Mifsud, the Trump Campaign, Russia, and Corsi to commit the offenses described in paragraphs 277-281, intending or knowing that those offenses would benefit the Russian government, Russian instrumentalities, or Russian agents, in violation of 18 U.S.C. § 1831(a)(5).

### b.  Theft of Trade Secrets

284.   Beginning on or before April 18, 2016, Russia repeatedly attempted—in many instances successfully—to steal, and without authorization appropriate, take, carry away, or by fraud, artifice, or deception obtain trade secrets from the DNC, with the intent to convert those

trade secrets, which are and were related to products or services used in or intended for use in interstate commerce, to the economic benefit of itself and the other Defendants and non-defendant coconspirators, and intending and knowing that the offense would injure the DNC, in violation of 18 U.S.C. § 1832(a)(1) and (a)(4).

285.    Beginning on or before April 22, 2016, Russia, without authorization, copied, duplicated, downloaded, uploaded, altered, destroyed, replicated, transmitted, delivered, sent, communicated, and/or conveyed trade secrets from the DNC, with the intent to convert those trade secrets, which are and were related to products or services used in or intended for use in interstate commerce, to the economic benefit of itself and the other Defendants and non-defendant coconspirators, and intending and knowing that the offense would injure the DNC, in violation of 18 U.S.C. § 1832(a)(2).

286.    Beginning on or before April 22, 2016, Russia received, bought, or possessed DNC trade secrets, with the intent to convert those trade secrets, which are and were related to products or services used in or intended for use in interstate commerce, knowing the same to have been stolen or appropriated, obtained, or converted without authorization, to the economic benefit of itself and the other Defendants and non-defendant coconspirators, and intending and knowing that the offense would injure the DNC, in violation of 18 U.S.C. § 1832(a)(3).

287.    Beginning on or before July 22, 2016, WikiLeaks and Assange, without authorization, copied, duplicated, downloaded, uploaded, altered, destroyed, replicated, transmitted, delivered, sent, communicated, or conveyed DNC trade secrets, with the intent to convert those trade secrets, which are and were related to products or services used in or intended for use in interstate commerce, to the economic benefit of themselves and the other Defendants

and non-defendant coconspirators, and intending and knowing that the offense would injure the DNC, in violation of 18 U.S.C. § 1832(a)(2).

288.    Beginning on or before July 22, 2016, and continuing daily thereafter, WikiLeaks and Assange, with the intent to convert trade secrets which are and were related to products or services used in or intended for use in interstate commerce, to the economic benefit of themselves and the other Defendants and non-defendant coconspirators, and intending and knowing that the offense would injure the DNC, received, bought, or possessed Plaintiff's trade secrets, knowing them to have been stolen or appropriated, obtained, or converted without authorization, in violation of 18 U.S.C. § 1832(a)(3).

289.    Beginning on or before March 2016, Papadopoulos, Mifsud, the Trump Campaign, and Russia, with the intent to convert trade secrets which are and were related to products or services used in or intended for use in interstate commerce, to the economic benefit of themselves and the other Defendants and non-defendant coconspirators, and intending and knowing that the offense would injure the DNC, conspired with each other to commit the offenses described in paragraphs 284-286, in violation of 18 U.S.C. § 1831(a)(5).

290.    Beginning on or before June 2016, WikiLeaks, Assange, Manafort, Kushner, Aras Agalarov, Emin Agalarov, Trump, Jr., Stone, Gates, and Corsi conspired with Papadopoulos, Mifsud, the Trump Campaign, Russia, and the GRU other to commit the offenses described in paragraphs 284-288, with the intent to convert trade secrets which are and were related to products or services used in or intended for use in interstate commerce, to the economic benefit of themselves and the non-defendant coconspirators, and intending and knowing that the offense would injure the DNC, in violation of 18 U.S.C. § 1831(a)(5).

### c.   Obstruction of Justice

291.    As explained in detail above, the Defendants and non-defendant coconspirators repeatedly obstructed justice in violation of 18 U.S.C. § 1503, including on the dates set forth below.

292.    Beginning on or before January 27, 2017, Papadopoulos corruptly endeavored to obstruct and impede—and did obstruct and impede—the due administration of justice, in violation of 18 U.S.C. § 1503(a).

293.    Beginning on or before September 2017, Stone corruptly endeavored to obstruct and impede—and did obstruct and impede—the due administration of justice, in violation of 18 U.S.C. § 1503(a).

294.    Beginning on or before September 14, 2018, Manafort corruptly endeavored to obstruct and impede—and did obstruct and impede—the due administration of justice, in violation of 18 U.S.C. § 1503(a).

### d.   Witness Tampering

295.    As explained in detail above, the Defendants and non-defendant coconspirators repeatedly obstructed official proceedings in violation of 18 U.S.C. § 1512, including on the dates set forth below.

296.    Beginning on or before January 2017, Corsi corruptly altered, destroyed, mutilated, or concealed a record, document, or other object with the intent to impair the object's integrity or availability for use in an official proceeding, in violation of 18 U.S.C. § 1512(c)(1).

297.    Beginning on or before February 17, 2017, Papadopoulos corruptly altered, destroyed, mutilated, or concealed a record, document, or other object with the intent to impair the object's integrity or availability for use in an official proceeding, in violation of 18 U.S.C. § 1512(c)(1).

73

298.    Beginning on or before January 27, 2017, Papadopoulos corruptly obstructed or impeded an official proceeding, in violation of 18 U.S.C. § 1512(c)(2).

299.    Beginning on or before July 24, 2017, Kushner corruptly attempted to obstruct or impede an official proceeding, in violation of 18 U.S.C. § 1512(c)(2).

300.    Beginning on or before September 2017, Stone corruptly attempted to obstruct or impede an official proceeding, in violation of 18 U.S.C. § 1512(c)(2). In addition, beginning on or before 2018, Stone knowingly used intimidation, threats, and other corrupt methods to influence, delay, or prevent Credico's testimony in an official proceeding, in violation of 18 U.S.C. § 1512(b)(1).

301.    Beginning on or before September 7, 2017, Trump, Jr. corruptly attempted to obstruct or impede an official proceeding, in violation of 18 U.S.C. § 1512(c)(2).

302.    Beginning on or before September 14, 2017, Manafort corruptly attempted to obstruct or impede an official proceeding, in violation of 18 U.S.C. § 1512(c)(2).

303.    Beginning on or before January 2017, Corsi and Stone conspired to commit the offenses described in paragraphs 296 and 300, in violation of 18 U.S.C. § 1512(k).

**D.    RICO Damages**

304.    Plaintiff has been injured in its business and property by Defendants' violation of 18 U.S.C. § 1962(c). Defendants caused enormous harm to Plaintiff's business, as described above, and to Plaintiff's computers and servers. All of these injuries occurred within the United States.

**COUNT III**

**RICO CONSPIRACY (18 U.S.C. § 1962(D))**
**(AGAINST ALL DEFENDANTS)**

305.    Plaintiff realleges and incorporates by reference all prior paragraphs of this Complaint and paragraphs in the counts below as though set forth fully herein.

306.    Defendants conspired with each other to violate 18 U.S.C. § 1962(c). Defendants knowingly agreed, combined, and conspired to conduct the affairs of the Enterprise or the Association-In-Fact Enterprise through a cyber-espionage operation. Each Defendant agreed that the operation would involve repeated violations of 18 U.S.C. § 1831 (economic espionage); 18 U.S.C. § 1832 (theft of trade secrets); 18 U.S.C. § 1503 (relating to obstruction of justice); and 18 U.S.C. § 1512 (relating to tampering with a witness, victim, or an informant).

307.    Defendants' conspiracy to violate 18 U.S.C. § 1962(c) violated § 1962(d).

308.    Plaintiff has been injured in their business or property by Defendants' violation of 18 U.S.C. § 1962(d). Plaintiff has been injured in its business and property by Defendants' violation of 18 U.S.C. § 1962(c). Defendants caused enormous harm to Plaintiff's business, as described above, and to Plaintiff's computers and servers. All of these injuries occurred within the United States.

**COUNT IV**

**WIRETAP ACT (18 U.S.C. §§ 2510-22)**
**(AGAINST WIKILEAKS, ASSANGE, THE TRUMP CAMPAIGN, AND THE TRUMP ASSOCIATES)**

309.    Plaintiff realleges and incorporates by reference all prior paragraphs of this Complaint and paragraphs in the counts below as though set forth fully herein.

310.    Each of the above-listed defendants is a "person" within the meaning of 18 U.S.C. §§ 2510, 2511.

311.    In violation of 18 U.S.C. § 2511(1)(c), WikiLeaks and Assange willfully and intentionally endeavored to disclose and did disclose the contents of Plaintiff's wire, oral, or electronic communications, knowing or having reason to know that the information was obtained through the interception of wire, oral, or electronic communication in violation of 18 U.S.C. § 2511.

312.     In violation of 18 U.S.C. § 2511(1)(d), WikiLeaks, Assange, the Trump Associates, and the Trump Campaign willfully and intentionally endeavored to use and did use the contents of wire, oral, electronic communications, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of 18 U.S.C. § 2511.

313.     Plaintiff had a justifiable expectation that its wire, oral, or electronic communications were not subject to interception.

314.     Plaintiff is a "person" whose wire, oral, or electronic communications were intercepted within the meaning of 18 U.S.C. § 2520.

315.     As a direct result of WikiLeaks, Assange, the Trump Associates, and the Trump Campaign's actions, Plaintiff suffered irreparable harm to its business and property and is entitled to an award of the greater of the actual damages suffered or the statutory damages and injunctive relief pursuant to 18 U.S.C. § 2520(c). This harm includes, but is not limited to, harm to DNC computers and servers, harm to the DNC's reputation, loss in the value of DNC trade secrets and business information, and harm to business as described above.

316.     In light of the egregious nature of WikiLeaks, Assange, the Trump Associates, and the Trump Campaign's violations, Plaintiff is entitled to punitive damages and reasonable attorneys' fees and costs pursuant to 18 U.S.C. §§ 2520(b)(2) & (3).

## COUNT V

### STORED COMMUNICATIONS ACT (18 U.S.C. §§ 2701-12)
### (AGAINST RUSSIA)

317.     Plaintiff realleges and incorporates by reference all prior paragraphs of this Complaint and paragraphs in the counts below as though set forth fully herein.

318.     Plaintiff is a "person" within the meaning of 18 U.S.C. §§ 2510(6) and 2707(a).

319.     Russia willfully and intentionally accessed without authorization a facility through which an electronic communication service is provided, namely, the DNC's computer systems, including their email servers, thereby obtaining access to wire or electronic communications while they were in electronic storage in such systems, in violation of 18 U.S.C. § 2701(a).

320.     As a result of these willful and intentional violations, Plaintiff has suffered damages and, as provided for in 18 U.S.C. § 2707, seeks an award of the greater of the actual damages suffered or the statutory damages; punitive damages; attorneys' fees and other costs of this action; and appropriate equitable relief.

## COUNT VI

## DIGITAL MILLENNIUM COPYRIGHT ACT (17 U.S.C. § 1201 ET SEQ.) (AGAINST RUSSIA)

321.     Plaintiff realleges and incorporates by reference all prior paragraphs of this Complaint and paragraphs in the counts below as though set forth fully herein.

322.     Plaintiff's computer networks and files contained information subject to protection under the copyright laws of the United States, including campaign strategy documents and opposition research that Russia illegally accessed without authorization.

323.     Access to the copyrighted material contained on Plaintiff's computer networks and email was controlled by technological measures, including measures restricting remote access, firewalls, and measures restricting access to users with valid credentials and passwords.

324.     In violation of 17 U.S.C. § 1201(a), Russia circumvented these technological measures by stealing credentials from authorized users, conducting a "password dump" to unlawfully obtain passwords to the system controlling access to the DNC's domain, and installing malware on Plaintiff's computer systems.

325.   Russia's conduct caused Plaintiff significant damages. These damages include, but are not limited to, damage resulting from harm to DNC computers and servers, loss in the value of DNC trade secrets and business information, and harm to business as described above. Plaintiff is entitled to the greater of its actual damages or statutory damages as provided by 17 U.S.C. § 1203, in an amount to be proven at trial.

326.   Plaintiff is entitled to an award of attorneys' fees and costs as provided by 17 U.S.C. § 1203.

## COUNT VII

### MISAPPROPRIATION OF TRADE SECRETS UNDER THE DEFEND TRADE SECRETS ACT (18 U.S.C. § 1836 *ET SEQ.*) (AGAINST RUSSIA, WIKILEAKS, AND ASSANGE)

327.   Plaintiff realleges and incorporates by reference all prior paragraphs of this Complaint and paragraphs in the counts below as though set forth fully herein.

328.   The documents and computer code that Russia stole from the DNC's computer systems include trade secrets within the meaning of 18 U.S.C. § 1839.

329.   Specifically, the DNC is in the business of supporting Democratic political campaigns, and the stolen documents included Democratic donor information, digital information, DNC-developed code, opposition research, and strategic information regarding planned political activities that allow it to effectively carry out its mission.

330.   The DNC takes and has taken reasonable measures to keep such information secret. In particular, the DNC maintains and maintained their information on secured servers and uses two-factor authentication to ensure that only authorized users gain access to their data and computer code. In addition, the DNC uses firewalls and the cybersecurity best practices described above.

331.     Plaintiff's trade secrets were related to products or services used in, or intended for use in, interstate or foreign commerce.

332.     Russia misappropriated Plaintiff's trade secrets. Russia acquired Plaintiff's trade secrets knowing or having reason to know that the trade secrets were acquired by improper means. Russia, WikiLeaks, and Assange disclosed Plaintiff's trade secrets without consent, on multiple dates, discussed herein, knowing or having reason to know that the trade secrets were acquired by improper means. These misappropriations started before the effective date of the Defend Trade Secrets Act (May 11, 2016) and continued for months after the effective date.

333.     As a direct consequence of Defendants' misappropriation, Plaintiff has suffered damages for the cost of materials, loss of goodwill, and attorneys' fees and costs. Plaintiff is also entitled to punitive damages. These damages include, but are not limited to, damage resulting from harm to DNC computers and servers, loss in the value of DNC trade secrets and business information, and harm to business as described above.

334.     Plaintiff is also entitled to a preliminary and permanent injunction pursuant to 18 U.S.C. § 1836(b)(3).

## COUNT VIII

### WASHINGTON D.C. UNIFORM TRADE SECRETS ACT
### (D.C. CODE ANN. §§ 36-401 – 46-410)
### (AGAINST ALL DEFENDANTS)

335.     Plaintiff realleges and incorporates by reference all prior paragraphs of this Complaint and paragraphs in the counts below as though set forth fully herein.

336.     The District of Columbia expressly empowers a party to recover damages for misappropriation of a trade secret.

337.    The documents and computer code that Russia exfiltrated from the DNC's computer systems include trade secrets under District of Columbia law, as discussed above, and in keeping with the definition of trade secrets under District of Columbia law:

> information, including a formula, pattern, compilation, program, device, method, technique, or process, that: (A) Derives actual or potential independent economic value, from not being generally known to, and not being readily ascertainable by, proper means by another who can obtain economic value from its disclosure or use; and (B) Is the subject of reasonable efforts to maintain its secrecy.
>
> D.C. Code Ann. § 36-401(2).

338.    This information derived an actual independent economic value by remaining confidential and private, and not being readily ascertainable to others. Plaintiff takes and has taken reasonable measures to keep such information secret, as discussed *supra* in Count VII.

339.    Each Defendant disclosed, received, and used these misappropriated trade secrets without Plaintiff's consent, knowing or having reason to know that the trade secrets were acquired by improper means.

340.    As a direct consequence of Defendants' misappropriation, Plaintiff has suffered damages for actual loss and from Defendants' unjust enrichment. These damages include, but are not limited to, damage resulting from harm to DNC computers and servers, loss in the value of DNC trade secrets and business information, and harm to business as described above.

341.    Defendants' misappropriation of Plaintiff's trade secrets was willful and malicious. Accordingly, Plaintiff is entitled to exemplary damages in an amount up to twice actual damages awarded, as well as attorneys' fees and costs.

**COUNT IX**

**TRESPASS (D.C. COMMON LAW)**
**(AGAINST RUSSIA)**

342.    Plaintiff realleges and incorporates by reference all prior paragraphs of this Complaint and paragraphs in the counts below as though set forth fully herein.

343.    The DNC owns and operates private computers and a private computer network. This network and the information contained therein constitutes the property of Plaintiff.

344.    On or about July 27, 2015, Russian intelligence agents hacked into the DNC's computers and network, placed malware on the computers and network, and left the malware on the computers and network. On or about April 18, 2016, GRU agents hacked into the DNC's computers and network, placed malware on the computers and network, and left the malware there until at least June of 2016. On or about June 10, 2016, Russia placed malware on Raider. That malware remained on Raider until at least the fall of 2016. In or about September 2016, the GRU separately hacked into the DNC's cloud computing service. Each hack constituted a separate and independent trespass in the District of Columbia. In addition, Russia's acts of leaving malware on the DNC's computers and networks constitute separate and independent trespasses in the District of Columbia. The hacks and malware provided Russia with unauthorized access to Plaintiff's property in its network. At no point has anyone with authority to do so provided Defendants with authorization to access or remain on Plaintiff's networks.

345.    Russia's hacks and malware interfered with the DNC's possessory interests in their network and the information contained therein. By means of trespass onto Plaintiff's computer network, Russia acquired and disseminated confidential and personal information that is Plaintiff's property. Defendants would have been unable to disclose this information but for the illegal trespass. Russia therefore deprived Plaintiff of its possessory interest in maintaining the privacy

81

and confidentiality of its property. As a result, Plaintiff has suffered diminution in the value of its property, and is entitled to damages.

## COUNT X

## CONVERSION (D.C. COMMON LAW)
### (AGAINST RUSSIA)

346.    Plaintiff realleges and incorporates by reference all prior paragraphs of this Complaint and paragraphs in the counts below as though set forth fully herein.

347.    The DNC owns and operates a private computer network, with computers and servers located in Washington, D.C. and in Virginia. This network and the information contained therein constitutes the property of Plaintiff.

348.    On April 22, 2016, the GRU staged several gigabytes of DNC data located on the DNC's servers for unauthorized and surreptitious exfiltration—known more commonly as theft. The GRU later used malware known as "X-Tunnel" to exfiltrate this stolen DNC data outside of the DNC network through encrypted tunnels to a GRU-leased computer located in Illinois. That exfiltration constituted an unlawful exercise of dominion or control over the DNC's property, in violation of the DNC's property rights.

349.    The GRU further exercised unlawful dominion or control over the DNC's property when it deleted computer logs and files to cover its tracks, in violation of the DNC's property rights.

350.    As a result, Plaintiff has suffered diminution in the value of its property, and is entitled to damages.

## COUNT XI

## TRESPASS TO CHATTELS (VIRGINIA COMMON LAW)
## (AGAINST RUSSIA)

351.    Plaintiff realleges and incorporates by reference all prior paragraphs of this Complaint and paragraphs in the counts below as though set forth fully herein.

352.    Plaintiff the DNC owns and operates a private computer network, with computers and servers located in Washington, D.C. and in Virginia. This network and the information contained therein constitutes the property of Plaintiff.

353.    On or about July 27, 2015, Russian intelligence agents hacked into the DNC's computers and network, placed malware on the computers and network, and left the malware on the computers and network. On or about April 18, 2016, GRU agents hacked into the DNC's computers and network, placed malware on the computers and network, and left the malware there until at least June of 2016. On or about June 10, 2016, Russia placed malware on Raider. That malware remained on Raider until at least the fall of 2016. In or about September 2016, the GRU hacked into the DNC's cloud computing service. Each hack constituted a separate and independent trespass in Virginia. The hacks and malware provided Russia with unauthorized access to Plaintiff's property in its network. At no point has anyone with authority to do so provided Defendants with authorization to access or remain on Plaintiff's networks.

354.    Russia and GRU's hacks and malware interfered with Plaintiff's possessory interests in its network and the information contained therein. By means of trespass onto Plaintiff's network, Russia acquired and disseminated confidential and personal information that is Plaintiff's property. Defendants would have been unable to disclose this information but for the illegal trespass. Russia therefore deprived Plaintiff of its possessory interest in maintaining the privacy

and confidentiality of its property. As a result, Plaintiff has suffered diminution in the value of its property, and is entitled to damages.

## COUNT XII

### CONSPIRACY TO COMMIT TRESPASS TO CHATTELS
### (VIRGINIA COMMON LAW)
### (AGAINST ALL DEFENDANTS)

355.   Plaintiff realleges and incorporates by reference all prior paragraphs of this Complaint and paragraphs in the counts below as though set forth fully herein.

356.   Defendants were part of a common scheme in which they conspired and combined to access without authorization the DNC's computer systems to steal confidential information, publicly disseminate the stolen information, and use that stolen and publicly disclosed information for the common purpose of using illegal means to secure Trump's grip on the Presidency, in part by denigrating Secretary Clinton and the Democratic Party. These actions constituted an exercise of wrongful dominion over Plaintiff's computers and computer system and private email accounts.

357.   Pursuant to, and in furtherance of, this common scheme, Defendants conspired to commit the unlawful acts described herein, including acts that constitute trespass.

358.   Pursuant to, and in furtherance of, this common scheme, each Defendant committed overt acts, including arranging meetings between the co-conspirators, encouraging and planning for the scheme to occur, hacking into the DNC's computers and network, installing and leaving malware on the DNC's computers and network, stealing the DNC's private, confidential information, and releasing that information, without permission, to the public. These overt acts caused Plaintiff injury and damages, as discussed *supra*.

359.   All of the named Defendants aided and abetted in the unlawful acts described herein as part of and furtherance of a common scheme, and each of these Defendants knowingly and

substantially assisted the common scheme, and was generally aware of his role as part of an overall common scheme. Accordingly, the actions of Defendants constitute conspiracy to trespass.

360.    As a result, Plaintiff has suffered diminution in the value of its property, and is entitled to damages.

**COUNT XIII**

**CONVERSION (VIRGINIA COMMON LAW)**
**(AGAINST RUSSIA)**

361.    Plaintiff realleges and incorporates by reference all prior paragraphs of this Complaint and paragraphs in the counts below as though set forth fully herein.

362.    The DNC owns and operates a private computer network, with computers and servers located in Washington, D.C. and in Virginia. This network and the information contained therein constitutes the property of Plaintiff.

363.    On April 22, 2016, the GRU staged several gigabytes of DNC data located on the DNC's servers for unauthorized and surreptitious exfiltration—known more commonly as theft. That same day, the GRU later used malware known as "X-Tunnel" to exfiltrate this stolen DNC data outside of the DNC network through encrypted tunnels to a GRU-leased computer located in Illinois. That exfiltration constituted an unlawful exercise of dominion or control over the DNC's property, in violation of the DNC's property rights.

364.    The GRU further exercised unlawful dominion or control over the DNC's property when it deleted computer logs and files to cover its tracks, in violation of the DNC's property rights.

365.    As a result, Plaintiff has suffered diminution in the value of its property, and is entitled to damages.

85

## COUNT XIV

## VIOLATION OF THE VIRGINIA COMPUTER CRIMES ACT
(VA. CODE ANN. § 18.2-152.1 ET SEQ.)
(AGAINST ALL DEFENDANTS)

366.     Plaintiff realleges and incorporates by reference all prior paragraphs of this Complaint and paragraphs in the counts below as though set forth fully herein.

367.     Russia used Plaintiff's computers and computer networks without authority, obtained property by false pretenses, and converted Plaintiff's property in violation of Va. Code Ann. § 18.2-152.3.

368.     Russia, with malicious intent:

a)  temporarily or permanently removed, halted, or otherwise disabled computer data, computer programs or computer software from the DNC's computer or computer network, in violation of Va. Code Ann. § 18.2-152.4(1);

b)  caused the DNC's computers to malfunction, in violation of Va. Code Ann. § 18.2-152.4(2);

c)  altered, disabled, or erased computer data, computer programs or computer software, in violation of Va. Code Ann. § 18.2-152.4(3);

d)  used a computer or computer network to make or cause to be made an unauthorized copy of computer data, computer programs or computer software residing in, communicated by, or produced by a computer or computer network, in violation of Va. Code Ann. § 18.2-152.4(6);

e)  installed or caused to be installed, or collected information through, computer software that records all or a majority of the keystrokes made on

the DNC's computers, without their authorization, in violation of Va. Code. Ann. § 18.2-152.4(8).

369.   Russia used a computer or computer network and intentionally examined, without authority, employment, credit, financial, or identifying information relating to other persons, in violation of in Va. Code. Ann. § 18.2-152.5.

370.   Russia used a computer to obtain, access, or record, through the use of material artifice, trickery or deception, identifying information, including social security numbers and passport numbers, in violation of Va. Code Ann. § 18.2-152.5:1.

371.   Each Defendant knowingly aided, abetted, encouraged, induced, instigated, contributed to and assisted Russia's violation of Va. Code Ann. § 18.2-152.3, § 18.2-152.4, and § 18.2-152.5.

372.   All Defendants' violations of the foregoing provisions caused Plaintiff injury. This injury includes, but is not limited to, injury resulting from harm to DNC computers and servers, loss in the value of DNC trade secrets and business information, and harm to business as described above. Plaintiff is entitled to recover damages and the costs of suit under Va. Code Ann. § 18.2-152.12.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants on all Counts, and seeks such relief as specified below for all Counts for which such relief is provided by law:

a) Awarding Plaintiff damages in an amount to be determined, including but not limited to all damages and losses suffered by Plaintiff as a result of the illegal hacking, theft, and subsequent release of Plaintiff's confidential documents and/or Plaintiff's response to and remediation related thereto;

b)  Awarding Plaintiff compensatory and treble damages, as available, in an amount to be proven at trial;

c)  Awarding Plaintiff the financial gain earned by Defendants as a consequence of the violations described herein;

d)  Awarding Plaintiff statutory damages, as available;

e)  Awarding Plaintiff punitive damages, as available;

f)  Issuing a declaration that: Defendants, according to proof, conspired to and did engage in a common scheme to effect the illegal and unauthorized hacking of Plaintiff's computer systems and/or personal emails and the exfiltration of confidential information; disseminated that stolen information to the public; and used that disclosed stolen information to impact the 2016 election for their own gain;

g)  Issuing an injunction restraining Defendants and their officers, agents, servants, employees, assigns, and those acting in active concert or participation with them from:

   a.  Accessing Plaintiff's computer networks and/or personal emails without Plaintiff's authorizations;

   b.  Engaging in any activity that disrupts, diminishes the quality of, interferes with the performance of, or impairs the functionality of Plaintiff's computer networks or personal emails; and

   c.  Selling, publishing, distributing, or using any property or information obtained from Plaintiff's computer networks or personal emails without Plaintiff's authorization;

   d.  Removing, extracting, or copying any information or data from Plaintiff's computers or personal emails without Plaintiff's authorization;

88

h) Awarding Plaintiff all costs and attorneys' fees to the full extent permitted under the applicable law;

i) Awarding Plaintiff pre- and post-judgment interest as permitted by law;

j) Awarding any other relief as the Court may deem just and proper.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands trial by jury in this action of all issues so triable.

January 17, 2019                                          Respectfully submitted,


*/s/ Michael Eisenkraft*
Michael Eisenkraft                                        Joseph M. Sellers
Cohen Milstein Sellers & Toll PLLC                        Geoffrey A. Graber
88 Pine St. # 14                                          Julia A. Horwitz
New York, NY 10005                                        Alison S. Deich
(212) 838-7797                                            Eric S. Berelovich
                                                          Cohen Milstein Sellers & Toll PLLC
meisenkraft@cohenmilstein.com                             1100 New York Ave. NW ● Fifth Floor
                                                          Washington, DC 20005
                                                          (202) 408-4600

                                                          jsellers@cohenmilstein.com
                                                          ggraber@cohenmilstein.com
                                                          jhorwitz@cohenmilstein.com
                                                          adeich@cohenmilstein.com
                                                          eberelovich@cohenmilstein.com


                                                          *Attorneys for Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that on January 17, 2019, I electronically filed the *Second Amended Complaint* with the Clerk of the Court using the ECF, who in turn sent notice to all counsel of record.


Dated: January 17, 2019                                    /s/ *Michael Eisenkraft*
                                                                         Michael Eisenkraft

## ENDNOTES

[1] Maggie Haberman, *Roger Stone, the 'Trickster' on Trump's Side, Is Under F.B.I. Scrutiny,* N.Y. Times (Mar. 21, 2017), https://www.nytimes.com/2017/03/21/us/roger-stone-donald-trump-russia.html.

[2] Marty Lederhandler, *The Hidden History of Trump's First Trip to Moscow,* Politico Magazine (Nov. 19, 2017), https://www.politico.com/magazine/story/2017/11/19/trump-first-moscow-trip-215842.

[3] Assoc. Press, *Russian Real Estate Deals Never Materialized for Trump*, Fortune (Mar. 4, 2017), http://fortune.com/2017/03/04/trump-russian-real-estate/.

[4] Richard Behar*, Donald Trump And The Felon: Inside His Business Dealings With A Mob-Connected Hustler*, Forbes (Oct. 3, 2016, 7:59 AM), https://www.forbes.com/sites/richardbehar/2016/10/03/donald-trump-and-the-felon-inside-his-business-dealings-with-a-mob-connected-hustler/#5b94d7b52282.

[5] Assoc. Press, *supra* note 3.

[6] Amy Dempsey, *Trump vs. Trump: Inside Toronto's 5-Star Tower Struggle*, The Star (Apr. 17, 2016), https://www.thestar.com/news/gta/2016/04/17/trump-vs-trump-inside-torontos-5-star-tower-struggle.html.

[7] Vernon Silver & Evgenia Pismennaya, *Trump's Two Nights of Parties in Moscow Echo Years Later,* Bloomberg (July 13, 2017), https://www.bloomberg.com/news/articles/2017-07-13/trumps-two-nights-of-parties-in-moscow-reverberate-years-later.

[8] Tom Hamburger, Rosalind S. Helderman & Michael Birnbaum, *Inside Trump's Financial Ties to Russia and His Unusual Flattery of Vladimir Putin*, Wash. Post (June 17, 2016), https://www.washingtonpost.com/politics/inside-trumps-financial-ties-to-russia-and-his-unusual-flattery-of-vladimir-putin/2016/06/17/dbdcaac8-31a6-11e6-8ff7-7b6c1998b7a0_story.html?noredirect=on&utm_term=.dc2924d0db41.

[9] Michael Crowley, *When Donald Trump Brought Miss Universe to Moscow*, Politico (May 15, 2016), https://www.politico.com/story/2016/05/donald-trump-russia-moscow-miss-universe-223173.

[10] Hunter Walker & Brett Arnold, *Michael Cohen's Efforts to Build a Trump Tower in Moscow Went on Longer Than He Has Previously Acknowledged,* Yahoo News (May 16, 2018), https://www.yahoo.com/news/michael-cohens-efforts-build-trump-tower-moscow-went-longer-previously-acknowledged-232845349.html.

[11] Nathan Layne, Ned Parker, Svetlana Reiter et al., *Russian Elite Invested Nearly $100 Million in Trump Buildings*, Reuters (Mar. 17, 2017), https://www.reuters.com/investigates/special-report/usa-trump-property/.

[12] David Ignatius, *A History of Donald Trump's Business Dealings in Russia*, Wash. Post (Nov. 2, 2017), https://www.washingtonpost.com/opinions/a-history-of-donald-trumps-business-dealings-in-russia/2017/11/02/fb8eed22-ba9e-11e7-be94-fabb0f1e9ffb_story.html?utm_term=.340eff428fe4.

[13] Caitlin Yilek, *Author Claims Eric Trump Told Him All Funding for Trump golf courses Comes From Russia in 2014,* Wash. Exam'r (May 7, 2017), https://www.washingtonexaminer.com/author-claims-eric-trump-told-him-all-funding-for-trump-golf-courses-comes-from-russia-in-2014.

[14] Andrew E. Kramer, Mike McIntire & Barry Meier, *Secret Ledger in Ukraine Lists Cash for Donald Trump's Campaign Chief*, N.Y. Times (Aug. 14, 2016), https://www.nytimes.com/2016/08/15/us/politics/paul-manafort-ukraine-donald-trump.html.

[15] Assoc. Press, *Manafort Helped Funnel Money to US Lobbyists From pro-Putin Ukrainian Party, Report Claims*, Fox News (Aug. 17, 2016), http://www.foxnews.com/politics/2016/08/17/manafort-helped-funnel-money-to-us-lobbyists-from-pro-putin-ukrainian-party-report-claims.html.

[16] Michael Kranish & Tom Hamburger, *Paul Manafort's 'Lavish Lifestyle' Highlighted in Indictment*, Wash. Post (Oct. 30, 2017), https://www.washingtonpost.com/politics/paul-manaforts-lavish-lifestyle-highlighted-in-indictment/2017/10/30/23615680-bd8f-11e7-8444-a0d4f04b89eb_story.html?utm_term=.bb5d54a2da8e.

[17] Tom Hamburger & Rosalind S. Helderman, *Former Trump Campaign Chairman Paul Manafort Files as Foreign Agent for Ukraine Work*, Wash. Post (June 27, 2017), https://www.washingtonpost.com/politics/former-trump-campaign-chairman-paul-manafort-files-as-foreign-agent-for-ukraine-work/2017/06/27/8322b6ac-5b7b-11e7-9fc6-c7ef4bc58d13_story.html?utm_term=.c0c580285583.

[18] Katelyn Polantz, *Paul Manafort Pleads Guilty and Agrees to Cooperate with Mueller Investigation*, CNN (Sept. 14, 2018), https://www.cnn.com/2018/09/14/politics/paul-manafort-guilty-plea/index.html.

[19] *Manafort Had $10 Million Loan From Russian Oligarch: Court Filing*, Reuters (June 27, 2018), https://www.reuters.com/article/us-usa-trump-russia-manafort/manafort-had-10-million-loan-from-russian-oligarch-court-filing-idUSKBN1JN2YF.

[20] Sonam Sheth, *Manafort's Financial Troubles Raise New Questions About Why He Offered to Work As An Unpaid Volunteer to The Trump Campaign*, Bus. Insider (Feb. 28, 2018), http://www.businessinsider.com/paul-manafort-ukraine-debt-trump-campaign-unpaid-volunteer-2018-2.

[21] Kenneth P. Vogel, *Manafort's Man in Kiev*, Politico (Aug. 18, 2016), https://www.politico.com/story/2016/08/paul-manafort-ukraine-kiev-russia-konstantin-kilimnik-227181.

[22] *Id*.

[23] David Voreacos, *Mueller Draws Line to Russian Spy's Work With Manafort and Gates*, Bloomberg (Mar. 28, 2018), https://www.bloomberg.com/news/articles/2018-03-28/mueller-draws-line-to-russian-spy-s-work-with-manafort-and-gates.

[24] Superseding Indictment at ¶¶ 49, 51, *United States v. Manafort*, No. 17-cr-00201-ABJ (D.D.C. Jun. 8, 2018).

[25] Assoc. Press, *AP Probe Hints at Julian Assange's Budding Ties with Russia,* CBS News (Sept. 17, 2018), https://www.cbsnews.com/news/julian-assange-sought-russia-visa-wikileaks-us-secrets-ap-investigation/.

[26] *Id.*

[27] James Gordon Meek, Sean Langan & Aicha El Hammar Castano, *Was there a plan to help Julian Assange escape to Russia?*, ABC News (Sept. 28, 2018), https://abcnews.go.com/Politics/plan-julian-assange-escape-russia/story?id=58134811.

[28] Howard Amos & Patrick Sawyer, *Russian Protests: December 10 as it Happened*, The Telegraph (Dec. 10, 2011), https://web.archive.org/web/20140109114019/http://www.telegraph.co.uk/news/worldnews/europe/russia/8947840/Russian-protests-live.html.

[29] Evan Osnos, David Remnick & Joshua Yaffa, *Trump, Putin, and the New Cold War*, New Yorker (Mar. 6, 2017), https://www.newyorker.com/magazine/2017/03/06/trump-putin-and-the-new-cold-war.

[30] *Id.*

[31] Steven Pifer, *Trump and Russia: Expect a Change in Tone. But in Substance?*, Brookings (Jan. 4, 2017), https://www.brookings.edu/blog/order-from-chaos/2017/01/04/trump-and-russia-expect-a-change-in-tone-but-in-substance/.

[32] Franklin Foer, *Putin's Puppet*, Slate (July 4, 2016), http://www.slate.com/articles/news_and_politics/cover_story/2016/07/vladimir_putin_has_a_plan_for_destroying_the_west_and_it_looks_a_lot_like.html.

[33] Andrew Kaczynski, Chris Massie & Nathan McDermott, *80 Times Trump Talked about Putin*, CNN (Mar. 2017), http://www.cnn.com/interactive/2017/03/politics/trump-putin-russia-timeline/.

[34] *Presidential Candidate Donald Trump Primary Night Speech*, C-SPAN (Apr. 26, 2016), https://www.c-span.org/video/?408719-1/donald-trump-primary-night-speech&start=1889&transcriptQuery=putin.

[35] John Santucci, *Trump Says 'Great Honor' to Get Compliments from 'Highly Respected' Putin*, ABC News (Dec. 17, 2015), http://abcnews.go.com/Politics/trump-great-honor-compliments-highly-respected-putin/story?id=35829618.

[36] Michael R. Gordon & Niraj Chokshi, *Trump Criticizes NATO and Hopes for 'Good Deals' With Russia*, N.Y. Times (Jan. 15, 2017), https://www.nytimes.com/2017/01/15/world/europe/donald-trump-nato.html.

[37] Ashley Parker, *Donald Trump, in Scotland, Calls 'Brexit' Result 'a Great Thing'*, N.Y. Times (June 24, 2016), https://www.nytimes.com/2016/06/25/us/politics/donald-trump-scotland.html.

[38] Alexander Mallin, *Trump: Crimea's People Prefer Russia, But If He's Elected Putin Is 'Not Going Into Ukraine'*, ABC News (July 31, 2016), http://abcnews.go.com/ThisWeek/trump-crimeas-people-prefer-russia-elected-putin-ukraine/story?id=41029437.

[39] Stephanie Murray, *Putin: I wanted Trump to Win the Election*, Politico (July 16, 2018), https://www.politico.com/story/2018/07/16/putin-trump-win-election-2016-722486.

[40] Charlie Savage, *Assange, Avowed Foe of Clinton, Timed Email Release for Democratic Convention*, N.Y. Times, July 26, 2016, https://www.nytimes.com/2016/07/27/us/politics/assange-timed-wikileaks-release-of-democratic-emails-to-harm-hillary-clinton.html.

[41] *See* Indictment at ¶ 47, *United States v. Netyksho*, No. 18-cr-00215-ABJ (D.D.C. July 13, 2018) ("July 13 Indictment").

[42] Max Chafkin & Vernon Silver, *How Julian Assange Turned WikiLeaks Into Trump's Best Friend*, Bloomberg (Oct. 11, 2016), https://www.bloomberg.com/news/articles/2016-10-11/how-julian-assange-turned-wikileaks-into-trump-s-best-friend.

[43] Office of the Director of National Intelligence, National Intelligence Council, *No. ICA 2017-01D, Assessing Russian Activities and Intentions in Recent US Elections* (2017), *available at* https://www.dni.gov/files/documents/ICA_2017_01.pdf ("IC Report").

[44] *Id.* at 2-3.

[45] July 13 Indictment at ¶ 47.

[46] IC Report, at 2.

[47] Gloria Borger & Marshall Cohen, *Document Details Scrapped Deal For Trump Tower Moscow*, CNN Politics (Sept. 9, 2017), https://www.cnn.com/2017/09/08/politics/document-trump-tower-moscow/index.html+&cd=1&hl=en&ct=clnk&gl=us.

[48] *Id.*

[49] *Id.*

[50] Exec. Order No. 13,662, 79 Fed. Reg. 16,169 (Mar. 24, 2014).

[51] Matt Apuzzo & Maggie Haberman, *Trump Associate Boasted that Moscow Business Deal 'Will Get Donald Elected,'* N.Y. Times (Aug. 28, 2017), https://www.nytimes.com/2017/08/28/us/politics/trump-tower-putin-felix-sater.html.

[52] Meg Kelly, *All the Known Times the Trump Campaign Met With Russians*, Wash. Post (Nov. 13, 2017), https://www.washingtonpost.com/news/fact-checker/wp/2017/11/13/all-of-the-known-times-the-trump-campaign-met-with-russians/?noredirect=on&utm_term=.507d39ac9649.

[53] Luke Harding, Stephanie Kirchgaessner & Nick Hopkins, *Michael Flynn: New Evidence Spy Chiefs Had Concerns About Russian Ties*, The Guardian (Mar. 31, 2017), https://www.theguardian.com/us-news/2017/mar/31/michael-flynn-new-evidence-spy-chiefs-had-concerns-about-russian-ties.

[54] *Id.*

[55] Matt Apuzzo, Eileen Sullivan & Sharon LaFraniere, *Paul Manafort Was Deep in Debt. He Saw an Opportunity in Trump*, N.Y. Times (Aug. 3, 2018), https://www.nytimes.com/2018/08/03/us/politics/paul-manafort-trump-campaign.html.

[56] Julia Ioffe & Franklin Foer, *Did Manafort Use Trump to Curry Favor With a Putin Ally?,* The Atlantic (Oct. 2, 2017), https://www.theatlantic.com/politics/archive/2017/10/emails-suggest-manafort-sought-approval-from-putin-ally-deripaska/541677/.

[57] Defendant Paul J. Manafort Jr.'s Response to the Special Counsel's Submission in Support of its Breach Determination, *United States v. Manafort*, No. 17-cr-00201-ABJ (D.D.C. Jan. 8, 2019) ("Manafort Response").

[58] Sharon LaFraniere, Mark Mazzetti & Matt Apuzzo, *How the Russia Inquiry Began: A Campaign Aide, Drinks and Talk of Political Dirt*, N.Y. Times (Dec. 30, 2017), https://www.nytimes.com/2017/12/30/us/politics/how-fbi-russia-investigation-began-george-papadopoulos.html.

[59] Philip Bump, *Timeline: How a Trump Adviser Tried to Work with the Russian Government,* Wash. Post (Oct. 30, 2017). https://www.washingtonpost.com/news/politics/wp/2017/10/30/timeline-how-a-trump-adviser-tried-to-work-with-the-russian-government/.

[60] Statement of the Offense at ¶ 2b, *United States v. Papadopoulos*, No. 17-cr-00182-RDM (D.D.C. Oct. 5, 2017).

[61] *Id.*

[62] *Id.* at ¶ 5.

[63] *Id.* at ¶ 2.

[64] *Id.* at ¶ 11.

[65] *Id.* at ¶ 2.

[66] *Id.*

[67] *Id.*

[68] *Id.* at ¶ 8.

[69] Mark Abadi, *Trump Campaign Officials Suggested 'Someone Low Level' to Communicate with Russians*, Bus. Insider (Oct. 30, 2017), https://www.businessinsider.com/trump-campaign-george-papadopoulos-low-level-russia-manafort-gates-2017-10.

[70] *Transcript: Donald Trump's Foreign Policy Speech*, N.Y. Times (Apr. 27, 2016), https://www.nytimes.com/2016/04/28/us/politics/transcript-trump-foreign-policy.html.

[71] LaFraniere et al., *supra* note 58.

[72] *Id.*

[73] *Id.*

[74] *Id.*

[75] Shane Harris, *Former Trump Adviser's Guilty Plea Ties Campaign to Russian Officials*, Wall St. J. (Oct. 30, 2017), https://www.wsj.com/articles/former-trump-foreign-policy-adviser-to-plead-guilty-to-lying-to-fbi-1509374354.

[76] July 13 Indictment at ¶¶ 26-28

[77] *Id.* at ¶ 26

[78] *Id.* at ¶ 28.

[79] Department of Homeland Security and the Federal Bureau of Investigation, *GRIZZLY STEPPE – Russian Malicious Cyber Activity* (December 29, 2016), *available at* https://www.us-cert.gov/sites/default/files/publications/JAR_16-20296A_GRIZZLY%20STEPPE-2016-1229.pdf.

[80] Dmitri Alperovitch, *Bears in the Midst: Intrusion into the Democratic National Committee,* CrowdStrike (Jun. 15, 2016), https://www.crowdstrike.com/blog/bears-midst-intrusion-democratic-national-committee/.

[81] IC Report at 2.

[82] Alperovitch, *supra* note 80.

[83] *Id.*

[84] *Id.*

[85] *Id.*

[86] *See generally* July 13 Indictment.

[87] Alperovitch, *supra* note 80.

[88] July 13 Indictment at ¶ 31.

[89] *Id.* ¶ 28.

[90] *Id.* ¶ 31.

[91] *Id.* ¶ 29.

[92] *Id.* ¶ 28.

[93] *Id.* ¶ 47.

[94] Alperovitch, *supra* note 83.

[95] July 13 Indictment at ¶ 58.

[96] Priscilla Alvarez & Elaine Godfrey, *Donald Trump Jr.'s Email Exchange with Rob Goldstone*, The Atlantic (July 11, 2017), https://www.theatlantic.com/politics/archive/2017/07/donald-trumps-jrs-email-exchange/533244/.

[97] *Id.*

[98] Philip Bump, *Donald Trump Jr. Said He Didn't Recall Talking to Emin Agalarov. Agalarov Remembers It.*, Wash. Post (July 10, 2018),

https://www.washingtonpost.com/news/politics/wp/2018/07/10/donald-trump-jr-said-he-didnt-recall-talking-to-emin-agalarov-agalarov-remembers-it/?noredirect=on&utm_term=.cd41f6e41956.

[99] Chris Geidner, *Trump Jr. and Emin Agalarov Stayed in Touch Throughout the Transition*, Buzzfeed News (Apr. 27, 2018), https://www.buzzfeednews.com/article/chrisgeidner/trump-jr-and-emin-agalarov-stayed-in-touch-during-the.

[100] Alvarez & Godfrey, *supra* note 96.

[101] Ryan Teague Beckwith, *Read Donald Trump's Subdued Victory Speech After Winning New Jersey*, TIME (June 8, 2016), http://time.com/4360872/donald-trump-new-jersey-victory-speech-transcript/.

[102] K.K. Rebecca Lai & Alicia Parlapiano, *What We Know About Donald Trump Jr.'s Russia Meeting*, N.Y. Times (July 18, 2017), https://www.nytimes.com/interactive/2017/07/18/us/politics/donald-trump-jr-russia-meeting.html.

[103] Andrew E. Kramer & Sharon LaFraniere, *Lawyer Who Was Said to Have Dirt on Clinton Had Closer Ties to Kremlin Than She Let On*, N.Y. Times (Apr. 27, 2018), https://www.nytimes.com/2018/04/27/us/natalya-veselnitskaya-trump-tower-russian-prosecutor-general.html.

[104] Indictment, *United States v. Veselnitskaya*, 18-CR-904 (S.D.N.Y. Dec. 20, 2018).

[105] Information (Felony), *United States v. Cohen*, 18-CR-850 (S.D.N.Y. Nov. 29, 2018); Ellen Nakashima, *Russian government hackers penetrated DNC, stole opposition research on Trump*, Wash. Post (June 14, 2016), *https*://www.washingtonpost.com/world/national-security/russian-government-hackers-penetrated-dnc-stole-opposition-research-on-trump/2016/06/14/cf006cb4-316e-11e6-8ff7-7b6c1998b7a0_story.html?utm_term=.da632b3a2eee.

[106] House Permanent Select Committee on Intelligence, Minority Views to the Majority-produced "Report on Russian Active Measures," H.R. Doc. (Mar. 26, 2018).

[107] Aaron Blake, *10 Times the Trump Team Has Watered Down its Russia Collusion Denials*, Wash. Post (July 30, 2018), https://www.washingtonpost.com/news/the-fix/wp/2018/05/17/rudy-giuliani-just-watered-down-trumps-russia-collusion-denial-yet-again/?noredirect=on&utm_term=.4ff71c717925.

[108] Ashley Parker et al., *Trump Dictated Son's Misleading Statement on Meeting with Russian Lawyer,* Wash. Post (July 31, 2017), https://www.washingtonpost.com/politics/trump-dictated-sons-misleading-statement-on-meeting-with-russian-lawyer/2017/07/31/04c94f96-73ae-11e7-8f39-eeb7d3a2d304_story.html?noredirect=on&utm_term=.c71cc2ef6636.

[109] David E. Sanger & Nicole Perlroth, *As Democrats Gather, a Russian Subplot Raises Intrigue*, N. Y. Times (July 24, 2016), https://www.nytimes.com/2016/07/25/us/politics/donald-trump-russia-emails.html.

[110] July 13 Indictment at ¶ 32.

[111] *Peston on Sunday* (ITV broadcast June 12, 2016 5:59 PM)
http://www.itv.com/news/update/2016-06-12/assange-on-peston-on-sunday-more-clinton-leaks-to-come/.

[112] James Rogers, *Russian Government-Affiliated Hackers Breach DNC, Take Research on Donald Trump*, Fox News (June 14, 2016), http://www.foxnews.com/tech/2016/06/14/russian-government-affiliated-hackers-breach-dnc-take-research-on-donald-trump.html.

[113] Guccifer2, *Guccifer 2.0 DNC's Servers Hacked By A Lone Hacker*, Wordpress (June 15, 2016), https://guccifer2.wordpress.com/2016/06/15/dnc/.

[114] *Id.*

[115] Guccifer2, *Dossier on Hillary Clinton from DNC*, Wordpress (June 21, 2016), https://guccifer2.wordpress.com/2016/06/21/hillary-clinton/.

[116] Guccifer2, *FAQ from Guccifer 2.0*, Wordpress (June 30, 2016), https://guccifer2.wordpress.com/2016/06/30/faq/.

[117] Guccifer2, *Trumpocalypse and Other DNC Plans for July*, Wordpress (July 6, 2016), https://guccifer2.wordpress.com/2016/07/06/trumpocalypse/.

[118] Mark Landler & Eric Lichtblau, *F.B.I. Director James Comey Recommends No Charges for Hillary Clinton on Email*, N.Y. Times (July 5, 2016), https://www.nytimes.com/2016/07/06/us/politics/hillary-clinton-fbi-email-comey.html.

[119] July 13 Indictment at ¶ 47.

[120] *Id.*

[121] *Id.*

[122] *Id.*

[123] *Id.*

[124] *Search the DNC Email Database*, WikiLeaks (July 22, 2016 10:30 AM), https://wikileaks.org/dnc-emails/.

[125] State of the Union Transcript (CNN July 24, 2016 9:00 PM), http://transcripts.cnn.com/TRANSCRIPTS/1607/24/sotu.01.html.

[126] *What Donald Trump Said About Russian Hacking and Hillary Clinton's Emails*, N.Y. Times (July 27, 2016), https://www.nytimes.com/2016/07/28/us/politics/trump-conference-highlights.html.

[127] July 13 Indictment at ¶ 22.

[128] *Id.* at ¶ 43.

[129] Andrew Kaczynski, Nathan McDermott & Chris Massie, *Trump adviser Roger Stone repeatedly claimed to know of forthcoming WikiLeaks dumps,* CNN (Mar. 20, 2017), https://www.cnn.com/2017/03/20/politics/kfile-roger-stone-wikileaks-claims/index.html.

[130] *Id.*

[131] Draft Statement of the Offense, *United States v. Corsi*, (D.D.C.), available at https://assets.documentcloud.org/documents/5302125/Draft-Jerome-Corsi-statement-of-offense.pdf.

[132] *Id*.

[133] *Id*.

[134] Andrew Kaczynski & Gloria Borger, *Stone, on day he sent Assange dinner email, also said 'devastating' WikiLeaks were forthcoming*, CNN Politics (Apr. 4, 2018), https://www.cnn.com/2018/04/04/politics/roger-stone-julian-assange-email-wikileaks/index.html.

[135] Shelby Holliday & Rob Barry, *Roger Stone's Claim of a 2016 Julian Assange Meeting Draws Scrutiny*, Wall St. J. (Apr. 2, 2018), https://www.wsj.com/articles/roger-stones-claim-of-a-2016-julian-assange-meeting-draws-scrutiny-1522695471.

[136] Tom Hamburger et al., *Roger Stone Claimed Contact with WikiLeaks Founder Julian Assange in 2016, According to Two Associates*, Wash. Post (Mar. 13, 2018), https://www.washingtonpost.com/politics/roger-stone-claimed-contact-with-wikileaks-founder-julian-assange-in-2016-according-to-two-associates/2018/03/13/a263f842-2604-11e8-b79d-f3d931db7f68_story.html?utm_term=.2d4b927521e5.

[137] Kaczynski et al., *supra* note 129.

[138] Eric Lichtblau & Noah Weiland, *Hacker Releases More Democratic Party Documents*, N.Y. Times (Aug. 12, 2016), https://www.nytimes.com/2016/08/13/us/politics/democratic-party-documents-hack.html.

[139] Ryan Goodman, *How Roger Stone Interacted With Russia's Guccifer and Wikileaks*, Newsweek (Sep. 28, 2017), http://www.newsweek.com/how-stone-interacted-russias-guccifer-and-wikileaks-673268.

[140] Matt Dixon & Marc Caputo, *Hacked DCCC docs dish on strategy and scandal for Florida congressional candidates*, Politico (Aug. 16, 2016), https://www.politico.com/states/florida/story/2016/08/dccc-hack-unearths-dirt-on-partys-own-candidates-104744.

[141] *Id*.

[142] Andrew Blake, *Roger Stone, Trump confidant, acknowledges 'innocuous' Twitter conversation With DNC hackers*, Wash. Times (Mar. 10, 2017), https://www.washingtontimes.com/news/2017/mar/10/roger-stone-trump-confidant-acknowledges-innocuous/.

[143] *Id.*

[144] Robert Windrem & William M. Arkin, *Trump Told Russia To Blame for Hacks Long Before 2016 Debate*, NBC News (Oct. 10, 2016), https://www.nbcnews.com/news/us-news/trump-was-told-russia-was-blame-hacks-long-debate-n663686.

[145] Rosalind S. Helderman, Tom Hamburger & Rachel Weiner, *At Height of Russia Tensions, Trump Campaign Chair Manafort Met With Business Associate from Ukraine*, Wash. Post (June 19, 2017), https://www.washingtonpost.com/politics/at-height-of-russia-tensions-trump-campaign-chairman-manafort-met-with-business-associate-from-ukraine/2017/06/18/6ab8485c-4c5d-11e7-a186-60c031eab644_story.html?utm_term=.ff9630ce9209.

[146] Statement of the Offense, *United States v. Alex Van Der Zwaan*, No. 18-cr-00031-ABJ (D.D.C. March 27, 2018).

[147] Kaczynski et al., *supra* note 129.

[148] Shelby Holliday, Peter Nicholas & Rebecca Ballhaus, *Jerome Corsi Says Roger Stone Sought 'Cover Story' for 2016 Tweet*, Wall St. J. (Nov. 28, 2018), https://www.wsj.com/articles/jerome-corsi-says-roger-stone-sought-to-cover-up-podesta-tweet-1543363107.

[149] Shelby Holliday & Rob Barry, *Roger Stone Sought Information on Clinton From Assange, Emails Show*, Wall St. J. (May 24, 2018), https://www.wsj.com/articles/roger-stone-sought-information-on-clinton-from-assange-emails-show-1527191428.

[150] *Roger Stone Joins Herald Drive Discussing 2016 Election*, Boston Herald Radio (Sept. 16, 2016), https://soundcloud.com/bostonherald/roger-stone-joins-herald-drive-discussing-2016-election-1.

[151] Julia Ioffe, *The Secret Correspondence Between Donald Trump, Jr. and WikiLeaks*, The Atlantic (Nov. 13, 2017), https://www.theatlantic.com/politics/archive/2017/11/the-secret-correspondence-between-donald-trump-jr-and-wikileaks/545738/; *see also* House Permanent Select Committee on Intelligence, *supra* note 106.

[152] Ioffe, *supra* note 151.

[153] Donald J. Trump (@realDonaldTrump), Twitter (Oct. 12, 2016, 9:46 AM), https://twitter.com/realdonaldtrump/status/786201435486781440.

[154] Kaczynski et al., *supra* note 129.

[155] Media Matters Staff, *Trump Adviser Roger Stone Says He's Been "Assured" Through An Assange Intermediary That "The Mother Lode Is Coming"*, Media Matters for America (Oct. 3, 2016), https://www.mediamatters.org/video/2016/10/03/trump-adviser-roger-stone-says-he-s-been-assured-through-assange-intermediary-mother-lode-coming/213488.

[156] Hamburger et al., *supra* note 136.

[157] *The Podesta Emails*, WikiLeaks (Oct. 7, 2016), https://wikileaks.org/podesta-emails/.

[158] *Leaks*, WikiLeaks, https://wikileaks.org/-Leaks-.html (last visited Apr. 11, 2018).

[159] Natasha Bertrand, *Roger Stone's Secret Messages with WikiLeaks*, The Atlantic (Feb. 27, 2018), https://www.theatlantic.com/politics/archive/2018/02/roger-stones-secret-messages-with-wikileaks/554432/.

[160] Alexandra Berzon & Rob Barry, *How Alleged Russian Hacker Teamed Up With Florida GOP Operative*, Wall St. J. (May 25, 2017, 11:33 PM), https://www.wsj.com/articles/how-alleged-russian-hacker-teamed-up-with-florida-gop-operative-1495724787.

[161] *Id.*

[162] Rosalind S. Helderman & Manuel Roig-Franzia, *Charges Against Russian Intelligence Officers Intensify Spotlight on Trump Adviser Roger Stone*, Wash. Post, July 13, 2018, https://www.washingtonpost.com/politics/charges-against-russian-intelligence-officers-intensify-spotlight-on-trump-adviser-roger-stone/2018/07/13/ba0d0caa-86bb-11e8-8553-a3ce89036c78_story.html?utm_term=.8729e904dc94.

[163] July 13 Indictment at ¶ 43.

[164] Guccifer2, *Trump's Taxes: Clinton Campaign Prepares A New Provocation*, Wordpress (Oct. 18, 2016), https://guccifer2.wordpress.com/2016/10/18/trumps-taxes/.

[165] Donald J. Trump (@realDonaldTrump), Twitter (July 24, 2016, 6:16 PM), https://twitter.com/realdonaldtrump/status/757338816487235584.

[166] Donald J. Trump (@realDonaldTrump), Twitter (July 24, 2016, 5:53 PM), https://twitter.com/realdonaldtrump/status/757332905047752704.

[167] Donald J. Trump (@realDonaldTrump), Twitter (July 25, 2016, 7:31 AM), https://twitter.com/realdonaldtrump/status/757538729170964481.

[168] Donald J. Trump (@realDonaldTrump), Twitter (Oct. 12, 2016, 9:46 AM), https://twitter.com/realdonaldtrump/status/786201435486781440.

[169] Donald Trump, Jr. (@DonaldJTrumpJr), Twitter (Oct. 14, 2016, 9:34 AM), https://twitter.com/DonaldJTrumpJr/status/786923210512142336.

[170] Ioffe, *supra* note 151.

[171] WikiLeaks (@wikileaks), Twitter (Apr. 21, 2017, 7:10 AM), https://twitter.com/wikileaks/status/855378158379573248.

[172] Chuck Todd, Mark Murray & Carrie Dann, *How Trump Took Advantage of Russian Interference: Amplifying Wikileaks*, NBC News (Feb. 19, 2018), https://www.nbcnews.com/politics/first-read/how-trump-took-advantage-russian-interference-amplifying-wikileaks-n849326.

[173] *Id.*

[174] *Id.*

[175] *Id.*

[176] *Id.*

[177] WikiLeaks (@wikileaks), Twitter (Nov. 6, 2016, 5:39 PM), https://twitter.com/wikileaks/status/795440430259335168?lang=en.

[178] *Id.*

[179] Zoya Sheftalovich, *Russia cheers Trump victory*, Politico (Nov. 9, 2016), https://www.politico.eu/article/russia-cheers-trump-victory-republican-nato/.

[180] *Id.*

[181] Bertrand, *supra* note 159.

[182] Jim Heintz & Matthew Lee, *Russia Eyes Better Ties with Trump; Says Contacts Underway*, Assoc. Press (Nov. 11 2016), https://apnews.com/323f28f7f5e242498f43e4a7188336bc/trumps-election-boosts-kremlin-hopes-better-relations.

[183] Kaitlan Collins, *The Trump officials who denied Russia contact*, CNN Politics (July 12, 2017), https://www.cnn.com/2017/07/11/politics/trump-campaign-denials-russia-contact/index.html.

[184] Noah Kirsch, *The Full Exclusive Interview: Emin Agalarov, Russian Scion At Center Of Trump Controversy*, Forbes (July 12, 2017), https://www.forbes.com/sites/noahkirsch/2017/07/12/the-full-exclusive-interview-emin-agalarov-russian-donald-trump-jr-controversy/#2e4112b569d0.

[185] Rod Rosenstein's Letter Appointing Mueller Special Counsel (May 17, 2017), *available at* https://www.nytimes.com/interactive/2017/05/17/us/politics/document-Robert-Mueller-Special-Counsel-Russia.html.

[186] Del Quentin Wilber & Byron Tau, *Special Counsel Robert Mueller Impanels Washington Grand Jury in Russia Probe*, Wall St. J. (Aug. 3, 2017), https://www.wsj.com/articles/special-counsel-mueller-impanels-washington-grand-jury-in-russia-probe-1501788287.

[187] Craig Timberg, Tony Romm & Elizabeth Dwoskin, *Russian disinformation teams targeted Robert S. Mueller III, says report prepared for Senate*, Wash. Post (Dec. 17, 2018), https://www.washingtonpost.com/business/technology/russian-disinformation-teams-targeted-robert-s-mueller-iii-says-report-prepared-for-senate/2018/12/17/0e0047f6-0230-11e9-8186-4ec26a485713_story.html?utm_term=.58704bb0f9f7.

[188] Natasha Bertrand, *Roger Stone's Shifting Story Is a Liability*, The Atlantic (Nov. 3, 2018), https://www.theatlantic.com/politics/archive/2018/11/roger-stones-murky-relationship-wikileaks/574852/.

[189] Matt Zapotosky, *Why Jared Kushner has had to update his disclosure of foreign contacts more than once*, Wash. Post (July 17, 2017), https://www.washingtonpost.com/world/national-security/why-jared-kushner-has-had-to-update-his-disclosure-of-foreign-contacts-more-than-once/2017/07/17/b04e8158-6b05-11e7-96ab-5f38140b38cc_story.html?utm_term=.ecde404e4fe2.

[190] Callum Borchers, *Roger Stone's defiant congressional testimony on Trump and Russia, annotated*, Wash. Post (Sept. 26, 2017), https://www.washingtonpost.com/news/the-fix/wp/2017/09/26/roger-stones-defiant-congressional-testimony-on-trump-and-russia-annotated/.

[191] Manuel Roig-Franzia, *Roger Stone helped Donald Trump get elected president – now he's helping himself*, Wash. Post (Apr. 19, 2017), https://www.washingtonpost.com/lifestyle/style/roger-stone-a-master-of-dark-political-arts-is-playing-the-russia-scandal-for-all-its-worth/2017/04/18/1518184e-236f-11e7-b503-9d616bd5a305_story.html?utm_term=.a3d7b31d2ec1.

[192] Renato Mariotti, *Method to the "Madness": Dissecting Roger Stone's Statement to Congress, by a Former Fed Prosecutor*, Just Security (Sept. 26, 2017),

https://www.justsecurity.org/45404/method-madness-dissecting-roger-stones-statement-congress/.

[193] Draft Statement of the Offense, *supra* note 131.

[194] *Id*.

[195] Guardian Staff, *Roger Stone 'dropped off card' for Julian Assange at embassy*, The Guardian (Feb. 1, 2018), https://www.theguardian.com/media/2018/feb/01/roger-stone-dropped-off-card-for-julian-assange-at-embassy.

[196] Collins, *supra* note 183.

[197] Liam Stack, *Donald Trump Jr.'s Two Different Explanations for Russian Meeting*, N.Y. Times (July 9, 2017), https://www.nytimes.com/2017/07/09/us/donald-trump-jrs-two-different-explanations-for-russian-meeting.html.

[198] *Id*.

[199] House Permanent Select Committee on Intelligence, Report on Russian Active Measures, H.R. Doc. (Mar. 22, 2018), available at https://www.documentcloud.org/documents/4448600-House-Intel-Final-Report.html.

[200] David Willman, *Giuliani comment focuses attention on campaign huddle two days before Trump Tower meeting*, L.A. Times (Aug. 1, 2018), https://www.latimes.com/politics/la-na-pol-giuliani-russia-meeting-20180801-story.html.

[201] *READ: Jared Kushner's statement on Russia to congressional committees*, CNN Politics (July 24, 2017), https://www.cnn.com/2017/07/24/politics/jared-kushner-statement-russia-2016-election/index.html.

[202] Ellen Nakashima, Adam Entous, & Greg Miller, *Russian ambassador told Moscow that Kushner wanted secret communications channel with Kremlin*, Wash. Post (May 26, 2017), https://www.washingtonpost.com/world/national-security/russian-ambassador-told-moscow-that-kushner-wanted-secret-communications-channel-with-kremlin/2017/05/26/520a14b4-422d-11e7-9869-bac8b446820a_story.html?utm_term=.647da5a4d865.

[203] WikiLeaks (@wikileaks), Twitter (July 29, 2017, 4:44 PM),https://twitter.com/wikileaks/status/891444244619120644.

[204] S. Comm. on the Judiciary, Robert Goldstone Exhibits, https://www.judiciary.senate.gov/imo/media/doc/Goldstone%201%20Exhibits_redacted.pdf; S. Comm. on the Judiciary, Interview of: Robert Goldstone, Transcript (Dec. 15, 2017), https://www.judiciary.senate.gov/imo/media/doc/Goldstone%201%20Transcript_redacted.pdf.

[205] Statement of the Offense, *supra* note 60, at ¶¶ 33-34.

[206] Bertrand, *supra* note 188.

[207] *Id*.

[208] *Id.*

[209] Draft Statement of the Offense, *supra* note 131.

[210] Phillip Bump, *A timeline of the Roger Stone-WikiLeaks question*, Wash. Post (Oct. 30, 2018), https://www.washingtonpost.com/politics/2018/10/30/timeline-roger-stone-wikileaks-question/?utm_term=.a2c4706e8e47.

[211] *Id.*

[212] Testimony of Natalia Veselnitskaya Before the U.S. S. Comm. on the Judiciary, Nov. 20, 2017, https://www.judiciary.senate.gov/imo/media/doc/2017-11-20%20Veselnitskaya%20to%20CEG%20(June%209%20Meeting).pdf.

[213] Sharon LaFraniere & Andrew E. Kramer, *Talking Points Brought to Trump Tower Meeting Were Shared With Kremlin*, N.Y. Times (Oct. 27, 2017), https://www.nytimes.com/2017/10/27/us/politics/trump-tower-veselnitskaya-russia.html.

[214] *Id.*

[215] Indictment, *supra* note 104.

[216] Dan Friedman, *Roger Stone Offered to Assistant His Alleged WikiLeaks Source With Legal Expenses*, Mother Jones (Sept. 25, 2018), https://www.motherjones.com/politics/2018/09/roger-stone-offered-to-assist-his-alleged-wikileaks-source-randy-credico-with-legal-expenses/.

[217] Shelby Holiday & Aruna Viswanatha, *Mueller Probes Possible Witness Intimidation by Roger Stone*, Wall St. J. (Nov. 14, 2018), https://www.wsj.com/articles/mueller-probes-possible-witness-intimidation-by-roger-stone-1542222284.

[218] Dan Friedman, *Text Messages Show Roger Stone Was Working to Get A Pardon for Julian Assange*, Mother Jones (Oct. 25, 2018), https://www.motherjones.com/politics/2018/10/text-messages-show-roger-stone-was-working-to-get-a-pardon-for-wikileaks-julian-assange/.

[219] *Id.*

[220] *Id.*

[221] Draft Statement of the Offense, *supra* note 131.

[222] Michael S. Schmidt, Sharon LaFraniere & Maggie Haberman, *Manafort's Lawyer Said to Brief Trump Attorney's on What He Told Mueller*, N.Y. Times (Nov. 27, 2018), https://www.nytimes.com/2018/11/27/us/politics/manafort-lawyer-trump-cooperation.html.

[223] Joint Status Report, *United States v. Manafort*, No. 17-cr-00201-ABJ (D.D.C. Nov. 26, 2018).

[224] *Id.*

[225] Government's Submission in Support of its Breach Determination, *United States v. Manafort*, No. 17-cr-00201-ABJ (D.D.C. Dec. 7, 2018).

[226] Manafort Response, *supra* note 57.

[227] Government's Submission in Support of its Breach Determination, *supra* note 225.

[228] Kevin Poulsen & Andrew Desiderio, *Russian Hackers' New Target: a Vulnerable Democratic Senator*, Daily Beast (July 26, 2018), https://www.thedailybeast.com/russian-hackers-new-target-a-vulnerable-democratic-senator; *see also* Ellen Nakashima, *Claire McCaskill, a vulnerable Democrat running for reelection, targeted in hacking attempt by Russian spies*, Wash. Post (July 26, 2018), https://www.washingtonpost.com/world/national-security/claire-mccaskill-a-vulnerable-democrat-running-for-reelection-targeted-in-hacking-attempt-by-russian-spies/2018/07/26/215312dc-9126-11e8-bcd5-9d911c784c38_story.html?utm_term=.ec6e26df3f0e.

[229] Poulsen & Desiderio, *supra* note 228.

[230] Jen Kirby, *The US intel chief just said Russian interference is "continuing"*, Vox (Aug. 2, 2018), https://www.vox.com/policy-and-politics/2018/8/2/17644744/russia-interference-midterms-fbi-intelligence-dan-coats-christopher-wray-trump.

[231] *Amazon Atlas*, WikiLeaks (Oct. 11, 2018), https://wikileaks.org/amazon-atlas/.

[232] Marcy Wheeler, *Information in Amended DNC Lawsuit Reveals that Roger Stone is at Significantly Greater Risk for CFAA Indictment*, Emptywheel (Dec. 9, 2018), https://www.emptywheel.net/2018/12/09/information-in-amended-dnc-lawsuit-reveals-that-roger-stone-is-at-significantly-greater-risk-for-cfaa-indictment/.

[233] Peter Baker, *Trump and Putin Have Met Five Times. What Was Said Is a Mystery.*, N.Y. Times (Jan. 15, 2019), https://www.nytimes.com/2019/01/15/us/politics/trump-putin-meetings.html.

[234] Michael McFaul, *The Trump-Putin summit in Helsinki was a historic event – in the worst possible way*, Wash. Post (July 17, 2018), https://www.washingtonpost.com/news/global-opinions/wp/2018/07/17/the-trump-putin-summit-in-helsinki-was-a-historic-event-in-the-worst-possible-way/?utm_term=.4dc32a21446f.

[235] Donald J. Trump (@realDonaldTrump), Twitter (Sept. 16, 2018 7:20 AM), https://twitter.com/realDonaldTrump/status/1041330897948160002

[236] Donald J. Trump (@realDonaldTrump), Twitter (Nov. 27, 2018 4:42 AM), https://twitter.com/realDonaldTrump/status/1067398375337791488

[237] Donald J. Trump (@realDonaldTrump), Twitter (Aug. 22, 2018 6:21 AM), https://twitter.com/realDonaldTrump/status/1032256443985084417

[238] Donald J. Trump (@realDonaldTrump), Twitter (Dec. 3, 2018 7:48 AM), https://twitter.com/realDonaldTrump/status/1069619316319035392

[239] Julian E. Barnes and Helene Cooper, *Trump Discussed Pulling U.S. From NATO, Aides Say Amid New Concerns Over Russia*, N.Y. Times (Jan. 14, 2019), https://www.nytimes.com/2019/01/14/us/politics/nato-president-trump.html.

[240] John Hudson, Paul Sonne, & Anton Troianovski, *Trump's decision to withdraw from Syria marks a win for Putin*, Wash. Post (Dec. 20, 2018), https://www.washingtonpost.com/world/national-security/trumps-withdrawal-from-syria-marks-a-win-for-putin/2018/12/20/59c685e8-0491-11e9-b5df-5d3874f1ac36_story.html?noredirect=on&utm_term=.35d6fcab5b7e.