## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

DEMOCRATIC NATIONAL
COMMITTEE,

*Plaintiff,*

v.

THE RUSSIAN FEDERATION, et al.,

*Defendants.*

Case No. 1:18-cv-3501-JGK-SDA

Oral Argument Requested

---

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT DONALD J. TRUMP FOR PRESIDENT, INC.'S MOTION TO DISMISS COUNTS II, III, IV, VIII, XII, AND XIV OF THE SECOND AMENDED COMPLAINT

---

James M. Gross
JONES DAY
250 Vesey Street
New York, NY 10281
(212) 326-3939
jgross@jonesday.com

Michael A. Carvin (*pro hac vice*)
   *Counsel of Record*
William D. Coglianese (*pro hac vice*)
JONES DAY
51 Louisiana Avenue, NW
Washington, DC 20001
(202) 879-3939
macarvin@jonesday.com
wcoglianese@jonesday.com

*Counsel for Donald J. Trump for President, Inc.*

# TABLE OF CONTENTS

Page

INTRODUCTION ........................................................................................................................1

BACKGROUND ..........................................................................................................................3

STANDARD OF REVIEW ..........................................................................................................4

ARGUMENT ...............................................................................................................................5

I.   The Court Should Dismiss All Claims Against the Campaign Because the Imposition of Liability Would Violate the First Amendment. ....................................................................6

II.  The Political-Question Doctrine Precludes Judicial Review of the DNC's Criticisms of President Trump's Political Decisions. ..............................................................................10

III. The DNC Fails to State RICO Claims Against the Campaign. .........................................12

   A.   The DNC has not alleged a valid enterprise. ..........................................................13

      1.   The DNC fails to allege a common purpose. ...............................................14

      2.   The DNC fails to allege an *unlawful* common purpose. ..............................19

      3.   The DNC fails to allege relationships amongst the purported association-in-fact enterprise members. .......................................................21

      4.   The DNC fails to allege an enterprise with the required longevity. ............23

      5.   The DNC fails to allege an enterprise that is separate from the purported pattern of racketeering activity. ..................................................24

   B.   The DNC has not alleged that the Campaign conducted or participated in the conduct of the alleged association-in-fact enterprise. ...............................................24

   C.   The DNC has not alleged that the Campaign committed any predicate acts, let alone a pattern of racketeering activity. ..................................................................26

      1.   The DNC fails to allege that the Campaign committed a single predicate act. .................26

      2.   The DNC fails to allege a threat of continuing criminal conduct. ...............31

   D.   The DNC has not alleged any cognizable injury that was proximately caused by the alleged RICO violations. .................................................................................33

   E.   The DNC's tagalong RICO-conspiracy claim also fails. .........................................37

IV.  The DNC Fails to State a Wiretap Act Claim Against the Campaign. ..............................38

   A.   The DNC fails to allege that there was an interception or that the Campaign knew or had to reason to know of an interception. ..................................................38

   B.   The DNC fails to allege that the Campaign "used" intercepted communications. ..................41

V.   The DNC Fails to State State-Law Claims Against the Campaign. ...................................43

   A.   The Court should not exercise supplemental jurisdiction over the state-law claims. ..............43

   B.   The DNC fails to state a trade-secrets claim against the Campaign. .........................45

**TABLE OF CONTENTS**
(continued)

Page

C. The DNC fails to state a claim against the Campaign for conspiracy to commit trespass to chattels.............................................................................................................47

D. The DNC fails to state a Virginia Computer Crimes Act claim against the Campaign...........49

CONCLUSION .................................................................................................................................50

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*4 K & D Corp. v. Concierge Auctions, LLC,*
  2 F. Supp. 3d 525 (S.D.N.Y. 2014) .................................................................. 13, 38

*Aerowest GmbH v. Freitag,*
  2016 WL 3636619 (E.D.N.Y. June 28, 2016) ................................................. 24

*Agency Holding Corp. v. Malley-Duff & Assocs.,*
  483 U.S. 143 (1987) ...................................................................................... 26

*Albright v. Attorney's Title Ins. Fund,*
  504 F.Supp.2d 1187 (D. Utah 2007) ............................................................. 32

*Alexander Interactive, Inc. v. Leisure Pro Ltd.,*
  2014 WL 4651942 (S.D.N.Y. Sep. 16, 2014) ................................................. 45

*Alliance Tech. Grp., LLC v. Achieve 1 LLC,*
  2013 WL 143500 (E.D. Va. Jan. 11, 2013) ................................................... 44

*America Online, Inc. v. IMS,*
  24 F.Supp.2d 548 (E.D. Va. 1998) ............................................................. 43, 44

*America Online, Inc. v. LCGM, Inc.,*
  46 F.Supp.2d 444 (E.D. Va. 1998) ............................................................. 48

*Anza v. Ideal Steel Supply Corp.,*
  547 U.S. 451 (2006) ...................................................................................... 33, 35

*Apotex Inc. v. Acorda Therapeutics, Inc.,*
  823 F.3d 51 (2d Cir. 2016) ........................................................................... 4

*Ashcroft v. Free Speech Coalition,*
  535 U.S. 234 (2002) ...................................................................................... 9

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) ...................................................................................... 37, 40

*Bartnicki v. Vopper,*
  532 U.S. 514 (2001) ...................................................................................... 7, 8, 9, 41

*Bastable v. Muslu,*
  2009 WL 7339887 (Va. Cir. Ct. July 8, 2009) ............................................. 50

*Beacon Prods. Corp. v. Reagan,*
  633 F.Supp. 1191 (D. Mass. 1986) ............................................................. 12

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007) ...................................................................................... 4, 28, 40, 45

*Boccardi Capital Sys. v. D.E. Shaw Laminar Portfolios,*
  2009 WL 362118 (S.D.N.Y. Feb. 9, 2009) ................................................... 45

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Boehner v. McDermott,*
484 F.3d 573 (D.C. Cir. 2007) ...................................................................... 7, 41, 42

*BondPro Cop. v. Siemens Power Generation,*
463 F.3d 702 (7th Cir. 2006) ........................................................................ 46

*Boyle v. United States,*
556 U.S. 938 (2009) ............................................................................. 14, 20, 21, 23

*Buckley v. Valeo,*
424 U.S. 1 (1976) ........................................................................................ 20

*CAIR Action Network, Inc. v. Gaubatz,*
82 F.Supp.3d 344 (D.D.C. 2015) .................................................................. 46

*Cal. Democratic Party v. Jones,*
530 U.S. 567 (2000) ..................................................................................... 9

*Cannon v. Douglas Elliman, LLC,*
2007 WL 4358456 (S.D.N.Y. Dec. 10, 2007) .............................................. 23

*Casio Computer Co. v. Sayo,*
2000 WL 1877516 (S.D.N.Y. Oct. 13, 2000) .............................................. 37

*Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,*
511 U.S. 164 (1994) ............................................................................. 42, 49, 50

*Cherrie v. Va. Health Servs., Inc.,*
787 S.E.2d 855 (Va. 2016) ........................................................................... 49

*Citizens United v. FEC,*
558 U.S. 310 (2010) ............................................................................... 10, 42

*City of New York v. Smokes-Spirits.com, Inc.,*
541 F.3d 425 (2d Cir. 2008) ..................................................................... 25, 26

*Clinton v. Jones,*
520 U.S. 681 (1997) ...................................................................................... 1

*Cofacredit, S.A. v. Windsor Plumbing Supply Co.,*
187 F.3d 229 (2d Cir. 1999) ...................................................................... 32, 37

*Comm. to Protect our Agric. Water v. Occidental Oil & Gas Corp.,*
235 F.Supp.3d 1132 (E.D. Cal. 2017) .......................................................... 15

*Corrie v. Caterpillar, Inc.,*
503 F.3d 974 (9th Cir. 2007) ....................................................................... 11

*Crichton v. Golden Rule Ins. Co.,*
576 F.3d 392 (7th Cir. 2009) ....................................................................... 25

*D. Penguin Bros. v. City Nat. Bank,*
587 F. App'x 663 (2d Cir. 2014) .................................................................. 15

## TABLE OF AUTHORITIES
(continued)

<div align="right">**Page(s)**</div>

*DeFalco v. Bernas,*
   244 F.3d 286 (2d Cir. 2001) ........................................................................................... 33, 34

*Econ. Research Servs. v. Resolution Econ., LLC,*
   208 F.Supp.3d 219 (D.D.C. 2016) ........................................................................................47

*First Capital Asset Mgmt., Inc. v. Satinwood, Inc.,*
   385 F.3d 159 (2d Cir. 2004) .......................................................................14, 19, 31, 32

*First Nat'l Bank v. Holland,*
   39 S.E.126 (Va. 1901) ........................................................................................................48

*Fisher v. Offerman & Co.,*
   1996 WL 563141 (S.D.N.Y. Oct. 2, 1996) ...........................................................................32

*Fla. Star v. B.J.F.,*
   491 U.S. 524 (1989).........................................................................................................8, 9

*Fraser v. Nationwide Mut. Ins. Co.,*
   352 F.3d 107 (3d Cir. 2003) ...............................................................................................38

*Gelber v. Glock,*
   800 S.E.2d 800 (Va. 2017) ........................................................................................... 47, 48

*Gilligan v. Morgan,*
   413 U.S. 1 (1973) ................................................................................................................11

*Goldwater v. Carter,*
   444 U.S. 996 (1979) ............................................................................................................11

*Green v. New Vision Int'l, Inc.,*
   156 F.3d 721 (7th Cir. 1998).................................................................................................25

*Grimes v. Fremont Gen. Corp.,*
   785 F.Supp.2d 269 (S.D.N.Y. 2011).....................................................................................13

*Grosjean v. Am. Press Co.,*
   297 U.S. 233 (1936)............................................................................................................10

*Gross v. Waywell,*
   628 F.Supp.2d 475 (S.D.N.Y. 2009).....................................................................................36

*H.J. Inc. v. Nw. Bell Tel. Co.,*
   492 U.S. 229 (1989)......................................................................................................26, 31

*Hechler Chevrolet, Inc. v. Gen. Motors Corp.,*
   337 S.E.2d 744 (Va. 1985) ..................................................................................................48

*Herold v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,*
   2018 WL 1950641 (E.D. Va. April 25, 2018)........................................................................50

*Japan Whaling Ass'n v. Am. Cetacean Soc.,*
   478 U.S. 221 (1986)............................................................................................................11

## TABLE OF AUTHORITIES
(continued)

Page(s)

*Kerik v. Tacopina,*
   64 F.Supp.3d 542 (S.D.N.Y. 2014) ................................................................................................12

*Kolari v. N.Y.-Presbyterian Hosp.,*
   455 F.3d 118 (2d Cir. 2006) .............................................................................................. 44, 45

*Konop v. Hawaiian Airlines, Inc.,*
   302 F.3d 868 (9th Cir. 2002) ...........................................................................................................38

*Kucinich v. Bush,*
   236 F.Supp.2d 1 (D.D.C. 2002) ....................................................................................................11

*Louis Vuitton Malletier, S.A. v. LY USA, Inc.,*
   676 F.3d 83 (2d Cir. 2012) .............................................................................................................44

*Luis v. Zang,*
   833 F.3d 619 (6th Cir. 2016) .................................................................................................. 38, 39

*McCutcheon v. FEC,*
   572 U.S. 185 (2014) ........................................................................................................................20

*Miller v. California,*
   413 U.S. 15 (1973) ...........................................................................................................................9

*Monitor Patriot Co. v. Roy,*
   401 U.S. 265 (1971) ........................................................................................................................20

*Moss v. BMO Harris Bank, N.A.,*
   258 F.Supp.3d 289 (E.D.N.Y. 2017) .....................................................................................*passim*

*N.Y. Times Co. v. United States,*
   403 U.S. 713 (1971) .........................................................................................................................7

*Nat'l Grp. for Commc'ns & Computers Ltd. v. Lucent Techs. Inc.,*
   420 F.Supp.2d 253 (S.D.N.Y. 2006) .................................................................................. 14, 15, 37

*Packingham v. North Carolina,*
   137 S. Ct. 1730 (2017) ....................................................................................................................10

*Pure Power Boot Camp v. Warrior Fitness Boot Camp,*
   587 F.Supp.2d 548 (S.D.N.Y. 2008) ...................................................................................... 38, 39

*Reed Constr. Data Inc. v. McGraw-Hill Cos.,*
   745 F.Supp.2d 343 (S.D.N.Y. 2010) ..............................................................................................14

*Reves v. Ernst & Young,*
   507 U.S. 170 (1993) ................................................................................................................ 24, 25

*Rosner v. Bank of China,*
   528 F.Supp.2d 419 (S.D.N.Y. 2007) ....................................................................................... 19, 21

*Roth v. Jennings,*
   489 F.3d 499 (2d Cir. 2007) .............................................................................................................4

**TABLE OF AUTHORITIES**
(continued)

<div align="right">

**Page(s)**

</div>

*RSM Prod. Corp. v. Fridman,*
   643 F.Supp.2d 382 (S.D.N.Y. 2009) ................................................................ 22, 23

*Ruckelshaus v. Monsanto Co.,*
   467 U.S. 986 (1984) ................................................................................................ 46

*Salinas v. United States,*
   522 U.S. 52 (1997) .................................................................................................. 37

*Sedima, S.P.R.L. v. Imrex Co.,*
   473 U.S. 479 (1985) .......................................................................................... 35, 36

*Shaw v. Nissan N. Am., Inc.,*
   220 F.Supp.3d 1046 (C.D. Cal. 2016) .................................................................. 15

*Snyder v. Fantasy Interactive, Inc.,*
   2012 WL 569185 (S.D.N.Y. Feb. 9, 2012) .......................................................... 39

*Snyder v. Phelps,*
   562 U.S. 443 (2011) .............................................................................................. 8, 9

*Snyder v. Phelps,*
   580 F.3d 206 (4th Cir. 2009) ................................................................................... 9

*Spinale v. United States,*
   2004 WL 50873 (S.D.N.Y. Jan. 9, 2004) ............................................................ 27

*Spool v. World Child Int'l Adoption Agency,*
   520 F.3d 178 (2d Cir. 2008) ........................................................................ 4, 31, 33

*State Analysis, Inc. v. Am. Fin. Servs. Ass'n,*
   621 F.Supp.2d 309 (E.D. Va. 2009) ..................................................................... 47

*Stein v. World-Wide Plumbing Supply Inc.,*
   71 F.Supp.3d 320 (E.D.N.Y. 2014) ...................................................................... 24

*Steve Jackson Games, Inc. v. U.S. Secret Serv.,*
   36 F.3d 457 (5th Cir. 1994) ................................................................................... 38

*Tarantos v. Fox News Network, LLC,*
   2018 WL 2731268 (S.D.N.Y. May 18, 2018) ..................................................... 39

*Tarros S.p.A. v. United States,*
   982 F.Supp.2d 325 (S.D.N.Y. 2013) .................................................................... 11

*Town of Mamakating v. Lamm,*
   2015 WL 5311265 (S.D.N.Y. Sept. 11, 2015) .................................................... 21

*United Mine Workers v. Gibbs,*
   383 U.S. 715 (1966) .............................................................................................. 43

*United States v. Agrawal,*
   726 F.3d 235 (2d Cir. 2013) .................................................................................. 30

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*United States v. Aleynikov*,
    737 F.Supp.2d 173 (S.D.N.Y. 2010) ............................................................................... 27, 29

*United States v. Lee*,
    2010 WL 8696087 (N.D. Cal. May 21, 2010) ........................................................................ 30

*United States v. Lloyds TSB Bank PLC*,
    639 F.Supp.2d 326 (S.D.N.Y. 2009) ..................................................................................... 29

*United States v. Persico*,
    832 F.2d 705 (2d Cir. 1987) ................................................................................................... 31

*United States v. Steiger*,
    318 F.3d 1039 (11th Cir. 2003) .............................................................................................. 38

*United States v. Turkette*,
    452 U.S. 576 (1981) ................................................................................................... 13, 14, 24

*Westchester Cty. Indep. Party v. Astorino*,
    137 F.Supp.3d 586 (S.D.N.Y. 2015) ........................................................... 33, 34, 36, 37

*Wood v. Incorporated Vill. of Patchogue*,
    311 F.Supp.2d 344 (E.D.N.Y. 2004) ..................................................................................... 24

**STATUTES**

18 U.S.C. § 1831 ................................................................................................ 27, 28, 29, 30

18 U.S.C. § 1832 ................................................................................................ 27, 28, 29, 30

18 U.S.C. § 1961 .............................................................................................................. 13, 26

18 U.S.C. § 1962 ............................................................................................................. *passim*

18 U.S.C. § 1964 .............................................................................................................. 12, 33

18 U.S.C. § 2510 ......................................................................................................................... 39

18 U.S.C. § 2511 ............................................................................................................. *passim*

18 U.S.C. § 2701 ......................................................................................................................... 39

28 U.S.C. § 1367 .............................................................................................................. 43, 44

52 U.S.C. § 30101 .................................................................................................................... 45

D.C. Code § 36-401 ..................................................................................................... 45, 46, 47

Va. Code § 18.2-152 ...................................................................................................... 49, 50

**OTHER AUTHORITIES**

D. Balz & S. Clement,
    *Clinton Holds Narrow Lead over Trump on Eve of Conventions*,
    Wash. Post (July 17, 2016) .................................................................................................... 35

**TABLE OF AUTHORITIES**

(continued)

Page(s)

A. Chozick et al.,
*Bernie Sanders Endorses Hillary Clinton, Hoping to Unify Democrats,*
N.Y. Times (July 12, 2016) ..................................................................................................35

A. Chozick,
*Hillary Clinton Blames F.B.I. Director for Election Loss*, N.Y. Times (Nov. 12, 2016) ..........................35

FEC,
*Transaction Query by Individual Contributor* ..............................................................................45

Jack L. Goldsmith,
*Uncomfortable Questions in the Wake of Russia Indictment 2.0*, Lawfare (July 16, 2018) ..........................7

Merriam-Webster Online Dictionary, *intercept* ..........................................................................39

North Atlantic Treaty,
63 Stat. 2241, 34 U.N.T.S. 243 (Apr. 4, 1949) ..................................................................................12

Office of the Director of National Intelligence,
*Assessing Russian Activities and Intentions in Recent US Elections* (Jan. 6, 2017) .............................. 16, 17

Evan Osnos et al.,
*Trump, Putin, and the New Cold War*, New Yorker (Mar. 6, 2017) ........................................................16

J. Peters et al.,
*Black Turnout Soft in Early Voting, Boding Ill for Hillary Clinton,*
N.Y. Times (Nov. 1, 2016) ..................................................................................................35

J. Peters and Y. Alcindor,
*Hillary Clinton Struggles to Win Back Young Voters From Third Parties,*
N.Y. Times (Sept. 28, 2016) ..................................................................................................35

Restatement (Second) of Torts § 217 ..........................................................................................48

Charlie Savage,
*Assange, Avowed Foe of Clinton, Timed Email Release for Democratic Convention,*
N.Y. Times (July 26, 2016) ..................................................................................................18

**INTRODUCTION**

In this case, the Democratic National Committee ("DNC") seeks to litigate and explain away its candidate's defeat in the 2016 presidential election. The DNC thus alleges—unburdened by any actual facts—that President Trump's campaign (Donald J. Trump for President, Inc.; "the Campaign") conspired with Russia and a hodgepodge of others to publish materials stolen from the DNC's computer systems. But the DNC does not claim the Campaign had any role in hacking its systems and stealing the materials—it attributes that only to Russia. Nor does the DNC claim the Campaign played any part in publishing the stolen materials—it attributes that only to Russia and WikiLeaks. Instead, the DNC predicates its claims against the Campaign exclusively on allegations that: (1) the Campaign received advance notice of some disclosures; and (2) after disclosures occurred, the Campaign made political use of the revealed information and publicly encouraged additional disclosures.

There are many problems with the DNC's politically motivated lawsuit. It threatens to unleash discovery that would interfere with the President's "vast and important" responsibilities, which require "his undivided time and attention." *Clinton v. Jones*, 520 U.S. 681, 697 (1997). It expressly challenges policy decisions the President has made, like the decision to withdraw troops from Syria. And it would inevitably collide with the various investigations (and at least one pending prosecution) relating to alleged collusion between Russia and Americans during the 2016 campaign.

Fortunately, the DNC's partisan effort to drag the Court into a political thicket already occupied by Congress and Special Counsel Robert Mueller is legally meritless, and so must be dismissed. For starters, *even if* the Campaign had a role in publishing materials stolen by others (which the DNC does not claim), the First Amendment protects disclosures of public issues. This protection undoubtedly covers the disclosed materials, which revealed, for instance, the DNC's questionable conduct during its presidential primaries, its correspondence with wealthy donors, and its cozy relationship with the media.

The DNC's claims also fail on their own terms. *First*, the centerpiece of the Second Amended Complaint ("SAC") consists of claims that the Campaign participated in an enterprise that violated the Racketeer Influenced Corrupt Organizations Act (RICO) and conspired to violate RICO. But RICO claims are notoriously meritless, and the DNC's are no different:

- The DNC needs to allege an enterprise whose members pursued an unlawful common purpose by working closely together for an extended time. But it simply lumps together Defendants who pursued differing objectives, who were connected only by isolated interactions, and who did not even allegedly come together until well after the alleged misconduct began.
- The DNC needs to allege that the Campaign played a role in directing the enterprise's affairs. But the most it claims is that the Campaign cheered on *others* who were directing those affairs.
- The DNC needs to allege that the Campaign itself committed criminal acts amounting to a pattern of racketeering. It attempts to satisfy this requirement by claiming that the Campaign conspired to deal in trade secrets of the DNC, but it fails to come anywhere close to plausibly alleging any such conspiracy.
- The DNC needs to allege that the supposed RICO violations proximately caused injury to its business or property. But it instead alleges mostly noneconomic (and political) injuries, and fails to establish a single cognizable injury directly traceable to the alleged enterprise.
- Finally, the DNC needs to plausibly allege that the Campaign agreed with the other Defendants to violate RICO. But it does not even attempt to make this showing.

*Second*, the DNC's claim under the Wiretap Act fails, because it does not allege that the Campaign had any role in intercepting in-progress communications or using intercepted communications.

*Third*, the DNC's state-law claims fare no better. Given the defects in the federal claims and the complex issues that the state claims raise, the Court should not exercise supplemental jurisdiction. But even if the Court kept the claims (and even if the First Amendment did not bar them), they would all require dismissal. The DNC invokes D.C.'s Uniform Trade Secrets Act, but fails to plead that this case involves trade secrets; it alleges conspiracy to commit trespass to chattels under Virginia law, but implicitly recognizes that the Campaign had no role in Russia's obtaining DNC materials; and it asserts a claim under the Virginia Computer Crimes Act, but ignores that the Act does not authorize aiding-and-abetting liability (and, again, that the Campaign was not involved in any hacking).

Despite now having attempted *three times* to assert viable legal claims, the DNC still falls far short. The Court should dismiss all claims against the Campaign with prejudice.

## BACKGROUND

The DNC alleges that, during the 2016 presidential campaign, "Russia's intelligence services illegally hacked into the DNC's computer systems and email server." (SAC ¶ 83 (Dkt. 216).) Russian intelligence agents allegedly launched the first phase of the cyberattack in July 2015 (*id.* ¶ 115), and the second phase in April 2016 (*id.* ¶ 101). As a result of these attacks, Russian intelligence agents allegedly copied "thousands of DNC documents and emails." (*Id.* ¶ 14.)

The DNC further alleges that, after Russian agents had stolen the DNC's emails and other documents, Russian agents entered into a conspiracy with the Campaign, WikiLeaks, and others to "disseminate [the] stolen DNC material." (*Id.* ¶ 82.) The DNC claims that, in accordance with this supposed conspiracy, Russia and WikiLeaks released batches of stolen DNC materials over the course of the next several months. (*See id.* ¶¶ 143–76.)

These disclosures revealed important information about the DNC to the public. For example:

- The disclosures revealed DNC officials' hostility toward Senator Sanders during the primaries. Officials discussed portraying him as an atheist, speculating that "my Southern Baptist peeps would draw a big difference between a Jew and an atheist." (Ex. 1, 3.) They suggested pushing a "narrative" that he "never ever had his act together, that his campaign was a mess." (Ex. 2, 3.) They opposed his push for additional debates. (Ex. 3.) They complained that he "has no understanding" of the Democratic Party. (Ex. 4.) The DNC's chairperson even leaked debate questions to Secretary Clinton. (Ex. 5.)

- According to *The New York Times*, "thousands of emails" between donors and fundraisers revealed "in rarely seen detail the elaborate, ingratiating and often bluntly transactional exchanges necessary to harvest hundreds of millions of dollars from the party's wealthy donor class." These emails "capture[d] a world where seating charts are arranged with dollar totals in mind, where a White House celebration … is a thinly disguised occasion for rewarding wealthy donors and where physical proximity to the president is the most precious of currencies." (Ex. 6.)

- The disclosures revealed Secretary Clinton's positions on important questions of foreign policy. For example, in one email, Secretary Clinton stated: "My dream is a hemispheric common market, with open trade and open borders." (Ex. 7.)

- The disclosures revealed racism at the DNC and the Clinton Campaign. One memo discussed ways to "acquire the Hispanic consumer," claiming that "Hispanics are the most brand loyal consumers in the World" and that "Hispanics are the most responsive to 'story telling.'" (Ex. 8.) Another email pitched "a new video we'd like to use to mop up some more taco bowl engagement." (Ex. 9.) Still another email described "Latinos" as "needy." (Ex. 10.)

- The disclosures revealed alleged cover-ups of sexual harassment at the Clinton Campaign. A campaign official wrote in one email: "I was recently contacted by a source who claims to have worked on the 2008 Hillary Clinton campaign and is alleging that Marlon Marshall [a senior campaign staffer] made unwelcome sexual advances and propositions towards women on the campaign repeatedly." The email continues: "The source also claims that [campaign manager] Robby Mook was made aware of the issue, but declined to act on it or intervene because he is personal friends with Marshall." (Ex. 11.)

- The disclosures revealed the DNC's cozy relationship with the media. For example, emails showed that reporters would ask the DNC to approve articles before publication. (Ex. 12.) They also showed DNC staffers discussing giving a CNN reporter "questions to ask us." (Ex. 13.)

In April 2018, the DNC brought this lawsuit. The DNC has amended its complaint twice since then. The SAC raises six claims against the Campaign: (1) violation of RICO (count II), (2) conspiracy to violate RICO (count III), (3) violation of the Wiretap Act (count IV), (4) violation of the Washington, D.C. Uniform Trade Secrets Act (count VIII), (5) conspiracy to commit trespass to chattels in violation of Virginia law (count XII), and (6) violation of the Virginia Computer Crimes Act (count XIV).

## STANDARD OF REVIEW

Rule 12(b)(6) provides for the dismissal of a complaint for failure to state a claim. Dismissal is necessary where a complaint fails to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "[B]ald assertions and conclusions of law will not suffice. The pleadings must create the possibility of a right to relief that is more than speculative." *Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 183 (2d Cir. 2008) (citation omitted).

A court must decide a motion under Rule 12(b)(6) on the basis of the factual allegations in the complaint, documents "integral to the complaint," and judicially noticeable matters. *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007). Here, the Court may consider the contents of the materials published by Russia and WikiLeaks: Those materials are integral to the SAC because it necessarily relies on them, and they are also subject to judicial notice because their contents are publicly available on the internet. *Apotex Inc. v. Acorda Therapeutics, Inc.*, 823 F.3d 51, 60 (2d Cir. 2016).

**ARGUMENT**

Many of the legal issues in this case turn on the distinction between (1) stealing documents and (2) disclosing documents that someone else previously stole. It is thus essential to emphasize at the outset: The SAC alleges only that the Campaign conspired to disclose documents that someone else—namely, Russia—previously stole. The SAC does not allege that the Campaign itself stole any documents, or even that it conspired to steal any documents.

The DNC's description of the Campaign's conduct makes clear that the DNC alleges participation in the disclosure of the emails, not participation in the hacking or the theft (all emphases added):

- "The Conspiracy *To Disseminate* Stolen DNC Data To Aid Trump." (SAC at 24.)
- "Defendants *disseminated* documents and data stolen from the DNC." (*Id.* ¶ 34.)
- "Defendants launched a scheme *to disseminate* information that was damaging to the Democratic party and the DNC." (*Id.* ¶ 132.)
- "Following The Trump Tower Meeting, Russia Continues Its Hacking And Launches A Massive *Public Dissemination* Of Stolen DNC Documents." (*Id.* at 37.)
- "After The Trump Campaign Blocks Anti-Russia Language From The GOP Platform, WikiLeaks Begins *Disseminating* Stolen DNC Documents." (*Id.* at 40.)
- "Trump Associates Secretly Communicate With Russian Agents And WikiLeaks As They *Strategically Release* Stolen DNC Documents." (*Id.* at 42.)
- "The illegal conspiracy inflicted profound damage upon the DNC. The timing and selective *release* of the stolen materials prevented the DNC from communicating with the American electorate on its own terms." (*Id.* ¶ 244.)
- "The timing and selective *release* of stolen materials was designed to and had the effect of driving a wedge between the DNC and Democratic voters." (*Id.* ¶ 245.)

The DNC's factual theory likewise makes it clear that the alleged conspiracy between Russia and the Campaign came into being *after* the hack and *after* the theft of the emails. The DNC alleges that Russia began "its cyberattack on the DNC" in July 2015, "launched a pervasive cyberattack on DNC servers" on "April 18, 2016," and "staged several gigabytes of DNC data located on the DNC's servers for unauthorized and surreptitious exfiltration" on "April 22, 2016." (*Id.* ¶ 84, 101, 104.) The DNC separately alleges that, "[f]our days" after the April 22 theft, a "Kremlin-tied agent" informed George Papadopoulos, an advisor to the Campaign, "that the Russians 'have dirt' on [Hillary Clinton]

- 5 -

in the form of 'thousands of emails.'" (*Id.* ¶ 13.) The DNC continues that on "June 3, 2016"—two months after the first theft of information in April, and a month after the last theft of information in May—Russians offered the information to the Campaign. (*Id.* ¶ 14.) The DNC insinuates that the Campaign accepted this supposed offer in a meeting on "June 9, 2016." (*Id.* ¶ 137.) In short, the DNC's own factual theory is that (1) Russia stole the DNC's emails on April 22, 2016, but (2) Russia made contact with the Campaign only on April 26, and offered to assist the Campaign only in June.

To be sure, the SAC alleges that Russia continued to "maintain[] an [un]authorized presence within the DNC network" after April 22, 2016. (*Id.* ¶ 120.) Even so, the SAC fails to tie this continued unauthorized presence to the Campaign. First, the SAC nowhere alleges that the Campaign agreed that Russia should continue to maintain an unauthorized presence in the DNC's servers. Second, the SAC nowhere alleges any facts from which one could infer that the Campaign made such an agreement. Third, the DNC identifies "May 2016" as the last date on which Russia stole data from the DNC (*id.* ¶ 57), but "June 9, 2016," as the first date on which Russia offered to assist the Campaign (*id.* ¶ 15). As a result, even taking into account the allegation of Russia's continued presence in the DNC servers, the SAC *still* fails to allege that the Campaign had any involvement in the hacking of the DNC's servers or in the theft of its materials.

Against this backdrop, the Court should dismiss the DNC's claims.

## I.   The Court Should Dismiss All Claims Against the Campaign Because the Imposition of Liability Would Violate the First Amendment.

In each of their claims, the DNC seeks to hold the Campaign legally responsible for the publication of the DNC's emails and other data on the internet. Of course, the DNC does not actually claim that the Campaign played any role in publishing those materials—only that it took advantage of the materials after WikiLeaks published them. But even if the DNC did make such a claim, the First Amendment protects a speaker's right to disclose stolen information so long as (1) the speaker did not participate in the theft and (2) the information deals with matters of public concern. The

DNC does not allege that the Campaign participated in the theft of the leaked materials, and the materials plainly deal with matters of public concern. Each claim must thus be dismissed.

**A.** In *Bartnicki v. Vopper*, 532 U.S. 514 (2001), the Supreme Court held that the First Amendment protects a speaker's right to disclose stolen information if (1) the speaker was not "involved" in the acquisition and (2) the disclosure deals with "a matter of public concern." *Id.* at 529, 535. There, leaders of a teachers' union spoke on the phone about using violence against school-board members to influence salary negotiations. *Id.* at 518–19. An unknown person secretly intercepted the call and shared the illegal recording with a local radio host, who played the recording on his show. *Id.* at 519. The Court ruled that the First Amendment prohibited the imposition of liability on the radio host, because the host "played no part in the illegal interception" and "the subject matter of the conversation was a matter of public concern." *Id.* at 525. It reasoned that "state action to punish the publication of truthful information" "seldom" complies with the Constitution. *Id.* at 527. The state has an interest in deterring theft of information, but it must pursue that goal by imposing "an appropriate punishment" on "the intercepto[r]"—not by punishing a speaker who was "not involved in the initial illegality." *Id.* at 529. The state also has an interest in protecting "privacy of communication," but "privacy concerns give way when balanced against the interest in publishing matters of public importance." *Id.* at 534. In short, *Bartnicki* establishes that "a stranger's illegal conduct does not suffice to remove the First Amendment shield from speech about a matter of public concern." *Id.* at 535.

"[A]n opposite rule"—under which a speaker may be punished for truthful disclosures on account of a "defect in the chain of title"—"would be fraught with danger." *Boehner v. McDermott*, 484 F.3d 573, 586 (D.C. Cir. 2007) (op. of Sentelle, J., joined by a majority of the *en banc* court). "U.S. newspapers publish information stolen via digital means all the time." Jack L. Goldsmith, *Uncomfortable Questions in the Wake of Russia Indictment 2.0*, Lawfare (July 16, 2018), https://goo.gl/ovq117. Indeed, they "openly solicit such information." *Id.*; *see N.Y. Times Co. v. United States*, 403 U.S. 713 (1971)

(publication of the stolen *Pentagon Papers*). Punishing "conspiring to publish stolen information" "would certainly narrow protections for 'mainstream' journalists." Goldsmith, *supra*.

**B.** The Campaign satisfies the first part of *Bartnicki*'s test: It "played no part in the illegal interception." *Bartnicki*, 532 U.S. at 525. As explained above, the DNC alleges a "Conspiracy *To Disseminate* Stolen DNC Data To Aid Trump." (SAC at 24 (emphasis added); *supra* pp. 5–7.) The DNC does not assert—and cannot plausibly assert—a conspiracy to steal the emails in the first place.

**C.** The Campaign also satisfies the second part of *Bartnicki*'s test: the disclosure deals with "a matter of public concern." 532 U.S. at 525. "Speech deals with matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest." *Snyder v. Phelps*, 562 U.S. 443, 453 (2011) (citations and quotation marks omitted). In applying this test, a court must examine the "content, form, and context" of the speech. *Id.*

A court must judge the public character of a disclosure in the aggregate, not line by line. For example, in *Bartnicki*, leaders of a teachers' union spoke on the phone about "blow[ing] off the[] front porches" of school-board members to influence salary negotiations. 532 U.S. at 518–19. Even though that specific threat was not itself speech about public issues, the First Amendment protected the disclosure because the host made it while "engaged in debate about" teacher pay—"a matter of public concern." *Id.* at 535. The "public concern" test thus turns on the broader context of the disclosure, not the nature of the specific fact disclosed.

The Supreme Court followed the same holistic approach in *Florida Star v. B.J.F.*, 491 U.S. 524 (1989). In that case, a newspaper published an article that revealed the name of a rape victim, violating a state statute that forbade the disclosure of this private fact. Even though the victim's name itself was a private fact not of public concern, the Court ruled that the First Amendment barred civil liability, because "the *news article* concerned a matter of public significance." *Id.* at 536 (emphasis

added). The Court emphasized that "the article generally, *as opposed to the specific identity contained within it*, involved a matter of paramount public import." *Id.* at 536–37 (emphasis added).

The Supreme Court again took this approach in *Snyder*. There, protesters held up hateful signs at a soldier's funeral—some addressing public issues ("God Hates the USA"), some condemning the fallen soldier ("You're Going to Hell"). 562 U.S. at 454. The Court held that the First Amendment protected the entire protest—including the private taunts "related to [the fallen soldier and his family] specifically"—because "the overall thrust and dominant theme of [the] demonstration spoke to broader public issues." *Id.* The Fourth Circuit, too, had ruled that the whole protest was protected, "even when [the soldier's parents] are mentioned," because the "general message" "primarily concerned" matters of public concern. *Snyder v. Phelps*, 580 F.3d 206, 225–26 (4th Cir. 2009).

*Bartnicki*, *Florida Star*, and *Snyder* thus show that courts must apply the public-concern test to a disclosure as a whole, not to individual snippets of the disclosure taken in isolation. This approach accords with the broader "First Amendment rule" that courts must always judge speech "as a whole." *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 248 (2002); *cf. Miller v. California*, 413 U.S. 15, 24 (1973) (speech is obscene only if "the work, *taken as a whole*, appeals to the prurient interest" and "*taken as a whole*, lacks serious … value" (citation omitted, emphasis added)).

Here, the content, form, and context of the disclosures establish that the disclosures, in the aggregate, dealt with public issues. To begin with the content: Every disclosed item was (1) work material (2) created, sent, or received by a political operative (3) during a presidential campaign. Every disclosed item thus inherently addressed politics, elections, and campaigns—all paradigmatic public issues. Indeed, the disclosed materials dealt pervasively with *important* public issues. They revealed the DNC's conduct during its presidential primaries—which are "public affair[s]," "structur[ed] and monitor[ed]" by the state. *Cal. Democratic Party v. Jones*, 530 U.S. 567, 572 (2000). They revealed the nature of the DNC's interactions with rich donors—educating citizens about the influence of

"moneyed interests." *Citizens United v. FEC*, 558 U.S. 310, 370 (2010). And they revealed the closeness of the party's ties to the media—"the great interpreters between the government and the people." *Grosjean v. Am. Press Co.*, 297 U.S. 233, 250 (1936). The importance of these issues to the public is only further confirmed by the overwhelming media coverage that the disclosures received.

The form of the disclosure reinforces its public character. WikiLeaks published the emails on "the vast democratic forums of the Internet." *Packingham v. North Carolina*, 137 S. Ct. 1730, 1735 (2017). It communicated the disclosed information to the public at large, confirming the public interest attached to this information.

Finally, the context of the disclosure confirms that the disclosure deals with matters of public concern. WikiLeaks published the emails on July 22, 2016, "just three days before the Democratic National Convention." (SAC ¶ 156.) That timing shows that the "overall thrust" of the disclosure was to reveal important facts to the electorate.

In sum, the Campaign did not participate in the theft of the emails, and the emails taken as a whole concerned public issues. The First Amendment bars civil liability.

## II. The Political-Question Doctrine Precludes Judicial Review of the DNC's Criticisms of President Trump's Political Decisions.

Compounding the constitutional problems with this lawsuit, the DNC seeks to air grievances it has with policy decisions President Trump has made *as President*. It claims, for instance, that President Trump has "help[ed] Russia" by "threaten[ing] to withdraw the U.S. from NATO." (SAC ¶ 243.) And it takes issue with the President's decision as Commander in Chief to "order[] the withdrawal of U.S. forces from Syria." (*Id.*)

The political-question doctrine exists precisely to keep courts from wading into such quintessential policy disputes committed to the political branches. The doctrine "excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive

Branch." *Japan Whaling Ass'n v. Am. Cetacean Soc.*, 478 U.S. 221, 230 (1986). The DNC's complaints about policy decisions by its political opponent—the President—clearly fall within this doctrine, and thus clearly fall beyond any court's authority to address.

"It is well established," for instance, "that the political question doctrine generally precludes judicial review of discretionary military decisions related to military operations"—like the decision to pull troops from Syria. *Tarros S.p.A. v. United States*, 982 F.Supp.2d 325, 330–39 (S.D.N.Y. 2013) (collecting cases). After all, "[i]t would be difficult to think of a clearer example of the type of governmental action that was intended by the Constitution to be left to the political branches directly responsible—as the Judicial Branch is not—to the electoral process" than "[t]he complex subtle, and professional decisions as to the … control of a military force." *Gilligan v. Morgan*, 413 U.S. 1, 10 (1973). The decision "[w]hether to grant military or other aid to a foreign nation is a political decision inherently entangled with the conduct of foreign relations," and so courts "cannot intrude into [this] decision … even indirectly." *Corrie v. Caterpillar, Inc.*, 503 F.3d 974, 983 (9th Cir. 2007) (affirming dismissal of challenge to defense contractor's arms sales to Israel).

Just as clearly, the political-question doctrine forbids courts from becoming entangled in challenges to a President's authority to terminate—or, even more clearly, to "threaten[] to withdraw from"—a treaty such as NATO. "In light of the absence of any constitutional provision governing the termination of a treaty, and the fact that different termination procedures may be appropriate for different treaties," the decision to terminate a treaty "must surely be controlled by political standards." *Goldwater v. Carter*, 444 U.S. 996, 1003 (1979) (plurality op., Rehnquist, J.). Indeed, "the justifications for concluding that [such] question[s] [are] political in nature" are particularly "compelling … because [they] involve[] foreign relations—specifically a treaty commitment to use military force in the defense of a foreign government if attacked." *Id.* at 1003–04; *see also, e.g., Kucinich v. Bush*, 236 F.Supp.2d 1, 17–18 (D.D.C. 2002) (dismissing challenge to President George W.

Bush's withdrawal from Anti-Ballistic Missile Treaty); *Beacon Prods. Corp. v. Reagan*, 633 F.Supp. 1191, 1198 (D. Mass. 1986) (dismissing challenge to President Reagan's termination of treaty), *aff'd on other grounds*, 814 F.2d 1 (1st Cir. 1987). Of course, a key aspect of NATO is the "commitment to use military force in the defense" of other signatories. *See* North Atlantic Treaty art. 5, 63 Stat. 2241, 34 U.N.T.S. 243 (Apr. 4, 1949). Given that courts lack the constitutional authority to adjudicate the legality of an *actual* withdrawal from a treaty, the Court obviously cannot rule on the President's statements *threatening* such a withdrawal. (And even apart from the political-question doctrine, there would be obvious First Amendment problems with a court policing statements made by a sitting President about policy matters of clear public concern.)

That the DNC seeks to litigate its loss in the 2016 election is bad enough. Its efforts at having the Court second-guess political decisions made by the President, in exercising his constitutional authority, are even worse. The Constitution forecloses these efforts.

## III. The DNC Fails to State RICO Claims Against the Campaign.

The DNC asserts that the Campaign committed a substantive RICO violation under § 1962(c), which makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." A plaintiff must plausibly allege "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Kerik v. Tacopina*, 64 F.Supp.3d 542, 553 (S.D.N.Y. 2014) (citation omitted). The plaintiff also must establish that the RICO violation proximately caused an injury to its "business or property." § 1964(c). The DNC also alleges that the Campaign violated § 1962(d), which makes it "unlawful for any person to conspire to violate any of the" substantive RICO provisions.

RICO's standards are hard to satisfy: "although civil RICO may be a 'potent weapon,' plaintiffs wielding RICO almost always miss the mark." *Moss v. BMO Harris Bank, N.A.*, 258 F.Supp.3d 289,

297 (E.D.N.Y. 2017) (citing *Gross v. Waywell*, 628 F.Supp.2d 475, 479–83 (S.D.N.Y. 2009)). For example, of the 36 civil RICO cases brought in this District from 2004 through 2007, *every case* that was "resolved on the merits resulted in judgments against the plaintiffs, mostly at the motion to dismiss stage." *Id.* Courts therefore must "look with particular scrutiny at [RICO] claims." *Grimes v. Fremont Gen. Corp.*, 785 F.Supp.2d 269, 299 (S.D.N.Y. 2011) (citation omitted).

The DNC's RICO claims—under both § 1962(c) and (d)—do not withstand this scrutiny.

**A. The DNC has not alleged a valid enterprise.**

"The existence of an enterprise at all times remains a separate element which must be proved" to prevail in a RICO action. *United States v. Turkette*, 452 U.S. 576, 583 (1981). A RICO enterprise "includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).

The DNC makes two attempts at alleging the existence of a RICO enterprise. It first alleges that the Campaign was itself an enterprise. (SAC ¶¶ 267–71). It immediately concedes, however, that this theory applies (if at all) only to the other Defendants, *not* the Campaign. (*Id.* ¶ 269 ("[E]ach Defendant—except the Trump Campaign itself—participated in the operation or management of the Trump Campaign.").) This concession was a necessary one: § 1962(c) "imposes liability on a 'person' who is *employed by or associated with* an 'enterprise,'" and so a "plaintiff could not allege a claim against a corporation as a defendant 'person' while also claiming that the corporation was the 'enterprise.'" *4 K & D Corp. v. Concierge Auctions, LLC*, 2 F.Supp.3d 525, 536 n.4 (S.D.N.Y. 2014) (Koeltl, J.) (emphasis added). (In any event, the DNC's "Campaign as enterprise" theory fails, because the DNC cannot establish that other Defendants "conduct[ed] or participate[d] … in the conduct of the [Campaign's] affairs through a pattern of racketeering activity (§ 1962(c)), and also for many of the same reasons that its association-in-fact theory fails (*infra* § III.A).)

The DNC's claim against the Campaign thus rests entirely on its second theory of a RICO enterprise: the allegation that the Campaign "was part of an Association-In-Fact comprising" all Defendants and one non-defendant, Jerome Corsi ("the AIF Enterprise"). The DNC alleges that the AIF Enterprise formed no earlier than March 2016 ("or, at the very least, by June 2016"), and worked "to further [the members'] mutual goal of using illegal means to secure Trump's grip on the Presidency, in part by damaging the DNC." (SAC ¶ 272.) This theory, too, fails. An "association-in-fact enterprise must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle v. United States*, 556 U.S. 938, 946 (2009). In addition, the enterprise requirement is separate from the requirement of a pattern of racketeering activity, and so a plaintiff must plausibly allege "an entity separate and apart from the pattern of activity in which it engages." *Turkette*, 452 U.S. at 583. The AIF Enterprise does not satisfy *any* of these requirements.

### 1. The DNC fails to allege a common purpose.

The members of an association-in-fact enterprise must be "associated together for a common purpose of engaging in a course of conduct." *Boyle*, 556 U.S. at 946 (citation omitted). A RICO plaintiff therefore must "provide … solid information" from which a court "could fairly conclude that [alleged enterprise] members functioned as a unit … for a common purpose of engaging in a course of conduct." *First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 174–75 (2d Cir. 2004) (citations and internal quotation marks omitted)). "Individuals or [entities] that do not share such a common purpose cannot be considered part of a RICO enterprise as a matter of law." *Reed Constr. Data Inc. v. McGraw-Hill Cos.*, 745 F.Supp.2d 343, 351 (S.D.N.Y. 2010).

To satisfy this requirement at the motion-to-dismiss stage, a RICO complaint must "set forth facts to support the conclusion that all [] defendants were actually working with one another … to accomplish a common purpose." *Nat'l Grp. for Commc'ns & Computers Ltd. v. Lucent Techs. Inc.*, 420

F.Supp.2d 253, 271 (S.D.N.Y. 2006); *see also, e.g.*, *D. Penguin Bros. v. City Nat. Bank*, 587 F. App'x 663, 668 (2d Cir. 2014) (rejecting alleged common purpose of "purchas[ing] the favor and influence of political leaders and government officials" because "this allegation is little more than a 'naked assertion' devoid of further factual enhancement" (citations omitted)); *Shaw v. Nissan N. Am., Inc.*, 220 F.Supp.3d 1046, 1056 (C.D. Cal. 2016) (rejecting unsupported allegations that defendants "shared a common fraudulent purpose" that were unaccompanied by allegations of "plausible facts that satisfy the common purpose requirement"). Where a plaintiff "allege[s] only a series of disconnected incidents, each involving a subset of the overall group of defendants, with no clear indication of a unified agenda," dismissal is required. *Comm. to Protect our Agric. Water v. Occidental Oil & Gas Corp.*, 235 F.Supp.3d 1132, 1175 (E.D. Cal. 2017).

Originally, the DNC claimed the members of the AIF Enterprise had the common purpose "of improving Trump's electoral prospects and damaging the DNC." (Am. Compl. ¶ 227 (Dkt. 182).) The Campaign's prior Motion to Dismiss explained that this theory was fatally flawed: far from plausibly alleging that all Defendants shared this common purpose, the DNC was forced to acknowledge (and to rely on materials explaining) that the hodgepodge, disparate members of the supposed AIF Enterprise—a foreign nation, an "Azeri-born oligarch" and his pop-singer son, a London-based Maltese academic, "an international organization of unknown structure" and its founder, the Campaign and several employees, multiple members of President Trump's family, and the President's supposed "long-time confidant"—actually held widely divergent objectives in connection with the election. (SAC ¶¶ 48–61, 70–80; *see also* Campaign's Mem. ISO MTD at 12–16 (Dkt. 212).)

Now, engaging in meaningless semantic games, the DNC rewords the AIF Enterprise's supposed common purpose as "using illegal means to secure Trump's grip on the Presidency, in part by damaging the DNC." SAC ¶ 272. That cosmetic change plainly cannot cure the fundamental defect. There is no difference, especially for purposes of RICO, between working to "improv[e] Trump's

electoral prospects" and working to "secure Trump's grip on the Presidency." (And as explained *infra* at III.A.2, merely tagging on the words "using illegal means" does not change this.) Notwithstanding the new rhetoric, the DNC's theory fails for the same reason as before: its own allegations and cited materials confirm that the supposed AIF Enterprise members were working to further their own quite different objectives. The DNC has made no attempt at demonstrating otherwise, and doing so would be impossible in light of the well-documented facts confirming these divergent objectives.

**Russia.** The SAC and the materials cited therein make clear that Russia's goals were complex and evolving, but centered on that nation's overarching geopolitical objectives. For example, a report that the DNC repeatedly cites (reflecting the joint views of the Central Intelligence Agency, the Federal Bureau of Investigation, and the National Security Agency) characterizes "Russian efforts to influence the 2016 US presidential election" as "the most recent expression of Moscow's longstanding desire to undermine the US-led democratic order," "the promotion of which [Russian President Vladimir] Putin and other senior Russian leaders view as a threat to Russia and Putin's regime." Office of the Director of National Intelligence, *Assessing Russian Activities and Intentions in Recent US Elections* at ii, 1 (Jan. 6, 2017), https://goo.gl/GLuFuz (cited at SAC ¶¶ 81, 84, 115, 118) ("IC Report"). Or, as another article cited by the DNC puts it: "the e-mail hacks were part of a larger, and deeply troubling picture: Putin's desire to damage American confidence and to undermine the Western alliances—diplomatic, financial, and military—that have shaped the postwar world." Evan Osnos et al., *Trump, Putin, and the New Cold War*, New Yorker (Mar. 6, 2017), https://goo.gl/kzdhPo (cited at SAC ¶ 72).

The tactics that Russia deployed in pursuit of this objective "evolved over the course of the campaign based on Russia's understanding of the electoral prospects of the two main candidates." IC Report at ii. As the DNC alleges, Russia's hacking efforts began in July 2015—long before President Trump even became the front-runner for the Republican nomination, let alone clinched that

nomination in May 2016. (SAC ¶¶ 81, 84, 115.) "When it appeared to Moscow that Secretary Clinton was likely to win the election," Russia "began to focus more on undermining her future presidency." IC Report at ii. The common thread in all of this was Russia's objective of improving its own global standing and undermining U.S. democracy, regardless of which candidate prevailed. Indeed, even the DNC acknowledges that Putin's since-declared preference for President Trump was based on Putin's "belie[f]" that "Trump's policies would be *more favorable to the Kremlin*." (*Id.* ¶ 76 (emphasis added).)

The DNC also alleges that Russia pursued other objectives having nothing to do with "secur[ing] Trump's grip on the Presidency" or "damaging the DNC." (SAC ¶ 272.) Specifically, the DNC asserts that Russia's efforts were driven in part by Putin's clashes with Secretary Clinton, stemming from his view that she was to blame for "massive protests [that] broke out in Russia" in December 2011 and that threatened his "power" and "control." (*Id.* ¶¶ 71–72.) Thus, Russia would have sought to defeat Mrs. Clinton regardless of her Republican opponent, and was seeking to "damage" her, not "the DNC." Moreover, the DNC unsurprisingly does not claim that any other Defendant shared Putin's objective of "maintaining power and exerting control" as President of Russia. (*Id.* ¶ 72.)

***Assange and WikiLeaks.*** The DNC does not allege that Assange or WikiLeaks shared Russia's objective of "undermin[ing] the US-led liberal democratic order." IC Report at ii. More to the point, it does not allege facts plausibly suggesting that either had any particular interest in helping President Trump's electoral prospects. Instead, the DNC sets forth three personal objectives unique to Assange and WikiLeaks. *First*, the DNC alleges that Assange and WikiLeaks held a goal of undermining Secretary Clinton, based on Assange's "history [of] conflicts" and personal "policy disagreements" with Clinton. (SAC ¶ 78.) Those conflicts and disagreements spanned the spectrum from political (Assange criticized Secretary Clinton for "pushing to intervene in Libya in 2011") to philosophical (he saw Clinton "as a bit of a problem for freedom of the press more generally") to personal (he accused Clinton of "pushing to indict him after WikiLeaks disseminated a quarter of a

million diplomatic cables during her tenure as secretary of state"). Charlie Savage, *Assange, Avowed Foe of Clinton, Timed Email Release for Democratic Convention*, N.Y. Times (July 26, 2016), https://goo.gl/JRbCMk (cited at SAC ¶ 78). No other Defendant is alleged to have shared these personal vendettas against Secretary Clinton. *Second*, the DNC alleges, "[u]pon information and belief," that Assange and WikiLeaks "worked to secure Trump's grip on the Presidency even after the 2016 election because of Trump's favorable view of WikiLeaks." (SAC ¶ 79.) But the DNC does not claim any other Defendant held an objective of advancing WikiLeaks' interests or mission. *Third*, the DNC alleges—again upon information and belief—that Assange and WikiLeaks supported Trump "because of the Russian government's inclination to assist Assange" in evading extradition to Sweden. (*Id.*) The DNC makes no attempt at explaining what one has to do with the other.

**The Campaign.** The DNC does not ascribe any of the aforementioned purposes—longstanding desires to "undermine the US-led democratic order" and "American confidence," or efforts to prosecute personal vendettas against Secretary Clinton—to the Campaign. Instead, it offers only a single sentence as to the Campaign's purpose, asserting that the Campaign's "stated goal was to get Trump elected, both in 2016 and 2020." (SAC ¶ 80.) In other words, the Campaign is alleged to have held the same purpose held by every other political campaign ever formed (not to mention the 63 million Americans who voted for President Trump).

**Other Defendants.** The DNC makes only passing references to the purposes supposedly held by the other Defendants. It alleges that Joseph Mifsud "wanted to advance Russia's interests." (*Id.* ¶ 77.) But this conclusory assertion obviously does not establish that Mifsud held any purpose whatsoever with respect to either President Trump or the DNC. Separately, the DNC alleges that Aras and Emin Agalarov sought to "curr[y] favor with Russian officials"—an objective no other Defendant is claimed to have held. (*Id.* ¶ 80.) The DNC also alleges that "the Agalarovs and the Trump Associates … stood to benefit financially and professionally from a Trump Presidency." (*Id.*) Of course,

it is hardly surprising that the Defendants who worked for or are related to President Trump would desire his election. Regardless, the DNC does not claim that any other Defendant shared this supposed desire for pecuniary and professional gain—an inherently personal objective—or that any of the Agalarovs or Trump Associates held an objective of "damaging the DNC." (SAC ¶ 272.) (Also, despite claiming that non-defendant Corsi—an "associate" of Roger Stone's (*id.* ¶ 162)—was a member of the AIF Enterprise, the DNC offers no allegations as to his supposed objectives.)

In short, the DNC's own allegations and cited materials confirm that the AIF Enterprise cobbles together an assortment of disparate individuals and entities, each pursuing unique purposes not held by other purported enterprise members. Because the DNC has not plausibly alleged that the supposed enterprise members shared a *common* purpose, this enterprise theory—and with it, the DNC's § 1962(c) claim against the Campaign—fails.

### 2. The DNC fails to allege an *unlawful* common purpose.

Even if the DNC *did* plausibly allege that the AIF Enterprise members held a common purpose, this enterprise theory would still fall short. A RICO plaintiff must allege not just a common purpose, but an *unlawful* common purpose. Where a complaint does not plausibly allege that the members of an association-in-fact enterprise "shared a common unlawful purpose to violate RICO," it " fails to sufficiently allege the 'enterprise' element" under § 1962(c). *Rosner v. Bank of China*, 528 F.Supp.2d 419, 429 (S.D.N.Y. 2007); *see also Moss*, 258 F.Supp.3d at 299 ("[F]ailing to allege that members of an association-in-fact enterprise shared a wrongful intent to violate RICO is fatal to an 18 U.S.C. § 1962(c) claim."); *First Capital Asset Mgmt.*, 385 F.3d at 174 ("[F]or an association of individuals to constitute an enterprise, the individuals must share a common purpose to engage in a particular *fraudulent* course of conduct and work together to achieve such purposes." (emphasis added)).

The DNC seems to ascribe talismanic power to the phrase "Trump's grip on the Presidency," deploying variations of that phrase over and over in the SAC. (SAC ¶¶ 3, 5, 28, 70, 77, 79, 206, 211,

272, 356.) The phrase did not appear even once in the DNC's prior Complaints, which instead used less caustic rhetoric like "Trump's candidacy." (E.g., Am. Compl. ¶ 2.) But whatever the rhetoric, there is nothing illicit about the AIF Enterprise's alleged purpose of advancing President Trump's electoral prospects and diminishing the DNC's. Quite the contrary, the rights to "support [a] candidate and his views," and to "affiliate … with a candidate" "in furtherance of common political goals" are at the heart of the First Amendment. *Buckley v. Valeo*, 424 U.S. 1, 22 (1976) (per curiam); *see also McCutcheon v. FEC*, 572 U.S. 185, 226 (2014) (plurality) (noting "the basic nature of the party system, in which party members join together to further common political beliefs, and citizens can choose to support a party because they share some, most, or all of those beliefs"). Indeed, "it can hardly be doubted that the constitutional guarantee has its fullest and most urgent application precisely to the conduct of campaigns for political office." *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 272 (1971).

To be sure, the DNC takes issue with the *tactics* it accuses the AIF Enterprise of deploying. To that end, it seeks to cure the deficiencies in its theorized common purpose by amending that purpose to include the "us[e]" of "illegal means." (SAC ¶ 272.) But as explained below, an association-in-fact enterprise must exist independently of the acts in which it engages, and that existence (or nonexistence) turns on whether the enterprise members shared an unlawful purpose. *Boyle*, 556 U.S. at 946; *infra* III.A.5. The DNC cannot circumvent the separate enterprise requirement by alleging that illegal means were used to obtain a lawful objective. Because Defendants' alleged objective was entirely legitimate, Defendants did not form an enterprise.

Indeed, accepting the DNC's theory could have dire and far-reaching consequences. Every campaign this country has ever seen has held the objective of securing some political candidate's "grip" on political office, which necessarily comes at the expense of opposing candidates and their supporters. If this were enough to satisfy the common-purpose requirement, any campaign could be deemed a RICO enterprise and subjected to the threat of RICO liability (including treble damages)

for promoting its candidate. Injecting this rule into the already overheated world of modern campaigning would invite abusive RICO litigation designed to turn political contests into legal ones.

The Court need not and should not go down this dangerous path. Because the DNC offers no basis for concluding that the alleged AIF Enterprise members "shared a common unlawful purpose to violate RICO" (*Rosner*, 528 F.Supp.2d at 429), this enterprise theory fails.

### 3. The DNC fails to allege relationships amongst the purported association-in-fact enterprise members.

For an association-in-fact enterprise to exist, its members also must have "interpersonal relationships" with one another. *Boyle*, 556 U.S. at 946. Such relationships are crucial to providing the needed "evidence of an ongoing organization, formal or informal, and [] evidence that the various associates function as a continuing unit.'" *Id.* at 945 (quoting *Turkette*, 452 U.S. at 583). "[A]n association-in-fact enterprise must have [this] structure." *Id.*

A plaintiff cannot satisfy the relationships requirement merely by alleging that "participants in [an enterprise] preserve close business relationships and maintain established and defined roles within the enterprise" (*Moss*, 258 F.Supp.3d at 301), or that "several individuals, independently and without coordination, engaged in a pattern of crimes listed as RICO predicates" (*Boyle*, 556 U.S. at 947 n.4). Nor is it enough to simply "string[] together [] various defendants and label[] them an enterprise." *Town of Mamakating v. Lamm*, 2015 WL 5311265, at *9 (S.D.N.Y. Sept. 11, 2015), *aff'd on other grounds*, 651 F. App'x 51 (2d Cir. 2016). Rather, a plaintiff must set forth factual allegations demonstrating that the enterprise members "had an interpersonal relationship in which they worked together for a common illicit interest," from which it could plausibly be inferred that the members were "acting in any way [other than] in their own independent interests." *Moss*, 258 F.Supp.3d at 301.

The SAC does not plausibly allege the required relationships. The DNC baldly asserts that the AIF Enterprise "had an ongoing organizational framework" and theorizes that the enterprise "could not have carried out its intricate task of sharing confidential information at the moments when it

would be most beneficial to the Trump Campaign unless it had some structure for making and communicating group decisions." (SAC ¶ 273.) But at no point does it actually identify any such "framework" or "structure." In fact, it does not allege any connection at all among most Defendants.

Instead, the DNC alleges a series of isolated connections between various individuals. First, it asserts that some Defendants had "long-standing personal, professional, and financial ties to Russia" or to "individuals closely linked to the Russian government." (SAC ¶ 63; *see id.* ¶¶ 64–69.) But none of these supposed "ties"—President Trump's pre-presidency business dealings in Russia, Paul Mana-fort's previous work for "Russian-allied" Ukrainians, Manafort's and Robert Gates' "communica-tion[s]" with a former "linguist in the Russian army," and Assange's attempts to flee to Russia to es-cape extradition on sexual-assault charges—are alleged to have anything to do with the supposed enterprise. And it is not enough to allege simply that various individuals "preserve close business relationships" or other relationships. *Moss*, 258 F.Supp.3d at 301.

Beyond this, the DNC merely alleges isolated interactions between certain enterprise members: for instance, Papadopoulos's meetings with Mifsud, a Maltese academic "based in London" with un-defined connections to Russia (SAC ¶¶ 93–98); a meeting at Trump Tower that Donald Trump, Jr., Jared Kushner, and Manafort attended with a Russian publicist and an allegedly "Kremlin-connected Russian lawyer," among others (*id.* ¶¶ 136–37); and electronic correspondence involving "GRU op-eratives," WikiLeaks, Stone, and Corsi (*id.* ¶¶ 149–51, 162–63, 167). These allegations are insufficient.

*First*, many of these allegations rely on unsupported assertions that certain individuals were "agents" for other Defendants. (*See, e.g., id.* ¶ 52 (alleging that Mifsud "acted as a de facto agent of the Russian government"); *id.* ¶ 138 (alleging that the Russian lawyer who attended the Trump Tow-er meeting "had a history of acting as an agent of the Russian government").) But "conclusory alle-gations regarding [an] agency relationship," without "facts that support [this] assertion[,] … are not sufficient to survive a motion to dismiss." *RSM Prod. Corp. v. Fridman*, 643 F.Supp.2d 382, 408

(S.D.N.Y. 2009), *aff'd*, 387 F. App'x 72 (2d Cir. 2010); *see also Cannon v. Douglas Elliman, LLC,* 2007 WL 4358456, at *5 (S.D.N.Y. Dec. 10, 2007) (dismissing complaint that contained only "conclusory allegations of an agency relationship" and "offer[ed] no facts from which inferences of actual or apparent authority in this context can be drawn"). The DNC offers no such facts, and so cannot rely on these bare allegations to bootstrap relationships between various Defendants. It therefore has no basis for, among other things, establishing relationships between the Campaign and Russia.

*Second*, these isolated interactions between various Defendants do not establish that the disparate and geographically dispersed enterprise members were "work[ing] together for a common illicit interest," through "interpersonal relationships," rather than for "their own independent interests." *Moss*, 258 F.Supp.3d at 301 (citation omitted). As explained above (*supra* § III.A.1), the SAC establishes that the enterprise members held distinct purposes from one another and pursued those distinct purposes rather than some shared objective. And all of the alleged interactions are entirely consistent with Defendants each pursuing their unique, separate objectives. The fact that various Defendants occasionally communicated with one another does not provide any "evidence of an ongoing organization" that "function[ed] as a continuing unit." *Boyle*, 556 U.S. at 945 (citation omitted).

### 4. The DNC fails to allege an enterprise with the required longevity.

The DNC similarly cannot establish the third structural requirement of an association-in-fact enterprise: "longevity sufficient to permit the[] associates to pursue the enterprise's purpose." *Boyle*, 556 U.S. at 946. Even in the DNC's telling, the AIF Enterprise did not form until, at the earliest, March 2016—eight months *after* Russia allegedly "undert[ook] its cyberattack on the DNC" by infiltrating the DNC's network. (SAC ¶¶ 81, 84, 115, 227.) And the DNC does not allege that any other enterprise members assisted Russia in infiltrating the DNC's systems and extracting data. (*See id.* ¶¶ 3, 82–83.) The AIF Enterprise therefore did not exist long enough to play any role in the conduct that facilitated *every* theft and *every* disclosure at issue here. The enterprise lacks the required longevity.

**5. The DNC fails to allege an enterprise that is separate from the purported pattern of racketeering activity.**

Under § 1962, "[t]he 'enterprise' is not the 'pattern of racketeering activity'"; it "is an entity separate and apart from the pattern of activity in which it engages." *Turkette*, 452 U.S. at 583. The enterprise, in other words, "must have some sort of existence independent of the commission of the predicate acts." *Wood v. Incorporated Vill. of Patchogue*, 311 F.Supp.2d 344, 357 (E.D.N.Y. 2004). A plaintiff asserting a RICO claim therefore cannot merely lump defendants "'together for the sole reason that they all allegedly had [a hand]' in the alleged acts." *Aerowest GmbH v. Freitag*, 2016 WL 3636619, at *4 (E.D.N.Y. June 28, 2016) (citation omitted). A "RICO enterprise that is coterminous with the pattern of racketeering activity in which it engages … is not actionable." *Stein v. World-Wide Plumbing Supply Inc.*, 71 F.Supp.3d 320, 327 (E.D.N.Y. 2014).

The DNC quite plainly fails this test. At no point does it even attempt to allege that the AIF Enterprise had any "existence independent of the commission of the predicate acts." *Wood*, 311 F.Supp.2d at 357. To the contrary, all of the interactions between various Defendants that the DNC cobbles together are alleged to have been for the purpose of engaging in a pattern of racketeering activity. The DNC has not alleged "an organized entity," but rather has "plead[ed] only that a group existed to commit" predicate acts. *Aerowest GmbH*, 2016 WL 3636619, at *3. Such allegations "do not substantiate an 'enterprise' as required for a RICO claim." *Id.* at *4.

**B. The DNC has not alleged that the Campaign conducted or participated in the conduct of the alleged association-in-fact enterprise.**

Under § 1962(c), "one is not liable … unless one has participated in the operation or management of the enterprise itself." *Reves v. Ernst & Young*, 507 U.S. 170, 183 (1993). It is not enough for a defendant merely to associate with an enterprise; "*some* part in *directing* the enterprise's affairs is required." *Id.* at 179 (second emphasis added). This standard is not met where a defendant merely at-

tends to its own business; "liability depends on showing that the defendants conducted or partici-pated in the conduct of the *enterprise's* affairs, not just their *own* affairs." *Id.* at 185.

This being the case, "a person may not be held liable merely for taking directions and perform-ing tasks that are necessary and helpful to the enterprise, or for providing goods and services that ultimately benefit the enterprise." *Moss*, 258 F.Supp.3d at 306; *see also Green v. New Vision Int'l, Inc.*, 156 F.3d 721, 728 (7th Cir. 1998) ("[S]imply performing services for an enterprise, even with knowledge of the enterprise's illicit nature, is not enough to subject an individual to RICO liability …."). Nor do "[a]llegations that a defendant had a business relationship with a putative RICO enterprise … suffice." *Crichton v. Golden Rule Ins. Co.*, 576 F.3d 392, 399 (7th Cir. 2009). In short, "[s]imply alleging that certain entities provide services which are helpful to an enterprise[,] without any allegations that those entities exert any control over the enterprise[,] does not sufficiently allege a claim under RICO against those entities." *City of New York v. Smokes-Spirits.com, Inc.*, 541 F.3d 425, 449 (2d Cir. 2008), *rev'd on other grounds sub nom.*, *Hemi Grp., LLC v. City of New York*, 559 U.S. 1 (2010).

Here, the DNC does not even allege that the Campaign provided helpful services to the sup-posed AIF Enterprise—allegations that *still* would not pass the operation-and-management test. It does not claim the Campaign had any role in hacking into the DNC's systems, any role in exfiltrating data, or any role in publishing that data. In other words, the DNC does not allege that the Campaign played a part in—let alone directed—*any* of the conduct upon which its RICO claim is predicated.

Instead, the most the DNC alleges is that the Campaign cheered on *others* to direct the enter-prise's affairs, by supposedly "prais[ing]" and "celebrat[ing]" the publication of information relating to the DNC and "encourag[ing] Russia to continue its illegal hacking campaign." (SAC ¶¶ 4, 158; *see also, e.g., id.* ¶¶ 25, 158, 196–202.) This does not suffice.

As an initial matter, "prais[ing]," "celebrat[ing]," and "encourag[ing]," by definition, do not amount to "directing the enterprise's affairs." *Reves*, 507 U.S. at 179. This is particularly true given

that none of the Campaign's supposed conduct is alleged to have had any impact on the AIF Enter-

prise's conduct. The DNC alleges only that those actually involved in carrying out the theft and dis-

semination of information told others at the Campaign of their plans, without soliciting or receiving

any assistance—much less direction—from those individuals. (*E.g.*, SAC ¶¶ 94(d), 133, 173.) This is

the polar opposite of "exert[ing] … control over the enterprise." *Smokes-Spirits.com*, 541 F.3d at 449.

Just as clearly, praising the results of *others'* efforts in directing the AIF Enterprise's affairs is not

tantamount to directing those affairs. If it were, every journalist that credited the disclosures with

providing useful information could similarly be said to have directed the AIF Enterprise. But that is

obviously nonsense (and contrary to the First Amendment). The Campaign did not direct the AIF

Enterprise's affairs by praising the disclosure of (true and newsworthy) information any more than a

stadium of baseball fans can be said to have directed their team's affairs on the field.

### C.  The DNC has not alleged that the Campaign committed any predicate acts, let alone a pattern of racketeering activity.

"[T]he heart of any RICO complaint is the allegation of a *pattern* of racketeering." *Agency Holding*

*Corp. v. Malley-Duff & Assocs.*, 483 U.S. 143, 154 (1987). A "'pattern of racketeering activity' requires

at least two acts of racketeering activity"—known as "predicate acts"—occurring "within ten years"

of one another. § 1961(5). A plaintiff must establish that the predicate acts "are related, *and* that they

amount to or pose a threat of continued criminal activity." *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229,

239 (1989). The DNC is unable to establish that the Campaign engaged in a pattern of racketeering

activity, both because it fails to plausibly allege that the Campaign committed a single predicate act

and because it in any event fails to allege the continuous criminal activity that RICO requires.

#### 1.  The DNC fails to allege that the Campaign committed a single predicate act.

**a.** Previously, the DNC recognized the inescapable fact that the Campaign did not commit *any*

predicate acts. It instead based its § 1962(c) claim exclusively on a theory that the Campaign aided

and abetted *others* in committing such acts. The fatal problem with their allegations, as the Campaign

explained (Campaign's Mem. ISO MTD at 24–25), is that "[c]ourts in this district have routinely held that 'aiding and abetting' a RICO enterprise is not a valid cause of action." *Spinale v. United States*, 2004 WL 50873, at *6 (S.D.N.Y. Jan. 9, 2004).

Conceding its mistake, the DNC has abandoned its defective aiding-and-abetting theory. Now, it alleges in conclusory fashion that the Campaign conspired with the other Defendants to commit (1) economic espionage under 18 U.S.C. § 1831(a)(5); and (2) theft of trade secrets under § 1832(a)(5). SAC ¶¶ 282–83, 289–90. (The DNC cites § 1831(a)(5) in its claims that the Campaign conspired to commit theft of trade secrets, but the Campaign assumes this was a typographical error.) This new theory is just as deficient as the discarded one.

**b.** Sections 1831 and 1832 are part of the Economic Espionage Act. The two statutes "guard against the same types of threats to trade secrets, albeit from actors with different motivations": § 1831 prohibits stealing or misusing trade secrets for the benefit of foreign governments, and § 1832 prohibits stealing or misusing trade secrets for the benefit of private individuals and corporations. *United States v. Aleynikov*, 737 F.Supp.2d 173, 180 (S.D.N.Y. 2010).

The statutes' conspiracy provisions reflect these different objectives. Both provisions create liability for someone who "conspires with one or more other persons to" commit a substantive violation of the respective statutes, such as by "steal[ing] … a trade secret," "without authorization cop[ying] … or communicat[ing] … a trade secret," or "receiv[ing], buy[ing] or possess[ing] a trade secret" while knowing it was stolen or received without authorization. 18 U.S.C. § 1831(a)(5); *id.* § 1832(a)(5). But the statutes differ as to the intent required. Section 1831(a)(5) applies only to those who conspire "intending or knowing that the offense will benefit any foreign government, foreign instrumentality, or foreign agent." *Id.* § 1831(a). Section 1832(a)(5), by contrast, applies only to those who conspire "with intent to convert a trade secret, that is related to a product or service used in or intended for use in interstate or foreign commerce, to the economic benefit of anyone other than

the owner thereof, and intending or knowing that the offense will, injure any owner of that trade secret." *Id.* § 1832(a).

The DNC fails to plausibly allege that the Campaign committed multiple predicate acts of conspiracy under either § 1831 or § 1832.

**c.** At the threshold, the DNC has not plausibly alleged that the Campaign engaged in *any* predicate acts of conspiracy under either statute. A conspiracy claim requires plausible allegations raising "a reasonable expectation that discovery will reveal evidence of *illegal* agreement." *Twombly*, 550 U.S. at 556 (emphasis added). But at no point does the DNC allege that the Campaign reached *any* agreement with *anybody* to accomplish some illegal objective, let alone the two different objectives covered by §§ 1831 and 1832.

In fact, the DNC's allegations affirmatively refute any such inference. As explained above (*supra* pp. 5–7), the DNC does not allege that the Campaign had any role in stealing—or conspiring to steal—materials from the DNC. Nor does the DNC plausibly allege that the Campaign reached any agreement to disseminate stolen DNC materials. In fact, it does not even claim any American had communications even potentially related to disseminating materials until *after* Russia and WikiLeaks had already begun such disseminations. It alleges that Mifsud told Papadopoulos about emails "that could harm Hillary Clinton's presidential campaign" "[o]n April 26, 2016" (SAC ¶ 94), but the DNC does not claim that Papadopoulos discussed disseminating those (or any other) emails—let alone that the Campaign formed any agreement to do so. The DNC then claims that Stone began trying to contact Assange "[o]n July 25, 2016"—*after* both Russia and WikiLeaks had already begun disseminating stolen DNC materials, "[o]n June 15, 2016," and "July 22, 2016," respectively. *Id.* ¶¶ 147, 156, 162. To be clear, Stone was not a Campaign employee, and the DNC does not claim that he was acting as an agent of the Campaign. Regardless, the DNC offers no basis for concluding

that the Campaign conspired with Russia and WikiLeaks to do what those entities were already doing. The DNC is thus unable to sustain its allegations that the Campaign joined any conspiracy.

**d.** Even if the DNC *had* plausibly alleged the existence of an agreement, it has not satisfied the requirements of either § 1831 or § 1832.

Start with § 1831. *First*, the Campaign cannot possibly have joined a conspiracy to misappropriate trade secrets. "The law of conspiracy requires agreement as to the object of the conspiracy"; "the essential nature of the plan must be shown." *United States v. Lloyds TSB Bank PLC*, 639 F.Supp.2d 326, 344 (S.D.N.Y. 2009) (quoting *United States v. Rosenblatt*, 554 F.2d 36, 38 (2d Cir. 1977)). The "essential nature" of a conspiracy under § 1831 is an agreement to commit economic espionage involving trade secrets. *See Aleynikov*, 77 F.Supp.2d at 180 (the Economic Espionage Act statutes "guard against … threats to trade secrets"). Thus, the Campaign can have violated the statute only if it *actually knew* that any agreement it was supposedly entering was one involving trade secrets. But as explained below, none of the materials at issue are trade secrets. *Infra* § V.B. And even if the DNC alleged that the Campaign entered any agreement regarding disclosure of DNC materials, it certainly does not claim that the Campaign had any reason to believe the materials were trade secrets—much less that it "knew" this. Instead, the most it alleges is that certain individuals were told about "emails" (SAC ¶ 94) and "documents and information" (*id.* ¶ 133) that could be politically harmful to Secretary Clinton's campaign. There is no basis for concluding that the Campaign could have divined from these representations that the materials in question were trade secrets. The Campaign therefore cannot have entered a conspiracy prohibited by § 1831.

*Second*, the DNC does not (because it cannot) allege that the Campaign "intend[ed] or kn[e]w[]" that the alleged misappropriation of supposed trade secrets would "benefit any foreign government, foreign instrumentality, or foreign agent." § 1831(a). This element "must be interpreted to refer to the benefits ordinarily associated with 'espionage'"—namely, "gaining access to the stolen

- 29 -

information." *United States v. Lee*, 2010 WL 8696087, at \*5–6 (N.D. Cal. May 21, 2010). By contrast, "[e]vidence that Defendants solely intended to benefit themselves … is insufficient for the charge of Economic Espionage." *Id.* at \*7.

The DNC does not allege that the Campaign intended or knew that any supposed agreement to disclose alleged trade secrets would benefit a foreign government by granting it "access to the stolen information." *Id.* at \*6. In fact, its allegations are directly to the contrary: It alleges that Russia *already had* access to stolen information without any involvement of the Campaign, and so the Campaign cannot have intended that Russia would gain such access. And it alleges that the Campaign's only intent "was to get Trump elected"—in other words, to benefit the Campaign itself, not some foreign government. (SAC ¶ 80.) This "is insufficient" under § 1831. *Lee*, 2010 WL 8696087, at \*7.

The DNC's allegations fall similarly short under § 1832. *First*, § 1832(a) specifically requires a defendant to have acted "with intent to convert a trade secret." But as explained above, the Campaign cannot possibly have joined any sort of conspiracy to deal in trade secrets. This alone is fatal to its claim that the Campaign violated §1832. (And because no trade secrets were involved, the DNC by definition cannot show that the relevant trade secrets "related to a product or service used in or intended for use in interstate or foreign commerce," as the statute requires.)

*Second*, a defendant must have "formed the requisite intent to convert" "when the defendant engaged in" proscribed conduct, such as conspiring. *United States v. Agrawal*, 726 F.3d 235, 256 (2d Cir. 2013). But given the DNC's failure to allege that the Campaign had any role in the theft of the DNC materials, the Campaign certainly cannot have had the intent to "convert" trade secrets.

*Third*, the DNC does not allege that the Campaign "inten[ded] to convert a trade secret … to the economic benefit of anyone other than the owner thereof." § 1832(a). At no point does the DNC plausibly allege facts suggesting that the Campaign intended that *anyone* would economically benefit from use of the DNC's supposed trade secrets. Again, its only allegation as to the Campaign's intent

is to the contrary: that the Campaign's objective "was to get Trump elected," which has nothing to do with economically benefitting anyone. (SAC ¶ 80.)

In short, the DNC has not plausibly alleged that the Campaign committed any predicate acts.

### 2. The DNC fails to allege a threat of continuing criminal conduct.

Even if the DNC had plausibly alleged that the Campaign committed at least two predicate acts, it still could not establish the "continued criminal activity" that RICO requires. *H.J.*, 492 U.S. at 239. A plaintiff can satisfy this requirement "either by showing a 'closed-ended' pattern—a series of related predicate acts extending over a substantial period of time—or by demonstrating an 'open-ended' pattern of racketeering activity that poses a threat of continuing criminal conduct beyond the period during which the predicate acts were performed." *Spool*, 520 F.3d at 183 (citation omitted).

Previously, the DNC attempted to establish only closed-ended continuity, alleging that the AIF Enterprise ceased on November 8, 2016 (Election Day). (SAC ¶ 227.) The Campaign, however, pointed out that the resulting length of the enterprise (at most, nine months) fell well short of the minimum duration that the Second Circuit has ever found sufficient to show closed-ended continuity (two years). Campaign's Mem. ISO MTD at 26–27; *see also Spool*, 520 F.3d at 184 ("[W]e have 'never held a period of less than two years to constitute a 'substantial period of time.''" (citation omitted)). So now the DNC does an about-face, alleging only open-ended continuity by claiming that the AIF Enterprise continues operating in "the present." (SAC ¶ 272.) This theory fares no better.

"In analyzing the issue of continuity," the Court must "evaluate the RICO allegations with respect to each defendant individually." *First Capital Asset Mgmt.*, 385 F.3d at 180; *see also United States v. Persico*, 832 F.2d 705, 714 (2d Cir. 1987) ("The focus of section 1962(c) is on the individual patterns of racketeering engaged in by a defendant, rather than the collective activities of the

members of the enterprise."). So the DNC must show that the Campaign itself—not the AIF Enterprise more broadly—engaged in conduct that "poses a threat of continuing criminal conduct."

It has not done so. To the contrary, *all* of the DNC's allegations against the Campaign center on the notion that it joined a conspiracy to influence the 2016 election. At no point does the DNC allege facts suggesting a conspiracy to influence President Trump's electoral prospects *after* Election Day 2016, let alone that the Campaign is involved in such a conspiracy. The DNC's allegations thus raise precisely the sort of "'inherently terminable' scheme" that the Second Circuit has consistently held "does not imply a threat of continued racketeering activity." *Cofacredit, S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d 229, 244 (2d Cir. 1999) (citation omitted); *see also, e.g., First Capital Asset Mgmt.*, 385 F.3d at 180–81 (no open-ended continuity where enterprise aimed at defrauding creditors "essentially came to its conclusion" when the defendant filed for bankruptcy); *Fisher v. Offerman & Co.*, 1996 WL 563141, at *4 (S.D.N.Y. Oct. 2, 1996) (Koeltl, J.) (no "threat of continuity" from enterprise that allegedly committed fraud in debt offerings, given that "the plaintiff alleges no acts of fraud associated with the offerings beyond the period during which the debentures were sold").

The DNC's allegations regarding post-election conduct do not alter this conclusion. Instead, they only confirm the DNC's inability to allege the Campaign's involvement in a conspiracy to deal in stolen DNC trade secrets beyond the 2016 election. The DNC claims that certain AIF Enterprise members—but not the Campaign—took steps to "cover up their collusion" relating to the 2016 election. (SAC ¶¶ 5, 206–31.) But it does not allege that any of these individuals or entities have sought to use stolen DNC information *after* the election. In any event, "[i]t is well established that 'attempts merely to conceal an underlying illegal predicate act are not sufficient to establish the open-ended continuity required for RICO claims.'" *Albright v. Attorney's Title Ins. Fund*, 504 F.Supp.2d 1187, 1207 (D. Utah 2007) (citation omitted) (collecting cases). The DNC also alleges that Russia— with no involvement of the Campaign—attempted to interfere in several congressional midterm

elections. (SAC ¶¶ 232–33.) But this obviously has nothing to do with a conspiracy to "secure Trump's grip on the Presidency." (*Id.* ¶ 272.)

<div align="center">*     *     *     *     *</div>

The DNC has not plausibly alleged that the Campaign committed *any* predicate acts. And even if it had, it has not plausibly alleged that any such acts *by the Campaign* "pose[] a threat of continuing criminal conduct beyond the period during which the predicate acts were performed." *Spool*, 520 F.3d at 183. For these reasons, too, its § 1962(c) claim fails.

### D. The DNC has not alleged any cognizable injury that was proximately caused by the alleged RICO violations.

A plaintiff has a cause of action under RICO only if it was "injured in [its] business or property." 18 U.S.C. § 1964(c). The injury must be "actual [and] quantifiable"; "courts have required that the plaintiff show concrete financial loss in order to show injury under RICO." *Westchester Cty. Indep. Party v. Astorino*, 137 F.Supp.3d 586, 613 (S.D.N.Y. 2015).

The injury to business or property, moreover, must be "by reason of a violation of section 1962" (§ 1964(c)) meaning that a RICO violation must be "both the proximate cause and the but-for cause of the plaintiffs' injuries." *Westchester Cty. Indep. Party*, 137 F.Supp.3d at 612 (citing *UFCW Local 1776 v. Eli Lilly & Co.,* 620 F.3d 121, 132 (2d Cir. 2010)). "When a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led *directly* to the plaintiff's injuries." *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 460–61 (2006) (emphasis added). A plaintiff must plausibly allege that its damages are "attributable to the violation, as distinct from other, independent factors." *DeFalco v. Bernas*, 244 F.3d 286, 329–30 (2d Cir. 2001).

The DNC makes four attempts at asserting cognizable injuries proximately caused by the supposed RICO violations. The Campaign's prior Motion to Dismiss explained why all four attempts fail. Nevertheless, the DNC simply advances the same deficient theories yet again.

*First*, the DNC alleges that the WikiLeaks publications disrupted its political efforts, including by "driving a wedge between the DNC and Democratic voters," "impair[ing] the DNC's ability to support Democratic candidates," "undermining the party's ability to achieve unity and rally members around their shared values," and "chilling potential donors." (SAC ¶¶ 245–48.) But interference with the DNC's political efforts does not constitute an "injury to business or property." "[I]njury to the [p]arty's 'business of choosing and securing candidates of their choice'"—or supporting those candidates—"does not become a business injury simply by virtue of calling it that." *Westchester Cty. Indep. Party*, 137 F.Supp.3d at 615. This is instead, "at most, a non-economic" political injury. *Id.* Proving the point, the DNC does not even claim to have any way of quantifying the "impair[ment]" of its "ability to support Democratic candidates" or the "interfer[ence] with [its] opportunity to communicate its vision to the electorate." (SAC ¶¶ 245–46.) Similarly, allegations that the DNC "has been unable to earn the money donations it normally secures … lack[] the requisite precision necessary to constitute a RICO injury." *Westchester Cty. Indep. Party*, 137 F.Supp.3d at 615.

Further, the DNC cannot show that these purported injuries directly followed from the alleged RICO violation, "as distinct from other, independent factors." *DeFalco*, 244 F.3d at 329–30. As an initial matter, the DNC cannot establish that any political injury it suffered was caused by the alleged predicate acts (the theft and disclosure of the emails) as opposed to the public's reaction to the information those emails revealed about the DNC's conduct. And in any event, there are a number of well-known factors—having nothing to do with the WikiLeaks releases—that caused the DNC to struggle politically in the lead-up to its candidate's defeat in the general election: the protracted primary fight between Secretary Clinton and Senator Sanders, the then-FBI Director's public statement declaring that Secretary Clinton had been "extremely careless" in using a private email server as Secretary of State (and later announcing, days before the election, that the investigation into Secretary Clinton's email practices was being reopened), low enthusiasm for Secretary Clinton among im-

portant demographic groups, and so on. *See, e.g.*, A. Chozick et al., *Bernie Sanders Endorses Hillary Clinton, Hoping to Unify Democrats*, N.Y. Times (July 12, 2016), https://goo.gl/5y6hQh ("After 14 months of policy clashes and moments of disdain, Senator Bernie Sanders endorsed Hillary Clinton ...."); D. Balz & S. Clement, *Clinton Holds Narrow Lead over Trump on Eve of Conventions*, Wash. Post (July 17, 2016), https://goo.gl/CneHZk (reporting that polls "shift[ed] in Trump's direction" after "Clinton received a stern rebuke from [the] FBI Director" for her and her aides' "handling of sensitive classified material in their email exchanges"); A. Chozick, *Hillary Clinton Blames F.B.I. Director for Election Loss*, N.Y. Times (Nov. 12, 2016), https://goo.gl/CVhaAo ("Hillary Clinton on Saturday cast blame for her surprise election loss on the announcement by the F.B.I. director ... days before the election that he had revived the inquiry into her use of a private email server."); J. Peters et al., *Black Turnout Soft in Early Voting, Boding Ill for Hillary Clinton*, N.Y. Times (Nov. 1, 2016), https://goo.gl/cjk9cm (reporting that "disappointing black turnout" was "creating a vexing problem for Hillary Clinton as she clings to a deteriorating lead over Donald J. Trump with Election Day just a week away"); J. Peters and Y. Alcindor, *Hillary Clinton Struggles to Win Back Young Voters From Third Parties*, N.Y. Times (Sept. 28, 2016), https://goo.gl/GTGsjm ("[Young voters] are not moving toward the [Democratic] party and its nominee as quickly and predictably as they have in past elections."). These factors and others all played major roles in "undermining the party's ability to achieve unity." (SAC ¶ 246.) The DNC thus cannot show that "the alleged violation led *directly* to" its supposed injuries. *Anza*, 547 U.S. at 461 (emphasis added).

*Second*, the DNC alleges that "the public releases ... exposed employees of the DNC to intense, frightening, and sometimes life-threatening harassment." (SAC ¶ 249; *see also id.* ¶¶ 250–53.) But those individuals are not plaintiffs, and the DNC has no standing to sue on their behalf. A RICO "plaintiff only has standing if, and can only recover to the extent that, *he* has been injured in *his* business or property by the conduct constituting the violation." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S.

479, 496 (1985) (emphases added). And in any event, "RICO violations must cause injury to 'business or property'"; "personal or emotional damages do not qualify." *Gross*, 628 F.Supp.2d at 488; *see also Westchester Cty. Indep. Party*, 137 F.Supp.3d at 612 (collecting cases).

*Third*, the DNC alleges that its computer systems were damaged by the alleged hacking, purportedly creating the need to repair and replace certain technology, and to retain staff and consultants to investigate the hacking and remediate the damage. (SAC ¶ 254.) But the DNC alleges that the hacking commenced in July 2015—months before the AIF Enterprise allegedly came into existence (somewhere between March and June 2016). (*Id.* ¶¶ 8, 272.) And the DNC does not suggest that it can identify particular damage that resulted from subsequent conduct after the AIF Enterprise came into being, rather than the initial hack. It therefore has no basis for claiming that the AIF Enterprise proximately caused this injury.

*Finally*, the DNC alleges that the GRU "stole proprietary computer code" and "proprietary information concerning the ways in which the DNC analyzed its data, developed its strategies and approached decisions in its efforts to win the 2016 election." (*Id.* ¶¶ 255–256.) Although the DNC says that it "derives value" from this code and information "by virtue of their secrecy" (*id.* ¶¶ 184, 186, 189) and that "[t]he GRU could have derived significant economic value" from this data by "selling the data to the highest bidder" (*id.* ¶ 193), it does not allege that the information actually *was* sold, or that the information was disseminated at any point. These supposed injuries thus have no connection to the releases of trade secrets that underlie the DNC's § 1962(c) claim. And even if they did, the DNC does not claim that it can quantify any "concrete financial loss" stemming from this alleged theft, as would be required. *Westchester Cty. Indep. Party*, 137 F.Supp.3d at 612.

\*      \*      \*      \*      \*

The DNC does not allege a valid association-in-fact enterprise, does not allege that the Campaign participated in the operation or management of any such enterprise, does not allege that the

Campaign committed any predicate acts (let alone a continuous pattern of such acts), and does not allege that it sustained any cognizable injury to its property or business that was proximately caused by RICO violations. Its § 1962(c) claim against the Committee must be dismissed.

### E. The DNC's tagalong RICO-conspiracy claim also fails.

The DNC's RICO-conspiracy claim under § 1962(d) fares no better. "To establish the existence of a RICO conspiracy, a plaintiff must prove 'the existence of an agreement to violate RICO's substantive provisions.'" *Cofacredit*, 187 F.3d at 244 (citation omitted). After all, "[a] conspirator must intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense." *Salinas v. United States*, 522 U.S. 52, 65 (1997). So where, as here, a plaintiff cannot plead a violation of any of RICO's substantive provisions, it by definition cannot establish a conspiracy to violate any of those provisions. That is why "[c]ase law in this Circuit confirms that a 1962(d) conspiracy claim must be dismissed where the substantive RICO claim is deficient." *Nat'l Grp.*, 420 F.Supp.2d at 272; *see also Westchester Cty. Indep. Party*, 137 F.Supp.3d at 618 (collecting cases).

In any event, the DNC's conspiracy claim fails on its own terms because the DNC has not alleged a conspiratorial agreement with anywhere near the required specificity. "The core of a RICO civil conspiracy is an agreement to commit predicate acts," and so the DNC must plausibly allege a "conscious agreement among all defendants to commit at least two predicate acts." *Casio Computer Co. v. Sayo*, 2000 WL 1877516, at *22 (S.D.N.Y. Oct. 13, 2000). "Conclusory allegations of a conspiracy," by contrast, "are insufficient to plead a Section 1962(d) claim." *Nat'l Grp.*, 420 F.Supp.2d at 272 (citation omitted); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice ….").

But conclusory allegations are all that the DNC offers. Its § 1962(d) claim spans all of four paragraphs, one of which just incorporates the rest of the SAC and the other three of which merely recite the elements of a § 1962(d) cause of action. (SAC ¶¶ 305–08.) At no point does the DNC al-

lege *specific* facts *plausibly* suggesting that the Campaign reached an agreement with the other Defendants to commit predicate acts of economic espionage and theft of trade secrets. For this reason, too, the DNC's § 1962(d) claim fails. *See 4 K & D Corp.*, 2 F.Supp.3d at 545 (dismissing § 1962(d) claim because "plaintiffs have alleged no facts to show specifically that the defendants had any 'meeting of the minds' in the alleged violations").

<div align="center">*      *      *      *      *</div>

The DNC's RICO claims under § 1962(c) and § 1962(d) should be dismissed with prejudice.

## IV. The DNC Fails to State a Wiretap Act Claim Against the Campaign.

A person violates the "use" clause of the Wiretap Act—the only clause that the SAC accuses the Campaign of violating (SAC ¶ 312)—if he "intentionally uses … the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of" the statute. 18 U.S.C. § 2511(1)(d). The DNC fails to state a Wiretap Act claim against the Campaign because it does not allege that there was (1) an interception or that the Campaign knew or had reason to know that there was an "interception," and (2) a prohibited "us[e]" of an intercepted communication.

### A. The DNC fails to allege that there was an interception or that the Campaign knew or had to reason to know of an interception.

The Wiretap Act addresses the "interception" of communications. "Every circuit court to have considered the matter has held that an 'intercept' under the Act must occur contemporaneously with transmission." *Luis v. Zang*, 833 F.3d 619, 627 (6th Cir. 2016); *see Fraser v. Nationwide Mut. Ins. Co.*, 352 F.3d 107, 113 (3d Cir. 2003); *United States v. Steiger*, 318 F.3d 1039, 1047 (11th Cir. 2003); *Konop v. Hawaiian Airlines, Inc.*, 302 F.3d 868, 876 (9th Cir. 2002); *Steve Jackson Games, Inc. v. U.S. Secret Serv.*, 36 F.3d 457, 461 (5th Cir. 1994). This Court, too, has ruled that the Act "has a requirement of contemporaneous interception." *Pure Power Boot Camp v. Warrior Fitness Boot Camp*, 587 F.Supp.2d 548, 557

(S.D.N.Y. 2008); *see Tarantos v. Fox News Network, LLC*, 2018 WL 2731268, at *8 (S.D.N.Y. May 18, 2018); *Snyder v. Fantasy Interactive, Inc.*, 2012 WL 569185, at *2 (S.D.N.Y. Feb. 9, 2012).

This requirement of contemporaneousness follows from the ordinary meaning of "intercept": "stop, seize, or interrupt *in progress or course or before arrival.*" Merriam-Webster Online Dictionary, *intercept* (emphasis added). Just as a football player cannot "intercept" a pass that has already been caught, a defendant cannot "intercept" a communication that has already concluded.

This requirement of contemporaneousness also makes sense in context. The Wiretap Act distinguishes between "electronic communication" (a "transfer" of electronic signals) and "electronic storage" (a "storage" of an electronic communication). § 2510(12), (17). "The term 'intercept' … applies only to electronic communications, not to electronic storage.… [This] means that the term intercept applies solely to the transfer of electronic signals. The term does not apply to the acquisition of electronic signals that are no longer being transferred." *Luis*, 833 F.3d at 627.

This interpretation likewise makes sense in light of the distinction between the Wiretap Act and the Stored Communications Act. The Wiretap Act—which, again, addresses "interception"— punishes both the interception itself and the subsequent disclosure of the intercepted information. 18 U.S.C. § 2511(1). In contrast, the Stored Communications Act—which addresses "access to a wire or electronic communication while it is in electronic storage"—punishes only the "access[ing]" of the stored communication; it does not punish the subsequent disclosure of that communication. § 2701(a). Interpreting "interception" to cover accessing stored communications would subvert the distinctions that Congress drew between these statutes.

The DNC fails to allege an "interception." The SAC claims that Russian agents stole "several gigabytes of DNC data located"—i.e., stored—"on the DNC's servers." (SAC ¶ 104.) The SAC does *not* state that Russian agents acquired the emails *while DNC employees were sending or receiving them.* The

SAC thus alleges only that Russian agents gained access to stored communications—not that they intercepted communications contemporaneously with the communications' transmission.

The DNC attempts to solve this problem by alleging, "[u]pon information and belief," that Russian agents "monitored"—or at least had "access" that would "allow [them] to monitor"—DNC communications "in realtime," "simultaneously with their transmission." SAC ¶¶ 103, 128, 129. This does not suffice. *First*, a complaint must "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555. A complaint also must plead "factual content," and not just "conclusory statements" that parrot "the elements of a cause of action." *Iqbal*, 556 U.S. at 678. The DNC's allegations simply assert the legal conclusion that the hackers "intercepted" emails, but do not back up that legal conclusion with factual allegations that the hackers obtained any particular communications contemporaneously with their transmission. These allegations thus fail to provide fair notice as to what the DNC's claim is. The Campaign and the Court have no way to determine whether the DNC has plausibly alleged that communications were intercepted at all, whether the Campaign knew or had reason to know of any such interception, or whether the Campaign made any use of the supposedly intercepted communications.

*Second*, the DNC's allegations in all events do not establish that *the Campaign* "kn[ew] or ha[d] reason to know that the information was obtained through … interception." § 2511(1)(d). The SAC nowhere alleges that the Campaign knew or should have known that Russian agents acquired the emails contemporaneously with the emails' transmission. It is particularly telling that, even though the DNC hired "a cybersecurity technology firm" to "investigate the attack" and conduct a "forensic analysis of the DNC's computer network" (SAC ¶¶ 110–11), the DNC pleads interception only "[u]pon information and belief" (*id.* ¶¶ 103, 128, 129). If the DNC cannot tell whether there was an interception, the Campaign surely cannot have known or had reason to know there was an interception.

**B.  The DNC fails to allege that the Campaign "used" intercepted communications.**

The provision of the Wiretap Act at issue here prohibits the intentional "use" of intercepted communications. § 2511(1)(d). But a defendant does not "use" an interception if someone else discloses the contents of an intercepted communication to the public, and the defendant then discusses those publicly available materials.

Common sense and the First Amendment compel this reading of the statute. Newspapers and other media resources routinely publish unlawfully intercepted communications. *See, e.g.*, *Bartnicki*, 532 U.S. 514 (radio show's publication of wiretapped telephone call); *Boehner*, 484 F.3d 573 (newspaper's publication of wiretapped telephone call). Members of the public, in turn, routinely listen to or read these disclosed communications. As discussed above (*supra* § I), it would defy common sense and violate the First Amendment to punish, as an illegal user of intercepted communications, "every reader of the information in the newspapers [who] learned that it had been obtained by unlawful intercept." *Boehner*, 484 F.3d at 586 (op. of Sentelle, J.). "Under [such a ] rule … no one in the United States could communicate [about publicly available information] because of the defect in the chain of title." *Id.* Neither logic nor the law "permits this interdiction of public information." *Id.*

Under these principles, the DNC fails to allege that the Campaign engaged in a prohibited "use" of any intercepted communications. The SAC alleges that "WikiLeaks and Assange"—*not* the Campaign—"disclose[d] the contents of [the DNC's] wire, oral, or electronic communications." (SAC ¶ 311.) The SAC adds that, *after* WikiLeaks publicly "disclose[d]" these communications, then-candidate Trump "lauded the disclosure," "encouraged the media and voters to pay more attention to the leaks," and "direct[ed] attention to those stolen documents." (*id.* ¶¶ 196, 202.) But this alleged conduct does not amount to a prohibited "use," because WikiLeaks had already made the emails public by that time. The Wiretap Act does not prohibit—and, under the First Amendment, cannot prohibit—a speaker from discussing publicly available information, even if there is a "defect in the

chain of title." *Boehner*, 484 F.3d at 586 (op. of Sentelle, J.). That is all the more true when the speaker is a political candidate, for "the First Amendment has its fullest and most urgent application to speech uttered during a campaign for political office." *Citizens United*, 558 U.S. at 339.

In effect, the DNC's Wiretap Act claim goes a step beyond what the Supreme Court prohibited in *Bartnicki*. As explained above, the Supreme Court ruled in *Bartnicki* that the Government may prohibit the theft of private communications, but may not punish their subsequent disclosure. *Supra* § I. Here, the DNC does not claim that the Campaign stole or even disclosed its communications; rather, it claims only that the Campaign "used" those communications *after* their theft and *after* their disclosure. This theory of liability has no logical stopping point. Thousands of newspaper, radio, television, and internet journalists covered the disclosed DNC emails, and millions of citizens read and discussed them. On the DNC's theory, all of these people would be "users" of intercepted information, simply because they (like the Campaign) "discussed the disclosure." (SAC ¶ 202.) Certainly all media that covered the story would fall squarely within the DNC's expansive interpretation of "use." That result is absurd and unconstitutional.

The DNC cannot get around these problems by asserting that the Campaign conspired with Russian agents and WikiLeaks to disclose the DNC emails. For one thing, the Wiretap Act includes separate clauses addressing the "use" and the "disclos[ure]" of intercepted communications. § 2511(1)(c)–(d). The SAC asserts a claim against the Campaign only under the use clause, not the disclosure clause. (SAC ¶¶ 312.) For another thing, federal statutes, as noted, presumptively impose civil liability only on "primary violator[s]"—the people who actually commit the act prohibited by the statute. *Cent. Bank of Denver N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 191 (1994). Courts may impose "secondary liability"—for instance, liability for conspiracy, aiding and abetting, or concerted action—only where Congress expressly authorizes it. *Cent. Bank of Denver*, 511 U.S. at 184. In contrast with other clauses of the Wiretap Act, the use and disclosure clauses do not author-

- 42 -

ize any form of secondary liability. *Compare* § 2511(1)(a) ("intentionally intercepts, endeavors to intercept, *or procures any other person to intercept or endeavor to intercept*") (emphasis added), *with* § 2511(1)(c)–(d) ("intentionally discloses, or endeavors to disclose … [or] intentionally uses, or endeavors to use"). As a result, allegations that the Campaign conspired with others to disclose DNC emails are beside the point. As far as the Wiretap Act is concerned, all that matters is what the Campaign *itself* allegedly did. And what the Campaign allegedly did—talk about the DNC emails after WikiLeaks published them—is protected speech, not a violation of a federal statute.

## V.   The DNC Fails to State State-Law Claims Against the Campaign.

The DNC fails to state a claim against the Campaign for misappropriation of trade secrets in violation of Washington, D.C. law, for conspiracy to commit trespass to chattels in violation of Virginia law, and for violation of Virginia's Computer Crimes Act.

### A.   The Court should not exercise supplemental jurisdiction over the state-law claims.

The DNC urges the Court to exercise supplemental jurisdiction over its state-law claims. (SAC ¶ 42.) But supplemental jurisdiction "is a doctrine of discretion, not of plaintiff's right." *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966). The Court should exercise its discretion to decline supplemental jurisdiction over the state-law claims in this case.

**1.** The supplemental-jurisdiction statute identifies four grounds for declining supplemental jurisdiction, two of which are relevant here. A federal court may decline supplemental jurisdiction over a claim if "the claim raises a novel or complex issue of State law." 28 U.S.C. § 1367(c)(1). The trade-secrets claim raises the novel issue whether a political party's donor information qualifies as a trade secret, and the complex issues associated with sorting through the thousands of documents on the DNC's servers in order to determine which (if any) qualify as trade secrets and which do not. The claim for conspiracy to commit trespass to chattels raises novel issues regarding the scope of the tort of trespass to chattels in Virginia. *See America Online, Inc. v. IMS*, 24 F.Supp.2d 548, 550 (E.D. Va.

1998) ("[A]uthority under Virginia law respecting an action for trespass to chattels is sparse ...."). And the claim that the Campaign aided and abetted a violation of the Computer Crimes Act raises the novel issue whether the Act imposes liability upon aiders and abetters. *See Alliance Tech. Grp., LLC v. Achieve 1 LLC*, 2013 WL 143500, at *4 (E.D. Va. Jan. 11, 2013) ("[T]he Supreme Court of Virginia has refrained from either recognizing or rejecting a separate 'aiding and abetting' tort.").

A federal court may also decline to exercise supplemental jurisdiction if it "has dismissed all claims over which it has original jurisdiction." § 1367(c)(3). For the reasons explained above and in the other Defendants' motions to dismiss, the Court should dismiss the federal claims in this case—the only claims over which it has original jurisdiction.

**2.** When a case falls within one of the factors set forth in § 1367(c) and "trigger[s]" the district court's discretion, the court "balances the traditional values of judicial economy, convenience, fairness, and comity" to determine whether to exercise that discretion to decline jurisdiction. *Kolari v. N.Y.-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006). These factors strongly support declining jurisdiction here. *First*, the Special Counsel and multiple congressional committees are already investigating allegations of collusion between Russia and Americans during the 2016 presidential campaign. Exercising supplemental jurisdiction would complicate those investigations by forcing the Special Counsel and congressional committees to coordinate their efforts with a private plaintiff's discovery demands. *Second*, the Special Counsel has already filed an indictment against twelve Russians for allegedly conspiring to hack into the DNC's servers. *See* Indictment, *United States v. Netyshko*, No. 1:18-cr-215 (D.D.C. July 13, 2018), ECF No. 1. If the Court were to exercise supplemental jurisdiction, it may have to stay proceedings in this case anyway, to ensure that civil discovery does not interfere with the criminal defendants' rights in the pending criminal case. *See Louis Vuitton Malletier, S.A. v. LY USA, Inc.*, 676 F.3d 83, 101 (2d Cir. 2012) ("There is considerable authority for the principle that a stay is most justified where a movant ... is already under indictment for a serious crimi-

nal offense and is required at the same time to defend a civil action involving the same matter"). *Finally*, the Second Circuit has "repeatedly held that a district court particularly abuses its discretion when it retains jurisdiction over state-law claims raising unsettled questions of law following dismissal of all original-jurisdiction claims." *Kolari*, 455 F.3d at 124.

**B. The DNC fails to state a trade-secrets claim against the Campaign.**

The District of Columbia Uniform Trade Secrets Act prohibits the misappropriation of "trade secrets"—"information … that (A) [d]erives actual or potential independent economic value, from not being generally known …; and (B) [i]s the subject of reasonable efforts to maintain its secrecy." D.C. Code § 36-401(4). The DNC fails to state a claim for misappropriation because they fail to plead that this case involves any "trade secrets."

**1.** A complaint must "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555. To provide fair notice of a trade-secrets claim, a plaintiff must, "at a minimum," "generally identify the trade secrets at issue." *Alexander Interactive, Inc. v. Leisure Pro Ltd.*, 2014 WL 4651942, at *5 (S.D.N.Y. Sep. 16, 2014). A plaintiff cannot just identify "broad" "categories" that "potentially encompass both confidential information and [public] information." *Boccardi Capital Sys. v. D.E. Shaw Laminar Portfolios*, 2009 WL 362118, at *4 (S.D.N.Y. Feb. 9, 2009).

The DNC's Complaint fails this test. The SAC asserts that the pertinent "trade secrets" "included Democratic donor information, … opposition research, and strategic information regarding planned political activities." (SAC ¶ 329.) But these "broad" "categories" encompass at least some plainly public information. *Boccardi*, 2009 WL 362118, at *4. For example, "Democratic donor information" encompasses the names and addresses of donors—information that federal law requires political committees to disclose, and which the Federal Election Commission already posts on its website. *See* 52 U.S.C. § 30101; FEC, *Transaction Query by Individual Contributor*, https://goo.gl/1V6DaC. "Opposition research" encompasses damaging information about political

adversaries that is already publicly known. And "strategic information" is so vague that it could encompass nearly anything. The Campaign cannot properly defend itself against the DNC's trade-secrets claim when the DNC refuses to say what the trade secrets in question are.

**2.** To qualify as a trade secret, information must also "[d]eriv[e] … independent economic value[] from not being generally known to, and not being readily ascertainable by, … another who can obtain economic value from its disclosure or use." D.C. Code § 36-401(4)(A). It is not enough for the information simply to have "independent economic value"; the information must *derive* that value "from not being generally known" and "not being readily ascertainable."

The DNC's purported "trade secrets" fail this test. *First*, the DNC has failed to show that "donor information" derives value from secrecy. A list of potential donors may have value to political parties, but that value does not depend on whether the list is public or private. Either way, a political party can continue to use the information to reach potential contributors. *See CAIR Action Network, Inc. v. Gaubatz*, 82 F.Supp.3d 344, 361 (D.D.C. 2015) ("The Court doubts that Plaintiffs have shown, as necessary, that the donor lists in this case qualify as trade secrets: Plaintiffs have not … shown how their particular value derives from their secrecy"). *Second*, the DNC has failed to show that "opposition research" derives value from secrecy. Quite the opposite, opposition research derives value from publicity; it can have an effect only when the damaging information is revealed to the public. *Finally*, the DNC has failed to show that "strategic information"—whatever that may be—has any "independent economic value" at all, much less that it derives such value from secrecy.

**3.** Next, a trade secret must be secret—"not … generally known." § 36-401(4)(A). "A trade secret that becomes public knowledge is no longer a trade secret." *BondPro Cop. v. Siemens Power Generation*, 463 F.3d 702, 706 (7th Cir. 2006) (Posner, J.); *see Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1002 (1984).

This principle defeats the DNC's trade-secret claims against the Campaign, because the DNC's information was no longer secret by the time the Campaign allegedly used it. The SAC alleges that

Russian agents first stole the DNC's information, that WikiLeaks then disclosed that information to the public, and that the Campaign then "used" the information by discussing that public disclosure. *Supra* pp. 5–6. The SAC nowhere alleges that the Campaign itself stole the information, that the Campaign itself disclosed the information, or even that the Campaign itself used the information at any time between the theft and the disclosure. Put simply, WikiLeaks' disclosure of the DNC's information had already extinguished any trade-secret protection by the time the Campaign did anything with that information. The trade-secret claim against the Campaign thus must be dismissed.

**4.** Finally, to qualify as a trade secret, information must be "the subject of reasonable efforts to maintain its secrecy." D.C. Code § 36-401(4)(B). The DNC's Complaint fails to allege this element. The SAC nowhere describes measures the DNC took to keep its information secret before the theft. Rather, the SAC discusses only the measures that the DNC took *after* "discovering the intrusion." (SAC ¶ 110.) Because "the Complaint contains no factual allegations that would support an inference … that [the plaintiff] used 'reasonable efforts to safeguard its secrecy,'" the trade-secret claim should be "dismissed … for failure to state a claim." *Econ. Research Servs. v. Resolution Econ., LLC*, 208 F.Supp.3d 219, 233 (D.D.C. 2016) (citation omitted).

## C. The DNC fails to state a claim against the Campaign for conspiracy to commit trespass to chattels.

Under Virginia law, two or more persons engage in civil conspiracy if they "combin[e] to accomplish, by some concerted action, some criminal or unlawful purpose or some lawful purpose by a criminal or unlawful means." *Gelber v. Glock*, 800 S.E.2d 800, 820 (Va. 2017). And a person commits trespass to chattels if he "intentionally uses or intermeddles with personal property in rightful possession of another without authorization," and as a result "the chattel is impaired as to its condition, quality, or value." *State Analysis, Inc. v. Am. Fin. Servs. Ass'n*, 621 F.Supp.2d 309, 320 (E.D. Va. 2009).

Critically, hacking a computer network may qualify as trespass to chattels, but publishing emails retrieved from such a hack does not. The term "chattel" covers "visible, tangible, personal property

only." *First Nat'l Bank v. Holland*, 39 S.E. 126, 129 (Va. 1901). And a person "intermeddles" with a chattel if he "intentionally bring[s] about a physical contact with the chattel." Restatement (Second) of Torts § 217, comment (e). A "computer network" may qualify as a chattel, because "computers … are tangible personal property." *America Online, Inc. v. LCGM, Inc.*, 46 F.Supp.2d 444, 452 (E.D. Va. 1998). And the unauthorized "transmission of electrical signals through a computer network [may be] sufficiently 'physical'" to qualify as intermeddling. *Id.* In contrast, however, merely publishing an email that someone else has hacked does not involve unauthorized physical contact with tangible personal property—and, thus, does not amount to trespass to chattels.

In light of this principle, the Court should dismiss the DNC's claim for conspiracy to commit trespass to chattels for two separate reasons. *One*, a plaintiff alleging a civil conspiracy under Virginia law must first show that the defendants have "combined to accomplish" the asserted "criminal or unlawful" act. *Gelber*, 800 S.E.2d at 820. The DNC, however, has not alleged that the Campaign has combined with anyone else to hack into the DNC's servers (which would be a trespass to chattels). Rather, the DNC has alleged, at most, that the Campaign has combined with Russia to disclose emails that Russia has already obtained (which would not be a trespass to chattels). *Supra* pp. 5–6. The Campaign thus did not conspire to commit a trespass to chattels.

*Two*, a plaintiff alleging a civil conspiracy under Virginia law must also show that the conspirators sought to use "concerted action" to commit the unlawful act. *Gelber*, 800 S.E.2d at 820; *see Hechler Chevrolet, Inc. v. Gen. Motors Corp.*, 337 S.E.2d 744, 748 (Va. 1985) (contrasting a "criminal conspiracy," which requires only "an agreement," with a "civil conspiracy," which also requires "some concerted action … to accomplish [the] criminal or unlawful purpose"). The DNC, however, alleges that Russia hacked the DNC's servers and extracted information all by itself. *Supra* pp. 5–6. The DNC does not allege that the Campaign acted in concert with Russia during the hacking or the theft of information. Because the DNC fails to allege concerted action to trespass on its computer net-

work (as opposed to mere concerted action to publish the emails after the trespass had occurred), the DNC fails to state a claim against the Campaign for conspiracy to commit a trespass to chattels.

**D.  The DNC fails to state a Virginia Computer Crimes Act claim against the Campaign.**

The Virginia Computer Crimes Act prohibits computer fraud, computer trespass, and invasion of computer privacy. Va. Code § 18.2-152.2–4. The DNC claims that the Campaign is liable under the Act because it "knowingly aided, abetted, encouraged, induced, instigated, contributed to and assisted" Russia's violation of these prohibitions. (SAC ¶ 371.) The Court should dismiss this claim, because (1) the Computer Crimes Act does not authorize aiding-and-abetting liability, and (2) the DNC in all events does not plausibly plead that the Campaign aided and abetted a violation.

**1.** The Computer Crimes Act does not establish liability for aiders and abettors. "One of the basic principles of statutory construction" in Virginia "is that where a statute creates a right and provides a remedy for the vindication of that right," "that remedy is exclusive." *Cherrie v. Va. Health Servs., Inc.*, 787 S.E.2d 855, 858 (Va. 2016). A court has "no authority" to create or expand a remedy where the statute "is silent" about that remedy. *Id.* This principle means that—in Virginia, as in the federal system—a statute creates a remedy against aiders and abetters only if the legislature "expressly" "used the words 'aid' and 'abet' in the statutory text." *Cent. Bank of Denver*, 511 U.S. at 177. Here, the Computer Crimes Act creates a civil remedy for a "violation of any provision" of the statute—not for the aiding and abetting of a violation of the statute. Va. Code § 18.2-152.12(A). Indeed, the civil-remedy section of the statute nowhere uses the words "aid" and "abet." Under Virginia's "basic principles of statutory construction," a court has "no authority" to create aiding-and-abetting liability that the state legislature refused to create. *Cherrie*, 787 S.E.2d at 858.

This point is all the more true because, as a general matter, Virginia courts do not even recognize aiding-and-abetting liability in the context of common-law torts. The Supreme Court of Virginia has not definitively resolved the issue, but the Supreme Court of the United States has observed

that the "aiding and abetting tort … [has] not [been] expressly recognized by the state courts of the Commonwealth of Virginia." *Cent. Bank of Denver*, 511 U.S. at 182; *see Herold v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 2018 WL 1950641, at *4 (E.D. Va. April 25, 2018) ("Virginia law has not clearly recognized an aiding and abetting cause of action for tortious claims"); *Bastable v. Muslu*, 2009 WL 7339887, at *3 (Va. Cir. Ct. July 8, 2009) ("With respect to … [the] cause of action of 'Aiding and Abetting,' the Court does not believe this is a valid cause of action in the Commonwealth … [T]here is no modern authority which supports a claim for aiding and abetting a tortious action"). In other words, Virginia courts refuse to impose aiding-and-abetting liability even when exercising their own common-law powers to define the scope of tort actions. It follows, *a fortiori*, that they would also refuse to impose such liability when interpreting a statute that says nothing about aiding and abetting.

**2.** In all events, the DNC fails to plausibly plead that the Campaign aided and abetted a violation of the Computer Crimes Act. The provisions on which the DNC relies prohibit acts involved in hacking into another person's computer network: "us[ing]" the network to convert property, "disabl[ing]" computer programs, "[c]aus[ing] [the] computer to malfunction," "[a]lter[ing]" computer data, "[u]s[ing] [the] computer … to make … an unauthorized copy," "collect[ing] information" by installing certain kinds of malicious software, and "us[ing] [the] computer" to examine private financial information. Va. Code § 18.2-152.3–4; *see* SAC ¶¶ 367–70. None of the provisions prohibits publishing information that someone else has previously retrieved from a computer.

The DNC's Complaint fails to allege that the Campaign did anything to aid and abet the Russian hack of the DNC's servers. Quite the contrary, the SAC's theory is that Russia began colluding with the Campaign *after* the hack had occurred and the information in the DNC's servers had been stolen. The DNC thus fails to state a claim against the Campaign under the Computer Crimes Act.

## CONCLUSION

The Court should dismiss all claims against the Campaign with prejudice.

Dated:    March 4, 2019

Respectfully submitted,

/s/ Michael A. Carvin
_____

James M. Gross
JONES DAY
250 Vesey Street
New York, NY 10281
(212) 326-3939
jgross@jonesday.com

Michael A. Carvin (*pro hac vice*)
  *Counsel of Record*
William D. Coglianese (*pro hac vice*)
JONES DAY
51 Louisiana Avenue, NW
Washington, DC 20001
(202) 879-3939
macarvin@jonesday.com
wcoglianese@jonesday.com

*Counsel for Donald J. Trump for President, Inc.*

**CERTIFICATE OF COMPLIANCE**

I, Michael A. Carvin, certify that this brief complies with the Scheduling Order that this Court entered on October 1, 2018 (ECF No. 181) because it is under 50 pages, and that this brief complies with this Court's formatting rules.

Dated:   March 4, 2019                          /s/ Michael A. Carvin
                                                _____
                                                Michael A. Carvin

                                                *Counsel for Donald J. Trump for President, Inc.*

**CERTIFICATE OF SERVICE**

I, Michael A. Carvin, certify that on March 4, 2019, I caused the foregoing document to be electronically filed with the Clerk of Court using the CM/ECF system, which will send a notice of electronic filing to all registered parties.

Dated:   March 4, 2019                    /s/ Michael A. Carvin
                                          _____
                                          Michael A. Carvin

                                          *Counsel for Donald J. Trump for President, Inc.*

# Exhibit 1

*Democratic National Committee v. Donald J. Trump for President, Inc., et al.*
(No. 1:18-cv-3501-JGK-SDA)

View email          View source

# Re: No shit

---

From:DaceyA@dnc.org

To: MARSHALL@dnc.org, MirandaL@dnc.org, PaustenbachM@dnc.org

Date: 2016-05-05 12:23

Subject: Re: No shit

---

AMEN

Amy K. Dacey | Chief Executive Officer

Democratic National Committee

430 S. Capitol Street, SE Washington, D.C. 20003

202-528-7492 (c) | 202-314-2263 (o)

DaceyA@dnc.org

On 5/5/16, 1:33 AM, "Brad Marshall" <MARSHALL@dnc.org> wrote:

>It's these Jesus thing.

>

>> On May 5, 2016, at 1:31 AM, Brad Marshall <MARSHALL@dnc.org>

wrote:

>>

>> It might may no difference, but for KY and WVA can we get

someone to

>>ask his belief. Does he believe in a God. He had skated on

saying he

>>has a Jewish heritage. I think I read he is an atheist. This

could

>>make several points difference with my peeps. My Southern

Baptist peeps

>>would draw a big difference between a Jew and an atheist.



Top

    

WL Research Community - user contributed research based on documents published by WikiLeaks. (https://our.wikileaks.org)

Tor is an encrypted anonymising network that makes it harder to intercept internet communications, or see where communications are coming from or going to. (https://www.torproject.org/)

Tails is a live operating system, that you can start on almost any computer from a DVD, USB stick, or SD card. It aims at preserving your privacy and anonymity. (https://tails.boum.org/)

The Courage Foundation is an international organisation that supports those who risk life or liberty to make significant contributions to the historical record. (https://www.couragefound.org/)

Bitcoin uses peer-to-peer technology to operate with no central authority or banks; managing transactions and the issuing of bitcoins is carried out collectively by the network. (https://www.bitcoin.org/)

 (https://www.facebook.com/wikileaks)      (https://twitter.com/wikileaks)

# Exhibit 2

*Democratic National Committee v. Donald J. Trump for President, Inc., et al.*
(No. 1:18-cv-3501-JGK-SDA)

View email    View source

# Bernie narrative

---

From:markpaustenbach@gmail.com

To: mirandal@dnc.org

Date: 2016-05-21 22:23

Subject: Bernie narrative

---

Wondering if there's a good Bernie narrative for a story, which is that
Bernie never ever had his act together, that his campaign was a mess.

Specifically, DWS had to call Bernie directly in order to get the campaign
to do things because they'd either ignored or forgotten to something critical.

She had to call Bernie after the data breach to make his staff to

respond

to our concerns. Even then they didn't get back to us, which is why we had

to shut off their access in order to get them to finally let us know

exactly how they snooped around HFA's data.


Same was true with the standing committee appointments. They never got back

to us with their names (HFA and even O'Malley got there's in six weeks

earlier) for the committees. So, again, the chair had to call Bernie

personally for his staff to finally get us critical information. So, they

gave us an awful list just a few days before we had to make the announcements.


It's not a DNC conspiracy, it's because they never had their act together.



Top

    

WL Research Community - user contributed research based on documents published by WikiLeaks.

(https://our.wikileaks.org)

Tor is an encrypted anonymising network that makes it harder to intercept internet communications, or see where communications are coming from or going to.

(https://www.torproject.org)

Tails is a live operating system, that you can start on almost any computer from a DVD, USB stick, or SD card. It aims at preserving your privacy and anonymity.

(https://tails.boum.org/)

The Courage Foundation is an international organisation that supports those who risk life or liberty to make significant contributions to the historical record.

(https://www.couragefound.org/)

Bitcoin uses peer-to-peer technology to operate with no central authority or banks; managing transactions and the issuing of bitcoins is carried out collectively by the network.

(https://www.bitcoin.org/)

 (https://www.facebook.com/wikileaks)    (https://twitter.com/wikileaks)

# Exhibit 3

*Democratic National Committee v. Donald J. Trump for President, Inc., et al.*
(No. 1:18-cv-3501-JGK-SDA)

The Washington Post

**The Fix**

# Here are the latest, most damaging things in the DNC's leaked emails

By **Aaron Blake**  July 25, 2016

*This post has been updated.*

Thousands of leaked emails have sealed the fate of Rep. Debbie Wasserman Schultz's uneven five-plus-year tenure as DNC chair.

Wasserman Schultz's resignation announcement Sunday afternoon comes as a bad situation just keeps getting worse -- and appears as though it might continue to do so. That's because WikiLeaks has so far released nearly 20,000 emails, new details are still being discovered, and there is still the prospect of additional, damaging emails coming to light.

Many of the most damaging emails suggest the committee was actively trying to undermine Bernie Sanders's presidential campaign. Basically all of these examples came late in the primary -- after Hillary Clinton was clearly headed for victory -- but they belie the national party committee's stated neutrality in the race even at that late stage.

Below is a running list of the most troublesome findings for Wasserman Schultz and her party. As new revelations come out, we'll update it.

## 1) Targeting Sanders's religion?

On May 5, DNC officials appeared to conspire to raise Sanders's faith as an issue and press on whether he was an atheist -- apparently in hopes of steering religious voters in Kentucky and West Virginia to Clinton. Sanders is Jewish but has previously indicated that he's not religious.

One email from DNC chief financial officer Brad Marshall read: "It might may no difference, but for KY and WVA can we get someone to ask his belief. Does he believe in a God. He had skated on saying he has a Jewish heritage. I think I read he is an atheist. This could make several points difference with my peeps. My Southern Baptist peeps would draw a big difference between a Jew and an atheist."

Marshall added in a later email: "It's these Jesus thing."

In response, CEO Amy Dacey said: "Amen."

**2) Wasserman Schultz calls top Sanders aide a "damn liar"...**

On May 17, after controversy erupted over the Nevada state Democratic convention and how fair the process was there, Wasserman Schultz herself took exception to Sanders campaign manager Jeff Weaver's defense of his candidate's supporters.

"Damn liar," she wrote. "Particularly scummy that he barely acknowledges the violent and threatening behavior that occurred."

**3) ... and says Sanders has "no understanding" of the party**

That wasn't the only time Wasserman Schultz offered an unvarnished opinion about the Sanders operation. And in one late-April email, she even questioned Sanders's connection to the party.

"Spoken like someone who has never been a member of the Democratic Party and has no understanding of what we do," she said in response to a Politico story about Sanders saying the party hadn't been fair to him.

Sanders, for what it's worth, wasn't a Democrat before entering the Democratic primary. He caucused with the party but has long been an independent.

In that way, Wasserman Schultz's comments could be read simply as her defending her party; Sanders was attacking the party, after all. But her comment also suggests a particularly dim view of Sanders that she didn't feel the need to obscure in conversations with other DNC staff.

**4) A Clinton lawyer gives DNC strategy advice on Sanders**

When the Sanders campaign alleged that the Clinton campaign was improperly using its joint fundraising committee with the DNC to benefit itself, Clinton campaign lawyer Marc Elias offered the DNC guidance on how to respond.

"My suggestion is that the DNC put out a statement saying that the accusations the Sanders campaign are not true," Elias said May 3 in response to an email about the issue sent by communications director Luis Miranda to other DNC stuff that copied Elias and another lawyer at his firm, Perkins Coie.

Elias continued: "The fact that CNN notes that you aren't getting between the two campaigns is the problem. Here, Sanders is attacking the DNC and its current practice, its past practice with the POTUS and with Sec Kerry. Just as the RNC pushes back directly on Trump over 'rigged system', the DNC should push back DIRECTLY at Sanders and say that what he is saying is false and harmful the the Democratic party."

Elias's guidance isn't perhaps all that shocking; he's Clinton's lawyer, after all. But the fact that he was talking to the DNC about how to respond would appear to suggest coordination between the DNC and Clinton campaign against Sanders in this particular case.

## 5) Plotting a narrative about how Sanders's campaign failed

On May 21, DNC national press secretary Mark Pautenbach suggested pushing a narrative that Sanders "never ever had his act together, that his campaign was a mess."

After detailing several arguments that could be made to push that narrative, Paustenbach concludes: "It's not a DNC conspiracy, it's because they never had their act together."

Paustenbach's suggestion, in that way, could be read as a defense of the committee rather than pushing negative information about Sanders. But this is still the committee pushing negative information about one of its candidates.

## 6) Mocking Sanders for his California debate push

One of the chief complaints from Sanders and his supporters was a lack of debates. They said the fact that there were so few was intended to help Clinton by reducing her opponents' exposure and their chances to knock her down.

After the Sanders campaign presumptuously declared that an agreement for an additional debate in California had been reached, Miranda responded to the Sanders campaign's release on May 18 simply:

"lol"

As noted, the release from the Sanders campaign was presumptuous in declaring that an agreement had been reached. Miranda could simply have been responding to the somewhat-silly tactic. But the debate never actually happened, as the Clinton campaign later opted not to participate.

## 7) Wishing Sanders would just end it

Many of these emails came as it was clear Clinton was going to win -- which makes the apparent favoritism perhaps less offensive (though Sanders supporters would certainly disagree).

But it's also clear that there was plenty of cheerleading for the race to simply be over -- for Sanders to throw in the towel so that Clinton could be named the presumptive nominee. The party, of course, was still supposed to be neutral even though the odds and delegate deficit for Sanders looked insurmountable.

On May 1, in response to Sanders again saying he would push for a contested convention, Wasserman Schultz said, "So much for a traditional presumptive nominee."

## 8) Calling an alleged Sanders sympathizer a "Bernie bro"

The term "Bernie bro" -- or "Berniebro," depending on your style -- over the course of the campaign became a kind of shorthand for the worst kind of Sanders supporter. These were the supporters who couldn't be reasoned with and verbally assaulted opponents, sometimes in very nasty ways.

Some in the DNC apparently used the pejorative to refer to one particular radio host seen as overly sympathetic to Sanders, Sirius XM's Mark Thompson.

"Wait, this is a s——— topic," Miranda wrote on May 4 after Thompson's program director, David Guggenheim, requested an interview on a Clinton fundraising controversy. "Where is Guggenheim? Is he a Bernie Bro?"

"Must be a Bernie Bro," DNC broadcast booker Pablo Manriquez responds. "Per Mark's sage, I turned him down flat (and politely) and inquired into opportunities next week to talk about something else.

## 9) Criticizing Obama for lack of fundraising help -- "That's f---ing stupid"

While the Sanders emails have gained the most attention, some of the more interesting emails involve a peek behind to curtain of how party officials talk about fundraising and major donors -- and even President Obama.

In one email on May 9, DNC mid-Atlantic and PAC finance director Alexandra Shapiro noted that Obama wouldn't travel 20 minutes to help the party secure $350,000 in donations.

"He really won't go up 20 minutes for $350k?" Shapiro wrote. "THAT'S f---ing stupid."

DNC national finance director Jordan Kaplan responded: "or he is the president of the united states with a pretty big day job."

## 10) Flippant chatter about donors

In a May 16 exchange about where to seat a top Florida donor, Kaplan declared that "he doesn't sit next to POTUS!" -- referring to Obama.

"Bittel will be sitting in the sh---iest corner I can find," responded Shapiro. She also referred to other donors as "clowns."

Here are some other things Kaplan and Shapiro said about donors, via Karen Tumulty and Tom Hamburger:

> Kaplan directed Shapiro to put New York philanthropist Philip Munger in the prime spot, switching out Maryland ophthalmologist Sreedhar Potarazu. He noted that Munger was one of the largest donors to Organizing for America, a nonprofit that advocates for Obama's policies. "It would be nice to take care of him from the DNC side," Kaplan wrote.

Shapiro pushed back, noting that Munger had given only $100,600 to the party, while the Potarazu family had contributed $332,250.

In one email attachment from Erik Stowe, the finance director for Northern California, to Tammy Paster, a fundraising consultant, he lists the benefits given to different tiers of donors to the Democratic National Convention, which starts next week in Philadelphia. The tiers range from a direct donation of $66,800 to one of $467,600 to the DNC. The documents also show party officials discussing how to reward people who bundle between $250,000 to $1.25 million.

*Correction: This post initially referred to Guggenheim as the host of a Sirius XM show. He is program director for Sirius XM host Mark Thompson.*

Aaron Blake is senior political reporter for The Fix. 🐦 Follow @aaronblake

# Exhibit 4

*Democratic National Committee v. Donald J. Trump for President, Inc., et al.*
(No. 1:18-cv-3501-JGK-SDA)

View email     View source

# Re: Politico - Sanders: Democratic Party hasn't been fair to me

From:hrtsleeve@gmail.com

To: PaustenbachM@dnc.org

CC: MirandaL@dnc.org

Date: 2016-04-24 17:25

Subject: Re: Politico - Sanders: Democratic Party hasn't been fair to me

Spoken like someone who has never been a member of the Democratic Party and has no understanding of what we do.

DWS

On Apr 24, 2016, at 3:19 PM, Paustenbach, Mark <PaustenbachM@dnc.org> wrote:

```
>>> "We're in this race to California, and we're proud of the
campaign we ran."
>
>
> http://www.politico.com/story/2016/04/bernie-sanders-
democratic-party-fairness-222355
>
>
> Mark Paustenbach
> National Press Secretary &
> Deputy Communications Director
> Democratic National Committee
> 202.863.8148
> paustenbachm@dnc.org
```



Top

    

WL Research
Community - user
contributed
research based on

Tor is an encrypted
anonymising
network that makes
it harder to

Tails is a live
operating system,
that you can start
on almost any

The Courage
Foundation is an
international
organisation that

Bitcoin uses peer-
to-peer technology
to operate with no
central authority or

documents published by WikiLeaks. (https://our.wikileaks.org)

intercept internet communications, or see where communications are coming from or going to.

computer from a DVD, USB stick, or SD card. It aims at preserving your privacy and anonymity.

supports those who risk life or liberty to make significant contributions to the historical record.

banks; managing transactions and the issuing of bitcoins is carried out collectively by the network.

(https://www.torproject.org/) (https://tails.boum.org/) (https://www.couragefound.org/) (https://www.bitcoin.org/)

(https://www.facebook.com/wikileaks)          (https://twitter.com/wikileaks)

# Exhibit 5

*Democratic National Committee v. Donald J. Trump for President, Inc., et al.*
(No. 1:18-cv-3501-JGK-SDA)

# The New York Times

## CNN Parts Ways With Donna Brazile, a Hillary Clinton Supporter

**By Michael M. Grynbaum**

Oct. 31, 2016

CNN has severed ties with the Democratic strategist Donna Brazile, after hacked emails from WikiLeaks showed that she shared questions for CNN-sponsored candidate events in advance with friends on Hillary Clinton's campaign.

Ms. Brazile, a veteran political analyst for the network, was already on leave from CNN since becoming interim chairwoman of the Democratic National Committee. On Monday, CNN said it had accepted her formal resignation on Oct. 14.

"We are completely uncomfortable with what we have learned about her interactions with the Clinton campaign while she was a CNN contributor," Lauren Pratapas, a network spokeswoman, said in a statement.

"CNN never gave Brazile access to any questions, prep material, attendee list, background information or meetings in advance of a town hall or debate," Ms. Pratapas wrote.

The announcement followed the release of new emails on Monday that included a message from Ms. Brazile on the day before a CNN-sponsored Democratic primary debate in Flint, Mich., in March. Her subject line: "One of the questions directed to HRC tomorrow is from a woman with a rash."

"Her family has lead poison and she will ask what, if anything, will Hillary do as president to help the ppl of Flint," Ms. Brazile wrote to John D. Podesta, the Clinton campaign chairman, and Jennifer Palmieri, the candidate's communications director.

At the debate the next night, two women asked similar questions of Mrs. Clinton and her opponent, Senator Bernie Sanders of Vermont.

The episode has cast a harsh spotlight on the cable news practice of paying partisan political operatives to appear as on-air commentators. Like Ms. Brazile, these guests can offer a plugged-in viewpoint on the day's events, but they often also parrot campaign talking points and, as in this case, create potential ethical conflicts.

CNN has already faced criticism over its hiring of Corey Lewandowski, Donald J. Trump's former campaign manager, as a paid contributor, even as he remains an informal adviser to the candidate.

Case 1:18-cv-03501-JGK   Document 227-4   Filed 03/04/19   Page 3 of 4

Ms. Brazile's infraction, however, may be more damaging. Her sharing of questions with a candidate would seem to undercut the impartiality of the event and, as a CNN contributor, potentially reflect poorly on the network, which received big ratings, and thus profits, from primary debates and town halls.

In an interview on Monday, Ms. Brazile said she offered her resignation to CNN when emails surfaced earlier in October that showed her telling Ms. Palmieri: "From time to time I get the questions in advance."

"I didn't want CNN to get involved in this WikiLeaks controversy," Ms. Brazile said by telephone. "I didn't want to put CNN in the middle of what has been a real invasive cyberintrusion."

Ms. Brazile, who said she has changed her mobile phone number twice because of harassment related to the leaked emails, said CNN "never, never" shared advance questions with her ahead of debates or town hall-style events.

Asked to explain her emails with the Clinton campaign, she said she "seeks as much information as I can possibly get" ahead of a televised program, in part to prepare for her own on-air responses.

"I often talk to everybody before an event," she said. "I try to learn as much as I can, share as much as I can."

But Ms. Brazile declined to elaborate on the exchanges in question, saying: "I am not going to verify, deny, confirm or even try to make sense out of stolen emails that were hacked."

Her departure from CNN quickly became fodder on the campaign trail. Mr. Trump, at a rally in Grand Rapids, Mich., on Monday, seized on Ms. Brazile's messages to attack Mrs. Clinton and press his case that the news media is biased against him.

"Speaking of draining the swamp, Donna Brazile did it again," he said. "WikiLeaks today, she gave the questions to a debate to Hillary Clinton. And that was from a couple of weeks ago. Happened again, but this time far worse. She gave the questions to a debate to Hillary Clinton."

If Mrs. Clinton received questions in advance from Ms. Brazile, Mr. Trump asked, "why didn't she report it?"

The Clinton campaign has declined to verify the authenticity of the emails.

Ms. Brazile's discussions with the Clinton campaign first raised concerns earlier in October when emails released by WikiLeaks showed she had contacted Ms. Palmieri to share a question about the death penalty. Ms. Brazile said the question would be asked at a coming CNN town hall.

In the Monday interview, Ms. Brazile said her experience over the last few weeks had been "very invasive."

Case 1:18-cv-03501-JGK   Document 227-5   Filed 03/04/19   Page 4 of 4

"It's like you get hit three times," Ms. Brazile said. "You get hit with the hack, with the fact that your information has been stolen, and then you get hit with trying to make sense of the nonsense."

*Find out what you need to know about the 2016 presidential race today, and get politics news updates via Facebook, Twitter and the First Draft newsletter.*

A version of this article appears in print on Nov. 1, 2016, on Page A16 of the New York edition with the headline: CNN Cuts Ties to Analyst as Emails Show She Tipped Off Clinton Allies

# Exhibit 6

*Democratic National Committee v. Donald J. Trump for President, Inc., et al.*
(No. 1:18-cv-3501-JGK-SDA)

9/4/2017
In Hacked D.N.C. Emails, a Glimpse of How Big Money Works | The New York Times
Case 1:18-cv-03501-JGK Document 227-6 Filed 03/04/19 Page 2 of 7

**The New York Times** | https://nyti.ms/2abaqXw

**ELECTION 2016**   Full Results   Exit Polls   Trump's Cabinet

# In Hacked D.N.C. Emails, a Glimpse of How Big Money Works

By NICHOLAS CONFESSORE and STEVE EDER   JULY 25, 2016

Last October, a leading Democratic donor named Shefali Razdan Duggal emailed a sweetly worded but insistent list of demands to a staff member at the Democratic National Committee.

Ms. Duggal wanted a reminder of how much she had raised for President Obama and the Democrats (the answer: $679,650) and whether it qualified her for the premium package of hotel rooms and V.I.P. invitations at the party's convention in Philadelphia. She asked whether she could have an extra ticket to Vice President Joseph R. Biden's holiday party, so she could bring her children. But most on her mind, it seemed, was getting access to an exclusive November gathering at the White House.

"Not assuming I am invited...just mentioning/asking, if in case, I am invited :)," wrote Ms. Duggal, who was appointed by Mr. Obama to oversee the United States Holocaust Memorial Museum and is married to a San Francisco financial executive. "Might you have an intel?"

Ms. Duggal's note was among 19,000 internal Democratic Party emails released on Friday by WikiLeaks, setting off a frenzy on the eve of the party's quadrennial nominating convention and forcing the resignation of the party chairwoman, Debbie Wasserman Schultz. Some of the emails revealed internal discussion by committee

officials — obligated under party rules to remain neutral in the presidential primary — about how to discredit Senator Bernie Sanders of Vermont, enraging some of his supporters.

But the leaked cache also included thousands of emails exchanged by Democratic officials and party fund-raisers, revealing in rarely seen detail the elaborate, ingratiating and often bluntly transactional exchanges necessary to harvest hundreds of millions of dollars from the party's wealthy donor class.

The emails capture a world where seating charts are arranged with dollar totals in mind, where a White House celebration of gay pride is a thinly disguised occasion for rewarding wealthy donors and where physical proximity to the president is the most precious of currencies.

In a statement, Amy Dacey, the chief executive of the Democratic committee, said the party had "engaged a record number of people in the political process" and "adhered to the highest of standards."

The emails reflect the struggles of midlevel staff members in a demanding environment, seeking to bring in money at a steady clip while balancing demands from donors and party officials.

Some messages suggest efforts by donors to gain access to prominent Democratic officials on behalf of clients. In May, Lester Coney, an executive at a Chicago-based financial services firm, emailed a party finance staff member seeking a contact with "clout within the administration." Mr. Coney appeared to be referring to Gov. Mark Dayton, the governor of Minnesota.

"I have a very importance client/friend needed access with someone within the administration," Mr. Coney wrote. "So I promise him I would investigate."

The staff member appeared worried about the request, writing "No idea what to tell him here," to the party's national finance director, Jordan Kaplan, an Obama campaign veteran with deep ties to Midwestern donors.

"I told him to call rt," Mr. Kaplan replied, referring to R.T. Rybak, a Democratic committee vice-chairman and former mayor of Minneapolis.

Mr. Rybak, in response to questions from The New York Times on Sunday, said he never heard from Mr. Coney.

"I have no idea what this person wanted but the request was never made to me," Mr. Rybak wrote in an email. "If it had been, I would not have made such a call." Mr. Coney told The Times that he did not end up speaking to anyone in Minnesota about the query, which he said had been routine. He said he had sought the contact for a friend's client, whom he declined to name.

The leaked emails span the period from January 2015 to late May of this year, during which Mr. Obama was the party's chief fund-raising draw but the Democratic National Committee was beginning to raise money jointly with the party's presumed future nominee, Mrs. Clinton. Many revolve around donors' efforts to qualify for top packages at the convention that begins Monday in Philadelphia. Donors who raise $1.25 million for the party — or who give $467,000 — are entitled to priority booking in a top hotel, nightly access to V.I.P. lounges and an "exclusive roundtable and campaign briefing with high-level Democratic officials," according to a promotional brochure obtained by The Times.

For some donors, Mr. Obama's personal presence was most important. In an exchange in May, committee finance staff members debated how to preserve a $350,000 fund-raiser to be hosted by Carol Goldberg, an artist, and her husband, Hank Goldberg, a real estate executive. The Goldbergs had been eager to host Mr. Obama at their home, in Chevy Chase, Md. But after White House officials concluded that the extra drive was not a good use of Mr. Obama's time, aides discussed proposing to the family that they could instead host with other donors an event at the Jefferson Hotel, a luxury establishment near the White House.

Another staff member, given the task of letting the Goldbergs down, knew they would be disappointed. "I think the excitement of hosting at home was a big factor," he wrote. The Goldbergs pulled out of the fund-raiser.

In some cases, the party offered donors the chance to join "roundtables" — meetings for major givers disguised as high-minded discussions of national economic and social policy, where wealthy givers are treated as savants and sages.

"Wonderful event yesterday," Robert Pietrzak, a New York lawyer and top Obama fund-raiser, wrote to a committee fund-raiser after he participated in an event with Mr. Obama in May. "A lot of foreign policy, starting with my question on China. The President was in great form."

As is common in national politics, Democratic staff members kept detailed track of every dollar contributed by targeted donors, aiming to get each of the wealthiest givers to "max out," or contribute the maximum legal amount to each party account. The biggest national donors were the subject of entire dossiers, as fund-raisers tried to gauge their interests, annoyances and passions.

"Jon has an off and on again relationship with the DNC. He does not like DWS and feels we don't invite him to enough things," read one memo, about Jon Stryker, a prominent gay donor and heir to a medical supply fortune, referring to the committee's chairwoman, Ms. Wasserman Schultz.

Few details of fund-raising events were too small to escape notice. Reviewing one seating chart, staff members debated whether to seat Philip Munger, the son of the Berkshire Hathaway billionaire Charles Munger Sr., next to Mr. Obama at a May round table. Mr. Munger was the largest donor to Mr. Obama's political group, Organizing for Action, and a huge potential source of money for the committee.

The alternative was Sreedhar Potarazu, a Maryland ophthalmologist whose family members were already major Democratic donors, and who appears to have alienated some within the committee for his persistence. In his push to meet with Mr. Obama, Mr. Potarazu had apparently shared with party officials the story of his battle with cancer, a tactic that some of them viewed as crass.

"The Potarazu family has written $332,250 to us since '13. Munger has written $100,600 (and that's only if you reach back to 2008)," wrote a committee official in charge of mid-Atlantic fund-raising. "I don't understand why we'd be rewarding someone for giving to OFA over us. I also don't understand why everyone seems to hate Sreedhar so much."

Mr. Kaplan was firm. "Phil Munger is one of the largest democratic donors in the country," he said. "He is looking to give his money in new places and I would like

that to be to us."

Though some of the leaked emails are highly critical of Mr. Sanders, others show the party's fund-raisers seeking to avoid any appearance that Mr. Obama was favoring Mrs. Clinton. When the party invited John A. Braun, a Virginia-based defense contractor, to what was billed as a discussion with Mr. Obama on economic issues in May, Mr. Braun informed the Democratic committee that he had already written a large check to the party through a fund-raiser held jointly with Mrs. Clinton.

"Could I try to strike a deal with him and push for $20k or $15k so he feels like he's getting a discount for his past support?" a staff member wrote to Mr. Kaplan. "I'll pitch him on doing a second max out to get the main line package. I just don't know him and am worried about striking out if he won't do the full."

Party officials ultimately concluded that Mr. Braun would first have to give or raise additional money for the party, to avoid the appearance that Mr. Obama's events were helping raise money for Mrs. Clinton. As they looked to maximize opportunities to bring in money, the party's fund-raisers also grappled with delicate personal considerations among the Obama family, who were unenthusiastic about the demands of wooing donors.

There was, however, one potential way to interest Mr. Obama in donor maintenance. In May, Mr. Kaplan emailed each of his regional fund-raising directors with a request: Send the names of donors who would be good golf partners for the president. Mr. Obama, it seemed, was looking to hit the links on his upcoming trips.

"Laugh as you may at this because I did — but if you had to pick people from your regions to play golf with POTUS, who would they be?" Mr. Kaplan wrote.

Kitty Bennett contributed research.

*Find out what you need to know about the 2016 presidential race today, and get politics news updates via Facebook, Twitter and the First Draft newsletter.*

A version of this article appears in print on July 26, 2016, on Page A11 of the New York edition with the headline: Hacked Emails Reveal How the Party Favors Flow to Wealthy Donors.

© 2017 The New York Times Company

# Exhibit 7

*Democratic National Committee v. Donald J. Trump for President, Inc., et al.*
(No. 1:18-cv-3501-JGK-SDA)

Return to search (/podesta-emails/)

| View email | View source | Attachments |

# HRC Paid Speeches

From:tcarrk@hillaryclinton.com To:
jpalmieri@hillaryclinton.com, john.podesta@gmail.com,
slatham@hillaryclinton.com, kschake@hillaryclinton.com,
creynolds@hillaryclinton.com, bfallon@hillaryclinton.com
Date:
2016-01-25 00:28 Subject: HRC Paid Speeches

Team, Attached are the flags from HRC's
paid speeches we have from HWA. I put some highlights
below. There is a lot of
policy positions that we should give an extra scrub with
Policy. In terms of
what was opened to the press and what was not, the
Washington Examiner got a
hold of one of the private speech contracts (her speeches
to universities were
typically open press), so this is worth a read
http://www.washingtonexaminer.com/clintons-speeches-are-
cozy-for-wall-streeters-but-closed-to-
journalists/article/2553294/section/author/dan-friedman
*CLINTON ADMITS SHE IS OUT OF TOUCH* *Hillary Clinton:

"I'm Kind Of Far

Removed" From The Struggles Of The Middle Class "Because
The Life I've Lived And

The Economic, You Know, Fortunes That My Husband And I Now
Enjoy." *"And I am

not taking a position on any policy, but I do think there
is a growing sense of

anxiety and even anger in the country over the feeling
that the game is rigged.

And I never had that feeling when I was growing up. Never.
I mean, were there

really rich people, of course there were. My father loved
to complain about big

business and big government, but we had a solid middle
class upbringing. We had

good public schools. We had accessible health care. We had
our little, you

know, one-family house that, you know, he saved up his
money, didn't believe in

mortgages. So I lived that. And now, obviously, I'm kind
of far removed

because the life I've lived and the economic, you know,
fortunes that my husband

and I now enjoy, but I haven't forgotten it." [Hillary
Clinton Remarks at

Goldman-Black Rock, 2/4/14] *CLINTON SAYS YOU NEED TO HAVE
A PRIVATE AND PUBLIC

POSITION ON POLICY* *Clinton: "But If Everybody's
Watching, You Know, All Of The

Back Room Discussions And The Deals, You Know, Then People

Get A Little Nervous,

To Say The Least. So, You Need Both A Public And A Private

Position."* CLINTON:

You just have to sort of figure out how to -- getting back

to that word,

"balance" -- how to balance the public and the private

efforts that are

necessary to be successful, politically, and that's not

just a comment about

today. That, I think, has probably been true for all of

our history, and if you

saw the Spielberg movie, Lincoln, and how he was

maneuvering and working to get

the 13th Amendment passed, and he called one of my

favorite predecessors,

Secretary Seward, who had been the governor and senator

from New York, ran

against Lincoln for president, and he told Seward, I need

your help to get this

done. And Seward called some of his lobbyist friends who

knew how to make a

deal, and they just kept going at it. I mean, politics is

like sausage being

made. It is unsavory, and it always has been that way, but

we usually end up

where we need to be. But if everybody's watching, you

know, all of the back room

discussions and the deals, you know, then people get a

little nervous, to say

the least. So, you need both a public and a private

position. And finally, I

think -- I believe in evidence-based decision making. I
want to know what the

facts are. I mean, it's like when you guys go into some
kind of a deal, you

know, are you going to do that development or not, are you
going to do that

renovation or not, you know, you look at the numbers. You
try to figure out

what's going to work and what's not going to work.
[Clinton Speech For National

Multi-Housing Council, 4/24/13] *CLINTON TALKS ABOUT
HOLDING WALL STREET

ACCOUNTABLE ONLY FOR POLITICAL REASONS* *Clinton Said That
The Blame Placed On

The United States Banking System For The Crisis "Could
Have Been Avoided In

Terms Of Both Misunderstanding And Really Politicizing
What Happened."* "That

was one of the reasons that I started traveling in
February of '09, so people

could, you know, literally yell at me for the United
States and our banking

system causing this everywhere. Now, that's an
oversimplification we know, but

it was the conventional wisdom. And I think that there's a
lot that could have

been avoided in terms of both misunderstanding and really
politicizing what

happened with greater transparency, with greater openness

on all sides, you
know, what happened, how did it happen, how do we prevent
it from happening?
You guys help us figure it out and let's make sure that we
do it right this
time. And I think that everybody was desperately trying to
fend off the worst
effects institutionally, governmentally, and there just
wasn't that opportunity
to try to sort this out, and that came later." [Goldman
Sachs AIMS Alternative
Investments Symposium, 10/24/13] *Clinton: "Even If It May
Not Be 100 Percent
True, If The Perception Is That Somehow The Game Is
Rigged, That Should Be A
Problem For All Of Us." *"Now, it's important to recognize
the vital role that
the financial markets play in our economy and that so many
of you are
contributing to. To function effectively those markets and
the men and women
who shape them have to command trust and confidence,
because we all rely on the
market's transparency and integrity. So even if it may not
be 100 percent true,
if the perception is that somehow the game is rigged, that
should be a problem
for all of us, and we have to be willing to make that
absolutely clear. And if
there are issues, if there's wrongdoing, people have to be

held accountable and

we have to try to deter future bad behavior, because the

public trust is at the

core of both a free market economy and a

democracy." [Clinton Remarks to

Deutsche Bank, 10/7/14] *CLINTON SUGGESTS WALL STREET

INSIDERS ARE WHAT IS

NEEDED TO FIX WALL STREET* *Clinton Said Financial Reform

"Really Has To Come

From The Industry Itself." *"Remember what Teddy Roosevelt

did. Yes, he took on

what he saw as the excesses in the economy, but he also

stood against the

excesses in politics. He didn't want to unleash a lot of

nationalist,

populistic reaction. He wanted to try to figure out how to

get back into that

balance that has served America so well over our entire

nationhood. Today,

there's more that can and should be done that really has

to come from the

industry itself, and how we can strengthen our economy,

create more jobs at a

time where that's increasingly challenging, to get back to

Teddy Roosevelt's

square deal. And I really believe that our country and all

of you are up to

that job." [Clinton Remarks to Deutsche Bank, 10/7/14]

*Speaking About The

Importance Of Proper Regulation, Clinton Said "The People

That Know The Industry

Better Than Anybody Are The People Who Work In The Industry."* "I mean, it's

still happening, as you know. People are looking back and trying to, you know,

get compensation for bad mortgages and all the rest of it in some of the

agreements that are being reached. There's nothing magic about regulations, too

much is bad, too little is bad. How do you get to the golden key, how do we

figure out what works? And the people that know the industry better than anybody

are the people who work in the industry. And I think there has to be a

recognition that, you know, there's so much at stake now, I mean, the business

has changed so much and decisions are made so quickly, in nano seconds

basically. We spend trillions of dollars to travel around the world, but it's

in everybody's interest that we have a better framework, and not just for the

United States but for the entire world, in which to operate and trade."

[Goldman Sachs AIMS Alternative Investments Symposium, 10/24/13] *CLINTON ADMITS

NEEDING WALL STREET FUNDING* *Clinton Said That Because Candidates Needed Money

From Wall Street To Run For Office, People In New York

Needed To Ask Tough

Questions About The Economy Before Handing Over Campaign

Contributions.

*"Secondly, running for office in our country takes a lot

of money, and

candidates have to go out and raise it. New York is

probably the leading site

for contributions for fundraising for candidates on both

sides of the aisle, and

it's also our economic center. And there are a lot of

people here who should ask

some tough questions before handing over campaign

contributions to people who

were really playing chicken with our whole

economy." [Goldman Sachs AIMS

Alternative Investments Symposium, 10/24/13] *Clinton: "It

Would Be Very

Difficult To Run For President Without Raising A Huge

Amount Of Money And

Without Having Other People Supporting You Because Your

Opponent Will Have Their

Supporters."* "So our system is, in many ways, more

difficult, certainly far

more expensive and much longer than a parliamentary

system, and I really admire

the people who subject themselves to it. Even when I, you

know, think they

should not be elected president, I still think, well, you

know, good for you I

guess, you're out there promoting democracy and those

crazy ideas of yours. So I

think that it's something -- I would like -- you know,
obviously as somebody who

has been through it, I would like it not to last as long
because I think it's

very distracting from what we should be doing every day in
our public business.

I would like it not to be so expensive. I have no idea how
you do that. I

mean, in my campaign -- I lose track, but I think I raised
$250 million or some

such enormous amount, and in the last campaign President
Obama raised 1.1

billion, and that was before the Super PACs and all of
this other money just

rushing in, and it's so ridiculous that we have this kind
of free for all with

all of this financial interest at stake, but, you know,
the Supreme Court said

that's basically what we're in for. So we're kind of in
the wild west, and, you

know, it would be very difficult to run for president
without raising a huge

amount of money and without having other people supporting
you because your

opponent will have their supporters. So I think as hard as
it was when I ran, I

think it's even harder now." [Clinton Speech For General
Electric's Global

Leadership Meeting – Boca Raton, FL, 1/6/14] *CLINTON

TOUTS HER RELATIONSHIP TO

WALL STREET AS A SENATOR* *Clinton: As Senator, "I
Represented And Worked With"

So Many On Wall Street And "Did All I Could To Make Sure
They Continued To

Prosper" But Still Called For Closing Carried Interest
Loophole. *In remarks at

Robbins, Gellar, Rudman & Dowd in San Diego, Hillary
Clinton said, "When I

was a Senator from New York, I represented and worked with
so many talented

principled people who made their living in finance. But
even thought I

represented them and did all I could to make sure they
continued to prosper, I

called for closing the carried interest loophole and
addressing skyrocketing CEO

pay. I also was calling in '06, '07 for doing something
about the mortgage

crisis, because I saw every day from Wall Street literally
to main streets

across New York how a well-functioning financial system is
essential. So when I

raised early warnings about early warnings about subprime
mortgages and called

for regulating derivatives and over complex financial
products, I didn't get

some big arguments, because people sort of said, no, that
makes sense. But boy,

have we had fights about it ever since." [Hillary

Clinton's Remarks at Robbins

Geller Rudman & Dowd in San Diego, 9/04/14] *Clinton On Wall Street: "I Had

Great Relations And Worked So Close Together After 9/11 To Rebuild Downtown, And

A Lot Of Respect For The Work You Do And The People Who Do It." *"Now, without

going over how we got to where we are right now, what would be your advice to

the Wall Street community and the big banks as to the way forward with those two

important decisions? SECRETARY CLINTON: Well, I represented all of you for

eight years. I had great relations and worked so close together after 9/11 to

rebuild downtown, and a lot of respect for the work you do and the people who

do it, but I do -- I think that when we talk about the regulators and the

politicians, the economic consequences of bad decisions back in '08, you know,

were devastating, and they had repercussions throughout the world." [Goldman

Sachs AIMS Alternative Investments Symposium, 10/24/13] *CLINTON TALKS ABOUT THE

CHALLENGES RUNNING FOR OFFICE* *Hillary Clinton Said There Was "A Bias Against

People Who Have Led Successful And/Or Complicated Lives," Citing The Need To

Divese Of Assets, Positions, And Stocks.* "SECRETARY

CLINTON: Yeah. Well,

you know what Bob Rubin said about that. He said, you

know, when he came to

Washington, he had a fortune. And when he left Washington,

he had a small --

MR. BLANKFEIN: That's how you have a small fortune, is you

go to

Washington. SECRETARY CLINTON: You go to Washington.

Right. But,

you know, part of the problem with the political

situation, too, is that there

is such a bias against people who have led successful

and/or complicated lives.

You know, the divestment of assets, the stripping of all

kinds of positions, the

sale of stocks. It just becomes very onerous and

unnecessary." [Goldman Sachs

Builders And Innovators Summit, 10/29/13] *CLINTON

SUGGESTS SHE IS A MODERATE*

*Clinton Said That Both The Democratic And Republican

Parties Should Be

"Moderate." *"URSULA BURNS: Interesting. Democrats?

SECRETARY CLINTON: Oh,

long, definitely. URSULA BURNS: Republicans? SECRETARY

CLINTON: Unfortunately,

at the time, short. URSULA BURNS: Okay. We'll go back to

questions. SECRETARY

CLINTON: We need two parties. URSULA BURNS: Yeah, we do

need two parties.

SECRETARY CLINTON: Two sensible, moderate, pragmatic

parties." [Hillary Clinton

Remarks, Remarks at Xerox, 3/18/14] *Clinton: "Simpson-Bowles… Put Forth The

Right Framework. Namely, We Have To Restrain Spending, We Have To Have Adequate

Revenues, And We Have To Incentivize Growth. It's A Three-Part Formula… And They

Reached An Agreement. But What Is Very Hard To Do Is To Then Take That Agreement

If You Don't Believe That You're Going To Be Able To Move The Other Side."*

SECRETARY CLINTON: Well, this may be borne more out of hope than experience in

the last few years. But Simpson-Bowles -- and I know you heard from Erskine

earlier today -- put forth the right framework. Namely, we have to restrain

spending, we have to have adequate revenues, and we have to incentivize growth.

It's a three-part formula. The specifics can be negotiated depending upon

whether we're acting in good faith or not. And what Senator Simpson and Erskine

did was to bring Republicans and Democrats alike to the table, and you had the

full range of ideological views from I think Tom Coburn to Dick Durbin. And

they reached an agreement. But what is very hard to do is to then take that

agreement if you don't believe that you're going to be

able to move the other

side. And where we are now is in this gridlocked

dysfunction. So you've got

Democrats saying that, you know, you have to have more

revenues; that's the sine

qua non of any kind of agreement. You have Republicans

saying no, no, no on

revenues; you have to cut much more deeply into spending.

Well, looks what's

happened. We are slowly returning to growth. It's not as

much or as fast as

many of us would like to see, but, you know, we're

certainly better off than our

European friends, and we're beginning to, I believe, kind

of come out of the

long aftermath of the '08 crisis. [Clinton Speech For

Morgan Stanley, 4/18/13]

*Clinton: "The Simpson-Bowles Framework And The Big

Elements Of It Were Right…

You Have To Restrain Spending, You Have To Have Adequate

Revenues, And You Have

To Have Growth."* CLINTON: So, you know, the Simpson-

Bowles framework and the

big elements of it were right. The specifics can be

negotiated and argued over.

But you got to do all three. You have to restrain

spending, you have to have

adequate revenues, and you have to have growth. And I

think we are smart enough

to figure out how to do that. [Clinton Speech For Morgan

Stanley, 4/18/13]

*CLINTON IS AWARE OF SECURITY CONCERNS AROUND

BLACKBERRIES* *Clinton: "At The

State Department We Were Attacked Every Hour, More Than

Once An Hour By Incoming

Efforts To Penetrate Everything We Had. And That Was True

Across The U.S.

Government."* CLINTON: But, at the State Department we

were attacked every hour,

more than once an hour by incoming efforts to penetrate

everything we had. And

that was true across the U.S. government. And we knew it

was going on when I

would go to China, or I would go to Russia, we would leave

all of our electronic

equipment on the plane, with the batteries out, because

this is a new frontier.

And they're trying to find out not just about what we do

in our government.

They're trying to find out about what a lot of companies

do and they were going

after the personal emails of people who worked in the

State Department. So it's

not like the only government in the world that is doing

anything is the United

States. But, the United States compared to a number of our

competitors is the

only government in the world with any kind of safeguards,

any kind of checks and

balances. They may in many respects need to be

strengthened and people need to

be reassured, and they need to have their protections

embodied in law. But, I

think turning over a lot of that material intentionally or

unintentionally,

because of the way it can be drained, gave all kinds of

information not only to

big countries, but to networks and terrorist groups, and

the like. So I have a

hard time thinking that somebody who is a champion of

privacy and liberty has

taken refuge in Russia under Putin's authority. And then

he calls into a Putin

talk show and says, President Putin, do you spy on people?

And President Putin

says, well, from one intelligence professional to another,

of course not. Oh,

thank you so much. I mean, really, I don't know. I have a

hard time following

it. [Clinton Speech At UConn, 4/23/14] *Hillary Clinton:

"When I Got To The

State Department, It Was Still Against The Rules To Let

Most -- Or Let All

Foreign Service Officers Have Access To A Blackberry." *"I

mean, let's face it,

our government is woefully, woefully behind in all of its

policies that affect

the use of technology. When I got to the State Department,

it was still against

the rules to let most -- or let all Foreign Service

Officers have access to a

Blackberry. You couldn't have desktop computers when Colin

Powell was there.

Everything that you are taking advantage of, inventing and

using, is still a

generation or two behind when it comes to our

government." [Hillary Clinton

Remarks at Nexenta, 8/28/14] *Hillary Clinton: "We

Couldn't Take Our Computers,

We Couldn't Take Our Personal Devices" Off The Plane In

China And Russia. *"I

mean, probably the most frustrating part of this whole

debate are countries

acting like we're the only people in the world trying to

figure out what's going

on. I mean, every time I went to countries like China or

Russia, I mean, we

couldn't take our computers, we couldn't take our personal

devices, we couldn't

take anything off the plane because they're so good, they

would penetrate them

in a minute, less, a nanosecond. So we would take the

batteries out, we'd

leave them on the plane." [Hillary Clinton Remarks at

Nexenta, 8/28/14]

*Clinton Said When She Got To State, Employees "Were Not

Mostly Permitted To

Have Handheld Devices."* "You know, when Colin Powell

showed up as Secretary of

State in 2001, most State Department employees still

didn't even have computers

on their desks. When I got there they were not mostly permitted to have

handheld devices. I mean, so you're thinking how do we operate in this new

environment dominated by technology, globalizing forces? We have to change, and

I can't expect people to change if I don't try to model it and lead it."

[Clinton Speech For General Electric's Global Leadership Meeting – Boca Raton,

FL, 1/6/14] *Hillary Clinton Said You Know You Can't Bring Your Phone And

Computer When Traveling To China And Russia And She Had To Take Her Batteries

Out And Put them In A Special Box. *"And anybody who has ever traveled in other

countries, some of which shall remain nameless, except for Russia and China,

you know that you can't bring your phones and your computers. And if you do,

good luck. I mean, we would not only take the batteries out, we would leave the

batteries and the devices on the plane in special boxes. Now, we didn't do that

because we thought it would be fun to tell somebody about. We did it because we

knew that we were all targets and that we would be totally vulnerable. So it's

not only what others do to us and what we do to them and

how many people are
involved in it. It's what's the purpose of it, what is
being collected, and how
can it be used. And there are clearly people in this room
who know a lot about
this, and some of you could be very useful contributors to
that conversation
because you're sophisticated enough to know that it's not
just, do it, don't do
it. We have to have a way of doing it, and then we have to
have a way of
analyzing it, and then we have to have a way of sharing
it." [Goldman Sachs
Builders And Innovators Summit, 10/29/13] *Hillary Clinton
Lamented How Far
Behind The State Department Was In Technology, Saying
"People Were Not Even
Allowed To Use Mobile Devices Because Of Security Issues."
*"Personally,
having, you know, lived and worked in the White House,
having been a senator,
having been Secretary of State, there has traditionally
been a great pool of
very talented, hard-working people. And just as I was
saying about the credit
market, our personnel policies haven't kept up with the
changes necessary in
government. We have a lot of difficulties in getting—when
I got to the State
Department, we were so far behind in technology, it was

embarrassing. And, you

know, people were not even allowed to use mobile devices
because of security

issues and cost issues, and we really had to try to push
into the last part of

the 20th Century in order to get people functioning in
2009 and '10." [Goldman

Sachs Builders And Innovators Summit, 10/29/13] *CLINTON
REMARKS ARE PRO

KEYSTONE AND PRO TRADE* *Clinton: "So I Think That
Keystone Is A Contentious

Issue, And Of Course It Is Important On Both Sides Of The
Border For Different

And Sometimes Opposing Reasons…" *"So I think that
Keystone is a contentious

issue, and of course it is important on both sides of the
border for different

and sometimes opposing reasons, but that is not our
relationship. And I think

our relationship will get deeper and stronger and put us
in a position to

really be global leaders in energy and climate change if
we worked more closely

together. And that's what I would like to see us
do." [Remarks at tinePublic,

6/18/14] *Hillary Clinton Said Her Dream Is A Hemispheric
Common Market, With

Open Trade And Open Markets. *"My dream is a hemispheric
common market, with

open trade and open borders, some time in the future with

energy that is as

green and sustainable as we can get it, powering growth
and opportunity for

every person in the hemisphere." [05162013 Remarks to
Banco Itau.doc, p. 28]

*Hillary Clinton Said We Have To Have A Concerted Plan To
Increase Trade; We

Have To Resist Protectionism And Other Kinds Of Barriers
To Trade. *"Secondly, I

think we have to have a concerted plan to increase trade
already under the

current circumstances, you know, that Inter-American
Development Bank figure is

pretty surprising. There is so much more we can do, there
is a lot of low

hanging fruit but businesses on both sides have to make it
a priority and it's

not for governments to do but governments can either make
it easy or make it

hard and we have to resist, protectionism, other kinds of
barriers to market

access and to trade and I would like to see this get much
more attention and be

not just a policy for a year under president X or
president Y but a consistent

one." [05162013 Remarks to Banco Itau.doc, p. 32] *CLINTON
IS MORE FAVORABLE TO

CANADIAN HEALTH CARE AND SINGLE PAYER* *Clinton Said
Single-Payer Health Care

Systems "Can Get Costs Down," And "Is As Good Or Better On

Primary Care," But

"They Do Impose Things Like Waiting Times." *"If you look at countries that are

comparable, like Switzerland or Germany, for example, they have mixed systems.

They don't have just a single-payer system, but they have very clear controls

over budgeting and accountability. If you look at the single-payer systems,

like Scandinavia, Canada, and elsewhere, they can get costs down because, you

know, although their care, according to statistics, overall is as good or better

on primary care, in particular, they do impose things like waiting times, you

know. It takes longer to get like a hip replacement than it might take here."

[Hillary Clinton remarks to ECGR Grand Rapids, 6/17/13]

*Clinton Cited President

Johnson's Success In Establishing Medicare And Medicaid And Said She Wanted To

See The U.S. Have Universal Health Care Like In Canada.*

"You know, on

healthcare we are the prisoner of our past. The way we got to develop any kind

of medical insurance program was during World War II when companies facing

shortages of workers began to offer healthcare benefits as an inducement for

employment. So from the early 1940s healthcare was seen as

a privilege

connected to employment. And after the war when soldiers

came back and went

back into the market there was a lot of competition,

because the economy was so

heated up. So that model continued. And then of course our

large labor unions

bargained for healthcare with the employers that their

members worked for. So

from the early 1940s until the early 1960s we did not have

any Medicare, or our

program for the poor called Medicaid until President

Johnson was able to get

both passed in 1965. So the employer model continued as

the primary means by

which working people got health insurance. People over 65

were eligible for

Medicare. Medicaid, which was a partnership, a funding

partnership between the

federal government and state governments, provided some,

but by no means all

poor people with access to healthcare. So what we've been

struggling with

certainly Harry Truman, then Johnson was successful on

Medicare and Medicaid,

but didn't touch the employer based system, then actually

Richard Nixon made a

proposal that didn't go anywhere, but was quite far

reaching. Then with my

husband's administration we worked very hard to come up

with a system, but we
were very much constricted by the political realities that
if you had your
insurance from your employer you were reluctant to try
anything else. And so
we were trying to build a universal system around the
employer-based system. And
indeed now with President Obama's legislative success in
getting the Affordable
Care Act passed that is what we've done. We still have
primarily an
employer-based system, but we now have people able to get
subsidized insurance.
So we have health insurance companies playing a major role
in the provision of
healthcare, both to the employed whose employers provide
health insurance, and
to those who are working but on their own are not able to
afford it and their
employers either don't provide it, or don't provide it at
an affordable price.
We are still struggling. We've made a lot of progress. Ten
million Americans
now have insurance who didn't have it before the
Affordable Care Act, and that
is a great step forward. (Applause.) And what we're going
to have to continue
to do is monitor what the costs are and watch closely to
see whether employers
drop more people from insurance so that they go into what

we call the health

exchange system. So we're really just at the beginning. But we do have

Medicare for people over 65. And you couldn't, I don't think, take it away if

you tried, because people are very satisfied with it, but we also have a lot of

political and financial resistance to expanding that system to more people. So

we're in a learning period as we move forward with the implementation of the

Affordable Care Act. And I'm hoping that whatever the shortfalls or the

glitches have been, which in a big piece of legislation you're going to have,

those will be remedied and we can really take a hard look at what's succeeding,

fix what isn't, and keep moving forward to get to affordable universal

healthcare coverage like you have here in Canada. [Clinton Speech For

tinePublic - Saskatoon, CA, 1/21/15]

Download entire raw dataset for all published Podesta Emails here

(https://file.wikileaks.org/file/podesta-emails/)

Case 1:18-cv-03501-JGK   Document 227-7   Filed 03/04/19   Page 27 of 27

Top

    

WL Research Community - user contributed research based on documents published by WikiLeaks. (https://our.wikileaks.org/)

Tor is an encrypted anonymising network that makes it harder to intercept internet communications, or see where communications are coming from or going to. (https://www.torproject.org/)

Tails is a live operating system, that you can start on almost any computer from a DVD, USB stick, or SD card. It aims at preserving your privacy and anonymity. (https://tails.boum.org/)

The Courage Foundation is an international organisation that supports those who risk life or liberty to make significant contributions to the historical record. (https://www.couragefound.org/)

Bitcoin uses peer-to-peer technology to operate with no central authority or banks; managing transactions and the issuing of bitcoins is carried out collectively by the network. (https://www.bitcoin.org/)

 (https://www.facebook.com/wikileaks)   (https://twitter.com/wikileaks)

# Exhibit 8

*Democratic National Committee v. Donald J. Trump for President, Inc., et al.*
(No. 1:18-cv-3501-JGK-SDA)

View email      View source      Attachments

# RE: Follow Up

―――――――――――――――――――――――――――――――

From:GomezB@dnc.org

To: MirandaL@dnc.org, DavisM@dnc.org

Date: 2016-05-22 22:11

Subject: RE: Follow Up

―――――――――――――――――――――――――――――――

Sorry forgot to attached the document. Attached now.

From: Gomez, Bridgette

Sent: Sunday, May 22, 2016 8:07 PM

To: Miranda, Luis; Davis, Marilyn

Subject: FW: Follow Up

Hey Luis and Marilyn,

I wanted to flag this your way. Steve Lucero is building an mApp
that will have a storytelling component. You can see the attached

document that has more details of his proposal. Clearly it's
something they want to do with the DNC and Campaigns/Nominee, but
are beginning to do it on their own. They too are reaching out to
Soros, Buffet, Steyer, and other funders.


· Steven Lucero, 505-697-0055<tel:505-697-0055>,
steve.lucero@gmail.com<mailto:steve.lucero@gmail.com>
Let me know if you want more information and around this. It's
their solution to reaching millennials.
Thanks,
Bridgette

Top

    

WL Research Community - user contributed research based on documents published by WikiLeaks.

(https://our.wikileaks.org)

Tor is an encrypted anonymising network that makes it harder to intercept internet communications, or see where

Tails is a live operating system, that you can start on almost any computer from a DVD, USB stick, or SD card. It aims at

The Courage Foundation is an international organisation that supports those who risk life or liberty to make

Bitcoin uses peer-to-peer technology to operate with no central authority or banks; managing transactions and the issuing of

| communications are coming from or going to. | preserving your privacy and anonymity. | significant contributions to the historical record. | bitcoins is carried out collectively by the network. |

(https://www.torproject.org/) (https://tails.boum.org/) (https://www.couragefound.org/) (https://www.bitcoin.org/)

[f] (https://www.facebook.com/wikileaks)        [t] (https://twitter.com/wikileaks)

**Getting out the Latino Vote in 2016 and Beyond**

<u>Introduction</u>

The US Hispanic population and its influence have reached the tipping point.
Specifically Hispanic Millennials are now larger than the current Baby Boomer
demographic and growing.  There is one shot to capture this demographic or lose the
window of opportunity for generations:

1. Hispanics are the most brand loyal consumers in the World: **Known fact.**
2. Hispanic brand loyalty is generational: **Entire families.**
3. Once a brand loses this loyalty, Hispanics never re-engage: **Unforgiving.**
4. If a brand earns this loyalty, Hispanics will always be loyal and influence family
   and extended family to be loyal: **Long term relationship.**
5. Hispanics are the most responsive to "story telling": **Brands need to "speak with
   us".**

Without a comprehensive brand strategy and plan, The DNC will lose the opportunity to
acquire the Hispanic consumer.

<u>Objectives</u>

- To empower and inspire US Hispanics 18+ yrs of age to register & vote in the
  2016 Presidential and Congressional elections
- To develop a relationship with Hispanics based on trust and inclusion.
- To increase the turnout of Hispanic voters from 48 % to 75% or more
- To extend the success in 2016, own the Hispanic loyalty, and convert states like
  Florida, Colorado, New Mexico, Nevada and Texas to become reliably blue

<u>Assumption</u>

The DNC possesses reliable demographic data and voting statistics of US Hispanics. This
document does not seek either to address or expand on DNC data.

<u>Issues</u>

US Hispanics have been underrepresented and marginalized in education, finance and
civic representation, while being the fastest growing demographic in the US, in the last
40 years

1. **The Latino share of eligible voters is growing** Latinos will make up 13
   percent of all eligible voters in 2016, a 2 percent increase from 2012 higher
   in some states. In Florida, for example, the share of eligible voters who are Latino
   will increase from 17.1 percent in 2012 to 20.2 percent in 2016. And in Nevada,
   the increase is from15.9% to 18.8%.

2. **Hispanic voter turnout is low—compared to other groups.** Hispanic voter turnout in 2012 was 48% compared with 64.1% for non-Hispanic whites and 66.2% for blacks.

3. **A total of 800,000 Latinos turn 18 each year—one every 30 seconds** (or more than 66,000 individuals per month). Ninety-three percent of Latino children are U.S.-born citizens and will be eligible to vote when they reach age 18. As of 2014, one in four children in the United States—17.6 million total—were Latino.

4. **As of 2013, 3.9 million lawful permanent residents were eligible to become citizens but had not naturalized.** They come from Latin American countries, with more than 2.7 million from Mexico. Horrified by the anti-Hispanic messages coming from Trump, Cruz and others, they are applying for citizenship in record numbers.

5. **Hispanic voters are voting for Democrats in ever-increasing margins** (% voting for D minus % voting for R). The margins were 18% in 2004, 36% in 2008 and 44% in 2012

6. **These five facts suggest that increasing Hispanic turnout could—and likely would—lead to the election of many more Democrats.**

7. **Traditional methods to reach Hispanics are ineffective.** They include
   i. Hispano/Leadership to reach/engage
   ii. TV/Print

8. **US Hispanic Millennials feel betrayed** by politics, elected officials and parties

9. **US Hispanic Millennials distrust** politicians and parties

10. **The US Hispanic Demographic** is made up of multiple "Hispanic" or "Latino" cultures

11. **There is no homogeneous Omni-channel platform** that can scale across each Hispanic/Latino community in the country to
   - Discover/learn issues and how they impact local communities
   - Share and express point-of-view re: issues
   - Feel included in process
   - Be motivated to take action (Register and vote)

## Solution

In order for a dramatic and impactful GOTV and branding effort targeting the US Hispanic eligible voters, the solution must be focused on the US Hispanic Millennial. This effort will be successful if the brand marketing is based on issues and conversations versus direct politicking, polling, advertising and robo-calling. P2P now replaces Door-to-door, which obligates the 2016 effort to have a strong digital and interative/ experiential execution.

To register Hispanic/Latino Millennial voters and motivate them to vote via an Omni-channel platform to include:

1. Web

2. Mobile Messaging Platforms
3. Mobile Video Vehicles  (automobile or other)
4. In person experiential events + voter registration

The features of an Omni-channel platform, with Viral Loop, scalable to dozens of
Hispanic Communities Nationally:

1. GOTV
   a. Responsive Web applications with deep link interaction connecting partner
      sites
   b. P2P / P2G mobile application based on Messaging
   c. Issue Discovery + Call To Action
      i. Broadcast issues (content) to mobile application and website
      ii. Subscriber expresses opinion or sentiment
      iii. Straw voting
2. Allow communities to engage with each other and create sustainable behavior
   a. Social Media +Networking
      i. Link all social media & networks to mobile applications and
         website
      ii. Allow direct targeting of local communities
3. Reach out to communities
   a. Experiential events in conjunction with video story telling and local events
   b. Organize local events via mobile city-to-city
   c. Provide video based storytelling of Hispanics/Latinos to express
      themselves
   d. Setup GOTV activities at each local event

# Exhibit 9

*Democratic National Committee v. Donald J. Trump for President, Inc., et al.*
(No. 1:18-cv-3501-JGK-SDA)

View email       View source       Attachments

# Re: New video: Trump isn't trying to bring people together

From:ChristopherR@dnc.org

To: WalkerE@dnc.org

CC: Video-Vetting_d@dnc.org

Date: 2016-05-06 19:44

Subject: Re: New video: Trump isn't trying to bring people together

Attached again ‹ I can swing by if you still can¹t open?

On 5/6/16, 5:20 PM, "Walker, Eric" <WalkerE@dnc.org> wrote:

>Sory this isn't popping up for me for some reason. Can you
resend

>

>

>

>On May 6, 2016, at 3:59 PM, Christopher, Rebecca

<ChristopherR@dnc.org>

>wrote:

>

>Hi everyone,

>

>Attached is a script for a new video we¹d like to use to mop up some more

>taco bowl engagement, and demonstrate the Trump actually isn¹t trying.

>

>Let me know if you have any flags and thank you!

><TrumpHesTrying-1.docx>



Top







WL Research Community - user contributed research based on

Tor is an encrypted anonymising network that makes it harder to

Tails is a live operating system, that you can start on almost any

The Courage Foundation is an international organisation that

Bitcoin uses peer-to-peer technology to operate with no central authority or

| | | | | |
|---|---|---|---|---|
| documents published by WikiLeaks. (https://our.wikileaks.org) | intercept internet communications, or see where communications are coming from or going to. | computer from a DVD, USB stick, or SD card. It aims at preserving your privacy and anonymity. | supports those who risk life or liberty to make significant contributions to the historical record. | banks; managing transactions and the issuing of bitcoins is carried out collectively by the network. |

(https://www.torproject.org)    (https://tails.boum.org/)    (https://www.couragefound.org/)    (https://www.bitcoin.org/)

(https://www.facebook.com/wikileaks)      (https://twitter.com/wikileaks)

# Exhibit 10

*Democratic National Committee v. Donald J. Trump for President, Inc., et al.*
(No. 1:18-cv-3501-JGK-SDA)

Return to search (/podesta-emails/)

| View email | View source |

# Needy Latinos and 1 easy call.

From:john.podesta@gmail.com To:
hdr29@hrcoffice.com, ha16@hillaryclinton.com CC:
arenteria@hillaryclinton.com Date: 2015-08-21 14:01
Subject: Needy Latinos and 1 easy call.

A few
calls you might consider making: 1) Fedrico Pena. Ken
Salazar who has been an
absolute trooper really wants to get Fedrico Pena on
board. I talked to Pena
early, before March and he hemmed and hawed. Ken had lunch
with him early this
week and reports the following, he's close to committing
but carrying some
baggage. Fed never said this to me but he confided to Ken
that his Cabinet
stints ripped up his family, he gave everything to the
cause and no time to his
family, he went through a messy divorce in the late 90's
and was left really

down and felt like no one reached out to him then so he
felt pretty cut off from

Clinton World. In 07, the only candidate that asked for
his support was Obama,

so he endorsed. (by the way, not sure any of this is
factually accurate, but

this is how he is feeling). His life now revolves around
his new wife, Cindy,

who is a supporter of yours and came to the fundraiser at
the Chambers house. He

kind of wants to be with you, but this stuff is still
grinding on him. Ken

suggests a call to him and was very explicit about making
the following four

points: 1) you really enjoyed seeing Cindy at the Chambers
event and

appreciate her support. 2) ask him how he's been doing 3)
ask about his views on

the race and what she should be doing in Colorado 4) ask
that he consider

publicly supporting you. On balance, I recommend making
this call as much

because it's important to Ken who has been great. Pena's
cell: 303-294-1824 2)

Bill Richardson. I had heard that you were upset that I
encouraged a call

between WJC and Richardson to bury the hatchet. I did that
at the request of

Jose Villarreal who pushed me and made the point that
Richardson is still on TV

a lot, especially on Univision and Telemundo and not
withstanding the fact that
he can be a dick, it was worth getting him in a good
place. He had a good
conversation with the President and has been good in his
interviews since. I
have pressed Bill, but I think it will take a call from
you to get a formal
endorsement. He's on Meet the Press on Sunday. Probably
worth a quick call to
ask him to stay stout and publicly endorse, but if it's
too galling, don't
bother. Richardson's cell: 505-699-4862 3) Governor Jim
Hodges. I just spent a
couple days in South Carolina and did an event with him
and Steve Benjamin where
he endorsed. He was really good and I think it sent a
strong signal in South
Carolina, following Dick Reilly's endorsement, that the
support there is strong
broad and determined. He and his wife Rachel also co
hosted a successful
fundraiser with Don and Carol Fowler and Ben and Sydney
Rex that I attended.
Worth a quick call to Jim to thank him and Rachel for
their support. Hodges
cell: 803-315-0955

Download entire raw dataset for all published Podesta Emails here

(https://file.wikileaks.org/file/podesta-emails/)



Top

    

WL Research Community - user contributed research based on documents published by WikiLeaks.

(https://our.wikileaks.org)

Tor is an encrypted anonymising network that makes it harder to intercept internet communications, or see where communications are coming from or going to.

(https://www.torproject.org/)

Tails is a live operating system, that you can start on almost any computer from a DVD, USB stick, or SD card. It aims at preserving your privacy and anonymity.

(https://tails.boum.org/)

The Courage Foundation is an international organisation that supports those who risk life or liberty to make significant contributions to the historical record.

(https://www.couragefound.org/)

Bitcoin uses peer-to-peer technology to operate with no central authority or banks; managing transactions and the issuing of bitcoins is carried out collectively by the network.

(https://www.bitcoin.org/)

 (https://www.facebook.com/wikileaks)        (https://twitter.com/wikileaks)

# Exhibit 11

*Democratic National Committee v. Donald J. Trump for President, Inc., et al.*
(No. 1:18-cv-3501-JGK-SDA)

Return to search (/podesta-emails/)

| View email | View source |

# This email has also been verified by Google DKIM (https://www.wikileaks.org/DKIM-Verification.html) 2048-bit RSA key

# Fwd: Hi Mara

---

From:robbymook@gmail.com To: john.podesta@gmail.com Date: 2015-01-19 23:05

Subject: Fwd: Hi Mara

---

---------- Forwarded message ---------- From: mara lee <maralee@gmail.com> Date: Mon, Jan 19, 2015 at 5:08 PM Subject: Fwd: Hi Mara To: Marlon Marshall <marlondmarshall@gmail.com>, Robert Mook < robbymook@gmail.com> FYI. Happy to speak out based on my very positive experience working with all of you if that helps - on or off the record. Let me know. ---------- Forwarded message --------

-- From:

Catanese, David <DCatanese@usnews.com> Date: Mon, Jan 19,
2015 at 6:47 PM

Subject: Hi Mara To: "Maralee@gmail.com"

<Maralee@gmail.com> Hi

Mara, Thanks for getting back to me on Facebook and
providing your e-mail; I do

appreciate it. This is a bit of a sensitive topic, so
forgive me if my

questions are general in nature as I'm only responding to
a tip, but feel

obligated to follow through. I was recently contacted by a
source who claims to

have worked on the 2008 Hillary Clinton campaign and is
alleging that Marlon

Marshall made unwelcome sexual advances and propositions
towards women on the

campaign repeatedly. The allegation is that he would
"corner women, make them

uncomfortable and make suggestions about having sex." The
source encouraged me

to contact women who worked under him in the Nevada
office. I was wondering if

you were able to describe your experience with Marshall
and if any of this rings

true, with you or anyone else you know who worked there.
The source also claims

that Robby Mook was made aware of the issue, but declined
to act on it or

intervene because he is personal friends with Marshall. Do

you know if there is

any truth to this? Again, my apologies for the personal

nature of the questions,

but it is information that was recently provided to me. If

there's any light you

can shed on this, whether there's truth to it, or if it's

completely off base, I

would appreciate that. I understand the sensitive nature

of the allegations so

am happy to protect your identity at this point, unless

you feel otherwise

compelled to speak out. Thank you for your time.

Sincerely, David *David

Catanese* *Senior Politics Writer* *U.S. News & World

Report*

*TheRun2016.com* -- Mara Lee | +962 (0) 79 545 7386 |

maralee@gmail.com

Download entire raw dataset for all published Podesta Emails here

(https://file.wikileaks.org/file/podesta-emails/)



Top

    

WL Research Community - user contributed research based on documents published by WikiLeaks. (https://our.wikileaks.org)

Tor is an encrypted anonymising network that makes it harder to intercept internet communications, or see where communications are coming from or going to. (https://www.torproject.org/)

Tails is a live operating system, that you can start on almost any computer from a DVD, USB stick, or SD card. It aims at preserving your privacy and anonymity. (https://tails.boum.org/)

The Courage Foundation is an international organisation that supports those who risk life or liberty to make significant contributions to the historical record. (https://www.couragefound.org/)

Bitcoin uses peer-to-peer technology to operate with no central authority or banks; managing transactions and the issuing of bitcoins is carried out collectively by the network. (https://www.bitcoin.org/)

 (https://www.facebook.com/wikileaks)    (https://twitter.com/wikileaks)

# Exhibit 12

*Democratic National Committee v. Donald J. Trump for President, Inc., et al.*
(No. 1:18-cv-3501-JGK-SDA)



*US*
EDITION

*MEDIA*   07/24/2016 05:25 pm ET

# Politico Admits 'Mistake' In Sending DNC An Article In Advance

No substantive changes were made to the piece, though the arrangement has prompted criticism from the RNC and prominent conservatives.



**By Michael Calderone**



MSNBC

Politico says it was a mistake for reporter Ken Vogel to have sent the DNC an article in advance.

NEW YORK — Politico acknowledged Sunday that it was a "mistake" for one of its top reporters to send the Democratic National Committee an advance copy of an article while emphasizing there were no substantive changes made to the piece prior to publication.

A May 2 article by Politico's Ken Vogel and Isaac Arnsdorf — "Clinton fundraising leaves little for state parties" — has come under scrutiny since WikiLeaks published over 19,000 internal DNC emails on Friday.

In an April 29 email thread, DNC national press secretary Mark Paustenbach shared Vogel's detailed questions with others working to coordinate a response to what would be an unflattering story about fundraising efforts. Paustenbach also spoke to the Clinton campaign that day in preparing the DNC's pushback, according to the emails.

On April 30, Paustenbach told DNC Communications Director Luis Miranda that he'd received the story in advance. "Vogel gave me his story ahead of time/before it goes to his editors as long as I didn't share it," he wrote. "Let me know if you see anything that's missing and I'll push back."

### Fwd: per agreement ... any thoughts appreciated

From:Paustenbach@dnc.org
To: Miranda@dnc.org
Date: 2016-04-30 22:32
Subject: Fwd: per agreement ... any thoughts appreciated

Vogel gave me his story ahead of time/before it goes to his editors as long as I didn't share it. Let me know if you see anything that's missing and I'll push back.

WIKILEAKS

Sharing articles with sources in advance is generally frowned upon in newsrooms.

Journalists are expected to ask questions of those they write about prior to publication, but sharing entire stories in advance is generally discouraged in newsrooms.

On Sunday, Politico spokesman Brad Dayspring told The Huffington Post in an email that sharing stories with sources isn't standard practice.

"Politico's policy is to not share editorial content pre-publication except as approved by editors," Dayspring wrote. "In this case the reporter was attempting to check some very technical language and figures involving the DNC's joint fundraising agreement with the Clinton campaign. Checking the relevant passages for accuracy was responsible and consistent with our standards; Sharing the full piece was a mistake and not consistent with our policies. There were no substantive changes to the piece and in fact the final story was blasted out by the both RNC and the Sanders campaign, and prompted Politifact to revise its rating on the issue in question."

Vogel, Politico's chief investigative reporter and author of the 2014 book *Big Money*, is regarded as one of the top journalists on the politics and money beat. He's reported critically on fundraising across party lines and the article in question wasn't one the DNC or the Hillary Clinton campaign would have liked to see in print. Vogel and Arnsdorf reported that only 1 percent of $61 million raised by the Hillary Victory Fund — a group comprised of Clinton's campaign, the DNC and 32 state party committees — had gone to state parties.

Two days later, Politifact revised its rating on a claim from actor and Clinton supporter George Clooney that "the overwhelming amount" of money raised at a Clinton fundraiser would go to down-ballot Democrats. In light of Politico's reporting, the fact-checking organization changed its assessment from "Mostly True" to "Half True."

As Vogel and Arnsdorf wrote at the time, allies of Sen. Bernie Sanders (I-Vt.) were concerned with the joint fundraising arrangement. "They see it as a circumvention of campaign contribution limits by a national party apparatus intent on doing whatever it takes to help Clinton defeat Sanders during the party's primary, and then win the White House," they wrote.

The WikiLeaks trove, more broadly, has reinforced long-running perceptions among Sanders supporters that the DNC was assisting the Clinton campaign during the Democratic primary. DNC Chair Debbie Wasserman Schultz announced her resignation Sunday in response to the fallout from the leak.

Though the Politico story wasn't positive toward the DNC, the courtesy Vogel extended to the party has been seized upon as evidence of liberal media bias by some conservatives media figures, such as radio hosts Laura Ingraham and Mark Levin and Republican pollster Frank Luntz.



The Republican National Committee, too, has turned a spotlight on leaked emails involving Politico.

On Saturday, The Republican National Committee blasted a Business Insider story on Vogel's emails to its press mailing list and communications director Sean Spicer charged that the reporter allowed the Democrats "to edit" his stories in advance.

*Disclosure: The reporter worked with Vogel at Politico from November 2007 to March 2010.*

**ALSO ON HUFFPOST**

---

**Michael Calderone**
Senior Media Reporter, HuffPost

Suggest a correction

**MORE:**

Dnc     Politico

FROM OUR PARTNERS

Presented by LendingTree

Case 1:18-cv-03501-JGK   Document 227-12   Filed 03/04/19   Page 6 of 6

**Do This Before Your Next Mortgage Payment (It's Genius!)**

**2017 Mortgage Rates now at 3.04% APR (15 yr.)**

**Veteran Homeowners Get A Huge Reward In 2017**

**Refinance rates take a sharp decline**

**Mortgage rates just plummeted. Lock in now!**

**Huge mortgage rate drop. Could be last chance to refinance.**

| ABOUT US | Contact Us | Careers | Privacy Policy |
| ADVERTISE | RSS | Archive | Comment Policy |
| About Our Ads | FAQ | User Agreement | |

©2017 Oath Inc. All rights reserved. Part of HuffPost • HPMG News

# Exhibit 13

*Democratic National Committee v. Donald J. Trump for President, Inc., et al.*
(No. 1:18-cv-3501-JGK-SDA)

View email     View source

# Re: Pablo!

From:ManriquezP@dnc.org

To: MirandaL@dnc.org, PaustenbachM@dnc.org, WalkerE@dnc.org

Date: 2016-04-28 16:46

Subject: Re: Pablo!

Window closing on this. Need to know asap if we want to offer
Jake Tapper questions to ask us.

Sent from my iPhone

On Apr 28, 2016, at 1:11 PM, Manriquez, Pablo
<ManriquezP@dnc.org<mailto:ManriquezP@dnc.org>> wrote:

Lmk and I'll call Jason. Might wanna loop Freundlich &/or Dillon
here to see if there's any newsworthy oppo Luis can drop

Sent from my iPhone


Begin forwarded message:


From: "Seher, Jason"

<Jason.Seher@turner.com<mailto:Jason.Seher@turner.com>>

Date: April 28, 2016 at 1:01:18 PM EDT

To: "ManriquezP@dnc.org<mailto:ManriquezP@dnc.org>"

<ManriquezP@dnc.org<mailto:ManriquezP@dnc.org>>

Subject: Pablo!



Thanks for facilitating Luis coming on today, and bearing with us
through a meelee of GOP nonsense and cancellations and all that.


Any particular points he'll want to make? We're gonna stay Dem
focused...


Thanks!


Jason


Jason Seher | CNN

Writer/Producer | The Lead with Jake Tapper

(202) 772-2640 | (856) 979-8021

Top

    

WL Research Community - user contributed research based on documents published by WikiLeaks.

(https://our.wikileaks.org)

Tor is an encrypted anonymising network that makes it harder to intercept internet communications, or see where communications are coming from or going to.

Tails is a live operating system, that you can start on almost any computer from a DVD, USB stick, or SD card. It aims at preserving your privacy and anonymity.

The Courage Foundation is an international organisation that supports those who risk life or liberty to make significant contributions to the historical record.

Bitcoin uses peer-to-peer technology to operate with no central authority or banks; managing transactions and the issuing of bitcoins is carried out collectively by the network.

(https://www.torproject.org/) (https://tails.boum.org/) (https://www.couragefound.org/) (https://www.bitcoin.org/)

 (https://www.facebook.com/wikileaks)    (https://twitter.com/wikileaks)