UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DEMOCRATIC NATIONAL COMMITTEE,<br><br>Plaintiff,<br><br>v.<br><br>THE RUSSIAN FEDERATION, *et al.*,<br><br>Defendants. | Civil Action No. 18-cv-03501-JGK |

**BRIEF OF AMICI CURIAE THE KNIGHT FIRST AMENDMENT INSTITUTE AT COLUMBIA UNIVERSITY, THE REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS, AND THE AMERICAN CIVIL LIBERTIES UNION IN SUPPORT OF WIKILEAKS' MOTION TO DISMISS**

Bruce D. Brown
Katie Townsend
Gabriel Rottman
Caitlin Vogus
Reporters Committee for Freedom of the
  Press
1156 15th Street, NW, Suite 1020
Washington, D.C. 20005
(202) 795-9300
bbrown@rcfp.org

Carrie DeCell
Adi Kamdar
Alex Abdo
Jameel Jaffer
Knight First Amendment Institute
  at Columbia University
475 Riverside Drive, Suite 302
New York, NY 10115
(646) 745-8500
carrie.decell@knightcolumbia.org

Ben Wizner
Esha Bhandari
Brett Max Kaufman
Dror Ladin
American Civil Liberties Union
125 Broad Street
New York, NY 10004
(212) 549-2500
bwizner@aclu.org

*Counsel for Amici Curiae*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................. ii

INTERESTS OF AMICI ....................................................................................................... 1

INTRODUCTION ................................................................................................................. 2

ARGUMENT ......................................................................................................................... 3

    I.    An act of publication that would otherwise be protected by the First Amendment does not lose that protection simply because a source acquired the published information unlawfully. .......................................................... 3

    II.    The press relies on this protection to inform the public about matters of public concern. ................................................................................................................. 7

        A.    Post-9/11 reporting on torture and mass surveillance. ..................................... 7

        B.    Watergate, COINTELPRO, and the Church and Pike Committees ................ 9

        C.    Reporting on corporate malfeasance and other non–national security stories. ........................................................................................................... 11

CONCLUSION .................................................................................................................... 12

CERTIFICATE OF COMPLIANCE ................................................................................... 14

## TABLE OF AUTHORITIES

**Cases**

*Bartnicki v. Vopper*, 532 U.S. 514 (2001) .................................................................. 3, 5, 6, 7

*Boehner v. McDermott*, 484 F.3d 573 (D.C. Cir. 2007) ............................................................ 6

*Cox Broad. Corp. v. Cohn*, 420 U.S. 469 (1975) ..................................................................... 4

*Florida Star v. B.J.F.*, 491 U.S. 524 (1989) ............................................................................. 7

*Jean v. Mass. State Police*, 492 F.3d 24 (1st Cir. 2007) ........................................................ 6, 7

*Landmark Commc'ns, Inc. v. Virginia*, 435 U.S. 829 (1978) ................................................. 6, 7

*New York Times Co. v. United States*, 403 U.S. 713 (1971) ..................................................... 4

*Smith v. Daily Mail Publ'g Co.*, 443 U.S. 97 (1979) ................................................................. 4

*United States v. Ehrlichman*, 546 F.2d 910 (D.C. Cir. 1976) .................................................. 4

*United States v. Morison*, 844 F.2d 1057 (4th Cir. 1988) ........................................................ 6

*Zerilli v. Evening News Ass'n*, 628 F.2d 217 (D.C. Cir. 1980) ................................................. 8

**Statutes**

Pub. L. No. 110-261, 122 Stat. 2436 (2008) .............................................................................. 9

Pub. L. No. 95-511, 92 Stat. 1783 (1978) ................................................................................ 11

**Other Authorities**

Betty Medsger, *Remembering an Earlier Time When a Theft Unmasked Government Surveillance*, Wash. Post (Jan. 10, 2014), https://perma.cc/T85B-3UT6 ............................................................................................................................. 11

Brian Stelter, *Stories About NSA Surveillance, Snowden Leaks Win Pulitzers for Two News Groups*, CNN (Apr. 15, 2014), https://perma.cc/EZ4P-MKS3 ........................... 10

Charlie Savage, *Whistle-Blower on N.S.A. Wiretapping Is Set To Keep Law License*, N.Y. Times (July 12, 2016), https://perma.cc/7JF2-5KZV ......................................... 9

Dana Priest, *CIA Holds Terror Suspects in Secret Prisons*, Wash. Post (Nov. 2, 2005), https://perma.cc/ZV9V-7ZED ................................................................................. 8

David Von Drehle, *FBI's No. 2 Was 'Deep Throat': Mark Felt Ends 30-Year Mystery of The Post's Watergate Source*, Wash. Post (June 1, 2005), https://perma.cc/2QQV-U2AD ........................................................................................ 10

Douglas Martin, *Merrell Williams Jr., Paralegal Who Bared Big Tobacco, Dies at 72*, N.Y. Times (Nov. 26, 2013), https://perma.cc/R5T4-BXBK ............................ 12

Ellen Nakashima, *Congressional Action on NSA Is a Milestone in the Post-9/11 World*, Wash. Post. (June 2, 2015), https://perma.cc/8RUV-EGZ5 ........................ 10

Emma Best, *The FBI Investigated the Village Voice and RCFP for Espionage in 1976*, Muckrock (Jan. 2, 2019), https://perma.cc/9APD-QYLR .............................. 11

Eric Lipton & Julie Creswell, *Panama Papers Show How Rich United States Clients Hid Millions Abroad*, N.Y. Times (June 5, 2016), https://perma.cc/9H6Z-XTBT ........................................................................................ 12

Frederick Obermaier et al., *About the Panama Papers*, Süddeutsche Zeitung, https://perma.cc/P86A-7W5Y ............................................................................... 12

Hamish Boland-Rudder & Will Fitzgibbon, *Panama Papers: German Police Raid Deutsche Bank Headquarters Over Alleged Money Laundering*, Int'l Consortium of Investigative Journalists (Nov. 29, 2018), https://perma.cc/C6AK-2R7F ...................................................................................... 13

Indictment, *United States v. Owens*, No. 18-cr-693 (S.D.N.Y. filed Sept. 27, 2018), https://perma.cc/88YE-FFZ4 ................................................................... 13

James Risen & Eric Lichtblau, *Bush Lets U.S. Spy on Callers Without Courts*, N.Y. Times (Dec. 16, 2005), https://perma.cc/UU4J-YE9U ..................................... 9

Max Holland, *The Myth of Deep Throat*, Politico Magazine (Sept. 10, 2017), https://perma.cc/KUK8-RTUH .............................................................................. 10

Neil A. Lewis & Eric Schmitt, *Inquiry Finds Abuses at Guantánamo Bay*, N.Y. Times (May 1, 2005), https://perma.cc/D579-MSJF ................................................ 9

On Secrets, *When In Doubt, Publish*, Wash. Post (July 9, 2006), https://perma.cc/97UM-LQKV ............................................................................... 10

*Parliament Examines SWIFT II Agreement*, Euro. Parl. (Feb. 7, 2010), https://perma.cc/8Z5Y-JMLK ................................................................................ 10

Robert F. Worth, *U.S. To Abandon Abu Ghraib and Move Prisoners to a New Center*, N.Y. Times (Mar. 10, 2006), https://perma.cc/7NJ9-TZX3. ...................... 9

Robert Pear, *President Reagan Pardons 2 Ex-F.B.I. Officials in 1970's Break-Ins*, N.Y. Times (Apr. 18, 1981), https://perma.cc/7BEB-G734 ................................... 11

*The Panama Papers: Exposing the Rogue Offshore Finance Industry*, Int'l
    Consortium of Investigative Journalists, https://perma.cc/AX4W-ESPY ............................... 13

Todd Richissin, *Soldiers' Warnings Ignored*, Balt. Sun (May 9, 2004),
    https://perma.cc/JK54-XJ94 ................................................................................................ 9

**INTERESTS OF AMICI**

Amici are organizations with expertise in the First Amendment that seek to brief the Court on an important constitutional question raised by this case with significant implications for freedom of the press.

The Knight Institute is a non-partisan, not-for-profit organization that defends the freedoms of speech and the press in the digital age through strategic litigation, research, and public education. The Knight Institute aims to promote a system of free expression that is open and inclusive, that broadens and elevates public discourse, and that fosters creativity, accountability, and effective self-government. Since its founding in 2016, the Knight Institute has brought and participated as amicus in a number of cases, including cases in this Court, raising important First Amendment questions.

The Reporters Committee for Freedom of the Press is an unincorporated nonprofit association. The Reporters Committee was founded by leading journalists and media lawyers in 1970 when the nation's news media faced an unprecedented wave of government subpoenas forcing reporters to name confidential sources. Today, its attorneys provide pro bono legal representation, amicus curiae support, and other legal resources to protect First Amendment freedoms and the newsgathering rights of journalists.

The ACLU is a nationwide, nonprofit, nonpartisan organization with nearly 2 million members dedicated to defending the principles embodied in the Constitution and our nation's civil rights laws. For nearly a century, the ACLU has been at the forefront of efforts nationwide to protect the full array of civil rights and civil liberties. Since its founding in 1920, the ACLU has frequently appeared before this Court in First Amendment cases, both as direct counsel and as amicus curiae.

## INTRODUCTION

The Democratic National Committee's ("DNC") Second Amended Complaint alleges illegal activity carried out by more than a dozen individuals and entities in the lead-up to the 2016 presidential election. Collectively, the allegations describe a broad effort by the Russian government to interfere in the United States' democratic process. The gravamen of the charges against WikiLeaks, however, is that WikiLeaks publicly released documents that alleged Russian intelligence operatives stole from the DNC,[1] and that WikiLeaks communicated with those operatives in the period between theft and publication about the delivery of the documents to WikiLeaks and the timing of their publication.[2] The DNC has not alleged that WikiLeaks was involved in the initial theft of the documents. WikiLeaks has moved to dismiss the DNC's charges, in part on First Amendment grounds. Amici write to emphasize one critical point in support of WikiLeaks' motion to dismiss: An act of publication that would otherwise be protected by the First Amendment does not lose that protection simply because a source acquired the published information unlawfully, or because the publishing party communicated with the source about the receipt or publication of that information.

In a series of cases over the last five decades, the Supreme Court has recognized broad protection for the publication of truthful information of public concern, and it has extended that protection to the publication of information that was acquired unlawfully in the first instance, so long as the publishing party was "not involved in the initial illegality." *Bartnicki v. Vopper*, 532 U.S. 514, 529 (2001). The press has relied on this protection to report on major stories—ranging

---

[1] *See* Second Am. Compl. ¶¶ 19–22, 83, 126, 147, 156, 175, 203, 249, 253, 280–81, 287–88, 311–12, 332, 339, 358.

[2] *See id.* ¶¶ 17, 78, 126, 149, 150–51, 154, 282–83, 290, 306–07, 356–59, 371.

from the Pentagon Papers to the Panama Papers—that inform the public and hold the powerful to account. A ruling that narrowed this protection could jeopardize the well-established legal framework that has made much important investigative and national security journalism possible.

## ARGUMENT

I. **An act of publication that would otherwise be protected by the First Amendment does not lose that protection simply because a source acquired the published information unlawfully.**

The First Amendment serves the public's interest in receiving the information necessary "to vote intelligently [and] to register opinions on the administration of government." *Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 492 (1975). Accordingly, as the Supreme Court emphasized in *Smith v. Daily Mail Publishing Co.*, "state action to punish the publication of truthful information seldom can satisfy constitutional standards . . . absent a need to further a state interest of the highest order." 443 U.S. 97, 102–103 (1979). The Court has repeatedly held that the unlawful acquisition or release of information by a source does not vitiate First Amendment protection of the subsequent publication of that information by a party not involved in the initial illegality.

The Court embraced this principle most famously in the *Pentagon Papers* case. There, the government attempted to prevent two newspapers from publishing a top-secret study about the Vietnam War, which military analyst Daniel Ellsberg had copied and distributed without authorization. *See New York Times Co. v. United States*, 403 U.S. 713, 714 (1971) (per curiam); s*ee also United States v. Ehrlichman*, 546 F.2d 910, 914 (D.C. Cir. 1976). Notwithstanding the government's declared national security interest in preventing further disclosure of the classified documents, the Court held that the government could not constitutionally seek to enjoin the newspapers from publishing them. *See New York Times*, 403 U.S. at 714; *id.* at 728 (Stewart, J., concurring) ("[A]n enlightened citizenry" relies on "an informed and free press."). Although the

*Pentagon Papers* case specifically addressed prior restraints on publication, the Supreme Court has characterized it broadly as having "upheld the right of the press to publish information of great public concern obtained from documents stolen by a third party." *Bartnicki*, 532 U.S. at 528.

The Supreme Court explicitly reaffirmed this right in *Bartnicki v. Vopper*. *See* 532 U.S. at 535. In that case, an unknown person had illegally intercepted a phone call between two union representatives and placed a tape recording of the call in the mailbox of Jack Yocum, the head of an organization opposed to the union's efforts. *Id.* at 518–19. Yocum gave the tape to Fred Vopper, a radio commentator and fellow union critic. *Id.* at 519. Vopper played the tape on his show, another radio station broadcast it, and a local newspaper published its contents. *Id.* The union representatives sued Yocum and those who broadcast and published the tape for violating federal and state wiretap laws, *id.* at 520, which prohibited the willful disclosure of the contents of a wire communication by someone who knew or had reason to know that the communication was unlawfully intercepted, *id.* at 524.

Though each defendant in *Bartnicki* had violated the wiretap laws, the Court concluded that the strong constitutional "interest in publishing matters of public importance" outweighed the privacy interests that would be served by enforcing the laws against the defendants. *Id.* at 534. Therefore, the Supreme Court held that the media defendants and Yocum did not lose First Amendment protection simply because the source had intercepted the communication unlawfully. As long as subsequent speakers were "not involved in the initial illegality," *id.* at 529, the Court explained, "a stranger's illegal conduct does not suffice to remove the First Amendment shield from speech about a matter of public concern," *id.* at 535.[3]

---

[3] The laws at issue in *Bartnicki* did not prohibit the *receipt* of unlawfully intercepted information, but the same logic would have applied even if they had, because receipt is a necessary antecedent to publication.

4

Notably, the Supreme Court held that the First Amendment protected the broadcasts and publication in *Bartnicki* even though the defendants knew or should have known that the underlying phone call had been intercepted unlawfully. *See id.* at 517–18 (noting that defendants "did know—or at least had reason to know" that the communication was unlawfully intercepted); *see also Jean v. Mass. State Police*, 492 F.3d 24, 32 (1st Cir. 2007) (noting that website operator "disclosed to others the contents of an oral communication that she knew had been recorded illegally"); *Boehner v. McDermott*, 484 F.3d 573, 585 (D.C. Cir. 2007) (Sentelle, J., dissenting) (noting, in a section joined by a majority of the *en banc* panel, a "lack of constitutional significance of the communicator's knowledge that the interception had been unlawfully conducted"). Moreover, although the defendants in *Bartnicki* did not know the identity of their source, the Court's holding makes clear that they would not have lost First Amendment protection even if they did. *See Bartnicki*, 532 U.S. at 520–30; *see also Jean*, 492 F.3d at 30 ("[W]here, as here, the identity of the interceptor is known, there is even less justification for punishing a subsequent publisher than there was in *Bartnicki*.").

*Bartnicki* joins other cases in which the Supreme Court has recognized constitutional protection for the publication of information despite a source's illegal conduct. In *Landmark Communications, Inc. v. Virginia*, for example, the Court held that the First Amendment protected the publication of the name of a state judge undergoing a disciplinary investigation, despite a statute that criminalized the disclosure. 435 U.S. 829, 831 (1978). Both the newspaper and its unknown sources had violated the law in disclosing the judge's name, but the Court concluded that

---

*See, e.g.*, *United States v. Morison*, 844 F.2d 1057, 1080–85 (4th Cir. 1988) (Wilkinson, J., concurring) (emphasizing that the Espionage Act, which prohibits the receipt of confidential information, would likely not apply to press organizations that receive classified material).

the newspaper could not be held liable because the information was of public concern and the newspaper was not involved in the initial unlawful acquisition of that information. *See id.* at 837–39. In *Florida Star v. B.J.F.*, the Court held that the First Amendment protected a newspaper's publication of a rape victim's name, which a sheriff's department had posted publicly in its press room. 491 U.S. 524, 527 (1989). Both the department and the newspaper had violated a statutory prohibition on the disclosure of the names of rape victims, *id.* at 536, but the Court concluded that the newspaper could not be held liable for its publication of the unlawfully released information, *id.* at 541. Thus, the Supreme Court has repeatedly held that the First Amendment protects the right to publish information of public concern despite a "defect in [the] chain" from source to publication. *Bartnicki*, 532 U.S at 528 (citation omitted).

Courts have explicitly rejected efforts to circumvent this First Amendment protection by plaintiffs seeking to attach liability not directly to the publication of unlawfully acquired information, but to communication with its source. Mere communication with a source of unlawfully acquired information does not amount to a constitutionally punishable conspiracy, courts have held, so long as the publishing party was "not involved in the initial illegality." *Bartnicki*, 532 U.S. at 529. In *Jean v. Massachusetts State Police*, for instance, political activist Mary Jean posted on her personal website an illegally recorded video of police officers conducting a warrantless search of a house. 492 F.3d at 25. Attempting to distinguish *Bartnicki*, the police officers argued that Jean was in "active collaboration" with the source of the unlawfully acquired information, because her communication with the source and knowledge of the video's illegality amounted to a violation of a conspiracy provision in Massachusetts' wiretap law. *Id.* at 30–31. Applying *Bartnicki*, the First Circuit considered Jean's "active" collaboration with her source irrelevant and held that the wiretap statute and its conspiracy provision, as applied, ran afoul of the

6

First Amendment. *Id.* at 31–32. Similarly, in *Zerilli v. Evening News Association*, the plaintiffs alleged that federal officials had unlawfully intercepted their communications and that the *Detroit News* had conspired with the officials to receive and publish those communications. 628 F.2d 217, 219 (D.C. Cir. 1980). The D.C. Circuit affirmed dismissal of the claim against the newspaper, in part because "finding the newspaper liable [for conspiracy] in the present case would amount to holding a newspaper liable in damages for uncovering and publishing information that it deems newsworthy. The values served by a free and vigilant press militate against such a result." *Id.* at 224.

## II.     The press relies on this protection to inform the public about matters of public concern.

The First Amendment protection described above helps to ensure that the public obtains the information it needs to understand and evaluate government policy and to hold the powerful accountable for their actions. This protection has been crucial to the ability of the press to inform the public about matters of public concern. Without it, era-defining stories about Watergate, the Vietnam War, post-9/11 counterterrorism policy, and recent global financial scandals might never have been written.

### A.     Post-9/11 reporting on torture and mass surveillance.

Numerous major revelations of illegal or potentially illegal U.S. government conduct following the terrorist attacks of September 11, 2001, were based on information from sources who may have violated the law in disclosing government secrets.

**Torture**: Much of the initial reporting around torture, both at the military prison at Abu Ghraib in the Iraq War and as part of the CIA's "enhanced interrogation" program, relied on anonymous sources disclosing highly classified information. *See, e.g.*, Dana Priest, *CIA Holds Terror Suspects in Secret Prisons*, Wash. Post (Nov. 2, 2005), https://perma.cc/ZV9V-7ZED

7

(revealing existence and locations of CIA "black site" prisons); Neil A. Lewis & Eric Schmitt, *Inquiry Finds Abuses at Guantánamo Bay*, N.Y. Times (May 1, 2005), https://perma.cc/D579-MSJF (reporting on internal Pentagon inquiry prompted by public release of FBI memorandums expressing concern with interrogation tactics); Todd Richissin, *Soldiers' Warnings Ignored*, Balt. Sun (May 9, 2004), https://perma.cc/JK54-XJ94 (detailing prisoner abuse at Abu Ghraib disclosed by two anonymous Army whistleblowers). This reporting prompted congressional and military investigations, military prosecutions, and the closure of the Abu Ghraib prison. *See* Robert F. Worth, *U.S. To Abandon Abu Ghraib and Move Prisoners to a New Center*, N.Y. Times (Mar. 10, 2006), https://perma.cc/7NJ9-TZX3.

**Warrantless Wiretapping**: In 2005, *New York Times* reporters James Risen and Eric Lichtblau disclosed the existence of what the George W. Bush administration called the "Terrorist Surveillance Program," under which the National Security Agency ("NSA") wiretapped communications between U.S. persons and non-U.S. persons overseas without a warrant and mistakenly swept in purely domestic communications. James Risen & Eric Lichtblau, *Bush Lets U.S. Spy on Callers Without Courts*, N.Y. Times (Dec. 16, 2005), https://perma.cc/UU4J-YE9U. The article, based in part on an anonymous tip by a Justice Department lawyer later identified as Thomas Tamm, won a Pulitzer Prize and led to extensive public debate over the program. *See* Charlie Savage, *Whistle-Blower on N.S.A. Wiretapping Is Set To Keep Law License*, N.Y. Times (July 12, 2016), https://perma.cc/7JF2-5KZV. It also led Congress to amend the Foreign Intelligence Surveillance Act ("FISA"). Pub. L. No. 110-261, 122 Stat. 2436 (2008).

**Mass Surveillance**: Groundbreaking stories about the NSA's secret surveillance programs—stories that earned the *Guardian* and the *Washington Post* the Pulitzer Prize for public service—were based on documents leaked by former government contractor Edward Snowden.

8

Brian Stelter, *Stories About NSA Surveillance, Snowden Leaks Win Pulitzers for Two News Groups*, CNN (Apr. 15, 2014), https://perma.cc/EZ4P-MKS3. This reporting informed the public about the excesses and inadequate oversight of U.S. surveillance, leading to worldwide debate and legislative reforms. *See* Ellen Nakashima, *Congressional Action on NSA Is a Milestone in the Post-9/11 World*, Wash. Post. (June 2, 2015), https://perma.cc/8RUV-EGZ5 (discussing enactment of the USA Freedom Act, Pub. L. No. 114-23, 129 Stat. 268 (2015)).

**Financial Surveillance**: In June 2006, numerous outlets revealed the existence of the CIA-run "Terrorist Finance Tracking Program," which collected records en masse from a Belgian cooperative, known as SWIFT, that facilitates international financial transactions. Although elements of the program had been reported years before, the disclosure led to a renegotiated agreement with the cooperative and extensive public debate about the propriety of the reporting itself. *See, e.g.*, On Secrets, *When in Doubt, Publish*, Wash. Post (July 9, 2006), https://perma.cc/97UM-LQKV; *Parliament Examines SWIFT II Agreement*, Euro. Parl. (Feb. 7, 2010), https://perma.cc/8Z5Y-JMLK.

### B.    Watergate, COINTELPRO, and the Church and Pike Committees.

Much of the reporting that ultimately led to President Richard Nixon's resignation in the Watergate scandal also relied on anonymous sources disclosing government secrets. *See* David Von Drehle, *FBI's No. 2 Was 'Deep Throat': Mark Felt Ends 30-Year Mystery of The Post's Watergate Source*, Wash. Post (June 1, 2005), https://perma.cc/2QQV-U2AD. Mark Felt, deputy director of the FBI and the most famous Watergate secret source, known as "Deep Throat," took extensive precautions to hide his identity precisely because the leaks were under criminal investigation. *Id.*; *see* Max Holland, *The Myth of Deep Throat*, Politico Magazine (Sept. 10, 2017), https://perma.cc/KUK8-RTUH.

Ironically, Felt himself was convicted, and later pardoned, for ordering illegal "black bag" searches as part of COINTELPRO, a secret FBI program that the press only discovered after receiving FBI files that had been acquired illegally by a source. *See* Robert Pear, *President Reagan Pardons 2 Ex-F.B.I. Officials in 1970's Break-Ins*, N.Y. Times (Apr. 18, 1981), https://perma.cc/7BEB-G734. Short for "counter-intelligence program," COINTELPRO was an illegal surveillance and harassment operation targeted at political activists and dissidents during the late 1960s and early 1970s. It came to light only after an activist group called the "Citizens' Commission to Investigate the FBI" physically broke into an FBI office and stole files in 1971. *See* Betty Medsger, *Remembering an Earlier Time When a Theft Unmasked Government Surveillance*, Wash. Post (Jan. 10, 2014), https://perma.cc/T85B-3UT6.

The COINTELPRO break-in and disclosure in part led to watershed congressional investigations into civil liberties abuses by intelligence agencies during the Cold War; the creation of dedicated intelligence oversight committees in the House of Representatives and Senate; and the passage of FISA, which, for the first time, created a statutory framework for court review of national security surveillance. Pub. L. No. 95-511, 92 Stat. 1783 (1978).

Indeed, the sealed findings of one of those investigative committees, chaired by Representative Otis Pike, were made public only after they were leaked to CBS correspondent Daniel Schorr, who gave them to the *Village Voice* to publish. Recently disclosed documents suggest that amicus Reporters Committee, to which Schorr donated any proceeds from the publication of the Pike Committee report, may itself have been investigated by the FBI for espionage. *See* Emma Best, *The FBI Investigated the Village Voice and RCFP for Espionage in 1976*, Muckrock (Jan. 2, 2019), https://perma.cc/9APD-QYLR.

### C. Reporting on corporate malfeasance and other non–national security stories.

Though there are myriad other examples of illegally acquired or disclosed material forming the basis for national security reporting in the public interest—including the aforementioned Pentagon Papers—reliance on material that sources may have illegally acquired is not limited to the national security context.

For example, in the 1990s, the $246 billion settlement of a lawsuit brought by dozens of states against the four largest American tobacco companies for misrepresenting the health risks of smoking resulted directly from the theft of thousands of pages of internal documents by a paralegal for a law firm representing the Brown & Williamson Tobacco Company. The documents were "debated in Congress, entered into court proceedings, posted on the Internet and printed in The New York Times." Douglas Martin, *Merrell Williams Jr., Paralegal Who Bared Big Tobacco, Dies at 72*, N.Y. Times (Nov. 26, 2013), https://perma.cc/R5T4-BXBK.

A more recent example involving a possibly illegal hack is the case of the so-called Panama Papers, more than 2.6 terabytes of internal documents from the now-shuttered Panamanian law firm Mossack Fonseca that were anonymously submitted to the German newspaper *Süddeutsche Zeitung*. *See* Frederick Obermaier et al., *About the Panama Papers*, Süddeutsche Zeitung, https://perma.cc/P86A-7W5Y. The Panama Papers, which included "confidential emails, copies of passports, ledgers of bank transactions and even the various code names used to refer to clients," offered a "how-to guide of sorts on skirting or evading United States tax and financial disclosure laws." Eric Lipton & Julie Creswell, *Panama Papers Show How Rich United States Clients Hid Millions Abroad*, N.Y. Times (June 5, 2016), https://perma.cc/9H6Z-XTBT. The International Consortium of Investigative Journalists, a U.S.-based non-profit, now maintains a Panama Papers database, which continues to generate stories as well as criminal investigations and indictments in

11

Germany and the United States. *See The Panama Papers: Exposing the Rogue Offshore Finance Industry*, Int'l Consortium of Investigative Journalists, https://perma.cc/AX4W-ESPY; Hamish Boland-Rudder & Will Fitzgibbon, *Panama Papers: German Police Raid Deutsche Bank Headquarters Over Alleged Money Laundering*, Int'l Consortium of Investigative Journalists (Nov. 29, 2018), https://perma.cc/C6AK-2R7F; Indictment, *United States v. Owens*, No. 18-cr-693 (S.D.N.Y. filed Sept. 27, 2018), https://perma.cc/88YE-FFZ4.

## CONCLUSION

The legal question addressed here is one with significant implications for the free press: does an act of publication that would otherwise be protected by the First Amendment lose that protection simply because a source acquired the published information unlawfully? The Supreme Court has repeatedly held that it does not, in recognition of the First Amendment's role in ensuring the public has access to the information it needs to hold those who seek and wield power to account. The press routinely relies on this First Amendment protection in performing its democratic function to inform the public on matters of public concern.

March 13, 2019

Bruce D. Brown
Katie Townsend
Gabriel Rottman
Caitlin Vogus
Reporters Committee for Freedom of the
  Press
1156 15th Street, NW, Suite 1020
Washington, D.C. 20005
(202) 795-9300
bbrown@rcfp.org

Respectfully submitted,

 /s/ Carrie DeCell
Carrie DeCell (CD-0731)
Adi Kamdar
Alex Abdo (AA-0527)
Jameel Jaffer (JJ-4653)
Knight First Amendment Institute
  at Columbia University
475 Riverside Drive, Suite 302
New York, NY 10115
(646) 745-8500
carrie.decell@knightcolumbia.org

>Ben Wizner
>Esha Bhandari
>Brett Max Kaufman
>Dror Ladin
>American Civil Liberties Union
>125 Broad Street
>New York, NY 10004
>(212) 549-2500
>bwizner@aclu.org
>
>*Counsel for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

I hereby certify that according to the word count feature of the word processing program used to prepare this brief, the brief contains 3,495 words (exclusive of the cover page, certificate of compliance, table of contents, and table of authorities), and complies with Local Civil Rule 11.1 of the Southern District of New York, as well as with Individual Practice Rule 2.D of Judge John G. Koeltl (to whom this case has been assigned).

      /s/ Carrie DeCell
      Carrie DeCell