# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

DEMOCRATIC NATIONAL
COMMITTEE,

<em>Plaintiff,</em>

v.

THE RUSSIAN FEDERATION, et al.,

<em>Defendants.</em>

Case No. 1:18-cv-3501-JGK-SDA

Oral Argument Requested

---

## REPLY IN SUPPORT OF
## DEFENDANT DONALD J. TRUMP FOR PRESIDENT, INC.'S
## MOTION TO DISMISS COUNTS II, III, IV, VIII, XII, AND XIV
## OF THE SECOND AMENDED COMPLAINT

---

James M. Gross
JONES DAY
250 Vesey Street
New York, NY 10281
(212) 326-3939
jgross@jonesday.com

Michael A. Carvin (*pro hac vice*)
  *Counsel of Record*
William D. Coglianese (*pro hac vice*)
JONES DAY
51 Louisiana Avenue, NW
Washington, DC 20001
(202) 879-3939
macarvin@jonesday.com
wcoglianese@jonesday.com

*Counsel for Donald J. Trump for President, Inc.*

# TABLE OF CONTENTS

**Page**

Introduction ...................................................................................................................1

Argument ......................................................................................................................1

I.   Because the DNC Does Not Allege the Campaign's Involvement in Stealing Materials, Its Efforts to Distinguish Away the Campaign's First Amendment Protection All Fail.................1

II.  The DNC Fails to State RICO Claims Against the Campaign. ...........................................6

   A.  The Campaign's alleged communications fall far short of plausibly suggesting that it directed the supposed Association-In-Fact Enterprise's affairs....................................7

   B.  The AIF Enterprise lacks every required structural feature. ..........................................8

      1.  The DNC fails to allege a common and unlawful purpose shared among the AIF Enterprise's disparate members. ...............................................................8

      2.  The DNC alleges isolated interactions, not the interpersonal relationships that RICO requires..........................................................................................11

      3.  The DNC does not allege the required longevity. ...........................................12

      4.  The DNC confirms that the AIF Enterprise would have no existence apart from its alleged pattern of racketeering activity. ...................................................12

   C.  The DNC has not alleged that the Campaign committed any predicate acts, let alone a pattern of racketeering activity. ...............................................................................14

      1.  The DNC does not allege that the Campaign committed a single predicate act of conspiring to steal and disseminate DNC trade secrets. ................................14

      2.  The DNC does not allege a threat of continuing criminal conduct....................17

   D.  The DNC has not alleged any cognizable injury that was proximately caused by the alleged AIF Enterprise...........................................................................................18

   E.  The DNC's RICO-conspiracy claim fails, too. ........................................................20

III. The DNC Fails to State a Wiretap Act Claim Against the Campaign...............................20

IV.  The DNC's State-Law Claims Against the Campaign All Fail. .......................................22

   A.  The Court should not exercise supplemental jurisdiction over the state-law claims. ..............22

   B.  The DNC fails to state a trade-secrets claim against the Campaign...........................23

   C.  The DNC fails to state a claim against the Campaign for conspiracy to commit trespass to chattels..............................................................................................24

   D.  The DNC fails to state a Virginia Computer Crimes Act claim against the Campaign...........25

Conclusion ..................................................................................................................25

# TABLE OF AUTHORITIES

**Page**

**CASES**

*4 K & D Corp. v. Concierge Auctions, LLC,*
 2 F.Supp.3d 525 (S.D.N.Y. 2014) ...................................................................................... 14

*Anza v. Ideal Steel Supply Corp.,*
 547 U.S. 451 (2006) ............................................................................................................ 19

*Apotex Inc. v. Acorda Therapeutics, Inc.,*
 823 F.3d 51 (2d Cir. 2016) ................................................................................................... 3

*Ashcroft v. Iqbal,*
 556 U.S. 678 (2009) ............................................................................................................ 24

*Bartnicki v. Vopper,*
 532 U.S. 514 (2001) ..................................................................................................... passim

*Bell Atl. Corp. v. Twombly,*
 550 U.S. 544 (2007) ..................................................................................................... 14, 21

*Black Radio Network, Inc. v. NYNEX Corp.,*
 44 F.Supp.2d 565 (S.D.N.Y. 1999) .................................................................................... 13

*Boehner v. McDermott,*
 484 F.3d 573 (D.C. Cir. 2007) ......................................................................................... 1, 4

*BondPro Corp. v. Siemens Power Generation,*
 463 F.3d 702 (7th Cir. 2006) .............................................................................................. 24

*Boyle v. United States,*
 556 U.S. 938 (2009) ................................................................................................... 8, 9, 10

*CAIR Action Network, Inc. v. Gaubatz,*
 82 F.Supp.3d 344 (D.D.C. 2015) ....................................................................................... 24

*Cherrie v. Va. Health Servs., Inc.,*
 787 S.E.2d 855 (Va. 2016) ................................................................................................. 25

# TABLE OF AUTHORITIES
(continued)

Page(s)

*Choice is Yours, Inc. v. Williams,*
2016 WL 5661709 (E.D. Pa. Sept. 30, 2016) ................................................................. 19

*City of New York v. Smokes-Spirits.com, Inc.,*
541 F.3d 425 (2d Cir. 2008), *rev'd on other grounds sub nom. Hemi Grp., LLC v. City of New York,* 559 U.S. 1 (2010) ................................................................................ 2, 7, 8

*Cockrum v. Donald J. Trump for President, Inc.,*
365 F.Supp.3d 652 (E.D. Va. 2019) ................................................................................ 5

*Cofacredit, S.A. v. Windsor Plumbing Supply Co.,*
187 F.3d 229 (2d Cir. 1999) ......................................................................................... 18

*D'Addario v. D'Addario,*
901 F.3d 80 (2d Cir. 2018), *cert. denied,* 139 S. Ct. 1331 (2019) ..............................9, 10

*First Cap. Asset Mgmt., Inc. v. Satinwood, Inc.,*
385 F.3d 159 (2d Cir. 2004) ................................................................................... passim

*Gelber v. Glock,*
800 S.E.2d 800 (Va. 2017) ............................................................................................ 24

*In re Zyprexa Injunction,*
474 F.Supp.2d 385 (E.D.N.Y. 2007) ............................................................................. 5

*Int'l Bhd. of Teamsters v. Carey,*
297 F.Supp.2d 706 (S.D.N.Y. 2004), *aff'd sub nom. Int'l Bhd. of Teamsters v. Blitz,*
124 F. App'x 41 (2d Cir. 2005) ................................................................................ 17, 18

*Marsh v. Curran,*
362 F.Supp.3d 320 (E.D. Va. 2019) ............................................................................. 25

*Mattel, Inc. v. MGA Entm't, Inc.,*
782 F.Supp.2d 911 (C.D. Cal. 2011) ............................................................................ 19

*Moss v. BMO Harris Bank, N.A.,*
258 F.Supp.3d 289 (E.D.N.Y. 2017) ..................................................................... 8, 11, 12

*N.Y. Times Co. v. United States,*
403 U.S. 713 (1971) (per curiam) .................................................................................. 4

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Nat'l Grp. for Commc'ns & Computers Ltd. v. Lucent Techs. Inc.*,
   420 F.Supp.2d 253 (S.D.N.Y. 2006) .................................................................................20

*Peavy v. WFAA-TV, Inc.*,
   221 F.3d 158 (5th Cir. 2000) ...............................................................................................5

*Reves v. Ernst & Young*,
   507 U.S. 170 (1993) ..........................................................................................................7, 8

*Ruby Dev. Corp. v. Charrim Dev. Corp.*,
   742 F.Supp. 1213 (E.D.N.Y. 1990) ..................................................................................18

*Schmidt v. Fleet Bank*,
   16 F.Supp.2d 340 (S.D.N.Y. 1998) ..................................................................................13

*Spool v. World Child Int'l Adoption Agency*,
   520 F.3d 178 (2d Cir. 2008) ..............................................................................................17

*United States v. Agrawal*,
   726 F.3d 235 (2d Cir. 2013) ..............................................................................................16

*United States v. Lee*,
   2010 WL 8696087 (N.D. Cal. May 21, 2010) ................................................................16

*United States v. Lloyds TSB Bank PLC*,
   639 F.Supp.2d 326 (S.D.N.Y. 2009) ...............................................................................15

*United States v. Turkette*,
   452 U.S. 576 (1981) .....................................................................................................12, 13

*Westchester Cty. Indep. Party v. Astorino*,
   137 F.Supp.3d 586 (S.D.N.Y. 2015) ..........................................................................18, 19

**STATUTES**

18 U.S.C. § 1831 ....................................................................................................................14, 16

18 U.S.C. § 1832 ....................................................................................................................14, 16

18 U.S.C. § 1962 ............................................................................................................6, 8, 13, 20

18 U.S.C. § 2511 ....................................................................................................................21, 22

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

28 U.S.C. § 1367 ................................................................................................... 22, 23, 25

D.C. Code § 36-401(4)(A) ............................................................................................. 24

**OTHER AUTHORITIES**

Ryan Goodman, *How Roger Stone Interacted With Russia's Guccifer and Wikileaks*,
    Newsweek (Sep. 28, 2017) ...................................................................................... 15

Special Counsel Robert Mueller, III's *Report On The Investigation Into Russian Interference*
    *In The 2016 Presidential Election* ("Mueller Report," *available at*
    http://bit.ly/2L2cGqL) ..................................................................................... 1, 3, 16

## INTRODUCTION

The DNC lacks a persuasive response to the Campaign's Motion to Dismiss. Most importantly, the DNC fails to overcome the Campaign's First Amendment defense, which entirely precludes the DNC's claims. And even setting the First Amendment aside, those claims all fail on the merits.

In fact, it is now clear that there is no scenario in which the DNC could plausibly allege claims against the Campaign. On April 18, 2019, Special Counsel Robert Mueller, III's *Report On The Investigation Into Russian Interference In The 2016 Presidential Election* ("Mueller Report," *available at* http://bit.ly/2L2cGqL) was released. The Report explains, in exhaustive detail, that the Special Counsel's two-year investigation—which went far beyond the limits of civil discovery—"did not establish that members of the Trump Campaign conspired or coordinated with the Russian government in its election interference activities." Mueller Report, Vol. I at 1–2. Indeed, the Special Counsel directly *refuted* many of the key allegations and inferences underlying the DNC's claims. The Special Counsel's findings only further confirm that it is time for this politically motivated lawsuit to end.

## ARGUMENT

### I.   Because the DNC Does Not Allege the Campaign's Involvement in Stealing Materials, Its Efforts to Distinguish Away the Campaign's First Amendment Protection All Fail.

The DNC does not get around to trying to square its position with the First Amendment until page 99 of its Opposition. Even then, all of its arguments are predicated on a reimagining of its own allegations and a misunderstanding of core First Amendment principles.

**1.**   The DNC does not dispute the governing standard: There can be no liability for disclosing stolen information if (1) the disclosing party "did not participate" in the theft, and (2) the disclosure "concern[s] public issues." *Bartnicki v. Vopper*, 532 U.S. 514, 517–18 (2001); *see also Boehner v. McDermott*, 484 F.3d 573, 586 (D.C. Cir. 2007) (op. of Sentelle, J, for majority of *en banc* court). In fact, the DNC accepts this test, agreeing that there can be no liability for someone who "stumble[s] upon stolen information about a matter of public concern." Opp. 101 (ECF 241). And it raises no challenge on

the second prong, rightly conceding that the published materials—which revealed important information about how the Democratic Party operates—were of public concern. So the only question is whether the DNC has plausibly alleged that the Campaign "participated" in stealing the materials.

**2.** It has not. The DNC accepts that the Campaign "did not personally commit certain offenses (such as hacking into the DNC's servers)." Opp. 3. And although it deploys an array of conclusory labels in an effort to portray the Campaign and other Defendants as "information thieves" who "participated in a criminal conspiracy to steal the DNC's information" (*id.* at 3–4), at no point does it claim the Campaign even *knew* of—let alone conspired in—Russia's hacking operation. Because the DNC spends much of its Opposition blurring its own allegations, a brief recap is in order:

- The DNC alleges that Russia commenced its cyberattack in July 2015. SAC ¶¶ 84, 115. But it admits that "Defendants are not liable for the information theft that occurred in 2015, before there was any conspiracy at all." Opp. 101 n.29.
- The DNC claims a conspiracy formed in March 2016 (*id.*), when Defendant George Papadopoulos first encountered Defendant Joseph Mifsud. SAC ¶ 94; Opp. 5. But it does not claim Mifsud said anything about "'thousands of emails' that could harm Hillary Clinton's presidential campaign" until April 26—*after* Russia allegedly "launched a pervasive cyberattack" on April 18, and *after* Russia "exfiltrate[d]" DNC data on April 22. SAC ¶¶ 94, 101, 104, 121; Opp. 5–6. And even then, the DNC does not allege that Mifsud said anything about the emails having been stolen by Russia from the DNC, does not allege that Papadopoulos told anyone else with the Campaign about the "thousands of emails," and does not allege that the Campaign even discussed stealing more documents—much less joined a conspiracy to do so.
- Next, the DNC alleges that "Kremlin-connected oligarchs" contacted Defendant Donald Trump, Jr. on June 3 about "official documents and information that would incriminate Hillary and her dealings with Russia," and that representatives of the Campaign met with various individuals allegedly connected to the Russian government on June 9. SAC ¶¶ 133, 137; Opp. 6–7. Again, however, the DNC does not allege that the Campaign was as at any point told of documents that had been stolen (from the DNC or anyone else). Nor does it allege any facts plausibly suggesting that the meeting was about such documents stolen from the DNC, let alone that the Campaign at that meeting joined a conspiracy to steal *new* documents.
- The DNC does not allege that Russia stole additional documents after the June 9 meeting. It claims that Russia exfiltrated "snapshots of [] virtual servers" containing analytic "data and proprietary computer code" in September 2016 (SAC ¶¶ 23, 180), but does not allege that the Campaign knew of or had any connection to that sophisticated hacking activity.

To summarize: The DNC does not claim the Campaign even knew Russia was hacking the DNC's servers and stealing documents *at any point* during that hacking campaign, much less that the

Campaign "participate[d] in the interception," as would be required for the DNC's claims against the Campaign to avoid the First Amendment. *Bartnicki*, 532 U.S. at 517.

Nor *could* the DNC plausibly allege the Campaign's involvement in a conspiracy to steal information. The Special Counsel exhaustively investigated the conduct at the center of the DNC's conspiracy theory—Papadopoulos's interactions with Mifsud, and the June 9 meeting—and determined that none of it involved the Campaign in Russia's election-interference efforts.[1] There is no evidence that Papadopoulos even mentioned Mifsud's "thousands of emails" to anyone else at the Campaign, and the 20-minute Trump Tower meeting had nothing to do with DNC materials. Mueller Report, Vol. I at 93–94, 117–20. Indeed, after reviewing every conceivable interaction between the Campaign and Russia-connected individuals, the Special Counsel did not and could not allege that the Campaign "conspired or coordinated with the Russian government in its election interference activities." *Id.* at 1–2. The DNC is thus *incapable* of alleging the Campaign's involvement in Russia's hacking.

*Bartnicki*'s first prong is thus satisfied, foreclosing all claims against the Campaign. Although the DNC essentially requests a First Amendment exemption (Opp. 105–06), such a ruling would have significant ramifications for the press—who regularly "present[] stolen information to the public" (*id.* at 106)—for the public, and, more broadly, for exposure of wrongdoing by public figures.

**3.**   The DNC tries evading this by limiting *Bartnicki* to its facts. None of these supposedly "crucial factual differences" (*id.* at 101) have any bearing on *Bartnicki*'s straightforward *legal* standard.

---

[1] Because the Special Counsel's Report is "publicly available and its accuracy cannot reasonably be questioned," the Court can take judicial notice of it. *Apotex Inc. v. Acorda Therapeutics, Inc.*, 823 F.3d 51, 60 (2d Cir. 2016). Moreover, because the SAC repeatedly references the Special Counsel's investigation (SAC ¶¶ 30, 211–12, 221, 231, 237), the Report representing the culmination of that investigation is also "integral" to the SAC. *Apotex*, 823 F.3d at 61 n.6 (citation omitted).

*First*, the DNC claims that *Bartnicki* and similar cases are distinguishable because the defendant who disclosed the contents of an illegal wiretap played "no part" in the wiretap itself. Opp. 101. But that hardly *distinguishes* this case, as the DNC's theory is that the Campaign is liable for (somehow) supporting disclosure of the emails hacked by Russia despite playing "no part" in the hacking. As just explained, the DNC does not and cannot allege that the Campaign even knew Russia was stealing DNC materials, much less that it "aid[ed], abet[ted], or conspire[d]" in that effort. *Id.* The DNC seems to be arguing that *Bartnicki* permits punishments of disclosers if they *know* the disclosed information was illegally obtained. But this assertion is at war with *Bartnicki* and every other relevant case. In *Bartnicki*, the defendants "did know—or at least had reason to know—that the interception was unlawful." 532 U.S. at 517–18. In the Pentagon Papers case, it was an "undisputed fact" that the information was "obtained from stolen documents." *Id.* at 528 (discussing *N.Y. Times Co. v. United States,* 403 U.S. 713 (1971) (per curiam)); *see also Boehner*, 484 F.3d at 585 (Sentelle, J.) ("[T]he otherwise-lawful receipt of unlawfully obtained information remains in itself lawful, even where the receiver knows or has reason to know that the source has obtained the information unlawfully.").

The DNC nevertheless insists the Campaign is "legally responsible" for Russia's hack because it supposedly agreed with Russia to disclose hacked materials. Opp. 101-102. Again, this turns *Bartnicki* on its head. *Bartnicki*'s entire point is that the First Amendment bars any law that would render a discloser "legally responsible" for a theft he was not involved in, regardless of his knowledge of the theft or participation in the disclosure. Rather, since the only constitutionally viable restrictions punish "the interceptor," no penalties may be imposed on those—like the Campaign—"not involved in the initial illegality." *Bartnicki*, 532 U.S. at 529. It is almost inevitable that the discloser "agrees" with the thief to disclose the stolen information, but this did not render the New York Times liable for "conspiring" with Ellsberg (*N.Y. Times*, 403 U.S. at 714) or Rep. McDermott liable for "conspiring" with those who intercepted Rep. Boehner's phone call (*Boehner*, 484 F.3d at 586).

Finally, liability would be particularly unconstitutional here because, unlike in *Bartnicki* and other cases, the Campaign did not *disclose* the hacked materials and instead only allegedly "praised" and "encouraged" the disclosures. SAC ¶ 4. Indeed, the DNC sues only WikiLeaks and Assange—but *not* the Campaign—for allegedly disclosing the stolen materials. *Id.* ¶ 311. Liability here would thus be even more attenuated than in *Bartnicki,* reaching not only the discloser but those purportedly associated with it. No reading of *Bartnicki* tolerates punishing someone who *neither* hacked *nor* disclosed.

The DNC provides nothing to undermine this black-letter law. Its cases all involve defendants who, unlike here, actively participated in the theft, such as journalists who taught sources to surreptitiously record conversations (*Peavy v. WFAA-TV, Inc.*, 221 F.3d 158, 164 (5th Cir. 2000)), or advised a source on how to "find[] a case which could be used as a pretense for subpoenaing … protected documents" (*In re Zyprexa Injunction*, 474 F.Supp.2d 385, 400 (E.D.N.Y. 2007)). These decisions only underscore the *absence* of such allegations against the Campaign. While a district court did reject the Campaign's First Amendment defense in a similar case, that was dicta because the court dismissed the case on other grounds. *Cockrum v. Donald J. Trump for President, Inc.*, 365 F.Supp.3d 652 (E.D. Va. 2019) (cited at Opp. 102). In any event, the court was obviously wrong. The court thought it sufficient that the Campaign was allegedly "aware that the stolen information had been unlawfully obtained" (*id.* at 658)—but as detailed above, that plainly does not distinguish *Bartnicki*.

*Second*, the DNC asserts that the Campaign "cooperat[ed] with a hostile foreign power to undermine Americans' right to self-governance." Opp. 103. But this McCarthyite demagoguery is of no legal significance. Since the Campaign was not involved in the theft, it does not lose its First Amendment protection simply because the party that *did* steal documents was a foreign nation. Nor can the DNC get around this by invoking "self-governance" or "fair democratic processes." Opp. 103. Again, *Bartnicki* makes clear that the means of protecting such interests is by punishing "the interceptor"—not someone who was "not involved in the initial illegality." 532 U.S. at 529.

*Third*, the DNC argues that, "unlike the plaintiffs in *Bartnicki*," it had a legitimate expectation of privacy. Opp. 104. But, outside of the DNC's Orwellian world, it is obvious that all Americans have a legitimate expectation that their private phone calls will not be intercepted by outsiders, as occurred in *Bartnicki*. *Bartnicki* recognized this obvious truism by holding that "[p]rivacy of communication is an important interest." 532 U.S. at 532. Nonetheless, prohibiting disclosure of these private calls was unconstitutional because "privacy concerns give way when balanced against the interest in publishing matters of public importance." *Id.* at 534. Again, the DNC does not dispute that the disclosed materials—which it claims were significant enough to affect a nationwide election—were of public concern. If the privacy interests of two individuals discussing the "mundane" topic of union negotiations with a high school are insufficient to overcome the First Amendment (*id.* at 535), surely the privacy interests of one of the country's major political parties cannot overcome that protection.

*Fourth*, the DNC argues that "Defendants disclosed the DNC's documents to further the agenda of a racketeering enterprise." Opp. 104. But it never claims the Campaign disclosed any materials, and instead claims only that the Campaign "praised" publications after the fact and "encouraged" more. SAC ¶¶ 4, 25, 158, 196–202. In any event, although the DNC seems to believe the First Amendment does not apply to RICO or to many of its other claims (Opp. 100 & n.28), that is false. Where a party is uninvolved in stealing materials, it cannot be liable for disclosing those materials— full stop. This is only clearer where, as here, the Campaign was also uninvolved in the dissemination.

*Finally*, the DNC argues that *Bartnicki* does not apply to the publication of trade secrets. Opp. 104–05. But the DNC has failed to establish that the materials actually contained trade secrets. *Infra* § IV.B. And even if it had, the DNC does not claim that the Campaign had any knowledge of the stolen documents' contents, let alone knew that they contained trade secrets. *Id.*

## II.  The DNC Fails to State RICO Claims Against the Campaign.

The DNC's substantive and conspiracy claims under RICO (18 U.S.C. § 1962(c) and (d)) fail.

### A. The Campaign's alleged communications fall far short of plausibly suggesting that it directed the supposed Association-In-Fact Enterprise's affairs.

The DNC recognizes it must allege not only a valid RICO enterprise, but that the Campaign "participated in the operation or management of" that enterprise. *Reves v. Ernst & Young*, 507 U.S. 170, 183 (1993); Opp. 16–17. The DNC's enterprise theory fails many times over (*infra* § II.B), but even if it were valid, the DNC fails to allege that the Campaign had any role in operating or managing any enterprise. As the Campaign has explained, to satisfy this requirement, the DNC needs to have plausibly alleged that the Campaign had "some part in directing [the Association-in-Fact Enterprise's] affairs," and "not just [its] *own* affairs." *Reves*, 507 U.S. at 179, 185. The DNC's response only confirms how far short its allegations fall.

The DNC offers all of one sentence as to how the Campaign "played a leadership role in the AIF Enterprise," staking its argument on the notion that the Campaign "communicated with Russian agents … to obtain information about stolen DNC documents and determine how to use those documents to Trump's advantage during the 2016 election." Opp. 21. In other words, the Campaign allegedly learned about materials stolen *by others*, and then internally assessed how it could "use" those materials—all disseminated *by others*—for its own purposes. All of this contrasts starkly with the DNC's allegations as to Russia (who "use[d] its military infrastructure to conduct hacking activity," and was "responsib[le] for stealing and disseminating the DNC's trade secrets") and WikiLeaks (who "disseminate[d] the hacked materials and provide[d] advice about the best materials to steal and the optimal timing for the thefts"). *Id.* at 29, 39.

The DNC's argument is doubly invalid. *First*, merely communicating with others about materials those others stole is the *opposite* of "directing" an enterprise's affairs (*Reves*, 507 U.S. at 179) and "exert[ing] … control over the enterprise" (*City of New York v. Smokes-Spirits.com, Inc.*, 541 F.3d 425, 449 (2d Cir. 2008), *rev'd on other grounds sub nom. Hemi Grp., LLC v. City of New York*, 559 U.S. 1 (2010)). Indeed, the DNC does not allege that the Campaign exercised any control over any aspect of the

alleged AIF Enterprise's efforts to steal and disseminate materials. The Campaign's alleged role in "communicat[ing]" falls short of even "performing tasks" or "provid[ing] services which are helpful to an enterprise"—either of which would *still* be insufficient to establish that the Campaign participated in operating or managing the AIF Enterprise. *Moss v. BMO Harris Bank, N.A.*, 258 F.Supp.3d 289, 306 (E.D.N.Y. 2017); *City of New York*, 541 F.3d at 449. *Second*, any internal assessment of how the Campaign could "use" the stolen and published materials "to Trump's advantage" is the epitome of a defendant conducting "[its] *own* affairs," not "the '*enterprise's* affairs.'" *Reves*, 507 U.S. at 185.

The DNC's threadbare position comes nowhere near what is required to allege the Campaign's role in operating or managing the AIF Enterprise's affairs. This alone defeats its § 1962(c) claim.

### B.  The AIF Enterprise lacks every required structural feature.

Even if the DNC could satisfy the "operation or management" requirement, its theorized AIF Enterprise—the sole basis for its § 1962(c) claim against the Campaign (Opp. 22 n.8)—lacks every "structural feature[]" that RICO requires. *Boyle v. United States*, 556 U.S. 938, 946 (2009).

#### 1.  The DNC fails to allege a common and unlawful purpose shared among the AIF Enterprise's disparate members.

As the Campaign has explained, the DNC must plausibly allege that the members of the AIF Enterprise formed "a continuing unit that functions with a common purpose." *Id.* at 948. And because the entire point of RICO is to target *criminal* enterprises, this common purpose must have been to accomplish something unlawful. *First Cap. Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 174 (2d Cir. 2004). The DNC confirms it cannot satisfy either requirement.

**a.**  The DNC agrees that its AIF Enterprise cobbles together individuals and entities that held "*different* motivations" and "*different* reasons" for their alleged actions. Opp. 23 (emphases added). This is the opposite of a "common purpose." *Boyle*, 556 U.S. at 948.

The DNC insists these different purposes are "of no moment" because each supposed enterprise member held the same ultimate objective of getting President Trump elected. Opp. 23.

But as the Campaign has explained, the DNC's own allegations—as well as judicially noticeable materials that the SAC relies upon—confirm this was *not* a shared objective across the alleged AIF Enterprise. Russia's purpose was to sow discord and improve its own geopolitical standing— objectives it could achieve *regardless* of who won the 2016 election. SAC ¶¶ 71–72. (Indeed, Russia was pursuing these objectives well before President Trump was viewed as a front-runner for the Republican nomination. Campaign's Br. 16–17.) WikiLeaks' purpose was to harm Secretary Clinton as payback for various personal vendettas of its founder, Julian Assange. SAC ¶¶ 78–79. The various Russia-connected individuals were seeking to curry favor with Russia for their own reasons. *Id.* at ¶¶ 77, 80. Only the Campaign had the objective of securing President Trump's election. *Id.* at ¶ 80.

The DNC claims this is an instance of individuals "join[ing] an enterprise for different reasons, but still work[ing] toward the enterprise's common objectives." Opp. 23. But that just begs the question. The entire point of RICO's structural requirements is to sweep up only groups that "function as a continuing unit." *Boyle*, 556 U.S. at 944–45 (quoting *United States v. Turkette*, 452 U.S. 576, 583 (1981)). The AIF Enterprise, however, cobbles together a far-flung group of individuals that engaged in *their own* endeavors, for *their own* ends. This is not enough. *See, e.g.*, *D'Addario v. D'Addario*, 901 F.3d 80, 101–02 (2d Cir. 2018), *cert. denied,* 139 S. Ct. 1331 (2019) ("Nor does the allegation that the various Defendants and subgroups agreed at different times to engage in various fraudulent schemes plausibly support the inference … that they acted with a sufficiently common purpose.").

The problem is most acute as to the Campaign and its employees. The Campaign's objective of securing then-candidate Trump's election is quite different from Russia's objective of advancing its own global standing (Opp. 24), or WikiLeaks' objective of "harming Secretary Clinton[]" as retribution for past "conflicts" (SAC ¶ 78). The fact that those other Defendants may have "preferred" President Trump's election as a means to their hoped-for ends (Opp. 24, 25) does nothing to suggest the Campaign and those other Defendants functioned as "a continuing unit."

*Boyle*, 556 U.S. at 948. Adopting the DNC's position would mean that this requirement for RICO liability could be satisfied any time a presidential candidate's election is the preferred outcome of some foreign power—a blueprint for transforming political contests into vexatious RICO litigation.

**b.** The first defect in the DNC's common-purpose theory leads to a second. The DNC recognizes that its only hope of satisfying the common-purpose requirement is by abstracting the supposed enterprise members' purposes to the highest possible level of generality, blurring their distinct objectives into an alleged common denominator of seeking Trump's election. But even if those different purposes can be set aside, an association-in-fact enterprise exists only where the members "share a common purpose to engage in a particular *fraudulent* course of conduct." *First Cap.*, 385 F.3d at 174 (emphasis added); *see also* Campaign's Br. 19 (collecting cases). And there obviously is nothing fraudulent or otherwise unlawful about securing a candidate's election.

The DNC, in fact, does not claim to have articulated an unlawful purpose. Instead, it insists this requirement is "outdated." Opp. 26. That is incorrect. The Second Circuit in *First Capital* was addressing the Supreme Court's common-purpose requirement first articulated in 1981. 385 F.3d at 173 (quoting *Turkette*, 452 U.S. at 583). The Supreme Court's subsequent decision in *Boyle* merely reiterated that requirement, without casting any doubt on the Second Circuit's conclusion that the purpose must be unlawful. 556 U.S. at 946. And far from overruling the requirement of an unlawful purpose in *D'Addario*, the Second Circuit there found that the plaintiffs had alleged a valid enterprise comprising two individuals who "systematically looted the assets of the [probate] Estate" for which they were the sole executors. 901 F.3d at 85. Though the court emphasized that probate estates have a purpose "prescribed by law" (*id.* at 103), it was the enterprise members' *unlawful* objective that gave rise to the enterprise. Indeed, the court specifically explained that its analysis flowed from *First Capital* and was driven by the fact that probate estates are vulnerable to "infiltration or exploitation by criminal elements"—the exact sort of unlawful purpose that *First Capital* requires. *Id.* at 103 n.12.

The DNC's only other argument is that its allegations suffice because it claims the AIF Enterprise "us[ed] illegal means." Opp. 26 (quoting SAC ¶ 272). But the Campaign already debunked this non sequitur: an enterprise's *purpose* is distinct from the *means* through which it pursues that purpose. Campaign's Br. 20. Particularly given that an enterprise must exist independently of its racketeering activity (*infra* § II.B.4), allegations as to the AIF Enterprise's supposed tactics cannot establish that the enterprise existed in the first place. The DNC has no response to these points.

### 2. The DNC alleges isolated interactions, not the interpersonal relationships that RICO requires.

The Campaign has shown that the DNC also fails to allege the "interpersonal relationship[s]" needed to show that the supposed enterprise members "worked together for a common illicit interest," as opposed to furthering "their own independent interests." *Moss*, 258 F.Supp.3d at 301 (citation omitted). The DNC has no good response. Despite having alleged an "ongoing organizational framework" (SAC ¶ 273), it now falls back to suggesting only a "loose structure" (Opp. 29)—and even that is overstated. As far as the Campaign is concerned, the DNC's claimed relationships center on Papadopoulos's interactions with Mifsud, the June 9 meeting, and various "Trump Associates secretly communicat[ing] with Russian agents and WikiLeaks." *Id.* at 27–28. This does not suffice.

*First*, as already explained, the DNC does not (and cannot) allege that Papadopoulos's interactions with Mifsud or the June 9 meeting had anything to do with materials stolen from the DNC— the alleged AIF Enterprise's *raison d'être*. *Supra* at 2–3.

*Second*, the DNC's only other allegations as to the Campaign involve supposed interactions that occurred after *every* document theft. Opp. 27–28; SAC ¶¶ 159–76. Such conduct cannot support liability, given that the Campaign had no involvement in the thefts themselves. *Supra* at § I. Anyway, these allegations paint a very different picture from the "extensive relationships" the DNC claims. Opp. 27. It alleges that Defendant Roger Stone exchanged a few Twitter messages with a "GRU operative[]" (SAC ¶ 167)—but the DNC recognizes that Stone was not an employee or agent of the

Campaign (*id.* at ¶ 58), and was unable to even directly communicate with WikiLeaks (*id.* at ¶¶ 162, 171). Beyond this, the DNC alleges only that WikiLeaks exchanged Twitter messages with Trump, Jr.; and that Defendants Paul Manafort and Richard Gates communicated with a Russia-connected individual. SAC ¶¶ 168–69, 173. But WikiLeaks' request that Trump, Jr. publicly link to its database of published DNC materials only confirms that the Campaign had nothing to do with publishing those materials, and the DNC does not even claim that Manafort's or Gates's communications were connected to DNC materials. These isolated interactions hardly demonstrate that the relevant individuals "worked together for a common illicit interest." *Moss*, 258 F.Supp.3d at 301 (citation omitted).

*Finally*, the DNC references its allegations of post-election conduct by certain individuals. Opp. 28. But it makes no such allegations as to the Campaign. In any event, alleged connections *after* all of the thefts and publications cannot establish an enterprise dedicated to those efforts.

### 3. The DNC does not allege the required longevity.

As the Campaign has explained, the AIF Enterprise also lacks the third required structural feature—longevity—because the DNC does not claim the enterprise even came into existence until *after* Russia launched the hacking operation on which the DNC's claim is predicated. Indeed, the DNC alleges that the Enterprise may not have formed until June 2016 (SAC ¶ 272), by which time Russia had carried out every document theft at issue here. The DNC's only response is that the AIF Enterprise existed long enough "to permit the[] associates to pursue the enterprise's purpose." Opp. 31 (citation omitted). But in a case predicated upon a supposed "conspiracy to steal the DNC's data and use it to support Trump's candidacy" (*id.* at 3), it makes no sense to say that an enterprise implementing that effort could have formed *after* all of the relevant data had been stolen.

### 4. The DNC confirms that the AIF Enterprise would have no existence apart from its alleged pattern of racketeering activity.

The Campaign has also shown that the DNC does not allege "an entity separate and apart from the pattern of [racketeering] activity in which it engages." *Turkette*, 452 U.S. at 583. The DNC con-

firms this failure. Over and over again, it relies solely on alleged predicate acts by the AIF Enterprise to prove the Enterprise existed in the first place. How do we know the enterprise members shared a common purpose? Because Russia went "to extraordinary lengths to help elect Trump," WikiLeaks "coordinat[ed]" releases, "the Agalarovs … arrange[d] the Trump Tower meeting," Mifsud "me[t] with Papadopoulos," and so on. Opp. 24–25. How do we know the members had relationships? Because they established "general roles" for committing predicate acts: Russia "conduct[ed] hacking activity," WikiLeaks "disseminate[d] the hacked materials," and the Trump Associates and Agalarovs "coordinat[ed]" and "amplif[ied]" those publications. *Id.* at 29. How do we know the AIF Enterprise had longevity? By looking to the "predicates" that "Defendants committed." *Id.* at 31. This question-begging argument violates the rule that "[t]he existence of an enterprise at all times remains a separate element which must be proved." *Turkette*, 452 U.S. at 583; *see also, e.g.*, *Black Radio Network, Inc. v. NYNEX Corp.*, 44 F.Supp.2d 565, 581 (S.D.N.Y. 1999) (dismissing § 1962(c) claim where alleged enterprise members were "a part of that enterprise only by virtue of the alleged racketeering activity").

The DNC's only response is that it has alleged a handful of *non*-predicate acts by a few Defendants. Opp. 32. These stray allegations do not alter the analysis. The question is "whether 'the enterprise would still exist were the predicate acts removed from the equation.'" *Schmidt v. Fleet Bank,* 16 F.Supp.2d 340, 349 (S.D.N.Y. 1998) (citation omitted). Here, removing the predicate acts would result in a supposed enterprise that did not steal or disseminate a single document. Instead, the most the DNC would have is allegations that WikiLeaks and Trump, Jr. accessed a website without permission, Manafort shared polling data with a Russian-connected individual, Russia and WikiLeaks posted on social media about the Special Counsel, and the Campaign denied contacts with Russia. Opp. 32. The DNC does not even claim these disconnected allegations could sustain its enterprise theory. And they could not. Because the AIF Enterprise "would not exist" without the alleged predicate acts, the DNC's enterprise theory fails. *Schmidt*, 16 F.Supp.2d at 350.

**C. The DNC has not alleged that the Campaign committed any predicate acts, let alone a pattern of racketeering activity.**

The Campaign has shown that the DNC fails to plausibly allege that it committed any predicate acts and fails to allege any threat of continued criminal activity. The DNC's responses all fail.

> **1. The DNC does not allege that the Campaign committed a single predicate act of conspiring to steal and disseminate DNC trade secrets.**

As the Campaign has explained, the DNC does not plausibly allege that the Campaign committed any predicate acts, let alone a pattern of racketeering activity. The DNC's claims against the Campaign are predicated solely on the conspiracy provisions of 18 U.S.C. §§ 1831 and 1832, which address the misappropriation of trade secrets. The DNC thus must plausibly allege a conspiracy to steal and disseminate not just any materials, but trade secrets in particular. Though the DNC insists it has done so, its position suffers from several fatal defects.

**a.** The DNC's allegations fail at the outset, because it does not—and, it is now clear, cannot—plausibly allege the Campaign's involvement in a conspiracy to steal and disseminate DNC trade secrets (or any other DNC materials, for that matter).

*First*, the DNC stakes its theory on Papadopoulos's interactions with Mifsud and on the Trump Tower meeting. Opp. 35–37. But as already explained, the DNC does not actually allege that, in either instance, the Campaign was even told about "documents … stolen from the DNC"—let alone that the Campaign "forged an agreement to steal the DNC's intellectual property, including trade secrets." *Id.* at 35–36, 37; *supra* at 2–3. In claiming that these allegations nonetheless "suggest" or support an "infer[ence]" of a conspiracy to steal trade secrets, the DNC relies on precisely the sort of "conclusory allegation[s] of agreement" that the Supreme Court has made clear "do[] *not* supply facts adequate to show illegality." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556–57 (2007) (emphasis added); *see also, e.g.*, *4 K & D Corp. v. Concierge Auctions, LLC*, 2 F.Supp.3d 525, 545 (S.D.N.Y. 2014) (Koeltl, J.) (finding conspiracy allegations insufficient where "the plaintiffs have alleged no facts to show specifically that the defendants had any 'meeting of the minds' in the alleged violations").

The DNC then claims its "inferences" are "bolstered" by various stray allegations. Opp. 38. None of those allegations plausibly suggest a conspiracy to steal and disseminate DNC trade secrets:

- The DNC references then-candidate Trump's statement, at a campaign rally, that he "hope[d]" Russia would find emails from Secretary Clinton's private server. *Id.* This very public statement regarding the very public issue of *Secretary Clinton's private server* has no connection to a supposed clandestine agreement—"shrouded in secrecy" (*id.* at 35)—to steal *DNC materials.*

- The DNC alleges that Paul Manafort shared polling data with a "known Russian spy." *Id.* at 38. But it does not allege facts plausibly suggesting this had anything to do with Russia's hacking efforts, and makes clear that any such connection is grounded in pure speculation. *Id.*

- The DNC asserts that Russia's intelligence service "asked Stone for his reaction to a 'turnout model'" it had stolen from someone other than the DNC, and publicly tweeted to thank Stone for "believ[ing] in the real #Guccifer2." Opp. 38–39; Ryan Goodman, *How Roger Stone Interacted With Russia's Guccifer and Wikileaks,* Newsweek (Sep. 28, 2017), http://bit.ly/30b5v3o (cited at SAC ¶ 165). But (again) Stone was not a Campaign employee or agent, and these allegations have nothing to do with an agreement to steal DNC materials.

- The DNC claims various Defendants sought to "cover up" Russia's conduct after the election. Opp. 39. But given the DNC's failure to allege the Campaign's involvement in any conspiracy in the first place, allegations of a cover-up cannot establish underlying wrongdoing.

*Second*, the DNC has no answer to the Campaign's point that there are no plausible allegations that the Campaign intended to steal trade secrets, as opposed to generic "documents," "data," or "materials." Opp. 36–37; *see also United States v. Lloyds TSB Bank PLC*, 639 F.Supp.2d 326, 344 (S.D.N.Y. 2009) ("The law of conspiracy requires agreement as to the object of the conspiracy." (quoting *United States v. Rosenblatt*, 554 F.2d 36, 38 (2d Cir. 1977))). The DNC does not allege that the Campaign was ever told the materials in question included trade secrets, much less that it joined a plan to steal trade secrets. References to "'thousands of emails' that could harm Hillary Clinton's presidential campaign" and "official documents and information that would incriminate Hillary and her dealings with Russia" (Opp. 36; SAC ¶¶ 94, 133) in no way suggest trade secrets were involved.

*Finally*, on top of all of these problems, the Special Counsel's Report refutes the inferences on which the DNC's arguments depend. As already explained, the Special Counsel determined that neither Papadopoulos's interactions with Mifsud nor the Trump Tower meeting resulted in the Campaign conspiring or coordinating with Russia's election-interferences efforts. And more to the

point, the Special Counsel's exhaustive investigation could not and did not establish that the Campaign conspired or otherwise coordinated with Russia. Mueller Report, Vol. I at 1–2, 13. The Special Counsel's findings put to rest the DNC's concern that requiring it to concretely allege the Campaign's involvement in a conspiracy "would impose an unreasonable investigative burden on plaintiffs, who can rarely find smoking-gun evidence of a conspiracy before discovery." Opp. 39–40. There has *already been* an investigation far more exhaustive than would ever be possible in civil discovery. And far from finding a smoking gun, the Special Counsel has refuted the DNC's theory. This is thus not merely a case in which the DNC has failed to plausibly allege the Campaign's involvement in the requisite conspiracy; it definitively *cannot* plead that involvement.

**b.** The DNC's claims under §§ 1831 and 1832 also fail for statute-specific reasons.

Section 1831 requires a defendant to intend or know that the misappropriation of trade secrets will "benefit a[] foreign government." § 1831(a). As the Campaign explained, the benefit must be one "ordinarily associated with 'espionage'"—i.e., "gaining access to the stolen information." *United States v. Lee*, 2010 WL 8696087, *5–6 (N.D. Cal. May 21, 2010) (emphasis added). By contrast, § 1831 "does not penalize a defendant's intent to *personally* benefit." *Id.* (emphasis added). The DNC accepts this rule, but baldly asserts in a footnote that Defendants "clearly knew that the conspirators' conduct would give a foreign government access to information." Opp. 39 n.13. But again, the idea that the "conspirators' conduct" gave Russia access to DNC materials is at war with the DNC's allegations that *Russia* alone "use[d] its military infrastructure to conduct hacking activity" and, after that, formed a conspiracy to *disseminate* the already-hacked materials. *Id.* at 29. In any event, the DNC does not deny that it claims the Campaign intended to benefit only itself, not Russia. SAC ¶ 80.

Section 1832 requires a defendant to intend to "convert a trade secret" "to the economic benefit of anyone other than the owner." § 1832(a). And the defendant must have formed this intent "when [it] engaged in" the conspiracy. *United States v. Agrawal*, 726 F.3d 235, 256 (2d Cir. 2013). Given the

DNC's failure to allege that the Campaign even knew trade secrets were involved, it obviously cannot show that the Campaign intended to *convert* trade secrets—much less intended any particular benefit from the to-be-converted trade secrets. And although the DNC baldly asserts that the Campaign knew its conduct would economically benefit itself and Russia by "sav[ing] [them] the time and expense of conducting costly opposition research" (Opp. 44), the SAC does not say a word about either's plans for opposition research. Nor could it: It is nonsensical to believe that "opposition research" would somehow be based on internal DNC "trade secret" emails, much less that the Campaign had *budgeted* for this research and then saved money by abandoning that research.

### 2.  The DNC does not allege a threat of continuing criminal conduct.

The Campaign has shown that, even if the DNC *had* plausibly alleged that the Campaign committed predicate acts, it does not allege that the Campaign's acts satisfy RICO's continuity requirement, which (as relevant here) requires the DNC to establish a "threat of continuing criminal conduct." *Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 183 (2d Cir. 2008). The DNC responds that "each Defendants' predicate acts 'by their very nature' present a threat of future criminal activity" because those acts "were inherently unlawful" and were in "pursu[it] [of] an inherently unlawful goal." Opp. 63–64 (citation omitted). But neither the Campaign's alleged predicate acts nor its goal were inherently unlawful for purposes of the continuity analysis.

As for the alleged predicate acts, "simple unlawfulness of past activity is not sufficient to embody the requisite specific threat of future criminal activity"; rather, the acts must "threaten repetition by their nature." *Int'l Bhd. of Teamsters v. Carey*, 297 F.Supp.2d 706, 715 (S.D.N.Y. 2004), *aff'd sub nom. Int'l Bhd. of Teamsters v. Blitz*, 124 F. App'x 41 (2d Cir. 2005). Even "fraud … has been held not to be 'inherently unlawful' in the RICO continuity context." *Id.* Even more clearly here, the DNC's alleged predicate acts of dealing in trade secrets implicate precisely the sort of "'inherently terminable' scheme"—one aimed at affecting the outcome of a presidential election—that "does *not*

imply a threat of continued racketeering activity." *Cofacredit, S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d 229, 244 (2d Cir. 1999) (emphasis added); *see also First Cap.*, 385 F.3d at 180 (same).

Similarly, the Campaign's goal—in the DNC's own words, "get[ting] Trump elected" (SAC ¶ 80)—obviously is not "inherently unlawful." *See, e.g., Teamsters*, 297 F.Supp.2d at 715 (noting that even goals of "depriving [a union] and its members of money, the honest services of its officers and employees[,] and the right to have elections conducted fairly … are not themselves unlawful").

Alternatively, the DNC argues that the *AIF Enterprise* "'projects criminal activity into the future'" because the "*AIF Enterprise* was 'primarily' engaged in … inherently unlawful" activity. Opp. 64 (emphasis added). But this simply ignores the Second Circuit's repeated recognition (which the Campaign noted) that "[i]n analyzing the issue of continuity, … we evaluate the RICO allegations with respect to each defendant individually." *First Cap.*, 385 F.3d at 180 (collecting cases). And the DNC admits that "the Trump Campaign was 'primarily' pursuing lawful aims." Opp. 64. This argument thus cannot establish continuity as to the Campaign, either.

The DNC tries to salvage its continuity argument by pointing to conduct *after* the 2016 election. Opp. 64–65. But it does not allege any such conduct by the Campaign. And although it insists that alleged acts of concealment can establish continuity, the law is precisely the opposite: "[I]it is not sufficient to claim that allegations of concealment on the part of the wrongdoer constitute a basis for establishing an open-ended scheme or threat of repetition to satisfy the continuity requirement. Otherwise every past act of wrongdoing which a wrongdoer attempts to conceal might be the basis for finding continuity." *Ruby Dev. Corp. v. Charrim Dev. Corp.*, 742 F.Supp. 1213, 1217 (E.D.N.Y. 1990).

**D. The DNC has not alleged any cognizable injury that was proximately caused by the alleged AIF Enterprise.**

The Campaign has also shown that the DNC does not plausibly allege any "concrete" injury to its "business or property" that was "proximate[ly] cause[d]" by the AIF Enterprise. *Westchester Cty. Indep. Party v. Astorino*, 137 F.Supp.3d 586, 612–13 (S.D.N.Y. 2015). The DNC admits that several of

its alleged injuries—harm to its political effectiveness and emotional harm to its employees—are not cognizable under RICO. Opp. 70. And it fails to establish that its other claimed injuries pass muster.

*First*, the DNC argues that Russia's hacking "damaged the DNC's computer systems," requiring repairs. Opp. 68. But, yet again, the DNC concedes that the hacking commenced *before* it claims the AIF Enterprise existed. The DNC's only response is that forensic analysis indicates that some hacking occurred after the AIF Enterprise supposedly formed. Opp. 72. But that just proves the Campaign's point: The DNC does not even claim it can identify damage it sustained as a result of conduct by the alleged AIF Enterprise, as opposed to damage stemming from earlier conduct that by definition was *not* undertaken by that Enterprise. The DNC thus cannot establish the "central" requirement for proximate causation: that "the alleged [RICO] violation led *directly* to [its] injuries." *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 460–61 (2006) (emphasis added).

*Second*, the DNC claims it was injured by the theft and dissemination of its trade secrets. Opp. 68–69. But the only trade-secret thefts that the DNC alleges caused financial harm were thefts of "proprietary information" and "proprietary computer code" in "September 2016," and the DNC does not claim those materials were disseminated. SAC ¶¶ 255–56; *id.* at ¶¶ 36–37, 193–94. There was thus no harm caused by dissemination, and so the DNC must allege that it was somehow harmed merely because outsiders *stole* its trade secrets without disseminating them publicly. In this regard, although the DNC claims it was injured by the thefts because it lost the ability to "us[e] [its] property as [it] wishe[d]" (Opp. 68), it never plausibly alleges that this amounts to a "concrete financial loss." *Westchester Cty. Indep. Party*, 137 F.Supp.3d at 613. Nor can it: "The loss of 'competitive advantage' that sometimes flows from the deprivation of exclusive use [of a trade secret] is nothing more than a non-concrete 'injury to a valuable intangible property interest,'" and so is not cognizable under RICO. *Mattel, Inc. v. MGA Entm't, Inc.*, 782 F.Supp.2d 911, 1020 (C.D. Cal. 2011); *see also Choice is Yours,*

*Inc. v. Williams*, 2016 WL 5661709, *6 (E.D. Pa. Sept. 30, 2016) ("[L]oss of value to intellectual property such as trade secrets, even if that loss could be measured, … are not sufficient [under RICO].").

### E.  The DNC's RICO-conspiracy claim fails, too.

As Defendants have explained, the infirmity of the DNC's substantive RICO claim means its RICO conspiracy claim also must be dismissed: "Case law in this Circuit confirms that a 1962(d) conspiracy claim must be dismissed where the substantive RICO claim is deficient." *Nat'l Grp. for Commc'ns & Computers Ltd. v. Lucent Techs. Inc.*, 420 F.Supp.2d 253, 272 (S.D.N.Y. 2006). The DNC quibbles that this rule applies only where the defendant did not "agree to a plan that—if completed—would constitute a substantive RICO violation." Opp. 75. But that is exactly the case here: For the reasons set forth above, the DNC has not alleged that the Campaign agreed to conduct that would violate RICO. The DNC's conspiracy claim against the Campaign instead depends on precisely the "'[c]onclusory allegations of a conspiracy [that] are insufficient' to plead a Section 1962(d) claim." *Nat'l Grp.*, 420 F.Supp.2d at 272 (citation omitted). Indeed, the Special Counsel's Report confirms that no such conspiracy existed, and thus that there is nothing the DNC *could* plausibly allege in support of this claim. *Supra* at 3. The § 1962(d) claim, too, must be dismissed.

## III.  The DNC Fails to State a Wiretap Act Claim Against the Campaign.

The Campaign has shown that the DNC's Wiretap Act claim fails in several ways. The DNC's response confirms these failures.

**No knowledge of interception.** The DNC accepts that the Wiretap Act applies only to interceptions that occur "as the message is traveling from one computer or electronic source to another." Opp. 76; *see also* Campaign's Br. 38–39 (collecting cases). It claims to have satisfied this requirement with allegations that Russia installed malware that would capture communications "simultaneously with their transmission" and gained access that "allow[ed]" "realtime" monitoring. Opp. 76 (citing SAC ¶¶ 103, 128–29). But this just highlights the deficiency: The DNC's claim is predicated on the

Campaign supposedly using intercepted communications, but it at no point alleges that a single communication *used by the Campaign* was intercepted during transmission. This omission is telling, given that the DNC alleges when the hacking occurred (e.g., SAC ¶¶ 114–31) and of course knows what materials were later published (and, even later, allegedly used by the Campaign). Unadorned "conclusory statements" regarding Russia's monitoring capabilities do not give the Campaign "fair notice of what the claim is and the ground upon which it rests." *Twombly*, 550 U.S. at 555 (citation omitted).

Even if the DNC *had* alleged contemporaneous interceptions, its claim would still fail because it does not plausibly allege that the Campaign "kn[ew] or ha[d] reason to know that the information was obtained through … interception." 18 U.S.C. § 2511(1)(d). The DNC argues that a defendant must know only "that neither party to the intercepted communication had consented to its interception." Opp. 77 (citation omitted). But it offers no such allegations as to the Campaign, and instead seeks to satisfy this requirement by "infer[ring]" the Campaign's knowledge from Papadopoulos's discussions with Mifsud and the June 9 meeting. *Id.* As already explained, the DNC's own allegations do not plausibly suggest that either set of interactions resulted in the Campaign even learning that Russia was stealing DNC materials—nor *could* the DNC so allege, given the Special Counsel's findings. *Supra* at 2–3. The DNC also argues that the Campaign must have been on notice of contemporaneous interceptions at least as of June 14, 2016, when the Washington Post reported on the hacks. But that report indicated only that Russia had hacked the DNC and could intercept communications; it did not identify whether the communications that the DNC alleges the Campaign later "used" had been intercepted during their transmission—nor could it, as the DNC alleges that the first public release of stolen materials did not begin until the day *after* the report was published. SAC ¶ 147.

**No use of intercepted communications.** The Campaign has shown that the DNC's Wiretap Act claim also fails because a defendant does not "use" an intercepted communication when it discusses materials previously published by someone else, as the Campaign is alleged to have done.

Campaign's Br. 41–43. The DNC accepts that premise, but argues that the Campaign went beyond "react[ing] to information published by WikiLeaks" when, "*before* WikiLeaks disclosed the DNC's information, Defendants collectively developed a Campaign strategy to promote stolen DNC communications at times they would be most beneficial to Trump." Opp. Br. 78.

This position is flawed. *First*, a claim based on "promot[ing]" materials would arise under the Wiretap Act's disclosure clause (§ 2511(1)(c)), not its use clause (§ 2511(1)(d)). But the DNC specifically *avoids* claiming the Campaign violated the disclosure clause (rightly recognizing that the Campaign had no role in the disclosures), and brings its claim against the Campaign only under the use clause. SAC ¶ 312. (In any event, given that the First Amendment precludes liability even for publishers of stolen information (*supra* at § I), one who merely "promote[s]" materials published by *others* obviously cannot be punished.) *Second*, the DNC acknowledges that the Campaign must have done something "beyond passive listening or reading" (Opp. 79)—but it does not claim the Campaign even learned of the contents of a single document before it was published. Rather, it claims only that the Campaign participated in the June 9 meeting (which had no connection to stolen materials), and that then-candidate Trump "directed the public to Wikileaks's cache of stolen documents" that *already* had been published. *Id.* at 80. This case is thus nothing like those the DNC invokes—which all involved defendants who reviewed and transcribed intercepted communications (*id.* at 79)—and instead falls squarely within what *Bartnicki* deemed protected. *Supra* at § I.

## IV. The DNC's State-Law Claims Against the Campaign All Fail.

### A. The Court should not exercise supplemental jurisdiction over the state-law claims.

The Campaign has shown that supplemental jurisdiction is inappropriate here for multiple reasons. A court has discretion to decline supplemental jurisdiction over state-law claims that raise "novel or complex issue[s] of State law." 28 U.S.C. § 1367(c)(1). And the DNC confirms that the highest courts of the District of Columbia and Virginia have not addressed, among other key ques-

tions here, the scope of the "used" or "disclosed" provisions of the District of Columbia Uniform Trade Secrets Act ("DCUTSA") (Opp. 92), or "whether there is an independent cause of action for aiding and abetting in Virginia" (Opp. 98). A court can also decline supplemental jurisdiction when it dismisses all federal claims (§1367(c)(3))—which the Court should do for all the reasons set forth above. The DNC's only response is that it has sued under several states' laws, a "significant portion of the relevant events occurred in New York, and multiple Defendants are at home" here. Opp. 87. But those are not valid reasons for keeping an exclusively state-law case in federal court.

Once the court's discretion is triggered, the Campaign explained that there are compelling reasons for declining supplemental jurisdiction, including the multiple pending congressional investigations and criminal prosecutions arising out of the 2016 election. Although the DNC claims there are no relevant criminal matters (Opp. 87), it simply ignores the prosecution of Stone. The DNC insists it can find ways to "coordinat[e]" this litigation with any such investigations or proceedings (*id.*), but the need for such coordination (which could be far more complicated than the DNC blithely suggests) is precisely why the court should decline to reach out and exercise jurisdiction over claims arising under state law—especially if the Court dismisses the DNC's federal claims (as it should).

### B.  The DNC fails to state a trade-secrets claim against the Campaign.

Even if this Court were to reach the merits of the DNC's DCUTSA claim, the Campaign has shown that this claim is deficient for a variety of reasons. The DNC's responses fall short.

*First*, the DNC fails to provide fair notice of what the relevant trade secrets underlying its DCUTSA claim even are. The DNC confirms that it is resting on broad generalities: "donor information, financial and economic information, proprietary opposition research[,] … information regarding planned political activities," and so on. Opp. 89–90 (quoting SAC ¶ 105). It also confirms that these categories encompass public information, but insists that compilations of public data can constitute trade secrets if "they were the result of extensive culling efforts." *Id.* at 90. Even if that is

correct, nowhere does the SAC plausibly allege that the stolen information resulted from any such culling effort. Indeed, it points only to allegations identifying "donor lists" and "list[s] of people who have signed up for DNC-sponsored events"—information that requires no culling. *Id.* at 91.

*Second*, the DNC fails to plausibly allege that any of the stolen information derived "independent economic value[] from not being generally known … [and] readily ascertainable." D.C. Code § 36-401(4)(A). In response, the DNC simply rehashes conclusory assertions that disclosure of its "financial and voter engagement strategies" would have "strategic and fundraising consequences." Opp. 92. But it does not even attempt to show how this could be true of donor information (which is subject to disclosure requirements), and ignores caselaw casting "doubt[]" on the notion that donor lists have a "particular value [that] derives from their secrecy." *CAIR Action Network, Inc. v. Gaubatz*, 82 F.Supp.3d 344, 361 (D.D.C. 2015). More broadly, the DNC rests on "mere conclusory statements" that do not satisfy federal pleading standards. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

*Third*, the DNC confirms that its claim is predicated exclusively on the Campaign supposedly "using the stolen DNC information as strategic tools in their candidate's presidential campaign." Opp. 93. But any such use necessarily occurred *after* that information was published by others—and a "trade secret that becomes public knowledge is no longer a trade secret." *BondPro Corp. v. Siemens Power Generation*, 463 F.3d 702, 706 (7th Cir. 2006) (Posner, J.).

## C. The DNC fails to state a claim against the Campaign for conspiracy to commit trespass to chattels.

As the Campaign has explained, the DNC's claim for conspiracy to commit a trespass to chattels fails both because the DNC does not allege that the Campaign "combined" or agreed with Russia "to accomplish" hacking—the only alleged conduct that could constitute a trespass to chattels— and because it does not allege that Defendants "combined to accomplish, *by some concerted action*," hacking activity. *Gelber v. Glock*, 800 S.E.2d 800, 820 (Va. 2017) (emphasis added, citation omitted); Campaign's Br. 47–49. The DNC does not even try rebutting the second point—to the contrary, it

confirms that Russia alone "committ[ed] the tort of trespass to chattels." Opp. 96. The absence of concerted action is alone fatal. In any event, the DNC's claim fails for the more fundamental reason that it does not and cannot allege that the Campaign joined a hacking conspiracy. *Supra* at 2–3.

### D. The DNC fails to state a Virginia Computer Crimes Act claim against the Campaign.

Finally, the Campaign showed that the DNC's Virginia Computer Crimes Act ("VCCA") claim fails because that statute does not authorize aiding-and-abetting liability—the only theory the DNC asserts against the Campaign. Campaign's Br. 49–50. The DNC does not dispute Virginia's "basic principle[] of statutory construction" that statutorily established causes of action and remedies are "exclusive." *Cherrie v. Va. Health Servs., Inc.*, 787 S.E.2d 855, 858 (Va. 2016) (citation omitted). But it nonetheless urges the Court to read an aiding-and-abetting provision into the VCCA, on the basis of a federal court's decision that expressly *declined* to "decid[e] whether an independent cause of action for aiding and abetting violations of the wiretapping statutes exists in Virginia." *Marsh v. Curran*, 362 F.Supp.3d 320, 332 (E.D. Va. 2019) (cited at Opp. 98). That non-decision is no basis for allowing the DNC's claim to move forward. (Moreover, *Marsh* simply conflicts with the numerous cases identified by the Campaign holding that Virginia does *not* recognize an independent aiding-and-abetting cause of action, underscoring why this Court should decline to exercise supplemental jurisdiction over this "novel or complex issue of State law." 28 U.S.C. § 1367(c)(1); Campaign's Br. 49–50.)

In any event, the VCCA does not prohibit using public information that *someone else* retrieved from a computer, as the Campaign is alleged to have done. *Id.* The DNC responds (yet again) by baldly asserting that "Defendants worked with one another to coordinate the theft of materials from DNC computers." Opp. 99. But as has been explained, that argument is inconsistent with the DNC's own allegations (which do not involve the Campaign in any theft) and with the Special Counsel's findings (which establish that the Campaign had no role in any such conduct). *Supra* at 2–3.

### CONCLUSION

The Court should dismiss all claims against the Campaign with prejudice.

Dated:    June 3, 2019                          Respectfully submitted,

                                                /s/ Michael A. Carvin

James M. Gross                                  Michael A. Carvin (*pro hac vice*)
JONES DAY                                          *Counsel of Record*
250 Vesey Street                                William D. Coglianese (*pro hac vice*)
New York, NY 10281                              JONES DAY
(212) 326-3939                                  51 Louisiana Avenue, NW
jgross@jonesday.com                             Washington, DC 20001
                                                (202) 879-3939
                                                macarvin@jonesday.com
                                                wcoglianese@jonesday.com

                        *Counsel for Donald J. Trump for President, Inc.*

## CERTIFICATE OF COMPLIANCE

I, Michael A. Carvin, certify that this brief complies with the Scheduling Order that this Court entered on October 1, 2018 (ECF No. 181) because it is under 25 pages, and that this brief complies with this Court's formatting rules.

Dated:   June 3, 2019

/s/ Michael A. Carvin
Michael A. Carvin

*Counsel for Donald J. Trump for President, Inc.*

**CERTIFICATE OF SERVICE**

I, Michael A. Carvin, certify that on June 3, 2019, I caused the foregoing document to be electronically filed with the Clerk of Court using the CM/ECF system, which will send a notice of electronic filing to all registered parties.

Dated:   June 3, 2019                                /s/ Michael A. Carvin
                                                     _____
                                                     Michael A. Carvin

                                                     *Counsel for Donald J. Trump for President, Inc.*