**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| DEMOCRATIC NATIONAL COMMITTEE,<br><br>*Plaintiff,*<br><br>v.<br><br>THE RUSSIAN FEDERATION, et al.,<br><br>*Defendants.* | Case No. 1:18-cv-3501-JGK-SDA<br><br>Oral Argument Requested |

---

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF**
**DEFENDANT DONALD J. TRUMP FOR PRESIDENT, INC.'S**
**MOTION FOR RULE 11 SANCTIONS**

---

James M. Gross
JONES DAY
250 Vesey Street
New York, NY 10281
(212) 326-3939
jgross@jonesday.com

Michael A. Carvin (*pro hac vice*)
   *Counsel of Record*
William D. Coglianese (*pro hac vice*)
JONES DAY
51 Louisiana Avenue, NW
Washington, DC 20001
(202) 879-3939
macarvin@jonesday.com
wcoglianese@jonesday.com

*Counsel for Donald J. Trump for President, Inc.*

## TABLE OF CONTENTS

Page

Introduction..........................................................................................................................1

Background...........................................................................................................................3

    A.   The DNC Brings Six Claims Against the Campaign, All Based on the Theory that the Campaign Agreed With Russia to Steal and Disseminate DNC Materials ...................3

    B.   The Special Counsel Refutes the Notion that the Campaign Conspired or Coordinated With Russia.......................................................................................................4

    C.   Despite the Special Counsel's Exhaustive Findings, the DNC Doubles Down on Its Claim that the Campaign Conspired or Coordinated With Russia ...............................8

    D.   After Being Served With the Campaign's Rule 11 Motion, the DNC Still Refuses to Withdraw Its Claims Against the Campaign.................................................................. 10

Legal Standard ................................................................................................................... 10

Argument ........................................................................................................................... 12

I.    The DNC Is Violating Rule 11 By Maintaining Its Claims Against the Campaign................... 12

II.    Sanctions Are Necessary to Remedy the DNC's Violation of Rule 11 and Deter Future Violations......................................................................................................................... 15

Conclusion ......................................................................................................................... 16

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Bletas v. Deluca,*
  No. 11-cv-1777, 2011 WL 13130879 (S.D.N.Y. Nov. 15, 2011) ......................................................11

*Boyle v. United States,*
  556 U.S. 938 (2009) .......................................................................................................................15

*Calloway v. Marvel Entm't Grp., a Div. of Cadence Indus. Corp.,*
  854 F.2d 1452 (2d Cir. 1988) ........................................................................................................11

*Catcove Corp. v. Patrick Heaney,*
  685 F.Supp.2d 328 (E.D.N.Y. 2010) ............................................................................................11

*Cheney v. U.S. Dist. Court for D.C.,*
  542 U.S. 367 (2004) .........................................................................................................................2

*F.E.C. v. Wisc. Right to Life, Inc.,*
  551 U.S. 449 (2007) .........................................................................................................................2

*Galin v. Hamada,*
  283 F.Supp.3d 189 (S.D.N.Y. 2017) ......................................................................................*passim*

*Galin v. Hamada,*
  753 F. App'x 3 (2d Cir. 2018) ................................................................................................ 11, 14

*Gambello v. Time Warner Comm'ns, Inc.,*
  186 F.Supp.2d 209 (E.D.N.Y. 2002) ............................................................................................11

*Mayor & City Council of Baltimore, Md. v. Citigroup, Inc.,*
  709 F.3d 129 (2d Cir. 2013) ..........................................................................................................15

*Murray v. Dominick Corp. of Can., Ltd.,*
  117 F.R.D. 512 (S.D.N.Y. 1987) ...................................................................................................16

*O'Brien v. Alexander,*
  101 F.3d 1479 (2d Cir. 1996) ........................................................................................................11

*Safe-Strap Co. v. Koala Corp.,*
  270 F.Supp.2d 407 (S.D.N.Y. 2003) .............................................................................................16

**TABLE OF AUTHORITIES**

(continued)

**Page(s)**

*Storey v. Cello Holdings, L.L.C.,*
　347 F.3d 370 (2d Cir. 2003) .......................................................................................... 10, 12

**OTHER AUTHORITIES**

*DNC Chair Tom Perez On Trump/Russia Lawsuit: "We Have To Deter This Conduct,"*
　Real Clear Politics (Apr. 22, 2018) ..................................................................................... 1

Fed. R. Civ. P. 11 ...............................................................................................................*passim*

Sarah N. Lynch, *Mueller Report Details to be Issued in 'Weeks, Not Months': Justice*
　*Department*, Reuters (Mar. 26, 2019) ................................................................................... 5

Sarah N. Lynch, *Redacted Mueller Report to be Issued by U.S. Attorney General on Thursday,*
　Reuters (Apr. 15, 2019) .............................................................................................. 5, 6, 7

Special Counsel Robert S. Mueller, III, *Report On The Investigation Into Russian Interfer-*
　*ence In The 2016 Presidential Election* (Mar. 2019)..................................................*passim*

## INTRODUCTION

In the Democratic National Committee's publicity campaign after filing this lawsuit, its Chair expressed his "great respect for [former FBI] Director [Robert] Mueller," who had been appointed as Special Counsel nearly a year earlier to investigate the very theory underlying all of the DNC's claims against Defendant Donald J. Trump for President, Inc. ("the Campaign")—namely, that the Campaign conspired with Russia in that nation's efforts to interfere in the 2016 presidential election by stealing and disseminating DNC materials. *DNC Chair Tom Perez On Trump/Russia Lawsuit: "We Have To Deter This Conduct,"* Real Clear Politics (Apr. 22, 2018), http://bit.ly/2JdOhvV. The DNC Chair explained that the DNC filed this lawsuit because "I don't know when Director Mueller's investigation is going to end" relative to the applicable statutes of limitations, "so we need to file now to protect our rights." *Id.* The assumption, of course, was that the Special Counsel would substantiate the DNC's claims.

Suffice it to say, that assumption did not pan out. Quite the opposite: Special Counsel Mueller's historically expansive investigation definitively refuted the notion that the Campaign conspired or in any way coordinated with Russia. In an over-400-page Report, the Special Counsel not only explains that his investigation "did not establish" any such conspiracy or coordination, but debunks any such conclusion by walking through the vast body of evidence that his Office collected and establishing that none of this evidence showed that the Campaign formed any sort of agreement with Russia. In so doing, the Report makes clear that the DNC will never be able to prove the key allegations underlying *all* of its claims against the Campaign.

For this reason, the Special Counsel's Report should have brought an end to the DNC's lawsuit against the Campaign. The DNC, however, has refused to accept this reality. In fact, just hours after the Report's public release, the DNC filed its Omnibus Opposition to Defendants' Motions to Dismiss, in which it emphatically doubled down on its now demonstrably false insistence that the Cam-

paign joined in Russia's election-interference activities. And even after the Campaign highlighted for the DNC the ways in which the Special Counsel's findings render its claims untenable, the DNC refused to withdraw those claims or even to amend a single allegation in its 372-paragraph Second Amended Complaint. The DNC has thus made clear that it wants to proceed with a politically motivated sham case, tying up the resources of this Court and the Campaign—and inevitably burdening the President himself—all in a doomed effort to prove a falsehood.

Fortunately, there is a remedy for the DNC's insistence on litigating discredited theories. As the DNC's Chair noted in the very same interview when addressing the possibility that this litigation would be used to air "wild theories," "[t]he beauty of the civil justice system" is that "facts matter" and "there's this thing called Rule 11 where you get sanctioned for trying to do things like that." *Id.*

That is of course correct. And by maintaining its claims against the Campaign in the face of the Special Counsel's exhaustive factual findings, it is the DNC that is pressing "wild theories." That is particularly troublesome here because discovery in this case would necessarily burden core separation-of-powers and First Amendment principles, both of which require courts to limit discovery to situations where it is actually needed. *Cf. e.g.*, *Cheney v. U.S. Dist. Court for D.C.*, 542 U.S. 367, 382 (2004); *F.E.C. v. Wisc. Right to Life, Inc.*, 551 U.S. 449, 469 (2007) (Roberts, C.J.).

In short, since the DNC's frivolous legal theories have now been exposed as resting on frivolous factual fantasies, these are two independent reasons to terminate this sham political litigation before it does even more harm. The DNC and its counsel are violating their obligations under Rule 11, and should be sanctioned by having all of their claims dismissed with prejudice and being ordered to reimburse the Campaign for all fees and costs it incurs as a result of the DNC's disregard for the truth.

# BACKGROUND

## A. The DNC Brings Six Claims Against the Campaign, All Based on the Theory that the Campaign Agreed With Russia to Steal and Disseminate DNC Materials

The DNC's claims against the Campaign are all predicated on the notion that the Campaign "was a willing and active partner in Russia's efforts" to "hack[] into the DNC's computers" and "use[] the stolen information to improve [then-candidate Trump's] chances of winning the 2016 Presidential election." SAC ¶¶ 1–2 (ECF 216). Under this theory, the Campaign "solicited Russia's illegal assistance" and "formed an agreement [with Russia] to secure Trump's grip on the Presidency through illegal means"—namely, through Russia's "trespass[ing] onto the DNC's computer network," stealing information, and "disseminat[ing] the information at times when it would best suit the Trump Campaign." *Id.* ¶ 2–3. Through this supposed agreement, the DNC claims, the Campaign put itself "in league with a hostile foreign power to bolster its own chance to win the Presidency." *Id.* ¶ 34.

The DNC alleges that the Campaign joined this endeavor with Russia "by March 2016, or, at the very least, by June 2016." *Id.* ¶ 272. Those two supposed start dates are tied to two sets of interactions that form the pillars of the DNC's theory that the Campaign formed an agreement with Russia.

*First*, the DNC's allegations as to March 2016 center on interactions between Defendants George Papadopoulos (at the time a foreign-policy advisor to the Campaign) and Joseph Mifsud (a London-based professor who the DNC alleges was a "de facto agent of the Russian government"). *Id.* ¶¶ 52, 92–95. The DNC alleges that those two first met in March, and that after several such meetings, on April 26, "Mifsud told Papadopoulos that the Russians had 'thousands of emails' that could harm Hillary Clinton's presidential campaign." *Id.* ¶ 94(d). The DNC alleges that Papadopoulos "reported [this information] back to his superiors at the Trump Campaign," and insinuates that the Campaign at this point began working to coordinate with Russia. *Id.* ¶¶ 13, 96–100.

*Second*, the DNC's allegations as to June 2016 center on the June 9 meeting at Trump Tower between several Campaign officials and certain individuals with ties to the Russian government. The

DNC alleges that Defendants Aras and Emin Agalarov contacted Defendant Donald Trump, Jr. on June 3 regarding "some official documents and information that would incriminate Hillary and her dealings with Russia," and that those individuals then arranged a "meeting at which Russians would provide the Trump Campaign with damaging information about the Democratic nominee." *Id.* ¶¶ 133–35. In the DNC's telling, this meeting represented "Russians [a]gain [o]ffer[ing] [t]o [a]ssist Trump—[a]nd Trump Associates [a]ccept[ing] [t]he [o]ffer." *Id.* at 34, § H; *see also id.* ¶ 132 (alleging that through this meeting, "Defendants launched a scheme to disseminate information that was damaging to the Democratic party and the DNC").

All of the DNC's claims against the Campaign are predicated on this agreement that the Campaign supposedly formed with Russia in March or June 2016. The DNC's RICO claims are premised on the Campaign joining an enterprise with Russia and others to conduct "a cyber-espionage operation" against the DNC. *Id.* ¶ 306; *see also id.* ¶¶ 272, 282–83, 289–90. The DNC's Wiretap Act claim depends on the Campaign knowingly using stolen communications. *Id.* ¶ 312. The DNC's D.C. Uniform Trade Secrets Act claim requires it to establish that the Campaign misappropriated DNC trade secrets. *Id.* ¶ 339. The DNC's claim for conspiracy to commit trespass to chattels requires the Campaign to have joined a conspiracy to steal DNC materials. *Id.* ¶ 356. And the DNC's Virginia Computer Crimes Act claim depends on the Campaign aiding and abetting Russia's hacking. *Id.* ¶ 371. In short, the DNC's entire case against the Campaign depends upon the theory that the Campaign conspired or coordinated with Russia in that country's efforts to steal and publish DNC materials.

## B. The Special Counsel Refutes the Notion that the Campaign Conspired or Coordinated With Russia

Almost one year before the DNC filed this lawsuit, the Special Counsel was appointed to investigate the theory underlying the DNC's entire case against the Campaign: whether the Campaign participated in any "conspiracy as defined in federal law" or whether there was any "agreement—tacit or express—between the Trump Campaign and the Russian government on election interfer-

ence." Special Counsel Robert S. Mueller, III, *Report On The Investigation Into Russian Interference In The 2016 Presidential Election*, Vol. I at 11 (Mar. 2019), http://bit.ly/2KclJDE ("Mueller Report")[1] (citing Office of the Deputy Att'y Gen., Order No. 3915-2017, *Appointment of Special Counsel to Investigate Russian Interference with the 2016 Presidential Election and Related Matters* (May 17, 2017)). The Special Counsel spent nearly two years investigating these questions, deploying resources that go far beyond what would ever be available—let alone feasible—in civil discovery. The Special Counsels' Office included 19 attorneys, various support staff, and "approximately 40 FBI agents, intelligence analysts, forensic accounts, a paralegal, and professional staff assigned by the FBI." *Id.* at 13. Among other things, the Office interviewed approximately 500 witnesses, issued over 2,800 subpoenas, executed nearly 500 search-and-seizure warrants, and obtained more than 230 orders for communications records and almost 50 orders authorizing use of pen registers. *Id.*

The Special Counsel concluded his investigation in March 2019 and provided to the Attorney General an over-400-page Report exhaustively detailing the Office's findings. The Justice Department announced that the Attorney General would publicly release the Report within weeks, after making redactions to protect confidential information. Sarah N. Lynch, *Mueller Report Details to be Issued in 'Weeks, Not Months': Justice Department*, Reuters (Mar. 26, 2019), https://reut.rs/2K6mK05. On April 15, the Justice Department announced that the Report would be released on April 18, the same day as the deadline for the DNC's opposition to Defendants' motions to dismiss this lawsuit.

---

[1] Because the Report is too large to be filed through ECF, the Campaign will deliver a copy to the Court. The Campaign included a copy of the Report when serving its Notice of Motion on the DNC's counsel. And as noted above, the Report is publicly available on the Department of Justice's website.

Sarah N. Lynch, *Redacted Mueller Report to be Issued by U.S. Attorney General on Thursday,* Reuters (Apr. 15, 2019), https://reut.rs/2XjJhtO. The Report was indeed released the morning of April 18.

The Report sets out the Special Counsel's conclusion: Although Russia "worked to secure" President Trump's election and the Campaign "expected it would benefit electorally" from the release of information Russia had stolen, the Special Counsel's "investigation did not establish that members of the Trump Campaign conspired or coordinated with the Russian government in its election interference activities." Mueller Report, Vol. I at 1–2. In reaching this conclusion, the Special Counsel's Office explained that it exhaustively investigated all of the events underlying the DNC's allegations against the Campaign. At every turn, the Office's findings refute the DNC's inferences that the Campaign conspired or coordinated in Russia's election-interference efforts. In fact, the Special Counsel specifically disproved the pillars of the DNC's conspiracy theory against the Campaign, centering on Papadopoulos's interactions with Mifsud and the Trump Tower meeting.

*First*, the Report debunks the notion that the Campaign conspired or coordinated with Russia through Papadopoulos's interactions with Mifsud. There is no finding that Papadopoulos told anyone else at the Campaign about any "stolen materials," much less that he brokered an agreement with Russia. The Special Counsel reported that Papadopoulos "could not clearly recall having told anyone on the Campaign" about Mifsud's reference to emails, and that "the Campaign officials who interacted or corresponded with him … could not recall Papadopoulos's sharing the information that Russia had obtained 'dirt' on candidate Clinton in the form of emails or that Russia could assist the Campaign through the anonymous release of information about Clinton." *Id.* at 93. Nor did any other evidence substantiate the DNC's theory: "No documentary evidence, and nothing in the email accounts or other communications facilities reviewed by the Office, shows that Papadopoulos shared this information with the Campaign." *Id.* at 94. The Special Counsel also found that, although

Papadopoulos discussed "with Mifsud and two Russian nationals" the possibility of a meeting between the Campaign and the Russian government, "[t]hat meeting never came to pass." *Id.* at 81.

*Second*, the Report puts to rest the notion that, through the Trump Tower meeting, the Campaign became involved in Russia's effort to steal and disseminate the DNC's materials. As the Report explains, "[t]he meeting lasted approximately 20 minutes." *Id.* at 117. During that time, the individuals associated with the Campaign did not raise any topics for discussion, and the Russia-connected individuals raised just two topics: (1) alleged "funds derived from illegal activities in Russia [that] were provided to Hillary Clinton and other Democrats," and (2) "a critique of the origins of … a 2012 [U.S.] statute that imposed financial and travel sanctions on Russian officials and that resulted in a retaliatory ban on adoptions of Russian children." *Id.* at 110. The meeting ended shortly thereafter, and was regarded by both American and Russian participants as a "waste of time." *Id.* at 118, 120. Thus, under the Special Counsel's findings, the meeting had *nothing* to do with documents stolen from the DNC, let alone with the Campaign even learning of—much less joining—a plan for Russia to continue stealing and disseminating such documents.

These are hardly the only ways in which the Report refutes the DNC's efforts at conjuring up an agreement between the Campaign and Russia. For example, although the DNC claims the Campaign "water[ed] down" a provision of the Republican Party platform to appease Russia (SAC ¶ 153), the Special Counsel's "investigation did not establish that [the amendment efforts] were undertaken at the behest of candidate Trump or Russia" (Mueller Report, Vol I at 10). In fact, several Campaign officials believed the amendment did not even accurately reflect the Campaign's stance. *Id.* at 127. Likewise, although the DNC asserts that Defendant Paul Manafort shared with "an individual tied to Russian military intelligence" polling data that "could have helped Russia … determine how best to utilize information stolen from the DNC" (SAC ¶¶ 12, 91), the Special Counsel "did not identify evidence of a connection between Manafort's sharing polling data and Russia's interference in the

election," and "did not establish that Manafort otherwise coordinated with the Russian government on its election-interference efforts" (Mueller Report, Vol. I at 131). And although the DNC speculates that various individuals made misstatements after the election in an effort to "cover up their collusion" (SAC ¶ 5; *see also id.* ¶¶ 206–31), the Special Counsel drew no such connection—and his Report makes clear that there could be no such connection, because there can be no concealment of something that did not occur in the first place.

### C. Despite the Special Counsel's Exhaustive Findings, the DNC Doubles Down on Its Claim that the Campaign Conspired or Coordinated With Russia.

Hours after the Mueller Report's public release, the DNC filed its Omnibus Opposition to Defendants' Motions to Dismiss. Despite by then being on full notice that the Special Counsel had refuted the allegations and inferences underlying all of its claims against the Campaign, the DNC stood by all of those claims. Indeed, it became even *more* adamant about its now demonstrably false insistence that "[t]he Trump Campaign, Trump's closest advisors, WikiLeaks, and Russia participated in a common scheme to hack into the DNC's computer system, steal its trade secrets and other private documents, and then strategically disseminate those materials to the public to improve Trump's chances of winning the election." MTD Opp. at 1–2 (ECF 241). Throughout the 136-page Opposition, the DNC repeatedly suggests the Campaign's involvement in Russia's election-interference efforts, falsely labeling the Campaign an "information thie[f]" who "aid[ed], abet[ted], or conspire[d] with" Russia. *Id.* at 4, 101; *see also id.* at 96 (claiming that the Campaign "agreed to a general plan to hack and steal"); *id.* at 99 ("Defendants worked with one another to coordinate the theft of materials from DNC computers before those materials were published.").

In fact, the DNC's Opposition goes even further than its SAC, expressly urging the Court to adopt inferences that the DNC by then had every reason to know the Special Counsel had disproven. Despite the Special Counsel's finding that there was no evidence of Papadopoulos even telling anyone else at the Campaign about Mifsud's reference to "'thousands of emails' that could harm Hillary

Clinton's presidential campaign," the DNC argues in its Opposition that Papadopoulos "met repeatedly with Mifsud to obtain damaging information regarding Clinton," "deliver[ed] information" about "stolen Democratic emails" "to his superiors at the Trump Campaign, and "was responsible for coordinating with Russian operatives before and during the April 2016 hacks on the DNC's computer systems." *Id.* at 19–20, 27, 36, 41. From all of this blatantly false information, the DNC urges the Court to draw the inference that "Russia was reporting on the progress of its cybercrimes to Papadopoulos, apprising him of stolen materials that could be helpful to the Trump Campaign, and giving him an opportunity to tell them whether the Campaign wanted more." *Id.* at 36.

The DNC's Opposition similarly disregards the Special Counsel's finding that the Trump Tower meeting in no way resulted in the Campaign becoming involved in Russia's election-interference efforts. Entirely ignoring the Special Counsel's detailed explanation of what transpired at the meeting, the DNC baldly speculates that the meeting participants "likely discussed data stolen from the DNC, and how that data could be of use to the Campaign," and that "the Trump Campaign repeatedly communicated with Russian agents (including the Russian agents at the Trump Tower meeting …) to obtain information about stolen DNC documents." *Id.* at 19, 21. The DNC thus draws from the meeting the "infer[ences] that: (a) Russia used the meeting to tell members of the Trump Campaign about the documents it had stolen from the DNC, including trade secrets; and (b) members of the Campaign blessed a plan in which Russia would continue stealing similar documents and disseminate the documents it already had to the public." *Id.* at 37.

While the DNC's Opposition acknowledged that "the Special Counsel's investigation is complete" (*id.* at 87), at no point does it even attempt to reconcile any of its assertions with the Special Counsel's comprehensive findings.

### D. After Being Served With the Campaign's Rule 11 Motion, the DNC Still Refuses to Withdraw Its Claims Against the Campaign

On May 13, in accordance with Federal Rule of Civil Procedure 11(c)(2), the Campaign served the accompanying Notice of Motion for Rule 11 Sanctions, along with a nearly six-page cover letter, on the DNC. Ex. A (Notice of Motion and Aff. of Service); Ex. B (Cover Letter). That Notice of Motion sets forth the Campaign's position that, in light of the Special Counsel's findings, the DNC's maintenance of its claims against the Campaign violates Rule 11. The DNC responded on June 2, refusing to withdraw its claims against the Campaign or even to amend any of its now disproven allegations. Ex. C.

## LEGAL STANDARD

Rule 11 provides that, when filing any "pleading, written motion, or other paper," or "later advocating" positions contained in such submissions, a party's counsel "certifies," among other things, that "to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances," the "factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery." Fed. R. Civ. P. 11(b)(3). When this certification is violated, Rule 11(c)(1) authorizes the Court to "impose an appropriate sanction on any attorney, law firm, or party that violated the rule or is responsible for the violation." The standard for assessing a party's compliance with Rule 11 is "objective unreasonableness." *Storey v. Cello Holdings, L.L.C.*, 347 F.3d 370, 387 (2d Cir. 2003) (citation omitted). Under this standard, sanctions are warranted where a party makes factual contentions that are "utterly lacking in support." *Id.* at 388 (citation omitted).

For obvious reasons, the duty imposed by Rule 11 does not cease once a party files a particular pleading or motion. Rather, the duty is a continuing one: "a litigant's obligations with respect to the contents of these papers are not measured solely as of the time they are filed with or submitted to the court, but include reaffirming to the court and advocating positions contained in those pleadings

and motions after learning that they cease to have any merit." *O'Brien v. Alexander*, 101 F.3d 1479, 1489 (2d Cir. 1996) (quoting Fed. R. Civ. P. 11 advisory committee's note to 1993 amendment). The Rule thus "impose[s] a continuing obligation to correct or withdraw previously filed briefs or pleadings." *Galin v. Hamada*, 753 F. App'x 3, 8 (2d Cir. 2018).

In light of this continuing duty, courts have routinely recognized that once a party learns that its "allegations on the central (and dispositive) issue in the case were 'utterly lacking in support,'" it is obligated to "withdraw the Complaint" containing those allegations. *Galin v. Hamada*, 283 F.Supp.3d 189, 203 (S.D.N.Y. 2017) (quoting *StreetEasy, Inc. v. Chertok*, 752 F.3d 298, 307 (2d Cir. 2014)), *aff'd*, 753 F. App'x 3 (2d Cir. 2018); *see also, e.g., Calloway v. Marvel Entm't Grp., a Div. of Cadence Indus. Corp.*, 854 F.2d 1452, 1472 (2d Cir. 1988) (sanctions are appropriate where an attorney or party "decline[s] to withdraw [a claim] upon an express request by his or her adversary after learning that it was groundless"), *rev'd in part on other grounds sub nom. Pavelic & LeFlore v. Marvel Entm't Grp.*, 493 U.S. 120 (1989); *Catcove Corp. v. Patrick Heaney*, 685 F.Supp.2d 328, 335 (E.D.N.Y. 2010) ("[A]ttorneys 'have a continuing obligation to monitor the strength of their clients' claims and discontinue representing clients who pursue claims that—although not obviously frivolous at the outset—are entirely unsupported or refuted by the evidence.'" (citation omitted)); *Gambello v. Time Warner Comm'ns, Inc.*, 186 F.Supp.2d 209, 229 (E.D.N.Y. 2002) (holding that sanctions were warranted when the plaintiff "refused to withdraw the claim" and "made arguments … [that] are completely contradicted by his sworn deposition testimony").

Nor can a party sidestep its Rule 11 obligations by simply making allegations "on information and belief," in hopes that evidence substantiating those allegations will eventually turn up. Although Rule 11(b)(3) authorizes parties to make allegations that "will likely have evidentiary support after a reasonable opportunity for further investigation or discovery," "this allowance cannot be understood to give parties free reign to fire shots into the proverbial dark." *Bletas v. Deluca*, No. 11-cv-1777, 2011

WL 13130879, at *10 (S.D.N.Y. Nov. 15, 2011). " [A] reasonable inquiry must still support the likelihood of the inference drawn." *Id.* As the Advisory Committee's Notes to Rule 11 explain, "[t]olerance of factual contentions … made on information and belief does not relieve litigants from the obligation to conduct an appropriate investigation into the facts that is reasonable under the circumstances." Fed. R. Civ. P. 11 advisory committee's note to 1993 amendment. "[I]f evidentiary support is not obtained after a reasonable opportunity for further investigation or discovery, the party has a duty under the rule *not* to persist with that contention." *Id.* (emphasis added).

## ARGUMENT

### I.   The DNC Is Violating Rule 11 By Maintaining Its Claims Against the Campaign.

The DNC's maintenance of its claims against the Campaign is irreconcilable with its continuing obligations under Rule 11. All of those claims depend upon the notion that the Campaign was a "willing and active partner in Russia's efforts" to interfere in the 2016 election (SAC ¶ 2) and "participated in a common scheme" with Russia "to hack into the DNC's computer system, steal its trade secrets and other private documents, and then strategically disseminate those materials to the public to improve Trump's chances of winning the election" (MTD Opp. at 1–2). But the Special Counsel's exhaustive findings affirmatively disprove the key factual contentions underlying these claims, and in so doing refute the notion that the Campaign conspired or otherwise coordinated with Russia. In other words, the Special Counsel's investigation established that the DNC is unable to prove any of its causes of action against the Campaign. The DNC's claims against the Campaign are thus not merely "utterly lacking in support" (*Storey*, 347 F.3d at 388)—it is now clear that those claims are contrary to fact and that there is no scenario in which they could ever *find* support.

The decisions in the *Galin v. Hamada* litigation are instructive. There, the plaintiff's action to recover proceeds from the sale of a painting required him to overcome the defendant's affirmative defense by showing that an intermediate purchaser was *not* a "buyer in ordinary course of business."

283 F.Supp.3d at 195 (citation omitted). Even though the plaintiff's initial filing of his complaint was not sanctionable because "it could not be said—in the first instance—that application of the [affirmative defense] was 'patently clear,'" that conclusion did "not end the inquiry," in light of the plaintiff's continuing obligation under Rule 11. *Id.* at 202. The Court went on to explain that "discovery yielded no admissible evidence whatsoever to support [the plaintiff's] assertion that there were red flags surrounding the transfer of the painting" to the intermediate purchaser, and "[i]n fact … yielded quite the opposite: myriad evidence *supporting*" the defendants' position that the intermediate purchaser *was* a good-faith buyer in the ordinary course of business. *Id.* This is where the problem arose: Even after "the absence of factual support for [the plaintiff's] position" became clear, he "and his counsel continued to represent to the Court," including "in his opposition to [the defendant's] motion for summary judgment, that a legal and factual basis existed to support his Complaint." *Id.* at 203.

The Court held that, by continuing to press his claim even after the factual basis for that claim had been definitively refuted, the plaintiff had violated Rule 11. "[O]nce discovery closed, [the plaintiff] and his counsel had an obligation under Rule 11 to withdraw the Complaint because they knew—by that point if not earlier—that their allegations on the central (and dispositive issue) in the case were 'utterly lacking in support.'" *Id.* "Their decision not to do so—despite [the defendant's] explicit requests—took their actions outside the ambit of 'zealous advocacy' and into the realm of Rule 11 sanctions." *Id.* (collecting cases). Accordingly, in addition to entering summary judgment for the defendant, the Court sanctioned the plaintiff and his counsel by requiring them, "jointly and severally, to reimburse [the defendant] for his reasonable attorney's fees and other expenses associated with briefing the motion for summary judgment and the Rule 11 motion." *Id.* at 204. And the Second Circuit affirmed, holding that "[t]he district court correctly concluded that the complaint's assertion that [the intermediate purchaser] was not a good faith purchaser was not borne out by dis-

covery and appellants' opposition to summary judgment violated Rule 11 by reaffirming the allegations in the complaint while making additional baseless legal and factual representations." 753 F. App'x at 8.

The DNC's conduct here is materially indistinguishable from the sanctionable conduct in *Galin*. Just as in *Galin*, an investigation into the key allegations at the heart of the DNC's claims—that the Campaign conspired with Russian agents to influence the 2016 election—has revealed those allegations to be "utterly lacking in support." *Galin*, 283 F.Supp.3d at 203 (citation omitted). Just as discovery in *Galin* yielded "myriad evidence" undercutting the plaintiff's position (*id.*), the Special Counsel's Report marshals an overwhelming body of evidence that definitively refutes the DNC's insistence that the Campaign formed any sort of agreement to participate in Russia's election-interference activities. And just as the plaintiff in *Galin* continued to assert his by-then disproven claims in opposing the defendant's motion for summary judgment, the DNC has doubled down on its thoroughly discredited conspiracy theory in opposing the dismissal of its claims against the Campaign.

In fact, the basis for imposing sanctions is, if anything, stronger here than in *Galin*. In that case, the discovery period spanned just under five months, and was "limited" strictly "to the circumstances surrounding the transfer [of the painting] to" the intermediate purchaser. 283 F.Supp.3d at 193 (alteration in original). Here, by contrast, the Special Counsel's fact-findings are the result of a nearly two-year investigation that went far beyond anything that would be available to the DNC through discovery. Any discovery the DNC could ever hope to take would involve only a subset of the massive evidentiary record available to the Special Counsel's Office, and some small fraction of the nearly 500 individuals from whom the Office obtained sworn testimony under penalty of perjury or subject to potential prosecution under the federal false-statements statute. Mueller Report, Vol. I at 191–92. The DNC would need to show not merely that the same evidence available to the Special Counsel establishes what the Special Counsel found that the evidence "did *not* establish" (*id.* at 1–2

(emphasis added)), but that this same evidence affirmatively *disproves* the Special Counsel's key factual findings grounded in that massive evidentiary record. And the DNC would be doing all of this under the constraints of civil-discovery rules far stricter than any limit on the Special Counsel's sweeping investigation, which was backed by the vast financial and manpower resources of the Department of Justice and the FBI. This is thus not a case where the DNC has simply tried but failed to substantiate claims that it had some good-faith basis for asserting in the first place. Rather, the Special Counsel has confirmed the impossibility of the DNC *ever* being able to substantiate its claims against the Campaign, no matter what discovery it could conceivably obtain.

Simply put, the Special Counsel's Report completely discredits the DNC's efforts to infer an agreement between the Campaign and Russia based upon the March 2016 Papadopoulos–Mifsud interactions and the June 2016 Trump Tower meeting. As a result, the DNC cannot even allege when the supposed conspiracy came into existence. *See, e.g., Mayor & City Council of Baltimore, Md. v. Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013) (plaintiff must "allege enough facts to support the inference that a conspiracy actually existed"); *see also Boyle v. United States*, 556 U.S. 938, 944, 946 (2009) (RICO requires plausible allegations that "a group of persons associated together" with "longevity sufficient … to pursue the enterprise's purpose"). And the DNC has no other basis for plausibly alleging that the Campaign entered into this conspiracy, particularly given the Special Counsel's conclusion that the voluminous body of evidence he amassed "did not establish" any such conspiracy or coordination. Mueller Report, Vol. I at 1–2. The Special Counsel's Report has gutted the DNC's claims against the Campaign, putting the DNC in violation of Rule 11 every day it refuses to acknowledge that reality and drop those claims.

## II.  Sanctions Are Necessary to Remedy the DNC's Violation of Rule 11 and Deter Future Violations.

Once a court finds that Rule 11 has been violated, it is authorized to impose sanctions "suffic[ient] to deter repetition of the conduct or comparable conduct by others similarly situated." Fed.

R. Civ. P. 11(c)(4). Such sanctions "may include nonmonetary directives," including dismissal of the complaint outright. *Id.*; *see also Safe-Strap Co. v. Koala Corp.*, 270 F.Supp.2d 407, 418 n.8 (S.D.N.Y. 2003) (explaining that Rule 11 permits a sanction of dismissal "for serious misconduct when lesser sanctions would be ineffective or are unavailable" (citation omitted)); *Murray v. Dominick Corp. of Can., Ltd.*, 117 F.R.D. 512, 516 (S.D.N.Y. 1987) (holding that "Rule 11 provides … grounds for the sanction of dismissal of the complaint").

The Court is likewise authorized to enter "an order directing payment to the movant of part or all of the reasonable attorneys' fees and other expenses directly resulting from the violation." Fed. R. Civ. P. 11(c)(4). Such an order can encompass the fees and costs a party incurs for filing the Rule 11 motion, as well as the fees and costs of litigation that "the parties would have avoided …, preserving their own resources (not to mention the Court's)" had the plaintiff "withdrawn his claims … when it was 'patently clear' that there was no evidence to support them and [when] he knew [the defendant] intended to seek Rule 11 sanctions." *Galin*, 283 F.Supp.3d at 204.

Both non-monetary and monetary sanctions are necessary and appropriate here. First, the Court should dismiss all of the DNC's claims against the Campaign with prejudice, as this is the only way to end the DNC's violation of its Rule 11 obligations. Second, the Court should require the DNC to reimburse the attorneys' fees and costs the Campaign has incurred in connection with this Motion, as well as all other fees and costs that the Campaign is forced to incur going forward to defend itself against the DNC's untenable claims. *Cf. id.*

## CONCLUSION

For all of these reasons, the Campaign asks the Court to impose Rule 11 sanctions on the DNC.

Dated:    June 4, 2019                                     Respectfully submitted,

                                                          /s/ Michael A. Carvin

James M. Gross                                            Michael A. Carvin (*pro hac vice*)
JONES DAY                                                   *Counsel of Record*
250 Vesey Street                                         William D. Coglianese (*pro hac vice*)
New York, NY 10281                                       JONES DAY
(212) 326-3939                                           51 Louisiana Avenue, NW
jgross@jonesday.com                                      Washington, DC 20001
                                                         (202) 879-3939
                                                         macarvin@jonesday.com
                                                         wcoglianese@jonesday.com

*Counsel for Donald J. Trump for President, Inc.*

## CERTIFICATE OF COMPLIANCE

I, Michael A. Carvin, certify that this brief complies with Rule 2(D) of the Individual Practices of Judge John G. Koeltl because it contains 5,511 words and complies with this Court's formatting rules.

Dated:    June 4, 2019                                    /s/ Michael A. Carvin
                                                         _____
                                                         Michael A. Carvin

                                                         *Counsel for Donald J. Trump for President, Inc.*

**CERTIFICATE OF SERVICE**

I, Michael A. Carvin, certify that on June 4, 2019, I caused the foregoing document to be electronically filed with the Clerk of Court using the CM/ECF system, which will send a notice of electronic filing to all registered parties.

Dated:    June 4, 2019                          /s/ Michael A. Carvin
                                                _____
                                                Michael A. Carvin

                                                *Counsel for Donald J. Trump for President, Inc.*

# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

DEMOCRATIC NATIONAL
COMMITTEE,

*Plaintiff,*

v.

THE RUSSIAN FEDERATION, et al.,

*Defendants.*

Case No. 1:18-cv-3501-JGK-SDA

Oral Argument Requested

**DEFENDANT DONALD J. TRUMP FOR PRESIDENT, INC.'S
NOTICE OF MOTION FOR RULE 11 SANCTIONS**

PLEASE TAKE NOTICE that upon the accompanying Memorandum of Law in Support of Defendant Donald J. Trump for President, Inc.'s ("the Campaign's") Motion for Rule 11 sanctions; the Exhibits annexed thereto; and all prior pleadings, submissions and proceedings herein, the Campaign moves the United States District Court for the Southern District of New York (located in the Daniel Patrick Moynihan United States Courthouse, 500 Pearl Street, New York, New York) for an order imposing sanctions on Plaintiff, the Democratic National Committee ("the DNC"), under Federal Rule of Civil Procedure 11(c).

This Motion is based on the DNC's violation of its certification that all of its "factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery." Fed. R. Civ. P. 11(b)(3). The DNC's claims against the Campaign are predicated on the notion that the Campaign "participated in a criminal conspiracy to steal the DNC's information and use it to support Russia's preferred presidential candidate." DNC's MTD Opp. at 3 (ECF 241). But that notion has been definitively refuted by Special Counsel Robert Mueller's Report On The Investigation Into Russian

Interference In The 2016 Presidential Election, released publicly by the Attorney General on April 18, 2019 (attached as Ex. A). In that Report, the Special Counsel—who was appointed specifically to investigate whether the Campaign conspired or coordinated with Russia in that country's efforts to steal and disseminate DNC materials—explained that his Office's nearly two-year "investigation did not establish that members of the Trump Campaign conspired or coordinated with the Russian government in its election interference activities." Mueller Report, Vol. I at 1–2.

More specifically, the Special Counsel's Report refutes many of the factual contentions that the DNC set forth in its Second Amended Complaint and reasserted in its Omnibus Opposition to Defendants' Motions to Dismiss, including the key allegations upon which the DNC predicates its claims that the Campaign conspired or otherwise coordinated with Russia in the effort to steal and publish DNC materials. Indeed, the Report disproves the two basic pillars of this theory:

- *First*, the DNC claims that after Joseph Mifsud told George Papadopoulos "that the Russians had 'thousands of emails' that could harm Hillary Clinton's presidential campaign" (SAC ¶ 94(d)), Papadopoulos "deliver[ed]" this information to others at the Campaign and "coordinat[ed] with Russian operatives" in their hacking efforts (DNC's MTD Opp. at 12–20, 41). But the Special Counsel reported that Papadopoulos "could not clearly recall having told anyone on the Campaign" about Mifsud's reference to emails, and that "the Campaign officials who interacted with him … could not recall Papadopoulos sharing the information that Russia had obtained 'dirt' on candidate Clinton in the form of emails or that Russia could assist the Campaign through the anonymous release of information about Clinton." Mueller Report, Vol. I at 93. Nor were the DNC's allegations substantiated by any other evidence: "No documentary evidence, and nothing in the email accounts or other communications facilities reviewed by the Office, shows that Papadopoulos shared this information with the Campaign." *Id.* at 94. And the Special Counsel did not find that, through Papadopoulos, the Campaign conspired or coordinated with Russia.

- *Second*, the DNC claims that, in a June 9 meeting between several Campaign officials and certain individuals with ties to the Russian government, the Campaign "[a]ccept[ed] [t]he [o]ffer" of assistance from Russia. SAC at 34, § H; *see also id.* ¶¶ 132–48. And the DNC draws from the meeting the "infer[ences] that: (a) Russia used the meeting to tell members of the Trump Campaign about the documents it had stolen from the DNC, including trade secrets; and (b) members of the Campaign blessed a plan in which Russia would continue stealing similar documents and disseminate the documents it already had to the public." MTD Opp. at 37; *see also id.* at 19, 21. But the Special Counsel explained that "[t]he meeting lasted approximately 20 minutes" and involved just two topics: (1) alleged "funds derived from illegal activities in Russia [that] were provided to Hillary Clinton and other Democrats," and (2) "a critique of the origins of … a 2012 [U.S.] statute that imposed financial and travel sanctions on

Russian officials and that resulted in a retaliatory ban on adoptions of Russian children." *Id.* at 110, 117. The Special Counsel did not find that the meeting had *anything* to do with documents stolen from the DNC, let alone that the Campaign "blessed" or otherwise became involved with a plan for Russia to continue stealing and disseminating such documents.

In these ways, the Special Counsel's Report refutes the key allegations underlying the DNC's claims. And the foregoing are only examples; the Report renders many other allegations in the Second Amended Complaint untenable.

Rule 11 requires the DNC to amend or withdraw each and every factual allegation that is inconsistent with the facts set forth in the Special Counsel's Report. After accounting for the Special Counsel's findings, there is no possible basis upon which the DNC could continue to assert any of its claims against the Campaign. This is particularly true because, even before the Special Counsel's Report, the DNC's conspiracy and RICO theories were based not on any direct evidence, but on speculative and implausible inferences.

For these reasons, and as further explained in the accompanying Memorandum of Law, the Campaign seeks as sanctions: (1) an order dismissing all of the DNC's claims against the Campaign with prejudice; (2) reimbursement of the Campaign's attorney's fees and costs in connection with this motion, and all other fees and costs that the Campaign incurs in defending itself against the DNC's claims going forward; and (3) any additional sanctions that the Court deems just and proper.

Dated:   May 13, 2019

Respectfully submitted,

/s/ *Michael A. Carvin*
_____

James M. Gross
JONES DAY
250 Vesey Street
New York, NY 10281
(212) 326-3939
jgross@jonesday.com

Michael A. Carvin (*pro hac vice*)
   *Counsel of Record*
William D. Coglianese (*pro hac vice*)
JONES DAY
51 Louisiana Avenue, NW
Washington, DC 20001
(202) 879-3939
macarvin@jonesday.com
wcoglianese@jonesday.com

*Counsel for Donald J. Trump for President, Inc.*

## CERTIFICATE OF SERVICE

I, Michael A. Carvin, certify that on May 13, 2019, I caused the foregoing document to be served by hand on counsel for the Democratic National Committee.

Dated: May 13, 2019             /s/  *Michal A. Carvin*
                                         Michael A. Carvin

                                         *Counsel for Defendant Donald J. Trump for President, Inc.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

DEMOCRATIC NATIONAL
COMMITTEE,

*Plaintiff,*

v.

THE RUSSIAN FEDERATION, et al.,

*Defendants.*

Case No. 1:18-cv-3501-JGK-SDA

## AFFIDAVIT OF SERVICE OF
## DEFENDANT DONALD J. TRUMP FOR PRESIDENT, INC.'S
## NOTICE OF MOTION FOR RULE 11 SANCTIONS

I, Morgan Johnson, am employed by Jones Day. I am over the age of eighteen years and am not

a party to the above-captioned action. I certify that on May 13, 2019, I served a copy of Defendant

Donald J. Trump for President Inc.'s Notice of Motion for Rule 11 Sanctions on Joseph M. Sellers,

counsel to Plaintiff the Democratic National Committee, by handing a copy to Mr. Sellers at the

office of Cohen Milstein Sellers & Toll PLLC, located at 1100 New York Avenue N.W., Fifth Floor,

Washington, DC 20005.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 13th day

of May, 2019, in Washington, D.C.

Morgan Johnson

# EXHIBIT B

# JONES DAY

51 LOUISIANA AVENUE, N.W.  •  WASHINGTON, D.C.  20001.2113

TELEPHONE: +1.202.879.3939  •  FACSIMILE: +1.202.626.1700

Direct Number:  (202) 879-7643
MACARVIN@JONESDAY.COM

May 13, 2019

**DELIVERED BY HAND**

Joseph M. Sellers
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Ave. NW, Fifth Floor
Washington, DC 20005
202.408.4600
jsellers@cohenmistein.com

Re: *Democratic National Committee v. The Russian Federation* (S.D.N.Y. No. 1:18-cv-3501)

Dear Mr. Sellers:

On behalf of Defendant Donald J. Trump for President, Inc. ("the Campaign"), and in accordance with Federal Rule of Civil Procedure 11(c)(2), I write to serve the Democratic National Committee with the Campaign's Motion for Rule 11 Sanctions. The Campaign will file the motion if the DNC does not dismiss all of its claims against the Campaign within twenty-one days. The basis for this motion is simple: The DNC's theory of liability has been definitively refuted by Special Counsel Robert Mueller's Report On The Investigation Into Russian Interference In The 2016 Presidential Election, publicly released by the Attorney General on April 18.

## I.  The Special Counsel's Findings Refute the DNC's Core Allegations Against the Campaign.

The DNC's claims against the Campaign are all predicated on the notion that the Campaign "participated in a criminal conspiracy" to steal the DNC's information and use it to support Russia's preferred presidential candidate." MTD Opp. at 3 (ECF 241). That is the very same theory the Special Counsel was appointed to investigate two years ago. Mueller Report, Vol. I at 11 (citing Office of the Deputy Att'y Gen., Order No. 3915-2017, *Appointment of Special Counsel to Investigate Russian Interference with the 2016 Presidential Election and Related Matters* (May 17, 2017)). Specifically, the Special Counsel assessed whether the Campaign participated in any "conspiracy as defined in federal law" and whether there was any "agreement—tacit or express—between the Trump Campaign and the Russian government on election interference." *Id.* at 2. In conducting this investigation, the Special Counsel deployed resources far beyond what would ever be available—let alone feasible—in civil discovery. His Office included 19 attorneys, various support staff, and "approximately 40 FBI agents, intelligence analysts, forensic accounts, a paralegal, and professional staff assigned by the FBI." *Id.* at 13. Among other things, the Office interviewed approximately 500 witnesses, issued over 2,800 subpoenas, and executed nearly 500 search-and-seizure warrants. *Id.*

After carrying out this historically expansive inquiry, the Special Counsel reached an unsurprising conclusion: "the investigation did not establish that members of the Trump Campaign conspired or coordinated with the Russian government in its election interference activities." Mueller Report, Vol. I at 1–2. In other words, the Special Counsel's Office, wielding investigative powers far greater than the DNC could ever hope to exercise here, failed to establish the core theory underlying every claim the DNC has asserted against the Campaign.

AMSTERDAM • ATLANTA • BEIJING • BOSTON • BRISBANE • BRUSSELS • CHICAGO • CLEVELAND • COLUMBUS • DALLAS • DETROIT
DUBAI • DÜSSELDORF • FRANKFURT • HONG KONG • HOUSTON • IRVINE • LONDON • LOS ANGELES • MADRID • MELBOURNE
MEXICO CITY • MIAMI • MILAN • MINNEAPOLIS • MOSCOW • MUNICH • NEW YORK • PARIS • PERTH • PITTSBURGH • SAN DIEGO
SAN FRANCISCO • SÃO PAULO • SAUDI ARABIA • SHANGHAI • SILICON VALLEY • SINGAPORE • SYDNEY • TAIPEI • TOKYO • WASHINGTON

Joseph M. Sellers
May 13, 2019
Page 2

In reaching this conclusion, the Special Counsel considered all of the key events that are the subject of the DNC's allegations. At each turn, the Special Counsel affirmatively *refuted* the DNC's inferences that the Campaign conspired or coordinated in Russia's hacking-and-dumping conspiracy. In fact, the Special Counsel expressly disproved the key pillars of the DNC's conspiracy theory against the Campaign, which center on George Papadopoulos's interactions with Joseph Mifsud and the June 9, 2016, meeting at Trump Tower.

The DNC claims that the Campaign joined forces with Russia "by March 2016, or, at the very least, by June 2016." Second Am. Compl. ¶ 272 ("SAC") (ECF 216). The DNC's allegations as to March 2016 center on interactions between Papadopoulos and Mifsud. Specifically, the DNC alleges that those two met on several occasions in March and April 2016, and that, on April 26, "Mifsud told Papadopoulos that the Russians had 'thousands of emails' that could harm Hillary Clinton's presidential campaign." *Id.* ¶ 94(d). From this, the DNC draws the inference that "Russia was reporting on the progress of its cybercrimes to Papadopoulos, apprising him of stolen materials that could be helpful to the Trump Campaign, and giving him an opportunity to tell them whether the Campaign wanted more." MTD Opp. at 36; *see also id.* at 19–20 (insisting that Papadopoulos "deliver[ed] information" about "stolen Democratic emails" "to his superiors at the Trump Campaign"), *id.* at 27 ("Papadopoulos … met repeatedly with Mifsud to obtain damaging information regarding Clinton ...."), *id.* at 41 ("Papadopoulos was responsible for coordinating with Russian operatives before and during the April 2016 hacks on the DNC's computer systems.").

The Mueller Report debunks the inference that, through Papadopoulos's interactions with Mifsud, the Campaign conspired or coordinated with Russia. There is no finding or evidence that Papadopoulos told the Campaign about any "stolen materials." Indeed, there is no finding or evidence that he even mentioned *any* emails or "dirt" to the Campaign, much less brokered an agreement with the Russians. The Special Counsel reported that Papadopoulos "could not clearly recall having told anyone on the Campaign" about Mifsud's reference to emails, and that "the Campaign officials who interacted or corresponded with him … could not recall Papadopoulos sharing the information that Russia had obtained 'dirt' on candidate Clinton in the form of emails or that Russia could assist the Campaign through the anonymous release of information about Clinton." Mueller Report, Vol. I at 93. Nor was the DNC's inference substantiated by any other evidence: "No documentary evidence, and nothing in the email accounts or other communications facilities reviewed by the Office, shows that Papadopoulos shared this information with the Campaign." *Id.* at 94. The Special Counsel also explained that, although Papadopoulos had discussed "with Mifsud and two Russian nationals" the possibility of arranging a meeting between the Campaign and the Russian government, "[t]hat meeting never came to pass." *Id.* at 81. Papadopoulos's interactions with Mifsud and other Russians simply cannot support any claim that the Campaign conspired or otherwise coordinated with Russia's hacking efforts.

The other pillar of the DNC's theory is the June 9 meeting between several Campaign officials and certain individuals with ties to the Russian government. In the DNC's telling, at this meeting "Russians [a]gain [o]ffer[ed] [t]o [a]ssist Trump—[a]nd Trump Associates [a]ccept[ed] [t]he [o]ffer." SAC at 34, § H; *see also id.* ¶¶ 132–48. And the DNC draws from the meeting the "infer[ences] that: (a) Russia used the meeting to tell members of the Trump Campaign about the documents it had stolen from the DNC, including trade secrets; and (b) members of the Campaign blessed a plan in which Russia would continue stealing similar documents and disseminate the documents it already

JONES DAY

Joseph M. Sellers
May 13, 2019
Page 3

had to the public." MTD Opp. at 37; *see also id.* at 19 (claiming that the meeting participants "likely discussed data stolen from the DNC, and how that data could be of use to the Campaign"), *id.* at 21 ("[T]he Trump Campaign repeatedly communicated with Russian agents (including the Russian agents at the Trump Tower meeting …) to obtain information about stolen DNC documents.").

Once again, the Special Counsel's investigation yielded facts that completely contradict the DNC's theory, and that put to rest the notion that the June 9 meeting had anything to do with the Campaign becoming involved in an effort to steal and disseminate the DNC's materials. As the Mueller Report explains, "[t]he meeting lasted approximately 20 minutes." Mueller Report, Vol. I at 117. During that time, the individuals associated with the Campaign did not raise any topics for discussion, and the Russian-connected individuals raised just two topics: (1) alleged "funds derived from illegal activities in Russia [that] were provided to Hillary Clinton and other Democrats," and (2) "a critique of the origins of … a 2012 [U.S.] statute that imposed financial and travel sanctions on Russian officials and that resulted in a retaliatory ban on adoptions of Russian children." *Id.* at 110. The meeting ended shortly thereafter, and was regarded by both American and Russian participants as a "waste of time." *Id.* at 118, 120. The Special Counsel did not find that the meeting had *anything* to do with documents stolen from the DNC, let alone that the Campaign "blessed" or otherwise became involved with a plan for Russia to continue stealing and disseminating such documents. The DNC's inferences to the contrary have thus been exposed as imaginary.

These are hardly the only ways in which the Mueller Report undercuts the DNC's allegations. Although the DNC claims that the Campaign "water[ed] down" a provision of the Republican Party platform to appease Russia (SAC ¶ 153), the Special Counsel's "investigation did not establish that [the amendment efforts] were undertaken at the behest of candidate Trump or Russia" (Mueller Report, Vol I at 10). In fact, several Campaign officials believed the amendment—pressed for by one Campaign employee—did not even accurately reflect the Campaign's stance. *Id.* at 127. Likewise, although the DNC baldly asserts that Paul Manafort shared polling data with a Russian to "help[] Russia gauge the effects of publishing DNC documents" (MTD Opp. at 8, 38), the Special Counsel "did not identify evidence of a connection between Manafort's sharing polling data and Russia's interference in the election," and "did not establish that Manafort otherwise coordinated with the Russian government on its election-interference efforts" (Mueller Report, Vol. I at 131). And although the DNC speculates that various individuals made misstatements after the election in an effort to "conceal[] their collusion" (MTD Opp. at 9), the Special Counsel drew no such connection—and his Report makes clear that there could be no such connection, because there can be no concealment of something that did not occur in the first place.

In short, the Special Counsel's Report confirms that the DNC will never be able to substantiate its theory that the Campaign joined a conspiracy to steal and disseminate the DNC's materials. And that debunked theory underlies *all* of the DNC's claims against the Campaign. The DNC's RICO claims are predicated on the notion that the Campaign joined an enterprise conducting "a cyber-espionage operation" against the DNC. SAC ¶ 306; *see also id.* at ¶¶ 272, 282–83, 289–90. The DNC's Wiretap Act claim depends on the Campaign having knowingly used stolen communications. *Id.* at ¶ 312. The DNC's D.C. Uniform Trade Secrets Act claim requires it to establish that the Campaign misappropriated DNC trade secrets. *Id.* at ¶ 339. The DNC's claim for conspiracy to commit trespass to chattels requires the Campaign to have actually joined a conspiracy to steal DNC

JONES DAY

Joseph M. Sellers
May 13, 2019
Page 4

materials. *Id.* at ¶ 356. And the DNC's Virginia Computer Crimes Act claim depends on the notion that the Campaign aided and abetted Russia's theft of DNC materials. *Id.* at ¶ 371.

The Mueller Report, however, establishes that the DNC cannot make any of these showings. Any discovery the DNC could ever hope to take would involve only a subset of the massive evidentiary record available to the Special Counsel's Office, and some small fraction of the nearly 500 individuals from whom the Office obtained sworn testimony under penalty of perjury or subject to potential prosecution under the federal false-statements statute. Mueller Report, Vol. I at 191–92. The DNC would need to not merely show that the same evidence available to the Special Counsel establishes what the Special Counsel did not establish, but affirmatively *disprove* many of the Office's key factual findings grounded in that massive evidentiary record. And the DNC would be doing all of this under the constraints of civil discovery rules far stricter than any limit on the Special Counsel's sweeping investigation, which was backed by the vast financial and manpower resources of the Department of Justice and the FBI.

To spell this out is to confirm the impossibility of the DNC ever being able to substantiate its claims against the Campaign. The DNC's case has always been founded on little more than conclusory inferences. Those inferences have now been definitively refuted by the Special Counsel's painstaking factual findings.

To further proceed with its claims, the DNC would need some good-faith basis to believe that the Special Counsel simply got it wrong. It obviously has no such basis. Indeed, DNC Chair Tom Perez emphasized, soon after filing this lawsuit, that he "ha[s] great respect for Director Mueller," and that the DNC filed this suit in part because "I don't know when Director Mueller's investigation is going to end" relative to the applicable statute of limitations, "so we need to file now to protect our rights." *DNC Chair Tom Perez On Trump/Russia Lawsuit: "We Have To Deter This Conduct,"* Real Clear Politics (Apr. 22, 2018), http://bit.ly/2JdOhvV. The DNC cannot reject the Special Counsel's core conclusions simply because those conclusions refute rather than substantiate the DNC's preferred theory.

## II. The DNC Is Violating Rule 11 By Maintaining Its Claims Against the Campaign.

In light of the foregoing, the DNC cannot—consistent with Rule 11—maintain any of its claims against the Campaign. As Mr. Perez noted when addressing the possibility that this litigation would be used to air "wild theories," "[t]he beauty of the civil justice system" is that "there's this thing called Rule 11 where you get sanctioned for trying to do things like that." *Id.*

That is of course correct. Rule 11(b)(3) mandates that when presenting any "pleading, written motion, or other paper" to the court, or "later advocating" for positions contained in those submissions, a party's counsel "certifies," among other things, that "to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances," the "factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery." Fed. R. Civ. P. 11(b)(3). This duty is a continuing one: "a litigant's obligations with respect to the contents of … papers are not measured solely as of the time they are filed with or submitted to the court, but include reaffirming to the court and advocating positions contained in those pleadings and motions after learning that they cease to have any merit." *Galin v. Hamada*, 753 F. App'x 3, 8 (2d Cir. 2018) (quoting Fed. R. Civ. P. 11 Adv. Comm. Note (1993)).

JONES DAY

Joseph M. Sellers
May 13, 2019
Page 5

Accordingly, once a party learns that its "allegations on the central (and dispositive) issue in the case were 'utterly lacking in support,'" it is obligated to "withdraw the Complaint" containing those allegations. *Galin v. Hamada*, 283 F. Supp. 3d 189, 203–04 (S.D.N.Y. 2017) (quoting *StreetEasy, Inc. v. Chertok*, 752 F.3d 298, 307 (2d Cir. 2014)), *aff'd*, 753 F. App'x 3 (2d Cir. 2018). A party's refusal to do so takes its "actions outside the ambit of 'zealous advocacy' and into the realm of Rule 11 sanctions." *Id.*; *see also Calloway v. Marvel Entm't Grp., a Div. of Cadence Indus. Corp.*, 854 F.2d 1452, 1472 (2d Cir. 1988) (sanctions are appropriate where an attorney or party "decline[s] to withdraw [a claim] upon an express request by his or her adversary after learning that it was groundless"), *rev'd in part on other grounds sub nom. Pavelic & LeFlore v. Marvel Entm't Grp.*, 493 U.S. 120 (1989); *Catcove Corp. v. Patrick Heaney*, 685 F. Supp. 2d 328, 335 (E.D.N.Y. 2010) ("'[A]ttorneys 'have a continuing obligation to monitor the strength of their clients' claims and discontinue representing clients who pursue claims that—although not obviously frivolous at the outset—are entirely unsupported or refuted by the evidence.'" (citation omitted)); *Gambello v. Time Warner Comm'ns, Inc.*, 186 F. Supp. 2d 209, 229 (E.D.N.Y. 2002) (sanctions warranted when plaintiff "refused to withdraw the claim" and "made arguments … [that] are completely contradicted by his sworn deposition testimony").

Nor can a party sidestep its Rule 11 obligations by simply making allegations "on information and belief." Although Rule 11(b)(3) authorizes parties to make allegations that "will likely have evidentiary support after a reasonable opportunity for further investigation or discovery," "this allowance cannot be understood to give parties free reign to fire shots into the proverbial dark." *Bletas v. Deluca*, 2011 WL 13130879, at *10 (S.D.N.Y. Nov. 15, 2011). " [A] reasonable inquiry must still support the likelihood of the inference drawn." *Id.* As the Advisory Committee notes to Rule 11 explain, "[t]olerance of factual contentions … made on information and belief does not relieve litigants from the obligation to conduct an appropriate investigation into the facts that is reasonable under the circumstances." Fed. R. Civ. P. 11 Adv. Comm. Note (1993). "[I]f evidentiary support is not obtained after a reasonable opportunity for further investigation or discovery, the party has a duty under the rule *not* to persist with that contention." *Id.* (emphasis added).

The DNC's conduct to date is irreconcilable with its continuing obligation under Rule 11. The DNC has not made any effort to withdraw or even amend its claims, notwithstanding that its key allegations have been disproven by the Mueller Report. To the contrary, mere hours after the Mueller Report was publicly released, the DNC filed its Opposition to Defendants' motions to dismiss, in which the DNC doubled down on its now demonstrably false insistence that "[t]he Trump Campaign, Trump's closest advisors, WikiLeaks, and Russia participated in a common scheme to hack into the DNC's computer system, steal its trade secrets and other private documents, and then strategically disseminate those materials to the public to improve  Trump's chances of winning the election." MTD Opp. at 1–2. In fact, the DNC expressly urged the Court to adopt inferences that it by then had every reason to know the Special Counsel had specifically refuted, including that the Campaign, through Papadopoulos, was providing input into Russia's hacking efforts (it was not), and that the Campaign "blessed" Russia's hacking operation at the June 9 meeting (it did not). MTD Opp. at 36–37; *see also, e.g., id.* at 19–20, 27, 41. And although the DNC's Second Amended Complaint had specifically omitted any allegation that the Campaign was involved in Russia's hacking efforts—and notwithstanding that the Mueller Report found no such involvement—the DNC's Opposition repeatedly suggests the Campaign's involvement in precisely those efforts, falsely labeling the Campaign an "information thie[f]" who "aid[ed], abet[ted], or conspire[d] with" Russia. *Id.* at 3, 101.

JONES DAY

Joseph M. Sellers
May 13, 2019
Page 6

Simply enough, the DNC is in violation of Rule 11 every day that it refuses to withdraw its claims against the Campaign. Rule 11 requires the DNC to amend or withdraw each and every factual allegation that is inconsistent with the facts set forth in the Special Counsel's Report. After doing so, there will be no possible basis upon which the DNC could continue to assert any of its claims against the Campaign. Accordingly, consistent with Rule 11(c)(2), if the DNC does not dismiss those claims within twenty-one days of receiving this letter, the Campaign will be left with no choice but to file the enclosed Motion for Rule 11 Sanctions, in which we will ask the Court to (1) dismiss all claims against the Campaign with prejudice; (2) order the DNC to pay the Campaign's attorneys' fees and costs associated with the motion itself, and all other fees and costs that the Campaign incurs going forward from the time of filing the Rule 11 motion; and (3) impose any additional sanctions that the court deems just and proper.

Please let me know as soon as possible—and no later than June 2—how the DNC will proceed.

Very truly yours,

Michael A. Carvin

Attachment

Cc: Counsel to Plaintiff Democratic National Committee (via email)

# EXHIBIT C

COHEN MILSTEIN

Joseph M. Sellers
(202) 408-4604
jsellers@cohenmilstein.com

June 2, 2019

*Via Email Only*

Michael A. Carvin, Esq.
Jones Day
51 Louisiana Avenue, N.W.
Washington D.C. 20001-2113

> Re:     *Democratic National Committee v. The Russian Federation*, *et al.*, No. 1:18-cv-3501 (S.D.N.Y.)

Dear Mr. Carvin:

Contrary to your May 13, 2019 letter, the Special Counsel's Report does not "refute" the DNC's claim that the Trump Campaign conspired with Russia. Rather, the Report methodically compiles evidence that the Trump Campaign participated in Russia's plan to interfere in the 2016 election. Over the course of more than 100 pages, the Report details the Campaign's repeated suspicious interactions with Russian agents, confirming and bolstering the central allegations of the DNC's Second Amended Complaint ("Complaint").

The Special Counsel specifically warned that his "statement that the investigation did not establish particular facts does not mean there was no evidence of those facts." Report at 2. Indeed, he reiterated in a televised press conference last week that a decision not to prosecute should not be confused with an exoneration. And yet, this is exactly what the Trump Campaign does in its letter: It wrongly equates the Special Counsel's finding that the evidence did not "establish" beyond a reasonable doubt that the Trump Campaign was involved in a conspiracy with the farfetched conclusion that the Campaign must be innocent of all charges. The Campaign's letter also ignores the different burdens of proof in civil and criminal actions and the fact-gathering tools that are available to civil plaintiffs like the DNC, but not to prosecutors like the Special Counsel.

In light of these obvious deficiencies, the Campaign's letter is wholly groundless. We urge the Campaign to refrain from proceeding with this ill-advised action, as the pursuit of a Rule 11

COHENMILSTEIN

June 2, 2019
Page 2

motion on the grounds set forth in the Campaign's letter would itself violate Rule 11 and could be sanctionable.

1.  *The Special Counsel's Report Provides Ample Evidence of Defendants' Liability*

Contrary to the Trump Campaign's insistence that the Special Counsel's Report "definitively refuted" the DNC's Complaint, Letter at 1, the Report confirms and reinforces the central allegations in the Complaint and presents additional evidence that the Trump Campaign agreed to a plan in which Russia would steal documents from Democratic targets—including the DNC—and use them to aid Trump. Among other findings, the Report stated that:

- In the run up to the 2016 Presidential election, there were "multiple links between Trump Campaign officials and individuals tied to the Russian government. Those links included Russian offers of assistance to the Campaign. In some instances, the Campaign was receptive [to] the offer[.]" Report at 173;[1] *cf.* Compl. ¶¶ 2, 10.

- In April 2016, Mifsud (a London-based academic with ties to the Russian government) told Papadopoulos (a foreign policy advisor to and agent of the Trump Campaign) that the Russian government "had obtained 'dirt' on candidate Hillary Clinton," in the form of "thousands of emails." Report at 86-89; *cf.* Compl. ¶¶ 13, 94. Ten days later, "Papadopoulos suggested to a representative of a foreign government that the Trump Campaign had received indications from the Russian government that it could assist the Campaign through the anonymous release of information damaging to Hillary Clinton." Report at 89; *cf.* Compl. ¶ 99.

- In April 2016, Manafort and Gates began sharing internal Campaign polling data and information on battleground states including "Michigan, Wisconsin, Pennsylvania, and Minnesota" with Konstantin Kilimnik, a man with known connections to Russian intelligence. Report at 140. This data sharing continued for several months. "Gates stated that, in accordance with Manafort's instruction[s], he periodically sent Kilimnik polling data via WhatsApp; Gates then deleted the communications on a daily basis." In addition to secretly sharing this data, Manafort and Kilimnik "discussed the status of the Trump Campaign and Manafort's strategy for winning Democratic votes in Midwestern states." *Id.* at 6, 136-37. *Compare generally* Report at 129-143 *with* Compl. ¶¶ 67, 91, 152, 231. Manafort later "lied to the [Special Counsel's] Office and the grand jury about . . . his meetings with Kilimnik[.]" Report at 130; *cf.* Compl. ¶ 231.

- In early June 2016, Rob Goldstone "passed along an offer purportedly from a Russian government official to provide 'official documents and information' to the Trump

---

[1] Citations to pages of the Report refer to Volume I of the Report.

COHENMILSTEIN

June 2, 2019
Page 3

Campaign for the purposes of influencing the presidential election. Trump Jr. appears to have accepted that offer and to have arranged a meeting to receive those materials." Report at 185; *cf.* Compl. ¶¶ 133-36. That meeting took place on June 9, 2016, when "senior representatives of the Trump Campaign met in Trump Tower with a Russian attorney expecting to receive derogatory information about Hillary Clinton from the Russian government. . . . Members of the Campaign discussed the meeting before it occurred, and Michael Cohen recalled that Trump Jr. may have told candidate Trump about an upcoming meeting to receive adverse information about Clinton, without linking the meeting to Russia." Report at 110; *cf.* Compl. ¶ 137. *Compare generally* Report at 110-20 *with* Compl. ¶¶ 132-138.

- At a press conference on July 27, 2016, Trump discussed the release of stolen DNC documents and data, and claimed that it was "ridiculous" that Russia was involved. Nevertheless, he "stated that it would give him 'no pause' if Russia had Clinton's emails. Trump added, 'Russia, if you're listening, I hope you're able to find the 30,000 emails that are missing.'" Report at 18, 49; *cf.* Compl. ¶ 158. Within "approximately five hours" of Trump's request for assistance, Russian intelligence officers launched a cyberattack against Secretary Clinton's personal office "for the first time," targeting the office's email accounts. Report at 49. While Russia was engaged in this hacking effort, Trump asked "individuals affiliated with his Campaign," including Michael Flynn, to find the emails. Flynn, in turn contacted Peter Smith, "an investment advisor who was active in Republican politics," to enlist him in the effort to find the emails. Report at 62. Within weeks of Trump's July 27 press conference, Smith "created a company, raised tens of thousands of dollars, and recruited security experts and business associates. Smith made claims to others involved in the effort (and those from whom he sought funding) that he was in contact with hackers with 'ties and affiliations to Russia' who had access to the emails, and that his efforts were coordinated with the Trump Campaign." Report at 63.

- On August 23, 2016, Sergei Millian, who told Papadopoulos that he had "insider knowledge and direct access to the top hierarchy in Russian politics," sent "a Facebook message to Papadopoulos promising that he would 'share with you a disruptive technology that might be instrumental in your political work for the campaign.'" Report at 94-95.

Given this extensive evidence that the Trump Campaign conspired with Russia to influence the results of the 2016 election, the Trump Campaign cannot in good faith claim that the Special Counsel's Report "definitively" proves its innocence.

COHEN**MILSTEIN**

June 2, 2019
Page 4

2.      *The Campaign's Letter Rests on a Logical Error*

      In arguing to the contrary, the Trump Campaign commits a logical error that the Report warned readers not to make. Specifically, the Campaign assumes that there were only two possible outcomes from the Special Counsel's investigation: (1) it would conclusively establish the Trump Campaign's guilt; or (2) it would conclusively establish the Trump Campaign's innocence. And because the investigation did not conclusively prove that the Trump Campaign conspired with Russia, the Campaign insists that investigation proved their innocence. By creating a false choice between these two extremes, the Trump Campaign leaves no room for the Report's actual findings: there was evidence of the Trump Campaign's guilt, but not enough to establish that guilt beyond a reasonable doubt. On page 2 of the Report, the Special Counsel warned readers not to make that mistake, explaining: "A statement that the investigation did not establish particular facts does *not* mean there was no evidence of those facts." Report at 2 (emphasis added). Nevertheless, the Trump Campaign's letter repeatedly and falsely suggests that, if the Special Counsel's investigation "did not establish" a particular fact, then the investigation refuted that fact.

3.      *The Campaign's Letter Overlooks the Differences Between Civil and Criminal Actions*

      The Campaign's May 13 letter also overlooks the crucial differences between civil and criminal cases. It is axiomatic that an "acquittal in [a] criminal action does not bar civil suit based on the same facts." 2A Charles Wright et al, *Federal Practice & Procedure* § 468 (4th ed. 2013); *see also Purdy v. Zeldes*, 337 F.3d 253, 259 (2d Cir. 2003). Similarly, the government's decision not to press criminal charges against a defendant has no effect on civil proceedings. Indeed, civil plaintiffs routinely prevail in cases where the government has declined to prosecute the defendants. *See, e.g.*, *In re: Urethanes Antitrust Litigation*, No. 04-1616 (D. Kan.) (after the government determined there was not enough evidence to prosecute the defendants, civil plaintiffs took the case to trial and secured a judgment of approximately $1.06 billion). This is not surprising in light of the different standards of proof in civil and criminal cases and the additional sources of evidence available to civil plaintiffs.

      First, a civil plaintiff's burden of proof is much lighter than the government's burden of proof in a criminal case. *See Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 491 (1985) (noting that a civil plaintiff only needs to show that it is more likely than not that the defendants violated the law, while criminal prosecutors must prove their case "beyond a reasonable doubt"). Thus, while the information available in the Special Counsel's Report may be insufficient to sustain a criminal conviction, a civil jury could find the same information more than sufficient to hold Defendants civilly liable.

      In view of the lower standard of proof in civil cases, a civil plaintiff can readily rely on evidence that a defendant obstructed justice. *See* 2 Kenneth S. Broun et al, *McCormick on Evidence* § 265 (7th ed. 2016) ("[W]rongdoing by [a] party in connection with its case amounting to an obstruction of justice is . . . commonly regarded as an admission by conduct."); *see also Great Am.*

COHENMILSTEIN

June 2, 2019
Page 5

*Ins. Co. v. Horab*, 309 F.2d 262, 264 (8th Cir. 1962) (Blackmun, J.) ("It is generally held that, in a civil case, evidence that a litigant, or his agent, has attempted to influence or suppress a witness is receivable as an admission or as an indication of the litigant's consciousness that his case is weak or unfounded or that his claim is false or fraudulent. Specifically, an attempt to persuade a witness not to testify is admissible against the party responsible for that attempt." (citations omitted)). Here, Defendants' extensive obstructive conduct, detailed in the Complaint, *see* Compl. ¶¶ 206-231, will strongly support the DNC's claims.

Moreover, a civil plaintiff can pursue evidentiary avenues unavailable to prosecutors. For example, unlike in a criminal proceeding, where a defendant has no obligation to speak to government investigators regarding her own illegal conduct, a civil plaintiff can compel a defendant to attend a deposition, and if the defendant refuses, she can be held in contempt of court or otherwise sanctioned. *See* Fed. R. Civ. P. 37(b). Similarly, if a defendant invokes her Fifth Amendment right not to answer specific questions during a deposition or at trial, a civil jury—unlike a criminal jury—can infer that the defendant invoked her rights because she violated the law. *See, e.g.*, *See Mitchell v. United States*, 526 U.S. 314, 328 (1999); *Woods v. START Treatment & Recovery Centers, Inc.*, 864 F.3d 158, 170 (2d Cir. 2017). Thus, in this case, Trump, Jr., Assange, and the Agalarovs—whom the Special Counsel did not interview—can be compelled to attend depositions, where they will have an incentive to answer the DNC's questions truthfully (rather than invoking their Fifth Amendment rights).

4.    *Additional Information Pertinent to This Case Continues to Come to Light*

The Trump Campaign's letter also overlooks the fact that the public portions of the Special Counsel's Report are not the only source of evidence of Defendants' wrongdoing. Many passages in the Report have been redacted, in part to protect ongoing investigations into misconduct surrounding the 2016 elections.

Additionally, the House Permanent Select Committee on Intelligence ("HPSCI") and the Senate Intelligence Committee continue to investigate Russian election interference. Indeed, on May 8, 2019 the HPSCI issued a subpoena for the unredacted Special Counsel's Report and the evidence underlying it.[2] Likewise, the Senate Intelligence Committee recently secured an agreement for Trump, Jr. to testify before that Committee regarding his participation in the Trump

---

[2] *House Intelligence Committee Issues Subpoena for Counterintelligence and Foreign Intelligence Materials in Mueller Investigation, Including Report and Underlying Evidence*, U.S. House of Representatives Permanent Select Committee on Intelligence (May 8, 2019), https://intelligence.house.gov/news/documentsingle.aspx?DocumentID=638.

COHENMILSTEIN

June 2, 2019
Page 6

Tower meeting, among other topics.[3] Not only are these ongoing investigations likely to reveal additional evidence pertinent to this action, but the very fact that these congressional bodies—led by both Republicans and Democrats—continue their investigations is a forceful rejection of the Campaign's false claim that the Special Counsel's Report "definitively refuted" the DNC's "theory of liability[.]" Letter at 1.

5.    *The Campaign's Letter Misconstrues Specific Events Discussed in the Report*

In addition to these overarching problems with the Trump Campaign's arguments, the May 13 letter presents a deeply misleading picture of specific events discussed in the Report. For example, the letter falsely claims that "[t]here is no . . . evidence that Papadopoulos told the Campaign about any 'stolen materials.'" Letter at 2. But Papadopoulos told investigators that he recalled an incident where he told Sam Clovis, the Trump Campaign's National Co-Chair, that he thought the Russian government had Secretary Clinton's emails, though he "wavered" about the accuracy of this recollection. Report at 93.

Similarly, the Campaign's letter misconstrues the Report's discussion of the Trump Tower meeting on June 9, 2016. Contrary to the Trump Campaign's suggestion, the Special Counsel's Report did not provide a complete record of the discussions at the Trump Tower meeting. Rather, it recounted the meeting participants' self-serving explanations of what happened, noted that the Special Counsel was not able to interview two of the attendees (Trump Jr. and Natalia Veselnitskaya), highlighted some meeting attendees' conflicting accounts of what transpired, and observed that the notes Manafort took during the meeting "reflect the general flow of the conversation, although not all of its details." Report at 118. Moreover, the Report notes that, even according to the meeting participants' self-serving statements, Russia gave the Trump Campaign some information about the Clinton Campaign, and Kushner expressed disappointment that the information was not more incriminating. *Id.* These findings are completely consistent with a situation where the participants in the Trump Tower meeting discussed stolen Democratic documents, but failed to record that discussion or confess to government investigators. That situation is plausible given that: (1) there is documentary evidence showing that the purpose of the meeting was for Russia to offer documents to the Trump Campaign, Report at 110; (2) the day after the meeting, Russia attempted to hack into a DNC backup server, Compl. ¶ 143; (3) less than a week after the Trump Tower meeting, Russia started disseminating stolen Democratic materials,

---

[3] Karoun Demirjian et al., *Donald Trump Jr. agrees to testify before the Senate Intelligence Committee again*, Wash. Post (May 14, 2019), https://www.washingtonpost.com/world/national-security/donald-trump-jr-agrees-to-testify-before-the-senate-intelligence-committee-again/2019/05/14/2efd4574-7686-11e9-bd25-c989555e7766_story.html?utm_term=.eef8d1b7e644.

COHEN**MILSTEIN**

June 2, 2019
Page 7

Report at 42; Compl. ¶ 148; and (4) members of the Trump Campaign lied about the existence and substance of the meeting, *see, e.g.*, Compl. ¶¶ 29, 141-42, 213, 217-19, 222.

Moreover, the Campaign misleadingly describes an event where J.D. Gordon, a Senior Campaign advisor on policy and national security, diluted proposed language in the Republican Party Platform that called on the United States to support Ukraine in a dispute with Russia. Letter at 3. The Report expressly notes that Gordon "felt obliged to object to the proposed platform [language] and seek its dilution" in light of "Trump's statements on the campaign trail." Report at 125.

Finally, while the Special Counsel's Report could not affirmatively prove why Manafort and Gates spent months sending internal Campaign polling data and strategies to Kilimnik—in part because Gates deleted his messages to Kilimnik on a daily basis and in part because Manafort lied to the Special Counsel about the data—nothing in the report would prevent a civil jury from adopting the most natural explanation for that data sharing (and the efforts to conceal it): The Campaign wanted to help Russia gauge the effectiveness of its election interference efforts. *See supra* at Section 3 (discussing adverse inference from destruction of evidence).

6.      *The Trump Campaign's Motion is a Transparent and Improper Effort to Litigate the Merits of this Action*

As the foregoing demonstrates, the Campaign's position that the DNC has violated Rule 11 by failing to "withdraw or even amend its claims" is untenable. Letter at 5. "Rule 11 sanctions are judged under an objective reasonableness standard and are appropriate only when it is patently clear that a pleading has no chance of success." *In re Bridge Constr. Servs. of Fla., Inc.*, 140 F. Supp. 3d 324, 332 (S.D.N.Y. 2015) (Koeltl, J.) (quoting *Shuster v. Oppleman*, No. 96cv1689 (JGK), 1999 WL 9845, at *6 (S.D.N.Y. Jan. 11, 1999)). "The imposition of Rule 11 sanctions is discretionary, and should be reserved for extreme cases." *Cooksey v. Digital*, 14cv7146 (JGK), 2016 WL 5108199, at *8 (S.D.N.Y. Sept. 20, 2016) (citation omitted). Given this exacting standard and the facts at hand, the Campaign's motion is baseless.

Notably, the Advisory Committee notes on Rule 11 expressly warn that Rule 11 "should not be employed as a discovery device or to test the legal sufficiency of allegations in the pleadings . . . . Nor should Rule 11 motions be prepared to emphasize the merits of a party's position, . . . to intimidate an adversary into withdrawing contentions that are fairly debatable, [or] to increase the costs of litigation . . . ." Fed. R. Civ. P. 11, advisory committee's notes to 1993 amendment. That is precisely the sort of inappropriate conduct in which the Trump Campaign has engaged here.

COHEN MILSTEIN

June 2, 2019
Page 8

7.      *Conclusion*

      Given the manifest deficiencies in the Campaign's letter, we remind the Campaign that "the filing of a [Rule 11] motion for sanctions is itself subject to the requirements of the rule and can lead to sanctions." *Id*. Rather than engage in this needless and wholly unfounded litigation over sanctions, the parties should proceed with the adjudication of the pending motions to dismiss and, should those motions be denied, embark on discovery and the ultimate trial of this action.

      Sincerely,

      Joseph M. Sellers