**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| DEMOCRATIC NATIONAL COMMITTEE,  )<br>)<br>Plaintiff,  )<br>)<br>v.  )<br>)<br>THE RUSSIAN FEDERATION et al.,  )<br>)<br>Defendants.  )<br>)<br>) | Civil Action No. 1:18-cv-03501-JGK |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT
DONALD J. TRUMP FOR PRESIDENT, INC.'S MOTION FOR RULE 11 SANCTIONS**

i

**TABLE OF CONTENTS**

I. Introduction ................................................................................................................... 1

II. Facts ............................................................................................................................. 2

III. Standard of Review on a Motion Under Fed. R. Civ. P. 11 ......................................... 5

IV. Argument ...................................................................................................................... 6
    A. The Campaign's Motion Rests on a Logical Error .................................................. 6
    B. The Motion Overlooks the Differences Between Civil and Criminal Actions ........................................................................................................................ 7
    C. The Campaign Ignores the Fact that Additional Information Continues to Come to Light ......................................................................................................... 10
    D. The Campaign's Motion Misconstrues Specific Events Discussed in the Report ..................................................................................................................... 11
    E. The Campaign Continues to Misconstrue and Dismember the Allegations in the Complaint ..................................................................................................... 14

V. Conclusion .................................................................................................................. 15

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Boca Raton Firefighters & Police Pension Fund v. Bahash*,
 506 F. App'x 32 (2d Cir. 2012) ................................................................................................2

*In re Bridge Constr. Servs. of Fla., Inc.*,
 140 F. Supp. 3d 324 (S.D.N.Y. 2015) (Koeltl, J.) ................................................................5, 6

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*,
 370 U.S. 690 (1962)................................................................................................................14

*Cooksey v. Digital*,
 14cv7146, 2016 WL 5108199 (S.D.N.Y. Sept. 20, 2016)........................................................5

*In re: Credit Default Swaps Antitrust Litig.*,
 No. 13-md-02476, 2016 WL 2731524 (S.D.N.Y. Apr. 26, 2016)............................................9

*Galin v. Hamada*,
 283 F. Supp. 3d 189 (S.D.N.Y. 2017).......................................................................................6

*Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc.*,
 146 F.3d 66 (2d Cir. 1998).......................................................................................................2

*Mitchell v. United States*,
 526 U.S. 314 (1999).................................................................................................................8

*Purdy v. Zeldes*,
 337 F.3d 253 (2d Cir. 2003).....................................................................................................7

*Sedima, S.P.R.L. v. Imrex Co.*,
 473 U.S. 479 (1985).................................................................................................................7

*Shuster v. Oppleman*,
 No. 96cv1689 (JGK), 1999 WL 9845 (S.D.N.Y. Jan. 11, 1999)..............................................5

*Standefer v. United States*,
 447 U.S. 10 (1980)...................................................................................................................8

*United States v. Ianniello*,
 646 F. Supp. 1289 (S.D.N.Y. 1986).........................................................................................9

*United States v. Papadopoulos*,
 No. 17-cr-00182-RDM (D.D.C. Oct. 5, 2017)........................................................................12

*In re: Urethane Antitrust Litig.*,
   No. 04-1616, 2013 WL 3879264 (D. Kan. July 26, 2013) ........................................................9

*Warren v. Byrne*,
   699 F.2d 95 (2d Cir. 1983) .....................................................................................................9

*Woods v. START Treatment & Recovery Ctrs., Inc.*,
   864 F.3d 158 (2d Cir. 2017) ...................................................................................................8

**OTHER AUTHORITIES**

2A Charles Wright et al., *Federal Practice & Procedure* § 468 (4th ed. 2013) .............................7

Fed. R. Civ. P. 11 ............................................................................................................... *passim*

Fed. R. Civ. P. 37 .................................................................................................................8

Karoun Demirjian et al., *Donald Trump Jr. agrees to testify before the Senate
   Intelligence Committee again*, Wash. Post (May 14, 2019) ......................................................11

2 Kenneth S. Broun et al., *McCormick on Evidence* § 265 (7th ed. 2016) ....................................14

*Mueller Investigation, Including Report and Underlying Evidence*, U.S. House of
   Representatives Permanent Select Committee on Intelligence (May 8, 2019),
   https://intelligence.house.gov/news/documentsingle.aspx?DocumentID=638 .......................10

Plaintiff Democratic National Committee ("Plaintiff" or "DNC") hereby submits this Memorandum of Law in Opposition to Defendant Donald J. Trump for President, Inc.'s (the "Trump Campaign" or the "Campaign") Motion for Rule 11 Sanctions ("Motion for Sanctions" or "Motion") (ECF No. 257).

## I.  INTRODUCTION

Contrary to the Trump Campaign's suggestion, the Special Counsel's Report did *not* "refute" the DNC's claim that the Campaign conspired with Russia. Rather, the Report methodically compiled evidence that the Campaign participated in Russia's plan to interfere in the 2016 election. Over the course of more than 100 pages, the Report identified "multiple links between Trump Campaign officials and individuals tied to the Russian government. Those links included Russian offers of assistance to the Campaign. In some instances, the Campaign was receptive to the offer[s]." Report at 173.[1] While the Special Counsel ultimately could not establish the Campaign's participation in a conspiracy beyond a reasonable doubt in a criminal proceeding, the Report's findings provide ample support for this civil lawsuit, where the DNC only has to prove that it is more likely than not that the Campaign conspired with Russia.

In arguing to the contrary, the Trump Campaign commits a logical error, falsely equating the Special Counsel's statement that he could not "establish" the Trump Campaign's guilt beyond a reasonable doubt with the very different (and unlikely) statement that the Trump Campaign is innocent of all wrongdoing. The Special Counsel's Report warned the public not to make this mistake, noting: "A statement that the investigation did not establish particular facts does *not* mean there was no evidence of those facts." Report at 2 (emphasis added). Indeed, the Special Counsel

---

[1] Unless otherwise specified, citations to pages of the Report refer to Volume I of the Report.

reiterated in a televised press conference last month that a decision not to prosecute should not be confused with an exoneration. Yet that is precisely what the Trump Campaign does in its Motion.

The Campaign's Motion also ignores fact-gathering tools that are available to civil plaintiffs like the DNC but not to prosecutors like the Special Counsel, dismisses ongoing investigations into the Trump Campaign's interactions with Russian agents and WikiLeaks, misleadingly describes key events discussed in the Special Counsel's Report, and improperly reads allegations from the DNC's Second Amended Complaint out of context.

In sum, the Trump Campaign has blustered past the bounds of law and logic. The Court should deny the Campaign's Motion in its entirety.[2]

**II.   FACTS**

Contrary to the Trump Campaign's insistence that the Special Counsel's Report "definitively refuted" Plaintiff's Second Amended Complaint ("Complaint"), Mot. at 1, the Report confirmed the central allegations in the Complaint and presented additional evidence that the Trump Campaign agreed to a plan in which Russia would steal and disseminate documents from Democratic targets, including the DNC. Among other findings too numerous to list here, the Report stated that:

- In the run up to the 2016 Presidential election, there were "multiple links between Trump Campaign officials and individuals tied to the Russian government. Those

---

[2] Likewise, the Court should reject the Campaign's argument that the Report is subject to judicial notice. *Compare, e.g.*, Campaign Reply (ECF No. 254) at 1, 3, 15-16, 20, 23, 25 *with* Pl.'s Opp. to Mot. to Dismiss at 15; *see also Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc.*, 146 F.3d 66, 70-71 (2d Cir. 1998) (testimony or findings from one case (such as the Special Counsel's criminal inquiry) are *not* judicially noticeable in another case (such as the DNC's civil suit)); *Boca Raton Firefighters & Police Pension Fund v. Bahash*, 506 F. App'x 32, 37 n.4 (2d Cir. 2012).

      links included Russian offers of assistance to the Campaign. In some instances, the Campaign was receptive [to] the offer[.]" Report at 173; *cf.* Compl. ¶¶ 2, 10.

- In April 2016, Josef Mifsud (a London-based academic with ties to the Russian government) told George Papadopoulos (a foreign policy advisor to and agent of the Trump Campaign) that the Russian government "had obtained 'dirt' on candidate Hillary Clinton," in the form of "thousands of emails." Report at 86-89; *cf.* Compl. ¶¶ 13, 94. Ten days later, "Papadopoulos suggested to a representative of a foreign government that the Trump Campaign had received indications from the Russian government that it could assist the Campaign through the anonymous release of information damaging to Hillary Clinton." Report at 89; *cf.* Compl. ¶ 99. Papadopoulos later "wavered about whether he accurately remembered an incident" where he told Sam Clovis (the Trump Campaign's National Co-Chair) that he thought the Russians "have her emails." Report at 93; *cf.* Compl. ¶¶ 96-99. *Compare generally* Report at 86-93 *with* Compl. ¶¶ 93-100.

- In April 2016, Manafort and Gates began sharing internal Campaign polling data and information on battleground states including "Michigan, Wisconsin, Pennsylvania, and Minnesota" with Konstantin Kilimnik, a man with known connections to Russian intelligence. Report at 140. This data sharing continued for several months. "Gates stated that, in accordance with Manafort's instruction[s], he periodically sent Kilimnik polling data via WhatsApp; Gates then deleted the communications on a daily basis." In addition to secretly sharing this data, Manafort and Kilimnik "discussed the status of the Trump Campaign and Manafort's strategy for winning Democratic votes in Midwestern states." *Id.* at 6, 136-37. *Compare generally* Report at 129-143 *with* Compl. ¶¶ 67, 91, 152, 231. Manafort later "lied to the [Special Counsel's] Office and the grand jury about . . . his meetings with Kilimnik[.]" Report at 130; *cf.* Compl. ¶ 231.

- In early June 2016, Rob Goldstone "passed along an offer purportedly from a Russian government official to provide 'official documents and information' to the Trump Campaign for the purposes of influencing the presidential election. Trump Jr. appears to have accepted that offer and to have arranged a meeting to receive those materials." Report at 185; *cf.* Compl. ¶¶ 133-36. That meeting took place on June 9, 2016, when "senior representatives of the Trump Campaign met in Trump Tower with a Russian attorney expecting to receive derogatory information about Hillary Clinton from the Russian government. . . . Members of the Campaign discussed the meeting before it occurred, and Michael Cohen recalled that Trump Jr. may have told candidate Trump about an upcoming meeting to receive adverse information about Clinton, without linking the meeting to Russia." Report at 110; *cf.* Compl. ¶¶ 137. *Compare generally* Report at 110-20 *with* Compl. ¶¶ 132-138.

- At a press conference on July 27, 2016, Trump discussed the release of stolen DNC documents and data, and claimed that it was "ridiculous" that Russia was involved. Nevertheless, he "stated that it would give him 'no pause' if Russia had Clinton's emails. Trump added, 'Russia, if you're listening, I hope you're able to find the 30,000 emails that are missing.'" Report at 18, 49; *cf.* Compl. ¶ 158. Within

"approximately five hours" of Trump's request for assistance, Russian intelligence officers launched a cyberattack against Secretary Clinton's personal office "for the first time," targeting the office's email accounts. Report at 49. While Russia was engaged in this hacking effort, Trump asked "individuals affiliated with his Campaign," including Michael Flynn, to collect the emails he asked Russia to steal. Flynn, in turn contacted Peter Smith, "an investment advisor who was active in Republican politics," to enlist him in the effort to find the emails. Report at 62. Within weeks of Trump's July 27 press conference, Smith "created a company, raised tens of thousands of dollars, and recruited security experts and business associates. Smith made claims to others involved in the effort (and those from whom he sought funding) that he was in contact with hackers with 'ties and affiliations to Russia' who had access to the emails, and that his efforts were coordinated with the Trump Campaign." Report at 63.

- On August 23, 2016, Sergei Millian, who told Papadopoulos that he had "insider knowledge and direct access to the top hierarchy in Russian politics," sent "a Facebook message to Papadopoulos promising that he would 'share with you a disruptive technology that might be instrumental in your political work for the campaign.'" Report at 94-95.

While the Report ultimately did not "establish that members of the Trump Campaign conspired or coordinated with the Russian government in its election interference activities," it cautioned that "[a] statement that the investigation did not establish particular facts does not mean there was no evidence of those facts." Report at 2. The Report also noted some of the constraints that limited the Special Counsel's ability to establish certain facts beyond a reasonable doubt. For example, the Report noted that "[s]ome individuals invoked their Fifth Amendment right against compelled self-incrimination," while others (such as the Agalarovs) declined to be interviewed. Report at 10. At the same time, "some of the individuals [the Special Counsel] interviewed or whose conduct [the Special Counsel] investigated—including some associated with the Trump Campaign—deleted relevant communications[.]" *Id.* As will be explained further below, the DNC will face fewer investigative barriers. *See* § IV(B), *infra*.

4

### III. STANDARD OF REVIEW ON A MOTION UNDER FED. R. CIV. P. 11

In relevant part, Rule 11 of the Federal Rules of Civil Procedure provides that, in "presenting to the court a pleading, written motion, or other paper . . . an attorney . . . certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances," "the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery[.]" Fed. R. Civ. P. 11(b)(3). "Rule 11 sanctions are judged under an objective reasonableness standard and are appropriate only when it is patently clear that a pleading has no chance of success." *In re Bridge Constr. Servs. of Fla., Inc.*, 140 F. Supp. 3d 324, 332 (S.D.N.Y. 2015) (Koeltl, J.) (quoting *Shuster v. Oppleman*, No. 96cv1689 (JGK), 1999 WL 9845, at *6 (S.D.N.Y. Jan. 11, 1999)). "The imposition of Rule 11 sanctions is discretionary, and should be reserved for extreme cases." *Cooksey v. Digital*, 14cv7146 (JGK), 2016 WL 5108199, at *8 (S.D.N.Y. Sept. 20, 2016) (citation omitted).

Rule 11 "should not be employed as a discovery device or to test the legal sufficiency of allegations in the pleadings . . . . Nor should Rule 11 motions be prepared to emphasize the merits of a party's position, . . . to intimidate an adversary into withdrawing contentions that are fairly debatable, [or] to increase the costs of litigation . . . ." Fed. R. Civ. P. 11, advisory committee notes to 1993 amendment. Further, "the filing of a [Rule 11] motion for sanctions is itself subject to the requirements of the rule and can lead to sanctions," and "the court may award to the person who prevails on a motion under Rule 11—whether the movant or the target of the motion—reasonable expenses, including attorney's fees, incurred in presenting or opposing the motion." *Id.*; *see* Fed. R. Civ. P. 11(c)(2).

5

## IV.   ARGUMENT

The Trump Campaign's Motion is a flawed attempt to shield the Campaign from the uncomfortable reality that the DNC's case has far more than the slight chance of success required by Rule 11. *See In re Bridge Constr. Servs. of Fla., Inc.*, 140 F. Supp. 3d at 332. The Motion turns on a serious logical error; overlooks the differences between criminal and civil cases; ignores the fact that additional information, currently shielded by redactions in the Report or within the custody of witnesses never interviewed, could become part of the record in this action; and misconstrues key passages of both the Report and the DNC's Complaint.

### A.   The Campaign's Motion Rests on a Logical Error

The Trump Campaign's Motion rests on a logical error: It falsely suggests that, because the Special Counsel could not prove a conspiracy between Russia and the Trump Campaign beyond a reasonable doubt, the Campaign must be innocent. That suggestion blinks common sense. It is not unusual for the government to compile substantial evidence that a suspect committed a crime without being able to prove the suspect guilty beyond a reasonable doubt. This case is no exception. As detailed above, the Special Counsel amassed considerable evidence that the Trump Campaign conspired with Russia, but that "evidence was not sufficient to charge" the Campaign in a criminal proceeding. Report, Volume II at 15 n.8. As explained more fully below, however, the evidence *is* sufficient to hold the Trump Campaign liable in a civil lawsuit.[3] *See* § IV(B), *infra*.

---

[3] This case is therefore distinguishable from the cases that the Trump Campaign cites, such as *Galin v. Hamada*, 283 F. Supp. 3d 189 (S.D.N.Y. 2017), where the plaintiff (unlike the DNC) was given the chance to conduct his own discovery, and that discovery "yielded *no admissible evidence whatsoever*" to support his claims. *Id.* at 202 (emphasis added).

6

The Trump Campaign was warned—both by the Special Counsel and the DNC—not to construe the Special Counsel's statement that his investigation "did not establish" a conspiracy as an exoneration. The Special Counsel noted—on page 2 of the Report—that "[a] statement that the investigation did not establish particular facts does *not* mean there was no evidence of those facts." Report at 2 (emphasis added). And just two days before the Trump Campaign filed the pending Motion for Sanctions, the DNC sent the Campaign a letter explaining how the Special Counsel's Report bolsters the DNC's claims. June 2, 2019 Letter, ECF No. 257-3. Failing to heed these warnings, the Trump Campaign proceeded with its ill-founded Motion.

B.  **The Motion Overlooks the Differences Between Civil and Criminal Actions**

In claiming that the Special Counsel's criminal investigation bars this civil case, the Trump Campaign ignores the fundamental differences in the burdens of proof that must be satisfied in criminal and civil proceedings and the different evidence available to criminal and civil lawyers. *See* 2A Charles Wright et al., *Federal Practice & Procedure* § 468 (4th ed. 2013) (explaining that, in light of these differences, an "acquittal in [a] criminal action does not bar civil suit based on the same facts"); *see also Purdy v. Zeldes*, 337 F.3d 253, 259 (2d Cir. 2003).

First, the burden of proof in a civil action is decisively lighter than the government's burden of proof in a criminal case. *See Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 491 (1985) (noting that a civil plaintiff only needs to show that it is more likely than not that the defendants violated the law, while criminal prosecutors must prove their case "beyond a reasonable doubt"). Thus, while information in the Special Counsel's Report may be insufficient to sustain a criminal conviction, a civil jury could find the same information more than sufficient to hold Defendants civilly liable.

This seems particularly likely because a central question before both the Special Counsel and this Court is whether the Trump Campaign conspired with Russia, *i.e.*, whether members of

7

the Trump Campaign had a "meeting of the minds" with Russian agents.[4] As the Special Counsel suggested in explaining his decision not to charge individuals involved in the June 9, 2016 Trump Tower meeting, it is extremely difficult to prove someone's mental state beyond a reasonable doubt. *See* Report at 185 (discussing "the government's substantial burden of proof on issues of intent[.]"). Consequently, it would have been particularly difficult for the Special Counsel to prove beyond a reasonable doubt that the Trump Campaign had a meeting of the minds with Russia. The DNC does not face that same difficulty; as explained above, the DNC only needs to show that it was more likely than not that such a meeting of the minds occurred.

Furthermore, a civil plaintiff like the DNC can pursue evidentiary avenues unavailable to prosecutors like the Special Counsel. *See Standefer v. United States*, 447 U.S. 10, 22 (1980) (noting that prosecutors' investigatory powers "are limited, both by rules of court and constitutional privileges"); *id.* at 23 (noting that prosecutors may be hindered by "rules of evidence and exclusion unique to our criminal law"). For example, unlike in a criminal proceeding, where a defendant has no obligation to speak to government investigators or testify in court, a civil plaintiff can compel a defendant to attend a deposition, and if the defendant refuses, she can be held in contempt of court or otherwise sanctioned. *See* Fed. R. Civ. P. 37(b). Similarly, if a defendant invokes her Fifth Amendment right not to answer specific questions during a deposition or at trial, a civil jury—unlike a criminal jury—can infer that the defendant invoked her rights because she violated the law. *See, e.g.*, *Mitchell v. United States*, 526 U.S. 314, 328 (1999); *Woods v. START Treatment & Recovery Ctrs., Inc.*, 864 F.3d 158, 170 (2d Cir. 2017). Because the consequences of refusing to testify in a civil case can be so severe, the DNC may be able to elicit relevant testimony from some of the Defendants who declined to speak with the Special Counsel, including Trump Jr., Assange,

---

[4] While many of Plaintiff's claims turn on the existence of a conspiracy, not all of them do. *See generally* Complaint.

8

and the Agalarovs. Moreover, if any agent of the Trump Campaign declines to testify, that decision might allow a jury to draw an adverse inference against the Trump Campaign at trial.

This case is therefore analogous to *United States v. Ianniello*, 646 F. Supp. 1289 (S.D.N.Y. 1986), where the government brought a civil RICO claim against a defendant who had been acquitted in a related criminal case. In rejecting the defendant's argument that the doctrine of collateral estoppel barred the civil action, the court emphasized the "differing standards of proof in criminal and civil proceedings," and noted that the government would be able to "call a key witness" who refused to testify in the criminal case; if the witness "invoke[d] his Fifth Amendment privilege to remain silent," the government could ask a jury "to draw an adverse inference from the assertion of that privilege[.]" *Id.* at 1291. The court concluded that, regardless of whether the witness chose to testify or to invoke his Fifth Amendment privilege, calling him to testify would create "significant evidence unavailable . . . in the criminal case." *Id.*; *see also Warren v. Byrne*, 699 F.2d 95, 97 (2d Cir. 1983) (dismissal of charges in a criminal case "was not determinative of the issues" in a civil action because "the rules of law and burdens of proof" in civil proceedings are "substantially different").

In light of the robust case law permitting plaintiffs to sue defendants who escape criminal conviction, civil plaintiffs routinely hold defendants liable for misconduct after the government finds insufficient evidence to warrant criminal prosecution. *See, e.g.*, *In re: Credit Default Swaps Antitrust Litig.*, No. 13-md-02476, 2016 WL 2731524, at *2 (S.D.N.Y. Apr. 26, 2016) (after the Department of Justice closed its investigation into an antitrust conspiracy, civil plaintiffs sued the conspirators and recovered $1.865 billion); *In re: Urethane Antitrust Litig.*, No. 04-1616, 2013 WL 3879264, at *2 (D. Kan. July 26, 2013) (after the Department of Justice closed its investigation

9

into an antitrust conspiracy, civil plaintiffs took the conspirators to trial and secured a judgment of $1.06 billion).

      **C.     The Campaign Ignores the Fact that Additional Information Continues to Come to Light**

The Trump Campaign also fails to recognize the substantial information cited in the Special Counsel's Report, likely pertinent to this action, that is currently redacted but may be disclosed at a later date. Many of the Report's redactions appear to relate to the interactions among the Trump Campaign, Stone, Assange, and WikiLeaks during the 2016 election. *See, e.g.*, Report at 51-59, 176-180, 188-191, 196-97. These facts are central to Plaintiff's Complaint. *See, e.g.*, Compl. ¶¶ 81-83, 149-65, 170-76. Because the basis cited for these redactions is "Harm to Ongoing Matter," it is likely that the redactions will be removed as the relevant criminal matters are resolved, revealing additional information that could bolster the DNC's already strongly supported claims.

Similarly, the Trump Campaign ignores ongoing congressional investigations from which evidence relevant to this action may emerge. Both the House Permanent Select Committee on Intelligence ("HPSCI") and the Senate Intelligence Committee continue to investigate Russian election interference. Indeed, on May 8, 2019 the HPSCI issued a subpoena for the unredacted Special Counsel's Report and the evidence underlying it.[5] Likewise, the Senate Intelligence Committee recently secured an agreement for Trump, Jr. to testify about his participation in the

---

[5] *House Intelligence Committee Issues Subpoena for Counterintelligence and Foreign Intelligence Materials in Mueller Investigation, Including Report and Underlying Evidence*, U.S. House of Representatives Permanent Select Committee on Intelligence (May 8, 2019), https://intelligence.house.gov/news/documentsingle.aspx?DocumentID=638.

Trump Tower meeting, among other topics.[6] Not only are these ongoing investigations likely to reveal additional evidence pertinent to this action, but the very fact that these congressional bodies continue their investigations is a forceful rejection of the Campaign's false claim that the Special Counsel's Report "definitively refuted" the DNC's theory of liability. Mot. at 1.

### D. The Campaign's Motion Misconstrues Specific Events Discussed in the Report

Moreover, the Campaign's Motion presents a deeply misleading picture of specific events discussed in the Report. For example, the Motion falsely contends that the Campaign could not have "conspired or coordinated with Russia through Papadopoulos" because the Special Counsel could not conclusively establish that Papadopoulos told other members of the Campaign about his interactions with Mifsud. Mot. at 6. But Papadopoulos himself was an employee of the Campaign. Thus, even if Papadopoulos forged an agreement with Russian agents on his own, the Campaign could be held liable for that misconduct. In any event, Papadopoulos told investigators that he recalled an incident where he told Sam Clovis, the Trump Campaign's National Co-Chair, that he thought the Russian government had Secretary Clinton's emails, though he "wavered" about the accuracy of this recollection. Report at 93. This "waver[ing]" is not surprising; at other points in his conversations with the Special Counsel's Office, Papadopoulos claimed not to remember incriminating interactions with individuals connected to the Russian Government. For instance, he denied any recollection of an incident where Sergei Millian, who told Papadopoulos that he had "insider knowledge and direct access to the top hierarchy in Russian politics," sent "a Facebook

---

[6] Karoun Demirjian et al., *Donald Trump Jr. agrees to testify before the Senate Intelligence Committee again*, Wash. Post (May 14, 2019), https://www.washingtonpost.com/world/national-security/donald-trump-jr-agrees-to-testify-before-the-senate-intelligence-committee-again/2019/05/14/2efd4574-7686-11e9-bd25-c989555e7766_story.html?utm_term=.eef8d1b7e644.

message to Papadopoulos promising that he would 'share . . . a disruptive technology that might be instrumental in [Papadopoulos's] political work for the campaign.'" *Id.* at 94-95. Moreover, Papadopoulos has admitted that he destroyed documentary evidence to conceal his suspicious interactions with Russian agents.[7] A jury could infer that Papadopoulos destroyed these documents in part because he wanted to hide the fact that he passed information between Russian agents and other members of the Trump Campaign. *See infra* at 13-14.

Similarly, the Campaign's Motion misconstrues the Report's discussion of the Trump Tower meeting on June 9, 2016. Contrary to the Trump Campaign's suggestion, the Special Counsel's Report did not provide a complete record of the discussions at the Trump Tower meeting. Rather, it recounted the meeting participants' self-serving explanations of what happened, noted that the Special Counsel was not able to interview two of the attendees (Trump Jr. and Veselnitskaya), highlighted some meeting attendees' conflicting accounts of what transpired, and observed that the notes Manafort took during the meeting "reflect the general flow of the conversation, although not all of its details." Report at 118. Moreover, the Report notes that, even according to the meeting participants' self-serving statements, Russia gave the Trump Campaign information that Russia believed to be related to the Clinton Campaign, and Kushner "became aggravated" that the information was not more incriminating. *Id.* This admission strongly supports the DNC's contention that members of the Campaign gave Russian agents feedback about the type of information they wanted Russian agents to gather and disseminate. A civil jury could readily infer that, after Kushner fumed that the first evidence Russia presented was not sufficiently helpful to the Trump Campaign, the Russian agents presented information about their ongoing efforts to steal Democratic documents. This inference would be reasonable given that: (1) the day

---

[7] Statement of the Offense at ¶¶ 33-34, *United States v. Papadopoulos*, No. 17-cr-00182-RDM (D.D.C. Oct. 5, 2017).

12

after the meeting, Russia attempted to hack into a DNC backup server, Compl. ¶ 143; (2) less than a week after the Trump Tower meeting, Russia started disseminating stolen Democratic materials, Report at 42; Compl. ¶ 148; (3) members of the Trump Campaign lied about the existence and substance of the meeting, *see, e.g.*, Compl. ¶¶ 29, 141-42, 213, 217-19, 222; (4) Manafort regularly gave a Russian agent internal Trump Campaign polling data, which would have allowed Russia to gauge the effectiveness of its document disseminations, Compl. ¶¶ 26, 91; and (5) other members of the Trump Campaign, as well as informal Campaign advisors like Stone, maintained suspicious contacts with Russian agents and WikiLeaks, *see, e.g.*, Compl. ¶¶ 89-100, 159-179.

Furthermore, the Campaign misleadingly describes an event where J.D. Gordon, a senior Campaign advisor on policy and national security, diluted proposed language in the Republican Party Platform that called on the United States to support Ukraine in a dispute with Russia. The Report expressly notes that Gordon "felt obliged to object to the proposed platform [language] and seek its dilution" in light of "Trump's statements on the campaign trail" about improved relations with Russia. Report at 125.

Moreover, while the Special Counsel's Report could not affirmatively prove why Manafort and Gates spent months sending internal Campaign polling data and strategies to Kilimnik—in part because Gates deleted his messages to Kilimnik on a daily basis and in part because Manafort lied to the Special Counsel about the data—nothing in the Report would prevent a civil jury from adopting the most natural explanation for that data sharing (and the efforts to conceal it): The Campaign wanted to help Russia understand the effectiveness of its election interference efforts.

Finally, the Special Counsel's Report did *not* foreclose the finding that Defendants may have destroyed evidence or obstructed official proceedings to conceal their own illegal activity. Nor could it: Under the federal rules of evidence, "an obstruction of justice is . . . commonly

regarded as an admission by conduct." 2 Kenneth S. Broun et al., *McCormick on Evidence* § 265 (7th ed. 2016). It is therefore permissible to infer that a suspect obstructed justice to conceal a crime, even if the inference is not strong enough to prove the suspect guilty beyond a reasonable doubt.

### E. The Campaign Continues to Misconstrue and Dismember the Allegations in the Complaint

The Campaign's Motion for Sanctions also ignores the Supreme Court's admonition that the "character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole." *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962). Like its Motion to Dismiss, the Campaign's current Motion impermissibly picks a few allegations out of the Complaint, misconstrues them, and then asserts that the allegations are insufficient to support the DNC's claims. For example, the Motion repeatedly asserts that there are just two "pillars" supporting the DNC's case: allegations about Papadopoulos's interactions with Mifsud and allegations about the Trump Tower meeting. Then, as explained above, the Campaign warps the Special Counsel's description of those events to suit its own narrative. But the DNC's Complaint does not rest on two "pillars"; it rests on a densely woven net of evidence, including (but not limited to): Felix Sater's statement that Trump could "become President of the USA and we can engineer it. I will get all of Putins [sic] team to buy in on this, I will", Compl. ¶ 9; dozens of secret communications between members of the Trump Campaign, Russian operatives, and WikiLeaks, *see, e.g.*, Compl. ¶¶ 89-100, 135-140, 152, 159-179; Russian hacking activity that occurred immediately after those communications *see, e.g.*, Comp. ¶¶ 121, 143; Trump's open request for Russia to find Secretary Clinton's emails, followed by Russia's attempt to do so, Compl. ¶ 158; Roger Stone, an informal advisor to the Trump Campaign, telling Russian spies that a stolen Democratic turnout model for the 2016 election was

14

"[p]retty standard," followed by Russia's intrusion into one of the computer servers that the DNC used to perform complex analysis of turnout data, Compl. ¶¶ 179-180; senior Trump Campaign members sharing Campaign polling data with a Russian intelligence agent, Compl. ¶¶ 26, 91; Stone's advanced knowledge that WikiLeaks would publish documents that Russia stole, Compl. ¶¶ 161-165, 170, 172, 174; and multiple Campaign members obstructing inquiries into their interactions with Russian agents and WikiLeaks, Compl. ¶¶ 211-231. Considered as a whole, the allegations in the Complaint are more than sufficient to satisfy the requirements of Rule 11 and survive the pending motions to dismiss.

## V. CONCLUSION

For the foregoing reasons, the Court should deny the Motion for Sanctions in its entirety.

June 18, 2019

Michael Eisenkraft
Cohen Milstein Sellers & Toll PLLC
88 Pine St.
14th Floor
New York, NY 10005
(212) 838-7797

meisenkraft@cohenmilstein.com

Respectfully submitted,

/s/ Joseph M. Sellers
Joseph M. Sellers
Geoffrey A. Graber
Julia A. Horwitz
Alison S. Deich
Eric S. Berelovich
Cohen Milstein Sellers & Toll PLLC
1100 New York Ave. NW ● Fifth Floor
Washington, DC 20005
(202) 408-4600

jsellers@cohenmilstein.com
ggraber@cohenmilstein.com
jhorwitz@cohenmilstein.com
adeich@cohenmilstein.com
eberelovich@cohenmilstein.com

*Attorneys for Plaintiff*

## CERTIFICATE OF COMPLIANCE

I, Joseph M. Sellers, certify that this memorandum of law complies with Rule 2.D. of the Individual Practices of Judge John G. Koeltl because it contains 4,838 words and complies with the Court's formatting rules.

Dated: June 18, 2019
      Washington, D.C.

/s/ Joseph M. Sellers
Joseph M. Sellers

*Attorney for Plaintiff*