## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

DEMOCRATIC NATIONAL
COMMITTEE,

<i>Plaintiff,</i>

v.

THE RUSSIAN FEDERATION, et al.,

<i>Defendants.</i>

Case No. 1:18-cv-3501-JGK-SDA

Oral Argument Requested

---

### REPLY IN SUPPORT OF
### DEFENDANT DONALD J. TRUMP FOR PRESIDENT, INC.'S
### MOTION FOR RULE 11 SANCTIONS

---

James M. Gross
JONES DAY
250 Vesey Street
New York, NY 10281
(212) 326-3939
jgross@jonesday.com

Michael A. Carvin (*pro hac vice*)
  *Counsel of Record*
William D. Coglianese (*pro hac vice*)
JONES DAY
51 Louisiana Avenue, NW
Washington, DC 20001
(202) 879-3939
macarvin@jonesday.com
wcoglianese@jonesday.com

*Counsel for Donald J. Trump for President, Inc.*

## TABLE OF CONTENTS

**Page**

Introduction ...................................................................................................................................1

Argument .......................................................................................................................................2

I.    The DNC confirms that its case depends on allegations the Special Counsel disproved. ..........2

II.    The DNC's arguments for nonetheless allowing this case to proceed all fail. .............................6

Conclusion .....................................................................................................................................8

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Apotex Inc. v. Acorda Therapeutics, Inc.*,
    823 F.3d 51 (2d Cir. 2016) ................................................................................................... 1

*Bletas v. Deluca*,
    No. 11-cv-1777, 2011 WL 13130879 (S.D.N.Y. Nov. 15, 2011) .................................... 5, 8

*ED Capital, LLC v. Bloomfield Inv. Res. Corp.*,
    316 F.R.D. 77 (S.D.N.Y. 2016) ........................................................................................... 2

*Galin v. Hamada*,
    283 F.Supp.3d 189 (S.D.N.Y. 2017) .................................................................................... 3

OTHER AUTHORITIES

Special Counsel Robert S. Mueller, III, Report On The Investigation Into Russian
    Interference In The 2016 Presidential Election (Mar. 2019) ............................................ 2, 3, 4, 6, 7

## INTRODUCTION

The DNC fails to disprove that it is pursuing allegations that are directly contradicted by the Special Counsel's factual findings. That resolves the question *whether* the DNC is violating Rule 11. The only question left is: How far does the violation go?

It goes all the way down, to the core of the DNC's claims against the Campaign. Those claims are predicated on an agreement with Russia to steal and disseminate DNC materials. But the Special Counsel's findings knock out any possible basis for that theory. The DNC tries escaping this by mis-casting the Campaign as relying merely on the Special Counsel's failure to establish that the Campaign conspired with Russia, under the criminal burden of proof. That is false. The Special Counsel's inability to establish a Campaign–Russia conspiracy certainly raises questions as to why this case is consuming a busy court's finite resources—but that significant non-finding is not the reason the DNC is in violation of Rule 11. Rather, the DNC is in violation of Rule 11 because the Special Counsel's *affirmative factual findings*—whose credibility the DNC concedes (e.g., Opp. 1, 6 (ECF 261))—bely the DNC's speculative allegations and gut its theory of liability. This puts to rest the supposed "logical error" on which the DNC centers its defense. *Id.* at 1, 6–7. The DNC's only other response is to insist that civil discovery or other sources might turn up evidence that the Special Counsel's army of prosecutors and FBI agents somehow missed. But Rule 11's entire point is to bar such "wing and a prayer" litigation.

The DNC has made clear that it will not heed the proven facts. It is intent upon dragging the Campaign and this Court on a years-long fool's errand in hopes of explaining away its political de-feat. Nothing short of Rule 11 sanctions will suffice.[1]

---

[1] Because the DNC clearly accepts—as it must—that the Report is "publicly available and its accura-cy cannot reasonably be questioned" (*Apotex Inc. v. Acorda Therapeutics, Inc.*, 823 F.3d 51, 60 (2d Cir. 2016)), its request that the Court *not* judicially notice the Report fails.

## ARGUMENT [2]

### I.   The DNC confirms that its case depends on allegations the Special Counsel disproved.

**A.** The DNC leaves no doubt: It wants to proceed with a complaint filled with allegations that the Special Counsel's Report refutes. The most consequential—but by no means the only—examples are the DNC's allegations regarding when the supposed Russia–Campaign conspiracy formed: either "by March 2016," when George Papadopoulos began interacting with Joseph Mifsud; "or, at the very least, by June 2016," when the Trump Tower meeting occurred. SAC ¶ 272 (ECF 216). As to each, the Report flatly contradicts the DNC's assertions:

- The DNC claims Papadopoulos told "his superiors at the Trump Campaign" about Mifsud's mention of "'thousands of emails' that could harm Hillary Clinton's presidential campaign," and then "coordinat[ed] with Russian operatives before and during the April 2016 hacks." MTD Opp. 19–20, 36, 41 (ECF 241). But the Special Counsel explained that Papadopoulos "could not clearly recall having told anyone on the Campaign" about Mifsud's message, that no one else with the Campaign recalled him doing so, and that "[n]o documentary evidence" shows any such communications. Mueller Report 93–94.[3] And the Special Counsel exhaustively detailed "Papadopoulos's Russia-related communications with Campaign officials," without finding any communications suggesting he coordinated with Russia on the Campaign's behalf. *Id.* at 89–93.

- The DNC contends that, at the June 9, 2016, Trump Tower meeting, "(a) Russia used the meeting to tell members of the Trump Campaign about the documents it had stolen from the DNC …; and (b) members of the Campaign blessed a plan in which Russia would continue stealing similar documents and disseminate the documents it already had to the public." MTD Opp. 37. But the Special Counsel found that the 20-minute meeting covered only two topics having nothing to do with hacking, and was regarded by both sides as a "waste of time"—to the point that Jared Kushner staged a phone call and left, and another participant followed up to "apologize[]" to Donald Trump, Jr. Mueller Report 117–20.

---

[2] The DNC observes that a party who defeats a Rule 11 motion can sometimes be awarded fees. Opp. 5. But it does not claim *it* is entitled to fees if the Court denies the motion—and for good reason: Fees would be warranted only if the motion were "filed for an improper purpose or 'utterly without support.'" *ED Capital, LLC v. Bloomfield Inv. Res. Corp.*, 316 F.R.D. 77, 82 (S.D.N.Y. 2016) (citation omitted). The DNC could never make this showing, as it concedes by declining to even try.

[3] All citations are to the Report's first volume.

The DNC cannot deny that these findings undermine its preferred rendition of the relevant events. And yet, the DNC apparently has no intention of even trying to amend its pleading to drop these debunked assertions (not that this would salvage its case). There could not be a clearer-cut violation of Rule 11. *See, e.g.*, *Galin v. Hamada*, 283 F.Supp.3d 189, 203 (S.D.N.Y. 2017) (plaintiff and his counsel "had an obligation under Rule 11 to withdraw the Complaint [once] they knew … that their allegations on the central (and dispositive) issue in the case were 'utterly lacking in support'" (citation omitted)), *aff'd*, 753 F. App'x 3 (2d Cir. 2018).

**B.** Undeterred, and in defiance of the timeless advice for anyone who finds themselves in a hole, the DNC keeps digging. It thus concocts new theories to try keeping these key allegations— and with them, its case against the Campaign—alive.

*First*, the DNC clings to the Special Counsel's note that Papadopoulos "wavered" over whether he told one Campaign official "that [he] thought 'they have her emails.'" Mueller Report 93; Opp. 11. But this ignores that: (1) that other official "did not recall" receiving such information from *anyone* (and there was no evidence of any such communication) (Mueller Report 93–94); and (2) even Papadopoulos's "waver[ing]" recollection was about "*Secretary Clinton's* emails" (Opp. 11 (emphasis added); Mueller Report 93), not the effort to steal *DNC* materials that is the subject of this case.

The DNC also posits that Papadopoulos could have singlehandedly joined a conspiracy on the Campaign's behalf. Opp. 12. But it goes far beyond the good-faith representations that Rule 11 requires to suggest that Papadopoulos alone carried out a sweeping "conspir[acy] with a hostile foreign power" and helped "coordinat[e]" that hostile power's hacking efforts (MTD Opp. 4, 41), without so much as mentioning the stolen emails to any colleagues or superiors. And such a theory appears nowhere in the SAC.

Finally, the DNC notes Papadopoulos's admission that, months after the election, he deactivated his Facebook account and changed his cell-phone number. Opp. 12 (citing Statement of the Offense

¶¶ 33–34, *U.S. v. Papadopoulos*, No. 17-cr-182 (D.D.C. Oct. 5, 2017)). But this cannot suggest Papadopoulos was "hid[ing] the fact that he passed information" to Russia (*id.*), given that the Special Counsel evidently *still* had access to Papadopoulos's Facebook messages and text messages covering the relevant period, without anything in those messages establishing what the DNC hypothesizes. *See* Mueller Report 94–95 nn. 502–15 (repeatedly citing Papadopoulos's text messages and Facebook messages from July 16, 2016 to January 20, 2017). And although the Report noted ways in which certain "false statements" from Papadopoulos "impeded the FBI's investigation" (*id.* at 193), it does not suggest the investigation was in any way hindered by Papadopoulos deactivating his Facebook account or changing his phone number.

*Second*, the DNC insists that, despite the Special Counsel's findings, the Trump Tower meeting still could have marked the Campaign's entry into a hack-and-disseminate conspiracy. To start, it misleadingly states that the Russian participants provided "information that Russia believed to be related to the Clinton Campaign" (Opp. 12), papering over the Special Counsel's explanation that this had *nothing* to do with hacking the DNC: It related to individuals who supposedly had "broken Russian laws and had donated their profits to the DNC or the Clinton Campaign." Mueller Report 117.

Next, the DNC concocts a theory as to how the meeting participants could still have formed a Russia–Campaign hacking partnership. Maybe, the DNC speculates, after "Kushner fumed" about the irrelevance of supposedly tainted campaign contributions, the Russian participants "presented information about their ongoing efforts to steal Democratic documents" (apparently after initially holding back this pivotal information). Opp. 12. There are many problems with this revisionist history, chief among them that it contradicts the Special Counsel's explanation of what *actually* happened after "Kushner fumed": one Russian representative "then spoke about U.S. sanctions … and Russia's response"; "Kushner sent an iMessage to Manafort stating 'waste of time,'" and then had a secretary "call him to give him an excuse to leave"; and the meeting ended. Mueller Report 118–19.

And even if the DNC's new theory *could* be reconciled with the Special Counsel's findings, it would change nothing, both because it is not alleged in the SAC and because it is utterly unsupported by any *factual basis*, as opposed to wild speculation. By the DNC's logic, a jury could always infer something different from and in addition to its allegations. But this obviously does not suffice, because Rule 11 does not "give [the DNC] free reign to fire shots into the proverbial dark." *Bletas v. Deluca*, No. 11-cv-1777, 2011 WL 13130879, at *10 (S.D.N.Y. Nov. 15, 2011).

In short, the DNC cannot square its account of the Papadopoulos–Mifsud interactions or the Trump Tower meeting with the Special Counsel's findings. And none of its new theories regarding those events align with its own allegations or the actual facts.

**C.** Falling back, the DNC protests that the Papadopoulos–Mifsud interactions and Trump Tower meeting are not *that* important to its claims. Opp. 14–15. But the DNC has made clear that those events are the anchors for its theory that the Campaign conspired with Russia. Most tellingly, they represent the DNC's only theory as to when the conspiracy (or the association-in-fact RICO enterprise) supposedly formed. Even now, the DNC does not suggest that anything else relevant to its claims happened in "March 2016 or, at the very least, [in] June 2016." SAC ¶ 272. It thus cannot even say when the supposed conspiracy came into existence, or that a RICO enterprise formed in time to tie the Campaign to any alleged predicate acts of theft or dissemination.

More broadly, there is nothing else in the supposed "densely woven net of evidence" (Opp. 14–15) that can salvage the DNC's claims. None of the evidence that the DNC references (most of which is set forth in the cited SAC passages supposedly showing "dozens of secret communications," but then listed separately to give the illusion of breadth (*id.*)) supplies what the DNC tried to establish with its allegations regarding the Papadopoulos–Mifsud interactions or the Trump Tower meeting: a basis for concluding that the Campaign agreed to work with Russia on stealing and disseminating DNC materials. Indeed, the only other allegations of communications between the Cam-

paign and Russia-connected individuals are that Paul Manafort shared polling data with "known Russian spy" Konstantin Kilimnik, and that Roger Stone communicated with individuals who were publishing already-stolen materials. *Id.*; MTD Opp 38. But neither point comes anywhere near suggesting that the Campaign entered into a "common scheme to hack into the DNC's computer system, steal its trade secrets and other private documents, and then strategically disseminate those materials." MTD Opp. 1–2; *see also infra* at 6–8.

Simply put, the Special Counsel's findings leave nothing of the DNC's case against the Campaign.

## II.  The DNC's arguments for nonetheless allowing this case to proceed all fail.

Despite having the foundation of its claims destroyed, the DNC offers various reasons it should nevertheless be permitted to keep pursuing those claims. These arguments all fail.

**A.**  The DNC accuses the Campaign of "[m]isconstru[ing] [s]pecific [e]vents [d]iscussed in the [Special Counsel's] Report." Opp. 11. This argument largely centers on the Papadopoulos- and Trump-Tower-centric allegations addressed above. And the other events (1) were portrayed accurately in the Campaign's brief, and (2) cannot save the DNC's claims. For instance, the DNC insists that "the most natural explanation" for why Manafort shared polling data with Kilimnik is to "help Russia understand the effectiveness of its election interference efforts." *Id.* at 13. But even ignoring the question *how*, exactly, the Campaign's limited polling data would affect Russia's plan to disseminate stolen materials, the Special Counsel expressly provides a far more natural explanation: Manafort believed his role on the Campaign could persuade a Russian oligarch (to whom Kilimnik had access) that "Manafort's relationship with Trump could [be] help[ful]" and that the oligarch should "not move forward with [a pending] lawsuit against Manafort." Mueller Report 135–37. The DNC also suggests a jury could infer an agreement to hack because a Campaign staffer proposed an amendment to the Republican Party platform regarding Ukraine that he thought reflected then-candidate Trump's position. Opp. 13. But the Special Counsel explained that the other relevant wit-

nesses viewed the amendment as ill-advised and not even in line with the Campaign's stance. Mueller Report 127.

The DNC also suggests that unspecified "Defendants may have destroyed evidence or obstructed official proceedings," and that, if this could be demonstrated, it might support an inference of guilt. Opp. 13. But this is just one speculative inference piled atop another.

**B.**  The DNC makes much of the differences between civil and criminal litigation. But the lower civil burden of proof (Opp. 7–8) does not help the DNC, because (again) the problem is not that the Special Counsel lacked sufficient evidence to prove a "meeting of the minds" in a criminal case. Rather, the problem is that the Special Counsel's *affirmative findings* negate any basis for believing that the "meeting of the minds" that the DNC claims occurred in March or June 2016 ever actually happened, and thus refute the DNC's theory of liability.

Rather incredibly, the DNC also claims it would face "fewer investigative barriers" than the Special Counsel's team of prosecutors and FBI agents. Opp. 4. That argument requires ignoring the scope of the Special Counsel's two-year investigation, which encompassed not just 2,800 subpoenas and 500 witnesses, but also a host of criminal-investigation tools—roughly 500 search-and-seizure warrants, 230 orders for communications records, and 50 pen registers—that are unavailable in civil suits. Mueller Report 13. The DNC nevertheless insists it would have an advantage over the Special Counsel because civil litigants can compel testimony and seek negative inferences against defendants who invoke their Fifth Amendment rights. Opp. 8. But Papadopoulos and every single attendee of the Trump Tower meeting have either spoken to the Special Counsel or—as to Trump Jr. and Natalia Veselnitskaya—testified before Congress, and yet no evidence of a Campaign–Russia agreement has emerged. Mueller Report 117. Nor is there any credible reason to believe the DNC could secure some smoking-gun testimony (or some case-making inference) from any of the Special Counsel's other *500 witnesses*. The DNC cannot keep this case running on sheer hope that discovery conducted

under the constraints of the Federal Rules would yield crucial evidence that the Special Counsel's boil-the-ocean investigation somehow missed.

**C.**   Finally, the DNC pleads that additional information "may be disclosed at a later date." Opp. 10. But as already explained, Rule 11 prohibits plaintiffs from making unsupported assertions in the hopes that support will someday emerge. *Bletas*, 2011 WL 13130879, at *10. That conclusion applies with particular force here, given the potential sources of information on which the DNC stakes its hopes. The DNC observes that the publicly available Report redacts passages that "appear to relate to the interactions among the Trump Campaign, Stone, Assange, and WikiLeaks during the 2016 election." Opp. 10. But all of the DNC's allegations as to Stone relate solely to his supposed involvement in disseminating already-stolen materials. As the Campaign has thoroughly explained (MTD Opening Br. § I (ECF 227); MTD Reply § I (ECF 254)), the First Amendment precludes liability for the Campaign's supposed involvement in disseminating materials stolen by *others* (even if this could be proven). So even if the redacted information substantiated allegations as to Stone and WikiLeaks, this would not prop up the DNC's claims. The DNC also notes that Congress is "continu[ing] to investigate Russian election interference." Opp. 10. But that does not change the fact that the evidence amassed by the Special Counsel—the same evidence that Congress has subpoenaed and would be starting with (*id.*)—refutes the core allegations undergirding the DNC's claims against the Campaign.

## CONCLUSION

The Court should impose Rule 11 sanctions on the DNC.

Dated:   June 25, 2019    Respectfully submitted,

          /s/ Michael A. Carvin
          _____

James M. Gross      Michael A. Carvin (*pro hac vice*)
JONES DAY        *Counsel of Record*
250 Vesey Street      William D. Coglianese (*pro hac vice*)
New York, NY 10281     JONES DAY
(212) 326-3939      51 Louisiana Avenue, NW
jgross@jonesday.com     Washington, DC 20001
          (202) 879-3939
          macarvin@jonesday.com
          wcoglianese@jonesday.com

*Counsel for Donald J. Trump for President, Inc.*

## CERTIFICATE OF COMPLIANCE

I, Michael A. Carvin, certify that this brief complies with Rule 2(D) of the Individual Practices of Judge John G. Koeltl because it contains 2,787 words and complies with this Court's formatting rules.

Dated:    June 25, 2019                              /s/ Michael A. Carvin
                                                     —————————————————————————
                                                     Michael A. Carvin

                                                     *Counsel for Donald J. Trump for President, Inc.*

**CERTIFICATE OF SERVICE**

I, Michael A. Carvin, certify that on June 25, 2019, I caused the foregoing document to be electronically filed with the Clerk of Court using the CM/ECF system, which will send a notice of electronic filing to all registered parties.

Dated:    June 25, 2019                        /s/ Michael A. Carvin
                                                          Michael A. Carvin

                                                          *Counsel for Donald J. Trump for President, Inc.*