J7JHDEMO

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

DEMOCRATIC NATIONAL COMMITTEE,

                    Plaintiff,

            v.                          18 Civ. 3501 (JGK)

THE RUSSIAN FEDERATION, et
al.,
                                        Oral Argument

                    Defendants.

------------------------------x
                                        New York, N.Y.
                                        July 19, 2019
                                        3:00 p.m.

Before:

                    HON. JOHN G. KOELTL,

                                        District Judge

                        APPEARANCES

COHEN MILSTEIN SELLERS & TOLL
        Attorneys for Plaintiff
BY:  JOSEPH M. SELLERS
        GEOFFREY A. GRABER
        ALISON DEICH
        ERIC S. BERELOVICH
        MICHAEL BENJAMIN EISENKRAFT

JONES DAY (DC)
        Attorneys for Defendant Donald J. Trump For President
BY:  MICHAEL A. CARVIN
        JAMES MATTHEW GROSS
        WILLIAM D. COGLIANESE

BUSCHEL GIBBONS, P.A.
        Attorneys for Defendant Stone
BY:  ROBERT C. BUSHEL
        -and-
STRATEGYSMITH, P.A.
BY:  GRANT JEFFREY SMITH

J7JHDEMO

1                          APPEARANCES (Cont'd)

2    WINSTON & STRAWN LLP
             Attorneys for Defendant Kushner
3    BY:   CHRISTOPHER D. MAN

4    PIERCE BAINBRIDGE BECK PRICE & HECHT LLP
             Attorneys for Defendant Papadopoulos
5    BY:   BY:   CAROLINE JOHNSTON POLISI

6    HERBERT SMITH FREEHILLS NEW YORK LLP
             Attorneys for Agalarov Defendants
7    BY:   SCOTT SONNY BALBER

8    LAW OFFICES OF JOSHUA L. DRATEL, P.C.
             Attorneys for Defendant WikiLeaks
9    BY:   JOSHUA L. DRATEL

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

J7JHDEMO

```
1              (Case called)

2              MR. SELLERS:  Good afternoon, your Honor.  Joseph

3    Sellers representing the Democratic National Committee.  With

4    me is Geoffrey Graber, Eric Berelovich, Alison Deich, and

5    Michael Eisenkraft.

6              MR. CARVIN:  Good afternoon, your Honor.  Michael

7    Carvin for the Trump Campaign.  With me is Bill Coglianese and

8    James Gross.

9              MR. BUSCHEL:  Good afternoon, your Honor.  Robert

10   Buschel and Grant Smith on behalf of Roger Stone.

11             MR. MAN:  Good afternoon, your Honor.  I'm Chris Man.

12   I represent Jared Kushner.

13             MR. BALBER:  Good afternoon, your Honor.  Scott Balber

14   on behalf of Aras and Emin Agalarov.

15             MS. POLISI:  Good afternoon, your Honor.  Caroline

16   Polisi on behalf of George Papadopoulos.

17             MR. DRATEL:  Good afternoon, your Honor.  Joshua

18   Dratel for WikiLeaks.

19             THE COURT:  Good afternoon, all.

20             All right.  I have the motions to dismiss.  I'm

21   familiar with the motions.  I'm prepared to listen to argument.

22             MR. CARVIN:  Would you prefer argument at the podium

23   or here, your Honor?

24             THE COURT:  It's probably better to do it from the

25   podium, but if you wanted to do it from the table, that's OK.
```

J7JHDEMO

1          MR. CARVIN:  That's fine, your Honor.  Thank you.

2          Good afternoon, your Honor.  Again, Michael Carvin for

3     the Trump Campaign.

4          I'd like to begin with the First Amendment argument

5     under *Bartnicki* because that will resolve all the claims

6     against us.  The holding in *Bartnicki* is quite clear and

7     straightforward.  We have a First Amendment right to disclose

8     stolen speech about matters of public concern if you did not

9     participate in the theft.  Here, the other side concedes this

10    is speech about matters of public concern.  They concede that

11    only Russia was the one doing the hacking.  And even with

12    respect to cheerleading Russia's hacking, assuming that equates

13    to participation, they nowhere allege anywhere in the complaint

14    that we conspired in the Russian hacking.  Even with respect

15    under an information and belief, they can't identify a single

16    assertion in the complaint which says we conspired in the

17    hacking.

18         Now, the opposition, recognizing this fatal omission

19    seeks to mislead and obfuscate the issue.  They repeatedly say

20    there was a scheme to hack and disseminate the speech.  So they

21    lump together hacking and disseminating, and they have some

22    theory under conspiracy law where if you were involved in the

23    dissemination, you're somehow retroactively responsible for the

24    hacking.  But the key point is that there's nowhere in the

25    complaint where they separately allege hacking, and they can't

J7JHDEMO

1    allege that because their own timeline --

2            THE COURT:  They don't allege participation in the

3    hacking.  They allege hacking by The Russian Federation.

4            MR. CARVIN:  Correct.  And they don't allege any

5    participation by the Trump Campaign or anybody else in the

6    hacking, and they can't do that because if you look at the

7    timeline they set out in their own complaint, that would be

8    quite impossible.  I do want to go through this in some detail

9    because, as I say, it resolves not only the First Amendment

10   issue but many others.

11           They say the first hacking occurred July 27 of 2015,

12   which was well before any kind of enterprise is even alleged.

13   Then they say, paragraph 101, on April 18, 2016, there was the

14   pervasive hacking at the DNC.

15           Then at paragraph 127, they say from May 25 through

16   June 1, these thousands of emails that are at issue in this

17   case, all the emails, were released.  Now, the only meeting

18   that occurred during that time frame was the one between

19   Papadopoulos and Mifsud.  And they claim that on April 26,

20   2016, there was a meeting where Mifsud told Papadopoulos that

21   he had, past tense, that the Russians had thousands of emails.

22   So eight days --

23           THE COURT:  I'm sorry.  Hold on.  Thousands of Hillary

24   Clinton's emails.

25           MR. CARVIN:  That's the first point.  Of course, this

J7JHDEMO

1   is all a red herring because it has nothing do with the DNC

2   emails, but even if you accept their version that somebody

3   misunderstood the Hillary Clinton emails to be the DNC emails,

4   the dispositive point is this was eight days after they say

5   there had been this massive hacking.  Therefore, any such

6   hacking had already occurred.  They don't allege -- so that was

7   all done even before Papadopoulos heard about the Hillary

8   Clinton emails.

9          They don't allege that Papadopoulos conveyed this

10  information to the campaign.  They say what he conveyed to the

11  campaign was that he wanted to set up a meeting.  They don't

12  allege anything that Papadopoulos asked to participate in the

13  hacking or wanted to do more with the hacking.  There's no

14  allegation that they even discussed the contents of the emails.

15  There's no allegation that Papadopoulos was somehow authorized

16  by the campaign to enter into some kind of agreement or that

17  Mifsud was sometime, somehow authorized by the Russians to

18  enter into this agreement.  So this is entirely beside the

19  point.  And that's the only meeting that occurred when the

20  hacking was occurring.

21         The next meeting they talk about is the Trump Tower

22  meeting, and that's after all of the emails had been taken,

23  from May 25 to June 1, because the Trump Tower meeting, at

24  paragraph 137 of their complaint, was on June 9.  There's no

25  allegation even before Mueller that they discussed future hacks

J7JHDEMO

at that meeting, that they discussed the hacking at that

meeting.  There's no allegation of any discussion of the DNC

emails.

Indeed, the complaint says just the opposite.  At

paragraph 132 of the complaint, they say Trump had secured the

election by May 26 and a week later, referring to the

beginnings of the Trump Tower meeting, they said that they

started a scheme to disseminate the emails, not a scheme to

hack the emails, which of course would have been impossible

given the timing.

So there was no allegation anywhere about hacking at

the DNC because all that occurred after the hacking had

occurred.  They try and throw out another red herring in this

regard at paragraph 143, and they make something of this in

their opposition, they say:  Oh, you know, the very next day

there was some malware by the Russians on some Raider server in

Virginia, as if that's got anything to do with the emails that

are at the heart of this alleged conspiracy.  But if you read

paragraph 144, the very next paragraph, they say that that

malware was unable to exfiltrate any data.  So it's got nothing

to do with any emails, it's got nothing to do with any

illegality because there was no conversion or exposure of trade

secrets or anything else.

So then they string together -- I won't go into any

detail -- a bunch of other meetings with people peripherally

1    associated with Trump, people peripherally associated with the

2    Russians.  But the key denominator of all of those, of course,

3    is all of that occurred not only after all the hacking but

4    after the DNC convention where these things were publicly

5    released.

6         So we think, under *Bartnicki*, that's got to be the end

7    of this case.  They didn't participate in the hacking.  They

8    didn't conspire in the hacking.  And this indeed is a much

9    easier case than *Bartnicki*.  In *Bartnicki*, the defendant had

10   disclosed the email knowing that they'd been illegally

11   intercepted.  There's no allegation we disclosed anything.

12   Russia hacked, WikiLeaks disclosed, and we were doing some kind

13   of cheerleading which had no but-for causation of any kind.  If

14   *Bartnicki* makes it clear that even the discloser can't be

15   punished consistent with the First Amendment, then obviously

16   somebody who had nothing to do with either the hacking or the

17   disclosure is even more immune from any kind of penalty under

18   the First Amendment.

19        Recognizing the fatality of this point to their case,

20   they come up with a number of distinctions, all of which, in

21   candor, are facially feeble.  The first point they try and make

22   is, well, this is different from *Bartnicki* because we knew,

23   allegedly, when these were disclosed that they had been

24   illegally obtained.  Well, in any event, even if you assume the

25   unsupported speculation is true, the relevant point is it

1    doesn't matter.  In *Bartnicki*, the law said they had to know or

2    reason to know it was illegally intercepted.  In the Pentagon

3    Papers cases, it was stipulated that they knew the information

4    being disclosed was illegally stolen.  In *Boehner v. McDermott*,

5    it was stipulated that when McDermott disclosed Boehner's phone

6    call, he knew it had been illegally intercepted, and a majority

7    of the DC Circuit said that doesn't distinguish *Bartnicki* and

8    is irrelevant.  So, for that reason, the dicta from the *Cockrum*

9    district court decision they cite is also wrong because

10   knowledge doesn't distinguish *Bartnicki* in any way.

11          I note parenthetically that the plaintiffs in the

12   *Cockrum* case have now dropped their appeal.  So that case is no

13   longer on the books.

14          The second point they make is somehow we're legally

15   responsible for Russia's hacking.  They come up with this

16   theory under conspiracy law that if you join a conspiracy, then

17   somehow you become retroactively liable for everything your

18   coconspirators did previously.  Well, the basic point is in

19   *Bartnicki*, they were legally responsible, legally violating the

20   law for the disclosure.  It wasn't this indirect retroactive

21   liability that they posit under conspiracy law, it was in the

22   statute itself which said you can't do it.  And, of course, the

23   Supreme Court squarely held that you can't be held legally

24   responsible for disclosing materials regardless if the law

25   tells you it's illegal because you have a First Amendment right

1    to disclose it so long as you didn't participate in the theft.

2              I'll note parenthetically that they're quite wrong

3    about this conspiracy theory.  Again, we didn't conspire in the

4    hack.  The most you can cobble out of their complaint is that

5    we conspired in the dissemination, but that's, of course,

6    always true.  *The New York Times* conspired in the dissemination

7    of the Pentagon Papers case, but nobody had the audacity to

8    argue they were somehow retroactively liable for their

9    coconspirator Ellsberg's violations of federal law.  So it's

10   wrong as a matter of conspiracy law, but even if it was right,

11   it doesn't matter because it doesn't distinguish *Bartnicki*.

12             Perhaps their silliest argument is that there's no

13   expectation of privacy in *Bartnicki*, while there is an

14   expectation of privacy here.  It's simply mind-boggling to

15   assert that American citizens don't have an expectation of

16   privacy on their private phone calls that are being

17   intercepted.  *Bartnicki* embraced this obvious point, said of

18   course there's a right to privacy, indeed a right to privacy

19   with First Amendment concerns because you have a right not to

20   speak publicly unless you choose to do so.  But it quite

21   clearly held that that right to privacy is trumped by the First

22   Amendment right to disclose.  That you don't punish the

23   discloser, you punish the intercepter.

24             If this matters to anybody, there's obviously far more

25   of an expectation of privacy in a private phone call than there

J7JHDEMO

1    is in work-related emails at the DNC, which are of vast public

2    interest and where transparency is key.

3            Finally, they play the xenophobia card.  They say

4    Russia's --

5            THE COURT:  Whoa, whoa, whoa.  You refer to the

6    privacy card.  I read their papers as relying more on the

7    notion that there were trade secrets and that *Bartnicki* has an

8    exception for trade secrets.

9            MR. CARVIN:  Yes, actually, I think that's a separate

10   point, but I'm happy to address that, your Honor.  They do say

11   trade secrets, and there is -- at least *Bartnicki* didn't reach

12   that.  But the key point here is that the trade secrets were

13   not the alleged object of our conspiracy.  We were not here

14   conspiring with the Russians to expose all of these bytes and

15   technical inside stuff at the DNC.  The alleged conspiracy was

16   that we were getting out negative information that was going to

17   swing voters from Hillary Clinton to Donald Trump.  So there's

18   no allegation that the purpose of this was the trade secrets.

19           THE COURT:  But --

20           MR. CARVIN:  Sorry.  Please.

21           THE COURT:  But it's not so clear to me what that

22   distinction is.  As the plaintiff argues it, *Bartnicki* has an

23   exception, you would say *Bartnicki* left it open, for trade

24   secrets --

25           MR. CARVIN:  Right.

1              THE COURT:  -- which would mean that the protection,

2      as they would read it, the protection of the First Amendment

3      does not extend to the same situation as existed in *Bartnicki*,

4      namely, disclosure if, in fact, that disclosure is the

5      disclosure of trade secrets.

6              MR. CARVIN:  And the point I'm conveying -- and I'm

7      certainly happy to elaborate on it -- the trade secrets, at

8      worst, were a collateral damage by the fact that WikiLeaks

9      disclosed everything.  There's no allegation that we cared a

10     wit about getting the DNC donor list out there.  That's point

11     number one.

12              Point number two is that's legally dispositive under

13     *Bartnicki* because the key holding in *Bartnicki* was you need to

14     analyze the conversation as a whole.  Now, remember what the

15     person said in *Bartnicki*, said we're going to blow up their

16     porches.  That's not a matter of public concern, but it was in

17     the context of a discussion of matters of public concern, which

18     was this wage fight between the teachers in this county.  And

19     *Bartnicki* said as long as the context of the conversation as a

20     whole is about a matter of public concern, then that shields

21     the entire conversation.  Even if the thing that the plaintiff

22     is complaining about, like blowing up their porch, is

23     problematic, that doesn't give you -- and the reason for that

24     is, of course, that that would inhibit you from discussing

25     matters of public concern if there was some collateral subset

1    of things that were not protected.

2           So what *Bartnicki* had to be referring to was something

3    which discloses trade secrets, only trade secrets, and not

4    something where there was involved a matter of public concern.

5    If there's any ambiguity on that point, the court's decision in

6    *Florida Star* upon which *Bartnicki* heavily relied makes that

7    clear as well.  There, the privacy interest was the rape

8    victim's name.  The court squarely held that obviously

9    disclosing the name of this poor rape victim is not something,

10   in the balancing test, it's OK.  The rape victim's name is, if

11   you will, like the trade secrets.  But it said since the

12   conversation, since the article about the rape victim's name

13   concerned a matter of public concern, violent crime, that you

14   couldn't be penalized for the name since the general context

15   was a matter of public concern.

16          And that's the key point, which is the court made the

17   decision we're not going to inhibit matters of public concern

18   discussion.  We're not going to frustrate disclosure of all the

19   anti-Semitic, anti-Latino wrongdoing at the DNC, because at the

20   tail end of that tsunami of whistleblowing of corruption at the

21   DNC, there may or may not be a trade secret because then you're

22   throwing the baby out with the bath water.  You're not allowing

23   this disclosure to come forward.  There may have been something

24   in the Pentagon Papers revealing some GI's personal Social

25   Security information, but that doesn't matter because the

J7JHDEMO

1    general gist of what was being disclosed was matters of public

2    concern.  And I think that's the essential point and why their

3    trade secrets point goes no further.

4           The final point they make is that, that I was

5    addressing, was that these are Russians, and therefore, they

6    don't have First Amendment rights, and there's some kind of

7    policy of stopping foreign influence in elections.  All of

8    which I stipulate to, but all of which is beyond relevance

9    because we're not talking about the Russians' First Amendment

10   rights, we're talking about our First Amendment rights.  Nobody

11   has a First Amendment right to --

12          THE COURT:  Were the DNC documents that were

13   published, the hacked documents, first published on a public

14   website, whether Guccifer 2.0 or DCLeaks before they were

15   published by WikiLeaks?  The complaint alleges that Guccifer

16   sent WikiLeaks an email on how to access the stolen DNC

17   documents, and so that leads to the question of whether the

18   documents were, in fact, publicly disclosed before they were

19   disclosed on WikiLeaks and whether they were available to the

20   public.  Maybe you don't -- I'm going on the allegations in the

21   complaint.  DCLeaks isn't mentioned in the complaint but

22   Guccifer 2.0 is.

23          MR. CARVIN:  Right, as I understand the complaint --

24   and I will stand to be corrected by the people who wrote the

25   complaint -- what they were alleging is that there was a little

J7JHDEMO

1    trickle of information prior to the big data dump, I believe,

2    on July 22, on the eve of the Democratic National Convention.

3    I believe they were not necessarily attributing that initial

4    trickle exclusively to WikiLeaks but perhaps to Guccifer and

5    perhaps the people connected with the GRU.  But certainly the

6    main thrust was done by WikiLeaks, so there was some

7    allegations of some disclosure prior to that.  They haven't

8    drawn any distinction between the harm involved in the first

9    trickle and the second tsunami.

10         THE COURT:  Because the complaint plainly alleges that

11    it was Guccifer, one step removed from the GRU, that sent

12    WikiLeaks an email as to how to access the stolen DNC

13    documents, so that would at least suggest from the complaint

14    that there was public disclosure of the very same documents

15    that WikiLeaks made public disclosure of prior to the time that

16    WikiLeaks actually made the disclosure.

17         MR. CARVIN:  I've never understood the complaint, and

18    again, I --

19         THE COURT:  OK.  I'll ask Mr. Sellers in a moment.

20         MR. CARVIN:  No, no, but as best I can answer your

21    Honor's question, I do think Guccifer was, in essence, giving

22    WikiLeaks secret information about how to access these

23    documents that had not been made public.  If there was any

24    notion that these were already available and WikiLeaks was not

25    the discloser, then I suppose Guccifer and the GRU was the

J7JHDEMO

1    discloser, but in all events it wasn't the Trump Campaign.

2            Am I answering your question?

3            THE COURT:  Yes.  But, I mean, there is the issue that

4    you raise in your papers that there can't be an exception, even

5    putting aside all of the arguments over whether *Bartnicki*

6    allows an exception for trade secrets, there can't be an

7    exception for trade secrets which have already been disclosed.

8    So I was trying to understand the complaint with respect to the

9    issue of how much public disclosure or public availability

10   there was before WikiLeaks.

11           MR. CARVIN:  You're entirely right, your Honor.  The

12   reason I'm being very cautious here is because that would

13   certainly end any discussion.  I mean, it's been made clear by

14   Judge Posner and others, the obvious point, that it's not a

15   trade secret if it's already public.  You can't close the door

16   after the cow has left.  I just didn't want to put those words

17   in their mouth because I think we've -- got even on, if you

18   will, a conservative reading of the complaint, I think

19   participation in the hacking is key.  If it is a reasonable

20   understanding of the complaint that Guccifer made this public,

21   then of course this entire case goes away because then there

22   was no trade secret to be protected since they'd already been

23   exposed to the public.

24           THE COURT:  Were the results of the September 2016

25   hack ever published?

J7JHDEMO

1          MR. CARVIN:  No.  And that's an essential point, your

2     Honor.  They go long on this about the September 16 hack that

3     apparently gave them some snapshots to the Russians of this

4     stuff, about how many clicks they had and volunteer information

5     and that kind of stuff, but there's no allegation in the

6     complaint and of course it can't possibly be true that that

7     information was ever publicly disclosed because if it had been

8     publicly disclosed, we would have all seen it.

9          So, no, that's another red herring that there's

10    something -- that the Russians had gotten some information

11    about their trade secrets, which couldn't have possibly

12    implicated the Trump Campaign or possibly done any harm, much

13    less furthered this imaginary conspiracy, because it was never

14    made public to anybody.  According to them, the Russians sat

15    there and looked at it.  Indeed, they say the Russians could

16    have made money off of it if they offered to sell it to

17    somebody, which is quite inconsistent with the notion that they

18    would have given it away for free.  So there's no such

19    allegation.

20         THE COURT:  Can I consider the Mueller Report in

21    deciding the motion to dismiss?

22         MR. CARVIN:  I think you can for two reasons, but I

23    want to emphasize, your Honor, you don't need to.  You

24    certainly can because it's integral to their complaint.  It's

25    cited throughout, not the Mueller Report but all of the Mueller

J7JHDEMO

1    work product, and because it's a public document whose accuracy

2    can't reasonably be challenged, nor have they challenged it.

3            That said, our argument here is not that the Mueller

4    Report refutes all of these wild-eyed speculation by the DNC,

5    which it does, but that they have -- because it's such

6    wild-eyed, unsupported speculation, they have not made any such

7    allegations because they can't make any such allegations in

8    good faith.

9            I think that essentially disposes of what I wanted to

10   say about the First Amendment.  There are a number of issues

11   about RICO that I would like to address.

12           THE COURT:  Before we get to RICO, I did have another

13   initial question, which is what is the status of Donald Trump

14   Jr., Manafort, and Assange?  As to Donald Trump Jr., he waived

15   service of the summons, so he was prepared to participate in

16   the case.  I didn't see in the docket sheet proof of service

17   actually on Manafort or Assange.  What is the status of those

18   defendants, and what do you think that -- I mean, certainly as

19   to Donald Trump Jr. and Manafort, they're not wholly separate

20   from the Trump Campaign.  So what is your suggestion about what

21   ought to be done?

22           MR. CARVIN:  Well, your Honor, I think it's the

23   plaintiff's burden to bring these people into court, and if

24   they think that they want to make them part of this in an

25   ongoing way, they should have effectuated service and taken

J7JHDEMO

1    some actions about --

2           THE COURT:  Donald Trump Jr. waived service.

3           MR. CARVIN:  Right.  So, your Honor, I must say I

4    represent the Trump Campaign.  I really can't, I apologize,

5    cannot speak for Donald Trump Jr. or what happens in terms of

6    his exposure.  I will say that since nobody should be exposed

7    under any of these theories, that presumably he's made the

8    decision that your Honor's decision will dismiss this case, as

9    it should be done quite promptly.  If and when that doesn't

10   occur, I suppose Donald Trump Jr. can make whatever decisions

11   he needs to make about it.  We don't have any communications

12   with Manafort, and certainly we have no communication with

13   Assange.  So, unfortunately, I have no information on them

14   either.

15          THE COURT:  In terms of working through the RICO

16   issues, I mean, there are two enterprises asserted.  As to the

17   one enterprise, it's of course your client, and as to that,

18   there are lots of requirements for a RICO claim.  I appreciate

19   that.  One of them is participation in the operation or

20   management of the campaign.  And there's no dispute that as to

21   Trump Jr., Manafort, and Kushner there was participation in the

22   operation or management of the campaign, is there?

23          MR. CARVIN:  Again, your Honor, I apologize.  I

24   represent the Trump Campaign.

25          THE COURT:  But isn't that part of the issues with

J7JHDEMO

respect to the RICO claim as it deals with the Trump Campaign?

MR. CARVIN:  No, because under Kushner, as you undoubtedly know, we can neither be -- we can't be both the defendant and the enterprise.

THE COURT:  Right.

MR. CARVIN:  You know that law.  So if your Honor finds that the legal entity of the Trump Campaign is the enterprise, then we go away and we're out of this case.  I do think that everyone would have an extraordinarily strong argument that they didn't conduct the affairs of the enterprise.  I can't speak for either Trump Jr. or Manafort in that regard.  I don't think anybody, because of what I just said about the Trump Tower meeting, could argue that their conduct of the enterprise in any way involved a pattern of racketeering activity since, of course, whatever happened at the Trump Tower meeting had nothing to do with any potential illegality of the sort they've alleged here.

Hopefully this is not frustrating to your Honor, but you understand I'm representing the Trump Campaign.  If you go with the legal entity theory, they've stipulated that we're out of the case, and as far as my client's concerned, that's fine. I think you hear a lot of arguments from the other defendants that the motion based on how they conducted the affairs of the Trump Campaign is a nonstarter.  So I have focused my attention and my comments on the association-in-fact enterprise.

J7JHDEMO

1          THE COURT:  OK.  Go ahead.

2          MR. CARVIN:  In that regard, look, here's what

3     happened.  Russia hacked; WikiLeaks disclosed.  They've got

4     some theory that we somehow conspired in this operation.  But

5     they haven't brought any kind of conspiracy theory for those

6     activities.  I don't think they can under federal law.  What

7     they've done instead is try and erect something far more

8     difficult to establish in that we agreed with WikiLeaks and

9     Russia to disclose these things.  They've tried to create that

10    there was some kind of ongoing enterprise which has to have an

11    existence and purpose distinct from those predicate acts, and

12    as you know, courts in the Second Circuit have stopped that

13    kind of pleading in a variety of ways.

14          There are a number of reasons that that argument

15    fails.  I'd like to focus on the four that really don't even

16    require much discussion of fact but are completely contrary to

17    common sense and law.

18          The first point that requires dismissal of the RICO

19    claims is that they need to show under *Reves* that we had some

20    role in directing this association-in-fact enterprise of all

21    these disparate individuals and entities and that that

22    direction of -- their purposes was not directing our own

23    interests, and providing services to the enterprise would not

24    be sufficient to do that.

25          Well, here, there's no direction or control by the

J7JHDEMO

1    campaign over this alleged enterprise.  Russia hacked before

2    the enterprise.  WikiLeaks disclosed on its own.  There's no

3    allegation anywhere that we were the ones directing either of

4    those activities.  There's nothing in the complaint about this.

5    The one sentence in the voluminous opposition that they devote

6    to this essential issue is as follows on page 21.  Here's how

7    we directed the operation to enterprise:  We obtained

8    information from them and then we used that information to

9    Trump's advantage.  Well, obtaining information from other

10   people is hardly directing what they do.  *The New York Times*

11   was obtaining information from those people.  You're a

12   recipient, not a director.  So that can't possibly satisfy the

13   direction thing.

14        Then we used it to Trump's advantage.  Well, everyone

15   uses publicly available information to their own advantage.

16   And, again, that's not directing the affairs of the enterprise,

17   that's our own interest.  Our interest was in electing Donald

18   Trump president, and they have to distinguish, under *Reves*,

19   between our own interest and the purposes of the enterprise.

20   So since they failed to allege any kind of direction or control

21   by us over the operation and management of the enterprise, it

22   fails for that reason.

23        The other problem they've got when they try and cobble

24   together this wild global group of people into somehow being a

25   continuing unit with a common purpose, in the words of *Boyle*,

1   is that they can't define what actually glues them together,

2   both in terms of meeting or purpose.  So they've got to define

3   a common purpose at a extraordinarily high level of generality.

4   What do we all have in common?  We wanted Donald Trump to be

5   president.  That's what they said.  That was, of course, true

6   of tens of millions of Americans.

7          The key point is, of course, electing Donald Trump

8   president is not an unlawful purpose.  It's a constitutionally

9   protected purpose.  And in the Second Circuit, it is black

10   letter law that the enterprise needs to have a common unlawful

11   purpose.  That was the clear holding of *First Capital*, which

12   says under *Boyle* you need a common purpose or *Turkette* you need

13   a common purpose.

14          This circuit further requires that it be an unlawful

15   purpose, because we want a nexus to the predicate act.  That

16   case has been unthinkingly followed ever since it was issued as

17   recently as 2017 in the Eastern District in the *Moss* case.  How

18   do they answer that?  They tell you to defy that Second Circuit

19   precedent.  They tell you to say, no, no, a lawful purpose is

20   perfectly OK, notwithstanding the clear holding of *First*

21   *Capital*.

22          How is that happening?  There's a case called

23   *D'Addario*, if I've got that pronunciation correct.  It came

24   down in 2018, and they rip out of context one sentence from

25   that and they claim that *D'Addario* somehow implicitly overruled

J7JHDEMO

*First Capital*.  A very brief reading of that opinion, however, shows you they hardly distinguished *First Capital*.  They directly followed it.  *First Capital* had said with respect to bankruptcy trustees, they've got a lawful purpose that keeps them together.  They're supposed to preserve the assets and not hurt the creditors, but they engaged in the unlawful purpose of dissipating the assets and hurting the creditor.  *D'Addario* says, well, the executors of the estate did the same thing. Their lawful purpose is to distribute the assets of the estate to the heirs, but instead they engaged in self-dealing.  And since we are following *First Capital*, it can be an enterprise, association-in-fact enterprise.

So they said nothing about unlawful versus lawful purpose.  They said something to suggest that *First Capital*'s decision on that was in any way unclear, and they said nothing in any way to suggest that it was a problem.

THE COURT:  Am I correct that the violations of 18 -- alleged violations of Sections 1831 and 1832 cannot be predicate acts if they occurred before May 11, 2016?  That's the effective date for both statutes?

MR. CARVIN:  That is correct, your Honor.

THE COURT:  OK.

MR. CARVIN:  And you're right, I'll come back to that when I talk about those statutes.  But the notion that they are somehow worthy of special condemnation under RICO is belied by

J7JHDEMO

 1     the fact that they weren't even added till the date you gave us

 2     in 2016, which also has important point.

 3                 The final point I'd like to make about the common

 4     unlawful purposes is they play a semantic game with this as

 5     well.  They say the purpose was to elect Donald Trump through

 6     illegal means, so somehow this satisfies that requirement.

 7     But, of course, purpose is about ends, not about means.  And if

 8     you accepted this semantic gamesmanship, of course you would

 9     eliminate the basic rule in RICO is that you can't infer a

10     purpose in an association-in-fact enterprise simply because

11     they engaged in predicate acts.  There needs to be a purpose

12     distinct from the illegal means.

13                 Under their theory, every get-out-the-vote operation

14     in the world that has common cause with some campaign is now

15     part of a RICO enterprise if somebody does an illegal

16     registration or takes an illegal contribution.  So that's

17     clearly no good under *Turkette*, clearly no good under *First

18     Capital*, and that kind of semantic evasion exemplifies the

19     problem they've got with real, real RICO law.

20                 The third and obvious killer in terms of their RICO

21     problem is that you note -- you need to show a continuing

22     criminal activity.  That's *H.J., Inc*.  Now, in their first two

23     complaints, they recognize that, and what they said was the

24     obvious point, that if the purpose of this enterprise to elect

25     Donald Trump was to elect him, then, obviously, the enterprise

1    ended on November 8, 2016, because that was the day he was

2    elected.  That was their first two complaints.  And we pointed

3    out, well, that kind of closed-ended enterprise, you didn't

4    have enough time.  You needed at least two years.  So then,

5    magically, in their third complaint, they all of a sudden

6    decide, no, it didn't really end.  It wasn't inherently

7    terminable as courts put it on November 8.  It's actually a

8    continuing threat of ongoing activity.  So now they've decided

9    they're going to change their factual -- without changing any

10   of their factual assertions, they're going to change their

11   conclusory assertions about the enterprise, and they say it's

12   ongoing, it's an open-ended enterprise, it still exists to this

13   day.

14            THE COURT:  The pattern of racketeering activity.

15            MR. CARVIN:  Well, again, yes, under *Spool*, you

16   obviously need to show that under an open-ended enterprise,

17   there needs to be threat of continued criminal activity.  They

18   concede on page 63 of their opposition that under *Spool* each

19   defendant's predicate crimes must threaten continued criminal

20   activity.  Well, our predicate crimes were, under 1831 and

21   1832, stealing trade secrets.  So they need to convince you

22   that they have plausibly alleged that we are going to go into

23   the DNC and steal trade secrets in 2019 for the 2020 elections.

24            THE COURT:  They also allege obstruction as predicate

25   acts.

J7JHDEMO

1          MR. CARVIN:  Not as to the campaign, and therefore

2     they need to show that we will somehow do this.  And, of

3     course, obstruction presupposes some crime to obstruct, and so

4     then they not only have -- again, not speaking for the other

5     defendants, so they may correct me -- not only that they're

6     going to commit the crime, but then they're going to try and

7     obstruct it.  So as to us, it's only about 1831 and 1832.

8          They know they can't say with a straight face that

9     anybody could plausibly believe that we're going to hack the

10    DNC for trade secrets in 2019, so they try and change the law.

11    What they say is what we did in the past was "inherently

12    unlawful," citing this *Reich* case, and they say if it's

13    inherently unlawful, then you can somehow presume that we're

14    going to do it again.  But, of course, that's not what *Reich*

15    says, not at all.  What *Reich* really says is, listen, if the

16    act itself is inherently threatening and if the organization is

17    primarily dedicated, like a mafia family, to an unlawful

18    activity, then common sense tells you there's a continuing

19    threat.  *Reich* applied that -- so that was like the *Aulicino*

20    case where their entire business model was stealing drug

21    dealers and then holding them for ransom, and that satisfies

22    the standard.

23          But *Reich* applied that standard to an energy company

24    which had bribed foreign officials, and they said since their

25    activities are primarily lawful, selling oil, you need to show

J7JHDEMO

1   that this inherently lawful -- unlawful principle doesn't

2   apply.  And, again, on page 64 of their opposition, they

3   concede that the Trump Campaign is a primarily lawful activity.

4   So they lose under their own construction of *Reich*.  This is

5   directly analogous to the *Westchester* case where they're

6   alleging that a political party had done fraud to take over

7   another party, and the court said there, well, obviously, their

8   principle activity is constitutionally protected.  And even if

9   they committed fraud in the past, there's no reason -- that

10  can't be held to be unconstitutionally -- inherently unlawful.

11          THE COURT:  Could you finish up.  I want to make sure

12  I hear the other defendants before I give equal time to the

13  plaintiff.

14          MR. CARVIN:  I will certainly finish up.  I just need

15  to make, as quickly as I can, two points about our predicate

16  acts.

17          The key thing to understand is they're arguing that we

18  were conspiring to steal those trade secrets, not conspiring to

19  disclose them, because, remember, under 1831 we need to be

20  giving the Russians information that they didn't otherwise

21  have, like the Rosenbergs, and they also have to show that we

22  derived economic value.  Again, I think I've alluded to this,

23  the notion that we conspired in the hack is completely wrong,

24  but the notion that we had conspired and formed an intent at

25  the time of the conspiracy to steal trade secrets doesn't make

J7JHDEMO

any sense even from their perspective because the notion that,
remember, our motivation when they're trying to make this
plausible is to win the election.  Stealing DNC donor lists
doesn't help us win the election.  Plus, they can't show any
economic benefit.  They make the almost comical assertion that
we economically benefited by canceling our plans for opposition
research.

My final point on this is they need to show two
predicate acts, and they've only alleged two.  So if we went
win on either 1831 or 1832, then the pattern of racketeering
act goes away.

And the last thing they allege is the Wiretap Act.
They can't show that there was simultaneous interception at all
because we're talking about emails; we're not talking about
phone calls.  But what they really can't show is that we had
any reason to know that there was simultaneous interception.
Somebody gives you a phone call, and you know they haven't been
on the phone call, you have reason to know they stole the phone
call.  Somebody gives you an email, then you don't ever think
that this was simultaneously intercepted.  You think they'd
gone back and gotten old emails.  They don't in any way
counteract the commonsense point, so we can't be guilty under
the Wiretap Act.

I think, your Honor, I won't even bother the notion of
asserting supplemental jurisdiction over these meritless state

J7JHDEMO

```
 1    law claims, doesn't make any sense, but I will rest on the
 2    papers for that unless your Honor has any additional questions.
 3              THE COURT:  No.  Thank you.
 4              MR. CARVIN:  Thank you.
 5              THE COURT:  Other defendants?
 6              MR. BALBER:  Unless your Honor has a preference or
 7    anybody else has a strong desire to go next.
 8              THE COURT:  No, I have no preference.
 9              MR. BALBER:  Good afternoon.  I'm Scott Balber, and I
10    represent Aras and Amin Agalarov.
11              They are alleged in the complaint to have done one
12    thing, and one thing only, and that's arrange, not attend, not
13    show up at, not dial into a single meeting.  And this was not
14    any old meeting, your Honor.
15              THE COURT:  The Trump Tower meeting.
16              MR. BALBER:  Sorry?
17              THE COURT:  The Trump Tower meeting.
18              MR. BALBER:  That's right, Judge.  And I'll posit it
19    was the most thoroughly investigated, wildly reported meeting
20    in history.  And I say that not because I'm suggesting that
21    your Honor needs to go beyond the four corners of the complaint
22    and look at what you asked, which is the Mueller Report or the
23    congressional hearings and read beyond what they allege, I'm
24    telling you that because, despite this massive investigation by
25    Mueller, by multiple congressional committees, all the press
```

J7JHDEMO

1    coverage, all that they've alleged against my client are nine

2    specific facts, that's it, despite all this investigation, all

3    this developed narrative, nine facts.  And none of these nine

4    facts have anything whatsoever to do with this alleged

5    conspiracy to illegally access and disseminate the DNC's

6    electronic data.  There's an absolute lack of allegation in the

7    complaint vis-a-vis my clients on those issues.  Not a single

8    allegation they had any knowledge about a plot to access that

9    electronic data, nor a single allegation they had any

10   involvement in that computer hacking conspiracy.

11           Now, we lay out those nine specific factual

12   allegations --

13           THE COURT:  I've read all of the motions and the

14   response.

15           MR. BALBER:  Absolutely, Judge, I won't reiterate them

16   here, but you can see for yourself nothing to do with the

17   computer hacking and not a single allegation of any illegal

18   conduct whatsoever.  That has several implications, obviously,

19   your Honor.  There's no allegation of a single predicate act

20   against either, two separate people, Aras or Amin Agalarov, and

21   they would need to allege two as to each, not one.

22           There's no allegation that we were knowledgeable of,

23   agreed to join, or otherwise participated in the enterprise's

24   affairs.  There's no allegation of any continuity of the

25   conspiracy that we are alleged to have engaged in.  And

1    importantly, there's no allegation that anything that the

2    Agalarovs did vis-a-vis the arranging of this single meeting

3    caused the DNC any harm.

4          Lastly, your Honor, we don't believe that they've even

5    come close to alleging personal jurisdiction over either the

6    Agalarovs, who do not reside here, did not direct any conduct

7    here, and anything that they allege or alleged to have done,

8    they did from Russia.

9          If your Honor has no questions, I'll sit down.

10          THE COURT:  Thank you.

11          MR. BALBER:  Thank you, your Honor.

12          MS. POLISI:  Thank you.  I'll be brief, your Honor.

13    Caroline Polisi for George Papadopoulos.

14          Your Honor, we're resting primarily on our papers, but

15    we would just reiterate some key points.  There are many

16    weaknesses in the DNC's case, but I'll focus on perhaps the

17    most glaring weakness, which is plaintiff's RICO claims against

18    Mr. Papadopoulos.  Although there isn't a viable RICO claim

19    against any defendant, the claim against Mr. Papadopoulos is

20    particularly anemic and borders on the absurd.

21          The second amended complaint is big on cloak and

22    dagger innuendo but very, very weak on substance, facts, or

23    law.  As this Court is aware, and we've heard many times today,

24    a plaintiff bringing a RICO claim under Section 1962(c) must

25    allege participation in the affairs of an enterprise and a

J7JHDEMO

1    pattern of racketeering activity in the form of two or more

2    predicate acts.  These elements must be established as to each

3    individual defendant and there must be a common purpose to

4    engage in a fraudulent course of conduct.  Group pleadings do

5    not meet that standard, your Honor.

6          The RICO claims are woefully insufficient vis-a-vis

7    Mr. Papadopoulos on every single element.  First, plaintiff

8    must allege facts that show that each defendant participated

9    "in the operation or management of the enterprise" and had

10   "some part in directing its affairs."  In this circuit, your

11   Honor, the operation and the management test is extremely

12   rigorous.

13         What does the DNC allege that Mr. Papadopoulos did?

14   He met with Joseph Mifsud.  He met with him and he listened to

15   him.  He was a passive receptacle for information, and he

16   received that information.  And on April 26, 2016, Mifsud is

17   alleged to have told him that the Russian's have "dirt on

18   Hillary Clinton" in the form of "thousands of emails."

19         The only thing Mr. Papadopoulos did with this

20   information, in the form of reporting back to his superiors in

21   the campaign, was to say "interesting messages coming from

22   Moscow about a trip when the time is right."  That's it.  Full

23   stop, your Honor.  Nothing about how the emails were obtained,

24   nothing about the contents of the emails, and he didn't even

25   pass along substantive information to the Trump Campaign at

1   all.  The closest thing he did was saying there were

2   interesting messages coming from Russia about a potential

3   meeting, which isn't illegal, and it was a stated objective of

4   the Trump Campaign.  He was doing his job, your Honor, as a

5   low-level volunteer member of the campaign.  And attributing a

6   malicious agenda to lawful behavior is not evidence of criminal

7   intent.

8          Under the law, your Honor, it's not enough to take

9   directions or perform tasks that are necessary and helpful to

10  the enterprise, nor is it simply enough to provide goods and

11  services that ultimately benefit the enterprise.  None of which

12  it is even alleged Mr. Papadopoulos did here, but even so, that

13  would not be enough.  Where is the control, your Honor?  Where

14  is the exercising of some degree of control that

15  Mr. Papadopoulos has over this enterprise, whether that

16  enterprise is the Trump Campaign or the association-in-fact

17  enterprise?  It simply is not there.  There's not even one

18  predicate act here, your Honor, much less two.

19         I'm not going to get into the conspiracy charge

20  because the conspiracy claim under 1962(d) must fail if the

21  RICO claim isn't there under (c), and I'm not going to get into

22  the other minor allegations.

23         In conclusion, your Honor, the complaint fails to

24  suggest that Papadopoulos was even aware of the alleged scheme

25  at issue, much less perpetrated any illegal racketeering

J7JHDEMO

1   activities.   The DNC is trying to rewrite history with

2   speculation and innuendos.   Even when all of the facts are

3   construed in the light most favorable to the DNC, there's no

4   plausible or even possible way they've met the pleading

5   standards at this stage with respect to Mr. Papadopoulos, and

6   therefore the complaint must be dismissed entirely against him.

7            THE COURT:   Thank you.

8            Mr. Dratel.

9            MR. DRATEL:   Thank you, your Honor.

10           Your Honor, I just wanted to point out a couple of

11   unique and specific issues with respect to WikiLeaks and also

12   to respond to some of the questions that the Court asked

13   Mr. Carvin because I think there are answers, in some respects,

14   in the papers.

15           Obviously, WikiLeaks, I think, is in the strongest

16   First Amendment position because we are the publisher, and

17   that's it.   There's no allegation, obviously, of participation.

18   It is *Bartnicki*.   And I think that the amici brief makes very

19   clear the threat to investigative journalism, the threat to

20   independent journalism when you look at the number of

21   organizations and media outlets that publish this information,

22   although there's only one small, independent defendant in this

23   case in that regard, but it would open up a huge gap in First

24   Amendment protection for all news organizations and all

25   journalists in that regard.

J7JHDEMO

1          With respect to some of the specific statutory claims,

2     *Bartnicki* was a 2511 case, so we're in exactly the same

3     position.  With respect to the concept of trade secrets in

4     *Bartnicki*, the actual language of *Bartnicki* does not create an

5     exception.  What the Court said, "It need not decide whether

6     that interest" -- and it's talking about the privacy interest,

7     and I'll continue the quote -- "that interest is strong enough

8     to justify application of 2511(c) to disclosures of trade

9     secrets or domestic gossip or other information of purely

10    private concern."

11         And, again, earlier, in *Time Inc. V. Hill* -- this is

12    at page 8 of our reply memorandum, so it's in there -- but the

13    court reserved on whether truthful publication of private

14    matters unrelated to public affairs could be constitutionally

15    proscribed.  So what the court was talking about was purely

16    private matters.  Here, again, this is of extraordinary public

17    importance, and that is conceded.

18         When you look at the private aspect of it in terms of

19    trade secrets, and this is in the amici brief, is the

20    disclosures with respect to the tobacco industry included a

21    significant number of trade secrets, and there was never any

22    question that that somehow could be proscribed or prohibited or

23    that the First Amendment did not protect that.  The delivery of

24    nicotine, the way that their testings were done, the way that

25    cigarettes were manufactured -- all of that is in those

J7JHDEMO

1    documents in the tobacco cases, all public, all essentially

2    trade secrets in that regard.  So that cannot be a basis for an

3    end run to circumvent the protections of the First Amendment.

4          Also with respect to the trade secrets claims, there

5    are two statutory aspects of it that the plaintiffs have not

6    addressed.  One is 1831, which is the benefit of a foreign

7    government.  There's no allegation with respect to that to

8    WikiLeaks.  The motivations for WikiLeaks are set forth in the

9    complaint, and they have nothing to do with Russia.  That's in

10   our papers, so I'm not going to belabor that.  But also for

11   1832, an economic benefit to another, and there's no allegation

12   of that either.

13         With respect to the chronology that the Court

14   discussed, and I don't have it with me, unfortunately, but in

15   our papers, at page 4 of our initial brief back in December,

16   which is docket No. 208, our reply is 259, so our initial

17   memorandum of law to the first amended complaint, it appears

18   that the first amended complaint, I think paragraphs 146 to

19   148, actually does mention DCLeaks as an initial publisher.

20   And the Court is correct that there is no basis in the record

21   to determine that any of what's claimed as trade secrets were

22   not published in that initial trove.

23         Also, the same is true of the Netyksho indictment,

24   which I think is in the same character as the Mueller Report in

25   the sense that the --

1          THE COURT:  It's a little different.  That indictment

2     is, in fact, quoted and relied on in the second amended

3     complaint.

4          MR. DRATEL:  Right.

5          THE COURT:  The Mueller investigation is referred to

6     in the second amended complaint but not the Mueller Report,

7     which hadn't been issued yet.

8          MR. DRATEL:  Right.  I mean Netyksho is more integral

9     to the complaint even than the Mueller Report because that is

10    referred to specifically in the first and second amended

11    complaints, but that chronology also is the same.  It talks

12    about DCLeaks and Guccifer 2.0 initially -- Guccifer 2.0 using

13    DCLeaks, WordPress, other means of publication before WikiLeaks

14    is ever involved.

15         A defense that's only available to WikiLeaks, as far,

16    I think, in terms of the motion is concerned, also as a matter

17    of fact, is the Section 230 immunity.  The only thing I would

18    point out again is this is the essence of that provision, which

19    is about political discourse, and that's what this is about.

20    So if the protection applies anywhere, it really has to apply

21    here as well.

22         With respect to the RICO, again, as the other defense

23    has pointed out, with WikiLeaks in particular as an outsider to

24    any of the political operatives involved, no management at all,

25    no direction, the plaintiffs do not even argue in their papers

J7JHDEMO

1    closed-ended continuity against WikiLeaks.  As for open-ended,

2    it cannot argue it because it does not allege any obstruction

3    predicates against WikiLeaks.  So WikiLeaks is confined to

4    pre-election conduct, and in that regard, and I think for good

5    reason, they can't.  So the plaintiff has failed to make out a

6    RICO case.

7             The Court asked Mr. Carvin about Mr. Assange.  I do

8    not speak for Mr. Assange, but I would say that he, as a matter

9    of law, should get the benefit of any favorable decision to

10   WikiLeaks in this case without prejudicing his rights, even if

11   it's an unfavorable decision, to articulate defenses on his own

12   should he ever be served and the Court have jurisdiction over

13   him.

14             Thank you, your Honor.

15             THE COURT:  Thank you, Mr. Dratel.

16             MR. MAN:  Thank you, your Honor.

17             The plaintiffs don't have very much to say about

18   Mr. Kushner by name, so I don't have a whole lot to speak to

19   the Court about today.  But all of their allegations against

20   Mr. Kushner by name all go back to the July 9, 2016, Trump

21   Tower meeting, which is essentially a nonevent.  My client had

22   no involvement --

23             THE COURT:  June 9.

24             MR. MAN:  June 9, I'm sorry.  Apologies.

25             He did not plan the event.  He did not lead it.  He

J7JHDEMO

showed up to listen.  In the Mueller Report it says in the

middle of a meeting he sent an iMessage out saying this is a

waste of time and found an excuse to leave early.  There's no

follow-up involving him about that.  And later the plaintiffs

come back and say more than a year later, somehow my client

committed obstruction of justice by not reporting the

attendance of this meeting as part of a security clearance

process.

THE COURT:  You think I can consider the Mueller

Report as part of the motion to dismiss?

MR. MAN:  Yes, your Honor, I believe you can take

judicial notice of that.

But, in any event, the predicate act that's being

alleged here as obstruction of justice, it takes place after

the election.  So at that point there's no way this predicate

act could have been responsible for any harm to the plaintiffs.

And there's still the basic fact that for an act to be in

furtherance of a conspiracy, you would have had to have joined

the conspiracy first, and that is never established either.

The final point here is that concealing a meeting

where nothing happened concerning the DNC cannot possibly be in

furtherance anyway and certainly cannot have caused the

plaintiffs any harm.

So unless the Court has any questions, I'm ready to

sit down.

J7JHDEMO

1              THE COURT:  All right.  Thank you.

2              MR. BUSCHEL:  Good afternoon, your Honor.  Robert

3     Buschel on behalf of Roger Stone.

4              THE COURT:  Good afternoon.

5              MR. BUSCHEL:  I do believe that the court can consider

6     the Mueller Report.  Plaintiffs ask the Court to ignore the

7     Mueller Report and accept the intelligence community report,

8     and I encourage the Court to read that as well, because if you

9     read what level of high confidence and the definition of high

10    confidence in the intelligence community report is, the Court

11    will learn that high confidence is defined as generally

12    indicates the judgments are based on high-quality information

13    from multiple sources.  High confidence in a judgment does not

14    imply that the assessment is a fact or a certainty.  Such

15    judgments might be wrong.

16             So the plaintiff in its opposition is saying, well,

17    there's a different standard for civil cases versus criminal

18    cases, and so even if the Mueller Report or the intelligence

19    community comes up with something different, well, then

20    therefore the standard is different, and the Court can still

21    proceed with the civil case.  It cannot.

22             I want to draw the Court's attention -- we have the

23    Deputy Attorney General Rosenstein after the Netyksho

24    indictment both times saying that there's no conspiracy with

25    any American.

1          Secondly, there was a previous indictment with the

2     Concord Management and the Internet Research Association.

3     Also, Mr. Rosenstein said that no American conspired.  There is

4     no allegation in the indictment that any American was a knowing

5     participant in the alleged unlawful activity.  There is no

6     allegation in the indictment that the charged conduct altered

7     the outcome of the 2016 election.

8          Lastly, I think it's important from the Mueller Report

9     on page 47 to contradict paragraph 19 of the second amended

10    complaint, the office cannot rule out that stolen documents

11    were transferred to WikiLeaks through intermediaries who

12    visited the summer of 2016.  And the reason why that is

13    important is if WikiLeaks did not receive the documents, the

14    DNC's data, from the Russians, then this whole conspiracy

15    theory with everyone put together in this second amended

16    complaint falls apart.  Because if they received the DNC's

17    data, either it was an inside job or someone who hacked and

18    stole the DNC emails and gave it to the WikiLeaks, and it

19    wasn't Russians who gave it to them --

20         THE COURT:  I thought the Mueller Report concluded

21    that WikiLeaks got the documents through Guccifer 2.0?

22         MR. BUSCHEL:  Not -- Guccifer 2.0 may have done

23    hacking.  I'm not saying let's not say the Russians didn't

24    hack.

25         THE COURT:  No, I thought the GRU did the hacking and

J7JHDEMO

then Guccifer 2.0 got the documents and then proceeded to

disclose them.  Whether they were disclosed publicly or

provided to WikiLeaks is something that the plaintiffs can

expound on or plaintiff can expound on shortly, but certainly

Guccifer 2.0 was associated with the Russian government.

MR. BUSCHEL:  Perhaps.  That's what -- yes, the

Mueller Report does conclude that, but whether it was

transferred that way, I guess, we can -- you have what the

plaintiff states.  But page 47 of the Mueller Report says it

wasn't necessarily done from the outside, which is the only way

Guccifer could have hacked is from outside the DNC rather than

inside the DNC, which is what the Mueller Report is saying that

it had to be a physical transfer; that the office cannot rule

out the stolen documents were transferred to WikiLeaks through

intermediaries who visited during the summer of 2016.

Regardless, Roger Stone had nothing to do with the

hacking, the stealing of the data, or the transference.  At

best, they're saying that Roger Stone again is somehow a

cheerleader of the publication of WikiLeaks.  There's no

allegation of the conspiracy to join.  Roger Stone -- there's

no allegation until after the first tranche of DNC emails were

published, which is July 22, 2016.  And the first time that

Roger Stone is mentioned is this allegation about John Podesta,

who is not with the DNC.  He's with the Hillary Clinton

Campaign, and it was his gmail account that was hacked through

J7JHDEMO

a spear-phishing campaign.  So that is something that's

completely outside of this Russian hacking of the DNC

documents/data.

It also dovetails into that there's different purposes

and different conspiracies because -- it's on page 24 of the

second amended complaint -- it is about a conspiracy to

disseminate the DNC data, and then later on they talk about how

this is an ongoing claim in order to keep Trump's grip on

power.  Two separate, distinctive -- they don't say what Roger

Stone's goal is other than to say that he wanted to have Donald

Trump elected president.

Lastly, I wanted to comment on the -- they're claiming

that Roger Stone was indicted for obstruction of Congress and

witness intimidation.  That is correct.  We cited to the

indictment.  But this is all after the conspiracy has to end.

The DNC is still saying that there's now -- that there's this

ongoing, open-ended conspiracy.  That every day Donald Trump is

president this -- and if he seeks reelection, it's an ongoing

conspiracy.  All conspiracies must end.  It is black letter

law, *Grunewald*, *Krulewitch*, all of these cases, even the

*Freeman* case that they cited to in the circuit says there has

to be a beginning, there has to be an end.  And this idea that

the conspiracy continues, it ended on the day Donald Trump was

elected president.  So the obstruction charge and any

indictment that happened post shouldn't count as an overt act

J7JHDEMO

1    or a predicate act against Roger Stone.

2            Further, the conspiracy cases all assume that denying

3    is part of the conspiracy.  Saying, well, did you do the crime?

4    No, I didn't.  All those types of denials are part of the

5    conspiracy.  It's not a new overt act.

6            THE COURT:  All right.  Thank you.

7            MR. BUSCHEL:  Thank you.

8            THE COURT:  All right.  That leads us to the

9    plaintiff.  Let me just check with the court reporter.

10           All right.  Mr. Sellers.

11           MR. SELLERS:  Yes, sir.  Your Honor, good afternoon.

12           THE COURT:  Good afternoon.

13           MR. SELLERS:  The defendants' arguments fail for

14   several reasons common to them.  I want to address those first.

15           Turn first to the First Amendment issues.  I'm

16   prepared to discuss my some of the statutory claims if the

17   Court wishes, the Wiretap Act, certainly talk about the trade

18   secrets, what qualifies as a trade secrets.  With the Court's

19   permission, Mr. Graber is then going to address the conspiracy

20   and RICO aspects of the case, if that's acceptable.

21           THE COURT:  Sure.

22           MR. SELLERS:  So there are four key rules here that I

23   think apply across the board and which, I believe, have been

24   lost in part by the way the defendants have been making their

25   arguments.

J7JHDEMO

1            The first is conspiracies do not require evidence of a

2     smoking gun.  The Second Circuit has made that quite clear.  A

3     good deal of our evidence, as you'll hear more from Mr. Graber,

4     comes from inferences drawn by timing and the way in which

5     events overlay each other.  And the fact that there's no overt

6     statement about -- although there have been a number of overt

7     statements alleged in the complaint, but some of them are

8     inferred -- the unlawful conduct is inferred from the

9     circumstances.

10            The second is, obviously, the complaint has to be --

11    complaint allegations must be assessed together.  There has

12    been some effort here to separate out and isolate particular

13    instances, and they have to be viewed together.  And, again,

14    Mr. Graber's going to speak to that.

15            The third, and what I'm going to return to, is from

16    the *Twombly* decision, which is that conduct with no apparent

17    lawful justification can satisfy the plausibility standard.  I

18    need not remind the Court that we are at the stage of assessing

19    whether the allegations in the complaint are plausible -- this

20    is not a summary judgment hearing -- and we maintain that we

21    should be held to that standard.  And there are a number of

22    situations here alleged in the complaint where there is no

23    obvious lawful explanation for the conduct.

24            And the fourth, and one that is clearly one that has

25    been the subject of some debate, and, again, Mr. Graber is

1    going to address further, is that members of a conspiracy -- as

2    members of a conspiracy, individual defendants are liable for

3    the unlawful actions committed before as well as after they

4    joined the conspiracy.  So when defendants have asserted we

5    have no responsibility for this particular action, if they were

6    members, became members of the conspiracy at a later date, they

7    become responsible for their coconspirators' actions.  So as a

8    result, for instance, the allegations that Mr. Papadopoulos,

9    who had been named as a foreign policy adviser --

10           THE COURT:  Could I just stop you on that.

11           MR. SELLERS:  Sure.

12           THE COURT:  There's no allegation that any of the

13   defendants other than the Russian federation were involved in

14   the hacking.

15           MR. SELLERS:  There's no allegation about who other

16   than the Russians engaged in the hacking.  There are

17   allegations -- I'm going to come to that -- about encouraging

18   hacking, but there's no allegation that anyone other than the

19   Russians engaged in the hacking.

20           THE COURT:  Let me ask you some of the preliminary

21   questions that I asked Mr. Carvin also.  Do you think that I

22   can consider the Mueller Report in deciding the motion to

23   dismiss?

24           MR. SELLERS:  Well, the Second Circuit authority on

25   this makes clear that unless the report were to be integral to

J7JHDEMO

1   the complaint, it ought not to be the subject of judicial

2   notice.  Certainly the fact of the report can be taken subject

3   to judicial notice, but the contents ordinarily -- the *Concord*

4   *Associates* case, the Second Circuit, certainly suggests that it

5   would not ordinarily be considered.

6        THE COURT:  The reason, in part, is that the content

7   is hearsay, right?  I can take judicial notice of the fact that

8   the report was issued, but not for the truth of any of the

9   contents.

10       MR. SELLERS:  Right, correct.

11       THE COURT:  But there is an exception for reports of

12   public investigations.  Why wouldn't this fall within that

13   exception?

14       MR. SELLERS:  Well, I think it's because it would

15   be -- whether this public investigation -- if the complaint had

16   invoked the Mueller Report -- and I need not remind the Court

17   that the Mueller Report was issued about three hours before we

18   filed our opposition to the motion to dismiss, so we haven't

19   even filed a brief addressing the Mueller Report --

20       THE COURT:  Well, look, the parties briefed the

21   Mueller Report in the supplemental motion on Rule 11.

22       MR. SELLERS:  Yes, yes, to that extent that's correct,

23   we each cited to facets of it for that limited purpose of

24   whether Rule 11 was satisfied.

25       But anyway, I mean, my point only is we did not and

1    did not intend to address each of the points that Mueller

2    Report applies to -- whether it applies to each aspect of the

3    complaint.  As I said, I think that the *Concord* decision makes

4    clear that unless the Mueller Report were a central part of the

5    complaint, in the same context as if the complaint were

6    alleging some wrongdoing with respect to a contract and the

7    contract then would be made part of the complaint, but the

8    Mueller Report is not central to the -- obviously, there are

9    facets of the Mueller Report that are the subject of, the same

10   as the allegations.

11               THE COURT:  But I thought, for purposes of a motion to

12   dismiss, I can consider matters of which judicial notice can be

13   taken.

14               MR. SELLERS:  Correct.

15               THE COURT:  So I can consider the matters that are

16   integral in the complaint that the plaintiff relied upon in

17   bringing the complaint or matters of which judicial notice can

18   be taken.  So then I face the question, OK.  Matters of which

19   judicial notice can be taken.  Everyone agrees that the fact of

20   the Mueller Report is something of which I can take judicial

21   notice.  And then you correctly say, yes, we know about the

22   exception to the hearsay rule for the results of a public

23   investigation.  So I ask myself, doesn't that mean that I can

24   look at the Mueller Report also as a matter for which judicial

25   notice can be taken?

J7JHDEMO

1          MR. SELLERS:  Well, I think I've made my point, and I

2     perhaps haven't persuaded the Court, but I think that the

3     *Concord Associates* decision certainly stands for the

4     proposition, we think, that it is not integral to the

5     complaint.

6          That said, as the Court is aware, in very limited

7     fashion, because it was -- we were addressing Rule 11, not the

8     question of the sufficiency of the allegations, we did address

9     the Mueller Report.  I don't think that's really the same as

10    briefing the Mueller Report, but as we point out in our

11    opposition to the Rule 11 motion, there are many features of

12    the Mueller Report that we think make either conclusions or

13    observations that are consistent with the allegations in the

14    complaint.  The Mueller Report was in many ways inconclusive

15    about what it found.  It would often just recite testimony from

16    people without drawing credibility determinations, that sort.

17    So I'm not sure how much utility it has.  But I rest on the

18    *Concord Associates* case.

19         THE COURT:  OK.  The other question I had was the

20    initial question was were the stolen DNC documents first

21    publicly published by Guccifer 2.0 --

22         MR. SELLERS:  I think they were --

23         THE COURT:  -- and/or DCLeaks before they were posted

24    on WikiLeaks?  Paragraph 154 of your complaint, I thought,

25    suggests that, because Guccifer sent WikiLeaks an email --

J7JHDEMO

1          MR. SELLERS:  Right.

2          THE COURT:  -- as to how WikiLeaks would be able to

3   access the stolen DNC documents.

4          MR. SELLERS:  Correct.  So if I understood your

5   question, Guccifer made the stolen documents, the first tranche

6   of stolen documents, available on some kind of nonpublic site

7   because WikiLeaks needed a means of accessing them, which

8   Guccifer provided in July of 2016.  WikiLeaks wouldn't have

9   needed the help of Guccifer in locating the documents if they

10  had been made public.

11         THE COURT:  Is it true that there's no allegation that

12  the results of the September 2016 hack were ever published?

13         MR. SELLERS:  I believe that's correct.

14         THE COURT:  OK.

15         MR. SELLERS:  What I was just -- just to conclude very

16  quickly on my introductory remarks, the allegation, for

17  instance, that Mr. Papadopoulos had been named a foreign policy

18  adviser by the time he met with Mr. Mifsud about the emails and

19  therefore was a representative of the campaign in connection

20  with that meeting, the fact that he met with somebody about

21  these emails four times in the spring, at least -- not about

22  the emails but meetings of which during which at least one of

23  them discussed these emails, we would submit does not provide

24  for an obvious lawful explanation.  This was not some official

25  meeting between a representative of the campaign and somebody

officially representing the Russian government in which there
was some public reason to have these meetings.  This was a
furtive meeting.

In fact, it led to, as the allegations in the
complaint made clear, eventually to a failure to disclose this.
It was never disclosed to the FBI or anyone else.  We needed an
Australian diplomat to notify the FBI about this.  If this had
been something that Mr. Papadopoulos had reason to think this
was something that was improper, he could have notified the
FBI.  Just as when he reported back to the campaign and
suggested that the campaign representatives meet with Russians,
the campaign representatives could have notified the FBI that,
gee, we understand the Russians have these emails, and we think
you should be aware of that.  No effort to do that.  Instead,
they jumped to proceed to try to meet with clearly the
expectation, whatever happened at the meeting, but clearly the
expectation was that they were going to be meeting about dirt
about Hillary Clinton.  That was both what was described to
them, it was also what Mr. Goldstone's email on behalf of the
Agalarovs represented would be occurring.

So these facts have to be both taken together.  Again,
Mr. Graber will discuss the conspiratorial facet of it.  But
these are hardly situations where there was some obvious lawful
reason for this activity.

Let me turn to the First Amendment issue.  We all

agree that *Bartnicki* is a very important precedent in this

discussion.  We disagree, however, I think, about its

application.  We start with looking at Justice Breyer's

concurring opinion, because the opinion by Justice Breyer which

Justice O'Connor joined created the majority that the court

relied on.  And Justice Breyer made a point in concurring in

saying that these were limited to special circumstances

presented there, and in particular, there was no basis on which

the publisher of the material had any way in which it had any

association to any activity whatsoever that would have been

unlawful.

         And in particular, Justice Breyer -- this is at

page 538 of the decision, 532 U.S. at 538 -- says,

distinguishing cases in which the defendant "ordered,

counseled, encouraged, or otherwise aided or abetted the

interception, the later delivery of the information, or to the

intercepter or later delivery of the information to the media."

So any unclean hands in this process, I think, is a fair

conclusion from Justice Breyer's statement.

         THE COURT:  But that applies to participation in the

initial illegal acquisition of the materials.  It couldn't

apply to knowingly publishing materials that you know have been

obtained in some form of illegal fashion.

         MR. SELLERS:  Agreed.  I'm going to come to why I

think Justice Breyer's line has been crossed.

J7JHDEMO

1          THE COURT:  I'm sorry?

2          MR. SELLERS:  I'm going to come now to why we think

3    Justice Breyer's line has been crossed, but I agree with you

4    that the publication alone would not be sufficient.

5          So as I said before, on June 22, eight days after the

6    DNC announced that Russia had hacked its servers and one day

7    after Guccifer posted a batch of stolen documents, WikiLeaks

8    asked Guccifer to "send any new material here for us to review,

9    and it will have a much higher impact than what you are doing."

10   That's the amended complaint paragraphs 148 and 149.  We

11   believe that the inference that was drawn, and certainly a

12   plausible inference for purposes of satisfying the requirements

13   of the complaint, is that WikiLeaks was soliciting or

14   encouraging Guccifer to hack new material.  They asked for new

15   material from Guccifer, and indeed Guccifer did hack new

16   material.

17         Then on July 6, 2016, WikiLeaks told Guccifer to "send

18   anything Hillary-related in the next two days" because they

19   were trying to load up information that might undermine the

20   Democratic Convention and sow conflict.  We maintain that that

21   is, again, a solicitation to Guccifer to send anything

22   Hillary-related, certainly plausible that it would be a

23   solicitation to hack rather than just to send the materials,

24   and Guccifer thereafter transmitted a large cache of stolen

25   documents, and then again on September 20 of 2016, WikiLeaks

J7JHDEMO

1    provided Trump Jr. with a stolen password to an anti-Trump pact

2    website.  That was hardly the action, that's paragraph 173 --

3    sorry.

4              THE COURT:  The stolen password really doesn't have

5    anything to do with the stolen emails from the DNC.  It was

6    access to another website which contained some other

7    information, right?

8              MR. SELLERS:  Well, it didn't relate directly to the

9    hacking, that's correct.

10             THE COURT:  OK.  With respect to all of the

11   communications that you've gone over --

12             MR. SELLERS:  Yes.

13             THE COURT:  -- if *The Washington Post* asked the same

14   questions of a source, would that subject *The Washington Post*

15   to the same liability?

16             MR. SELLERS:  If *The Washington Post* asked a source,

17   please go hack --

18             THE COURT:  No, no.

19             MR. SELLERS:  -- the Pentagon, I think we'd all agree

20   that would be -- would divest it of First Amendment protection.

21             THE COURT:  If *The Washington Post* said, send us

22   anything new that you have, send us anything that hasn't been

23   published before.

24             MR. SELLERS:  Certainly that is -- one interpretation

25   is it's simply you may have already stolen it, but we want

J7JHDEMO

1   anything that you haven't already published.  Another

2   interpretation, because Guccifer was engaged in repeated

3   hacking, is go get us some new material.  Go hack some more and

4   get us some new material.  That is a plausible interpretation.

5   May not be the only interpretation, but that's sufficient to

6   satisfy the *Twombly* requirement.  And they did it a couple of

7   times.  So we submit that that divests WikiLeaks of what would

8   otherwise be traditional First Amendment protection.

9          Likewise, the meeting, the June 9 meeting in which

10  there was clearly an expectation that there would be materials

11  produced by Russia that would be incriminating of Hillary

12  Clinton, and there's -- whatever may have transpired, we

13  understand that the interviews of the witnesses through the

14  Mueller Report, they not surprisingly all denied anything of

15  that sort, which one would expect would happen.  But

16  importantly, for purposes of the complaint, the next day after

17  that meeting, there was an effort to hack the Raider backup

18  server at the DNC.  So we believe that that creates at least a

19  plausible inference that during that meeting, which was people

20  intended to discuss and obtain and were led to believe they

21  would be obtaining material from Russia about Hillary Clinton,

22  and that thereafter, the next day, Guccifer hacked the Raider

23  server.

24          THE COURT:  You don't mean Guccifer, I think.

25          MR. SELLERS:  I'm sorry.

J7JHDEMO

1              THE COURT:  You mean GRU.

2              MR. SELLERS:  GRU, I'm sorry.  GRU, yes.

3         Mr. Stone --

4              THE COURT:  Before we leave that, what were the trade

5    secrets that you contend were taken in the June hack?

6              MR. SELLERS:  I believe -- I was going to say I

7    believe it was donor information and proprietary opposition

8    research.

9              THE COURT:  It's OK.

10             MR. SELLERS:  That's my understanding.  I might come

11   back to you.

12             THE COURT:  OK.

13             MR. SELLERS:  Go ahead.  I'm sorry.

14             THE COURT:  It's not so clear why donor research or

15   donor information and opposition research is a trade secret.

16             MR. SELLERS:  Happy to discuss that.

17             THE COURT:  OK.

18             MR. SELLERS:  The reason is the donor information

19   includes things such as records of particular donors'

20   interests, what solicitations they respond to, other

21   information about their interests and proclivities that would

22   be important to determining how best to reach them.  Publishing

23   that information is going to both damage the relationship

24   between the DNC and the donors and potentially, for purposes of

25   a trade secret where it derives its value from the secrecy, may

J7JHDEMO

also then make those donors open to solicitation by others.
You could sell the donor information online, in the public, and
get a pretty penny for it.  That certainly suggests it could be
a trade secret.

With respect to the proprietary opposition research,
it reflects judgments about the features of opponents'
campaigns and backgrounds that might be used strategically with
respect to a candidate supported by the DNC.  The disclosure of
this information means that the knowledge the DNC had about
weaknesses of opponents would be ones that they would then be
in a position to correct or address or anticipate how to react
to.  And once again, you could sell that as information that
would be of considerable value to that campaign or others.

THE COURT:  If *The Washington Post* published that
information with respect to either of the parties in an
election, would *The Washington Post* be liable for trade secret
violations?

MR. SELLERS:  I think it could be.  As the Court is
aware, there is no First Amendment protection generally for
dissemination of trade secrets.

THE COURT:  But that's usually in the context of
private organizations, private parties who take trade secrets
from someone else for personal gain, rather than a publication
that publishes information of public interest that may
otherwise have been kept secret.

1          MR. SELLERS:  Well, your Honor, with all respect, we

2     submit the Democratic National Committee has its own privacy

3     interest.  The fact that it runs a political committee doesn't

4     mean that it relinquishes any interest in protecting the value

5     of its confidential material.  So I would submit that it

6     definitely are secrets that derive their value from their

7     secrecy -- material that derives its value from its secrecy.  I

8     don't think the fact that the Democratic National Committee is

9     a public institution, at least engages in public activity, it's

10    a private institution, I don't see why it relinquishes its

11    interests and rights to be able to keep its donor -- carefully

12    compiled donor information or its opposition research secret.

13          Anyway, to continue, among the other things that were

14    disseminated was proprietary computer code that revealed

15    critical insights into the DNC's political, financial, and

16    voter engagement strategies and services.  Once again --

17          THE COURT:  I thought the computer code was the object

18    of the September hack.

19          MR. SELLERS:  I'm sorry.  Maybe you're right.  Let me

20    look.  Sorry.

21          Yeah, I'm sorry, that's right.  That was later.

22          So I'm also prepared to talk about why I think the

23    various defendants violated both the Defend Trade Secrets Act

24    and the DC Trade Secrets Act.

25          So, first of all, needless to say, Russia violated the

J7JHDEMO

1    Defend Trade Secrets Act.  I don't think there's any question

2    about that.

3          THE COURT:  On Russia, what are the cases that you

4    rely on that what Russia did did not fall -- or fell within the

5    noncommercial tort exception?

6          MR. SELLERS:  Yes.  So we briefed these, but if we

7    turn just to the *Terrorist Attacks* case from the Second

8    Circuit, the key -- let me say, first of all, the theft of

9    trade secrets also qualifies under the commercial activity

10   exception.

11         THE COURT:  Right.  I was going to ask you for the

12   cases under both.

13         MR. SELLERS:  All right.  I'm happy to do that, but

14   I'll start with the tort exception.

15         THE COURT:  OK.

16         MR. SELLERS:  So the point here is that, obviously, I

17   think the Court's focused on did the entire tort occur in this

18   country?  And the answer is yes for a couple of reasons.  First

19   of all, there was a trespass by leaving malware on the DNC's

20   servers beginning in July of 2015, which occurred entirely in

21   this country, as did the tort of conversion from the --

22         THE COURT:  But all of this, according to the

23   allegations in the complaint, were directed from Moscow --

24         MR. SELLERS:  Correct.

25         THE COURT:  -- by GRU agents.

J7JHDEMO

1          MR. SELLERS:  Correct.

2          THE COURT:  And there are the series of cases about

3     hacking which start abroad and are then conducted --

4          MR. SELLERS:  I'm going to distinguish them.

5          The most important distinction is the nature of the

6     tort.  The torts here were strict liability torts.  No intent

7     was required for these torts.  This was trespass and

8     conversion.  The tort, for instance, that was addressed in the

9     *Doe* case by the DC circuit, the *Doe v. Federal Democratic*

10    *Republic*, was that of invasion of privacy, which requires

11    intent which was formed outside the United States.  And the

12    *Terrorist Attacks* decision from the Second Circuit dealt with

13    fundraising or funding of activities in this country.  There

14    was no question that while the harm occurred in this country,

15    all of the funding activities occurred outside this country.

16    So that wasn't even a close call.

17         I think the *Doe* case is the one that is most

18    significant in terms of whether or not it is control -- doesn't

19    control, but whether it is informative here.  And I submit,

20    because of the difference of the type of tort and how the tort

21    is defined, no intent is required.  I'd add one more thing,

22    which is that, in addition, once the material was exfiltrated

23    from the DNC server, the Russians then transmitted to another

24    server in Illinois.  So, at the very least, that transmission

25    from the server in Virginia to the server in Illinois occurred

J7JHDEMO

1    completely within this country.  But we submit that because of

2    the nature of the tort, intent is not an issue, and therefore

3    the *Doe* case does not apply here.

4              THE COURT:  Is there any comparable case where the

5    court has found that there was an exception to foreign

6    sovereign immunity in any similar case to this?  You've been

7    distinguishing cases.

8              MR. SELLERS:  I know.  You ask me for something I can

9    rely on affirmatively.  I don't know that there's anything

10   quite on point other than asking the Court to look closely at

11   the nature of the torts, which I suggest distinguishes the

12   other cases, certainly the *Doe* case.

13             THE COURT:  Then the commercial activity.

14             MR. SELLERS:  So the commercial activity applies to

15   torts resulting from nondiscretionary acts -- I'm sorry, my

16   mistake.

17             Commercial activity applies to claims based on a

18   commercial activity carried on in the United States by a

19   foreign state.  The theft of material that qualifies as a trade

20   secret can qualify as that kind of commercial activity even if

21   the purpose with which the government may have engaged in it

22   was for a noncommercial purpose.  I cite to you the Sixth

23   Circuit case in *Gould v. Pechiney*, I think it's

24   P-e-c-h-i-n-e-y, at 853 F.2d 445, 453 (6th Cir. 1988).  So I

25   submit that that's where I believe it was recognized, trade

63

J7JHDEMO

1  secrets were recognized as a commercial activity under the

2  Foreign Sovereign Immunity Act.

3          THE COURT:  OK.

4          MR. SELLERS:  So going back to the trade secrets, as I

5  said, I think that Russia plainly violated the Defend Trade

6  Secrets Act, and we submit that the sovereign immunity does not

7  protect against its liability here.  Then --

8          THE COURT:  By the way, do you agree with your

9  colleague on the other side, violations of Sections 1831 and

10  1832 cannot be predicate acts if they occurred before May 11,

11  2016?  That was the effective date of the statute for both.

12          MR. SELLERS:  I understand.  If the Court would permit

13  me, I'm going to defer to Mr. Graber.  I don't think we agree

14  with that, but I'd like to turn it over to Mr. Graber when it

15  comes to that question.

16          THE COURT:  Sure, that's fine.  That's fine.

17          MR. SELLERS:  So WikiLeaks, for the same reasons I've

18  already discussed, we maintain solicited and Mr. Assange -- by

19  the way, Mr. Assange -- you asked the question about evidence

20  of service with respect to Mr. Assange and Mr. Manafort.  We

21  believe there's evidence in the record, which I don't have

22  right in front of me, but I can submit to the Court,

23  demonstrating satisfaction of service.  I didn't expect the

24  question, so I don't have it cited for you.

25          THE COURT:  It's OK.  I just don't think there is an

J7JHDEMO

1    affidavit of service that's in the docket sheet for those two

2    individuals.

3            MR. SELLERS:  OK.  We will obviously look, but we

4    believe we achieved service, and we believe we have a record of

5    it.  We thought it was in the docket sheet, and we will

6    double-check that.

7            THE COURT:  OK.

8            MR. SELLERS:  But we believe that all three of them,

9    Mr. Trump, Trump Jr., and the others are all properly before

10   the Court.  Why they didn't file a brief, I can't explain.

11           THE COURT:  OK.

12           MR. SELLERS:  So, as I said, we maintain that they

13   were, these other parties, WikiLeaks particularly and

14   Mr. Assange, by soliciting Russia to steal material qualifying

15   as trade secrets and disseminating it, they violated the Defend

16   Trade Secrets Act as well.

17           With respect to the DC Trade Secrets Act, it's

18   violated where persons improperly use material qualifying as a

19   trade secret by exploiting the trade secret in a way likely to

20   injure the DNC or the defendant -- or benefit the defendants or

21   both.  Here, all the defendants, we maintain, violated the DC

22   Trade Secrets Act by the improper use of trade secret material

23   for the purpose of injuring the DNC and benefiting the Trump

24   Campaign.  Again, Russia's role in this, if the Court finds

25   Russia is susceptible to suit here, I think is pretty clear.

J7JHDEMO

The other defendants used the trade secrets by incorporating
them into their campaign strategy.  They were using them in
various ways knowing that they were -- had been secrets.  I
don't think there's any question about that.  And we maintain
that, as I said before, that they were trade secrets.

          Let me turn to the Wiretap Act for a few minutes,
unless the Court has further questions about that.

          THE COURT:  No.

          MR. SELLERS:  Here, of course, the Wiretap Act imposes
liability on those who intentionally use any material -- any
electronic communication that's intercepted or have reason to
know that the information was obtained through an interception.
They have reason to know.  Obviously, here, Russia is not
subject to the Wiretap Act.  It doesn't qualify as a person
under the Wiretap Act, although we would maintain it engaged in
wiretapping.

          The question is about the other defendants and whether
they had reason to know the material had been intercepted.  So
in this court, in this jurisdiction, at the motion to dismiss
stage, the knowing of the -- having a reason to know that the
material was intercepted only requires the plaintiff allege an
awareness that neither party to the intercepted communication
had consented to its interception.  This is in our brief, but I
cite for that the *Fernicola*, F-e-r-n-i-c-o-l-a, v. *Specific
Real Property* case from the Southern District (2001), and it

1    relies on some other cases.  We maintain that the disclosure,

2    for instance, that people had -- when Mr. Mifsud told

3    Mr. Papadopoulos that there were thousands of emails, it's

4    highly unlikely, for instance, that those emails would have

5    been made -- ordinarily been public.  People don't normally

6    publicize thousands of emails.  And we believe, as a result,

7    they had reason to know that that material would not have been

8    publicized with the consent of both parties.

9            THE COURT:  No requirement that the parties have

10   reason to know that the communication was simultaneously

11   intercepted?

12           MR. SELLERS:  I don't believe the *Fernicola* decision

13   requires that, at least at this juncture.  But I would say

14   further that there were -- well, that's what I would stand on.

15           THE COURT:  OK.

16           MR. SELLERS:  Then on the question of the defendants

17   using the intercepted material, the legislative history makes

18   clear that use means doing something with the intercepted

19   material apart from simply reading or listening to it.  It's

20   something more than being totally passive.  Here, the

21   defendants used the hacked material by incorporating it into

22   their campaign strategy, and each of them by their own means --

23   and we've documented this in our complaint -- used these

24   materials to promote their campaign strategies:  WikiLeaks, to

25   disseminate the material in a way and a time that would disrupt

J7JHDEMO

the Democratic Convention or do other things that would

distract from the tape about the candidate Trump at the time

that he was engaged in some mistreatment of women in the past.

Quite clearly from the complaint, there are a number

of ways in which they used this with the intention of affecting

the campaign.  Trump Jr., Manafort, and Kushner who attended

the June 9 meeting at which they were -- intended to provide

illicit materials damaging to Hillary Clinton.  Mr. Stone

repeatedly communicated and counseled WikiLeaks about when to

disseminate hacked material in order to provide the greatest

assistance to the campaign.  As such, he used the intercepted

material by counseling WikiLeaks how and when to deploy it to

serve the campaign's interest.

The campaign was engaged in virtually every use of the

intercepted material, from the Mr. Papadopoulos meeting with

Mr. Mifsud in April about the thousands of emails, the June 9

meeting between the Russian representatives and senior campaign

leaders, to candidate Trump calling for Russia to hack Hillary

Clinton's emails, followed that day by Russia attempting to do

the very thing in trying to hack her emails.

I'm happy to talk about the Virginia Computer Crimes

Act and the Virginia conspiracy to commit trespass of chattels

act for a very particular purpose.  Since we didn't have a

chance to respond to the reply briefs, I want to just point out

a couple authorities I think are relevant here.

J7JHDEMO

1          The first is Russia again accessed the DNC computers

2     without authorization and obtained property by false pretenses.

3     The other defendants, we maintain, aided and abetted in

4     violating the Virginia Computer Crimes Act.  Some defendants,

5     particularly Mr. Kushner, contend that Virginia doesn't

6     recognize aiding and abetting as a theory of tort liability.

7     That's citing to the *L-3 Communications v. Serco* decision,

8     Serco.  But the same decision later in the same paragraph

9     states that "under Virginia law two or more individuals that

10    have jointly interfered tortiously with a contract can both be

11    held liable for that tort."  That is, there is no independent

12    tort of aiding and abetting.  We agree with that, and that was

13    the point the decision makes.  We're not contending that there

14    was aiding and abetting separately.  They were aiding and

15    abetting in the violation of the computer crimes act.

16          With respect to the conspiracy, Virginia conspiracy to

17    commit trespass of chattels, again Russia committed trespass of

18    chattels by intentionally using or intermeddling with personal

19    property that was in the rightful possession of the DNC.  The

20    other defendants, we contend, engaged in a conspiracy to commit

21    the trespass.  And, again, in Virginia conspiracy consists of

22    two or more persons combined to accomplish a concerted action,

23    either with an unlawful purpose or a lawful purpose by unlawful

24    means.  The campaign argues that we failed to allege the

25    defendants engaged in some kind of concerted action, therefore

J7JHDEMO

1    there could be no conspiracy to commit trespass of chattels.

2    But the very case that the campaign cites in its reply brief,

3    this is the *Gelber v. Glock* decision, says that the function of

4    a conspiracy claim is to extend liability and tort beyond the

5    active wrongdoer to those who have merely planned, assisted, or

6    encouraged the wrongdoer's acts.  As a result, we maintain that

7    others encouraged the wrongdoer's acts, and in so doing, for

8    the reasons we've already described, they have conspired to

9    violate the Virginia conspiracy -- Virginia trespass of

10   chattels.

11           Your Honor, I can certainly speak to the special

12   counsel report, and the like, but unless the Court has any

13   other questions, I think I want to turn the balance of my time

14   over to Mr. Graber.

15           THE COURT:  OK.  Thank you, Mr. Sellers.

16           Mr. Graber.

17           MR. GRABER:  Good afternoon.  Your Honor.

18           THE COURT:  Good afternoon.

19           MR. GRABER:  If I could just address a couple of

20   points, I'm going to address the conspiracy allegations as well

21   as the RICO allegations, and I'll try to keep my remarks brief.

22   I understand it's late in the day, but if I could, I would like

23   to address a couple of points that came up earlier.

24           The Court had asked a question about when the

25   predicate acts need to be committed.  Your Honor, under 18

J7JHDEMO

1   U.S.C. Section 1961(5), only one predicate has to be violated

2   after the effective date, which here would be May 11, and we

3   have alleged that.  In any event, we've alleged multiple

4   violations after May 11 because of the ongoing thefts through

5   June of 2016.

6           THE COURT:  But, I mean, the technical issue in my

7   mind is not whether there are predicate acts after May 11, but

8   whether I could consider any allegations as being violations of

9   those two statutes if they occurred before May 11.

10          Am I correct that the effective date of those statutes

11  is May 11 so that, in looking at the various predicate acts

12  that are alleged, I should disregard any predicate acts which

13  are alleged to be violations of 1831 and 1832 if they occurred

14  before May 11?

15          MR. GRABER:  I don't think the Court needs to -- I

16  don't think the Court should disregard the prior acts.  I think

17  the question is whether the commission of the predicate acts

18  here are sufficient to trigger the statute, and they are

19  sufficient.  But I don't think the Court should disregard what

20  happened beforehand.

21          THE COURT:  I'm not sure why that's right.  The

22  statutes became effective on May 11, 2016, correct?

23          MR. GRABER:  Yes.

24          THE COURT:  So conduct alleged to be in violation of

25  those statutes were not violations of those statutes prior to

1    May 11, 2016.

2              MR. GRABER:  Well, if I could draw the Court's

3    attention to the language of the statute, that might provide

4    some clarity.  It states "a pattern of racketeering activity

5    requires at least two acts of racketeering activity, one of

6    which occurred after the effective date of this chapter," which

7    would imply that the Court could, should consider the violation

8    of predicates prior to the date, prior to May 11.

9              THE COURT:  But -- and I won't spend much time on

10   this -- conduct prior to May 11, 2016, was not a violation of

11   those two statutes because the statutes weren't effective

12   before May 11, 2016.  What the RICO statute says is in order to

13   violate the statute, you have to have two predicate acts, at

14   least one of which occurred after the effective date of the

15   RICO statute, but you still need two predicate acts.  And the

16   predicate acts are defined in the statute as violations of

17   these statutes.  This is racketeering activity, violation of

18   these statutes.

19             So I would have thought it was uncontroversial, but

20   perhaps not, that you can't have a predicate act that alleges a

21   violation of the statute before the statute became effective.

22   By "effective," I mean the effective date of 1831 and 1832, not

23   the effective date of the RICO statute.

24             MR. GRABER:  Well, the Economic Espionage Act took

25   effect in 2016, your Honor, so it was effective prior to

1    May 11.  It was added to the RICO statute in 2016.  So the

2    other thing is this relates to ongoing conspiracies.  So I

3    would stand on the language of the statute, your Honor.

4             THE COURT:  OK.

5             MR. GRABER:  Going to the dates of the hacks, there

6    were some questions about that, your Honor -- I'm sorry.  I

7    misspoke, your Honor.  The Economic Espionage Act became

8    effective years before 2016.  I misspoke.

9             THE COURT:  Sorry?

10            MR. GRABER:  That was my point, your Honor.  The

11   Economic Espionage Act was in effect many years before 2016.

12            THE COURT:  But it only became a predicate act -- no,

13   I understood your argument.  It only became a predicate act on

14   May 11, 2016.

15            MR. GRABER:  Correct, which, it's our view, that as

16   long as one of the predicate acts is violated after May 11, the

17   prior acts would count.

18            THE COURT:  I understand.

19            MR. GRABER:  Your Honor, there were some questions

20   about the dates of the hacking.  Just so we're clear, there was

21   hacking, obviously, in April of 2016.  That hacking continued

22   through June of 2016.  I'm referring, in particular, to

23   paragraph 123 referencing the hacking that continued from

24   May 25 to June 1.

25            In addition, there was hacking, as the Court

1    referenced earlier, in September of 2016.  While we don't know

2    what use was -- we don't know for sure what use was made of the

3    materials that were hacked in September of 2016, it can be

4    reasonably inferred that the Russians made some use of it in

5    furtherance of this conspiracy based on, among other things,

6    the fact that the Russians were sharing with Roger Stone

7    turnout models, the similar type of information that would be

8    found in the databases that were being hacked in September.

9            THE COURT:  There's no allegation in the complaint

10   that the results of the September 2016 hack was disclosed to

11   any of the other defendants.

12           MR. GRABER:  That is correct, your Honor.  That is

13   correct.

14           THE COURT:  OK.

15           MR. GRABER:  So, your Honor, if I could turn now to

16   the conspiracy allegations, which really lie at the heart of

17   the facts alleged.  The complaint alleges that the defendants

18   conspired, that is, agreed to steal the DNC's trade secrets and

19   conspired to disseminate them to the public.  And the two

20   predicate acts at issue, primarily at issue, are economic

21   espionage as well as theft of trade secrets.

22           The central question is whether the conspiracy

23   allegations are plausible.  And as alluded to before,

24   plausibility is not a probability test.  It simply calls for

25   enough facts to raise a reasonable expectation that discovery

J7JHDEMO

```
1    will reveal evidence of an illegal agreement.  Of course, all
2    reasonable inferences must be drawn in favor of the DNC, and at
3    this stage plausibility is established even if the Court finds
4    a different version more plausible.  In addition, the
5    conspiracy allegations must be considered as a whole and not
6    dismembered.
7             So if I could just walk through at a high level, your
8    Honor, some of the types of evidence or facts that are alleged
9    here that would support a finding of conspiracy.
10            First, one type of evidence that supports a finding of
11   a conspiracy at the pleading stage is frequent communications
12   between persons who do not ordinarily have reason to talk to
13   one another, especially where there is no obvious lawful
14   explanation for the alleged conspirator's conduct.  Here, the
15   complaint alleges numerous suspicious meetings and
16   communications between persons who would not normally be
17   talking to one another.  For example, in March and April of
18   2016, Papadopoulos, a foreign policy adviser to the Trump
19   Campaign, met repeatedly with Mifsud who he understood to have
20   connections to Russia and during which he discussed Russian
21   dirt on Clinton in the form of thousands of emails.  At that
22   point it can be reasonably inferred, your Honor -- we don't
23   allege that those emails belonged personally to Hillary
24   Clinton.  We allege simply that he was talking about thousands
25   of emails, and it can be reasonably inferred that they're
```

J7JHDEMO

1    talking about DNC emails that had been stolen.

2              THE COURT:  Why is that right?  You say you don't

3    allege that they belonged to Secretary Clinton, but you also

4    don't allege that they belong to the DNC or if there was

5    anything that was said that indicated that they belonged to the

6    DNC.

7              MR. GRABER:  We allege what has been reported, and

8    what has been reported is that Mifsud told Papadopoulos that

9    Russia has dirt on Clinton in the form of thousands of emails.

10             But, again, your Honor, this has to be taken in the

11   context of all the other facts.  So, look, I think it's also

12   important to point out when Papadopoulos told an Australian

13   diplomat that single fact, it was enough to trigger an FBI

14   counterintelligence investigation into contacts between Russia

15   and the Trump Campaign.

16             In June 2016, senior campaign officials, including

17   Kushner, Manafort, and Trump Jr., met with Russians to discuss

18   official documents and information that would incriminate

19   Clinton as part of Russia and its government's support for

20   Mr. Trump.  That's another meeting that previously would have

21   been shocking on its own, and it's plausible -- there have been

22   references earlier to some of the defendants have said, well,

23   people left that meeting supposedly disappointed, referring to

24   evidence that's outside of the four corners of the complaint.

25   But even crediting their version of the facts, it's plausible

to infer that Kushner, Trump Jr., and Manafort were

disappointed that Russia failed to produce those stolen

documents and directed Russia to deliver stolen documents and

disseminate them, which Russia in fact did shortly thereafter.

During the presidential campaign, Manafort, the

chairman of the campaign, and Gates, the deputy chairman, had

extensive contacts with Konstantin Kilimnik, who they knew as

the guy from the GRU, i.e., a Russian intelligence officer, or

put another way, a likely Russian spy.  During the campaign

Manafort shared internal campaign polling data with an

individual connected to Russian military intelligence.  And in

July, WikiLeaks asked the GRU to send WikiLeaks additional

hacked materials.  And throughout the summer of 2016, Stone,

who was in frequent contact with the Trump Campaign, had

multiple communications with GRU agents using the online

persona Guccifer 2.0 and with Assange and with WikiLeaks.  In

the summer of 2016, Trump Jr. secretly communicated with

WikiLeaks as well.

Some of these contacts standing alone would be enough

to support a plausible conspiracy claim, but together, your

Honor, they form -- they paint a stark picture.  Then when we

look at the timing, that provides even further support for

plausibility of a conspiracy finding.

A conspiracy is plausible where suspicious contact

takes place right after defendants meet.  On April 18,

J7JHDEMO

Papadopoulos met with Mifsud for the third time.  That same day, Russia hacked into the DNC's computer network.

On April 26, eight days after Russia hacked into the DNC's computer network, Papadopoulos met with Mifsud for a fourth time.  Mifsud told Papadopoulos the Russians had dirt on Clinton in the form of thousands of email.  The next day, Trump gave a major foreign policy speech calling for improved relations with Russian.  And that evening, Papadopoulos flagged the speech for one of his Russian contacts, explaining, that's the signal to meet.  And then shortly thereafter, on June 3, the Russians did reach out for a meeting with the Trump Campaign.  And the day after that meeting, the Trump Tower meeting, the Russians tried to hack into the DNC again.  And within days of the Trump Tower meeting, the disseminations began by the Russians and then by WikiLeaks.

On September 9, 2016, GRU officers using the Guccifer 2.0 persona contacted Stone, writing:  "Please tell me if I can help you anyhow."  Adding, "It would be a great pleasure to me."

Guccifer asked for Stone's reaction to a stolen turnout model for the democratic entire presidential campaign. Stone replied, "Pretty standard."  On September 20, just days after Stone appeared dismissive of the turnout model, the DNC discovered that Russia had lacked so its analytic database which included DNC models.

J7JHDEMO

1          So, your Honor, all of these facts, all of these

2     meetings and the timing provide even more evidence and more

3     support to a finding of plausibility.

4          Then you combine that with the effort of the

5     defendants to cover up their actions.  For example, after the

6     election, Trump Campaign spokespersons repeatedly denied any

7     contact between members of the campaign and Russians, saying it

8     never happened, absolutely not.  That was not true.  Stone

9     repeatedly lied to Congress about his contact with Russia,

10    WikiLeaks, and Assange.  Trump Jr. tried to cover up his

11    meetings with Russians by falsely stating he had never had any

12    meetings that were set up, and none where he was representing

13    the campaign in any way, shape, and form.  Papadopoulos has

14    pleaded guilty to lying to the FBI about his contact with

15    Mifsud and the Russians.  Kushner's provided false information

16    to Congress about the Trump meeting.  Manafort has lied to the

17    special counsel about his contact with Russians, resulting in

18    his conviction and incarceration.

19         All of these facts taken together, as they must, paint

20    a stark picture of guilt, your Honor.

21         I'll just say a few words about the RICO claim.

22         THE COURT:  All right.  Briefly.

23         MR. GRABER:  Yes, your Honor.  I think it's important

24    to point out that, unlike a lot of the cases that the

25    defendants have cited, this is not a business dispute between

J7JHDEMO

1    competitors.

2              THE COURT:  I'm sorry.  This is?

3              MR. GRABER:  Sorry?

4              THE COURT:  I didn't hear you.  I'm sorry.

5              MR. GRABER:  I said this is not a business dispute

6    between competitors.  It's not an unfair business practices

7    case dressed up as a RICO case.  It's about criminal conduct,

8    conspiracy to steal and disseminate DNC's property, and a

9    pervasive coordinated attempt to cover up that conspiracy

10   through obstruction of justice and witness tampering.  And,

11   indeed, several of the individual defendants in this case have

12   either been indicted, pled guilty, been convicted, or jailed

13   for their efforts to cover up the actions at issue here.

14             In short, your Honor, the RICO allegations here

15   concern a coordinated pattern of criminal conduct committed by

16   the defendants, and the DNC now seeks civil redress for the

17   damages it suffered as a result of the defendants' crimes.

18             THE COURT:  All right.  Thank you.

19             Any very brief rebuttals?  Mr. Carvin?

20             MR. CARVIN:  Yes, I'll make this as brief as possible,

21   your Honor.

22             I think they keep talking about how there's a viable

23   conspiracy here.  They didn't allege a conspiracy.  They

24   alleged a RICO enterprise.  We got no response on whether or

25   not we conducted or operated the management of the enterprise.

J7JHDEMO

We got no response on whether or not there was a continuing

threat, lawful threat.  We got no response or whether or not

you needed a common unlawful purpose.  Their silence is

deafening.  They've got no RICO claim, and all of that needs to

go out before you ever get to the predicate acts.

          If, on the unlikely event you ever got to the

predicate acts, which is the first time conspiracy comes up,

they need to allege that we conspired in the hacking.  I think

Mr. Sellers conceded that.  They don't allege it.  The Trump

Tower meeting, paragraph 132, the purpose of that meeting was

to discuss disseminating the stolen emails, not to discuss

future hacking.  This June 10 red herring keeps coming up, the

day after, but they don't allege out loud, because they can't,

that in that 18-minute meeting we said:  You know what we

really want?  Can you go get us some DNC trade secrets?

There's no allegation that they got trade secrets in this

June 10 ranger thing.

          THE COURT:  June 9.

          MR. CARVIN:  There's no allegation that they gave it

to anybody.  So this is a complete and utter red herring.

          In terms of the trade secrets, the key conceptual

point is their entire theory of this case is that we conspired

with Russia and WikiLeaks to benefit politically the Trump

Campaign, but what they need to do is convince you that

stealing trade secrets would somehow benefit us politically,

and they've never closed that circle.  Why would our disclosing

DNC donor lists swing voters from Clinton to Trump?  It just

doesn't make any sense under their own theory of the case.

        Plus, under 1832, they need to show you that our

getting the trade secrets somehow economically benefited the

Trump Campaign, not politically, and they haven't done that.

Mr. Sellers couldn't stand up here and say with a straight face

what they said in their opposition, that it economically

benefited us by saving money on opposition research.  That's

because it's facially absurd.  They've got to argue that it

somehow benefited Russia by giving them access to information

they didn't have.  They can't argue that because, under their

own theory, Russia got the information, so we didn't need to

give it to them.

        So even if you chase this conspiracy rabbit down every

rabbit hole they want to get you to, what you wind up with is

no trade secrets, no viable allegation under 1831 or 1832 or

under the Virginia law.  Their conception of using trade

secrets is reading about them after they've been made public

and are no longer trade secrets and using them for

constitutionally protected activity.  If *Bartnicki* makes

anything clear, it's that people who read the newspapers or

people like *The New York Times* who read and talked about their

donor lists and about the corrupt relationship of the DNC and

their big donors can't possibly be indicted for exposing trade

 1   secrets --

 2              THE COURT:  There's no indictment here.

 3              MR. CARVIN:  Excuse me?

 4              THE COURT:  I say this is a civil case.  There is no

 5   indictment.  You say no one can be indicted for, and I said

 6   this is a civil case.

 7              MR. CARVIN:  Fair point.  And I was using "indicted"

 8   in the colloquial sense.  You're entirely right.  Nor can they

 9   be held civilly liable.

10              THE COURT:  OK.  Anyone else?

11              MR. BUSCHEL:  Just something quick.

12              THE COURT:  There's no need repeat what's already been

13   said.  All right.

14              MR. BUSCHEL:  Very good.  I understand, Judge.  Robert

15   Buschel on behalf of Roger Stone.

16              First point I want to make is the DNC doesn't say when

17   this conspiracy ends.  We say that the conspiracy ends on

18   election day.  If that is the case, then Stone's predicate acts

19   go away because they are claiming that he lied to Congress,

20   which was after the election, and witness intimidation is after

21   the election.

22              The second point I make on behalf of Mr. Stone is that

23   his involvement in any type of alleged conspiracy occurred

24   after July 22, which is the day that the DNC's relevant data

25   was published via WikiLeaks.

1          My last point is that this response that Mr. Stone

2     gave, and it is part of the record, to Guccifer 2.0, what do

3     you think of the DNC's turnout model, it was a link to a

4     publicly disclosed document, a database that was open to the

5     world at that point.  And his response was, nothing unusual

6     about it, something to that effect.  This is not a secret

7     communication about secret data.  It was on the Internet.

8     Therefore, they cannot sustain their case against Mr. Stone.

9          THE COURT:  Thank you.

10          No obligation for everyone just to say something.

11          MS. POLISI:  I'll say something new, your Honor.

12          Your Honor, it's our position that the Court can

13     consider matters of which judicial notice may be taken, and

14     official government reports are appropriate for judicial

15     notice.  So it's our position that you can consider the Mueller

16     Report, and that's *Paskar v. City of New York*, 3 F.Supp.3d 129

17     (S.D.N.Y. 2014).

18          All of this, the DNC is asking you to make a pretty

19     big leap in terms of Mr. Papadopoulos' meetings with Professor

20     Mifsud, who, by the way, is -- upon information and belief has

21     substantial connections to the Russian government.  He's a

22     Maltese professor based in London, by the way.  And I would

23     just note that any number of a defendant's activities or

24     affiliations can create circumstances for a RICO predicate act,

25     but the legal question is whether the predicate act could

1    rationally be ascribed to the enterprise such that it was the

2    conduct of the enterprise.

3           As I stated before, they failed to allege any facts

4    that permit the inference that there was something nefarious

5    about this meeting.  The fact of the 1001 violation doesn't get

6    you there, and the Mueller Report made clear that they weren't

7    charging any conspiracy between any Russians or any Americans.

8    The investigation did not establish any agreement among

9    campaign officials or between such officials and Russian-linked

10   individuals to interfere with or obstruct the lawful function

11   of a government agency during the campaign or transition

12   period.  Nor did they find any conspiracy to commit election

13   fraud.

14           Thank you.

15           THE COURT:  OK.  Mr. Dratel.

16           MR. DRATEL:  Thank you, your Honor.

17           With respect to the Court's colloquy with Mr. Sellers

18   about the initial releases through WordPress and DCLeaks, in

19   the Netyksho indictment, which is integral to the complaint

20   being quoted, paragraph 6 says that the defendants released

21   tens of thousands of stolen emails and documents using

22   fictitious online persons, including DCLeaks and Guccifer 2.0.

23   So it's not a trickle, number one.  And number two is

24   "released" is the same verb that's used in the next paragraph,

25   paragraph 7, with respect to organization number one, which is

J7JHDEMO

1    ostensibly WikiLeaks.  So "released" is a public concept.

2             Also, at paragraph 125 of the second amended

3    complaint, the WordPress URL that is listed is publicly

4    available.  I just went on it on my phone.  So that www. --

5    I'm sorry, www.Guccifer2.wordpress.com, there is nothing

6    about it that's not public.  So it was not a private or

7    otherwise circumscribed access.  It was public access to tens

8    of thousands of documents before WikiLeaks ever publishes one.

9             I just want to clarify, just in case it was ambiguous

10   in any respect, I do not represent Mr. Assange in this

11   proceeding or any other.  I represent only WikiLeaks and only

12   in this proceeding.

13            One final thing, your Honor, in your colloquy with

14   Mr. Sellers -- with Mr. Graber about the predicate acts and the

15   timing, I think what plaintiffs are doing, and I think it's

16   confusion, is they're applying a statute of limitations

17   analysis to what is really an *ex post facto* question, and it

18   doesn't apply.

19            Thank you, your Honor.

20            THE COURT:  All right.  I will take the motion under

21   submission.  Thank you, all.

22            (Adjourned)

23

24

25